CTRS
ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

OCT 3 0 2008

CLERK, U.S. DISTRICT COURT
By _____
          Deputy

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# FT. WORTH DIVISION

| | | |
|---|---|---|
| **BILLY JACK CRUTSINGER** | ) | |
| **Petitioner** | ) | |
| | ) | **4:07-CV-703-Y** |
| **v.** | ) | **ECF** |
| | ) | |
| **NATHANIEL QUARTERMAN, Director** | ) | |
| Texas Department of Criminal Justice, | ) | **(Death Penalty Case)** |
| Correctional Institutions Division, | ) | |
| Respondent | ) | |

---

## PETITION
## FOR A WRIT OF HABEAS CORPUS
### and
### *Exhibits*

### (and separately filed)
## MOTION #1 FOR
## EVIDENTIARY HEARING
## INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Lydia M.V. Brandt
Texas Bar No. 00795262
THE BRANDT LAW FIRM, P.C.
P.O. Box 850843
Richardson, Texas   75085-0843
(972) 699-7020 Voice; (972) 699-7030 Fax
COUNSEL FOR CRUTSINGER

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    1.   Basis of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    2.   Overview of Procedural History . . . . . . . . . . . . . . . . . . . . . . . . 2
    3.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

REASONS TO ISSUE THE WRIT OF HABEAS CORPUS . . . . . . . . . . . . . . . . . 5
    GROUND ONE (DIRECT APPEAL ISSUE 4 & STATE HABEAS CLAIM 17):  Whether
    Mr. Crutsinger's Fourth Amendment rights were violated because the
    taint of his illegal arrest was not sufficiently attenuated as to authorize
    the admission of his confession, DNA sample, and other evidence . . 6
    A.    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    B.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        1.   The Fifth Circuit in *Doescher* recognizes that the *Stone*
           Doctrine does not apply when a litigant is denied a full and
           fair opportunity to litigate . . . . . . . . . . . . . . . . . . . . . 10
        2.   The conflict between and among *Doescher*, *Swicegood*,
           and *Gamble*, is currently before the Fifth Circuit in
           *Balentine v. Quarterman* . . . . . . . . . . . . . . . . . . . . . . . 12
    C.    The state court decisions were contrary to and an unreasonable
        application of *Brown v. Illinois* . . . . . . . . . . . . . . . . . . . . . . . 14
        1.   *Brown* requires an in-custody statement to be "sufficiently
           an act of free will to purge the primary taint". . . . . . . . . 14
        2.   The evidence was obtained by exploitation of the illegality
           of his arrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
           a.    The Findings of Fact are speculative . . . . . . . . 16
           b.    There is clear and convincing record evidence that
                because of his mental impairments, the confession
                was not voluntary . . . . . . . . . . . . . . . . . . . . . . . 19

       (i)     Mr. Crutsinger has low IQ, a learning disorder, and had been placed in special education . . . . . . . . . . . . . . . . . . . . . . . . 19

       (ii)    Mr. Crutsinger was mentally ill; he suffered from depression for many years. . . . . . . . 20

       (iii)   Mr. Crutsinger was addicted to alcohol . . 20

       (iv)   Mr. Crutsinger suffered head trauma . . . . 22

       (v)    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . 22

   3.    The decision of the state courts are contrary to and an unreasonable application of *Brown* . . . . . . . . . . . . . . . 23

       a.    Mr. Crutsinger was interrogated for a half-hour *before* the tape recorder was turned on . . . . . . . 23

       b.    The REID method of interrogation results in covert coercion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

       c.    Mentally impaired persons like Mr. Crutsinger, are more sensitive to coercion, and less likely to withstand the pressures of interrogation than the average person . . . . . . . . . . . . . . . . . . . . . . . . . 25

       d.    The short interval between his arrest and confession is a critical factor in the *Brown* analysis . . . . . . . 25

       e.    The jury instructions omitted any instruction to the jury that the threshold question was the voluntariness of the statement . . . . . . . . . . . . . . . . . . . . . . . . 26

       f.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

   4.    The error was not harmless . . . . . . . . . . . . . . . . . . . . . . . 27

GROUND TWO (STATE HABEAS CLAIM 15):  Whether Mr. Crutsinger was denied his Sixth and Fourteenth amendment rights to effective assistance of counsel because counsel failed to adequately investigate and develop crucial evidence in all phases of the trial. . . . . . . . . . . . . . . . . . . . . . 31

A.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

B.     The FF are *not* entitled to a presumption of correctness. . . . . 31

   1.    A little less than six (6) months elapsed from the date of appointment of trial counsel to the imposition of the death sentence -- and no continuance was requested. . . . . . . 37

   2.    The mitigation investigation was too late. . . . . . . . . . . 38

       a.    The social history investigation began <u>after</u> the suppression hearing . . . . . . . . . . . . . . . . . . . . . . . 38

b.    The social history investigation began <u>after</u> voir dire
      had commenced . . . . . . . . . . . . . . . . . . . . . . . 40
c.    The social history investigation began <u>after</u> any
      examination or diagnosis by Dr. Mills, forensic
      psychiatrist for the defense . . . . . . . . . . . . . . . . 41
C.    Trial counsel's performance was constitutionally deficient . . 41
  1.    Trial counsel's performance was deficient . . . . . . . . . 42
    a.    They failed to timely and adequately investigate and
          develop (and thereafter present) the theme of alcohol
          addiction in all phases of the trial. . . . . . . . . . . . 42
      (i)    There is an association between heavy
             drinking and physical brain damage . . . . 44
      (ii)   Frontal lobe dysfunction (brain damage) is
             associated with increased rates of *non*-
             volitional antisocial behavior . . . . . . . . . . 45
      (iii)  Mr. Crutsinger's alcohol addiction and its
             effects comport with current scientific
             knowledge . . . . . . . . . . . . . . . . . . . . . . . 45
    b.    They failed to timely and adequately investigate and
          develop (and thereafter present) the theme of head
          trauma and non-volitional violence in all phases of
          the trial . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
    c.    They failed to present evidence of Mr. Crutsinger's
          mental impairments in all phases of the trial,
          including: . . . . . . . . . . . . . . . . . . . . . . . . . 48
      (i)    pre-trial – *in*voluntary confession . . . . . . 48
      (ii)   guilt/innocence – no *mens rea* . . . . . . . . . 50
      (iii)  punishment – less morally culpable . . . . . 52
  2.    Trial counsel's performance was prejudicial . . . . . . . . 52
  3.    The state court determinations are contrary to, and an
        unreasonable application of, *Strickland* . . . . . . . . . . . 54
GROUND THREE (HERRERA – ACTUAL INNOCENCE) . . . . . . . . . . . . . . . 56
A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . 56
B.    Mr. Crutsinger is actually innocent of capital murder . . . . . 57
  1.    *Mens rea* is an essential element of capital murder . . . 57
  2.    Because of his "settled insanity," Mr. Crutsinger lacked the
        necessary *mens rea* for capital murder; however, there was

confusion in the law at the time of trial as to whether this evidence was admissible in guilt/innocence to negate *mens rea* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

REQUEST TO EXPAND THE RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
    Exhibit A:   NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM, *Imagining and Alcoholism: A Window on the Brain* . . . . . . . 67
    Exhibit B:   HAMDY F. MOSELHY, GEORGE GEORGIOU, AND ASHRAF KAHN, *Frontal Lobe Changes in Alcoholism: A Review of the Literature*, Vol. 36, No. 5, ALCOHOL & ALCOHOLISM 357 (2001)   . . 67
    Exhibit C:   Report of Dr. Goodness, dated September 10, 2003. . . . . . . . 67
    Exhibit D:   Letter of Goodness to Ray, dated 06-16-03 . . . . . . . . . . . . . 67
    Exhibit E:   Letter of Dasher to Ray, dated 07-10-03. . . . . . . . . . . . . . . . 67
    Exhibit F:   Terms of Engagement Contract, dated 7-11-03 . . . . . . . . . . 67
    Exhibit G:   M. C. Brower and B.H. Price, 71 J. NEUROL NEUROSURG. PSYCHIATRY, *Neuropsychiatry of Frontal Lobe Dysfunction in Violent and Criminal Behavior: a Critical Review*, 720, 721 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

## **TABLE OF ABBREVIATIONS**

The following are a list of abbreviations used within the pleading:

CR __:__              CR is the abbreviation for Clerk's Record, as required by TEX. R. APP. PROC. 34.1. It is followed by the volume number before the colon, and the page numbers after the colon.

RR __:__              RR is the abbreviation for Reporter's Record, pursuant to TEX. R. APP. PROC. 34.1,which is the trial transcript testimony recorded by the court reporter. The abbreviation RR is followed by the volume number before the colon, and the page numbers after the colon.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FT. WORTH DIVISION

| | | |
|---|---|---|
| **BILLY JACK CRUTSINGER** | ) | |
| **Petitioner** | ) | |
| | ) | **4:07-CV-703-Y** |
| **v.** | ) | **ECF** |
| | ) | |
| | ) | |
| **NATHANIEL QUARTERMAN, Director** | ) | |
| Texas Department of Criminal Justice, | ) | **(Death Penalty Case)** |
| Correctional Institutions Division, | ) | |
| Respondent | ) | |

---

**BILLY JACK CRUTSINGER** (hereinafter also referred to as Petitioner, Applicant, or **CRUTSINGER**) petitions pursuant to 28 U.S.C. § 2241 & 28 U.S.C.§ 2254 for a writ of habeas corpus because he is confined by the State of Texas under a sentence of death, in violation of the laws and Constitution of the United States.

**BILLY JACK CRUTSINGER** has never sought federal habeas corpus relief for this conviction and sentence before. This is his first appearance in federal district court for any purpose.

## INTRODUCTION

### 1.    BASIS OF CONFINEMENT.

**BILLY JACK CRUTSINGER**, inmate number #999-459, is confined by the Texas Department of Criminal Justice, Correctional Institutions Division, Nathaniel Quarterman, Director, TDCJ-ID.   Petitioner is being denied his liberty and also faces execution under an unconstitutional conviction for capital murder and the concomitant sentence of death.

### 2.    OVERVIEW OF PROCEDURAL HISTORY.

On September 25, 2003, Mr. Crutsinger was tried and convicted of capital murder in the 213th Judicial District Court in Tarrant County, TX.  (CR 7:1284). He was sentenced to death on October 1, 2003 (CR 7:1302).  On May 10, 2006, the Texas Court of Criminal Appeals affirmed the conviction and sentence of death on direct appeal.  *Crutsinger v. State*, 206 S.W.3d 607 (Tex. Crim. App. 2006).  On December 11, 2006, the United States Supreme Court denied certiorari. *Crutsinger v. Texas*, 127 S.Ct. 836 (2006).

Mr. Crutsinger had filed a timely Application for Writ of Habeas Corpus, received by the Texas Court of Criminal Appeals on November 14, 2005, in which he presented eighteen allegations.   The State's Proposed Findings of Fact and

---

Conclusions of Law were adopted verbatim by the trial court on November 7, 2005,

and the trial judge recommended that relief be denied.  On November 7, 2007, the

Texas Court of Criminal Appeals, in an unpublished order, adopted the trial judge's

findings and conclusions, and denied habeas relief. *Ex parte Crutsinger*, No. WR-

63,481-01 (Tex. Crim. App. November 7, 2007).

### 3.    STANDARD OF REVIEW.

Title 28, section 2254(d) of the United States Code provides:

An application for a writ of habeas corpus on behalf of a person in
custody pursuant to the judgment of a State court shall not be granted
with respect to any claim that was ***adjudicated on the merits*** in State
court proceedings unless the adjudication of the claim –

(1)    resulted in a decision that was ***contrary to, or involved an
unreasonable application of***, clearly established Federal
law, as determined by the Supreme Court of the United
States; or

(2)    resulted in a decision that was based on an ***unreasonable
determination of the facts*** in light of the evidence
presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis supplied).

In *Buntion v. Quarterman*, 524 F.3d 664, 670 (5th Cir. 2008), the Fifth Circuit

Court of Appeals held:

"A decision is contrary to clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts.' " *Gardner v. Johnson,* 247 F.3d 551, 557 (5th Cir.2001 (alterations in original)(quoting *Williams v. Taylor,* 529 U.S. 362, 413 (2000)). Where the state court has identified the proper legal principle but unreasonably applied it to the case, that court's determination represents an unreasonable application of federal law. *Id.* (quoting *Williams,* 529 U.S. at 413).

***"The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."*** *Schriro v. Landrigan,* __ U.S.__, 127 S.Ct. 1933, 1939 (2007) (citing *Williams,* 529 U.S. at 410). The factual findings of the state habeas court are to be given deference unless they are "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2)."

*Buntion,* 524 F.3d at 670 (emphasis supplied).

*Buntion* further held that this Court "reviews the district court's legal determinations and application of AEDPA *de novo. Foster v. Quarterman,* 466 F.3d 359, 368 (5th Cir.2006)" [and it reviews factual findings] for clear error." *Buntion,* 524 F.3d at 670.

## REASONS TO ISSUE THE WRIT OF HABEAS CORPUS

Petitioner's conviction and death sentence were obtained in violation of his rights under the Fourth, Sixth and Fourteenth amendments to the United States Constitution. U.S. CONST. amend. IV;  U.S. CONST. amend. VI; U.S. CONST. amend. XIV.

Set out below are the grounds that warrant the issuance of the writ of habeas corpus.  All factual and legal allegations presented in any claim in this petition are fully incorporated into each and every other claim in this petition.

**GROUND ONE (DIRECT APPEAL ISSUE 4 & STATE HABEAS CLAIM 17):   Whether Mr. Crutsinger's Fourth Amendment rights were violated because the taint of his illegal arrest was not sufficiently attenuated as to authorize the admission of his confession, DNA sample, and other evidence**

### A.     Statement of Facts

Mr. Crutsinger filed a motion to suppress his confession, DNA evidence and other evidence, because it was obtained pursuant to an illegal arrest. (CR 2:119-122; CR 2:132; CR 7:1197-1201). Following a hearing on the motion to suppress, the trial court entered Findings of Fact and Conclusions of Law. (RR vol. 7; CR 8:1335-1339).

In deciding the issue, the Texas Court of Criminal Appeals wrote that "a review of the pertinent facts is necessary to address" Mr. Crutsinger's complaint that "the taint of his illegal arrest was not sufficiently attenuated so as to authorize the admission of his confession, DNA sample, and other evidence obtained pursuant to his illegal arrest." *Crutsinger v. State*, 206 S.W.3d 607, 609 (Tex. Crim. App. 2006).

Thereafter, the direct appeal opinion recites:

On April 6, 2003, appellant entered the home of eighty-nine-year-old Pearl Magouirk and her seventy-one-year-old daughter Patricia Syren and stabbed them both to death. Appellant then took items from the house including Syren's Cadillac and credit card. Magouirk's and Syren's bodies were discovered on April 8, 2003. While investigating the crime,

officers learned that Syren's credit card was being used in Galveston, Texas. The detectives contacted the Galveston Police Department and traveled to the city to further investigate. The Galveston police determined that the person using the credit card was currently in one of several bars in Galveston. The investigation ultimately led Officer Clemente Garcia to a man later identified as appellant. When Garcia approached appellant and asked him his name, appellant did not initially answer. When Garcia asked appellant for his name again, appellant told him his name was "David." Garcia arrested appellant for failing to identify himself and read him his *Miranda* rights. [footnote omitted]. After reading appellant his rights, Garcia asked him again for his name, and appellant identified himself as "David Townsend." Garcia took appellant to the Galveston Police Department where he subsequently was able to properly identify him.

While in the holding cell, appellant was introduced to Detective John McCaskill of the Fort Worth Police Department. McCaskill asked appellant if he could see his hands, and appellant obliged. [footnote omitted]. Immediately thereafter, McCaskill left the area where appellant was being held. A few minutes later, appellant said that he had "messed up" and asked to speak to McCaskill. Appellant was then taken to an interview room where McCaskill met with him and again read him his rights. Appellant subsequently consented to having a DNA sample taken from him and to a search of a black duffel bag that had been in his possession when he was arrested. After McCaskill again read appellant his legal warnings and appellant again waived them, appellant confessed in a tape recorded statement to killing the two women in Fort Worth and taking their property. In the confession, appellant told officers where other evidence of the crime could be found. [footnote omitted].

After a pre-trial hearing on appellant's motion to suppress, the trial court found that appellant had waived his legal rights and had voluntarily signed the consent forms allowing the police to collect DNA evidence and to search his duffel bag. The court also determined that appellant had voluntarily given a recorded statement and was not threatened, coerced, or promised anything.

The court concluded that, although the Galveston police had probable cause to arrest appellant for the offense of credit card abuse, a warrantless arrest was not justified because there was insufficient evidence to show that the defendant was about to escape. The court further concluded that appellant did not commit the offense of failure to identify before he was arrested. Therefore, the police illegally arrested appellant on statutory grounds. *See* TEX. PENAL CODE, Ch. 14.

Turning to an attenuation of the taint analysis, the court determined that the short time that passed between appellant's arrest and his confession was not important due to the facts in the case. Specifically, appellant was given his warnings three times before he completed the oral confession. He indicated that he understood his rights each time, but he never invoked them. Significant intervening circumstances were present in the case, including the fact that after his arrest appellant became very emotional, asked to speak to McCaskill, and was very cooperative with the police during the detention and investigation. The court determined that appellant's request to speak to McCaskill was an independent act of free will. The court concluded that: although appellant was illegally arrested, the police conduct was not purposeful or flagrant; probable cause existed for arresting appellant for credit card abuse, therefore his arrest was not a gross violation of the legal process; and appellant's confession was not a product of coercion or duress. Thus, the court concluded that any taint from the illegal arrest was sufficiently attenuated, and the confession and any other evidence discovered after appellant asked to speak to McCaskill was admissible.

The trial court was correct in its determinations. ....

*Crutsinger v. State,* 206 S.W.3d 607, 609-610 (Tex. Crim. App. 2006).

**B.    Standard of Review**

The Fourth Amendment to the U.S. Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

In *Stone v. Powell*, 428 U.S. 465, 481-482 (1976), the United States Supreme Court wrote:

> We hold, therefore, that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

It is Mr. Crutsinger's contention that the *Stone* Doctrine is not a bar to full merits review of the current claim because the state court denied him the full and fair opportunity to litigate. *Doescher v. Estelle*, 616 F.2d 205 (5th Cir. 1980); *Swicegood v. Alabama*, 577 F.2d 1322 (5th Cir. 1976).

However, as more fully discussed below, there is a conflict between the Fifth Circuit and other circuits as to whether the failure of the state courts to apply the correct constitutional standard is a denial of an opportunity for full and fair litigation.

---

*See   Gamble v. Oklahoma*, 583 F.2d 1161, 1164-65 (10th Cir. 1978); *but see Swicegood v. Alabama*, 577 F.2d 1322 (5th Cir. 1976).

Additionally, there appears to be an internal conflict in the judicial precedent in the Fifth Circuit as to this issue. *Compare Doescher v. Estelle*, 616 F.2d 205 (5th Cir. 1980) *with Swicegood v. Alabama*, 577 F.2d 1322 (5th Cir. 1976).

### 1.   The Fifth Circuit in *Doescher* recognizes that the *Stone* Doctrine does not apply when a litigant is denied a full and fair opportunity to litigate

In *Doescher v. Estelle*, 616 F.2d 205 (5th Cir. 1980), a case from the Northern District of Texas, the Fifth Circuit recognized that the *Stone* Doctrine is not a bar when the litigant's full and fair opportunity to litigate was denied because after the constitutional law had changed, the Texas state court nonetheless applied prior law.

The *Doescher* Court held:

> The state trial court did not fully adjudicate Doescher's claim that the affidavit for the warrant contained false statements, since the court followed a procedure which was subsequently ruled unconstitutional by Franks v. Delaware, 438 U.S. 154 (1978). ***On direct appeal, the Texas Court of Criminal Appeals was apparently unaware that, since the trial, Franks had been handed down. Stone v. Powell, supra, is therefore no bar since the State of Texas did not provide Doescher with a "full and fair" determination of his Fourth Amendment claim.*** As

a matter of comity, however, it is appropriate that Doescher be required
to first exhaust his state remedies as to this claim.

*Doescher*, 616 F.2d at 207.  *See also* RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL

HABEAS CORPUS PRAC. & PROC. 1388, n.47 (4th ed. 2001).

The concept of a "full and fair" determination of a Fourth Amendment claim

is further elucidated by *Gamble v. Oklahoma*, 583 F.2d 1161, 1164-65 (10th Cir.

1978).  In *Gamble*, the Tenth Circuit discussed the application of the *Stone* Doctrine.[1]

The *Gamble* court wrote:

> Although *Stone* announced a verbal standard, it failed to clothe the words
> "opportunity for full and fair litigation" with any precise meaning.  The
> only hint of meaning is a single, oblique footnote signaling the reader to
> consult *Townsend v. Sain*....
>
> ....
>
> An increasing number of circuits, including this one, believe that
> *Townsend* ... is not the sole measure of the meaning of "opportunity for
> full and fair litigation."...  ***"Opportunity for full and fair consideration"
> ... contemplates recognition and at least colorable application of the
> correct Fourth Amendment constitutional standards*.  Thus, a federal
> court is not precluded from considering Fourth Amendment claims in
> habeas corpus proceedings where the state court willfully refuses to
> apply the correct and controlling constitutional standards....

---

[1]   In *Stone v. Powell*, 428 U.S. 465, 481-482 (1976), the Supreme Court wrote:

We hold, therefore, that where the State has provided an opportunity for full and fair
litigation of a Fourth Amendment claim, the Constitution does not require that a state
prisoner be granted federal habeas corpus relief on the ground that evidence obtained
in an unconstitutional search or seizure was introduced at his trial.

---

Further, the *Gamble* court wrote that "[a]lthough the court announced its

holding in terms of 'full and fair litigation... its opinion repeatedly spoke of 'full and

fair consideration.'.... The Court's use of the words "consideration" and "litigation

interchangeably" suggests that in some instances more than procedural opportunity

to raise and litigate a Fourth Amendment claim is required.  Indeed, consideration

connotes the actual evaluation of a claim under the correct constitutional standard.

Although it is not presented by this case, we also can foresee the possibility that the

correct federal standard could be applied, but in a manner so unconscionable as to

deny a defendant the opportunity for full and fair litigation." *Gamble*, 583 F.2d nn.

2 & 3.


> ## 2. The conflict between and among *Doescher*, *Swicegood,* and *Gamble,* is currently before the Fifth Circuit in *Balentine v. Quarterman*

The issue of the conflict between *Swicegood v. Alabama*, 577 F.2d 1322 (5th

Cir. 1976) and *Gamble v. Oklahoma*, 583 F.2d 1161, 1164-65 (10th Cir. 1978) is

currently before the Fifth Circuit Court of Appeals in *Balentine v. Quarterman*, No.

08-70014.   The Magistrate's Report, adopted by the district judge, recites:

> Grounds one and two were denied under the rule of *Stone v. Powell*, 428
> U.S. 465, 494,  96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976). Each of
> these grounds sought the benefit of the Exclusionary Rule to prevent
> consideration of evidence petitioner contends was illegally seized.  This

---

Court determined the Exclusionary Rule may not be invoked in federal habeas corpus proceedings to collaterally challenge the admission of evidence obtained as a result of illegal searches and seizures unless the state court did not afford a full and fair opportunity to litigate such Fourth Amendment claims. *See Stone v. Powell*, 428 U.S. at 494, 96 S.Ct. at 3052; *Swicegood v. Alabama,* 577 F.2d 1322, 1324 (5th Cir.1978).

In presenting these grounds, petitioner relied upon the law of other Circuits which is different than the rule announced by the Fifth Circuit in *Swicegood*. In his amended petition petitioner argued that "[t]he failure of the state courts to apply the correct constitutional standard is a denial of an opportunity for full and fair litigation. *Gamble v. Oklahoma*, 583 F.2d 1161, 1164-65 (10th Cir. 1978); *but see Swicegood v. Alabama*, 577 F.2d 1322 (5th Cir. 1976)." (Am. Pet. at 58.) ....

... While the undersigned fully agrees with the rule in this Circuit as announced in *Swicegood* and its progeny, ***it does appear this rule is "debatable" since reasonable jurists of other circuits have adopted a different rule as petitioner argues in presenting these claims***. Therefore, even though Fifth Circuit law appears to clearly bar petitioner from relief on grounds one and two, the undersigned recommends a certificate of appealability be issued with respect to grounds one and two.

*Balentine v. Quarterman*, Case No. 2:03-CV-00039 (U.S.D.C. May 2, 2008) [Doc #73] (emphasis supplied). Even if this district court perceives it is bound by the judicial precedent of *Swicegood*, and any Fifth Circuit determination in Balentine, Mr. Crutsinger raises the current issue plead herein, in order to preserve it for further appellate review.

**C.    The state court decisions were contrary to and an unreasonable application of *Brown v. Illinois***

        **1.    *Brown* requires an in-custody statement to be "sufficiently an act of free will to purge the primary taint"**

In *Brown v. Illinois*, 422 U.S. 590, 591 (1975), the defendant, Richard Brown, had been arrested without probable cause and without a warrant, but given *Miranda* warnings.   Thereafter, while he was in custody, he made two inculpatory statements. The Supreme Court wrote that "[t]his case lies at the cross roads of the Fourth and the Fifth Amendments. .... Expressed another way, the issue is whether the statements were to be excluded as the fruit of the illegal arrest, or were admissible because the giving of the Miranda warnings sufficiently attenuated the taint of the arrest." *Brown*, 422 U.S. at 591.

In answering the issue, the *Brown* Court ruled that "[i]n order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* [*v. United States*, 371 U.S. 471 (1963)], requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'" *Brown*, 422 U.S. at 602, *citing Wong Sun*, 371 U.S. at 486.  Placing the burden of showing admissibility on the prosecution, the *Brown* Court looked to the following in making the determination:

- The "voluntariness of the statement is a threshold requirement;"

- The "*Miranda* warnings ... in determining whether the confession is obtained by exploitation of an illegal arrest;"

- The "temporal proximity of the arrest and the confession;"

- The "presence of intervening circumstances;" and

- The "purpose and flagrancy of the official misconduct are all relevant."

*Brown*, 422 U.S. at 604.

## 2.    The evidence was obtained by exploitation of the illegality of his arrest

It is a given that the trial court concluded that Mr. Crutsinger's arrest was illegal. (CR 8:1338).   The Texas Court of Criminal Appeals concurred. *Crutsinger*, 206 S.W.3d at 610 ("The [trial] court ... concluded that appellant did not commit the offense of failure to identify before he was arrested.  Therefore, the police illegally arrested appellant on statutory grounds..... The trial court was correct in its determinations."). Given that the state courts determined that the arrest was illegal, *Brown* dictates that the "voluntariness of the statement is a threshold requirement."

In its analysis, the state courts erroneously found that the evidence seized, and the statements made, were the product of the free will of Mr. Crutsinger. Following therefrom, the state courts then concluded that "any evidence obtained after [Mr. Crutsinger] requested to speak to [Detective] McCaskill was sufficiently attenuated from the illegal arrest as to be admissible." *Crutsinger*, 206 S.W.3d at 611.

As will be demonstrated below, the state courts conclusions were predicated on findings that were both speculative and conjectural, and not entitled to a presumption of correctness. Rather, the record amply supports the fact that Mr. Crutsinger's relinquishment of his rights was *not* an act of free will.

### a.      The Findings of Fact are speculative

The findings at trial,[2] on direct appeal,[3] and in state habeas,[4] are not entitled to a presumption of correctness[5] because they are predicated on speculation about

---

[2]     Finding of Fact #15, CR 8:1337-1338.

[3]     "... after McCaskill stepped out of the holding room, appellant became emotional, stated that he had 'messed up," and asked to speak to the detective. Appellant's request was a product of his own free will and an intervening circumstance which weighs heavily in the State's favor." *Crutsinger*, 206 S.W.3d at 611.

[4]     *See* State's Proposed Findings of Fact and Conclusions of Law, Claim #17, Finding of Fact #37 incorporating the trial court's FFCL in toto from the suppression hearing.

[5]     "Under [28 U.S.C. § 2254](d)(2), a state court decision may be overturned on factual grounds if its determinations of fact are "objectively unreasonable in the light of the evidence presented in the state-court proceeding". *Guidry v. Dretke*, 397 F.3d 306, 316-317 (5th Cir.

---

"appearances" and "thought processes," based on testimony from law enforcement, who had no training in forensic psychology. These findings include, by way of example, but not limitation:

- "Appellant's request [to speak to Detective McCaskill] was a product of his own free will." *Crutsinger*, 206 S.W.3d at 611;

- "the Defendant had knowingly, intelligently and voluntarily waived his rights," CR 8:1337-1338, FFCL #15; and

- "the Defendant did not appear to be intoxicated and seemed cognizant of his situation." (CR 8:1337-1338, FFCL #11);

The suppression hearing reflects that law enforcement testified from their subjective "belief," rather than personal knowledge:

Prosecutor:  "Did Mr. Crutsinger *appear* cognizant of what was going on around him?,"

McCaskill:  "Yes, ma'am."

Prosecutor:  "Did he *appear* to you to be under the influence of any type of narcotic, drug or alcohol?,"

McCaskill:  "No. *I believe* he had been drinking earlier in the day, but he in no way appeared to be intoxicated."

---

2005) *citing Miller-El*, 537 U.S. 322, 340 (2003). A determination of a factual issue made by a State court shall be presumed to be correct, but that presumption of correctness can be rebuttable by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

---

(RR 7:18) (emphasis supplied).   Law enforcement did not do a breath or blood test to determine blood alcohol levels; so it is impossible to know whether in fact Mr. Crutsinger was or was not intoxicated, during the interrogation. The aforementioned "belief" of Detective McCaskill as to whether Mr. Crutsinger was intoxicated is irrelevant in determining the voluntariness of Mr. Crutsinger's statement. (RR 7:18). This is particularly true because Detective McCaskill's subjective belief that Mr. Crutsinger was not intoxicated is contradicted by McCaskill's testimony during the suppression hearing that he "could smell a little bit of alcohol" on Mr. Crutsinger's breathe. (RR 7:59).

Further, merely because a defendant is "cooperative," does not mean he is acting voluntarily.  Indeed, a finding of "free will" can not be predicated on an absence of action  –  as the state court conclusions are, and which rely for their support on the testimony of Detective McCaskill:

> Prosecutor:   "Were you able to observe anything about Mr. Crutsinger's demeanor that indicated to you whether or not he was still willing to speak with you?"
>
> McCaskill:   "Well, he was very cooperative. *He gave me no indication that he did not want to speak to us at all*"

(RR 7:66) (emphasis supplied).

**b.    There is clear and convincing record evidence that because of his mental impairments, the confession was not voluntary**

In contrast, there is evidence that Mr. Crutsinger suffered from several significant mental impairments, including mental illness, specifically, depression; low intellectual functioning; and head trauma and alcohol addiction, which likely resulted in brain damage.  These mental impairments call into question the voluntariness of Mr. Crutsinger's confession, and his ability to waive his rights knowingly, intelligently and voluntarily.

**(i)    Mr. Crutsinger has low IQ, a learning disorder, and had been placed in special education**

Testimony reveals that Mr. Crutsinger had low intellectual functioning, and a learning disorder.  Several siblings were mentally retarded:

- Mr. Crutsinger had two sisters and three brothers.  Three of them were mentally retarded.  (CR 31:38);

- Mr. Crutsinger's fourth (4th) grade school records memorialize that he has "low I.Q.  Social promotion."(Defense Exhibit 10: p. 3, note of 4th grade teacher);

- Testing prior to trial confirmed that Mr. Crutsinger "obtained a Verbal IQ (VIQ) score of 74 (4th percentile; Borderline), a Performance IQ (PIQ) score of 94 (34th percentile; Average), and a Full Scale IQ (FSIQ) score of 80 +/- 4 placing him in the Low Average range of intellectual functioning." (Exhibit C: Report of Dr. Goodness, dated September 10, 2003, p. 8); and

- "Billy Jack has a learning Disorder .... was previously labeled a "slow learner" and was given special education services. He has three siblings who were in special education and none of his five siblings graduated high school." (Exhibit C:   Report of Dr. Goodness, dated September 10, 2003, p. 11).

### (ii)   Mr. Crutsinger was mentally ill;  he suffered from depression for many years

There is also evidence that Mr. Crutsinger was mentally ill, in the form of depression.  "Billy Jack has struggled with depression for the past several years." Exhibit C:  Report of Dr. Goodness, dated September 10, 2003, p.10.

### (iii)   Mr. Crutsinger was addicted to alcohol

Mr. Crutsinger had a long-standing alcohol addiction, as did other members of his immediate family  – a fact that demonstrates a _non_-volitional genetic component to his disease of addiction. Mr. Crutsinger's addiction was so severe, that it resulted in physical deterioration:

- Linda Tucker Crutsinger, a former wife, testified that at least 15 years prior to the offense conduct, Mr. Crutsinger had a serious alcohol addiction. In 1988 (the offense conduct was April 6, 2003 (CR 1:3)), Linda Tucker had met Mr. Crutsinger while working in a bar. Mr. Crutsinger was a customer who "drank a lot," and "got drunk a lot." (CR 32:55-56).

- Linda Tucker's sister (Mr. Crutsinger's sister-in-law), Tammy Bullard, testified that Mr. Crutsinger's drinking was a "huge problem." (RR 32:103).

- Further, Mr. Crutsinger's alcohol addiction has a genetic component. Louise Crutsinger, his mother, testified that her husband, Mr. Crutsinger's father, had a problem with alcohol, and drank all the time, even when working. (RR 32:115). The records from John R. Lindsey State Jail reflect that Mr. Crutsinger's brother, too, was addicted to alcohol. (Defense Exhibit 9: the "yes" box was checked to the question: "Has anyone in your immediate family been hospitalized for treatment of alcoholism, narcotics addiction or mental disorders," and "BRO - RALPH CRUTSINGER, JR." and FA - RALPH CRUTSINGER identified as the immediate family members))

- Detective McCaskill testified during the suppression hearing that he "could smell a little bit of alcohol" on Mr. Crutsinger's breathe. (RR 7:59)

- "Billy Jack's family reported that his drinking 'got bad' approximately four years ago and Billy Jack began to be verbally aggressive and sometimes violent when he got drunk. His drinking must have been quite heavy as he was diagnosed with alcoholic hepatitis in 1996 following an automobile accid3ent. Alcoholic hepatitis is a precursor to cirrhosis of the liver which comes from excessive, consistent alcohol consumption over a long period of time.... When an individual has abused alcohol to the degree that their liver is affected, chances are that their brain will also have incurred damage." (Exhibit C: Report of Dr. Goodness, dated September 10, 2003, p. 12).

### (iv)   Mr. Crutsinger suffered head trauma

Mr. Crutsinger experienced severe head trauma several years before the charged offenses, as a result of an automobile accident, and concomitant brain impairment:

- Cheryl Moffett, the RN at the Galveston County jail, who testified that Mr. Crutsinger "explained he took [Zoloft] after his sister died in a car accident, he was driving, ...." (RR 29:14);

- Linda Tucker Crutsinger, a former wife, testified that "they had a car accident, him [Mr. Crutsinger] and his mother and her [his sister]." Mr. Crutsinger was driving the car. (RR 32:64, 65);

- Mr. Crutsinger's medical history reflects that he "has at least one incident of lost consciousness which was the result of hitting his head in an automobile accident in 1996." (Exhibit C: Report of Dr. Goodness, dated September 10, 2003, p. 6); and

- Testing also reflected that Mr. Crutsinger "has some level of brain impairment." (Exhibit C: Report of Dr. Goodness, dated September 10, 2003, p. 9).

### (v)   Conclusion

As the aforementioned record evidence reflects, the findings of facts are not entitled to a presumption of correctness. There is clear and convincing evidence that Mr. Crutsinger did _not_ voluntarily, knowingly, and intelligently relinquish his rights and agree to talk to law enforcement. 28 U.S.C. §§ 2254(d)(2), (e)(1).[6]

---

[6]   *See also Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005) ("Notwithstanding AEDPA's requiring substantial deference for state court determinations of fact, such deference does not imply abandonment or abdication of judicial review. Deference does not by definition

3.   **The decision of the state courts are contrary to and an unreasonable application of** *Brown*

The   conclusions of law are contrary to and an unreasonable application of

*Brown.  See e.g., Crutsinger*, 206 S.W.3d at 610, 611;[7] Conclusions of Law #17-43.[8]

a.   **Mr. Crutsinger was interrogated for a half-hour** ___before___ **the tape recorder was turned on**

The state courts omitted altogether any reference to the fact that Detective

McCaskill testified that he had talked to Mr. Crutsinger "probably around a half hour,"

___before___ the tape recorder was even turned on.  (CR 28:150, 151).  Because it was not

recorded, there is no way to know what transpired during that interview.  The absence

of this evidence can not lead to the conclusion that there was no coercion.  To the

---

preclude relief.  A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude [under subpart (d)(2)] the decision was unreasonable or that [under subpart (e)(1)] the factual premise was incorrect by clear and convincing evidence.")

[7]   "The court also determined that appellant had voluntarily given a recorded statement and was not threatened, coerced, or promised anything".... "Appellant's request to speak to McCaskill was an independent act of free will" .... ""appellant confession was not a product of coercion or duress"..... "Appellant's request was a product of his own free will and an intervening circumstance which weights heavily in the State's favor."

[8]   *See also Crutsinger*, 206 S.W.3d at 611 ("With regard to temporal proximity, the record clearly shows that less than one hour to an hour and half elapsed between appellant's arrest and his interview with McCaskill... [but] Appellant's request [to speak to the detective] was a product of his own free will....").

---

contrary, the REID method of interrogation is a covertly, coercive method of interrogation.

### b.    The REID method of interrogation results in covert coercion

Although law enforcement testified that Mr. Crutsinger was "cooperative" and "confessed," that alone does not justify a conclusion that the relinquishments of his rights was an "act of free will."   The social science literature reflects that law enforcement  can induce a confession *covertly*, communicating promises and threats through the arrangement of the physical layout of the interrogation room, the physical proximity of the interrogator to the accused, and the techniques of maximization[9] and minimization,[10] even absent overt coercion, force, or necessity. SAUL M. KASSIN, *The Psychology of Confession Evidence,* 52 AMERICAN PSYCHOLOGIST 221 (1997).

---

[9]    *Maximization* is a covert interrogation technique that effectively communicates a threat of harm by exaggerating the strength of the evidence, magnitude of the charges, or seriousness of the offense

[10]    *Minimization* is a covert interrogation technique that effectively conveys a promise of leniency by playing down the strength of the evidence, the magnitude of the charges or seriousness of the offense.