**c.     Mentally impaired persons like Mr. Crutsinger, are more sensitive to coercion, and less likely to withstand the pressures of interrogation than the average person**

Persons with mental impairments, such as Mr. Crutsinger, are more sensitive to coercion than the average person, and thus, may relinquish their rights involuntarily as a result of their impairment. *See e.g., Jurek v. Estelle*, 623 F.2d 929, 938, 941 (5th Cir. 1980) (reviewing "with that suspicion mandated by the Supreme Court" the voluntariness of a confession made by a defendant of "limited intelligence");*United States ex rel. Rush v. Ziegele*, 474 F.2d 1356 (3d Cir. 1973) (law mental capacity is important in determining what amount of coercion would render a confession involuntary); *Roark v. State*, 644 N.E.2d 565 (Ind. 1994) (recognizing that a person's mental condition is relevant to the issue of susceptibility to police coercion).

**d.     The short interval between his arrest and confession is a critical factor in the *Brown* analysis**

The "short time that passed between [Mr. Crutsinger's] arrest and his confession" <u>was</u> a critical factor in the *Brown* analysis – contrary to the state courts' determinations to the contrary. *Crutsinger*, 206 S.W.3d at 610.  Mr. Crutsinger's mental illness, low intellectual functioning, and probably brain damage, as a result of head trauma and long-standing alcoholism, reflect that his in-custody statements (and the resulting evidence), were not "sufficiently an act of free will to purge the primary

taint." *Brown*, 422 U.S. at 591.   Contrary to the holding of the Texas Court of Criminal Appeals, his request to speak to Detective McCaskill was not an intervening circumstance, that was a product of his own free will. *Crutsinger*, 206 S.W.3d at 611.

> e.   **The jury instructions omitted any instruction to the jury that the threshold question was the voluntariness of the statement**

Finally, the jury was not instructed at all that the voluntariness issue was the threshold issue they were to consider.   This is reflected by contrasting the dictates of *Brown* ("voluntariness of the statement is a threshold requirement,") with the jury instruction given to the jury at the conclusion of the guilt/innocence phase, which makes no mention of voluntariness as a threshold requirement:

> ... evidence obtained from a person after an illegal arrest may nonetheless be considered by the jury if the jury finds that the State has demonstrated beyond a reasonable doubt that the taint of the illegal arrest, if any, is sufficiently attenuated to render any resulting evidence free of said taint.   The factors to be considered by the jury to decide if the taint of an illegal arrest, if any, is sufficiently attenuates are as follows: 1) whether the Miranda warnings were given to the person; 2) the proximity in time of the illegal arrest to the evidence obtained; 3) the presence of intervening circumstances; and 4) the purpose and flagrancy of any official misconduct.

(CR 7:1282).

#### f.      Conclusion

In conclusion, the determinations of the state courts that his statements were voluntary, and any taint was purged, is contrary to and an unreasonable application of *Brown*, 422 U.S. 590 (1975). The evidence was illegal and inadmissible. Habeas relief should be granted.

### 4.      The error was not harmless.

The introduction of the fruits of the poisonous tree was not harmless. In *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), the United States Supreme Court looked to whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623, *quoting Kotteakos*, 328 U.S. at 776. The factors include, among others:

(3)    "the importance of the phase [of trial] affected by the error,"

....

(5)    the frequency of the error or the extent to which it "permeate[d] the proceedings"

(6)    The "central[ity] to the case, as actually tried, of the issue affected by the error."

(7)    The relative weakness of the properly admitted evidence, to the extent that this factor bears on the question whether the constitutional error did or did not affect the thinking or

deliberative processes of the actual jurors, or the "closeness of the case" on the evidence adduced at the original trial.

(8)     In cases in which evidence was improperly admitted, the extent to which:

    (a)     the prosecutor emphasized the improper evidence in closing argument....

    (b)     the improperly admitted evidence was likely to influence the jury's deliberations, either because it was particularly salient or appeared to be particularly probative of the ultimate issue ....

    (c)     the improperly admitted evidence did not duplicate other evidence that was lawfully presented to the jury

(10)    In cases in which there was more than one error, the "cumulative effect" of the errors.

(11)    Whether the court failed to give "curative instructions" or to take other remedial measures sufficient to prevent the error from substantially affecting the jurors' deliberative process.

RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRAC. & PROC. 1406-1412 (4th ed. 2001).

In the case at bar, the admission of Mr. Crutsinger's confession and its relation to the other evidence, including the DNA evidence, resulted in a fundamentally unfair trial. A review of the record demonstrates that this evidence permeated each and every aspect of the trial. The prosecution relied on this illegal evidence in his opening statement to link Mr. Crutsinger to the homicides. *See e.g.,* (RR 27:15-17: "the

Defendant asked to speak to Detective McCaskill... and a full confession was given...... McCaskill had samples taken from the inside of the Defendant's cheek cells to be used in DNA analysis;" RR 27:21-23: "he gave a statement to the police... also gave the police a sample of his DNA," and thereafter, law enforcement obtained a search warrant, "without probable cause").

Likewise, the prosecution also relied on this illegal evidence in his closing statement to urge the jury to find Mr. Crutsinger guilty. *See e.g.,* (RR 30:207-209: "the Defendant asked to talk to them and that is absolutely essential for you to realize, because that confession was voluntary and it was legal and it confessed to the crime in its entirety").

The statements and illegally obtained physical evidence were a focal point of the trial in guilt/innocence. The confession itself was played to the jury, in which Mr. Crutsinger admits to killing the victims. (State's Exhibit 131; CR 28:116). Likewise, the consent form for the buccal swab that resulted in matching DNA evidence was admitted before the jury, as were the DNA results, which identified Mr. Crutsinger "to a reasonable degree of certainty, [as] ... the contributor of the sample." (CR 28:121-126; CR 29:53).

The error was not harmless because the fruits of the illegal arrest, and concomitant search and seizure were central to the case. They were emphasized by

the prosecutor, and likely to influence the jury's deliberations, particularly because there was no testimony from any witness who saw thekillings, and did not duplicate other evidence that was lawfully admitted.

**GROUND TWO (STATE HABEAS CLAIM 15):  Whether Mr. Crutsinger was denied his Sixth and Fourteenth amendment rights to effective assistance of counsel because counsel failed to adequately investigate and develop crucial evidence in all phases of the trial**

### A.    Standard of Review

The applicable federal law for this ineffective assistance of counsel claim is *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* stated a two-pronged test for judging claims of ineffective assistance of counsel:

> First, "whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professionally competent assistance," and

> Second, "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt."

*Strickland,* 466 U.S. at 995.

### B.    The FF are *not* entitled to a presumption of correctness

In *Guidry v. Dretke*, 397 F.3d 306, 326 (5th Cir. 2005), the Fifth Circuit instructed that "[n]otwithstanding AEDPA's requiring substantial deference for state court determinations of fact, such deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.  A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude [under subpart (d)(2)] the decision was unreasonable or

that [under subpart (e)(1)] the factual premise was incorrect by clear and convincing evidence."

The following Findings of Fact (FF), submitted by the prosecution and adopted verbatim by the trial court on November 7, 2005, with respect to claim fifteen (15) in the state habeas application, are not entitled to a presumption of correctness. 28 U.S.C. §§ 2254(d)(2), (e)(1).

## FINDINGS OF FACT

- 10. Mr. Ray and Mr. Moore investigated the relevant guilt/innocence issues in the applicant's case. *See* Counsel's Affidavit, page. 2.

- 11. Mr. Ray and Mr. Moore determined that the applicant's confession was the critical piece of evidence in its relation to the inculpatory DNA testing results. *See* Counsel's Affidavit, page. 2.

- 12. Mr. Ray and Mr. Moore filed several motions to suppress the applicant's confession and the DNA evidence, and participated in a suppression hearing on these issues. *See* Counsel's Affidavit, page. 2; C.R. II:119-22, VII:1197-1202; R.R. VII*passim.*

....

- 18. To prepare for the punishment phase of the applicant's trial, Mr. Ray and Mr. Moore arranged for a psychiatrist and a psychologist

---

to interview the applicant and review the facts of his case. *See* Counsel's Affidavit, page. 3.

- 19. Mr. Ray and Mr. Moore determined that it was not in the applicant's benefit to offer these witnesses. *See* Counsel's Affidavit, page. 3.

- 20. Mr. Ray and Mr. Moore investigated the applicant's family background for mitigation evidence. *See* Counsel's Affidavit, page. 3.

- 21. Counsels [sic] and their investigators interviewed family members and presented the testimony of those who would be helpful. *See* Counsel's Affidavit, page. 3.

....

- 29. The following guilt/innocence phase evidence undercuts any additional other potential evidence or theory which Mr. Ray and Mr. Moore could have been presented to the jury: [(a) - (am)]

....

- 30. The following punishment phase evidence undercuts any additional other potential evidence or theory which Mr. Ray and Mr. Moore could have been presented to the jury: [(a) - (t)]

- 31. Given the gruesome circumstances of the murders of Pearl Magouirk and Patricia Syren, the overwhelming evidence connecting the applicant to these murders, his lifelong history of violence toward women, and his prior criminal record, it is not reasonable to believe that the jury would have reached a different result had Mr. Ray and Mr. Moore done more investigation, more communications, or more preparation in this case.

- 32. Mr. Ray and Mr. Moore more than adequately investigated this cause and prepared for trial, and there is no reasonable probability that other attorneys would have obtained a different jury result.

- 33. The applicant was not denied effective assistance of counsel by Mr. Ray and Mr. Moore's representation.

Contrary to the implications of effective representation arising from the aforementioned Findings of Fact, there is clear and convincing evidence that neither Mr. Moore nor Mr. Ray timely and adequately investigated and developed (and thereafter, presented) crucial evidence in the guilt/innocence or punishment phases of the trial.

Consider the time line of the events as they unfolded from the date of the offense to the sentence of death, which amply demonstrate the ineffectiveness of trial counsel:

04-06-03    death of Patricia Syren and Pearl Magouirk (CR 1:3)

06-19-03    indictment of Billy Jack Crutsinger (CR 1:3)

04-17-03    appointment of Bill Ray, trial counsel (CR 1:19)

06-13-03    appointment of Tim Moore, trial counsel (CR 1:38)

06-16-03    Letter from forensic defense expert, Dr. Goodness, psychologist and mitigation expert, to Mr. Ray, warning : "*I believe it is critical both for trial as well as mitigation to know what the mitigating issues might be in order to develop an appropriate trial strategy.* Please note that it

---

would be difficult, if not impossible to collect all of the information necessary for either trial or mitigation in anything less than three full months. Thus, swift action is required." (Exhibit D: Letter of Goodness to Ray, dated 06-16-03)

06-19-03    order of appointment and authorization of reasonable expert fees and expenses of forensic defense expert, Dr. Barry Mills, psychiatrist (CR 1:50)[11]

07-03-03    defense filed motion to suppress oral statements arising from Mr. Crutsinger's illegal arrest, and concomitant evidence obtained as a result of that statement, including the first DNA sample, as well as other evidence (CR 1:88)

07-10-03    Letter from Heather Dasher, assistant to Dr. Goodness, to Mr. Ray: "Dr. Goodness no longer accepts mitigation cases with trial dates less than three months away, due to the time required to conduct these comprehensive investigations. My concern is that Mr. Krutsinger's [sic] trial date is within the three month mark and I am uncertain if you are going to require mitigation work...." (Exhibit E: Letter of Dasher to Ray, dated 07-10-03)

07-16-03    Terms of Engagement Contract between Ray and Goodness (Exhibit F: Terms of Engagement Contract, dated 7-11-03)

08-07-03    first amended motion to suppress oral statements (CR 2:119)

08-08-03    motion to suppress evidence seized as a result of illegal arrest as fruits of the poisonous tree (CR 2:132)

---

[11]    Trial counsel files do not contain a report prepared by Dr. Mills.  Mr. Ray confirmed by telephone call that Dr. Mills did not prepare one.  Upon information and believe, Dr. Mills has moved out of state.  Although undersigned counsel has attempted in an unrelated death penalty case to reach Dr. Mills by telephone, he has not taken or returned her telephone calls.

---

08-18-03     voir dire begins, and ends 09-18-03 (RR 1-26)

08-22-03     hearing on motion to suppress evidence (confession, first DNA sample) as a result of illegal arrest (RR vol 7)

09-10-03     report of Kelly Goodness, Ph.D., forensic psychologist (Exhibit C: Report of Dr. Goodness, dated September 10, 2003)

09-12-03     after jury selection had begun, defense filed a motion to suppress DNA analysis performed on epithelial cheek cells removed pursuant to search warrant executed on 8-27-03, alleging lack of probable cause to issue search warrant (CR 7:1197)

09-18-03     hearing on motion to suppress DNA analysis performed on epithelial cheek cells removed pursuant to search warrant executed on 8-27-03, after jury selection began, because of lack of probable cause to issue search warrant (RR vol 24)

09-22-03     guilt/innocence phase of the trial begins, and ends 09-25-03 (4 days) (RR vol. 27-30)

09-25-03     jury verdict of guilty (CR 7:1284)

09-26-03     punishment phase of the trial begins, and ends 09-30-03 (3 days) (RR vol 31-33)

09-30-03     jury verdict: "yes" - future dangerousness special issue #1; "no" – mitigation special issue #2 (CR 7:1294-1295)

10-01-03     judgment and death sentence (CR 7:1300)

**1.    A little less than six (6) months elapsed from the date of appointment of trial counsel to the imposition of the death sentence – and no continuance was requested**

The time line refutes, by clear and convincing evidence, the findings of fact that

Mr. Ray and Mr. Moore "more than adequately investigated this cause and prepared

for trial,..." FF #10, 32, 33.  A little less than six (6) months elapsed from the date of

appointment of counsel (April 2003) until the imposition of a sentence of death

(October, 2003):

04-17-03    appointment of Bill Ray, trial counsel (CR 1:19)

06-13-03    appointment of Tim Moore, trial counsel (CR 1:38)

10-01-03    judgment and death sentence (CR 7:1300)


Further, Dr. Goodness put trial counsel on notice that they could not formulate

a viable trial strategy without a timely and adequate social history investigation:

06-16-03    Letter from forensic defense expert, Dr. Goodness, psychologist and mitigation expert, to Mr. Ray, warning : "*I believe it is critical both for trial as well as mitigation to know what the mitigating issues might be in order to develop an appropriate trial strategy*.  Please note that it would be difficult, if not impossible to collect all of the information necessary for either trial or mitigation in anything less than three full months.  Thus, swift action is required." (Exhibit D: Letter of Goodness to Ray, dated 06-16-03)

Yet, there is no motion for continuance anywhere in the eight (8) volumes, and 1,440 pages of clerk's record.


### 2.     The mitigation investigation was too late

Messrs. Ray and Moore attested that they had "determined that the confession obtained by the police was *the critical piece of evidence*," because of "its relation to the inculpatory DNA testing results." *See* Counsel's Affidavit, page 2; FF #11.  And the fact findings recite that:

> 12.   Mr. Ray and Mr. Moore filed several motions to suppress the applicant's confession and the DNA evidence, and participated in a suppression hearing on these issues. *See* Counsel's Affidavit, page. 2; C.R. II:119-22, VII:1197-1202; R.R. VII:*passim.*

However, the mitigation investigation was too-little, too-late.


### a.     The social history investigation began **after** the suppression hearing

As of the date of the suppression hearing, the law was clear that:

- the "voluntariness of the statement is a threshold requirement,"[12]

---

[12]   *Brown v. Illinois*, 422 U.S. 590, 604 (1975).

- the voluntariness of a confession should be reviewed "with that suspicion mandated by the Supreme Court" from a defendant of "limited intelligence,"[13] and

- "[i]n Texas, it is well established that confessions given by adults are to be evaluated with the totality of the circumstances standard,"[14]

There was an abundance of available evidence as to Mr. Crutsinger's mental impairments, which would have refuted that he had the ability to provide a "voluntary, knowing, or intelligent" waiver. He was mentally ill. He had experienced significant depression for many years. He also suffered from low intellectual functioning. And finally, Mr. Crutsinger had head trauma following a car accident, which together with his long-standing alcohol addiction, likely rendered him, brain-damaged.   *See* Exhibit C:  Report of Dr. Goodness, dated September 10, 2003, pp. 9, 10 ("Billy Jack's test scores ... suggest that he has some level of brain impairment;" "he is not

---

[13]   *Jurek v. Estelle*, 623 F.2d 929, 938, 941 (5th Cir. 1980); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included ...his lack of education, *e.g., Payne v. Arkansas*, 356 U.S. 560; or his low intelligence, *e.g., Fikes v. Alabama*, 352 U.S. 191 ....").

[14]   *Delao v. State*, 235 S.W.3d 235, n. 9 (Tex. Crim. App. 2007), *citing Creager v. State,* 952 S.W.2d 852, 855 (Tex. Crim. App. 1997) (contending that "[v]oluntariness is decided by considering the totality of the circumstances under which the statement was obtained"); *Green,* 934 S.W.2d at 99 (asserting that a confession will be rendered forced or involuntary "if the totality of the circumstances demonstrates that the confessor did not make the decision to confess of his own free will"); *Kearney v. State,* 181 S.W.3d 438, 444 (Tex. App. – Waco 2005, pet. ref'd) (stating that "[v]oluntariness [of a confession] is determined by looking at the totality of the circumstances").

---

mentally retarded, but does have some intellectual and cognitive difficulties;" Billy

Jack has struggled with depression for the past several years").

### b.   The social history investigation began **after** voir dire had commenced

Yet, when the date of Dr. Goodness' report, 9-10-03 is juxtaposed against the

date of the suppression hearing, 8-8-03, and/or the date of the beginning of the voir

dire, 8-18-03, it becomes apparent that trial counsel did not have the facts they needed

to develop a viable trial strategy in the pre-trial phase:

08-07-03    first amended motion to suppress oral statements (CR 2:119)

08-08-03    motion to suppress evidence seized as a result of illegal arrest as fruits of the poisonous tree (CR 2:132)

*08-18-03    voir dire begins*, and ends 09-18-03 (RR 1-26)

*08-22-03    hearing on motion to suppress evidence* (confession, first DNA sample) as a result of illegal arrest (RR vol 7)

*09-10-03    report of Kelly Goodness, Ph.D.*, forensic psychologist (Exhibit C:  Report of Dr. Goodness, dated September 10, 2003)

        **c.**     **The social history investigation began <u>after</u> any examination or diagnosis by Dr. Mills, forensic psychiatrist for the defense**

A court order, dated June 19, 2003, authorized the appointment of Dr. Mills, a psychiatrist. The time line confirms that Dr. Mills did not have the benefit of a timely, adequate and thorough social history to provide context to his examination, and/or support any diagnosis, he may have made of Mr. Crutsinger, (CR 1:50):

    **06-19-03**    *order of appointment* and authorization of reasonable expert fees and expenses of forensic defense expert, ***Dr. Barry Mills, psychiatrist***(CR 1:50)

    **09-10-03**    *report of Kelly Goodness, Ph.D.*, forensic psychologist (Exhibit C: Report of Dr. Goodness, dated September 10, 2003)

**C.**    **Trial counsel's performance was constitutionally deficient**

Messrs. Ray and Moore attested that Mr. Crutsinger's confession was a *<u>critical piece of evidence</u>.* (FF #11). Dr. Goodness put counsel on notice that a timely and adequate social history was necessary for a viable trial strategy. (Exhibit D: 6-16-03 letter of Goodness to Ray). Yet trial counsel did nothing to timely and adequately investigate and develop Mr. Crutsinger's mental impairments sufficiently in advance of the pre-trial and trial phases of this capital case.

---

As a result, the performance of counsel was deficient because they could not have made strategic decisions given the lack of critical social history information about Mr. Crutsinger, which was necessary to effectively represent him in each phase of the trial. *Wiggins*, 123 S.Ct. at 2535 (2003) ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation"). *See also* ABA GUIDELINE 10.7[15]

### 1.   Trial counsel's performance was deficient

#### a.   They failed to timely and adequately investigate and develop (and thereafter present) the theme of alcohol addiction in all phases of the trial

A timely and adequate mitigation investigation, together with qualified experts in these particular areas, would have revealed that one of the critical themes running throughout the case of Mr. Crutsinger was alcohol addiction. The pervasive, non-voluntary nature of Mr. Crutsinger's alcohol addiction is reflected by the following facts about Mr. Crutsinger who:

---

[15]   GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (rev. ed. Feb. 2003), ABA GUIDELINE 10.7 – Investigation, *Commentary*, p. 1023 ("The mitigation investigation should begin as quickly as possible, because it may affect the investigation fo first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations").

---

- "has a biological predisposition to alcoholism as at a minimum, his father and brother were alcoholics. It is likely that his alcohol abuse has resulted in poor brain functioning." Report at p. 11;

- "began drinking alcohol at the age of seventeen (17)" (he was approximately 48 years old at thetime of the murders), Report at 6;

- "would sometimes spend eight or more hours at a time drinking in a bar," Report at 6;

- was addicted to alcohol as reflected by the fact that he "twice received treatment for alcoholism in addition to attending Alcoholics Anonymous meeting," Report at 6; and

- "was diagnosed with alcoholic hepatitis," Report at 6.

(Exhibit C: Report of Dr. Goodness, dated September 10, 2003).

Further, Detective McCaskill testified that when he interviewed Mr. Crutsinger, the detective "could smell a little bit of alcohol" on Mr. Crutsinger's breathe. Yet, because of their lack of preparation, trial counsel lacked the necessary understanding of the interrelationship between Mr. Crutsinger's alcoholaddiction, and its effect on his involuntary waiver of his rights, his lack of criminal responsibility for the crime, and its mitigating significance. (RR 7:59).

(i)      **There is an association between heavy drinking and physical brain damage**

The NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM ("NIAAA"),

*Imagining and Alcoholism: A Window on the Brain,*

http://alcoholism.about.com/cs/alerts/l/blnaa47.htm teaches that:

> ***Structural imaging reveals a consistent association between heavy drinking and physical brain damage,*** even in the absence of medical conditions previously considered to be clinical indicators of severe alcoholism (e.g., chronic liver disease or alcohol-induced dementia).

> ***Imaging reveals shrinkage to be more extensive in the folded outer layer (i.e., cortex) of the frontal lobe*** (2), which is believed to be ***the seat of higher intellectual functions.*** In men, vulnerability to frontal lobe shrinkage increases with age (2-4).

> ....

> In alcoholics, some frontal brain regions exhibit a smaller metabolic change following benzodiazepine administration than is seen in nonalcoholics. ***These results may indicate a diminished capacity for dampening excessive neuronal activity, possibly weakening a person's ability to inhibit behavior*** (30).

Exhibit A: NATIONAL INSTITUTE ON ALCOHOL ABUSE AND ALCOHOLISM ("NIAAA"),

*Imagining and Alcoholism: A Window on the Brain. See also* Exhibit B: HAMDY F.

MOSELHY, GEORGE GEORGIOU, AND ASHRAF KAHN, *Frontal Lobe Changes in*

*Alcoholism: A Review of the Literature,* Vol. 36, No. 5, ALCOHOL & ALCOHOLISM 357

(2001) (this  Review concludes, among other things, that there is "evidence from

neuropsychological studies that there are specific deficits in alcoholism that suggest frontal lobe dysfunction.  Considered together, these studies lend a strong credence to the concept of frontal lobe pathology in alcoholism....").

> **(ii)     Frontal lobe dysfunction (brain damage) is associated with increased rates of *non*-volitional antisocial behavior**

. Today's scientific literature reflects "*that clinically significant frontal lobe dysfunction is associated with aggressive dyscontrol.*  Subjects with both traumatic and neurodegenerative disorders primarily involving the prefrontal cortex display *increased rates of aggressive and antisocial behaviour* compared with subjects who have no, or non-frontal brain injury." M. C. BROWER AND B.H. PRICE, 71 J. NEUROL NEUROSURG. PSYCHIATRY, *Neuropsychiatry of Frontal Lobe Dysfunction in Violent and Criminal Behavior: A Critical Review,* 720, 724 (2001) (emphasis supplied).

> **(iii)    Mr. Crutsinger's alcohol addiction and its effects comport with current scientific knowledge**

Mr. Crutsinger's alcohol addiction, its lethal effects on the brain and other organs, and the non-volitional, exaggerated response to stimuli, including alcoholic rage, comport with current scientific knowledge.

---

Dr. Goodness wrote:

_Alcoholism_: ....  **Over the years, Billy Jack began to drink more and more beer and he became an alcoholic.** .....  Billy Jack's family members report that his drinking 'got bad' approximately four years ago and billy Jack began to be verbally aggressive and sometimes violent when he got drunk.  His drinking must have ben quite heavy as **he was diagnose with alcoholic hepatitis in 1996 following an automobile accident.**  Alcoholic hepatitis is a precursor to cirrhosis of the liver which comes from excessive, consistent alcohol consumption over a long period of time. .....  **When an individual has abused alcohol to the degree that their liver is affected, changes are that their brain will also have incurred damage.**  Furthermore, poor thinking and brain functioning occurred during times of intoxication.  Those who remain constantly or consistently intoxicated will often exhibit faulty thinking and impaired judgement.... p. 12.

....

_Alcoholic rage_:  .... **stressors increase the likelihood that individuals will act out aggressively.  This is especially true of individuals prone to alcoholic rage as it seems Billy Jack is.**  Billy's Jack's alcohol consumption had long been so great that many days, he would likely have continued to have had alcohol in his system the following day from what he consumed the night before.  It is unknown if this were the case on the day of the offense, but at any rate, Billy Jack also drank several beers before going to the victims' house in anticipate of securing a job that would get him on his feet.  As he was growing increasingly more prone to do when drinking alcohol, Billy Jack went into a rage when he realized that Ms. Syren did not have a significant amount of work for him to do which meant that he would not be experiencing much stress relief.  All of his anger at being left to fend for himself and of having his safety net taken from him was then brought to bear on the victims.

Exhibit C:  Report of Dr. Goodness, dated September 10, 2003, pp. 12, 14.

Had Mr. Crutsinger's alcohol addiction, together with scientific information about the disease of alcohol addiction, been timely investigated and developed, it would have allowed the defense to assert a *non*-voluntary waiver of rights; a lack of criminal responsibility for capital murder; and a credible response to the prosecution's assertion that Mr. Crutsinger was "evil" – specifically that the alcoholic rages exhibited by Mr. Crutsinger were a *non*-volitional product of the disease of addiction. (*See* RR 33:5 – "There is nothing that would explain or justify this propensity for violence, nothing that mitigates this; nothing but the concept of alcoholism. The offense has nothing to do with alcohol. It is a result of evil.")

> **b.** **They failed to timely and adequately investigate and develop (and thereafter present) the theme of head trauma and non-volitional violence in all phases of the trial**

The evidence also reveals that "Billy Jack has had at least one incident of lost consciousness which was the result of hitting his head in an automobile accident in 1996." Report at p. 6. The scientific literature notes the correlation between head injury and aggressive or antisocial behavior. "Large systematic studies on cohorts of war veterans with head injury have also tended to find an association between frontal lobe lesions and aggressive or antisocial behavior, although the prevalence of actual violent crime seems small.... The Vietnam Head Injury Study (VHIS) found that

subjects with lesions limited to the frontal lobes tended to show more aggressive and violent behaviours compared with patients with non-frontal head injury and controls without head injury."  Exhibit G:  M. C. BROWER AND B.H. PRICE, 71 J. NEUROL. NEUROSURG. PSYCHIATRY, *Neuropsychiatry of Frontal Lobe Dysfunction in Violent and Criminal Behavior: a Critical Review,* 720, 721 (2001).

Had Mr. Crutsinger's head trauma, together with scientific information about brain injury and associated antisocial behavior, been timely investigated and developed, it would have provided even more support for a defense of <u>*non*</u>-voluntary waiver of rights; a lack of criminal responsibility for capital murder; and a credible response to the assertion of antisocial personality disorder  – specifically that Mr. Crutsinger's antisocial behavior was a *non*-volitional product of brain injury.

      **c.**    **They failed to present evidence of Mr. Crutsinger's mental impairments in all phases of the trial, including:**

Despite the multiple mental impairments of Mr. Crutsinger, the defense failed to investigate, develop and present this evidence in all phases of the trial.

      **(i)**    **pre-trial  – *in*voluntary confession**

Under Texas and federal law, Mr. Crutsinger could have introduced his mental impairment evidence to refute any showing that his confession was voluntary, and that

the fruits of his illegal interrogation were admissible. Trial knew, or should have known, that judicial precedent dating back to 1975 considered this evidence a critical component in a totality-of-the-circumstances analysis. *See Brown v. Illinois*, 422 U.S. 590, 604 (1975) ("voluntariness of the statement is a threshold requirement); *Jurek v. Estelle*, 623 F.2d 929, 938, 941 (5th Cir. 1980) (the voluntariness of a confession should be reviewed "with that suspicion mandated by the Supreme Court" from a defendant of "limited intelligence"); *Delao v. State*, 235 S.W.3d 235, n. 9 (Tex. Crim. App. 2007) ("In Texas, it is well established that confessions given by adults are to be evaluated with the totality of the circumstances standard"), *citing Creager v. State,* 952 S.W.2d 852, 855 (Tex. Crim. App. 1997) (contending that "[v]oluntariness is decided by considering the totality of the circumstances under which the statement was obtained"); *Green,* 934 S.W.2d at 99 (asserting that a confession will be rendered forced or involuntary "if the totality of the circumstances demonstrates that the confessor did not make the decision to confess of his own free will"); *Kearney v. State,* 181 S.W.3d 438, 444 (Tex. App. – Waco 2005, pet. ref'd) (stating that "[v]oluntariness [of a confession] is determined by looking at the totality of the circumstances").

### (ii)    guilt/innocence – no *mens rea*

Trial counsel knew, or should have known that under historical, but still valid

precedent (*i.e., Evers, Duke,* and *Thomas*),  a defendant's "settled insanity" results in

"no criminal responsibility" because there is a breakdown of the person's system by

long continued or habitual drunkenness.

Since the 1800's, Texas law has recognized the concept of "settled insanity."

*Evers v. State,* 31 Tex. Crim.. 318, 330; 20 S.W. 744, 748 (Tex. Crim. App. 1892).

The *Evers* Court explained:[16]

> There are two kinds of insanity produced by alcoholism: First. Delirium
> tremens, caused by *the breaking down of the person's system by long
> continued or habitual drunkenness*, and brought on by abstinence from
> drink. This is what *is called 'settled insanity,' to distinguish it from*
> 'temporary insanity' or *drunkenness, directly resulting from drink.* ....

More importantly, the *Evers* Court held:

> *There is no difference between the two kinds of insanity, so far as the
> mental status is concerned, but they differ widely in their causes and
> results. The first is from drinking as a remote result, the second from
> drinking as a direct result.* The first is an involuntary result, from which
> all shrink alike; the second is voluntarily sought after. **_In the first, there_**

---

[16]    *See also Thomas v. State,* 147 Tex. Crim. 45, 50; 177 S.W.2d 777, 779 (Tex. Crim. App.
1944) ("while a temporary insanity produced by the recent use of ardent spirits is not a defense
to crime, but can be used, if the jury so desire, in mitigation of the punishment, *a settled insanity
produced by a long-continued use of such spirits* is a full defense therefor."); *Duke v. State,* 61
Tex. Crim. 441, 447; 134 S.W. 705, 708 (Tex. Crim. App. 1911) ("*The law draws a distinction*
which the decisions have clearly recognized *between temporary insanity from the recent
voluntary use of intoxicants*, drunkenness produced from that source, *and the settled insanity*
which *is the result of long continued use of such intoxicants*").

---