IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BILLY JACK CRUTSINGER, | § | |
| | § | |
| PETITIONER, | § | |
| v. | § | |
| | § | No. 4:07-CV-703-Y |
| RICK THALER, Director, | § | |
| Texas Department of Criminal | § | (death-penalty case) |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| RESPONDENT. | § | |

**OPINION AND ORDER
DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner Billy Jack Crutsinger was convicted of capital murder and sentenced to death in Tarrant County, Texas, in the case styled *State v. Crutsinger*, No. 08-85306-D (213th Judicial District Court, Oct. 1, 2003). The conviction and sentence were affirmed on appeal in *Crutsinger v. State*, 206 S.W.3d 607 (Tex. Crim. App.), *cert. denied*, 549 U.S. 1098 (2006).  Later, he petitioned for post-conviction relief in state court, but the application was denied in *Ex parte Crutsinger*, No. WR-63,481-01, 2007 WL 3277524 (Tex. Crim. App. Nov. 7, 2007) (orig. proceeding) (not designated for publication).

Pursuant to 28 U.S.C. § 2254, Petitioner has filed an application for writ of habeas corpus alleging three grounds for relief

(doc. 31).  Respondent Rick Thaler filed a brief in response (doc. 36), and Petitioner filed a reply (doc. 37).[1]

### I.  BACKGROUND FACTS

The Texas Court of Criminal Appeals summarized the facts of this offense as follows:

> On April 6, 2003, [Petitioner] entered the home of eighty-nine-year-old Pearl Magouirk and her seventy-one-year-old daughter Patricia Syren and stabbed them both to death.  [Petitioner] then took items from the house including Syren's Cadillac and credit card.  Magouirk's and Syren's bodies were discovered on April 8, 2003. While investigating the crime, officers learned that Syren's credit card was being used in Galveston, Texas. The detectives contacted the Galveston Police Department and traveled to the city to further investigate.  The Galveston police determined that the person using the credit card was currently in one of several bars in Galveston.  The investigation ultimately led Officer Clemente Garcia to a man later identified as [Petitioner]. When Garcia approached [Petitioner] and asked him his name, [Petitioner] did not initially answer. When Garcia asked [Petitioner] for his name again, [Petitioner] told him his name was "David." Garcia arrested [Petitioner] for failing to identify himself and read him his *Miranda* rights.   After reading [Petitioner] his rights, Garcia asked him again for his name, and [Petitioner] identified himself as "David Townsend." Garcia took [Petitioner] to the Galveston Police Department where he subsequently was able to properly identify him.

> While in the holding cell, [Petitioner] was introduced to Detective John McCaskill of the Fort Worth Police Department. McCaskill asked [Petitioner] if he could see his hands, and [Petitioner] obliged. Immediately thereafter, McCaskill left the area where [Petitioner] was being held. A few minutes later, [Petitioner] said that he had "messed up" and asked to speak to

---

[1]Contemporaneously with the filing of the petition, Crutsinger moved for an evidentiary hearing on the ineffective-assistance-of-counsel claim (doc. 30). The Court denied the motion on August 17, 2009, primarily because Petitioner failed to develop the factual basis of the claim in state court, as required by 28 U.S.C. § 2254(e)(2)(doc. 42, p. 6).

McCaskill. [Petitioner] was then taken to an interview room where McCaskill met with him and again read him his rights. [Petitioner] subsequently consented to having a DNA sample taken from him and to a search of a black duffel bag that had been in his possession when he was arrested. After McCaskill again read [Petitioner] his legal warnings and [Petitioner] again waived them, [Petitioner] confessed in a tape-recorded statement to killing the two women in Fort Worth and taking their property. In the confession, [Petitioner] told officers where other evidence of the crime could be found.

*Crutsinger*, 206 S.W.3d at 609 (footnotes omitted).

A jury convicted Petitioner of causing the deaths of Syren and Magouirk during the same criminal transaction, and based on the jury's answers to the special issues in the court's charge, the trial judge sentenced him to death. (7 CR 1280, 1294-95).[2] In his Petition, Crutsinger alleges (1) the trial court failed to suppress evidence resulting from his illegal arrest in violation of the Fourth Amendment; (2) trial counsel provided ineffective assistance in failing to timely initiate a social history investigation, which caused counsel to overlook evidence of his mental impairments caused by alcohol addiction, head trauma, depression, and low intelligence (the "IAC" claim); and (3) actual innocence.

## II.  FOURTH AMENDMENT CLAIM

In the first ground for relief, Petitioner contends his Fourth Amendment rights were violated by the admission of his confession,

---

[2] "CR" refers to the eight volumes of the trial court clerk's record, preceded by the volume number and followed by the page number. Similarly, "RR" refers to the reporter's record from trial, and "SHR" refers to the seven volumes of state-court habeas records.

a DNA sample, and other evidence tainted by his illegal arrest. This claim is barred under *Stone v. Powell,* 428 U.S. 465, 494 (1976).

### A.   Prior Litigation of this Claim

Petitioner raised Fourth Amendment claims in four separate pretrial motions to suppress, which the trial court denied after two separate hearings.[3]   The trial court ruled that Petitioner's arrest was illegal under the Texas warrantless-arrest statutes and excluded any evidence obtained in the period after Petitioner was arrested but before he asked to speak to a detective.   (25 RR 14; 8 CR 1333).   Petitioner's police statement, consent to search, and DNA sample were deemed admissible because they were voluntarily provided after he asked to speak to the detective and were sufficiently attenuated from the taint of the illegal arrest.   (8 CR 1333-34); *see generally Brown v. Illinois*, 422 U.S. 590 (1975).

At trial, Petitioner relitigated the legality of his arrest and the attenuation of the taint, and a legal expert was appointed to testify on his behalf.   (30 RR 4, 16-47, 72-77).   The State also presented expert testimony on the issue.   (30 RR 89-124, 178-183).

---

[3]Petitioner filed his first motion to suppress his statements on July 30, 2003.   (1 CR 88).   He filed an amended motion to suppress the statements on August 7.   (2 CR 119).   On August 8 he filed a motion to suppress all evidence seized as a result of his illegal arrest.   (2 CR 132).   On September 12 Petitioner filed a motion to suppress DNA evidence that had been obtained by search warrant dated August 26.   (7 CR 1197).   A suppression hearing was held August 22 and written findings were issued October 27.   (7 RR 8-192; 8 CR 1331). A second hearing was held on the motion to suppress the DNA search warrant on September 18 and the trial court denied it orally from the bench. (24 RR 4-12).

The matter was argued and submitted to the jury, which rendered a guilty verdict. (30 RR 193, 198-202, 208-210; 7 CR 1281-1284).

Petitioner next raised the issue on direct appeal in the Court of Criminal Appeals (CCA). The CCA agreed that the taint of the illegal arrest was sufficiently attenuated under *Brown* because (1) Petitioner had three times received and waived his legal rights under *Miranda,* (2) Petitioner had broken down emotionally and requested to speak to the detective of his own free will, and (3) the police misconduct was not purposeful or flagrant in that the officer arguably had probable cause to get a warrant for credit-card abuse when he arrested Petitioner on a different charge that the officer thought was correct. *Crutsinger*, 206 S.W.3d at 610-11.

In his state habeas petition, Petitioner asserted that the trial court erroneously decided the attenuation issue under *Brown.* (1 SHR 138-39). The state habeas court concluded the claim was not cognizable via a writ of habeas corpus and also rejected the claim on the merits. (1 SHR 1588, 1591-92 (Nos. 4, 38)).

## B. The *Stone* Bar

The United States Supreme Court has held that where a state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. *Stone v. Powell,* 428 U.S. 465, 494 (1976). The Fifth Circuit

5

applies this bar as long as the state gives the defendant an opportunity to litigate the issue, whether or not the defendant takes advantage of the opportunity. *ShisInday v. Quarterman*, 511 F.3d 514, 525 (5th Cir. 2007) (citing *Janecka v. Cockrell*, 301 F.3d 316, 320-21 (5th Cir. 2002)). The mere allegation that the state court erred in its determination of the Fourth Amendment issue does not suffice to circumvent *Stone*. *See Sonnier v. Maggio*, 720 F.2d 401, 409 (5th Cir. 1983). *Stone* forecloses review absent allegations that the processes provided by a state are routinely or systematically applied in such a way as to prevent the actual litigation of Fourth Amendment claims on their merits. *Moreno v. Dretke*, 450 F.3d 158, 167 (5th Cir. 2006)(quoting *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980)).

Petitioner litigated his Fourth Amendment claim before trial, during trial, on appeal, and in state habeas proceedings. He makes no assertion that the state processes are routinely or systematically applied in such a way as to prevent the actual litigation of Fourth Amendment claims on the merits. Rather, Petitioner maintains that the state-court application of *Brown* was unreasonable in this case and that *Doescher v. Estelle*, 616 F.2d 205 (5th Cir. 1980) and *Gamble v. Oklahoma*, 583 F.2d 1161 (10th Cir. 1978) allow the Court to address the correctness of the state-court ruling irrespective of *Stone*. He points out that this issue was granted a certificate of appealability in *Balentine v.*

6

*Quarterman*, No. 2:03-CV-00039 (N.D. Tex. May 2, 2008) (doc. 73), and he seeks to preserve it for further appellate review.

The circumstances in *Doescher*, where the litigation procedure used by the trial court was subsequently declared unconstitutional but not addressed on direct appeal, do not exist in this case. Likewise, the circumstances in *Gamble*, where the state court "willfully refuse[d] to apply the correct and controlling constitutional standards," do not exist here. *Gamble*, 583 F.2d at 1165. Further, the *Stone* issue in *Balentine* was ultimately decided against Petitioner's position. *Balentine v. Quarterman*, 324 F. App'x 304, 307 (5th Cir. 2009) (rejecting claim that state court must correctly apply federal constitutional law for *Stone* bar to apply) (quoting *Swicegood v. Alabama*, 577 F.2d 1322, 1324 (5th Cir. 1978)).[4]  Since Petitioner was not deprived of a full and fair opportunity to litigate his Fourth Amendment claim in state court, *Stone* bars consideration of this ground for relief.

### III.  ASSISTANCE OF TRIAL COUNSEL

In ground two, Petitioner contends trial counsel initiated the social-history investigation too late, which prevented counsel from using evidence obtained by the mitigation specialist of Petitioner's alcohol addiction, head trauma, depression, and low intelligence.  Petitioner contends this evidence should have been

---

[4]Balentine's execution was stayed in 2011 pending resolution of an unrelated issue. *Balentine v. Thaler*, 131 S. Ct. 3017 (2011)

used to (1) challenge the admission of his confession and the tainted fruits thereof, (2) present a "settled insanity" defense and rebut the culpable mental state, and (3) mitigate evidence of his antisocial personality disorder.

## A. Applicable Law

The substance of this three-part claim was not developed or presented in the state-court proceedings.[5]  As this Court has previously determined, Petitioner's failure to develop the factual basis of these claims in state court bars any factual development in this Court. *See Order Denying Motion for Evidentiary Hearing*, p. 6 (doc. 42); 28 U.S.C. 2254(e)(2).  Nevertheless, the record contains sufficient facts to make an informed decision on the merits, and the Court will review the claims de novo. *See* 28 U.S.C. § 2254(b)(2)(providing that writ application may be denied on the merits, notwithstanding the failure to exhaust state remedies); *Porter v. McCollum*, 130 S. Ct. 447, 452 (2009) (making de novo determination of whether counsel was deficient because

---

[5] The claims presented in state court alleged a general failure to investi-gate, failure to adequately communicate with the client, and an attempt to coerce a guilty plea. (1 SHR 127-28; 7 SHR 1564, 1614). The present claims are, there-fore, unexhausted. *See* 28 U.S.C. § 2254(b)(1)(A). This Court stated as much in its *Order Denying Motion for Evidentiary Hearing* (doc. 42, p. 8). Respondent, however, does not assert a procedural bar based on the failure to exhaust, as he does against the third ground for relief. *Answer*, p. 26 (doc. 36). Nor does the Petition or Reply anticipate any such defense by presenting arguments to overcome a procedural bar. Under these circumstances, where the omission appears to be the result of a deliberate decision rather than inadvertent omission, the Court is not inclined to apply a procedural bar sua sponte. *See Magouirk v. Phillips*, 144 F.3d 348, 359-60 (5th Cir. 1998) (holding that district court must consider whether state's failure to raise procedural default is inadvertent or purposeful before exercising discretion to raise it sua sponte).

state court did not decide this element of *Strickland*); *Carty v. Thaler*, 583 F.3d 244, 253 (5th Cir. 2009)(recognizing that the AEDPA-mandated deference to state-court decisions does not apply when the state court did not adjudicate claim on the merits); *e.g., Hernandez v. Thaler*, 398 Fed. App'x 81, 85 n.1 (5th Cir. 2010) (denying appeal of denial of IAC claims, which district court had determined de novo because the state did not assert a procedural bar based on the failure to exhaust).

To prevail under the well-known *Strickland* standard, a petitioner must demonstrate that (1) counsel's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that prejudice, sufficient to undermine confidence in the trial outcome, resulted from the deficiency. *See Bower v. Quarterman*, 497 F.3d 459, 466 (5th Cir. 2007) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). The failure to prove either deficient performance or actual prejudice is fatal to an ineffective-assistance claim. *Strickland*, 466 U.S. at 700.

In evaluating counsel's representation, counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable profes-sional judgment." *See Strickland*, 466 U.S. at 690. Because it is easy to denounce an unsuccessful course of action with the benefit of hindsight, courts should evaluate the challenged conduct from counsel's perspective at that time. *Id.* at 689. Strategic deci-

sions following a thorough investigation are "virtually unchallengeable." *Id.* at 690.  Strategic choices made after a less-than-thorough investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *Id.* at 691.

Under the prejudice element, a "reasonable probability" requires a substantial, not just a conceivable, likelihood of a different outcome. *Harrington v. Richter*, 133 S. Ct. 770, 792 (2011). Conclusory assertions of prejudice do not satisfy the prejudice requirement of *Strickland*. *Green v. Johnson*, 160 F.3d 1029, 1041 (5th Cir. 1998).

## B.  Counsels' Pretrial Representation

Petitioner first contends that counsel should have challenged the voluntariness of his confession on the grounds that he was depressed, of low intelligence, and brain damaged due to long-standing alcohol addiction and a car-accident injury.

### *Counsels' Representation*

On counsels' motion, the trial court appointed a forensic psychologist, Dr. Kelly Goodness, on July 11, 2003, as a mitigation specialist, whose tasks included a social- history investigation. (1 CR 65, 67); Exhibit F.  In addition, psychiatrist Barry Mills was appointed on June 19.  (1 CR 48, 50).

In their affidavit to the state habeas court, trial counsel explained that the opinions of their two mental-health experts

would not have benefitted Petitioner at punishment and that the use of experts would have allowed the State to present evidence based on their own expert's evaluation.   (7 SHR 1420).   Although Petitioner contends this affidavit is vague, conclusory, and self-serving (*Motion for Evidentiary Hearing*, p. 1-2), it is supported by the record.

Counsels' misgivings about a state-sponsored examination are apparent during pretrial proceedings where counsel, after an off-the-record discussion with Petitioner, withdrew his intent to offer psychiatric testimony at punishment in order to avoid introduction of a psychiatric evaluation by the state's expert.   (24 RR 16-18). The trial court agreed and reversed its previous ruling that the state's expert, Dr. Price, could interview Petitioner.   (24 RR 18; 1 CR 42-47).   This corroborates counsels' asserted belief that the evidentiary value of the mental-health evidence was outweighed by the risks associated with its use.   Specifically, when a defendant plans to introduce expert testimony based on his personal psychia-tric interview, the trial court may (as it did in this case) order him to submit to a pre-trial state-sponsored examination, and the defendant may not use the Fifth Amendment as a shield against cross-examination on disputed issues.   *See generally Davis v. State*, 313 S.W.3d 317, 351-52 (Tex. Crim. App. 2010) (citing *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997)); *e.g., Yowell v. Thaler*, No. 10-70026, 2011 WL 4056707, *1-2 n.1 (5th Cir.

11

Sept. 12, 2011) (noting that trial counsel, who made a strategic decision not to present expert testimony based on a psychiatric evaluation of the defendant, stated to the trial court, "Based on my experience in the past, there's probably no way on God's green earth that we're going to do anything to allow the State to examine our client with one of their own experts"). Not only would a State's expert have had unfettered access to Petitioner during a forensic psychological evaluation, but the prosecution in this case would have been entitled to discovery of Dr. Goodness's reports, underlying data, and notes. (1 CR 52-54 (Order Granting State's Motion for Discovery of Expert Witnesses)); *see* Tex. R. Evid. 705 (providing for disclosure of facts or data underlying expert opinion).[6]

The record also supports counsels' assertion that the expert testimony would not have benefitted the defense. Dr. Goodness opined that "chances are" Petitioner's brain is damaged from alcohol abuse and that he does have "some" intellectual and cognitive difficulties. Ex. C, pp. 10, 12. But she cautioned against the usefulness of further neuropsychological testing, and she noted that there is "no particular definitive neuropsychological pattern exhibited by individuals who have damaged their brains due to alcohol use." Ex. C, p. 10. Dr. Goodness diagnosed

---

[6]Of course, counsels' statements during the pretrial proceeding pertained to the punishment phase of trial, but the same risks arise at any phase because the rule focuses on the defendant's choice to break his silence by presenting testimony based on a personal interview. *See Davis*, 313 S.W.3d at 352.

Petitioner with learning disorder, but he is not mentally retarded and tested in the low-average range of intellectual functioning. Ex. C, p. 8.  And although Petitioner's "ability to think with words, react with speed and use common sense is below average," his "ability to visually take-in information, use that information to plan, as well as his analytic reasoning ability are in comparison good." Ex. C, p. 10.  The report also reflects that Petitioner was a forty-eight-year-old man with experience in the criminal justice system dating back to 1974, which tends to undermine the claim of a coerced confession.  Ex. C (Records Review, pp. 2-5).  In sum, the report does not contain strong evidence of brain impairment, much less evidence that brain impairment allowed law enforcement personnel to extract an involuntary confession.

Petitioner supplements his Petition with articles on alcoholism, dating back to the time of trial, which discuss attempts to link brain shrinkage caused by alcoholism to cognitive function and criminal behavior.  Ex. A, B, G.[7]  The conclusions in these research articles are equivocal at best.  One article finds little or no consistent relationship between alcoholism and the cognitive functions of short-term memory and problem solving.  Ex. A, p. 2.  Another concludes that, "No study shows that disorders of the prefrontal cortex predict violent crime."  Ex. G, p. 724.

---

[7]Even though further development of the record is prohibited by 28 U.S.C. § 2254(e)(2), these articles are considered under the Court's power to review the merits of an otherwise unexhausted claim under § 2254(b)(2).

Another appears to corroborate Dr. Goodness's conclusions, suggesting that brain impairment due to alcoholism cannot be distinguished from brain impairment that predates the alcoholism, and further stating, "Our understanding of the frontal lobe changes caused by alcohol . . . remains fragmented." Ex. B, p. 365. These articles do not improve the probative value of Dr. Goodness's report.

On the other hand, the report contains significant aggravating evidence that would have been provided to the prosecution under the trial court's discovery order. For example, Dr. Goodness writes that Petitioner "clearly meets the criteria for Antisocial Personality Disorder in that he has a pervasive pattern of disregard for, and a violation of, the rights of others and has repeatedly broken the law." Ex. C, p. 11. Although Dr. Goodness opined Petitioner would not be a future danger, she found, or presumed, that he possessed four out of the six risk factors associated with future violence among incarcerated murderers. Ex. C, p. 16. She attributes the murders to his alcoholism, alcoholic rage, a downward spiral of problems often caused or worsened by alcohol, and a "lifelong lack of consequences," which taught him he could get away with acting on his impulses and desires because others often bailed him out of financial problems or legal scrapes. Ex. C, p. 12-14. The witness interview summaries depict a man who physically abused his wife and never cared about his children, who

14

lied easily, who stole from people close to him including his handicapped siblings, whose mother rescued him his whole life even though he mistreated her, and who had threatened to kill his family members on more than one occasion. Ex. C (Collateral Interview Summaries, pp. 1-12).

As Petitioner points out, trial counsel knew that the confession was "the" critical piece of evidence in the case. (7 CR 1419). Indeed, counsel challenged the confession and its evidentiary fruits in four motions to suppress and two hearings. *See supra* note 3. Counsel convinced the trial court of the illegality of the arrest and relitigated the suppression issue before the jury. Counsel also recognized the possible issues regarding their client's mental capacity and the need for expert assistance. They requested and received funds to employ a psychiatrist and a psychologist to assist at trial "and testify, if necessary." (1 CR 48, 65). That Dr. Goodness provided an opinion unhelpful to the defense does not render counsel ineffective. *See Dowthitt v. Johnson,* 230 F.3d 733, 748 (5th Cir. 2000) (holding that counsel was not deficient by not canvassing the field to find a more favorable defense expert).

To be clear, Petitioner does not contend that the social-history investigation was less than thorough or overlooked any helpful information. Rather, he contends that counsels' decision not to use it to challenge the voluntariness of his confession was

15

unreasonable because counsel made the decision before Dr. Goodness generated her final, written report. This allegation assumes that trial counsel received no information from Dr. Goodness until the day she issued the written report. Such an assumption is contradicted by the record.

Dr. Goodness's report reflects that she would make an oral report to Petitioner's counsel and only prepare a written report if counsel requested one. Ex. C, p. 3. The report further shows that on August 4, 5, and 8, 2003, Dr. Goodness reviewed Petitioner's school, hospital, probation, criminal history, substance-abuse treatment, and jail records; a letter written by his mother to a judge; and the autopsy reports. Ex. C (Records Review). Dr. Goodness and her staff[8] conducted clinical interviews and testing of Petitioner on July 23 and 30 and August 8, 14, and 26. Ex. C, p. 3. Thus, although Dr. Goodness did not issue her written report until September 10, she and her staff were gathering information well before that date and before the date of the suppression hearing, which was August 22. (7 RR). Given Dr. Goodness's intent to first present counsel with an oral report of her findings, Petitioner's assumption that counsel did not consult his retained expert until September 10 is not supportable. The fact that the written report post-dates the suppression hearing does not

---

[8]Dr. Goodness utilized the services of a social worker and a psychological associate to collect data and conduct 14 hours of clinical interviews with Petitioner. Ex. F, p. 1; Ex. C, p. 3.

undermine the reasonableness of counsels' chosen strategy at the hearing.[9]

## *Prejudice*

Even assuming, however, that the record could support a finding that trial counsels' strategy was developed without the benefit of Dr. Goodness's investigation, it does not show prejudice. Regarding the pretrial portion of counsels' representa-tion, Petitioner alleges, "The absence of evidence of . . . mental impairments pre-trial, resulted in the mistaken conclusion by the state courts' [sic] that because the confession was voluntary, the confession, as well as all the evidence flowing from it, was admissible." *Petition,* pp. 52-53. This conclusory assertion fails to allege the prejudice required by *Strickland. See Mallard v. Cain*, 515 F.3d 379, 383 (5th Cir. 2008); *Green*, 160 F.3d at 1041.

In any event, the determination of an involuntary-confession claim is guided by the due-process voluntariness test, which the Supreme Court has refined into an inquiry that examines "whether a defendant's will was overborne" by the circumstances surrounding

---

[9]Petitioner's untimeliness allegation is also based on letters from Dr. Goodness and her staff, written before she was retained, indicating that "it would be difficult if not impossible" to collect all the information necessary in less than three months, and that Dr. Goodness would no longer take cases with trial dates fewer than three months away.   Ex. C, D, E; *Petition,* p. 37. Regardless of the stated preference for three months' lead time, Dr. Goodness accepted the July 11, 2003 court appointment for a trial that began on September 22, about two and a half months later.  Ex. F; (1 CR 67; 27 RR 1).  She prepared her written report twelve days before trial began, which contradicts her previously asserted three-month requirement, at least in this particular case. Here, again, the Court notes that Petitioner does not challenge the thoroughness of the report.

the giving of a confession. *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckcloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).  To establish that his confession was involuntary, a defendant must demonstrate that it resulted from coercive police conduct, and it is essential that there be a link between the coercive conduct of the police and the confession of the defendant. *Hopkins v. Cockrell*, 325 F.3d 579, 584 (5th Cir. 2003) (citing *Colorado v. Connelly*, 479 U.S. 157, 163-65 (1986)).

Petitioner fails to identify any coercive tactics by the police that would have rendered his confession involuntary. *Petition*, pp. 52-53.  The additional circumstances surrounding the confession, which Petitioner does not contest, show that he is a middle-aged man with multiple prior arrests, that he expressed remorse and asked to speak to the detective, that he appeared cooperative and willing to talk, and that he was given *Miranda* warnings three times.  (7 RR 18-19, 28-29, 65-66, 153-54; 31 RR 57); Ex. C (Records Review).  He had been drinking in a bar at the time of arrest but was not intoxicated. (7 RR 58-59).  In Petitioner's recorded confession, he says that, after the murders, he kept telling himself to "just go ahead and tell the police what you did, you know, and get it behind you . . . go to the FBI, you know.  You are sick[;] you are going to need some help."  State's Pretrial Ex. 4, p. 12; 7 RR 26-27.  This is strong evidence that Petitioner was of a mind to confess even before he encountered the

18

police in Galveston.   A challenge to the voluntariness of the resulting confession using the contents of Dr. Goodness's report would have been futile under these circumstances.

Counsels' investigation in this case was not deficient, but was guided by sufficient information upon which a reasonable strategic decision could be made.   The decision not to use Dr. Goodness's report to challenge the voluntariness of the confession was a reasonable strategy given its weak probative value and the associated risks.   Further, Petitioner was not prejudiced by the decision because the information upon which he relies would not have convinced a fact finder that his confession was involuntary under the circumstances.

### C.   Counsels' Guilt-Phase Representation

Petitioner next contends that counsel should have used evidence of his long-term alcohol addiction to present the defense of "settled insanity" and to negate the alleged mens rea.   Had they done so, Petitioner contends the jury would have reached a different result as to his culpability.

*Delirium Tremens as an Insanity Defense*

According to Petitioner, Texas law since 1892 has recognized the defense of "settled insanity" (as opposed to temporary insanity due to intoxication) which is defined as follows: "Delirium tremens, caused by the breaking down of the person's system by long continued or habitual drunkenness and brought on by the abstinence

19

from drink." *Petition*, p. 50; *Evers v. State*, 20 S.W. 744, 748 (Tex. Crim. App. 1892); *see also Thomas v. Texas*, 177 S.W.2d 777, 779 (Tex. Crim. App. 1944); *Duke v. Texas*, 134 S.W. 705, 708 (Tex. Crim. App. 1911).

Section 8.01 of the Texas Penal Code defines the insanity defense. *See* 1993 Tex. Gen. Laws 900 (now codified in Tex. Penal Code Ann. § 8.01(a) (West 2011)). Section 8.01(a) states: "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." *Id.* The insanity defense in section 8.01 is the only "diminished capacity" defense to criminal responsibility in Texas. *Ruffin v. Texas* 270 S.W.3d 586, 593 (Tex. Crim. App. 2008). Texas does not recognize any form of insanity short of the inability to distinguish right from wrong. *See Jackson v. Texas*, 160 S.W.3d 568, 572 (Tex. Crim. App. 2005) (holding that Texas does not recognize diminished capacity as an affirmative defense but only as a "failure-of-proof" doctrine in which the defendant claims that, due to his mental or physical impairments, the state failed to prove he had the required state of mind at the time of the offense). To the extent this claim relies on a definition of "settled insanity" that is different from insanity as defined in section 8.01, there is no legal basis for it.

As for Petitioner's apparent claim that counsel should have raised an insanity defense under section 8.01 (i.e., that delirium tremens due to long-term alcoholism caused Petitioner not to know his conduct was wrong), there is no factual basis for it. While Dr. Goodness allowed that Petitioner's brain "does not function in an altogether average manner," this is a long way from establishing that he did not know his conduct was wrong. Ex. C, p. 10. If anything, Dr. Goodness believed that Petitioner was intoxicated at the time of the offense, not insane due to alcohol withdrawal or delirium tremens. She identified "alcoholic rage" as a factor that contributed to his crime. Ex. C, p. 14. She reported that he drank several beers before going to the victims' house and, "as he was growing increasingly more prone to do when drinking alcohol, [Petitioner] went into a rage when he realized" that the victims would not hire him to work. Ex. C, p. 14. Voluntary intoxication on the part of a defendant, even an alcohol-addicted defendant, does not constitute any defense to the commission of a crime in Texas. *See* 1993 Tex. Gen. Laws 900 (now codified at Tex. Penal Code Ann. § 8.04(a) (West 2011)); *Raby v. State*, 970 S.W.2d 1, 4 (Tex. Crim. App. 1998); *Heard v. State*, 887 S.W.2d 94 (Tex. App.–Texarkana 1994, pet. ref'd) (rejecting argument that, to an alcoholic, drinking is not voluntary); *see also Hernandez v. Johnson*, 213 F.3d 243, 250 (5th Cir. 2000) (noting that Texas courts have consistently ruled that alcoholism may not be the basis

for an involuntary intoxication defense).   There is no evidence supporting an insanity defense in this case.

*Alcohol-Related Brain Damage to Negate the Mens Rea*

Petitioner alternatively contends that counsel should have introduced his alleged settled insanity evidence as relevant "condition-of-the-mind" evidence under article 38.36 of the Texas Code of Criminal Procedure to negate the mens rea.[10]   In ground three, however, Petitioner asserts that there was confusion in the law at the time of trial as to whether a defendant could introduce mental impairment evidence to negate mens rea and that this confusion ended only in 2005, when the CCA issued *Jackson*, 160 S.W.3d 568.   *Petition*, p. 59-61.   If this is true, then counsel cannot be deemed ineffective for failing to predict the future. *Ogan v. Cockrell*, 297 F.3d 349, 360 (5th Cir. 2002) (stating that assessment of counsel's performance under *Strickland* is based upon the law that existed at the time of trial); *Ex parte Chandler,* 182 S.W.3d 350, 359 (Tex. Crim. App. 2005) (holding that legal advice that only later proves to be incorrect does not normally fall below *Strickland*'s objective standard of reasonableness).

In any event, the Court assumes for purposes of this claim, as does Petitioner, that mental-impairment evidence less than insanity

---

[10]Article 38.36 provides that "In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to . . . all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."   Tex. Code Crim. Proc. Ann. art. 38.36(a) (West 2002).

was admissible to negate mens rea at the time of trial.   Under *Jackson* and its progeny, a defendant may present any relevant evidence (except for intoxication) that a jury may consider to negate the mens-rea elements, just as he may present evidence to negate any other elements of the alleged offense.   *Jackson*, 160 S.W.3d at 574; *see Davis*, 313 S.W.3d at 328-29 (holding that intoxication evidence is inadmissible to negate mens rea).   But such evidence must "truly negate the mens rea." *See, e.g., Ruffin*, 270 S.W.3d at 594, 596 (explaining that, if a defendant suffers from delusions such that he sees a "trespasser" or "Muslim" when everyone else around him sees a police officer, he cannot be convicted of intentionally shooting at a police officer).

Petitioner fails to identify any condition of his mind that shows he did not "intentionally cause the death" of the victims, the mental state alleged in this case.   1 CR 3.   Evidence of general cognitive impairment, unconnected to Petitioner's intent during the commission of the offense, does not negate the allegation that he intended to cause the victims' deaths.   *See United States v. Cameron*, 907 F.2d 1051, 1067-68 (11th Cir. 1990) (stating that psychiatric evidence is admissible to negate specific intent when such evidence focuses on the defendant's specific state of mind at the time of the charged offense, but that generalized psychiatric testimony failed to negate intent); *Ruffin*, 270 S.W.3d at 596 n. 32 (citing *Cameron*).   Here, in fact, Dr. Goodness's

findings confirm that Petitioner intentionally caused the victims'
death during an alcoholic rage because they would not hire him to
work.  *See, e.g., Jackson*, 160 S.W.3d at 572 (observing that
evidence of defendant's paranoia provided motive for the
intentional murder of his brother).

There is no evidence that Petitioner was insane at the time of
the offense or lacked intent to cause the victims' deaths.
Therefore, counsel was not ineffective for failing to present men-
tal impairment evidence on the issue of insanity or to negate the
culpable mental state.  *See United States v. Kimler*, 167 F.3d 889,
893 (5th Cir. 1999) (holding that an attorney's failure to raise a
meritless argument cannot form the basis of a successful ineffec-
tive-assistance-of-counsel claim); *Sones v. Hargett*, 61 F.3d 410,
415 n.5 (5th Cir. 1995) (noting that counsel cannot be deficient
for failing to press a frivolous point).

E.  Counsels' Sentencing-Phase Representation

Petitioner's remaining allegation regarding counsels' repre-
sentation is that counsel should have presented the mental-
deficiency evidence in Dr. Goodness's report to mitigate punish-
ment.  Petitioner contends this evidence would have proved the non-
volitional nature of Petitioner's aggression by showing the
correlation between brain injury and antisocial behavior, leading
the jury to conclude he was less morally culpable than a defendant
who acts deliberately.  *Petition*, p. 52.

24

*Counsel's Representation*

Counsels' affidavit in the state habeas proceeding indicates that they did not perceive their expert reports to be beneficial to the defense.  The Court has already concluded that this strategic decision, made after hiring two experts to assist with mental-health issues, was reasonable given the content of the report and the risk associated with triggering a state-sponsored psychiatric examination.  Petitioner states that a timely investigation would have uncovered scientific literature that explained Petitioner's antisocial personality disorder as a non-volitional act.  *Reply*, p. 6.  He cites for support a scientific article which states that persons with traumatic and neurodegenerative disorders involving the prefrontal cortex display increased rates of aggressive and antisocial behavior.  *Reply*, p. 6-7.

Assuming, for the sake of argument, that Petitioner can show he has such a level of brain impairment, this same article also states that, "No study, however, shows that disorders of prefrontal cortex predict violent crime," and that "few studies attributing violent crime to frontal lobe dysfunction adequately address concurrent psychosocial variables such as emotional stress, drug and alcohol misuse, physical and sexual abuse, family breakdown, and poverty."  Ex. G, p. 724.  It also observes, "The reported reductions in prefrontal size or activity may, therefore, represent a predisposition to affective states relevant to aggressive

behaviour, without necessarily signifying an incapacity to avoid actual violent acts." *Id.* As previously noted, the article is equivocal evidence at best, does not assign an involuntary cause to antisocial personality disorder, and does not undermine the reasonableness of counsels' decision not to use Dr. Goodness's report at sentencing.

Dr. Goodness was aware of all the factors that Petitioner now contends contributed to brain impairment--the car accident, depression, low-average intelligence, and alcoholism. She nevertheless attributed the murders to Petitioner's (1) alcoholism, (2) lifelong lack of consequences, (3) a downward spiral of problems that resulted directly from or were worsened by, his alcoholism, and (4) alcoholic rage. Exhibit C, p. 12-14. Petitioner's contention that Dr. Goodness should have been called to testify about the involuntary nature of antisocial personality disorder overlooks her conclusion that alcohol abuse was a direct and indirect cause of this crime--a conclusion that Dr. Goodness would most certainly be asked to admit on cross-examination. Since the evidence does not reasonably support an argument that Petitioner's crime was cause by non-volitional frontal-lobe impairment as opposed to alcohol abuse, counsel was not ineffective for failing to make such an argument. *See Byrd v. Smith*, No. 93-6939, 1995 WL 8928, *4 (4th Cir. Jan 11, 1005) (holding that counsel's failure to make a jury argument unsupported by the trial evidence is not error).

Petitioner contends this case is similar to *Walbey v. Quarterman*, 309 Fed. Appx. 795, 2009 WL 113778 (5th Cir. Jan. 19, 2009), in which the court of appeals concluded that trial counsel rendered ineffective assistance, in part because counsel failed to discover and present evidence that would have explained Walbey's antisocial personality. *Reply*, p. 6. Trial counsel in *Walbey* hired a mental-health expert one week before trial, and no mitigation investigation was conducted. *Walbey*, 309 Fed. Appx. at 797. Walbey's attorney therefore overlooked evidence of Walbey's abandonment by the murder victim, who was his former foster mother, as well as evidence of Walbey's nightmarish childhood of "blood-curdling" neglect and abuse. *Id.* at 797, 803. Walbey's counsel was also unprepared to challenge his own expert's admission that Walbey could be diagnosed with antisocial personality disorder, even though the expert disagreed with such a diagnosis. *Id.* at 804.

The facts of this case are nothing like *Walbey*. Counsel here hired a forensic psychologist who, with the assistance of a social worker and psychological associate, conducted a mitigation investigation that is documented in a twenty-three page report. That report is supported by interviews with Petitioner's friends and family, document review summaries, a criminal history, fourteen hours of clinical interviews with Petitioner, and the administration of nineteen different psychological instruments.

27

Ex. C, D.  In addition, counsel retained a psychiatrist.  Unlike *Walbey*, Petitioner's expert *agreed* with the diagnosis of antisocial personality disorder, a factor that supports the decision *not* call her to testify.  If anything, the *Walbey* opinion demonstrates by contrast that counsels' decision in this case was based on a reasonable investigation.

*Prejudice*

Alternatively, there is no prejudice.  To determine whether Petitioner has made a showing of prejudice, the Court ascertains whether there is a reasonable probability that, absent the alleged errors, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant a death sentence.  *See Strickland*, 466 U.S. at 695.  The Court must evaluate the totality of the available mitigation evidence presented both at trial and in the habeas proceeding and reweigh it against the evidence in aggravation.  *See id*. at 694.

Petitioner's allegation of prejudice, that the jurors were left with "evilness" as the only explanation for Petitioner's conduct, is not true.  Trial counsels' sentencing strategy consisted of testimony that Petitioner behaved well while incarcerated (31 RR 155-60; 32 RR 4-16); that he had an unstable upbringing and was a "train wreck of a child" (33 RR 16-17, 25; that all of his bad behavior is connected to alcohol abuse, which he learned from his father at a young age, and which would not be

a factor in prison (32 RR 57-59, 68-70, 88, 94-95, 101, 103-06, 1115, 118); that he was deeply affected by the deaths of many people close to him, including three of his children (32 RR 46-47, 64-68); and that he was sad and overwhelmingly desperate in the weeks leading up to the offense (32 RR 33-39, 44); (33 RR 16-26 (closing argument)).

In contrast, Dr. Goodness's report would have confirmed the antisocial personality disorder diagnosis, as well as the fact that Petitioner was an indulged, favored child who never suffered the consequences of his impulsive acts until he was in his forties. Had counsel chosen to present Dr. Goodness's testimony, her report would have provided the prosecution with information specifically from Petitioner's sister who told Dr. Goodness that she would be "pleased to say how horrible she thinks he is in front of a jury." Ex. C (Interview Summaries, p. 8). The prosecution would have been provided with the sister's opinion of Petitioner as an over-protected son who assaulted and stole from an elderly mother "who let him get away with it," and refused to press charges. Ex. C. (Interview Summaries, p. 8). Instead, trial counsel were able to present Petitioner as a neglected child whose mother had to be arrested before she would come testify for him. 33 RR 17.

Dr. Goodness's report would have also corroborated the prose-cution's evidence regarding Petitioner's criminal history, spouse abuse, and child abuse. (31 RR 2-145). To the extent Dr. Goodness

opined on Petitioner's mental functioning, she reported minimal evidence of brain impairment, likely caused by his volitional abuse of alcohol.  Her report, the mitigation value of which Petitioner overstates, would not have changed the jury's assessment of his moral blameworthiness, nor does it show that the trial cannot be relied on as having produced a just result.  *See Strickland*, 466 U.S. at 686 (clarifying the purpose of the effective-assistance guarantee); *Mitchell v. Epps*, 641 F.3d 134,152 (2011) (denying appeal on *Strickland* claim because, among other things, the mental health information that the defendant claimed counsel should have presented contained damaging facts that would not have helped in persuading the jury to spare his life).  Accordingly, Petitioner was not prejudiced by the alleged errors of counsel, and the Court denies this second ground for relief.

### III.  ACTUAL INNOCENCE

Petitioner's third ground for relief is a free-standing actual-innocence claim asserted under *Herrera v. Collins*, 506 U.S. 390 (1993).  He contends that his alcohol addiction very likely resulted in brain damage that produced a settled insanity, calling into question whether his acts of killing were intentional. *Petition*, pp. 58-59.  Petitioner concludes that if, due to mental impairment, he did not have the intent to cause the victims' deaths, then he is actually innocent of capital murder.

Respondent argues that this claim is unexhausted and procedurally barred because Petitioner would be foreclosed from presenting it now in state court. *See* 28 U.S.C. § 2254(b); *Coleman v. Thompson,* 501 U.S. 722, 735 n.1 (1991); *Woodfox v. Cain*, 609 F.3d 774, 793 250, 254 (5th Cir. 1999). The Court need not address the exhaustion issue, however, because a claim of actual innocence under *Herrera*, independent of any constitutional error, does not state a basis for federal habeas relief. *See Herrera*, 506 U.S. at 400 (holding that claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state proceeding); *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003); *cf. State ex rel. Holmes v. Court of Appeals*, 885 S.W.2d 389 (Tex. Crim. App. 1994) (holding that state habeas proceeding is an appropriate vehicle in which to assert a factual innocence claim based on newly discovered evidence).

Furthermore, even if this claim were cognizable, it would fail on the merits. "Actual innocence" means that, as a factual matter, Petitioner did not commit the crime of conviction. *See Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999). A free-standing actual-innocence claim of the sort addressed in *Herrera* must meet an extraordinarily high standard of proof based on newly discovered evidence. *See Herrera,* 506 U.S. at 417 (assuming for the sake of

argument that actual-innocence claims warrant federal habeas relief, the threshold showing for such an assumed right would be extraordinarily high); *see also Ex parte Chavez*, 213 S.W.3d 320, 322 (Tex. Crim. App. 2006) (holding that a habeas applicant making bare innocence claim must show by clear and convincing evidence that, presented with both the inculpatory evidence at trial and the newly discovered evidence of innocence, no reasonable juror would have convicted him). Newly discovered evidence is evidence that was not known to the defendant at trial and could not have been known to him even with the exercise of due diligence. *Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006) (defining "newly discovered evidence").

Petitioner presents no new evidence of his innocence, but rather a legal theory based evidence that was available at the time of trial. Further, such evidence does not demonstrate that as a factual matter, Petitioner did not commit the crime of conviction. Assuming Dr. Goodness's report could have been presented to the jury to determine his culpable mental state, its contents do not demonstrate a lack of intent. Dr. Goodness observes that the forty-eight year-old Petitioner had been recently abandoned by a mother who enabled him to avoid the consequences of his impulsive acts his entire life. He approached the victims looking for work and went into an alcoholic rage when they would not hire him. Exhibit C, p. 12-13. Dr. Goodness concludes, "All of his anger at

32

being left to fend for himself and of having his safety net taken from him was then brought to bear on the victims." Exhibit C, p. 12-14. She does not opine that he did not intend to stab the victims to death, but provides a motive and explanation as to why he intentionally killed them. Accordingly, the actual-innocence claim lacks merit. *See Ruffin*, 270 S.W.3d at 593 (Texas does not permit the exoneration or mitigation of an offense because of a person's supposed psychiatric compulsion, inability to engage in normal reflection or moral judgment, or impaired ability to reason through the consequences of his actions because of a mental disorder). Because bare innocence claims are not a ground for federal habeas relief and because this particular innocence claim lacks merit, ground three is denied.

The Petition for Writ of Habeas Corpus is DENIED. The clerk of the Court shall transmit a copy of this order to Petitioner by certified mail, return receipt requested.

SIGNED February 6, 2012.

*Terry R. Means*
_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/ks:be

33