REPORTER'S RECORD
VOLUME 2 OF 36 VOLUMES
TRIAL COURT CAUSE NO. 0885306D

| | | |
|---|---|---|
| THE STATE OF TEXAS | X | IN THE DISTRICT COURT |
| VS. | X | TARRANT COUNTY, TEXAS |
| BILLY JACK CRUTSINGER | X | 213TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CENTRAL JURY ROOM

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 7th day of August, 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Robert K. Gill, Judge presiding, held in Fort Worth, Tarrant County, Texas.

Proceedings reported by computerized stenotype machine.

FILED IN
COURT OF CRIMINAL APPEALS

AUG 2 6 2004

Troy C. Bennett, Jr., Clerk

**APPEARANCES**

HONORABLE MICHELE HARTMANN          SBOT NO.09167800
   and
HONORABLE LISA CALLAGHAN            SBOT NO.  0116700
Assistant District Attorneys
401 W. Belknap
Fort Worth, Texas 76196
Phone: (817) 884-1700               FOR THE STATE


HONORABLE WILLIAM H. RAY            SBOT NO. 16608700
5041 Airport Freeway
Fort Worth, Texas 76117
Phone:  817-831-8383
         And
HONORABLE TIM MOORE                 SBOT NO. 14378300
115 West 2nd Street
Suite No. 202
Fort Worth, Texas 76102
817-332-3822                        FOR THE DEFENDANT

## INDEX - VOLUME 2
## CENTRAL JURY ROOM

**August 7, 2003**                                                                    **PAGE**

Jury Panel Sworn......................................................................................   3

Instructions to Jury Panel.........................................................................   3

Exemptions Claimed.................................................................................   9

Reporter's Certificate...............................................................................   16

Page 1

```
 1              REPORTER'S RECORD
 2           VOLUME 2 OF 36 VOLUMES
 3        Trial Court Cause No. 0885306D
 4   THE STATE OF TEXAS    X   IN THE DISTRICT COURT
 5   VS.                   X   TARRANT COUNTY, TEXAS
 6   BILLY JACK CRUTSINGER X   213TH JUDICIAL DISTRICT
 7   -------------------------------------------
 8              CENTRAL JURY ROOM
 9   -------------------------------------------
10      On the 7th day of August, 2003, the following
11   proceedings came on to be heard in the above-entitled and
12   -numbered cause before the Honorable Bob Gill, Judge presiding,
13   held in Fort Worth, Tarrant County, Texas:
14
15      Proceedings reported by computerized stenotype
16   Machine; Reporter's Record produced by Computer-Assisted
17   Transcription.
18
19
20
21
22
23          STEVE SCHILLER, Texas CSR No. 4665
24              Official Court Reporter
                213th Judicial District Court
25               Tarrant County, Texas
```

Page 2

```
 1           PROCEEDINGS
 2           (August 7, 2003)
 3           (Morning Session:)
 4      THE COURT: Good morning, ladies and gentlemen.
 5   While you are filling out the questionnaires, let me address
 6   you. My name is Bob Gill I am Judge of the 213th District Court
 7   of Tarrant County, Texas.
 8      You have been summoned here as prospective jurors
 9   in a felony criminal case. The case on trial is the State of
10   Texas versus Billy Jack Crutsinger in which the
11   Defendant is charged with the capital murder. The State of
12   Texas alleges in this case that the Defendant participated in a
13   capital murder in April of 2003.
14      The parties that are going to be involved in the
15   trial of the case are seated at the two tables at either side of
16   me. At the table to my right and your left is the Defendant,
17   Billy Jack Crutsinger. He's represented by two attorneys in
18   private practice here in Tarrant County, Mr. Bill Ray and Mr.
19   Tim Moore.
20      At the table to my left are two Assistant
21   District Attorneys representing the State of Texas, Ms. Michelle
22   Hartmann and Ms. Lisa Callaghan.
23      This morning I am going to go through a process
24   of qualifying and instructing you as prospective jurors in this
25   case. In order that we properly conduct today's proceedings, I
```

Page 3

```
 1   must administer to you an oath, so please raise your right hand.
 2      (Jury panel sworn)
 3      THE COURT: Now I have to ask you three questions
 4   to test your qualifications.
 5      First, except for failure to register, are you a
 6   qualified voter in this county and state under the Constitution
 7   and laws of this state?
 8      Please raise your hand if you are not qualified
 9   to vote in Tarrant County.
10      (No response)
11      THE COURT: Question 2: Have you ever been
12   convicted of theft, which can include hot checks, or any
13   felony. Please raise your hand.
14      (No response)
15      THE COURT: Question 3: Are you under
16   indictment or legal accusation for theft, including hot checks,
17   or any felony? Please raise your hand.
18      (No response)
19      THE COURT: No one has raised their hand, so
20   everyone here is qualified.
21      I am now going to instruct you on the law as it
22   pertains to capital murder cases in the state of Texas. These
23   instructions are general in nature. The final instructions
24   regarding the law of the case will be given to the jury in a
25   written document called the Court's Charge after all of the
```

Page 4

```
 1   evidence in the case has been heard.
 2      You are instructed as follows: The Defendant in
 3   every criminal case is presumed to be innocent. The State of
 4   Texas has the burden of proving the Defendant guilty, and it
 5   must do so by proving each and every element of the offense
 6   charged beyond a reasonable doubt. If the State fails to do so,
 7   the presumption of innocence is sufficient to acquit the
 8   Defendant.
 9      It is not required that the prosecution prove
10   guilt beyond all possible doubt, but it is required that the
11   prosecution's proof excludes all reasonable doubt concerning
12   the Defendant's guilt. The law does not require a defendant to
13   prove his innocence or to produce any evidence at all.
14      The return of an indictment by a Grand Jury is no
15   evidence of guilt. The fact that a person has been arrested,
16   confined or indicted for or otherwise charged with an offense
17   gives rise to no inference of guilt at his trial.
18      Our law provides that a Defendant may testify in
19   his own behalf if he chooses to do so. This, however, is a
20   privilege accorded to a Defendant, and in the event he chooses
21   not to testify, that fact cannot be taken as a circumstance
22   against him, which means that you must not refer or allude to
23   that fact throughout your deliberations or take it into
24   consideration for any purpose whatsoever as a circumstance
25   against him.
```

Page 5

1 To be qualified to be a juror, you must be able
2 to take and apply the following oath: You and each of you do
3 solemnly swear that in the case of the State of Texas against
4 Billy Jack Crutsinger, you will a true verdict render according
5 to the law and the evidence, so help you God.
6 To be a juror in a criminal case, you must be
7 free from bias or prejudice in that particular case. This does
8 not mean that you cannot have heard about the case. It does not
9 mean that you have to condone the type of conduct charged in the
10 case. It does mean that you have to keep an open mind, consider
11 only the evidence admitted before you during the trial and apply
12 the evidence to the law which will be given you by the Court in
13 the written Court's Charge.
14 Criminal cases in Texas are tried in two separate
15 phases; first the guilt-innocence phase, and second the
16 punishment phase. At the first phase of the trial, the issue to
17 be resolved by the jury is whether the Defendant is guilty or
18 not guilty of the offense as charged.
19 If the jury finds the Defendant guilty of an
20 offense, that same jury is then called upon to participate in
21 the second phase of the trial, which I referred to earlier as
22 the punishment phase.
23 If a Defendant is found guilty of capital murder,
24 the jury is called upon in the punishment phase to
25 answer certain questions called special issues. Depending on

Page 6

1 the answers to the special issues, the Judge is called upon to
2 assess one of two possible punishments: either death by lethal
3 injection or life in prison.
4 In answering the special issues, the jury shall
5 consider all the evidence submitted to them in the guilt-
6 innocence phase of the trial as well as that submitted during
7 the punishment phase, including any evidence of the Defendant's
8 background or character or the circumstances of the offense that
9 militate for or mitigate against the imposition of the death
10 penalty.
11 The special issues to be submitted to the jury
12 are to be answered yes or no and are as follows:
13 Special Issue No. 1: Do you find from the
14 evidence beyond a reasonable doubt that there is a possibility
15 that the Defendant would commit criminal acts of violence that
16 would constitute a continuing threat to society?
17 If the jury answers Special Issue No. 1 yes, then
18 it is called upon to answer a second special issue that reads as
19 follows:
20 Special Issue No. 2: Taking into consideration
21 all of the evidence, including the circumstances of the offense,
22 the Defendant's character and background and the personal moral
23 culpability of the Defendant, do you find that there is
24 sufficient mitigating circumstance or circumstances to warrant
25 that a sentence of life imprisonment rather than a death

Page 7

1 sentence be imposed?
2 In any case, you must hear and consider only the
3 evidence presented before you in court. Until the case is
4 submitted to the jury for determination, no juror or prospective
5 juror may discuss the case within anyone or remain within the
6 hearing of anyone who is discussing it. Nor may you read any
7 newspaper article, listen to any radio broadcast or view any
8 television program that discusses the case.
9 After the case has been submitted to the jury,
10 the jury may discuss it only in the jury room when all members
11 of the jury are present.
12 All jurors must keep an open mind and must not
13 decide any issue in this case until it is submitted to the jury
14 for deliberation under the Court's instructions.
15 On Monday, August 18 we will begin individual
16 interviews of prospective jurors. Individual juror interviews
17 are required by law in capital murder cases. We will conduct
18 the individual interviews for approximately the next five
19 weeks. I expect the actual trial to begin around September 22
20 and to last for approximately five to seven business days.
21 Each of you will be contacted by a representative
22 of the court and directed when to report for your individual
23 interviews.
24 The scheduling will be done as we work through a
25 numeric list of your names, so if you are toward the end of the

Page 8

1 list, you may not hear from us for a month or so.
2 The individual interviews will be conducted on
3 the fifth floor of this building in the 213th District Court.
4 It is very important that you report at the time you are
5 scheduled. If you have an emergency that requires you to be
6 unavailable for a period of time, please contact the Court as
7 soon as you are able.
8 If we are able to empanel a jury before we reach
9 you on our list, you will be contacted by a representtive of the
10 Court and advised that you are excused from jury duty. Until
11 you hear from us one way or another, please be aware that you
12 are a potential juror in this case and that these instructions
13 continue to apply to you.
14 During the individual interview, the attorneys
15 for the State and Defendant will be asking questions of you
16 concerning your qualifications, background, experiences and
17 attitudes. In questioning you, they will not be permitted to
18 meddle in your personal affairs, but will be trying to select
19 fair and impartial jurors who are free from any bias or
20 prejudgment in this particular case.
21 Between now and the time of your individual
22 interview, please give some thought as to where you stand on the
23 legal issues in this case, especially the death penalty. These
24 matters will be discussed with you further during your
25 individual interview. At the end of the individual interview,

Page 9

1  you will be told whether you need to return to court for further
2  proceedings in the case.
3          There is a small possibility that the jury will
4  have to be sequestered during the trial.  Whether sequestration
5  will be necessary will depend on the intensity of local media
6  coverage and other factors.  The chance that the jury will be
7  sequestered is less if you will strictly follow the instructions
8  of the Court.
9          You have been asked to fill out questionnaires.
10 You have begun that I believe.  The purpose of that
11 questionnaire is to reduce the time it takes to conduct the
12 individual interview.  Please keep in mind that the oath to tell
13 the truth that you took a few moments ago applies to you as you
14 fill out that questionnaire.
15         This concludes the instructions from the Court.
16 I can now hear individually from anyone who wishes to claim a
17 legal exemption or who has a noneconomic hardship that would
18 make jury service difficult.  Please bring all of your paperwork
19 to the bench with you when you come up, and everybody who has an
20 exemption or noneconomic hardship matter can form a line right
21 up here, and we can take those matters up.
22         (Proceedings held at the bench)
23         THE COURT: This is No. 29, Robert Craft.  What
24 is your situation?
25         PROSPECTIVE JUROR: I was the victim of a violent

Page 10

1  crime back in high school.  I was stabbed in the chest.  I was
2  Care Flighted to Harris Methodist, and there was a Grand Jury
3  hearing and they decided, I believe, to not take the case to
4  trial.
5          THE COURT: That's a matter they will have to
6  take up more with you at your individual interview.
7          PROSPECTIVE JUROR: Okay.
8          THE COURT: Thank you.
9          PROSPECTIVE JUROR: I'm No. 25.
10         THE COURT: Mr. Vanpelt?
11         PROSPECTIVE JUROR: Yes, sir.
12         THE COURT: What is your situation?
13         PROSPECTIVE JUROR: A real good friend of ours,
14 her daughter was murdered, and it was about five or six years
15 ago, and I still have that definitely in my mind.  They were --
16 they are the Godparents of our child and --
17         THE COURT: That's a matter they will have to
18 take up with you more in the individual interview.
19         PROSPECTIVE JUROR: All right.
20         THE COURT: Thank you.
21         Name and number, please?
22         PROSPECTIVE JUROR: Martha Congleton.  I am
23 Juror No. 68.  I am the education coordinator for the University
24 of Texas Ob-gyn.  In the time of September we will be actively
25 recruiting our resident candidates for the upcoming season.  My

Page 11

1  backup in my office is me, and it would really put a hardship on
2  the office if I were out for five to seven days for service on a
3  jury.  I would be happy to take any on another case.  It is not
4  an economic hardship; it is a hardship of the office structure.
5          THE COURT: They will have to discuss that with
6  you at the individual interviews.
7          Name and number, please.
8          PROSPECTIVE JUROR: Darin Bowers, 107.
9          THE COURT: All right.
10         PROSPECTIVE JUROR: Fall semester of school is
11 starting August 25.
12         THE COURT: Where are you beginning school?
13         PROSPECTIVE JUROR: UTA.
14         THE COURT: In enrollment and actual attendance
15 at UTA?
16         PROSPECTIVE JUROR: If I need to bring paperwork,
17 I can.
18         THE COURT: Do you want to claim your exemption?
19         PROSPECTIVE JUROR: Yeah.
20         THE COURT: Okay.  You can do that.  See the lady
21 right over here, please.
22         Your name and number?
23         PROSPECTIVE JUROR: Chapple, No. 106.  My school
24 starts September 25, UTA on Monday, Wednesday, Friday and
25 Tuesday and Thursday.

Page 12

1          THE COURT: You are going to college?
2          PROSPECTIVE JUROR: Yeah.
3          THE COURT: The guy in front of you is doing the
4  same thing at UTA.  Do you want to claim your exemption then?
5          PROSPECTIVE JUROR: Yes.
6          THE COURT: Step right over there then.
7          State your name and number, please?
8          PROSPECTIVE JUROR: No. 39, Jim Poirier.
9          I'm a part time student at Dallas Theological
10 Seminary.  Also the week of the trial -- potential week of the
11 trial starting, I am supposed to tak a group of students to
12 Florida.
13         THE COURT: Do you already have arrangements
14 made?
15         PROSPECTIVE JUROR: Yeah.
16         THE COURT: Then I am going to postpone your
17 service.  You can go be part of another jury.
18         PROSPECTIVE JUROR: Thank you very much.
19         THE COURT: I'll excuse him under 35.03.
20         PROSPECTIVE JUROR: My name is Clark, No. 85.  I
21 have paid for a cruise leaving on the 25th of September.
22         THE COURT: You can't be two places at once, can
23 you?
24         PROSPECTIVE JUROR: No, sir.
25         THE COURT: I am going to excuse you under

Page 13

1 Article 35.03.

2          PROSPECTIVE JUROR: Thank you.

3          THE COURT: Name and number?

4          PROSPECTIVE JUROR: Tommy Franks, 33.

5          THE COURT: Okay.

6          PROSPECTIVE JUROR: I am scheduled for cataract

7 surgery the 20th.

8          THE COURT: Of what month?

9          PROSPECTIVE JUROR: This month. And also I am

10 scheduled for a house closing in Arkansas the 24th or 25th.

11          THE COURT: Of?

12          PROSPECTIVE JUROR: This month.

13          THE COURT: You will be contacted fairly soon as

14 to your individual interview. If either of those conflict with

15 the individual interview, tell the person calling you, and

16 we'll excuse you.

17          PROSPECTIVE JUROR: Thank you.

18          THE COURT: Name and number?

19          PROSPECTIVE JUROR: 144. I'm a diabetic and

20 actually at this point in time I need to go have a snack right

21 now, but at times as such I need to eat quickly. In fact, I

22 need to eat something right now.

23          THE COURT: As long as we can make those

24 arrangements during trial, is there a problem? I also

25          PROSPECTIVE JUROR: No, that's fine. I also

Page 14

1 have my younger daughter leaving for college at this time

2 period.

3          THE COURT: Which time period?

4          PROSPECTIVE JUROR: August 18, around that time.

5          THE COURT: If you have a conflict when we call

6 you for the individual interview --

7          PROSPECTIVE JUROR: Can I go get something --

8          THE COURT: Absolutely.

9          Name and number?

10          PROSPECTIVE JUROR: Andrew Low, 145.

11          THE COURT: Okay. What is your situation?

12          PROSPECTIVE JUROR: I thought this was just to

13 hand this in. I don't have a situation.

14          THE COURT: They will tell you when.

15          Name and number?

16          PROSPECTIVE JUROR: Rosas, No. 78. I am a law

17 school graduate, and I'm taking the bar tomorrow at 12:30, and I

18 want to make sure that doesn't interfere with anything at all.

19          THE COURT: No. Good luck.

20          I guess that's it. All right.

21          What is your name and number?

22          PROSPECTIVE JUROR: Jane McEndree, No. 126.

23          THE COURT: Okay.

24          PROSPECTIVE JUROR: I just feel like if it is a

25 long -- a lot of sitting that goes on for a long period of time,

Page 15

1 I can't to that. Due to physical problems I have got arthritis

2 real bad, and I just can't sit still that long. I hate to use

3 that for an --

4          THE COURT: Unfortunately jury duty requires a

5 lot of sitting. So does my job.

6          PROSPECTIVE JUROR: I know. I wish it were

7 otherwise.

8          THE COURT: I am going to excuse you under

9 Article 35.03.

10          PROSPECTIVE JUROR: Thank you.

11          (Proceedings recessed)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 16

1 STATE OF TEXAS    |

2 COUNTY OF TARRANT    |

3     I, Steve Schiller, Official Court Reporter for the

4 213th District Court of Tarrant County, Texas, do hereby certify

5 that the above and foregoing contains a true and correct

6 transcription of all portions of evidence and other proceedings

7 requested in writing by counsel for the parties to be included

8 in this volume of the Reporter's Record, in the above-styled and

9 numbered cause, all of which occurred in open court or in

10 chambers and were reported by me.

11

12

13     I further certify that this Reporter's Record of the

14 proceedings truly and correctly reflects the exhibits, if any,

15 admitted by the respective parties.

16

17     WITNESS MY OFFICIAL HAND this the 9th day of January, 2004.

18

19     STEVE SCHILLER, CSR
       Official Court Reporter
20     213th District Court
       401 West Belknap
21     Fort Worth, Texas 76196
       (817) 884-2687
22     State Certification No. 4665

23     Certification Expires: 12-31-05

24

25

REPORTER'S RECORD

VOLUME 3 OF 36 VOLUMES

TRIAL COURT CAUSE NO. 0885306D

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE 213TH DISTRICT |
| | * | |
| VS. | * | COURT OF |
| | * | |
| BILLY JACK CRUTSINGER | * | TARRANT COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY VOIR DIRE PROCEEDINGS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 18th day of August, 2003,
the following proceedings came on to be heard in the
above-entitled and numbered cause before the Honorable
Robert Gill, Judge Presiding, held in Fort Worth,
Tarrant County, Texas:

Proceedings reported by machine shorthand.

Case 4:07-cv-00703 Document 8-18 Filed 11/09/11 Page Date vs. Billy Jack Crutsinger  Vol. 3

Page 2

```
 1                    A P P E A R A N C E S

 2

 3        MS. MICHELE HARTMANN
          SBOT NO. 09167800
 4        MS. LISA CALLAGHAN
          SBOT NO. 01160700
 5        ASSISTANT DISTRICT ATTORNEYS
          Tarrant County Justice Center
 6        401 West Belknap Street
          Fort Worth, Texas  76196
 7        Phone: (817) 884-1400
          ATTORNEYS FOR THE STATE
 8

 9

          MR. WILLIAM H. "BILL" RAY
10        ATTORNEY AT LAW
          SBOT NO. 16608700
11        5041 Airport Freeway
          Haltom City, Texas  76117
12        Phone: (817) 831-8383
          ATTORNEY FOR DEFENDANT
13

14        MR. TIM MOORE
          EVANS, GANDY, DANIEL & MOORE
15        SBOT NO. 14378300
          115 W. 2nd Street, Suite 202
16        Fort Worth, Texas  76102
          Phone: (817) 332-3822
17        ATTORNEY FOR DEFENDANT

18

19

20

21

22

23

24

25
```

```
1                          VOLUME 3
                   JURY VOIR DIRE PROCEEDINGS
2
     AUGUST 18, 2003
3
                                          PAGE/VOL.#
4    Caption....................................  1    3

5    Appearances................................  2    3

6    Chronological Index........................  3    3

7    Defense Motion for Reasonable Doubt Instruction 5  3

8    State's Motion for Strict Application of
     Standefer v. State.........................  6    3
9
     VENIREPERSON         STATE      DEFENDANT    VOLUME
10
     TURNER, Craig          9           48          3
11   Defense Challenge for Cause................ 79    3
     Denied.....................................  79    3
12
     REED, John            82          121           3
13
     DEAL, Nancy           151         192           3
14
     CROW, Mark            210         245           3
15
     Prospective Juror No. 5 Excused by Agreement  282  3
16
     LEDFORD, Johnnie      285         ---           3
17   Excused by Agreement....................... 293   3

18   Recess for the day......................... 294   3

19   Reporter's Certificate..................... 295   3

20   ================================================
                       EXHIBITS - NONE
21   ================================================

22

23

24

25
```

```
 1                       VOLUME 3
             ALPHABETICAL LIST OF VENIREPERSONS
 2
     AUGUST 18, 2003
 3
     VENIREPERSON          STATE     DEFENDANT     VOLUME
 4
     CROW, Mark             210        245           3
 5

 6   DEAL, Nancy            151        192           3

 7
     LEDFORD, Johnnie       285        ---           3
 8

 9   REED, John              82        121           3

10
     TURNER, Craig            9         48           3
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

```
1           P R O C E E D I N G S
2           Monday, August 18, 2003
3           * * * * * * * *
4    (Open court, defendant present)
5        THE COURT: This is No. 0885306. We'll
6  begin hearing voir dire later this morning. But there
7  are a couple of motions both sides want to hear in the
8  meantime.
9        Is this your motion, motion requesting
10 definition of reasonable doubt?
11       MR. MOORE: Yes, sir.
12       THE COURT: What says the State?
13       MS. HARTMANN: Your Honor, the State says
14 that the current state of the law is that there is no
15 definition of reasonable doubt and we just ask the
16 Court to --
17       THE COURT: Well, there is if y'all agree to
18 it. Do you want to agree to it or not?
19       MS. HARTMANN: We don't.
20       THE COURT: The motion is denied.
21       MR. RAY: The only other thing, Judge, I'm
22 going to file a motion to have the jury sequestered
23 during deliberations which I'll do before the trial
24 date starts with your permission.
25       THE COURT: All right. Do you have a
```

Page 6

```
1  motion, also?
2        MS. HARTMANN: Yes, Your Honor, we have a
3  motion. And one other thing I'd like to put on the
4  record is that the questionnaire that the venire was
5  asked to fill out a couple of weeks ago, the State
6  would like the record to reflect that that
7  questionnaire was put together by both the State and
8  the defense and that both sides had the opportunity to
9  put in questions that they wanted. And that that
10 questionnaire was then submitted to the venire.
11       And then the State's motion to strict
12 applicability of Standefer v. State of Texas, an
13 objection to improper commitment of questions during
14 voir dire examinations is the motion the State would
15 like to hear at this point.
16       THE COURT: State's motion for strict
17 application of Standefer v. State?
18       MS. HARTMANN: That's correct, Your Honor.
19       THE COURT: All right. Really all I can do
20 is rule on the questions when I hear them. I can't
21 rule in advance.
22       MS. HARTMANN: We're just asking that when
23 there's an objection made by either side to commitment
24 that the terms under which we're objecting is, again,
25 Standefer v. State.
```

Page 7

```
1        And I'm sorry. If the defense could
2  acknowledge again my reference to the questionnaire
3  being put together by both the State and the defense,
4  that there were no objections to either -- by either
5  side of the finished version.
6        MR. RAY: That's fine, Judge. It's mostly
7  my questionnaire.
8        THE COURT: Why don't we stand in recess for
9  ten minutes or so until our first venireman shows up.
10       (Break taken.)
11       THE COURT: First venireperson is a Craig
12 Turner. Would you have Craig Turner step in here,
13 please?
14       (Venireperson Turner enters the courtroom.)
15       THE COURT: Good morning.
16       VENIREPERSON TURNER: Good morning, sir.
17       THE COURT: Go ahead and have a seat right
18 there and we'll pull that microphone right in front of
19 you.
20       If you would raise your right hand, please.
21       (Venireperson Turner sworn.)
22       THE COURT: And your name, please?
23       VENIREPERSON TURNER: Craig Turner.
24       THE COURT: Mr. Turner, what we're going to
25 do for the next little while is conduct your
```

Page 8

```
1  individual voir dire interview. You've just taken an
2  oath. All that binds you to do at this point is to
3  tell the truth about how you honestly feel about the
4  matters of law that both sides are going to be asking
5  of you this morning.
6        VENIREPERSON TURNER: Okay.
7        THE COURT: They're going to want to know
8  how you feel about the different areas of law that
9  we're going to cover this morning, which may bear upon
10 the trial of this case.
11       The folks that are going to be asking you
12 the questions are the prosecutors seated at the table
13 right in front of you. That's Michele Hartmann and
14 Lisa Callaghan.
15       At the table to the right is the defense.
16 That's Billy Jack Crutsinger, the Defendant. Mr. Tim
17 Moore and Mr. Bill Ray.
18       MR. MOORE: Good morning.
19       VENIREPERSON TURNER: Good morning.
20       THE COURT: And the State may proceed.
21       MS. HARTMANN: Thank you, Your Honor.
22            CRAIG TURNER,
23 having been duly sworn to make true answers to such
24 questions as may be propounded by the Court or under
25 its direction, touching upon his service and
```

1 qualification as a juror, gave answers as follows:

2       VOIR DIRE EXAMINATION

3 BY MS. HARTMANN:

4    Q. Mr. Turner, good morning.

5    A. Good morning.

6    Q. Have you ever been through a process like

7 this before?

8    A. I went to a group process once.

9    Q. Are you talking about just a couple weeks

10 ago?

11    A. No, I went through one about two and a half

12 years ago where we had about 40 people in this area

13 and they did a group, I guess, voir dire. That

14 afternoon the prosecutor went first and then the

15 defense went second.

16    Q. Was that here in Tarrant County?

17    A. Yes, ma'am.

18    Q. Do you remember which courtroom that took

19 place in?

20    A. It was in this courtroom.

21    Q. In this very one?

22    A. Yes.

23    Q. Positive experience, negative experience?

24    A. It was positive.

25    Q. Good. Well, you and a number of other

1 people filled out a pretty lengthy questionnaire for

2 us a couple of weeks ago. And we've had a chance to

3 review the information that you've provided to us and

4 that's been extremely helpful. And basically what

5 we're going to do this morning, although we're here

6 about a very obviously serious matter, this is really

7 just kind of an informal discussion to find out how

8 you and the other people on that big panel feel about

9 certain issues.

10    A. All right.

11    Q. And we're going to have some questions for

12 you about the information that you've provided on your

13 questionnaire. And we're also going to be discussing

14 with you the law that we feel is going to come into

15 play in this case or may come into play, might not.

16    There are no right or wrong answers to any

17 of our questions. The only thing that we're looking

18 for here, both sides, is that you be honest with us

19 and let us know exactly where you stand.

20    Fair enough?

21    A. Yes, ma'am.

22    Q. We anticipate we're probably going to be

23 starting the week of September the 22nd and the trial

24 would last anywhere from five days to two weeks. Do

25 you have any -- are there going to be any conflicts

1 during that time period for you?

2    A. I don't believe so.

3    Q. All right. I want to start off by asking

4 you about a couple things that were on your

5 questionnaire and then I'm going to move into the

6 areas of the law that I want to talk with you about.

7    A. All right.

8    Q. One of the questions asked you your feelings

9 or opinions about the death penalty. And your

10 response was, "If a person has broken the law and the

11 penalty is death and all evidence clearly is in line

12 with a conviction, I don't have a problem with the

13 death penalty."

14    And anything changed about that opinion --

15    A. No, ma'am.

16    Q. -- two weeks later? All right.

17    I noticed also that you are a deacon at your

18 church?

19    A. Yes, ma'am.

20    Q. And does your -- is it Gateway?

21    A. Yes, ma'am.

22    Q. Does Gateway have a particular position

23 on --

24    A. Not that I know of. I have not talked with

25 one of the pastors about that at all.

1    Q. Any conflict between -- obviously you are

2 very involved with your church?

3    A. Uh-huh.

4    Q. Any conflict with the fact that you're

5 involved with your church and your position on capit

6 punishment?

7    A. I don't believe so. Again, I have not

8 addressed that with them specifically.

9    Q. Okay. A couple questions asked you about

10 factors that might be important in determining whether

11 a person who's been convicted of a crime where the

12 death penalty is appropriate deserves the death

13 penalty and why do you feel this way. And one of the

14 things you put down was environmental factors, what

15 led to the murder.

16    And then there was a subsequent question,

17 "Do you believe there may be mitigating factors, if

18 any, that would be important to you in order to

19 justify a sentence of life in prison as opposed to the

20 death penalty and why do you feel this way?" And you

21 said, "Environmentally being placed in an area and by

22 circumstances that present."

23    So when you're talking about environmental

24 factors and being environmentally placed in

25 situations, can you be a little bit more specific

Page 13

1 about what you mean?
2   A. Maybe if there's something along the lines
3 of a family situation or something that there was a
4 lot of conflict or among a group of people that there
5 was a lot of conflict and the situation ended up in
6 the result of a death in that.
7   Q. Okay. So basically just the circumstances
8 that actually surround a particular crime?
9   A. Yes, ma'am.
10  Q. Okay. You mentioned that your brother is a
11 drug and alcohol counselor?
12  A. Yes.
13  Q. How long has he been doing that?
14  A. Oh, gosh, I'd say for at least seven years
15 up in Oklahoma.
16  Q. Do you talk with him frequently about that?
17  A. Not that often. We've had discussions, but
18 I don't talk with him that often about it.
19  Q. All right. Do you know anybody that's had a
20 problem with drugs or alcohol?
21  A. I can't think of anybody offhand.
22  Q. You also mentioned that you know several
23 defense attorneys?
24  A. Yes.
25  Q. Or know of them?

Page 14

1   A. I know of them, yes, ma'am.
2   Q. Steve Handy who is married to one of your
3 reps?
4   A. Yes.
5   Q. And then Wes Ball --
6   A. Correct.
7   Q. -- is married to one of your management
8 peers?
9   A. Correct.
10  Q. And then you also know Mark Lane, he's a
11 member of your church?
12  A. Yes.
13  Q. Anything about knowing those people, whether
14 you know them very well or just kind of through other
15 people that would affect you from being able to serve
16 as a fair and impartial juror?
17  A. No, ma'am, there's nothing.
18  Q. No concerns on your part that if you were to
19 render a guilty verdict and possibly a death sentence
20 verdict would you feel uncomfortable being around
21 people who are defense attorneys if they knew that?
22  A. No.
23  Q. Wouldn't affect you?
24  A. No.
25  Q. Okay. Fair enough.

Page 15

1   All right. Any questions for me so far?
2   A. No, ma'am.
3   Q. Okay. I'm going to move through some of the
4 law and stop me, if you will, if you have any
5 questions.
6   A. All right.
7   Q. If you don't understand something, it's not
8 going to hurt my feelings. My goal here is hopefully
9 to educate you somewhat on what the law is and see if
10 you can follow it.
11  A. All right.
12  Q. All right. First of all, there's a couple
13 of rules in every criminal trial with every
14 defendant. And I'm sure these are ones that you've
15 heard. The presumption of innocence. People are
16 presumed to be innocent unless and until the State
17 proves that they're guilty beyond a reasonable doubt.
18  A. Yes, ma'am.
19  Q. You've heard of that one?
20  A. Uh-huh.
21  Q. Any problems with that issue?
22  A. No, ma'am.
23  Q. Can you afford a defendant the presumption
24 of innocence and make the State carry its burden and
25 prove its case to you?

Page 16

1   A. Would you repeat that again, please?
2   Q. Sure. If you were a juror in a criminal
3 trial, would you presume the person innocent and make
4 the State of Texas, Lisa and I, prove our case to you
5 beyond a reasonable doubt before you would convict
6 somebody?
7   A. Yes.
8   Q. All right. And one thing about presumption
9 of innocence, that doesn't mean that someone is
10 actually innocent, that they are innocent in fact. It
11 just means that they are kind of cloaked with this
12 protection. And until the State brings sufficient
13 evidence for it, the jury has to view that person as
14 innocent until they're proven otherwise.
15  A. Yes, ma'am.
16  Q. Second of all, the right to remain silent.
17 Every defendant has an absolute right not to testify.
18 They basically just have to show up to court and sit
19 there. They don't have to cross-examine witnesses.
20 They don't have to put on testimony.
21      However, on the other hand, if they want to
22 testify, they can. If they do testify, they don't get
23 brownie points for waiving their right. You judge
24 them like you would any other witness.
25      Does that seem fair to do?

Page 17

1  A. Yes, ma'am.
2  Q. They have the same subpoena power to bring
3 in witnesses and they have the ability to put on a
4 case, but they are not required under the law to do
5 so.
6      Can you -- if you were a juror in a criminal
7 case and the defendant chose not to testify and you
8 were instructed by Judge Gill that you could not
9 consider that fact for any reason, could you follow
10 that instruction?
11  A. Yes, ma'am.
12  Q. All right. In Texas, the order of the trial
13 works this way. First, Lisa and I will go first and
14 we'll put on witnesses and we'll put on testimony. We
15 may call experts. We may have physical items of
16 evidence that we'll present to the jury.
17      After we're done with our case, the defense
18 has an opportunity to put on a case if they want to.
19 But remember, they don't have to.
20  A. Uh-huh.
21  Q. Once all the evidence is done, there will be
22 arguments of counsel to the jury, the Judge will give
23 the jury some instructions and you'll go back to a
24 room back here in the back of the courtroom and you'll
25 deliberate and discuss the case and come to a

Page 18

1 verdict.
2      Now, obviously if the verdict is not guilty,
3 the case is over. If the verdict is guilty, we all
4 come back to the courtroom and Lisa and I again will
5 be putting on additional evidence. And once we're
6 done, again the defense will have an opportunity if
7 they choose, and again they don't have to, to put on
8 evidence themselves, all right?
9  A. All right.
10  Q. Once all the evidence is done in that second
11 part of the trial, you'll get another set of
12 instructions from Judge Gill and the jury will then go
13 back and deliberate and come to a verdict.
14      Make sense to you?
15  A. Yes, ma'am.
16  Q. And basically the goal of this whole process
17 of speaking with you this morning is to try and find
18 people that are going to be fair and open-minded, who
19 are willing to follow the law and follow the rules
20 that are set out, okay?
21  A. Okay.
22  Q. Well, obviously you probably have realized
23 after filling out this lengthy questionnaire that the
24 subject matter of this case is a capital murder case.
25 And a lot of people say well, you know, what is

Page 19

1 capital murder? And we're going to be talking with
2 you about what capital murder is, how it can be
3 committed and some special issues or questions that
4 come up in a capital murder case. And so it's going
5 to require you to give some very serious thought to
6 your answers. Because both sides are going to need to
7 make some educated decisions about who's going to be
8 an appropriate juror.
9      So what is capital murder? Capital murder
10 is when you have an intentional killing plus some type
11 of aggravating or special circumstance. When we talk
12 about intentional killing, we're talking about someone
13 who does something on purpose. It's not an accident,
14 there's no self-defense issue involved and the person
15 is sane.
16      MR. RAY: Excuse me, Your Honor, I'm going
17 to object to the question, the statement as phrased
18 when she said there's no self-defense issue involved
19 that might or might not be the case.
20      THE COURT: Sustained.
21  Q. (BY MS. HARTMANN) What the State has to
22 prove to you is that there was no self-defense issue
23 involved, all right? That the person has done the act
24 on purpose. They desired to do it and they carried it
25 out.

Page 20

1      Does that make sense to you?
2  A. Yes, ma'am.
3  Q. All right. So we have an intentional
4 killing and in addition to that intentional killing,
5 there's some type of aggravating or special
6 circumstance that surrounds it. Something else about
7 intentional killing is that intent can be formed
8 instantaneously. I'm sure you've heard about
9 premeditation?
10  A. Uh-huh.
11  Q. Premeditation is what to you?
12  A. That they've thought about it, that they've
13 prepared for it and then they committed the act.
14  Q. That they've planned it, planned it out.
15 And murder may happen that way, capital murder may
16 happen that way. On the other hand, intent can be
17 formed as soon as you form that thought in your mind.
18 And let me kind of give you an example of where
19 someone didn't maybe plan to kill someone, but they
20 formed the intent and acted upon it.
21      Let's say you have someone who goes in to
22 hold up a convenience store and they take a gun with
23 them to scare the person into giving over the money,
24 all right? At that point they have no intent to kill
25 the clerk. They go into the store, they pull the gun,

Page 21

1 they demand the money and the clerk is not
2 cooperating, all right? The clerk is clearly just not
3 going to hand this money over.
4        And the person with the gun forms the intent
5 at that point he's not giving me the money, the only
6 way I'm going to get the money is if he's down on the
7 floor dead and he shoots him. There wasn't any
8 premeditation for that particular killing, but he
9 formed the intent and he acted on that intent.
10        Do you understand the difference?
11    A. Yes, ma'am, uh-huh.
12    Q. The State does not have to prove
13 premeditation. There may be evidence of it, there may
14 not. We just have to prove that the person intended
15 to do the act and they acted upon that intent.
16        Make sense to you?
17    A. Yes, ma'am.
18    Q. Okay. Now, there's a number of ways in
19 which capital murder can be committed. And these are
20 some examples up here, the special circumstances or
21 the aggravating circumstances. You can commit capital
22 murder if you kill a child under the age of six
23 years. If you intentionally kill a police officer or
24 a fireman and they're acting in the course of their
25 duty. If you intentionally kill a person in the

Page 22

1 course of aggravated robbery or kidnapping or sexual
2 assault.
3        And then the one that we're specifically
4 going to be talking about today is when you
5 intentionally kill more than one person and it's in
6 the same criminal transaction. And same criminal
7 transaction is basically talking about it's happening
8 at about the same time. Not instantaneously, but
9 during the same course of conduct.
10    A. All right.
11    Q. Make sense to you?
12    A. Yes, ma'am.
13    Q. Do you think that these offenses, these
14 examples that I have up here, and especially the last
15 one, do you think that it is appropriate that the
16 death penalty be a punishment option for that type of
17 crime?
18    A. Yes, I would consider it an option, yes.
19    Q. All right. So we've talked about what
20 capital murder is and different ways that you can
21 commit it. And I want to talk to you a little bit
22 about the elements, what the State has to prove when
23 we have a capital murder case.
24        We have to prove that the person on trial is
25 actually the person who did the act. Makes sense.

Page 23

1 That it happened in Tarrant County, Texas, on or about
2 a particular date. And on or about doesn't tie us to
3 a specific day, but we have to prove about when it
4 happened. Sometimes that's important, sometimes it's
5 not. Sometimes we know exactly when a crime occurs
6 and sometimes we know that it has occurred at some
7 point, we just don't know the exact minute of the
8 day.
9    A. Okay.
10    Q. Make sense to you?
11    A. Yes, ma'am.
12    Q. All right. Again, we have to prove that the
13 person intended to do the act, that it wasn't in
14 self-defense, wasn't an accident, and that there was
15 not a sanity issue going on.
16    A. All right.
17    Q. And we have to prove that the Defendant
18 caused the death of more than one person in the same
19 criminal transaction. Does that seem pretty easy to
20 understand?
21    A. Yes, ma'am.
22    Q. Any questions so far?
23    A. No, ma'am.
24    Q. All right. So let's say the State has
25 proven this case to you beyond a reasonable doubt.

Page 24

1 What happens next after the jury finds the person
2 guilty if that's what they choose to do based upon the
3 evidence? You would then hear again additional
4 evidence. And that evidence might be something about
5 the Defendant's good or bad character. If the person
6 has a criminal history, you might hear about it at
7 that point if they do. Any evidence that might be
8 deemed important at punishment would then be presented
9 to the jury, okay?
10    A. Right.
11    Q. You may hear a lot of evidence, you may hear
12 no evidence. It's just going to depend upon the
13 particular person who's on trial and what their life
14 history is.
15        Does that seem fair enough to you?
16    A. Yes, ma'am.
17    Q. All right. After the conclusion of the
18 punishment evidence in a capital murder case, the jury
19 would then be presented with two special issues or
20 questions. The first one is commonly referred to just
21 loosely as a future danger question. And the second
22 one is sometimes known as the mitigation question.
23    A. All right.
24    Q. All right. And when it comes to these
25 questions what we have to ask jurors is to keep an

Page 25

1  open mind. To be fair, to not close off possibility.
2      A. All right.
3      Q. All right. And when they answer these
4  questions, the questions are going to be answered in a
5  yes or no fashion. The order of those answers is
6  going to determine whether or not the Judge assesses a
7  life sentence or a death sentence. So even though you
8  don't go back into the jury room and write out on a
9  piece of paper life or death, the way that those
10 questions are answered will, in effect, direct the
11 Court to which sentence to assess?
12     A. Okay.
13     Q. Does that make sense to you?
14     A. Yes.
15     Q. All right. This first question, why don't
16 you just take a moment to read that to yourself.
17     (Brief pause.)
18     A. All right.
19     Q. All right. Couple things I want to point
20 out to you with this question. At the first phase of
21 the trial, the State has to prove its case beyond a
22 reasonable doubt in order for the jury to convict.
23     A. Uh-huh.
24     Q. And we talked about that a few minutes ago.
25     A. Yes, ma'am.

Page 26

1      Q. All right. You will see again this phrase
2  beyond a reasonable doubt. And what that means is
3  that Lisa and I have the burden of proving to the jury
4  that the answer to this first question should be yes.
5  And if we don't prove that beyond a reasonable doubt
6  that it should be yes, then the jury answers it no.
7      A. All right.
8      Q. And the reason I have the yes highlighted up
9  here is because that is the first step on the road of
10 the order in which a capital death sentence can be
11 assessed.
12     A. All right.
13     Q. In other words, if ten or more of the jurors
14 answer this question no, then basically everything
15 stops, the person is going to get a life sentence.
16     A. All right.
17     Q. If all 12 of you agree that the answer to
18 this question should be yes, then you would move to
19 the second question.
20     A. All right.
21     Q. Make sense so far?
22     A. Yes, ma'am.
23     Q. All right. Couple of other things. The
24 words and phrases that have been underlined:
25 Probability, criminal acts of violence and society,

Page 27

1  those are not defined in the law. Basically you and
2  the other jurors can assign whatever definition you
3  choose to those words and phrases.
4      The things that I would point out would be
5  criminal acts of violence. For some people it could
6  just be other murders. For other people it might be
7  anything from simple assault, the whole gamut, okay?
8      A. Right.
9      Q. It's basically what you and the other
10 individual jurors believe the definition of those
11 phrases to be?
12     A. Okay.
13     Q. Make sense to you?
14     A. Yes, ma'am.
15     Q. Beyond a reasonable doubt. I don't think I
16 mentioned this earlier. That is not defined in the
17 law. That is whatever you and the other individual
18 jurors in your own mind believe it to be.
19     A. Okay.
20     Q. Society. Society is whatever you choose it
21 to be. It can be free society, it can be prison
22 society, it can be any part of society.
23     A. All right.
24     Q. It's whatever you believe it to be. So any
25 questions about this at this point?

Page 28

1      A. No, ma'am.
2      Q. Do you believe that this is a question that
3  you would be capable as a juror answering either yes
4  or no based upon the evidence?
5      A. Yes.
6      Q. All right. In other words, there are some
7  people at one end of the spectrum that say, Michele,
8  I'm really sorry, but I just don't think you can
9  predict future behavior from people. So I'm always
10 going to answer this question no.
11     On the other end of the spectrum you might
12 have people who say, you know, what, Michele, if I've
13 convicted someone of capital murder, I'm always going
14 to find them a future threat to society.
15     And what we need are people that are in the
16 middle, that are open to the possibility of answering
17 that question either yes or no based upon what the
18 evidence that's been presented to them is.
19     A. Okay.
20     Q. Can you do that?
21     A. Yes, ma'am.
22     Q. All right. The evidence that you can use to
23 make that determination can either be the evidence of
24 the crime itself for which the person has been
25 convicted and/or additional evidence that's presented

|  |  |
|---|---|
| **Page 29** | **Page 31** |

Page 29

1 at punishment, all right?
2    A. Right.
3    Q. Make sense to you?
4    A. Yes, ma'am.
5    Q. You can use -- in other words, you can use
6 the actual circumstances of the offense to answer that
7 question in your own mind or you can use it in
8 conjunction with any additional punishment evidence
9 you might hear.
10    A. All right.
11    Q. Make sense to you?
12    A. Yes, ma'am.
13    Q. All right. Any questions about that?
14    A. No, ma'am.
15    Q. All right. If all 12 jurors unanimously
16 answer this question yes, you would then move to
17 special issue or Question No. 2.
18    A. All right.
19    Q. And just take a moment to read that one.
20 That one is a lot longer and you can tell it was
21 written by a bunch of lawyers in Austin.
22    (Brief pause.)
23    A. All right.
24    Q. Okay. And a couple things about this
25 question. First of all, it's a lot longer than the

Page 31

1 point. We can take it up later with your permission
2 if that's all right.
3    THE COURT: All right.
4    MR. RAY: I'm sorry.
5    Q. (BY MS. HARTMANN) There's no burden of
6 proof in this question, unlike the first part of the
7 trial and Question No. 1. Question No. 2 is asking
8 the jury to step back. You've already answered
9 Special Issue No. 1 yes to get to here.
10    A. Right.
11    Q. Follow me so far?
12    A. Uh-huh.
13    Q. You're on the road to a potential death
14 sentence. This question is asking you to take a step
15 back and ask yourselves is there anything about this
16 person and their situation, their character and
17 background, the offense, their moral culpability that
18 is a mitigating circumstance?
19    And what does mitigating mean to you?
20    A. Just something that possibly could alter the
21 outcome, I guess, of the situation or add influence on
22 the situation.
23    Q. Okay. Something that might lessen that
24 person's responsibility?
25    A. Right.

Page 30

1 first one.
2    Second of all, you will notice that there is
3 not a beyond a reasonable doubt standard in that
4 question. In other words, the State of Texas doesn't
5 carry a burden to prove that the answer to that
6 question should be one way or the other.
7    A. Okay.
8    Q. Okay. And again, highlighted in red, if you
9 answer the first question yes, all 12 of you, and all
10 12 of you answer the second question no, that is the
11 order in which the Judge would then be required to
12 assess a death sentence.
13    A. All right.
14    Q. So that you know the outcome or the impact
15 of what your answers to those questions are.
16    A. All right.
17    Q. This asks you --
18    MR. RAY: Excuse me, Michele, before you go
19 on.
20    Judge, I had previously filed a motion that
21 kind of addresses this. It's more of a trial motion,
22 but I think it is a request for a particular
23 instruction to the jury at the trial which refers to
24 this particular subject matter she's dealing with.
25 And I just don't want to waive that motion at this

Page 32

1    Q. Okay. This question asks you is there a
2 mitigating circumstance. And if there is, is it
3 sufficient such that it would warrant the imposition
4 of a life sentence over a death sentence. You might
5 hear all types of evidence in the punishment phase of
6 a trial. Some of it may appear to be mitigating. And
7 you have to ask yourself, number one, is this
8 mitigating to me? And, again, mitigating is not
9 defined, it's whatever you and the other jurors in
10 your own mind choose it to be.
11    A. All right.
12    Q. What I might find to be mitigating you might
13 not and vice-versa.
14    A. Correct.
15    Q. And so the individual jurors have to use
16 their own discretion and their own, I guess, belief
17 system as to what might lessen someone's moral
18 responsibility.
19    It might be that things that you think are
20 mitigating aren't present in the particular case. It
21 might be that you see things that are mitigating, but
22 you don't think that they are of sufficient quality to
23 have that person assessed a life sentence over a death
24 sentence.
25    A. Okay.

Page 33

1  Q. Make sense so far?
2  A. Yes, ma'am.
3  Q. So you would have to ask yourself, number
4  one, has anything been presented to me that I
5  personally find to be mitigating?  And number two, is
6  it sufficiently mitigating that it requires me to vote
7  for a life sentence over a death sentence?
8  A. Okay.
9  Q. Make sense?
10  A. Yes, ma'am.
11  Q. All right.  Again, do you think that this is
12  a question that you would be capable of answering
13  either yes or no based upon what evidence might be
14  before you?
15  A. Yes, ma'am.
16  Q. All right.  There are some people who say,
17  again on one end of the spectrum, everyone's a
18  victim.  And on the end of the spectrum you might have
19  people say, you know what, I don't care if this person
20  was locked in a closet for 15 years of their life, I'm
21  never going to find those to be any mitigating
22  evidence.  And we obviously want people who are going
23  to fall in the middle of that, people who are going to
24  be open to the possibility of that question being
25  answered either.  Yes or no.

Page 34

1       Where do you fall on that?
2  A. I think I would have to evaluate the
3  information that I have before I could make a
4  determination and I would give it just consideration
5  on both sides.
6  Q. And you wouldn't be predisposed to answer
7  the question one way or the other just right out the
8  gate?
9  A. No, ma'am.
10  Q. All right.  Any questions so far?
11  A. No, ma'am.
12  Q. Any questions about the elements of capital
13  murder or what a capital murder is or if you were to
14  reach the punishment stage, either of these two
15  questions that you would be confronted with answering?
16  A. No questions.
17  Q. Any questions about the impact of the
18  answers that might be rendered?
19  A. No, ma'am.
20  Q. Couple other areas of the law I want to talk
21  with you about are voluntary intoxication.  I don't
22  know if you were aware or not, but the law says that
23  people who voluntarily intoxicate themselves on drugs,
24  if they're prescription or street drugs or alcohol and
25  then commit a crime, those people are not excused from

Page 35

1  being punished for that crime or being held
2  accountable.
3  A. All right.
4  Q. Does that make sense to you?
5  A. Yes, ma'am.
6  Q. Do you think that that's a good law?
7  A. Yes, I do.
8  Q. And if you were instructed that that was the
9  law, could you follow that law?
10  A. Yes, ma'am.
11  Q. Another area of the law is oftentimes in a
12  criminal case, probably not going to be a big surprise
13  to you, you're going to see police officers come in
14  and testify.  And I don't recall if there was anything
15  specific on your questionnaire that had to do with how
16  you felt about law enforcement or police officers, but
17  again we go to the spectrum here.
18       We have people on one side who say if
19  they're wearing a uniform, before they even open their
20  mouth, I'm going to believe every single word that
21  they say just because they're a police officer.
22       We have other people who because of personal
23  experiences or the area in which they've grown up and
24  say I will never believe someone who's wearing a
25  uniform.

Page 36

1  A. Right.
2  Q. I don't trust them, just not going to
3  believe it.
4       And what we need are people who are going to
5  treat police officers like they would any other
6  witness.  Defendants, civilians, experts, we need
7  people who are going to wait and listen to what the
8  witness has to say, judge the credibility of that
9  witness and then say yes, I believe them.  No, I don't
10  believe them.  Or I believe a mixture of what they
11  have to say.
12       Can you do that?
13  A. Yes, ma'am.
14  Q. You won't give a police officer an immediate
15  leg up before they even open their mouth and tell you
16  what they saw or heard?
17  A. No, I would have to evaluate what they were
18  saying on the stand.
19  Q. Okay.  Very good.
20       You might have people that have special
21  training.  That can include police officers.  It might
22  be doctors, it might be scientists.  And obviously if
23  you hear about specialized training, you can use that
24  knowledge to bolster that person's credibility if you
25  so choose.  On the other hand, maybe it doesn't sound

## Page 37

1 that impressive to you. It's basically going to be up
2 to you and the other jurors to assess the credibility
3 of each individual witness.
4    Can you do that?
5    A. Yes, ma'am.
6    Q. All right. There may be circumstances in a
7 capital murder case where, for some reason or another,
8 let's say Lisa and I don't do our job properly and we
9 prove beyond a reasonable doubt that the defendant on
10 trial killed one person, but we somehow mess up and we
11 don't prove that either there was another dead person
12 or that the defendant did the killing, all right?
13 With me so far?
14    A. Yes, ma'am.
15    Q. And the jury goes back and they say, you
16 know what, we believe beyond a reasonable doubt that
17 he did one of these things or she did one of these
18 things, but we just don't think there's enough
19 evidence on the other one. And you come back out and
20 you return a verdict of guilty to a lesser-included
21 offense of murder.
22    A. Right.
23    Q. Are you with me?
24    A. Yes.
25    Q. And murder is one step down from capital

## Page 38

1 murder. And what then would be presented to you would
2 not be these two issues that we've talked about, but
3 there would be a punishment range the Judge would give
4 to you. And that would be a punishment range of five
5 years to basically life in prison, 99 years or life.
6    A. All right.
7    Q. And you would be required as the jury to
8 assess a sentence somewhere within that range of
9 punishment depending upon what the facts and
10 circumstances were to you all.
11    A. Right.
12    Q. To be a juror, you must have a fair and open
13 mind to that entire range of punishment before you
14 hear any of the facts. You may think after you hear
15 facts that the person deserves a minimum sentence of
16 five. You may hear evidence that leads you to believe
17 that a life sentence is more appropriate. And you're
18 not going to know what the fair and just punishment is
19 going to be unless and until you hear all of the
20 evidence. So it's important that you have an open
21 mind to that entire range.
22    A. Right.
23    Q. Do you think that that's the fair way to do
24 it?
25    A. Yes, ma'am.

## Page 39

1    Q. Again, there are some people who say for the
2 offense of murder, no way am I going to give someone
3 five years. Nope. Not going to do it. And there are
4 some people who say, you know what, life seems like an
5 awful long time. There's just no way I could ever
6 consider life as an option for the offense of murder.
7    And again, we're looking for people who are
8 able to say, you know what, I haven't heard any facts
9 that you've told me. I don't know about this
10 defendant, I don't know about anything else that may
11 be out there for me to hear, so I'm going to keep that
12 entire range open and available to me so that I can do
13 the fair thing and assess a punishment that this
14 particular person in their particular crime and
15 circumstances.
16    A. Okay.
17    Q. Does that seem the fair way to do it?
18    A. Yes, ma'am.
19    Q. Could you keep an open mind to that entire
20 range of punishment for the offense of murder if you
21 were called upon to do so?
22    A. I believe so, yes.
23    Q. Any questions so far?
24    A. No, ma'am.
25    Q. And I'm kind of going through this at a

## Page 40

1 rapid clip. If I'm going too fast, let me know, tell
2 me to slow down.
3    A. No, you're fine.
4    Q. I think we're going to visit with six people
5 today with this process and so we've got two people
6 that are out there probably waiting.
7    A. Yes, ma'am.
8    Q. And I don't want to hurry you up. But I
9 just want to let you know I'm not trying to rush
10 through this.
11    A. No, you're fine.
12    Q. Okay. Last area of law I want talk to you
13 about. Oftentimes the police will, in their
14 investigation, they will take statements from people
15 that have been arrested, they will gather evidence for
16 their investigation. And in criminal trials sometimes
17 there can be an allegation that the police didn't
18 follow the rules when they took the statement or
19 gathered the evidence. And I'm sure you've heard of
20 some of those rules. One of them, I guess the more
21 familiar one, is the Miranda warning.
22    A. Correct.
23    Q. And those are when you tell someone what
24 their rights are before they give a statement to the
25 police.

Page 41

1    A. Right.
2    Q. There are certain rules that dictate how and
3  when evidence can be gathered. And sometimes in a
4  criminal case, not just in capital murder cases but in
5  any case, there can be an assertion that the rules
6  weren't followed. And if that, in fact, happens in a
7  criminal case, the judge would then, in certain
8  circumstances, give the jury an instruction that if
9  they believed that the rules had not been followed
10  with regard to that particular piece of evidence,
11  whether it was a statement or a physical item,
12  whatever it may be, that if the jury finds, if they
13  believe that the rules have not been followed, then
14  they would be instructed that they would have to take
15  out that piece of evidence and remove it from their
16  consideration of deciding whether the person is guilty
17  or not guilty.
18    A. Exactly.
19    Q. Have you heard of that before?
20    A. Yes, ma'am.
21    Q. And a lot of people get very upset about
22  that. They think well, gosh, here's the gun and, you
23  know, I believe that the police didn't follow the
24  rules when they confiscated that gun, and now I'm
25  being told that if I believe that, I've got to take

Page 42

1  that gun out of my consideration. And a lot of times
2  people have difficulty with that concept. And that's
3  pretty normal. It's pretty normal to kind of have
4  that gut reaction to I really don't like this
5  situation that I'm being put in.
6    A. Correct.
7    Q. But the important thing is that, and let me
8  ask you this, you've got children?
9    A. Yes.
10    Q. I'm assuming you've got rules?
11    A. Yes, I do.
12    Q. Are there consequences when those rules are
13  broken?
14    A. Yes, ma'am.
15    Q. And why do you have consequences when the
16  rules are broken?
17    A. To try to deter them from doing that same
18  offense again.
19    Q. Absolutely. And do you think that that's
20  probably the same reason why the police have rules
21  that they have to follow?
22    A. Absolutely.
23    Q. Do you think it's fair that there are
24  consequences if the police break the rules?
25    A. Yes.

Page 43

1    Q. And so understanding, I guess, maybe why the
2  law is the way it is, if you were a juror in a
3  criminal case -- and again, I think I told you
4  earlier, we're going over law that may become
5  relevant, may not become relevant.
6    A. Okay.
7    Q. We don't get a chance later on down the line
8  to say oops, okay, time out, got to go back over and
9  discuss this law with you because I didn't think it
10  was going to come up, but it did. We have to go over
11  all the different areas of the law with you.
12    But if you are a juror in a criminal case
13  and there was evidence before you that the rules had
14  been broken and you believe that evidence. I mean,
15  you have to believe it first, obviously.
16    A. Correct.
17    Q. But if you, in fact, believed it and you
18  were instructed by the Court that if you found that
19  the rules had been violated you would have to discard
20  or set aside that particular item of evidence or
21  statement or whatever it was, could you follow that
22  instruction from the Court?
23    A. Yes, I could. That I would say, though, I
24  would have to step back from it and in my mind say I
25  have to do that. But if that was the rules and

Page 44

1  instructions, I would try to follow it to the best of
2  my ability, yes.
3    Q. And it would be distasteful with you?
4    A. Yes, it might be, yes.
5    Q. And you would probably be angry with the
6  police or the prosecution or whomever it was that yo
7  saw as being, I guess, behind whatever had happened.
8  But the important thing is that the people who are on
9  the jury, when they take an oath to follow the law,
10  that they are able to actually follow the law, no
11  matter how distasteful it might be to them.
12    A. Yes, ma'am.
13    Q. And you can do that?
14    A. Yes, ma'am.
15    Q. Any questions for me --
16    A. No, ma'am.
17    Q. -- about anything we've gone over?
18  Understand the special issues?
19    A. Yes.
20    Q. Capable to you of being answered yes or no
21  based upon the evidence?
22    A. Yes, ma'am.
23    Q. If the appropriate case and facts were
24  presented to you, could you vote to assess a death
25  penalty?

Page 45

1   A. Yes, ma'am.
2   Q. If the appropriate circumstances were
3 presented to you, could you vote for a life sentence?
4   A. Yes, ma'am.
5     MS. HARTMANN: Can I have just one moment,
6 Your Honor?
7   (Brief pause.)
8   Q. (BY MS. HARTMANN) Couple issues my
9 co-counsel brought to my attention. It's possible in
10 a capital murder case because of the nature of the
11 offense and the process that we go through, the time
12 and the expense and all that a jury may end up having
13 to be sequestered for deliberations.
14     Would that be a problem for you?
15   A. No, ma'am.
16   Q. I also just want to briefly ask you about --
17 we cannot tell you the facts of the case because then
18 you might start forming opinions based upon what I'm
19 telling you or the defense is telling you. And the
20 only way you can form opinions is by listening to the
21 actual witnesses.
22     But just to make sure that you have not
23 perhaps seen this in the media and formed an opinion
24 at some point, I'm going to give you some, just some
25 loose information that the defense and the State have

Page 46

1 agreed upon.
2   A. All right.
3   Q. The particular circumstances of this
4 particular case involved two ladies, one by the name
5 of Patricia Syren and one by the name of Pearl, she
6 went by "RD" MaGouirk. And they lived over on east
7 side of Fort Worth off of Scott. And this happened
8 back in April.
9     Anything about that that you've read or seen
10 in the papers?
11   A. No, ma'am.
12   Q. So you haven't formed any opinions?
13   A. No, ma'am.
14   Q. You've also put down that you've been a
15 witness before?
16   A. No, I was called to be a witness. They have
17 postponed it for some reason. I guess they're
18 negotiating outside. But I was called and I had a
19 summons and I called up and they said they had
20 postponed it.
21   Q. And what type of case was that for?
22   A. It was for a misdemeanor where we had a
23 speaker talking at a program and a gentleman came in,
24 another doctor came in, sat down and he put his hand
25 behind his neck and pulled it forward in a joking way

Page 47

1 to move his PowerPoint. And the doctor that he did
2 that basically filed charges.
3   Q. Okay. And I can tell from your rendering of
4 the account of what happened that you're probably
5 being called as a witness for the respondent?
6   A. Yes, for the physician that was the speaker,
7 yes.
8   Q. Anything about that that would prevent you
9 from being fair and impartial in this particular case?
10   A. No, ma'am.
11   Q. Couple other things. I've told you that the
12 result, what the result of your answering these
13 questions in a particular way will be. You all answer
14 the questions, the Judge is the one who actually
15 assesses the punishment.
16   A. Right.
17   Q. Do you understand that?
18   A. Yes.
19   Q. And finally I talked with you a little bit
20 ago about beyond a reasonable doubt, the standard that
21 we have at the first phase of the trial and with
22 Special Issue No. 1. And I've told you that there is
23 no definition for that, that's what you and the other
24 individual jurors believe it to be in your own mind.
25   A. Okay.

Page 48

1   Q. I can tell you, though, that it's not beyond
2 all possible doubt or beyond a shadow of a doubt
3 because basically you'd have to be a witness --
4   A. Correct.
5   Q. -- for it to be proven to you by that
6 standard. And if you're a witness, you're not going
7 to get to be a juror. You're going to be out in the
8 hall waiting to get called on the witness stand.
9   A. Right.
10   Q. Any questions for me, sir?
11   A. No, ma'am.
12     MS. HARTMANN: All right. Thank you. State
13 would pass the venireman.
14     THE COURT: Defense may proceed.
15     MR. MOORE: Thank you, Judge.
16     VOIR DIRE EXAMINATION
17 BY MR. MOORE:
18   Q. Good morning, Mr. Turner.
19   A. Good morning.
20   Q. My name is Tim Moore. This is Bill Ray.
21     MR. RAY: How you doing?
22     VENIREPERSON TURNER: Just fine.
23   Q. (BY MR. MOORE) And this is Billy Jack
24 Crutsinger?
25     MR. RAY: Michele, can you turn your screen

Page 49

1  off?
2       MS. HARTMANN: Oh, I'm sorry.
3       Q. (BY MR. MOORE) And I will start out by
4  stating this proposition.
5       A. All right.
6       Q. You've heard Ms. Hartmann and the State's
7  position that -- their position is that
8  Mr. Crutsinger, if found guilty of capital murder
9  should be put to death. Make no mistake about their
10  position.
11       Do you understand that?
12       A. I didn't quite hear it that way.
13       Q. Okay.
14       A. I heard it that they said there were options
15  in that whole realm.
16       Q. Okay. But in a few weeks, make no mistake,
17  they're going to be asking this jury of 12 people to
18  answer those questions in a way that the death penalty
19  will be imposed.
20       Do you have any doubt about that?
21       A. I really -- I just heard the facts that she
22  presented to me, so I don't believe that's the way
23  she's going at it because I haven't heard the whole
24  case or anything.
25       Q. I just want to let you know what our

Page 50

1  position is, is that Billy has a right to have a fair
2  trial, number one.
3       A. Yes, sir.
4       Q. Do you understand that?
5       A. Absolutely, yes, sir.
6       Q. Number two, that he has a right to make the
7  State prove their case beyond all reasonable doubt.
8       A. Yes, sir.
9       Q. And should they do that, our position is
10  that he is not worthy of the death penalty, okay?
11       A. All right.
12       Q. Can you accept that?
13       A. Yes.
14       Q. Do you accept the fact that the State of
15  Texas accepts a life sentence in a capital murder
16  case?
17       A. Yes.
18       Q. You have been on a prior voir dire panel in
19  this very courtroom, correct?
20       A. Correct.
21       Q. And there were 40 of you sitting out there,
22  45, 50 of you sitting out there. And the prosecution
23  got to go first just like they did here?
24       A. Correct.
25       Q. Explained the law to you and how you felt?

Page 51

1       A. Yes.
2       Q. And then the defense did. Do you have any
3  reason why in this particular situation and these
4  particular cases why we're bringing you in
5  individually to talk to you?
6       A. I would imagine from the severity of the
7  situation that this is not less important, but you
8  need to make sure that you pick the correct jurors.
9       Q. That's exactly right. You hit the nail
10  right on the head. Because we're talking about a
11  person's literal life here.
12       A. Correct.
13       Q. We're not just talking about locking them
14  away for a little while.
15       A. Yes.
16       Q. We're talking about the ultimate decision to
17  take a person's life.
18       A. Yes, sir.
19       Q. And that's why we bring you in individually,
20  that's why we have you fill out this lengthy
21  questionnaire. And it's our duty as lawyers to make
22  sure that we find some people who are not predisposed
23  one way or the other.
24       A. Correct.
25       Q. And that's what Billy deserves, don't you

Page 52

1  think?
2       A. Yes, sir.
3       Q. And so that's why we want to get you in
4  here, get to know you and find out if truly your
5  particular beliefs are proper for this particular
6  case.
7       A. All right.
8       Q. And all we can ask you is to be as honest as
9  you can.
10       A. All right.
11       Q. And if there's a certain area of law that
12  you just don't agree with and in your conscience just
13  can't follow, we need to know that.
14       A. All right.
15       Q. Is that not fair?
16       A. That's fair, sir. Yes, sir.
17       Q. And so far in this little voir dire process
18  -- well, the purpose is for us to get to know you.
19  And this is the only time we can ask questions back
20  and forth. That you can say, well, Tim, I don't know
21  about this, explain that better. Because once the
22  jury is in the box, the Judge is going to tell you we
23  can't talk any more.
24       A. All right.
25       Q. And you're the very first one.

Page 53

1  A. I realize that. I was the number one pick
2 that morning.
3  Q. You're the number one draft pick.
4  A. Yes.
5  Q. And quite frankly we do this individual voir
6 dire about once every year, year and a half, two
7 years.
8  A. Okay.
9  Q. And so if I'm a little rusty, I apologize.
10  A. That's quite all right.
11  Q. We don't have our coats on. It was hot in
12 here this morning. The Judge allowed us not to. Does
13 that offend you?
14  A. Oh, not at all. In fact, when I interview
15 people for jobs, I tell them they can take off their
16 jacket as well.
17  Q. Tell me what you do.
18  A. I'm a district sales manager for a
19 pharmaceutical company.
20  Q. And how long have you done that?
21  A. I've been district sales manager now for 11
22 years.
23  Q. You moved here from Oklahoma about 13 years
24 ago?
25  A. That's correct.

Page 54

1  Q. Was that a company move?
2  A. Yes, it was.
3  Q. How do you like Colleyville?
4  A. I love it.
5  Q. Better than Oklahoma?
6  A. Yes, I do.
7  Q. When you came in to fill out this lengthy
8 questionnaire the other day, tell me what your idea of
9 the death penalty was and how it applied in Texas.
10  A. The death penalty is, bottom line, if a
11 person was convicted of the crime of murder, I didn't
12 know the capital murder versus murder situation along
13 that line, but if they were convicted of that and the
14 jury deemed the person guilty and that all the
15 situations lined up and then the -- the sentencing I
16 didn't understand. I thought the jurors had to go
17 back and come out with a death penalty type
18 situation. But now these questions have changed that
19 a little bit. I didn't know that situation before.
20  Q. Okay. So when you were filling this out,
21 you thought that if you were convinced a person killed
22 another person, you could go back there write, "I'll
23 give this person the death penalty"?
24  A. I thought it would be an option or an
25 instruction for us to consider these and what would

Page 55

1 you suggest is what I believed, yes, sir.
2  Q. And you were in favor of that kind of
3 verdict?
4  A. I'm in favor of the death penalty?
5  Q. Right.
6  A. If the facts and everything line up, sir,
7 yes, sir. I have no problem giving that if it all
8 lined up.
9  Q. Okay. And don't take me wrong when I say
10 this --
11  A. I won't at all.
12  Q. But my job is to make sure that we know you
13 and how you feel?
14  A. Absolutely.
15  Q. And I wrote this down a minute ago in an
16 answer to Ms. Hartmann's question you said, "I would
17 try to follow the law to the best of my ability."
18  A. Absolutely.
19  Q. That's the kind of question that really
20 bothers us lawyers.
21  A. Okay.
22  Q. You know why?
23  A. No, sir.
24  Q. Because that is such a generic answer that
25 it really doesn't tell us how you truly feel.

Page 56

1  A. Okay. That's fair.
2  Q. Is that fair?
3  A. That's fair.
4  Q. And I know that in your daily routine in
5 pharmaceutical sales you probably don't sit around
6 thinking about the death penalty very much.
7  A. No, sir, I do not.
8  Q. You probably don't think about the
9 presumption of innocence and all these other legal
10 concepts that we've gone over?
11  A. No, I would not talk about this, but I do
12 consider the people in my job and I evaluate people
13 all the time, try to give them the benefit of the
14 doubt. And I look at them and I presume when they
15 tell me something that it is accurate and correct.
16  Q. But my point is do you remember the Judge
17 telling you when y'all filled out these questionnaires
18 to give some thought before you come in here?
19  A. Yes.
20  Q. And have you done that?
21  A. Yes, I have.
22  Q. And your thoughts about it haven't changed
23 from what you put down on your questionnaire?
24  A. No, sir, they have not.
25  Q. Ms. Hartmann asked you about this

Page 57

1 presumption of innocence that a person is shrouded
2 in.
3    A. Yes, sir.
4    Q. What do you think about that?
5    A. I think people are considered innocent until
6 they are proven guilty is the way I've been brought up
7 and that's the way I do believe.
8    Q. Okay. And the reason I ask you these
9 questions is when we say if the State charges someone
10 with murder, that person is probably guilty. Do you
11 remember that question?
12    A. Yes, I do.
13    Q. And how do you feel about that?
14    A. Could you repeat that one more time for me,
15 sir?
16    Q. If the State charges someone with murder,
17 that person is probably guilty.
18    A. No, I do not believe that.
19    Q. And you checked "No opinion" on your
20 questionnaire.
21    A. Correct.
22    Q. But now would it be a different opinion now
23 that you've thought about it?
24    A. No, because I would have to evaluate the
25 information and the facts that were presented to me

Page 58

1 before I could have an opinion along that line. I
2 can't consider a person guilty at that point until
3 I've heard the facts around the situation. I've heard
4 nothing along that line, that's the reason I put no
5 opinion because I have no facts to evaluate. And,
6 again, I'd consider innocence before going forward and
7 I had no facts to say otherwise.
8    Q. And like Ms. Hartmann told you, we can't go
9 into the facts of this case. All we can do is talk
10 about the law and how you feel about it.
11    A. I understand. But that's the reason I put
12 no opinion.
13    Q. And you agree that a person who is charged
14 with any criminal offense has a right to remain
15 silent?
16    A. That's correct.
17    Q. A lot of people say well, I think if I were
18 accused of an offense, I'd want to get up there and
19 tell my side of the story.
20       How do you feel about that?
21    A. If you were asking me if I were in those
22 shoes? I would say my side. I would say the truth
23 would come forth, yes.
24    Q. And would you feel that way in any criminal
25 action, any criminal trial?

Page 59

1    A. If they would -- you mean if the defendant
2 would like to get up or not get up, is that what
3 you're asking in that question?
4    Q. Yes.
5    A. They have that right and that opportunity.
6 If they want to tell their version of the truth, then .
7 I think they have that opportunity. I wouldn't hold
8 that against them if they did not, but I would judge
9 the facts as they present them to me if they were
10 talking to me about them at that point.
11    Q. So if the State ended its case, called its
12 last witness and said, "We rest" and I got up and I
13 said, "We rest," you go back in the jury room, the
14 fact that the person didn't testify, you could leave
15 that out of your thought processes?
16    A. Yes, sir. I would go on the facts that were
17 presented.
18    Q. Let me talk to you a little bit about this
19 burden of proof that we've been talking about. We
20 don't have a definition of beyond a reasonable doubt.
21 That is something that is up to each individual
22 juror.
23    A. All right.
24    Q. All we can do is give you kind of an example
25 of in our law compared to other kind of actions just

Page 60

1 what it is, okay?
2    A. All right.
3    Q. We start out -- we're a little rusty here?
4    A. That's all right.
5       MR. RAY: It's not an eye test.
6       VENIREPERSON TURNER: I was about to say m
7 trifocals are even working on this one.
8       MR. RAY: That's kind of hard to see, isn't
9 it? Can you see that all right?
10       VENIREPERSON TURNER: It's all right, yes.
11    Q. (BY MR. MOORE) Right before we go into
12 this, you've heard the term indictment before, haven't
13 you?
14    A. Uh-huh.
15    Q. What is your understanding of what an
16 indictment is?
17    A. It's a, I guess a declaration of someone
18 being called up on charges or something to that
19 effect. I don't know the correct definition. I'm
20 from Oklahoma, so hey.
21    Q. Here's what I'm getting at.
22    A. All right.
23    Q. You know Billy Jack Crutsinger sits over
24 here accused of capital murder.
25    A. Okay.

Page 61

1    Q. How do you feel right now about his guilt or
2 innocence?
3    A. I have no presumption either way, sir. Or
4 he's presumed innocent, I'll say that. I have no
5 facts of anything about this case whatsoever, so I
6 assume that he is innocent right now.
7    Q. Okay. And regardless of the facts of the
8 case, you can probably surmise that he's been
9 arrested?
10    A. I would assume so, yes.
11    Q. That he's been confined?
12    A. I don't know that.
13    Q. That the case has been presented to a grand
14 jury?
15    A. I did not know that.
16    Q. Did not know that was how an indictment was
17 returned?
18    A. No, sir, not from that standpoint.
19    Q. Knowing that, could you still afford him the
20 presumption of innocence?
21    A. Yes, sir.
22    Q. And when the State talked about these
23 elements that they had to prove, they have to prove
24 each one of them beyond all reasonable doubt.
25    A. All right.

Page 62

1    Q. You've heard of that many times. And just
2 by way of explanation, these on this chart are
3 different burdens of proof and different actions in
4 our legal system.
5    A. Right.
6    Q. And have you ever heard the term reasonable
7 suspicion?
8    A. No, I have not. I have not heard of the
9 term.
10    Q. Let me give you an example. We're a free
11 society?
12    A. Correct.
13    Q. And we like to drive about our streets
14 without interference from police officers pulling us
15 over for no reason.
16    A. All right.
17    Q. Do you agree with that?
18    A. Uh-huh.
19    Q. If a police officer is traveling behind
20 someone, say, and he sees them weave, maybe bump a
21 curb, maybe run a stop sign, that gives him reasonable
22 suspicion to pull him over.
23    A. All right.
24    Q. Okay? Do you agree with that?
25    A. Yes.

Page 63

1    Q. We ought to have that, shouldn't we?
2    A. Correct.
3    Q. But that's the kind of level of proof it
4 takes to be just pulled over in our society.
5    A. All right.
6    Q. Then if he gets that person out of their
7 vehicle and he smells alcohol on their breath and they
8 stumble around and he gives them various field
9 sobriety tests like walking a straight line and
10 holding their foot up for 30 seconds and they can't
11 perform those real well, that may give him enough
12 proximate cause to arrest them.
13    A. All right.
14    Q. Okay? They're not guilty of anything yet.
15    A. Correct.
16    Q. There's just enough reason to pull them
17 over, enough reason to arrest them.
18    A. Correct.
19    Q. Preponderance of the evidence we use in
20 civil actions like a car wreck case where one person
21 says the other one ran a red light and hurt them.
22 Then we go into civil court and the person who's
23 bringing the action has to prove by a preponderance of
24 the evidence, just a greater weight of the credible
25 evidence that that other person wronged them.

Page 64

1    A. Okay.
2    Q. The next higher standard -- and that's a
3 little bit higher than probable cause. The next
4 standard we get to is clear and convincing evidence.
5    A. All right.
6    Q. That's another civil remedy. And it's used
7 when say the State of Texas has decided that you're an
8 unfit parent and they take you into court and they
9 have to prove to a judge or a jury by clear and
10 convincing evidence that that child ought to be taken
11 away from that home?
12    A. All right.
13    Q. That's pretty severe, isn't it?
14    A. Absolutely.
15    Q. And that's the last standard we get to until
16 we get to beyond a reasonable doubt.
17    A. All right.
18    Q. And that's the kind of quality, the kind of
19 convincing evidence that the State of Texas is
20 obligated to bring each individual juror before they
21 can convict.
22    A. Okay.
23    Q. Okay?
24    A. All right.
25    Q. That's a pretty high burden, wouldn't you

Case 4:07-cv-00703   Document 86   Filed 09/17    Page 26 of 143 PageID

Page 65

1 agree?

2    A. Absolutely.

3    Q. And we also talked about that first special

4 issue; do you remember that?

5    A. Correct.

6    Q. That future dangerousness?

7    A. Uh-huh.

8    Q. They also have that high a burden to prove

9 that that person would be probably a future danger to

10 society.

11    A. Correct.

12    Q. Can you hold the State to that high burden?

13    A. Yes, sir, I can. I mean, personally I think

14 society depends on us holding it to that high of a

15 burden.

16    Q. Let me ask you, now that you know that

17 capital murder can be committed in various different

18 ways, such as the killing of a police officer in the

19 line of duty and the person knew he was a police

20 officer, killing a person under six years old.

21    A. Right.

22    Q. Killing a clerk at a convenience store in

23 the course of committing robbery or the murder of two

24 people pursuant to the same transaction, those are

25 various ways in our Penal Code that capital murder can

Page 66

1 be committed.

2     Do you think that capital murder should be

3 expanded beyond those?

4    A. I had not given that any thought, sir, so I

5 couldn't address that. Specifically I think those

6 have probably been set forth, I think those are pretty

7 defined, but I haven't given any thought to expanding

8 that.

9    Q. Do you think that of those examples that I

10 have given you that one is probably worse than the

11 other?

12    A. I have children, so I'm pretty partial to

13 children. I think they're pretty precious people. So

14 I would say that would be a little higher on the

15 priority scale on that list, but I think they're all

16 eligible for the capital murder. But I would say that

17 the children, again from a priority standpoint, that's

18 pretty impactful (sic) to me.

19    Q. What about elderly people?

20    A. Elderly people, same type of situation.

21 Depending on the age of the elderly person and your

22 definition of elderly. But if they are not able to

23 take care of themselves much like a child, or are

24 dependent on people, I would also take that very, very

25 seriously, also.

Page 67

1    Q. Would the classification of the person

2 killed have any bearing on your ability to be fair

3 about these issues we've talked about?

4    A. No, I would have to evaluate the facts as

5 they were presented as far as what took place. If a

6 person, whether it was a child or an adult or an

7 elderly person were murdered, again, I would have to

8 evaluate the facts that were presented to me to make

9 my determination of guilty along that line. Because,

10 again, I try to hold to the innocence as you indicated

11 earlier.

12    Q. Okay. Ms. Hartmann talked about the law of

13 confessions and evidence that the police gather. The

14 police have to follow certain rules that have been

15 laid out by the legislature and the courts.

16    A. Correct.

17    Q. Do you agree with that?

18    A. Yes I do.

19    Q. And especially as it pertains to taking a

20 confession or a statement from somebody who is accused

21 of a crime, they have to read these Miranda warnings.

22 What do you think about that?

23    A. Those are the rights as I understand it that

24 were put forth to protect people so they have the

25 opportunity, if they would like to, to withhold and

Page 68

1 not say anything at that time, that they have that

2 opportunity at that point. So those are the rules and

3 regulations that have been put down.

4    Q. What do you think about them?

5    A. I think they're appropriate because I think

6 people need to have that opportunity because they

7 might say something inadvertently that could be either

8 misconstrued or taken down or maybe taken out of

9 context. And if they aren't maybe as verbally, I

10 guess, polished or whatever, it could be taken out of

11 context. So I think it's good.

12    Q. Okay. Well, say, for instance, you're faced

13 with a situation where there's a confession that's

14 clear as a bell.

15    A. Okay.

16    Q. That this person used of an offense lays it

17 out, two typed pages or handwritten pages of yes, I

18 went in that convenience store and I put that clerk on

19 her knees and I shot her in the back of the head and I

20 liked it. It felt good. And the police arrest him

21 and they don't follow the rules.

22    A. Okay.

23    Q. And the only evidence that you have as a

24 juror sitting there is that confession of that

25 person. And it's read to you. And it's also

Page 69

1 instructed to you by the Judge that if you find that
2 the rules were broken, then you have to just
3 completely disregard that confession and you believe
4 the rules were broken. When you go back in that jury
5 room, what do you have to do?
6     A. I take the instructions of the Judge and I
7 have to disregard them, that the rule was broken. I
8 might not like that, but I do have to. That was the
9 instruction that was given to me and I took an oath to
10 uphold what's been presented to me and I took a vow to
11 do things the appropriate way, so therefore I would
12 have to disregard those if I was instructed to do
13 such.
14     Q. And find that person not guilty?
15     A. If that was the only thing that was
16 presented to me was guilt and there were no other
17 facts or no other things, then I would assume that
18 they have would have to be innocent if that was the
19 only fact available to us.
20     Q. And I know it would probably bother you, but
21 could you do it?
22     A. It would bother me, I'm not going to say it
23 would not. But I would have to do it yes, sir,
24 because I would feel very strongly about an oath that
25 I took.

Page 70

1     Q. Let me give you another -- well, let me ask
2 you about this.
3         MR. RAY: Can you see that all right?
4         VENIREPERSON TURNER: Yes, sir. It's a
5 little better than that red thing.
6     Q. (BY MR. MOORE) Say you found somebody
7 guilty, that you were convinced beyond a reasonable
8 doubt that that person was indeed guilty of capital
9 murder, okay?
10     A. Yes.
11     Q. Then you hear some other evidence, whatever
12 it be. Then you're faced with this question, whether
13 there is a probability that the defendant would commit
14 criminal acts of violence that would constitute a
15 continuing threat to society.
16         Do you feel that -- and you've said that you
17 wouldn't have a problem answering that question,
18 correct?
19     A. That's correct.
20     Q. What does probability mean to you?
21     A. That there would be a -- from the
22 information presented, that there would be a
23 likelihood that this act would be committed again or
24 another act of violence could be conducted again.
25     Q. And what if that society that we're talking

Page 71

1 about were a prison society?
2     A. Okay. Your question? I'm not following
3 your question. I apologize.
4     Q. Well, there's two different sentences for a
5 person convicted of capital murder.
6     A. Okay.
7     Q. Life.
8     A. Correct.
9     Q. Or death.
10     A. Correct.
11     Q. If you choose a life sentence, then there's
12 a provision in our law that says that after 40 years
13 that person could be eligible for parole.
14     A. All right.
15     Q. Did you know that?
16     A. Yes, sir. I read that, yes.
17     Q. How do you feel about that?
18     A. If that is the law and they have done their
19 time and they've been evaluated while they were in the
20 prison system and they had tried to redeem themselves
21 and then they could go before a board and they
22 assessed them and said that they were eligible, then I
23 would agree with that, yes.
24     Q. You've found somebody guilt of capital
25 murder.

Page 72

1     A. Correct.
2     Q. Killing two people. You found beyond a
3 reasonable doubt that that person, that's what they
4 wanted to do.
5     A. Okay.
6     Q. Because that's what intentional is, do you
7 remember that?
8     A. Yes.
9     Q. It was their conscious objective and desire
10 to take those two people's lives.
11     A. Yes.
12     Q. There's no self-defense, there's no
13 insanity, it's just killing two people intentionally.
14     A. Correct.
15     Q. Okay. In your mind, would that make --
16 would that make them a future danger regardless of
17 what the other evidence was?
18         MS. HARTMANN: Your Honor, I'm going to
19 object. That calls for a commitment and binding.
20         THE COURT: Sustained.
21     Q. (BY MR. MOORE) Well, if you believe -- and
22 you've already done all that. You've found them
23 guilty, you knew it was their intent and purpose
24 regardless of what the evidence showed, how could you
25 answer that question?

Page 73

1  MS. HARTMANN: Again, Your Honor, I'm going
2 to object to the attempt to bind the venireman.
3  THE COURT: Sustained.
4  MR. RAY: Judge, I think we're entitled to
5 explore the particular views --
6  THE COURT: You're asking him to set
7 hypothetical parameters on the basis of that
8 question. Explore it by some other question.
9  Q. (BY MR. MOORE) Okay. Would it matter to
10 you if that society we're talking about is a prison
11 society?
12  MS. HARTMANN: Your Honor, I'm going to
13 object because there is no definition of what society
14 is.
15  THE COURT: Overruled.
16  VENIREPERSON TURNER: If I may answer your
17 question in basically a question. So you're asking me
18 if I would have any thoughts about him being in a
19 prison society? Is that your question? I apologize.
20 I'm not following that.
21  Q. (BY MR. MOORE) Yes, sir. That's exactly
22 what my question is.
23  A. I apologize again because I'm trying to
24 follow your question and to answer it appropriately
25 here from the standpoint you're asking me if he was

Page 74

1 sentenced to life in prison if he would be a danger to
2 the society in a prison? Is that what you're asking?
3  Q. Yes, basically.
4  A. I mean, he could be a danger to the people
5 in a prison society. I don't know. But he could be.
6  Q. Okay. That question is going to be followed
7 by another instruction from the Judge, okay?
8  A. Correct.
9  Q. And that's what the second part of that
10 this. "In deliberating on this specific issue, the
11 jury is instructed to consider all evidence admitted
12 at the guilt/innocence stage and the punishment stage,
13 including evidence of the defendant's background or
14 character or the circumstances of the offense that
15 militates for or mitigates against the imposition of
16 the death penalty."
17  What does that mean to you?
18  A. That we have to take everything that was
19 presented as it states there in the jury, or during
20 the trial phase, and all the evidence based and all
21 the evidence that was presented at the sentencing
22 phase and make our determination at that point whether
23 we could basically give a yes or no that would
24 necessitate going, I believe, to the next question if
25 I remember correctly for the death penalty.

Page 75

1  Q. That's correct. And so you've considered
2 all that and you answer yes.
3  A. Okay.
4  Q. And that's got to be convincing beyond a
5 reasonable doubt, do you understand that?
6  A. Correct.
7  Q. And you've answered that yes beyond a
8 reasonable doubt, then we go to the last issue. So
9 after you've answered that yes beyond a reasonable
10 doubt that he's a future danger, after considering all
11 those circumstances, then this asks you whether,
12 taking into consideration all of the evidence,
13 including the circumstances of the offense, the
14 defendant's character and background, and the personal
15 moral culpability of the defendant, there is a
16 sufficient mitigating circumstance or circumstances to
17 warrant that a sentence of life imprisonment rather
18 than a death sentence be imposed.
19  That's familiar, isn't it?
20  A. Yes, sir.
21  Q. That's basically how that issue on future
22 dangerousness is worded, isn't it?
23  A. Yes, sir.
24  Q. So do you think, just be honest with us.
25  A. I will.

Page 76

1  Q. You've already found that you took all that
2 into consideration beyond a reasonable doubt that he
3 would be a future danger.
4  A. Correct.
5  Q. Is there anything you can think of where you
6 could answer that issue yes?
7  A. I can't think of anything at this time. I
8 would have to evaluate the situation at the time it
9 was presented to me to be real honest with you. I
10 can't think of a situation. But if I was presented
11 with and if I were held to making that determination,
12 I would have to evaluate it, just to be honest with
13 you. I can't think of a situation.
14  Q. Can't think of a --
15  A. A specific right now.
16  Q. -- specific mitigation that in your mind
17 right now that would warrant a yes answer, considering
18 all we've talked about?
19  A. No, sir, I can't.
20  Q. Would your -- and, you know, I appreciate
21 you being honest with me. Would your feelings about
22 that, about how these special issues, would that
23 impair your ability to be a fair juror?
24  A. I don't believe that would impair my
25 ability, no, sir.

Page 77

1    Q. Even though you can't think of an instance
2 or a circumstance where you would answer that second
3 question yes?
4    A. No, sir, I don't believe that it would
5 impair my ability to evaluate the information I had at
6 the time and to when I'm in that moment to make that
7 determination if I had to. I don't think it would
8 affect that.
9    Q. Would you agree that aggravating
10 circumstances may be easier to determine than
11 mitigation circumstances? Do you understand what I
12 mean?
13    A. Yes. I'm just trying to process. Yes, I
14 believe they probably would be, yes.
15    Q. And not to belabor the point, but we've got
16 to find out how you feel.
17    A. I understand.
18    Q. You know, after finding somebody guilty of
19 capital murder --
20    A. Correct.
21    Q. -- essentially taking the life of somebody,
22 finding beyond a reasonable doubt that that person was
23 going to be a probable future danger in no matter what
24 society they are in, finding all of that.
25    A. Correct.

Page 78

1    Q. And your feelings on mitigation, would you
2 always answer that second special issue no?
3    A. No, sir. I don't think I -- again, I'd have
4 to take a look at the information that was presented
5 to me and the background information that's presented
6 and make the determination when presented with that,
7 those facts, and information at that time. At this
8 time I don't have any information to even go by except
9 to say that I would hold to the oath that I was given.
10    Q. Would you consider how a person was brought
11 up as a mitigating factor if you believed it to be
12 mitigating?
13    MS. HARTMANN: I'm going to object. Calls
14 for a binding and commitment on the part of the
15 venireman.
16    THE COURT: Sustained.
17    Q. (BY MR. MOORE) Could you consider a drug or
18 alcohol problem to be mitigation if you believed it to
19 be mitigating?
20    MS. HARTMANN: Again, Your Honor, I'm going
21 to object to binding.
22    THE COURT: Sustained.
23    Q. (BY MR. MOORE) Could you consider a good
24 prison record, a good jail record to be mitigating if
25 you believed it to be mitigating?

Page 79

1    MS. HARTMANN: Your Honor, again I'm going
2 to object to binding.
3    THE COURT: Sustained.
4    MR. MOORE: I pass the witness. Thank you,
5 sir.
6    VENIREPERSON TURNER: Thank you.
7    THE COURT: Mr. Turner, there's a matter of
8 law I have to take up very briefly. If you will
9 please step outside the door, I'll be right back with
10 you.
11    VENIREPERSON TURNER: Yes, sir
12    (Venireperson Turner exits the courtroom.)
13    THE COURT: What says the State?
14    MS. HARTMANN: State will accept.
15    THE COURT: Defense?
16    MR. MOORE: We would challenge this juror
17 for cause. And Judge, you're sitting right by him,
18 you've had a chance to observe him. And we would
19 challenge him because he would be unable to honestly
20 answer the second question on mitigation. He quote
21 couldn't think of a situation in which mitigation
22 would be proper. We would challenge him under 35.16
23 of the Code of Criminal Procedure, the Sixth Amendment
24 and the Fourteenth Amendment of the Constitution.
25    THE COURT: Denied.

Page 80

1    MR. RAY: We're going to strike him.
2    THE COURT: Would you have him step back in,
3 please.
4    (Venireperson Turner enters the courtroom.)
5    THE COURT: Mr. Turner, I want to thank you
6 very much for the time you've spent here this
7 morning. You've been excused in this case. You have
8 no further obligation to us. You're free to go about
9 your business.
10    VENIREPERSON TURNER: Thank you.
11    THE COURT: Thanks again for your time.
12    MR. RAY: Thank you, Mr. Turner.
13    (Venireperson Turner exits the courtroom.)
14    THE COURT: Let's take a short stretch
15 break.
16    (Break taken.)
17    THE COURT: Who's next?
18    (Venireperson Reed enters the courtroom.)
19    THE COURT: Pull that microphone up in front
20 of you so everyone can hear you real well, please.
21 We're not trying to put you on the spot. Everyone
22 needs to hear what you have to say.
23    If you would please raise your right hand.
24    (Venireperson Reed sworn.)
25    THE COURT: Tell us your name, please.

| Page 81 | Page 83 |
|---|---|
| 1   VENIREPERSON REED: John Reed. | 1  being a juror in a capital murder case, okay? |
| 2   THE COURT: Mr. Reed, for the next little | 2   A. Yes. |
| 3  while each side in this lawsuit, which will be the | 3   Q. And so as the Judge mentioned, there is no |
| 4  State, seated over here, and the defense, seated over | 4  right or wrong answer. What we need to know is truly |
| 5  there, are going to have the right to ask you some | 5  actually how you feel about these things. Because if |
| 6  questions regarding your background and qualifications | 6  you have a feeling or if you have a belief that might |
| 7  to be a juror in a case such as this. | 7  conflict with the way the law is in this case, it |
| 8   VENIREPERSON REED: Yes, sir. | 8  might render you incapable of being a juror in this |
| 9   THE COURT: There are no right or wrong | 9  case, or it might cause you significant difficulty in |
| 10  answers to any of the questions they ask you. Both | 10  rendering a verdict, okay? |
| 11  sides are very interested in discovering your views on | 11   A. Yes. |
| 12  what they feel will be the issues that'll be | 12   Q. If there's anything you don't understand or |
| 13  confronting the jury in this trial. So just honestly | 13  is not clear to you, please ask and I'll go back and |
| 14  answer their questions. And at the end of the | 14  explain it, okay? |
| 15  proceeding you'll know whether or not you're going to | 15   A. All right. |
| 16  be a juror in this case. | 16   Q. Now, we anticipate that probably this case |
| 17   Let me introduce to you the parties. The | 17  will actually go to trial September 22nd. It could |
| 18  State of Texas is represented by Michele Hartmann and | 18  take anywhere from five days to about two weeks. Is |
| 19  Lisa Callaghan right here in front of you. | 19  that a problem for you in terms of scheduling? |
| 20   MS. CALLAGHAN: Good morning. | 20   A. No. |
| 21   THE COURT: The defense consists of Mr. Tim | 21   Q. We also anticipate it's possible that the |
| 22  Moore. | 22  jury may be sequestered, meaning that they would have |
| 23   MR. MOORE: Hi. | 23  to go back to a hotel room to gather and remain away |
| 24   THE COURT: And Mr. Bill Ray. | 24  from their homes and their families for a period of |
| 25   MR. RAY: Good morning. | 25  time. |

| Page 82 | Page 84 |
|---|---|
| 1   THE COURT: And the Defendant, Billy Jack | 1   Would that be a problem for you? |
| 2  Crutsinger. | 2   A. Not a real problem. I've got a bunch of |
| 3   The State may proceed. | 3  dogs that I normally go home to let out at lunchtime. |
| 4   MS. CALLAGHAN: Thank you, Your Honor. | 4  My wife works and so we'd have to make some |
| 5    JOHN REED, | 5  arrangement for the dogs, but that's it. |
| 6  having been duly sworn to make true answers to such | 6   Q. All right. Got to take care of those pups. |
| 7  questions as may be propounded by the Court or under | 7  All right. But other than that, you could arrange it? |
| 8  its direction, touching upon his service and | 8   A. Yes. |
| 9  qualification as a juror, gave answers as follows: | 9   Q. All right. Now, let's go into a criminal |
| 10    VOIR DIRE EXAMINATION | 10  trial so you'll understand what the procedure is. A |
| 11  BY MS. CALLAGHAN: | 11  criminal case is tried in two phases. The first phase |
| 12   Q. Good morning, sir, how are you today? | 12  would be the guilt/innocence phase, okay? And in the |
| 13   A. I'm fine, thank you. | 13  guilt/innocence phase what you do is you listen to |
| 14   Q. Very good. It doesn't appear to me from | 14  evidence about whether or not the person committed the |
| 15  your questionnaire that you've been on a jury before? | 15  crime you're being asked to pass on, okay? |
| 16   A. No, I have not. | 16   A. All right. |
| 17   Q. So this process is pretty new to you? | 17   Q. The only evidence that's admitted at that |
| 18   A. Yeah. | 18  time has to do with whether or not they did it or |
| 19   Q. Actually, this is kind of an unusual | 19  didn't do it, okay? |
| 20  process. It doesn't generally go this way. The | 20   A. Uh-huh. |
| 21  reason that we've brought you individually after | 21   Q. If a person is found guilty at that phase, |
| 22  calling in the big panel last week is, as the Judge | 22  then you proceed with what is called the punishment |
| 23  mentioned, we need to ask you specific questions | 23  phase. Now, if they're not guilty, that's it, that's |
| 24  concerning the law and possible prior experiences | 24  the end of it. But if they're found guilty, they |
| 25  you've had, feelings you have that might affect you in | 25  go to the second phase, which would be called the |

Page 85

1 punishment phase, okay?
2    A. Gotcha.
3    Q. At the punishment phase what you hear is
4 evidence related to that person's character, relating
5 to their past conduct. You're not asked to sentence
6 in a vacuum. You're given information so that you
7 know where in their total life conduct this particular
8 act is, okay?
9    A. All right.
10    Q. Does that make sense to you?
11    A. Uh-huh.
12    Q. And evidence of that nature which can give
13 you an idea of where in the punishment range to
14 sentence a person, okay?
15    A. Yes.
16    Q. All right. Now, the State goes first in
17 everything because we carry the burden of proof. So
18 we start off with an opening statement, then we get to
19 evidence. The State goes first, the defense can then
20 present evidence if they choose, but they have no
21 burden to present anything; do you understand that?
22    A. Yes.
23    Q. And then in arguments it's the same thing:
24 The State goes first, the defense in the middle and
25 then the State goes last, okay?

Page 86

1        Now, let's talk a little bit about the
2 burden of proof. The State must prove its case beyond
3 a reasonable doubt, okay? Now, beyond a reasonable
4 doubt doesn't have a precise definition. But what it
5 most definitely does not mean is beyond any doubt or
6 all doubt, okay?
7        Do you have any brothers and sisters?
8    A. Two brothers.
9    Q. Okay. Do you ever get together with them
10 and try to remember something that happened when you
11 were kids?
12    A. Not that I can recall at the moment, but
13 probably so, yes.
14    Q. Probably so, okay. Do you think that their
15 version of things sometimes differ from your memory of
16 the way things happened?
17    A. Oh, I'm sure.
18    Q. Why do you think that is?
19    A. Everybody perceives things a little
20 differently.
21    Q. Sure, okay. Have you ever been to a wedding
22 with your significant other?
23    A. A wedding of a significant other? I'm
24 sorry, what?
25    Q. No, with your wife?

Page 87

1    A. Oh, with my wife. Yes, I have.
2    Q. Okay. Who's more likely to remember the
3 bridesmaid's dresses, you or her?
4    A. She is, of course.
5    Q. Who's more likely to remember the car they
6 went off in the honeymoon on?
7    A. Since I don't remember, maybe she would. I
8 don't really know.
9    Q. Okay. Would you agree, though, that what
10 you remember as time passes may depend on what's
11 important to you?
12    A. Yes.
13    Q. Or what you were focusing on?
14    A. Sure.
15    Q. So that's why the burden of proof is not
16 beyond any doubt or all doubt, it's beyond a
17 reasonable doubt.
18        How would you have to know something in
19 order to know it beyond any doubt at all?
20    A. I don't know what the criteria would be for
21 what I called a moral certainty on my sheet that I
22 filled out. That's probably as indefinable as the
23 Court's requirement for beyond a reasonable doubt.
24    Q. Okay. Do you feel like, though, that you
25 would require the State to prove its case beyond

Page 88

1 absolutely any doubt, no doubt at all?
2    A. Not for guilt or innocence, no. But for the
3 death penalty, yes.
4    Q. Okay. So for the death penalty you would
5 hold the State to a higher burden than beyond a
6 reasonable doubt? You would hold the State to a
7 burden of beyond any doubt at all?
8    A. Actually it's not that I'm holding the State
9 to some standard, it's that I would personally not
10 vote to kill someone unless I felt morally certain
11 that they deserved that punishment.
12    Q. Okay.
13    A. But I can't define it any more precisely
14 than that.
15    Q. Okay. Tell you what. We're going to get to
16 the punishment phase in a little bit. Why don't I
17 hold off and revisit that question with you when we
18 get there because then it'll make a little more
19 sense.
20    A. Okay.
21    Q. Okay. But in the guilt/innocence phase, you
22 would hold the State to beyond a reasonable doubt?
23    A. Yes.
24    Q. Okay. All right. Now, let's talk a little
25 bit about what the elements of the offense are.

Page 89

1 Capital murder is a very specific law under our
2 statutes, okay? What the State has to prove is that a
3 murder was committed, plus one of a list of
4 aggravating circumstances. The vast majority of
5 murders that are committed are not capital, okay, it's
6 only a very limited number of murders that are
7 capital.
8    Does that make sense to you?
9    A. I understand that.
10    Q. So we have murder plus the aggravating
11 circumstances. Now, what are the elements of murder?
12 Tell you what, let's go -- yeah, and then I'll go back
13 in a minute.
14    In order to prove that someone committed a
15 murder, what you have to prove, of course, is that the
16 Defendant committed those acts, that it's one in the
17 same person. That the offense occurred in Tarrant
18 County, Texas, okay? That they occurred on or about a
19 certain date, that the person intentionally committed
20 those actions and that intentionally they caused the
21 death of an individual by doing a certain thing, a
22 manner and means, whatever it is: Shooting with a
23 gun, stabbing with a knife, running over with a
24 vehicle, okay?
25    Does that make sense to you?

Page 90

1    A. Sure.
2    Q. Good deal. Now, what then makes it
3 capital? What are the aggravating circumstances that
4 might make an offense capital? Well, one of the
5 things might be killing a child under six. Another
6 might be killing a police officer or a fireman in the
7 course of their official duties. That would make it
8 capital. Another would be killing during the course
9 of another offense, for example, an aggravated
10 robbery, a kidnapping or sexual assault, okay? So if
11 you're killing someone in the course of committing
12 another felony, that would be capital.
13    Or, and let us focus on this one for a
14 little bit, the intentional killing of more than one
15 person in the same criminal transaction, the same
16 criminal episode, okay?
17    A. All right.
18    Q. So in the course of committing this one
19 continuous action, you've killed two people or more.
20    Does that make sense to you?
21    A. I understand that, yes.
22    Q. Okay. All right. And let's talk about just
23 a couple of definitions. Remember when we went back
24 to murder, we had to prove that it occurred on or
25 about a certain date. That's very broad in the law.

Page 91

1 All we have to prove is that it occurred on or before
2 the date of the return of the indictment and within
3 the statute of limitations, okay?
4    A. All right.
5    Q. So if an indictment was returned today --
6 what's today, the 18th?
7    A. Yes.
8    Q. If an indictment was returned today, all
9 we'd have to do is prove that it was before today and
10 within the statute of limitations. Well, for homicide
11 there is no statute of limitations generally, okay?
12 So it's just before the date of the indictment.
13    Does that make sense to you?
14    A. Seems broad, but okay.
15    Q. Would you be able to follow that law?
16    A. Sure.
17    Q. Okay. Let's talk about intent a little
18 bit. A person acts intentionally or with intent with
19 respect to a result of their conduct when it is their
20 conscious objective or desire to cause the result,
21 okay? That's what they mean to do.
22    Pretend we shook hands, all right? How did
23 you know I wanted to shake your hand?
24    A. You held your hand out.
25    Q. Would you agree with me that people don't

Page 92

1 always say out loud verbally what their specific
2 intent is?
3    A. Sure.
4    Q. Sometimes you have to determine their intent
5 by their actions.
6    A. Yes.
7    Q. Now, you'll notice that in capital murder,
8 there is one thing you don't see. Starts with a P.
9    A. One thing you don't see?
10    Q. One element that you don't see. You see
11 intent but you don't see premeditation, correct?
12    A. Oh, you mean, there I don't see
13 premeditation? I'm sorry, yes.
14    Q. Okay. Premeditation is not a requirement of
15 the law. It is not required that we prove the offense
16 was premeditated, okay? And by premeditated, what
17 does that mean to you?
18    A. That in calm circumstances that I made a
19 decision to go forward and do something and then
20 subsequently did so.
21    Q. Okay. You thought about it?
22    A. Right.
23    Q. That's correct. Because the law is that
24 intent can arise almost instantaneously. There is no
25 requirement that you had thought about the offense for

Page 93

1 any particular period of time, just that you do it
2 intentionally.
3      Does that make sense to you?
4 A. Yes.
5 Q. I mean, suppose you had a grudge against
6 Michele here. You have no specific plan to kill her,
7 you see her walking down the street and
8 instantaneously you decide you're going to do it,
9 you're going to kill her, okay?
10      Do you see where you didn't plan that or
11 think about it because you didn't anticipate seeing
12 her on that day?
13 A. Right.
14 Q. But the intent can arise very quickly.
15 A. I can see that intent could arise very
16 quickly. The example is a little farfetched for me to
17 say that it's reasonable.
18 Q. Okay. But you could see circumstances in
19 which intent could arise very quickly?
20 A. Oh, sure.
21 Q. That makes sense to you?
22 A. Yes.
23 Q. All right. Now, we've gone through what the
24 elements of capital murder are. If it turns out that
25 an individual is convicted of the offense of capital

Page 94

1 murder and we move on to the punishment phase, then
2 the Judge will give you what is called special issues,
3 two of them. And these are basically two questions
4 that you have to answer, okay? If you answer both
5 those questions in a certain way, the Judge is
6 required to and will impose the death penalty.
7      On the other hand, if you answer those
8 questions in a different way, then he doesn't have to,
9 okay? And we'll go into what ways those are. It's
10 not like you vote for life or death, do you know what
11 I mean? It doesn't really work that way. It's that
12 you have these two questions and it depends on how you
13 answer those questions as to whether or not the death
14 penalty will be assessed, okay?
15 A. All right.
16 Q. Now, take a minute, if you will, and go
17 ahead and read this first special issue. This is the
18 first one, okay? And go ahead and read that for just
19 a moment.
20      (Brief pause.)
21 A. Okay.
22 Q. Now, before I get there, let me say
23 something. We've talked about the death penalty, of
24 course. That's one of two options you have in terms
25 of these special issues. A person can either be

Page 95

1 sentenced in a capital murder case to death or they
2 can be sentenced to life in prison. Let me explain to
3 you what we mean when we say life.
4      Life means that they must serve 40 years in
5 the penitentiary day for day before they would even be
6 considered for parole, okay? So it would be 40 flat
7 years. And at that point they could be considered for
8 parole by the Board of Pardons and Paroles. It's not
9 absolute that they would get it, okay?
10 A. Right.
11 Q. But they would have to serve 40 flat years
12 before they could be considered, okay? There is no
13 such thing as life without parole in Texas.
14 A. Okay.
15 Q. All right. Now, let's go on here to Special
16 Issue No. 1, future dangerousness. That's what we
17 call this because that's kind of the crux of what it
18 means. It's a question concerning whether or not you
19 believe this person, if there is a probability they
20 will be dangerous in the future, okay?
21 A. Okay.
22 Q. Now, the State has the burden of proof on
23 this question, which means we must prove this to you
24 beyond a reasonable doubt. And we'll go back to that
25 in a minute because of what you said.

Page 96

1      You'll note that probability is not defined
2 in the law, okay? There's no specific definition.
3 However, generally speaking the term probability means
4 more than a possibility, but less than a certainty,
5 okay?
6 A. Uh-huh.
7 Q. Do you fly at all?
8 A. No, I'm not a pilot.
9 Q. Oh, do you fly on commercial airplanes as a
10 passenger?
11 A. Yes.
12 Q. Do you consider it a possibility that that
13 plane might crash?
14 A. Sure.
15 Q. We all do, it's always a possibility.
16 That's what we mean in terms of possibility versus
17 probability, okay? It isn't a certainty that the
18 plane would crash or nobody would ever get on, okay?
19 It's a possibility. Probability is somewhere in
20 between.
21 A. Okay.
22 Q. Okay. Criminal act of violence. Does that
23 have any particular meaning to you?
24 A. It means that some other individual has been
25 hurt, injured by means of that same person.

Page 97

1  Q. Okay. So it could encompass another murder
2 to you?
3  A. Right. Or something lesser.
4  Q. Or something lesser, even as much as simple
5 assault?
6  A. You put the word simple in front of assault
7 then you make it sound like it's --
8  Q. Not important?
9  A. Not as important as assault might be.
10  Q. Okay.
11  A. But there's assault and then there's really
12 doing somebody great bodily harm.
13  Q. Okay. All right. The law does not define
14 that term for you. It means what you think it means,
15 okay? The law encompasses the possibility of it being
16 anywhere from a property crime like arson all the way
17 up to murder. But what it means is really up to you,
18 okay?
19  A. All right.
20  Q. Does that make sense to you?
21  A. Uh-huh.
22  Q. Now, in a particular case you might look at
23 this question and you might listen to the facts of the
24 case that was on trial and decide that the facts of
25 that offense alone were sufficient to decide whether

Page 98

1 or not a person has a probability of committing
2 criminal acts of violence in the future that would
3 constitute a threat to society. You yourself could
4 make that decision based just on the facts of this
5 case or you might require more than that, okay? That,
6 once again, is totally up to you.
7  A. Okay.
8  Q. Does that make sense to you?
9  A. Oh, yeah.
10  Q. Now, by society there is no set definition
11 of that term, either. By society we can mean what you
12 think of a society, any person on the street. It
13 could even include people in prisons who form a
14 society of their own basically, correct?
15  A. They apparently do, yes.
16  Q. Okay. All right. Now, do you feel like you
17 understand this question, what it means?
18  A. Yes.
19  Q. Okay. That seems pretty direct to you.
20  Do you feel that you would hold the State to
21 a higher burden than beyond a reasonable doubt with
22 regard to proving this question?
23  A. I'm hesitating because that does bear on my
24 previous comment, obviously. Is my answer yes to that
25 question and to other, the second one that you

Page 99

1 mentioned, does that automatically mean that the Judge
2 in the case must go for death or does the Judge have
3 the final choice?
4  Q. No, sir. If you answered this question yes
5 and then the subsequent question which we'll get to in
6 a minute no, it would be automatic. The Judge would
7 be required by the law in Texas to impose the death
8 penalty.
9  A. Okay. I really can't give you an honest
10 answer. I don't know what -- I just don't really know
11 that I can say yes or no.
12  Q. Okay. Well, let me ask it this way, then.
13 The Judge would give you a piece of paper at the end
14 of the trial that's called a Court's Charge. And in
15 that charge you would be given all of the law that
16 pertains to the case. The Judge would tell you in
17 that charge that you are required to hold the State to
18 the burden of beyond a reasonable doubt, okay?
19  A. Uh-huh.
20  Q. That is the specific burden of proof that
21 you are instructed you must use, okay? If the Judge
22 were to give you that instruction, could you follow
23 that instruction or, because of your personal moral
24 feelings concerning the death penalty and the
25 imposition of death, would you in that circumstance

Page 100

1 not be able to follow the law?
2  Does that make sense to you?
3  A. It does. I don't have a moral objection to
4 the death penalty. I think that it can be imposed
5 appropriately. It's just that this question seems to
6 -- I have to -- I'm not stating this very well.
7  A reasonable doubt is so unclear that I
8 don't know ahead of time that I could tell anybody
9 yep, I know for sure if there is no reasonable doubt
10 I'd say yes to this question. Or I suppose what is
11 reasonable doubt to one person is not necessarily the
12 same thing to another.
13  And I feel like I'm being held to some kind
14 of standard that I don't understand. It's not my
15 standard, it's the Court's standard. Or, I mean, it's
16 obviously not the prosecution's or the defense's
17 standard, but it's a standard that is not, probably
18 not definable, but I'm nevertheless being held to it.
19 And I feel very uncomfortable about that.
20  I think I can make good decisions, but I
21 don't know that I can honestly and truthfully, you
22 know, say that I understand or that my understanding
23 of reasonable doubt is the same understanding as the
24 Court's.
25  Q. Okay.

Page 101

1　A. Because I don't know what that really is.
2　Q. Okay. Well, the definition of that
3 particular thing, beyond a reasonable doubt, basically
4 is up to you, there is no set or established
5 definition in the State of Texas.
6　A. I understand.
7　Q. However, what it most definitely is not is
8 beyond any doubt or all doubt.
9　A. Right. And I don't think that any human
10 being can know that there is no doubt. Every human
11 being is capable of doubting his decisions.
12　Q. Sure. So the law defines that as beyond a
13 reasonable doubt, okay, understanding that in a
14 person's mind, there will always be some doubt. But
15 the question is are you able to hold yourself to the
16 burden of beyond a reasonable doubt or are you able to
17 hold the State to the burden of beyond a reasonable
18 doubt?
19　　I hate to press you?
20　A. Yeah, I think I'm probably just beating this
21 to death unnecessarily. I think, you know, I consider
22 myself reasonable and I know that I am not
23 omniscient. And so when I say that I want moral
24 certainty, I just want to know that this person
25 deserves to die before I say yes. And the reasonable

Page 102

1 doubt is probably a standard that I would act on
2 anyway. I just -- since we don't have a good
3 definition, obviously you will all judge me based on
4 all my comments. You'll have a reasonable doubt that
5 I am or am not qualified as a juror or not have a
6 reasonable doubt to that effect.
7　　But I can't get any more specific than
8 that. I'd like to, but I --
9　Q. Well, I don't mean to push, but the law
10 requires me to ask this.
11　A. That's fine.
12　Q. Can you follow the Court's Charge if it
13 instructs you that you must find this element, this
14 special issue beyond a reasonable doubt?
15　A. I think I can because I know that there is,
16 you know, we're not going to get any more precise than
17 reasonable doubt.
18　Q. Okay.
19　A. That is what I would use myself in making a
20 decision.
21　Q. So is that a yes or a no?
22　A. It's a yes. I'm sorry.
23　Q. I don't mean to bug you, but got to do it.
24　　All right. Then let's go on to the next --
25 hold on just one minute.

Page 103

1　　(Brief pause.)
2　Q. Does beyond a reasonable doubt to you mean
3 100 percent certainty or is it something less?
4　A. No, it's something less.
5　Q. All right. I was just curious about that.
6 Let's go on to the next one, then.
7　　Mitigation. Now, this is Special Issue
8 No. 2, Question No. 2. If you'll take a moment just
9 to go ahead and read it.
10　　(Brief pause.)
11　A. Okay.
12　Q. One thing that's interesting about this one,
13 this will make you happy, okay, there is no burden on
14 this one okay, there is no burden on the State, there
15 is no burden on anybody, okay? It's basically what it
16 means to you.
17　　This is pretty much a default provision,
18 okay, so that you may take all of the evidence into
19 consideration and considering and chewing on
20 everything that you have heard do you find something
21 that makes this individual not really appropriate for
22 the death penalty, okay? Or, on the other hand, if
23 you say no, is there just nothing in the whole
24 pictures that mitigates or changes what you have seen
25 in the evidence.

Page 104

1　　Does that make sense to you?
2　A. Yes, it does.
3　Q. Because the next step after that if you
4 answer that question no is the death penalty being
5 assessed.
6　A. Right.
7　Q. So you've gotten to the end of it and that's
8 the last stop before that final end of the road, okay?
9　A. Yes.
10　Q. All right. Now, mitigation, what does that
11 term mean to you?
12　A. That there is something about the person or
13 about the circumstances that don't necessarily excuse
14 the act, but makes it possible for me to understand
15 how it might have been committed.
16　Q. Okay. Does it mean just an explanation or
17 does it in some fashion reduce their blameworthiness
18 to you?
19　A. Well, it could reduce the blameworthiness.
20　Q. Because the general substance of this
21 basically is do you think there's anything there that
22 lowers their level of blame. That's what mitigation
23 -- I mean, I know mitigation has multiple definitions,
24 but that's basically what this is getting at.
25　　Does that make sense to you?

| Page 105 | Page 107 |
|---|---|
| 1   A. Yes.<br>2   Q. All right. And this is kind of important to<br>3 remember, mitigation, what is or is not mitigating is<br>4 totally and completely what you find mitigating. Some<br>5 people find a bad childhood, prior drug or alcohol<br>6 abuse, things like that to be mitigating, to lessen<br>7 responsibility. Other's don't. It really is what it<br>8 means to you. You are not required to take any<br>9 particular factor and think yeah, that's mitigating.<br>10 You're not required to agree with other jurors on<br>11 that, okay? It's really what it means to you.<br>12      Can you envision a set of facts that would<br>13 enable you, having answered yes to Special Issue No. 1<br>14 to then look at the case, complete picture, and then<br>15 answer yes to this? Yes, I think they're a future<br>16 danger, but yes I also see mitigation there?<br>17   A. Yes.<br>18   Q. There are some facts that might play that<br>19 out for you?<br>20   A. I think so. I don't have any in mind, but I<br>21 certainly think there would be.<br>22   Q. In your mind can you see a factual<br>23 circumstance or do you think there might be a factual<br>24 circumstance where you would be able to answer the<br>25 first question yes, this person is a future danger, | 1 dangerousness, in order to answer that yes, the 12 of<br>2 you have to agree. In order for the answer to be no,<br>3 only ten of you have to agree, okay?<br>4   A. Okay.<br>5   Q. Here it's reversed. The answer yes means a<br>6 life sentence. Ten of you have to agree for that.<br>7 For it to be no, for it to be the death penalty, all<br>8 of you have to be unanimous, okay?<br>9      Does that make sense to you?<br>10   A. Uh-huh, yes.<br>11   Q. If you were to answer these questions in<br>12 such a way that the death penalty would be assessed,<br>13 would you feel morally responsible for that person's<br>14 death, a defendant's death?<br>15   A. In one sense yes, since obviously my actions<br>16 are resulting in the death. But if I'm morally<br>17 responsible -- you mean, do I think that I will be<br>18 tried at a higher level somewhere sometime, no.<br>19   Q. So not on a religious basis?<br>20   A. No.<br>21   Q. Do you feel like your feelings of moral<br>22 responsibility would prevent you from imposing a death<br>23 penalty?<br>24   A. No.<br>25   Q. You feel like you'd be able to do it? |

| Page 106 | Page 108 |
|---|---|
| 1 but taking everything into consideration, the answer<br>2 to this question would be no?<br>3   A. Yes, I do.<br>4   Q. Okay. Now, let me ask you that. It's one<br>5 thing to make an intellectual exercise out of this,<br>6 but it's another thing as a human to do that<br>7 personally.<br>8      Do you think you can do that personally?<br>9   A. Yes, I do.<br>10   Q. Do you think you could answer these<br>11 questions in such a way that a person would be<br>12 sentenced to death?<br>13   A. Yes.<br>14   Q. Because that's kind of tough, isn't it?<br>15   A. Well, yes, it would be a heart-wrenching<br>16 experience, but it's doable.<br>17   Q. Because if you believe in it, but you<br>18 personally can't be a part of it, that's okay, I just<br>19 need to know.<br>20   A. No, I can be a part of it.<br>21   Q. Okay. All right. Thank you.<br>22      Now, I don't know if I mentioned this<br>23 before. With regard to both of these questions,<br>24 Special Issue 1 and 2, in order for the answer -- I'm<br>25 sorry. I reversed it. Number one, the future | 1   A. Yes.<br>2   Q. All right. Now, let's go over just a few<br>3 more legal issues and then I have some questions off<br>4 your questionnaires and that'll probably be it for<br>5 me.<br>6      Voluntary intoxication. Generally speaking<br>7 the, law is that if a person voluntarily takes in<br>8 drugs or alcohol and they're intoxicated because of<br>9 it, that's not a defense to the commission of a crime,<br>10 okay?<br>11   A. Uh-huh.<br>12   Q. Does that make sense to you?<br>13   A. Yes.<br>14   Q. Now, for mitigation purpose it has whatever<br>15 weight you think it should have. But generally<br>16 speaking it's not a defense to a crime, okay?<br>17      Let's talk a little bit about certain types<br>18 of evidentiary rules. Have you heard on TV of Miranda<br>19 warnings?<br>20   A. Oh, yeah, sure.<br>21   Q. Everybody has, right?<br>22   A. Not on TV, but everywhere.<br>23   Q. Now, in some types of cases, evidence might<br>24 be admitted, okay, just as an example, a statement<br>25 might be admitted. In order for it to be admitted, |

Page 109

1 certain rules of law have to be followed. For
2 example, Miranda warnings have to be given to a
3 defendant.
4    A. Yes, I'm familiar with that.
5    Q. Yeah, okay. In the State of Texas -- now,
6 you might not be familiar with this -- in the State of
7 Texas if a written statement is taken, it has to be
8 printed at the top of the written statement. Or if a
9 tape is made of the person confessing, it has to be at
10 the beginning of the tape. And that's pretty unique
11 to the State of Texas, okay?
12    A. Okay.
13    Q. The law says that in order for a piece of
14 evidence to be admissible, it must have been taken in
15 accordance with the law, okay? And if the police
16 violated the law in taking that statement, that that
17 statement is not admissible, even if it's a full
18 confession to the crime, okay?
19    A. Uh-huh.
20    Q. Does that make sense to you?
21    A. Yes, it does.
22    Q. So let's put it in more concrete terms,
23 okay? Suppose an individual commits a child abduction
24 and murder, okay? Leads the police to the body of the
25 child and at some point the police have him in custody

Page 110

1 because it's a requirement that if a statement is
2 going to be taken, that these are the requirements
3 that apply if the person is in custody, okay?
4        That person was in custody, they sat down,
5 they took a full confession from that individual. And
6 they know he's the right person, he led them to the
7 body, okay? But they didn't do their Miranda
8 warnings, they didn't do it right.
9        What the law says is that you would have to,
10 if it was not done legally, not done properly, you
11 would have to disregard that piece of evidence, throw
12 it out and consider what it left, okay?
13    A. Right. Yes. Absolutely.
14    Q. Could you do that?
15    A. Yes, I could. Very, very important.
16    Q. Sure. Because it makes sense, right? It
17 makes sense that you cannot reward behavior if it's
18 not in compliance with the rules, correct?
19    A. Correct.
20    Q. On the other hand, you know you've got
21 someone who abducted and killed a child. So the
22 question is could you disregard that evidence and
23 continue on what you have?
24        Would you be able to do that?
25    A. Yes, I would.

Page 111

1    Q. Okay. What if it eventually resulted in
2 finding that person not guilty? What if there was
3 insufficient evidence to continue?
4    A. That's the risk that the prosecution runs
5 when they bring a case that is so weak.
6    Q. Okay. So you would be able to hold the
7 State to its burden, then?
8    A. Yes.
9    Q. All right. Now, let's go a little bit into
10 individual rights. A defendant has a right to an
11 attorney, they have a right to a trial by jury. They
12 have a right to remain silent. You've heard that too,
13 right?
14    A. Oh, yes.
15    Q. If a person chooses to testify, they're held
16 to the same standard as any other witness if a
17 defendant chooses to testify. You consider their
18 credibility just like you consider anyone else's.
19        However, if they decide not to testify, that
20 means you cannot consider that for any purpose against
21 them.
22    A. Right.
23    Q. Does that make sense to you?
24    A. Yes, it does.
25    Q. Do you feel like you could follow that?

Page 112

1    A. Yes.
2    Q. And also understand there's a presumption of
3 innocence that a defendant is cloaked with, which
4 means that whether they're factually innocent or not,
5 you must presume them innocent until the State has
6 proved them guilty beyond a reasonable doubt.
7    A. Yes.
8    Q. All right. There is such thing as a
9 subpoena power in the State of Texas. That applies
10 equally to the State and the defense, we can both
11 equally subpoena witnesses, okay?
12        There is a right of discovery in criminal
13 cases generally speaking, but the State does not
14 generally have discovery of the defense case. But the
15 defense does have a right to have discovery of our
16 evidence as a rule. Now, there are some exceptions to
17 that, but that's the general rule, okay?
18        You were asked a question on your
19 questionnaire about whether or not any of this sounded
20 familiar to you or if you had read any accounts in
21 the media. Do you remember that?
22    A. Yes.
23    Q. Does the name Pat Syren or Pearl MaGouirk
24 sound familiar to you, MaGouirk?
25    A. No.

| Page 113 | Page 115 |
|---|---|
| 1   Q. What about any offense that occurred in | 1 accounts, eyewitness testimony that you are suspicious |
| 2 April of this year on Scott Avenue over on the east | 2 of? |
| 3 side? | 3   A. Oh, sure.  People misidentify things all the |
| 4   A. No. | 4 time.  I don't have any particular case that I can |
| 5   Q. So you have not read any media accounts? | 5 think of, but it just seems to me the fact that |
| 6   A. Not that I recall. | 6 someone is an eyewitness is not always sufficient · |
| 7   Q. Let me read you a list of names and see if | 7 evidence for anything. |
| 8 any of these people sound familiar to you, okay? | 8   Q. Okay.  Do you feel like you would disregard |
| 9   A. Okay. | 9 the testimony of an individual who was an eyewitness |
| 10   Q. April Syren, Robert Greer, Jamie Spore, | 10 to a crime because they were an eyewitness? |
| 11 Loretta Rouse, Carol Lain.  Do you know any officers | 11   A. Oh, no.  No.  I mean, it's certainly |
| 12 of the Galveston Police Department? | 12 relevant information.  But people mistakenly identify |
| 13   A. I don't know any officers at any police | 13 people all the time, so it's something to be |
| 14 departments. | 14 considered. |
| 15   Q. Judy Bell, Robert Pawlowksi, Cheryl Moffett | 15   Q. Okay.  You would just consider it along with |
| 16 Glendora White, Bobby Gabbert, Dr. Nizam Peerwani and | 16 other things? |
| 17 Carolyn Van Winkle of the Tarrant County Medical | 17   A. Right. |
| 18 Examiner's Office, David Ogden. | 18   Q. Do you attend a church? |
| 19     Do you know any probation officers? | 19   A. No, I don't. |
| 20   A. The name Peerwani rings a bell because he's | 20   Q. You described your religious belief or |
| 21 been in the news years and years.  But I do need to | 21 philosophy as questioning? |
| 22 say that I do know a police officer in a police | 22   A. Yeah.  I was raised a Catholic, but in |
| 23 department in Fayetteville, Arkansas.  He's the | 23 college fell away from those tenets of belief and have |
| 24 husband of my niece. | 24 not formed any new tenets.  I'm open to the question |
| 25   Q. Okay.  Now, do you have family in Arkansas? | 25 and interested in the question of a superior being, |

| Page 114 | Page 116 |
|---|---|
| 1   A. My father retired there and I have a brother | 1 but I don't currently have any belief in one. |
| 2 there, yes. | 2   Q. Okay.  All right.  Thank you. |
| 3   Q. Because my whole family is from Arkansas, my | 3     You probably guessed I was going to ask you |
| 4 parents are. | 4 this question.  Describe the first thing that came to |
| 5     All right.  David Ogden or anyone with adult | 5 your mind.  For district attorney you said |
| 6 probation? | 6 politician.  What does that mean? |
| 7   A. No. | 7   A. Well, in the past I have watched television, |
| 8   Q. A Dr. Randy Price, Kelly Goodness or · | 8 although I haven't watched it for about a year now. |
| 9 Dr. Barry Mills? | 9 And district attorneys are political creatures who |
| 10   A. No. | 10 make a -- make progress by getting a good conviction |
| 11   Q. Pamela Staples, Kevin Stephen, JoAnne | 11 record.  And so I don't have any great warm feelings |
| 12 Shoemaker? | 12 toward the legal profession. |
| 13   A. No. | 13   Q. I noticed that? |
| 14   Q. Geraldine Suggett, Randy McCullough, Debra | 14   A. And so that was probably an ill-considered |
| 15 Huffines? | 15 comment.  But part of being a prosecutor is to be a |
| 16   A. No.  Huffines, oh, that's the car | 16 political animal and to -- it's your job.  You |
| 17 dealership. | 17 prosecute cases.  And success in prosecuting cases is |
| 18   Q. No.  Okay.  One more minute, let me look at | 18 the way that you would progress in the prosecutorial |
| 19 my sheet here, ask my co-counsel some questions and we | 19 part of the law, which is the attorneys, the attorneys |
| 20 should be wrapping it up. | 20 general. |
| 21   (Brief pause.) | 21   Q. DA's office? |
| 22   Q. Robert Watson never did any criminal, right? | 22   A. Yeah, DA's office.  I'm sorry.  Probe some |
| 23   A. I don't think he ever did.  He was SEC law | 23 more.  I asked for it there. |
| 24 mostly before he came to our corporation. | 24   Q. Well, do you feel as though your feelings -- |
| 25   Q. Okay.  Is there something about eyewitness | 25 no, if it's honest, that's fine.  But do you feel as |

Jury Voir Dire Proceedings 8-16-05 — Multi-Page — State vs. Billy Jack Crutsinger Vol. 3

Case 4:07-cv-00703-Y Document 86 Filed 11/03/17 Page 39 of 143 PageID 3462

| Page 117 | Page 119 |
|---|---|
| 1 though that would affect you in listening to the facts<br>2 of this case?<br>3    A. No. As I said, it was an ill-considered<br>4 comment. I was a little frustrated by filling in all<br>5 of the answers there.<br>6    Q. Okay.<br>7    A. But it's true. It's true that saying<br>8 district attorney/politician would be a reasonable,<br>9 for me, word to come up with if we're just doing word<br>10 associations.<br>11    Q. Okay. The thing I need to make sure of,<br>12 though, I mean, and in all honesty if you do, that's<br>13 fine, I just need to know.<br>14    A. Uh-huh.<br>15    Q. Do you feel like you start off with a bias<br>16 against the State because of your feelings concerning<br>17 district attorneys?<br>18    A. If I allowed myself to be biased, yes. But<br>19 I think that I am capable of putting aside feelings<br>20 and just assessing the facts.<br>21    Q. Okay. That's kind of hard to do, though,<br>22 isn't it, on a day-for-day basis?<br>23    A. If I had some really, really strong feelings<br>24 about something, yes, it would be. But I really don't<br>25 have any terribly strong feelings about DA's and | 1    Q. Same thing. You've described criminal<br>2 defense attorney as trickster?<br>3    A. Yes.<br>4    Q. I hate to go back into this again, but I<br>5 have to kind of go one by one.<br>6      Do you also have a bias against criminal<br>7 defense attorneys?<br>8    A. No more or less than against prosecutors. A<br>9 defense attorney's job is to get their client off.<br>10 Some of their client deserve to be gotten off, some<br>11 don't. But the attorney's job is to get 'em off. And<br>12 so to some extent, they will use whatever they can get<br>13 away with in the court. And so trickster is probably<br>14 not an unfair accusation for some lawyers.<br>15    Q. Do you think that in listening to the facts<br>16 of this case, because of your feeling about criminal<br>17 defense attorneys, that you would give the defense<br>18 witnesses less credibility starting out than you might<br>19 other kinds of witnesses?<br>20    A. No, I think I would give defense or<br>21 prosecution witnesses equal weight.<br>22    Q. So you don't feel like you might think,<br>23 well, they're tricksters and these are their<br>24 witnesses?<br>25    A. No. I haven't endeared myself to anyone |

| Page 118 | Page 120 |
|---|---|
| 1 lawyers. It's just fairly nebulous distaste for some<br>2 of the things that some lawyers do and some of the<br>3 things some DA's do. There's good people in all the<br>4 professions and it's unfair for me to have a bias.<br>5 And so I struggle very hard not to let a feeling that<br>6 there is -- there are some bad people in these kinds<br>7 of positions or people in these positions that might<br>8 take advantage of them. There's lots of good people<br>9 there, too.<br>10      And so I'm -- I'm not happy with myself when<br>11 I have -- I'm not happy with myself when I have these<br>12 reactions to people because of the class that they<br>13 happen to be in. I mean, I look at that as just as<br>14 bad, you know, if I was racially prejudiced. And if<br>15 we set that aside, if I was, then I would feel badly<br>16 about being racially prejudiced. I feel badly about<br>17 being lawyerly prejudiced.<br>18    Q. Okay. Is there any individual or personal<br>19 experience you've had that makes you feel this way?<br>20    A. No.<br>21    Q. Is there any experience you've had actually<br>22 with Tim Curry's office, with our office?<br>23    A. No.<br>24    Q. So it's not based on personal, it's general?<br>25    A. Right. | 1 yet.<br>2    Q. Well, when it comes down to it ultimately<br>3 it's not really about endearing yourself, just like<br>4 it's not really about us. It's about essentially the<br>5 Defendant and the crime and the victims.<br>6    A. Right.<br>7    Q. So we have to make sure that we start off on<br>8 an even playing field.<br>9    A. I understand.<br>10    Q. Ayn Rand, what was it about her books that<br>11 spoke to you?<br>12    A. The importance of the individual. Probably<br>13 her book or her books were a part of my falling away<br>14 from the Catholic church. So anybody who has that big<br>15 an effect on you is -- that was a significant move on<br>16 my part.<br>17      But I like her individually. I don't like<br>18 her writing style, but I like her individually. I am<br>19 a strong believer in property rights, in capitalism.<br>20 She just said a lot of things that made a lot of sense<br>21 to me.<br>22    Q. Okay. You know, when you go back into the<br>23 jury room and you deliberate with other people, it's<br>24 important to take what they say into consideration and<br>25 if you feel like they have good points, to take those |

| Page 121 |
| --- |

1 into account in making your decision. Ultimately the
2 decision is yours. But the law provides for and
3 anticipates deliberation and consideration of all
4 viewpoints.
5     Do you think you'd be able to do that?
6   A. Yes, maybe to a fault. Maybe your opinion
7 of Ayn Rand is different than mine, maybe you're not
8 familiar with her. But if you think that my thinking
9 that she was a good writer and had lots of good things
10 to say would prevent me from -- well.
11   Q. I just keep thinking of "Who is John Galt."
12 But anyway.
13   A. Yeah, I would actively seek out the opinions
14 of the other jury members in deliberation.
15   Q. Okay. That seems a rational way of reaching
16 a conclusion of your own?
17   A. I think so.
18     MS. CALLAGHAN: Thank you very much,
19 Mr. Reed, we appreciate it.
20     VENIREPERSON REED: Thank you.
21     MS. CALLAGHAN: The State passes the
22 witness, Your Honor.
23     VOIR DIRE EXAMINATION
24 BY MR. RAY:
25   Q. How you doing, Mr. Reed?

| Page 122 |
| --- |

1   A. Very good, thanks.
2   Q. My name is Bill Ray. I represent Billy Jack
3 Crutsinger. This is Tim Moore, he's also a lawyer.
4 And I'm going to talk to you a little while, is that
5 okay?
6   A. That's fine.
7   Q. How are you doing today?
8   A. Good.
9   Q. What did you think when you first saw that
10 questionnaire last week, two weeks ago?
11   A. Well, it's not the first questionnaire I've
12 seen because I've been in some jury pools before.
13   Q. Have you ever served on a jury before?
14   A. No, I've never served on a jury.
15   Q. You were in a jury pool, I'm guessing, where
16 you came into the courtroom and the prosecutor talked
17 to you for a little while and then the defendant's
18 lawyer did, everybody was spoken to as a group?
19   A. That's correct.
20   Q. Okay. This is the first time you've ever
21 done a jury deal like this?
22   A. Yes, sir.
23   Q. Did you -- what did you think when you first
24 saw this questionnaire that we gave you. And if you
25 need to look at it, I'll bring it up there for you.

| Page 123 |
| --- |

1 What did you think about it as you were reading it?
2   A. I thought it was reasonable.
3   Q. Did you have any idea what kind of case you
4 were going to be listening to as you looked through
5 this questionnaire?
6   A. I assumed that it was a murder case based on
7 the questions about capital.
8   Q. Based on one of the questions that says in
9 big, bold letters on the third page, "In any case
10 where the death penalty is a possible punishment,"
11 that's a pretty good indicator, right?
12   A. Right.
13   Q. Did you like the questionnaire? Did you
14 think it was too long, too short, too nosy?
15   A. No, I thought it was reasonable.
16   Q. If you liked it, then I'm going to tell you
17 that I wrote it.
18   A. All right.
19     MS. HARTMANN: With a little help.
20   Q. (BY MR. RAY) The prosecutors gave me quite
21 a bit of input.
22   A. Some suggestions, okay.
23   Q. But we agreed on these questions, so you
24 can't really hold it against them or me. And I won't
25 tell you which ones they asked for and I won't tell

| Page 124 |
| --- |

1 you which ones I did.
2     Fair enough?
3   A. Fair enough.
4   Q. I think -- and this is a death penalty case,
5 the State is seeking the death penalty in this case.
6 They don't have to seek the death penalty, did you
7 know that?
8   A. No, I was not aware.
9   Q. You know, I'm going to tell you a couple
10 things and then I'm going to ask you if that would've
11 made some difference in your questionnaire.
12     Would you agree with me that, first of all,
13 that you ought to know kind of all of the facts that
14 would give rise to what a particular situation is
15 before you can really make a decision? That kind of
16 makes sense, doesn't it?
17   A. Sure.
18   Q. And what I'm getting at is we talk about the
19 death penalty and a life sentence. And sometimes
20 people talk about life without parole and parole for
21 that matter. Those are terms that I'm guessing since
22 you don't have a legal background, you're not a
23 lawyer, you might be sitting where I am if you did,
24 you might not understand all those things, so I'm
25 going to tell what they are and then we're going to

Page 125

1  talk a little bit about it, okay?
2      A. All right.
3      Q. To make sure that some of your questions or
4  the answers that you gave to the questions after you
5  know them, I'd assume that it might change your
6  answer, it might not. I want to make sure I got the
7  right answer to the right question based on your
8  knowledge of what the facts are.
9          Does that make sense? I'm not talking about
10  the facts of the case, I'm talking about the facts of
11  what the question is.
12      A. Yes.
13      Q. I guess it goes without saying, you probably
14  know what the death penalty is, right?
15      A. Yes.
16      Q. What's your understanding of the death
17  penalty?
18      A. That an injection is given to the person to
19  be killed and that as a result of that, he dies.
20      Q. The State kills you. That's what happens,
21  right?
22      A. Right.
23      Q. They take you down to Huntsville and then
24  they strap you on a, not an operating table, I think
25  they call it a gurney. They strap you down to that,

Page 126

1  they stick a needle in your arm and if you don't get a
2  call from the governor or the President or somebody,
3  they turn on the juice and you die.
4          That's what the death penalty is.
5      A. Yes, sir.
6      Q. Is that your understanding of it?
7      A. Yes, it is.
8      Q. In a capital murder case -- first of all,
9  all capital murders, and I kind of alluded to this a
10  minute ago, there's only two possible punishments for
11  capital murder; do you understand that?
12      A. Uh-huh.
13      Q. One being the death penalty, one is a life
14  sentence, okay? Now, you're going to need to answer
15  because Bill here is writing down everything.
16      A. Yes.
17      Q. To every question me or the prosecutors ask
18  you.
19          And that was a life sentence, you understand
20  that?
21      A. Yes.
22      Q. What's your understanding of a life
23  sentence? And if you don't get it right, I'm going
24  to --
25      A. Minimum of 40 years.

Page 127

1      Q. You got to serve 40 calendar years before
2  you're even eligible for parole in this state.
3          Are you with me?
4      A. Yes.
5      Q. Some states have what they call life without
6  parole, but that's not what we're talking about here.
7  Life without parole means you don't ever get out of
8  prison; do you understand that?
9      A. Yes, I do.
10      Q. Do you understand what parole is?
11      A. Yes.
12      Q. Parole is where you get released from prison
13  at some point, depending on what certain people say;
14  do you understand that?
15      A. Yes, sir.
16      Q. And I want to talk to you a little bit more
17  about that. This is what the law is for parole in
18  capital murder cases, all right? And that's the only
19  one we're going to consider. Can you see that? This
20  is not an eye test.
21      A. Yes, I can see.
22      Q. And it's actually entitled in our law an
23  extraordinary vote for the parole law, okay, because
24  it is for capital murder.
25          That makes sense, correct?

Page 128

1      A. Yes.
2      Q. To release on parole an inmate who was
3  convicted of a capital felony, first of all, all
4  members of the board got to vote. If they don't have
5  everybody there, the person doesn't get released,
6  okay? That's the first thing.
7          Two-thirds of those members got to vote in
8  favor of the release, okay? There's 18 members on the
9  Board of Pardons and Paroles, they're the Parole Board
10  in this state and they're appointed by the governor.
11  But before an inmate gets paroled, all 18 of them got
12  to be there, okay? And 12 of them have to say I want
13  to parole him.
14          Fair enough?
15      A. Okay.
16      Q. Also they can't vote on the release unless
17  the member first has a copy of a report from the
18  department. And where it says department up there,
19  that's the Department of Corrections, okay, on the
20  probability that an inmate would commit an offense
21  after being released on parole.
22          You remember the little future dangerousness
23  question that Ms. Callaghan talked to you about?
24      A. Yes.
25      Q. That's got the word probability. It's

Page 129

1 certainly not beyond a reasonable doubt or it'd say
2 that. But the prison authorities are going to make
3 some recommendation to the Parole Board. Everybody on
4 the Parole Board is going to have that recommendation
5 before they vote on whether or not to release an
6 inmate after 40 years, okay? That's what a life
7 sentence means in a case like this, okay?
8    A. Yes, sir.
9    Q. And that was probably a little more
10 education than you wanted on a life sentence. But for
11 purposes of my questions and the prosecutor's
12 questions, when we say life, that's what we mean,
13 okay?
14    A. I understand.
15    Q. Does that change any of your answers do you
16 think?
17    A. I don't think so.
18    Q. Okay. Got to ask.
19       Now, I want to talk to you about something
20 else. First of all, the law in this state -- and I
21 believe there are 38 states that have death penalty in
22 this country and there's 12 that don't. And I don't
23 know which ones they are. But Texas is one of them
24 that does, okay?
25       How do you feel about that?

Page 130

1    A. I think that it's an appropriate penalty in
2 some cases.
3    Q. Do you think it's an appropriate penalty in
4 all cases?
5    A. In all capital murder cases?
6    Q. Do you think it's an --
7    A. No, your question is do I think it's an
8 appropriate penalty in all capital murder cases?
9    Q. That's what my question was. I agree that's
10 not what I said. Wouldn't be appropriate in a DWI,
11 probably, would it?
12    A. No, certainly not. No, I don't think it's
13 necessarily appropriate in all capital murder cases.
14    Q. In capital murder cases, as Ms. Callaghan
15 said, first of all, just a murder is not a capital
16 murder.
17    A. Right.
18    Q. All capital murders are murders, but not all
19 murders are capital murders; you understand that?
20    A. Yes.
21    Q. There is some aggravating element, what I'm
22 going to call an aggravating element. And she had the
23 list of them up there: Child under six, police
24 officer, fireman, there's some she actually didn't
25 list, prison guard. There's a list of them. The one

Page 131

1 that's alleged in this case is intentionally killing
2 more than one person, okay?
3    A. Okay.
4    Q. So for purposes of what all the other
5 capital murders are, I'm just going to confine it to
6 that one, because that's the case we're trying. But
7 you'll agree that's different to kill two people than
8 it is to kill one?
9    A. Sure.
10    Q. Obviously to take one person's life is bad
11 enough. The law doesn't -- the law makes a
12 distinction from that being what I'm going to call a
13 regular murder, and that's not really the right term,
14 which has a different punishment range than capital
15 murder, okay?
16    A. That makes sense to me.
17    Q. In some cases a person could even get
18 probation for murder, but nobody gets probation for
19 capital murder. That doesn't happen, right?
20    A. All right.
21    Q. Now, would you agree with me that --
22 let me back up. The State says it's okay to kill
23 somebody who's committed capital murder. That's an
24 okay punishment under our law.
25    A. Right.

Page 132

1    Q. Do you agree with that?
2    A. Yes, I do.
3    Q. The State also says that it's okay to give
4 somebody a life sentence. In other words, the
5 legislature has not taken the position that everybody
6 gets convicted of capital murder ought to have the
7 death penalty. The legislature and our law recognizes
8 that some people don't get the death penalty even
9 though they commit capital murder. And you understand
10 that?
11    A. Yes.
12    Q. Do you feel like that's okay or do you have
13 some ill feeling towards that?
14    A. No, I think that's okay.
15    Q. Would you agree with me that it's better to
16 make a decision on a good, solid thought process as
17 opposed to being in anger about something?
18    A. Sure.
19    Q. Have you ever made a decision when you were
20 mad?
21    A. Sure.
22    Q. Mad at your kids because they did something
23 they weren't supposed to, maybe you overreacted?
24    A. Uh-huh.
25    Q. Have you done that before?

Page 133

1  A. Yes, I have.
2  Q. After you thought about it, I guess one of
3 the things that I'm -- I'm kind of a newlywed. One of
4 the things that I do, sometimes I say things when I'm
5 mad or angry that I wish I hadn't said later.
6     You ever had that happen to you?
7  A. Lots of times, yes.
8  Q. Would you agree with me that you're better
9 off most of the time making those decisions when you
10 got a cool head?
11  A. Yes.
12  Q. I want to talk to you about some things that
13 I think are important. And I call this, you may not
14 agree with it, I call this the Juror's Bill of
15 Rights. You've heard of the Bill of Rights before,
16 haven't you?
17  A. Yes.
18  Q. The Bill of Rights that says the police
19 can't come search your house, they can't quarter
20 troops in your house, you got a right to remain
21 silent, you got a right to an attorney, all those
22 things, cruel and unusual punishment.
23     Here's some things and I want to ask you,
24 first of all, if you can see that?
25  A. Yes, I can.

Page 134

1  Q. The right to decide for yourself whether the
2 person lives or dies. And that's what I just told
3 you. The law never requires a death verdict and is
4 satisfied with a sentence of life.
5     Do you agree with that?
6  A. Yes, sir.
7  Q. Let's go to the next one. You have a right
8 to vote for a life sentence and maintain that opinion
9 even if it ultimately means the jury can't come up
10 with a verdict.
11     Do you understand that?
12  A. Yes.
13  Q. You have a right to have your own individual
14 determination and to demand your own level of a
15 convincing or aggravating factor.
16     Do you understand what that means?
17  A. Yes.
18  Q. When the prosecutor was talking to you a few
19 minutes ago and she was talking about, I think y'all
20 mentioned simple assault versus regular assault.
21 Y'all got into that conversation. You as the juror
22 get to decide individually what's aggravating, do you
23 understand that, when we're at Special Issue No. 1?
24  A. Okay.
25  Q. In other words, what might be considered

Page 135

1 aggravating to you in the jury box might not be
2 aggravating to another person. Maybe simple assault
3 is to you, but the other person it's not. And that's
4 okay.
5     Do you understand that?
6  A. Okay.
7  Q. Just in a purely hypothetical sense, you
8 might take the position that before it could be
9 aggravating, someone would have to suffer bodily
10 harm. I'm not trying to tell you that's what your
11 version would be, but that might be one person's
12 requirement and it might not be another.
13  A. All right.
14  Q. Are you with me? By the same token, and
15 just as equally so, you have the right to decide
16 whether one mitigating factor is sufficient for you to
17 vote for life, for a life sentence, regardless of the
18 weight of any other juror or even all the other jurors
19 give to that.
20     That makes sense, doesn't it?
21  A. Yes.
22  Q. Do you agree with that?
23  A. Yes.
24  Q. You got a right to figure out whatever your
25 mitigating factor is and you can give it whatever

Page 136

1 weight you think it needs.
2     Fair enough?
3  A. Uh-huh.
4  Q. In other words, that last line that I got
5 down there in parentheses, you alone can determine
6 what you believe to be mitigating and whether it's
7 sufficiently mitigating to give a person a life
8 sentence in a capital murder case.
9  A. I understand that.
10  Q. You also have the right to find for yourself
11 that life is the proper punishment even if you don't
12 find any circumstances exist because you would
13 ultimately be answering the first question no if you
14 arrived at that decision.
15     Are you with me?
16  A. No, I'm not. That seems to contradict.
17     MS. CALLAGHAN: The State would object, Your
18 Honor. That is not a proper rendition of the law.
19 The law is essentially that -- I'm sorry, one moment.
20 Taking into consideration all the evidence, including
21 the circumstances of the offense, the defendant's
22 character and background, and the personal moral
23 culpability of the defendant do you find that there is
24 sufficient mitigating circumstance or circumstances to
25 warrant that a sentence of life imprisonment rather

Page 137

1 than death be imposed?  That does require that
2 mitigating circumstances exist.
3        THE COURT:  Sustained.
4        MR. RAY:  Judge, I don't think the law
5 requires a mitigating circumstance, and I was getting
6 ready to explain it to Mr. Reed here, in the event
7 that the jury has not found that there is future
8 dangerousness, which is an affirmative answer to the
9 first question, it doesn't matter if there's
10 mitigating evidence or not.
11        THE COURT:  So you're asking this in
12 relation to Question No. 1?
13        MR. RAY:  That's correct.  That's what I was
14 trying to explain to him.
15        Can I proceed?
16        THE COURT:  You may.
17    Q.  (BY MR. RAY)  What I'm getting at, Mr. Reed,
18 is, and I haven't put this list of questions up here,
19 but I will in a few minutes.
20        First question you got to answer is do you
21 find there's future dangerousness.
22    A.  Right.
23    Q.  And if you don't find there's future
24 dangerousness, it doesn't matter what your answer is
25 to Question No. 2, whether or not there's mitigating

Page 138

1 circumstances.
2        Do you understand that?  Because if you
3 don't --
4    A.  Sure.
5    Q.  If there's no future dangerousness, there is
6 no death penalty, period.
7    A.  Right.
8    Q.  Okay.  I want to look at these special
9 issues with you.  First of all, that's the two
10 questions that you're going to answer in the event you
11 find the Defendant guilty, okay?
12        First question is whether there's a
13 probability that the Defendant would commit criminal
14 acts of violence that constitute a continuing threat
15 to society.
16        Fair enough?
17    A.  Uh-huh.
18    Q.  Now, you're going to have to decide what
19 society is, whether you think that means society out
20 here on Belknap Street or in the penitentiary.  The
21 fact of the matter is he's going to be in the
22 penitentiary for a life sentence if you answer that
23 question no, right?
24    A.  Correct.
25    Q.  Then the second question is, assuming you've

Page 139

1 answered that question yes, whether taking into
2 consideration all of the evidence, including the
3 circumstances of the offense, the Defendant's
4 character and background, the personal moral
5 culpability of the Defendant, there is sufficient
6 mitigating circumstance or circumstances to warrant
7 that a sentence of life imprisonment rather than a
8 death sentence be imposed.  That's the second question
9 you got to answer, okay?
10        There's some instructions that go along with
11 this first question that you need to know before you
12 just throw it out there.  And that goes back to what I
13 first said.  You kind of need to know what the
14 question really means or what your process has to be.
15        You'd agree with that, correct?
16    A.  Yes.
17    Q.  And that's the second part up there.  And
18 the Judge would instruct you on this.  It's right out
19 of the book.  It says in deliberating on this specific
20 issue, you've got to consider all the evidence at the
21 guilt/innocence phase because you already had the
22 guilt/innocence phase before you get to this question,
23 right?
24    A.  Right.
25    Q.  And the punishment stage, including the

Page 140

1 evidence of the defendant's background or character,
2 or the circumstances of the offense that militates for
3 or mitigates against the imposition of the death
4 penalty.  So you're kind of milling this mitigation
5 around in response to this first question, too.
6 That's what the law requires.
7        Can you go along with that?  I'll admit that
8 seems a little difficult.
9    A.  Yeah, I can see that that's reasonable.
10    Q.  Okay.  If you answer yes to the future
11 dangerousness question, you go to the second
12 question.  You understand that.
13        If you answer no to future dangerous, then a
14 life sentence with no possibility of parole is imposed
15 for 40 years.  A yes has to be beyond a reasonable
16 doubt.  That's the same beyond a reasonable doubt
17 standard that you got for finding a person guilty.
18 And no just has to be by ten or more jurors.  It
19 doesn't have to be beyond a reasonable doubt.
20        And those ten jurors don't have to agree on
21 what particular evidence supports a no answer; do you
22 understand that?
23    A.  Yes.
24    Q.  So that all includes all of those things
25 we've talked about in this question right here above?

| Page 141 | Page 143 |
|---|---|
| 1   A. Actually, can you go back to that question? | 1   witness offers something that you individually feel |
| 2   Q. Sure. | 2   that is mitigating. |
| 3   A. Okay. You said something about if the ten | 3     Do you see where that comes from? |
| 4   jurors were saying no, that the reasonable doubt | 4   A. Yes. |
| 5   wouldn't have a factor? | 5   Q. Are you comfortable with all that? |
| 6   Q. Well, let me explain to you a little | 6   A. Yes, sir, I am. |
| 7   better. The question is a yes or no question, you | 7   Q. You've got some children? |
| 8   write yes or no. Before you can answer yes, all 12 of | 8   A. Yes, I do. |
| 9   the jury have to find yes beyond a reasonable doubt. | 9   Q. Looks like one of them is 33 and one of them |
| 10   A. Okay. | 10   is 30? |
| 11   Q. If ten or more don't find that, then the | 11   A. That's correct. |
| 12   answer is no. | 12   Q. Are those the only two children you've ever |
| 13   A. So if two have a reasonable doubt, then the | 13   had? |
| 14   answer is no? | 14   A. Yes. |
| 15   Q. Well, let me make sure I'm explaining this | 15   Q. Are you still -- I don't want to get |
| 16   to you right. 12 -- all 12 got to say yes, okay? | 16   personal, but is the mother of those children your |
| 17   A. Right. | 17   present wife? |
| 18   Q. If ten or more say no, what they're saying | 18   A. Yes, she is. |
| 19   -- if ten or more say no, what they're saying is that | 19   Q. How would you feel if something happened to |
| 20   there's not, they haven't found it beyond a reasonable | 20   one of your children or to your wife? |
| 21   doubt. | 21   A. Horrible, horrible. |
| 22   A. Okay. | 22   Q. That would be a pretty -- |
| 23   Q. Does that help? | 23   A. Yeah, it would be a life-changing event. |
| 24   A. Yes, I just misunderstood what you had said | 24   Q. It would be a life-changing event if |
| 25   at first. | 25   something pretty serious happened to them? |

| Page 142 | Page 144 |
|---|---|
| 1   Q. Now let's talk about the second question. | 1   A. Yes. |
| 2   Taking into consideration all of the evidence -- and | 2   Q. And I don't want to go into all what pretty |
| 3   this is assuming that you've answered the first one. | 3   serious would be, but I mean pretty serious. Kind of |
| 4   You don't even get to this question until all 12 of | 4   makes you -- let me ask you this. |
| 5   you have agreed that there's a future danger and about | 5     How would that relate to the way you |
| 6   all the rules we just talked about. | 6   operated for the rest of your life? Would it change |
| 7     This is where you're going to take in the | 7   things, would things be the same? How do you think |
| 8   circumstances of the offense, the moral culpability of | 8   about that? |
| 9   the Defendant, you're asking yourself is there some | 9   A. I think it would be a substantial change. |
| 10   mitigating circumstance to warrant that a sentence of | 10    MR. RAY: Judge, I need just a second. |
| 11   life imprisonment ought to be imposed instead of the | 11   (Brief pause.) |
| 12   death penalty, okay? You answer yes and this is the | 12   Q. (BY MR. RAY) Just one more kind of serious |
| 13   one that doesn't have any, there's not a burden on | 13   question. On the very last part of your |
| 14   this. The State doesn't have to prove the answer is | 14   questionnaire, there was a question that said, "Would |
| 15   no, we don't have to prove the answer is yes. | 15   you characterize yourself as a leader or a follower?" |
| 16   A. Right. | 16   You circled follower. |
| 17   Q. Life sentence is imposed if you answer yes | 17     Why did you do that? |
| 18   to that, okay? | 18   A. Because I think my personality is less of a |
| 19   A. Yes. | 19   leader than of a follower. Probably neither of those |
| 20   Q. And it could be from any source that you've | 20   two choices is the ideal choice. I would just do what |
| 21   heard in the trial. It could be from the case itself, | 21   I thought was appropriate and not necessarily try to |
| 22   the double murder for purposes of this case, it could | 22   bring anybody along with me. |
| 23   be some piece of evidence that you've heard from the | 23   Q. Let's suppose you get on the jury and you |
| 24   Defendant, it could be from some piece of evidence | 24   get back to the jury room and you're deliberating and |
| 25   that you've heard from the State. Maybe the State's | 25   a leader emerges from among you, okay, and it's not |

Page 145

1 you, okay, it's somebody else, one of the other 11.
2 And that particular juror kind of takes charge of the
3 meeting, okay? And I'm not going to say whether he's
4 guilty and you're not guilty or the other way around,
5 but let's just suppose for sake of my question that
6 he's different, he or she is different than you,
7 okay? Whatever the facts may be, y'all are just not
8 on the same picture. You have an opposite opinion of
9 what the verdict ought to be for either one of these
10 questions or at guilt/innocence, okay?
11   A. Uh-huh.
12   Q. How are you going to feel about that?
13   A. Well, I mean, it's probably inevitable, at
14 least at the beginning that there's going to be some
15 disagreement. So.
16   Q. And I'll grant you, you wouldn't be the
17 first person that ever had a disagreement with another
18 juror.
19   A. Right. You know, I don't think I would have
20 any objection to his being a leader and having a
21 different viewpoint than I have, as long as he's
22 arguing his case and not somehow or another
23 browbeating the rest of the jurors.
24   Q. How is it going to relate to you or how do
25 you think you would feel if it became a situation

Page 146

1 where, quite frankly, y'all just didn't agree? He
2 wanted you to agree to his position and you didn't
3 want to do it because you just didn't think he was
4 right for whatever reason? And regardless of which
5 way you fell on it, how do you think you would handle
6 a situation like that?
7   A. Well, I would argue my case, try to find
8 some way to convince him why I believed what I
9 believed. And if that ultimately failed, then it's
10 just a failed argument and we disagree and that would
11 be the end of it.
12   Q. If you really felt one way and that was
13 different from another person's -- I guess my fear in
14 the way you answered that question, I'll just tell you
15 what my fear is and I'll ask you to address it.
16   My fear is that when you checked follower,
17 and I'm not trying to put words in your mouth, and I
18 certainly don't want to make you angry by this, and I
19 apologize if I do, my fear is when you circled
20 follower, that might lead to a position that if it
21 just seemed like the way everybody else wanted to go,
22 that'd be all right with you?
23   A. Absolutely not.
24   Q. What I'm getting at is that this is a jury
25 in this particular kind of case where everybody's

Page 147

1 opinion is very important.
2   A. Right.
3   Q. Sometimes everybody's opinion is the same.
4 And I'll grant you that happens in many cases
5 sometimes everybody's opinion is not the same and, in
6 fact, on these special issues, the law even recognizes
7 that the opinions don't have to be the same.
8   How do you think about kind of putting that
9 all together as far as being able to work through
10 these two special issue questions if we get that far?
11 Do you think you could do that?
12   A. Yes. I am not going to change my mind just
13 because 11 other people think that I'm stupid. If I
14 think that an individual is guilty and no one can
15 convince me that I've missed something and that he's
16 really not, then I'll still believe that he's guilty.
17 And if it means a hung jury, then so be it. Or if I
18 think he's innocent, so be it.
19   Q. And I'm assuming that the same answers would
20 apply to both these special issues?
21   A. Yes.
22   Q. Do you want to be on this jury?
23   A. No.
24   Q. Tell me why.
25   A. It's too big a responsibility or it is a big

Page 148

1 responsibility.
2   Q. Do you want to trade places with me?
3   A. No, absolutely not.
4   Q. I have got a little responsibility.
5   A. I would just be -- the answer is no. If you
6 can find 12 other people who are better qualified that
7 me, I would be real thrilled that you picked them.
8   Q. Why do you think somebody might be better
9 qualified?
10   A. I'm going to drag things out.
11   Q. That's between you and the Judge, isn't it?
12   A. Right.
13   MR. RAY: I'll pass the witness.
14   THE COURT: Mr. Reed, there's a very brief
15 matter of law I have to take up outside your
16 presence. If you would step out the door, in just a
17 minute I'll be able to let you know.
18   (Venireperson Reed exits the courtroom.)
19   THE COURT: What says the State?
20   MS. HARTMANN: The State will exercise a
21 peremptory.
22   THE COURT: Will you have him step back in,
23 please? You don't have to wait all the way through
24 the defense's side to exercise them.
25   MS. HARTMANN: Well, we wanted to hear

Page 149

1 everything.
2      (Venireperson Reed enters the courtroom.)
3      THE COURT: Mr. Reed, apparently they're
4 going to find 12 other people. They've agreed to
5 excuse you from any further service in the case. You
6 are released from any further obligation and free to
7 go about your business. Thank you very much for your
8 time.
9      MS. HARTMANN: Thank you, sir.
10      MR. MOORE: Thank you, sir.
11      (Venireperson Reed exits the courtroom.)
12      THE COURT: Could you have Ms. Deal step in,
13 please?
14      (Venireperson Deal enters the courtroom.)
15      THE COURT: Right up here, please, ma'am.
16 Go ahead and have a seat. If you would raise your
17 right hand.
18      (Venireperson Deal sworn.)
19      THE COURT: Tell us your name, please.
20      VENIREPERSON DEAL: Nancy Deal.
21      THE COURT: Ms. Deal, I apologize for you
22 having to wait out there all morning, but sometimes
23 these things take more time than we expect them to.
24      But this is the individual interview you
25 were informed of earlier. And during this interview,

Page 150

1 both sides will be given an opportunity to ask you
2 some questions regarding your background and
3 qualifications to be a juror in this type of case.
4      What they are mainly going to want to do is
5 find out how you feel about the different areas of law
6 that are going to be a part of the trial. So they're
7 going to tell you how the law works and then ask you
8 how you feel about it.
9      And based upon the oath you just took a
10 second ago, all you owe us at this point of the trial
11 is to tell us how you honestly feel about these
12 matters, because there are no right or wrong answers
13 to anything you are asked.
14      The State is seated at the table that's
15 almost directly in front of you. That's Michele
16 Hartmann. She's also with Lisa Callaghan.
17      At the table over here -- well, Mr. Moore is
18 standing right here in front of you. That's Tim
19 Moore. And Mr. Bill Ray.
20      MR. RAY: Good morning.
21      THE COURT: And the Defendant, Billy Jack
22 Crutsinger.
23      THE DEFENDANT: Good morning, ma'am.
24      THE COURT: The State may proceed.
25      MS. HARTMANN: Thank you, Your Honor.

Page 151

1                NANCY DEAL,
2 having been duly sworn to make true answers to such
3 questions as may be propounded by the Court or under
4 its direction, touching upon her service and
5 qualification as a juror, gave answers as follows:
6            VOIR DIRE EXAMINATION
7 BY MS. HARTMANN:
8      Q. Ms. Deal, how are you?
9      A. Fine.
10      Q. Is it still morning?
11      A. No.
12      Q. Check my watch. My watch actually has a
13 couple minutes.
14      We're going to be talking to you about some
15 of the information that you have on your questionnaire
16 and also about some of the law that we think may come
17 into play for this particular case. I'm going to try
18 and slow down so the court reporter there in front of
19 you doesn't lob something at me. Apparently I went
20 too fast earlier.
21      But like the Judge just said, there are no
22 right or wrong answers at this point. The most
23 important thing is that you just tell us how you
24 honestly feel. You probably, after filling out this
25 pretty lengthy questionnaire, you've probably caught

Page 152

1 on to the fact that this is a capital murder case. It
2 is a case in which in the event of a conviction, the
3 State will, in fact, be asking the jury to return a
4 death sentence. So I want to make sure that you
5 understand that up front, where our positions are.
6      Obviously on this side of the table, they
7 are aiming to get a not guilty or if they get a
8 guilty, they're aiming for a life sentence. So that's
9 why we have a lawsuit here because we have two sides
10 that are diametrically opposed in the way we're going
11 about this; do you see that?
12      A. Uh-huh.
13      Q. All right. And one thing, if you will do
14 this, and this is really more again for Bill's benefit
15 is if you could just say spoken words. I understood
16 what you meant just a moment ago, but was that yes?
17      A. Yes.
18      Q. Just for the record so the record is clear.
19      When I looked at your questionnaire, there
20 were a couple of answers and responses that you gave
21 that had me concerned as a prosecutor. You are
22 absolutely entitled to have whatever feelings and
23 opinions that you desire to have based upon religious
24 convictions, moral convictions, a sense of right and
25 wrong. Nobody in this room is going to try and talk

| Page 153 |
|---|
| 1 you out of or into any particular belief or opinion, |
| 2 okay? |
| 3   A. Okay. |
| 4   Q. But what is important is that we ultimately |
| 5 end up with 12 people over here in this jury box that |
| 6 can take an oath to follow the law and that they will |
| 7 apply the law. And when we talk about capital murder, |
| 8 that's a topic that people generally have strong |
| 9 feelings one way or the other about. |
| 10      Do you think that that's probably true? |
| 11   A. Probably. |
| 12   Q. Okay. People are either for it or they're |
| 13 against it. And there's people in the middle who |
| 14 haven't really thought about it or they've never |
| 15 really been presented with a situation where it's been |
| 16 something they've had to form an opinion. |
| 17      So what's obviously going to be important to |
| 18 us here today is to find out exactly where you do |
| 19 stand and to talk with you about what the law is in |
| 20 regards to capital punishment and when it can be put |
| 21 into effect and whether or not your being in a |
| 22 situation of kind of helping things along in the |
| 23 process towards a possible death sentence, if that's |
| 24 going to require you to compromise any type of morals |
| 25 or beliefs that you have. |

| Page 154 |
|---|
| 1      Am I making myself clear? |
| 2   A. (Venireperson nods head.) |
| 3   Q. Is that yes? |
| 4   A. Yes, you're making yourself clear. |
| 5   Q. Okay. All right. One of the questions on |
| 6 the questionnaire said, "Please tell us your feelings |
| 7 or opinions about the death penalty." And your |
| 8 response was brief and to the point, "Mixed feelings." |
| 9      What did you mean by that? |
| 10   A. Well, I haven't really ever had to deal with |
| 11 it. And I guess I've never really given it a lot of |
| 12 thought. But I do have mixed feelings about taking |
| 13 the life of somebody because I think that life and |
| 14 death is up to God. |
| 15   Q. Okay. And, in fact, on the following page |
| 16 -- and when I'm going through your questionnaire, if I |
| 17 go over something and you don't recall that answer or |
| 18 you want to see your questionnaire, would you let me |
| 19 know? |
| 20   A. Okay. |
| 21   Q. And I will walk it up to you. Because I |
| 22 know it's been a couple weeks and you've slept since |
| 23 then and you might not remember exactly what you put |
| 24 down or maybe the answer has changed since you've had |
| 25 some time to think about things. |

| Page 155 |
|---|
| 1      But one of the subsequent questions was, |
| 2 "Which of the following describes your view of the |
| 3 death penalty as applied to the offense of capital |
| 4 murder?" And you checked off, "Appropriate in some |
| 5 cases, inappropriate in most cases." And then there |
| 6 was a section that allowed you to explain your |
| 7 answer. And your answer was, "I believe God is to |
| 8 have control of life or death." And that's, I think, |
| 9 basically what you just said a moment ago. |
| 10      And that obviously indicates to me that you |
| 11 have some religious concerns about human beings |
| 12 entering into the process of determining whether |
| 13 someone dies or not? |
| 14   A. Uh-huh. |
| 15   Q. Is that fair? |
| 16   A. Yes. |
| 17   Q. All right. In the State of Texas, the law |
| 18 allows for the offense of capital murder two possible |
| 19 punishments only. One is a life sentence, which is 40 |
| 20 years. And that's day for day. In other words, we |
| 21 don't have life without parole here in the State of |
| 22 Texas. The person basically has to serve 40 years on |
| 23 a life sentence for capital murder and that's day for |
| 24 day before they become eligible for consideration of |
| 25 parole. |

| Page 156 |
|---|
| 1      Are you with me? |
| 2   A. Okay. |
| 3   Q. If the person doesn't get a life sentence, |
| 4 well, then, they get the alternative, which is a death |
| 5 sentence by lethal injection. And when you are on a |
| 6 jury in a capital murder case, and just for the sake |
| 7 of an example, let's say you're on the jury and the |
| 8 jury finds that person guilty. The jurors would then |
| 9 not have to go back and write down "life" or "death" |
| 10 on a piece of paper. What the law has in place are |
| 11 two specific questions. And we're going to go over |
| 12 those in just a few minutes and talk about them. |
| 13      But in effect, the way that those questions |
| 14 are answered, those dictate what sentence the Judge |
| 15 imposes by law for a defendant. And that sentence is |
| 16 either going to be a life sentence or a death |
| 17 sentence. |
| 18      And what I want to start off asking you is |
| 19 it sounds like you have some very strong religious |
| 20 convictions about, I guess, the State playing God, in |
| 21 essence. In other words, killing people as a remedy |
| 22 for a criminal offense. |
| 23   A. Uh-huh. |
| 24   Q. Is that true? |
| 25   A. True. |

Page 157

```
 1    Q. Do you believe that -- let me ask you this.
 2 Do you believe that there is ever a situation where a
 3 death sentence is called for?
 4    A. That's where I put mixed emotions on it.
 5 Because yes, there have been, certainly, people that
 6 have done horrible things to a lot of horrible -- or
 7 horrible things to a lot of people and it does seem
 8 like in those instances it's better. But, again, I
 9 don't know if we have a right to play God.
10    Q. All right. And let me ask you this.
11 Because sometimes there are people who say, as you
12 have said, there are some special circumstances in
13 which I think that person, that the death penalty may
14 be appropriate for that person and their actions. But
15 because of my moral convictions and my sense of having
16 to answer maybe in a higher court at some point down
17 the road, don't ask me to be a part of that process
18 because I cannot morally participate in assessing what
19 in effect would be the termination of another person's
20 life. There would be too much responsibility on my
21 part to participate in that type of a process.
22       Do you understand what I'm saying?
23    A. Yes.
24    Q. Where do you stand under those
25 circumstances?
```

Page 158

```
 1    A. I would have a hard time participating in
 2 that.
 3    Q. All right. And when you say a hard time,
 4 does that mean -- and, again, I talked a few moments
 5 ago about, and I'll talk with you about what the law
 6 is. You have an absolute right to disagree with the
 7 law. You have an absolute right to say, I understand
 8 that the law is that way, but I can't follow it. It
 9 would cause me to compromise my internal set of values
10 and my own conscience.
11       Do you understand what I'm saying?
12    A. Okay.
13    Q. Not really?
14    A. No.
15    Q. Okay. Let me know if you don't understand.
16    A. Okay.
17    Q. Sometimes there may be situations where you
18 say, I understand that this is what the law is and
19 that the law provides that someone can be sentenced to
20 death. But I personally cannot be a participant in
21 that particular process because it would cause me to
22 violate my conscience and violate my oath that I would
23 take to follow the law because I could never under any
24 circumstance participate in assessing a death
25 sentence.
```

Page 159

```
 1    A. Okay. I can't make that statement. I can't
 2 say I would never participate. Because if the law
 3 says that I need to participate, then I would do it.
 4    Q. Okay. Even if it's law that you're
 5 uncomfortable with?
 6    A. Yes.
 7    Q. And even if it would cause you to violate or
 8 go against maybe some religious convictions or
 9 religious principles that you have?
10    A. I'm not sure.
11    Q. We're not going to put you in a situation
12 where you are called upon to violate your own
13 conscience as a juror.
14    A. Uh-huh.
15    Q. And that's what part of this process or
16 basically all this process is about is finding out if
17 putting you in that situation is going to cause you to
18 do violence to your own conscience because it's going
19 to require you to do something that you believe is
20 wrong.
21    A. I stated that I would have a hard time
22 coming to the conclusion that somebody needed to die,
23 being a part of the person that had to say that. A
24 part of that is my moral, my spiritual convictions,
25 but, then, I'm a law-abiding citizen, too. So I'm not
```

Page 160

```
 1 sure what you want me to say.
 2    Q. Well, and I don't want you to say anything
 3 in particular other than what you think and how you
 4 feel. I guess sometimes there are people who say, and
 5 this may not be you, but they say if I participate in
 6 a death sentence, I will be held, I will have to
 7 account for that before my creator. And I just can't
 8 do that because I believe that there is a higher,
 9 there is a higher power that I need to conform my
10 behavior to rather than man-made law.
11       And I just need to know if you fall into
12 that, that group of people or not. And maybe you
13 don't.
14    A. I guess I'm not sure, either.
15    Q. Okay. Well, let me talk with you about what
16 the law is. And it may become a little bit easier for
17 you, once you see what the law is and what the law
18 would ask you to do, it may become a little bit easier
19 for you to be able to tell us where you stand.
20 Because obviously you can see it would be important to
21 both sides to know. And again, we also don't want you
22 to be over here going through some type of mental
23 anguish about, oh, my gosh, I may have to -- you know,
24 I may have to vote, in essence, for someone to get a
25 death sentence and I'm going to have to live with that
```

| | |
|---|---|
| **Page 161** | **Page 163** |

**Page 161**

1  for the rest of my life.  Can I do that?
2      So let me talk with you about what the law
3  is and then you just let me know where you stand with
4  those things, okay?
5      A.  Okay.
6      Q.  All right.  Start off with some real easy
7  stuff, the rules in criminal cases.  And I do this
8  with everybody and you probably know these.  Every
9  defendant is presumed to be innocent.  It doesn't mean
10  that they are, in fact, innocent, but what it does
11  mean that Lisa and I have to bring sufficient evidence
12  to prove beyond a reasonable doubt that the person is
13  guilty.
14      Makes sense to you?
15      A.  Uh-huh.
16      Q.  Is that yes?
17      A.  Yes.
18      Q.  Okay.  Do you think that that's a good rule
19  to have?
20      A.  Uh-huh, yes.
21      Q.  And that basically is along the premise of
22  the people who do the charging ought to be the ones
23  who do the proving.  And that just seems only fair.
24      Second rule, which I'm sure you're familiar
25  with is the right to remain silent.  And that

**Page 162**

1  basically means that a criminal defendant has an
2  absolute right to basically just show up to court.
3  They don't have to testify.  And if they don't
4  testify, the jury can't hold it against that person
5  for any reason.
6      Can you do that?
7      A.  Yes.
8      Q.  Sometimes we get people who say, you know
9  what, there's always two sides to a story and I have
10  to hear both before I can make a judgment call.
11      Are you like that?
12      A.  No.
13      Q.  The way that the trial is going to progress
14  is Lisa and I will present evidence.  It may be
15  experts, it may be witnesses who testify, it may be
16  physical pieces of evidence and then we'll finish with
17  our evidence.
18      The defense has an opportunity at that point
19  to put on any evidence that they want to, but again
20  they don't have to.  The jury would then be given a
21  set of instructions by the Judge.  They would go back
22  into the jury room and deliberate.  If the jury found
23  the Defendant not guilty, what happens?
24      A.  He's free, I presume.
25      Q.  We all go home.

**Page 163**

1      A.  Okay.
2      Q.  All right.  If the jury finds the Defendant
3  guilty, we come back into the courtroom and we start
4  the process over.  Lisa and I will put on evidence.
5  The defense will have an opportunity if they want to,
6  but they don't have to, to put on evidence.  And then
7  the jury would go back again to the little room back
8  there and they would deliberate on what the
9  appropriate punishment would be.  So probably this
10  makes sense to you because you've probably seen at
11  least one or two law shows on TV?
12      A.  Yes.
13      Q.  I want to talk to you a little bit now about
14  the actual offense of capital murder.  And again, this
15  is where we really get down to what's important and
16  you have to give some very serious thought of what
17  you're capable of doing and what you just can't do,
18  would just be too difficult, all right?  And this is
19  our only chance to ask you questions and explain the
20  law to you and your only chance to ask us questions.
21  And that's why it's so important that if you have a
22  concern or you have a feeling that either side needs
23  to know about, that you let us know that, okay?
24      A.  Okay.
25      Q.  Will you do that?

**Page 164**

1      A.  Yes.
2      Q.  Okay.  First of all, people say, well, what
3  is capital murder?  A lot of people don't know that
4  there's a distinction between murder and capital
5  murder.  Capital murder is a murder, which is an
6  intentional killing, and there's some aggravating or
7  special circumstance that surrounds that intentional
8  killing, all right?  Intentional means that you do
9  something on purpose.  It's not an accident, you're
10  not negligent, it's not reckless, the State shows or
11  there's no evidence of self-defense.  The State shows
12  that the person desired to do the act and then they
13  acted on that desire.
14      Is that clear to you?
15      A.  Okay, yes.
16      Q.  Okay.  You understand?
17      A.  Uh-huh.
18      Q.  Sometimes we hear the word premeditation
19  when we talk about murder.  You may hear that a lot on
20  TV.  What does premeditation mean to you?
21      A.  Planned it ahead of time.
22      Q.  All right.  Very good.  And sometimes
23  people, in fact, do plan ahead of time to commit
24  murder.  Sometimes they don't.  Sometimes it's an
25  instantaneous forming of a thought and acting on it.

**Page 165**

1     Do you see where that might be the case?
2     A. Yes.
3     Q. And let me kind of give you an example, just
4 a hypothetical. Let's say that somebody goes into a
5 convenience store with a gun and their intent at that
6 point is to hold the store up and get some money. At
7 that point they don't have any desire or intent to
8 kill the clerk, they just want the money.
9     They go in with a gun, they threaten the
10 clerk with the gun to get them to hand over the
11 money. And as has happened before, the clerk resists,
12 doesn't want to give them the money. Maybe they think
13 the gun is fake. Maybe they think, oh, this person
14 isn't going to, you know, there's no cameras and
15 they're not going to ultimately shoot me, it'd be
16 caught on film. For whatever reason, the clerk
17 resists. And that robber then gets angry and gets
18 frustrated and they want the money and they think, you
19 know what, the only way to get that money is if I kill
20 this person. And they form that thought
21 instantaneously and they act on that thought, they act
22 on that intent. So there wasn't any premeditation,
23 but there was an intent on the part of that robber to
24 kill.
25     Do you see where that could happen?

**Page 166**

1     A. Yes.
2     Q. And what is my point in all this? The point
3 is that the State doesn't have to prove that the
4 killing, the intentional killing was planned. That
5 somebody thought about it, planned it out, set up
6 surveillance, went out and bought a special instrument
7 to use. We don't have to prove that. We just have to
8 prove that the person had the intent to kill and they,
9 in fact, acted on that intent.
10     Do you understand that?
11     A. Yes.
12     Q. Can you follow that law?
13     A. Yes.
14     Q. All right. Now, there's a number of ways in
15 which capital murder can take place. I'm going to
16 give you just a few examples. There's a couple more,
17 but I ran out of room on my slide.
18     If you kill a child that's under the age of
19 six years of age. If you intentionally kill a police
20 officer or fireman while they're in the line of their
21 duty. If you kill somebody, and this kind of goes to
22 my example here earlier, you intentionally kill
23 someone during the course of an aggravated robbery or
24 a kidnapping or sexual assault.
25     And the one we're going to focus on here

**Page 167**

1 today is when you intentionally kill more than one
2 person in the same criminal transaction. And
3 basically that's in the same course of conduct, okay,
4 not instantaneously, but takes place during the same
5 course of your committing the offense.
6     Does that make sense to you?
7     A. Okay.
8     Q. When you say okay, does that mean I'm
9 following you or I'm kind of fuzzy?
10     A. No, I'm following you.
11     Q. Okay. Because the tone of voice is kind of
12 like all right, I'll go on.
13     A. Well, I think you're going to say more, so I
14 was waiting for the rest of it.
15     Q. Okay. I just want to make sure.
16     Do you think that these types of offenses,
17 and especially this last one, do you think that those
18 are the types of situations where the death penalty
19 ought to be an option for punishment? Or do you say,
20 you know what, those are bad, I'll give you that.
21 Those are pretty bad, but in my mind those don't rise
22 to the level of taking another person's life.
23     And you tell me. I don't care what you have
24 to say. I mean, I care what you have to say in the
25 context of if it's honest, but I'm not looking for you

**Page 168**

1 to give me a particular answer.
2     A. Okay. I would have to really think about
3 that.
4     Q. All right. Tell me what's going on in your
5 thought process.
6     A. I guess when you talk about capital
7 punishment, the thing that I think about is, you know,
8 has the offense happened before, is it repeated, is it
9 something that can't -- where the person can't be
10 fixed, so to speak.
11     Q. Okay. So let me ask you this. If you were
12 a juror in a capital murder case where we're talking
13 about a person intentionally killing more than one
14 person in the same criminal transaction, do you think
15 that it's inappropriate to have a death sentence as a
16 possible punishment for that alone?
17     A. I don't think it's inappropriate. I'm not
18 sure if it's appropriate. I just don't know.
19     Q. And one of the bad things about this whole
20 process --
21     A. You have to know.
22     Q. Well, and I think you can understand why.
23 It's because we have to make some decisions. And we
24 don't want it to come across that we're beating a dead
25 horse or trying to get you to say one thing or the

Jury Voir Dire Proceedings 8-18-03   Multi-Page™   State vs. Billy Jack Crutsinger  Vol. 3

Case 4:07-cv-00703-Y  Document 86  Filed 11/08/17  Page 52 of 143  PageID 3473

Page 169

1 other. Because, like I said, I don't care what your
2 answer is, I just want it to be an honest answer.
3     But Lisa and I have to make an intelligent
4 choice and the defense has to make an intelligent
5 choice about who might be the best juror for this
6 case. And it may be that you'd be a great juror in a
7 burglary case or a sexual assault case or a DWI case.
8 But when it comes to the offense of capital murder,
9 there may be some concerns on your part where you
10 might not be the best juror.
11     Do you see where I'm coming from?
12   A. Yes.
13   Q. So when I ask you, when you say I don't know
14 or I think so and I have to press you, that's why. We
15 have to get you to kind of do a mental dance of, okay,
16 I'm in a situation, can I do this, can I not do this?
17 And no one is going to be upset with you if you can't
18 or you don't feel comfortable with the law or you
19 disagree with it, believe me. We've got 150 people to
20 talk to.
21   A. I know.
22   Q. So do you think that when you intentionally
23 kill more than one person in the same criminal
24 transaction that the death penalty ought to be an
25 option for that, that alone? Or do you think that

Page 170

1 there has to be -- in order to qualify for the death
2 penalty, they have to have done it once before, I
3 think you mentioned?
4   A. Yes, I think it would probably be
5 appropriate if somebody killed more than one person in
6 a crime.
7   Q. Okay. That alone?
8   A. Uh-huh.
9   Q. Is that yes?
10   A. Yes.
11   Q. All right. Are you sure about that?
12   A. Yes.
13   Q. So what do Lisa and I have to prove to you
14 in a capital murder case? We're going to talk about
15 the elements. And I like to tell people that elements
16 are just facts, they're pieces of information that the
17 State has to prove.
18     We have to prove that the person sitting
19 over here, Billy Jack Crutsinger, in Tarrant County,
20 Texas, on or about a particular date, intentionally,
21 and we talked about that a little bit ago, caused the
22 death of more than one person in the same criminal
23 transaction. We have to prove these beyond a
24 reasonable doubt.
25     There is no definition of what beyond a

Page 171

1 reasonable doubt is. I can tell you what it's not.
2 It's not beyond all doubt and it's not beyond a shadow
3 of a doubt. Sometimes you hear that on TV, that
4 phrase. And basically what it's saying is it's not
5 100 percent. Because if it was 100 percent, you'd
6 basically have to be a witness, would you agree with
7 that?
8   A. Yes.
9   Q. And if the State does prove the case to you
10 beyond a reasonable doubt, we would be entitled to a
11 verdict of guilty.
12     Do you think you could do that?
13   A. Yes.
14   Q. Do you think that beyond a reasonable doubt
15 to you would be 100 percent or do you think it's
16 something a little bit less than that?
17   A. Would you state the question again?
18   Q. Sure. Beyond a reasonable doubt you can
19 come up with your own definition for. And I've told
20 you that it's -- I can tell you what it's not, it's
21 not 100 percent. But some people say, Michele, I'm
22 sorry, there's too much at risk here. A man's life is
23 on the line, it's a criminal offense, for my peace of
24 mind I would have to have this proven to me 100
25 percent before I could return a verdict of guilty.

Page 172

1     Do you fall into that category of people or
2 do you think that you could hold us to beyond a
3 reasonable doubt, which is excluding all reasonable
4 doubt?
5   A. I think I would probably be okay with beyond
6 a reasonable doubt, excluded.
7   Q. So you wouldn't require the 100 percent?
8   A. Right.
9   Q. So let's say Lisa and I have presented our
10 case to you and the jury finds the person guilty. You
11 would then get to hear additional evidence about, say,
12 the defendant's good or bad character, any prior
13 criminal history if any that they might have, might
14 not have any. And at the conclusion of all the
15 evidence, you would have to answer two questions or
16 special issues. And these, in effect, determine what
17 sentence the Judge assesses, whether it's a life
18 sentence or death sentence.
19     Do you follow me --
20   A. Yes.
21   Q. -- so far? The first question, go ahead and
22 take a moment just to read through that.
23   (Brief pause.)
24   Q. Okay. In this question we also have to

Page 173

1 prove beyond a reasonable doubt that the answer to
2 this question should be yes, that they would be,
3 there's a probability that they would be a continuing
4 danger. The words that are underlined are not defined
5 in the law. They're pretty much whatever you as a
6 juror decide them to be.
7    Do you follow me on that?
8 A. Yes.
9 Q. Probability does not mean certainty, would
10 you agree with that?
11 A. Yes.
12 Q. And there are some people who say it is
13 impossible for me to predict what a person is going to
14 do in the future. And so I'm always going to answer
15 this question no, because I just feel like I can't
16 possibly make that determination.
17    Are you one of those people?
18 A. No.
19 Q. Do you think that you can use a person's
20 past history to help you determine what their future
21 history might be?
22 A. Yes.
23 Q. Do you think that this is a question that
24 you would be capable of answering either yes or no
25 depending upon the circumstances and the evidence?

Page 174

1 A. Yes.
2 Q. The word society, that again is something
3 that you can assign your own definition to. It can be
4 a free society, it can be prison society. It might be
5 that there's evidence presented in any type of a case
6 that the population in prison is made up of people
7 other than inmates. That there are nurses and doctors
8 and counselors and religious people that have access
9 to inmates.
10    Could you see where that might happen?
11 A. Yes.
12 Q. And if the jurors so chose, they could
13 consider society as that prison society or free
14 society or any other subgrouping of people.
15    Make sense to you?
16 A. Yes.
17 Q. And so understanding that if you answered
18 yes to this question, all 12 of you, that puts you one
19 step closer to a death sentence being imposed could
20 you still answer that question yes if you felt like
21 Lisa and I had indeed proved beyond a reasonable doubt
22 that the person was probably going to continue to
23 commit criminal acts of violence?
24 A. Yes.
25 Q. Any questions about that?

Page 175

1 A. No.
2 Q. If all 12 of you answer that question yes,
3 you would then go to Special Issue No. 2. And this
4 one is much longer and you can definitely tell it was
5 written by a bunch of lawyers, so take a moment, read
6 through that and let me know when you're done. Take
7 as much time as you need.
8 (Brief pause.)
9 A. Explain mitigating circumstances.
10 Q. Okay. Mitigating circumstances -- and,
11 against, this is one of those loopholes where the law
12 says you as a juror have to determine what is
13 mitigating is to you. But a mitigating circumstance
14 is generally something that you believe lessens that
15 person's moral responsibility or blameworthiness for
16 the commission of their crime.
17    Does that make sense to you?
18 A. Yes.
19 Q. Does that help you out?
20 A. Uh-huh.
21 Q. All right.
22 (Brief pause.)
23 A. Okay.
24 Q. All right. All done with it?
25 A. Uh-huh, yes.

Page 176

1 Q. You'll notice a couple things with this
2 question. There is no burden of proof. Unlike the
3 first phase of the trial and the first question, Lisa
4 and I don't have to prove anything beyond a reasonable
5 doubt for this last question.
6    Clear on that? And this basically is asking
7 you or telling you, okay, jury, you've already
8 answered the first question yes and we're one step
9 closer to a death sentence. This question is asking
10 you to step back, take a breather and look at the
11 evidence. And is there something in the evidence that
12 you yourself believe to be mitigating? And if you do
13 believe it to be mitigating, is it sufficiently
14 mitigating such that you would need to vote for a life
15 sentence over a death sentence? What's mitigating to
16 you might not be mitigating to me or to any of the
17 other jurors.
18    Some people might say, you know what, it's
19 mitigating to me that this person was abused -- and
20 I'm just throwing out hypotheticals. This doesn't
21 have anything to do with this particular case. But I
22 personally find it mitigating that somebody was locked
23 in a closet for the first ten years of their life,
24 they were horribly abused as a child. Doesn't excuse
25 their conduct, but I think that that played into,

1 perhaps, the person that they turned into. And so
2 that's mitigating to me and it's sufficiently
3 mitigating.
4      Some people might say, you know what, I
5 don't care. They know the rules, they know what's
6 right and wrong, that to me is not mitigating. So
7 what's mitigating to you may not be mitigating to
8 someone else.
9      The question also asks you not only is it
10 mitigating, but is it sufficiently mitigating? It has
11 to be a certain level within your own mind. We might
12 say, hey, you know, that's terrible that that person
13 abused crack cocaine through high school, that's
14 horrible. Obviously it's led to some bad choices, but
15 I don't think that that's sufficiently mitigating to
16 me to reduce their blameworthiness for the crime
17 they've committed.
18      Do you follow what I'm saying?
19      A. Uh-huh, yes.
20      Q. So you would have to ask yourself, number
21 one, is there evidence before me that I think is
22 mitigating? And number two, if I think it's
23 mitigating, is it of such a sufficient quantity or
24 quality that I think that that lessens that person's
25 responsibility?

1      Do you think that this is a question that
2 you would be capable of answering yes or no?
3      A. Taking everything into consideration, yes, I
4 think I could answer it.
5      Q. Okay. There are some people who say, you
6 know, everyone is a victim. And I don't mean that in
7 a snide sense, but I mean they believe that the way
8 the world functions that horrible things happen to
9 everybody and that causes us to do the things that we
10 do and so they're always going to find mitigation.
11      Are you one of those people?
12      A. No.
13      Q. There are other people who say, you know
14 what, if I've convicted this person of capital murder,
15 I don't care what evidence you bring to me, I don't
16 care what evidence I hear, I could care less if X, Y
17 and Z happened to this person, I'm never going to find
18 mitigating evidence or I'm always going to answer this
19 question no.
20      Are you one of those people?
21      A. No.
22      Q. So you think you would be open to answering
23 this question either way?
24      A. Yes.
25      Q. And if you didn't find sufficient mitigating

1 circumstances, you could answer that question no?
2      A. Yes.
3      Q. And if you found circumstances that were
4 mitigating to you and they were of sufficient quantity
5 or quality, you could answer that question yes?
6      A. Yes.
7      Q. See, I'm just trying to make sure you're
8 awake.
9      A. I'm awake.
10      Q. All right. So we've kind of gone over those
11 two questions that gets you to the point of does the
12 Judge assess a life sentence and does he access a
13 death sentence. And I want to kind of loop that back
14 into where we started, which is your concern or your
15 opinion that only God is to have that life or death
16 power, that life or death decision-making power.
17      And I guess what I need to know is now that
18 you understand how the law functions, knowing that you
19 personally are not going to be assessing a death
20 sentence, but in effect the answers to the questions
21 will determine what the Judge does, would you be
22 capable of sitting as a juror and answering those
23 questions in such a way that a death sentence can
24 result?
25      A. Yes.

1      Q. No, you're not going to do violence to your
2 conscience?
3      A. No.
4      Q. You sound pretty sure about that.
5      A. Yes.
6      Q. If you were sitting in my chair, would you
7 be concerned to have you on the jury?
8      A. I don't know.
9      Q. Does that question make sense?
10      A. Should you be concerned to have me on the
11 jury?
12      Q. Right.
13      A. No, I don't think so.
14      Q. Do you understand where I'm going with this?
15      A. I think so.
16      Q. That people who have a strong conviction
17 about, you know, an ultimate power only having that
18 right and then having someone with those feelings
19 being on a jury where the State of Texas is going to
20 be asking for a death sentence in the event of a
21 conviction, if you were me would you have concerns
22 about you being on the jury?
23      MR. RAY: Judge, excuse me. I'm going to
24 object to the form of the question because it's --
25 what it's asking this lady is is there no way she's

Jury Voir Dire Proceedings 8-18-09 — Multi-Page — State vs. Billy Jack Crutsinger Vol. 3

Case 4:07-cv-00703-Y Document 86 Filed 11/03/17 Page 55 of 143 PageID 3478

Page 181

1 ever going to give the death penalty. If they want to
2 ask the question that way, I don't have any objection
3 to it.
4        THE COURT: I'll sustain. It's just global
5 and doesn't have any bearing on this proceeding.
6    Q. (BY MS. HARTMANN) If I present evidence to
7 you and if you believe that those questions should be
8 answered in the order, and I'll go back. Let me
9 figure out how to do that.
10       If I prove to you beyond a reasonable doubt
11 that the answer to Question No. 1 should be yes and
12 you go to Question No. 2 and you don't find anything
13 sufficiently mitigating and you feel like you should
14 answer that question no, will you answer those
15 questions truthfully or will you answer them in such a
16 way that you won't have to assess a death sentence?
17   A. No, I would be truthful.
18   Q. Okay. You would be able to abide by your
19 oath and follow the law?
20   A. Absolutely.
21   Q. That's all I needed to know. And I probably
22 took the longer way to get there than I needed to, but
23 I just wanted to make sure.
24       Couple of other things. Any questions at
25 this point?

Page 182

1   A. No.
2   Q. Is it clearer to you now about the process?
3   A. Uh-huh.
4   Q. Do you feel better about that?
5   A. Yes.
6   Q. Little bit more comfortable now that you
7 know how it works?
8   A. Yes.
9   Q. Okay. Good. There is a part of the law
10 that says that voluntary intoxication is not a defense
11 to criminal acts. In other words, I can't go out and
12 get loaded up on prescription pills or street drugs or
13 drink alcohol and then commit a criminal act and say,
14 well, wait a minute, I didn't know what I was doing, I
15 was drunk or high. The law says that that is not an
16 excuse for criminal conduct.
17       Do you agree with that law?
18   A. Yes.
19   Q. Another part of the law that I like to go
20 over with people is police officers as witness.
21 Oftentimes in a criminal case, probably no surprise to
22 you, you're going to see police officers come in and
23 testify. And there are some people who say as soon as
24 I see that uniform, I'm going to believe every word
25 out of that person's mouth. They've got too much to

Page 183

1 lose to lie to me.
2       There are other people on the other end of
3 the spectrum who say because of my personal experience
4 or the way I grew up, I don't believe a word somebody
5 says that's in a uniform. And the only thing that's
6 important is that police officers don't get automatic
7 legs up or brownie points before they even open their
8 mouth.
9       Do you see where I'm going with this?
10   A. Yes.
11   Q. You have to be able to judge a police
12 officer like you would any other witness. And as soon
13 as they start talking if you say yeah, this person
14 knows what they're talking about and I think they're
15 credible, you can believe 'em. On the other hand, if
16 you don't think they're credible, then you would have
17 to treat them like any other witness and disbelieve
18 all or part of their testimony.
19       Does that make sense to you?
20   A. Yes.
21   Q. Can you do that?
22   A. Yes.
23   Q. Some of these questions probably seem a
24 little silly, don't they?
25   A. No.

Page 184

1   Q. We've got a pretty good panel, obviously you
2 were one of many. And people have different life
3 experiences and different feelings. And it's unusual
4 for people to come in and say, you know, I don't care
5 what police department they're with, I don't care if
6 I've never had a bad experience with that particular
7 police department, but I just think police officers
8 are generally untrustworthy.
9       And then you get other people who say I'm
10 always going to believe what they say, no matter
11 what. And we just need to make sure that you would be
12 able to say, you know what, I put everybody on the
13 same level, start them out the same and then I raise
14 them up or drop them down depending on what they say
15 to me and how they say it.
16       Can you do that?
17   A. Yes.
18   Q. Sometimes there can be a situation where in
19 a capital murder case, and again I'm not talking about
20 this one, but just in general, a jury may go back and
21 say, we don't think the State has done its job proving
22 that aggravating or special element. We think they've
23 only proved that the person committed a murder.
24       In that instance you wouldn't have these
25 special issues to answer, you would have a range of

Page 185

1 punishment from five to 99 years or life. And would
2 you be able to keep an open mind to that entire range
3 of punishment if that possibility were presented to
4 you?
5    A. Yes.
6    Q. There's also a circumstance wherein the
7 police have certain rules they have to follow when
8 they gather evidence or take statements. Have you
9 heard of those rules?
10    A. Probably.
11    Q. Miranda rights?
12    A. Yes.
13    Q. Search warrants?
14    A. Yes.
15    Q. Oh, gosh, all sorts of different rules that
16 the police have to follow. And do you have any
17 opinion about why they have rules to follow?
18    A. I presume it's to be fair to both sides.
19    Q. And do you think that there should be
20 consequences when rules have been broken?
21    A. Yes.
22    Q. Because otherwise what's the point of having
23 the rules if there's not kind of a hammer hanging over
24 your head to make you follow them.
25        Does that make sense?

Page 186

1    A. Yes.
2    Q. And I don't remember -- yes, you've got a
3 number of children.
4    A. Yes.
5    Q. And I'm assuming, of course, the ones in
6 their 20s and 30s are old enough to have their own
7 sets of rules. But the two younger ones, I'm assuming
8 you've got rules at home for them?
9    A. They aren't at home.
10    Q. Oh, they're not at home?
11    A. I've got three children, all married.
12    Q. Okay. I'm looking at -- oh, these are your
13 grandchildren.
14    A. I have grandchildren.
15    Q. Okay. Do your grandchildren have rules?
16    A. Oh, absolutely.
17    Q. And are there consequences when they don't
18 follow those rules?
19    A. Yes.
20    Q. And why is that?
21    A. So they can learn.
22    Q. And basically the same principle applies in
23 criminal cases. If there is evidence that is
24 presented to a jury that the jury believes -- I mean,
25 obviously you have to believe it. But if they believe

Page 187

1 that, for whatever reason, the rules were not
2 followed, the Judge would then probably instruct that
3 jury that they would have to remove that evidence or
4 statement from their deliberation consideration and
5 not use it. And that would probably be pretty hard,
6 wouldn't it?
7    A. Yes.
8    Q. Kind of like the, oh, I don't know, the
9 proverbial elephant in the corner. You know it's
10 there, but you got to pretend it's not. And most
11 people say, well, I can probably do that. You know,
12 it'd be hard, but I can do that. But let me give you
13 a situation and see where you stand on that.
14        Let's say you have a situation where someone
15 has kidnapped and murdered a child and buried their
16 body. And the police do an investigation and they
17 finally come up with a suspect who confesses to doi
18 all this stuff and where the child is and he takes
19 them or she takes them out to where this child is
20 buried. And the only evidence that the State has is
21 that person's confession or admission to the police.
22        You know the person is guilty. I mean, they
23 found the child right where they said they'd be. The
24 person said yep, I did it, I'll do it again. And for
25 whatever reason, the police didn't follow the proper

Page 188

1 procedures. And the jury knows that. They say, you
2 know that, the police screwed up.
3        They didn't do this the right way and now
4 we've got the situation where we've got a
5 self-admitted child abductor and killer. He's told us
6 in the statement that we've heard that he enjoyed
7 doing it and he's going to do it again if he gets the
8 chance. But over here on the other side we've been
9 told that if the police didn't follow the rules, we
10 have to take that statement out and set it aside.
11        And without that statement, there's nothing
12 left. Maybe there is, but let's say it's a situation
13 where there isn't anything left. The jury would then
14 be called upon if they followed their oaths to do
15 what?
16    A. We'd have to find the person not guilty.
17    Q. Right. And if you were put in that
18 situation, could you do that?
19    A. I guess I'd have to.
20    Q. You'd be able to follow the law?
21    A. Yes.
22    Q. Even knowing that you're letting this guy or
23 woman or whoever it is out the door possibly to go do
24 it again?
25    A. Yes.

Jury Voir Dire Proceedings  8-18-03    Multi-Page    State vs. Billy Jack Crutsinger    Vol. 3

Case 4:07-cv-00703-Y   Document 86   Filed 11/02/17   Page 57 of 143   PageID 3480

**Page 189**

1  Q. It seems to me, and I'm getting this reading
2 from you that when you'd be administered an oath, you
3 would take it very seriously?
4  A. Yes, I would.
5  Q. Is that an accurate reading?
6  A. Yes.
7  Q. I mean, I'm getting the impression that
8 she's asking me a lot of difficult things, but if I
9 took an oath to do this, then I would have to do it.
10 Is that accurate?
11  A. Yes.
12  Q. And no one here is going to say being a
13 juror is ever easy, because it's not.
14  A. And I'm sure you don't have people banging
15 on the doors saying, "Let me do it," either.
16  Q. You know what, and when we do, we get very
17 scared. We get very scared about those people.
18  No, that's true. We don't have people
19 banging on the doors. But it's an important duty and
20 it's one in which if you can take the oath and you can
21 follow the law and be fair to both sides, we want you
22 to do it. And if it's something where you're being
23 asked, you know, I understand this is the law, this
24 may make me sound bad, but, look, I'm always going to
25 answer these questions in such a way that a life

**Page 190**

1 sentence is always going to be the result because I
2 can't live with myself otherwise, are you one of those
3 people?
4  A. No, I don't think so.
5  Q. Okay. Just a few more things and I promise
6 I'm going to be done with you.
7  It is possible that the jury may be
8 sequestered for deliberations. Would that pose any
9 problem for you?
10  A. Probably pose a problem for everybody.
11  Q. Anything out of ordinary is what I'm
12 saying.
13  A. No.
14  Q. And finally, just to make sure that this
15 isn't something that you already know about, the names
16 of the complainants in our indictment, I want to see
17 if you're familiar with them. Patricia Syren?
18  A. No.
19  Q. And Pearl "RD" MaGouirk?
20  A. No.
21  Q. Do you know anything about any type of
22 offense that happened off of Scott Avenue in east Fort
23 Worth back in April?
24  A. No.
25  Q. Do you have any questions for me about

**Page 191**

1 anything I've gone over?
2  A. No, you've done very well.
3  Q. All right. Well, I really appreciate your
4 time and I appreciate your answers. And I know we've
5 asked you some tough questions.
6  Oh, one last question. On your
7 questionnaire there was a question that asked you,
8 "Could you be fair and impartial about the
9 application of the death penalty to persons of
10 less-than-average intelligence?" And what I want to
11 say to you right now is that in Texas we don't execute
12 people that are mentally retarded. We are prohibited
13 from doing that, which is a good thing.
14  A. Right.
15  Q. So with that understanding, would that
16 change your question or change your answer, excuse
17 me? I think you answered --
18  A. With that understanding, isn't that what
19 you're saying?
20  Q. Well, the question I don't think intended to
21 ask you about mental retardation. But I'm trying to
22 find out if that's the way you took it?
23  A. Yes.
24  Q. So understanding that there are all degrees
25 of intelligence levels that are above mental

**Page 192**

1 retardation, as long as we're not talking about a
2 mental retardation issue, you could be fair?
3  A. Yes.
4  MS. HARTMANN: Okay. Thank you. I really
5 appreciate your time and your candor with me.
6  We pass the venireman.
7  THE COURT: The defense may proceed.
8  VOIR DIRE EXAMINATION
9 BY MR. MOORE:
10  Q. Hi, Ms. Deal.
11  A. Hello.
12  Q. My name is Tim Moore. This is Bill Ray.
13  MR. RAY: Hi.
14  Q. (BY MR. MOORE) Billy Jack Crutsinger.
15  I'm not going to take as much time with you
16 as Ms. Hartmann did. We've had your, the benefit of
17 your questionnaire and your extensive interview by
18 her. There are some things that I need to go over
19 with you, though. It's my duty as a lawyer to do
20 that. You understand that, don't you?
21  A. Uh-huh, yes.
22  Q. When we ask a question about whether or not,
23 what's your opinion of defense lawyers and prosecutors
24 and your answer to that about defense lawyers was,
25 "Not always after the truth."

Page 193

1  A. I got that from "The Practice."
2  Q. Well, you don't see this episode of "The
3  Practice" very often, do you?
4  A. No.
5  Q. Because it wouldn't get very high ratings.
6  But I can tell you right now that's exactly what we're
7  after is the truth. We're not trying to trick you,
8  we're not trying to pry into your private business.
9  All we want to know here today is how truthfully
10 feel about things, okay. And I think you've done
11 that, haven't you?
12  A. Yes.
13  Q. And when Ms. Hartmann asked you, well,
14 should I be worried about having you on my jury, I
15 think we both ought to be worried about having you on
16 the jury, would that be fair to you?
17  A. Okay.
18  Q. And I tell you why is because what we're
19 looking for is somebody that's not on anybody's team,
20 okay? You know their position in this case is they're
21 going to be asking 12 people in the coming weeks to
22 execute him, okay? And we're going to be asking those
23 same people to give him a life sentence if they've
24 proved beyond any doubt that he's guilty, okay?
25  A. Okay.

Page 194

1  Q. Is there any doubt in your mind where we
2  stand on this issue?
3  A. No.
4  Q. And do you feel like you may be on one team
5  or the other?
6  A. No.
7  Q. Do you feel like you're the type of person
8  that regardless of what they say or what we say,
9  you're going to base a decision strictly on what comes
10 from the witness stand?
11  A. Yes.
12  Q. And if you're back there -- you know, we
13 talk about society and we'll talk a little bit more
14 about it in a minute, but actually a jury of 12 people
15 is kind of a little society, wouldn't you agree?
16  A. Yes.
17  Q. Especially in a capital murder case where
18 the death penalty is sought, they're going to spend a
19 lot of time together usually, wouldn't you think so?
20  A. Yes.
21  Q. And maybe become friends, maybe become
22 enemies, I don't know. I've never been on one. But I
23 would just imagine that that's how it would be,
24 wouldn't I?
25  A. Probably.

Page 195

1  Q. And what we're looking for is people that
2  once everything is heard and once they're back in that
3  jury room making an ultimate decision, whether it's
4  guilt/innocence or what the proper punishment is,
5  we're looking for people that if they're convinced one
6  way will not be swayed because of friendships or just
7  to get things over with, do you follow me?
8  A. Yes.
9  Q. Do you think you're that type of person?
10  A. Who could be swayed? Is that what you're
11 asking?
12  Q. Who would stand their ground and not be
13 swayed?
14  A. Who would stand their ground? Yes, if I
15 believed in something.
16  Q. On a different note, what is the Mid-Cities
17 Welcome Service?
18  A. It's a welcoming service to the Mid-Cities.
19 We welcome new residents and the businesses that come
20 into the community with a packet.
21  Q. Is that like a contract with the city?
22  A. No, I own it. It's a business.
23  Q. And do you make money doing it?
24  A. Absolutely. It's an advertising program for
25 businesses.

Page 196

1  Q. Okay. So you sign up various businesses and
2  then you're the kind of welcome mat for people?
3  A. Right.
4  Q. And you've served on a prior criminal jury
5  before?
6  A. In '96, I believe.
7  Q. And was that here in Tarrant County?
8  A. Yes.
9  Q. What kind of case was that?
10  A. It was a child that had killed another child
11 because he had been left in a crack house with a gun.
12 And he woke up and shot the child coming in the back
13 door.
14  Q. Okay. Do you remember what court that was
15 in?
16  A. It was on the other side of town.
17  Q. Out at juvenile?
18  A. Yes.
19  Q. And y'all found that kid guilty?
20  A. Yes.
21  Q. You didn't have any problem with that, did
22 you?
23  A. No.
24  Q. Do you see where -- so you sat through a
25 similar voir dire process when you went through that,

Page 197

1 correct?
2    A. No, it really wasn't as extensive as this
3 one.
4    Q. Because everybody was sitting out there
5 together, correct?
6    A. Exactly, yes. Much easier.
7    Q. Do you have a feeling why it's a little bit
8 more intense in this particular situation?
9    A. Because of the life and death penalty.
10    Q. Exactly. And that's what I want to talk to
11 you about a little bit. When Ms. Hartmann asked you
12 if you had children and grandchildren and if they
13 broke the rules, what are the consequences. And I
14 guess we all have a different -- I have children. We
15 all have different ideas of what the proper punishment
16 is when those children break the rules, don't we?
17    A. Yes.
18    Q. And just like in this particular situation,
19 kind of analogous. We've got somebody who broke the
20 rules or could've broken the rules. So now we've got
21 to see about consequences, don't we?
22    A. Yes.
23    Q. And I'm not going to go over the burden of
24 proof and presumption of innocence, but you know and
25 understand, don't you, that to get to punishment, the

Page 198

1 State has to prove their case beyond a reasonable
2 doubt to each juror's satisfaction?
3    A. Yes.
4    Q. And you would hold them to that, wouldn't
5 you?
6    A. Yes.
7    Q. And if they do then we've got to talk about
8 punishment now, do you understand that?
9    A. Yes.
10    Q. In other words, there's two stages of the
11 trial. We can't go through the guilt/innocence and
12 say well, okay, the jury found you guilty. Now, time
13 out, we're going to pick another jury to do
14 punishment. You understand we can't do that. So
15 while we're not admitting any kind of guilt, we by law
16 have to talk about the punishment with you now.
17    A. Okay.
18    Q. You won't hold that against us, will you?
19    A. No.
20    Q. The consequences of finding somebody guilty
21 of capital murder are life or death, it's that
22 simple. And you understand that now, don't you?
23    A. Yes.
24    Q. When you came in to fill out this
25 questionnaire the other day, did you have a different

Page 199

1 opinion or a different concept of what capital murder
2 was?
3    A. I really hadn't given it much thought
4 because I had never come in contact with it.
5    Q. When you welcome people into the city, you
6 don't talk about capital murder much, do you?
7    A. No.
8    Q. But now that you've had some time to think
9 about it, do you understand that the State of Texas
10 accepts a life sentence as proper punishment in a
11 capital murder case?
12    A. Yes.
13    Q. And the State of Texas has passed this
14 system, this little scheme, if you will, if a person
15 is found guilty of answering these certain questions.
16 You don't just go back there and say, oh, we're going
17 to give him death. You have to answer certain
18 questions.
19       You understand that now?
20    A. Yes.
21    Q. So in a way, it's a very restrictive
22 statute. In other words, you find somebody guilty of
23 intentionally killing somebody and if you get there,
24 then you don't just say -- and correct me if I'm
25 wrong, but you wouldn't just, if you found somebody

Page 200

1 guilty of capital murder, automatically think death was
2 the proper punishment, would you?
3    A. No.
4    Q. And the legislature didn't either. Because
5 what they did is they passed this scheme whereby you
6 have to find that that person, beyond a reasonable
7 doubt, would be a future danger to commit future acts
8 of violence in whatever society that person is in.
9 And I believe you said that you could find that?
10    A. Yes.
11    Q. And let me talk to you a little bit about
12 this society that we're talking about. Because if a
13 person gets a life sentence, obviously prison is going
14 to be a society that they're in, you understand that.
15 So we like to talk about what your concept of that is,
16 especially knowing that if it is a life sentence, the
17 person will not be eligible for parole for 40 calendar
18 years from the date of their conviction.
19       You understand that? Did you know that?
20    A. Yeah. Well, from the papers that we filled
21 out, yes.
22    Q. What is your feeling about that?
23    A. I'm not sure I have a feeling about that.
24    Q. What do you think about it? Do you think
25 that's good, bad, indifferent?

Page 201

1   A. It's probably good that they will have at
2 least 40 years.
3   Q. And a lot of people think that after -- and
4 you understand that's day for day. It doesn't matter
5 how good you are in the penitentiary, how many times
6 you mop the halls, you can't do enough good stuff for
7 40 years until the Board of Pardons and Parole looks
8 at you.
9       Do you understand that?
10   A. Yes.
11   Q. And then we don't just unlock the door after
12 40 calendar years and let that person back out in
13 society. There's another procedure that after that
14 person has spent 40 years, day for day -- so let me
15 just give you an example. A person is 30 years old
16 and they get convicted of capital murder and the jury
17 decides that a life sentence is an appropriate
18 sentence. That person is going to be 70 years old
19 under our law before our Board of Pardons and Paroles
20 can even consider them for probation (sic), okay? Do
21 you understand that?
22   A. Yes.
23   Q. And then when that 40 years rolls around,
24 like I said, they don't just unlock the door. What
25 they do is this. This is one of our laws. That to

Page 202

1 release on parole, an inmate who was convicted of a
2 capital felony, all members of the board, which is 18
3 of them, must vote on the release on parole of the
4 inmate. So they all got to vote. And at least
5 two-thirds or 12 of them have to vote in favor of the
6 release on parole, okay?
7   MS. HARTMANN: Excuse me, Your Honor. I'm
8 going to object. This is improper. The venire
9 members are entitled to know about the possibility of
10 parole but not the details of it because they can't
11 consider it.
12   THE COURT: Sustained.
13   MR. RAY: Judge, I believe that the
14 eligibility for parole is something that they can
15 consider and --
16   THE COURT: Well, this doesn't have anything
17 to do with it. They're either eligible or they're
18 not.
19   MR. RAY: I understand. But just because
20 they're eligible doesn't mean they're going to get
21 granted. And while we can't go into the facts that
22 might substantiate the Parole Board granting parole or
23 not, it's still a system that the person has to, his
24 case has to proceed through.
25   THE COURT: It's just like questioning

Page 203

1 someone on the workings of the grand jury. That's not
2 relevant, either.
3   MR. RAY: We'd like to ask it, Judge, and
4 we'd like to explain it because we think it is
5 relevant.
6   THE COURT: Sustained.
7   MR. RAY: Do you want me to take it down?
8 We'd like to make a bill after this.
9   Q. (BY MR. MOORE) Well, the bottom line is you
10 understand that the person must spend 40 calendar
11 years if they get a life sentence before they even
12 become eligible for parole. And how do you feel about
13 that? I mean, I know you've said, well, I really
14 don't know. But would that have any bearing on the
15 way you answered those questions whatsoever?
16   A. Probably not. It'd be the consequences of
17 the act.
18   Q. Okay. And then after you hypothetically
19 found somebody guilty of capital murder and found
20 beyond a reasonable doubt that they would be a future
21 danger to commit acts of violence, then the State of
22 Texas says well, a life sentence is still okay because
23 you got that last question to answer about
24 mitigation.
25       Did you understand when you were filling out

Page 204

1 this questionnaire what mitigation meant?
2   A. No.
3   Q. Okay. What do you think it means now?
4   A. Well, things that have happened to that
5 person to make him come to this point, probably, in
6 his life.
7   Q. Would that matter to you?
8   A. Would it matter to me?
9   Q. Yes?
10   A. I guess it would depend on what it was. It
11 might.
12   Q. Okay. Even after that you found the person
13 that intentionally killed two people, that's what they
14 wanted to do, you found them guilty beyond a
15 reasonable doubt and then you heard more evidence
16 about their future danger to society, that they might
17 commit criminal acts of violence and you've said
18 beyond a reasonable doubt yeah, I think that too, but
19 then this last question, is there any one circumstance
20 is all it would take, or circumstances, to merit a
21 life sentence, you could consider that?
22   A. I could consider it.
23   MR. MOORE: Okay. That's all the questions
24 I have, Your Honor.
25   MR. RAY: Safe and except our bill.

Jury Voir Dire Proceedings  8-18-09          Multi-Page          State vs. Billy Jack Crutsinger   Vol. 3

Case 4:07-cv-00703-Y   Document 86   Filed 11/03/17   Page 61 of 143   PageID 3484

Page 205

1  THE COURT: Ms. Deal, there's a very brief
2  matter I have to take up outside your presence. If
3  you'd just step outside the door for just a second
4  I'll be able to let you know shortly.
5      VENIREPERSON DEAL: Okay.
6  (Venireperson Deal exits the courtroom.)
7      THE COURT: What says the State?
8      MS. HARTMANN: State will accept.
9      MR. MOORE: We'll accept.
10     THE COURT: Have her step back in, please.
11     MR. RAY: Do you want us to make our bill
12 before or after since she's going to be on the jury?
13     THE COURT: You can make it after.
14     MR. RAY: Okay. That's fine.
15 (Venireperson Deal enters the courtroom.)
16     THE COURT: Just step up to the rail, please
17 ma'am.
18     Ms. Deal, you are going to be on our jury.
19 We are going to start the trial around September
20 22nd. And sometime between now and then, closer to
21 then than now, I will be getting in touch with you and
22 letting you know exactly when to report to court. You
23 will report to this courtroom right here when you're
24 asked to report.
25     In the meantime, we should have a booklet of

Page 206

1  instructions to give you. And if you take a minute
2  and read through that booklet, those instructions are
3  all very important to your conduct as a juror. But
4  especially important is to make sure that you don't
5  discuss this case with anyone or allow anyone to
6  discuss it with you or don't read anything about it in
7  the newspapers or watch anything about it on TV.
8      The rest of the instructions are pretty
9  self-explanatory. And if anything comes up that makes
10 jury service extremely difficult for you, just please
11 call us. There's a telephone number on there where
12 you can reach us. And I will be in touch with you.
13     Thank you very much for your time this
14 morning.
15 (Venireperson Deal exits the courtroom.)
16     THE COURT: We'll be in recess.
17     MR. RAY: Judge, can I make my --
18     THE COURT: You may make your bill.
19     MR. RAY: Judge, the record will reflect
20 that the screen I have up is the screen that the State
21 objected to. They did not object to the same screen
22 with Mr. Reed, Juror No. 2.
23     But this particular statute is entitled,
24 it's an extraordinary vote required. And with the
25 Court's permission, I'll read that into the record.

Page 207

1      It says, "To release on parole an inmate who
2  was convicted of a capital felony, all members of the
3  Board must vote on the release on parole of the
4  inmate, and at least two-thirds of the members must
5  vote in favor of a release on parole. A member of the
6  Board may not vote on the release unless the member
7  first receives a copy of a written report from the
8  Department on the probability that the inmate would
9  commit an offense after being released on parole." It
10 is Section 508.046 of the Government Code, which I
11 don't have on my chart. But that's the statute.
12     Our position is the reason that this is
13 relevant is while the factors of why a person may or
14 may not be granted parole, i.e., his participation in
15 the prison, who the governor is, what the governor's
16 whims are and that sort of thing, as well as the
17 members of the Board of Pardons and Parole, that's not
18 what we're trying to get into.
19     What we're wanting to show is that even
20 though a defendant is eligible by the fact that he's
21 got 40 calendar years in, which is what the Court has
22 allowed us to ask, I believe that we should be able to
23 take this one step further in that eligibility, while
24 he has to serve 40 years, he's still not eligible
25 until three things happen up there.

Page 208

1      Number one, that all 18 members of the board
2  are present. That two-thirds of them vote for it.
3  And that each member of the board, all 18 of them,
4  have received a copy of a written report from the
5  Department of Corrections. In other words, the
6  department doesn't ever get the report to the Board of
7  Pardons and Paroles or if only 17 of them meet because
8  one of them dies or resigns or isn't there for
9  whatever reason, the defendant is still not eligible,
10 regardless of how long he serves. He could
11 theoretically serve 41 years or 45 years depending on
12 the situation.
13     For that reason, his eligibility is
14 40-plus. Could be exactly 40, but it could be more
15 than 40. And we believe that we should be able to
16 explain those consequences to the jury that it's not
17 just 40 years, it's 40 plus the things in the
18 extraordinary vote. For those reasons we'd like to
19 ask the questions potentially of the jurors that we
20 have identified that's been an issue.
21     THE COURT: I will look at the matter over
22 the lunch hour.
23     MR. RAY: Thank you. How long are we going
24 to break for lunch?
25     THE COURT: Let's break until 1:45. Jurors

Page 209

1  are supposed to show up at 1:30.
2      (Break taken.)
3      THE COURT: All right. If you would have
4  Mr. Crow step in, please.
5      MR. MOORE: Wait a minute, Judge. Weren't
6  you going to think about our --
7      THE COURT: I haven't had a chance to do it
8  yet.
9      MR. MOORE: Okay. Fair enough.
10     MS. HARTMANN: And we have some additional
11 reasons for our objections as well.
12     MR. MOORE: That'll be overruled.
13     MS. HARTMANN: Only if you're a judge, which
14 you're not.
15     (Venireperson Crow enters the courtroom.)
16     THE COURT: Good afternoon.
17     VENIREPERSON CROW: How are you doing?
18     THE COURT: Raise your right hand, please.
19     (Venireperson Crow sworn.)
20     THE COURT: Tell us your name, please.
21     VENIREPERSON CROW: Mark Crow.
22     THE COURT: Mr. Crow, this is the individual
23 interview that you were told about earlier. And for
24 the next little while, each side, first the State,
25 over here at this table, and then the defense over at

Page 210

1  that table are going to be allowed to ask you
2  questions regarding your background and qualifications
3  to be a juror in a case such as this.
4      What they will generally do tell you how
5  the law works and some matters that may be involved in
6  the trial of this case. And then they're just going
7  to ask you how you feel about that. And based upon
8  that oath you just took a second ago, all you are
9  obligated to do at this point in the trial is to tell
10 us you how you honestly feel about those matters.
11     The State is Michele Hartmann and Lisa
12 Callaghan.
13     MS. HARTMANN: Good morning
14     MS. CALLAGHAN: Good morning.
15     THE COURT: The defense is Tim Moore.
16     MR. MOORE: Good afternoon.
17     THE COURT: Bill Ray.
18     MR. RAY: Hello, how are you doing?
19     THE COURT: And Billy Jack Crutsinger.
20     And the State may proceed.
21     MS. CALLAGHAN: Thank you, Your Honor.
22          MARK CROW,
23 having been duly sworn to make true answers to such
24 questions as may be propounded by the Court or under
25 its direction, touching upon his service and

Page 211

1  qualification as a juror, gave answers as follows:
2          VOIR DIRE EXAMINATION
3  BY MS. CALLAGHAN:
4      Q. How are you doing today?
5      A. Do what?
6      Q. How are you doing today?
7      A. I'm good.
8      Q. Good. Okay. Do you need to put that
9  microphone up a little bit? Is that more comfortable?
10     A. Sure. Is that better?
11     Q. Yeah, that's better.
12     Okay. Now, Michele and I together represent
13 the State of Texas. Do I understand from your jury
14 selection sheet, have you been through this process
15 before? Have you been picked on a jury before?
16     A. No. On a jury, no.
17     Q. So this is pretty new to you.
18     What happens is you know we brought the big
19 panel in last week and you filled out your
20 questionnaire last week. As the Judge mentioned, the
21 purpose of having you come down here today is so that
22 we can individually talk to you about what the law is
23 in a capital murder case and talk to you about your
24 feelings, how you feel about certain phases of the law
25 and whether or not you have any experiences in your

Page 212

1  life or any opinions which might affect your ability
2  to be a fair and impartial juror, okay?
3      So this is where you find out how the
4  process goes and what the law is. And if you have any
5  questions about that, you need to go ahead and ask me
6  here because we won't be able to speak once you're o.
7  the jury, okay?
8      A. Okay.
9      Q. So if there's anything you're unclear about,
10 anything you need to know, go ahead and ask it and
11 don't hesitate, okay?
12     A. (Venireperson nods head.)
13     Q. Very good. All right. There's no right or
14 wrong answers here. We just need to know truthfully
15 how you feel, okay?
16     A. Okay.
17     Q. We anticipate that this case will end up
18 being tried the week of September 22nd. It could take
19 anywhere from five days to two weeks. In terms of
20 scheduling, would that be a problem for you?
21     A. No, not for me. I mean, I just have a job,
22 regular job.
23     Q. Okay. So you would be able to appear then?
24 You don't have surgery scheduled or anything like
25 that?

| Page 213 | Page 215 |
|---|---|
| 1   A. No. | 1 they choose to, they can present evidence at that |
| 2   Q. Very good.  It is possible in this case that | 2 time. |
| 3 once the jury is picked and once the evidence starts | 3       Does that seem reasonable to you? |
| 4 that we may have to have the jury sequestered, meaning | 4   A. Yes. |
| 5 that they might have to stay together at a hotel at | 5   Q. Okay.  So you wouldn't place any burden on |
| 6 night instead of going back to their homes. | 6 the defense?  Do you understand that the State has to |
| 7       Would you be able to do that? | 7 prove its case beyond a reasonable doubt, but we're |
| 8   A. Yes, that would be fine. | 8 the only ones required to prove? |
| 9   Q. So you could bring your toothbrush and | 9   A. Yes. |
| 10 jammies and come visit us and stay for a while? | 10   Q. All right.  Anyway, then once all the |
| 11   A. I could do that. | 11 evidence is closed then you get to punishment -- or, |
| 12   Q. All right.  Now, let's talk a little bit | 12 I'm sorry, to final argument.  And the State starts |
| 13 about the order of trial.  Criminal cases are | 13 out in argument and then the defense can argue if they |
| 14 basically divided into two mini-trials, okay?  The | 14 choose and then the State gets to go last in |
| 15 first trial deals only with guilt/innocence.  What | 15 argument.  That same routine is followed in the |
| 16 happens during that phase of the trial is you hear | 16 punishment phase if there's a punishment trial, okay? |
| 17 evidence that relates to whether or not a given | 17   A. Okay. |
| 18 defendant committed the crime they're on trial for and | 18   Q. All right.  Let's talk a little bit about |
| 19 that's all that you hear, okay? | 19 the burden of proof.  The State must prove its case |
| 20       If a person is found guilty during that | 20 beyond a reasonable doubt, okay?  Beyond a reasonable |
| 21 phase, then you go to what's called the punishment | 21 doubt.  Now, that's not defined for you.  But what it |
| 22 phase.  Now, if they're found not guilty, of course, | 22 most definitely does not mean is beyond any doubt or |
| 23 that's the end of it, they go home.  But if they're | 23 all doubt, okay?  It's beyond a reasonable doubt. |
| 24 found guilty then you go to the punishment phase.  And | 24       Do you have any brothers or sisters? |
| 25 that's, basically, the trial proceeds in the same | 25   A. I've got two brothers. |

| Page 214 | Page 216 |
|---|---|
| 1 order, but it's all about punishment. | 1   Q. Two bothers, okay.  Have you ever gotten |
| 2       What you get to hear in that trial are | 2 together with them at a holiday, like Christmas, and |
| 3 things relating to punishment like a person's | 3 talked about things that you did when you were kids? |
| 4 character, past criminal history, you know, good | 4   A. Yes. |
| 5 character, anything that pertains to what their life | 5   Q. Did they necessarily remember it the same |
| 6 and history was like prior to that so that you can put | 6 way you did? |
| 7 this criminal offense in the context of their whole | 7   A. No, not really. |
| 8 life experience, okay?  So that way you don't have to | 8   Q. Why is that?  Why don't they remember it the |
| 9 sentence in a vacuum, you can sentence understanding | 9 same way? |
| 10 what their past and history is like, okay? | 10   A. I don't know.  I really don't know. |
| 11   A. Okay. | 11   Q. Can it make a difference how old you were or |
| 12   Q. But you don't get to know any of that until | 12 where you were when something happened or what's |
| 13 the punishment phase, okay?  Because the first part is | 13 important to you? |
| 14 just about whether they did it. | 14   A. Yeah, possibly.  You're right. |
| 15       Does that make sense to you? | 15   Q. Okay.  Are you married? |
| 16   A. Yeah, that makes sense. | 16   A. No. |
| 17   Q. Okay.  That seems pretty fair, doesn't it? | 17   Q. Okay.  Do you have a girlfriend or |
| 18   A. Uh-huh, yes. | 18 significant other? |
| 19   Q. All right.  Now, the State goes first in | 19   A. No. |
| 20 everything because we have the burden of proof.  We | 20   Q. Have you ever been to a wedding before? |
| 21 carry the burden of proving the case.  So we start off | 21   A. Yes. |
| 22 in opening statement, we start off when the evidence | 22   Q. Okay.  Let's say you went with your mom, |
| 23 starts.  And then after we put on our evidence, then | 23 okay?  Who's more likely to remember what the |
| 24 the defense goes.  And the defense has no burden, they | 24 bridesmaid's dresses looked like, your mom or you? |
| 25 don't have to do anything but just sit here.  But if | 25   A. Her, I imagine. |

Page 217

1    Q. Yeah. You're not going to pay any attention
2 to that, right?
3    A. Not really.
4    Q. Would you agree that what you remember as a
5 witness can often depend on what's important to you?
6    A. Yes.
7    Q. Does that make sense to you? That's why the
8 State's burden is beyond a reasonable doubt as opposed
9 to beyond any doubt or all doubt. No two witnesses
10 will ever remember anything exactly the same.
11 Different human beings remember things differently.
12       How would you have to know something to know
13 it beyond any doubt at all?
14    A. Oh, boy. Probably have to see it on video.
15 That's a good question.
16    Q. I'm sorry, I didn't mean to interrupt you.
17    A. I said that's a good question.
18    Q. Wouldn't you basically have to be an
19 eyewitness? Wouldn't you have to have seen it happen
20 yourself? When you said video, you mean see it
21 happen?
22    A. Uh-huh, yes.
23    Q. So you can see why the State couldn't choose
24 as jurors people who are eyewitnesses? Eyewitnesses
25 would be testifying as witnesses, right?

Page 218

1    A. Yes.
2    Q. So the State's burden is beyond a reasonable
3 doubt. Do you think you could hold the State to that
4 burden of beyond a reasonable doubt, the State must
5 prove its case beyond a reasonable doubt?
6    A. Yes, I do.
7    Q. Would you require the State to do anything
8 more than that? Would you require the State to prove
9 its case beyond any doubt or all doubt? Or could you
10 stick to beyond a reasonable doubt?
11    A. I could stick to the reasonable.
12    Q. Okay. Very good.
13    A. I could stick to that.
14    Q. Now, let's talk a little bit about what the
15 State has to prove, what the elements are in a capital
16 murder case, okay?
17    MR. RAY: Lisa, if you'll move it over to
18 the box on the left, it'll come up.
19    Q. (BY MS. CALLAGHAN) Okay. Capital murder.
20 Capital murders you have what's called a regular
21 murder, just a plain Jane murder, plus an aggravating
22 circumstance, aggravating meaning something that makes
23 it worse than regular murder, okay? So you have to
24 have a regular murder plus an aggravating circumstance
25 for it to be capital murder.

Page 219

1    Does that make sense to you?
2    A. Yes.
3    Q. Now, what are the kinds of thing -- first of
4 all, let's go to murder, how you prove murder, and
5 then we'll go back to the aggravating circumstances.
6    In order to prove just regular murder, what
7 you have to prove is that it's the Defendant, that
8 it's one in the same person who's on trial in the
9 case, okay, that the offense occurred in Tarrant
10 County, Texas, that it occurred on or about a certain
11 date, and that the person intentionally caused the
12 death of an individual by what we call the manner and
13 means, meaning by shooting them or by stabbing them or
14 by running them over with a car. The manner and means
15 is how they did it, okay?
16    And those are the basic elements of murder.
17 That they did it intentionally, they caused the death
18 of the individual and they did it in a certain way,
19 okay?
20    Now, that's murder. In order to be capital
21 murder, you have to have an aggravating circumstance.
22 Now, which aggravating circumstances make it capital?
23 Well, here are some examples. There's a whole long
24 list. I'm not going to go over all of them, but some
25 examples of things that can make it capital are, one,

Page 220

1 if the person that was killed was a child under six
2 years of age, or if they were a police officer or
3 fireman in the course of their duties, or if the
4 person was killed during the course of committing
5 another felony offense, an aggravated robbery, a
6 kidnapping or a sexual assault. If you're doing one
7 of those things: Robbery, kidnapping and sexual
8 assault and you kill the person in the course of
9 committing that crime, that's capital, okay?
10    And then finally, and we'll pay more
11 attention to this last one, the intentional killing of
12 more than one person in the same criminal transaction,
13 meaning in the same series of events, ongoing series
14 of events more than one person was killed. It could
15 be two or it could even be more than that, you just
16 don't know, okay?
17    A. Okay.
18    Q. Those things are aggravating circumstances
19 which make a regular murder a capital murder. So you
20 can see from this that the vast majority of murders
21 that occur aren't capital. Only a very small
22 percentage of them are.
23    A. Okay.
24    Q. Anything about that that you don't
25 understand or is that pretty clear?

Jury Voir Dire Proceedings 8-18-03   Multi Page   State vs. Billy Jack Crutsinger   Vol. 3

Case 4:07-cv-00703-Y   Document 86   Filed 11/03/17   Page 65 of 143   PageID 3488

Page 221

1    A. No, it's pretty clear.
2    Q. Okay. So let's go to the cause the death of
3  more than one person by a certain manner and means.
4  What do those elements mean? Well, first of all, on
5  or about. We have to prove that it happened on or
6  about a certain date. And that date will be in the
7  indictment, which is the piece of paper which tells
8  the State and the defense what it is we have to
9  prove.
10      We must prove that that offense occurred on
11  or about a certain date. Well, what the law says is
12  that all we have to prove is that that date was before
13  the date of the return of the indictment and within
14  the statute of limitations. It doesn't say we have to
15  pick out any special day.
16      So what's today, the 18th?
17    A. Yes, the 18th.
18    Q. Okay. So let's say an indictment in this
19  case was handed down today. All we have to prove is
20  that it was before today and within the statute of
21  limitations. Well, there is no statute of limitations
22  for murder, so all we have to prove is just before the
23  date the indictment was returned, like today, okay?
24  That's the only requirement, it's not any more
25  specific than that.

Page 222

1      Intent. We have to prove that a person
2  committed the offense intentionally, that it was their
3  conscious objective or desire to cause that result,
4  okay? They meant to do it.
5      Suppose I came up to you and shook your
6  hand. How do you generally know that somebody wants
7  to shake your hand?
8    A. They put their hand out.
9    Q. Okay. Very good. Okay. Would you agree
10  with me that not everyone tells you what their intent
11  is by saying it out loud? They don't necessarily say
12  it in words. Sometimes you have to decide what their
13  intent is by what they do.
14      Would you agree with that?
15    A. Yes.
16    Q. Okay. So you think you could determine what
17  a person's intent was, whether they intended to do
18  something by their actions or behavior without them
19  necessarily saying it out loud.
20      Do you think you could do that?
21    A. Yes, I think I could.
22    Q. Okay. All right. You'll notice in this
23  list it doesn't say premeditated. Are you familiar
24  with the term premeditated, the word?
25    A. Yes.

Page 223

1    Q. It's not an element that the State prove
2  that they thought about this in advance or planned it
3  out. We don't have to prove that. Intent can arise
4  like that, okay?
5      Just by way of an example, suppose there's
6  an individual that I have a grudge against, I don't
7  like them. I didn't have any plan to kill them, I
8  just don't like them. Walking down the street all of
9  a sudden I see them on the other side of the street,
10  they start yelling obscenities at me. Boom, I decide
11  to pull out my gun and kill 'em. It wasn't a plan, I
12  wasn't anticipating meeting them that day, but my
13  intent arose when they were nasty to me.
14      Does that make sense to you, that intent can
15  arise very quickly?
16    A. Yeah, that makes sense.
17    Q. Okay. All right. Now, that's what some of
18  those elements of capital murder are. I think we
19  pretty much explained what all those legal words
20  mean.
21      Does that make sense to you?
22    A. Yes.
23    Q. Is there anything in there that you don't
24  understand?
25    A. No.

Page 224

1    Q. Now, if a jury finds the Defendant guilty
2  beyond a reasonable doubt of the crime itself, the
3  capital murder, then you go on to the punishment
4  phase. At the punishment phase, the Judge gives you
5  two questions. Those questions are called special
6  issues. But what they basically are is two
7  questions.
8      If you answer those two questions in a
9  certain way, then the Judge has to assess the death
10  penalty. You don't vote for life or death. It
11  doesn't work that way in a capital case. The way it
12  is is that you're given these two questions and
13  depending on how you answer those questions life or
14  death is assessed, all right?
15    A. Okay.
16    Q. Now, when we say life -- and those are the
17  only two punishments available for a capital murder,
18  okay, either life in the penitentiary or death. There
19  is nothing else, just those two.
20      When we say life, what we mean is they must
21  serve 40 years in the pen. 4-0 flat. No good time,
22  no anything. Day for day, 40 years before they're
23  even eligible. And at the end of 40 years, then the
24  Board of Pardons and Paroles may consider whether or
25  not they should receive it. It's not automatic, they

Page 225

1 simply consider it at that time. But the board is not
2 entitled to consider it until 40 calendar years have
3 passed, okay? So that's what we're talking about when
4 we say the word life.
5      Let's go on to the very first special issue,
6 the very first question. The first question is one
7 that we call the future dangerousness question because
8 that's basically the crux of what it's talking about.
9 Why don't you take just a minute and go ahead and read
10 that to yourself.
11      (Brief pause.)
12      A. Okay.
13      Q. Okay. What does that mean to you?
14      A. Kind of means what it says, but it's hard
15 for me to describe it. I guess if I thought this
16 person would do this again to somebody else.
17      Q. Okay. That's one possible, but whether they
18 would be dangerous to people in the future?
19      A. Uh-huh.
20      Q. Is that basically what you're getting from
21 that?
22      A. That's what it looks like to me.
23      Q. Okay. Let's go over some of the words in
24 here. It says, "Do you find beyond a reasonable doubt
25 that there is a probability that the defendant would

Page 226

1 commit criminal acts of violence that would constitute
2 a continuing threat to society?"
3      Okay. Let's first of all point out that the
4 State has to prove this first question beyond a
5 reasonable doubt, too, okay? That's our burden. We
6 have to prove that and we have to prove it beyond a
7 reasonable doubt.
8      Now, you see the word probability there.
9 That's not defined anywhere for you. But generally
10 speaking what probability is, it means more than a
11 possibility, but less than a certainty, okay?
12      A. Okay.
13      Q. Do you see what I mean by that? Have you
14 ever flown on an airplane?
15      A. Yes.
16      Q. Is it a possibility that that airplane might
17 go down and crash?
18      A. Yes.
19      Q. Always is when you fly. It's always a
20 possibility. But would you get on that airplane
21 knowing it was a certainty --
22      A. No.
23      Q. -- that it would crash? Okay. Probability
24 is somewhere in between those two. That's
25 probability, that the defendant would commit criminal

Page 227

1 acts of violence.
2      What is a criminal act of violence to you?
3      A. Raping somebody, beating somebody up pretty
4 bad.
5      Q. Okay. So you wouldn't necessarily -- from
6 what you're saying, criminal acts of violence might be
7 another murder, but it might be other acts that are
8 physically violent?
9      A. Yes.
10      Q. Criminal act of violence can be anything
11 that you define it as being, okay? That's totally up
12 to you. The law anticipates it could be anything from
13 a property crime like arson or assault, meaning
14 beating someone up, or anything all the way up to
15 murder. It would be up to you to decide whether
16 that's a criminal act of violence, any evidence the
17 State or the defense might present to you, okay?
18      A. Okay.
19      Q. And then that would constitute a continuing
20 threat to society. So here's future danger. Here's
21 where we decide right here, are they a danger to
22 society in the future?
23      Now, society also can be anything you decide
24 it is. It can include anyone who lives in Tarrant
25 County. It can also include people in jail or the

Page 228

1 penitentiary. And you can see why that would be
2 important. A person convicted of capital murder, if
3 they're going to spend the rest of their life in jail,
4 you can see how they would treat other prisoners might
5 be an issue.
6      Does that make sense to you?
7      A. Yes.
8      Q. So society means whatever you define it to
9 mean. It's up to you. But it's not limited to any
10 one group of people, okay?
11      A. Okay.
12      Q. All right. Now, in answering this question,
13 you could look at the case that's on trial, the case
14 that the State is seeking the death penalty on, you
15 could take a look at that and say, you know, the facts
16 of this one case are bad enough that I could answer
17 that question yes, just flat. That's up to you.
18      Or, and this is also totally up to you, you
19 could take a look at this and think, you know, I'm
20 going to have to have more than just the case we're
21 here on. I've got to have acts of criminal violence
22 elsewhere, I've got to have other evidence. That also
23 is up to you.
24      Does that make sense to you?
25      A. Yes.

Page 229

1    Q. All right. Now, if you answer this question
2  yes, that there is beyond a reasonable doubt a
3  probability that this person would commit criminal
4  acts of violence that would constitute a continuing
5  threat to society, if you say yep, that person is a
6  future danger, then you go on to Question No. 2.
7       If you answer it no, that's it, that's the
8  end of it, that person is going to get a life
9  sentence, okay? Because you found that they're not a
10 future danger. But if you answer it yes, then you go
11 on to the next question.
12      In order for a jury to answer this question
13 yes, 12 of them, it has to be unanimous, all 12 have
14 to agree. For them to answer it no, ten of you have
15 to agree, okay? So to go yes, to go on to the next
16 question, all 12 have to agree. For it to be no, for
17 life, only ten of you have to agree.
18      Okay. You have this look like you're
19 expecting there to be a pop quiz at the end of it.
20 It's cool. There won't be. And all this will be in a
21 charge given to you at the end, a piece of paper,
22 okay?
23      A. Okay.
24   Q. It's a long piece of paper, but all this
25 stuff will be in there. So don't worry about it.

Page 230

1       So if you answer that yes, then you go on to
2  Question No. 2. This is Question No. 2. So why don't
3  you take a minute and go ahead and read it.
4    (Brief pause.)
5    A. Okay.
6    Q. Okay. Let's talk a little bit about
7  mitigation. Now, can you tell me what the word
8  mitigation means to you?
9    A. I really don't know.
10   Q. Okay. I know now we're throwing the
11 dictionaries at you, aren't we? Sorry.
12      Here's what we're asking about, basically.
13 By mitigation what we're talking about is something
14 that reduces the defendant's blameworthiness or moral
15 culpability for what he did. Something that makes a
16 person less morally responsible, okay?
17   A. Okay.
18   Q. Does that make sense to you? Some people
19 think that, well, if that person had a very bad
20 childhood, they were abused as a child, that might
21 lower it some. If that person had a drug or alcohol
22 problem, that might lower it some. Stuff like that.
23      Does that make sense to you?
24   A. Yes.
25   Q. Okay. That's the general universe of stuff

Page 231

1  we're talking about that might be mitigating
2  circumstances. Anything that you can think of that
3  comes in evidence, okay, that might make him less
4  responsible morally, okay?
5       Now, mitigating circumstances are anything
6  you find to be mitigating. We admit the evidence, the
7  State, and if they choose to, they have no burden to.
8  But if they choose to, the defense admits it and the
9  State admits it, of course. And of all the stuff
10 that's admitted, whether or not you find it to be
11 mitigating or not is totally up to you. So you have
12 to look at that evidence and decide, first of all, do
13 I think it's true? Do I think that evidence is
14 correct? And if I do think it's true, then do I think
15 it's mitigating, okay?
16      If you find that it is mitigating, you think
17 it is, then you have to ask yourself another
18 question. Is it mitigating enough that it would cause
19 me not to go for the death sentence, okay?
20   A. Okay.
21   Q. Does that make sense to you?
22   A. Yes.
23   Q. Okay. What this question is, is it's a
24 fail-safe, okay? If you've answered the other
25 questions in such a way that you get to this question,

Page 232

1  you found him guilty, the other question was yes
2  they're a future danger, this is the last stop on the
3  line. This is where you hang back, you look at this
4  and you think, all right, is there anything in this
5  whole thing that makes me think this person should not
6  receive the death sentence, okay?
7       Does that make sense?
8    A. Okay. Yes. Yes, it makes sense.
9    Q. Okay. So this is the final place that you
10 get to make that. And anything you find mitigating
11 you can put it into effect if you think it is
12 mitigating. But if you don't find anything, then
13 logically the answer is no.
14      Does that make sense to you?
15   A. Yes.
16   Q. Could you envision a set of facts, a set of
17 circumstances, where you could've found the Defendant
18 guilty, where you could have found that he was a
19 future danger, but then you take back, look at this
20 question and you think, yeah, there is some mitigating
21 circumstance, I'm going to vote yes and the Defendant
22 will get a life sentence?
23      Could you envision that as a possibility?
24   A. Yes.
25   Q. Could you also, other stretch, envision a

Page 233

1 situation in your mind where you would find the person
2 guilty, find that they were a future danger and then
3 look at this, think about it and go no, I just don't
4 see anything that's mitigating in here, or what there
5 is is just not mitigating enough. My answer is no.
6        Could you do that?
7    A. Yes, I can do that.
8    Q. So you could answer it either way depending
9 on the facts?
10    A. Yes, I could.
11    Q. Okay. All right. Now, let's go on and talk
12 a little bit more about what some of other elements of
13 the law are other than death-penalty related stuff,
14 okay?
15        Voluntary intoxication. If a person
16 voluntarily drinks or takes drugs or does something
17 that makes them intoxicated, that's not a defense to
18 committing a crime, okay? Whether or not it mitigates
19 for the purposes of the death penalty is up to you.
20 That's up for you to decide.
21    A. Okay.
22    Q. But if they committed the crime in that
23 state, that's not a defense. They're still legally
24 guilty of capital murder, okay?
25        Does that make sense to you?

Page 234

1    A. Yes.
2    Q. Okay. Now, let's talk a little bit about
3 evidence. Do you watch any police officer shows or
4 lawyer shows on TV?
5    A. No. Not really, no.
6    Q. You're not big on those? Have you ever
7 heard of Miranda rights?
8    A. Yes.
9    Q. You know what those are?
10    A. Yes.
11    Q. You know then that the law is that before a
12 statement is taken from a person if they're in
13 custody, if they're arrested, that their Miranda
14 rights have to be given to them.
15        Does that make sense to you?
16    A. Yes.
17    Q. It has to be given in Texas in a certain
18 form. In this state you can't just tell them. If
19 they give a written statement, it has to be in writing
20 at the top of the page where they put their
21 statement. Or if it's a recording, it has to be at
22 the beginning of the recording, okay?
23        Now, the law is that if the Miranda warnings
24 are not, and this is just one example, there can be
25 many things that if done improperly, it could have

Page 235

1 this effect, okay? But this is just one example.
2        If Miranda warnings are not given or not
3 given properly and a person then gives a statement,
4 you cannot consider that statement. The statement is
5 thrown out, you can't consider it, you have to
6 consider what's left, okay?
7        So let me give you an example of that, all
8 right? Let's say you have a guy who kidnaps and
9 murders a child, okay? And then after he kills the
10 child, he buries the child. Nobody knows where that
11 child is.
12        This person, however, comes to the attention
13 of the police department for some reason, they talk to
14 him, he is able to lead them to the child's body, so
15 they know it's the right person, okay, they know
16 they've got the right person.
17        That person is in custody, but they forget,
18 they don't give him his Miranda warnings, they mess
19 up. It's not right, okay, and that person confesses
20 to the whole thing. Did it, would do it again, would
21 love to do it. They confess to everything pertaining
22 to it, all right?
23        Under those situations, the law says that
24 because that statement wasn't taken correctly, you
25 have to completely disregard it. A juror has to

Page 236

1 disregard it, throw it out and continue with what you
2 have left, okay?
3    A. Okay.
4    Q. You continue with the evidence you have
5 left, totally putting that statement to one side,
6 okay? And you can see why that is. Because if the
7 police do not follow the rules, you can't reward that
8 kind of behavior. It has to be done properly for the
9 rules to have any meaning, right?
10    A. Right.
11    Q. You can see where that would be. Well,
12 suppose the information that's left in the case, you
13 can't convict the person, there's not enough to get
14 you beyond a reasonable doubt, okay?
15        Could you follow the law and just throw out
16 that statement and consider what you have left? And
17 if it means they're guilty, fine. But also if it
18 means they're not guilty, fine. Could you follow that
19 law?
20    A. It would be tough, but I think I could do
21 it. I think I could do it.
22    Q. And, of course, it would be tough. It would
23 be emotionally very difficult, that would be pretty
24 obvious. But you can see where if the law is to have
25 any meaning or effect, it has to be followed

Page 237

1 literally.
2    Does that make sense to you?
3    A. Yes.
4    Q. So you think you could do that?
5    A. Yes.
6    Q. Now, a defendant has certain rights. They
7 have the right to an attorney, they have a right to a
8 jury trial if they would like one. They have a right
9 to remain silent. You've heard of the Fifth
10 Amendment?
11    A. Yes.
12    Q. That means that they have the right, if they
13 choose to testify they can do so and they're to be
14 considered the same as any other witness. You listen
15 to them and decide whether you think they're telling
16 the truth.
17    Does that make sense?
18    A. Yes.
19    Q. On the other hand, if they choose not to
20 testify, you cannot consider that against them for any
21 reason, okay? You put that out of your mind and
22 consider the evidence that is before you.
23    Do you think you could follow that law?
24    A. Yes.
25    Q. Defense has a right to discovery of the

Page 238

1 State's case. They can basically have knowledge and
2 information about what evidence the State has against
3 them. And generally speaking that doesn't go both
4 ways. There's one exception to that, but generally
5 speaking it doesn't.
6    But both sides have the right to subpoena
7 power, meaning both sides can subpoena witnesses to
8 appear.
9    Let me ask you this. I'm going to ask you
10 about a series of names. But first of all, have you
11 been reading in the newspaper anything about this case
12 that you know of?
13    A. No.
14    Q. Have you heard of the names Pat Syren or
15 Pearl MaGouirk, "RD" MaGouirk?
16    A. No.
17    Q. Those names don't ring a bell?
18    A. No.
19    Q. Do you know anything about an offense that
20 occurred in April of this year out on Scott Avenue,
21 which is east side of Fort Worth?
22    A. No.
23    Q. So none of this has come to your attention?
24 All right.
25    Do you know anyone by the last name of

Page 239

1 Crutsinger?
2    A. No.
3    Q. Do you know anyone you see in this room?
4    A. No, I don't think so.
5    Q. Do you know any of the following people:
6 April Syren, Robert Greer, Jamie Spore, Loretta Rouse,
7 Carol Lain, Judy Bell, Robert Pawlowski, Cheryl
8 Moffett, Glendora White, Bobby Gabbert, Dr. Nizam
9 Peerwani and Carolyn Van Winkle of the Tarrant County
10 Medical Examiner's Office? David Ogden, adult
11 probation? Dr. Randy Price, Kelly Goodness, Dr. Barry
12 Mills, Pamela Staples, Kevin Stephen, JoAnne
13 Shoemaker, Geraldine Suggett, Randy McCullough, Debra
14 Huffines?
15    A. No, never heard of them. I don't know them.
16    Q. All right. Do you know any Galveston police
17 officers?
18    A. No.
19    Q. Do you know any Fort Worth police officers?
20    A. Yes.
21    Q. Who do you know that are Fort Worth police
22 officers?
23    A. Clint Wise. I know Russell Johnson. I know
24 Craig Murrah.
25    Q. Craig who?

Page 240

1    A. Craig Murrah.
2    Q. Murrah? How do you spell that?
3    A. M-u-r-r-a-h.
4    Q. So it's Wise, Johnson and Murrah?
5    A. Yes. I think that's it. Maybe Jack Land.
6 I'm not sure if he's a Fort Worth police officer.
7    Q. All right. Now, on the topic of police
8 officers, let's talk about that for just a minute.
9 Police officers, before they are police officers are
10 regular people, right?
11    A. Right.
12    Q. Put their pants on one leg at a time?
13    A. Right.
14    Q. Okay. Then they go through the training and
15 become police officers and put on the uniform,
16 correct? What I'm talking about is as human beings,
17 as individuals.
18    Would you decide, for example, if you saw
19 any average person take the witness stand and testify,
20 would you decide whether they're telling you the truth
21 before you even heard them speak? Or would you wait
22 to listen to what they had to say?
23    A. I think I would wait and listen.
24    Q. Okay. Well, since police officers are
25 regular people who also happen to wear a uniform,

## Page 241

1 would you consider what they had to say the same as
2 any other witness when listening to their testimony?
3    A. Oh, yeah. Yeah, I'd consider it.
4    Q. They wouldn't come to the stand because
5 they're police officers with extra credibility from
6 the very start, extra believability? You would wait
7 and hear as individuals what they have to say and
8 decide whether you believe they're telling the truth?
9    A. Yes, I would do that.
10    Q. And you can see where that's only fair. You
11 know, you can't start out giving people a halo before
12 you've even heard what they had to say, right?
13       Does that make sense to you?
14    A. Right.
15    Q. You think you could stick to that standard?
16    A. Yes.
17    Q. You have an uncle who is a lawyer in Ennis?
18    A. Yes.
19    Q. Does he do any criminal work?
20    A. No, I don't think so. I really don't know
21 what kind he does.
22    Q. There's some questions here about eyewitness
23 accounts. You said you would find them somewhat
24 believable. Tell me how you feel about eyewitness
25 accounts.

## Page 242

1    A. Oh, I was just basically saying that because
2 I know how people misread things or lie or whatever.
3 That's why I put that on there.
4    Q. So it would depend on your assessment of
5 whether or not that person was being accurate and
6 whether they're telling the truth?
7    A. Right.
8    Q. Okay. Statement or confession of an accused
9 you put "Somewhat." What's your feelings on that?
10    A. Basically the same, you know. I know people
11 can say things that, you know, I mean, I wouldn't hold
12 that to be for sure.
13       You're talking about confession, right?
14    Q. Right.
15    A. I know that -- I mean, I would have to see
16 the evidence and see what went on and all that.
17    Q. Okay. You want to have something to support
18 a defendant's confession or statement?
19    A. Yes.
20    Q. You want to have other evidence and take a
21 look at it and think, all right, this person said they
22 did it, but let's look at the rest of it and let's
23 make sure they did?
24    A. Right.
25    Q. I don't want to put words in your mouth.

## Page 243

1 I'm just trying to see if I understand.
2    A. Yes. Yes.
3    Q. Now, towards the end there was a question
4 about what comes into your mind when you first think
5 of a district attorney or a criminal defense
6 attorney. And you put "Win their case."
7    A. Yeah, that's what comes to my mind. I know
8 they're trying to win a case. I'm not thinking guilt
9 or innocence, really.
10    Q. Okay. Doesn't sound like you like lawyers
11 very much?
12    A. No. I like lawyers, I guess. Just like the
13 normal person. I just know that you're trying to win
14 your case.
15    Q. Okay. Do you have any feelings about
16 lawyers that might affect you in listening to the
17 facts of this case?
18    A. No. No, I really don't.
19    Q. Not really? Okay. Because that's okay.
20 Lots of people don't like lawyers.
21       Did you ever see "Jurassic Park"?
22    A. Yes.
23    Q. Do you remember when the lawyer gets eaten
24 everyone in the theatre clapped?
25    A. Yes.

## Page 244

1    Q. But you see what I mean?
2    A. Yes.
3    Q. But that's okay as long as you could still
4 listen fairly to the facts of the case.
5    A. Oh, yes.
6    Q. Do you attend church?
7    A. Yes.
8    Q. Which church do you go to?
9    A. Church of Christ. It's in Lake Worth.
10    Q. Is there anything about your religious
11 beliefs -- I'm not really all that familiar with
12 Church of Christ. I don't know what their beliefs
13 are. But is there anything about your religious
14 beliefs that says you shouldn't give the death
15 penalty?
16    A. No.
17    Q. Does the Church of Christ even really talk
18 about that any?
19    A. No, not really.
20    Q. Okay. That's not really a part of it for
21 them?
22    A. No.
23    Q. One more question and then I think that'll
24 be pretty much it for me.
25    A. Okay.

## Page 245

1    Q. It's one thing to talk about this, but
2  another thing to do it, okay?  As a person, as a human
3  being do you think you could be part of this?  Could
4  you serve on a death penalty jury?  Could you make
5  that decision?
6    A. I think I could.  I mean, you know, you
7  never know until you get in that situation, you know,
8  because you're talking about someone's life.  But I
9  think I could.
10    Q. Okay.  Anything else you want to ask me or
11  think I ought to know?
12    A. No.
13    MS. CALLAGHAN:  Well, thank you very much,
14  sir.  We appreciate it.  Pass the witness.
15    THE COURT:  Defense may proceed.
16    VOIR DIRE EXAMINATION
17  BY MR. RAY:
18    Q. How you doing, Mr. Crow?
19    A. Good.
20    Q. I'm Bill Ray.  The Judge introduced me a few
21  minutes ago.  This is Billy Jack Crutsinger.  Tim
22  Moore is the lawyer.  He's going to help me a little
23  bit.  Got to turn on my projector.  We got to share
24  the screen.
25    How are you doing today?

## Page 246

1    A. Good.
2    Q. You said you had a new job; is that right?
3    A. A what?
4    Q. You said you had a new job or you were
5  working somewhere new?
6    A. No, it's not new.  Just a regular job.
7    Q. What do you do for -- is it Federal Express?
8    A. Yes, Federal Express.
9    Q. What do you do for them?
10    A. I deliver for them.
11    Q. You drive a truck?
12    A. Right, a truck.
13    Q. If you're on this jury and this trial takes
14  ten days to try, does Federal Express pay you while
15  you're down here?  Anybody talked to you about that or
16  have you got that far along with them?
17    A. Oh, yeah.  I've worked there for close to
18  nine years.  I'm really not sure how much they pay.
19    Q. We're going to pay you $6 a day.  Judge Gill
20  is going to pay you six bucks a day.  If you get on
21  the jury and you're here over the third day, they're
22  going to start paying you ten.  You get a raise if you
23  show up every day.
24    What does that do for you?
25    A. That sounds pretty good.

## Page 247

1    Q. And you don't know if Federal Express will
2  pay you or not?
3    A. I really don't.  I've been out a while for
4  hernia surgery, a couple months.  But I really don't
5  know what they do.
6    Q. Okay.  How would you feel if they didn't pay
7  you?
8    A. I have money saved up.  It wouldn't be the
9  end of the world.
10    Q. Okay.  I want to ask you about a couple of
11  things.  One of your questions, what you wrote down,
12  and I'll bring it up there if you want to see it.  But
13  the question was, "Which describes your view of the
14  death penalty as applied to the offense of capital
15  murder?"  And it was that laundry list that said
16  appropriate sometimes, sometimes with few exceptions.
17  You remember those questions?
18    A. Yes.
19    Q. I want to read you what you wrote and then I
20  want to ask you a couple questions, okay?  It said
21  please explain your answer.  You said, "Not knowing
22  the specific details, most of the time the death
23  penalty is appropriate."
24    Do you remember writing that down?
25    A. Yes.

## Page 248

1    Q. What did you mean by that?
2    A. I think that was talking about a capital
3  murder.
4    Q. Uh-huh.  The question was, "Which of the
5  following describes your view of the death penalty as
6  applied to the offense of capital murder?"  And it said
7  check in one of the boxes.  You checked "Generally
8  appropriate with very few exceptions" and then said
9  please explain your answer.  And you hand-wrote in,
10  "Not knowing the specific details, most of the time
11  the death penalty is appropriate."
12    Do you remember doing that?
13    A. Yes.
14    Q. Tell me what you were thinking about when
15  you checked that box and more specifically what you
16  were thinking about when you wrote, "Not knowing the
17  specific details most of the time the death penalty is
18  appropriate"?
19    A. Oh, just not knowing the case, the person
20  involved.
21    Q. Let me ask you this, and I think I know the
22  answer before I ask it.  You probably didn't know the
23  specific elements that Ms. Callaghan showed you here a
24  few minutes ago as far as what, in fact, is capital
25  murder, did you?

Page 249

1   A. I knew a little bit.
2   Q. You knew you could kill somebody and be
3 charged with capital murder, right?
4   A. Right.
5   Q. To be charged with murder somebody has to
6 die. That's generally the way that works, right?
7   A. Right.
8   Q. Just as kind of a sideline, if I'm going
9 home this afternoon and I haven't had any alcohol or
10 any drugs or whatever and somebody runs out in front
11 of me as I'm going through a green light, even if it's
12 just a very small child I haven't committed capital
13 murder, right?
14   A. No.
15   Q. Under those facts I wouldn't even be
16 prosecuted. As sad as it is, it's a car wreck, right?
17   A. Right.
18   Q. In this state before we get to murder, just
19 murder that's not capital murder, we have what we call
20 a mental state that the person has to go through. We
21 have some definitions. And one of them is
22 intentionally. And intentionally kind of means what
23 it says, on purpose, right? Is that what you take
24 that to mean?
25   A. Yes.

Page 250

1   Q. You have to answer, Mr. Crow, because Bill
2 here is writing everything down.
3   A. Yes.
4   Q. Okay. I'm going to show you, do you see my
5 definition of intentionally up there? A person acts
6 intentionally, or with intent, with respect to the
7 nature of his conduct or to a result of his conduct,
8 whatever that might be, when it's his conscious
9 objective or desire to engage in the conduct or cause
10 the result. That's what the law says intentionally
11 means, okay?
12   A. Okay.
13   Q. And that's about what you thought it was
14 pretty much?
15   A. Pretty much.
16   Q. If you have something that's not done
17 intentionally for capital murder, it's not against the
18 law, right?
19   A. Right.
20   Q. In other words, if I'm an airline pilot and
21 I'm flying a plane and something happens in the
22 cockpit that causes the plane to crash and it's my
23 fault, okay, 300 or 400 people might get killed,
24 right?
25   A. Right.

Page 251

1   Q. But if it's not my conscious objective or
2 desire, it's not murder. Do you see the distinction
3 I'm making?
4   A. Yes.
5   Q. Maybe I slept too late or didn't sleep
6 enough and I fell asleep when I was landing the plane
7 and it crashed on the runway or crashed into another
8 plane or whatever.
9     Do you see the difference?
10   A. Yes.
11   Q. So before we get to doing something
12 criminally, before we get to the courthouse and with
13 the district attorney's office and everything, you got
14 to be doing this type of conduct, right?
15   A. Yes.
16   Q. Now, I'm going to show you another
17 definition that is not the definition of the mental
18 state and that's knowingly. This is a little bit
19 less. The law prescribes this as a lower mental
20 state. A person acts knowingly, with knowledge, with
21 respect to the nature of his conduct or to
22 circumstances surrounding that conduct when he's aware
23 of the nature of his conduct or that the circumstances
24 exist. What that means is that you're aware of the
25 situation, you realize that something is going to

Page 252

1 happen if you do something, but that's not enough for
2 capital murder, okay?
3   A. Okay.
4   Q. And that's the only thing I wanted to make
5 sure you understand. Because when I come back to this
6 answer in just a second, I want to make sure you hav
7 a working knowledge of these definitions, okay?
8   A. Okay.
9   Q. Now I'm going to show you something that is
10 kind of a mixture of the two. This is not an eye
11 test, by the way. If you can't read that -- I can't
12 make it bigger, but I can read it to you because I've
13 got it a little bigger on my screen.
14     That's just the same definitions, but you
15 can see the difference over here on the left.
16 Conscious objective or desire, how do you feel about
17 that compared to aware of the nature of his conduct or
18 that the circumstances exist? What distinctions do
19 you draw between those two in relation to each other?
20   A. Yeah, I see the difference.
21   Q. Okay. What difference do you see? What's
22 just your general consensus of what's different about
23 an intentional act as opposed to a knowing act?
24   A. That's a good question.
25   Q. Let me ask you this as just a matter of

Page 253

1 suggestion. Would it be fair to say that if you do
2 something intentionally, that's a little more
3 deliberate, result-oriented? I mean, it says
4 conscious objective or desire. What that says to me
5 is you're really wanting that to happen.
6      Does that make sense?
7      A. Yes.
8      Q. Okay. Can you live with that?
9      A. Yes, I can see the difference.
10     Q. Now let's look here at something if I can
11 find it. Not all murders are capital murders; do you
12 understand that?
13     A. Yes.
14     Q. The prosecutor told you that some murders or
15 I thought she did, maybe I was asleep, all capital
16 murders are murders, but it doesn't work the other way
17 around.
18     A. Right.
19     Q. Do you see what I mean? A murder can be an
20 intentional or knowing cause of death. It could be
21 either one of those two definitions I showed you,
22 okay?
23     A. Okay.
24     Q. That's not the case we're trying, but that
25 could be what a person would go to trial for that,

Page 254

1 right?
2      A. Right.
3      Q. Okay. Capital murder is a little
4 different. What the State has alleged in this
5 indictment, and I'm not going to tell you the facts of
6 the case, but I'm going to tell you the summary of the
7 allegation and that's not the same thing. But they
8 have alleged that Billy Jack here intentionally, not
9 knowingly, but that he intentionally killed two people
10 basically at the same time. That the indictment
11 alleges a transaction.
12     If I go in a bank and there's two tellers
13 there and I shoot both of them, that's the same
14 transaction. I could be prosecuted for capital murder
15 if I intentionally did that, okay?
16     A. Okay.
17     Q. That's what they've alleged against Billy
18 Jack, okay? So we know that -- second of all, only a
19 capital murder can you get a life or death sentence;
20 did you know that?
21     A. Yes.
22     Q. You knew that before you came in here?
23     A. I believe so.
24     Q. If you get mad at me and kill me this
25 afternoon, you can only get charged with a noncapital

Page 255

1 murder. Do you see the difference?
2      A. Yes.
3      Q. Do you see what I mean? And a noncapital
4 murder has a completely different range of punishment,
5 which is from five to 99 years or life and a fine up
6 to $10,000. So you can see there's a great, huge
7 difference between a murder, which can be an
8 intentional or knowing murder, and a capital murder
9 which requires a conscious objective or desire to kill
10 two people at the same time.
11     Do you see the difference?
12     A. Yes.
13     Q. Does it make sense to you that the
14 punishment range would be different for those two
15 crimes?
16     A. Yes.
17     Q. Let me ask you this. Knowing what you know
18 at this point, can you conceive of a set of facts in
19 your mind that if you were in a situation where you
20 just had a murder -- and I'm not taking about capital
21 murder, I'm over on the murder plate for a minute --
22 if you just had a murder case, could you conceive of a
23 set of circumstances where anywhere in that range of
24 punishment that I have up there might apply? Or would
25 some of those years kind of get blocked out by virtue

Page 256

1 of the fact that you were trying a murder case?
2      A. No. It would make sense. I understand.
3      Q. Could you consider?
4      A. Yes.
5      Q. And when I say consider, I mean really
6 consider. We're not having a law school deal like
7 when I used to talk to professors and they say, well,
8 you could consider this? And I say, oh, yeah, I can
9 think about that.
10     The legislature when they set out this law,
11 they said that that's going to be the range of
12 punishment. Some people can consider it and some
13 can't. And it really, quite frankly, goes to both
14 ends of the spectrum. Some people say in a noncapital
15 murder I can never give a life sentence, no matter
16 what the facts are. And some folks come in and say, I
17 could never give a five-year sentence in a noncapital
18 murder.
19     Do you fall into either one of those
20 categories?
21     A. No, I could give pretty much anything
22 probably.
23     Q. Could you conceive, and I'm not going to ask
24 you the specific set of facts, I'm not going to ask
25 you to give me an example, but what I am going to ask

Page 257

1 you is could you conceive in your mind a set of facts
2 that would be an intentional or knowing murder of one
3 person that you would feel comfortable with a sentence
4 of five years for someone that's killed somebody
5 intentionally or knowingly?
6    A. Intentional or knowingly.
7    Q. Yeah.
8    A. Did you say knowingly was not under capital
9 murder? Is that what you said?
10    Q. Knowingly is not an element of capital
11 murder as has been alleged against this Defendant.
12 But in a noncapital murder -- I don't want to call it
13 regular murder, but I don't want to diminish how
14 serious that is. But in a noncapital murder, you can
15 commit that offense by intentionally or knowingly
16 causing the death of an individual, one person. And
17 that range of punishment is on the bottom of the three
18 lines that I have up there on the screen.
19    And so the question is if that was the
20 situation, you were trying a case like that, could
21 you, in fact, really consider a sentence as low as
22 five years, given that you'd have to find a person
23 guilty of intentionally or knowingly causing the death
24 of an individual? Or would five years be something
25 you just couldn't do?

Page 258

1    A. Again, I think I could depending on what I
2 would see during the course of the trial.
3    Q. Well, without giving me an example, can you
4 come up with a set of facts in your own mind where you
5 would think that a five-year sentence would be
6 appropriate for the offense of murder?
7    A. Yes, I could see that.
8    Q. Okay. You could see that happening in some
9 form?
10    A. I think I could.
11    Q. All right. Now, I want to elevate this up a
12 little bit because I think that maybe we didn't have
13 exactly the same examples, but we're both correct
14 because the list is actually larger than what we both
15 have.
16    Capital murder you commit by killing a child
17 under six years of age. You kill a five-year-old,
18 that's a capital murder. You kill a policeman or
19 fireman or actually a prison guard, it would be
20 included in that, too, in the official discharge of
21 their duties. You kill a policeman because he is out
22 of uniform and he backs into you at the grocery store
23 and you get mad at him, that's not capital murder
24 unless he says he's a policeman first. Or fireman,
25 you shoot a fireman while they're driving their fire

Page 259

1 truck.
2    Or you commit a murder in the course of
3 committing aggravated sexual assault, robbery,
4 burglary, kidnapping, arson obstruction or
5 retaliation. That's a capital murder. If you're
6 committing one of those offenses -- you go into a bank
7 and rob a bank and you kill the teller, that's capital
8 murder.
9    Makes sense?
10    A. Right.
11    Q. Or the last one which is the one we've been
12 talking about and the one we're going to try here, one
13 or more persons in the same transaction. And the
14 State has alleged that there were two people killed
15 and that they were both intentional acts, that first
16 definition I gave you.
17    Are you with me now? Okay. And the law
18 says if the State proves that to the jury, then Billy
19 Jack here is going to get convicted of capital murder,
20 okay? And I want to assume for just a second that
21 we've got that far. You're on a jury and you found a
22 person guilty of capital murder, which means you have
23 found that he intentionally, conscious objective or
24 desire killed two people, two separate individuals, at
25 the same time. Let's assume that for just a second.

Page 260

1    Are you with me so far?
2    A. Yes.
3    Q. Now the range of punishment is no longer
4 that five to 99 deal, what is it?
5    A. Life or death, or 40 years.
6    Q. I'm sorry. I didn't hear you.
7    A. 40 years, right?
8    Q. No. It's death or life in the penitentiary,
9 okay?
10    A. Okay.
11    Q. And you understand what the death penalty
12 entails, right?
13    A. Yes.
14    Q. Tell me what your understanding of that is.
15 Somebody gets the death penalty, what do they do to
16 them?
17    A. Lethal injection.
18    Q. They put a needle in their arm, put some
19 chemicals in and those chemicals will kill you within
20 a few minutes.
21    A. Yes.
22    Q. You die. What's your understanding of a
23 life sentence?
24    A. I believe you would spend at least 40 years
25 for sure.

| Page 261 | | Page 263 |
|---|---|---|

**Page 261**

1  Q. That's partially right.

2      MR. RAY: And, Your Honor, at this time I

3  would ask to be able to go into the matter that the

4  State raised with the prior juror.

5      MS. CALLAGHAN: State would object, Your

6  Honor.

7      THE COURT: I think we're going to have to

8  end up hashing this matter out in more detail later

9  on. The objection is still sustained.

10      MR. RAY: So my bill can just be carried for

11  the purposes of this?

12      THE COURT: That's right.

13      Q. (BY MR. RAY) First of all, you're not old

14  enough to have been here, but you remember, I guess,

15  Richard Nixon was President of the United States when

16  you were born, right?

17      A. Sounds right.

18      Q. Two presidents before him, you'll remember

19  John Kennedy was assassinated November 22nd of 1963.

20  You probably read that in the history books, right?

21      A. Right.

22      Q. And the next day when the police brought Lee

23  Harvey Oswald through the police department, Jack Ruby

24  shot him on national TV. You've probably seen that

25  picture, too?

**Page 262**

1      A. Yes.

2      Q. That was November 23rd of 1963, right?

3      A. Right.

4      Q. If Jack Ruby had been tried -- and he went

5  to jail that day, okay? And he ultimately died in

6  jail. I don't know if you knew that or not. He died

7  of cancer. But if Jack Ruby had been tried under this

8  capital murder statute that we're trying here, he'd

9  still be in jail today, okay, if he lived that long.

10      Are you with me?

11      A. Right.

12      Q. Do you know why? Because we haven't got to

13  November 23rd of 2003, which would be the 40th

14  anniversary of when he did that, in November of this

15  year, right?

16      A. Right.

17      Q. Now, if a person serves 40 years, the law

18  doesn't just kick 'em out on the 40th anniversary, did

19  you know that?

20      A. Yes.

21      Q. They're eligible for parole and they may or

22  may not be granted parole.

23      Do you understand that?

24      A. Yes.

25      Q. Okay. Now , in the case of a capital murder

**Page 263**

1  double intentional conscious objective or desire

2  killing where you've got one of two possible

3  sentences, I want to go back to this question, number

4  17, which is where you said not knowing the specific

5  details, and you still don't know the specific details

6  of the offense, right?

7      A. Right.

8      Q. All I've told you is just some specific

9  details about what the specific law is for capital

10  murder. That's all I've tried to do, okay?

11      Do you understand?

12      A. Yes.

13      Q. Okay. But your next line says most of the

14  time the death penalty is appropriate, right?

15      A. Yes.

16      Q. Does that change anything now that you know

17  a little more about the specifics of how long a person

18  might serve or not serve or what happens to them if

19  they get convicted and how that all -- and the mental

20  states that are involved, does that change any of that

21  answer?

22      A. Yes, maybe a little.

23      Q. Okay. And how is that?

24      A. Oh, maybe the 40 years.

25      Q. Okay. What does that do? Could you explain

**Page 264**

1  that?

2      A. Well, that's 40 years they would have to

3  serve for sure.

4      Q. That's right.

5      A. That's a long time, I mean.

6      Q. You're going to be -- if you had committed

7  the crime and got a life sentence, you'd be 75 years

8  and two months. Have I got that right?

9      A. Yes.

10      Q. Does that change your position on how you

11  feel about the death penalty?

12      A. On just any case?

13      Q. Okay. Not just on any case, because

14  remember you only get to the death penalty when you

15  have one of these type of capital murders. A regular

16  noncapital murder, the death penalty is not even an

17  option.

18      Just in capital murder cases -- tell me what

19  you think about the death penalty. Start there.

20      A. I don't -- you know, I'm not like really

21  against it or anything like that.

22      Q. Are you for it?

23      A. Yes, I'm for it.

24      Q. Why are you for it?

25      A. Because --

**Page 265**

1  Q. I think you said -- the question before,
2 about three questions before said, "Please tell us
3 your feelings about the death penalty." You remember
4 that question. It said -- your answer was, "I support
5 it. Society needs" and then looks like you kind of
6 inserted "to enforce penalty," I think you meant death
7 penalty, "to keep society safe and secure."
8      Do you remember writing that?
9  A. Yeah, that's about how I feel.
10  Q. Tell me what you mean by that.
11  A. Oh, I think if we didn't have the death
12 penalty, I think there would probably be a lot more
13 crimes and people wouldn't be, wouldn't have a lot of
14 fear in doing anything, anything against society.
15  Q. I'm writing. I'm going to ask you another
16 question, but I'm just writing down your answer.
17      What you said was there would be more crime
18 if we didn't have the death penalty?
19  A. Yeah, I believe that.
20  Q. Okay. And there would be less civility? I
21 mean, kind of the corollary of that? Not only would
22 there be more crime, people wouldn't behave as well?
23  A. That's what I think.
24  Q. Okay. Do you believe that the death penalty
25 deters crime?

**Page 266**

1  A. Do I believe what?
2  Q. That the death penalty deters crime?
3  A. Deters crime?
4  Q. Yeah.
5  A. Well, it deters that person that's being
6 killed.
7  Q. If you kill the person that committed the
8 crime, it's an individual deterrence; is that what you
9 mean?
10  A. Yeah, for sure, that one. He's never going
11 to escape and do it again.
12  Q. He's not going do so much as steal a pack of
13 cigarettes, is he? He's out of the game.
14  A. Right.
15  Q. Given the choice between the two, all things
16 being equal, do you think the death penalty is a
17 better sentence for society than a life sentence for
18 society?
19  A. Yeah, I would believe so.
20  Q. Okay. And there's nothing wrong with your
21 position. Don't hear me say that, because I'm not.
22 But what you've said is you feel that crime would be
23 -- it'd be a deterrence, there'd be less crime, I'm
24 assuming, because people would read about it or hear
25 about it and so they wouldn't go commit crimes.

**Page 267**

1 That's one belief you have?
2  A. Yes.
3  Q. It certainly deters the individual because
4 he's not going to commit any more crimes, right?
5  A. Right.
6  Q. And it kind of saves society because for
7 sure he's not ever going to commit any more crimes if
8 he's dead. If we stuck him in the ground, that's the
9 end of that problem; is that right?
10  A. Yes.
11  Q. Do you believe that -- well, let me ask it
12 this way. How do you feel about a life sentence
13 taking care of those same issues: Deterring crime,
14 deterring the individual, deterring people at large
15 that find out about it?
16      What do you think about that? If the death
17 penalty is the better way to go, how do you feel about
18 a life sentence being able to convey those same
19 things?
20  A. I think it's pretty good, too.
21  Q. Is it? Which one do you prefer?
22  A. That's a tough one. It would probably
23 depend on the person.
24  Q. The person meaning the defendant --
25  A. The defendant, right.

**Page 268**

1  Q. -- who committed the crime or the person
2 that got killed?
3  A. Probably the person who committed the crime.
4  Q. And what do you mean by that?
5  A. Oh, just, you know, what there is about him,
6 you know, his mental state, all these other.
7  Q. Okay. You said in Question 20, the question
8 was, "What are some factors that would be important to
9 you in determining whether a person who's been
10 convicted of a crime where the death penalty is
11 appropriate deserves the death penalty and why do you
12 feel this way?"
13      Your answer was "Mentally -- is the person
14 stable?"
15  A. Right.
16  Q. Do you remember that? Is that what you were
17 talking about?
18  A. Yes. Are they stable? I mean, are they --
19 there's just a lot of different kinds of people out
20 there.
21  Q. Well, let me ask you this, make sure we're
22 all on the same, you and I are on the same
23 wavelength. Murder committed in self-defense, that's
24 not a crime. I pull a gun on you and you shoot me,
25 they're not going to do anything to you. They're

Page 269

1 going to give you a medal, maybe.
2          Murder committed in an act of war, and I've
3 skipped one because I'm going to come back to it.
4 Murder committed in an execution. They don't do
5 anything to the executioner down in Huntsville. You
6 understand all that.
7          But the one I wanted to point out, which is
8 what you've kind of raised here, murder committed by
9 reason of insanity. If a person is insane and they
10 commit a murder, that's not against the law, either.
11          Did you know that?
12     A. I didn't know the exact.
13     Q. If a person is insane. And we have to
14 actually give notice. That's one of the things that
15 Ms. Callaghan was talking about. They don't have
16 there's no reciprocal discovery. I don't have to show
17 these prosecutors all these papers over here on my
18 desk. But if I want to say that Billy Jack here is
19 insane, I've got to give them notice of that. And I
20 had to have done that a long time ago.
21          And if a person is insane, he's found not
22 guilty by reason of insanity. So mental insanity,
23 that's a defense to the crime. That's not a defense
24 to the death penalty.
25     A. Okay.

Page 270

1     Q. Okay. You got a person that's just a little
2 goofy or maybe he doesn't like his lawyer or maybe
3 he's mad all the time or maybe he's just kind of a
4 degenerate, you wouldn't want him around your house,
5 that doesn't make him, that doesn't qualify. That guy
6 can get the death penalty, okay. Right?
7          Okay. So here's what I want to know. Let's
8 go back to, and just keeping in mind I'm not going to
9 go through all the definitions, the instructions about
10 a noncapital murder. But just in regard to capital
11 murder, if the only two options available are life or
12 death, and to get to that stage to begin with, you
13 must have deliberately, excuse me, intentionally -- I
14 use the word deliberate -- but your conscious
15 objective or desire was to kill two people. And in
16 light of your feelings on the death penalty, how it
17 would deter crime, would modify society's behavior and
18 certainly would deter the individual, do you think the
19 death penalty is more appropriate in that type of case
20 than a life sentence?
21     A. Intentionally?
22     Q. It's got to be -- you don't ever get to the
23 capital murder unless it's intentionally twice. Just
24 to give you an example, if I intentionally shoot
25 Mr. Moore here and then I'm running away from his

Page 271

1 house and his son comes out and tries to stop me but I
2 don't see him and I back over him, I haven't committed
3 capital murder.
4          MS. CALLAGHAN: Your Honor, the State would
5 object on the grounds that to ask specifically which
6 is more appropriate in this type of offense is
7 binding.
8          THE COURT: I'm sorry. I didn't hear you.
9          MS. CALLAGHAN: The State would object on
10 the grounds that asking which type of penalty, life or
11 death is more appropriate in a double homicide, in a
12 murder of two people, that would be binding.
13          THE COURT: Sustained.
14     Q. (BY MR. RAY) Let me ask you this. Do you
15 understand the example I gave with Mr. Moore?
16     A. Yeah.
17     Q. I go shoot him because I deliberately don't
18 like him and it's my conscious objective or desire to
19 shoot him and I sight him in with my deer rifle and I
20 shoot him at 25 yards, okay, which is about as far as
21 I can shoot. And I shoot him and he falls down on the
22 ground. And I get in my car and I back out of his
23 driveway and I'm going down the street, but his son
24 has come out and tried to stop me and I back over him
25 and kill him. I don't see him.

Page 272

1          Have I committed capital murder?
2     A. Have you committed capital murder?
3     Q. And the answer is no.
4     A. No.
5     Q. Because I've made one intentional conscious
6 objective or desire, but not two, okay? If I shoot
7 him and his son at the same time, that's capital
8 murder. You understand that?
9     A. Yes.
10     Q. Okay. Given that definition, and now that
11 I've told you what it was four or five times, are you
12 ever going to be in a position under those facts,
13 those type of facts to give fair consideration to a
14 life sentence or is that something that's not ever
15 going to happen?
16     A. No, I could give consideration to that.
17     Q. Okay. So you can conceive of a case that
18 has two intentional murders where you could, in fact,
19 give a life sentence?
20     A. Yes.
21     Q. I need to ask him something and then I'll
22 get right back with you. I'm almost done.
23     (Brief pause.)
24     Q. Let me ask you this. You said you went to
25 -- we're almost finished. Do you need some water?

| Page 273 | Page 275 |
|---|---|

**Page 273**

1   A. Sure, if you got any.
2   Q. I'll get you some. You know, one of the
3 things that you've got to decide, assuming that you
4 found a person guilty of capital murder, when you're
5 deciding whether or not you're going to give the death
6 penalty or not is you've got to have a pretty good
7 working knowledge of the word mitigation, right?
8     And mitigation actually, it's in the
9 instructions you're going to get in two places, okay?
10 On your questionnaire, you had actually, you didn't
11 answer what mitigation was, right?
12   A. Right.
13   Q. Tell me about that.
14   A. I tried to get back to it, but I guess I
15 couldn't ever figure out what to put.
16   Q. What does it mean to you? What do you think
17 it means?
18   A. It means what she said about background of
19 the person, maybe what they, certain things that have
20 happened to them, maybe their IQ. I'm not sure.
21 Stuff like that, maybe.
22   Q. That might be mitigating, I mean, both of
23 those could be. You get to decide as a juror whether
24 or not it's mitigating. You might think it's
25 mitigating and the guy next to you might not; do you

**Page 274**

1 understand that?
2   A. Right.
3   Q. But I want to go over something with you
4 real quick. These are the two issues you're going to
5 get. Whether there's a probability the person would
6 commit criminal acts of violence that would be a
7 continuing threat to society. The second one is -- if
8 you answer that first one yes, then you get to the
9 second one.
10     The second one is whether when you take into
11 consideration all of the evidence, including the
12 offense, the defendant's character and his personal
13 moral culpability, is any sufficient mitigating
14 circumstance or circumstances that warrant a life
15 sentence, okay?
16     And I want to talk to you about, there's a
17 couple more instructions that you get. First of all,
18 on this first one, and I just got that question back
19 up there again, but the Judge is also going to
20 instruct you if you're on the jury that you are to
21 consider all of the evidence admitted at the
22 guilt/innocence stage and the punishment stage,
23 because by this time you would've heard two stages of
24 the trial, including the defendant's background or
25 character, or the circumstances of the offense, either

**Page 275**

1 one of those two things or both, that either militates
2 for or mitigates against the imposition of the death
3 penalty. In other words, just on this first question,
4 there's a mitigation issue when it comes to deciding
5 future dangerousness.
6     How do you feel about that?
7   A. I understand it.
8   Q. Well, mitigation, she gave you kind of a
9 generic term and it's one that I can live with and I
10 think you can live with it, too. Mitigation is kind
11 of a term that's, for whatever reason, it's almost a
12 feel sorry for the defendant kind of deal for whatever
13 reason. Maybe he's slow in school. And I'm not
14 trying to pin you down to whether these are right or
15 wrong deals. Had a troubled life, maybe he was
16 sexually abused, I don't know. Maybe he only had one
17 leg his whole life. There's a whole variety of things
18 that could be.
19     But would you agree with me that at least on
20 this question you could have no mitigation, there
21 could be none and strictly from his background or
22 character or the circumstances of the offense by
23 itself. You could ultimately end up answering no to
24 that, right?
25     Do you see how that could happen?

**Page 276**

1   A. Yes.
2   Q. Okay. And then that question has got to be
3 answered beyond a reasonable doubt. If it is, you go
4 to the next question. If you don't, the Defendant
5 gets a life sentence; you understand that?
6   A. Yes.
7   Q. You don't have to agree what particular
8 evidence supports an answer. You can think it's one
9 thing, the next guy could think the other. You're
10 comfortable with that, right?
11   A. Right.
12   Q. Second question. If you've answered the
13 first one yes, then we get to the second question,
14 which I'm not going to go over with you again, except
15 there's some additional instructions that go along
16 with that. The Judge would instruct and it would be
17 that bottom paragraph that the jurors need not agree
18 on what supports an affirmative answer, and further
19 would be instructed that mitigating evidence is
20 evidence that a juror might regard as reducing the
21 defendant's moral blameworthiness. This is the
22 mitigation question that doesn't have any burden of
23 proof on it, okay?
24     Would you agree with me it could be a little
25 different potentially than the mitigation concerning

Page 277

1 just the offense or the future dangerousness question?
2    A. Yes.
3    Q. Okay. So you've really got to consider that
4 mitigation word twice in two different contexts. Do
5 you see how that works?
6    A. Yes.
7    Q. Are you going to be able to work through all
8 that?
9    A. If you write it down.
10    Q. Okay.
11    A. Yes, I think I can work through it.
12    Q. Let me ask you a couple more questions
13 here. You appear to be a person that has a pretty,
14 what I would call, solid religious belief?
15    A. I would say so.
16    Q. The question we asked is, "What is the
17 current religious or spiritual affiliation or
18 preference?" And you put "Christian." Tell me --
19 broaden that up for me a little bit if you don't
20 mind. Tell me a little bit more about your religious
21 beliefs.
22    A. I just believe the Bible. I believe if you
23 don't believe or are baptized into Christ, that you'll
24 go to hell. Jesus was a person that was innocent
25    Q. Okay. Jesus was a person that was innocent

Page 278

1 and actually got the death penalty; is that right?
2    A. Yes.
3    Q. You believe in the Ten Commandments, I
4 guess?
5    A. Yes.
6    Q. "Thou shalt not kill" would be one of those,
7 right?
8    A. Yes.
9    Q. Don't have any problem with that, I don't
10 guess?
11    A. No.
12    Q. Do you know what I'm fixing to ask you?
13    A. About the death penalty or something?
14    Q. Well, I'm getting to that. There's another
15 verse in the Bible and it's in the book of Romans, the
16 New Testament. It talks about how we as mortals
17 shouldn't be the executioner. Are you familiar with
18 that verse?
19    A. You may want to repeat it to me. I can't
20 remember it.
21    Q. Let me put it up here on the screen for
22 you. Right down there at the bottom. Exodus 20:13,
23 you're comfortable with that? "Thou shalt not kill."
24 That's pretty straightforward, isn't it?
25    A. Yes.

Page 279

1    Q. Old Testament. Three books later, the book
2 of Deuteronomy, "Life for life, eye for an eye, tooth
3 for a tooth." That's where that comes from, isn't it?
4    A. Yes.
5    Q. How about that next one?
6    A. Yes, I understand that.
7    Q. That's in the New Testament, right?
8    A. Right.
9    Q. That seems to say -- I mean, it seems a
10 little inconsistent with Deuteronomy 19:21, doesn't
11 it?
12    A. Yeah.
13    MS. CALLAGHAN: Your Honor, the State would
14 object on the grounds of relevance at this time.
15    MR. RAY: I'm asking about his religious
16 beliefs, Judge.
17    THE COURT: Let's get through it.
18    Q. (BY MR. RAY) Can you rationalize those two?
19    A. Oh, yeah, I can.
20    Q. Tell me how you do that or what you're
21 thinking.
22    A. Oh, in the Old Testament, God was trying to
23 keep the Jewish nation pure and, you know, to keep it
24 up until Christ. And he had strict, strict laws
25 within the Israelites. And I think that New Testament

Page 280

1 there, I think he's mainly talking about -- he's not
2 so much talking about the state, he's talking more
3 about an individual that if somebody does me wrong,
4 one of my friends, I don't repay them, you know. I
5 don't think he's talking about society, the state.
6    Q. Don't take the law into your own hands? Is
7 that what you kind of --
8    A. Yeah, basically.
9    Q. So to kind of cut it to the chase, you
10 rationalize that by if the State is doing it, that's
11 different than if you yourself went and did it because
12 you saw something like that happen?
13    A. Yes. And he's talking to specific
14 Christians in the early church.
15    MR. RAY: We'll pass the witness. Thank
16 you.
17    THE COURT: Mr. Crow, there's a matter of
18 law I have to take up. If you'd step outside for just
19 a second, I'll be right back with you.
20    VENIREPERSON CROW: Okay.
21    THE COURT: Thank you.
22    (Venireperson Crow exits the courtroom.)
23    THE COURT: What says the State?
24    MS. HARTMANN: State will accept.
25    MR. RAY: I would like to reurge my bill,

| Page 281 |
|---|
| 1 but other than that we'll strike him. |
| 2 THE COURT: Do you want to reurge your bill |
| 3 now? |
| 4 MR. RAY: Yes, sir, I would. I would like |
| 5 to have asked the witness or given him the |
| 6 instructions on the parole law, which I mentioned to |
| 7 the Court a minute ago, which is this, the vote of the |
| 8 Parole Board that I referred to with the last juror. |
| 9 For all those reasons I would like to have |
| 10 instructed him on the parole law of this case. |
| 11 THE COURT: The objection made by the State |
| 12 is sustained. So given that -- |
| 13 MR. RAY: My bill would be to instruct him |
| 14 and I'm assuming that when you sustain the objection, |
| 15 you're saying I can't do that. |
| 16 THE COURT: That's correct. |
| 17 MR. RAY: Okay. And I would like to ask |
| 18 that of each individual juror, if the subject matter |
| 19 gets to that point. And what I'm hearing from the |
| 20 Court is that I'm not going to be allowed to do that |
| 21 if the State objects to it. |
| 22 THE COURT: If there's a proper objection, |
| 23 I'm going to sustain it. |
| 24 MR. RAY: Can I have a running objection? |
| 25 Can I have a running -- I don't want to have to do |

| Page 282 |
|---|
| 1 this each time for the next hundred jurors and I don't |
| 2 want to waive anything. |
| 3 THE COURT: You may have a running |
| 4 objection. |
| 5 MR. RAY: Thank you. Then we'll exercise a |
| 6 peremptory challenge. |
| 7 THE COURT: Will you have Mr. Crow step back |
| 8 in, please? |
| 9 (Venireperson Crow enters the courtroom.) |
| 10 THE COURT: Mr. Crow, I want to thank you |
| 11 very much for the time you've spent here this |
| 12 afternoon. You are free from any further obligation |
| 13 in this case and you're free to go about your |
| 14 business. |
| 15 Thanks again. |
| 16 (Venireperson Crow exits the courtroom.) |
| 17 THE COURT: Who is our next person? |
| 18 MR. RAY: Actually, Judge, I think we've got |
| 19 an agreement on No. 5. With the Court's permission, |
| 20 we'd like to agree to excuse him. |
| 21 The prosecutors and ourselves and my client, |
| 22 Billy Jack Crutsinger, have agreed to excuse |
| 23 Prospective Juror No. 5. |
| 24 THE COURT: Would have Mr., is it Gancy? Is |
| 25 that him? Gause. |

| Page 283 |
|---|
| 1 MR. RAY: Gause, I believe is his name, |
| 2 Judge. |
| 3 THE COURT: Between his handwriting and my |
| 4 eyes. |
| 5 (Venireperson Gause enters the courtroom.) |
| 6 THE COURT: Are you Mr. Gause? |
| 7 VENIREPERSON GAUSE: Yes, sir. |
| 8 THE COURT: Sorry to make you wait out there |
| 9 all this time. But the good news is that your |
| 10 interview is over with. Both sides have agreed to |
| 11 excuse you and you are free to go about your business |
| 12 with no further obligation to us. |
| 13 VENIREPERSON GAUSE: I'm glad I took care of |
| 14 that for you, sir. |
| 15 (Venireperson Gause exits the courtroom.) |
| 16 THE COURT: And we need Mr. Ledford, |
| 17 please. |
| 18 (Venireperson Ledford enters the courtroom.) |
| 19 THE COURT: Walk right up here, please, |
| 20 sir. Please raise your right hand. |
| 21 (Venireperson Ledford sworn.) |
| 22 THE COURT: And tell us your name, please. |
| 23 VENIREPERSON LEDFORD: Johnnie Ledford. |
| 24 THE COURT: Mr. Ledford, this will be your |
| 25 individual interview. And each side, first the State |

| Page 284 |
|---|
| 1 of Texas over at this table and then the defense over |
| 2 here are going to be allowed to ask you some questions |
| 3 regarding your background and qualifications to be a |
| 4 juror in this type of case. They're going to want to |
| 5 know how you feel about the different areas of the law |
| 6 that are going to be a part of this trial. So what |
| 7 they'll do is tell you how the law works and then ask |
| 8 you how you feel about it. |
| 9 And all you owe us at this point based upon |
| 10 that oath you just took is to tell us how you honestly |
| 11 feel about these matters, keeping in mind that there |
| 12 are no right or wrong answer to any question asked of |
| 13 you. |
| 14 The State is Michele Hartmann and Lisa |
| 15 Callaghan. |
| 16 MS. HARTMANN: Good afternoon. |
| 17 THE COURT: And the defense is Tim Moore. |
| 18 MR. MOORE: Hi. |
| 19 THE COURT: Bill Ray, and the Defendant, |
| 20 Billy Jack Crutsinger. |
| 21 MR. RAY: How you doing? |
| 22 THE COURT: The State may proceed. |
| 23 JOHNNIE LEDFORD, |
| 24 having been duly sworn to make true answers to such |
| 25 questions as may be propounded by the Court or under |

Page 285

1 its direction, touching upon his service and
2 qualification as a juror, gave answers as follows:
3       VOIR DIRE EXAMINATION
4 BY MS. CALLAGHAN:
5   Q. Mr. Ledford?
6   A. Yes, ma'am.
7   Q. How are you doing today?
8   A. Pretty good.
9   Q. Are those your prescription glasses you're
10 wearing?
11   A. Uh-huh.
12   Q. Okay.
13   A. Yeah, but I can take them off.
14   Q. Is that okay so I can see your eyes? Thank
15 you, sir. I appreciate it.
16     Michele and I represent the State of Texas
17 in this case. And have you ever been on a jury
18 before?
19   A. Huh-uh. No, ma'am.
20   Q. You haven't? What we're here going to do right
21 now is we're going to ask you some questions and we're
22 going to tell you about what the law is in a case like
23 this. This is a capital murder case, okay?
24   A. Okay.
25   Q. And the reason we're doing this is because

Page 286

1 we need to find out whether or not you have any
2 problems with the law or whether or not you agree with
3 it. And two, whether or not you've had any personal
4 experiences or if you have any personal feelings which
5 might make it hard for you to be a juror in a case
6 like this, okay? Does that make sense to you?
7   A. Yes, ma'am.
8   Q. Is it hard for you to see me?
9   A. A little bit.
10   Q. Okay. Do you want to put your glass back on
11 it? Looks like it's tough on you. There we go. Is
12 that better?
13   A. Yeah. I can see you now.
14   Q. Oh, my.
15     MS. CALLAGHAN: Could we have just a moment,
16 Your Honor? We're having some technical difficulties
17 with our projector here.
18   Q. Anyway, in asking you these questions and in
19 listening to your answers, it's important to remember
20 something. There's no right or wrong answers just as
21 long as they're honest, okay? Just as long as that's
22 really how you feel, okay?
23     But it is important when you leave here
24 today that you understand everything we've talked
25 about, okay, because this is the last time we'll get

Page 287

1 to talk. We won't get to talk together again, okay?
2     So if there's anything you don't understand,
3 anything you're unsure about, make sure and ask me
4 about it and we'll go over it until you're sure that
5 you feel comfortable with that, okay?
6   A. Okay.
7   Q. This case actually should be tried in
8 September.
9     MR. MOORE: That's on fire. It's smoking.
10     MS. CALLAGHAN: Oh, my goodness.
11 (Brief pause.)
12   Q. (BY MS. CALLAGHAN) Well, that's the first
13 question I should have asked you is are you a fireman
14 or do you have any experience in that area? We might
15 need one.
16     It looks like this case is probably going to
17 go to trial in September, September 22nd, okay, that
18 week. And it could take as little as five days, it
19 could take as long as two weeks.
20     Would that be a scheduling problem for you?
21   A. No.
22   Q. Okay. Now, it's possible that during that
23 time when the jury is actually sitting in the box and
24 listening to the case that you may sequestered, which
25 means that at nighttime when the case is over you

Page 288

1 don't go home, you go to a hotel. And that's to
2 prevent the press or any other group of persons from
3 talking to you while you're considering the case?
4     Would you have a problem with that or would
5 that be okay?
6   A. Well, except I have to take heart medicine
7 every day. And I don't know how I could manage that.
8   Q. Okay. Would you be able to bring your heart
9 medication with you?
10   A. Yeah, I could probably do that.
11   Q. Okay. Because when you would be staying at
12 a hotel, you'd have to bring a suitcase with your
13 pajamas and fresh clothes and all that sort of thing.
14 And you can bring any medications you needed and
15 everyone would make sure that you were able to take
16 your medications as needed.
17     But other than that, would there be any
18 other problems that you know of?
19   A. No, ma'am.
20   Q. All right. Now, let me tell you a little
21 bit about how a criminal trial goes. Basically a
22 criminal trial is two little mini-trials. The first
23 one is for guilt/innocence. That's where you decide
24 whether the person really did commit the crime that
25 they're on trial for. And the only evidence you hear

| Page 289 | Page 291 |
|---|---|

**Page 289**

1 at that time is evidence that goes to whether or not
2 the person did it or not, okay? That's all you hear.
3       And then if and only if you find the person
4 guilty of the crime, if you do find them guilty beyond
5 a reasonable doubt, then you go on to the second part
6 of the trial, which is the punishment phase.
7       Now, at the punishment phase, you get to
8 hear all kinds of evidence about what kind of person
9 this is, their character. You get to hear evidence
10 about whether or not they've committed any crimes in
11 the past or bad acts. You also get to hear evidence
12 about good character. Everything that lets you know
13 what their life was like in the past so that when you
14 listen to it, you'll then know where the offense that
15 they're on trial for now fits into this whole picture,
16 okay, so you can get a complete picture of their
17 life.
18       Does that make sense to you?
19       A. Yes.
20       Q. And only after you hear all that evidence
21 then at the end of the punishment phase, then you
22 decide during the punishment phase what kind of
23 punishment they should get, okay?
24       A. Yeah.
25       Q. Okay. The State goes first in everything,

**Page 290**

1 which means that at the very beginning we have opening
2 statements where we tell you what you can expect the
3 evidence to be. The State goes first and the defense
4 then goes if they choose to. They don't have to.
5 Then we come to the evidence and the State starts
6 admitting evidence, witnesses testify. And physical
7 evidence comes in.
8       And after we finish up, then the defense
9 gets to go. Now, they don't have a burden to go.
10 They don't have to do anything other than just be
11 here. They don't have to put on evidence, they have
12 no burden to do that at all. The burden to prove the
13 case beyond a reasonable doubt is with us, with the
14 State, the people bringing the charges.
15       Does that make sense to you?
16       A. Uh-huh.
17       Q. Okay. But the defense, if they want to
18 present evidence, then they get to go after us, all
19 right?
20       Then after all of the evidence is finished,
21 then there's argument. And we get to argue first
22 because we have the burden of proof. And then after
23 us the defense can argue if they would like to, they
24 don't have to. And then we get to go last, okay? So
25 the defense is kind of sandwiched in between us.

**Page 291**

1       And that order of trial is the same during
2 the guilt/innocence part and during the punishment
3 phase. That's the way it goes for both parts, okay?
4       A. Okay.
5       Q. Any questions about that so far?
6       A. No.
7       Q. Okay. Now, we have to prove that this
8 person is guilty of capital murder beyond a reasonable
9 doubt, okay? Now, beyond a reasonable doubt doesn't
10 have a set definition anywhere. You get to decide
11 what beyond a reasonable doubt is for yourself. But
12 it absolutely does not mean beyond any doubt or all
13 doubt, okay.
14       Now, do you have any brothers or sisters?
15       A. Yes, ma'am.
16       Q. How many?
17       A. I got four brothers and six sisters.
18       Q. Whoa. That's a lot. Okay.
19       Did you ever get together with your brothers
20 and sisters at a holiday and talk about things that
21 happened when you were kids?
22       A. Oh, yeah.
23       Q. Quite a lot, huh?
24       A. Yeah, quite a lot.
25       Q. Okay. Do your brothers and sisters

**Page 292**

1 necessarily remember what happened like you do? Or
2 sometimes do they remember things differently?
3       A. Oh, I guess they probably remember about
4 what I do.
5       Q. Okay. But are some of the details different
6 sometimes?
7       A. I don't understand the question.
8       Q. Okay. Well, let me ask you this: Are you
9 married?
10       A. Yes, ma'am.
11       Q. Have you ever been to a wedding with your
12 wife?
13       A. A what.
14       Q. Have you ever been to a wedding, somebody's
15 wedding with your wife?
16       A. Yes, ma'am.
17       Q. When you leave that wedding, who's more
18 likely to remember what the bridesmaid's dresses look
19 like, you or your wife?
20       A. My wife.
21       Q. Your wife? Who's more likely to remember
22 what kind of car they got in to take off to go to
23 their honeymoon?
24       A. My wife. I've got to where I can't remember
25 nothing anymore.

Page 293

1    Q. Okay.
2        MS. CALLAGHAN: Could we have a moment, Your
3    Honor?
4    (Brief pause.)
5        MS. CALLAGHAN: One moment, please, Your
6    Honor.
7    (Brief pause.)
8        MS. CALLAGHAN: Your Honor, I believe at
9    this time the State and the defense can agree with
10   regard to this juror.
11       THE COURT: Agree to what?
12       MS. CALLAGHAN: Agree that he should be
13   excused.
14       MR. RAY: We'll agree.
15       THE COURT: Mr. Ledford, you are excused
16   from any further service in this case. You are free
17   to go about your business and you have no further
18   obligation to us.
19       VENIREPERSON LEDFORD: Thank you, sir.
20       THE COURT: Have a good day.
21       VENIREPERSON LEDFORD: You bet. Thank
22   y'all.
23       MR. MOORE: Thank you.
24       MR. RAY: Thank you, Mr. Ledford.
25       MS. CALLAGHAN: Thank you, Mr. Ledford, we

Page 294

1    appreciate it.
2    (Venireperson Ledford exits the courtroom.)
3    (Proceedings concluded.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 295

1    STATE OF TEXAS        )
2    COUNTY OF TARRANT     )
3
4        I, William Shelton, Deputy Official Court
     Reporter in and for the 213th District Court of
5    Tarrant County, State of Texas, do hereby certify that
     the above and foregoing contains a true and correct
6    transcription of all portions of evidence and other
     proceedings requested in writing by counsel for the
7    parties to be included in this volume of the
     Reporter's Record in the above-styled and numbered
8    cause, all of which occurred in open court or in
     chambers and were reported by me.
9
10       I further certify that this Reporter's Record of
     the proceedings truly and correctly reflects the
11   exhibits, if any, admitted by the respective parties.
12       WITNESS MY OFFICIAL HAND on this 30th day of
     July, 2004.
13
14
15   WILLIAM SHELTON, CSR #4089
     Expiration Date: 12/31/2004
16   Deputy Official Court Reporter
     213th Judicial District Court
17   Tarrant County, Texas
18   6111 N. Beach St. #611
     Fort Worth, Texas  76137
19   Phone: (817) 366-4948
20
21
22
23
24
25

1

REPORTER'S RECORD

VOLUME 4 OF 36 VOLUMES

TRIAL COURT CAUSE NO. 0885306D

| | | |
|---|---|---|
| THE STATE OF TEXAS | * | IN THE 213TH DISTRICT |
| | * | |
| VS. | * | COURT OF |
| | * | |
| BILLY JACK CRUTSINGER | * | TARRANT COUNTY, TEXAS |

*************************

JURY VOIR DIRE PROCEEDINGS

*************************

On the 19th day of August, 2003,
the following proceedings came on to be heard in the
above-entitled and numbered cause before the Honorable
Robert Gill, Judge Presiding, held in Fort Worth,
Tarrant County, Texas:

Proceedings reported by machine shorthand.

William Shelton, CSR

```
 1                 A P P E A R A N C E S

 2

 3         MS. MICHELE HARTMANN
           SBOT NO. 09167800
 4         MS. LISA CALLAGHAN
           SBOT NO. 01160700
 5         ASSISTANT DISTRICT ATTORNEYS
           Tarrant County Justice Center
 6         401 West Belknap Street
           Fort Worth, Texas  76196
 7         Phone: (817) 884-1400
           ATTORNEYS FOR THE STATE
 8

 9

           MR. WILLIAM H. "BILL" RAY
10         ATTORNEY AT LAW
           SBOT NO. 16608700
11         5041 Airport Freeway
           Haltom City, Texas  76117
12         Phone: (817) 831-8383
           ATTORNEY FOR DEFENDANT
13

14         MR. TIM MOORE
           EVANS, GANDY, DANIEL & MOORE
15         SBOT NO. 14378300
           115 W. 2nd Street, Suite 202
16         Fort Worth, Texas  76102
           Phone: (817) 332-3822
17         ATTORNEY FOR DEFENDANT

18

19

20

21

22

23

24

25
```

Page 3

 1                          VOLUME 4
                  JURY VOIR DIRE PROCEEDINGS

 2

     AUGUST 19, 2003

 3                                         PAGE/VOL.#

     Caption.....................................   1     4

 4   Appearances.................................   2     4

     Chronological Index.........................   3     4

 5

     VENIREPERSON          STATE     DEFENDANT    VOLUME

 6

     MARSHALL, James           7          45            4

 7   Defense Challenge for Cause................. 61,67  4

     Denied......................................  68     4

 8   Excused by Agreement........................  69     4

 9   MORGAN, John             72          114           4

10   Prospective Juror No. 9 Excused by Agreement  149    4

11   HERNANDEZ, Leroy        156          189           4

     Defense Challenge for Cause................. 206     4

12   Granted..................................... 207     4

13   ELLIOTT, Lisa           209          257           4

14   BELTRAN, Irma           280          ---           4

     State's Challenge for Cause................. 281     4

15   Granted..................................... 281     4

16   Recess for the day.......................... 281     4

17   Reporter's Certificate...................... 282     4

18   =========================================================

                       EXHIBITS - NONE

19   =========================================================

20

21

22

23

24

25

```
 1                         VOLUME 4
              ALPHABETICAL LIST OF VENIREPERSONS
 2
     AUGUST 19, 2003
 3
     VENIREPERSON          STATE     DEFENDANT    VOLUME
 4
     BELTRAN, Irma          280        ---          4
 5

 6   ELLIOTT, Lisa          209        257          4

 7
     HERNANDEZ, Leroy       156        189          4
 8

 9   MARSHALL, James         7          45          4

10
     MORGAN, John           72        114          4
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

William Shelton, CSR

Page 5

1      P R O C E E D I N G S
2         Tuesday, August 19, 2003
3            * * * * * * * *
4   (Open court, defendant present)
5      THE COURT: Everybody ready?
6      MS. HARTMANN: State's ready.
7      MR. MOORE: We're ready.
8      THE COURT: Bring Mr. Marshall on in,
9   please.
10  (Venireperson Marshall enters the courtroom.)
11     THE COURT: Good morning.
12     VENIREPERSON MARSHALL: Good morning, sir.
13     THE COURT: If you would raise your right
14  hand.
15  (Venireperson Marshall sworn.)
16     THE COURT: Would you tell us your name,
17  please?
18     VENIREPERSON MARSHALL: James Francis
19  Marshall.
20     THE COURT: Mr. Marshall, for the next
21  little while we're going to conduct an individual voir
22  dire interview. You will be interviewed first by the
23  State, that's Michele Hartmann and Lisa Callaghan over
24  here at the table directly in front of you.
25     MS. HARTMANN: Good morning.

Page 6

1      THE COURT: Followed by the defense. That's
2   Tim Moore, Bill Ray.
3      MR. MOORE: Good morning.
4      MR. RAY: Good morning.
5      THE COURT: And the Defendant, Billy Jack
6   Crutsinger.
7      THE DEFENDANT: Good morning.
8      THE COURT: And the purpose of this
9   individual interview is to discover how you honestly
10  feel about the different areas of law that are going
11  to be a part of this trial. You're under oath and the
12  oath at this time only obligates you to tell us how
13  you honestly feel about these matters.
14     VENIREPERSON MARSHALL: Yes, sir.
15     THE COURT: There are no right or wrong
16  answers to any of the questions asked of you. The
17  lawyers generally will tell you how the law works and
18  then just ask you how you feel about it.
19     VENIREPERSON MARSHALL: Yes, sir.
20     THE COURT: And your obligation at this
21  point is to tell us how you honestly feel.
22     VENIREPERSON MARSHALL: Yes, sir.
23     THE COURT: State may proceed.
24     MS. HARTMANN: Thank you, Your Honor.
25            JAMES MARSHALL,

Page 7

1   having been duly sworn to make true answers to such
2   questions as may be propounded by the Court or under
3   its direction, touching upon his service and
4   qualification as a juror, gave answers as follows:
5               VOIR DIRE EXAMINATION
6   BY MS. HARTMANN:
7      Q. Good morning, Mr. Marshall.
8      A. Good morning.
9      Q. As the Judge just told you, this is the
10  attorneys' opportunity to visit with you and to talk
11  with you about some of the information that you gave
12  us on that pretty lengthy questionnaire you filled out
13  for us, and also to go over areas of the law that may
14  be important in this case. And again, like the Judge
15  has said, there are no right or wrong answers. Your
16  only obligation at this point is just to tell us
17  truthfully how you feel and more importantly or just
18  as importantly to tell us whether or not you can
19  follow the law as it's set out.
20       If I go over something and I'm confusing you
21  or you have a question, would you please let me know?
22     A. Yes, ma'am.
23     Q. Okay. Because I need to make sure and I
24  know the defense wants to make sure that you
25  understand what we're going over with you. A lot of

Page 8

1   it is probably going to be new to you. It's like
2   getting kind of a crash course in the law. And most
3   people are not familiar with it when they come in here
4   and we're trying to teach you it in about an hour or
5   so.
6        So let me know if I lose you or I go too
7   fast or you have a question or concern about
8   something, okay?
9      A. Yes, ma'am.
10     Q. I see from your questionnaire that you are a
11  shop supervisor?
12     A. Yes, ma'am.
13     Q. And what exactly is it -- who do you
14  supervise?
15     A. Well, basically we've got, we work on
16  vehicles, okay, and basically I assign the mechanics
17  with the jobs that they're supposed to do each day. I
18  take the jobs in, I deal with the customers, write
19  work orders, close work orders for the internal
20  portions of the shop work.
21     Q. All right. And you work for Industrial
22  Power?
23     A. Yes, ma'am.
24     Q. All right. And what is their primary
25  function?

Page 9

1    A. Vehicle repair I guess would sum it up. We
2 take care of motor homes, trucks. If it's got wheels
3 on it, we fix it.
4    Q. Okay. All right. Sounds like obviously if
5 you're a supervisor, you're kind of in charge of a
6 number of people. We anticipate that this trial will
7 start probably about September 22nd and go anywhere
8 from five days to two weeks. Is that time frame and
9 that length of time going to cause any problems for
10 you?
11    A. I would not think so, not at this particular
12 point in time. I've already let my bosses know, you
13 know, what's going on. Of course they know I'm here
14 today. So as far as any type of problem, I'm not
15 aware of any at this point in time.
16    Q. All right. Very good.
17       There's also a chance like there is in any
18 big criminal case that the jury could be sequestered
19 during their deliberations, which would mean that you
20 and the other members of the jury if you were on the
21 jury in the evenings after the testimony was finished
22 for the day, you all would be taken probably by the
23 sheriff's department over to one of the downtown
24 hotels where you would spend the night.
25       If that, in fact, happened, would that cause

Page 10

1 any difficulties for you?
2    A. Not that I'm aware of, no.
3    Q. All right. Good. Well, I want to go over
4 with you just some basic rules in every criminal trial
5 just to make sure that you understand what the law
6 says and to find out whether or not that's law that
7 you agree with, and more importantly can you follow
8 it. Some of these are going to relate to some of the
9 questions that you were asked on the questionnaire.
10       The first rule is that every criminal
11 defendant in any kind of case, whether it's a traffic
12 ticket on all the way up to capital murder is presumed
13 to be innocent. That doesn't mean that they are, in
14 fact, innocent. But what it does mean is that unless
15 and until the State of Texas or this table right here
16 can bring sufficient evidence to prove beyond a
17 reasonable doubt that the person is guilty, the jury
18 has to presume that that person is innocent.
19       Have you heard of that before?
20    A. Yes, ma'am.
21    Q. Do you think that that's a good law or rule
22 to have?
23    A. Yes, ma'am.
24    Q. It's only fair that the people who are
25 making the accusation have to do the proving, would

Page 11

1 you agree with me?
2    A. Yes, ma'am.
3    Q. All right. The second rule that I want to
4 go over with you is that any defendant, again, has the
5 absolute right to remain silent. That means that they
6 don't have to testify if they don't want to. They can
7 if they want to, no one can stop them, but they have
8 an absolute right basically to just show up to trial
9 and make the State put on its case and then sit back
10 and not do anything at all.
11       Have you heard about that rule?
12    A. Yes, ma'am.
13    Q. Do you think that that's a good rule?
14    A. Yes, ma'am.
15    Q. Okay. And one of the questions on your
16 questionnaire asks you, the statement was, "Even
17 though the law says a defendant has the right to
18 remain silent, an innocent person accused of murder
19 would testify if he was innocent." And you put down
20 that you agreed strongly with that statement?
21    A. Yes, ma'am.
22    Q. And anytime I'm talking to you about your
23 questionnaire or the defense is, if you want to look
24 at that and take another look, let us know and we can
25 walk it up to you.

Page 12

1    A. Okay.
2    Q. But tell me what you were thinking about
3 when you said that you agreed strongly that an
4 innocent person in a murder case would testify?
5    A. Well, it's my belief that if a person is
6 charged with something and he knows in his heart an.
7 his mind or her heart and mind that they did not do
8 it, of course personally I would protest strongly to
9 the fact and I would do everything I can to prove my
10 innocence, especially in the fact that I did not do
11 the crime in question.
12    Q. All right. And is that something that you
13 feel strongly about?
14    A. Yes.
15    Q. All right. And the way that you phrased
16 that, I think -- or the way I'm understanding it is,
17 you said if I was the person, meaning you, accused, I
18 would want to. Or do you mean that anybody? And
19 there are no right or wrong answers here. We just
20 need to know.
21    A. I think that I can speak on how I feel.
22    Q. And that's what we need to know.
23    A. How another person feels about that same
24 thing I don't think that I'm qualified to interject
25 those type of thoughts. I would think in my opinion

Page 13

1 that a person that's innocent would want to do
2 everything that they could to prove that innocence to
3 prove that they were wrongly accused.
4    Q. And you are by no means alone in thinking
5 that way. A lot of people feel very strongly that if
6 a person is innocent, they would surely want to
7 vigorously defend themselves in court. The law says
8 that in a criminal trial, the defendant has an
9 absolute right not it testify. And if they choose not
10 to testify, then the jury would be instructed that
11 they could not consider or use that fact in their
12 deliberations.
13    In other words, let's say you were a juror
14 in a criminal trial and for whatever reason, and there
15 may be a number of reasons why a person doesn't
16 testify. It may be because they're guilty. It may be
17 because they have a speech impediment. It may be
18 because they get nervous talking in front of, you
19 know, strangers. It may be that they think, you know
20 what, those two ladies over at the prosecution table,
21 you know, they scare me. They're going to trick me,
22 they're going to get me to say things and I just don't
23 wasn't to get up there. I mean, there may be a number
24 of reasons why somebody might choose not to testify.
25    The law says that because you don't know

Page 14

1 what the reason is and because the State has the
2 absolute burden of proof, you as the jury can't go
3 back into that jury room and say, well, I wonder why
4 he or she didn't testify. I wonder if it's because
5 they're guilty. I wonder if it's because they're
6 innocent but they look kind of timid and afraid.
7    Do you see what I'm saying?
8    A. Uh-huh.
9    Q. And so the question is understanding how you
10 feel about the fact that an innocent person would
11 testify, and again you are not alone, a lot of people
12 feel that way very strongly. But the question is if
13 you were a juror in a criminal case and the defendant
14 chose not to testify and you were instructed by the
15 Court that you could not consider that for any reason,
16 could you follow that instruction or would you be
17 tempted to get back there and say, you know what, I'm
18 sorry, I just feel very strongly that if that person
19 was innocent, they would get up there and defend
20 themselves.
21    A. No, I could follow the instructions.
22    Q. Okay. All right. Just to kind of give you
23 a little overview about how the trial will progress.
24 Lisa and I get to go first. And that's because we
25 have the burden of proof. Because we have the main

Page 15

1 job, so to speak. We have the ultimate
2 responsibility. We get to go first. That's why I'm
3 talking to you first. And at trial we get to go first
4 and put on our evidence because we're the ones that
5 have to do the job, so to speak, all right?
6    Once we finish putting on our evidence, the
7 defense has an opportunity to put on evidence if they
8 want to. They don't have to, but they can if they
9 want to.
10    After all the evidence is done, the lawyers
11 argue the case to the jury, the jury goes back and
12 deliberates and they reach a verdict, we hope. Come
13 back out and if that verdict is not guilty, then what
14 happens?
15    A. The person is set free.
16    Q. All right and everyone goes home.
17    A. I would assume so, yes.
18    Q. All right. If the jury comes back with a
19 guilty verdict, then we start the process all over
20 again with Lisa and I putting on additional evidence.
21 When we're done, again the defense has an opportunity
22 if they want to, but they don't have to, to put on any
23 additional evidence that they want to, punishment,
24 okay?
25    Following me?

Page 16

1    A. Yes, ma'am.
2    Q. All right. And at the conclusion of that,
3 again, the lawyers get up and yap some more at you,
4 argue their case and then you go back into the jury
5 room with some instructions from Judge Gill and you
6 hopefully come to an agreement on what the appropriate
7 punishment is.
8    You probably were able to tell from the
9 questionnaire that this is a capital murder case.
10    A. Yes, ma'am.
11    Q. This is the top offense here in the State of
12 Texas. And obviously we visit with you all
13 individually because there is a lot at stake here.
14 And I will tell you just so that our position is very
15 clear from this side of the room that in the event of
16 a conviction, Lisa and I will be asking the jury that
17 is seated in this case to return a death sentence.
18 Based upon the evidence, we're going to feel that
19 that's the appropriate sentence to ask for.
20    We're going to go over with you the law of
21 capital murder. And hopefully -- this is the
22 education part, I hope. This is where we give you the
23 crash course in what the law is.
24    A lot of people say, well, what is a capital
25 murder as distinguished from murder, straight murder.

Page 17

1 And capital murder, if you'll look over here, is going
2 to be a murder, which is an intentional killing, plus
3 the additional of some aggravating or special
4 circumstances, all right?  When we talk about
5 intentional killing, we're talking about an act that
6 is done on purpose.  We're not talking about an
7 accident, we're not talking about someone being
8 reckless or negligent.  The State would show that
9 there was no self-defense involved.  We're not talking
10 about a situation where someone is criminally insane.
11 We're talking about someone who has decided to do an
12 act, has decided to kill someone and has acted on that
13 desire.
14       Are you following me?
15    A. Yes, ma'am.
16    Q. All right.  So we have an intentional
17 killing, we have a deliberate, intended killing.  And
18 in addition to that killing, we have some special or
19 aggravating circumstance that surrounds that killing.
20 So what are some of those aggravating or special
21 circumstances?
22       The law says if you kill a child under the
23 age of six years of age.  If you kill a police officer
24 or a fireman while they're in the course of their
25 duty.  If you kill an individual, intentionally kill

Page 18

1 someone and you're in the process of robbing them,
2 committing sexual assault or kidnapping them.
3       There's another way you can commit capital
4 murder, another way that there can be an aggravating
5 circumstance.  And that is when a person intentionally
6 kills more than one person during the same course of
7 conduct, all right?  Have you ever heard about that?
8    A. I probably have, but nothing comes to mind
9 right now.
10    Q. Okay.  And let me just kind of give you an
11 example.  Let's say that -- and again, I didn't
12 mention this earlier, but we cannot talk to you about
13 the specific facts of this case.  So any hypotheticals
14 or examples that I use do not relate specifically to
15 this case?
16    A. Yes, ma'am.
17    Q. I'm just putting them out there to kind of
18 help illustrate my point, which I hope they do.
19       But on this last one, intentionally killing
20 more than one person in the same criminal transaction,
21 let's say we have a gang situation and there's a
22 member of the gang that wants to get out.  And his
23 family is trying to get him out.  And one of his
24 fellow gang members is upset about this.  And he goes
25 to that wanna be getting out gang member's house and

Page 19

1 he breaks into the house an he shoots all four members
2 of the family, all right?  Goes through and picks them
3 off one at a time in whatever room they're in.  Kills
4 four people during the same course of conduct.
5       That might be an example of when you
6 intentionally kill more than one person in the same
7 criminal transaction.  Does that kind of help you
8 understand?
9    A. Yes, ma'am.
10    Q. Do you think that that type of offense where
11 you kill more than one person basically at the same
12 time, do you think that that is the type of offense
13 for which the death penalty ought to be an option for
14 punishment?
15    A. Yes, ma'am.
16    Q. And when we talk about capital murder, there
17 are only two possible punishments that would be
18 available to a jury.  And again, one would be the
19 death sentence and the other would be a life
20 sentence.  And that basically translates into 40 years
21 day for day before the person becomes eligible for
22 parole.  It doesn't mean they would get parole, but it
23 means that's the first they could come up before the
24 Parole Board, okay?
25       So let's say hypothetically in my little

Page 20

1 gang case the State tries its case, the State proves
2 its case beyond a reasonable doubt and the jury
3 convicts that person, all right?  What would then
4 happen is we'd move into what stage of the trial?
5    A. They've convicted him?  They would move into
6 the punishment phase.
7    Q. Absolutely.  Very good.  You were paying
8 attention.
9       All right.   At that point we would've had
10 to have proven that the defendant on trial, in Tarrant
11 County, Texas, on or about a particular date,
12 intentionally caused the death of more than one
13 person.  We would've had to have proven that beyond a
14 reasonable doubt.
15       Beyond a reasonable doubt is not defined by
16 the law.  It's whatever you believe it to be, all
17 right, you and the other individual jurors.
18       Make sense to you?
19    A. Yes, ma'am.
20    Q. I can tell you that it's not proof beyond
21 all possible doubt or 100 percent.  Because basically
22 you would have to be a witness to something to have it
23 proven to you by 100 percent.  It's a high standard,
24 but it's not beyond all possible doubt.  It's beyond a
25 reasonable doubt.

Jury Voir Dire Proceedings    8-19-03                                    State vs. Billy Jack Crutsinger    Vol. 4

Case 4:07-cv-00703-Y    Document 86    Filed 11/03/17    Page 93 of 143    PageID 3516

Page 21

1    Does that make sense to you?
2    A. Yes, ma'am.
3    Q. All right. Can you follow that instruction
4 and follow that burden of proof?
5    A. Yes, ma'am.
6    Q. So we get to the punishment phase. And at
7 this point Lisa and I go back into mode and we start
8 putting on some additional evidence. And that
9 evidence can be about the defendant's good or bad
10 character, it can be about any type of prior criminal
11 history or record if they have any. It can be any
12 type of evidence that would be relevant for the jury
13 to help put this defendant and their crime into
14 context of their entire life.
15    The first phase of the trial is kind of like
16 a snapshot of that one day in that person's life. Are
17 you following me?
18    A. Yes, ma'am.
19    Q. If you get to the punishment stage, Lisa and
20 I get to bring in the photo album. We get to bring in
21 pictures of everything else that happened before,
22 if there is anything. Sometimes there's not.
23 Sometimes there is nothing in a person's past.
24 Sometimes there's a whole lot, okay? But if there's
25 any type of evidence that we feel is important, we're

Page 22

1 going to bring that to the jury.
2    Once we get done, the defense again has an
3 opportunity to offer any evidence, but they don't have
4 to. And in a capital case, the jury would get two
5 instructions that they would have to answer based upon
6 the evidence, all right? And one is what we call the
7 future danger question and one is called the
8 mitigation question.
9    Have you heard about those before?
10    A. I understand what the future danger question
11 would be. The mitigation question, the way I
12 understand that is that if there would be like some
13 type of special circumstances or things that would
14 cause someone to change an opinion. That's my
15 impression of that word.
16    Q. Okay. And that's pretty close. And we're
17 going to go over those, each one individually.
18    Why don't you take a moment and just read
19 that one to yourself if you would.
20    (Brief pause.)
21    A. Okay.
22    Q. Okay. If you'll notice, this question says
23 do you find beyond a reasonable doubt. What that
24 means is that Lisa and I have to prove that the answer
25 to this question should be yes. We have to prove that

Page 23

1 beyond a reasonable doubt, all right? Kind of like at
2 the first phase of the trial where we had to prove our
3 case, we have to prove beyond a reasonable doubt that
4 the answer to this question should be yes, that they
5 are probably going to be a future danger to society,
6 okay?
7    You can base your answer on the
8 circumstances of the trial, of the offense itself or
9 you can base it upon the offense and any evidence that
10 Lisa and I choose to present at the punishment phase,
11 okay?
12    Do you understand that?
13    A. Yes, ma'am.
14    Q. The words and phrases that are underlined up
15 there, you are allowed to give your own meaning to
16 those words and phrases.
17    Probability does not mean certainty, all
18 right? Basically this question is asking you to
19 predict future behavior. Do you think that that's
20 possible?
21    A. Yes.
22    Q. Okay. Do you think it's possible to look at
23 someone's past history to try and predict what they
24 might do in the future?
25    A. In most cases, yes.

Page 24

1    Q. All right. And criminal acts of violence
2 can be anything you choose it to be. It can be other
3 murders, it can be assault, it can be criminal
4 mischief if there's any type of violence involved in
5 that, it can be arson. It can be anything that you
6 choose it to be, all right?
7    Society. Society can be free society to
8 you, it can be prison society if you want it to be.
9 It can be a combination of those two things. It's
10 whatever you and the other individual jurors believe
11 it to be in your own mind.
12    Does that make sense to you?
13    A. Yes, ma'am.
14    Q. Do you think that this is a question that
15 you would be capable of answering either yes or no
16 based upon the evidence?
17    A. Yes, ma'am.
18    Q. Would you be the type of person that would
19 say, you know, Michele, I understand what you're
20 telling me, I understand that this question, obviously
21 there's two options, yes or no, but if I've convicted
22 someone of capital murder, I'm always going to find
23 that they're a future danger. And there are some
24 people who feel that way.
25    A. You know, again, I would say that there are

Page 25

1 probably some individuals out there that would fit
2 into that traditional mold. My opinion would be that
3 they would be few and very far between.
4      Q. Okay. What I'm hearing from you is that you
5 would think that most capital murder defendants who
6 have been convicted are going to be a future danger,
7 but there might be some exceptions?
8      A. Yes.
9      Q. Is that -- I don't want to put words in your
10 mouth.
11      A. No. I just -- first of all, I think the
12 biggest part of this is going to fall into the type of
13 individual that you may be dealing with, okay?
14      Q. Right.
15      A. Again, we're back to those mitigating
16 circumstances again because nothing fits into a
17 perfect mold and nothing is 100 percent in this
18 world. I think it all goes back to the evidence and I
19 think that if everything is based on the evidence, the
20 evidence speaks for itself. I mean, that's really my
21 opinion, the evidence speaks for itself. If it is
22 proven beyond any reasonable doubt and there is
23 absolutely no question whatsoever, that I believe that
24 that person, whoever that may be, he or she, would
25 have the propensity to cause some type of problems in

Page 26

1 the future, especially if their past reflects that.
2      Q. All right. And so you think that you would
3 be open to listening to what the evidence was and
4 basing your decision on the evidence that was
5 presented to you? And if the evidence said to you,
6 you know what, I just don't think that I can say
7 there's a probability this person would be a future
8 danger, I could answer this question no. Or, you know
9 what, I've looked at this evidence and I do think that
10 there's a probability that this person would be a
11 continuing threat, you could answer that question yes?
12      A. Yes, ma'am.
13      Q. So you're not closing off from answering it?
14      A. No.
15      Q. Because obviously there wouldn't be any
16 point in asking the question if people were always
17 going to pick one answer.
18      A. Exactly.
19      Q. Any questions about this question?
20      A. No, ma'am.
21      Q. If all 12 jurors unanimously answer this
22 question yes, you move one step closer to a death
23 sentence, all right? You would then go to Special
24 Issue No. 2. This question is much longer and you're
25 going to be able to tell by reading it that a bunch of

Page 27

1 lawyers down in Austin drafted this. So go ahead and
2 take an opportunity just to read through that to
3 yourself.
4      (Brief pause.)
5      Q. Done?
6      A. Yes, ma'am.
7      Q. Okay. Couple things about this question.
8 First of all, there is no burden of proof on this
9 question. The first phase of the trial, Lisa and I
10 have to prove beyond a reasonable doubt the person's
11 guilty. Get to punishment, that first question we
12 have to prove beyond a reasonable doubt the answer
13 should be yes.
14      You remember that, right?
15      A. Yes, ma'am.
16      Q. This question, we don't have to prove that
17 the answer should be one way or the other. This
18 question asks you to step back as a jury and say, all
19 right, we find this person is going to be a future
20 danger, okay? They're on the track to a death penalty
21 or death sentence. Is there anything about the
22 offense, the person's character and background, their
23 moral culpability that leads me to believe that there
24 is something that lessens their blameworthiness? And
25 if I think there's something, if there's some evidence

Page 28

1 that's been presented to me -- I mean, first of all,
2 that evidence has to be before you. You can't just
3 like, well, I think maybe this is the result of X, Y
4 and Z, okay? You can't make something up in your
5 mind. I mean, there has to be something before you in
6 the evidence for you to consider to be mitigating,
7 okay?
8      And then you have to say do I think whatever
9 evidence is before me, is there anything here that
10 lessens this person's responsibility or
11 blameworthiness for their crime? If I do find that
12 evidence, is it sufficient to pull that person out of
13 line for that death sentence and put that person over here in
14 a life sentence?
15      Do you follow me?
16      A. Yes.
17      Q. There can be all sorts of things that can be
18 presented to a jury. You have to ask yourself do I
19 believe this. Because people can claim all sorts of
20 things, right? It may be that there's some evidence
21 that you believe is true, but you say, you know what,
22 in my mind, that is not mitigating. Too bad that this
23 person had an alcohol problem for the first 15 years
24 of their life. There's a lot of alcoholics out there
25 that don't go out and do things like this.

Page 29

1 You might say, you know what, that's
2 terrible that that person was locked in a closet when
3 they did something bad by their parents. But, you
4 know what, that doesn't excuse whatever behavior has
5 been shown to me.
6 MR. MOORE: Well, I'm going to have to
7 object to that because I don't believe that there has
8 to be a nexus between the mitigation that's proved and
9 the offense. And her example --
10 THE COURT: Sustained.
11 MR. MOORE: Ask you to ask Mr. Marshall to
12 disregard that example.
13 THE COURT: Disregard what she just said,
14 please.
15 VENIREPERSON MARSHALL: Yes, sir.
16 Q. (BY MS. HARTMANN) If there's something
17 about the person's background that you think has
18 helped to shape their moral responsibility towards
19 society, whatever that evidence might be, okay, and
20 whatever is mitigating is what you think is
21 mitigating, okay? What you think is mitigating may
22 not be mitigating to the person sitting next to you.
23 You may have different definitions of what is
24 mitigating, okay?
25 But let's say there may be evidence before

Page 30

1 you about the person's life that you think helped to
2 shape them and their moral system, their moral values,
3 all right? And you find that that is mitigating, all
4 right? You have to ask yourself is it sufficiently
5 mitigating for me to pull them off that track towards
6 a death sentence and channel them over here to a life
7 sentence.
8 If you do think it's -- if you don't believe
9 any of the evidence that is before you, or you think
10 it's mitigating, but it's not sufficiently mitigating,
11 then under the law you would be required to answer
12 that question no; do you see that?
13 A. Yes, ma'am.
14 Q. All right. There are all sorts of things
15 that you all can take into account in assessing a
16 particular defendant. In other words, at that point
17 in the punishment phase, we're not asking you to set a
18 punishment in a vacuum, okay? We're asking you to
19 take a look at the offense, the defendant's character,
20 their background, whatever is in their background,
21 whether it's child abuse, drug abuse, Vietnam war
22 veteran. I mean, it can be good things. We ask you
23 to take a look at that evidence and ask yourself is it
24 sufficiently mitigating. And if it's not to you, then
25 you answer that question no. And if it is, you answer

Page 31

1 that question yes.
2 Do you understand?
3 A. Yes, ma'am.
4 Q. All right. Do you think that this is a
5 question that you would be capable of answering either
6 yes or no?
7 A. Yes, ma'am.
8 Q. All right. You are not closing yourself off
9 to the possibility of there being sufficiently
10 mitigating evidence in a particular case?
11 A. No. I mean, it's my opinion you got to keep
12 an open mind to everything. I mean, it's just that
13 simple. I mean, the evidence has to do the work, I
14 mean, in my opinion. As I said before, the evidence
15 speaks for itself. If it's beyond any type of doubt,
16 then the evidence will speak for itself.
17 Q. And you said beyond any reasonable doubt and
18 that's fine at the first phase of the trial and the
19 first question. But on this question Lisa and I don't
20 have to do any proving beyond a reasonable doubt,
21 okay? So there is no burden of proof on this
22 question, okay?
23 There may be no mitigating evidence before a
24 jury. There may be lots of mitigating evidence.
25 There may be some that the jury believes, there may be

Page 32

1 some that the jury chooses to disbelieve.
2 If it's evidence that they do believe, they
3 have to ask themselves is it sufficient, is it a
4 sufficiently mitigating circumstance for me to take
5 away some of the responsibility or blameworthiness of
6 this defendant for their act, okay?
7 So you think you would be capable of
8 answering this question either yes or no?
9 A. Yes, ma'am.
10 Q. Okay. One thing that I thought was
11 interesting on your questionnaire is there was a
12 question that asked you, "If you lived in a place
13 where the death penalty was carried out publicly would
14 you" and then it had a bunch of different options
15 about attending, not attending, watching on TV. And
16 the ones that you checked off was watch on television
17 once in a while.
18 Can you tell me what your thoughts are on
19 that?
20 A. It's not something that I would probably
21 make a steady diet of, so to speak. But, for example,
22 those, for lack of a better term, we'll call them
23 gentlemen that dragged that dragged that black
24 gentleman to his death in that one little town, I'd
25 have probably watched that one, you know. Why I have

Page 33

1 never bothered to put much thought into it. But as
2 far as going to them or something like this, I don't
3 think it would interest me that much unless, of
4 course, it was a personal issue. If it was a personal
5 issue, I'd be there.
6    Q. All right. Couple other things I wanted to
7 go over with you. The law says that voluntary
8 intoxication is not a defense to the commission of a
9 crime, all right? Basically, a person cannot get high
10 on street drugs or prescription drugs or drink so much
11 that they're intoxicated and then go out and commit
12 some type of criminal act and then say sorry, Kings X,
13 I was high or I was drunk, okay? That doesn't get
14 people off the hook for committing a crime.
15    A. Yes, ma'am.
16    Q. Do you think that that's a good law?
17    A. Yes, ma'am.
18    Q. Another area. There will be a number of
19 witnesses that come to testify in any type of criminal
20 case. And not unusually there's going to be police
21 officers that will testify in a criminal case. And
22 what you have to know about that is that you can't
23 give police officers a leg up in their credibility
24 before they open their mouth. You have to judge them
25 as you would any other witness by listening to what

Page 34

1 they have to say and how they say it and do they have
2 any specialized training or experience.
3    Can you do that?
4    A. Yes, ma'am.
5    Q. By the same token, if a defendant chooses to
6 get up and testify, they don't automatically get
7 Brownie points for waiving that right, all right?
8 They get judged just like everybody else.
9    Do you think that that's a good way to do
10 it?
11    A. Yes, ma'am. Again, back to what I said
12 earlier. The evidence will speak for itself.
13    Q. All right. I want to go over one last area
14 of the law. And that has to do with when the police
15 take a statement or they gather evidence from a
16 person. There are rules that dictate or tell the
17 police how they have to go about doing those things.
18    Do you think that it's good that the police
19 have rules to follow?
20    A. Yes, ma'am.
21    Q. And what happens is that when rules have
22 been broken, if they have been broken, there are
23 consequences to those rules, just like there are with
24 your kids or your employees up at work. Because if
25 you don't have consequences to rules, then are people

Page 35

1 really going to be inclined to follow the rules?
2    A. In my opinion, probably not.
3    Q. And so in the law, the consequence to the
4 police not following a rule when it's in regards to
5 maybe taking of a statement or collecting a piece of
6 evidence, let's say, going back to my hypothetical
7 earlier, the gang guy that goes in and shoots the
8 family. Let's say in that hypothetical the police
9 seize the gun and they don't follow the proper rules
10 in seizing that gun, all right?
11    If there is evidence that's brought before
12 the Court, all right, that somehow the rules have been
13 violated, then it's possible that the evidence of that
14 gun could be basically removed from the trial. In
15 other words, the jury might be instructed that if they
16 believe that the evidence had been obtained illegally,
17 they'd have to believe the evidence first, and if they
18 believed it had been obtained illegally, they would
19 have to pull, let's say, the consideration of that gun
20 out of their deliberations. And then whatever
21 evidence was left they would have to base their
22 verdict on that remaining evidence.
23    Does that make sense to you?
24    A. Yeah, I've heard it before.
25    Q. Tell me what you're thinking.

Page 36

1    A. I know where this one is going. First of
2 all, I guess in certain circumstances police officers
3 have, you know, a pretty rough job, okay. I guess
4 there's one side of me that says if a police officer
5 has followed the rules to the utmost of his ability
6 and just dropped the ball on one little thing, I'm not
7 buying that one. I don't bite off on the fact that
8 they're just going to throw everything out because of
9 the fact that this guy in the heat of the battle or
10 whatever the case may be dropped the ball or didn't
11 exactly put all of it in the right perspective.
12    I'm hard-pressed on that one. You know, I
13 believe police officers should follow the law just
14 like they ask everybody else to follow the law, okay.
15 But I don't know, I just -- there's a part of me that
16 says that I don't think anything should be thrown out
17 because one officer made one tiny mistake. We're
18 human beings. And I guess the brunt of the evidence,
19 you know, should be considered. I guess the whole
20 story should be considered, not just one fact that he
21 didn't do something or she didn't do something exactly
22 to the limits of the law. Like I said, I'm
23 hard-pressed on that one.
24    Q. All right. Well, let me get down to, I
25 guess the real question here is understanding how you

Page 37

1 feel, which, again, is the way a lot of people feel.
2 I mean, you are by no means alone in having those
3 concerns and those feelings.
4      But the question is if you were a juror in a
5 criminal case where there was evidence before you that
6 you believed showed that the police had not followed
7 the rules and that as a result of that, if you believe
8 that the evidence had been obtained illegally, the
9 Judge instructed you if you believe that that
10 particular piece of evidence was obtained illegally,
11 you have got to remove it from your consideration and
12 it kind of becomes the big pink elephant in the
13 corner. You know it's there, but you have to pretend
14 it's not, all right?
15    A. Yes, ma'am.
16    Q. And so only you can answer this question
17 because only you know what you're capable of doing.
18 And sometimes people feel so strongly one way or the
19 other that they say, you know what, I understand
20 that's the way the law is, but don't ask me to do it,
21 because I just can't.
22      But let me ask you, if you were a juror in a
23 criminal case no matter how hard it might be, if you
24 believed -- you have to believe the evidence first
25 that there was some illegality, but if you truly

Page 38

1 believed that there was some illegality and you knew
2 that that meant you had to pull that piece of evidence
3 out of your consideration, could you render a verdict
4 based upon the remaining evidence, even if it meant
5 that there wouldn't be enough evidence left to convict
6 that person and they would walk out the door?
7      And some people say, you know what, I can't
8 do that, no way. And some people say it'd be hard,
9 but I can do it.
10    A. I think it would definitely take a lot of
11 consideration. But I don't know, in my past if I was
12 directed to do something, I would find a way to do
13 it. So, yeah, I guess I could. I mean, I guess I
14 could put that piece of information off to the side.
15 And based on the rest of it, if that means that the
16 person has to walk, that means the person has to walk.
17    Q. Okay. Let me give you the worst-case
18 scenario. And again, like I told you, the examples
19 and hypotheticals I give you in here today don't have
20 anything to do with this case.
21    A. I understand.
22    Q. But let me give a worst-case scenario.
23 Let's say you are a juror in a case where the person
24 on trial has been accused of kidnapping, molesting and
25 killing a child and burying them. And, of course, the

Page 39

1 police at this point don't know where the child is.
2 And they do some investigation and they come up with
3 the defendant's name.
4      And they get a statement from this person
5 and he or she tells them what they did to this child,
6 where this child was buried, takes them out there to
7 the field, they find the child, he gives them a
8 statement and says, you know what, I did it and I'm
9 going to do it again and I enjoyed it. I'm your worst
10 nightmare. I'm every parent's worst nightmare.
11      Goes to trial and evidence is presented that
12 the police screwed up, took the statement wrong. They
13 didn't Mirandize him properly or withheld food and
14 drink from him or whatever it was, okay, and the jury
15 believed that evidence, just say hypothetically
16 evidence was there and the jury chose to believe it,
17 all right? And without that statement, there's
18 nothing else. I mean, there just isn't anything else
19 to prove that this person did this act, all right?
20      And the jury goes back there and they say
21 you know what, it was taken illegally, the Judge has
22 told us if we believe that, we have to pull it out,
23 and there ain't nothing left and we're going to have
24 to walk this child killer, child molester out the
25 door.

Page 40

1      I mean, that's worst-case scenario. But the
2 bottom line is even in the worst-case scenario, could
3 you follow the law and do that?
4    A. Oh, you're good. So the Rules of Evidence
5 weren't followed, you have an individual who claims
6 that they did this, they did this, they did this, and
7 he's going to do it again?
8    Q. And the police know because they go out
9 exactly where this person told them the body was, find
10 the body, they're able to do some DNA testing, they
11 link it up to him. But everything, all the evidence
12 that was obtained by the police was from that one
13 statement, so it all gets tossed out.
14    A. It's my opinion, I mean, he did it.
15    Q. And you know he did it.
16    A. You said this is my opinion of things.
17    Q. Absolutely.
18    A. All right. As far as I'm concerned, he said
19 he did it, you went out and found the information.
20 You may not have found it exactly according to the
21 limits of exactly how you're supposed to do it, but as
22 far as I'm concerned, he did it or she did it or
23 whoever you're talking about.
24    Q. And I understand that that intellectually is
25 what you're going to know or think in your mind. The

Page 41

1  question I have for you is could you follow the law
2  and hypothetically when you take that statement out of
3  your consideration and there's not anything left, can
4  you come back in and say we find the person not guilty
5  and walk them back out the door?  And if you can't,
6  that's okay.  And if you can, that's okay.  We're not
7  looking for any particular answer here, just what
8  you're capable of doing.
9      A.  In that particular situation where it was a
10  child and the things that happened to that child were
11  done, I'd have a hard time with that, to be honest
12  with you.
13      Q.  And unfortunately being a lawyer, I have to
14  tie you down.  When you say I'd have a hard time, does
15  that mean I could do it and hold my nose doing it or
16  no way, can't do it, I'm not going to be responsible
17  for putting him back out on the street to do it again?
18      A.  No, I couldn't be responsible for putting
19  him back out on the street again, especially if
20  everything pointed to the fact that he did, in fact,
21  do it and just the fact that the evidence was gathered
22  wrong, no.
23      Q.  So you would not be able to render -- and
24  again, I'm talking about this particular hypothetical
25  where once you take the statement out, there's nothing

Page 42

1  left, you would still find that person guilty, even
2  based upon the illegally obtained statement?
3      A.  I think in that particular case I think that
4  I probably would.
5      MS. HARTMANN:  May I have just one moment,
6  Your Honor?
7      (Brief pause.)
8      Q.  (BY MS. HARTMANN)  All right.  Do you have
9  any questions for me over any of the law that I have
10  gone over with you?
11      A.  No, ma'am.
12      Q.  One last question from your questionnaire.
13  Let me just ask you about, and this is kind of one of
14  the more unpleasant aspects of my job when I talk with
15  you all.
16      We generally ask everyone that comes through
17  whether or not either they themselves or anyone in
18  their family has ever been arrested or charged with an
19  offense.  And on your questionnaire you had put down
20  no, but it looks like in our records you have a, there
21  was a prior case?
22      A.  Well, I wondered about that after I left.
23  When I came to court, the district attorney, and I'm
24  not, it was a young lady, she said I should have never
25  been arrested, okay.  And that's, if anybody were to

Page 43

1  have ever asked me or if I ever was questioned about
2  it, she said that there would be no record of it
3  because they threw it out.
4      Q.  I see.
5      A.  And that's what I was told.  And, of course,
6  after I filled that out and I got home and I asked my
7  wife about it and she said no, she told me the same
8  thing.  She said that lady told us that if anybody
9  were to ever ask you or anything that this was more of
10  a mistake than it was anything else.
11      Q.  Okay.  And I know that that case was
12  dismissed, the case was dismissed.  But I guess it was
13  based upon something that -- was it the prosecutor or
14  your attorney?
15      A.  No, no.  I guess we're going to call it the
16  district attorney, I'm pretty sure, was the lady that
17  spoke with us.  And it was kind of a weird thing
18  because when we came to the courtroom like we were
19  told to do, she had pulled us off to the side and she
20  told me to go fire my attorney.  She said you don't
21  need him.  This should have never got here she said.
22      Q.  Okay.
23      A.  Okay.  So I did.  And that's why I put no
24  because of the fact that I was told that by rights,
25  this should have never gotten to where it did.  And

Page 44

1  that was from the district attorney.  So if I did
2  answer that question wrong, I apologize.
3      Q.  Okay.  All right.  Well, I thought maybe
4  there might have been some confusion because the case
5  was dismissed.  And I just wanted to make sure that
6  did we have the right person or what the circumstanc
7  were.
8      A.  Yeah.  And like I said, it never -- I mean,
9  all I did was talk to this lady in a room, we never
10  actually got into the courtroom other than the fact
11  that she brought me in so I could fire that fella, you
12  know, in front of the judge.
13      Q.  Okay.  Well, I'm sure he didn't appreciate
14  that too much.
15      A.  He didn't like it, I'll tell you that.
16      Q.  Okay.  I apologize for having to ask you
17  about it.
18      A.  No, that's fine.
19      Q.  Let me see if there was anything else on
20  your questionnaire.  Oh, one of your three favorite TV
21  shows, "Combat."  What is that?  I've never heard of
22  that.  I know what CSI is because I watch that one
23  myself.
24      A.  "Combat" is a show with regards to Easy
25  Company.  It's about five or six guys in World War

Page 45

1  II. And that was a show what I watched when I was a
2  young man, probably back in the '60s, early '60s when
3  it came out. And they're showing reruns of it on
4  Lifetime, which I enjoy.
5    Q. Okay. Very good. Well, any questions for
6  me?
7    A. No, ma'am.
8    MS. HARTMANN: Well, I really appreciate
9  your time and your candor. And the State would pass
10  the venireman to the defense.
11    THE COURT: You may proceed.
12    MR. MOORE: Thank you, Judge.
13    VOIR DIRE EXAMINATION
14  BY MR. MOORE:
15    Q. Good morning, Mr. Marshall.
16    A. Good morning, sir.
17    Q. Again, my name is Tim Moore. This is Bill
18  Ray.
19    MR. RAY: Good morning.
20    Q. (BY MR. MOORE) This is Billy Jack
21  Crutsinger.
22    A. Sir.
23    Q. And again, I want to stress to you that
24  anything you tell us, we just want to know how you
25  feel, okay?

Page 46

1    A. Yes, sir.
2    Q. You know how they feel about this case is in
3  a few weeks they're going to be standing up before
4  this jury, whoever it is, asking them to take Billy
5  Jack Crutsinger and execute him, okay? We're going to
6  be asking that jury if they find him guilty beyond a
7  reasonable doubt, should that happen, that, number
8  one, he's not guilty of capital murder. And if he is,
9  he's not worthy of the death penalty, that it would be
10  a life sentence.
11    Do you understand our position?
12    A. Yes, sir.
13    Q. And that being the case, do you understand
14  that it's one awesome job for whoever is sitting over
15  there in that jury box to decide that issue?
16    A. Yes, sir.
17    Q. And the law says we don't take this
18  lightly. In fact, we take it so seriously that we
19  bring these individual jurors in by themselves and
20  question them for an hour or two just to see how they
21  feel.
22    Do you understand that?
23    A. Yes, sir.
24    Q. Do you know how we usually pick a jury in a
25  regular case, say a burglary case? Have you ever sat

Page 47

1  on a jury before?
2    A. No, sir, I haven't.
3    Q. Usually we bring them in and they're all
4  sitting out here together and the State gets to go
5  first and ask them a bunch of questions and we get to
6  go and then we strike them. And whoever is left is
7  the jury.
8    But in this kind of case, you can understand
9  why it's so important to bring you in by yourself and
10  see how you truly feel about some of these issues?
11    A. Yes, sir.
12    Q. Now, you were in the Army for several years;
13  is that correct?
14    A. Yes, sir.
15    Q. Tell me about that experience.
16    A. Well, I went in in 1972. My first duty
17  assignment was after basic and AIT was Korea. After I
18  went to Korea, I came back, went to Fort Belvoir and
19  spent some time in Fort Belvoir, Virginia. I also
20  spent some time at Fort Indiantown Gap, Pennsylvania
21  under what they called Project New Arrivals/New Hope,
22  which was where we, the unit that I was in at that
23  time was an MP company and we were assigned to
24  guarding the Vietnamese refugees that were brought
25  into this country at that particular point in time.

Page 48

1    From there I went to Germany and spent about
2  five years in Germany. Again, my job was -- well, I
3  started out as a private, worked my way up and, of
4  course, when I left I was what they called a Sergeant
5  First Class promotable, just waiting for my E-7
6  stripes and such. So I spent almost 11 years in the
7  military.
8    Q. And you were in the military police?
9    A. No, sir, I was actually a mechanic.
10    Q. Oh, okay?
11    A. I actually worked as a mechanic.
12    Q. I never served in the military. I don't
13  know what some of those mean.
14    And so after about ten years you left the
15  military?
16    A. Yes, sir.
17    Q. Why?
18    A. Hardship reasons. My wife and I at that
19  time, my first wife and I had gotten divorced and I
20  had gotten custody of the children. And they were
21  going to send me back to Korea, which at this time
22  they wanted to send me up to what they call the Second
23  Infantry Division, which was a hardship tour. And I
24  didn't have anybody to take care of my kids. So I got
25  out on a hardship discharge.

Page 49

1    Q. What division?
2    A. When I was in Germany I was with the Third
3 Infantry Division.
4    Q. What is MOS?
5    A. Military Occupational Specialty.
6    Q. What is that?
7    A. It's your job, basically. They categorize
8 the jobs in the military, for example, with certain
9 numbers. The number that applied to what I had done
10 in the military was between a 63 Bravo and a 63
11 Charlie 40, which indicated that I was a track and
12 wheeled vehicle mechanic.
13    Q. And you're originally from Ohio, I mean,
14 Illinois.
15    A. Yes, sir, Chicago.
16    Q. Chicago?
17    A. Yes.
18    Q. You've lived here for about 15 years. What
19 brought you here?
20    A. Well, I was working for a school, a variety
21 of schools in the United States, they asked me to
22 school and they asked me to come down here and run the
23 one that was in Grand Prairie. So I started out as an
24 instructor in Chicago and worked there for a while and
25 then got promoted and came down here to take care of

Page 50

1 that school and worked for them for probably pretty
2 close to about 12 years I think it was.
3    Q. And you have two children, correct, 11 and
4 13?
5    A. I've got two at home living with me now.
6 I've actually got more than that. I got two
7 step-children and two children from my previous
8 marriage.
9    Q. How old are they?
10    A. Twenty-eight and 32. Pretty much both
11 step-children or my wife's children are the same age.
12    Q. Do you have any grandchildren?
13    A. Grandchildren, yes. Actually when you boil
14 all of the fat out of this conversation, the two
15 children that are with me now started out to be my
16 grandchildren, but my daughter couldn't take care of
17 them, so we've raised them. And as far as they're
18 concerned, as far as I'm concerned, we're mom and dad.
19    Q. Well, I think that's wonderful.
20    A. Thank you.
21    Q. Let me ask you, you understand when somebody
22 gets charged with a crime, regardless of what it is,
23 certain constitutional rights attach to that person
24 accused; do you understand that?
25    A. Yes.

Page 51

1    Q. And the very first one that attaches is what
2 we call the presumption of innocence. You've heard of
3 that, haven't you?
4    A. Yes, sir.
5    Q. And what concerns me, Mr. Marshall, and we
6 ask these questions and I know it's time-consuming to
7 fill them out and we appreciate that. But when we ask
8 you if the State charges someone with murder, that
9 person is probably guilty. And you agreed with that
10 statement. And then we asked you if a person is
11 brought to trial on murder charges, that person is
12 probably guilty and you agreed with that also.
13    And so that's kind of designed to see how
14 you feel about this presumption of innocence. And I
15 understand you may not have thought about that
16 particular legal concept, but you can see where that
17 would concern me in defending my client here in thi
18 criminal action, couldn't you?
19    A. I think I can understand your point of view,
20 but at the same time it was my contention that when I
21 filled that out, or at least my way of thinking was
22 that if, in fact, that the State did their or the city
23 or police officers or whatever, that if they didn't
24 believe that they had a case, chances are that person
25 wouldn't be sitting in jail to begin with.

Page 52

1    Q. And that's what I want to talk to you about
2 a little bit here. Because a lot of people feel that
3 way. A lot of people feel that because a person has
4 been arrested and confined and charged with an
5 offense, that that is some indication of guilt.
6    Would that be an accurate statement about
7 how you feel?
8    A. Could you repeat that for me again, please?
9    Q. Well, some people feel that if the police
10 arrest somebody and they put 'em in jail and the DA,
11 the district attorney charges that person with an
12 offense and, in fact, the grand jury hears some
13 evidence and they indict that person, that some people
14 think that's an indication of guilt.
15    Do you feel that way?
16    A. I believe that a person that is charged with
17 something, that there is enough evidence to indicate
18 that that person is probably guilty of that particular
19 offense or that person would not -- the State would
20 have not spent as much money to do all of the things
21 that they have to do if they believe that, well, yeah
22 this is an innocent person and, well, we ain't got
23 nothing better to do, so let's just pick on this
24 person.
25    Q. And, you know, that's fine. I guess my

Page 53

1 question would be this, then. Judge Gill, he's the
2 judge of the law in this case. The jury, they're the
3 judge of the facts. And the jury gets the facts from
4 that witness stand, but they get the law from Judge
5 Gill.
6        And the law says that the fact that a
7 person, and you'll be instructed this by Judge Gill,
8 the fact that a person has been arrested or confined
9 or indicted for an offense, you can't take that as any
10 indication of guilt whatsoever, okay?
11   A. Okay.
12   Q. That's what the law and the instructions
13 would be.
14        And my question to you is knowing how you
15 feel about that, do you think that you could set your
16 feelings aside and follow that law that Judge Gill
17 would give you? Or would there be some kind of
18 lingering in the back of your mind, gosh, I know Judge
19 Gill just told me I can't take all this into
20 consideration, but, by golly, the police have gone to
21 this trouble, the DA has gone to this trouble, that's
22 some indication of guilt to me?
23   A. Maybe I'm not explaining this right. But as
24 I said earlier, the evidence is going to prove whether
25 or not that person is, in fact, guilty or not guilty,

Page 54

1 okay? I guess what I'm trying to say is that just
2 because a person makes a presumption doesn't
3 necessarily mean that that is going to weigh in a
4 person's decision. You can presume that that person
5 was brought to trial because of the fact that the
6 State or the city or county or whoever it may be
7 believes that that person and that they have
8 sufficient evidence to indicate that that person did
9 this particular crime. I guess that's what I'm trying
10 to say. But the evidence that is brought within the
11 trial is going to prove that this either did or did
12 not happen.
13   Q. So correct me if I'm wrong. Then the fact
14 that a person has been arrested, has been charged, has
15 been indicted, that wouldn't affect you in holding, in
16 affording a presumption of innocence?
17   A. No. I think that as the evidence is
18 presented, that the evidence will weigh as to what
19 decision has to be made based on what is heard and
20 what is seen.
21   Q. Okay. And, sir, I appreciate your stance on
22 that, that the evidence, it's all based on the
23 evidence. But what we've got here is we can't talk
24 about the case. We can't talk about the facts of this
25 case, okay? All we can talk about now is what the law

Page 55

1 is and how it applies and how you feel about the law.
2 That's why I asked you about if it would affect you
3 knowing that a person had been arrested and indicted.
4 You know, how you truly feel about that before we even
5 get to the evidence. That's what's important here,
6 okay?
7        And I know you-- and I'm not trying to
8 argue, I'm just trying to get to your true feelings
9 about this because you told me earlier that the fact
10 that a person has been arrested, indicted, that there
11 must be something there, correct?
12   A. Well, that would be my opinion, yes. I
13 mean, in other words, to me that if I'm going to
14 accuse you of something, then I'm going to make darn
15 sure that what I'm accusing you of, I've got something
16 to back me up. And that's the way I feel about it.
17   Q. Okay.
18   A. But is it going to affect how I make a
19 decision? No. It's going to be based on the facts
20 that are presented.
21   Q. Okay. And along those same lines, this
22 right to remain silent, a person doesn't have to
23 testify in their own behalf. We asked you the
24 question even though the law says a defendant has a
25 right to remain silent, an innocent person accused of

Page 56

1 murder would testify if he was innocent and you agreed
2 strongly with that statement.
3   A. That would be my personal feelings, yes. In
4 other words, I just kind of looked inside myself and I
5 said if I was accused of something that I didn't do,
6 would I get up and say something? And I would. And I
7 would think that most people, in my opinion, that were
8 innocent of a crime, whatever it may be, would do the
9 same.
10        Now, as the young lady there presented
11 before, I'm sure that there's situations to where a
12 person might not feel comfortable doing that or
13 whatever. But again, I only base that on what I
14 thought was a true statement, my feelings, I guess.
15   Q. And if Judge Gill were to tell you in his
16 instructions that if a person does not testify, you
17 cannot consider that as evidence at all, could you
18 follow that instruction?
19   A. Yes.
20   Q. Couldn't go back there in the jury room and
21 say well, you know, I've heard all this, but we didn't
22 hear from him, so I'm going to kind of hold that
23 against him?
24   A. No, no.
25   Q. We asked you, "Which of the following

Page 57

1 describes your view of the death penalty as applied to
2 the offense of capital murder?" And you checked
3 "Appropriate in all cases where someone has been
4 murdered."
5    Do you remember that?
6    A. Vaguely. But, I mean, I remember the
7 question. Again, as I explained earlier, my thoughts
8 on that, for example, and I go back to the case where
9 they dragged that gentleman through the street and
10 killed him. I have no qualms about what they did to
11 those people to be perfectly honest with you. The
12 same thing with those fellows that shot that Irving
13 cop for no apparent reason, just because of the fact
14 that they didn't have nothing better to do. We don't
15 need people like that in this country.
16    Q. And you felt that way before you filled this
17 questionnaire out, I would assume, didn't you?
18    A. Yeah. Whether I answered that 100 percent
19 correctly or whether I worded it wrong, that's the way
20 I feel.
21    Q. That's okay. Your answer is your answer.
22 There's no inappropriate answer here.
23    A. I mean, it's my opinion that a person does
24 not have the right to take another person's life
25 unless it's in an act of self-defense. And that's the

Page 58

1 bottom line. I don't believe in hurting people. I
2 mean, that's just the type of individual that I am,
3 okay, unless it's in the act of self-defense.
4    Q. Okay.
5    A. And that's my opinion.
6    Q. If somebody were acting in self-defense,
7 what should it be?
8    A. I'm sorry, I didn't hear that.
9    Q. If someone took another's life in
10 self-defense, what kind of offense do you think that
11 ought to be?
12    A. Well, I believe that if a person was
13 defending themself against somebody that was trying to
14 kill, maim or hurt and it resulted in another person's
15 death, then that's what it is. I believe it's
16 self-defense. I don't believe that there's any
17 criminal activity that took place.
18    Q. And the reason I ask you that, kind of along
19 the lines of an accident. You know, say you're
20 driving down the street and I walk out against a red
21 light and you run into me and kill me, that's an
22 accident. That's not a criminal act.
23    Would you agree with that?
24    A. Now, if you come out of a bar and you've
25 been drinking and you run over my kid, then I say that

Page 59

1 that's a different story. That's, you know, that's
2 not an accident.
3    Q. Okay. And the reason I asked you that is on
4 one of these questions where we ask you about what are
5 some factors that would be important to you in
6 determining whether a person who's been convicted of a
7 crime where the death penalty is appropriate deserves
8 the death penalty, you answered, "Was it premeditated
9 or accidental? Was it committed out of hate?"
10    Could you tell me what you were feeling when
11 you answered that?
12    A. Well, back to your original question is that
13 if you had walked out of a -- was walking across
14 the street and I wasn't paying attention and I
15 accidentally hit you with my car, it was an accident.
16 It's an unfortunate accident, but in either event
17 it's still an accident.
18    Premeditated is where a person sits back
19 and, in my opinion, considers all the options of how
20 they're going to go about killing somebody is
21 completely different. And I believe that if a person,
22 and it's proven beyond any reasonable doubt that this
23 was premeditated and there was forethought and that
24 they'd planned this and then they carried out that
25 plan, then as far as I'm concerned, the death penalty

Page 60

1 would apply.
2    Q. Okay. And --
3    A. Now, on that last part, there was a third
4 answer, but I can't remember exactly what it was that
5 you told me.
6    Q. All right. Let me ask you this, then. And
7 I appreciate the way you feel about if somebody kills
8 another person intentionally. That's what our law
9 provides. You understand that. That person, it was
10 their conscious objective and desire to take another
11 person's life, that's what our law says; you
12 understand that?
13    A. Yes.
14    Q. In other words, that dragging somebody to
15 death, that was their conscious objective and desire
16 evidently from the outcome that they wanted to kill
17 that person, wouldn't you think?
18    A. That would be my opinion, yes. And the way
19 I would understand it is that the only reason for it
20 was because of the fact that the gentleman was not of
21 the same color as they were. And that's my
22 understanding of the situation.
23    Q. And if I get the way you feel correctly, if
24 I understand, that if a person intentionally takes the
25 life of another person, it's not self-defense, it's

Page 61

1 not insanity, there is no legal justification for it,
2 then if you find beyond a reasonable doubt that that's
3 true, then that person deserves the death penalty.
4      A. I said that that applies, yes.
5      MR. MOORE: Judge, at this point we'll
6 challenge him for cause.
7      THE COURT: On what grounds?
8      MR. MOORE: On, I guess, the inability to
9 follow the statutory scheme in answering the special
10 issues.
11     THE COURT: You haven't explained the
12 statutory schemes. The questions weren't asked in the
13 context of the statutory schemes. The challenge is
14 denied.
15     Q. (BY MR. MOORE) Well, here's what I'm
16 getting at. Is you've been explained that there are
17 two phases to a trial, correct?
18     A. Yes.
19     Q. The first phase is the guilt/innocence
20 phase, just whether or not the State, who has the
21 burden of proof, can convince 12 people beyond a
22 reasonable doubt that this person is guilty of capital
23 murder; you understand that?
24     A. Yes, sir.
25     Q. And if they do that, then what they've

Page 62

1 proved is that this person, it was their conscious
2 objective and desire to kill two people in the same
3 episode, okay? That's what you found, that there
4 wasn't any legal excuse, there wasn't any
5 self-defense. You found beyond all doubt, beyond all
6 reasonable doubt, that that person wanted to take the
7 life of these two people and, in fact, did take the
8 life of these people, okay?
9      A. Okay.
10     Q. After you found that person guilty of that,
11 then you understand we go to a second stage. And that
12 second stage is when you have to answer three
13 questions about will the person probably commit acts
14 of violence in the future; you understand that?
15     A. Yes, sir.
16     Q. And my question to you is if how you feel,
17 how you've explained that you feel to us if you found
18 that person guilty, would that first special issue
19 even matter to you?
20     A. All I said before was that if the person was
21 found guilty beyond a reasonable doubt, that the death
22 penalty would apply. I mean, he would be or she would
23 be eligible to receive the death penalty for the
24 crimes that they performed.
25     Q. Okay. Could you consider, after you had

Page 63

1 found somebody guilty --
2      A. It has to be considered. But that doesn't
3 mean that I won't come back and say no, I believe that
4 this person should be put to death.
5      Q. Okay. So if you found a person guilty of
6 capital murder as it's been described, the intentional
7 taking of life, then you won't rule out a life
8 sentence?
9      A. It cannot be ruled out until everything is
10 all said and done. I guess what I'm trying to say is
11 that if there are some type of mitigating
12 circumstances that would sway me to believe that this
13 person deserved something other than the death
14 penalty, then yes, that would be considered.
15     Q. Okay. And you understand what mitigation
16 is?
17     A. As I explained earlier, situations that
18 change the outcome of something, I guess, is the best
19 way I can put it.
20     Q. Would you like a glass of water?
21     A. Oh, please. Thank you.
22     MR. RAY: You didn't know we could think of
23 this many questions, did you?
24     VENIREPERSON MARSHALL: I thought you
25 could. Thank you.

Page 64

1      Q. (BY MR. MOORE) Earlier, and I took down a
2 little note here about mitigation. I put that you
3 said something to cause him to change his opinion.
4      A. Yeah.
5      Q. Would that be accurate?
6      A. Yes, that sounds like what I said.
7      Q. Okay. Here's my question to you at this
8 point. On the number one, you've found somebody
9 guilty of capital murder and so here we go to this
10 Special Issue No. 1, whether there's a probability
11 that the defendant would commit criminal acts of
12 violence that would constitute a continuing threat to
13 society, okay? And you have to be convinced beyond a
14 reasonable doubt by the State's evidence that that's
15 going to happen; do you understand that?
16     A. Right.
17     Q. Now, the Judge --
18     MR. MOORE: Can I stand up?
19     THE COURT: Uh-huh.
20     Q. (BY MR. MOORE) The Judge is going to also
21 instruct you regarding this first special issue that
22 in deciding whether there's a probability that the
23 defendant would commit criminal acts of violence that
24 constitute a continuing threat to society, he's going
25 to tell you this. That when you're deliberating on

Page 65

1 that issue, you're instructed to consider all the
2 evidence admitted at the guilt/innocence stage and the
3 punishment stage, including evidence of the
4 defendant's background or character or the
5 circumstances of the offense that militates for or
6 mitigates against the imposition of the death penalty,
7 okay?
8    A. Yes, sir.
9    Q. A lot of words. But it's telling you, look,
10 when you're deciding whether or not there's a future
11 danger of this person committing acts of violence, we
12 want you to consider everything. And when you
13 consider everything, you've got to, all 12 of you
14 agree beyond a reasonable doubt that that's true to
15 answer yes, we do. If you answer no, it's a life
16 sentence; you understand that?
17    A. Yes, sir.
18    Q. But say all 12 of you read that, followed
19 that instruction and decided yes, taking into
20 consideration all that, we think he's going to be a
21 future danger to whatever society he's in.
22       Then we're going to look at this last
23 special issue. Whether, taking into consideration all
24 of the evidence, including the circumstances of the
25 offense, his character and background and personal

Page 66

1 moral culpability, there is a mitigating circumstance
2 or circumstances to warrant a sentence of life rather
3 than death.
4       Now, if I can understand you right,
5 mitigation means to change somebody's opinion,
6 correct? So if you've already found this person
7 guilty of capital murder and you have strong feelings
8 about the death penalty, correct?
9    A. I don't know if you want to call them
10 strong, but I do believe in it.
11    Q. Okay. You've found that person guilty of
12 capital murder beyond a reasonable doubt, you've found
13 beyond a reasonable doubt taking all that into
14 consideration that he's going to be a danger to
15 society, is there anything you can think of on this
16 mitigation issue where you could ever answer that
17 yes? And we're just looking for the way you truly
18 feel, because the whole scheme is designed to be fair
19 to the person accused, okay?
20    A. Uh-huh.
21    Q. And, you know, if you say look, I found this
22 guy guilty of killing two people intentionally, he's
23 going to be a future danger beyond all doubt in my
24 mind, that third special issue can just go out the
25 window, there's nothing there for me to consider, you

Page 67

1 know. And if you truly feel that way, we all need to
2 know. And you would need to know.
3    A. I just can't think of anything at this
4 particular point in time that comes to my mind that
5 would cause that last part to change. I mean, in my
6 opinion, if that person was found beyond a reasonable
7 doubt guilty of the crimes that they were charged
8 with, and that they did pose a threat or future threat
9 to, in your words, whatever society that they lived
10 in, then at this point in time I can't think of
11 anything that would change me from coming back and
12 saying no, that I believe that the death penalty would
13 apply in that particular instance.
14    Q. So the answer to that mitigation issue would
15 be no?
16    A. I mean, I wouldn't just say I'm going to
17 throw it out the window because I don't feel like
18 paying attention to it. I'm saying I can't think of
19 anything right now off the top of my head that may
20 cause something like that. And again, maybe I'm not
21 bright enough to follow exactly where you're trying to
22 take me. But at this point in time, no.
23       MR. MOORE: We'd renew our challenge for
24 cause, Judge, that he can't consider the mitigation
25 special issue.

Page 68

1       THE COURT: If there was something that came
2 up that you thought was mitigating, would you give it
3 consideration before you answered that question?
4       VENIREPERSON MARSHALL: Yes.
5       THE COURT: Denied.
6       VENIREPERSON MARSHALL: But I just can't
7 think of anything right now. When you asked me if I
8 could think of any mitigating circumstances, nothing
9 comes to mind right now.
10    Q. (BY MR. MOORE) And when we talked about it
11 was your opinion, mitigation was something that would
12 change your opinion, correct me if I'm wrong, but
13 after you've found somebody guilty of capital murder
14 and found somebody to be a future danger, that would
15 be your opinion that they were worthy, should get the
16 death penalty, correct?
17    A. That I think that it would apply to that
18 particular individual. Now, if there's something else
19 there that somebody can present to me that may make
20 that option or may make my opinion change because of
21 something that I hadn't heard before or hadn't seen
22 before, then I would still entertain the thought of
23 saying okay, well, now I got to rethink this. And
24 there is a possibility to change my mind, yes.
25    Q. So find somebody guilty of capital murder as

Jury Voir Dire Proceedings 8-19-03 Multi-Page™ State of Texas vs. Billy Jack Crutsinger Vol. 4

Case 4:07-cv-00703-Y Document 86 Filed 11/04/17 Page 105 of 143 PageID 2523

Page 69

1 we've talked about, find they're a future danger to
2 society, you're not automatic on giving the death
3 penalty?
4      A. No. I said the death penalty applies to
5 that individual, okay?
6      MR. MOORE: Judge, could we take something
7 up outside the presence of the juror?
8      THE COURT: Would you mind stepping out in
9 the hallway very briefly, sir? We'll be right back
10 with you.
11      (Venireperson Marshall exits the courtroom.)
12      MR. MOORE: Judge, at this time subject to
13 your approval obviously, the State and the defense
14 would agree to excuse Mr. Marshall.
15      THE COURT: We spent an hour and a half.
16 Why do you want to agree now?
17      MS. HARTMANN: Well, actually there was an
18 offer earlier.
19      THE COURT: Here's what we'll do. I will
20 allow y'all to excuse this guy by agreement. In the
21 future, if we start talking to somebody, no
22 agreements. Don't ever waste an hour and a half.
23      MR. MOORE: I understand and I appreciate
24 that, Judge. There was -- I mean, you just don't ever
25 know until you actually get into some of these areas

Page 70

1 with them.
2      THE COURT: That's true. And that's what
3 challenges for cause and peremptory challenges are
4 for.
5      Could we have Mr. Marshall step back in,
6 please?
7      (Venireperson Marshall enters the courtroom.)
8      THE COURT: Mr. Marshall, I want to thank
9 you very much for the time you spent down here today.
10 You are free from any further obligation here and
11 allowed to go about your business.
12      Thanks again for your time.
13      VENIREPERSON MARSHALL: Thank you.
14      (Venireperson Marshall exits the room.)
15      (Break taken.)
16      THE COURT: All right. We need Mr. John
17 Morgan, please.
18      (Venireperson Morgan enters the courtroom.)
19      THE COURT: Good morning.
20      VENIREPERSON MORGAN: Good morning.
21      THE COURT: Please raise your right hand.
22      (Venireperson Morgan sworn.)
23      THE COURT: Your name, please?
24      VENIREPERSON MORGAN: John Morgan.
25      THE COURT: Mr. Morgan, this will begin your

Page 71

1 individual interview. And during this interview the
2 State of Texas seated at the table right there in
3 front of you and then the defense at the table more to
4 the right are going to have the opportunity to ask you
5 questions regarding your background and qualifications
6 to be a juror in this type of case.
7      The State is represented by Ms. Michele
8 Hartmann.
9      MS. HARTMANN: Good morning.
10      THE COURT: And Ms. Lisa Callaghan.
11      MS. CALLAGHAN: Good morning.
12      THE COURT: The Defendant is represented by
13 Mr. Tim Moore and Mr. Bill Ray.
14      MR. RAY: How are you doing this morning?
15      THE COURT: And the Defendant is Billy Jack
16 Crutsinger at the end of the table.
17      Both sides are going to want to know how you
18 feel about different areas of the law that are going
19 to be a part of the trial of this case. They're going
20 to explain to you how the law works and then ask you
21 how you feel about it.
22      Based upon the oath you just took a second
23 ago, your only obligation to us at this point of the
24 trial is to tell us how you honestly feel about these
25 matters, because there are no right or wrong answers

Page 72

1 to any of the questions they're going to be asking
2 you.
3      VENIREPERSON MORGAN: Okay.
4      THE COURT: State may proceed.
5      MS. CALLAGHAN: Thank you, Your Honor.
6      JOHN MORGAN,
7 having been duly sworn to make true answers to such
8 questions as may be propounded by the Court or under
9 its direction, touching upon his service and
10 qualification as a juror, gave answers as follows:
11      VOIR DIRE EXAMINATION
12 BY MS. CALLAGHAN:
13      Q. Good morning, sir, how are you?
14      A. Good morning, fine.
15      Q. Good. You've been out here a long time,
16 haven't you?
17      A. I brought a book.
18      Q. What are you reading today?
19      A. It's a certification book on Unix.
20      Q. Unix, oh, okay. My name is Lisa Callaghan.
21 This is Michele Hartmann. Together we represent the
22 State of Texas. And as the Judge mentioned to you,
23 this is a capital murder case in which the State is
24 seeking the death penalty.
25      Now, you've been a juror before, right?

Page 73

1    A. Yes, I have.
2    Q. So you can tell this is quite a bit
3 different from the usual way that jury selection is
4 done?
5    A. Yes, it is.
6    Q. Well, the reason we brought you down here
7 individually is so that we could talk to you about
8 what the law is in a case like this so that you would
9 know and understand it, and also to talk to you about
10 issues relating to the death penalty so that we could
11 find out whether or not you would be able to be fair
12 and impartial on all aspects of that law, or are there
13 issues that you have personal experience with or
14 personal feelings that might cause you a problem in
15 that area, okay?
16    A. Okay.
17    Q. So it's very important during this phase
18 that if you don't understand or you're not sure about
19 something that I ask, let me know because we won't get
20 a chance to talk again as you know.
21    A. Okay. I will.
22    Q. So before you leave this room, you want to
23 understand everything fully, okay? There's no right
24 or wrong answers. We're not looking for anything in
25 particular other than just your honest response to

Page 74

1 things.
2    A. I understand.
3    Q. Okay. Now, what we anticipate is that this
4 case probably would actually be tried in September,
5 the week of September 22nd. It could take anywhere
6 from five days to two weeks.
7       Would that cause you a scheduling problem?
8    A. The only conflict I had was a four-day trip
9 to visit my sister that's already been paid for. That
10 was -- let me confirm that date. It was October 9th
11 through October 13th.
12    Q. I wouldn't think that would be a problem for
13 you.
14    A. Okay.
15    Q. And the second thing is it's possible that
16 when evidence is being presented to jurors that they
17 would have to be sequestered in the evenings, meaning
18 that you would have to stay at a hotel as a group, not
19 in the same room, of course, but that you would have
20 to stay in a hotel as a group and you would not be
21 able to be in touch with your home and family really
22 much.
23       Is that a problem for you or could you do
24 that?
25    A. No, that's not a problem.

Page 75

1    Q. Okay. All right. So you're ready to bring
2 your toothbrush and jammies and join us?
3    A. If necessary, yes.
4    Q. Let's talk a little bit about how criminal
5 trials go. As you know, criminal trials are like two
6 mini-trials. The first trial is concerned only with
7 the guilt or innocence of a given defendant. And
8 that's the only kind of evidence you hear, is that
9 relating to guilt or innocence. If the defendant is
10 found guilty, then you proceed to the punishment
11 phase. If they're found not guilty, of course you
12 don't and that ends it right there.
13       But if you proceed to the punishment phase,
14 then you get to hear evidence that relates to issues
15 involved in punishment, that is, a person's character,
16 either good or bad character, evidence of previous
17 history of crimes, evidence that relates to their
18 entire life history so that you can place the act
19 they've just been convicted of in the context of their
20 whole life so that you can see the big picture. The
21 crime is like a snapshot. You get the whole photo
22 album in punishment.
23       Does that make sense to you?
24    A. Yeah, I'm familiar with that.
25    Q. Okay. All right. The State goes first, of

Page 76

1 course, in everything. You know that?
2    A. Pardon me?
3    Q. The State goes first in everything. You
4 know that from having previously been a juror? We
5 argue first.
6    A. Yeah. I had forgotten that.
7    Q. Well, consider this a refresher. The State
8 argues first, the State puts on evidence first.
9 That's because we have the burden of proof. The
10 burden is on us to prove the case. And if we fail in
11 proving the case, then there's a presumption of
12 innocence, the defendant is presumed to be innocent
13 and the State must produce evidence that overcomes
14 that burden.
15       Does that make sense to you?
16    A. Yes, certainly.
17    Q. All right. So that's why we argue first,
18 that's why we put on evidence first. And in final
19 argument, we go both first and last because the burden
20 is ours, okay?
21       Now, let's talk a little bit about burden of
22 proof. You'll recall this from when you were a juror
23 last time. The State must prove its case beyond a
24 reasonable doubt, okay? There is not a technical
25 definition of beyond a reasonable doubt. But it most

Page 77

1 certainly does not mean beyond any doubt or all doubt,
2 okay?
3        Do you have any brothers or sisters?
4    A. Yes, I have a twin sister and a brother.
5    Q. Okay. Have you ever gotten together at a
6 holiday with them and talked to them about things that
7 happened when you were children?
8    A. Oh, yes.
9    Q. Did they necessarily remember it the same
10 way you do?
11    A. No.
12    Q. Okay. And why do you think that is?
13    A. Probably just perceptions are different and
14 memories are better in some cases.
15    Q. Okay. Well, every human being is going to
16 remember something in their own way, correct?
17    A. Yes.
18    Q. Pretty much?
19    A. Yeah, I think so.
20    Q. So you would not expect any two witnesses to
21 remember even a single event the same way precisely?
22    A. No, probably not.
23    Q. That is largely why the State's burden is
24 beyond a reasonable doubt as opposed to beyond any
25 doubt or all 100 percent shadow of a doubt. In order

Page 78

1 to know something 100 percent, no question, how would
2 you have to know it?
3    A. To know something 100 percent?
4    Q. Uh-huh.
5    A. Well, you would have to certainly be there
6 when the event occurred and be very observant as to
7 what was happening.
8    Q. Yeah. You'd have to be a witness, wouldn't
9 you?
10    A. Yeah.
11    Q. And if you were a witness you couldn't be a
12 juror, you'd be up on the witness stand, right?
13    A. Right.
14    Q. So the State's burden is beyond a reasonable
15 doubt. Do you feel like you could follow that burden?
16    A. Yes, I do.
17    Q. Do you feel like you would hold the State to
18 a higher burden than that in a case of this importance
19 or do you think you could stay with beyond a
20 reasonable doubt?
21    A. Well, like you say, that's a loose
22 definition of reasonable doubt. And that's somewhat
23 subjective. But yes, I believe so.
24    Q. Okay. I think a witness list was presented
25 to you when you were waiting?

Page 79

1    A. Yes, it was.
2    Q. Did you know anybody on that list?
3    A. No, I did not.
4    Q. Now, let's talk a little bit about the
5 elements of capital murder. The elements are the
6 pieces of the puzzle we have to prove in order to
7 prove the completed crime. And that's all we have to
8 prove. We don't to have to prove anything beyond
9 that, okay?
10        Capital murder is a regular murder, a plain
11 Jane murder, plus an aggravating circumstance, a
12 special circumstance which makes it capital. The
13 majority of crimes that are tried as murder cases are
14 not capital. Only in very selected certain
15 circumstances is a person charged with capital
16 murder.
17        So let's look here and see what the elements
18 of murder are. In order to prove murder, the State
19 must prove that a given defendant in Tarrant County,
20 Texas, on or about a certain date, did intentionally
21 cause the death of an individual by, and then whatever
22 the manner and means of their death was: Shooting,
23 stabbing, drowning, running over with a car,
24 whatever. So basically that they intentionally caused
25 the death of the individual by a certain manner and

Page 80

1 means, okay?
2    A. Yes.
3    Q. That's murder. Now, what can make it
4 capital murder? Well, you have to have certain
5 specific circumstances. For example, the intentional
6 killing of a child under six is capital. The
7 intentional killing of a police officer or a fireman
8 in the course of their duty is capital. Killing
9 during the course of committing another crime like
10 aggravated robbery, kidnapping or sexual assault, that
11 is capital murder. You might see those most often in
12 the context of like a convenience store robbery in
13 which they shot the clerk, something like that.
14        And finally and we'll focus on this more
15 because this is the one that's significant in this
16 case, the intentional killing of more than one person,
17 okay? If it's during the same criminal transaction,
18 the same criminal episode essentially, within the same
19 prolonged series of events, if you killed more than
20 one person, it could be two or upwards, then that is a
21 capital murder, okay?
22    A. Okay.
23    Q. Does that make sense to you?
24    A. Yes, it does.
25    Q. Okay. Because if it doesn't, be sure and

Page 81

1  let me know.
2      A. I will.
3      Q. So here are the elements for capital murder
4  that we must prove.  Defendant, Tarrant County, on or
5  about a certain date, intentionally caused the death
6  of more than one person and then we have to prove to
7  you the manner and means that we've put in the
8  indictment, which is the document that we use to
9  notify the defense and that we use to establish
10  whether or not we've proved all of our elements.
11  That's what leads us, okay, our map, our road map.
12      Anyway, these are the elements of capital
13  murder that we have to prove.  Now, let's look a
14  little more closely at some of those terms in there
15  because they have technical definitions, some of them,
16  okay?
17      Do you see where it says on or about a
18  certain date?
19      A. Uh-huh.
20      Q. All that we have to prove is that the
21  offense occurred before the date of the return of the
22  indictment and within the statute of limitations,
23  okay?
24      Today is what, the 19th?
25      A. I believe so.  Yeah, it is.

Page 82

1      Q. All right.  If an indictment in this case
2  was returned today, we'd have to prove any day before
3  today, as long as it was within the statute of
4  limitations.  Well, generally in murder cases there is
5  no statute of limitations, okay?  So generally we just
6  have to prove that it occurred before the date of the
7  return of the indictment.  And any day in there would
8  be good enough.
9      Is that all right?
10      A. Yes.
11      Q. Intentionally.  By intentionally we mean
12  when it is a person's conscious objective or desire to
13  cause the result, okay?  They meant to do it.
14      Pretend I came up and shook your hand,
15  okay?  How did you know I wanted to shake your hand?
16      A. Because you extended your hand.
17      Q. Would you agree with me that people often
18  signal to you what their intent is by things that they
19  do as opposed to what they just say?  People don't
20  always announce their intent verbally, in other words?
21      A. Most certainly.  Body language or gestures
22  and different things.
23      Q. Yeah.  And by the actions they take?
24      A. Yes.
25      Q. So you think that you could determine what a

Page 83

1  person's intent was from what they do as opposed to
2  requiring them to say it out loud, that their actions
3  could tell you what a person's intent was?
4      A. Generally I would say that, yes.
5      Q. Okay.  Now, nowhere up there in that list of
6  things the State has to prove do you see the word
7  premeditated, correct?
8      A. No, I don't.
9      Q. Okay.  That's because the State is not
10  required to prove premeditation.  And by premeditation
11  I mean thinking it out in advance or planning the
12  crime.  That is something you can always use in
13  determining what punishment is appropriate.  But it's
14  not required for guilt/innocence that the State prove
15  it.  Intent can arise like that, okay, and still be
16  intentional.
17      For example, let's suppose -- let's suppose
18  my co-counsel and I here hate each other's guts, okay,
19  and I go out, I have a gun with me, I habitually carry
20  one and I'm going out on the street.  I don't see her
21  earlier that day, I don't have any plan to kill her,
22  no plans to do anything whatsoever, but I'm on the
23  street and she happens to go down the opposite
24  sidewalk, sees me and begins yelling obscenities at
25  me.  And I decide, well, that's it, I'm not going to

Page 84

1  take it from that so and so.  Boom.
2      Can you see where intent can arise very
3  quickly?
4      A. Yes, certainly.
5      Q. All right.  Now, if the State has proven
6  these elements beyond a reasonable doubt and a jury
7  has convicted someone of capital murder, then you go
8  on to the punishment phase, okay?
9      A. And that's where the premeditation would
10  maybe ameliorate sentencing or something based on it?
11      Q. In the punishment phase if there was
12  evidence of premeditation, that could be something you
13  could consider.
14      A. Or lack of that, yeah.
15      Q. Or lack of that.  And you could consider for
16  whatever it means to you.  There is no requirement
17  that you consider it at all.  But if you felt like it
18  was important, you could consider it.
19      In the punishment phase of a death penalty
20  case, okay, you don't just vote I want life, I want
21  death.  It doesn't work that way.  The way it happens
22  is that the Judge presents you with a jury charge that
23  contains two questions.  Those questions are called
24  special issues, okay?  And the answers that you give
25  to each of those two questions separately indicates

Page 85

1 whether or not the Judge is to sentence someone to
2 life or death. It depends on what answers you give to
3 those two questions, okay?
4       If you give the answer that indicates life,
5 the Judge is required to do that. If you give the
6 answers that indicate death, the Judge is required to
7 do that as well. So he doesn't get to decide well,
8 yeah, maybe I'll accept this, maybe I won't. If the
9 answers are answered in a certain way, the Judge has
10 to follow that, okay?
11       So that's how it works. Why don't we go on
12 and take a look at what those two questions are, okay?
13    A. Okay.
14    Q. And here's the first question. They're in a
15 certain order and this is the first one you would
16 get. Why don't you take a moment and take a look at
17 that.
18    (Brief pause.)
19    A. Okay. That's fine.
20    Q. Okay. Now, before I go on to this first
21 special issue, there's two things I need to mention to
22 you. For a capital case, there are only two possible
23 punishments. One is life and one is death.
24       When we say life, what we mean is that the
25 person must serve 40 years before they are eligible

Page 86

1 for parole. Meaning that they must serve 40 years day
2 for day, no good time, no exceptions, 40 flat years.
3 And at that point the Board of Pardons and Paroles can
4 consider whether or not that person should receive
5 parole. They're eligible for it, but that doesn't
6 necessarily mean they'll get it when 40 years is up.
7 It just means that they can be considered for it.
8       Does that make sense?
9    A. Yes, it does.
10    Q. So when we say life, that's what we mean.
11 So let's go to Special Issue No. 1, future
12 dangerousness.
13       What does this mean to you?
14    A. Well, it means they could commit other
15 violent acts that would be a threat to society, you
16 know, other murders or other violent crimes.
17    Q. Okay. Very good. Most of these words are
18 not defined specifically. It says, "Do you find
19 beyond a reasonable doubt that there is a probability
20 that the defendant would commit criminal acts of
21 violence?" By probability, that is not defined for
22 you. What we know about it is that it means more than
23 a possibility, but less than a certainty, okay?
24       For example, have you ever flown on an
25 airplane, a commercial airplane?

Page 87

1    A. Yes, sure.
2    Q. Okay. Is it a possibility that that
3 airplane may crash?
4    A. Yeah.
5    Q. Always, anytime you fly.
6    A. Yeah.
7    Q. Is it a certainty that it would crash?
8 Would you get on it if it was a certainty?
9    A. No.
10    Q. What we can tell you about probability is it
11 lies somewhere in between possibility and certainty.
12    A. Okay.
13    Q. That the defendant would commit criminal
14 acts of violence that would constitute a continuing
15 threat to society. Criminal acts of violence is not
16 defined. It could mean anything from a property crime
17 like arson all the way up to another murder, or
18 anything in between. It means basically what you
19 think it means, okay? It's not required that another
20 murder be committed, but that is certainly one thing
21 you can consider. And since you can define it any way
22 you like, you can take into account any kind of
23 behavior that to you seems to be a criminal act of
24 violence, okay?
25       Does that make sense to you?

Page 88

1    A. Yes, it does.
2    Q. All right. And then it says that would
3 constitute a continuing threat to society. Society is
4 not defined, either. Society can mean all of us in
5 here, the people we see on the street, the people in
6 Tarrant County. For a person who is facing the
7 possibility of a life sentence or a sentence, it can
8 also mean the other people around them in the
9 penitentiary: Other prisoners, guards, nurses, people
10 who serve food, and all of the people who live within
11 that society itself.
12       Does that make sense to you?
13    A. Yeah, I hadn't looked at it that way. But
14 yes, it makes sense.
15    Q. So, you know, society basically is another
16 term that means what you think it means.
17       Now, the State's burden of proof on this
18 issue is beyond a reasonable doubt. Just like
19 guilt/innocence, the State must prove this issue,
20 special issue to you beyond a reasonable doubt.
21       Now, you could make a decision on this based
22 solely on the evidence of the offense for which the
23 defendant is being tried. You could look at that one
24 case and decide yeah, that's enough to say that person
25 is or is not a future danger. Or if you needed

Page 89

1 additional information, you could base it both on the
2 case on trial and on evidence you received in the
3 punishment phase as well. Once again, that's up to
4 you.
5        You know, if a certain act that the person
6 is being tried for is terrible enough, you might be
7 able to decide based on that alone. On the other
8 hand, you may require more. So it's perfectly up to
9 you in that circumstance as well, okay?
10        Now, is there any question you have right
11 now about this?
12    A. No, I don't.
13    Q. You feel like you understand it pretty well?
14    A. Yes.
15    Q. In order for that question to be answered
16 yes, and yes means that that's the first stop on your
17 traveling towards the death penalty, okay, you have to
18 answer that yes in order to proceed to the next
19 question towards the death penalty. In order to
20 answer it yes, all 12 must be able to agree, it has to
21 be a unanimous verdict. For it to be no, only ten
22 have to agree, okay?
23        So if it's answered no, that ends it right
24 there, the person gets a life sentence, that's what
25 happens. If he's not found to be a future danger, if

Page 90

1 the jury does not believe beyond a reasonable doubt
2 that he will be dangerous in the future, then that's
3 it.
4    A. You said if any one person does that or that
5 was the ten and 12?
6    Q. In order to reach a verdict of yes, all 12
7 have to agree. Because that means that's one step
8 closer to the death penalty. That has to be 12, 12
9 have to agree.
10    A. Okay.
11    Q. If the answer is going to be no, ten have to
12 agree. It has to be a verdict of ten at least. It
13 can be 12, but at least ten must agree in order to
14 answer the question no.
15        Okay. Is that clear?
16    A. Yes.
17    Q. So my question to you is taking all of this
18 into account, can you in your mind see a set of facts
19 where you would be able to find someone guilty of a
20 capital murder and then consider this question,
21 consider all the punishment phase evidence and decide,
22 you know, I just don't think that person is going to
23 be a future danger, my answer is no.
24        Do you think you could do that?
25    A. I think I could weigh the facts and could

Page 91

1 come up with an answer to that that would be based on
2 the facts and things brought out in the jury and past
3 history.
4    Q. Okay. If it seems to you that that person
5 would not constitute a continuing threat to society,
6 if from the evidence it seems to you that they are not
7 going to be a future danger, would you be able to
8 answer that question no?
9    A. Yes.
10    Q. And chips fall where they may, if it's a
11 life sentence, it's a life sentence?
12    A. Yeah, sure.
13    Q. On the other hand, could you conceive
14 of a set of circumstances where you could find someone
15 guilty of capital murder, review all of the facts that
16 are admitted to you and consider that question and
17 answer it, well, yeah, based on the facts here, I do
18 believe that person would be a continuing threat to
19 society?
20    A. Yes, I could.
21    Q. So you feel like when you hear the evidence
22 you could go into it not predisposed towards any
23 particular answer, but consider the facts and consider
24 the evidence and make a rational and impartial
25 decision?

Page 92

1    A. Yes, I could, yes.
2    Q. Okay. All right. Now, if a person gets the
3 death sentence, they have already been found guilty of
4 capital murder, this question has been answered yes,
5 so then we go to the second question that's asked
6 before the death penalty is imposed. You will never
7 get to the second question if you said no here, okay?
8        Why don't you take a minute and take a look
9 at that.
10    (Brief pause.)
11    Q. Are you ready?
12    A. Yes.
13    Q. Okay. This question is kind of different in
14 one sense in that there is no burden on either side,
15 there is no burden of proof. What this question is is
16 it's a fail-safe, okay? If you have gotten to the
17 point of finding the person guilty and answering that
18 first question yes, what this question permits you to
19 do is to sit back, take a deep breath, consider
20 everything that you have heard and decide whether or
21 not you think there is any factor there that says to
22 you this person should still get life, even though
23 you've answered those two previous questions the way
24 you have, okay?
25        It's a way of standing back from it, taking

## Page 93

1 a good close look and seeing if there's any factor
2 that makes you think well, yeah, I know he did this
3 and I know he's a future danger, but there's something
4 that to me is mitigating. And it appears to me from
5 the answer you gave on your sheet that you do
6 understand what mitigation means. That basically it's
7 something that lessens or reduces moral culpability
8 for a crime?
9     A. Yes.
10    Q. So this gives you the chance to sit back and
11 look. What is it about this person's background?
12 What is it about this person's moral culpability?
13 What is it that makes them suitable for the death
14 penalty or not suitable and therefore deserving of
15 life, okay?
16     Does that make sense to you?
17    A. Yes, it does.
18    Q. Okay. So, hold on just a minute. The word
19 mitigation doesn't have, once again, any specific
20 definition, okay? It is what it is to you. There are
21 some people that find, perhaps, if a person was abused
22 as a child it --
23     MR. RAY: Excuse me. Judge, I'm going to
24 object in regard to this second question, there is a
25 specific instruction that the Court gives to

## Page 94

1 mitigation.
2     THE COURT: Sustained.
3    Q. (BY MS. CALLAGHAN) What specific fact
4 circumstances are or are not mitigating is up to you,
5 okay? You can look at a specific fact, a piece of
6 evidence that's admitted before you and you can think,
7 well, some people might say that being abused as a
8 child is mitigating. In these circumstances, I don't
9 find it to be such.
10     Or, on the contrary, some people would not
11 say that having a drug or alcohol problem is
12 mitigating. Some people don't think it is. But in
13 this circumstance, I think it is.
14     Do you see what I mean?
15    A. Yes.
16    Q. There is no laundry list anywhere of things
17 that are or are not mitigating and you don't have to
18 place the same emphasis on it that other jurors do.
19 You don't have to agree with them on it, you know?
20 You get to consider every fact admitted before you and
21 determine basically three things about it. And this
22 is what you need to do. To look and determine, first
23 of all, whether or not you think that the evidence is
24 correct or true. Are these things true? Are they
25 fact, okay?

## Page 95

1     Second of all, if you find that they're
2 true, are they mitigating? They may or may not be to
3 you. And if they are mitigating thirdly, are they
4 sufficient mitigating circumstance to warrant that a
5 sentence of life imprisonment rather than death be
6 imposed, okay? So that's kind of the process that you
7 would go through in looking at the evidence, all
8 right? And you could look at stuff admitted by the
9 State, by the defense, either side doesn't matter,
10 okay?
11     Does that make sense to you?
12    A. Yes, it does.
13    Q. Okay. Now, we've gone over all that, let me
14 ask you this. Can you conceive of a set of
15 circumstances, can you envision one in which you would
16 find someone guilty of a capital murder, you would
17 find from Question No. 1 that they were a future
18 danger, but in considering this question, you would
19 sit back, consider all of the evidence and say, you
20 know, my answer to this is yes, I think that there is
21 a mitigating circumstance here that warrants a life
22 sentence instead of death. I just see this one
23 particular thing or two particular things as something
24 that lessens his moral culpability overall. And I'm
25 going to vote for yes.

## Page 96

1     Could you see, envision a circumstance in
2 which you would be capable of doing that?
3    A. Yeah. It's kind of contrary to the first
4 question. But you'd have to base it on facts and I
5 guess your own experience and come up with a decision
6 on it.
7    Q. Uh-huh. Well, there are some things that
8 conflict in those two questions without a doubt. But
9 there is absolutely nothing in either of those
10 questions that's completely black or white. It's all
11 a matter of degree if you see what I mean. So you may
12 decide on one hand, well, that person is a future
13 danger, yeah, that exists. But on the other hand, I
14 have to also take these other factors into account.
15     Does that make sense to you?
16    A. Yes, it does.
17    Q. Okay. I know that you work for DeVry,
18 right?
19    A. Yes, I do.
20    Q. So you work in kind of an IT field where
21 things are not quite so gray, fuzzy, you know?
22    A. Well, yeah. I deal a lot with logic and
23 programming and, you know, things that are very well
24 defined.
25    Q. Yeah. The law is not like that. The law

Page 97

1 does not contain much that is terribly well defined.
2 But anyway, do you see on the other hand circumstances
3 in which you could have found someone guilty, have
4 found that they are a future danger and you would
5 consider and fairly think and give credit and consider
6 all of the evidence, but where you would make the
7 decision, well, no, I just don't see anything that's
8 sufficiently mitigating?
9    A. Well, that would be my duty as a juror to
10 take everything into consideration and deal with it
11 fairly.
12    Q. Do you think you could answer that question
13 no, though, understanding that the death penalty would
14 result?
15    A. Yes, I could.
16    Q. Okay. Now, we've talked about this on both
17 sides as kind of an intellectual exercise so far, but
18 as a person, as a human being, sometimes people say,
19 you know, I believe intellectually in the death
20 penalty, I could answer those questions, but as a
21 person, as a human being, I just can't do this, I
22 cannot be personally responsible for this, for making
23 those decisions.
24    Do you feel like you personally could do
25 that?

Page 98

1    A. I think you have to kind of put yourself in
2 a different role and function a little more
3 objectively rather than subjectively and look at the
4 facts and make a fair determination based on that, not
5 on humanity of death penalty or otherwise. I believe
6 it is warranted in some cases, but, you know, you just
7 have to look at the facts and make an objective
8 decision without, you know, without bringing your
9 personal humanity into it if you can.
10    Q. Okay. So you feel like you could do that?
11    A. Yeah, I think I can.
12    Q. Now, let's go on to some other general
13 questions of law. And I've got a couple questions out
14 of your questionnaire to ask you and then that'll be
15 it for me.
16    Voluntary intoxication. If a person
17 voluntarily becomes intoxicated on drugs or alcohol,
18 that's not a defense to the commission of a crime,
19 okay, as long as you voluntarily took the stuff. That
20 doesn't mean that you can't consider it as mitigation
21 in punishment. That is, you know, if it's mitigating
22 is up to you whether that particular factor is or is
23 not mitigating. But it is not a defense to the
24 commission of the crime itself, okay?
25    Is that clear to you?

Page 99

1    A. Yes.
2    Q. All right. Now, let's talk a little bit
3 about evidence. 38.23, Code of Criminal Procedure,
4 there are some rules, laws, that law enforcement has
5 to follow in obtaining evidence. I'm sure on TV or
6 somewhere you've heard of Miranda warnings?
7    A. Yes.
8    Q. The law requires that those Miranda warnings
9 be given before a statement can be taken from a
10 person, okay? And in Texas, the rule is even stiffer
11 than it is in other states. You can't just give them
12 to them orally. If a person makes a written
13 confession, they have to be in writing at the top of
14 the page. And if they give a taped statement,
15 audiotape or videotape, it has to be at the beginning
16 of the tape.
17    Does that make sense to you?
18    A. Yes, it does.
19    Q. That's what the law is in this state. The
20 law is also that if the police do not comply with the
21 law in obtaining evidence like that, if they don't
22 follow the letter of the law and evidence is taken,
23 then that evidence may not be used against a
24 defendant, okay?
25    What a juror has to do is if they find that

Page 100

1 the evidence was illegally obtained, if it was taken
2 wrongly, then they have to put it aside and not
3 consider it, okay? Just put it to one side and
4 consider what remains in the case to see if they have
5 sufficient evidence to find someone guilty or not.
6 And if from the remaining evidence if they do, then
7 fine. If from the remaining evidence they don't,
8 however, then they must find that person not guilty,
9 because you remember from before from being a juror,
10 presumption of innocence cloaks a person. They're
11 presumed innocent until the State carries its burden
12 beyond a reasonable doubt, okay?
13    A. Yes.
14    Q. So that's what this means is that unless
15 evidence is taken legally, then you can't consider
16 it. And I'm sure that you can see why that is. You
17 cannot be in a position of rewarding the police or law
18 enforcement for not following the law. It's like --
19 do you have kids?
20    A. Yes, I do. I have a son.
21    Q. Okay. You know how sometimes you have to
22 lay down rules and they've got to stick with them
23 because they have to learn from them, does that make
24 sense to you?
25    A. Yes, it does.

| Page 101 | Page 103 |
|---|---|

**Page 101**

1 Q. So that is basically what the law is.
2 Now, to put it into context of a particular
3 case or particular situation, now, of course, what I'm
4 going to tell you now has nothing to do with the facts
5 of this case. This is just to highlight what I'm
6 talking about, okay?
7 Suppose you have an individual that has
8 kidnapped, molested and murdered a child, all right?
9 The police are talking to people and trying to figure
10 out who did it. One guy comes to their attention,
11 they take a statement from him, but they don't do it
12 the right way, they mess up, they make a mistake. But
13 in that statement, he confesses, okay? I did it, I'm
14 the one, I liked it and I'd do it again, okay? No
15 question. And then after that, he leads them to the
16 child's body, okay? So as a result of the information
17 they obtained in that statement, that's how they got
18 evidence of where the child was buried, okay? That's
19 just an example.
20 In a circumstance like that, would you be
21 able to follow the law? And by that I mean if the
22 statement was not properly taken, then disregard it.
23 Put it to one side, disregard it and consider what
24 evidence you have left?
25 MR. RAY: Excuse me. Before you answer

**Page 102**

1 that, sir. Judge, I'm going to object. That example
2 does not have a consequence that she's leading to in
3 that a person confesses and then the confession is
4 illegal, but yet it leads to evidence, that evidence
5 would, in fact, be admissible under those
6 circumstances. So I'm going to object to the form of
7 the question.
8 THE COURT: Overruled.
9 MR. RAY: Thank you.
10 Q. (BY MS. CALLAGHAN) My question is if the
11 law instructed you to disregard a statement that was
12 illegally obtained, could you follow that law? Could
13 you disregard it and consider whatever evidence you
14 had left?
15 A. Again, you'd have to be objective and you'd
16 have to base it on the other evidence. Are you
17 alluding to a situation where it was presented in
18 court and later on it was thrown out or it was never
19 presented?
20 Q. Well, what I'm talking about is a situation
21 where evidence was presented to you. But in the
22 Court's Charge you would be given an instruction. And
23 in that instruction it would say here's the rules, if
24 these rules weren't followed, you're instructed to
25 disregard this piece of evidence, okay?

**Page 103**

1 A. I understand, yes.
2 Q. Would you be able to do that? If you found
3 that the statement, for example, was illegally taken,
4 would you be able to disregard that piece of evidence
5 and continue with what you have left?
6 A. Yeah, I would have to do that.
7 Q. Okay. Even if that meant that there wasn't
8 sufficient evidence left to convict them?
9 A. Yeah.
10 Q. Okay. You'd be able to do that?
11 A. Yes, I would.
12 Q. Now, defendants have certain rights. They
13 have a right to an attorney, they have a right to a
14 trial by jury, they have a right to remain silent,
15 meaning that if they choose to testify, if they want
16 to, you can consider them the same as you would any
17 other witness, okay? They start off equal with any
18 other witness and then you can decide whether you
19 believe them or not based on what they say and how
20 they say it to you.
21 On the other hand, if they choose not to
22 testify, that's it, you cannot consider that for any
23 reason against them. You have to just, like the other
24 thing, put it aside and consider what you have before
25 you that you can consider legally.

**Page 104**

1 Could you do that?
2 A. Yeah, I have no problem with that at all.
3 Q. There is also generally a right that the
4 defense has of discovery of the State's case. They
5 may know what evidence generally we have against an
6 individual defendant. With one exception, that
7 generally does not go both ways. We don't have a
8 right to discovery of their case.
9 However, there's an equal right of subpoena
10 power. Both sides can subpoena witnesses, okay?
11 Now, let me ask you this. Suppose in a
12 case, a capital murder case, let's say, for example,
13 if we had a capital murder case and it was based upon
14 a convenience store robbery, okay, so you were in the
15 course of committing a robbery and you committed a
16 murder, okay, let's say it turns out that the State's
17 evidence doesn't turn out to be what the State thought
18 it was, that they really weren't able to prove the
19 robbery. So what you're left with is a plain Jane
20 murder, okay? It's not capital any more. You're left
21 with the lesser of murder.
22 In that case, the punishment range changes.
23 It's no longer life or death. In a regular murder,
24 not capital, the punishment range is from five years
25 to 99 years or life, okay, and up to a $10,000 fine.

| Page 105 |
|---|
| 1  In looking at that range of punishment, the law says |
| 2  that in order to be a fair and impartial juror, you |
| 3  must be able to consider the full punishment range, |
| 4  all the way from the minimum of five to the maximum of |
| 5  life and anywhere in between.  And the reason the |
| 6  legislature made it that way was because they didn't |
| 7  know what kind of fact circumstance you'd be asked to |
| 8  pass on.  It could be pretty much anything. |
| 9      And you might, for example, find the minimum |
| 10  only acceptable in one in a hundred cases or one in a |
| 11  thousand cases.  Or the same with the maximum.  But |
| 12  the question is could you wait for it and consider |
| 13  fairly the full punishment range until you know what |
| 14  the facts are and then you could make a decision on |
| 15  where within that punishment range an offense lay. |
| 16      Does that make sense to you? |
| 17      A.  Yeah, I believe it does.  You're implying |
| 18  that there was initial evidence that there may have |
| 19  been a robbery and a murder, but subsequent evidence |
| 20  don't prove that there was a robbery in progress? |
| 21      Q.  Uh-huh. |
| 22      A.  And so you are looking at the lesser range |
| 23  of punishment possibilities? |
| 24  ·  Q.  Sure.  I mean, suppose the State's evidence |
| 25  originally looks like it went in there to rob the guy |

| Page 106 |
|---|
| 1  in the convenience store.  It later comes out that he |
| 2  didn't go in to rob the guy at all, he just had a |
| 3  personal grudge.  So there's no longer any robbery, |
| 4  but there's still the murder because there's the |
| 5  personal grudge and the killing itself. |
| 6      Does that make sense to you? |
| 7      A.  Yes, it does. |
| 8      Q.  Would you be able to fairly consider the |
| 9  full punishment range in a murder case of five to 99 |
| 10  years or life if the facts justify it and the law |
| 11  allowed it? |
| 12      A.  Yes, I think so. |
| 13      Q.  Now, do you recall whether or not you've |
| 14  heard anything in the newspapers, anywhere like that |
| 15  about an offense that occurred in April of this year? |
| 16      A.  No, I haven't.  We take "USA Today."  We |
| 17  don't even take the local paper.  I don't recall |
| 18  anything. |
| 19      Q.  Nothing on Scott Avenue, east Fort Worth, |
| 20  the names Pat Syren or Pearl MaGouirk, "RD" MaGouirk? |
| 21  Does that make any -- |
| 22      A.  No, I have no knowledge of that at all. |
| 23      Q.  All right.  Let me ask you a few individual |
| 24  questions and then that'll do it for me. |
| 25      Your wife is a probation officer? |

| Page 107 |
|---|
| 1      A.  Well, she's considered that.  She's actually |
| 2  a counselor at Mansfield.  They have a, kind of a |
| 3  recovery class there for probationers where she |
| 4  teaches like 12-step things.  And she's been over |
| 5  there about four months now. |
| 6      Q.  Okay.  Does she talk to you sometimes about |
| 7  cases at home? |
| 8      A.  Oh, sometimes.  You know, she'll talk about |
| 9  things that are happening in class or something or, |
| 10  you know, so she does sometimes. |
| 11      Q.  Okay.  Anything about what you've discussed |
| 12  that would affect you in listening to the facts of |
| 13  this case? |
| 14      A.  No, I don't think so.  I can't think of |
| 15  anything that she has said or would say that would |
| 16  change my objectivity as far as being a juror. |
| 17      Q.  Okay.  Has she in any way discussed with you |
| 18  any problems that have occurred out at Mansfield? |
| 19      A.  No.  What do you mean by problems? |
| 20      Q.  Anything that's been in the news, anything |
| 21  that's caught your attention? |
| 22      A.  No.  Just I've had a hard day and, you know, |
| 23  I had a jerk in class and things like that. |
| 24      Q.  The usual things that wives engage in? |
| 25      A.  Yeah. |

| Page 108 |
|---|
| 1      Q.  Anything that has happened that has affected |
| 2  your opinion of criminal justice in Tarrant County: |
| 3  Judges, prosecutors, even defense attorneys, anything |
| 4  like that? |
| 5      A.  No, nothing that I wouldn't have, you know, |
| 6  figured out otherwise or from other sources. |
| 7      Q.  What does that mean, that you wouldn't have |
| 8  figured out from other sources? |
| 9      A.  Well, I just mean by just talking to other |
| 10  people just generally, newspapers, talking to people |
| 11  at work, just kind of weighing all of the input from |
| 12  everyplace. |
| 13      Q.  Do you have any particular opinions |
| 14  concerning the DA's office? |
| 15      A.  Regarding what? |
| 16      Q.  Concerning the DA's office, the district |
| 17  attorney's office? |
| 18      A.  No, not at all. |
| 19      Q.  Do you have any particular opinions |
| 20  concerning this Court or concerning adult probation in |
| 21  this county? |
| 22      A.  No. |
| 23      Q.  I don't mean to distress you in any way, but |
| 24  there was a question about a family member being a |
| 25  victim of a crime. |

Page 109

1    A. Yes.
2    Q. And your son was a victim?
3    A. Pardon me?
4    Q. Your son was a victim?
5    A. Yes, he was.
6    Q. How old was he at that time?
7    A. He was 12, I believe, when that occurred.
8    Q. Okay. The individual that was charged, was
9 that a family member, a stranger?
10    A. It was my ex-wife's husband.
11    Q. A step-father, sort of?
12    A. Yeah, step-father.
13    Q. Was there more than one individual or just
14 one?
15    A. The step-father and my ex-wife were both
16 charged with this.
17    Q. Okay. Do you know -- was that here in
18 Tarrant County?
19    A. It was Denton County.
20    Q. Denton County. Do you feel that the State
21 handled that case fairly?
22    A. I think they did. There was a problem with
23 the -- there was two separate trials. The trial with
24 my ex-wife was, actually resulted in a mistrial and
25 they gave her probation instead of any sentence. I

Page 110

1 think it had something to do with something the
2 prosecutors knew that they didn't share with the
3 defense.
4        And so they asked if -- and they called us
5 in and asked us if, you know, we wanted to go through
6 another trial or, you know, just accept some kind of
7 plea-bargain with probation. And I didn't want my son
8 to go through that again, so that was acceptable to
9 us.
10    Q. Okay. What was your wife charged with
11 specifically? I'm sorry, your ex-wife?
12    A. Yes. She was really forced to have sex with
13 my son was basically it and performed some sexual acts
14 with his step-father.
15    Q. Okay. And so she was probated on that and
16 then he was sentenced to some time in the
17 penitentiary?
18    A. Yes, he was.
19    Q. Do you have any particular -- do you feel
20 like that set of circumstances would affect you in
21 listening to this case?
22    A. I think only it would if, you know, just the
23 pain of the sexual abuse of my son, it would be a
24 little bit harder to be objective in that specific
25 kind of case. I think other than that, I feel like I

Page 111

1 can be very objective. But that may be a little bit
2 different there, maybe a little bit more subjective.
3    Q. Okay. All right. But other than a specific
4 incidence which is similar to your son's you feel like
5 generally you'd be able to be fair?
6    A. Yes, I think so.
7    Q. When you were a juror last time, did a judge
8 or a jury assess punishment on that case?
9    A. The jury did.
10    Q. Now, with regard to witnesses, generally
11 speaking, you have talked at some length about being
12 objective, being fair. Presumably when a witness
13 takes the stand and testifies, you would then decide
14 whether or not they're telling the truth based on what
15 they tell you and how they tell you?
16    A. Yes.
17    Q. Police officers, they are human beings like
18 everybody else, correct?
19    A. Yes.
20    Q. Okay. The uniform doesn't necessarily make
21 them different as human beings, it's a uniform, right?
22    A. No, you're right. Exactly.
23    Q. Do you feel like you would be able to listen
24 fairly and impartially to what a police officer said
25 to you the same as any other witness and judge it on

Page 112

1 its credibility?
2    A. Yes, I would. I think there was a question
3 there that kind of alluded to that, would you think
4 that a police officer's testimony would be more
5 believable, I forget how it was actually worded. And
6 my answer to that was typically -- what I was thinking
7 when I answered that was that police officers are
8 typically more observant and they're trained to get
9 facts, maybe look better than a normal, regular
10 person.
11        So that was really the intent, not that a
12 police officer would be necessarily, you know, way
13 above a regular person as far as believability, but
14 just in terms of observational skills. And that was
15 really the intent there.
16    Q. Sure. And there's nothing wrong when you're
17 listening to a witness to taking into account any
18 training or education they have. I mean, that's part
19 of the whole package. But you would be able, in terms
20 of credibility or believability, to wait and you get
21 what you get, see what you get.
22        Does that make sense to you?
23    A. Yes.
24    Q. Do you think you could do that?
25    A. Yes.

Page 113

1   Q. There's a question ever since I read this
2 that I have been just dying to ask you. You rated
3 Rosie O'Donnell number one over Adolph Hitler of the
4 people that you least admire.
5   A. Well, actually I probably should move him
6 up. I was thinking more contemporary. And then I
7 said well, you know, he's got to be the worst, so I
8 guess I should've drawn an arrow up there.
9   Q. Now, what about Rosie bugs you?
10   A. Huh?
11   Q. What bugs you about Rosie O'Donnell?
12   A. Oh, just irritating personality and, you
13 know, just -- she really does bug me. Who else? Did
14 I put Roseanne? I should have put her, too. I don't
15 like her, either.
16   Q. I hear you. I hear you. I'm with you
17 that one.
18     If you could give me just a moment.
19   (Brief pause.)
20   Q. I don't think we have any other questions.
21 Thank you very much, sir, we appreciate it.
22   MS. CALLAGHAN: Pass the witness.
23   MR. RAY: May I proceed?
24     VOIR DIRE EXAMINATION
25 BY MR. RAY:

Page 114

1   Q. How are you doing, Mr. Morgan?
2   A. Very good.
3   Q. I'm Bill Ray. This is Billy Jack
4 Crutsinger.
5   THE DEFENDANT: Hidy, sir.
6   Q. (BY MR. RAY) He's my client and I'm trying
7 to keep him from getting executed. That's my job,
8 fair enough?
9   A. I understand.
10   Q. Everybody has got a job in the world. Do
11 you want to trade places with me?
12   A. No.
13   Q. Do you want to trade places with the DA?
14 They're trying to kill him.
15   A. No, I think I'll just teach classes.
16   Q. Okay. I want to talk about one thing you
17 just talked about a minute ago and then I'm going to
18 go back to some of the stuff on your questionnaire.
19 But particularly Adolph Hitler, you said you didn't
20 like him? I don't like him, either.
21     What do you not like about him?
22   A. Well, racist mass-murderer.
23   Q. He was a mass-murderer.
24   A. You know, caused misery throughout the
25 world. Certainly would rank real high on the worst of

Page 115

1 the worst.
2   Q. Do you know how he got to power?
3   A. Yeah, I've read quite a bit about it, yeah.
4   Q. Then you know that Adolph Hitler didn't take
5 over Germany.
6   A. Yes, I know.
7   Q. He was actually -- he rose to power on a
8 wave of popularity, right? Would you agree with that?
9   A. Generally.
10   Q. Okay. And he rose to power under a theory
11 of the German people, the people of the Rhine are
12 better people than the rest of the world. And that
13 kind of, maybe it got a little off track, but
14 ultimately that was his basic theory was that the
15 German people were the superior race and he wanted to
16 get rid of everybody else in the world starting with
17 the Jews. That's kind of where he came from.
18   A. Well, I might disagree a little bit with
19 that. I think he also, during that time, that was a
20 time of depression and he offered jobs and other
21 things. And some people looked at that rather than
22 the racist attitudes and Aryan superiority.
23   Q. He gave people a way to overlook maybe his
24 racial, racist views, racist more than racial, I
25 guess, by providing the population a way to come out

Page 116

1 of what they viewed as a bad time, right?
2   A. Yeah, that's fair.
3   Q. Would you agree that after World War I,
4 Germany kind of became a scapegoat in the '20s?
5   A. Absolutely.
6   Q. I mean, the powers -- after Germany lost
7 first World War, the other European countries and I
8 guess the United States to some extent, and certainly
9 England and France, they said, y'all are the problems
10 and you're going to pay for the problems that your
11 country has caused. And Adolph Hitler kind of helped
12 get them out of that, helped the Germans at least
13 think they were going to get out of that; is that a
14 fair statement?
15   A. Yeah.
16   Q. And the people kind of overlooked his
17 killing, right?
18   A. Well, I don't know that they were aware of
19 it initially until he assumed full power. I think
20 they kind of overlooked a lot of things that they
21 probably shouldn't have. I mean, may not have been
22 fully aware of it.
23   Q. And I don't disagree with you, but that puts
24 him on the list of bad people, fair enough?
25   A. Fair enough.

| Page 117 | Page 119 |
|---|---|

**Page 117**

1  Q. Because the list of bad people that you
2  have, Rosie O'Donnell, Bill Clinton and Adolph
3  Hitler. Is Bill Clinton ahead of Adolph or are they
4  just on the same list?
5  A. No, my mind was wandering as I looked at
6  that and I was looking more contemporary.
7  Q. What do you not like about Bill Clinton?
8  A. Well, he's not real high on the list,
9  really. But, you know, I lean a little bit more
10 toward the other side, a little more conservative and,
11 you know, I think he's done some things that certainly
12 while he was in office that were unbecoming of the
13 President and I think probably when he was governor,
14 also.
15 Q. What do you think about John Kennedy?
16 A. Pardon me?
17 Q. John Kennedy, the 35th President of the
18 United States?
19 A. I have a lot of respect for him. I know he
20 was also involved in other things that detracted from
21 the Presidency, but I think the world was a lot more
22 naive back then, too.
23 Q. We didn't find out about it until several
24 years after he was gone.
25      Okay. I want to kind of dive into something

**Page 118**

1  just really in the interest of time. And I've got a
2  screen up here. First of all, just to kind of go
3  through the hierarchy, I want to make sure that we're
4  on the same page, so to speak.
5      Capital murders, our society and our state
6  really views them as the worst of the worst murders.
7  You understand that, right?
8  A. Yes.
9  Q. And that's the only kind of murder in this
10 state that you can actually get a death sentence for;
11 do you understand that?
12 A. Yes.
13 Q. If you have a regular murder or a noncapital
14 murder, that has a different punishment range. And
15 I've got it up there. That makes sense, doesn't it?
16 A. Yes.
17 Q. While all capital murders are murders, not
18 all murders are capital murders. Do you see that
19 distinction?
20 A. I understand.
21 Q. Now, you had mentioned on one of your
22 questions back about, it's Question No. 22 and I'll
23 bring it up there, but I'm going to read it to you.
24 If you need me to bring it up there, I will.
25      The question was, "Do you believe there may

**Page 119**

1  be mitigating factors that would be important to you
2  in order to justify a sentence of life in prison as
3  opposed to the death penalty?"
4      Do you remember that question?
5  A. Yes.
6  Q. And then it was, "Why do you feel that way?"
7      Your answer was, "Self-defense, lack of
8  premeditation, mental state can mitigate the
9  sentence."
10     Do you remember writing that down?
11 A. Yes.
12 Q. What was it about self-defense? Why does
13 self-defense belong in that category?
14 A. Well, if you're in fear of your life, if you
15 have been threatened or someone is advancing towards
16 you aggressively, then I think that is perhaps a
17 mitigating circumstance.
18 Q. Well, you know, if I come over to your house
19 tonight and I say, you know, I really didn't like the
20 way you testified today and I believe I'm going to
21 shoot you, that would be murder if I killed you,
22 right? And you if you said, hey, I don't particularly
23 want to die right now and you pulled out your gun and
24 shot me, that would be in self-defense, right?
25     The law -- what do you think should happen

**Page 120**

1  to you? Should you get a life sentence for killing me
2  in self-defense?
3  A. No.
4  Q. Okay. Self-defense is actually, if you look
5  up here at my next screen, that's not a crime at all.
6  A. Yeah, I think it's degrees. I think -- I
7  don't know exactly what I was thinking during my train
8  of thought when I was answering that.
9  Q. And what I was getting up to is those four
10 reasons that I've got up there, and an accident would
11 be up there, too, I just don't have it up there. A
12 person who commits murder, murder is murder is
13 murder. If you intentionally kill somebody, that's
14 murder, okay? If you do it in self-defense, that's
15 not against the law, not supposed to be. If you do it
16 because you're insane, likewise that's not a crime,
17 okay? It's not recognized as a crime.
18     Murder in the act of war. If you enlist in
19 the Marine Corps and you go over to Iraq and you kill
20 some Iraqi soldiers, the United States Government is
21 not going to prosecute you for that, fair enough?
22 A. Fair enough.
23 Q. Likewise, the executioner, we got an
24 executioner that works down in Huntsville. He's on
25 the State payroll and he kills people, right? That's

Page 121

1 not against the law.
2       And you understand why that is?
3    A. Yes. I think what I was thinking of there
4 is where someone is maybe in fear of their life, that
5 may or may not be true, but if they commit a murder
6 with the thought that they were in danger, then it
7 would still be murder, but it may be mitigating.
8    Q. And the law actually recognizes that. And
9 what I'm giving you and what the prosecutor has done
10 is we're not trying to give you the facts of this
11 case, but we're trying to see your views on certain
12 principles.
13       The law actually says it's either
14 self-defense or it's not. It's like being pregnant,
15 for lack of a better phrase. And if it's in
16 self-defense, the law says that's not a crime. The
17 law even goes a little step further to include your
18 example, which says if you think that you have to act
19 in self-defense, the law basically concludes that
20 self-defense for the purposes of whether or not you
21 ought to be prosecuted.
22       Does that make sense? Or ought to be
23 convicted of a crime.
24    A. Yes.
25    Q. And what I guess I'm asking you is in

Page 122

1 regards to your question or the answer on No. 22, now
2 that I've kind of explained that self-defense is not a
3 crime at all, you don't ever get to whether or not --
4    A. Okay. So based on a more thorough
5 understanding of that, I would have to cross that out,
6 I guess.
7    Q. Okay. I thought that's what you meant, but
8 I wanted to make sure that we're on the same page.
9       Next you got some noncapital punishments.
10 All these types of crimes, sexual assault up there,
11 the incident that involved your son, your ex-wife and
12 her boyfriend or husband, whatever he was, they
13 couldn't have got the death penalty for what you
14 described happened; you understand that?
15    A. Yes.
16    Q. Do you think that's a fair law? That's a
17 pretty serious offense.
18    A. Well, it is a serious offense, but that is
19 the law.
20    Q. Let's talk about capital murder. This is
21 not the exhaustive list in our state, but it's some
22 examples and it's the one that we're trying in this
23 case. I'm not going to go into the facts of the case,
24 but I am going to tell you what the allegation is so
25 that you'll know.

Page 123

1       A child under six years of age, if that's
2 the victim, the law says that's capital murder, fair
3 enough? Same if you have a policeman or a fireman or
4 if you're in the course of committing any one of those
5 felonies. And that would be like one of the examples
6 that Ms. Callaghan gave you was the person that goes
7 into the convenience store and robs the person and
8 shoots them, that would fall into that category.
9       The last one is what's on trial here. The
10 allegation is that Billy Jack here has murdered two
11 people in the same transaction. Doesn't have to be
12 with the same bullet, so to speak. But he killed one
13 person and look over at another one and kill another
14 one, that's capital murder in the same event, okay?
15       If a person -- before we get to capital
16 murder, the first thing we have to know is the mental
17 process that goes on. And this kind of comes back to
18 it could be exactly the same for self-defense, but
19 that's not against the law.
20       If you look over here on the left, and if
21 you can't read that, I'll read it to you. This is not
22 an eye test. Before you can commit the offense of
23 capital murder, it has to be an intentional act,
24 okay? Down there in the red it says the conscious
25 objective or desire to engage in the conduct or cause

Page 124

1 the result. That's what the law says to try a person
2 for capital murder and convict them, when it's a
3 two-person murder, okay, which makes it capital
4 murder, that has to be what the individual that
5 commits the crime is going through his or her mind
6 before they can be convicted. And those are pretty
7 strong words; would you agree with that?
8    A. Yeah, just means he meant to do it.
9    Q. He meant to do it and he really wanted it to
10 happen.
11    A. Yeah.
12    Q. If I get out of here this afternoon and I'm
13 going home and I'm going through a green light
14 downtown an two little bitty four-year-old children
15 run through the red light and I hit 'em, they're just
16 as dead as if I had shot them with my shotgun, but I'm
17 not going to be prosecuted for that because that's an
18 accident, right?
19    A. I understand, yes.
20    Q. The fact, if you change one fact, if I had
21 seen them and decided I wanted to kill them, of course
22 that would be capital murder for a couple different
23 reasons. Do you see the difference?
24    A. Yes, I do.
25    Q. Okay. Let me go to the next slide. And

| Page 125 | Page 127 |
|---|---|

**Page 125**

1 that causes us to get to these special issues that the
2 prosecutor talked to you about, okay? And she's
3 talked to you about it quite a bit, so I'm going to
4 jump on to the next one.
5 But in a capital murder case, and I want you
6 to think back with me for just a second, Mr. Morgan.
7 Before you ever get to this first question, before
8 that question even becomes relevant for your purposes
9 as a juror, and it's real important in a situation
10 like this to not put the cart before the horse. You
11 understand why that would be important, right?
12 A. Yeah. You have to know whether they're
13 guilty or not.
14 Q. You got to know whether they're guilty or
15 not and you also got to know in this particular case,
16 it's got to be two intentional, conscious objective
17 murders; do you understand that?
18 In other words, before we ever get to the
19 future dangerous question, you, if you're on the jury,
20 is going to have found Billy Jack guilty of committing
21 two intentional murders; do you understand that?
22 A. You're saying both murders would have to
23 have the same intent?
24 Q. Sure. Let me give you an example of what
25 that would not be. If I walked into a store, for

**Page 127**

1 Question No. 1.
2 A. Okay. I understand.
3 Q. Are you with me now?
4 A. Yes.
5 Q. And then the Judge is going to tell you that
6 in order to consider what you're supposed to consider
7 in my italicized, bold-letter question there is what's
8 on that second paragraph. You're going to have to
9 consider all the evidence at both the guilt phase and
10 what you might hear at the punishment phase, which is
11 usually more evidence, including evidence of the
12 defendant's background, you're going to hear about his
13 background, how he grew up, if he's done something
14 else bad, if he's done something else good. You hear
15 all about that and the circumstances of the offense
16 itself that would either militate for or mitigate
17 against the imposition of the death penalty.
18 That's the instruction you're going to get.
19 And the Judge is going to tell that if you answer yes
20 to this, you go to the next question. If you answer
21 no, you get a life sentence, no possibility of
22 parole. But there's a burden of proof on this
23 question; do you understand that?
24 A. Okay. The second question you're talking
25 about?

| Page 126 | Page 128 |
|---|---|

**Page 126**

1 example, and I knew somebody that was working there
2 and I just didn't like them -- this is not a robbery
3 murder, but I shot that person and killed them, that
4 would be an intentional murder, right?
5 If I'm running out of a store and I get in
6 my car and I'm trying to get away and I'm driving off
7 and I just physically don't see somebody who's just
8 got out of their car, they're not trying to catch me,
9 I'm not trying to run from them and I hit that other
10 person and kill them, that might not be an intentional
11 murder; does that make sense?
12 A. Yes.
13 Q. It could still be considered in the same
14 transaction, but that wouldn't be a capital murder
15 because I didn't kill the first person and the second
16 person both intentionally.
17 Do you see the difference?
18 A. Yes, I see the difference. You'd have to
19 weigh the facts.
20 Q. You'd have to weigh the facts. And I'm not
21 trying to tell you what the facts are in this case.
22 A. I know it's a hypothetical.
23 Q. I will tell you the facts have nothing to do
24 with what I just told you. But you got to -- both of
25 the murders have to be intentional before you get to

**Page 128**

1 Q. No, we're not to the second question at
2 all. The burden of proof is only on the first
3 question. And that is it's got to be unanimous.
4 That's not the burden of proof, but that's what the
5 score has got to be. And whatever that future
6 dangerousness question is in your mind, that has to be
7 proven to you beyond a reasonable doubt just like the
8 two murders had to be proven to you.
9 A. Yes, I understand.
10 Q. Now, and you said you understand that law?
11 A. Yes, I do.
12 Q. Then we get to the second question. And
13 this particular question talks about -- this has no
14 burden of proof, by the way. You take into
15 consideration the circumstances of the offense just
16 like you did before, the defendant's character and
17 background, just like you did before, and then there's
18 one other thing that's thrown in there, the personal
19 moral culpability of the defendant. The question asks
20 you is there some sufficiently or sufficient
21 mitigating circumstance or circumstances to warrant a
22 life sentence.
23 You understand that question?
24 A. Yes.
25 Q. And the answers in order to get the death

## Page 129

1 penalty are just the opposite. If you answer yes,
2 what you're saying there essentially is there is some
3 mitigating circumstance.
4     Do you see how that works?
5   A. Yes, I understand that.
6   Q. And no there's not, in which case the
7 defendant would get the death penalty, right? Do you
8 see how that works?
9   A. Yes.
10   Q. Now, there is a definition, though, of
11 mitigation that you're going to get in this second
12 question. And it means this one thing. And that's
13 what I've got down there in the blue. And that is
14 told that you don't have to agree on what particular
15 evidence is mitigating. You could think it's one
16 thing, somebody else might think it's another. But
17 you shall consider mitigating evidence to be evidence
18 that a juror might regard as reducing the defendant's
19 moral blameworthiness, okay? So that's a little bit
20 different, or at least it's more specified than the
21 mitigation you considered in Special Issue No. 1.
22     Do you see how that works?
23   A. Yes, I believe so.
24   Q. Now, let's look at this. I want to kind of
25 go back through this again. In order for someone to

## Page 130

1 get the death penalty, there's a list of things that
2 have to happen. The first thing is you've got to have
3 an intentional murder; you understand that?
4   A. Yes.
5   Q. We talked about that. Plus you've got to
6 have a second intentional murder, and both of those
7 murders have to have been committed in the same
8 transaction, but it has to have been a conscious
9 objective or desire to cause the murder.
10     Do you see what I mean?
11   A. Yes.
12   Q. Now, let me just ask you hypothetically. Of
13 course, if you find both of those two, you're going to
14 have a guilty verdict beyond a reasonable doubt,
15 right?
16   A. I think so.
17   Q. If you found beyond a reasonable doubt
18 intentional murder number one plus intentional murder
19 number two, both beyond a reasonable doubt, both as a
20 conscious objective or desire, then you're going to
21 get a guilty verdict because that's what the Judge is
22 going to tell you to do.
23   A. Yes.
24   Q. Okay. Now, future dangerousness. And you
25 understand that question without me going back through

## Page 131

1 it all again?
2   A. Right, yes.
3   Q. And I will if you want me to, for either
4 that or the mitigation.
5   A. No, that's fine.
6   Q. Can you conceive of a -- let me ask you
7 this. What do you think about a person in your own
8 mind that has committed intentional murder number one
9 and intentional number two at the same time as far as
10 being a person who's going to be dangerous in the
11 future? Just how do you feel about that? If they're
12 bad enough to have committed two murders at the same
13 time, what does that tell you about what they might be
14 doing in the future? How do you feel about that?
15     MS. CALLAGHAN: Your Honor, the State would
16 object on the grounds of commitment, binding.
17     THE COURT: Overruled.
18     VENIREPERSON MORGAN: Certainly I think that
19 just based on that and nothing else, it would indicate
20 a dangerous person. So generally I would say yes.
21   Q. (BY MR. RAY) Well, can you -- what you're
22 saying is it indicates a person is dangerous. How do
23 you feel about it being dangerous as far as tomorrow
24 or the next day or sometime after they've done that?
25   A. Well, if you're looking at just the isolated

## Page 132

1 incident, I would say that with nothing else to go on
2 indicates the person is dangerous. If you present
3 other information contrary to that, then that would
4 have to be taken into account.
5   Q. Well, but in and of itself, and what I'm
6 looking for is you've said dangerous, but my question
7 was couched in terms of whether the person is going to
8 be dangerous in the future as opposed to whether or
9 not they're already dangerous.
10   A. Yes.
11   Q. How do you feel about that?
12   A. Again, that's pretty subjective without any
13 facts to go on. But still in general I would lean
14 toward that person being dangerous.
15   Q. Let me ask you this. If you found a person
16 has committed intentional murder plus second
17 intentional murder and found them guilty, in other
18 words, we're at that step, does that or does that not
19 in and of itself always get you to this future
20 dangerousness question?
21   A. No, it doesn't.
22     MS. CALLAGHAN: Objection, Your Honor
23 binding.
24     THE COURT: Overruled.
25   Q. (BY MR. RAY) So you can conceive, then, of

| Page 133 | Page 135 |
|---|---|
| 1 some person that would kill a person intentionally and<br>2 kill a second person intentionally who might not be a<br>3 future danger?<br>4    A. Yeah, I could. Yeah, it would have to be<br>5 presented.<br>6    Q. Well, let me ask it this way. That future<br>7 dangerous question, okay, is a question that the State<br>8 has to prove. It has a burden of proof assigned to<br>9 it. It's not just what's your answer going to be if<br>10 you found the other two, okay? And what I heard you<br>11 say, and maybe I misread your answer, but what I<br>12 understood you to say, and please correct me if I'm<br>13 wrong, is that for you to find that it wasn't a future<br>14 dangerousness, you would have to hear something to<br>15 show you that it wasn't. Is that what I understood<br>16 you to say?<br>17    A. Or to hear evidence that would indicate that<br>18 it was, you know, just looking at all of the facts<br>19 involved and what's being presented. And you're<br>20 right, that was the question that it was a burden of<br>21 proof on that first question. So, yes.<br>22    Q. I'm not sure I understand your answer.<br>23    A. I'm just saying that you would have to look<br>24 at what was presented during the determination of<br>25 guilt or innocence and weigh all of that in | 1 may or may not be true in all cases. And what I'm<br>2 trying to find out is how you feel about if it would<br>3 be true all the time that you found two intentional<br>4 murders, would that always be enough to show a future<br>5 dangerousness or would it might not be?<br>6    A. No.<br>7    Q. Why is that?<br>8    A. Well, again, I could conceive of some<br>9 circumstances where it might not be.<br>10    Q. And I don't want to ask you what the<br>11 circumstances are.<br>12    A. And you're saying -- well, you're saying and<br>13 your key phrase there, I guess, was under all<br>14 circumstances if we find someone guilty of two<br>15 intentional murders, does that automatically mean, you<br>16 know, that we'd answer yes to that first question<br>17 about the future danger?<br>18    Q. Right.<br>19    A. You know, I can't say it would in all<br>20 cases. I would certainly say it would in some cases<br>21 and it would be based on other evidence.<br>22    Q. Okay. As long as -- I understand your<br>23 answer, but I just want to make sure that on those<br>24 cases where it is some that when you go back to what<br>25 the two murders were that gave rise to that, that it's |
| **Page 134** | **Page 136** |
| 1 determining any future danger with this person.<br>2    Q. Well, let me give you one little piece of<br>3 information and maybe it'll make a difference to you.<br>4 The law says that you can find future dangerousness,<br>5 and I can put that issue back up there. The law says<br>6 you can find future dangerousness solely based on the<br>7 offense itself. In other words, the State can make<br>8 their burden of proof for future dangerousness if you,<br>9 the jury, believe that the crime that was committed<br>10 that you found a person guilty of is bad enough in and<br>11 of itself, that can be enough to prove future<br>12 dangerousness to you, okay?<br>13    A. Okay.<br>14    Q. So kind of a partial answer is you could<br>15 find a person guilty of an intentional murder plus<br>16 another intentional murder and those facts in and of<br>17 themselves could be enough to show you, hey, this<br>18 person is a future dangerousness, too, beyond a<br>19 reasonable doubt in and of itself; do you understand<br>20 that?<br>21    A. Yes.<br>22    Q. My question is, though, and it's a little<br>23 bit different. It's kind of an all versus some<br>24 question. And what I'm getting at is while that's<br>25 true in some cases, okay, the law recognizes that it | 1 figured into your answer that both of those cases,<br>2 instances, are an intentional, conscious murder.<br>3    A. Yeah.<br>4    Q. Okay. Let's go to the next one. We've<br>5 answered future dangerousness yes. And now we are at<br>6 mitigation. And I'm going to ask you the same<br>7 question, but with just one more answer given.<br>8 Already found an intentional murder, already found the<br>9 second intentional murder, both beyond a reasonable<br>10 doubt, both a conscious objective or desire, and you<br>11 found future dangerousness beyond a reasonable doubt,<br>12 okay?<br>13    Now, my question is if you have found all<br>14 three of those things, whatever those facts might be,<br>15 all of them beyond a reasonable doubt and they all<br>16 relate to one another and that they add to one<br>17 another, because you got to have all three parts of<br>18 them the way I've explained it. We get to the<br>19 mitigation issue, okay, and the mitigation question is<br>20 when you're talking about the defendant's moral<br>21 blameworthiness, because that's the instruction that<br>22 you get.<br>23    Remember this issue right here, what you're<br>24 going to consider in that question is mitigating<br>25 evidence that you might regard as reducing the |

|  | Page 137 |
|---|---|

1 defendant's moral blameworthiness, can you conceive of
2 a set of facts honestly that the defendant could have
3 that reduces -- a set of facts that would show
4 reducing his moral blameworthiness such that it could
5 ever overcome those other three answers that have been
6 given in order to warrant a life sentence as opposed
7 to the death penalty?
8     Is there ever going to be anything that you
9 could hear, and I'm not going to ask you to give me an
10 example, I'm just asking you is there anything that
11 you can think of that would ever justify a life
12 sentence after you've found those other three things
13 to be true?
14   A. Well, there's very few absolutes. It would
15 have to be -- I think the mitigating evidence would
16 have to be very concrete and overwhelming to override
17 the other three.
18   Q. So is your answer yes, there might be
19 something?
20   A. Yes, there might be. But I would say it
21 would have to be in my mind very strong evidence that
22 would have to mitigate that.
23   Q. Without telling me what an example of that
24 might be, can you conceive in your own mind, just
25 thinking here of what it might be? It would be a

|  | Page 138 |
|---|---|

1 realistic piece of evidence. I'm not talking about
2 some diving intervention.
3   A. Well, I think you'd have to look at
4 everything. I think you'd have to look at background,
5 look at previous offenses, look at --
6   Q. But you're going to be --
7   A. -- the things about the crime.
8   Q. Right. And I don't want to cut you off.
9 But the mitigating evidence that's going to be used in
10 this question, the Judge is going to instruct you that
11 it's going to be evidence that you might regard as
12 reducing the defendant's moral blameworthiness.
13     Is there any piece of evidence that fits
14 that definition that's going to be able to override
15 guilty of two murders and a future dangerous person?
16 Is there anything that you could hear that could
17 satisfy you on that?
18   A. Yeah, there would have to be. There's
19 circumstances that that may be the right thing to do.
20   Q. You know, in that case that involved your
21 son, I don't want to dwell on this and I'm not going
22 to dwell on the facts, but just something you said.
23 It kind of sounds like to me that your ex-wife ended
24 up getting probation and what you said was you didn't
25 want your son to have to go back through it again.

|  | Page 139 |
|---|---|

1   A. Yes.
2   Q. And I understand that. You're not the first
3 person that's ever happened to and I understand where
4 you're coming from.
5     But it sounds to me from what you said that
6 the DA up in Denton County did something to screw that
7 case up; is that what I heard you say? They didn't
8 give the defendant something they were supposed to
9 give him?
10   A. Yeah, that was --
11   Q. They violated some rule the Judge had?
12   A. I think it was probably a minor point of
13 law, but there was some information that the defense
14 didn't have that the prosecutors did have, so it
15 was --
16   Q. What I'm hearing, then, is that some
17 district attorney up in Denton County screwed this
18 case up and it caused it to have to be retried.
19 Wasn't anything you did or your son did?
20   A. Correct.
21   Q. And it certainly didn't have anything to do
22 in your mind with the guilt of your son's mother's
23 boyfriend, your ex-wife's boyfriend?
24   A. Right.
25   Q. Didn't affect his guilt in your mind?

|  | Page 140 |
|---|---|

1   A. Yeah, that was her trial.
2   Q. How did you feel about that?
3   A. Well, my main concern was my son. And as a
4 part of that, she would have no contact with him. So
5 I was satisfied with that. And, you know, based on
6 his relationship with his mother, that was probably
7 the best thing.
8   Q. Okay. Did you particularly like that,
9 though, that some rule, some technicality had been
10 violated that basically put you in a position you
11 didn't want to be in and put your son in a position
12 that was potentially harmful?
13   A. I didn't particularly like it, but I
14 understood what was happening and, you know, accepted
15 it.
16   Q. Okay. Let's talk about just a couple more
17 things.
18     This is the law that the prosecutor was
19 talking about. And that might cause you as a juror in
20 this case to have to review that. The law says that
21 any evidence obtained by a police officer, and I'm
22 going to kind of paraphrase it, that's in violation of
23 the laws of this country or this state can't be
24 admitted in evidence against the accused on his
25 trial.

| Page 141 |
|---|

1 What that kind of means is the police get
2 some evidence illegally, they're not supposed to be
3 able to use it in the trial; do you understand that?
4 Sometimes, and if you look down here on the
5 second box, it says if the evidence raises an issue
6 about that, you might be instructed, the jury might
7 have to decide whether or not they feel the evidence
8 was, in fact, illegally obtained. In other words, you
9 might hear about it and have to make the decision in
10 your own mind or you and 11 of your best friends have
11 to decide whether or not you thought that evidence was
12 illegally obtained.
13 Do you see how that could happen? In other
14 words, the Judge --
15 A. Yeah.
16 Q. Let me tell you how this can kind of works
17 and it might make it easier for you to understand.
18 Sometimes in a criminal case the defendant or his
19 lawyer will raise some objection to a piece of
20 evidence and the judge might say I'm going to exclude
21 that. You as a jury never hear about that. The
22 district attorney just presents their case like they
23 never had it to begin with, okay?
24 In some cases, that process is done in front
25 of the jury. In other words, the district attorney

| Page 142 |
|---|

1 will take the position, hey, this is a proper piece of
2 evidence, the judge is allowing it to go in front of
3 the jury, it's going to be a fact question, the jury
4 is going to have to decide whether the evidence was
5 properly, is a proper piece of evidence in the case.
6 You're going to get the call on it.
7 Does that make sense?
8 A. Yes.
9 Q. I'm not going to go into why it would happen
10 one way or the other, but just suffice it to say
11 sometimes the jury gets to decide whether it's a
12 proper piece of evidence.
13 A. Well, by deciding that, if it is
14 inadmissible, even though I've heard it, I would have
15 to discount that in terms of coming up with any
16 decision. So you're saying I would have to weigh
17 that, it's my job not to weigh that.
18 Q. Let me give you an example that's kind of
19 extreme, but it nevertheless happens every once in a
20 while. Let's suppose you had a situation where the
21 only piece of evidence that the police had to tie a
22 person with a crime was a confession. He confessed.
23 And to use Ms. Callaghan's example, the confession
24 says, I did it, I'm proud of it, I'd do it again and I
25 wish I'd done it more. I've done it ten other times

| Page 143 |
|---|

1 that you don't even know about.
2 Let's suppose that you as a juror, you hear
3 that confession, the Judge gives you that instruction
4 on the bottom of my example up there on the screen
5 that says if you don't think this was a legal
6 confession, then don't, then disregard it, okay, you
7 can't use it.
8 And let's suppose that you as the jury, you
9 as a juror, you find, hey, it was not a correct
10 confession for whatever reason, okay? It's an illegal
11 confession. The Judge has just told me that I can't
12 use this confession, okay, if you found it to be
13 illegal, which is the facts I'm giving you. If you
14 found it to be illegal, you're not going to use it,
15 okay?
16 And you know the confession says the
17 defendant did it, he has admitted to the crime and not
18 only has he admitted to it, he's proud of the crime.
19 He wished he had done it to your wife as well as the
20 victim. He's proud of what he did. He's really
21 a bad person as you can see from this confession.
22 But the Judge has told you if you don't
23 think that confession is any good, you can't use it
24 and you've found that it's not any good. And now you
25 got to decide do I disregard that which would

| Page 144 |
|---|

1 ultimately mean that you have to find the person not
2 guilty and let him go.
3 What do you think about that?
4 A. I think I wouldn't like it, but I think
5 that, you know, looking at the law, that's what you
6 have to do. Otherwise it's anarchy. You've got to
7 abide by that.
8 Q. Okay. Just a couple more questions.
9 On Question No. 56, I don't expect you to
10 remember what 56 was, so I'll tell you. If the death
11 penalty was carried out publicly, we had several
12 answers there. You said on the television you'd watch
13 it every once in a while.
14 What were you thinking about when you wrote
15 that?
16 A. I don't know. I think it should certainly
17 not be any kind of public spectacle, but just from the
18 standpoint of maybe as a deterrent or something, I
19 guess, is really what I was thinking of.
20 Q. If you try this case, you're on the jury and
21 Billy Jack here gets the death penalty and three,
22 four, five years from now, they come on the NBC news
23 and they say we've changed the law in Texas, we're
24 going to allow death penalties to be watched, this is
25 going to be our first one, so we got the cameras down

1 there in the execution room. The guy we're going to
2 execute is Billy Jack Crutsinger.
3        You hear that on TV and you say, man, that
4 was the case that I tried. I was a juror on that.
5 Are you going to watch this execution if you've given
6 him the death penalty?
7    A. That's a hard one, you know. I don't know.
8    Q. What do you -- who do you believe, if you
9 have somebody that you believe -- in a capital murder
10 case, who do you view, and maybe you haven't thought
11 about this, so I'm going to give you a little time to
12 think about it. Who do you feel is the person that is
13 actually administering the death penalty? And I'm
14 going to give you some examples of who it might be and
15 I'll let you choose and maybe it's more than one or
16 whatever.
17        It might be the person that sticks the
18 needle in the arm, that would be one person. The
19 warden who runs the prison. Maybe the judge who
20 actually signs the death warrant. Maybe the
21 prosecutors or the police who try the case, come down
22 here and bring the evidence, sign on to ride that
23 horse. Or the jury, the people that actually hear the
24 case.
25        Who in your mind, and maybe there's someone

1 that's on that list that I didn't mention. Maybe
2 there's another person that you might be thinking
3 about. Who is it that you feel in your mind are the
4 people or persons who are actually carrying out the
5 death sentence?
6    A. Well, I would have to say society is
7 carrying that out. It's not just the jury. The jury
8 hears the facts and weighs the facts and they all have
9 different parts in it. But I think society as a whole
10 is, would be responsible.
11    Q. And how do you feel about that?
12    A. How do you mean?
13    Q. How do you feel about being someone involved
14 in carrying out that sentence? And if you're -- and
15 make no mistake about it. If you get on this jury and
16 those questions get answered in the way that we've
17 been talking about that gets the death penalty, Judge
18 Gill is going to sign the order because it's his job
19 and somebody at the penitentiary is going to do that
20 when the time comes because it's their job.
21        How do you feel about having a place on that
22 train?
23    A. Well, you know, I think you'd look at it
24 several different ways. I think it would be certainly
25 a sad thing. And as a human being, I would feel bad

1 about. I think I also have a responsibility as a
2 member of this society and for the good of the whole
3 society to, you know, do my duty, you know. So I
4 think that you have to look at it objectively on one
5 hand and do your job as a part of society and, you
6 know, do your job as a juror to the best of your
7 ability based on facts without letting a lot of other
8 things enter into it.
9    Q. Let me just go over one quick piece of
10 evidence with you -- not evidence, one little teeny
11 rule and then we'll be done.
12        We've been talking about life versus death.
13 And I'm not going to put anything up there, I'm just
14 going to tell you. We've been talking about life
15 versus death. You understand what the death penalty
16 is?
17    A. Yeah.
18    Q. I've kind of run that into the ground. Do
19 you understand what a life sentence really is, what
20 that really means?
21    A. Yes.
22    Q. Tell me what that means to you, life
23 sentence for capital murder, what happens to the
24 person?
25    A. Well, the life sentence was 40 years without

1 the possibility of parole during that time with no
2 hearing or anything until after that time has
3 elapsed. Based on the age, that basically could be a
4 death sentence.
5    Q. Depending on how old you are, it could -- if
6 you're 17, which is the youngest age you could com.
7 a crime and be prosecuted for capital murder when the
8 State seeks the death penalty and get a life sentence,
9 that would make that person eligible when he's 57.
10    A. Yeah.
11    Q. If Jack Ruby had been prosecuted under this
12 statute and received a life sentence for killing Lee
13 Harvey Oswald on November 23rd of 1963, he still
14 wouldn't be eligible for parole, at least for another
15 three or four months.
16        Do you see how that works?
17    A. Yes.
18    Q. That's quite a length of time.
19    A. Yes, it is.
20    MR. RAY: I believe that's all.
21    THE COURT: Mr. Morgan, will you step
22 outside for just a second? I'll be able to let you
23 know shortly if you have any further obligation.
24    (Venireperson Morgan exits the courtroom.)
25    THE COURT: What says the State?

## Page 149

1    MS. CALLAGHAN: The State accepts this
2    juror, Your Honor.
3        MR. RAY: Can we have just a second?
4    (Brief pause.)
5        MR. RAY: We're going to strike him.
6        THE COURT: Have him step back in, please.
7    (Venireperson Morgan enters the courtroom.)
8        THE COURT: Mr. Morgan, you are released
9    from any further service in this case. Thank you very
10   much for the time you spent down here and the
11   attention you paid to the case. You have no further
12   obligation to us. Thank you.
13   (Venireperson Morgan exits the courtroom.)
14   (Break taken.)
15       THE COURT: All right. What do y'all say
16   about Venireman No. 9?
17       MR. RAY: We'll agree to excuse No. 9.
18       MS. HARTMANN: We've agreed on 9.
19       THE COURT: All right. No. 9 is excused by
20   agreement.
21       MR. RAY: But before we go on, Judge, you
22   had indicated, the Court had indicated that you got a
23   call from Ms. Enlow, which is Juror No. 36. It was my
24   understanding, I don't know if it was on the record or
25   not, but you'd indicated at least in the courtroom and

## Page 150

1    I heard you say that you excused her under
2    Section 35.03 because she told the Court she had
3    travel arrangements or plane ticket or something to
4    that effect?
5        THE COURT: That's correct.
6        MR. RAY: We would object to the Court
7    having done that. It was my understanding during jury
8    selection -- excuse me. It was my understanding on
9    the 8th when we had the jury big panel, there were
10   some people that had indicated, and I don't remember
11   which ones they were, but I guess she was one of them,
12   maybe she was one of them that had indicated that she
13   had a travel conflict. And what I had heard the Court
14   say at that point in time was if you get notice to be
15   here and it's the time that we need you for jury
16   service to come in and be interviewed, the Court would
17   take up the matter then.
18       I would submit that the way to having
19   excused her or instead of excusing her was to have her
20   come in at some other time and we could just, if we
21   didn't have a challenge for cause by either side,
22   either side could just exercise their peremptory
23   challenges at the point in time when she became
24   necessary, which wouldn't put us out of sync.
25       And so for those reasons, we would object to

## Page 151

1    the Court having excused Ms. Enlow sua sponte.
2        THE COURT: You have your objection. What I
3    told them at the earlier opportunity was if there was
4    a conflict that arose, that we would take it up at
5    that time. But we wouldn't know if there was going to
6    be a conflict until we contacted them for the
7    individual interview.
8        In the future if y'all want to agree to take
9    these people out of order, we can try to do that. But
10   there was no such agreement to try to take people out
11   of order.
12       MR. RAY: I understand, Judge.
13       THE COURT: And in the past there's always
14   been an objection in other cases I've tried to taking
15   persons out of order.
16       MR. RAY: Well, it wouldn't be taking
17   someone out of order. If we brought her in this
18   afternoon, for instance, and the State didn't have a
19   challenge for cause and we didn't have a challenge for
20   cause and then we just let her go on her trip or
21   wherever she had to go during her time for jury
22   service to be interviewed independently, what her
23   normal time would be, it would seem to me that if we
24   took up the peremptory challenges at the point that we
25   got after, in this instance Juror No. 35, we could've

## Page 152

1    made that --
2        THE COURT: We can do that if there's an
3    agreement to do that. But there hasn't been to now.
4        MR. RAY: Right. My objection goes to the
5    fact that the Court excused her without telling us. I
6    mean, you've already excused her.
7        THE COURT: That's right, I have.
8        MR. RAY: So there's no remedy at this point
9    in time for what's already been done. And that's part
10   of the basis of my objection.
11       THE COURT: Well, there's another person,
12   No. 33 is going out of town for his individual
13   interview and he's going to be gone for two or three
14   weeks. If y'all want him beforehand, let me know.
15   Otherwise I'm going to excuse him under 35.03, also.
16   He told us about this difficulty at the August 8th
17   opportunity.
18       MR. MOORE: No. 33?
19       THE COURT: No. 33.
20       MR. RAY: Judge, with all respect, I would
21   like to interview him at some point other than when
22   his scheduled time is, assuming that we get that far.
23   If it gets to a situation where we don't get to Juror
24   No. 33, then obviously --
25       THE COURT: We're going to get to Juror

| Page 153 |
|---|

1 No. 33.
2    MR. RAY: More than likely.
3    THE COURT: You can be sure of that.
4    MR. RAY: I'd at least like the opportunity
5 to --
6    THE COURT: When do we want him? We could
7 schedule him for sometime next week. He has a closing
8 in Arkansas and I think it's on the 25th.
9    MR. RAY: I don't care when the Court
10 schedules him. I don't care when you schedule him
11 for, Judge.
12    THE COURT: We already have next week's
13 schedule, so one day is going to be a long day. Which
14 one do you want it to be?
15    MR. RAY: You could bring him on Friday
16 afternoon. We don't have anybody scheduled on Friday
17 afternoon.
18    THE COURT: That's because we have pretrials
19 scheduled. Will we have time that day for pretrials?
20 Don't y'all have a bunch of people coming from out of
21 town?
22    MS. HARTMANN: We have a number of people.
23 I can't tell you how long it will take because that
24 obviously depends upon the length of cross-examination
25 and some other issues. I mean, it could take half a

| Page 154 |
|---|

1 day, it could take the whole day. I don't know.
2    MR. MOORE: We're starting in the morning
3 Friday, aren't we? But no jurors, just motions.
4 Okay.
5    MR. RAY: I don't care when you do it,
6 Judge. However you want to handle that is fine.
7    THE COURT: All right. I will just ask
8 Sheila to have him come down at some time that's
9 convenient for him before his vacation and hope he's
10 back in time for the trial.
11    MR. RAY: Lastly, Judge, I would ask that
12 we, at the appropriate time, that we be allowed to
13 offer a copy of Ms. Enlow's questionnaire for the
14 record.
15    THE COURT: You may.
16    MR. RAY: In that I would submit the Court's
17 ruling is harmful in some of the answers that I
18 remember from her answering.
19    THE COURT: Okay. Are you ready for your
20 next venireman?
21    MR. RAY: And the only other thing is I'd
22 ask for an additional peremptory challenge at this
23 point.
24    THE COURT: Denied.
25    MR. RAY: Thank you.

| Page 155 |
|---|

1    THE COURT: Leroy Hernandez, please.
2    (Venireperson Hernandez enters the courtroom.)
3    THE COURT: Good afternoon.
4    VENIREPERSON HERNANDEZ: Good afternoon.
5    THE COURT: Please raise your right hand,
6 sir.
7    (Venireperson Hernandez sworn.)
8    THE COURT: And would you tell us your name,
9 please?
10    VENIREPERSON HERNANDEZ: Leroy Hector
11 Hernandez.
12    THE COURT: Mr. Hernandez, this is the
13 individual interview that we're going to commence at
14 this time. The State of Texas is seated at that table
15 right there and the defense is seated at that table
16 over there.
17    The State is Michele Hartmann and Lisa
18 Callaghan.
19    MS. HARTMANN: Good afternoon.
20    THE COURT: The defense is Tim Moore.
21    MR. MOORE: Hi.
22    THE COURT: Bill Ray.
23    MR. RAY: How you doing?
24    THE COURT: And the Defendant, Billy Jack
25 Crutsinger.

| Page 156 |
|---|

1    And for the next little while, each side,
2 first the State and then the defense will be given an
3 opportunity to ask you questions regarding your
4 background and qualifications to be a juror in this
5 type of case. Both sides will want to know how you
6 feel about the different areas of the law that are
7 going to be a part of the trial. They're going to ask
8 you how you feel about those different areas and give
9 you an explanation of how the law works.
10    Based upon that oath you took just a second
11 ago, all you owe us is an honest explanation of how
12 you feel on those matters because there is no right or
13 wrong answer to any of the questions that are asked
14 here this afternoon.
15    VENIREPERSON HERNANDEZ: I understand.
16    THE COURT: State may proceed.
17    MS. CALLAGHAN: Thank you, Your Honor.
18    LEROY HERNANDEZ,
19 having been duly sworn to make true answers to such
20 questions as may be propounded by the Court or under
21 its direction, touching upon his service and
22 qualification as a juror, gave answers as follows:
23    VOIR DIRE EXAMINATION
24 BY MS. CALLAGHAN:
25    Q. How are you doing today, Mr. Hernandez?

| Page 157 | Page 159 |
|---|---|
| 1   A. I'm doing well. | 1   Q. Okay. You hesitated there. |
| 2   Q. Good. My name is Lisa Callaghan. This is | 2   A. The reason I hesitated was we all work. But |
| 3 Michele Hartmann. And together we represent the State | 3 I feel like this is my duty and if I need to be here, |
| 4 of Texas in this case. | 4 I will be here. |
| 5      As the Judge has told you, this is a capital | 5   Q. Okay. Good deal. It's also possible that |
| 6 murder case and the State is seeking the death | 6 during that period of time the jury may be |
| 7 penalty. I don't recall, have you been a juror | 7 sequestered, meaning that they will have to stay at a |
| 8 before? | 8 hotel as opposed to going home for the evening. |
| 9   A. Not of this magnitude, no. | 9 Understanding that's not particularly pleasant, but do |
| 10   Q. I'm sorry, what? | 10 you think you'd be able to do that? |
| 11   A. I have not been a capital murder juror | 11   A. Again, I will do it if I need to. |
| 12 before. | 12   Q. Okay. All right. Good deal. |
| 13   Q. But you have been a juror on another type of | 13      Let's talk a little bit about the order of |
| 14 case before? | 14 trial. As you remember from previous service, a trial |
| 15   A. Yes. | 15 in this state is separated into two phases. The first |
| 16   Q. Well, then, you probably realize by now the | 16 phase has to do with the guilt or innocence of the |
| 17 procedure here is quite a bit different than it is on | 17 defendant and that's the only thing that you hear |
| 18 the other cases? | 18 during that portion of the trial is evidence relating |
| 19   A. I understand. | 19 to whether that person did the crime or not, okay? |
| 20   Q. The reason we brought you down individually | 20      If a person is found not guilty, that's the |
| 21 is to talk to you about what the law is in a capital | 21 end of it, of course. But if a person is found |
| 22 murder case and to make sure that you're okay with | 22 guilty, then you proceed to the second mini-trial, |
| 23 that law and that you understand it, and also to talk | 23 which is on the punishment phase. And at the |
| 24 to you about what your feelings are concerning capital | 24 punishment phase, that's where you hear evidence |
| 25 punishment and issues that may relate to this case so | 25 concerning a person's character, good or bad, |

| Page 158 | Page 160 |
|---|---|
| 1 that we can make sure that you are able to follow the | 1 background, prior criminal history, anything like that |
| 2 law should you become a juror. But if you're not able | 2 that gives you an idea of the nature and character of |
| 3 to follow the law, if you have some personal issues | 3 the person you're sentencing. It's like in |
| 4 that would prevent you from being fair and impartial, | 4 guilt/innocence you get a snapshot of just that day in |
| 5 that we find those out and talk about them, okay? | 5 their life sort of thing. But you get the whole photo |
| 6   A. I understand. | 6 album on punishment so that you can see where this |
| 7   Q. So the important thing here is to remember | 7 fits in the scheme of their whole life, okay? |
| 8 there are no right or wrong answers, but if there's | 8   A. I understand. |
| 9 anything that you need to know about, anything that is | 9   Q. Now, the State goes first in everything |
| 10 bothering you or that you think might be an issue, | 10 because we have the burden of proof, meaning that we |
| 11 please tell me whether I ask it or not, okay? | 11 start in opening statement, we give it first. In the |
| 12   A. Okay. | 12 evidence we put on evidence first. In final argument |
| 13   Q. And also make sure you understand everything | 13 we argue first. We also argue last because we carry |
| 14 before you leave here today after today. Because | 14 the burden of proof. The State must prove its case |
| 15 after today, we won't be able to talk personally like | 15 beyond a reasonable doubt. And there's a presumption |
| 16 this. | 16 of innocence, meaning that the defendant is presumed |
| 17   A. Yes, ma'am. | 17 innocent in law until and unless the State can present |
| 18   Q. Now, this trial we anticipate will actually | 18 enough evidence to overcome that presumption by |
| 19 go to trial in terms of the evidence being presented | 19 proving its case beyond a reasonable doubt. |
| 20 in September, September 22nd, that week. And we | 20   A. I understand. |
| 21 anticipate it should take anywhere from five days to | 21   Q. Does that make sense to you? |
| 22 two weeks to present the evidence. | 22   A. Of course. |
| 23      Now, would that be a problem scheduling-wise | 23   Q. Good deal. Now, as I said, the burden of |
| 24 for you? | 24 proof is beyond a reasonable doubt. There's not |
| 25   A. No, ma'am. | 25 really a definition of what that means. But what it |

Page 161

1 most definitely does not mean it is beyond any doubt, all
2 doubt, 100 percent. And I'm sure you can see kind of
3 why that is.
4      In order to know something beyond any doubt
5 at all, how would you have to know it?
6    A. You'd have to be there.
7    Q. Sure. And if you were there, where would
8 you be sitting in this courtroom?
9    A. On the other side.
10    Q. Well, you'd be sitting in the witness
11 stand. You'd be a witness and you'd be testifying to
12 what you saw. You certainly wouldn't be a juror.
13    MR. MOORE: He is sitting in the witness
14 stand.
15    Q. (BY MS. CALLAGHAN) You are sitting in the
16 witness stand, that's right. Thank you.
17    Anyway, so you can see why the State could
18 not empanel 12 eyewitnesses, it wouldn't be possible.
19 So the State's burden is beyond a reasonable doubt.
20    Do you think you could follow that?
21    A. I can.
22    Q. And do you feel like you would hold the
23 State to any higher burden than that?
24    A. I feel like the State needs to prove to me
25 whatever the problem is, that they can prove that he

Page 162

1 or she did the crime.
2    Q. Okay. Beyond a reasonable doubt?
3    A. Correct.
4    Q. Okay. But you would not hold us to anything
5 higher than that?
6    A. I would not.
7    THE COURT: Did they ask you about the
8 medications that you take?
9    VENIREPERSON HERNANDEZ: I'm sorry?
10    THE COURT: Have they asked you about the
11 medications you take.
12    VENIREPERSON HERNANDEZ: No.
13    THE COURT: Is there anything about your
14 health situation to make jury service difficult for
15 you?
16    VENIREPERSON HERNANDEZ: I'm just diabetic.
17    THE COURT: Thank you.
18    Q. (BY MS. CALLAGHAN) Is your diabetes
19 controlled through insulin or through medication?
20    A. Medication. It's Type II.
21    Q. You take care of your diet, take some
22 medicine and you're all right?
23    A. Correct.
24    Q. Good deal. You were handed a witness list
25 earlier. Did you recognize the name of any person on

Page 163

1 that witness list?
2    A. I did not.
3    Q. Now, let's talk a little bit about the
4 elements of capital murder. An element is a piece of
5 the puzzle. We have to put all those pieces together
6 and prove each element beyond a reasonable doubt in
7 order to make the completed picture, the completed
8 prong, and that is all the State has to prove.
9    So what are the elements here of capital
10 murder? Well, first of all, capital murder is a
11 murder, a regular, plain murder under the statute,
12 plus some aggravating or special circumstance that
13 makes it capital, okay? So the vast majority of
14 murder cases are not capital, okay? The vast majority
15 are just plain murder.
16    A. I understand.
17    Q. The only ones for which you can stand at
18 jeopardy of the death penalty, though, are capital
19 murders. So that's within the category of murder.
20 That's a fairly limited number of cases, okay?
21    A. Yes.
22    Q. Now, what are the elements, first off, of
23 murder? Well, in order to prove that a murder
24 occurred, you must prove that, of course, it was the
25 Defendant, it was the same person. That the offense

Page 164

1 occurred in Tarrant County, Texas. That it occurred
2 on or about a certain date. That it was caused
3 intentionally, that they intentionally caused the
4 death of an individual by, and then fill in the
5 blank: By shooting them, stabbing them, drowning
6 them, whatever they did to cause the death, okay?
7    So it's intentionally caused the death of an
8 individual by X.
9    A. Whatever means, okay.
10    Q. Yeah. Okay. That's what murder means.
11 Well, so what makes it capital? Well, there are
12 certain types of murders that can be capital murders.
13 For example, the intentional killing of a child under
14 six years of age, that is a capital murder. The
15 intentional killing of a police officer or fireman in
16 the course of their duties is capital. If you
17 intentionally kill someone during the course of
18 committing another felony, like an aggravated robbery
19 or a kidnapping or sexual assault, that is capital
20 because you're committing another felony offense and
21 you commit the murder while doing it, okay?
22    And then finally, and this is the one we pay
23 more attention to because it's operative in this case,
24 is the intentional killing of more than one person,
25 okay, during the same criminal transaction, all

Page 165

1 right? So what we're talking about is in an
2 uninterrupted chain or sequence of events at the same
3 time committing the murder of more than one person.
4 Could be two or it could even be more than that.
5        Now, does that make sense to you?
6    A. I understand.
7    Q. Now, those aren't all the aggravating
8 factors, there's more on the list, but those are some
9 examples.
10       Let's go then to the elements of capital
11 murder. You see, it's a combination of both of those
12 things. Some of those elements in there have
13 technical definitions. For example, on or about a
14 certain date. We have to prove that something
15 happened on or about a certain date. Well, really
16 what we have to prove there is that it occurred before
17 the date of the return of the indictment and within
18 the statute of limitations. We don't have to be any
19 more specific about what date it was in there.
20       So let's say the indictment in this case was
21 returned today. Today is the 19th, right?
22    A. Correct.
23    Q. So we'd have to prove that it was a day
24 before today, before August 19th, as long as that day
25 was within the statute of limitations. Well, in a

Page 166

1 murder case there is no statute of limitations, okay?
2 So what we have to do is say, hey, it has to be before
3 August 19th, 2003. And any day you pick in there is
4 just as good as any other day, okay?
5        Does that make sense?
6    A. Yes, I understand.
7    Q. Let's talk a little bit about
8 intentionally. What we mean by intentionally is that
9 something was their conscious objective or desire to
10 cause the result. They meant to do it, okay? That
11 was their conscious objective or desire to cause the
12 result?
13    A. At that time?
14    Q. At that time, exactly.
15       Okay. Let's pretend for a moment I came up
16 and I shook your hand, all right? How do you know
17 that I wanted to shake your hand?
18    A. By extending your hand.
19    Q. Would you agree with me that sometimes you
20 can tell a person's intent by what they do as opposed
21 to what they say?
22    A. Sure.
23    Q. They won't necessarily say, excuse me, it is
24 now my intention to cause the death of more than one
25 person by hitting them in head with a rake. They're

Page 167

1 unlikely to say that out loud, but you could tell by
2 their behavior what they intended.
3        Does that makes sense to you?
4    A. That makes sense.
5    Q. Do you think you could find a person's
6 intent from their behavior and their actions?
7    A. Yes.
8    Q. You'll notice that there's something you
9 don't see in this list up here. You don't see the
10 word premeditation. The reason for that is that the
11 law does not require that a capital murder be
12 premeditated. There is no requirement that it be
13 premeditated, meaning that there is no requirement
14 that it be thought out or planned in advance. Intent
15 can arise like that, okay?
16       Does that make sense to you?
17    A. Yes, I understand.
18    Q. Okay. Although premeditation is something
19 you might consider in the punishment phase or might
20 not, depending on how you feel about it, but you can
21 certainly consider it, but it's not required under the
22 law, okay?
23    A. Okay.
24    Q. Now, if a person is convicted of capital
25 murder, beyond a reasonable doubt the jury finds him

Page 168

1 guilty, then you go on to the punishment phase. And
2 in the punishment phase, the Judge gives you in the
3 jury charge two questions, okay? Those two questions
4 are called special issues. And they're arranged in a
5 certain order. And depending on how you answer those
6 questions, that determines whether or not the Judge
7 sentences the person to life or to death, okay? Now,
8 in a capital murder case, there's only those two
9 options of punishment, either life or death, okay?
10       Now, let me explain for a minute what we
11 mean by life. By life we mean that the person must
12 serve 40 calendar years, 40 years day for day for day,
13 flat years, no good time, no exceptions to the rule,
14 40 years and then at that time they are eligible for
15 parole, meaning that the Board of Pardons and Paroles,
16 if they decide to, can parole them, or they don't have
17 to. You can't tell after 40 years whether a person
18 will or will not get paroled, that's up to the Board
19 of Pardons and Paroles. But they can't even put them
20 on the calendar to make that decision until 40 actual
21 years have passed, okay?
22    A. I understand.
23    Q. All right. That's what that means.
24       So the special issues, depending on how you
25 answer them, that determines whether or not the Judge

| Page 169 | Page 171 |
|---|---|

Page 169

1 sentences the person to life or death. You don't just
2 vote, hey, I want life or I want death, it doesn't
3 work that way, okay?
4 A. Okay.
5 Q. Now let's go ahead then and look and see
6 what the two questions are that you would be asked to
7 consider.
8 The first one is the one that we call the
9 future dangerousness question. This is Special Issue
10 No. 1. And this is the order in which you would
11 receive them. The very first question -- well, wait a
12 minute, why don't you go ahead and read it for just a
13 minute to yourself.
14 (Brief pause.)
15 Q. Are you ready?
16 A. I'm ready.
17 Q. What does that mean to you?
18 A. To me it means that if for some reason after
19 40 years that he would go back into society, would he
20 commit another crime.
21 Q. Okay. Well, there isn't necessarily the
22 limitation of after they had served 40 years. That's
23 not really what it's asking. It's asking you
24 generally.
25 A. Oh, generally, okay.

Page 170

1 Q. Okay. Have you looked at it again?
2 A. Yes.
3 Q. Okay. All right. The question generally is
4 based on the evidence that you have seen, do you find
5 that there is a probability that the Defendant would
6 commit criminal acts of violence that would constitute
7 a continuing threat to society, okay?
8 Probability. The word probability will not
9 be defined for you anywhere, okay? What we know,
10 though, is that it is more than a possibility, but
11 less than a certainty, okay?
12 Let me ask you this, have you ever flown on
13 a commercial airplane?
14 A. I have.
15 Q. Okay. Is there a possibility when you get
16 on that plane that it may crash?
17 A. There is.
18 Q. Okay. Is it a certainty that that plane
19 would crash?
20 A. There is not.
21 Q. Yeah, because you would never get on there
22 if there was, right? So probability is somewhere in
23 between those two things. That's all we can really
24 tell you about it. That the Defendant would commit
25 criminal acts of violence.

Page 171

1 Criminal acts of violence, what does that
2 mean to you?
3 A. Willful harm to somebody else, willfully
4 wanting to hurt somebody.
5 Q. The law says it can be anything from
6 property crimes like arson all the way up to another
7 murder. The law does not define for you what is a
8 criminal act of violence. You may decide anywhere in
9 there what acts are criminal acts of violence, okay?
10 It can be simple assault, assault with weapons,
11 murder, arson, any one of a number of things. What
12 you decide is a criminal act of violence, okay?
13 And then finally it says criminal acts of
14 violence that would constitute a continuing threat to
15 society. Society is not defined, either. By society
16 you can mean the people in this room, you can mean the
17 people on the street, you can mean the people in
18 Tarrant County, and you can even mean the people --
19 A. People in general.
20 Q. People in general or even people in the
21 penitentiary. It can include people who are other
22 prisoners, who are employees of the penitentiary,
23 people who serve food, cut hair, people who are
24 guards. Society can mean what you define it to be,
25 okay?

Page 172

1 A. Okay.
2 Q. All right. Now, on this particular
3 question, Special Issue No. 1, future dangerousness,
4 the State has the burden of proof. We must prove this
5 to you beyond a reasonable doubt. So we have the
6 burden on that as well.
7 If you answer this question yes, that that
8 person would be a continuing threat to society, then
9 you go on to the second special issue, okay? That's
10 one step closer to the death penalty if you say yes
11 that person is a future danger.
12 If you say no to it, then at that point the
13 Defendant is sentenced to life. You don't go on
14 because that answers the question right there, okay.
15 A. Okay.
16 Q. Now, in order to answer that question yes,
17 all 12 of you must agree, because that's one step
18 closer to the death penalty. All 12 must agree to say
19 yes, but only ten must agree to say no. If ten of you
20 agree to say no, then it's no and a life sentence is
21 imposed.
22 Does that make sense to you?
23 A. It makes sense.
24 Q. So understanding that now and taking into
25 account everything that I have just told you, can you

Page 173

1 envision in your mind a circumstance in which you have
2 listened to the evidence, found a person guilty of
3 capital murder and then proceeded to this first
4 special issue, considered all of the evidence and
5 decided in your mind to answer this question no, I do
6 not think that there is a probability that this person
7 would commit criminal acts of violence that would be a
8 threat to society in the future? I understand he
9 committed this offense, but I don't think that he's
10 going to be a future danger.
11      Can you envision a situation where you could
12 make that decision?
13 A. Once his background was presented, we could
14 go from there.
15 Q. Okay. You feel like depending on what the
16 facts and evidence are --
17 A. Yes.
18 Q. -- you could make that decision if the
19 evidence supported it?
20 A. Yes.
21 Q. Okay. Can you also, on the other side,
22 envision a situation where you have convicted someone
23 of capital murder and you've considered all the
24 evidence and you decide, well, yeah, I do think that
25 person would be a future danger?

Page 174

1 A. Sure.
2 Q. You could envision that as well?
3 A. Under the same circumstances. Because once
4 you learned about the person's background, you know
5 what his history is, what his tendencies are, where he
6 has gone in his life up until that point and you can
7 make an intelligent situation.
8 Q. Very good. Let me point one thing out to
9 you. Depending on the facts of the case, you might be
10 able to, depending on what you think is proper and
11 fair, look at the facts of only this offense and
12 decide based on only this offense with no other
13 information that that person would be a future
14 danger. You could do that, that's within the law.
15      On the other hand, you might look at this
16 offense and think no, I need to consider the history
17 and decide from both the facts and the history whether
18 this person is a future danger. You can do that,
19 too. It's up to you whether you base it solely on
20 that or whether you consider everything. You should
21 think about and consider everything, but what I'm
22 saying is some offenses are so violent, so terrible,
23 you might be able to decide it just based on the facts
24 of the offense.
25      MR. MOORE: I'm going to have to object to

Page 175

1 that because your charge tells them in answering that
2 question that they have to take into account the
3 background and circumstances of the Defendant.
4      THE COURT: Sustained.
5      MR. MOORE: And I would ask you to ask this
6 juror to disregard that last example.
7      THE COURT: Disregard the last example,
8 please, sir.
9 Q. (BY MS. CALLAGHAN) It is always proper for
10 you all the time to always consider all the evidence
11 presented before you.
12 A. I understand.
13 Q. You must consider everything before reaching
14 a decision. That makes sense to you, right?
15 A. That makes sense.
16 Q. But you understand the point I was trying to
17 make?
18 A. I did.
19 Q. Okay. All right. Now, if you answer yes to
20 this, then you would go on to the second question, the
21 second special issue. Why don't you take a minute and
22 go ahead and read it.
23      (Brief pause.)
24 Q. Have you had a chance to read that?
25 A. Yes, ma'am.

Page 176

1 Q. Okay. Basically this question has no burden
2 of proof, okay? There's no burden on either side in
3 this question. What this question is is basically a
4 fail-safe, okay? Because if you've found the person
5 guilty of capital murder and then you've answered yes
6 to the first question, you're well down the road to a
7 death penalty, okay, to a sentence of death.
8      This question gives you an opportunity to
9 sit back, consider all of the evidence that you have
10 heard and decide whether or not taking everything into
11 account this person still merits the death penalty or
12 whether there is some mitigating circumstance,
13 something that lessens the Defendant's moral
14 culpability in all this that would make him worthy of
15 a life sentence instead. It's the last stop, the last
16 moment of hesitation before you make that decision.
17      Does that make sense to you?
18 A. Yes, ma'am, a fail-safe.
19 Q. A fail-safe, exactly. So, now, mitigating
20 circumstance. Generally speaking what we mean by that
21 is something which lessens the Defendant's moral
22 responsibility for the crime.
23 A. I'm sorry, repeat that again.
24 Q. Generally what we mean by that is something
25 that lessens the Defendant's moral culpability for the

| Page 177 | Page 179 |
|---|---|
| 1 crime. It reduces the amount of their moral<br>2 responsibility for it, okay?<br>3     Now, some people consider that evidence, for<br>4 example, of child abuse when they were a child, if<br>5 they had been the victim of child abuse, drug and<br>6 alcohol addiction, things like that. Some people<br>7 think that those circumstances are mitigating. Other<br>8 people do not believe so. Which circumstances you<br>9 find to be mitigating are up to you. You may consider<br>10 and you should consider all of the evidence, but the<br>11 weight that you give them and whether or not you<br>12 consider them to be mitigating is eventually up to you<br>13 to decide, okay?<br>14     So what you essentially would do in a case<br>15 like this, if you have answered, you've found the<br>16 person guilty, you've answered No. 1 yes, then at this<br>17 point you would sit back and listen to the evidence<br>18 and consider points that are presented to you as<br>19 possible mitigating issues. And first of all, you<br>20 have to decide whether or not you think they're true,<br>21 whether they factually occurred or not, okay?<br>22     If you find that they did, then you have to<br>23 ask yourself, well, is that mitigating? If you find<br>24 that it is, then you have to consider thirdly whether<br>25 or not it is sufficiently mitigating to warrant that a | 1 dangerousness question does not necessarily in and of<br>2 itself take into account all circumstances which might<br>3 have affected that person in causing them to commit<br>4 the crime as they did, okay?<br>5     MR. MOORE: Well, I'm going to have to<br>6 object to that because they're supposed to base it on<br>7 all the evidence. And those two questions are<br>8 answered at the same time.<br>9     MS. CALLAGHAN: Your Honor, the State would<br>10 object. That's not true. They're not answered at the<br>11 same time. They're answered separately.<br>12     THE COURT: Let him finish his objection.<br>13     MS. CALLAGHAN: I'm sorry, Your Honor.<br>14     MR. MOORE: And I may be wrong. But she's<br>15 making it sound like you hear the evidence about<br>16 Question No. 1 and then you hear additional evidence<br>17 about Question No. 2. And that's just not the<br>18 situation as we know. That you hear all the evidence<br>19 and then you answer those questions, one after the<br>20 other.<br>21     THE COURT: Overruled.<br>22     MR. MOORE: Did I make myself clear?<br>23     THE COURT: The whole thing is muddled to<br>24 me, the explanation and the objection.<br>25     Q. (BY MS. CALLAGHAN) Now, you understand that |

| Page 178 | Page 180 |
|---|---|
| 1 sentence of life be imposed as opposed to death,<br>2 okay? So that's kind of the reasoning process that<br>3 you would look at in considering that evidence, okay?<br>4     A. Yes, ma'am.<br>5     Q. All right. Is there anything I've said so<br>6 far that is confusing or that you're wondering about<br>7 or that you have any questions about?<br>8     A. Not to this point.<br>9     Q. All right. Now, once again let me ask you,<br>10 can you envision a situation in which you would find<br>11 someone guilty of capital murder, you would answer yes<br>12 to future dangerousness, that you do think they are a<br>13 future danger to society, but then with regard to this<br>14 question, you would sit back, consider and say, you<br>15 know, yes, I do think there are mitigating<br>16 circumstances here. I do think there are<br>17 circumstances that reduce this person's moral<br>18 culpability and I do think they're sufficient to give<br>19 them a life sentence. Yes, under the circumstances I<br>20 think that's fair.<br>21     Can you envision a circumstance in which you<br>22 would do that?<br>23     A. No.<br>24     Q. Okay. Let's go back then for a minute and<br>25 let me ask you this. Understanding that the future | 1 you've listened to all the punishment phase evidence<br>2 before you answer these questions, right?<br>3     A. Yes.<br>4     Q. But the first question that you're being<br>5 asked to focus on specifically goes to the person's<br>6 future dangerousness, okay?<br>7     A. And I answered that yes.<br>8     Q. Yeah. Because that's all you're considering<br>9 at that point is whether or not they'd be dangerous in<br>10 the future, okay? You're not focusing on the issues<br>11 in this second question. The second question is<br>12 asking you about general moral culpability. That's<br>13 where you have an opportunity to take into account all<br>14 kinds of thing that you might not have considered<br>15 relevant to the first question, okay, such as their<br>16 raising, their upbringing, their past.<br>17     MR. MOORE: And I'm going to have to object<br>18 because that is not a correct statement of the law.<br>19 He's asked to take that into consideration in the very<br>20 first question.<br>21     THE COURT: Sustained.<br>22     MR. MOORE: And ask the juror to disregard<br>23 that last statement.<br>24     THE COURT: Denied.<br>25     Q. (BY MS. CALLAGHAN) You do understand that |

Page 181

1 they are separate questions?
2    A. I do understand that.
3    Q. Now, can you tell me with regard to the
4 mitigation question why you think there would never be
5 a circumstance in which you could answer it yes?
6    A. I usually feel that a person is responsible
7 for their own actions. And at that time I have
8 already decided that they would be a danger to society
9 and I just don't see where any mitigating
10 circumstances would change my mind.
11    MR. RAY: We submit him for cause, then.
12    VENIREPERSON HERNANDEZ: I'm sorry, I didn't
13 hear you.
14    MS. CALLAGHAN: If I may ask a few more
15 questions, Your Honor.
16    THE COURT: Go ahead.
17    Q. (BY MS. CALLAGHAN) Do you think it's
18 possible that there are mitigating circumstances out
19 there, you just haven't thought of them yet?
20    A. There may be, yes.
21    Q. Would you be open to considering those
22 issues should they be presented before you in this
23 case?
24    A. Of course. I've got an open mind.
25    Q. So at this point you can't personally think

Page 182

1 of anything that might cause you to answer that yes,
2 but you're willing to wait for it, wait for the
3 evidence and then decide whether you should answer it
4 yes or no?
5    A. I'm open to that, yes.
6    Q. You haven't foreclosed anything at this
7 point?
8    A. Correct.
9    THE COURT: Challenge is denied.
10    Q. (BY MS. CALLAGHAN) Now, let's talk about a
11 couple of more general issues involving the law.
12 Voluntary intoxication. The law is that if you
13 voluntarily become intoxicated on drugs or alcohol,
14 that that is not a defense to committing a crime. It
15 is something that you can consider as mitigation if
16 you think it is mitigating, okay? But that it is not
17 a defense to the commission of a crime.
18    Does that make sense to you?
19    A. I understand.
20    Q. Next thing. The law is that with regard to
21 certain issues, the State must be able to establish
22 that evidence taken by the police in a case of a crime
23 was obtained legally, okay? Evidence must be obtained
24 in accordance with the law, otherwise you can't use
25 it, okay?

Page 183

1    Here's an example of what I mean. On TV
2 have you ever heard of Miranda warnings?
3    A. I'm sorry?
4    Q. Have you ever heard of Miranda warnings?
5    A. Certainly.
6    Q. Right to remain silent, all that sort of
7 stuff, okay. The law is that in order to use a
8 confession that a person gives, you have to give the
9 Miranda warnings before taking that confession, okay?
10 The law in the State of Texas, for example, is even
11 more restrictive than it is in most areas of the
12 country. If you're going to take a written statement
13 from a person, a written confession, the Miranda
14 warnings have to be printed at the top of the page.
15 And if you're going to take an audio or video
16 confession on tape, it has to be at the beginning of
17 the tape, okay?
18    A. Okay.
19    Q. Now, what the law is is that if you don't
20 follow those rules, if you don't do what you're
21 supposed to do with regard to the Miranda warnings,
22 then the jury gets to decide. In the written charge,
23 there is an instruction to them, whether or not that
24 statement was taken legally. And if they decide that
25 it was not taken legally, then the jury must disregard

Page 184

1 that statement and consider the remainder of the
2 evidence that they have in front of them. If they can
3 convict based on the remainder of that evidence, then
4 they will. But if they can't, then they must find the
5 person not guilty because there's the presumption of
6 innocence and that's the State's burden.
7    A. I understand.
8    Q. Do you think you could follow that law?
9    A. Certainly.
10    Q. Now, let me give you the difficult example
11 here, okay? Suppose in a -- and I'm not talking about
12 the facts of this case, remember. This is just to
13 highlight my example.
14    A. Okay.
15    Q. Suppose you have an individual who
16 kidnapped, molested and murdered a child, okay? And
17 the only evidence that you have of that is the police
18 began talking to people that they thought might be
19 involved and they talked to this person and during the
20 course of this interview, this person did confess. I
21 did it, I'd do it again, I liked it, okay?
22    But the police did not follow the rules
23 prior to that statement, they did not give that
24 individual their Miranda warnings. They didn't do it
25 the right way, okay? So very difficult scenario.

Page 185

1  But the question is if you were a juror in a
2  case like that, would you be able if you found that
3  the evidence was illegally obtained, if you found that
4  was factually true, would you be able to disregard
5  that statement, put it to one side, not consider it
6  and consider only the evidence you have left?
7  A. Yes.
8  Q. Okay. And if it turned out that there was
9  not sufficient evidence without that to convict a
10  person, could you find them not guilty?
11  A. Yes. It's very difficult, but I'd say yes.
12  Q. All right. Understanding it would be
13  emotionally just trying, terribly trying. But you
14  could follow the law?
15  A. Yes.
16  Q. Now, a defendant has certain rights. They
17  have the right to an attorney, they have a right to a
18  trial by jury. They have a right to remain silent,
19  meaning that if they choose to testify, that you may
20  consider their testimony just as you would anyone
21  else, okay? You can decide whether or not they're
22  telling the truth or not just as you would weigh any
23  other witness.
24  On the other hand, should they choose not to
25  testify, you cannot hold that against them for any

Page 186

1  reason. You can't consider it.
2  Would you be able to follow that?
3  A. I understand that completely.
4  Q. And would you be able to do that?
5  A. Certainly.
6  Q. Now, suppose you had a particular case, a
7  capital murder case, let's say it was robbery, that
8  the murder was committed in the course of a robbery.
9  The State presents its evidence, but it turns out in
10  that case that what the State presented as a robbery
11  really turned out not to be a robbery, okay, it turned
12  out that this person just had a personal grudge
13  against the individual and went in and shot the clerk
14  because of a personal argument. The robbery really
15  didn't exist. So that person ends of convicted of
16  just plain Jane murder.
17  What you have here in straight murder is you
18  have a range of punishment going from five years all
19  the way up to 99 years or life and up to a $10,000
20  fine. So minimum of five, maximum of 99 or life.
21  The law says that in order to be a fair and
22  impartial juror, you have to be able to consider the
23  full punishment range from a minimum of five to a
24  maximum of life and everything in between, okay,
25  because the legislature set that range of punishment

Page 187

1  not knowing what kind of facts you'd be asked to pass
2  on.
3  It may be that in the case of murder it
4  would be a very rare case where you'd give the
5  minimum. Maybe one in a hundred or one in a
6  thousand. Same thing with the maximum. It might be
7  that you'd look at that and say it's a very rare case
8  I could give the maximum, very unusual.
9  But the question is can you be like a car in
10  neutral and just wait for it, wait until you get the
11  facts and keep an open mind to fairly considering the
12  full range of punishment?
13  A. I can.
14  Q. And would you be able to give all the way
15  from a minimum of five to a maximum of life if the
16  facts justified it and the law allowed it in that
17  case?
18  A. Yes.
19  Q. Now, do you know the name Pat or Patricia
20  Syren or the name Pearl MaGouirk?
21  A. I do not.
22  Q. "RD" MaGouirk?
23  A. No.
24  Q. Did you hear anything about an offense that
25  was committed out on Scott Avenue in April of this

Page 188

1  year, east Fort Worth?
2  A. No, ma'am.
3  Q. None of that rings a bell?
4  A. It does not.
5  Q. Let me look through your individual
6  questionnaire and I'll ask you a few more questions
7  and then that'll be it for me.
8  Do you have five children or are some of
9  those grandchildren?
10  A. I have two children.
11  Q. And the three are grandchildren?
12  A. Yes.
13  Q. There's a question about how you feel about
14  people with emotional disorders and you did not answer
15  that.
16  A. I really didn't know how to answer it to be
17  honest with you. You said emotional disorders.
18  Q. Uh-huh.
19  A. That's so broad. It's really hard. It
20  could be -- I'm sorry, I don't know how to answer that
21  question.
22  Q. Okay. All right. Eyewitness accounts in
23  terms of how reliable do you believe it to be. You
24  put eyewitness account, you put somewhat?
25  A. Eyewitnesses sometimes can -- it isn't

Page 189

1  always -- I don't know, it's hard to explain. What
2  you see isn't always what it actually is. Or I don't
3  know, it just doesn't seem like an eyewitness is
4  always saying exactly what they saw or can express
5  exactly what they saw. I don't know if I can explain
6  myself correctly.
7      Q. To you it's less clear-cut than hard
8  evidence like scientific evidence?
9      A. Yes, exactly.
10     Q. I don't mean to put words in your mouth, but
11  is that basically what you're trying to say?
12     A. Right.
13     MS. CALLAGHAN: I think that's all we have.
14  Thank you very much, Mr. Hernandez.
15     VENIREPERSON HERNANDEZ: You're welcome.
16     MS. CALLAGHAN: Your Honor, we pass the
17  witness.
18     THE COURT: You may proceed.
19     MR. MOORE: Thank you.
20         VOIR DIRE EXAMINATION
21  BY MR. MOORE:
22     Q. Good afternoon, Mr. Hernandez.
23     A. Good afternoon, sir.
24     Q. Again, my name is Tim Moore. My co-counsel
25  is Bill Ray.

Page 190

1      MR. RAY: How you doing?
2      Q. (BY MR. MOORE) That's Billy Jack
3  Crutsinger.
4      THE DEFENDANT: Good afternoon, sir.
5      Q. (BY MR. MOORE) And unless you have any
6  doubts about what is happening here, do you understand
7  that the State's position in this matter is that they
8  believe that Billy Jack is guilty of capital murder
9  and are going to be asking folks like you in a few
10  weeks to answer those questions so that he'll get the
11  death penalty?
12     A. I understand that, yes.
13     Q. It's pretty clear, isn't it?
14     A. Pretty clear.
15     Q. And it would be our position that he has an
16  absolute right to make the State prove their case
17  against him as the law allows. And should they be
18  able to do that, then the death penalty is not
19  appropriate. That's our position; do you understand
20  that?
21     A. I understand that, yes.
22     Q. And so we're pretty far apart here, wouldn't
23  you agree?
24     A. It seems that way.
25     Q. So what we're doing is looking for people

Page 191

1  who can be on nobody's team and don't consider
2  themselves to be on anybody's team to decide that
3  issue; do you understand that?
4      A. Correct.
5      Q. Do you find it to be some kind of an awesome
6  responsibility to think about sitting in judgment of
7  an issue such as this?
8      A. It is a hard responsibility, yes, I agree.
9      Q. And I made a note here that when you were
10  talking to the prosecutor earlier about being
11  sequestered and making decisions in a case like this,
12  you said, well, it's my duty to be here.
13     A. I feel that way, yes.
14     Q. Okay. And some people come in here and it
15  is their duty to show up for jury duty because the
16  Judge can send the deputy sheriff out to get you if
17  you don't show up. But once you sit in that witness
18  chair, that duty -- or that juror chair, that duty is
19  fulfilled; you understand that?
20     A. Yes, sir.
21     Q. In other words, you don't have a duty to go
22  along with the law if you don't like it. Do you know
23  that?
24     A. I understand.
25     Q. And you don't have a duty to answer these

Page 192

1  questions in a way that make people satisfied; do you
2  understand that?
3      A. Yes.
4      Q. Your only duty is to tell us how you really
5  feel about these issues that we're talking with you
6  about.
7      A. About the evidence before me, I understand
8  that.
9      Q. No, not the evidence before you. We can't
10  talk about any evidence, okay? We can't talk about
11  the facts of this case. All we can talk about,
12  Mr. Hernandez, is you and what the law is and how you
13  feel about the law, okay?
14     A. Okay.
15     Q. Now, we can give hypotheticals that have
16  some facts in them, but that's not evidence; you
17  understand that?
18     A. Completely.
19     Q. And so what we need to do is find out how
20  Mr. Hernandez feels about these issues and if you're
21  able to follow the law. Because it's not wrong to not
22  be able to follow the law; you understand that, don't
23  you?
24     A. I understand.
25     Q. That legislature passes laws all the time

| Page 193 | Page 195 |
|---|---|

**Page 193**

1 that people don't agree with, wouldn't you agree with
2 that?
3    A. One hundred percent.
4    Q. And if for some reason this law that we're
5 talking about may not fit you personally, that's okay;
6 you understand that?
7    A. I understand.
8    Q. You don't have a duty to answer these
9 questions in any other way than what's honest to
10 Mr. Hernandez.
11    A. Correct.
12    Q. Because I can tell you this, one of these
13 weeks in the near future you'll be sitting in that
14 jury box or could be sitting in that jury box and if
15 all of a sudden you find at that point in time, you
16 know, come to think of it, I really can't be fair in
17 this situation, then that's too late. You understand
18 that?
19    A. I understand that.
20    Q. This is your only show here, okay?
21    A. Okay.
22    Q. And, you know, there's two parts to every
23 criminal trial; you understand that?
24    A. I understand that.
25    Q. And the first part is whether or not the

**Page 194**

1 State can prove beyond a reasonable doubt to each
2 juror's satisfaction the allegations that they have
3 brought against that person; you understand that?
4    A. Yes, sir.
5    Q. In other words, when the State of Texas
6 points their finger at somebody and says we're
7 accusing you of this, then all the burden falls over
8 here; do you understand that?
9    A. Yes, sir.
10    Q. And so we start with the proposition that a
11 person who has the finger pointed at him by the State
12 is presumed innocent; do you understand that?
13    A. Completely.
14    Q. What does that mean to you?
15    A. It means that until the prosecution can give
16 sufficient evidence to prove the Defendant guilty, he
17 is innocent until that time.
18    Q. Okay. What about the fact that the person
19 has been arrested to begin with? What does that mean
20 to you?
21    A. How many people have been arrested that have
22 not been guilty? A lot.
23    Q. Do you know any of them?
24    A. Not personally.
25    Q. What about the fact that a person has been

**Page 195**

1 charged by the district attorney's office and indicted
2 by a grand jury? What does that mean to you?
3    A. It means that they feel like they have
4 enough evidence to hold them over for trial.
5    Q. What do you think about that?
6    A. That's the way the law works.
7    Q. Does that in your mind create some kind of
8 indication of guilt?
9    A. It creates some indication that they have
10 evidence to hold them over for trial and that's all
11 that it means it me.
12    Q. Okay. And then they have this burden of
13 proof of beyond a reasonable doubt. Are you familiar
14 with that term?
15    A. Completely.
16    Q. How are you completely familiar with that
17 term?
18    A. That I have to be completely convinced that
19 the defendant is guilty of whatever crime he or she
20 were accused of.
21    Q. And there's no definition that the Judge can
22 give you as to what beyond a reasonable doubt means;
23 you understand that?
24    A. That is up to me.
25    Q. That is up to you. But it's a high

**Page 196**

1 standard, would you agree?
2    A. I would agree.
3    Q. Why should it be such a high standard?
4    A. Because in this case somebody's life is at
5 stake.
6    Q. That's exactly right. In any criminal case
7 what we're talking about is freedom.
8    A. That is correct.
9    Q. And that's what we value almost as much as
10 life itself. And so we're here now determining
11 whether or not the State can prove its case beyond a
12 reasonable doubt to your satisfaction, and then if
13 they can, then we have this punishment stage; do you
14 understand that?
15    A. Yes, sir.
16    Q. At the punishment stage -- and we have to
17 talk about that now; you understand that?
18    A. I understand.
19    Q. In other words, the same jury in any kind of
20 criminal case, they not only do the first part, the
21 guilt/innocence part, but then it's their
22 responsibility to also, if they find the person
23 guilty, to assess the punishment, okay? So we can't
24 take a time out after a person is found guilty and
25 then start talking to you about punishment. Our law

Jury Voir Dire Proceedings 8-09-03      State of Texas vs. Juan Quintero   Vol. 4

Case 4:07-cv-02703   Document 86   Filed 11/02/17   Page 137 of 143   PageID 856

Page 197

1 says we have to do it now, okay; do you understand
2 that?
3    A. Yes, sir.
4    Q. And that's why without conceding anything,
5 we must talk to you about some of these issues, okay?
6    A. Okay.
7    Q. Now, the first thing is that to get to
8 capital murder in this particular instance, the State
9 has alleged, and we can't go into the facts, but I can
10 tell you what they've alleged, that there were two
11 people killed in the same incident, okay?
12      Do you remember them telling you about the
13 different ways a capital murder can be committed?
14    A. Yes.
15    Q. Killing of a person in the middle of a
16 robbery or a sexual assault or a child under six. But
17 this particular way is killing two people
18 intentionally in the same criminal episode; do you
19 understand that?
20    A. Yes, sir.
21    Q. How do you feel about that?
22    A. I don't understand the question.
23    Q. Is that an offense -- well, let me ask you
24 this. Before you came and filled out this information
25 sheet, what was your -- or came in here, basically,

Page 198

1 what was your idea in Texas of when the death penalty
2 applied?
3    A. The only thing that I was sure of was the
4 murder of a police officer or fireman on the course of
5 duty. That's the only thing that I knew for sure was
6 a capital offense.
7    Q. And we have this bad habit of saying regular
8 murder versus capital murder. Not lessening anything,
9 but what we mean by regular murder is not capital
10 murder. In other words, if I just walked up and
11 plugged you in the head with a gun, without anything
12 else, that would be just plain murder, regular murder;
13 you understand that?
14    A. Yes, sir.
15    Q. But if I was trying to get your money out of
16 your pocket, that's robbery, and that elevates it to
17 capital murder.
18    A. Now I understand.
19    Q. Do you understand?
20    A. Yes.
21    Q. Do you think that's good? Do you like that
22 law?
23    A. Yes, I do.
24    Q. Why?
25    A. Because there is two crimes actually being

Page 199

1 committed at the same time. And one, the second
2 resulted from the first one. Your intention might
3 have been just robbery and then it escalated to
4 murder.
5    Q. So you'd agree with the distinction that the
6 legislature has made that just killing somebody does
7 not elevate that crime to a death-worthy offense?
8    A. Yes.
9    Q. Do you find -- or in your mind after hearing
10 these examples of why an intentional murder is
11 elevated to a capital murder, do you see any of the
12 examples that you have been given to be not worthy of
13 the death penalty?
14    A. No.
15    Q. And you have some pretty strong opinions
16 about the death penalty, don't you?
17    A. Yes, I do.
18    Q. In fact, we asked you this question about
19 what are some factors that would be important to you
20 in determining whether a person who has been convicted
21 of a crime where the death penalty is appropriate
22 deserves the death penalty and why do you feel this
23 way. And instead of listing the factors, your answer
24 was, "I believe capital murder should get the death
25 penalty."

Page 200

1    A. That is my opinion.
2    Q. Okay. And that's what we're here for is to
3 get your opinion and how you truly feel about these
4 issues. And I appreciate that.
5      So if we start with Mr. Hernandez's opinion
6 that a person who commits capital murder where the
7 death penalty is appropriate should receive the death
8 penalty?
9    A. Yes, sir.
10    Q. Let me ask you this. Let me turn on the
11 projector. Our machine is not working. It'll be up
12 there in a minute.
13      MR. RAY: It's a little noisy.
14    Q. (BY MR. MOORE) Now, first of all, when a
15 juror gets in the jury box to hear this case, they
16 take an oath. And they tell the Judge that they can
17 follow the law so help me God, okay? And you could do
18 that, couldn't you?
19    A. Certainly.
20    Q. And you're Catholic?
21    A. I don't go to church.
22    Q. Don't go to church?
23    A. No.
24    Q. Haven't been influenced a lot by your
25 religion in your life?

**Page 201**

1   A. As a child.

2   Q. As a child. Okay. So I guess what I'm

3  getting at is there's no church-mandated feeling about

4  the death penalty. It's just your individual feeling

5  from life's experiences, I guess?

6   A. That is correct.

7   Q. Okay. And you know now that after the first

8  stage of a trial is over with and a person has been

9  found guilty of capital murder, which you now know is

10  the intentional killing of two individuals in the same

11  incident, okay? That's what that person wanted to do,

12  it was their conscious objective and desire to take

13  the lives of two people at the same time. There

14  wasn't any justification under the law for it. There

15  was no self-defense and there was no insanity issue.

16  It's just a matter of you found those people guilty,

17  or that person guilty beyond a reasonable doubt.

18      And then you go to the punishment stage.

19  And you understand our law says we got to answer this

20  special issue of whether there's a probability that

21  the defendant would commit criminal acts of violence

22  that would constitute a continuing threat to society.

23      Based on just finding them guilty of capital

24  murder as we talked about, would you need any evidence

25  to answer that special issue?

**Page 202**

1   A. No.

2   Q. Taking into consideration all the evidence,

3  including the circumstances of the offense, the

4  defendant's character and -- would you even care about

5  the defendant's character and background at that point

6  in time?

7   A. I answered the question earlier today that I

8  would listen to all phases of the punishment.

9   Q. Okay.

10   A. And make my mind at that time.

11   Q. And so --

12   A. It's not a closed -- I don't have a closed

13  mind. I would be open to whatever circumstances may

14  surround the case.

15   Q. Okay. So I would be wrong if I said

16  Mr. Hernandez feels that if he found somebody guilty

17  of intentionally killing two people in the same

18  episode, that a life sentence is never a possibility?

19   A. Yes.

20   Q. Because a life sentence would be a

21  possibility in your mind? That's what you're telling

22  us?

23   A. No, that's not what I'm telling you. What

24  I'm telling you is that I would listen to the evidence

25  and I could make a decision at this time.

**Page 203**

1   Q. Do you want to be on this jury?

2   A. Yes.

3   Q. So you answer Special Issue No. 1 -- what

4  does probability mean to you?

5   A. That he would, he or she would probably be a

6  danger to society at a later date.

7   Q. But the word probability just in and of

8  itself, what does that mean to you?

9   A. That it's not 100 percent, but there is a

10  good chance that it might happen.

11   Q. And if that society we were talking about,

12  since you're also in favor of a life sentence, were

13  the penitentiary, would you think that that meant a

14  continuing threat to people in the penitentiary?

15   A. Yes.

16   Q. And so in deciding that, you're also asked

17  to take into consideration his character and

18  background and the personal --

19     MR. MOORE: No, put that other one up.

20     MR. RAY: Is that the one you want or do you

21  want the one after that?

22     MR. MOORE: I want the first one with all of

23  it.

24   Q. (BY MR. MOORE) Okay. Do you see that

25  future danger question right there?

**Page 204**

1   A. Yes.

2   Q. Well, the Judge is also going to tell you

3  that when you're deciding beyond a reasonable doubt

4  whether the State's proved that there is a probability

5  he's going to be a continuing threat to society, that

6  you are instructed to consider all evidence admitted

7  at the guilt/innocence stage and the punishment stage,

8  including evidence of the defendant's background or

9  character or the circumstances of the offense that

10  militates for or mitigates against the imposition of

11  the death penalty; do you understand that?

12   A. Yes, sir.

13   Q. That's going to be your duty from this Judge

14  to consider that when you decide if the person is a

15  future danger, okay?

16   A. Okay.

17   Q. And say that you said, okay, I've taken into

18  consideration all that and I find beyond a reasonable

19  doubt not only is he guilty of capital murder, of

20  intentionally killing those two people, but he's going

21  to be a future danger beyond a reasonable doubt in my

22  mind, no matter what society he's in, okay, taking

23  into consideration his character and background.

24     Then you get to that last issue, is there

25  anything at all left for you to consider to answer

Page 205

1 that last question yes, I do find there's a mitigating
2 circumstance? Could you ever envision a situation
3 where that would happen?
4     A. No.
5     Q. So you would answer that mitigation question
6 no all the time?
7     A. You're probably right, yes. That's probably
8 true.
9        MR. RAY: Your Honor, we'd renew our
10 challenge.
11       MS. CALLAGHAN: May I ask a few questions,
12 Your Honor?
13       THE COURT: Challenge is denied.
14       MR. RAY: I'm sorry, I didn't hear you,
15 Judge.
16       THE COURT: Denied.
17     Q. (BY MR. MOORE) Well, and we kind of get
18 hung up on this probably. Only Mr. Hernandez knows.
19 You've taken an oath to follow the law. And if on
20 that question you would violate that oath if you
21 answered it yes, we need to know.
22     A. I understand that.
23     Q. Okay. Do you feel like it would be a
24 violation of your oath to answer that question yes
25 under any circumstance?

Page 206

1     A. If I felt in my heart that I couldn't do it,
2 I wouldn't answer it yes.
3     Q. That's not my question, though, sir.
4     A. I didn't understand your question then.
5     Q. Whether or not after you've found a person
6 guilty of capital murder, after you've found them,
7 going through all their background and circumstances.
8     A. I understood all that.
9     Q. You've taken this oath, sir, to follow the
10 law. And if it would impair you or violate that oath
11 for you to answer that question yes, there is a
12 mitigating circumstance, that's what we need to know.
13     A. I probably couldn't answer that question
14 yes.
15       MR. MOORE: Judge, we would renew our
16 challenge for cause.
17       THE COURT: Well, Mr. Hernandez, what we're
18 -- we're asking you questions about matters of law
19 here. And these questions have no flesh on them.
20 They have no facts -- they have no facts along with
21 them.
22       And you've been asked the same question a
23 number of different ways by both sides. And what it
24 boils down to is this, is that different people think
25 different things of mitigating circumstances. One

Page 207

1 person may believe that "X" condition is a mitigating
2 circumstance and someone else may not.
3       But no matter what you believe or don't
4 believe is a mitigating circumstance, if a mitigating
5 circumstance is presented to you at trial, could you
6 give that mitigating circumstance effect through your
7 answers to these questions?
8       VENIREPERSON HERNANDEZ: No.
9       THE COURT: All right. Challenge is granted
10 and you are excused from any further service here.
11 Thank you very much for your time and attention to
12 this matter this afternoon.
13       MR. MOORE: Thank you, sir.
14       (Venireperson Hernandez exits the courtroom.)
15       (Break taken.)
16       THE COURT: Lisa Elliott, please.
17       (Venireperson Elliott enters the courtroom.)
18       THE COURT: Please raise your right hand.
19       (Venireperson Elliott sworn.)
20       THE COURT: And tell us your name, please.
21       VENIREPERSON ELLIOTT: Lisa Elliott.
22       THE COURT: And Ms. Elliott, this is the
23 beginning of your individual interview. The State of
24 Texas is represented over at this table by Ms. Michele
25 Hartmann.

Page 208

1       MS. HARTMANN: Good afternoon.
2       THE COURT: And Ms. Lisa Callaghan.
3       And the defense is Tim Moore.
4       MR. MOORE: Hi.
5       THE COURT: Bill Ray.
6       MR. RAY: How you doing, ma'am?
7       THE COURT: And they represent Billy Jack
8 Crutsinger, the Defendant.
9       THE DEFENDANT: Good evening, ma'am.
10       THE COURT: And each side will have an
11 opportunity to ask you questions about how you feel
12 about different areas of the law that may be involved
13 in the trial of this case. Both sides want to know
14 your opinions of the law, so they'll tell you how the
15 law works and then ask you how you feel about it.
16       And that oath you took a second ago
17 obligates you only to tell us how you honestly feel
18 about these matters at this point in the trial because
19 there are no right or wrong answers to any of the
20 questions that will be asked here this afternoon.
21       State may proceed.
22       MS. HARTMANN: Thank you, Your Honor.
23       LISA ELLIOTT,
24 having been duly sworn to make true answers to such
25 questions as may be propounded by the Court or under

Page 209

1 its direction, touching upon her service and
2 qualification as a juror, gave answers as follows:
3          VOIR DIRE EXAMINATION
4 BY MS. HARTMANN:
5    Q. Good afternoon.
6    A. Hello.
7    Q. Well, I've had a chance, we've all had a
8 chance to look through that lengthy questionnaire you
9 filled out for us a couple weeks ago. And I notice
10 that this is not your first time in the courtroom?
11    A. No, it's not.
12    Q. Not your first time to go through jury
13 selection?
14    A. It's not.
15    Q. This is probably the first time you've gone
16 through the individual questioning process; is that
17 correct?
18    A. That's right.
19    Q. It looks like you have been on at least
20 three juries in the past?
21    A. Three.
22    Q. Have they issued you your professional jury
23 card yet?
24    A. I'm waiting.
25    Q. Well, the bad news is that if you were to

Page 210

1 make this jury, you're not going to paid any type of
2 bonus for being experienced. But what we're going to
3 be doing is visiting with you today about some of the
4 information that was on your questionnaire and
5 visiting with you about what the law is pertaining to
6 capital murder.
7          And as the Judge has told you, the oath that
8 you've just taken is an oath at this point to tell the
9 truth, not to follow the law. If you make it over
10 here to the jury box, you would then get a second oath
11 to follow the law that would be given to you in the
12 case, all right?
13          And why do I make that distinction? Because
14 at this point it's okay to disagree with the law, we
15 just need to know, okay?
16    A. Okay.
17    Q. I'm sure since you have been through a
18 number of trials, at least two of which were criminal
19 trials, you're well aware of the principles of the
20 presumption of innocence and the right of a defendant
21 not to testify and if they don't testify, it can't be
22 held against them.
23          You're familiar with those, aren't you?
24    A. Yes.
25    Q. And I'm assuming if you've been a witness,

Page 211

1 you know what they are and can you apply those laws?
2    A. Yes.
3    Q. In other words, if someone doesn't testify
4 in a criminal trial and you were instructed you
5 couldn't consider that for any reason can you follow
6 that law?
7    A. Yes.
8    Q. And can you afford a criminal defendant in
9 any type of case the presumption of innocence, which
10 means that they're not necessarily innocent, but it
11 means that the State has to bring sufficient evidence
12 forth to prove that they are, in fact, guilty?
13    A. Yes, I have no problem with that.
14    Q. Great. So I'm going to be able to kind of
15 speed along through here with you because you have had
16 the actual experience of being through some trials and
17 what the process is.
18          I want to ask you a couple questions on your
19 questionnaire. You know that this is a capital murder
20 case, which is going to be different law than what
21 you've worked with in the past. And obviously both
22 sides are very interested in knowing how you feel
23 about capital punishment, the death penalty, it's
24 application here in the state. And one of the
25 questions asks you what your feelings or opinions

Page 212

1 about the death penalty were. And your response was,
2 well, "I wonder how effective it is in deterring
3 crime. I believe it is our responsibility to continue
4 it."
5          Can you elaborate on that for me, if you
6 would?
7    A. Well, when I think about most punishment I
8 think about, I mean, it has two -- there's two reasons
9 to give a punishment. One is to prevent that person,
10 make that person learn so that person won't do that
11 type of crime again.
12    Q. Rehabilitate them.
13    A. Rehabilitate, yes. Obviously that's not an
14 issue in capital punishment.
15          The other reason you would give a certain
16 punishment is to deter or prevent other people from
17 doing that same crime. And yet I think in most cases,
18 and I have to say most cases because everything is
19 different, but I don't think anybody who deliberately
20 commits a crime thinks he's going to be caught. So
21 it's not, oh, I think I better kill somebody because I
22 might get the death penalty because they think, I
23 won't get caught.
24          That's where my own personal dilemma is,
25 what does it accomplish? Certainly in some cases it

Page 213

1 eliminates that person from committing the same crime
2 again and again or even once more would be too many.
3 And yet I feel it's our responsibility as a society,
4 and I'm not sure if this is just ingrained in me from
5 Biblical study and the Old Testament or exactly why
6 that it is our responsibility that we really do need
7 to have that as a law on the books.
8    Q. All right. Do you think, and you've
9 mentioned two goals of the criminal justice system.
10 One is to rehabilitate the offender and one is to
11 deter. And whether it's deterring other people or
12 deterring that specific person, and you can argue that
13 there's two ways that deterrence can take place, would
14 you also agree that one of the goals in the judicial
15 system is to punish people for their acts, that there
16 are consequences to the acts that they commit?
17    A. Absolutely.
18    Q. And that one of the options may be or one of
19 the reasons why there's a death penalty available is
20 because it's the ultimate punishment for what may be
21 the ultimate crime?
22    A. Absolutely.
23    Q. Okay. So what I'm hearing from you is, and
24 don't let me put words in your mouth if this isn't
25 where you're at let me know. Because it's not

Page 214

1 important what I think at this point. We're here to
2 listen to you.
3        But what I'm hearing from you is, well, I
4 don't really know if it has that much of a deterrent
5 effect, but I still think that we need to have it
6 available for the protection of society in certain
7 cases?
8    A. Yeah, that's what I was trying to say on
9 that line.
10    Q. Okay. All right. And you mentioned that
11 you don't know if maybe some of that is from the way
12 that you were raised and maybe some type of Biblical
13 reference or connection. Is there anything about your
14 religious convictions that interfere with your belief
15 that it's necessary that we have the death penalty?
16    A. At a high level, at an abstract level, no.
17    Q. All right.
18    A. On a personal level, I've never been faced
19 with that before. You know, to think about having
20 that responsibility is very, oh, goodness, scary.
21    Q. Sure.
22    A. It's very difficult to really know if it
23 came down to it what you'd do.
24    Q. Okay. And I guess one of the unfair things
25 to you all when you come in here and sit down and

Page 215

1 you're at the mercy of us asking you these questions
2 and you're having to think about things that you've
3 never really thought in depth about before is we have
4 to get you to commit not to a particular answer, but
5 to -- well, I said that very poorly.
6        We have to get you to kind of project
7 yourself into certain situations and tell us what
8 you're capable of doing and what you're not capable of
9 doing, either way. Because obviously in a capital
10 case, there's only two possible punishments
11 available. One is a life sentence, and that's 40
12 years, day for day, before the person comes up for the
13 possibility of parole. Or there's a death sentence.
14        And I don't want there to be any mistake
15 about it, in this particular case in the event that
16 there is a conviction by the jury of capital murder,
17 Lisa and I will be asking the jury to return a death
18 sentence. So you know where we stand in this
19 situation.
20        So when I'm asking you these questions about
21 this is what the law is and can you apply the law,
22 we're going to need to know, both sides, that the
23 people over in that jury box are going to give both
24 sides a fair shake and they're not going to be
25 predisposed to judge one way or the other, all right,

Page 216

1 all the time, I mean, if there's going to be an
2 absolute for them. Or that we don't want people over
3 here who say, you know what, I thought I could do
4 this, but I'm going to have a nervous breakdown if you
5 make me make this decision, okay?
6        So that's why we ask you to kind of project
7 yourself into the situation and say okay, I know that
8 I haven't heard any facts yet -- and we can't tell you
9 what the facts are because then you'd start forming
10 opinions and that wouldn't be proper.
11        But all we can do is say this is what the
12 law is, do you understand what the law is? And if you
13 were put in the position of being instructed on the
14 law, could you follow it? And for some people they
15 say, you know what, I understand this is the way the
16 law is, I disagree with it or I agree with it, but I
17 just can't be put in a position of doing it. I can't
18 enforce the law because it would be too great a burden
19 for me to carry for the rest of my life, okay?
20        So let me go over with you what the law is
21 and then ask you some particular questions about
22 whether or not you could be fair in applying that
23 law.
24    A. Okay.
25    Q. Okay? All right. First of all -- well, I

Page 217

1 went the wrong way here. What is a capital murder?
2 Capital murder is where you have an intentional
3 killing plus there is some aggravating or special
4 circumstance that surrounds that intentional killing.
5 When we talk about intentional killing, it's not an
6 accident, there's not negligence, there's not
7 recklessness, there's not an issue of whether the
8 person is criminally insane, all right? And the
9 State's contention is, of course, that there's no
10 self-defense involved.
11       Intentional means that the person does it on
12 purpose. They desire to do it, they act upon that
13 desire and they do it. Seem pretty simple?
14    A. Seems so.
15    Q. Okay. One of the things that I'd like to go
16 over with you in regards to whether it's an
17 intentional killing is, and I saw this several times
18 in your questionnaire, you had the word premeditated
19 or premeditation. And I'm sure that you're aware that
20 premeditation is planning or forethought, all right.
21       The State of Texas never has to prove in
22 either a murder case or a capital murder case that the
23 person planned it or that it was premeditated. We
24 don't have to prove that. All we have to prove is
25 that the person formed the intent to kill and then

Page 218

1 they acted on that intent.
2       Does that make sense to you? Do you see the
3 distinction?
4    A. Right.
5    Q. And let me try and give you a couple of
6 examples to see if I can make myself a little
7 clearer.
8       Let's say you have a situation where a
9 person wants to kill another individual. And the
10 examples and facts that I give you don't have any
11 relation to this particular case, I'm just trying to
12 give you an idea, maybe, to illustrate the point.
13       But let's say Person A wants to kill
14 Person B. And they spend weeks studying this
15 Person B's habits: When they come home from work,
16 when they leave from work, when they walk the dog.
17 They go out to a pawnshop, they find a certain type of
18 gun, they decide whether to do it in the morning or
19 the evening. They put all this thought into it and
20 then they go out, Person A goes out and kills
21 Person B.
22       Well, they had the intent to kill the person
23 and they did kill the person and they planned it, all
24 right? That may be one set of facts where the person
25 committed an intentional killing and they planned it.

Page 219

1       Let me give you another set of facts. You
2 may have a situation where a person, Person A, goes in
3 to rob a convenience store and they take a gun with
4 them to make the clerk give up the money. They don't
5 have any intent to kill, okay, they're just taking
6 that gun along to ensure that the clerk will comply
7 with the demands.
8       Person A walks into the convenience store
9 and Person B is the clerk. An Person A pulls out the
10 gun and says, "Give me your money." And Person B, the
11 clerk, probably rather unwisely resists. "No, not
12 gonna do it because they're going to take it out of my
13 paycheck if I give you this money." Person A gets
14 very angry and figures out the only way they're going
15 to get this money is if they shoot and kill this
16 person. They form that intent and they act on it
17 immediately, right there, no planning, all right?
18 Before he walked into that store, didn't have any
19 intent or plan at that point, but formed that thought,
20 formed that intent and acted on it.
21       So do you see the distinction?
22    A. Sure.
23    Q. You can have an intentional killing with
24 planning and without. Are you okay with that?
25    A. Yes. I mean, it's got to be in your head

Page 220

1 before you do it.
2    Q. Okay. And you're okay with the fact that it
3 can be in your head an instant before you do it or it
4 can be in your head for two weeks, two months, three
5 years?
6    A. Yes.
7    Q. Just so long as the State proves that the
8 person had that intent and acted on it. It
9 doesn't matter how long that intent was present.
10    A. That's correct.
11    Q. You're okay with that?
12    A. I'm okay with that.
13    Q. All right. We've talked about what a
14 capital murder is, we have an intentional killing and
15 an aggravating or special circumstance. Only two
16 possible punishments for that. We've talk about
17 that: Life and death, all right?
18       What are some types of ways that a capital
19 murder can be committed? All right. If you
20 intentionally kill a child under the age of six, the
21 law says that the age of that child is a special
22 circumstance. If you intentionally kill a police
23 officer or a fireman while they were in the course of
24 their duty, that's a capital murder offense. And if
25 you intentionally kill during the course of an

Page 221

1 aggravated robbery or kidnapping or sexual assault.
2 And that kind of goes along with that example I gave
3 you of the convenience store. That's a capital murder
4 offense.
5     This last one that's all in caps I want to
6 draw your attention to because that's basically what
7 the allegations are in this particular case, when you
8 intentionally kill more than one person in the same
9 criminal transaction. And basically that means that
10 you kill more than one person in the same course of
11 criminal conduct.
12     Do you follow that?
13     A. Yeah, right.
14     Q. All right. Do you think that these are the
15 types of offenses for which the death penalty ought to
16 be a possible option?
17     A. Possible, yes.
18     Q. Okay. All right. So what do Lisa and I
19 have to prove when we charge someone with capital
20 murder? We have to prove that the person in the
21 courtroom is the person who did the act, all right?
22 We have to prove that it happened here in Tarrant
23 County, on or about a particular date, again that it
24 was intentional. In other words that it wasn't an
25 accident, no self-defense, no recklessness or

Page 222

1 negligence. I mean, the person had the intent and
2 acted on it, all right? And that the person caused
3 the death of more than one person, which is going to
4 be anywhere from two on up to however many people, all
5 right?
6     And if we prove those things beyond a
7 reasonable doubt to the jury, then we would be
8 entitled for that jury to return a verdict of guilty.
9     Does that make sense to you?
10     A. Yes.
11     Q. And you've heard, I'm sure, this beyond a
12 reasonable doubt standard. You've probably had it
13 addressed at least twice in your history. And the
14 current state of the law is that there is no
15 definition of what beyond a reasonable doubt is,
16 there's no legal definition. And what that means is
17 it's basically whatever you and the other individual
18 jurors decide it to be.
19     Does that make sense to you?
20     A. Sure.
21     Q. I can tell you what it's not. It's not 100
22 percent. Because you would basically have to be a
23 witness to know something by 100 percent; would you
24 agree with me?
25     A. Sure.

Page 223

1     Q. And if you're a witness can you be a juror?
2     A. Not in the same trial.
3     Q. Absolutely. You got that right.
4     So the reason that -- and don't get me
5 wrong. I mean, obviously beyond a reasonable doubt is
6 a very high standard as it should be because we're
7 talking about very serious things. But I want to make
8 sure that you understand that it's not proof beyond
9 all possible doubt or beyond a shadow of a doubt, it's
10 beyond a reasonable doubt.
11     In other words, any doubts that you as a
12 juror might have have to be reasonable. They can't
13 just be kind of flights of fancy or what-ifs. They
14 have to be doubts that are, in fact, reasonable based
15 upon the evidence; do you understand the difference?
16     A. The difference between shadow and reasonable
17 gets a little fuzzy, but I probably understand
18 reasonable more than I understand shadow.
19     Q. And shadow, we hear that on TV a lot. And
20 my impression of it may be different from yours. When
21 I hear that beyond a shadow of a doubt, that in my
22 mind denotes to 100 percent. It may be different for
23 you, I don't know. But I just want you to be aware of
24 what it's not. But you pretty much decide in your own
25 mind basically how much evidence it takes to convince

Page 224

1 you that the person is guilty, okay? And you get to
2 determine what level that is on your own.
3     Is that okay with you?
4     A. Yes.
5     Q. All right. So let's say hypothetically we
6 present our case to the jury, the jury finds that
7 we've met our burden and they return a verdict of
8 guilty. What happens at that point is -- and let me
9 ask you this, in any one of the trials that you sat
10 in, did you sit through any type of punishment
11 hearing?
12     A. Yes, both.
13     Q. So you're aware of the second phase of a
14 trial that happens after a guilty verdict?
15     A. Correct.
16     Q. So you're aware that there can be additional
17 evidence brought forward by the State and by the
18 defense if they choose, although they don't have to,
19 you may hear additional evidence about the defendant's
20 character, good or bad, you may hear about the
21 defendant's prior criminal history if he or she has
22 any. Some cases people have some and some cases
23 people don't have any. Just depends on what's
24 happened in their life up to a certain point.
25     And in a capital murder case after that