Page 173

1  A. Okay.
2  Q. Then you go to that last question.
3  A. Okay.
4  Q. And after you've done all that, can you
5  think of any circumstance in your mind that would
6  mitigate that where you would answer that question
7  yes, I do find that there's something mitigating, that
8  person deserves a life sentence? And again, only you
9  can answer that for us, you know. That's all we want
10  to know is an honest answer. And you understand
11  mitigation, we can't tell you what that is. We can
12  give you examples of what people think it is?
13  A. Well, my example on that, and you can, I
14  guess, correct me if I'm wrong. If, for example,
15  someone killed maybe two people that had abused them
16  when they were kids or something and they
17  intentionally, said my life is screwed up because of
18  them or whatever and they decide they were going to
19  kill them or whatever in that respect and they killed
20  those people that had done the abuse or whatever and
21  they intentionally killed them and they killed two
22  people doing that, and I found it intentional, they
23  did do that, but I'm not sure that to me would be a
24  mitigating factor of life as opposed to the death
25  penalty. Because to me that would be why, their

Page 174

1  reasoning behind that was like their abuse for years
2  or whatever.
3  Q. And you've used that example.
4  A. As my -- right.
5  Q. As an abused family?
6  A. Right.
7  Q. In your mind would it just have to be in the
8  case of a family member harming another family member?
9  A. No, I don't think it would have to be a
10  family member.
11  Q. Okay. So are you telling us that after you
12  found somebody guilty, intentional killing two people,
13  you found that in your mind beyond a reasonable doubt
14  they're going to be a future danger, that you could
15  still consider, that you could still find something in
16  the evidence if it were presented?
17  A. I think that if there was anything in the
18  evidence that would help, would let me think that they
19  would be better off, that it would be better off for
20  society in general, that that person have life in
21  prison as opposed to the death penalty, I think I
22  would choose that.
23  Q. And, you know, we talk about the death
24  penalty a lot. We've said that no telling how many
25  times. But you understand you start off with the

Page 175

1  premise that a life sentence is appropriate; you
2  understand that?
3  A. Okay. What you're saying throughout this
4  whole case, those are the only choices if it's actual
5  guilty of capital murder.
6  Q. That's right.
7  A. So those are the only choices there are.
8  And if I find them guilt of capital murder. So I
9  don't get the choice of any other choices. Those are
10  the two choices I have.
11  Q. That's right. But you understand that a
12  life sentence in the State of Texas is an appropriate
13  sentence?
14  A. Yes.
15  Q. That actually this death penalty scheme that
16  the legislature came up with is kind of a restrictive
17  type scheme; do you follow me? And I'll explain why.
18  Well, they're asking you, look, if you don't think
19  he's a future danger, you answer that question no and
20  a life sentence automatically. You don't even get to
21  the mitigation question?
22  A. Okay.
23  Q. And you talk about -- they talk about, well,
24  it has to be unanimous to say yes and it has to be ten
25  to two to say no. But in reality, if you think it's

Page 176

1  no in your mind, certainly you wouldn't change it just
2  to be one of the ten or one of the 12, would you?
3  A. No.
4  Q. So while the law contemplates that that has
5  to be answered unanimously, or ten to two to say no,
6  it could just not be answered; you understand that?
7  A. Okay.
8  Q. Okay. Same thing for the mitigation
9  question.
10  A. Right.
11  Q. If you felt that there was some circumstance
12  that warranted a life sentence and you were the only
13  one back there in that jury room --
14  MR. RAY: Tim, they're going to strike her.
15  MS. HARTMANN: Judge, at this time the State
16  is going to exercise a peremptory.
17  THE COURT: Ms. Deramus, you are excused
18  from any further service here. And I want to thank
19  you very much for the time you spent down here this
20  afternoon. You are free from any further obligation
21  to us. If you would leave us the plastic portion of
22  that badge there. Just leave it with Dennis here and
23  your check will be mailed to you.
24  VENIREPERSON DERAMUS: Okay.
25  THE COURT: And thanks again.

Page 177

1 VENIREPERSON DERAMUS: Thank you.
2 (Venireperson Deramus exits the courtroom.)
3 (Venireperson Ealy enters the courtroom.)
4 THE COURT: Good afternoon.
5 VENIREPERSON EALY: Good afternoon.
6 THE COURT: Please raise your right hand.
7 (Venireperson Ealy sworn.)
8 THE COURT: Thank you. Tell us your name,
9 please.
10 VENIREPERSON EALY: Kim Ealy.
11 THE COURT: Ms. Ealy, this is the individual
12 interview we spoke of. And for the next little while,
13 each side, the State of Texas and then the defense,
14 will be given an opportunity to ask you questions
15 regarding your background and qualifications to be a
16 juror in this type of case.
17 The State is represented by Michele Hartmann
18 and Lisa Callaghan right there in front of you.
19 The defense is represented by Tim Moore and
20 Bill Ray. And the Defendant is Billy Jack
21 Crutsinger.
22 And both sides are going to want to know how
23 you feel about different areas of the law that are
24 going to be involved in the trial of this case. So
25 they're going to tell you how the law works and then

Page 178

1 ask you how you feel about it. And all you owe us
2 based upon the oath you just took a second ago was to
3 tell us how you honestly feel about those matters,
4 because there are no right or wrong answers to any of
5 the questions that you will be asked here today.
6 The State may proceed.
7 MS. HARTMANN: Thank you, Your Honor.
8 KIM EALY,
9 having been duly sworn to make true answers to such
10 questions as may be propounded by the Court or under
11 its direction, touching upon her service and
12 qualification as a juror, gave answers as follows:
13 VOIR DIRE EXAMINATION
14 BY MS. HARTMANN:
15 Q. Good afternoon, Ms. Ealy.
16 A. Good afternoon.
17 Q. How are you?
18 A. Fine.
19 Q. Is this whole setup a little intimidating?
20 A. Somewhat, yes.
21 Q. Well, just relax. Basically what we are
22 after here this afternoon is discussing with you the
23 law that deals with the offense of capital murder.
24 And hopefully we're going to explain that law to you
25 in a way that you understand it. And finally, we're

Page 179

1 going to see whether or not understanding what the law
2 is, will you be able to follow it if you took an oath
3 to do that, okay?
4 A. Okay.
5 Q. I'm sure you could tell when you filled out
6 your questionnaire a couple weeks ago that this was,
7 in fact, a capital murder case?
8 A. Yes.
9 Q. And just so that we're all, you know exactly
10 where Lisa and I stand, when we present this case to
11 the jurors, the people who actually end up over here
12 in this jury box, if those jurors choose to return a
13 guilty verdict, Lisa and I will be standing up and
14 asking that jury based upon the evidence presented to
15 them to assess a death sentence in the case. So you
16 know exactly where this side of the room stands in
17 this case, okay?
18 A. Okay.
19 Q. It's obviously important for us to have an
20 idea of where you stand as far as what you think about
21 capital punishment and again, more importantly, if you
22 were faced with the job of being a juror in a capital
23 murder trial, could you, in fact, assess a death
24 sentence if that was the appropriate punishment.
25 And that's pretty much what we're going to

Page 180

1 be going over with you this afternoon. So just
2 relax. And the Judge has told you there's no right or
3 wrong answers. The only answers we're looking for are
4 truthful answers, okay?
5 A. Okay.
6 Q. We can't go into the facts of the individual
7 case that's going to be tried. If we start going into
8 the facts, then you start forming opinions and that
9 wouldn't be proper. So we can only, you know, tell
10 you what the law is in general and we might be able to
11 use some hypotheticals or facts to help illustrate our
12 points, but any facts that I give you are just
13 examples, they are not related to this particular
14 case.
15 A. All right.
16 Q. Okay. We anticipate that this case would
17 start the week of September 22nd and would go anywhere
18 from five days to two weeks. Does that pose any
19 difficulty for you for that time period?
20 A. No.
21 Q. There's also a chance, as there is with any
22 serious criminal case, that the jury might be
23 sequestered for a period of time. And that would mean
24 basically that you as a group would then be taken to
25 one of the downtown hotels, I think they usually try

Page 181

1 and work it out that it's the Worthington so that you
2 have a nice place to stay. But there is a chance that
3 sequestration can happen.
4         Would that pose any difficulty for you if
5 that were to occur?
6    A. No.
7    Q. All right. Let me just ask you, one of the
8 questions on the questionnaire said, "Please tell us
9 your feelings or opinions about the death penalty."
10 And your response was, "Believe in death."
11        Can you elaborate on that for me, please?
12    A. In certain circumstances, yes, I do believe
13 in the death penalty.
14    Q. All right. Do you believe that -- there are
15 sometimes people who say I believe the death penalty
16 is an appropriate punishment here in the state, but I
17 personally could never be involved in the assessment
18 of a death penalty. Are you one of those people?
19    A. I don't think so, no.
20    Q. So it sounds to me, and I haven't yet
21 explained how we get to that end result of a possible
22 death sentence, but it sounds to me that you agree
23 with the law as it is written, at least as far as you
24 understand it today at this moment and that you would
25 be able to participate in a decision that might result

Page 182

1 in a death sentence?
2    A. Yes.
3    Q. All right. I want to just go over with you,
4 just to start off with, we're going to start off with
5 the real easy stuff and work our way. There are some
6 basic rules that apply in every criminal trial. The
7 first is that everyone who is charged with a criminal
8 offense is presumed to be innocent. Doesn't mean that
9 they are, in fact, innocent. It just means that the
10 State of Texas must bring enough evidence to prove to
11 the jury beyond a reasonable doubt that the person
12 did, in fact, do the crime that we've charged them
13 with; do you understand that?
14    A. Yes.
15    Q. Do you agree with that law?
16    A. Yes.
17    Q. Okay. Another rule that applies in every
18 criminal trial is the right of a defendant to remain
19 silent. Basically what that means is that the person
20 who's on trial has an absolute right not to testify.
21 And if they so choose not to testify, then the people
22 hearing their case when they go back to deliberate on
23 whether the person is guilty or not guilty, they can't
24 use that person's not testifying as any type of
25 evidence of their guilt; do you understand that?

Page 183

1    A. Right.
2    Q. Do you think that that's a good law?
3    A. I think so.
4    Q. All right. If you were a juror in a
5 criminal case where the defendant chose not to testify
6 and you were instructed by the Judge that you could
7 not consider that for any reason, could you follow
8 that instruction?
9    A. Yes.
10    Q. Basically the way a criminal trial works --
11 and I'm trying to remember, I don't think you had had
12 any prior jury service?
13    A. No. I've been called a couple times. I
14 went down to, I'm not sure what it was, civil court
15 one time where we waited. Never needed a jury.
16    Q. All right. Let me just kind of give you a
17 little overview of what generally happens. There's
18 two parts to a trial. The first part is basically
19 asking did this person do the crime that they've been
20 charged with, okay?
21    A. Uh-huh.
22    Q. And the jury would listen to evidence
23 presented by the State, the defense would have an
24 opportunity to present evidence if they wanted to, but
25 they don't have to. After all the evidence had been

Page 184

1 presented, the jury would then go back into the jury
2 room with some instructions from the Court, from the
3 Judge, and you would have to make a determination of
4 whether the person was guilty or not guilty based upon
5 the evidence that had been presented to you.
6        Are you following?
7    A. Yes.
8    Q. The State of Texas has to prove its case
9 beyond a reasonable doubt. Beyond a reasonable doubt
10 is not defined in the law. It is whatever proof,
11 level of proof you believe it is to satisfy you that
12 the person is guilty.
13        Does that make sense to you?
14    A. Yes.
15    Q. In other words, it's up to each individual
16 juror to determine in their own mind what beyond a
17 reasonable doubt is. And it's whatever level of proof
18 you are comfortable with that makes you believe that
19 the defendant is guilty.
20    A. All right.
21    Q. I can tell you what beyond a reasonable
22 doubt isn't. It's not proof of 100 percent or beyond
23 all possible doubt.
24        Can you think of a reason why it wouldn't be
25 that high of a standard?

Page 185

1    A. Honestly?
2    Q. Uh-huh.
3    A. Nothing in life is 100 percent.
4    Q. Okay. Well, the way I like to explain it is
5 most people could not be convinced 100 percent that an
6 event happened unless they saw it with their own eyes,
7 unless they were, in fact, a witness to it. And
8 obviously if you witness an offense, you don't get to
9 be a juror.
10    A. Right.
11    Q. Because you'd be in line to be called up to
12 the witness stand, where you're sitting right now.
13 And so while the State of Texas has a very high burden
14 of proof, I mean, I'm not trying to minimize it in any
15 way, because obviously we're talking about very
16 important things here. We're talking about a possible
17 life sentence or a possible death sentence. But on
18 the other hand it's important to also understand that
19 it would be impossible for me to prove my case 100
20 percent or beyond all possible doubt. So the law says
21 that you have to exclude all reasonable doubts.
22    Do you follow?
23    A. Right.
24    Q. Do you think that you would be able to
25 follow that standard of proof or would you require the

Page 186

1 100 percent?
2    A. No, beyond a reasonable doubt.
3    Q. Makes sense to you?
4    A. Yes.
5    Q. All right. Okay. If the jury comes back
6 and they say, State, you didn't meet your burden of
7 proof, we find the person not guilty, the trial is
8 over. If they come back and they find the person
9 guilty, we then kind of start the process all over.
10 And what happens at that point is that Lisa and I
11 would again put on additional evidence.
12    And the way I kind of like to explain it is
13 the first part of the trial, did the person do it or
14 not is kind of a snapshot in that person's life, at
15 that particular time of their life. That's all the
16 jury is looking at at the first part of the trial.
17    If you get to the second part of the trial,
18 I like to tell people that's the chance that Lisa and
19 I have to show the photo album. We get to show the
20 snapshot and other things that may have existed in
21 that person's life prior to the time of the offense.
22    What do I mean by that? Maybe evidence of
23 bad character. Maybe prior criminal acts if there are
24 any. Maybe prior criminal convictions if there are
25 any. And sometimes there's not anything. Sometimes a

Page 187

1 person, the only thing they have in their life history
2 is that offense for which they've just been
3 convicted. Some people have a pretty good track
4 record, okay?
5    The punishment phase is the opportunity for
6 Lisa and I to present any additional evidence to help
7 the jury make an appropriate decision for punishment.
8    Does that make sense to you?
9    A. Yes.
10    Q. Do you understand how the trial system
11 works?
12    A. Yes.
13    Q. At any time the defense also has the same
14 opportunity to present evidence, but only if they want
15 to. They have an absolute right just to basically
16 show up if they want and not do anything else; do you
17 understand that?
18    A. Yes.
19    Q. All right. Well, we know that we're here to
20 talk about capital murder law. And a lot of people
21 don't really know what distinguishes a capital murder
22 from just, let's say, when you hear someone say
23 murder. Because in Texas we have a murder offense and
24 we have a capital murder offense. And a lot of people
25 are kind of fuzzy about what's the distinction, okay?

Page 188

1    Are you one of those people?
2    A. Yes, I don't -- I know certain circumstances
3 it's a capital murder.
4    Q. Okay. A capital murder is where you have an
5 intentional killing, all right, which is a murder,
6 plus there is an aggravating or special circumstance
7 that surrounds that murder. And the law sets out the
8 different types of aggravating or special
9 circumstances that can elevate a murder into a capital
10 murder; do you follow?
11    A. Uh-huh.
12    Q. If you intentionally kill a child under the
13 age of six. The age of that child aggravates that
14 intentional killing and makes it a capital murder. If
15 you intentionally kill a police officer or fireman
16 while they are performing their duty, that can be a
17 capital murder. If you intentionally kill someone in
18 the course of committing another type of felony
19 offense. And some examples are aggravated robbery,
20 kidnapping, and sexual assault.
21    The last one up there is the one I want to
22 draw your attention to because that is specifically
23 what we're going to be talking with you about here
24 today. And that is where you intentionally cause more
25 than one person -- you intentionally kill more than

Jury Voir Dire Proceedings  8-21-03  Multi-Page™  State vs. Bill Jack Cratsinger  Vol. 6

Case 4:07-cv-00703-Y   Document 86-1   Filed 11/05/17   Page 5 of 72   PageID 897

**Page 189**

1  one person in the same criminal transaction, all
2  right?  It could be two people, it could be 100
3  people.  As long as it's more than one, you
4  intentionally kill each one of those people, and it
5  happens basically during the same course of conduct,
6  that can elevate that person up to a capital murder
7  charge.
8     A.  Okay.
9     Q.  Do you follow?
10    A.  Yes.
11    Q.  Okay.  Do you think looking at these
12  examples up here that those are the types of offense
13  for which the death sentence should be an appropriate
14  option for punishment?
15    A.  For most of them, yeah.  I'm not sure about
16  the one about aggravated robbery.
17    Q.  Okay.  Let me give you an example of that
18  and it's one you're probably going to immediately
19  recognize.  Somebody goes in to rob a convenience
20  store and in the course of committing the offense of
21  robbery or aggravated robbery, all right, let's say
22  they go in with a gun.
23    A.  Okay.
24    Q.  Okay.  They're committing one offense of
25  aggravated robbery, and that's where you threaten

**Page 190**

1  someone with death or serious bodily injury with a
2  deadly weapon, okay, so there's one offense.  And in
3  the course of committing that aggravated robbery, they
4  kill the clerk.
5     A.  Okay.
6     Q.  So you've got an aggravated robbery offense
7  plus an intentional killing, that intentional killing
8  gets elevated up to a capital murder.
9     A.  Okay.
10    Q.  Does that make sense to you?
11    A.  That makes sense, yes.
12    Q.  Or let's say you kidnapped somebody, okay?
13    A.  Uh-huh.
14    Q.  You kidnapped them, you drive them off and
15  then you kill them.  Okay.  Again, we're having kind
16  of a combination of two offenses there.  So that one
17  kind of says if you're committing an intentional
18  killing plus another type of felony offense, we're
19  going to put you up higher.
20    A.  Okay.
21    Q.  All right.  Do you see what I'm saying?
22    A.  Yes.
23    Q.  What about -- do you think that a death
24  sentence is an appropriate option for punishment if
25  you intentionally kill more than one person during the

**Page 191**

1  same criminal transaction?
2     A.  Yes.
3     Q.  Okay.  You think it's -- maybe not in every
4  circumstance, but there may be some circumstances
5  where it is appropriate?
6     A.  Sometimes, yes, depends on the circumstance.
7     Q.  Absolutely.  All right.  In a capital murder
8  case, what would Lisa and I have to prove?  We would
9  have to prove that the person sitting in the
10  courtroom, the Defendant, was the person who actually
11  committed the act.  We have to prove that it happened
12  in Tarrant County, Texas, on or about a particular
13  date, that the acts were intentional and that the
14  intentional acts caused the death of more than one
15  person in the same criminal transaction.
16    I want to focus you on the word
17  intentionally.  Intentionally basically means, and
18  there's a formal legal definition.  But what it boils
19  down to is did the person act on purpose?  In other
20  words, it's not an accident, it's not negligence, it's
21  not recklessness, the person isn't insane.  And
22  obviously from the State's perspective they're not
23  acts being committed in self-defense.  They formed the
24  intent, the desire to kill and they acted on that
25  intent; do you follow?

**Page 192**

1     A.  Yes.
2     Q.  Does that seem reasonable to you?
3     A.  Yes.
4     Q.  Oftentimes you will hear people say that the
5  act was premeditated.  Do you know what premeditation
6  means?
7     A.  Planned out beforehand.
8     Q.  Okay.  Very good.  In Texas, Lisa and I
9  don't have to prove that a person planned out the
10  killing ahead of time.  In other words, that may be
11  the circumstance in any particular case, that a person
12  made plans and made arrangements to do the killing.
13  On the other hand, it could be that the person formed
14  that thought and acted on it just as quickly as that
15  thought formed.
16    Do you see where that's possible?
17    A.  Yes.
18    Q.  Let me give you just an example.  It's an
19  extreme example, but hopefully it illustrates the
20  point.  My co-counsel likes to use it.
21    Let's say that she and I don't get along,
22  all right?  Maybe we're neighbors and we're having
23  property disputes, but we don't like each other.  I
24  have a permit to carry a concealed weapon, which you
25  can do in Texas under certain circumstances.

Page 193

1　　　　And I go out to do my shopping and I don't
2　plan on seeing her. I have no idea where she's going
3　to be at any given time of the day, but I'm out and
4　just so happens I run into her. And she comes back at
5　me with a string of obscenities and starts yelling and
6　hollering at me. And I think, you know what, I am
7　just fed up with this. And I pull out my gun and I
8　shoot her. I have the intent and desire to kill her
9　and I do it, okay?
10　　　　In that situation I didn't plan on it, I
11　didn't know she was going to be where I was going to
12　be. I didn't take my gun specifically along with me
13　for the purpose of if I ran into her, all right? But
14　I formed that thought and I acted on it. Didn't plan
15　on it, but I had the intent and acted.
16　　　　Do you see where that is a possibility?
17　　A. Possibility of?
18　　Q. Of forming a thought instantaneously and
19　acting on it?
20　　A. Yes.
21　　Q. Do you understand that Lisa and I don't have
22　to prove planning or premeditation in a capital murder
23　case?
24　　A. Yes, right.
25　　Q. Understanding that, would you still require

Page 194

1　us to prove some type of premeditation or planning?
2　　A. No.
3　　Q. Might be present, might not be present.
4　Just so long as I prove that the person acted
5　intentionally, proved that beyond a reasonable doubt,
6　along with these other elements, then I'm entitled to
7　have that jury return a verdict of guilty; do you
8　understand that?
9　　A. Yes.
10　　Q. Do you think you could do something like
11　that if that was the particular situation?
12　　A. Would I have any knowledge of anything going
13　on in that person at that time, what might have
14　occurred maybe before the incident?
15　　Q. Let me tell you this. First of all, do you
16　think it's possible to infer someone's intent by their
17　behavior or their actions?
18　　A. Yes.
19　　Q. All right. Because people don't always
20　verbally announce what they're going to do.
21　　A. Right.
22　　Q. Okay. A very simple example of that is if I
23　walked up to you and I put my hand out, you would
24　probably put your hand out and shake my hand, wouldn't
25　you?

Page 195

1　　A. Yes.
2　　Q. If I hadn't said anything but I just put my
3　hand out, how would you know that I wanted to shake
4　your hand?
5　　A. By your action.
6　　Q. So I guess in that sense you can determine
7　or infer intent from someone's actions or behavior.
8　　A. Okay.
9　　Q. From the circumstances surrounding their
10　conduct. Now, if you're asking me would you know,
11　would you know what was specifically going through a
12　defendant's mind, well, I have to refer you back to
13　that rule that we have, which is a person's right not
14　to testify. And it's distinctly possible in any
15　criminal case that a person would chose not to testify
16　for a number of reasons.
17　　　　It could be because they are, in fact,
18　guilty. It could be because they're afraid of
19　answering questions from the prosecutor. It could be
20　that they're afraid of maybe not sounding very
21　intelligent or English isn't their first language. So
22　when you ask me would you know what the defendant or
23　the person on trial was thinking, what I can tell you
24　is you would have to do some inferring from the facts
25　and circumstances of the offense, okay?

Page 196

1　　A. Okay.
2　　Q. If you're asking would you get to hear from
3　that defendant what was going on, you might or you
4　might not, okay? Did I answer your question or no?
5　　A. Kind of. Circumstances that had happened
6　earlier that day, maybe.
7　　Q. Okay.
8　　A. Could be, would be in the second part of the
9　trial if they choose to enter that?
10　　Q. And that's a possibility. It would just
11　depend upon the individual case. It might be that you
12　would hear things of that nature at the first part of
13　the trial, it might be that you wouldn't hear those
14　types of things until the second part of the trial.
15　　A. Okay.
16　　Q. Your task at the first part of the trial
17　would be to just determine whether or not the person
18　was guilty or not guilty of this particular act or
19　offense.
20　　A. Okay.
21　　Q. All right. You might have that additional
22　information, you might not. And that's why I say that
23　jurors are called upon to infer intent from the
24　actions and circumstances surrounding a crime.
25　　A. Right.

Page 197

1  Q. Sometimes you have people who say, who
2  express their intent verbally. Oftentimes in a case
3  where the only people who would be witnesses for the
4  State, so to speak are the murder victims, well,
5  they're obviously not around to testify about what any
6  given person said to them before they were shot.
7      So do you think that you would be able to
8  listen to the evidence and infer what someone's intent
9  was from the evidence presented to you?
10  A. Yes.
11  Q. Okay. Any other concerns or questions about
12  that?
13  A. No.
14  Q. Okay. And you're doing great because we
15  need you to ask questions at this point because if you
16  end up on the jury, we can't talk with you any longer
17  and we can't answer your questions. So if you have
18  questions, keep on asking, that's a good thing.
19      All right. With capital murder, if the
20  person was convicted, there are only two possible
21  punishments. One is a life sentence, which is 40
22  years before the person would become eligible for
23  parole. The other option is a death sentence. And
24  you know here in Texas, you've lived in Texas for --
25  well, you lived here in Tarrant County for 22 years.

Page 198

1  You're from Iowa?
2  A. Yes, I am.
3  Q. You've here, though, long enough, probably
4  for most of your adult life, to know that in Texas,
5  the death sentence is a reality.
6  A. Right.
7  Q. I mean, it's not some -- I guess I have to
8  be careful so that I don't say this to someone who's
9  from California, but I often hear about California's
10  death row, but nobody ever seems to be executed out
11  there, which could be a good or bad thing, I guess,
12  depending on your views.
13      But in Texas people who go to death row
14  actually get executed.
15  A. Yes.
16  Q. And so obviously when we talk here about
17  somebody possibly being assessed a death sentence,
18  we're talking about something that might happen, it
19  may be two years, it may be five years, but it's
20  something that is most likely going to happen.
21  A. Right.
22  Q. Or isn't going to happen.
23      If Lisa and I hypothetically, let's just
24  say, in a capital murder case, if the State proves its
25  case beyond a reasonable doubt, we move to that second

Page 199

1  phase of the trial. And that would be the punishment
2  phase.
3  A. Punishment phase.
4  Q. And if you'll look up here, that is the time
5  in which Lisa and I, again, if there's anything in
6  that photo album, we get to bring it out. Good
7  character, bad character, prior criminal history or
8  record if the person has any, all sorts of things
9  about that person's life to help you put that criminal
10  offense for which they've just been convicted into
11  some type of context, all right.
12      Is it the only bad thing they've ever done
13  in their life? Is it just one thing out of a whole
14  laundry list of bad things they've ever done in their
15  whole life? This would be the part of the trial where
16  you would find out that information.
17      Does that seem reasonable to you?
18  A. Yes.
19  Q. All right. At the conclusion of all the
20  evidence, the jury would then take, go back into the
21  jury room and they would have to consider or would be
22  instructed to consider all of the evidence that had
23  been presented to them from the first part of the
24  trial and the second part of the trial, okay?
25  A. Okay.

Page 200

1  Q. And they would be asked to answer two
2  questions. In other words, you would not go back to
3  the jury room and say, okay, let's take a poll on who
4  wants life and who wants death, all right?
5  A. Okay.
6  Q. The foreperson wouldn't write in the words
7  "life" or "death". It doesn't work that way.
8      What happens is you have two questions that
9  you have to answer based upon the evidence, all the
10  evidence that's been presented to you. And go ahead
11  and take a moment just to read this first question.
12  (Brief pause.)
13  Q. Okay?
14  A. Okay.
15  Q. Couple things I want to point out to you.
16  In this first special issue, you see the phrase beyond
17  a reasonable doubt. And that phrase popped up where
18  before this?
19  A. In the whether you find them guilty or not.
20  Q. Absolutely. That's right. When we get to
21  punishment, if we do, the jury would have to answer
22  this first question. And they would -- Lisa and I
23  would have to prove beyond a reasonable doubt that the
24  answer to this question should be yes, that the
25  person, that there is a probability that the Defendant

Jury Voir Dire Proceedings 8-21-03    Multi-Page™    State vs. Billy Jack Crutsinger  Vol. 6

Case 4:07-cv-00703-Y   Document 86-1   Filed 11/03/17   Page 8 of 72   PageID 33742

Page 201

1  would commit criminal acts of violence that would
2  constitute a continuing threat to society, all right?
3      It would be our burden to prove beyond a reasonable
4  doubt that the answer to that question should be yes.
5      A. Okay.
6      Q. If we fail in that burden, then the jury
7  would have to answer that question no, do you see
8  that?
9      A. Right.
10      Q. The words probability, criminal acts of
11  violence and society are not legally defined for you.
12  Kind of like beyond a reasonable doubt. What that
13  means is you and the other individual jurors would
14  determine in your own mind what you believed those
15  words to mean. Probability is not going to be a
16  certainty, okay, and it's going to be more than a
17  possibility. It's going to be somewhere in between
18  there; do you see that?
19      A. Yes.
20      Q. And I guess where within those two that it
21  falls is up to you.
22      A. Okay.
23      Q. Criminal acts of violence, okay? One person
24  may think it's just strictly other murders. Another
25  person might think it's any type of assaultive

Page 202

1  behavior whether it's simple assault, aggravated
2  assault, robbery, kidnapping, sexual assault. They
3  could say, you know what, criminal acts of violence to
4  me is a pretty big list. Other people might find it
5  to be a short list.
6      Society. You might think that society
7  should defined in terms of the free world. In other
8  words, people like you and I who are out conducting
9  our business outside of the prison society. Some
10  people might think that society means the prison
11  society. In other words: Guards, inmates, teachers,
12  doctors, counselors, the people who work within the
13  prison system. It is, again, up to you and the other
14  individual jurors to determine in your own mind what
15  the definition of society should be. Some people may
16  view it as anyone with whom a defendant may come into
17  contact with at any given time.
18      All right. After having looked at this
19  question, do you think that this is a question that
20  you would be capable of answering either yes or no
21  based upon the evidence?
22      A. Yes.
23      Q. There are some people who say if I have
24  found someone guilty of capital murder, intentionally
25  taking the life of more than one person, I am always

Page 203

1  going to find that that person is probably going to be
2  a future danger.
3      Do you fall into that category?
4      A. No.
5      Q. All right. There are some people who say
6  this, you know what, this question is asking me to
7  predict the future and I just don't think that's
8  possible, so I'm always going to answer this question
9  no.
10      Do you fall into that category?
11      A. No.
12      Q. So what I'm hearing from you is based upon
13  the evidence presented to you, you would be open to
14  answering this question either yes or no?
15      A. Yes.
16      Q. Any questions about this question?
17      A. No.
18      Q. All right. If all 12 members of the jury
19  unanimously answer yes, that you do find that the
20  person will be a future threat or future danger, you
21  would then move to the second question.
22      And why don't you take a moment to read
23  through that.
24      (Brief pause.)
25      A. Okay.

Page 204

1      Q. What do you think this question is asking
2  you -- or statement, what is it saying?
3      A. Whether I could lessen the charge or lessen
4  it from, you know, death to life in prison.
5      Q. Okay. That's pretty much what it's asking.
6  It's asking you to take into consideration all of the
7  evidence, including the circumstances of the offense,
8  the defendant's character and background, and the
9  defendant's personal moral culpability, all right, is
10  there a sufficient mitigating circumstance or
11  circumstances to warrant a life sentence over a death
12  sentence.
13      What a mitigating circumstance is, again, is
14  not defined for you. It's whatever you believe it to
15  be. What you believe to be a mitigating circumstance
16  might not be a mitigating circumstance to the next
17  person.
18      Let me give you some examples. There may be
19  a situation in a case where evidence is presented that
20  the person on trial has been convicted of a Vietnam
21  War vet. And some people on the jury may find that to
22  be a sufficiently mitigating circumstance to give that
23  person a life sentence over a death sentence.
24      A. Yes.
25      Q. Some people might say on that jury hearing

## Page 205

1 that same evidence, to me that's not sufficiently
2 mitigating. They know what a tragedy death is from
3 their war experience and they should know better.
4 There are all sorts of types of evidence that might be
5 presented to you in the light of it being mitigating.
6 There may be no evidence that's mitigating that's
7 presented to you, okay?
8    What you would need to ask yourself is is
9 there any evidence before me that I believe to be
10 mitigating, that I personally feel to be mitigating?
11 If there is, do I think it is sufficiently
12 mitigating? Is it of sufficient quality or quantity,
13 whatever it is to you, to merit that person deserves a
14 life sentence over a death sentence; do you understand
15 that?
16    A. Yes.
17    Q. Do you think that this is a question that
18 you would be capable of answering either yes or no
19 based upon the circumstances?
20    A. Yes.
21    Q. In other words, sometimes there are people
22 who say, I understand this is the way the law is set
23 up and I think that there's a good reason for it being
24 set up this way with these questions. But to be
25 honest with you, if I have found someone guilty of

## Page 206

1 capital murder, in other words, intentionally taking
2 the life of more than one person during the same
3 course of conduct, and I find that they are a future
4 danger, there is never going to be anything that I can
5 think of presented to me that I'm going to believe to
6 be of sufficient mitigating quality to give that
7 person a life sentence.
8    Do you follow?
9    A. Yes.
10    Q. In other words, if I found the person
11 guilty --
12    A. Uh-huh.
13    Q. -- and I've answered yes, they are a future
14 danger --
15    A. Uh-huh.
16    Q. -- then I'm always going to say no, there
17 are no mitigating circumstances.
18    A. No.
19    Q. Where do you fall with that?
20    A. It would depend on the circumstances. I
21 could answer -- it could go yes or no.
22    Q. So if you were a juror in a case and there
23 were not sufficient mitigating circumstances that were
24 before you, could you also answer this question no,
25 that you didn't find sufficient mitigating

## Page 207

1 circumstances?
2    A. Okay. Rephrase that again.
3    Q. Okay. That was very poorly worded. I'm
4 sorry. If you were a juror in a capital case and you
5 were instructed that this was the question that you
6 had to answer based upon what was before you in the
7 trial.
8    A. Uh-huh.
9    Q. Okay. Do you follow?
10    A. Okay.
11    Q. And you either didn't see any mitigating
12 evidence before you --
13    A. Okay.
14    Q. -- or there may have been some evidence that
15 was mitigating, but it wasn't sufficiently
16 mitigating.
17    A. Okay.
18    Q. Didn't rise to that level, whatever that
19 level is to you, could you answer that question no,
20 understanding that that would then dictate the Court
21 assessing a death sentence?
22    A. No, I would probably answer it yes.
23    Q. Okay. And why would that be?
24    A. I'm getting confused here.
25    Q. Okay. Well, I don't want to confuse you.

## Page 208

1    A. What I'm saying is it would two depend on --
2 if there's no circumstances could I answer yes to the
3 death sentence?
4    Q. Well, actually an answer of no.
5    A. Yes, I could go with no.
6    Q. Because this is asking you is there a
7 sufficient mitigating circumstance to warrant a life
8 sentence over a death sentence.
9    A. Rather than a death sentence, okay.
10    Q. So if the answer was no, at that point --
11    A. It would be a life sentence.
12    Q. -- as long as the jury was unanimous, then
13 there would be a death sentence.
14    A. Yes.
15    Q. Do you understand?
16    A. Yes.
17    Q. Am I confusing you?
18    A. No.
19    Q. I'm sure I am. I'm sorry.
20    A. It's just a lot of new terminology.
21    Q. Okay. And I guess when you said you would
22 be prone to answer it yes, were you saying you would
23 be prone to answer it in such a way that a life
24 sentence would always result or a death sentence would
25 always result?

| Page 209 | Page 211 |
|---|---|
| 1  A. A death sentence would result. | 1  that. |
| 2  Q. Do you think that you are open to the | 2  A. I would be open. It would depend. |
| 3  possibility that there may be some evidence out there | 3  Q. On what you heard? |
| 4  that you would find sufficiently mitigating such that | 4  A. Right. |
| 5  a life sentence might be more appropriate than a death | 5  Q. And if the circumstances that are listed up |
| 6  sentence? | 6  here, if you deemed it appropriate that a death |
| 7  A. Yes, I do. | 7  sentence was appropriate, you could do that? |
| 8  Q. Can you think -- and without telling me what | 8  A. Yes. |
| 9  it is, because I can't ask you what evidence you think | 9  Q. And on the other hand, if after seeing all |
| 10  is mitigating -- but at this point in time, can you | 10  the evidence, the offense, the Defendant's character |
| 11  think in your own mind of something that you might | 11  and his personal moral culpability, you could always |
| 12  find to be sufficiently mitigating depending upon the | 12  answer it in such a way that a life sentence might be |
| 13  circumstances presented to you? | 13  the result? |
| 14  A. You mean as far as like their mental | 14  A. Yes. |
| 15  health? The status of what their health was at that | 15  Q. Okay. Any other confusion about those |
| 16  time, their mental health? | 16  questions? |
| 17  MR. RAY: Excuse me. I'm going to object. | 17  A. No. |
| 18  The context of mitigation in that question needs to be | 18  Q. I'm sorry. I just didn't do a very good job |
| 19  couched in the framework of moral blameworthiness. | 19  with it. I don't know if it's Thursday afternoon or |
| 20  THE COURT: Sustained. | 20  what it is. |
| 21  Q. (BY MS. HARTMANN) This question asks you to | 21  So any questions about the terms in those |
| 22  make a determination of whether this answer should be | 22  two questions? |
| 23  yes or no based upon what's listed up here, okay? You | 23  A. And I'm assuming that that would be in |
| 24  get to take into consideration in answering that | 24  writing for us to refer to? |
| 25  question, you look at the offense, all right, what | 25  Q. Absolutely. When we go over the law with |

| Page 210 | Page 212 |
|---|---|
| 1  were the circumstances of the offense for which you've | 1  you, you're not going to be given a pop quiz after you |
| 2  convicted that person? | 2  step off the witness stand. This would all be written |
| 3  A. Right. | 3  out for you in what's called the Court's Charge. And |
| 4  Q. You get to look at the fact of does this | 4  that's just a fancy word basically for paper that's |
| 5  person have good or bad character and what was their | 5  stapled together that tells you in writing what the |
| 6  background, okay? | 6  law is. |
| 7  A. Uh-huh. | 7  A. Okay. |
| 8  Q. You get to look at and make a decision about | 8  Q. Kind of your directions that are given to |
| 9  the personal moral culpability or responsibility of | 9  the jurors. And let's put it this way, if you're a |
| 10  the Defendant, okay? You get to use all those things | 10  juror in this case, it's possible that you will see |
| 11  to help you answer this question. | 11  this language that's up here on a piece of paper back |
| 12  A. Okay. | 12  in that jury room. |
| 13  Q. All right. And the law says that people who | 13  A. Okay. |
| 14  sit on juries, whether it's a DWI or a capital murder, | 14  Q. So no, you don't have to sit here and |
| 15  must be able to give both sides a fair trial, all | 15  memorize this. |
| 16  right? And to give a fair trial, you have to be open | 16  Now, we obviously can't answer any |
| 17  to the possibility, at least in this situation, to | 17  questions. Once you all get back in the jury room, |
| 18  answering this question either yes or no. And | 18  you all can't be sending out notes, okay, what is a |
| 19  sometimes there are people who say I'm always going to | 19  mitigating circumstance? What is beyond a reasonable |
| 20  answer it a certain way each and every time. I don't | 20  doubt? You have to remember that stuff. |
| 21  care what the evidence is, it's always going to be yes | 21  A. Right. |
| 22  or it's always going to be no. And if you feel that | 22  Q. But as far as the actual questions and the |
| 23  way, that's okay, we need to know that. If you think | 23  law, you will get that in writing. |
| 24  that you are open to the possibility of it being | 24  A. Okay. |
| 25  either yes or no realistically, then we need to know | 25  Q. Does that help? |

Jury Voir Dire Proceedings 3-21-02 · Multi-Page™ · State of Texas vs. Billy Paul Crutsinger · Vol. 6

Case No. Cr-Proceedings 3-21-02 Document 86-1 Filed 10/17 Page 1 of 72 PageID 2455

Page 213

1     A. Yes.
2     Q. Okay. All right. Any other questions about
3 those two issues?
4     A. No.
5     Q. Okay. Let me turn this off. Certain other
6 parts of the law that I want to go over with you.
7 First of all, the law is that people who voluntarily
8 intoxicate themselves, whether it's from alcohol or
9 drugs, if they go out and commit a criminal offense,
10 the law says that that voluntary intoxication is not a
11 defense.
12       Did you know that?
13     A. No.
14     Q. Do you agree with that law?
15     A. So they knowingly go out and drink too much,
16 they can't use that as a defense as why they did
17 something?
18     Q. Correct. In other words, let me give you an
19 example. Let's say you have somebody who smoked some
20 crack cocaine and then they go out and rob a
21 convenience store and kill the clerk.
22     A. Okay.
23     Q. They go to trial, there is not a legal
24 defense with the fact that they -- they can't get up
25 and say you can't find me guilty because I was high.

Page 214

1     A. Okay.
2     Q. You know, that's my excuse and you can't
3 hold me accountable because I was high.
4     A. Okay.
5     Q. The law says if you voluntarily get drunk,
6 get high and then you go commit some type of criminal
7 offense, that voluntary intoxication is not a defense;
8 do you follow now?
9     A. Yes.
10     Q. Do you think that that's a good law or bad
11 law?
12     A. I think it's a good law. You're being held
13 for your actions.
14     Q. Okay. Do you think it's good that it's kind
15 of an absolute law as far as it's not an excuse, it's
16 not a defense?
17     A. Right, yes.
18     Q. And that might be something -- that fact
19 night be something that may be important to you at the
20 punishment phase, all right, whether they were high or
21 intoxicated or whatever. Might not be. Might be
22 irrelevant to you or to any other juror. Might be
23 important, might not be. But as far as whether the
24 person is guilty or not guilty, it doesn't factor in.
25     A. Right.

Page 215

1     Q. Do you understand that?
2     A. Yes.
3     Q. Could you follow that law?
4     A. Yes.
5     Q. Oftentimes in a criminal case, no big
6 surprise, police officers will testify. And why I
7 mention that is there are some people who say if that
8 person is wearing a uniform, I'm going to believe
9 everything they have to say before they even open
10 their mouth. There are some people who say if that
11 person is wearing a uniform and a badge, I'm not going
12 to believe a word out of their mouth before they say
13 anything. The law says that jurors, to be fair, must
14 start everybody off kind of at the same place
15 credibility wise. And once they start testifying, you
16 can take into account their experience, their
17 training, their demeanor, and then you can kind of
18 raise them up or lower them down on that scale; do you
19 see that?
20     A. Yes.
21     Q. All right. And that includes defendants.
22 Defendants, if they choose to testify, they don't get
23 brownie points. They don't get extra credibility
24 points just because they take the stand. You would
25 have to listen to what he or she had to say, is it

Page 216

1 reasonable, is it believable, does this person have a
2 motive, are they credible or not credible.
3     A. Right.
4     Q. Do you think that that's the fair way to do
5 it?
6     A. Yes.
7     Q. There may be situations where a jury finds a
8 person guilty of a lesser offense of just murder.
9 Let's say for some reason we don't prove that second
10 killing, second intentional killing, right? And the
11 jury says, well, the person is not guilty of capital
12 murder, but they are guilty of murder.
13     A. Okay.
14     Q. The punishment range that you would have to
15 work with at that point would not have to do, have
16 anything to do with those special issues, all right?
17 You'd have a different punishment range. Capital
18 murder is life or death.
19     A. Okay.
20     Q. Murder has a punishment range of five years
21 to 99 years or life; do you follow?
22     A. Okay. Five years to?
23     Q. To 99 years or life.
24     A. Okay.
25     Q. And there's really no difference between

Page 217

1 those two for the jury's purposes.
2    A. Purpose.
3    Q. And the law says for a juror to sit in a
4 case, they must be fair and impartial and they must be
5 able to keep an open mind to the entire range of
6 punishment and wait and listen to what the facts are
7 before they determine what might be appropriate for
8 any given defendant or circumstances.
9    A. Right.
10    Q. Do you think that that's the right way to do
11 it?
12    A. Yes.
13    Q. In other words, some people say I could
14 never consider the minimum of five. Some people say I
15 could never consider the maximum of life, all right?
16 For whatever reason, they have closed off either one
17 of those possibilities in their mind before they know
18 what the circumstances are.
19     People who sit on juries have to be able to
20 keep that entire range available and open to them.
21    A. Right.
22    Q. Once they hear the facts, five may be what's
23 appropriate. Once they hear the facts, life may be
24 appropriate.
25    A. Right.

Page 218

1    Q. Would you be able to keep an open mind to
2 that entire range of punishment if it became necessary
3 and listen to the facts before determining what was
4 appropriate?
5    A. Yes.
6    Q. So you're not closing off either end of the
7 range from the beginning?
8    A. No.
9    Q. Another area of the law has to do with there
10 being rules that the police have to follow when they
11 either collect evidence or take a statement.
12    A. Okay.
13    Q. And I'm sure you've heard of Miranda rights?
14    A. Yes.
15    Q. And what is your understanding of those?
16    A. That's where they read them their rights
17 that they have, that they can have a lawyer present before
18 they talk.
19    Q. Okay. And that's one of them. There's
20 actually several of them. But you know exactly what
21 I'm talking about.
22    There are certain rules that the police have
23 to follow. And if they don't follow those rules, if
24 they don't take the necessary steps, then it's
25 possible that the jury could get an instruction to

Page 219

1 disregard certain evidence if they believed that it
2 had been illegally obtained.
3    A. Okay.
4    Q. In other words, if the jury believed that a
5 certain piece of evidence had been illegally obtained,
6 all right, the Court would instruct them if they so
7 believed, that they would have to pull that piece of
8 evidence out of their consideration.
9    A. Okay.
10    Q. And you couldn't use that particular piece
11 of evidence in your deliberations process.
12    A. Okay.
13    Q. All right? You would be instructed by the
14 Court if you believed it had been illegally obtained,
15 you would have to remove it and not use it in your
16 consideration for a verdict, guilty or not guilty.
17    Would you be able to follow that instruction
18 if it was presented to you?
19    A. I think so.
20    Q. It may be that if that situation were to
21 present itself to you as a juror in any criminal case,
22 that if you pulled that statement or piece of evidence
23 out, what was left would be sufficient for you to
24 convict. It might be a situation where once that
25 piece of evidence came out, you didn't feel like there

Page 220

1 was enough left for the person to be found guilty.
2    A. Uh-huh.
3    Q. Understanding that those are possibilities
4 that could occur, would you still be able to follow
5 the law and the Court's instruction?
6    A. Yes.
7    Q. Let me ask you this. We've talked mostly
8 here about the capital murder law. If you -- and I
9 know you're a nurse. If you got to be, let's say you
10 won the lottery and you got to be governor, the
11 legislature and the judiciary, you got to be all three
12 branches for one day, all right, and you could change
13 any laws on the books that you wanted to, would you
14 change anything about the capital murder statute?
15 Would you add offenses, take offense away, take it off
16 the books completely?
17    A. I've really never thought about it. I don't
18 know. That would require some thinking.
19    Q. Well, I guess I'm asking maybe for your gut
20 feeling. Is it something that you would want to keep
21 or want to remove?
22    A. The death penalty?
23    Q. Yes, ma'am.
24    A. I don't think I would think of removing it,
25 no.

Page 221

1  Q. Okay. Do you think that it is a useful tool
2 for society?
3  A. Yes.
4  Q. In the appropriate circumstances?
5  A. Right.
6  Q. I know that you're a nurse, but
7 unfortunately I could not read where you were a nurse
8 at.
9  A. I actually have two jobs. I work for
10 American Airlines as an occupational nurse and I'm
11 also a home health nurse.
12  Q. Okay. I didn't get home health out of this
13 at all.
14  A. I probably wrote Genteva.
15  Q. That's what it is. Is Genteva the --
16  A. Home health.
17  Q. That's the business name?
18  A. Yes.
19  Q. So as an occupational nurse for American
20 Airlines what is your practice primarily made up of?
21  A. Well, we actually have a full clinic out at
22 the maintenance base. So we do work with Worker's
23 Comp and we also work with personal. You know, if
24 they've got a sore throat, a sinus infection, dropped
25 a drawer on their foot and it hurts, you know. So

Page 222

1 just a wide range. Then we also do a lot of mandated
2 stuff from the government.
3  Q. Okay. And I'm assuming that the people you
4 see are not only pilots and flight attendants, but
5 also people that work within American Airlines as a
6 company?
7  A. Our clinics are pretty small, so we're base
8 only. So basically I work with mechanics.
9  Q. Okay. All right. And as far as the home
10 health, is that where you have, I guess, individual
11 patients you see on a regular basis?
12  A. Uh-huh. Where you go into the home for a
13 wide range of, depends on what it would be.
14  Q. Do you -- I guess maybe people who are
15 recovering from surgery?
16  A. It could be surgery, it could be they were
17 diagnosed and going in to do some teaching. It could
18 be a long-term chronic problem where they need, maybe,
19 some IV therapy or IV drugs that they're going to need
20 for a lifetime.
21  Q. And so I take it from your occupation of
22 being a nurse, and correct me if I'm wrong, but it
23 seems reasonable to me that you're probably someone
24 who has seen death up close or seen people in the
25 process of death.

Page 223

1  A. Yes.
2  Q. There's a lot of people probably who can't
3 say that. Because of your particularized employment
4 or your occupation, you have a pretty good grasp on
5 the whole life and death situation.
6  A. Right.
7  Q. Anything about your job that would prevent
8 you from being fair and impartial in a case where --
9 and if I didn't say this before, you know that the
10 State is seeking the death penalty?
11  A. Yes.
12  Q. There is something about your work?
13  A. No, I knew that you were seeking the capital
14 murder.
15  Q. I'm sorry. Is there anything about your
16 particular occupation and experience that would
17 prevent you from being fair and impartial?
18  A. I don't think so.
19  Q. Do you think that if it came down to it and
20 the evidence in your mind called for it, could you be
21 a part of assessing a death sentence against another
22 human being?
23  A. Yes.
24  Q. And if the facts were appropriate, you could
25 participate in a life sentence?

Page 224

1  A. Yes.
2  Q. One of the questions asked what does
3 mitigation mean to you and you had put down you didn't
4 know. And you were not the only person, there were a
5 lot of people that didn't really know what that was.
6 That's just not a term we use every day.
7  A. No. I went home and looked it up. I think
8 it's to lessen.
9  Q. To lessen, right. There was a question that
10 said, "Do you believe there may be mitigating factors,
11 if any, that would be important to you in order to
12 justify a sentence of life imprisonment as opposed to
13 the death penalty?" And you put yes.
14  Does that go back to your, what you were
15 saying, it depends upon the circumstances?
16  A. Yes.
17  Q. Upon what the evidence was that was
18 presented to you?
19  A. Okay. Go back and rephrase that.
20  Q. I'm sorry. You would be open to hearing
21 whatever the evidence was in making a decision at that
22 time as opposed to -- well, would you be able to
23 listen to the evidence and make a decision based upon
24 what you heard and what was presented to you?
25  A. Right.

Jury Voir Dire Proceedings 8-21-03    Multi-Page™    State vs. Billy Jack Crutsinger    Vol. 6

Case 4:07-cv-00703-Y   Document 86-1   Filed 11/03/17   Page 14 of 72   PageID 3580

Page 225

1   Q. You mentioned that an aunt -- was it an aunt
2 that had received some treatment?
3   A. Yes, I have an aunt that's schizophrenic.
4   Q. Well, of course being a nurse, are you
5 fairly aware of what her problems are? Is she on
6 medication?
7   A. She is on medication. I don't see her that
8 often. My family is all a long ways away. And, of
9 course, her outbreak was as a child. I really don't
10 remember a whole lot.
11   Q. Okay. Anything about that that would affect
12 you in a capital murder case?
13   A. No.
14   Q. You put down that you is the name of your
15 church Discovery?
16   A. Uh-huh.
17   Q. And it's a Baptist?
18   A. Well, we're nondenominational. But our
19 funds do go through the Baptist Foundation for
20 Ministry.
21   Q. Okay. Are you aware of any particular views
22 or stance that your particular church has on the death
23 penalty?
24   A. Do you mean other members?
25   Q. Well, I guess does the church itself have a

Page 226

1 standing one way or the other?
2   A. Oh, goodness, I wouldn't know.
3   Q. You don't know?
4   A. I don't know.
5   Q. What about other members? Is there kind of
6 a general concensus on where you all should fall?
7   A. Honestly I don't think it's anything we've
8 ever discussed.
9   Q. Okay. All right. Some churches do and some
10 don't. So I always like to ask, just to see.
11   You put down that you knew someone who had
12 been involved with a civil medical case. Was that you
13 or someone else?
14   A. That was me.
15   Q. Could you just kind of tell me a very simple
16 version of what type of case it was?
17   A. I was accused of being told that somebody
18 else had done something and not reporting it as far as
19 abuse goes. But it never went to trial.
20   Q. Was it settled or dismissed?
21   A. I do believe they settled with the company
22 that I worked for.
23   Q. So somebody was claiming that you had not
24 reported abuse?
25   A. Right. Right, in a timely manner, yes.

Page 227

1   Q. Did it involve a child or an adult?
2   A. It involved an adult, a nurse abusing an
3 adult patient.
4   Q. Oh, okay. Okay. All right.
5   Was that here in Tarrant County or was that
6 somewhere else?
7   A. No, that was here in Tarrant County.
8   Q. How long ago was that?
9   A. In '91, '92.
10   Q. Anything about that experience -- did you
11 have to go through depositions?
12   A. No.
13   Q. Anything about that experience that causes
14 you to just despise anyone who says they're a lawyer?
15   A. No.
16   Q. Or works in a courtroom?
17   A. No.
18   Q. Anything you would hold against any of us
19 here in this room?
20   A. No.
21   Q. One thing you put on your questionnaire,
22 there were a series of questions that asked you to
23 check off an answer that you thought was appropriate.
24 "If evidence is such that you cannot decide if a
25 defendant is not guilty or guilty, you should find a

Page 228

1 defendant not guilty." And the answer you had checked
2 off was "Don't know." And, of course, this was kind
3 of towards the end of the questionnaire where people
4 start getting tired and you just want to get done.
5   A. Yes.
6   Q. I want to make sure that you understand that
7 a jury hearing a case, if the State has not met its
8 burden of proof beyond a reasonable doubt, then you
9 would have to return a verdict of not guilty.
10   A. Not guilty, right.
11   Q. If you as a juror or you all as a body of
12 jurors get back there and you said, you know what, we
13 don't know if he did it or not, we don't know if he's
14 guilty, we don't know if he's not guilty or she's not
15 guilty or she's guilty, whoever it is, if you just
16 don't know, the law says that the person has to be
17 found not guilty.
18   A. Right.
19   Q. Because obviously at that point the jury
20 doesn't feel like there's enough evidence to believe
21 that the person was, in fact, guilty.
22   A. Right.
23   Q. Does that make sense to you now?
24   A. Yes.
25   Q. Do you understand that? Would you have

Page 229

1 given a different answer?
2    A. I probably didn't read the question well.
3    Q. Okay. All right. You put down on your
4 questionnaire how your close friends and relatives
5 would describe you and you put "strong-willed."
6    A. Yes.
7    Q. Can you tell me about that?
8    A. I'm just usually an adamant person. That's
9 just how I am.
10    Q. A lot of times people who are strong-willed
11 have very strong opinions. Are you one of those
12 people?
13    A. In certain areas.
14    Q. Okay. When there are people that you
15 disagree with, how does that -- how do you, I guess
16 maybe if you were talking with them and they disagreed
17 with you about something, would you try and work it
18 out? Would you --
19    A. What do you mean disagree? Disagree about
20 what?
21    Q. Just about, I mean, anything that might be
22 important, whether it's work-related or in your family
23 life.
24    A. Uh-huh. A discussion. If they're not going
25 to change, then that's fine, you know. Just like at

Page 230

1 work, we all work differently. Some of the things I
2 tend to do a little different from the other nurses.
3 Doesn't make either one of us wrong.
4    Q. And you put that it would depend on the
5 circumstances whether you were a leader or a follower?
6    A. Right.
7    Q. And that's probably true for most people,
8 actually.
9    A. Yes.
10    Q. You put down that you are taking medication,
11 beta-blockers for migraines?
12    A. Yes.
13    Q. Do those migraines happen on a frequent
14 basis, infrequent?
15    A. Not since I started medication. I may have
16 one a month. I may go two months without one.
17    Q. Any concerns on your part about if you end
18 up being a juror in this case, you're going to be with
19 us anywhere from five days to two weeks. Usually for
20 jurors it's stressful just having to be here and
21 listen to evidence.
22       Do you think that there would be any
23 concerns on your part about the migraine or serving as
24 a juror?
25    A. No.

Page 231

1    MS. HARTMANN: Could I just have one
2 moment?
3    (Brief pause.)
4    Q. (BY MS. HARTMANN) Just a few more questions
5 and then I'm going to actually be done and the defense
6 will have a chance to talk with you.
7       The civil case that you were involved with
8 back in 1991, who was it that, I guess, did the
9 accusing of you? Who was it that lodged the complaint
10 against you?
11    A. Well, the complaint wasn't actually against
12 me. A family alleged that a nurse had hit a patient.
13 We notified the State, the Health Department, State
14 Department, they came in to investigate. And I was
15 involved in the case because a nurse aid said that
16 they had told me the day before instead of the day
17 that we reported it.
18    Q. So the allegation was that you --
19    A. Didn't report it in a timely manner. That
20 is something that has to be reported immediately.
21    Q. That there was a delay in reporting?
22    A. Right.
23    Q. And it was a nurse's aid that had reported
24 you or the family?
25    A. It was the nurse aid.

Page 232

1    Q. Okay. And the nurse aid was claiming that
2 the family had said that they had told you that day
3 before; am I understanding that correctly?
4    A. Well, let me see if I can make it clearer.
5 That it was a case of abuse. And it was actually
6 against the facility and the nurse that committed it,
7 myself, who was assistant director, and the director.
8 Myself and the director were involved because they
9 said we didn't report it in a timely manner.
10    Q. Okay. And do you know why that case was
11 settled?
12    A. No, I do not.
13    Q. Do you know what the extent of the injury to
14 the patient was?
15    A. There was no injury. We did have a, as soon
16 as it was reported, he was sent to the hospital for a
17 head-to-toe assessment, you know, to look for
18 anything. Nothing was found.
19    Q. Was this in a --
20    A. Nursing home.
21    Q. -- nursing home?
22    MS. HARTMANN: All right. Thank you. I
23 appreciate your candor. And I hope I've answered your
24 answers and not confused you too much.
25    The State will pass the venire member.

Page 233

1    VOIR DIRE EXAMINATION
2  BY MR. RAY:
3    Q. How you doing, Ms. Ealy?
4    A. Hi, I'm fine.
5    Q. I'm Bill Ray. This is Billy Jack
6  Crutsinger. You already met Tim Moore.
7        Your husband works for the City of Fort
8  Worth?
9    A. Yes.
10   Q. What's he do?
11   A. He's a carpenter.
12   Q. Like build rooms and fixes things?
13   A. Usually for the city it involves remodeling,
14 yes.
15   Q. So his boss, I guess, ultimately is the city
16 manager?
17   A. Probably so.
18   Q. How long has he worked there?
19   A. About ten years.
20   Q. There's a person named Ealy that works for
21 the police department. Are you related to him?
22   A. We have no family here in the State of
23 Texas.
24   Q. Okay. You're not related to that guitar
25 player named Ealy?

Page 234

1    A. No. And I do believe there was an actor,
2  but it was spelled different.
3    Q. Enough about that. I'm showing you
4  something, and isn't written down anywhere except on
5  my computer, but it's some things that a lot of times
6  that they're kind of the converse of some of the
7  things you've have been told. You realize you got a
8  right to vote guilty or not guilty depending on the
9  facts, right?
10   A. Uh-huh.
11   Q. This is a death penalty case. You're kind
12 of like, what's the guy's name, Pontius Pilate, from
13 the standpoint of you're going to get to make a
14 decision potentially whether or not Billy Jack lives
15 or dies; do you understand that?
16   A. Right.
17   Q. And as Ms. Hartmann told you, that's not
18 like some far off state that just has death penalty
19 cases just to have them. You vote the right way and
20 11 other people vote with you that way, that's going
21 to happen.
22   A. Right.
23   Q. Okay. It's going to come to pass. It won't
24 be tomorrow or the next day, but it happens.
25   A. Right.

Page 235

1    Q. And our state, right or wrong, has got that
2  mechanism. They've got the bugs worked out of it.
3    A. Uh-huh.
4    Q. Do you feel that way? I'm not trying to
5  put --
6    A. Right.
7    Q. But I want to make sure you understand a
8  couple things.
9        First of all, you got a right to decide for
10 your own self whether or not a person lives or dies.
11 And what I mean by that is, and you didn't understand
12 the full ramification and we kind of cheated you a
13 little bit by not telling you all that when you filled
14 out this questionnaire. But a person can get a life
15 sentence or a death sentence and the legislature is
16 just as happy either way. The governor is happy
17 either way. And the guy that runs the penitentiary is
18 just as happy either way; do you understand that?
19   A. Uh-huh.
20   Q. Your decision or your, I guess your --
21 you're not here to decide whether you like the DA
22 better than you like the Defendant; does that make
23 sense?
24   A. Right.
25   Q. You're here to decide whether they can prove

Page 236

1  some things to you, okay?
2    A. Right.
3    Q. And ultimately we got a question at the end
4  that doesn't require anybody to prove. But
5  essentially you're here to decide what the facts are,
6  you and the 11 other people.
7        The law is completely satisfied if those
8  facts turn out to show a life sentence of 40 calendar
9  years; does that make sense?
10   A. Okay.
11   Q. So when you answered your question here
12 about, "Please tell us your feelings or opinions about
13 the death penalty." And your answer is "Believe in
14 death." Now that you kind of know the whole system
15 and what it requires to get to that and kind of how
16 the terms work, do you have any different feelings
17 about the death penalty scheme? In other words, if I
18 asked you to answer this question again, would it be
19 the same answer or would you add to it, would you
20 subtract?
21       How do you feel about that?
22   A. No, I think I would still believe in the
23 death penalty.
24   Q. Okay. Do you believe -- how do you feel
25 about the death penalty as far as the only punishment

Page 237

1 for capital murder? Do you feel like it's more
2 appropriate or ought to be used more in capital murder
3 cases or less?
4    A. I'm not sure. I don't know how often it's
5 ever used.
6    Q. Well, let me -- I'm not going to tell you
7 the numbers of people tried and convicted. But it's
8 fair to say that every person that gets convicted of
9 capital murder doesn't get the death penalty.
10    A. Okay. Right.
11    Q. And the reason for that is that before you
12 get to those two questions that Ms. Hartmann was
13 telling you about, you got to find somebody guilty of
14 capital murder, right?
15    A. Uh-huh.
16    Q. And I think we can safely assume without
17 going into every county in this state that at least
18 one of people that has been convicted of capital
19 murder, that jury found that the State did not prove
20 that first question beyond a reasonable doubt, right?
21 They didn't prove the future dangerousness.
22    A. Oh, okay.
23    Q. And that guy didn't get the death penalty.
24    A. Okay.
25    Q. Okay. So at least in that one case, I mean,

Page 238

1 everybody is tried and convicted. Everybody that's
2 tried for capital murder doesn't get convicted, first
3 of all.
4    A. Right.
5    Q. Some of them get convicted of nothing and
6 they leave the courthouse with everybody. Some of
7 them get convicted of some other offense. And she
8 went over, I think, like you might have just what we
9 call a regular murder. Person might get convicted of
10 just murder.
11        An example of that, for instance, is one of
12 the ways you commit capital murder is you kill a
13 police officer, okay? If it turns out that police
14 officer is not in official discharge of his duty, in
15 other words you just shoot a police officer, maybe you
16 didn't know he was a policeman when you him, that
17 might turn out to not be capital murder.
18    A. Right.
19    Q. See how that works? So everybody that
20 starts out charged with capital murder, first of all,
21 they don't get convicted of capital murder.
22    A. Right.
23    Q. And everybody that's convicted of capital
24 murder might not be considered a future dangerousness
25 or be a future danger. So we weed those out. Then

Page 239

1 those that are a future danger, there might be some
2 mitigating circumstance, which is the second question,
3 to warrant that the death penalty not be imposed.
4        So do you see how that kind of works?
5    A. Yes.
6    Q. So what I'm getting at is back to your
7 answer, tell us your feelings about the death
8 penalty. Now, that you know that whole scheme about
9 how everybody charged with capital murder doesn't get
10 convicted, everybody that gets convicted is not a
11 future danger, and everybody that is a future danger
12 may have some mitigation, does that change how you
13 feel about the law and the application of that?
14    A. Well, does it change my mind as to whether I
15 believe in the death penalty?
16    Q. That's not really what I'm asking you. What
17 I'm getting at is the impression I got from your
18 reading your questionnaire, and this is true that I
19 get this impression from most people. Maybe I
20 incorrectly got it from you.
21        A lot of people feel like if a person gets
22 convicted of capital murder, then the death penalty is
23 kind of an automatic deal and they say they're okay
24 with that. But there's a completely different
25 sentence that can arise. And I just want to know if

Page 240

1 you're comfortable with both of those and how you feel
2 about that in a given case.
3    A. So you're asking whether in a capital murder
4 I could not give the death and give life?
5    Q. That's what I'm getting at.
6    A. Yes.
7    Q. Okay. Now, if you have found -- let's go
8 through these first and then we'll come back.
9        Second one is right to vote for a life
10 sentence, even if it means the jury can't reach a
11 verdict. Might be 11 to one for guilty and you might
12 be the one or you might be in the 11, okay? It really
13 doesn't matter which side of the fence you're on. But
14 the point of that statement is you have the right to
15 stick with your verdict if you believe in your heart
16 of hearts that's what the verdict ought to be.
17    A. Right.
18    Q. Sometimes that ends up being the jury cannot
19 agree?
20    A. Right.
21    Q. Do you understand that?
22    A. Right.
23    Q. Are you comfortable with that?
24    A. Yes.
25    Q. The last one, you have a right to your own

Page 241

1  individual feelings. Even though you're a jury of 12,
2  you're a jury of 12 individuals and you get to decide
3  what's convincing to you or aggravating. Make sense?
4        You have a right to decide whether any one
5  particularly mitigating factor is sufficient for you
6  to vote for life, depending on how it plays out in the
7  questions. And you can do that regardless of how any
8  one or all the other jurors feel about that; do you
9  understand that?
10  A. Right.
11  Q. Are you comfortable with that?
12  A. Yes.
13  Q. And the last one is you get to assess
14 whatever weight you want on that.
15  A. Right.
16  Q. In other words, you can say this is
17 mitigating to me, everybody else can say it isn't
18 mitigating to us, but if they've got some other thing
19 that they think is mitigating that maybe you don't
20 think is mitigating, the law says in that case if ten
21 or more of you do it, then you would have a life
22 sentence.
23        Does that make sense?
24  A. Uh-huh.
25  Q. Do you see how that works?

Page 242

1  A. Yes.
2  Q. Part of what I'm telling you is to make sure
3  that you're clear kind of on the converse of what
4  she's told you. She didn't intentionally leave it
5  out, it's just that there's so many things sometimes.
6        In the first special issue, that second
7  instruction I would anticipate you're going to get if
8  we get this far along. The mitigation -- a lot of
9  folks put I don't know for mitigation, so you're not
10 the lone ranger. But you're going to be instructed to
11 consider the Defendant's background as well as the
12 facts of case, the offense itself. And you're going
13 to be considering what either militates, which is kind
14 of what goes for the death penalty or future
15 dangerousness or mitigates against it. You're going
16 to be weighing that out, all right, just like the
17 entire.
18        Just like the entire burden of proof on the
19 guilt/innocence phase, the State has got to prove that
20 exists. There's a presumption that there is no future
21 dangerousness; do you understand that? They got to
22 prove there is.
23  A. Right.
24  Q. If they don't prove it, what's going to
25 happen?

Page 243

1  A. Then you would have to go with the life
2  sentence.
3  Q. Let me ask you this, can you conceive, and
4  maybe you've already answered this, can you conceive
5  of a situation where you have two intentional murders
6  that you've found to be true beyond a reasonable
7  doubt, can you conceive of a situation where you could
8  have two intentional murders where you never -- or
9  where you would not have a probability of future
10 dangerousness?
11  A. I guess if I thought long enough I could
12 probably come up with something. I'm not sure.
13  Q. Okay. What I'm getting at is, and it goes
14 back to what I started out with. The law contemplates
15 that people that get the death penalty is not just
16 people that have committed capital murder. There has
17 to be something more. And that's why you've got t̶
18 questions.
19        MS. HARTMANN: Your Honor, I'm going to
20 object that as phrased because that's incorrect.
21        THE COURT: Overruled.
22  Q. (BY MR. RAY) The law contemplates that
23 people who are convicted of capital murder, before
24 they can get the death penalty, there has to be
25 something more than just -- you got to answer these

Page 244

1  questions in the proper way or we don't get there,
2  regardless of what they did to get to that point.
3  A. Right.
4  Q. And I want to know how you feel about if you
5  have found someone guilty of capital murder, which
6  our case is going to be the death of two individuals.
7  We're not trying a child or a policeman or an
8  aggravated robbery. If you have gone that far, is
9  that something that's either always going to be able
10 to prove this future dangerousness or is it something
11 that might not. And I just kind of want to know how
12 you feel about that. Assuming that you found the two
13 intentional murders to begin with, or that was proven
14 to you?
15  A. Would I always feel like that person was a
16 danger no matter what?
17  Q. That's right.
18  A. No.
19  Q. So there might be something that
20 realistically, that the State wouldn't be able to
21 prove that?
22  A. Now, what did you say?
23  Q. Let me explain again, try to explain again.
24 It's just like what Ms. Hartmann said when, you know,
25 when we talk in a school book or in law school or in a

Page 245

1  theoretical sense, we could probably come up with some
2  fact if we talked about it long enough where a person
3  might not be a future danger because of whatever,
4  okay?
5     A. Uh-huh.
6     Q. What I'm interested in is realistically,
7  okay, if you've got a person who's been convicted of
8  capital murder, who has killed with a conscious
9  objective or desire two people, two different
10 individuals, some folks say, hey, that doesn't in and
11 of itself prove a future danger to me every time, it
12 doesn't always do that. Some folks say that in and of
13 itself with nothing else is always going to show me
14 that the guy is a future danger.
15         And I'm just trying to figure out which side
16 of that fence you fall on.
17    A. No, I don't think that would always prove
18 that he'd be a future danger.
19    Q. And realistically what I'm hearing you say
20 is there might be some -- that in and of itself,
21 you're going to require more than just the two than
22 just the fact that you've found somebody guilty?
23    A. Right.
24    Q. Okay. Have I ask you that enough times?
25        You put in one of your questions, "What are

Page 246

1  some factors that would be important to you in
2  determining whether a person that has been convicted
3  of a crime where the death penalty is appropriate
4  deserves the death penalty and why do you feel this
5  way?" And you put, "Death of a child." Is that an
6  exhaustive list or are there some others or was that
7  just an example?
8     A. It was just example. It was one thing that
9  kind of came to mind.
10    Q. Okay. Just kind of came to mind. Okay.
11        Do you work out at Alliance airport or are
12 you over at D/FW?
13    A. I'm out by Alliance.
14    Q. So when you said maintenance people, you're
15 treating the people that get hurt out there?
16    A. Right. That's our maintenance base, yes.
17    Q. What do you think about, this is just a
18 little bit different. That probability word up there,
19 as the prosecutor said, there's no real definition of
20 that. We've used an airplane as an example. And I'm
21 going to kind of toss that back to you.
22        You'd get on an airplane that had a
23 possibility that it would crash, would you not? Every
24 airplane that there is has a possibility?
25    A. Yeah, I guess.

Page 247

1     Q. Hopefully it's a very low possibility.
2     A. Yes.
3     Q. Would you get on an airplane and fly that
4  had a certainty of crashing?
5     A. A certainty of crashing? Probably not, no.
6     Q. In the context of our language, would you
7  get on an airplane that was probably going to crash?
8     A. Probably not.
9     Q. What I'm getting at is all three of those
10 words mean different things. And under our law, some
11 words get a definition and some don't, okay?
12 Probably, what that might mean to me or to Mr. Moore
13 or to Billy Jack might be different. But generally
14 speaking in the common phrase of our language,
15 probably means certainly might happen.
16    A. Right.
17    Q. Certainly not absolute, certainty I think is
18 the word I used, and certainly not possible. It's not
19 it's somewhere certainly in between.
20        Do you see the difference?
21    A. Uh-huh.
22    Q. Do you want to be on this jury?
23    A. Huh?
24    Q. Do you want to be on this jury?
25    A. Do I want to be? I really haven't thought

Page 248

1  about that.
2     Q. How do you feel about ultimately making a
3  decision about, based on facts, that ultimately might
4  result in somebody's death?
5     A. I think it's going to require some serious,
6  serious, serious, thought.
7        MR. RAY: Hang on just a minute.
8        (Brief pause.)
9     Q. (BY MR. RAY) If a person is given a life
10 sentence, what's your understanding of it?
11    A. I would assume life in prison.
12    Q. Okay. A life sentence in this state means
13 that you have to serve 40 calendar years. If you
14 committed the murder today, you wouldn't be eligible
15 for parole, no chance of getting paroled until the
16 year 2043 on August the 20th, which would've been
17 yesterday. 40 years from now; do you see that?
18    A. Okay.
19    Q. Jack Ruby, if he had been prosecuted under
20 this statute for killing Lee Harvey Oswald, he still
21 wouldn't be eligible for parole.
22    A. Okay.
23    Q. Do you see that?
24    A. Yes.
25    Q. Eligibility, it's kind of like possibility.

Page 249

1 Just because you're eligible doesn't mean you're
2 getting out. That just means that's when they're
3 going to start thinking about letting you out.
4     A. Right.
5     Q. Do you see how what works?
6     A. Right.
7     Q. Obviously a person who's 90 years old, he
8 gets a life sentence for capital murder, that's
9 certainly a death sentence -- not a death sentence,
10 but certainly a life sentence in the penitentiary.
11    A. Right.
12    Q. It's all a function of how long you live.
13 If you were 17, 18 years old, you might get out when
14 you're in your 60's -- 50's, excuse me.
15       How do you feel about that?
16    A. What do you mean?
17    Q. How do you feel about a life sentence being
18 that long a period of time?
19    A. It could be very well justified.
20    Q. Do you think there are some situations that
21 would involve capital murder where a life sentence
22 would be the more appropriate sentence?
23    A. I'm sure there are circumstances where life
24 would be the appropriate one considering death.
25    Q. And what about the other way around? Do you

Page 250

1 think there's some capital murder situations where the
2 death penalty is more appropriate?
3     A. It would be appropriate, yeah.
4     Q. Are you locked down to either one at this
5 point?
6     A. No.
7     MR. RAY: I'll pass the juror.
8     VENIREPERSON EALY: Huh?
9     MR. RAY: I was just telling the Judge.
10    THE COURT: There's a matter of law we're
11 going to have to take up outside your presence very
12 briefly. If you would step right outside the door, in
13 just a minute we'll let you know whether you're going
14 to be on the jury or not.
15    (Venireperson Ealy exits the courtroom.)
16    THE COURT: What says the State?
17    MS. HARTMANN: State will exercise a
18 peremptory.
19    THE COURT: Have her step back in, please.
20    (Venireperson Ealy enters the courtroom.)
21    THE COURT: Ms. Ealy, you are going to be
22 excused from any further service in the case. I want
23 to thank you very much for the time you spend down
24 here this afternoon. We'd like to get the plastic
25 portion of that badge you're wearing. You can keep

Page 251

1 the paper part. And your check will be mailed to you
2 and you have no further obligation to us.
3       Thank you very much.
4     (Venireperson Ealy exits the courtroom.)
5     THE COURT: Would you have Mr. Walker step
6 in, please?
7     MR. MOORE: Actually, Judge, before he even
8 darkens the door, prior to any question being asked --
9     MS. HARTMANN: Prior to anyone asking him
10 anything, we have an agreement to excuse him.
11    THE COURT: Okay. Both sides in agreement
12 to excuse Mr. Walker?
13    MS. HARTMANN: State is.
14    MR. MOORE: Yes, sir, State -- defense is.
15    THE COURT: All right. Have him step in,
16 too.
17    (Venireperson Walker enters the courtroom.)
18    THE COURT: Mr. Walker, I apologize for
19 making you wait all afternoon long, but the parties
20 just informed me that they are going to agree to
21 excuse you from any further service in the case. So
22 you are released and allowed to go about your business
23 and you have no further obligation to us.
24    THE COURT: Thanks for your time.
25       (Proceedings concluded.)

Page 252

1 STATE OF TEXAS          )
2 COUNTY OF TARRANT       )
3
4     I, William Shelton, Deputy Official Court
5 Reporter in and for the 213th District Court of
Tarrant County, State of Texas, do hereby certify that
6 the above and foregoing contains a true and correct
transcription of all portions of evidence and other
7 proceedings requested in writing by counsel for the
parties to be included in this volume of the
8 Reporter's Record in the above-styled and numbered
cause, all of which occurred in open court or in
chambers and were reported by me.
9
10    I further certify that this Reporter's Record of
the proceedings truly and correctly reflects the
11 exhibits, if any, admitted by the respective parties.
12    WITNESS MY OFFICIAL HAND on this the 30th day of
July, 2004.
13
14
15    WILLIAM SHELTON, CSR #4089
Expiration Date: 12/31/2004
16 Deputy Official Court Reporter
213th Judicial District Court
17 Tarrant County, Texas
18 6111 N. Beach St. #611
Fort Worth, Texas  76137
19 Phone: (817) 366-4948
20
21
22
23
24
25

Case 4:07-cv-00703-Y Document 88-1   Filed 11/05/17   Page 21 of 72   PageID 5587

Motion to Suppress, 8-22-03     State vs. Billy Jack Crutsinger   Vol. 7

1

REPORTER'S RECORD

VOLUME 7 OF 36 VOLUMES

TRIAL COURT CAUSE NO. 0885306D

THE STATE OF TEXAS        *     IN THE 213TH DISTRICT
                          *
VS.                       *     COURT OF
                          *
BILLY JACK CRUTSINGER     *     TARRANT COUNTY, TEXAS


*************************

DEFENDANT'S MOTION TO SUPPRESS

*************************


On the 22nd day of August, 2003,
the following proceedings came on to be heard in the
above-entitled and numbered cause before the Honorable
Robert Gill, Judge Presiding, held in Fort Worth,
Tarrant County, Texas:


Proceedings reported by machine shorthand.

William Shelton, CSR

Case 4:07-cv-00703 Document 88-1   Filed 11/05/17   Page 22 of 72 PageID 6558

Motion to Suppress  8-22-03    Multi-Page State vs. Billy Jack Crutsinger  Vol. 7

Page 2

 1                    A P P E A R A N C E S

 2

 3        MS. MICHELE HARTMANN
          SBOT NO. 09167800
 4        MS. LISA CALLAGHAN
          SBOT NO. 01160700
 5        ASSISTANT DISTRICT ATTORNEYS
          Tarrant County Justice Center
 6        401 West Belknap Street
          Fort Worth, Texas  76196
 7        Phone: (817) 884-1400
          ATTORNEYS FOR THE STATE
 8

 9

10        MR. WILLIAM H. "BILL" RAY
          ATTORNEY AT LAW
11        SBOT NO. 16608700
          5041 Airport Freeway
12        Haltom City, Texas  76117
          Phone: (817) 831-8383
13        ATTORNEY FOR DEFENDANT

14        MR. TIM MOORE
          EVANS, GANDY, DANIEL & MOORE
15        SBOT NO. 14378300
          115 W. 2nd Street, Suite 202
16        Fort Worth, Texas  76102
          Phone: (817) 332-3822
17        ATTORNEY FOR DEFENDANT

18

19

20

21

22

23

24

25

Page 3

1
2
3

CHRONOLOGICAL INDEX
VOLUME 7
DEFENDANT'S MOTION TO SUPPRESS

4   AUGUST 22, 2003                              Page Vol.

5   Proceedings . . . . . . . . . . . . .        6    7
6
    Eight witnesses sworn/Rule invoked  . . . .  6    7
7

| STATE'S WITNESSES | Direct | Cross | Vol. |
|---|---|---|---|
| MCCASKILL, JOHN | 9,65 | 46 | 7 |
| SIMPSON, GEORGE | 68,86 | 78 | 7 |
| CONTENTA, PETER | 87,98 | 94 | 7 |
| GARCIA, CLEMENTE WARREN III | 99,136 | 120 | 7 |
| GARCIA, CLEMENTE WARREN JR. | 138,154 | 145,156 | 7 |
| MOFFITT, CHERYL | 158,168 | 162,170 | 7 |

Both sides rest and close . . . . . . . . .     180 7

Defendant's Argument by Mr. Ray . . . . . .     180 7

State's Argument by Ms. Hartmann  . . . . .     185 7

Defendant's Argument by Mr. Ray . . . . . .     190 7

Court's Ruling (Held in abeyance) . . . . .     192 7

Proceedings Concluded . . . . . . . . . .       192 7

Court Reporter's Certificate  . . . . . . .     193 7

Case 4:02-cv-00703 Motion to Suppress, 8-22-02 Document 66-1 Filed 11/06/17 Multi-Page State vs Billy Page Crusoe Page 24 of 72 Vol. 7

Page 4

```
1                    ALPHABETICAL WITNESS INDEX
                             VOLUME 7
2              DEFENDANT'S MOTION TO SUPPRESS

3                               Direct      Cross      Vol.

4
    CONTENTA, PETER                87,98        94        7
5

6   GARCIA, CLEMENTE WARREN III   99,136      120         7

7
    GARCIA, CLEMENTE WARREN JR.   138,154    145,156      7
8

9   MCCASKILL, JOHN                9,65        46         7

10
    MOFFITT, CHERYL               158,168    162,170      7
11

12  SIMPSON, GEORGE                68,86        78         7

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT INDEX
VOLUME 7
DEFENDANT'S MOTION TO SUPPRESS

STATE'S PRETRIAL

| No. | Description | Offered | Admitted | Vol. |
|---|---|---|---|---|
| 1 | Miranda Rights | 20 | 20 | 7 |
| 2 | DNA Sample Request | 23 | 23 | 7 |
| 3 | Consent to Search | 23 | 23 | 7 |
| 4 | Transcript of Audiotape | 34 | 34 | 7 |
| 5 | Audiotape (with statement) | 33 | 33 | 7 |
| 5A | Audiotape Case | 33 | 33 | 7 |

DEFENDANT'S PRETRIAL

| No. | Description | Offered | Admitted | Vol. |
|---|---|---|---|---|
| NONE | | | | |

William Shelton, CSR

Page 6

```
1           P R O C E E D I N G S
2          Friday, August 22, 2003
3              * * * * * * * *
4      (Open court, Defendant not present:)
5      THE COURT: If you're going to testify,
6  please raise your right hand.
7      (Eight witnesses sworn.)
8      THE COURT: I need everyone to state your
9  name for the record, please, starting over here,
10 please, sir.
11     THE WITNESS: Robert Pawlowski.
12     THE WITNESS: Nick Patel.
13     THE COURT: I'm sorry, I didn't get the last
14 name sir.
15     THE WITNESS: Patel.
16     THE COURT: Patel, okay.
17     THE WITNESS: Denice Schrader.
18     THE WITNESS: Joe Fuller.
19     THE WITNESS: Judy Bell.
20     THE WITNESS: Loretta Angrum.
21     THE WITNESS: Cindy Marshall.
22     THE WITNESS: John McCaskill.
23     THE COURT: Is that everyone?
24     MS. HARTMANN: That's everyone that's here
25 at this time.
```

Page 7

```
1      THE COURT: All right. Does either side
2  call for the Rule?
3      MR. RAY: I'd ask for it.
4      THE COURT: The Rule means unless you are
5  testifying, you have to remain outside the courtroom
6  and outside the hearing of any witness who is
7  testifying. Before and after you testify, you cannot
8  discuss your testimony with any other witness or allow
9  any other witness to discuss their testimony with
10 you.
11     Who will be the State's first witness?
12     MS. HARTMANN: John McCaskill will be the
13 State's first witness.
14     THE COURT: Mr. McCaskill, please come to
15 the witness stand. Everyone else may go out into the
16 hallway.
17     MS. HARTMANN: Actually, Your Honor, these
18 other witnesses are not going to be called for the
19 suppression hearing. They're going to be witnesses
20 for the trial.
21     May they be released?
22     THE COURT: That's fine with me.
23     MR. MOORE: That's fine with us.
24     MR. RAY: We don't care.
25     (Seven Witnesses exit the courtroom.)
```

Page 8

```
1      (Witness approaches witness stand.)
2      (Defendant enters the courtroom.)
3      (Open court, Defendant present:)
4      THE COURT: All right. We're hearing the
5  First Amended Motion to Suppress Written or Oral
6  Statements and the Motion to Suppress Evidence; is
7  that right?
8      MR. MOORE: That's correct.
9      MR. RAY: That's correct, Judge.
10     THE COURT: All right. You may proceed.
11     MS. HARTMANN: Your Honor, at this time the
12 State is prepared to go forward and present evidence
13 in regards to the Defendant's motion to suppress the
14 statement.
15     However, before we proceed into any
16 testimony in regards to suppressing any evidence
17 obtained out of the motel room, the State has filed a
18 request for the defense to show standing to contest
19 any such search.
20     THE COURT: Are you going to question your
21 witness?
22     MS. HARTMANN: Yes, Your Honor.
23     THE COURT: Go ahead.
24            JOHN MCCASKILL,
25 having been first duly sworn, testified as follows:
```

Page 9

```
1           DIRECT EXAMINATION
2  BY MS. HARTMANN:
3      Q. Would you state your name for the record?
4      A. John McCaskill.
5      Q. How are you employed?
6      A. I'm a detective with the Fort Worth Police
7  Department.
8      Q. And back in April of this year, what were
9  your duties and responsibilities as a detective with
10 the Fort Worth Police Department?
11     A. I was assigned to the homicide unit.
12     Q. Did you receive in the course of your
13 employment as a detective an investigation regarding a
14 double homicide off of Scott Avenue?
15     A. Yes, ma'am, I did.
16     Q. In the course of your investigation of that
17 double homicide, did you and another detective travel
18 to another city here in the State of Texas?
19     A. Yes, ma'am.
20     Q. Where did you go?
21     A. To Galveston.
22     Q. Who were you with?
23     A. Detective Matt Hardy.
24     Q. What was your purpose in going to Galveston
25 in relation to the investigation of the double
```

Page 10

1 homicide off of Scott Avenue?
2    A. While we were on the scene on Scott Avenue,
3 we received information that a credit card that
4 belonged to one of the victims, Ms. Syren, was
5 actively being used in Galveston.
6    Q. Did you or another member of the Fort Worth
7 Police Department contact the Galveston Police
8 Department in regards to the credit card of one of the
9 victims being used in Galveston?
10    A. Yes, ma'am.
11    Q. Did you have information before you left
12 Fort Worth for Galveston where that credit card had
13 been used in Galveston?
14    A. Yes, ma'am.
15    Q. To whom did this particular credit card
16 belong to?
17    A. Patricia Syren.
18    Q. Was she identified as one of the victims in
19 this double homicide?
20    A. Yes, ma'am.
21    Q. What locations or what businesses was this
22 credit card used in Galveston that you knew of?
23    A. I knew of a motel, I believe it was called
24 the Seahorse Inn. And there was a liquor store. I'm
25 sorry, I don't recall the name of the liquor store off

Page 11

1 the top of my head. But it was understood that the
2 hotel room had been rented on the previous night.
3    Q. And Patricia Syren's credit card had been
4 used?
5    A. Yes, ma'am.
6    Q. From whom did you receive the information
7 insofar as the credit card?
8    A. I was talking to a representative of
9 Morgan-Stanley MasterCard.
10    Q. All right. And that information was
11 communicated to Galveston PD?
12    A. Yes, ma'am.
13    Q. On what day did -- let me ask you this. On
14 what day did you receive the investigation of this
15 double homicide?
16    A. On April 8th.
17    Q. Which was what day?
18    A. I believe it was a Tuesday.
19    Q. And on what day and date did you and
20 Detective Hardy travel to Galveston?
21    A. On Wednesday, April 9th.
22    Q. Do you know approximately what time it was
23 that you arrived in the city of Galveston?
24    A. At about -- we arrived in Galveston at
25 around 11:20. We actually got to the -- I'm sorry,

Page 12

1 about 12:20. And we actually got to the police
2 department at about 12:38.
3    Q. Were you informed at some point prior to
4 your physical arrival at the Galveston Police
5 Department that someone had been arrested as a suspect
6 for your double homicide?
7    A. Yes, ma'am.
8    Q. Do you remember who it was that gave you
9 that information?
10    A. Yes, it was Galveston Lieutenant Matt
11 Stanich.
12    Q. When you arrived at the Galveston Police
13 Department, what took place upon your arrival?
14    A. I met with Lieutenant Stanich in the parking
15 lot. And he took us inside and we briefly met with a
16 patrol sergeant who was involved in the
17 investigation. And I asked to be taken to an area
18 where the Defendant, Mr. Crutsinger, was being held so
19 I could speak with him briefly.
20    Q. Let me ask you this. Prior to your arrival
21 in Galveston and speaking with the Galveston police
22 officers, did you have the name of a suspect involved
23 with this double homicide?
24    A. No.
25    Q. Was the name Billy Jack Crutsinger given to

Page 13

1 you as the name of the suspect who had been arrested
2 there in Galveston?
3    A. Yes.
4    Q. You said that you asked to be taken to see
5 Mr. Crutsinger?
6    A. Yes, ma'am.
7    Q. And were you, in fact, taken at some point
8 to see him?
9    A. Yes.
10    Q. How soon after your arrival did that take
11 place?
12    A. Just within a few minutes.
13    Q. Where was Mr. Crutsinger located?
14    A. In a little holding area just inside the
15 jail portion of their police department.
16    Q. Was there anybody with Mr. Crutsinger?
17    A. Yes, there was a Galveston officer in the
18 room.
19    Q. Was there anybody else in the room?
20    A. No.
21    Q. When you met with Mr. Crutsinger, did you
22 identify yourself?
23    A. Yes.
24    Q. How did you do that?
25    A. I showed identification and told him I was a

Page 14

1 detective with the Fort Worth Police Department.
2      Q. Were you in plain clothes?
3      A. Yes, ma'am.
4      Q. Do you see anybody here in the room that you
5 recognize to be the same Billy Jack Crutsinger that
6 you met with on April the 9th of 2003 at the Galveston
7 Police Department?
8      A. Yes, I do.
9      Q. And where is that person seated and could
10 you describe something that they're wearing?
11      A. He's seated to the far right of the table.
12 He's wearing, looks like a white and blue vertically
13 striped longsleeve shirt and dark blue pants.
14      Q. Vertical or horizontal?
15      A. I'm sorry. I guess that would be
16 horizontal. No, it's vertical.
17      Q. Okay.
18         MS. HARTMANN: Your Honor, at this time may
19 the record reflect that Detective McCaskill has
20 identified the Defendant?
21         THE COURT: It will.
22      Q. (BY MS. HARTMANN) Did you say anything else
23 to Mr. Crutsinger at that time other than identifying
24 yourself as a detective with the Fort Worth Police
25 Department?

Page 15

1      A. I told him that I would be speaking with him
2 in a little bit, but I had some business to attend
3 to. And then I stepped out of the room.
4      Q. Did you ask to see anything? Did you ask
5 him to do anything in particular before you left the
6 room?
7      A. Yes, ma'am.
8      Q. And what was that?
9      A. I wanted to see his hands.
10      Q. Why was it that you wanted to see
11 Mr. Crutsinger's hands?
12      A. I wanted to see if he had any injuries.
13      Q. And did you have reason to believe that the
14 person involved in this homicide might have had
15 injuries?
16      A. Yes, ma'am.
17      Q. Why did you have that belief?
18      A. While investigating the scene of the
19 offense, there was significant drops of blood that led
20 away from the victims' bodies to the front door of the
21 residence and then another trail of blood that led
22 through a dining room into a kitchen up to a drawer
23 where towels were kept. And that point, the trail of
24 blood stopped. And we also located some significant
25 drops of blood inside a detached garage where a

Page 16

1 vehicle was missing.
2      Q. All right. And so from that you all
3 suspected that the person involved had injured
4 themselves in some way and had blood throughout the
5 house?
6      A. Yes, ma'am.
7      Q. In the garage?
8      A. Yes, ma'am.
9      Q. Did you notice any type of injuries to
10 Mr. Crutsinger's hands?
11      A. Yes, I did.
12      Q. And what type of injury did you observe?
13      A. A laceration to his right forefinger.
14      Q. In your opinion, was it a significant
15 laceration?
16      A. Yes, it was.
17      Q. After you observed the laceration, what did
18 you do that point?
19      A. I stepped out of the room and I wanted to
20 speak with the officers that had been involved and get
21 some information on what had led to the point of
22 Mr. Crutsinger's arrest. And just within probably
23 less than two minutes, I was advised that
24 Mr. Crutsinger wanted to speak with me.
25      Q. All right. And were you advised of that by

Page 17

1 Officer Garcia with the Galveston Police Department?
2      A. Yes, ma'am.
3      Q. Do you remember which Officer Garcia it was?
4      A. Well, I think there's two or three. I don't
5 know that I even -- I don't even know his first name.
6 But it was the one that was in the room with him.
7      Q. All right. And so shortly after introducing
8 yourself to the Defendant, you leave and then you're
9 told that he actually wants to speak with you?
10      A. Yes, ma'am.
11      Q. When you're told of that, what do you do at
12 that point?
13      A. Well, I asked one of the Galveston officers
14 if there was an interview room that we might be able
15 to use. And they actually took us upstairs to their
16 detective offices and took us to an interview room.
17 And Mr. Crutsinger was brought to that room.
18      Q. All right. And was Detective Hardy with
19 you?
20      A. Yes, he was.
21      Q. When Mr. Crutsinger came into the room, did
22 he say anything initially at that point to you?
23      A. Not immediately, no.
24      Q. What steps did you and Detective Hardy take
25 at that point in the interview room with

Page 18

1  Mr. Crutsinger?
2  A. I read him his Miranda warnings. We call it
3  the green sheet warnings just because it's on a green
4  sheet of paper.
5  Q. All right. And did you read those to him or
6  did you ask him to read them to himself?
7  A. I actually read them to him out loud and
8  then asked him if he understood each of them.
9  Q. All right. And did he indicate to you that
10 he did understand each of those rights?
11 A. Yes, ma'am.
12 Q. How did he indicate that to you?
13 A. I just asked him, "Do you understand your
14 rights that I've read to you?" And he said yes.
15 Q. All right. And let me ask you this: Did
16 Mr. Crutsinger appear cognizant of what was going on
17 around him?
18 A. Yes, ma'am.
19 Q. Did he appear to you to be under the
20 influence of any type of narcotic, drug or alcohol?
21 A. No. I believe he had been drinking earlier
22 in the day, but he in no way appeared to be
23 intoxicated.
24 Q. Did he appear to understand what you and
25 Detective Hardy were saying to him? By that I mean

Page 19

1  did he respond appropriately?
2  A. Yes.
3  Q. Did he have any questions for you at that
4  time that you initially read him his Miranda warning?
5  A. No.
6  Q. Did he ask for an attorney?
7  A. No, ma'am.
8  Q. Did he ever tell you he did not want to talk
9  to you?
10 A. No, ma'am.
11 MS. HARTMANN: May I approach the witness?
12 Q. (BY MS. HARTMANN) Detective McCaskill, I'm
13 going to show you what has been marked for purposes of
14 identification as State's Exhibit Pretrial 1 and ask
15 if you recognize that?
16 A. Yes, I do.
17 Q. And how is it that you recognize State's
18 Pretrial 1?
19 A. That is a copy of the Miranda warning sheet
20 I used on a particular date.
21 Q. And does your name appear on that exhibit?
22 A. Yes, ma'am.
23 Q. Does the Defendant's name appear on that
24 exhibit?
25 A. Yes, ma'am.

Page 20

1  Q. Does a date appear?
2  A. Yes.
3  Q. And does a time?
4  A. Yes, ma'am.
5  Q. And what is the date?
6  A. April 9th, 2003.
7  MS. HARTMANN: Your Honor, for purposes of
8  this hearing, State would offer State's Pretrial 1.
9  MR. MOORE: No objection.
10 THE COURT: Pretrial 1 is admitted.
11 (State's Pretrial Exhibit No. 1 admitted.)
12 Q. (BY MS. HARTMAN) And does it have the time
13 at which that Mr. Crutsinger was advised of his
14 Miranda warnings?
15 A. Yes, ma'am.
16 Q. And what time was that?
17 A. What I've got written down here is 13:14
18 hours. Actually that would be 1:14 p.m.
19 Q. After advising Mr. Crutsinger of his Miranda
20 warnings and him not telling you he wanted a lawyer or
21 he didn't tell you he didn't want to talk to you, what
22 happened at that point?
23 A. I just asked him what happened, what had
24 brought him to this point to Galveston. And he
25 basically just explained it to Detective Hardy and I.

Page 21

1  Q. All right. Let me back you up for just a
2  moment.
3  Did you all ask for Mr. Crutsinger to
4  consent to either any type of search or taking of DNA
5  sample?
6  A. Actually both, yes.
7  Q. All right. Can you tell me about that,
8  please?
9  A. Yes, ma'am. The first thing we did was I
10 actually took some digital photographs of
11 Mr. Crutsinger as he appeared, including the
12 laceration on his finger. Then I asked him if he
13 would provide us his permission to search a black
14 duffel bag that I understood had been in his
15 possession at the time of his arrest. And we provided
16 him with a Consent to Search form and read that to him
17 and asked if he would sign it and give us his
18 permission. And he agreed and did so.
19 And also, there's a consent form to provide
20 a DNA sample. Provided that to him and he reviewed
21 that and signed it. And then I actually took, we call
22 them buccal or buccal swabs, which are just cheek
23 swabs to take the DNA sample.
24 Q. All right. And the permission to collect
25 the buccal swabs and the consent to search the duffel

Page 22

1  bag, when did those conversations with Mr. Crutsinger
2  take place in relation to the Miranda warnings?
3      A. Just a few minutes after.
4      Q. So we have the Miranda warnings first?
5      A. Yes, ma'am.
6      Q. And then you have talking to him about
7  giving some buccal swabs and asking him for consent to
8  search this bag?
9      A. Yes, ma'am.
10     Q. And then subsequent to that is when you
11 actually speak with him about what's happened?
12     A. Yes, ma'am.
13     MS. HARTMANN: May I approach the witness?
14     Q. (BY MS. HARTMANN) Detective, I'm going to
15 show you what's been marked for identification
16 purposes as State's Exhibit Pretrial 2 and Pretrial 3
17 and ask you to take a look at those, please.
18     A. Yes, ma'am.
19     Q. Do you recognize each one of those exhibits?
20     A. Yes, I do.
21     Q. And how is it that you recognize them?
22     A. I recognize my handwriting and I also
23 recognize that these are the forms or copies of the
24 forms, the Consent to Search and the permission to
25 collect biological sample that were used that date.

Page 23

1      Q. And are these copies of the originals?
2      A. Yes, ma'am.
3      Q. Do they appear to have been altered, amended
4  or changed in any way?
5      A. No, ma'am.
6      Q. Do they fairly and accurately depict the
7  originals in this case?
8      A. Yes.
9      MS. HARTMANN: State would offer State's
10 Pretrials 2 and 3.
11     MR. MOORE: No objection.
12     THE COURT: 2 and 3 are admitted
13 (State's Pretrial Exhibit Nos. 2 and 3 admitted.)
14     Q. (BY MS. HARTMANN) Detective, State's
15 Pretrial 2 is a copy of which form?
16     A. The permission to collect a DNA sample or,
17 actually a biological sample.
18     Q. And specifically what type of biological
19 sample was collected from Mr. Crutsinger?
20     A. The cheek swabs.
21     Q. And State's Exhibit Pretrial 3 is a copy of
22 which form in this case?
23     A. The Consent to Search, in this case the
24 duffel bag.
25     Q. The duffel bag and its contents?

Page 24

1      A. Yes, ma'am.
2      Q. And did Mr. Crutsinger freely and
3  voluntarily sign each one of these forms in your
4  presence?
5      A. Yes, he did.
6      Q. Did he have any questions for you about what
7  exactly these forms were going to allow you to do?
8      A. No.
9      Q. Did you, in fact, collect some, a DNA sample
10 from the cheeks, the inside cheeks of Mr. Crutsinger?
11     A. Yes, ma'am.
12     Q. Did you, in fact, at a later point search
13 the black duffel bag to which he had consented to your
14 searching?
15     A. Yes, ma'am.
16     Q. Did you find any items of interest in that
17 black duffel bag?
18     A. Yes, ma'am.
19     Q. What items did you locate?
20     A. Particularly a cell phone that we believe
21 belonged to Ms. Syren.
22     Q. Was there also a bus ticket?
23     A. Yes, there was.
24     Q. Do you remember anything else of interest to
25 your investigation that you found in that black duffel

Page 25

1  bag?
2      A. The specific things that I recall finding
3  were the cell phone and the Greyhound bus ticket that
4  I believe was purchased with Ms. Syren's MasterCard.
5  There was a lot of other just personal effects and
6  clothes. I don't recall anything.
7      Q. And the search of that bag, was that done
8  after your contact with Mr. Crutsinger?
9      A. Yes.
10     Q. The collection of the DNA swabs, was that
11 done actually there in the interview room?
12     A. Yes, ma'am.
13     Q. After you received consent to search this
14 black duffel bag and collect the DNA samples, did you
15 then talk to Mr. Crutsinger?
16     A. Yes.
17     Q. Did you in any way memorialize or document
18 the statement that you took from Mr. Crutsinger?
19     A. Yes.
20     Q. And how was that done?
21     A. It was recorded.
22     Q. Was there a transcript subsequently created
23 on the basis of that original tape recording?
24     A. Yes, ma'am, it was.
25     Q. And when you interviewed Mr. Crutsinger, on

Page 26

1  the audiotape did you mirandize Mr. Crutsinger again?
2      A. Yes, I did.
3          MS. HARTMANN: Your Honor, at this time
4  there may be an agreement with the defense. We've got
5  a copy of the transcript. If we could use that in
6  place of the audiotape at this point for this
7  particular hearing.
8          MR. RAY: Judge, I don't have any -- my
9  objection, if I have one, and I'm not going to have
10  one, I just want to tell you the transcript is not
11  completely accurate about some of the things that are
12  said. There are places where -- it's mostly Billy
13  Jack's statement don't, are not hearable and they've
14  written unintelligible.
15          However, there's not any discrepancy as far
16  as the transcript is concerned, I believe, for
17  purposes of this hearing. And what I'm getting at are
18  the things that Detective McCaskill said to Billy Jack
19  as far as reading him his rights and the responses to
20  that stuff.
21          So with that caveat, I don't have any
22  objection to her using the transcript for purposes of
23  this hearing for your purpose of determining
24  voluntariness, whether or not the Article 38.22 was
25  complied with.

Page 27

1          And he does say enough on there that's on
2  the transcript to show inculpatory statements. But I
3  would have an objection to that in front of the jury.
4          But with that caveat, I don't have any
5  objection to that transcript.
6          Does that make sense?
7          MS. HARTMANN: May I proceed?
8          May I approach the witness?
9      (Brief pause.)
10      Q. (BY MS. HARTMANN) Detective McCaskill, I
11  want to show you what's been marked as Pretrial
12  State's Exhibit No. 4 and ask if you would take a look
13  at that.
14      A. (Witness complies.)
15      Q. Do you recognize the information that's
16  contained in State's Exhibit Pretrial 4?
17      A. Yes, I do.
18      Q. And how is it that you recognize that
19  information?
20      A. I recognize that as a transcript of the tape
21  recording that we made on that particular date.
22      Q. All right. And insofar as, I think you were
23  obviously here and heard the defense attorney's
24  contention that there may be some disagreements about
25  some specific words that were said by the Defendant as

Page 28

1  far as how they had been transcribed, but insofar as
2  the section of the transcript that pertains to the
3  Miranda warnings, the rights that you advised the
4  Defendant of, are those fair and accurate translations
5  of what you recall taking place?
6      A. Yes, ma'am.
7      Q. Do you tell the Defendant that he's being
8  recorded?
9      A. Yes.
10      Q. Does he acknowledge that he understands that
11  fact?
12      A. Yes.
13      Q. Do you tell him that you are going to read
14  him his Miranda rights again?
15      A. Yes, ma'am.
16      Q. Did you ask him if he understood those
17  rights the first time that you read them?
18      A. Yes.
19      Q. And did he acknowledge that he did?
20      A. Yes, ma'am.
21      Q. Did you tell him that you were going to read
22  him his rights a second time?
23      A. Yes.
24      Q. And did he acknowledge that fact?
25      A. Yes, he did.

Page 29

1      Q. Did you go through each one of the Miranda
2  warnings and read each one individually to him?
3      A. Yes, ma'am.
4      Q. And after reading each one individually to
5  Mr. Crutsinger, did he acknowledge that he understood
6  each one of those individual rights?
7      A. Yes, ma'am.
8      Q. Did you tell him that he had the right to
9  remain silent and not make any statement at all and
10  any statement he made could be used at his trial?
11      A. Yes.
12      Q. Did you tell him that any statement he made
13  could be used as evidence against him in court?
14      A. Yes.
15      Q. Did you tell him that he had the right to
16  have a lawyer present to advise him prior to and
17  during any questioning?
18      A. Yes, ma'am.
19      Q. Did you tell him that if he was unable to
20  employ a lawyer, he had the right to have a lawyer
21  appointed to advise him prior to and during any
22  questioning?
23      A. Yes, ma'am.
24      Q. Did you tell him that he had the right to
25  terminate the interview at any time?

Page 30

1    A. Yes, ma'am.
2    Q. Did you ask him after hearing all those
3 rights did he still want to talk with you?
4    A. Yes.
5    Q. And what was his response?
6    A. He replied, "Yes, sir."
7    Q. Did you ask him if there was anything about
8 those rights that he didn't understand?
9    A. Yes, ma'am.
10    Q. Did he indicate that he had any questions
11 about any of those?
12    A. No.
13    Q. Did you ask him on the audiotape whether
14 either you or Detective Hardy had ever threatened him?
15    A. Yes, ma'am.
16    Q. Did he indicate that anything like that had
17 happened?
18    A. No.
19    Q. No, he didn't indicate or he said nothing
20 had happened?
21    A. Nothing had happened.  I'm sorry.
22    Q. That's okay.  Did you ask him if you all had
23 promised him anything?
24    A. Yes, ma'am.
25    Q. And did he give you a response to that

Page 31

1 question?
2    A. The answer was no.
3    Q. Did you ask him if he was talking to you of
4 his own free will?
5    A. Yes, ma'am.
6    Q. And what was his indication or what was his
7 response to that?
8    A. He stated that he was talking to us out of
9 his own free will.
10    Q. All right.  And again, did you ask him or
11 did you notify him a second time that he was being
12 recorded?
13    A. Yes, ma'am.
14    Q. Did you then proceed to speak with him about
15 what might have happened in regards to him up in Fort
16 Worth the previous Sunday?
17    A. Yes, ma'am.
18    Q. Did he, in fact, give you some information
19 or inculpate himself in an offense?
20    A. Yes.
21    Q. And did he inculpate himself in the double
22 homicide specifically that you were investigating that
23 had taken place off of Scott Avenue?
24    A. Yes, ma'am.
25    Q. At the conclusion of your speaking with

Page 32

1 Mr. Crutsinger, did you give him an opportunity to add
2 any information that he wanted to on the audiotape
3 before you stopped the recording?
4    A. Yes, ma'am.
5    Q. All right.  And was there any additional
6 information that he wanted to offer?
7    A. Yes, ma'am.
8    Q. And was he given an opportunity to do that?
9    A. Yes.
10    Q. Detective McCaskill, I'm going to show you
11 what's been marked as State's Pretrial Exhibit 5 and
12 5A and ask you to take a look at those.
13    A. Yes, ma'am.
14    Q. And do you recognize what State's Pretrial 5
15 is?
16    A. That's a copy of the audiotaped statement
17 that was made with Mr. Crutsinger on April 9th of this
18 year.
19    Q. All right.  The tape recorder -- let me ask
20 you this.  We've talked about a transcript being done
21 of the tape recording in this case.  Why was that
22 transcript done?
23    A. We always do that in a particular case like
24 this so in the event that a tape recorder, the
25 playback is not available, it was just so it can be

Page 33

1 read.
2    Q. All right.  Also, the tape recorder that was
3 being used, was that one that you had taken down to
4 Galveston with you?
5    A. Yes, ma'am.
6    Q. For whatever reason, do the voices -- can
7 you identify all the voices on State's Exhibit 5?
8    A. Yes, ma'am.
9    Q. All right.  Do they sound truly accurate of
10 what your normal everyday voices sound like?
11    A. Well, it records a little fast for whatever
12 reason, and that makes the voices sound a little
13 higher pitched than they typically are.
14    Q. All right.  But otherwise, whose voices
15 appear on State's Exhibit 5?
16    A. It would be myself, Mr. Crutsinger's and
17 Detective Hardy's.
18    MS. HARTMANN: Your Honor, for purposes of
19 this hearing, State would offer State's Pretrial 5 and
20 5A.
21    MR. MOORE: No objection.
22    THE COURT: 5 and 5A are admitted.
23    (State's Pretrial Exhibit No. 5 and 5A admitted.)
24    MS. HARTMANN: And with permission of the
25 Court, may we publish the pertinent parts insofar as

Case 4:07-cv-00703-Y Document 86-1 Filed 11/03/17 Page 33 of 72 PageID 3589

Motion to Suppress 8/22/03                State vs. Billy Jack Crutsinger    Vol. 7

Page 34

1 the Miranda warnings?
2    THE COURT: You may. Are you going to offer
3 the transcript, also?
4    MS. HARTMANN: Yes. The State would offer
5 the transcript for the purpose of this hearing.
6    MR. RAY: No objection.
7    THE COURT: Pretrial 4 is admitted
8 (State's Pretrial Exhibit 4 admitted.)
9 (State's Pretrial Exhibit No. 5 published.)
10   Q. (BY MS. HARTMANN) Detective McCaskill,
11 we've now had an opportunity, everyone in the
12 courtroom, to listen to State's Pretrial No. 5, the
13 audio recording of your interview with
14 Mr. Crutsinger.
15   Has it been altered in any way?
16   A. The recording?
17   Q. That's correct.
18   A. No, ma'am.
19   Q. Is it accurate?
20   A. Yes, ma'am.
21   Q. Were you competent to operate the recording
22 equipment?
23   A. Yes, ma'am.
24   Q. And was the recording equipment capable of
25 taking the recording and was it in working order?

Page 35

1    A. I'm sorry?
2    Q. Did the tape recorder work?
3    A. Yes.
4    Q. And you've previously identified the voices
5 on that tape regarding as being yours, Detective
6 Hardy's and Mr. Crutsinger's?
7    A. Yes, ma'am.
8    Q. Were there any other voices on that tape
9 recording?
10   A. No, ma'am.
11   Q. The Miranda warnings that appear on that
12 recording, do they appear prior to any interview with
13 Mr. Crutsinger?
14   A. Yes.
15   Q. And did he knowingly, intelligently and
16 voluntarily waive each one of those rights?
17   A. Yes, ma'am.
18   Q. Was Mr. Crutsinger subjected to any duress
19 during the taking of that statement?
20   A. No, ma'am.
21   Q. Were any threats made to him?
22   A. No, ma'am.
23   Q. Any promises made?
24   A. No, ma'am.
25   Q. Was there withholding of food, drink or

Page 36

1 using the restroom facility?
2    A. No, ma'am.
3    Q. Did any of those things occur either before
4 or after the making of that oral recording?
5    A. No.
6    Q. Did the Defendant, in his oral statement to
7 you that's been recorded in State's Exhibit No. 5,
8 pretrial exhibit, does the Defendant provide you with
9 information, facts and circumstances that were found
10 to be true and helped to establish the guilt of
11 Mr. Crutsinger?
12   A. Yes.
13   Q. Let's go through a number of those facts and
14 circumstances. Mr. Crutsinger tells you that the
15 clothes he was wearing at the time of the offense he
16 disposed of?
17   A. That's correct.
18   Q. And where did he tell you he disposed of
19 them?
20   A. At a dumpster by or adjacent to or on the
21 property of the Cowboy Inn.
22   Q. Where is the Cowboy Inn located?
23   A. It's up on North Main here in Fort Worth.
24   Q. And let me just ask you this. The location
25 of the offense, what city did that take place in?

Page 37

1    A. It was also here in Fort Worth.
2    Q. In Tarrant County, Texas?
3    A. Yes, ma'am.
4    Q. When Mr. Crutsinger provided the information
5 about the disposal of his clothes in a dumpster at or
6 near the Cowboy Inn, did you take any steps to verify
7 that information?
8    A. Yes.
9    Q. What steps did you take?
10   A. I contacted my supervisor, Sergeant
11 Thornton, by telephone and told him about that and
12 asked if he could, either he or someone else could go
13 and see if that dumpster had been emptied and if not,
14 to try to recover those clothes.
15   Q. All right. And do you have any knowledge
16 whether or not some bloodstained clothing was, in
17 fact, recovered out of the dumpster at the Cowboy Inn?
18   A. Yes, ma'am, it was.
19   Q. Do you know if that clothing, whether or not
20 that clothing has been submitted for DNA testing?
21   A. Yes, it has.
22   Q. And have you received the results back on
23 the DNA testing for that clothing?
24   A. Yes, ma'am.
25   Q. Do the DNA results indicate that the

Page 38

1  Defendant and both victims' blood appear in various
2  places on those items of clothing?
3    A. As I recall, I believe that's correct, yes.
4    Q. Do you have a copy of the DNA report with
5  you?
6    A. No, ma'am, I don't.
7    Q. Mr. Crutsinger told you that he had
8  purchased some new shoes. The shoes that he was
9  wearing at the time of his interview, he told you he
10  had purchased those?
11    A. Yes, ma'am.
12    Q. Did he tell you where?
13    A. At a shoe store in the Tandy Mall.
14    Q. Do you know if there is, in fact, a shoe
15  store in the Tandy Mall?
16    A. Yes.
17    Q. And what shoe store is that?
18    A. If I can have just a second.
19    Q. Sure.
20    (Brief pause.)
21    A. It's called the Factory Brand Shoe Store.
22    Q. And when we talk about the Tandy, are we
23  talking about the outlet mall that's just across the
24  street from this building?
25    A. Yes, ma'am.

Page 39

1    Q. Did you or another member of the Fort Worth
2  Police Department visit the Factory Brand Outlet Shoe
3  Store over in the Tandy Mall?
4    A. Yes. Actually I did, Detective Hardy did,
5  who was with me at the time, I think, on that next day
6  that Detective Carroll and Detective Johnson, who also
7  work in our office went over there to try to locate
8  receipts and that type of thing.
9    Q. All right. When you or another member of
10  the Fort Worth Police Department visited with the
11  personnel that worked at the Factory Brand Outlet,
12  were you able to locate a salesperson who had
13  participated in a transaction involving the use of Pat
14  Syren's credit card?
15    A. Yes, ma'am.
16    Q. And do you recall the date or do you recall
17  what item was purchased with Pat Syren's credit card?
18    A. It was a pair of white tennis shoes.
19    Q. Do you know whether or not the salesperson
20  was able to pick the Defendant out of a photo spread?
21    A. Yes, she did.
22    Q. As the person using Pat Syren's credit card?
23    A. Yes, that's correct.
24    Q. Mr. Crutsinger told you in his interview
25  that he had used a knife to commit these offenses?

Page 40

1    A. Yes.
2    Q. Was a knife found or located at the crime
3  scene?
4    A. A blade of a knife that had been actually
5  broken. We did not locate the handle to the knife.
6    Q. Did you have any reason to believe that the
7  knife blade that was located at the crime scene had,
8  in fact, been used in the course of the offense?
9    A. Yes, ma'am.
10    Q. And how did you form that opinion?
11    A. Well, it was located right next to the
12  victims' bodies.
13    Q. Did it, in fact, have blood on it?
14    A. Yes, it did.
15    Q. Mr. Crutsinger told you that, or indicated
16  to you that he had cut one or both victims' throats?
17    A. Yes, ma'am.
18    Q. And, in fact, there's a portion of the
19  audiotape where he apparently made a motion with his
20  hand and then you described that motion for the
21  purpose or the benefit of the tape recording?
22    A. Yes, ma'am.
23    Q. Can you tell us what motion he used or show
24  us?
25    A. He just reached up and grabbed his throat

Page 41

1  and made a motion like that (indicating).
2    Q. Okay. And you kind of slid the edge of your
3  hand across your throat just now?
4    A. Yes.
5    Q. Do you know whether or not from your
6  investigation in this case, whether one or both
7  victims' throats had, in fact, been cut?
8    A. Yes, ma'am, they were both cut.
9    Q. Mr. Crutsinger told you that he had taken
10  one of the victims' vehicles?
11    A. Yes, ma'am.
12    Q. During your investigation, in fact, prior to
13  even going down to Galveston, did you have any
14  knowledge about whether or not one of the victims
15  involved in this double homicide, if their vehicle had
16  been taken or was missing?
17    A. Yes.
18    Q. Whose vehicle was that?
19    A. I believe it was Ms. Syren's.
20    Q. Did you have any knowledge -- well, strike
21  that.
22    Did Mr. Crutsinger tell you what he had done
23  with that vehicle?
24    A. Yes.
25    Q. And on the tape recording, what was it that

Motion to Suppress 4:07-cv-00703-Y Document 86-1 Filed 11/03/17 Page 35 of 72 PageID 3601

Multi-Page™ State vs. Billy Jack Crutsinger Vol. 7

Page 42

1 he told you he did?
2 A. That he had driven it and parked it at the
3 parking lot of what he describes as a Mexican joint.
4 Q. Do you have any knowledge gained from your
5 investigation whether that vehicle was, in fact, found
6 in any such establishment?
7 A. Yes.
8 Q. And where was that vehicle found?
9 A. It was up on North Main in the parking lot
10 of a Hispanic bar.
11 Q. Was that the El Triangula (phonetic) bar?
12 A. I believe so, yes.
13 Q. And was that information you had prior to
14 going down to Galveston?
15 A. Yes, ma'am.
16 Q. The information about the victims' throats
17 being cut and the knife at the scene, was that
18 information you had prior to going down to Galveston?
19 A. Yes, ma'am.
20 Q. He indicated to you that he had purchased a
21 bus ticket with the credit card, Patricia Syren's
22 credit card?
23 A. Yes, ma'am.
24 Q. Do you have any knowledge based upon your
25 investigation of whether or not Patricia Syren's

Page 43

1 credit card was used for the purchase of a bus ticket?
2 A. Yes, it was.
3 Q. He indicated to you, Mr. Crutsinger did,
4 that he had used the credit card to pay for a motel?
5 A. Yes.
6 Q. Do you have any indication from your
7 investigation that Patricia Syren's credit card was
8 used to pay for a motel?
9 A. Yes.
10 Q. And which motel was that?
11 A. The Seahorse Inn in Galveston.
12 Q. He also indicated to you that he had used
13 the credit card to purchase the -- or did he tell you
14 that he had used the credit card to purchase the Joe's
15 Crab Shack t-shirt?
16 A. I believe so.
17 Q. Was he, in fact, wearing that Joe's Crab
18 Shack t-shirt?
19 A. Yes, he was.
20 Q. Did the t-shirt appear to be in good shape
21 or poor shape?
22 A. Appeared to be brand new.
23 Q. Did you have an opportunity to see the shoes
24 that he was wearing?
25 A. Yes.

Page 44

1 Q. And how did they appear?
2 A. They also appeared to be brand new.
3 Q. Mr. Crutsinger told you that he had not only
4 cut the victims' throats, but that he had stabbed
5 them?
6 A. Yes.
7 Q. From your investigation, did it appear that
8 one or both victims in this double homicide had been
9 stabbed?
10 A. Yes, ma'am.
11 Q. Did Mr. Crutsinger ever indicate to you how
12 he had gotten down to Galveston?
13 A. Yes, ma'am.
14 Q. And what did he tell you about that?
15 A. He had taken a bus. But I believe he had
16 maybe gone to -- I don't recall. I think he didn't go
17 directly to Galveston. I think maybe he stopped in
18 Houston or -- well, the bus would've made several
19 stops, anyway. I'm not sure of the direct route, but
20 he did get there by Greyhound bus as I recall.
21 Q. Okay. The information he gave you insofar
22 as the general layout of the house, in other words,
23 when he was describing to you his movements inside of
24 the house, did those appear to be consistent with your
25 knowledge of how that house is actually set up?

Page 45

1 A. Yes, ma'am.
2 Q. And what is the specific address of the
3 house on Scott Avenue?
4 A. It's in the 2700 block. I believe it's 2716
5 Scott. Yes, it is. Yes, ma'am.
6 Q. Okay. And the names of the two victims in
7 that double homicide?
8 A. Patricia Syren and Pearl Magouirk.
9 Q. Are you aware of whether or not during Fort
10 Worth's contact with Galveston Police Department, did
11 you all convey information to the Galveston Police
12 Department that you believe the suspect involved in
13 this crime could've been cut?
14 A. Yes.
15 Q. Did you convey to them the information
16 regarding the suspect for this homicide or suspects
17 might have been using Patricia Syren's credit card?
18 A. Yes, ma'am.
19 Q. And specifically at this Seahorse Inn motel?
20 A. Yes, ma'am.
21 Q. And a liquor store?
22 A. Yes, ma'am.
23 Q. When this information was conveyed to
24 Galveston Police Department, at what point in your
25 investigation did that take place at? Was it before

Page 46

1 you left for Galveston?
2    A. Yes, ma'am. It was still on the night of
3 the 8th.
4    Q. All right. Did you also convey information
5 to Galveston about the status of that credit card
6 being able to be used? Do you understand my question?
7    A. Yes, ma'am. I later became aware that the
8 card had been cancelled by the company. But when we
9 were speaking with the Galveston PD that night, as far
10 as I knew it was still usable, still active or
11 activated.
12    Q. When you were speaking with the credit card
13 company, were they advised of what the situation was?
14    A. Yes, ma'am.
15    Q. So at some point they became aware that if
16 the credit card was being used, it was not being used
17 with the permission of the cardholder?
18    A. Yes.
19       MS. HARTMANN: Your Honor, at this time
20 we'll pass the witness.
21       CROSS-EXAMINATION
22 BY MR. MOORE:
23    Q. Detective McCaskill, as far as you know,
24 these offenses occurred on April 6th of this year,
25 correct?

Page 47

1    A. I believe that's correct, sir.
2    Q. That would've been a Sunday?
3    A. Yes, sir.
4    Q. Is that when you were called in for the
5 investigation?
6    A. No, sir. Not until Tuesday the 8th.
7    Q. Okay. And as of Tuesday the 8th, had Billy
8 Jack Crutsinger's name ever been brought up?
9    A. No, ma'am. No, sir, I'm sorry.
10    Q. Had -- how did -- well, let me ask you
11 this. It was the telephone message left on the lady's
12 phone from the credit card company that was the first
13 lead in the case, wasn't it?
14    A. Yes, sir.
15    Q. Before that -- and did the credit card
16 company, did you speak to them yourself?
17    A. Yes, sir, I did.
18    Q. And did they tell you that it was being used
19 in Galveston, Texas?
20    A. Eventually, yes.
21    Q. What do you mean eventually?
22    A. Well, they didn't want to give me anything
23 over the telephone. I had to explain to them that I
24 was investigating the homicides of two elderly ladies
25 and they appeared to have been deceased based on our

Page 48

1 investigation probably since Sunday sometime during
2 the day and that any charges occurring after Sunday
3 afternoon or Sunday night was a possibility that the
4 suspect would be using that credit card. At that
5 point, they agreed to give us some information.
6    Q. And what information did they give you?
7    A. That evening of the 9th -- I'm sorry, of the
8 8th, the lady that I was speaking to with the credit
9 card company told me that a hotel room, the Seahorse
10 Inn in Galveston, had been used. I mean the card had
11 been used to rent a room. And it had also been used
12 at a liquor store in Galveston on the evening of the
13 8th.
14    Q. Okay. So you know that there was the -- and
15 that was it?
16    A. That's all I knew at the time. There
17 were more charges, but that's all the information I
18 was given on the evening of the 8th.
19    Q. Okay. When did you get the other
20 information about where that credit card had been
21 used?
22    A. It was actually faxed over to our office on
23 the morning of the 9th while Detective Hardy and I
24 were on our way to Galveston.
25    Q. Okay. So what kind of information did you

Page 49

1 get faxed over to you about the credit card?
2    A. Well, they had given us a list of all the
3 charges that had been used on that credit card
4 probably from about the time that the remains of the
5 victims were discovered back about 48 hours.
6    Q. So the charges in Fort Worth for the shoes
7 and bus ticket and meals, hotel rooms, motel rooms you
8 already knew about?
9    A. I was provided that information by
10 telephone, yes, sir, on the 9th while we were on our
11 way to Galveston.
12    Q. Okay. The information from the credit card
13 company, that would cause you to contact the Galveston
14 Police Department, correct?
15    A. Yes, sir.
16    Q. And advise them that somebody down there is
17 using these, this woman's credit card?
18    A. Yes, sir.
19    Q. You didn't have a description of anybody?
20    A. No, I did not.
21    Q. You didn't have a name of anybody?
22    A. No, sir.
23    Q. But you knew that whoever was down there was
24 using the credit card without, obviously, their
25 permission?

Page 50

1    A. Yes, sir.
2    Q. When you -- and you left when? You went
3    down there April 9th, the morning of April 9th,
4    correct?
5    A. Yes, sir.
6    Q. Why were you going down there?
7    A. Well, because the card was being used. That
8    was our main lead, really our only lead at that time.
9    We felt it was absolutely imperative that we go down
10   to Galveston to continue the investigation. We'd
11   obviously have to have the assistance of Galveston
12   Police.
13   Q. Okay. You did not have an arrest warrant
14   for anybody at that time?
15   A. No, sir.
16   Q. In fact, you didn't have enough information
17   to even go to a judge and ask for an arrest warrant,
18   did you?
19   A. No, sir, I did not.
20   Q. You and the other detective left about what
21   time April 9th?
22   A. About 8:00 o'clock.
23   Q. And I believe you testified that you got
24   there at 12:38 in the afternoon?
25   A. Yes, sir.

Page 51

1    Q. To the Galveston Police Department?
2    A. Yes, sir.
3    Q. Were you in contact with the Galveston
4    Police Department, anybody in the Galveston Police
5    Department while you were traveling from Fort Worth to
6    Galveston?
7    A. Yes, sir.
8    Q. How often would you be in contact with them?
9    A. Well, I called them when we left and told
10   them we were on our way and we would be down there in
11   four to five hours, I wasn't sure how long it was
12   going to take us to get there. And I was advised by
13   the officer I spoke to that they were continuing to
14   work on this for us and following some leads that they
15   had developed.
16   Q. Okay. So you knew that at point in time,
17   8:00 o'clock on April 9th of this year, that the
18   Galveston Police Department had some leads on this
19   credit card?
20   A. Yes, sir.
21   Q. And they call you and tell you they had
22   a description of the guy that had been using it?
23   A. Yes, sir.
24   Q. And what kind of description did they tell
25   you?

Page 52

1    A. I recall that they talked about a white
2    male. But I believe the age, there was some
3    discrepancy there. I recall them mentioning something
4    about a person in their 20s or 30s.
5    Q. Okay. That was the information they gave
6    you they had developed, that some white male in maybe
7    his 25 to 30 years old had tried to use that credit
8    card?
9    A. Yes, sir.
10   Q. And that certainly wasn't the description of
11   Billy Jack Crutsinger, was it?
12   A. No.
13   Q. Did they tell you where that person tried to
14   use the credit card?
15   A. I remember we had a discussion that it was
16   being, I think, used at some bars and that they had
17   developed information that the individual using that
18   card was using the cab companies down there or some
19   taxicabs to get around town. I don't know exactly how
20   they developed that. That wasn't related to me at the
21   time.
22   Q. Okay. When they did make an arrest, did
23   they call you and let you know?
24   A. Yes, sir.
25   Q. Who called you?

Page 53

1    A. Lieutenant Matt Stanich.
2    Q. And what did he tell you?
3    A. He just told me that they had taken an
4    individual into custody that they believed to be the
5    person that was using the victim's credit card and
6    that he did have a cut on his hand.
7    Q. Did he have the credit card on him?
8    A. No.
9    Q. Was the credit card ever recovered?
10   A. No, sir.
11   Q. Did you ask Stanich what the person was
12   arrested for?
13   A. Not immediately. I didn't know that until
14   we actually got to the police department. But that
15   was only about 15 minutes after the call, after he
16   called us.
17   Q. So you were right outside of Galveston when
18   he called you and said, We've arrested somebody?
19   A. We were on the north end of Galveston, yes,
20   sir.
21   Q. Okay. Do you recall about what -- well, if
22   you got there about 12:38 to the police department,
23   then the arrest had to have been very shortly right
24   before that, correct?
25   A. Well, Lieutenant Stanich called me at

Page 54

1  12:20. So it would've had to have been, you know, I'm
2  sure within 20 or 30 minutes before that.
3      Q. Okay. And you took a tape recorder with
4  you?
5      A. Yes, sir.
6      Q. And that was in anticipation of taking a
7  recorded statement from somebody, wasn't it?
8      A. No, sir.
9      Q. What was it for?
10     A. I keep it with me all the time.
11     Q. Do you have it with you today?
12     A. I keep it in the car all the time.
13     Q. Okay. So you get to the Galveston Police
14  Department around 12:38. You talk to the Galveston
15  Police Department about why they arrested
16  Mr. Crutsinger, correct?
17     A. Yes, sir.
18     Q. Who did you talk to?
19     A. Lieutenant Stanich.
20     Q. And did the lieutenant, is that the only
21  person you talked to about the arrest?
22     A. He was the one that was kind of briefing me
23  and Detective Hardy on what had happened. I also
24  spoke with a Sergeant Sammy Jones, who was, I think,
25  actually participated in the arrest. And that's when

Page 55

1  I learned that the charge was failure to identify.
2      Q. Okay. And that's what they told you they
3  arrested Mr. Crutsinger for failure to identify?
4      A. Yes, sir.
5      Q. Did anybody -- did any of the police
6  officers, the Galveston PD, Fort Worth Police
7  Department run Mr. Crutsinger for any other type of
8  warrants he may have had?
9      A. I didn't. I don't know if the Galveston
10  department did or not.
11     Q. Okay. So you're there and you know that the
12  Galveston police have arrested him for failure to ID
13  and that is the reason he's in custody?
14     A. Yes, sir.
15     Q. Because he's definitely in custody, isn't
16  he?
17     A. Yes, sir.
18     Q. And at that point in time you and the other
19  detective go in and talk to Mr. Crutsinger; is that
20  correct?
21     A. Well, I stepped in the room. Detective
22  Hardy did not step in the room immediately. And I'm
23  speaking of, I hope I'm answering your question
24  correctly, the little holding area where
25  Mr. Crutsinger was located.

Page 56

1      Q. Right.
2      A. That was only myself. Detective Hardy was
3  somewhere in the main part of the building.
4      Q. Okay. And in that room was Officer Garcia
5  of the Galveston Police Department?
6      A. I believe that was his name, yes, sir.
7      Q. You're not for sure?
8      A. As far as I know, it is. But I don't know
9  the man and I didn't notice a name tag. But from
10  speaking later and reading the reports, it would've
11  been Officer Garcia.
12     Q. Okay. And that was your first contact with
13  Mr. Crutsinger; is that correct?
14     A. Yes, it was.
15     Q. And what did you say to him when you went in
16  there?
17     A. I introduced myself as Detective McCaskill
18  with the Fort Worth Police Department and I showed him
19  a badge, an identification card, and then I told him
20  that we had come down here on an investigation and I
21  would be talking about him with that in a little bit,
22  but I asked him if he would let me see his hands. And
23  his hands were handcuffed behind his back. He stood
24  up and turned around so I could see his hands. At
25  that point I observed that laceration on his

Page 57

1  forefinger.
2      Q. Do you recall about what time that was?
3      A. We got there at 12:38. It was probably
4  12:45.
5      Q. And that tape, that tape begins at 1:45,
6  correct?
7      A. I believe that's correct, sir.
8      Q. So there was an hour in between you seeing
9  the cut on his hand and the tape recorder beginning
10  his statement, right?
11     A. That sounds about right, yes, sir.
12     Q. And he was arrested, to your knowledge,
13  shortly before you arrived at the Galveston Police
14  Department?
15     A. Yes, sir.
16     Q. So he wouldn't have been taken to a
17  magistrate before you talked to him to be warned,
18  would he?
19     A. No.
20     Q. No Galveston magistrate had warned him
21  before you talked to him, had he?
22     A. Not that I'm aware of.
23     Q. Okay. You wouldn't -- do you know if a
24  Galveston police officer took him before a magistrate
25  before you talked to him?

Page 58

1    A. I don't know.
2    Q. Okay. Then for about 30 minutes before
3 12:45 -- or 1:45, excuse me, I believe on the tape you
4 said, "Well, we've been talking for about 30 minutes
5 before the tape begins," correct?
6    A. Yes, sir.
7    Q. Was that 30 minutes taped?
8    A. No, sir.
9    Q. Why wasn't it?
10    A. Well, I didn't know what Mr. Crutsinger was
11 going to say. And plus I didn't see any reason to
12 record us asking his permission to search the bag.
13 That would've been documented on the Consent to Search
14 form. And also didn't see any reason to have me
15 recorded taking the DNA sample and asking his
16 permission to do that.
17       And I also had to step out of the room. We
18 like to wear latex gloves when we're taking a DNA
19 sample. I had to step out of the room and ask for
20 those. And all that took a little bit of time. I
21 didn't think it would be productive to do that.
22    Q. Okay. And I believe you also testified that
23 Mr. Crutsinger did not appear under the influence of
24 alcohol or any other drug?
25    A. I think he had been drinking, but, again, I

Page 59

1 didn't feel like he was in any way intoxicated.
2    Q. What gave you an indication that he may have
3 been drinking?
4    A. I could smell a little bit of alcohol.
5    Q. Okay. No Galveston police officer told you
6 that he had been arrested for public intoxication?
7    A. No, sir.
8    Q. Did any Galveston police officer tell you
9 that in their opinion he was intoxicated?
10    A. No, I don't believe, so, no, sir.
11    Q. Okay. But you could smell alcohol on his
12 breath?
13    A. Yes, sir.
14    Q. I guess we'll go ahead and talk about the
15 duffel bag a little bit.
16       How did you come into possession of that
17 duffel bag? Was it black?
18    A. Yes, sir.
19    Q. How did you come into possession of it?
20    A. One of the Galveston sergeants turned that
21 over to us after the interview was over.
22    Q. After the interview was over?
23    A. Yes, sir. We didn't search the bag until
24 later.
25    Q. Okay. Do you know if any of the Galveston

Page 60

1 police officers had already searched that bag?
2    A. No, sir, I don't know.
3    Q. Do you know where that bag was when the
4 Galveston Police Department obtained it?
5    A. I understand it was at the bar where
6 Mr. Crutsinger was arrested.
7    Q. Okay. Did you have any reason to believe
8 that that bag contained any kind of evidence?
9    A. I didn't know what it contained.
10    Q. Okay. You didn't have any information that
11 that bag contained a credit card, cell phone, anything
12 that would link him to that offense?
13    A. No, sir, I did not know.
14    Q. Okay. Is that tape that we heard, is that
15 the original tape that you did in Galveston?
16    A. No, sir, that's a copy.
17    Q. Where is the original?
18    A. It's locked up across the street at the
19 police department.
20    Q. Okay. So we have it available?
21    A. Yes, sir.
22    Q. So basically you were relying on the
23 Galveston police officer's arrest in order to question
24 Mr. Crutsinger?
25    A. Well, he was in custody because of the

Page 61

1 arrest. And because of that, I was able to talk to
2 Mr. Crutsinger. I'm not sure that I understood your
3 question exactly.
4    Q. Maybe I didn't phrase it correctly.
5       But what I mean was you didn't arrest him
6 for any offense, did you?
7    A. No, sir.
8    Q. You didn't have an arrest warrant for him?
9    A. No, sir.
10    Q. He hadn't committed any kind of offense in
11 your view?
12    A. No, sir.
13    Q. As far as you know, he wasn't wanted
14 anywhere else in the state or country for any offense?
15    A. I'm not aware of any warrants, no.
16    Q. And weren't then, were you?
17    A. No.
18    Q. So it was just specifically because he was
19 in custody in Galveston County, arrested by a
20 Galveston police officer is why you had the
21 opportunity to talk to him?
22    A. Yes, sir.
23    Q. And the only information that you had at
24 that time was that somebody in Galveston, Texas, was
25 using the lady's credit card?

Page 62

1　A. Yes, sir.

2　Q. And as far as we can determine, if you got
3　there at 12:38 and began questioning him -- and he was
4　either in the small room with Officer Garcia or taken
5　to the interview room within the period of time when
6　you got there, correct?

7　A. Yes, sir.

8　Q. As far as you know, he wasn't taken anywhere
9　else?

10　A. Not that I'm aware of, no.

11　Q. So that maybe from the time of his arrest,
12　which was shortly before 12:38?

13　A. Yes, sir. I don't have an exact time, but
14　it would've had to have been if he was already in
15　custody. So, yes.

16　Q. Okay. And then you start questioning him,
17　if the tape begins at 1:45, you had actually started
18　questioning him about 30 minutes before, correct?

19　A. Yes, sir. And it took some time to take the
20　DNA samples and to go through the forms to do that and
21　for me to locate gloves and all that. So I probably
22　only actually spoke with him about this offense for 10
23　to 15 minutes before we started recording.

24　Q. Okay. Within a couple of hours from arrest
25　to start talking to him about it?

Page 63

1　A. Yes, sir.

2　Q. And as far as you know, between the time
3　that he was arrested by Galveston Police Department
4　and the time that you started questioning him, he had
5　started questioning him, he had not had a chance to
6　speak to a lawyer, had he?

7　A. Not that I'm aware of. He certainly never
8　asked me to speak to one.

9　Q. Okay. To your knowledge a lawyer was never
10　consulted, correct, by Mr. Crutsinger?

11　A. That's correct. That's correct.

12　Q. Let me ask you real quickly, when you first
13　went in to the initial observation of Mr. Crutsinger,
14　some officer was in there with him, correct?

15　A. Yes, sir.

16　Q. And when you left, that officer stayed with
17　him, correct?

18　A. Yes, sir.

19　Q. And I believe you testified that you were
20　told by someone that Mr. Crutsinger wanted to talk to
21　you; is that correct?

22　A. Yes, sir.

23　Q. Who told you that?

24　A. It was the officer that was in the room with
25　him. And, again, I believe that's Officer Garcia. I

Page 64

1　don't recall seeing a name tag and I never met the
2　man. But after reviewing the reports that they
3　provided us later, it would've been Officer Garcia.

4　Q. So the conversation between Mr. Crutsinger
5　and Officer Garcia, do you know if anybody else heard
6　that conversation?

7　A. Well, I was not aware -- there was no one
8　else in the room when I stepped out. And I didn't see
9　anyone go in the room. I would be assuming to say no
10　one else heard it. I'm not aware that anybody was in
11　the room with him.

12　Q. Wasn't anybody else in there when you left?

13　A. No, sir.

14　Q. When you were told that Mr. Crutsinger
15　wanted to talk to you, did you go right back into that
16　same room?

17　A. No, sir.

18　Q. What did you do?

19　A. I asked the Galveston, some of the officers,
20　if they could provide us with an interview room. And
21　they said they had one upstairs in their detective
22　office. And I asked if Mr. Crutsinger could be taken
23　up there to that interview room.

24　Q. Okay. And do you know if Officer Garcia
25　told Mr. Crutsinger anything?

Page 65

1　A. I don't know.

2　MR. MOORE: Thank you, sir. That's all I
3　have.

4　THE WITNESS: Yes, sir.

5　MS. HARTMANN: Just very, very briefly.

6　REDIRECT EXAMINATION

7　BY MS. HARTMANN:

8　Q. Was it your understanding based upon the
9　last set of questions that Mr. Moore was asking you,
10　did you believe Mr. Crutsinger was initiating wanting
11　to have a conversation with you and Detective Hardy at
12　that time?

13　A. Yes, ma'am.

14　Q. At any time that you were with
15　Mr. Crutsinger, did he ever ask you for a lawyer?

16　A. No, ma'am.

17　Q. Did he ever ask any questions about whether
18　he should get a lawyer?

19　A. No, ma'am.

20　Q. Could you tell the Court what the
21　Defendant's demeanor was insofar as the way he
22　appeared about wanting to speak with you? Did you
23　understand the question? I didn't phrase it very
24　well. Let me try again.

25　You've told the Court that before you

Page 66

1 actually spoke with the Defendant for purposes of the
2 tape recording that you were getting a consent signed
3 for the bag and handling the taking of the DNA
4 samples?
5     A. Yes, ma'am.
6     Q. Were you able to observe anything about
7 Mr. Crutsinger's demeanor that indicated to you
8 whether or not he was still willing to speak with you?
9     A. Well, he was very cooperative. He gave me
10 no indication that he did not want to speak to us at
11 all.
12     Q. Did he seem eager or reticent about talking
13 to you?
14     A. No. He was, again, very cooperative. Just
15 from his mannerisms, I definitely got the impression
16 he had a story he wanted to tell.
17     Q. Did he seem impatient with the length of
18 time it was taking you all to kind of take care of
19 this other stuff before you actually talked to him?
20     A. No, I didn't believe so.
21     MS. HARTMANN: And may I approach the
22 witness?
23     Q. (BY MS. HARTMANN) Detective McCaskill, I'm
24 going to show you what's been marked as State's
25 Pretrial 6 for identification purposes. And just if

Page 67

1 you'd take a look at that.
2     A. Yes, ma'am.
3     Q. And after viewing State's Exhibit
4 Pretrial 6, did you have information conveyed to you
5 during the course of your investigation that the
6 Defendant's and both victims' blood were found on the
7 clothing that was retrieved out of the dumpster at the
8 Cowboy Inn?
9     A. Yes, ma'am.
10     MS. HARTMANN: We pass the witness.
11     MR. RAY: Nothing further.
12     MR. MOORE: We don't have any questions.
13     THE COURT: You may step down, sir.
14     (Witness exits the courtroom.)
15     THE COURT: Break time.
16     (Break taken.)
17     THE COURT: Got another witness?
18     MS. HARTMANN: I do. State calls Officer
19 Simpson.
20     THE COURT: Right up here, please, sir.
21     (Witness approaches witness stand.)
22     (Witness sworn.)
23     THE COURT: Be seated, please.
24     THE WITNESS: Thank you, sir.
25         GEORGE SIMPSON,

Page 68

1 having been first duly sworn, testified as follows:
2     DIRECT EXAMINATION
3 BY MS. HARTMANN:
4     Q. Could you state your name for the record?
5     A. My name is George Simpson.
6     Q. How are you employed?
7     A. I am gainfully employed with Galveston
8 Police Department.
9     Q. Is that Galveston, Texas?
10     A. Yes, it is.
11     Q. Fare city south of here?
12     A. Yes.
13     Q. How long have you been employed with the
14 Galveston Police Department?
15     A. In addition, 13 years, prior to that, five
16 years with the Galveston County Sheriff's Department.
17     Q. Were you employed as a peace officer for the
18 city of Galveston, Texas, on or about April the 9th
19 and 10th -- April 8th, 9th and 10th of this year?
20     A. Yes, I was.
21     Q. During that time period, what were your
22 particular duties and assignments with the Galveston
23 Police Department?
24     A. I was assigned to the night watch patrol
25 from 10:00 p.m. to 6:00 am.

Page 69

1     Q. Were you a supervisor on that patrol?
2     A. No, I'm a corporal.
3     Q. What are the hours that you worked from
4 April the 8th of 2003 into April 9th of 2003?
5     A. 10:00 p.m. to 6:00 am.
6     Q. So you would've been on duty from 10:00 p.m.
7 on April the 8th through?
8     A. 6:00 a.m. April the 9th.
9     Q. April the 9th, all right.
10         During the course of your duties on the
11 evening -- you can kind of back up from that
12 microphone.
13     A. I'm sorry.
14     Q. That's okay. Just a little bit.
15         During the course of your duties on April
16 the 8th of 2003, did you have an opportunity to speak
17 with a Detective Thornton of the Fort Worth Police
18 Department?
19     A. Yes, I did.
20     Q. Did Detective Thornton convey any particular
21 information to you at that time?
22     A. Yes, he did.
23     Q. And what information did he give you?
24     A. He advised me that they was working a double
25 murder in the city of Fort Worth and if I would

Page 70

1  conduct a follow-up investigation, and that a credit
2  card of one of the deceased individuals was used at a
3  local motel in Galveston.
4      Q. And what motel was that?
5      A. The Seahorse.
6      Q. And do you know or did you know at that time
7  where the Seahorse Inn was located?
8      A. Yes, I did.
9      Q. Were you familiar during the course of your
10  regular duties as a police officer to know where that
11  motel was located?
12      A. Yes.
13      Q. Were you asked by Detective Thornton to do
14  anything insofar as going to that motel?
15      A. It all surrounded follow-up investigation.
16  And I advised him that I would immediately conduct a
17  follow-up investigation in regards to the credit card
18  being used.
19      Q. Did you, in fact, go to the Seahorse Motel
20  there in Galveston?
21      A. Yes, I did.
22      Q. Did you speak with anyone at the Seahorse
23  Motel?
24      A. Yes, I did.
25      Q. Who did you speak with?

Page 71

1      A. I spoke to Mr. Daniel Teo, T-e-o.
2      Q. All right. And did you ask him whether --
3  well, can you tell the Court what you asked him in
4  regards to this credit card?
5      A. I entered the establishment and I advised
6  him that I was conducting a follow-up investigation
7  and I wanted to see if he had a registered guest by
8  the name of Patricia Lee Syren registered in the
9  motel.
10      Q. All right. And did consult anything in
11  trying to locate Patricia Syren's name?
12      A. He went through his wall slots where they
13  have the names of registered guests and he advised me
14  that he did not have anyone by that name.
15      Q. All right. And then what happened at that
16  point?
17      A. At this time, knowing that Detective
18  Thornton said that the credit card was used at the
19  Seahorse, I advised Mr. Teo that I would like to do a
20  manual check of the registration cards.
21      Q. And did he do that or did he allow you to do
22  that?
23      A. We both did.
24      Q. Did you and he both find Patricia Syren's
25  name anywhere in the motels records?

Page 72

1      A. Yes, we did.
2      Q. And what information was found?
3      A. The information that was found was a
4  registration card, credit card receipt and a credit
5  card slip that's attached to her name. Basically the
6  credit card used was in the name of Patricia Lee
7  Syren, but it was signed under a different name.
8      Q. Okay. The credit card slip was signed with
9  a different name?
10      A. Yes.
11      Q. And what was the name signed on the credit
12  card slip?
13      A. David Jones.
14      Q. And for what particular room was that for?
15      A. Room 101.
16      Q. Did you at that time do anything in regards
17  to Room No. 101?
18      A. At that time I contacted Sergeant Pena and
19  advised him that we did have a confirm on the name
20  Patricia Lee Syren that was passed on to me by
21  Detective Thornton. He came over -- at that point, he
22  and I made a decision we was going to check that
23  room.
24      Q. All right. And did the -- did Mr. Teo
25  accompany you and Sergeant Pena to Room 101?

Page 73

1      A. No, he did not. What he basically did is
2  said that he had to watch the desk and that he gave us
3  a master key and we had his permission to enter the
4  motel room.
5      Q. All right. And did you and Sergeant Pena go
6  to Room 101?
7      A. Yes, we did.
8      Q. Did you attempt to see if the door was
9  unlocked before you entered?
10      A. I checked the patio area, the sliding door,
11  it was secured. Sergeant Pena checked the main
12  entrance door and it was secured. And at that time I
13  walked around to where Sergeant Pena was located and
14  we both entered the room through the main door.
15      Q. Did you have to use the master key that
16  Mr. Teo had given to you?
17      A. Yes.
18      Q. When you entered Room 101, did it appear to
19  be abandoned?
20      A. No one was there. It appeared to be
21  abandoned.
22      Q. Was there any personal property laying
23  around?
24      A. There was few items that we noted.
25      Q. Was there any clothing?

1    A. No clothing.
2    Q. The items that you located, were they --
3 well, can you tell the Court what the items were?
4    A. It was the motel key was located on the
5 night stand that was next to the master bed. There
6 was an empty potato chip bag, which was lying on a
7 wooden table that was next to the night stand. And
8 there was a small amount of chili and cheese found
9 inside the potato chip bag that we noted.
10   Q. All right. Other than the room key and this
11 potato chip bag, was there anything else that you
12 noticed in that motel room that didn't appear to be a
13 piece of furniture or a bedspread? I mean, was there
14 anything else that appeared to be something that
15 wouldn't normally be in that room?
16   A. No, it was well-kept, nothing was in
17 disarray.
18   Q. Did you see any used towels?
19   A. No used towels.
20   Q. Did you see any trash?
21   A. No trash at all.
22   Q. Did you call another officer out to process
23 that motel room?
24   A. Yes, I did.
25   Q. And who was that?

1    A. It was Officer P. Contenta.
2    Q. And when he processed the room, did he do
3 things like collect the key and the potato chip bag?
4    A. Yes, that was his assignment. Once he
5 processed it, he advised me that he was going to
6 collect the items.
7    Q. And when you say processed, does that mean
8 that he did what was necessary to try and lift any
9 type of latent prints?
10   A. At that particular time, I don't know. He
11 just conveyed to me that he was going to collect the
12 evidence and take some pictures.
13   Q. All right. Did you do anything in
14 particular after discovering this potato chip bag with
15 the chili and cheese on it?
16   A. Yes, I did.
17   Q. And what was that that you did?
18   A. I wanted to more or less pinpoint where the
19 potato chips and the chili dog was purchased from.
20   Q. All right. And the stores that are in that
21 area, is this kind of a commercial area?
22   A. Yes, it's commercially zoned.
23   Q. Other businesses around the Seahorse Inn?
24   A. Yes.
25   Q. Are there only certain stores in that area

1 that actually sell chili or cheese dogs?
2    A. Yes, there's a few.
3    Q. All right. In other words, can you walk
4 into any of the stores and purchase that or are there
5 just a few of them that those types of things are
6 available for sale?
7    A. There's some that, I guess it's like a
8 rotisserie, hot dogs and, yeah, there's a few other
9 stores in which they're packaged in the plastic, you
10 have to place in the microwave and heat up.
11   Q. Okay. And I guess what I'm asking you is
12 how would know which places to go in and ask whether
13 someone had purchased something like this? How would
14 you know what specific places to go to?
15   A. Well, it came to my attention that, first of
16 all, there was no trash whatsoever. It led me to
17 believe that it possibly could have been a rotisserie
18 hot dog with the chili and cheese. From that point, I
19 went to the store located at 3428 Seawall. And I
20 entered and spoke with the manager and more or less
21 asked him was a MasterCard used and did anybody
22 purchase a hot dog and potato chips within the last
23 few hours thereabout.
24   Q. All right. And had anyone to his knowledge?
25   A. No, ma'am.

1    Q. Where did you go next?
2    A. From that point I went to 3228 Seawall,
3 which is a Diamond Shamrock convenience store.
4    Q. Did you meet with the person who worked
5 there?
6    A. Yes, I did.
7    Q. Did you ask that person the same questions?
8    A. Yes, I did.
9    Q. Did you ask whether or not a MasterCard had
10 been used to purchase a hot dog and chips?
11   A. Yes. And the clerk in this case,
12 Ms. Loretta Rouse, advised me that a white male
13 entered the store between 21:30 and 22:00 hours and he
14 obtained a chili dog and a bag of potato chips. She
15 advised me that he tried to use a MasterCard, but the
16 MasterCard was declined. And at this time he
17 presented to her cash in the amount of $1.98 to
18 purchase the items.
19   Q. And she was able to tell you that it was a
20 white male?
21   A. Yes.
22   Q. Was she able to give you any other type of
23 general description?
24   A. Basically a white male between 25, 35 years
25 of age.

Page 78

1 Q. What did you do with that particular
2 information?
3 A. That particular information, I got on the
4 back channel and advised Officer Contenta the
5 information that I obtained at the Stop & Go. Of
6 course you had other officers that was listening also
7 and the information was shared with them.
8 Q. Okay. You put out that general description
9 as a possible description of the suspect?
10 A. Yes.
11 MS. HARTMANN: We pass the witness at this
12 time.
13 CROSS-EXAMINATION
14 BY MR. MOORE:
15 Q. Officer Simpson, you made a report about
16 this incident, correct?
17 A. Yes, I did.
18 Q. You got that with you?
19 A. Yes, I have that here.
20 MR. MOORE: Could I take a look at it,
21 Judge? I've got a copy, but I just want to make sure
22 it's the same.
23 (Brief pause.)
24 Q. (BY MR. MOORE) Let me ask you, Officer --
25 A. Yes, sir.

Page 79

1 Q. -- this second -- actually the third page of
2 your offense report --
3 A. Yes.
4 Q. -- there's some activity and some times out
5 here on the side.
6 A. Yes.
7 Q. Does that all relate to the investigation of
8 this offense?
9 A. That's hard to say because that's from
10 dispatch. And just anything that's communicated or
11 over the radio, they document it and they just print
12 it out, yes.
13 Q. Okay. But your main report starts back
14 here?
15 A. Yes, the initiating case summary.
16 Q. And you did this report, I would assume,
17 shortly after this all took place?
18 A. Yes, sir.
19 Q. So you talked to Detective Thornton up here
20 and they say, tell you that the credit card may have
21 been used at the Seahorse Inn down there, correct?
22 A. Yes, sir.
23 Q. And you were sent to the Seahorse to follow
24 up on that?
25 A. Yes, sir.

Page 80

1 Q. And the Seahorse has seen better days,
2 hasn't it?
3 A. I would say as an old Galvestonian, yes.
4 Q. It wouldn't be a place where you'd take the
5 family for a week-long vacation, would it?
6 A. I wouldn't recommend it.
7 Q. Okay. It's kind of run down now, isn't it?
8 A. Somewhat.
9 Q. When you went there, you talked to Mr. Teo;
10 is that correct?
11 A. Yes.
12 Q. Y'all found this registration card. Did he
13 give you a description of the person who had rented
14 that room?
15 A. No, sir.
16 Q. Was there a time that the person was going
17 to stay or do you just rent it until you check out?
18 A. It's more or less that people just come in,
19 pay, stay. And if it's credit card, normally the
20 protocol is everything is placed on the credit card.
21 If it's cash, if they're going to stay for two days,
22 you pay for two days.
23 Q. Okay. And this particular registration card
24 that you found for Room 101 in Patricia Syren's name,
25 was that rented for a particular length of time?

Page 81

1 A. More or less.
2 MS. HARTMANN: Objection to speculation.
3 THE WITNESS: Exactly.
4 Q. (BY MR. MOORE) Well, did you look at the
5 registration card?
6 A. I looked at the registration and it was an
7 open registration.
8 Q. Okay.
9 A. Which means that he hadn't completely signed
10 the checkout receipt. And that's normal protocol.
11 And the computer slip itself was still open.
12 Q. Okay. So when you got the key from the
13 Mr. Teo there, as far as you knew whoever was in
14 Room 101, whoever had rented Room 101 was still the
15 occupant of Room 101?
16 MS. HARTMANN: Objection to speculation.
17 THE COURT: Overruled.
18 THE WITNESS: I would say that being that
19 the key was left in the room, as an officer I would
20 say that it's a possibility that the room was
21 abandoned.
22 Q. (BY MR. MOORE) But you found that out after
23 you'd already entered the room, correct?
24 A. That is correct.
25 Q. Did you have a search warrant to search that

|  |  |
|---|---|
| Page 82 | Page 84 |

**Page 82**

1 room?
2    A. No, sir, I did not.
3    Q. Did you have consent from anybody who had
4 rented that room?
5      MS. HARTMANN: Excuse me, Your Honor. At
6 this time we'd ask for the defense to show standing to
7 contest any search of the room.
8      MR. RAY: Judge, Detective McCaskill said
9 the Defendant had rented a room at the Seahorse Inn.
10      MS. HARTMANN: Said somebody had rented the
11 room at the Seahorse Inn.
12      MR. RAY: The Defendant's confession says --
13      THE COURT: The objection is overruled to
14 these questions that they can't show standing.
15    Q. (BY MR. MOORE) Didn't have a consent from
16 anyone who had rented that room to search it, did you?
17    A. I would say being that Mr. Teo gave us a key
18 to check the room, we had his permission to check the
19 room. We didn't have a search warrant, but we knew
20 that according to Detective Thornton that the credit
21 card has been reported stolen, and it also has been
22 canceled, so therefore no one should have been
23 occupying that room. Not under that registration,
24 that credit card.
25    Q. Okay. Did Mr. Teo tell you that that person

**Page 83**

1 that had rented Room 101 had checked out?
2    A. No, he did not.
3    Q. Okay. The follow-up investigation after
4 that, you go to the Diamond Shamrock, correct?
5    A. Yes, sir.
6    Q. Well, where did you talk to Loretta Rouse?
7    A. At the Diamond Shamrock.
8    Q. That's the Diamond Shamrock?
9    A. Yes, sir.
10    Q. What time did you talk to Loretta Rouse?
11    A. I have documented the date of 4-9-2003,
12 approximately 12:10 hours.
13    Q. 12:10 in the morning?
14    A. 00:10 hours, I'm sorry.
15    Q. Okay. So 12:10 a.m. on 4-9 you talked to a
16 Loretta Rouse at the Diamond Shamrock who says that
17 somebody, a white male, 25 to 35 years of age,
18 correct?
19    A. Yes, sir.
20    Q. And you also have in your report that she
21 described this person as wearing a yellow shirt,
22 correct?
23    A. Yes, sir.
24    Q. So you have on the bottom of your report,
25 "Actor: White male, 25 to 35 years of age, yellow

**Page 84**

1 shirt, NOD." Would that be no other details?
2    A. No other description.
3    Q. No other description?
4    A. Yes, sir.
5    Q. Okay. And that's the description that you
6 put out to the rest of the Galveston Police
7 Department?
8    A. Right, on the back channel.
9    Q. Did you get the videotape from the Seahorse?
10    A. I obtained the videotape and also the
11 registration forms.
12    Q. Okay. Have you looked at that videotape?
13    A. No, sir, I did not look at the videotape.
14    Q. Where is that videotape?
15    A. It was turned in to identification.
16    Q. Okay. Did you get the videotape at the
17 Diamond Shamrock?
18    A. No, sir, I did not obtain that videotape
19 from Diamond Shamrock.
20    Q. Did anybody?
21    A. I don't know. Because the manager is the
22 one that has access to the videotape and it was going
23 to be after I ended my tour of duty.
24    Q. Okay. Do you know from your own knowledge
25 if the Galveston Police Department ever obtained that

**Page 85**

1 videotape from the Diamond Shamrock?
2    A. I didn't read no other reports as
3 supplements, so that's something I wouldn't know.
4    Q. Okay. Did you get the videotape from the
5 Economy Liquor Store?
6    A. Yes, sir, I did.
7    Q. And did you review it?
8    A. He tried to go through it and see if we
9 could see anything on it. But since we was -- I
10 started to receive phone calls and everything else, I
11 told him just go ahead and stop it and we'll pass it
12 on to the detectives. Because they was the ones that
13 was going to investigate the videotape and everything
14 else from all stores.
15      From that point, I turned the videotape in
16 to ID as evidence. So who actually looked at the
17 video in its entirety, I would have no idea.
18    Q. Okay. You weren't involved in the arrest of
19 Mr. Crutsinger?
20    A. No, sir. This is the first time I've seen
21 him.
22    Q. First time you've seen him?
23      MR. MOORE: Okay. That's all. Thank you.
24      MS. HARTMANN: Just very briefly, Your
25 Honor.

Page 86

1      REDIRECT EXAMINATION
2  BY MS. HARTMANN:
3      Q. Room No. 101 that you entered, that room was
4  rented with a stolen credit card belonging to Patricia
5  Syren?
6      A. That is correct.
7      Q. And the name of the registered guest was
8  David Jones?
9      A. That is correct.
10     Q. Did the name Billy Jack Crutsinger appear on
11 any record of that motel?
12     A. No, ma'am, it did not.
13     MS. HARTMANN: Pass the witness.
14     MR. RAY: We don't have anything else.
15     THE COURT: You may step down, sir.
16     THE WITNESS: Thank you, Your Honor.
17     (Witness exits the courtroom. )
18     MS. CALLAGHAN: Your Honor, the State would
19 call Officer Contenta.
20     (Witness enters the courtroom)
21     (Witness sworn.)
22     THE COURT: Have a seat, please.
23     THE WITNESS: Thank you.
24          PETER CONTENTA,
25 having been first duly sworn, testified as follows:

Page 87

1      DIRECT EXAMINATION
2  BY MS. CALLAGHAN:
3      Q. Could you please state your name for the
4  Court?
5      A. My name is Peter Contenta.
6      Q. And how are you employed?
7      A. I'm a police officer with the Galveston
8  Police Department.
9      Q. And how long have you been so employed?
10     A. Approximately 12 years.
11     Q. And what do you do for them?
12     A. Currently I work in the crime scene
13 investigation unit.
14     Q. And how long have you been doing that?
15     A. Approximately five years.
16     Q. Okay. Did you become involved with a case
17 involving a victim named Patricia Syren?
18     A. Yes, ma'am, I did.
19     Q. And what date and time did you become
20 involved in this?
21     A. Approximately 23:30 or 11:30 p.m. on the 8th
22 of April of this year.
23     Q. Okay. And how did you become involved in
24 it?
25     A. I was called to the scene by Sergeant Pena

Page 88

1  and Officer George Simpson.
2      Q. Okay. And when you say called to the scene,
3  what scene was that you were called to?
4      A. It was in the 3400 block of the Sea Wall
5  Boulevard. It's known as the Seahorse Motel, Room
6  101.
7      Q. Okay. Was your purpose in going there to
8  process the room?
9      A. Yes, ma'am.
10     Q. For any evidence?
11     A. Correct.
12     Q. All right. Did you then go ahead and
13 process the room while you were there?
14     A. Yes, I did.
15     Q. Okay. Moving on after that, did you at any
16 point go to the office and speak to any individuals?
17     A. Yes. At my conclusion of processing the
18 room, I went back up to talk up the manager, the night
19 manager of the Seahorse Motel.
20     Q. Okay. And what was his name?
21     A. Daniel Teo I believe is how it's pronounced.
22     Q. Okay. And did you talk to Daniel about the
23 person in Room 101?
24     A. Yes, ma'am.
25     Q. And what was your conversation like with

Page 89

1  him?
2      A. I asked Mr. Teo if he remembered when the
3  subject that had rented the room had arrived and how
4  he arrived.
5      Q. Okay. What did Daniel Teo tell you?
6      A. He advised me that he thought it was
7  approximately 1:00 o'clock a.m. on the 8th and that he
8  believed the subject arrived by a Yellow Cab.
9      Q. Are you familiar with Yellow Cab?
10     A. Yes, ma'am, I am.
11     Q. There is Yellow Cab service there on
12 Galveston Island, is there not?
13     A. That is correct.
14     Q. And did Daniel tell you anything else?
15     A. He gave me a brief description of what he
16 believed, to his recollection of what the subject may
17 have looked like.
18     Q. Okay. What did he indicate to you at that
19 time?
20     A. He told me it was a white male, somewhere
21 between 30, 40 years of age. And that was about as
22 consistent as he could get.
23     Q. Okay. Did he indicate in any way what kind
24 of activities he thought that person was engaging in?
25     A. He advised me that he thought maybe the

Page 90

1 subject had been drinking at a local club called
2 Club 23, which is on 23rd Street in Galveston.
3    Q. Now, did you have any indication concerning
4 some credit cards being used?
5    A. Yes.
6    Q. By the individual who was staying in Room
7 101?
8    A. That's correct.
9    Q. And were these the credit cards that
10 belonged to the victim of the double homicide out in
11 Fort Worth?
12    A. Yes.
13    Q. Did you have any information that those
14 credit cards had been used at the Economy Liquor in
15 that area?
16    A. Yes, I did.
17    Q. And Economy Liquor is what?
18    A. It's a liquor store in Galveston on 23rd
19 Street.
20    Q. Okay. Can you give the Judge some idea in
21 terms of distance or closeness how close Club 23, the
22 Seahorse Inn and Economy Liquor are?
23    A. Certainly. The Economy Liquor and the
24 Yellow Cab stand and Club 23 are all on 23rd Street.
25 They're roughly within a block of each other. The

Page 91

1 Seahorse from there is approximately 13 blocks west of
2 that location on Seawall.
3    Q. So the Economy Liquor, Club 23 are all in
4 very close proximity of each other?
5    A. That's correct.
6    Q. Now, is there a Yellow Cab stand in that
7 area?
8    A. Yes, there is.
9    Q. Where is the Yellow Cab stand?
10    A. It's actually attached and in the same
11 building as Club 23.
12    Q. Okay. So they're really at the same place?
13    A. Yes.
14    Q. Okay. Is that the Yellow Cab stand that is
15 closest there to the Seahorse?
16    A. Yes, I believe it is.
17    Q. What did you do next?
18    A. Well, when we got down there, I left the
19 Seahorse, I went to Diamond Shamrock, roughly the 3300
20 block of Seawall, spoke to the clerk there.
21    Q. Did you find anything of interest or of use
22 at the Diamond Shamrock when you spoke to the clerk at
23 that time?
24    A. Nothing more than Officer Simpson had
25 already advised me that he had secured his information

Page 92

1 from her.
2    Q. Okay. And did you proceed to the Yellow Cab
3 stand itself?
4    A. Yes, I did.
5    Q. And what did you do there?
6    A. I went in and I interviewed the night
7 dispatcher to ascertain if they had had any walk-ins
8 that might match the general description that I was
9 able to secure through our investigation up until that
10 point.
11    Q. At that time were you able to obtain any
12 information from them?
13    A. Yes. She had found a log that indicated
14 that they may have had a walk-in for a cab fare at
15 approximately 1:19 on the 8th of April.
16    Q. Okay. And by walk-in you mean someone who
17 walked into the cab stand to get a cab?
18    A. That's correct.
19    Q. Anything else that was useful?
20    A. Discovered that they had a video
21 surveillance camera inside the cab stand, but we were
22 unable to access it at that time.
23    Q. Did you ask them to take any steps to help
24 you secure additional information?
25    A. Yes, I did. I asked her to put out a

Page 93

1 broadcast to any cab drivers that were working on this
2 day to see if they remembered picking up can fare at
3 that location in the time frame that I had given her.
4    Q. Okay. So you wanted her to notify through
5 dispatch all of the cab drivers what you were looking
6 for?
7    A. Correct.
8    Q. Now, during this time or prior to it, did
9 you have any conversation with any Fort Worth police
10 officers?
11    A. Not at this point in time, no.
12    Q. It was later?
13    A. Yes.
14    Q. Okay. Did you talk to them about any
15 information they could give you about the individual
16 you were seeking?
17    A. Yes, we did.
18    Q. And you were already aware of the credit
19 card issues?
20    A. Correct.
21    Q. Did you specifically talk to anybody about a
22 possible cut the individual might have anywhere on
23 their body?
24    A. Yes, I did.
25    Q. What was that conversation like?

Page 94

1    A. I believe his name was McCluskey (sic) at
2  Fort Worth PD, he advised me that they were still
3  processing the scene where the homicide victims had
4  been discovered. They found blood at the scene that
5  they did not believe belonged to the victims, so that
6  conceivably the actor or perpetrator in the crime may
7  have been cut during the altercation at the scene.
8    Q. So you all were aware of that and knew that
9  that might be one characteristic of the person you
10 were looking for?
11   A. That's correct.
12   MS. CALLAGHAN: Pass the witness.
13           CROSS-EXAMINATION
14 BY MR. MOORE:
15   Q. Officer Contenta, you made a report
16 regarding this, correct?
17   A. I'm sorry, sir?
18   Q. You made a report regarding what you've just
19 testified to?
20   A. Yes, sir, I did.
21   Q. Do you have that with you up there?
22   A. Yes, I do.
23   Q. Could I take a look at it real quick?
24   A. Certainly.
25   (Brief pause.)

Page 95

1    Q. When you -- you actually gathered some
2  fingerprints out of that Seahorse Room No. 101?
3    A. Yes, sir, I did.
4    Q. What happened to those fingerprint cards?
5    A. Well, as customary, we take them back to the
6  identification room at the Galveston Police
7  Department. I fill out the backs of them with the
8  pertinent information that I have at the time, put
9  them in a little manila envelope. And then because
10 this was another case involving another agency, I
11 actually put them in an evidence envelope and sealed
12 them up, hoping that Fort Worth would be able to
13 secure them when they sent the detectives to Galveston
14 PD.
15   Q. Are you a fingerprint expert?
16   A. No, sir, I'm not.
17   Q. Does Galveston have one?
18   A. Yes, we do.
19   Q. Do you know if those prints were compared to
20 -- the prints that you took out of Room 101 were ever
21 compared to the prints of Mr. Crutsinger?
22   A. It is my understanding that they were not by
23 our department.
24   Q. Okay. When you got over there to the
25 Seahorse, had Officer Simpson called you to come over

Page 96

1  there to help him?
2    A. Actually, Sergeant Pena did.
3    Q. Okay. Because Simpson would not be a crime
4  scene officer, you are, correct?
5    A. That's correct.
6    Q. Was Simpson already there at the Seahorse by
7  the time you got there?
8    A. Yes, sir.
9    Q. Was he already in Room 101 or did you enter
10 together?
11   A. He and Sergeant Pena were standing at the
12 doorway. The door was open and they were standing in
13 the doorway.
14   Q. So they had already opened the door to
15 Room 101 by the time you got there?
16   A. That's correct.
17   Q. Okay. You didn't have a search warrant to
18 search that room, did you?
19   A. No, sir, I did not.
20   Q. And you didn't have a consent to search that
21 room from anybody who may have rented Room 101 at that
22 time?
23   A. That's correct.
24   Q. Okay. Do you know where Club 23 is in
25 relation to the Seahorse?

Page 97

1    A. Yes, sir.
2    Q. Is it within walking distance?
3    A. Could be.
4    Q. Could be? Pretty good ways? How many
5  blocks?
6    A. About 14 blocks.
7    Q. 14 blocks? What kind of information did
8  Mr. Teo say led him to believe that somebody had,
9  whoever rented that room had been to Club 23?
10   A. He didn't give me any specifics.
11   Q. Okay. And the description he gave you of
12 the person was just simply a white male, 30 to
13 years of age?
14   A. Yes, sir.
15   Q. Did he give you a hair color?
16   A. No, not at the time.
17   Q. Clothing description?
18   A. Not that I recall.
19   Q. Any kind of cuts, scrapes, anything like
20 that?
21   A. No, sir.
22   Q. That's all, just a white male, 30 to 40
23 years old?
24   A. Yes, sir.
25   Q. Were you involved in the arrest of

**Page 98**

1 Mr. Crutsinger?
2 A. No, sir, I was not.
3 MR. MOORE: Okay. Thank you, sir. That's
4 all I have.
5 REDIRECT EXAMINATION
6 BY MS. CALLAGHAN:
7 Q. The information that you received from Fort
8 Worth concerning -- or not from Fort Worth, the
9 information you received concerning the individual
10 using the cabs, did you relate that to the other
11 officers?
12 A. Yes, I did.
13 MS. CALLAGHAN: State has no further
14 questions.
15 MR. MOORE: Nothing else.
16 THE COURT: You may step down, sir.
17 THE WITNESS: Thank you.
18 (Witness exits the courtroom.)
19 MS. CALLAGHAN: State would call Officer
20 Garcia, III.
21 (Witness enters the courtroom.)
22 THE COURT: If you would raise your right
23 hand.
24 (Witness sworn.)
25 THE COURT: Be seated, please.

**Page 99**

1 CLEMENTE WARREN GARCIA, III,
2 having been first duly sworn, testified as follows:
3 DIRECT EXAMINATION
4 BY MS. CALLAGHAN:
5 Q. Officer, could you please state your name
6 for the Court?
7 A. Clemente Warren Garcia, III.
8 Q. And how are you employed?
9 A. As a Galveston police officer, currently on
10 patrol division.
11 Q. Okay. How long have you been doing that?
12 A. Eight years.
13 Q. And you are a patrol officer generally?
14 A. Yes, ma'am.
15 Q. Okay. Just to clarify for the Judge, there
16 is another witness also named Garcia here to testify
17 today, correct?
18 A. Yes, ma'am.
19 Q. And he is Clemente Garcia, Jr.?
20 A. Yes, ma'am.
21 Q. And that's your father?
22 A. Yes, ma'am.
23 Q. Did you become involved in a case pertaining
24 to a defendant named Billy Jack Crutsinger?
25 A. Yes, ma'am.

**Page 100**

1 Q. Now, can you give me the date and the time
2 in which you first became involved?
3 A. It would be April the 9th, 2003, at 11:20
4 hours.
5 Q. Okay. Were you in uniform?
6 A. Yes, ma'am.
7 Q. And were you in a patrol car?
8 A. Yes, ma'am.
9 Q. So how did you first become aware of it?
10 A. I heard bits and pieces over the radio in
11 reference to a suspect they were looking for in a
12 credit card abuse. And I met up with my father, who
13 then informed me of the information he had.
14 Q. Okay. Where was it that you met up with
15 your father?
16 A. 57th and Avenue J, Broadway. It's a Taco
17 Bell parking lot.
18 Q. What's up there?
19 A. Ma'am?
20 Q. What is that?
21 A. It's a Taco Bell parking lot. We met up
22 there and he informed me of the information he had.
23 Q. What information did he basically inform you
24 of?
25 A. He gave me a description of the suspect that

**Page 101**

1 was in possession of a stolen credit card and was
2 using those credit cards at various places.
3 Q. Okay. What description did he give you at
4 that time?
5 A. He was a male, white, wearing blue jeans and
6 a white Joe's Crab Shack shirt. And they believed him
7 to be approximately five foot nine.
8 Q. Okay. Did you get this -- you got this
9 information from your father you said?
10 A. Yes.
11 Q. Did he -- do you know what source he
12 obtained it from?
13 A. Officer George Simpson, he came in, into
14 lineup and gave a detailed description of what he
15 investigated the morning prior to day shift. And he
16 told it to everyone that was working patrol that day.
17 Q. Okay. Did you end up going to talk to
18 anybody after you met up with your father?
19 A. When I met with him in the parking lot,
20 there was a cab driver, Yellow Cab driver, Mr. Epps, I
21 believe. I don't know if I have his name in my
22 report. His last name was Epps. That he met up with
23 us also and gave some more information.
24 Q. Okay. Did he give specific information
25 about the Joe's Crab Shack T-shirt?

Page 102

1   A. Yes, he did.
2   Q. And he was able to describe the individual
3   to you as a person in blue jeans?
4   A. Yes.
5   Q. And approximately what age?
6   A. From what I was told to me, it was 25 to 35
7   years of age at that time.
8   Q. Okay. Now, what did you do after you
9   obtained the information?
10  A. Well, we learned that he possibly may be at
11  a bar at this time, that another cab driver may have
12  dropped him off, so we proceeded to that location.
13  Q. Okay. Did Mr. Epps, while you were talking
14  to him, indicate why it was he had a description of
15  that individual?
16  A. Yes. He had stated that when he picked the
17  gentleman up, that he had stated he was from Dallas.
18  That's all I remember, that he had stated he was
19  from Dallas, the Dallas area.
20  Q. But the police had notified the cab drivers
21  that you were looking for an individual of a specific
22  description?
23  A. Yes, yes.
24  Q. And this individual said that he had picked
25  up an individual fitting that description?

Page 103

1   A. Yes, he did.
2   Q. And he gave the description to you and did
3   he indicate where he took them?
4   A. Yes, he did.
5   Q. Where did he say he took him?
6   A. It's going to be the Elbow Room on 52nd and
7   Avenue S.
8   Q. So after that did you then go to the Elbow
9   Room?
10  A. Yes, I did.
11  Q. And what happened at the Elbow Room?
12  A. I met up with Officer Garcia, Officer Casso,
13  Officer Garcia, Jr., Officer Casso (sic), Officer
14  Varela. And we went in to see if we could locate a
15  subject fitting that description.
16  Q. Okay. And what did you see when you got to
17  the Elbow Room?
18  A. There was a number of people in there
19  drinking. I didn't locate anyone fitting that
20  description. We spoke with the bartenders and decided
21  to leave.
22  Q. Okay. Where did you go next?
23  A. We walked across the street to, there's a
24  bar right across the street, right on 53rd and
25  Avenue S, that's called the Corner Bar. No one was in

Page 104

1   there. So we told the bartender we were looking for a
2   man and gave her the description. Said if anyone
3   comes in fitting the description, give us a call. She
4   stated okay and we left.
5       We then proceeded to Toni's Lazy Lounge on
6   57th and Avenue S and walked in and spoke with the
7   bartender at that time, also.
8   Q. Okay. And what happened when you spoke to
9   that bartender?
10  A. We had noticed that there were two gentlemen
11  at the bar sitting approximately two to three seats
12  away from each other. We spoke to the gentlemen,
13  asked them if they were -- how long they had been
14  here. And both of them had stated they come here all
15  the time. We spoke with the bartender. She said that
16  these guys are regulars and we decided to leave.
17  Q. Okay. At that point you see two individuals
18  in the bar?
19  A. Yes.
20  Q. And the bartender represented that they were
21  regulars?
22  A. Yes, ma'am.
23  Q. And at that time did you notice anything
24  about the age of those individuals?
25  A. Yes, I did.

Page 105

1   Q. What did you note?
2   A. One of the males was a Hispanic gentleman.
3   The other one was a white male. He appeared to be in
4   his mid- to late-40s. And that's what I observed.
5   Q. Okay. Did he -- initially did you think he
6   fit the description of the person you were looking
7   for?
8   A. Initially no, because he was a lot older
9   than the description, the initial description we had.
10  Q. Okay. Your description described a man who
11  was 10 to 15 years younger?
12  A. Yes.
13  Q. So what did you do next?
14  A. We proceeded to the Tosser's Bar, which is
15  about a block away on the north side of Avenue S. And
16  we approached the bartender in that bar, no one was in
17  there at the time. And the bartender stated she
18  hadn't seen -- no one has come in today and she didn't
19  know anyone fitting that description.
20      While we were speaking with her, the phone
21  rang and she answered it. And then she handed the
22  phone to me and said it was the bartender from the
23  Elbow Room and she wants to speak to you.
24      When I got on the phone, it was the
25  bartender there. She stated that the gentleman we

Page 106

1 were looking for had just left the Elbow Room right
2 after we had left, which was approximately probably
3 ten, a little over 10 minutes, 15 minutes prior to us
4 walking into Tosser's.
5     And he said that -- well, she said that he
6 was wearing a white Joe's Crab Shack shirt, he had
7 blue jeans on. Let me read my report real quick.
8     She stated he was in his mid-40s wearing a
9 white Joe's Crab Shack shirt, blue jeans, and that he
10 was approximately 250 pounds. She had mentioned that
11 he had a gut, a stomach. And that's about the --
12     Q. Did she mention anything about the tennis
13 shoes?
14     A. No, she -- wait a minute. I'm sorry. Yes,
15 she did. She said he was wearing brand new white
16 tennis shoes.
17     Q. Did she indicate anything to you about the
18 appearance of his hair?
19     A. Yes, she did.
20     Q. What did she say?
21     A. She said that you can't miss him, he's got
22 this silver wavy hair, gray hair, grayish-colored
23 hair. And that's how she remembered him. And she had
24 stated that he came in maybe a couple days before
25 trying to sell cigarettes in the bar. She also

Page 107

1 remembered that about him, too.
2     Q. Okay. So at this point you have some
3 additional information about the person?
4     A. Yes.
5     Q. That makes them a little bit older and
6 having silver or gray wavy hair?
7     A. Yes, ma'am.
8     Q. And also some information about some tennis
9 shoes they were wearing?
10     A. Yes, ma'am.
11     Q. What did you do next?
12     A. I -- Officers Varela and Casso were still
13 with me. I told them to go ahead and head back to the
14 area to see if they could locate anyone fitting that
15 description. I stayed on the phone, gathered what I
16 needed to gather and then hung up the phone with her
17 and went back to the Elbow Room and spoke with her
18 personally. And she relayed the same information to
19 me.
20     I then told her, well, I'm going to go out
21 and see if I can locate him, you know, we'll get back
22 with you. Got in my unit and started circling the
23 area and couldn't locate him.
24     Q. What did you do next?
25     A. At that time, while I was circling the area,

Page 108

1 I remembered that there was a gentleman at the Toni's
2 Lazy Lounge who fit that description perfectly. And I
3 got on my radio and notified Officer Casso and Varela
4 that I was headed back to Toni's Lazy Lounge to
5 question the subject --
6     Q. Okay.
7     A. -- or get a better look at him.
8     Q. Did you go back to the Toni's Lazy Lounge?
9     A. Yes, I did.
10     Q. And did you walk in?
11     A. Yes, I did.
12     Q. Did you see the individual you had seen
13 before there?
14     A. Yes, I did.
15     Q. Now, the first time you went in, had you
16 noticed anything about his T-shirt?
17     A. No, I didn't. I noticed it was white.
18     Q. Okay. But you didn't see any printing or
19 marking on it that indicated Joe's Crab Shack?
20     A. No, I didn't.
21     Q. Was he physically positioned the first time
22 you saw him so that you could see that writing on the
23 shirt?
24     A. I believe he was facing the door. The
25 reason I didn't really pay too much attention to it, I

Page 109

1 had noticed that he was an older gentleman. And we
2 kind of ruled him out the first time.
3     Q. Okay. But when you came back the second
4 time, you had a better description of his age?
5     A. Yes, ma'am.
6     Q. As well as his general appearance?
7     A. Yes.
8     Q. Okay. And when you walked in the second
9 time and you saw him, did you notice whether or not he
10 fit the description that the lady bartender had given
11 you?
12     A. Yes, he did, he fit the description.
13     Q. Did he have the wavy gray or silver hair?
14     A. Yes, he did.
15     Q. Was he wearing a Joe's Crab Shack shirt?
16     A. Yes, he was.
17     Q. Was he wearing brand new tennis shoes?
18     A. Yes, he was.
19     Q. Was he wearing blue jeans?
20     A. Yes, he was.
21     Q. Did he appear to have a stomach on him, have
22 some extra weight?
23     A. Yes, he did.
24     Q. Did he appear to weigh between 220 and 250,
25 somewhere in that area?

## Page 110

1 A. Yes, he did.
2 Q. So at that time when you saw him, he fit the
3 description of the person you were looking for pretty
4 closely?
5 A. Yes, ma'am.
6 Q. Now, what did you do at this point?
7 A. Well, I approached him. I noticed as I was
8 walking up that he, in fact, was wearing a white Joe's
9 Crab Shack shirt printed on the front.
10 I approached him, he was standing facing me
11 holding a plastic Styrofoam cup and it had some beer
12 in it, what appeared to be beer.
13 And I walked up to him and introduced myself
14 and, you know, said, "Hi, how you doing?" I asked him
15 what his name was. As I walked up
16 to him, he appeared to -- he had a smile on his face
17 and appeared normal and appeared to be having a decent
18 time in the bar, didn't look worried about anything.
19 When I approached him and asked him his
20 name, his smile kind of faded away and he just froze.
21 And what he did was he kind of motioned his eyes at
22 the door.
23 Q. Would you look at the Judge and show him
24 what you're doing with your eyes?
25 A. Yes. I was facing him, just as you are

## Page 111

1 facing me. And if you were myself, he was smiling.
2 And as I asked him the questions, his smile faded
3 down. And he motioned to the door like this, as if to
4 see if there was a clear path. I don't know what he
5 was thinking, but that's what he had done.
6 Q. That's how it appeared to you?
7 A. Yes.
8 Q. What happened next?
9 A. I asked him -- hold on a second. I asked
10 him again what his name was. And he said -- he said
11 his name was David.
12 Q. Okay. What did you say next?
13 A. I then asked him his last name. And he just
14 ignored my question as he did the first time when I
15 asked him his name.
16 Q. So the first time you asked him, he ignored
17 it completely?
18 A. Yes.
19 Q. You asked him again and he said David?
20 A. Uh-huh.
21 Q. You asked him the last name and he ignored
22 the question?
23 A. Yes, ma'am.
24 Q. And then what next?
25 A. I then -- I asked David where he was from

## Page 112

1 and he refused to answer the question again, just
2 ignored it. And this whole time he just continued to
3 stare me into my face without saying a word.
4 Q. Okay. At this point did you decide to
5 detain him?
6 A. Yes, I did.
7 Q. And how did you detain him?
8 A. I advised him to put his hands on the back
9 of his head and I walked him outside. I held his
10 hands like this, the back of his hands, and I told him
11 to walk outside, which he did.
12 Q. So when -- did you have him turn around and
13 face away from you when he put his hands on his head?
14 A. Yes, I did.
15 Q. When he was putting his hands on his head,
16 did you notice anything about his hand?
17 A. Yes.
18 Q. What did you notice?
19 A. I don't recall which, I believe it was the
20 first finger, he had some -- he had some cuts on it
21 that were visible. And it looked like he had a -- he
22 had some tape or some bandage maybe wrapped around it,
23 but the cuts were still visible to me.
24 Q. Okay. So then you walked him outside?
25 A. Yes.

## Page 113

1 Q. As part of your detention?
2 A. Yes.
3 Q. Did you have any security concerns about
4 remaining in the bar with him while doing your
5 investigation?
6 A. Yes, I did.
7 Q. Why was that?
8 A. It was very dark in the bar, there were a
9 lot of things, a lot of objects he could've grabbed
10 ahold of. Directly in front of him was a beer
11 bottle. There were many stools and chairs in the
12 bar. I thought it was best and safe for both myself
13 and Mr. Crutsinger that we walk outside.
14 Q. Okay. That he be detained in some area
15 where there wasn't anything immediately around him?
16 A. Yes.
17 Q. So when you took him outside, at that point
18 did you ask him for his name or identification?
19 A. Yes, I did. I asked him his date of birth.
20 Q. Okay. What did he say in response to that?
21 A. He just, same thing, just ignored me, he
22 didn't answer, didn't say a word.
23 Q. He refused to respond when you asked for his
24 date of birth?
25 A. Yes. Yes, ma'am.

Page 118

1 you to be sent along with the Defendant?
2 A. Well, she carried it -- I don't know exactly
3 how far she carried it, but she gave it to Officer
4 Trochesset, who had stepped inside the bar. And then
5 he walked it out.
6 Q. Okay. She gave it to the police
7 voluntarily?
8 A. Yes.
9 Q. And then it was handed from Officer -- how
10 do you pronounce that, Trochesset?
11 A. Trochesset, yes.
12 Q. It was handed from that officer to you?
13 A. Yes, ma'am.
14 Q. What did you do at that time?
15 A. I inventoried the bag for weapons. And as
16 soon as I did that, I sealed it, zipped the bag up and
17 released it to Officer Hilton, who worked ID.
18 Q. Okay. You looked in there to make sure
19 there were no weapons; is that correct?
20 A. Yes, ma'am.
21 Q. Is that a requirement of your police
22 department when taking property belonging to a
23 defendant with them to the police department?
24 A. Yes, ma'am.
25 Q. Why do you do that?

Page 119

1 A. For our safety and for the safety of the
2 person that was arrested. If we don't check his
3 property on his person and he has a hidden weapon, he
4 could use that weapon to hurt someone or hurt himself
5 while in our custody. We do it for the safety.
6 Q. Okay. So you want to make sure that there
7 are no weapons or other items that could cause harm
8 before you bring that property along with you?
9 A. Yes, ma'am.
10 Q. And before you maintain it there at the
11 police department?
12 A. Yes, ma'am.
13 MS. CALLAGHAN: One moment, Your Honor.
14 (Brief pause.)
15 Q. (BY MS. CALLAGHAN) Just to clarify one
16 thing. Initially at the very beginning when you and
17 your father were getting information from Mr. Epps,
18 who was the cab driver --
19 A. Yes, ma'am.
20 Q. -- was it your understanding that a Yellow
21 Cab had driven the individual that you were looking
22 for to the Elbow Room?
23 A. Yes, ma'am.
24 Q. And that's why you were talking to cabbies
25 and that's why you went to the Elbow Room?

Page 120

1 A. Yes, ma'am.
2 Q. Now, we've talked about Mr. Crutsinger the
3 person that you arrested. Do you see that individual
4 in the courtroom today?
5 A. Yes, I do.
6 Q. Can you point to him and describe an article
7 of clothing he's wearing?
8 A. Yes, he's sitting right there. He has gray.
9 hair, it's combed backwards. He has on a blue and
10 white shirt and it's striped, blue stripes on it, blue
11 pants and black shoes.
12 MS. CALLAGHAN: May the record reflect that
13 the witness has identified the Defendant?
14 THE COURT: It will.
15 Q. (BY MS. CALLAGHAN) And that is one in the
16 same person that you arrested there in Galveston as
17 you described to the Judge?
18 A. Yes, ma'am.
19 MS. CALLAGHAN: Pass the witness.
20 CROSS-EXAMINATION
21 BY MR. RAY:
22 Q. Hello, Officer Garcia, how are you doing?
23 A. Good morning, sir. Good.
24 Q. Have you enjoyed your trip to Fort Worth?
25 A. Yes, sir.

Page 121

1 Q. My name is Bill Ray. We've spoken before,
2 have we not?
3 A. Yes, sir.
4 Q. And I called the Galveston Police Department
5 and I believe you called me back?
6 A. Yes, sir.
7 Q. And we talked within a day or so after that;
8 is that right?
9 A. Yes.
10 Q. I want to direct your attention to your
11 report. You've got a copy of your report up there,
12 don't you?
13 A. Yes, I have my supplement, that's all.
14 Q. Let's see here if I can't get you the
15 report. Maybe we're talking about the same thing.
16 The report that I want to ask you about
17 where the narrative starts out on, it says, "On April
18 9th of 2003 at approximately 11:20 hours."
19 Is that the report you're reading from?
20 A. Yes, sir.
21 Q. Okay. And then down at the bottom of it,
22 the last line, the last line starts out, "Male white
23 we were looking for and stated he was under arrest."
24 Is that the report you have?
25 A. Yes, sir.

| Page 122 | Page 124 |
|---|---|

**Page 122**

1 　Q. The following page starts out, "At that time
2 Officer Casso"?
3 　A. Yes, sir.
4 　Q. Okay. So we're on the same sheet of music.
5 　Here's what I want to direct your attention
6 to. First of all, you had indicated that you actually
7 arrested Billy Jack Crutsinger, I think you said about
8 11:20; does that sound right? And feel free to look
9 through there if you need to.
10 　A. No.
11 　Q. Tell me what time you placed him under
12 arrest.
13 　A. I didn't exactly put the time on there.
14 　Q. Okay. This whole thing started out at
15 11:20; is that right?
16 　A. For me it did, yes.
17 　Q. And that was when you were talking to your
18 dad up at the Taco Bell. From the Taco Bell, y'all
19 went to the Elbow Room, then you went to the Corner
20 Bar, which is just right across the street, right?
21 　A. Yes.
22 　Q. And if I remember correctly, both of those
23 bars are about a block from the Galveston Police
24 Department; is that right?
25 　A. It's our substation, yes.

**Page 123**

1 　Q. But that's where you took Billy Jack after
2 you arrested him, right?
3 　A. The substation?
4 　Q. Yeah.
5 　A. No, I didn't.
6 　Q. You took him downtown?
7 　A. Downtown, yes.
8 　Q. To the other police station, which is on
9 about 25th and Winnie Street, maybe? Does that sound
10 about right?
11 　A. That's 2517 Ball.
12 　Q. Ball is a street that runs either
13 parallel --
14 　A. Uh-huh.
15 　Q. Ball is parallel to Broadway, is it not?
16 　A. Ball is a block south of Winnie.
17 　Q. So Winnie and Ball run parallel, right?
18 　A. Uh-huh.
19 　Q. I thought I saw Winnie Street in there.
20 　Now, went around to these little bars, your
21 business started at 11:20. About what time did you
22 finally get Billy Jack to the police department?
23 　A. I don't recall, sir.
24 　Q. Hour, hour and a half later, does that sound
25 right?

**Page 124**

1 　A. Maybe 45 minutes. I'm just guessing,
2 though.
3 　Q. But it wasn't a three- or four-hour deal?
4 　A. No.
5 　Q. Let's get to Toni's Lounge, okay?
6 　A. Yes, sir.
7 　Q. And you went to Toni's Lounge twice that
8 day, correct?
9 　A. Yes, sir.
10 　Q. First time you saw Billy Jack and another
11 man there. And then you did a little running around,
12 you went to Tosser's, went back to the Elbow Room.
13 And then you remembered that you had seen him at
14 Toni's, so you went back to Toni's, right?
15 　A. Yes, sir.
16 　Q. When you came back to Toni's the second
17 time, was he in the same chair?
18 　A. He was standing up.
19 　Q. Toni's is not that big of a place; is that a
20 fair statement?
21 　A. It is very small.
22 　Q. It's not as big as this courtroom, is it?
23 　A. I don't believe so.
24 　Q. Does Toni's have more than one door? How
25 many ways can you get out of there?

**Page 125**

1 　A. I only noticed the front door.
2 　Q. The front door is right there on Stewart,
3 and that's the way you walked in, right?
4 　A. Yes, sir.
5 　Q. There were other officers with you, right?
6 　A. At that time, no.
7 　Q. Did you walk into Toni's, then, by yourself?
8 　A. Yes, I did.
9 　Q. But you were between Billy Jack and the
10 door; is that right?
11 　A. Yes, I was.
12 　Q. You walked in and you walked over to him
13 and, first of all -- let me back up just a second.
14 When we talked on the phone, one of the things -- we
15 didn't talk very long, right?
16 　A. No, we didn't.
17 　Q. But one of the things I asked you was is
18 what was in this report actually what had happened.
19 Do you remember us having that conversation?
20 　A. I don't recall exactly. It may have been.
21 You may have asked me that.
22 　Q. Well, the first thing you did is you walked
23 up to him -- and feel free to look at your report if
24 you need to before you answer a question.
25 　A. Okay.

Page 126

1 Q. You walked in and you noticed that he was
2 the person that you had seen before and that you
3 thought you were looking for. That was kind of the
4 first thing that went on in your mind, right?
5 A. Yes, sir.
6 Q. You walked up to him and you asked him his
7 name, correct?
8 A. Yes. Well, that's not the first thing I
9 said.
10 Q. Okay. What was the first thing you said to
11 him?
12 A. I said, "Hey, how you doing?"
13 Q. Okay. You spoke to him and said hello. I
14 think you said that a minute ago. And you asked him
15 his name, right?
16 A. Yes.
17 Q. Did he tell you his name or any name that
18 point?
19 A. No, he didn't.
20 Q. And I think you wrote in here the white male
21 just stared me in the face without saying a word.
22 That's what you wrote down, right?
23 A. Yes.
24 Q. Okay. Then you asked him his name again.
25 You asked him again what his name was and he said

Page 127

1 David, right?
2 A. Yes.
3 Q. Then you asked him his last name and he
4 didn't answer. I think you said he ignored your
5 question, right?
6 A. Yes, sir.
7 Q. Then you asked David where he was from. And
8 he once again refused to -- refused to answer once
9 again, right?
10 A. Yes.
11 Q. Now, the next statement is, and this was in
12 a response that Ms. Callaghan asked you. Was that the
13 point that you detained him, when you took him
14 outside?
15 A. Well, I decided to detain him while in the
16 bar when he refused to --
17 Q. Okay. In response to a question that
18 Ms. Callaghan asked you a minute ago, and we can read
19 that question back, was it at that point when you
20 detained him?
21 A. Yes.
22 Q. Okay. He wasn't detained before that right?
23 A. No, no.
24 Q. He certainly wasn't arrested before that?
25 A. No.

Page 128

1 Q. And you hadn't communicated anything to him
2 to say he was detained up until that point. In other
3 words, you didn't say, Hey, I want to talk to you, you
4 got to come outside? Sir, you're not free to go. You
5 didn't say anything like that to him, right?
6 A. Yes, I did.
7 Q. Okay. What did you tell him?
8 A. I told him that I was going to take him
9 outside.
10 Q. Okay. But, I mean, before that did you say
11 anything to that effect?
12 A. No, I didn't.
13 Q. Okay. And what I'm getting at is the
14 physical communication from yourself to Billy Jack
15 that he was being detained was immediately before you
16 walked him outside, because that was part of the
17 conversation; is that right?
18 A. Yes, sir. Yes, sir.
19 Q. And up until that point, he wasn't under
20 arrest and you hadn't communicated to him that he was
21 being detained; is that right?
22 A. No.
23 Q. Is that a correct statement?
24 A. Yes, sir.
25 Q. And up to that point, the only conversation

Page 129

1 y'all had, the complete conversation y'all had was you
2 said, "Hi, how you doing?" That was the first thing.
3 You said, "What's your name?" And he didn't say
4 anything. The third thing was you asked him what his
5 name was again and he said David. You asked him his
6 last name, he didn't answer, ignored your question.
7 The fifth thing was is you asked him where he was
8 from, and he once again refused to answer. That's the
9 five conversational phrases that happened, right?
10 A. Yes.
11 Q. Then you said words to the effect, I'm going
12 to detain you or you need to come with me and let's go
13 outside; is that right?
14 A. Well, yes. Yes, that's correct.
15 Q. At that point you had communicated to him
16 that he was not free to leave --
17 A. Yes.
18 Q. -- whether verbally or by your actions?
19 A. Yes.
20 Q. But up until that point, you had not?
21 A. Huh-uh.
22 Q. Okay. And you arrested him for failure to
23 identify truthfully, correct?
24 A. Yes, sir.
25 Q. Now, this black bag that you looked in, that

| Page 130 | Page 132 |
|---|---|
| 1 whole conversation inside the bar -- first of all, how<br>2 long did that take for y'all to have those five little<br>3 phrases? Was it just 30, 40 seconds, maybe?<br>4     A. Maybe a little bit longer.<br>5     Q. Maybe a minute, two minutes tops?<br>6     A. Yes, sir.<br>7     Q. But you certainly took him outside and you<br>8 didn't know anything about the bag when you took him<br>9 outside; is that right?<br>10     A. That's correct.<br>11     Q. You went back inside. And I assume there<br>12 was some other officers. You wouldn't have left him<br>13 outside by himself, right?<br>14     A. I stayed next to him the whole time -- next<br>15 to my unit, actually.<br>16     Q. But when you came back inside, by that point<br>17 in time there were already some police officers that<br>18 had showed up; is that right?<br>19     A. I didn't go back inside.<br>20     Q. Oh, you didn't? How did you get the bag?<br>21     A. Officer Trochesset brought it out.<br>22     Q. He went in and got it?<br>23     A. Yes.<br>24     Q. Okay. I'm sorry. So you stayed outside and<br>25 never went back in. Officer Trochesset showed up, he | 1 You didn't ask Mr. Crutsinger, Hey, is it okay if I<br>2 look in this bag?<br>3     A. No.<br>4     Q. Did any other officer do that in your<br>5 presence?<br>6     A. No, we didn't have to.<br>7     Q. Because -- that's because of some<br>8 departmental policy; is that what you're telling us?<br>9     A. When he was placed under arrest and we have<br>10 to inventory his property.<br>11     Q. Right. But when he was placed under arrest,<br>12 that bag wasn't anywhere near him, was it?<br>13     A. No, it wasn't.<br>14     Q. If there had been a bomb in the bag at the<br>15 point that he was placed under arrest, he wasn't to be<br>16 in a position to set the bomb off or a knife or any<br>17 other weapon. He wasn't in a position to get to that<br>18 bag, was he?<br>19     A. No, he wasn't.<br>20     Q. From the time you walked in -- or when you<br>21 first walked in the bar, was it anywhere around him?<br>22 Did you know it was there?<br>23     A. I didn't even see it, sir.<br>24     Q. Okay. Hang on just a second.<br>25     A. Yes, sir. |

| Page 131 | Page 133 |
|---|---|
| 1 went inside and the bartender gave him the bag?<br>2     A. Yes, sir.<br>3     Q. So you weren't really a part of that<br>4 conversation with the bartender about whose bag it<br>5 was, then, were you?<br>6     A. No, I wasn't.<br>7     Q. That was something that Officer Trochesset<br>8 relayed to you?<br>9     A. Yes, sir.<br>10     Q. He brought you the bag out. Did you ask<br>11 Mr. Crutsinger if it was his bag?<br>12     A. I wasn't the one that asked him.<br>13     Q. Okay. You didn't have a part in that?<br>14     A. No.<br>15     Q. Was that done in your presence?<br>16     A. I don't recall.<br>17     Q. Okay. And then you opened the bag and<br>18 looked in it?<br>19     A. Yes, sir.<br>20     Q. Strictly for weapons?<br>21     A. Yes, sir.<br>22     Q. You didn't have any kind of search warrant<br>23 to look in the bag?<br>24     A. No, I didn't.<br>25     Q. And you didn't have any type of consent. | 1     (Brief pause.)<br>2     Q. When you looked in the bag, your report goes<br>3 on to say that you saw a bus ticket, right?<br>4     A. Yes, sir.<br>5     Q. Bus ticket certainly wasn't a -- not a<br>6 weapon, right?<br>7     A. Yes.<br>8     Q. You also looked at some -- you also noted<br>9 that you found some clothing and personal hygiene<br>10 items, right?<br>11     A. Yes, sir.<br>12     Q. Why did you make note of that if all you<br>13 were doing was looking for a weapon, just out of<br>14 curiosity?<br>15     A. I decided to add it to the report when I saw<br>16 the bus ticket. I saw the name "David" on it and saw<br>17 that his last name was Jones.<br>18     Q. Okay.<br>19     A. So I knew that he had said his name was<br>20 David. And I just wanted to see if the last name<br>21 matched up with the last name that was on the bus<br>22 ticket.<br>23     Q. Did you ever talk to Officer Hilton in<br>24 regards to this arrest?<br>25     A. No, I didn't. Well, I believe I may have |

Page 134

1  just briefed him on what had occurred. And there was
2  a lot of other officers there that were helping out.
3      Q. Let me ask you this. When you were
4  originally looking for him, for Mr. Crutsinger here --
5      A. Yes, sir.
6      Q. -- I mean, the description you had was 25 to
7  30 years old and a white male, right?
8      A. Yes, sir.
9      Q. That fits the description of an awful lot of
10 people that are in Galveston on any given day, right?
11     A. Yes, sir.
12     Q. And the fact of the matter is it doesn't fit
13 his description, does it?
14     A. No, it doesn't.
15     Q. He's got a little grayer hair than most
16 people 25 years old. And, for that matter, this Joe's
17 Crab Shack T-shirt, there's a Joe's Crab Shack in
18 Galveston, isn't there?
19     A. Yes, sir.
20     Q. And they sell 15, 20 different kinds of
21 T-shirts?
22     A. Yes, sir.
23     Q. And it's not uncommon to see somebody in
24 Galveston wearing a Joe's Crab Shack T-shirt, is it?
25     A. No, it's not.

Page 135

1      Q. And Joe's Crab Shack is not 15 blocks from
2  this bar, is it?
3      A. No, it's not.
4      Q. Okay. What was it that -- and also, the
5  Elbow Room, Tosser's, Toni's, the Corner Bar, none of
6  those places even take credit cards, do they?
7      A. I'm not sure, sir.
8      Q. Well, nobody was saying that the person you
9  were looking for had used a credit card in any of
10 those places, right?
11     A. No.
12     Q. And y'all didn't even know at that point --
13 since the description was wrong, you had no reason to
14 believe that this man, Billy Jack here, had used a
15 credit card in any of those gas stations or any place
16 down there. He just physically didn't fit the
17 information you had; is that right?
18     A. He didn't fit the age.
19     Q. Why was it, then, that him of all people you
20 decided to talk to and ultimately arrest?
21     A. After speaking with the bartender at the
22 Elbow Room the second time, she gave a better
23 description and was able to say that he was in his
24 mid-40s and also that he was a heavier man. And also
25 said that he had gray, wavy hair.

Page 136

1      Q. She hadn't taken a credit card from him, had
2  she?
3      A. I don't believe so, sir.
4      MR. RAY: I'll pass the witness.
5           REDIRECT EXAMINATION
6  BY MS. CALLAGHAN:
7      Q. Just to clarify something. If you'll look
8  back on your offense report in that first paragraph.
9      A. Yes, ma'am.
10     Q. The initial description you have is of a
11 white male wearing blue jeans, a white Joe's Crab
12 Shack shirt.
13     A. Yes, ma'am.
14     Q. Okay. So this Defendant did meet that
15 description initially?
16     A. Yes, he did.
17     Q. It was the age that threw you off, then?
18     A. Yes.
19     Q. But when you had an additional better
20 description of the age and appearance of the hair of
21 the individual, that's what clued your memory in to
22 Mr. Crutsinger?
23     A. Yes, ma'am.
24     Q. Because you remembered seeing a person that
25 fit that more defined description?

Page 137

1      A. Yes, ma'am.
2      MS. CALLAGHAN: Pass the witness.
3      MR. RAY: Nothing further.
4      THE COURT: You may step down, sir.
5      THE WITNESS: Thank you, Your Honor.
6      THE COURT: Lunch break until 1:30.
7  (Three witnesses enter courtroom.)
8      THE COURT: Please raise your right hands.
9  (Three witnesses sworn.)
10     THE COURT: Your names for the record,
11 please.
12     THE WITNESS: Robert Tucker.
13     THE WITNESS: Linda Crutsinger.
14     THE WITNESS: Ted Beasley.
15     THE COURT: Okay. The Rule has been called
16 for in this case. That means unless you're
17 testifying, you have to remain outside the courtroom
18 and outside the hearing of any witness who is
19 testifying. Before and after you testify, you cannot
20 discuss your testimony with any other witness or allow
21 any other witness to discuss their testimony with you.
22     MS. HARTMANN: Thank you, Judge.
23 (Witnesses exit the courtroom.)
24 (Lunch break taken.)
25     THE COURT: State may proceed.

Page 138

1     MS. HARTMANN: State would call Officer
2  Garcia, Jr.
3     (Witness approaches witness stand.)
4     (Witness sworn.)
5     THE COURT: Be seated, please.
6     CLEMENTE GARCIA, JR.,
7  having been first duly sworn, testified as follows:
8          DIRECT EXAMINATION
9  BY MS. HARTMANN:
10    Q. Could you state your name for the record?
11    A. Clemente Garcia, Jr.
12    Q. And back in April of this year, were you a
13 police officer for the city of Galveston, Texas?
14    A. Yes, ma'am.
15    Q. Are you now retired?
16    A. Yes, ma'am.
17    Q. When did you retire?
18    A. May 30 of this year, 28 years.
19    Q. Well, congratulations.
20    A. Thank you.
21    Q. I want to direct your attention back to the
22 date of April the 8th and April the 9th of this year.
23 You were still employed with Galveston?
24    A. Yes, ma'am.
25    Q. Did you become involved in an investigation

Page 139

1  that originated out of the Fort Worth Police
2  Department in regards to trying to locate someone
3  using a stolen credit card?
4     A. Yes, ma'am.
5     Q. In the process of helping with that
6  investigation, did you receive any descriptive
7  information from a cab driver?
8     A. Yes, ma'am.
9     Q. And do you recall what day and what time
10 that was?
11    A. About 11:30 in the morning, it was on the
12 9th of April. The cab driver was named Donald Epps.
13 He told me that he picked up on a fare on 61st Street
14 by the Waffle House. It was a male, white, wearing a
15 red cap, he had glasses, he had a white t-shirt with
16 Joe's Crab Shack printed in the front of it and he was
17 wearing blue jeans.
18    Q. All right. Did he mention to you that the
19 man that he had picked up, the fare he had picked up
20 said he was from the Dallas area?
21    A. Yes, ma'am.
22    Q. Did you convey that information to other
23 officers that were assisting in this investigation?
24    A. Yes, ma'am.
25    Q. Was one of those other officers your son,

Page 140

1  Officer Garcia, III?
2     A. Yes, ma'am.
3     Q. Is that the same person who's testified
4  previously in this courtroom prior to your coming in?
5     A. Yes, ma'am.
6     Q. Subsequent to your receiving that
7  description from Mr. Epps, the cabbie, did you at some
8  point get notified that an arrest had been made at
9  Toni's Lazy Lounge?
10    A. Yes, ma'am.
11    Q. Did you actually go to that scene?
12    A. Yes, ma'am.
13    Q. Once you got to the scene at Toni's Lazy
14 Lounge, had the arrest already been made?
15    A. Yes, ma'am.
16    Q. Did you see the person who had been
17 arrested?
18    A. Yes, ma'am.
19    Q. Did that person appear to fit the
20 description that you all had gotten from the cabbie?
21    A. No, ma'am. Well, the outfit and all, yes,
22 ma'am.
23    MR. RAY: I'm sorry. I didn't hear your
24 answer.
25    THE WITNESS: The white shirt, the blue

Page 141

1  jeans. But the age that we received earlier --
2     Q. (BY MS. HARTMANN) Okay. Did the cabbie
3  actually tell you that the person was in his mid-40s?
4     A. No, ma'am, he didn't give me an age.
5     Q. Okay. Other than the age difference, did he
6  appear to fit the description?
7     A. That the cab driver gave us, yes, ma'am.
8     Q. All right. Did you at some point meet --
9  did you at some point go back to the Galveston Police
10 Department?
11    A. Yes, ma'am.
12    Q. Were you there at the Galveston Police
13 Department when the arrested person was brought in?
14    A. Yes, ma'am.
15    Q. Who had transported him?
16    A. Officer Garcia, III.
17    Q. Your son?
18    A. Yes, ma'am.
19    Q. Had you accompanied them or had you gone in
20 your own vehicle?
21    A. I went in my own vehicle.
22    Q. Do you see anybody here today in the
23 courtroom that you recognize to be the person that was
24 arrested out there at Toni's Lazy Lounge?
25    A. Yes, ma'am.

Page 142

```
 1    Q. Could you just tell the Court where that
 2 person is located and something that they're wearing?
 3    A. He's wearing a longsleeve white and blue
 4 shirt that looks like it has stripes on them with dark
 5 pants and gray hair.
 6    Q. Is he sitting at the --
 7    A. With the defense attorney.
 8    Q. Okay. The table to your right or left?
 9    A. To the right.
10    MS. HARTMANN: Your Honor, at this time may
11 the record reflect that the witness has identified the
12 Defendant?
13    THE COURT: It will.
14    Q. (BY MS. HARTMAN) Where was the Defendant
15 taken or where was he at the police department when
16 you arrived?
17    A. I was already there when they brought him
18 in.
19    Q. Where was he taken?
20    A. We have a little breathalyzer room. He was
21 put in there because there was a lot of prisoners in
22 the hallway there that were being booked in and I
23 didn't want him around the prisoners, so I put him in
24 that little room.
25    Q. Did somebody stay in that room with him or
```

Page 143

```
 1 was he left in there alone?
 2    A. My son and I stayed in that room with him.
 3    Q. Did you have any conversation with him in
 4 that room?
 5    A. I was just trying to get his name and date
 6 of birth.
 7    Q. All right. Did he eventually give you a
 8 name and date of birth?
 9    A. Yes, ma'am.
10    Q. The name and date of birth he gave you, were
11 you able to verify whether or not there was a person
12 with such a name and date of birth?
13    A. Yes, ma'am.
14    Q. Up until that point had he given you the
15 correct name and date of birth?
16    A. Yes, ma'am.
17    Q. Other than trying to find out what his true
18 name and date of birth was, were you and your son
19 having any other type of conversation with him?
20    A. No, ma'am.
21    Q. Was he trying to talk to you all?
22    A. He didn't say anything until the Fort Worth
23 detective showed up.
24    Q. Okay. Who was present in the room when the
25 Fort Worth detective showed up?
```

Page 144

```
 1    A. I was.
 2    Q. And your son had left at that point?
 3    A. Yes, ma'am.
 4    Q. Did you hear -- did the Fort Worth detective
 5 introduce himself to Mr. Crutsinger?
 6    A. Yes, ma'am.
 7    Q. Did the detective stay and talk with
 8 Mr. Crutsinger at that time or did he leave?
 9    A. No, he left.
10    Q. Once the detective left the room, did the
11 Defendant say anything at that point?
12    A. Yes, ma'am.
13    Q. What if anything did he say?
14    A. He said, "I messed up and I need to talk to
15 somebody."
16    Q. Did he ask you to do anything with reference
17 to that detective?
18    A. No, he just repeated again that he needed to
19 talk to someone. So I went ahead and called for the
20 detective to come back down.
21    Q. Okay. Do you remember him saying, "I need
22 to talk to the detective"?
23    A. No, he just said he needed to talk to
24 someone.
25    Q. Okay. Did you do a report in this case?
```

Page 145

```
 1    A. Yes, ma'am.
 2    Q. Do you have that with you?
 3    A. Yes, ma'am.
 4    Q. Could you take a look at your report and
 5 refresh your memory from it?
 6    A. "I need to talk to the detective."
 7    Q. Okay. Do you remember that happening?
 8    A. Yes, ma'am.
 9    Q. Now that you've refreshed your memory?
10    A. Yes, ma'am.
11    Q. Okay. And do you also have in your report
12 that he started crying?
13    A. Yes, ma'am.
14    Q. And was saying, "I messed up"?
15    A. That was upstairs in the bathroom.
16    Q. Okay. And you do, in fact, remember him
17 telling you, "I need to talk to the detective"?
18    A. Yes, ma'am.
19    Q. And then what did you do at that point?
20    A. I called Sergeant Parks and he got ahold of
21 the detective. And he told me to go ahead and bring
22 him upstairs.
23    MS. HARTMANN: Pass the witness.
24    CROSS-EXAMINATION
25 BY MR. MOORE:
```

Page 146

1  Q. Officer Garcia, you made a report regarding
2  this, correct?
3  A. Yes, sir.
4  Q. Do you have it up there with you?
5  A. Yes, sir.
6  Q. You've used it to refresh your memory here?
7  A. Yes, sir.
8  Q. Can I take a look at that real quick? I've
9  got a copy. I just want to make sure we're on the
10 same page.
11 (Brief pause.)
12 Q. Okay. April 9th, 2003, about 5:50 in the
13 morning you're told by Officer Simpson that they're
14 looking for a white male subject in possession of a
15 stolen credit card staying at the Seahorse motel,
16 right?
17 A. Yes, sir.
18 Q. And the description at 5:50 in the morning
19 on April 9th was white male, 5'9, 150 to 175 pounds,
20 dirty blond hair wearing a yellow or dirty white shirt
21 and blue jeans, correct?
22 A. Yes, sir.
23 Q. Wasn't anything about tennis shoes on there,
24 was there?
25 A. No, sir.

Page 147

1  Q. And so you check around the area and you
2  don't find anybody matching that description?
3  A. Correct.
4  Q. They give you a description of having a big
5  old belly on him?
6  A. No, sir.
7  Q. So then you're still on patrol that morning
8  and you talk to a cab driver named Donald Epps,
9  correct?
10 A. Yes, sir.
11 Q. He works for Yellow Cab?
12 A. Yes, sir.
13 Q. And y'all stopped in the Kroger parking lot
14 and you say, well, Mr. Epps, I've got information that
15 that suspect came to the cab stand and wanted a cab,
16 right?
17 A. Yes, sir.
18 Q. And then Cab No. 004 was dispatched to the
19 location. Was that a different one than Mr. Epps?
20 A. No, sir, that's the same cab.
21 Q. Same cab. So then Mr. Epps contacts the cab
22 driver who worked last night by cell phone and you
23 talked to that cab driver?
24 A. Yes, sir.
25 Q. And he told you that he didn't pick up

Page 148

1  anyone last night in front of the cab stand?
2  A. Correct, sir.
3  Q. Okay. So then you are contacted about 11:15
4  in the morning that Donald Epps wanted to talk to you
5  again?
6  A. Yes, sir.
7  Q. Same Donald Epps that you'd talked to
8  earlier in the morning?
9  A. Yes, sir.
10 Q. And when you talked to him earlier in the
11 morning, had he told you that he had picked up
12 anybody?
13 A. No, sir.
14 Q. So you go to the Taco Bell about 11:25 in
15 the morning and meet Donald Epps, correct?
16 A. Yes, sir.
17 Q. And then he says I picked up a fare in front
18 of the Waffle House on 61st Street matching the
19 description of the suspect?
20 A. Yes, sir.
21 Q. And that was in between the time that you
22 had talked to him earlier in the morning --
23 A. Yes, sir.
24 Q. -- and then. What kind of description did
25 he give you of the suspect?

Page 149

1  A. I gave him the description, suspect a male,
2  white, 5'9, 150 to 175 pounds, dirty blond hair.
3  Q. Okay. And so he tells you that he picks up
4  a suspect that is matching that description?
5  A. That's what he told me, um.
6  Q. Wearing a red baseball cap, glasses?
7  A. Yes, sir.
8  Q. And he told you that he was from Dallas,
9  Texas, correct?
10 A. That's what the man told him and that's what
11 he told me.
12 Q. And that's what you put in your report?
13 A. Yes, sir.
14 Q. Not the Dallas area?
15 A. No, he just said Dallas.
16 Q. He said Dallas, Texas.
17 A. And so he says he drops that guy, and that
18 matched the description of the person you'd gotten
19 earlier, correct?
20 A. As to height and weight, I didn't get that
21 description.
22 Q. Okay. But as far as the age -- you didn't
23 have an age?
24 A. It was between 25 and 35 is what I was told
25 earlier in the morning.

Page 150

1 Q. Okay. And so that cab driver gave you that
2 description of the person that he dropped off at
3 Toni's?
4 A. Yes, sir.
5 Q. Okay. And this was about 11:25 in the
6 morning?
7 A. Yes, sir.
8 Q. So you and your son and another officer go
9 to -- all right. Wait a minute. I'm sorry. Let's
10 back up.
11    You get that information. And Mr. Epps told
12 you that he had dropped that person off at Toni's Lazy
13 Lounge, correct?
14 A. Yes, sir.
15 Q. And then Mr. Epps somehow receives some
16 information from another cab driver that that subject
17 was taken from Toni's to the Elbow Room?
18 A. Yes, sir.
19 Q. How did you get that information?
20 A. That's what Mr. Epps -- somebody told
21 Mr. Epps that and he relayed that information to me.
22 Q. Was there any description of that person?
23 A. The same thing, wearing the white t-shirt.
24 Q. Red ballcap, glasses?
25 A. Red ballcap, yes, sir.

Page 151

1 Q. Nothing about white tennis shoes?
2 A. No, sir.
3 Q. So y'all go to the Elbow Room?
4 A. Yes, sir.
5 Q. Was there anybody at the Elbow Room?
6 A. There was several people there.
7 Q. Did you get their names?
8 A. No, sir.
9 Q. But they didn't fit the description of a
10 5'9, 150 to 175 pound dirty blond hair guy?
11 A. Yes, sir.
12 Q. Wearing a red ballcap or glasses?
13 A. Correct.
14 Q. Okay. And then you go to the Seahorse,
15 correct?
16 A. Yes, sir.
17 Q. And you get information that a person who
18 rented Room 101 left his black canvas bag and light
19 blue shirt in there?
20 A. Yes, sir.
21 Q. When did -- when was that information given
22 to you?
23 A. Right after we left the Elbow Room, I heard
24 Sergeant Parks was out there at the Seahorse, so I
25 went over there with them.

Page 152

1 Q. Okay. And then you go back to Toni's?
2 A. Yes, sir.
3 Q. Correct? And by the time you get there,
4 your son has already arrested Mr. Crutsinger?
5 A. Yes, sir.
6 Q. Did you talk to the bartender at the Elbow
7 Room?
8 A. No, sir.
9 Q. When you drove up, did you see
10 Mr. Crutsinger in custody?
11 A. He was in the back seat of the police car
12 when I drove up.
13 Q. Okay. Did you talk to your son at that
14 point?
15 A. There was so many officers there, I know he
16 told me that he had somebody and he had them in
17 custody.
18 Q. Did it strike you as strange when you saw
19 Mr. Crutsinger that he wasn't 25 to 30 years old?
20 A. I was -- yeah, yes, sir.
21 Q. Did it strike you as strange that he wasn't
22 wearing glasses?
23 A. Yes, sir.
24 Q. Did it strike you as strange that he didn't
25 have a red baseball cap on?

Page 153

1 A. Correct.
2 Q. Did you say, This doesn't fit the
3 description of the guy we're looking for?
4 A. No, I didn't say anything. I looked at him
5 and I was surprised because I was looking for somebody
6 between 25 and 35.
7 Q. Okay. And you actually read him his Miranda
8 warnings, correct?
9 A. Yes, sir.
10 Q. And what time was that?
11 A. I don't know if I wrote it down or not.
12 12:18.
13 Q. 12:18, okay. And he was taken directly to
14 the Galveston Police Department?
15 A. Yes, sir.
16 Q. You saw him there at the Galveston Police
17 Department, correct?
18 A. Yes, sir.
19 Q. This was after the detective had asked to
20 speak to him, correct?
21 A. Yes, sir.
22 Q. And you actually took him to the bathroom
23 before he started being interrogated, correct?
24 A. Yes, sir.
25 Q. And you told him to tell the truth to the

Page 154

1 detective, correct?

2 A. Yes, sir.

3 Q. Why did you tell him to tell the truth?

4 A. He dropped to his knees and started crying.

5 Q. He did? He dropped to his knees and started

6 crying?

7 A. Yes, sir.

8 Q. What all did he say to you?

9 A. He just start crying. And he grabbed my

10 son's hand. And I grabbed him and we picked him up.

11 And he kept saying, "I'm sorry." I said, "Well, if

12 you have anything to say, just tell the truth."

13 That's all I told him.

14     MR. MOORE: Thank you, sir. That's all I

15 have.

16     MS. HARTMANN: Very briefly.

17         REDIRECT EXAMINATION

18 BY MS. HARTMANN:

19 Q. Mr. Moore asked you about -- asked you about

20 a black canvas bag and light blue shirt being in the

21 motel room?

22 A. Yes, ma'am.

23 Q. That information was conveyed to you by a

24 room service lady, wasn't it?

25 A. Yes, ma'am.

Page 155

1 Q. And she was telling you what she had seen in

2 that room the day before?

3 A. Yes, ma'am.

4 Q. Correct?

5 A. Yes, ma'am.

6 Q. Not that day?

7 A. No.

8 Q. But on some prior occasion?

9 A. Yes, ma'am.

10 Q. And would you be aware if your son had

11 received a better description at some point during his

12 investigation of what the suspect looked like?

13 A. Repeat the question.

14 Q. Sure. Are you aware that your son received

15 some additional information about the suspect's

16 description from talking to a bartender?

17 A. I didn't find out until later on.

18 Q. Okay. When Mr. Crutsinger was in the

19 restroom with you and your son --

20 A. Yes, ma'am.

21 Q. -- why was he there?

22 A. He wanted to use the restroom.

23 Q. And this was before the interview --

24 A. Yes, ma'am.

25 Q. -- with Detective McCaskill?

Page 156

1 A. No, ma'am. We took him to the CID, Criminal

2 Investigation Division. And he wanted to use the

3 restroom. We got permission from our lieutenant and

4 the detective to go ahead and allow him to go to the

5 bathroom. And then we brought him back.

6 Q. All right. So him being taken to the

7 restroom was at his, at the Defendant's request?

8 A. Yes, ma'am.

9 Q. When you said that, he started crying and

10 saying, "I messed up."

11 A. Yes, ma'am.

12 Q. Was that in response to any questioning by

13 you and your son?

14 A. No, ma'am.

15 Q. Were you or your son questioning him in any

16 way?

17 A. No, ma'am.

18 Q. And your response to him was, "If you have

19 anything to say, just tell the truth"?

20 A. Yes, ma'am.

21     MS. HARTMANN: Pass the witness.

22         RECROSS-EXAMINATION

23 BY MR. MOORE:

24 Q. As far as you know, as far as this

25 investigation was concerned about this person who was

Page 157

1 using a credit card that didn't belong to them, do you

2 know of anyone who actually received that credit card

3 in Galveston from the person?

4 A. No, sir.

5 Q. So nobody that either received a stolen

6 check, forged check, wrong credit card in Galveston

7 Texas, as far as you're aware, nobody who had received

8 one of those gave the Galveston Police Department a

9 description of that person; do you follow me?

10 A. Yes, sir, I'm following you. I'm only going

11 based on what Officer Simpson, his investigation. And

12 he came in and told us that he's looking for this

13 suspect and supposed to be using a stolen credit card,

14 that he handled the investigation.

15 Q. Did he tell you that, well, this guy tried

16 to use it at the Diamond Shamrock and here's how they

17 describe him?

18 A. He did mention that he got a description.

19 That's the description I have there. That's what he

20 gave me.

21 Q. Okay. And that was of a 5'9, 150 to 175

22 pound dirty blond guy and he's 25 to 35 years old?

23 A. Yes, sir.

24     MR. MOORE: That's all I have. Thank you.

25     MS. HARTMANN: State has nothing further

Page 158

1 from this witness.

2 THE COURT: You may step down, sir.

3 (Witness exits the courtroom.)

4 MS. HARTMANN: State calls Cheryl Moffitt.

5 And, Your Honor, just for the Court's

6 enlightenment, the State intends to offer

7 some statements the Defendant made to Ms. Moffitt.

8 And we're merely trying to establish ahead of time

9 that these are statements made to a non-law

10 enforcement personnel. But I know that she had been

11 named in a prior motion by the defense, so we just

12 thought we'd address it pretrial.

13 (Witness enters the courtroom.)

14 THE COURT: Please raise your right hand.

15 (Witness sworn.)

16 CHERYL MOFFITT,

17 having been first duly sworn, testified as follows:

18 DIRECT EXAMINATION

19 BY MS. HARTMANN:

20 Q. Could you state your name?

21 A. Cheryl Moffitt.

22 Q. How are you employed?

23 A. I'm employed with Correctional Medical

24 Services of the Galveston County Jail as an RN and

25 administrator for the medical department.

Page 159

1 Q. All right. And were you so employed back on

2 April the 10th of this year?

3 A. Yes, ma'am.

4 Q. What were your specific duties and

5 responsibilities on that date?

6 A. Making sure the jail functions as a medical

7 department, checking inmates into the jail medically,

8 fit for incarceration, scheduling nurses, EMTs,

9 medication pass.

10 Q. And do you work for a law enforcement

11 agency?

12 A. No, ma'am.

13 Q. Are you a law enforcement agent?

14 A. No, ma'am.

15 Q. On or about April the 10th of this year, did

16 you come into contact with an inmate at the Galveston

17 County Jail by the name of Billy Jack Crutsinger?

18 A. Yes, ma'am.

19 Q. And do you see him in the courtroom today?

20 A. Yes, ma'am.

21 Q. Where is he located?

22 A. Right there (indicating).

23 Q. Okay. At the table to your right or left?

24 A. To the right.

25 Q. And if I'm person one and so on down the

Page 160

1 line, what number would he be?

2 A. Four.

3 MS. HARTMANN: Your Honor, at this time may

4 the record reflect that the witness has identified the

5 Defendant?

6 THE COURT: It will.

7 Q. (BY MS. HARTMANN) When you met with

8 Mr. Crutsinger, what was your purpose in meeting with

9 him?

10 A. To reevaluate him for medical housing in the

11 county jail.

12 MR. RAY: I'm sorry. I didn't hear all your

13 answer.

14 THE WITNESS: To reevaluate him for medical

15 housing, to make sure we placed him correctly in

16 housing in the jail.

17 Q. (BY MS. HARTMANN) All right. And the

18 procedure and protocol you followed in your meeting

19 with Mr. Crutsinger, is that the same procedure and

20 protocol you follow with every inmate there at the

21 Galveston County Jail?

22 A. Yes, ma'am.

23 Q. Were you at any time during your contact

24 with Mr. Crutsinger acting at the direction of law

25 enforcement agents?

Page 161

1 A. No, ma'am.

2 Q. Were you acting at the request of law

3 enforcement agents?

4 A. Yes, ma'am.

5 Q. Okay.

6 A. For his safety, for security to make sure we

7 had him within the right housing area.

8 Q. All right. Were you requested to ask him

9 any type of questions to incriminate himself?

10 A. No, ma'am.

11 Q. The questions that you asked him, are they

12 standard questions?

13 A. Standard questions.

14 Q. That are asked of everybody?

15 A. Every inmate that comes into the jail.

16 Q. All right. And the purpose of asking those

17 questions is for what?

18 A. A mental health evaluation.

19 Q. And that is for their assignment within the

20 confines of the jail?

21 A. Yes.

22 Q. Did any Fort Worth or Galveston detective or

23 police officer ask you to ask any specific questions

24 of the Defendant?

25 A. No, ma'am.

Page 162

1  Q. Is your purpose in asking these questions to
2  turn that information over to detectives or
3  investigators investigating criminal offenses?
4  A. No, ma'am.
5  MS. HARTMANN: We pass the witness.
6  CROSS-EXAMINATION
7  BY MR. RAY:
8  Q. How you doing, Ms. Moffitt?
9  A. Good, thank you.
10  Q. Did you make a report as a result of this
11 interview?
12  A. Yes, ma'am -- yes, sir.
13  Q. Have you got that with you?
14  A. Yes, sir.
15  MR. RAY: Can I approach the witness?
16  (Brief pause.)
17  Q. (BY MR. RAY) Now is there, this just looks
18 like a handwritten set of notes. Is there some little
19 checklist that the prosecutor was talking about?
20  A. Her questions, yes, sir. This is the first
21 set of questions all inmates are asked.
22  Q. I'm sorry. I didn't hear what you just said
23 to me.
24  A. That's an intake screening.
25  Q. Now, do I understand correctly that when you

Page 163

1 asked these questions, this is something you ask
2 everybody that comes in the Galveston County Jail; is
3 that right?
4  A. Yes, sir.
5  Q. Okay. And this appears to be kind of a form
6 that asks if you've seen a doctor, if you have a head
7 injury.
8  A. Yes, sir.
9  Q. Do you drink? Are you on drugs? That sort
10 of thing; is that right?
11  A. Yes, sir.
12  Q. And this is what you went over with him?
13  A. No, sir. I went over the 14-day mental
14 health right here. I asked him these questions. He
15 had already been evaluated mentally, a mental health
16 evaluation on an intake. This is a more elaborate
17 questionnaire.
18  Q. I guess what I'm getting at is when a person
19 comes into the Galveston County Jail and you go over
20 this little blank form, not blank form, but just kind
21 of a medical history, is that done with everybody when
22 they come in?
23  A. Every single person. We have to do that
24 before they can book them in to make sure they're fit
25 for incarceration.

Page 164

1  Q. Okay. This is kind of a form to see if
2 they've got anything the matter with them that you
3 might have to take them to the hospital for?
4  A. Yes, sir. And then here is the mental
5 health evaluation form.
6  Q. Now, does everybody that comes into the
7 Galveston County Jail have this mental health
8 evaluation form?
9  A. Yes, sir.
10  Q. How is it, then, that you got called -- and
11 these are not forms that you filled out, correct?
12  A. No, sir. This is the one I filled out.
13  Q. The one that you filled out was a day later?
14  A. No, the same day.
15  Q. April the 10th, about four hours later; does
16 that sound about right?
17  A. Four or two, I'd have to look. This was
18 done at 12:00 noon on 4:10 and mine was done --
19  Q. 14:45?
20  A. -- 2:45.
21  Q. Couple hours later?
22  A. Yes, sir.
23  Q. What I'm trying to find out is everybody
24 that comes in the jail gets the initial screening?
25  A. This one is a mental health evaluation, yes,

Page 165

1 sir.
2  Q. Is that this observation?
3  A. That is a 14-day mental health evaluation.
4 Everyone that is in the facility within 14 days has a
5 mental health and medical screening to make sure we
6 didn't miss anything at intake.
7  Q. So everybody is going to get this?
8  A. Yes, sir, eventually.
9  Q. Eventually if they're in jail that long?
10  A. If they're still incarcerated, yes, sir.
11  Q. Even if they don't complain or any give you
12 any indication that they have some abnormal behavior?
13  A. Yes, sir. They have the right to refuse,
14 but everyone is given the opportunity to have that.
15  Q. So if I go down to Galveston this afternoon
16 and I get arrested for DWI --
17  A. You'll see a nurse before you see an
18 officer.
19  Q. I'm going to see a nurse, the nurse is going
20 to go over this form that says do I have epilepsy,
21 have I ever tried to commit suicide, have I had a head
22 injury, all those things?
23  A. Yes, sir.
24  Q. And then you're going to come along; is that
25 right? Or someone is going to come along a couple

Page 166

1 hours later and talk to me again?
2 A. No, sir.
3 Q. That's not normal then?
4 A. No, sir.
5 Q. Why is it that you came along two hours
6 later, then?
7 A. It was a high-profile case. We were worried
8 about his safety.
9 Q. When you say high-profile, what was
10 high-profile about it?
11 A. It would've been in the newspaper the day
12 before, suspected inmate or the person.
13 Q. Okay. Now, let's back up for a minute.
14 The newspaper, the Galveston newspaper?
15 A. The newspaper or the sheriff's department
16 had been talking about that he would be coming from
17 the city jail into our facility.
18 Q. Okay. Y'all don't have a city/county jail?
19 A. We have a Galveston City and a Galveston
20 County Jail.
21 Q. And those are two different places?
22 A. Two different places.
23 Q. All right. So let me back up. He was at
24 the city jail and y'all kind of heard through the
25 grapevine he was coming over?

Page 167

1 A. Yes, sir.
2 Q. And this was a big case?
3 A. Yes, sir.
4 Q. High-profile case?
5 A. Yes, sir.
6 Q. And so that's why you went over to see him?
7 A. To reevaluate for medical housing.
8 Q. And let's just -- what did you think he was
9 in jail for? What was your understanding of why he
10 was in jail when you went to interview him? What was
11 high-profile about it?
12 A. It had been a possible murder case.
13 Q. Okay. A murder case. And so why is it,
14 then, that you went over to visit him? Just as a --
15 A. Just to make sure -- this intake right here
16 shows jail population. And I just wanted to make sure
17 he was okay to go into population.
18 MR. RAY: Okay. That's all I have. I'd
19 like to make some copies of this if I could. But I'll
20 pass the witness.
21 MS. HARTMANN: You should have those.
22 MR. RAY: Let me make sure I've got these
23 copies and I'll give them back to you. I think I do.
24 I'll pass the witness.
25 MS. HARTMANN: Just very briefly.

Page 168

1 REDIRECT EXAMINATION
2 BY MS. HARTMANN:
3 Q. The 14-day mental health evaluation, that
4 happens with everybody?
5 A. Yes, sir -- yes, ma'am, if they're here 14
6 days after being initially arrested.
7 Q. All right. And you said that because he was
8 a possible suspect in a high-profile type case, y'all
9 were concerned about his safety?
10 A. His safety. We didn't want anything to
11 happen to him in our facility.
12 Q. Okay. And talking frank, this was a suspect
13 out of -- for another county?
14 A. That we were holding so they could come
15 get. And just protecting him from himself and didn't
16 want -- the end of the road had come, something
17 high-profile, we didn't want him to commit suicide.
18 There was nowhere else to turn.
19 Q. Y'all didn't want anything to happen on your
20 watch?
21 A. Yes. Nothing was going to happen to this
22 inmate while he was in our jail.
23 Q. And when I asked you earlier about were you
24 acting at the request of law enforcement and you said
25 yes, I'm confused. What did you mean by that?

Page 169

1 A. On housing, high-profile case we house
2 within the medical facility. The EMT did not know he
3 was a high-profile case, he answered appropriately no,
4 no, no. Any other inmate we sent to general
5 population like the paramedic EMT did.
6 Captain and major both said, Ms. Moffitt,
7 Crutsinger is here, where are you housing him? And I
8 told him, Let me go get the intake. And Joe had said
9 he was in general population. They said, Well, you
10 might want to double-check.
11 So I went to reevaluate.
12 Q. Okay. So there were extra precautions taken
13 for Mr. Crutsinger's sake?
14 A. For his safety.
15 Q. Okay. All right. But you didn't go and do
16 this 14-day mental health evaluation at the request of
17 any detective or investigator or police officer that
18 had to do with this case?
19 A. No, ma'am.
20 Q. It was basically jail protocol?
21 A. It was jail protocol. The basic questions
22 for mental health had been asked. I knew this was the
23 next step as an RN, because the RNs are the ones that
24 do these 14-day mental health. So I knew these had
25 more elaborate questions on psychiatric mental health

Page 170

1 evaluation. So that's where I got the questions from.
2    Q. Okay. And they weren't questions that you
3 made up or somebody handed to you?
4    A. No, ma'am.
5       MS. HARTMANN: All right. Thank you. I
6 appreciate it. We pass the witness.
7       MR. RAY: Just a couple more questions.
8          RECROSS-EXAMINATION
9 BY MR. RAY:
10    Q. Ms. Moffitt, did you tell Mr. Crutsinger the
11 things he told you were going to be passed on to law
12 enforcement?
13    A. No, sir.
14    Q. Okay. You knew the things he told you were
15 going to be passed on to law enforcement, did you not?
16    A. At the time, no, I didn't when I first
17 started the evaluation.
18    Q. Well, he ultimately made some statements
19 about what had happened, did he not?
20    A. Yes, sir.
21    Q. Okay. You knew -- once he made those
22 statements, you knew exactly what was going to happen,
23 did you not?
24    A. Yes, sir. Because I didn't know what to do
25 with it.

Page 171

1    Q. Okay. You've been working for the Galveston
2 County Jail in that capacity for how long?
3    A. Since 1997.
4    Q. This wasn't the first time somebody had come
5 in and confessed to you in the jail, was it?
6    A. Yes, sir.
7    Q. Was it really?
8    A. Yes, sir.
9    Q. You never --
10    A. Never in my years of working, no one has
11 ever confessed anything.
12    Q. Let me back up again. In six or seven years
13 of interviewing people -- and I take it you
14 interviewed just almost everybody that goes in there.
15    A. No, sir.
16    Q. Well, do you interview every high-profile
17 case?
18    A. No, sir.
19    Q. How many interviews have you done?
20    A. I wouldn't have a clue.
21    Q. Well, is it quite a few?
22    A. A lot. Yes, a lot.
23    Q. And you've never had anybody tell you, Hey,
24 I committed this crime?
25    A. No, sir.

Page 172

1    Q. Never has happened?
2       MR. RAY: Ill pass the witness.
3       MS. HARTMANN: State has nothing further.
4       THE COURT: What date did the evaluation
5 take place?
6       THE WITNESS: On the 10th.
7       THE COURT: You may step down.
8       MR. RAY: Can I ask just a couple more
9 questions?
10          RECROSS-EXAMINATION CONT'D
11 BY MR. RAY:
12    Q. Did you tell Mr. Crutsinger that whatever he
13 told you was going to be strictly confidential?
14    A. Yes, sir.
15    Q. Okay. Well, it isn't, was it?
16    A. No, sir.
17    Q. You knew when you told him it was strictly
18 confidential after he told you what he told you that
19 you were going to get that right over to the sheriff's
20 department or the DA's office or whoever wanted it,
21 right?
22    A. Well, I took it to administration because I
23 didn't really know what to do with it.
24    Q. Why did you lie to him?
25    A. I didn't lie to him. I had no idea what he

Page 173

1 was going to tell me. Patient confidentiality, they
2 have the right to know. It goes over medication,
3 diagnosis, that kind of stuff. I was not expecting a
4 confession.
5    Q. Well, what I'm getting at is, I mean,
6 there's nothing that he told you that's confidential.
7 The fact that he told you he had a head injury in the
8 last six months, I mean, the answer to that question
9 is not confidential, is it?
10    A. They have the right to know.
11    Q. Okay. So the medical people in the jail
12 have a right to know about every answer he gives you;
13 is that what you're telling me?
14    A. Yes, sir.
15    Q. So when you told him -- he said he had
16 something he wanted to tell you; is that what
17 happened?
18    A. No.
19    Q. How did y'all get to this part about
20 committing crimes?
21    A. I asked him if he -- I would have to look at
22 my notes. It had to do with the violent behavior.
23       MS. HARTMANN: Your Honor, I'd request that
24 if defense counsel still has her notes, she have an
25 opportunity to review those.

Page 174

1  MR. RAY: Sure. Sure. I've still got one
2 page. I'm looking to make sure I've got copies of
3 it.
4  THE WITNESS: One of the questions was any
5 suicidal ideations, hallucinations. And then I asked
6 the victim if he has been the victim of a violent
7 crime or committed a violent crime. He teared up and
8 he dropped his head and answered, "Yes."
9  Q. (BY MR. RAY) Okay. So was that a question
10 you would ask everyone?
11  A. On the 14-day mental health evaluation, yes.
12  Q. So you've asked that question, then, before
13 of other people, right?
14  A. Yes, sir.
15  Q. And this is the first time anybody in the
16 history of your working in Galveston ever said, Oh, by
17 the way, I committed a crime?
18  A. Yes, sir.
19  Q. And when was the confidentiality statement
20 made? When did you tell him it'll be confidential,
21 before or after that question?
22  A. I honestly don't remember.
23  Q. But you knew whatever he told you, whether
24 he confessed to a crime or whether he just said I
25 haven't had my penicillin in the last three weeks, you

Page 175

1 knew that whatever he told you wasn't going to be
2 confidential?
3  A. Right.
4  Q. You knew when you told him that that you
5 were lying to him?
6  A. No, not lying.
7  Q. Well, what were you doing?
8  A. The jail administration had the right to
9 know whether it be he's seizure, whether he has high
10 blood pressure.
11  Q. But what I'm getting at, Ms. Moffitt, is you
12 knew everything that told you was going to go to jail
13 administration, right?
14  A. Not unless he -- his medical would not have
15 gone to jail administration had he not said what he
16 said.
17  Q. Well, his medical was going in a drawer
18 somewhere.
19  A. Yes, sir.
20  Q. And the jail administrator or the sheriff
21 could've looked at it if he wanted to.
22  A. It's their records, yes, sir.
23  Q. Sure. And so there was nothing that was
24 confidential in that record, right?
25  A. Yes, sir.

Page 176

1  Q. Okay. And yet you told him that -- he said
2 he had something he wanted to tell. And you said
3 it'll be confidential, it isn't going to go any
4 further than this room.
5  A. No.
6  Q. What did you tell him? I thought you just
7 told me you made that statement to him.
8  A. I don't understand what you're --
9  Q. Mr. Crutsinger said he had something he
10 wanted to tell you.
11  A. Okay.
12  Q. Is that right?
13  A. He didn't say that.
14  Q. Well, I thought you told me that he did.
15  A. Well, he didn't say in those words.
16  Q. Okay.
17  A. That I have something to tell you.
18  Q. Did he use words similar to that?
19  A. No, he just kind of, it just came out when I
20 asked that one question, Have you been the victim of a
21 violent crime or violent behavior.
22  Q. I'm sorry, Ms. Moffitt. I thought what you
23 told me was originally that he said he had something
24 he wanted to tell you and you said that it would be
25 confidential. Have I missed that?

Page 177

1  A. I didn't say that.
2  Q. Okay. Or that it wouldn't go any further
3 than here. And I'm not trying to tie you to those
4 specific words.
5  A. Right.
6  Q. Was the subject matter of you telling him
7 that it wouldn't go any further than you, was that
8 ever conveyed to him?
9  A. No, sir.
10  Q. Okay. Did you not just say that here in the
11 courtroom not too long ago?
12  A. I don't remember.
13  Q. Did you ever tell him that what he told you
14 would be confidential?
15  A. How I did the screening, I walked up and
16 told him who I was, who I worked for, that we were
17 reevaluating him for a medical housing and why he took
18 the Zoloft. I don't remember that.
19  Q. Did you say that here in the courtroom just
20 a little while ago?
21  A. I don't remember if I did.
22  Q. You don't remember if you just, I mean, in
23 the last 20 minutes, made the statement that, under
24 oath, that you told Mr. Crutsinger words to the effect
25 of what he told you either wouldn't go any further

Page 178

1 than you or would be confidential?
2     A. I didn't tell him it would go any further
3 than me.
4         MR. RAY: Judge, I would ask that the court
5 reporter read that back to her and maybe remind her of
6 it.
7         THE COURT: Okay.
8     (Requested portion read by the court reporter.)
9         MR. RAY: Can I proceed?
10         THE COURT: Let him load it back up.
11     Q. (BY MR. RAY) You just heard the court
12 reporter read you that question --
13     A. Yes, sir.
14     Q. -- that I asked you and the answer that you
15 gave. Does that refresh your memory about what you
16 said a few minutes ago?
17     A. Yes, sir.
18     Q. You told Mr. Crutsinger -- is that true?
19     A. That they asked him if it was confidential?
20     Q. If you told him it wasn't -- the question
21 that the court reporter just answered or read, I asked
22 you did you tell Mr. Crutsinger if it was going to be
23 confidential and you said yes. And that's what he
24 read back, that's what you testified to.
25         My question is, is that, in fact, what

Page 179

1 happened?
2     A. I do not remember telling him it was
3 confidential.
4     Q. Why did you tell me that it was a few
5 minutes ago?
6     A. I don't know. I don't remember discussing
7 confidentiality. I was just answering. I don't --
8     Q. Is there anything tricky about the question?
9     A. No, sir.
10     Q. Okay. Was I kind of looking out the side of
11 my head or talking out of the side of my mouth? I
12 asked you the question -- would you agree with me it
13 was a fairly simple question?
14     A. Very simple question.
15     Q. And no question you said yes?
16     A. I said yes.
17     Q. And now you don't remember if that's the
18 truth or not?
19     A. I do not recall that.
20         MR. RAY: Okay. I'll pass the witness.
21         MS. HARTMANN: State doesn't have anything
22 further, Your Honor.
23         THE COURT: You may step down, ma'am.
24         MR. RAY: And I did get a copy.
25 Ms. Hartmann has given me a copy of everything in her

Page 180

1 file.
2     Q. Did you get all your stuff back,
3 Ms. Moffitt?
4         THE WITNESS: Yes.
5         MR. RAY: Okay.
6     (Witness exits the courtroom.)
7         MS. HARTMANN: The State would rest at this
8 time, Your Honor.
9         THE COURT: Your turn.
10         MR. RAY: Well, now he's telling me yes and
11 no.
12         Yes, we're going to rest. No, we don't want
13 to put anything on?
14         MR. MOORE: We're gonna rest.
15         MR. RAY: We'll rest.
16         THE COURT: All right. Either side have any
17 objections, citations, authority, arguments?
18         MR. RAY: I have all of that.
19         THE COURT: All right. Go ahead.
20         MR. RAY: The Defendant is going to object
21 to anything that was obtained after he was arrested,
22 which is the evidence in the black bag, the statement
23 to the police, to Detective McCaskill, as well as the
24 statement to this lady, Ms. Moffitt, because his
25 arrest was not valid.

Page 181

1         I would cite the Court to this case of
2 Quick, Q-u-i-c-k v. State. It is at 999 sw2d, page
3 79, which is a Houston 14th Court of Appeals case
4 which holds that in a failure to identify case, the
5 issue is whether or not the Defendant would believe he
6 was free to leave. Anything that happens before the
7 point of his detainment does not substantiate the
8 charge of failure to ID.
9         The testimony in this case from Officer
10 Garcia, III, which is the Officer Garcia that actually
11 arrested the Defendant, was that he came into the bar,
12 he asked the Defendant what his name was, he didn't
13 answer. He asked the Defendant what his name was, he
14 gave him a fake name. He asked him where he was from,
15 he didn't answer. And then he detained him. Up until
16 that point, he was not detained, nor had the officer
17 given him any indication that he would be detained.
18         At that point, the officer took him outside
19 and arrested him for failure to ID. Failure to ID, as
20 the Court's aware, can be accomplished by -- or,
21 excuse me, that offense can be accomplished by a
22 couple of different ways. But the only one that
23 applies for a detainment, because clearly the
24 Defendant was not under arrest for some other offense,
25 nor was he a witness, which is the other two

Page 182

1 applications, the detainment, the only time that law,
2 the only time -- when you're detained, the only time
3 you can be arrested for failure to ID is if you
4 intentionally give a false or fictitious name,
5 residence or address or date of birth. None of that
6 happened after the Defendant was detained.
7       And this Quick case holds that until such
8 time as that happens, there is no offense. So for
9 that reason I would submit that the Defendant was not
10 legally arrested for any offense and everything that
11 happens after that is tainted, it's fruit of the
12 poisonous true under Wong Sun (phonetic) v. The United
13 States, the 4th and 14th Amendments, and Article 1,
14 Section 9 of the Texas Constitution.
15       The time frame from the time the Defendant
16 was arrested until he finished giving the statement to
17 Detective McCaskill was the statement ended at 2:06.
18 It began at 1:45. Detective McCaskill said he talked
19 to him about 15 minutes before that in regards to --
20 he said 30 minutes total, but about 15 minutes
21 actually about the statement. That everything else
22 appeared to be some sort of booking or procedural
23 matters, I guess. He didn't really elaborate on it.
24       And the Defendant was originally -- the
25 police officers originally started looking for him at

Page 183

1 about 11:20. And it was about 12:20 when he finally
2 got arrested. So if you go from 12:20 to 13:30,
3 that's about an hour from the time that he was
4 arrested. Then he was transported to the jail, which
5 is where he first met Detective McCaskill, which is
6 some 20 or 30 blocks away. Presumably then Detective
7 McCaskill had -- there was about a 30-minute time
8 frame from the time that he entered the Galveston
9 Police Department jail until the interrogation
10 started. I would submit that that's not attenuated,
11 it's not something that goes away by just the fact
12 that the Defendant was sitting in jail.
13       As far as what, the statements that were
14 made to Officer Garcia, Jr., which was the older
15 gentleman that testified, the father of Officer
16 Garcia, III, our position is that when he told the
17 Defendant to go ahead and tell the truth, that was a
18 coercive statement that he clearly didn't have to make
19 that gave the Defendant the impression that he needed
20 to go ahead and make that statement. In other words,
21 he was telling him that's what he ought to do. So we
22 would object to the statement on all those bases.
23       As far as the black bag is concerned, I
24 would submit that the search exceeded the scope of
25 what the officer, what Officer Garcia, III, said. He

Page 184

1 said he was looking for weapons, and yet he's talking
2 about receipts and clothing, which are clearly not
3 weapons, which are clearly -- exceeded the -- clearly
4 exceeded the scope of the search for any type of
5 administrative purpose.
6       In regards to the search of the hotel room,
7 the search is without a warrant. As the police
8 testified, there's no reason to believe that the
9 Defendant had checked out of his room. Ms. Hartmann
10 had filed a motion concerning the standing. And I
11 would submit to the Court that in the statement that
12 the Defendant gave to Officer McCaskill, he has
13 indicated that he, in fact, has standing because he
14 admitted using the credit card of one of the victims
15 in this case to purchase a hotel room, to purchase the
16 hotel room, which is where he had stayed.
17       So our position is he has standing. The
18 State didn't have a warrant. They certain didn't have
19 any exigent circumstances. They just simply went and
20 got a key and went over there.
21       As far as the testimony of Ms. Moffitt
22 concerning the oral statements that the Defendant made
23 to her in the jail, I would submit that her testimony,
24 first of all, it's incredible that -- uncredible in
25 that she forgot that she just told me that she had

Page 185

1 lied to the Defendant when, in fact, ten minutes later
2 she said she hadn't. And I would submit that her
3 statements, number one, she's an agent of the police
4 because she went over there specifically in a
5 high-profile case. That she was sent there, it was
6 not the normal course of her duties to even do the
7 interview that she did. And second of all, she
8 doesn't have a good memory of what she did since she
9 forgot what she told him.
10       I think that's it.
11       MS. HARTMANN: First of all, Your Honor, in
12 addressing the Defendant's claim that he has standing
13 to contest the search of Room No. 101 of the Seahorse,
14 while it is true that defense counsel has pointed in
15 the Defendant's statement he admitted to using the
16 credit card to rent a room, he does not specifically
17 say Room No. 101. And it exceeds the bounds of the
18 credibility to claim that you have standing to contest
19 a search of a room that was rented out in someone
20 else's name and using a stolen credit card. The
21 Defendant absolutely has not shown that he has any
22 standing to contest the search of Room No. 101 at the
23 Seahorse Motel.
24       Second of all, Cheryl Moffitt testified that
25 she's an RN, she was not acting at the behest or

Motion to Suppress 8-22-03    Multi-Page™    State vs. Billy Jack Crutsinger Vol. 7

Case 4:07-cv-00703-Y Document 86-1    Filed 11/03/17    Page 71 of 72   PageID 3637

Page 186

1 request of any law enforcement member or agency. That
2 the process that she took with this Defendant was a
3 process taken with everyone who is booked in to the
4 Galveston County Jail. That she saw him sooner than
5 she might normally have seen him because she was given
6 word that he was a suspect in what appeared to be a
7 high-profile case.
8        And to be quite honest, Galveston did not
9 want anything to happen to him in their jail because
10 he was not their suspect. And they took extra care
11 with him in getting her down there to make sure he had
12 an absolute mental health screening as soon as
13 possible, which is something he would've gotten at
14 some point anyway.
15        She was acting within the normal course of
16 her duties and was not acting -- again, was not
17 working as a state agent, she was not working at the
18 request or as an agent of law enforcement pursuant to
19 any type of police practice.
20        And the State can cite the Court to a number
21 of cases that specifically address the role of a jail
22 nurse. One such case would be Johnston v. State, 959
23 sw2d 230 at 240. It's a Dallas Court of Appeals
24 case.
25        And also there was a Court of Criminal

Page 187

1 Appeals case, Josie Paez, P-a-e-z, v. State of Texas.
2 And that is a Court of Criminal Appeals case from
3 1984.
4        In addition to Hates v. State, which is a
5 Court of Criminal Appeals case from 1989. And they
6 discuss people who may work for the State, but are not
7 necessarily acting as extensions of law enforcement.
8        So the State would submit that any
9 statements the Defendant made to Cheryl Moffitt, while
10 they were made while he was in custody, they were not
11 made to a law enforcement official and therefore she
12 had no duty to mirandize him. She stated that the
13 Defendant was told that the evaluation was voluntary,
14 and he apparently agreed to it.
15        Insofar as the statement to Detective
16 McCaskill is concerned and the items of evidence that
17 were obtained as a result of that statement or as a
18 result of the arrest, the State's first contention is
19 that there was a lawful detainment and a subsequent
20 lawful arrest. Defense counsel leaves out the facts
21 as stated by Officer Garcia, III, that the point of
22 detainment was when he asked the Defendant to turn
23 around, place his hands behind his head and he walked
24 him out of the bar.
25        And I believe the testimony is clear that at

Page 188

1 that point he is certainly not free to leave, he has
2 been seized and that he had been lawfully detained.
3        That the Defendant subsequently gave a false name and
4 a false date of birth both and that he was arrested
5 for failure to ID under 38.02 of the Texas Penal
6 Code.
7        If, in fact, the Court chooses to find that
8 that arrest was not legal, the State's second argument
9 would be that any taint from that illegal arrest was
10 sufficiently attenuated by virtue of an intervening
11 circumstance, which I believe out of the factors is
12 one of the most crucial. The time element is not.
13 The case law is very clear on that.
14        The intervening circumstance here is that
15 Mr. Crutsinger reinitiated contact with law
16 enforcement by telling Officer Garcia, Jr., once
17 Detective McCaskill had left the room, that he wanted
18 to talk to the detective. He wanted to talk. He had
19 messed up.
20        The Defendant's reinitiation of contact with
21 law enforcement is of high enough quality that any
22 taint that the Court may find, if it so chooses to
23 find, is sufficiently attenuated. And the statement
24 was given on a voluntary basis, it was made
25 intelligently and knowingly. That's presented through

Page 189

1 the evidence.
2        Finally, Your Honor, if the Court so chooses
3 to find that the taint has not been sufficiently
4 attenuated, the evidence of the clothing that was
5 recovered as a result of the Defendant's statement to
6 the police would fall under the provisions of 38.22(3)
7 section (c), I believe. Let me just make sure of
8 that, to site to the Court the correct provision.
9 38.22 section (3)(c), which states that statements
10 which contain assertions of fact or circumstances that
11 are found to be true and which conduce to establish
12 the guilt of the accused, such as the finding of
13 secreted or stolen property or the instrument with
14 which he states the offense was committed.
15        Clearly we have clothing that is found where
16 the Defendant says it is and it has his blood and both
17 victims' blood on it.
18        THE COURT: But if there's still a taint
19 from the illegal arrest, how would that statement be
20 admissible?
21        MS. HARTMANN: Well, the State's position,
22 of course, is that it was not an illegal arrest.
23        THE COURT: But you said if there was an
24 illegal arrest, that the taint had been removed by the
25 fact there were intervening circumstances.

| Page 190 | Page 192 |
|---|---|
| 1     MS. HARTMANN: That's correct.<br>2     THE COURT: If I don't find that the taint<br>3 was removed, then these statements are admissible<br>4 under the 38.22 provision you cited?<br>5     MS. HARTMANN: That would be the State's<br>6 position, yes.<br>7     And as far as the black duffel bag, the<br>8 officer testified he did a cursory weapons search.<br>9 And I don't know how defense counsel believes that<br>10 people conduct searches by narrowing their eyesight<br>11 only to weapons. I mean, it's obvious when you open a<br>12 bag, you're going to see other things that are in<br>13 there. I think it's ridiculous to try and claim that<br>14 the officer did a search by noticing what else was in<br>15 the bag when he was looking for weapons. He testified<br>16 he zipped the bag back up and the bag was not actually<br>17 searched for evidence until the Defendant signed a<br>18 Consent to Search form.<br>19     MR. RAY: Judge, if I could just make two<br>20 little points that I didn't make. And she certainly<br>21 may have an opportunity to respond to them. I just<br>22 forgot to make them.<br>23     First of all, as far as the search of the<br>24 motel, we don't know what they found. I still don't<br>25 know what they found. I don't know if they found | 1 silence, and the statute doesn't allow that. So<br>2 that's why I believe that the arrest was illegal.<br>3 That's all I have. She may want to respond to that.<br>4     That's all I have.<br>5     THE COURT: I don't have anything now. I'm<br>6 going to do some research on these points and I'll let<br>7 y'all know as soon as I can.<br>8     (Proceedings concluded.) |

| Page 191 | Page 193 |
|---|---|
| 1 anything. So assuming that the Court finds the search<br>2 is all right, I'd like some opportunity to have some<br>3 further argument. I think it's a little late in the<br>4 game to come up with what they found after the hearing<br>5 on the motion to suppress.<br>6     Lastly, on the issue of failure to identify,<br>7 Ms. Hartmann is exactly correct. And I think we have<br>8 all agreed as to when the detainment was. The problem<br>9 with what she said, and I just forgot to tell you, is<br>10 that once you're detained, then and only then can you<br>11 be arrested for failure to ID if you intentionally<br>12 give a false for fictitious name, residence address or<br>13 date of birth. The Defendant didn't do any of that<br>14 after he was detained. He was detained, then they<br>15 asked him some questions and he didn't answer.<br>16     Doesn't say refused to answer. You can<br>17 arrest someone -- if you're lawfully under arrest and<br>18 you refuse to answer, then you can be arrested for<br>19 failure to ID. But if you're only detained, the<br>20 statute says you have to give a false name or an<br>21 incorrect -- you have to tell them something. A<br>22 refusal to answer does not substantiate that. And I<br>23 didn't say that a few minutes ago.<br>24     Then they made the decision to arrest him<br>25 and take him to jail. But that was based solely on | 1 STATE OF TEXAS )<br>  COUNTY OF TARRANT )<br>2<br>3    I, William Shelton, Deputy Official Court<br>Reporter in and for the 213th District Court of<br>Tarrant County, State of Texas, do hereby certify that<br>4 the above and foregoing contains a true and correct<br>transcription of all portions of evidence and other<br>5 proceedings requested in writing by counsel for the<br>parties to be included in this volume of the<br>6 Reporter's Record in the above-styled and numbered<br>cause, all of which occurred in open court or in<br>7 chambers and were reported by me.<br>8    I further certify that this Reporter's Record of<br>the proceedings truly and correctly reflects the<br>9 exhibits, if any, admitted by the respective parties.<br>10    WITNESS MY OFFICIAL HAND on this the 30th day of<br>July, 2004.<br>11<br>12<br>13    WILLIAM SHELTON, CSR #4089<br>  Expiration Date: 12/31/2004<br>14   Deputy Official Court Reporter<br>  213th Judicial District Court<br>15   Tarrant County, Texas<br>16   6111 N. Beach St. #611<br>  Fort Worth, Texas 76137<br>17   Phone: (817) 366-4948 |