# REPORTER'S RECORD
## VOLUMES 27 THROUGH 33 OF 36 VOLUMES
### TRIAL COURT CAUSE NO. 0885306D

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | X | **IN THE DISTRICT COURT** |
| **VS.** | X | **TARRANT COUNTY, TEXAS** |
| **BILLY JACK CRUTSINGER** | X | **213TH JUDICIAL DISTRICT** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## TRIAL ON THE MERITS AND PUNISHMENT PHASE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FILED IN**
COURT OF CRIMINAL APPEALS

AUG 2 6 2004

Troy C. Bennett, Jr., Clerk

# A P P E A R A N C E S

HONORABLE MICHELE HARTMANN          SBOT NO.09167800
and
HONORABLE LISA CALLAGHAN            SBOT NO. 0116700
Assistant District Attorneys
401 W. Belknap
Fort Worth, Texas 76196
Phone:  (817) 884-1700                                    **FOR THE STATE**

ORIGINAL

HONORABLE WILLIAM H. RAY             SBOT NO. 16608700
5041 Airport Freeway
Fort Worth, Texas 76117
Phone:  817-831-8383
         And
HONORABLE TIM MOORE                  SBOT NO. 14378300
115 West 2nd Street
Suite No. 202
Fort Worth, Texas 76102
817-332-3822                                         **FOR THE DEFENDANT**

REPORTER'S RECORD
VOLUME 27 OF 36 VOLUMES
TRIAL COURT CAUSE NO. 0885306D

| | | |
|---|---|---|
| THE STATE OF TEXAS | X | IN THE DISTRICT COURT |
| VS. | X | TARRANT COUNTY, TEXAS |
| BILLY JACK CRUTSINGER | X | 213TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRIAL ON THE MERITS CONTINUED

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On September 22, 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Robert K. Gill, Judge presiding, held in Fort Worth, Tarrant County, Texas.

Proceedings reported by computerized stenotype machine.

## A P P E A R A N C E S

HONORABLE MICHELE HARTMANN
      and                                                   SBOT NO.09167800
HONORABLE LISA CALLAGHAN
Assistant District Attorneys                        SBOT NO.  0116700
401 W. Belknap
Fort Worth, Texas 76196
Phone:  (817) 884-1700
                                                                      FOR THE STATE


HONORABLE WILLIAM H. RAY
5041 Airport Freeway                                 SBOT NO. 16608700
Fort Worth, Texas 76117
Phone:  817-831-8383
          And
HONORABLE TIM MOORE
115 West 2nd Street                                   SBOT NO.  14378300
Suite No. 202
Fort Worth, Texas 76102
817-332-3822
                                                                      FOR THE DEFENDANT

## INDEX - VOLUME 27 - TRIAL ON THE MERITS

**September 22, 2003**                                                    **PAGE**

Discussion of Motions in Limine.................................................................. 2

Jury Sworn and Instructed by the Court...................................................... 9

Defendant Arraigned.................................................................................... 12

State's Opening Statement............................................................................ 12

Defendant's Opening Statement................................................................... 17

### STATE'S EVIDENCE

| NAME | DIRECT | CROSS | VOIR DIRE |
|---|---|---|---|
| Syren, April | 26 | 43 | |
| Greer, Robert | 44 | 61 | |
| O'Brien, Thomas | 69 | 79 | |
| Plowman, Todd | 83 | 88 | |
| McClenny, Brian | 90 | 99 | |
| Wells, Elvis | 104 | 115 | |
| Suggett, Geraldine | 117 | | |
| Crowell, Tammy | 125 | 131 | |
| Wilson, Glenn | 133 | | |

Reporter's Certificate................................................................................... 157

### INDEX OF EXHIBITS - VOLUME 27
### STATE'S EXHIBITS

| No. | Description | Offered | Received |
|---|---|---|---|
| 1 | Photo | 40 | 40 |
| 2 | Photo | 40 | 40 |
| 3 | Photo | 42 | 42 |
| 4 | Newspaper Article | 59 | -- |
| 5 | Photo | 61 | 61 |
| 7 | Large Photo | 15 | 15 |
| 8 | Diagram | 138 | 138 |
| 9 - 25 | Large Mounted Photographs | 140 | 140 |
| 26 - 41 | Large Mounted Photographs | 151 | 151 |
| 94 | Photocopy of Check | 129 | 129 |
| 115 | Photos | 111 | 111 |
| 116 | Envelope | 108 | 108 |
| 116-A | Documents | 123 | |
| 116-B | Documents | 108 | 108 |
| 117 | Envelope with Car Keys | 114 | 114 |
| 118-123 | Bags with Victims' Clothing | 115 | 115 |

## ALPHABETICAL INDEX OF WITNESSES - VOLUME 27

| NAME | DIRECT | CROSS | VOIR DIRE |
|---|---|---|---|
| Crowell, Tammy | 125 | 131 | |
| Greer, Robert | 44 | 61 | |
| McClenny, Brian | 90 | 99 | |
| O'Brien, Thomas | 69 | 79 | |
| Plowman, Todd | 83 | 88 | |
| Suggett, Geraldine | 117 | | |
| Syren, April | 26 | 43 | |
| Wells, Elvis | 104 | 115 | |
| Wilson, Glenn | 133 | | |

Page 1

```
 1              REPORTER'S RECORD

 2         VOLUME 27 OF   VOLUMES

 3        Trial Court Cause No. 0885306D

 4    THE STATE OF TEXAS    X   IN THE DISTRICT COURT

 5    VS.                   X   TARRANT COUNTY, TEXAS

 6    BILLY JACK CRUTSINGER X   213TH JUDICIAL DISTRICT

 7    -----------------------------------------

 8              TRIAL ON THE MERITS

 9    -----------------------------------------

10      On the 22nd day of September, 2003, the following

11  proceedings came on to be heard in the above-entitled and

12  -numbered cause before the Honorable Bob Gill, Judge presiding,

13  held in Fort Worth, Tarrant County, Texas:

14

15      Proceedings reported by computerized stenotype

16  Machine; Reporter's Record produced by Computer-Assisted

17  Transcription.

18

19

20

21

22

23          STEVE SCHILLER, Texas CSR No. 4665
                  Official Court Reporter
24            213th Judicial District Court
                  Tarrant County, Texas
25
```

Page 2

```
 1            PROCEEDINGS

 2         (September 22, 2003 )

 3         (Afternoon Session: )

 4         (Jury not present)

 5      THE COURT: Are both sides ready for the jury?

 6      MS. HARTMANN: State's ready, Your Honor.

 7      MR. RAY: Judge, we have a motion in limine that

 8  we filed this morning I'd like to take up at this time.  I gave

 9  the State a copy of it.  If they don't have copy, they can have

10  another one.

11      MS. HARTMANN: May we have a moment to review

12  it?

13      THE COURT: All right.

14      (Pause in the proceedings)

15      MS. HARTMANN: Your Honor, the State has no

16  objection to Item No. 1.  Item No. 2 is too with regard, any

17  acts of misconduct on the part of the Defendant.  That's what

18  we are here about.  So I don't really understand the specifics

19  of what that --

20      MR. RAY: They can try their case in chief.

21      THE COURT: No. 2 will refer to any extraneous

22  acts of misconduct.

23      MR. RAY: That's what I meant.

24      MS. HARTMANN: All right.  The State has no

25  objection to No. 3.
```

Page 3

```
 1      We have no objection to No. 4.

 2      I'm assuming No. 5 refers to offered into

 3  evidence witness statements?  It doesn't say that.

 4      MR. RAY: Well, what I'm getting at is if

 5  they've got a witness and then they have several that made

 6  police reports or that made statements to the police, I don't

 7  care for them talking about that.  I'm talking about some

 8  statement that would not in and of itself be admissible.

 9      I mean, obviously, if they refer to a statement

10  and the witness has reviewed it and goes through all the rules,

11  I don't mind them talking about that -- and I think Ms.

12  Callaghan even has a witness that after he gave a statement,

13  has recognized a picture of the Defendant.  I don't have a

14  problem with them talking about that.

15      My only concern is if it's a statement which

16  would not be admissible.  So I guess it's pretty much what it

17  says.

18      THE COURT: Granted.

19      MS. HARTMANN: And the State has no objection to

20  No. 6.

21      Number 7 we have got all the photographs.

22      MR. RAY: And I have seen them and they can

23  drive on with those.

24      MS. HARTMANN: State has no objection to No. 8;

25  No. 9; No. 10, assuming that it is reciprocal to both sides,
```

Page 4

```
 1  applies to both sides.

 2      THE COURT: They always are.

 3      MS. HARTMANN: No objection to No. 11.

 4      No objection to No. 12.

 5      Number 13 actually says that -- makes an

 6  incorrect statement because I believe the Court has ruled that

 7  the oral statement is admissible.  And we do intend to offer

 8  the 911 tape.  The Court has not ruled on that.  Do we need to

 9  have a hearing outside the presence?

10      MR. RAY: If they are going to offer the 911

11  tape, I would like the Court to listen to it.  It's our

12  position it is going to be hearsay.

13      THE COURT: Granted.

14      MS. HARTMANN: As to the Defendant's statement

15  as well?

16      THE COURT: Is it a recorded statement?

17      MS. HARTMANN: That's correct.

18      THE COURT: The motion says any recorded

19  statement the Court has not previously ruled admissible.

20      MR. RAY: Judge, if I might elaborate, there

21  is -- basically we have got two sets of recordings.  One is the

22  911 call, and one of the Defendant's statement.  I have said my

23  peace about the 911 call.

24      In regards to the Defendant's statement, it is

25  going to be our position that the Defendant's statement, until
```

Page 1 - Page 4

## Page 5

1 such time as they can show that it was done with an accurate
2 recording and hasn't been altered, that statement would not be
3 admissible.
4        What I'm really getting at in this is -- and
5 what I would ask that the Court exclude from the courtroom is
6 their tape recording machine that's sitting over here in front
7 of the jury until you have ruled that that's going to be
8 admissible; because you might not, and with the recording
9 device sitting in here, that tells the jury there is some audio
10 portion that they may or may not hear. I would just ask that
11 it be removed from the courtroom until it becomes admissible.
12        THE COURT: All right.
13        MR. MOORE: Do you want to listen to the 911
14 tape now?
15        THE COURT: No. With the modifications, the
16 motion in limine is granted.
17        Are both sides ready for the jury?
18        MS. HARTMANN: State's ready, Your Honor.
19        MR. RAY: Judge, I have about three more things
20 I would just like to put on the record. I think Ms. Callaghan
21 and I have a stipulation of evidence that we are not going to
22 get to today. She's indicated that's later on, so we can take
23 that up at a later point in time.
24        It's my understanding that the Court is going to
25 exclude television cameras from the courtroom as per counsel

## Page 6

1 for both sides' wishes.
2        THE COURT: That's correct.
3        MR. RAY: The State has indicated they have an
4 individual -- and I can't remember the lady's name -- that they
5 want to excuse from the Rule.
6        MS. HARTMANN: Linda Morris.
7        MR. RAY: Linda Morris. And we don't have any
8 objection to that. She is a fact witness, but what -- she's
9 not a fact of the offense. I think she discovered something in
10 the house later on. We don't have any objection to that.
11        The State has indicated they want to offer, I
12 believe, State's Exhibit 4, which is a copy of the Fort Worth
13 Star Telegram that was printed and published on the 11th of
14 April.
15        It's my understanding that the State's intent on
16 that newspaper is to show that one witness later saw a picture
17 of the Defendant in the paper and then realized that's the
18 person that he saw.
19        Certainly we don't have any objection to that
20 witness telling that; however, that newspaper article contains
21 matters which, number one, are inaccurate; number two, are
22 hearsay; number three, would relate to extraneous conduct on
23 the part of the Defendant. So we would object to the newspaper
24 article. And I think Ms. Callaghan has indicated she may have
25 some second plan on that. I will let her respond on that.

## Page 7

1        THE COURT: When will this be offered?
2        MS. CALLAGHAN: With the second witness, Mr.
3 Robert Greer.
4        THE COURT: Go ahead.
5        MS. CALLAGHAN: What we can do if this Court
6 decides that it is prudent is I can make a copy that redacts
7 most of the written information of the article, but the Xerox
8 will contain still the photograph of the Defendant's face,
9 which is the operative part, and we can offer that as a
10 redacted version.
11        THE COURT: Okay.
12        MS. CALLAGHAN: The remainder of the article is
13 irrelevant. So the Defense has said I can make the redacted
14 version and show it to them and see if they are satisfied.
15        MR. RAY: One last thing. I would ask that the
16 State indicate on the record that they know of -- and they
17 have given us everything in their file and they have been real
18 good about providing information to us as recently as this
19 morning. However, I would like for them to state on the record
20 that they have complied with Brady vs. Maryland and Kyle vs.
21 Whitley in that they have provided anything that relates to the
22 innocence of the defendant or might negate his guilt and would
23 also be useful in cross-examination and/or mitigation of
24 punishment in the event the Defendant is convicted for use at
25 trial.

## Page 8

1        And I would submit that that duty not only goes
2 to the two prosecutors and District Attorney's Office, but the
3 police department and other agents of law enforcement as well,
4 and I would just ask that they put that on the record.
5        MS. HARTMANN: We have complied with Brady. In
6 addition, we made an offer that was not taken up. The Defense
7 did not take up that offer. I offered to open up my trial
8 notebook for the Defense to review to see if there was anything
9 they were missing, they would be more than welcome to go
10 through my things and take a look at that. They didn't do that
11 for whatever reason, but we have we have complied with Brady v.
12 Maryland.
13        MS. CALLAGHAN: One thing for the record, Your
14 Honor. I asked Mr. Robert Greer this morning about some
15 medication I saw on his table when I talked to him. He told me
16 back in '99 or 2000 he had a brain tumor and that he took
17 medication for the brain tumor. He said to me that the
18 medication for the brain tumor affected his memory. That may
19 be something the Defense wishes to ask him about.
20        MR. RAY: I think we're ready.
21        THE COURT: Is the State ready?
22        MS. HARTMANN: State's ready.
23        (Jury present)
24        THE COURT: Good afternoon, ladies and
25 gentlemen. We're ready to start the trial. I have to place

Page 9

1 you under oath as jurors. Please raise your right hand.
2          (Jury sworn)
3          THE COURT: Now, the case is going to proceed in
4 the following order. I have a few instructions to read to
5 you. Following that, the State is going to read the indictment
6 and the Defendant is going to enter his plea to the
7 indictment.
8          After that, each side, first the State and then
9 the Defense, has the right to make an opening statement, which
10 is their opportunity to outline to you the facts they feel they
11 will prove during their portion of the trial of the case.
12          After the opening statements, the State is
13 allowed to call any witnesses they wish to call to back up
14 their accusations. When they rest, the Defense is given an
15 opportunity to present any witness they wish to present to
16 establish their defenses.
17          You will recall from the voir dire examination
18 that the Defense is under no obligation to present any
19 witnesses or to present any testimony.
20          After each side has presented everything that
21 they wish, they will rest and close. At that point I prepare a
22 document called the Court's Charge which contains all the law
23 that you will follow during your deliberations as well as any
24 definitions of terms that have a specific legal definition.
25          The charge is then read to you in open court,

Page 10

1 and following the reading of the charge, each side is allowed
2 to make a summation to you arguing what they feel they have
3 proven during the trial of the case, and then the case is yours
4 for deliberation.
5          The law applicable to the case will be contained
6 in the written Court's Charge and in the instructions I will be
7 giving you during the course of trial, and it is your duty to
8 follow all such instructions.
9          No statement, ruling, remark or facial
10 expression I may make during the course of testimony is
11 intended to indicate my opinion as to what you should believe
12 or how you should decide the issues in the case.
13          It is your duty to resolve the factual issues in
14 the case, and to this end you must decide upon the
15 believability of the evidence and its weight and value.
16          The evidence that you are to consider consists
17 of the testimony of witnesses and the exhibits admitted into
18 evidence.
19          You are allowed to make reasonable inferences
20 arising from the evidence, but you are not allowed to engage in
21 guesswork or speculation.
22          The admission of evidence is governed by rules
23 of law. From time to time it may be the duty of the attorneys
24 to make objections based on rules of law, and it is my duty as
25 Judge to rule on those issues. Since these are matters of law,

Page 11

1 you must not concern yourself with the objections or the
2 Court's reasons for the rulings.
3          You must not consider questions to which an
4 objection was sustained or testimony or exhibits that have been
5 ordered stricken.
6          The opening statements, questions and closing
7 arguments of the attorneys are not evidence. The purpose of
8 questions is to elicit evidence from the witness. The purpose
9 of the opening statements and closing arguments are to assist
10 you, if they do, in understanding the law and applying the
11 evidence to the law during your deliberations.
12          You must not be influenced in any degree by any
13 personal feeling of sympathy for or prejudgment against the
14 State or the Defendant in this case, for each is entitled to
15 the same fair and impartial consideration.
16          I don't allow jurors to take notes during the
17 trial because the notes are often given an unfair advantage
18 over persons' memories in the jury room during deliberations
19 even if they are taken incorrectly. Many times the notes are
20 taken incorrectly or inaccurately. Obviously in that
21 situation, the jury would be deliberating on false evidence,
22 and that would be highly improper.
23          There are a number of you in the jury box, and
24 the witness stand is right here in front of you. If you will
25 all pay careful attention to the testimony as it comes to you

Page 12

1 from the witness stand, I don't think you will have any
2 difficulty recalling it and deliberating on it when the time
3 comes.
4          Keep in mind that it is important that you pay
5 careful attention to all the testimony because it often becomes
6 evident during deliberations that something you felt was
7 unimportant when you first heard it is actually very important
8 in deciding the issues in the case.
9          The State may read the indictment.
10          (Indictment read by Ms. Callaghan)
11          THE COURT: Sir, to this indictment you may
12 plead guilty or not guilty.
13          THE DEFENDANT: Not guilty, sir.
14          THE COURT: You may be seated.
15          Does the State wish to make an opening
16 statement?
17          MS. CALLAGHAN: Yes, Your Honor.
18          THE COURT: You may proceed.
19          STATE'S OPENING STATEMENT
20          MS. CALLAGHAN: May it please the Court, Counsel
21 for the Defense, co-counsel.
22          Ladies and gentlemen, in April of 2003 there
23 were two more citizens in Tarrant County than there are now.
24 They were two ladies. They were Patricia Syren and Pearl
25 Magouirk. They lived together in a house on Scott Avenue on

## Page 13

1 the east side of Fort Worth. Pearl was 89 years of age, and
2 Patricia was 71. They were mother and daughter.
3          Now, the State's evidence will show you in this
4 case that Pearl Magouirk -- she never went by Pearl; she went
5 by R.D. -- R.D. was active, feisty, loved gardening.
6          The State's evidence will show you that her
7 daughter, Patricia, who went by Pat, was also in excellent
8 health and very active at 71 years of age.
9          The State's evidence will show you that she had
10 been married in the past to Mr. Syren and that they had
11 divorced, but that she was very close to her stepdaughter, who
12 was also her goddaughter, April Syren. So close, in fact, that
13 two days a week she would take care of April's daughter, Alexa,
14 at her home. After school she picked her up and took care of
15 her in her home.
16          The State's evidence will show you that Patricia
17 Syren was very active in the community; that she was a
18 voluntary receptionist at Meadowbrook Methodist Church and that
19 that, unfortunately, was her downfall. Because it was there,
20 it was at that church that she met this Defendant, Billy Jack
21 Crutsinger.
22          The State's evidence will show you that he came
23 there; that he did asbestos (sic) work and he came to the
24 church to do a job, to fill in a pothole in the parking lot,
25 for which he

## Page 14

1 was paid $300; and that because he was there and doing work,
2 Patricia decided there was work that needed to be done,
3 asbestos work; and that he came to her home, and that's how she
4 knew the Defendant.
5          The State's evidence will show you and you will
6 get to see photographs that they lived -- the ladies lived in a
7 very nice home. It was a nice house, it was well furnished, a
8 very nice house.
9          And the State's evidence will show you that on
10 April 6, 2000, this Defendant was down on his luck; that he was
11 under a bridge on the east side of Fort Worth not far from this
12 house and he started thinking. He started thinking about that
13 house. And he started walking.
14          And he walked all the way to that house and
15 knocked on the door and spoke to Patricia Syren about work;
16 and that he followed her through the house and out into the
17 back where she showed him an area in the back where some work
18 could be done.
19          And then they turned around, they came back to
20 the house, and while they were going through the kitchen, the
21 State's evidence will show you there was a knife on the
22 counter. And he picked up that knife and he stabbed them both
23 to death.
24          He stabbed Patricia nine times; he stabbed Pearl
25 seven times, twice in the back. And he cut them. He cut their

## Page 15

1 throat.
2          Now, the State's evidence will show you he then
3 went through the house to the front door and locked it. He
4 then went to Pat's purse, took her credit cards and her keys
5 and then went to the garage and took the Cadillac and drove
6 back to the hotel where he was staying.
7          And the State's evidence will show you at that
8 point it was party time. After abandoning the Cadillac in the
9 parking lot of a bar, he went to KFC, got chicken, fed his
10 buddies at the hotel, got a bus ticket and went out of town to
11 Galveston.
12          And the State's evidence will show you he went
13 to Galveston and used the credit cards there. But that was his
14 downfall. Because the State's evidence will show you that
15 Detective John McCaskill of the Fort Worth Police Department,
16 when the offense was discovered, it was discovered by April
17 Syren and by a neighbor, Mr. Robert Greer two days later when
18 Pat never went and picked up Alexa from school.
19          And when Detective McCaskill went in the house,
20 he saw there were messages on the answering machine. There
21 were messages from MasterCard wondering what the deal was, why
22 the card was being used in an unusual fashion.
23          And it was those messages that led those
24 detectives to Fort Worth and led them to the Defendant, and he
25 was apprehended in Galveston.

## Page 16

1          What you will hear is that the Defendant asked
2 to speak to Detective McCaskill. And at that time in
3 Galveston, first of all, Detective McCaskill noted there were
4 some injuries to the Defendant's hand.
5          He spoke to the Defendant, and a full confession
6 was given. You will hear from the evidence that Detective
7 McCaskill had samples taken from the inside of the Defendant's
8 cheek cells to be used in DNA analysis.
9          You will find that as a result of this
10 conversation with the Defendant, a crime scene officer was sent
11 out to the dumpster next to the Cowboy Inn Motel and that at
12 that location clothing was recovered, bloody clothing that
13 belonged to the Defendant.
14          You will learn that he referred the matter to
15 the DNA expert. Carolyn Van Winkle of the Tarrant County
16 Medical Examiner's Crime Lab did a DNA examination and
17 discovered that there was blood from the Defendant's injury on
18 the inside of the victim's house and there was blood from the
19 victims on that bloody clothing found in the dumpster. There
20 is DNA evidence there.
21          Now, how is it the State will prove all of this
22 to you? Well, we will bring you April Syren and Mr. Greer to
23 talk to you about how these victims were found. We will bring
24 to you police officers who preserved the crime scene, preserved
25 the evidence, obtained the information necessary to find this

CondenseIt™

Page 17

1 individual.

2          We will bring you Detective McCaskill to tell
3 you about how he followed the trail all the way down to
4 Galveston and then returned. We will bring you information
5 from people who saw that credit card being used, people
6 employed in shops.

7          We will bring you information from the Medical
8 Examiner's Office from their DNA lab on how the examination was
9 done and the information that was obtained.

10          And finally we will bring you Dr. Nizam
11 Peerwani, who is the Medical Examiner of Tarrant County. He
12 will talk to you about the horrifying physical injuries that he
13 observed on these ladies and their cause of death.

14          We will ask you to think about, to consider, to
15 strain for every bit of information we bring you about this
16 case. Listen very carefully because at the conclusion of this
17 case, we will be asking you for a verdict of guilty for the
18 offense of capital murder against this Defendant, Billy Jack
19 Crutsinger. Thank you.

20          THE COURT: Does the Defense wish to make an
21 opening statement?

22          MR. RAY: Yes, sir.

23          DEFENDANT'S OPENING STATEMENT

24          MR. RAY: Ladies and gentlemen, probably the
25 hardest decision that you are going to make in your life is

Page 18

1 going to be in front of you in a few days. It will start when
2 I sit down, and it is going to continue for three or four or
3 five days.

4          And the reason it's going to be hard, the reason
5 it is going to be hard is because you are going to hear -- you
6 are going to hear about two people who none of us have ever
7 met. And they were probably two of the nicest, most caring,
8 most innocent, most giving -- just two of the finest ladies you
9 ever met if you had ever met them.

10          You are going to hear about them, and you are
11 going to hear about how they were murdered. And you are going
12 to hear about -- from the police officers who went to that
13 crime scene and that stepdaughter that went there, as well as
14 from the Medical Examiner.

15          This was a set of crimes that, I anticipate, was
16 committed in a rage. The evidence is going to show you that
17 these were rage, violent, evil. It is going to be hard for you
18 to digest just that information in and of itself. You are
19 going to have feelings of rage, and you probably should, when
20 you see those photographs over there. They are going to get to
21 them sometime today or tomorrow.

22          And then you are going to hear -- you are going
23 to hear about how the police came and they kind of started
24 digging around in all this and they weren't sure what they had
25 and they some names that might have been using this credit

Page 19

1 card that turned up missing, and as Ms. Callaghan told you, the
2 credit card started being used in a manner that was
3 inconsistent with its prior use, and that's what caused the
4 credit card company to call these two ladies' home.

5          And the police developed a name and a
6 description which doesn't fit that man over there. And they
7 went to Galveston because that's where the credit cards were
8 being used. There was a bus ticket that was bought -- I think
9 will show you that was purchased to go to Corpus Christi and
10 that the bus goes through Houston.

11          And the credit card was being used in Galveston.
12 And the police will tell you when they got down there, that the
13 Galveston, Texas Police Department, they had been talking to
14 Detective McCaskill; and they had been given the names and the
15 places of some of these places where credit cards had been
16 used, one of which was a place called the Seahorse Inn. If you
17 have ever seen it, it's a motel right there on Seawall in
18 Galveston. It's probably seen its better days. The credit
19 card was used there. There is not going to be any evidence
20 about who used the credit card.

21          Then there is going to be some testimony about
22 how the credit card was used at a few convenience stores. And
23 the police went to talk to some of these people at the
24 convenience store, and they developed somewhat of a
25 description. And the description that they developed was a 25

Page 20

1 year old man, weighed about 175 pounds with blond hair. And
2 the police will tell you that does not fit Mr. Crutsinger. It
3 doesn't fit his description.

4          Well, we go a little further along, and there is
5 a police officer, his name is Garcia -- there are two Garcia
6 police officers that you may hear from in this case, and one of
7 them happens to be the father of the other one. The younger of
8 the two kind of happenstance managed to go to this bar in
9 Galveston, which is not one of the bars you have probably been
10 to, a little place over on Stewart Avenue or Stewart Street at
11 about 57th, which interestingly is about three blocks from the
12 police department.

13          And he went inside that bar and he saw Billy
14 Jack Crutsinger. But he didn't arrest him because he didn't
15 fit the description. So he left.

16          And then the evidence is going to show you that
17 a short time later, he had a conversation with a lady that runs
18 another bar which is -- in this part of town there are two or
19 three little bars right there within four or five blocks of
20 each other. The lady called him and said, "Hey, I think the
21 person you are looking for is over here."

22          And the police went back and forth and back and
23 forth; and kind of the long story short here -- it will be told
24 in more detail. Officer Garcia ultimately went back to Tony's
25 Tavern and he saw Mr. Crutsinger there, and he arrested him.

**Condense It**

Page 21

1 And he arrested him without just cause.

2        The evidence is going to be that he arrested him
3 without a warrant and without any probable cause to believe
4 that he had committed a crime. Because up until that point,
5 Officer Garcia had no knowledge that Billy Jack Crutsinger had
6 committed a crime, any crime.

7        He arrested him and he took him to jail and he
8 was in contact -- or not necessarily Officer Garcia, but the
9 Galveston police were in contact with Detective McCaskill as he
10 was driving to Galveston from Fort Worth.

11        The evidence will show you that Billy Jack got
12 arrested about 11:20 or 11:30 in the morning, and within just a
13 few minutes of this arrest, which was illegal, he was
14 interrogated by the police.

15        He was interrogated. He gave a statement to the
16 police. He also gave the police a sample of his DNA, which you
17 may not know this, but the way they get the sample, they used
18 to stick a needle in your arm, and now they just swab your
19 cheek. But be that as it may, all of that was as a result of
20 the arrest that was clearly illegal.

21        Now, that's going to be enhanced by the fact
22 that Detective McCaskill, during jury selection of this case,
23 when about half of you had been talked to and about half of you
24 hadn't, Detective McCaskill came into this courtroom, stood
25 right here where I stand now; and he had gotten, unbeknownst to

Page 22

1 us, to Judge Gill, but not unbeknownst to the District
2 Attorney, he had gone right across the hall to another District
3 Judge and obtained a search warrant.

4        I believe the evidence is going to show you that
5 happened on about August 27 -- 26th or 27th. Judge Sharen
6 Wilson, she's a District Judge here in this courthouse. She
7 signed a search warrant, which the law allows a judge to do on
8 proper affidavit.

9        I anticipate you are going to see that
10 affidavit. She signed a search warrant that allowed Detective
11 McCaskill to obtain DNA from the Defendant, Billy Jack
12 Crutsinger.

13        And Detective McCaskill is going to tell you
14 he's about a 15 or 20 year veteran of the police department.
15 And the reason he went to get that search warrant is because
16 the State of Texas is worried. Worried about this arrest down
17 in Galveston. They were worried.

18        And there is going to be another little problem
19 come along here. That search warrant, I anticipate, you will
20 see -- you will hear evidence that search warrant was granted
21 without probable cause because I think you are going to be told
22 in this courtroom that before you can issue a search warrant,
23 there has to be an affidavit that goes with it that alleges
24 that a person has -- he's probably committed a crime. Doesn't
25 have to be beyond a reasonable doubt, obviously. It can be

Page 23

1 based on hearsay.

2        But that affidavit that Judge Sharen Wilson
3 signed, I submit to you that the evidence is going to show
4 either she didn't read it or she wasn't paying attention
5 because she signed a search warrant that was lacking of
6 probable cause.

7        Where is all this going? The evidence is going
8 to show you -- and I anticipate you are going to get an
9 instruction at the end that we talked about whether or
10 not evidence obtained in violation of the law can be used.

11        And that's the second part of your hard
12 decision. What you are going to hear in this case are just
13 absolutely horrible facts. They are absolutely horrible, and
14 there were never two people who are more deserving of life than
15 these two ladies. And there is not going to be one single
16 shred of disputed testimony on that. And they died a horrible
17 death and they had no reason to be in that position.

18        But the gut-wrenching testimony is going to come
19 when the police decided to arrest this man right over here.
20 They weren't even looking for this man.

21        MS. HARTMANN: Your Honor, I'm going to object
22 to argumentative.

23        THE COURT: Sustained.

24        MR. RAY: I anticipate the evidence will show
25 you they weren't even looking for this man. I anticipate that

Page 24

1 Officer Garcia's father, who is also Officer Garcia, I
2 anticipate he will tell you that when he saw Billy Jack
3 Crutsinger in the back seat of that Galveston police car, he
4 wondered what's he doing here, what is that guy doing here.

5        I anticipate that the Medical Examiner's Office,
6 which Dr. Peerwani is the head of, you will also find that they
7 do crime -- they do DNA testing and they did the DNA testing in
8 this case.

9        I anticipate that the evidence is going to show
10 you quite clearly and quite technically that there was a major
11 categorical flaw in the manner and the procedure that the
12 Defendant's DNA was analyzed in this case.

13        I anticipate you are going to hear some
14 testimony about how Billy Jack's DNA was on the steering wheel
15 of the car. I anticipate you will hear a lot of DNA evidence
16 and a lot of opinion that's going to place his DNA at the crime
17 scene and various things that would make good crime solving.

18        But the problem I anticipate you are going to
19 see when it is all over with is there is a major test that has
20 to be done. It is a very simple test. It just wasn't done.

21        So when all of that is over, when you have heard
22 all that testimony, we are going to stand up here -- actually,
23 Mr. Moore is going to stand up here, and he's going to ask you,
24 as hard as it is going to be, he's going to ask you that
25 because there was an illegal arrest and because there was a

## Page 25

1 problem with the arrest that even caused the State to try to
2 fix it, even though they didn't, and because the DNA wasn't
3 done properly, we are going to ask you to find Billy Jack
4 Crutsinger not guilty.
5          And that's going to be hard because you are
6 going to have heard about these two ladies, and this is going
7 to be hard. And that's why we asked every one of you if you
8 could do that if we got in that situation.
9          MS. HARTMANN: Objection to argumentative.
10          THE COURT: Sustained.
11          MS. HARTMANN: Ask the jury to be instructed to
12 disregard the --
13          THE COURT: Denied.
14          MR. RAY: Thank you.
15          THE COURT: Will both sides who have any
16 witnesses who are present have them come in to be sworn in at
17 this time?
18          MR. RAY: I believe we do, Judge.
19          THE COURT: If you are going to testify, please
20 raise your right hand.
21          (Witnesses sworn)
22          THE WITNESS: Everyone please state their name
23 for the record starting over here.
24          THE WITNESS: Thomas O'Brien.
25          THE WITNESS: Todd Plowman.

## Page 26

1          THE WITNESS: Brian McClenny.
2          THE WITNESS: April Syren.
3          THE WITNESS: Carolyn Ray Odoms.
4          THE WITNESS: Glen Wilson.
5          THE WITNESS: Linda Morris.
6          THE COURT: The Rule has been called for. That
7 means unless you are testifying, you have to remain outside the
8 courtroom and outside the hearing of any witness who is
9 testifying.
10          Before and after you testify, you cannot discuss
11 your testimony with any other witness or allow any other
12 witness to discuss their testimony with you.
13          Who will be the State's first witness?
14          MS. HARTMANN: April Syren.
15          THE COURT: Ms. Syren, please come up to the
16 witness stand. Everyone else please retire to the hallway.
17 Whereupon,
18          APRIL SYREN,
19 having been first duly sworn, testified as follows:
20          DIRECT EXAMINATION
21 BY MS. HARTMANN:
22   Q. April, could you introduce yourself to the members of
23 the jury.
24   A. I'm April Syren.
25   Q. April, what city do you live in?

## Page 27

1   A. I live in Fort Worth.
2   Q. Do you have any children?
3   A. I have one daughter.
4   Q. What is her name?
5   A. Alexa.
6   Q. How old is Alexa?
7   A. She's 12 years old.
8   Q. April, do you know someone by the name of Patricia
9 Syren?
10   A. Yes, I do.
11   Q. How do you know Patricia?
12   A. She's my godmother.
13   Q. How long has she been your godmother?
14   A. Since I was about two years old.
15   Q. I'm sorry to have to do this, but how old are you
16 now?
17   A. I'm 31.
18   Q. Do you know a lady by the name of Pearl, who also
19 went by R.D. Magouirk?
20   A. Yes, I do.
21   Q. How do you know R.D.?
22   A. She's my godmother's mother.
23   Q. Where -- back in April of this year, where did Pearl,
24 or R.D., and Pat live?
25   A. They lived together in Fort Worth, 2716 Scott Avenue.

## Page 28

1   Q. Is that an address in Fort Worth, Tarrant County,
2 Texas?
3   A. Yes, it is.
4   Q. Did anybody else live there with them?
5   A. No.
6   Q. Was that a house?
7   A. It is a house.
8   Q. Do you know back in April of this year how old
9 Patricia Syren was?
10   A. Patricia was 71 years old.
11   Q. How old was R.D., or Pearl?
12   A. R.D. was 89.
13   Q. Did either one of them work at that time?
14   A. They were both retired.
15   Q. And where was R.D. retired from?
16   A. She was a (inaudible).
17   Q. And Pat, where was Pat retired from?
18   A. She retired from Bell Helicopter.
19   Q. Did Pat and R.D. have a relationship with your
20 daughter, Alexa?
21   A. Yes, they did.
22   Q. Were they close as well?
23   A. Yes, they were.
24   Q. Were there any arrangements between Pat and you in
25 regard to Alexa?

## Page 29

1  A. Yes. She always helped me with Alexa's schedule and
2  between my work schedule. At that time she was picking her up
3  on Tuesdays and Wednesdays.
4  Q. After school?
5  A. After school.
6  Q. What city did Alexa attend school in?
7  A. Arlington.
8  Q. And where were you working back in April of this
9  year?
10  A. At a day surgery center in downtown Fort Worth.
11  Q. In what capacity?
12  A. As a nurse.
13  Q. I want to direct your attention back to the date of
14  April 8 of this year. Do you recall that being a Tuesday?
15  A. Yes, I do.
16  Q. Would that have been a day that Pat would normally
17  have gone to pick up Alexa after school?
18  A. Yes.
19  Q. During that day prior to the time which Pat would
20  have picked up Alexa, did you attempt any phone calls to Pat
21  and R.D.'s house?
22  A. Yes. I was going to get off a little early that day
23  and be able to pick her up, and I tried to call her at home and
24  got no answer.
25  Q. All right. Did the phone just ring, or did the

## Page 30

1  answering machine pick up?
2  A. The answering machine picked up.
3  Q. All right. Did you leave a message?
4  A. I believe so.
5  Q. When you didn't get any answer initially, did you at
6  some point drive over to Pat and R.D.'s house?
7  A. Yes. It is kind of on the way between there and
8  Alexa's school, so I stopped by.
9  Q. So you didn't have Alexa?
10  A. No.
11  Q. When you got to Pat and R.D.'s house, were there any
12  cars in the driveway?
13  A. R.D.'s car was in the driveway.
14  Q. What type of car did R.D. drive?
15  A. A green Ford Taurus.
16  Q. If you would, tell the members of the jury, did Pat
17  have a car?
18  A. Yes, she did.
19  Q. What type of car did she drive?
20  A. She drove a Cadillac.
21  Q. Was that Cadillac normally kept there in the
22  driveway, or was it kept somewhere else?
23  A. It was kept in a garage that you got to from a back
24  alley behind the house. It was a detached garage.
25  Q. Detached garage; is that correct?

## Page 31

1  A. Yes.
2  Q. So when you initially drive up that afternoon, do you
3  recall approximately what time it was?
4  A. Around 4:15, 4:20.
5  Q. All right. And was R.D.'s car in the -- you see
6  R.D.'s car in the driveway. What do you do, if anything, at
7  that point? Do you get out of the car?
8  A. I get out of the car, went up to the door and rang
9  the doorbell.
10  Q. Was there an answer?
11  A. No answer.
12  Q. What did you do after ringing the doorbell?
13  A. I just went back to my car and waited a few minutes.
14  Q. Do you know approximately how long it was that you
15  waited there outside the house?
16  A. 10, 15 minutes.
17  Q. What did you do at that point?
18  A. I decided that I would go ahead and go on over to my
19  boyfriend's, we had an errand to run, and then I would just
20  call her or catch up with them later, go back and catch up with
21  her later.
22  Q. Were you planning to pick up Alexa, or did you think
23  Pat would still do that?
24  A. She would pick her up from school, and then I would
25  pick her up later on.

## Page 32

1  Q. So at this point you are assuming that Pat is still
2  going to be picking Alexa up.
3  A. Right.
4  Q. Do you get to your boyfriend's house?
5  A. Yes.
6  Q. Did you get any phone calls from anyone while you
7  were there?
8  A. I get a call from my mother.
9  Q. What is your mother's name?
10  A. Linda Morris.
11  Q. And did she give you some information over the phone?
12  A. She said that Alexa --
13      MR. MOORE: We would object to the hearsay,
14  Judge.
15      THE COURT: Sustained.
16  Q. Without telling us what your mother said, did she
17  give you some information regarding your daughter?
18  A. Yes.
19  Q. All right. And at that point what did you decide to
20  do after receiving the phone call from your mother?
21  A. I dropped off my boyfriend and his dad at the car
22  shop and I proceeded to go to Alexa's school to pick her up.
23  Q. Was Alexa there at the school?
24  A. Yes, she was.
25  Q. Do you know whether or not when you drove up, she was

## Page 33

1 expecting you?

2   A. Yes, she was.

3   Q. And how is it you knew she was expecting that it
4 would be you picking her up when you drove up?

5   A. She had called me in the car.

6   Q. And did you tell her you were on your way to pick her
7 up?

8   A. Yes.

9   Q. Did you make any other attempts at that point to try
10 and get in touch with Pat and R.D.?

11   A. I tried to call a couple of times.

12   Q. Any answer?

13   A. No answer.

14   Q. Did you get the answering machine again?

15   A. Yes.

16   Q. Did you leave messages?

17   A. Yes.

18   Q. Did you decide to go anywhere with Alexa at that
19 point?

20   A. Yes. We went -- we decided to go over to Pat's to
21 see if they were home with --

22   Q. Was it unusual for Pat to have not picked up Alexa?

23   A. Very unusual. It had never happened before.

24   Q. And not give you any head-up notice?

25   A. Right.

## Page 34

1   Q. When you got to Pat and R.D.'s house there on Scott,
2 what did you and Alexa do at that point?

3   A. We had parked in the driveway. We went up to the
4 door. I range the doorbell several times. Alexa went around
5 the side gate thinking maybe they were out in the yard working
6 or something --

7   Q. Did they frequently work out in the yard?

8   A. Yes.

9   Q. Can you describe what the door situation was there --
10 was there one door or more than one door?

11   A. There are two doors.

12   Q. What type of doors are they?

13   A. The first door would be considered like a screen
14 door, and it is glass with bars; and the second door is a
15 wooden-and-glass door.

16   Q. Were you able to open the screen door?

17   A. Yes, I was.

18   Q. Did you notice anything in the screen door?

19   A. The keys were on the inside of the first door.

20   Q. Okay. So they would have been sandwiched between the
21 screen door and the actual house door?

22   A. Yes.

23   Q. Did you attempt to open up the door that actually
24 leads directly into the house?

25   A. Yes.

## Page 35

1   Q. Were you able to enter it initially?

2   A. No.

3   Q. What did you do at that point?

4   A. I went next door to the neighbor's, Charlotte Combs
5 and Michael, and asked if they had seen Pat or R.D.

6   Q. All right.

7   A. And --

8   Q. Without going into what they said, you asked them if
9 they had seen them.

10   A. Yes.

11   Q. Did you notice any items out in the driveway --

12   A. Yes.

13   Q. -- that you thought was unusual?

14   A. There was a couple of newspapers.

15   Q. When you say a couple, do you mean two?

16   A. Two.

17   Q. Was it unusual for those papers to be laying there?

18   A. Yes.

19   Q. After going over to Charlotte's house next door, what
20 did you do at that point?

21   A. I asked her if they had seen Pat or R.D. that day
22 because Pat had not picked up Alexa at school and I was
23 worried.

24   Q. Did you eventually go back over to Pat and R.D.'s
25 house?

## Page 36

1   A. Yes.

2   Q. Where is Alexa at this point?

3   A. She's inside Charlotte's house. Charlotte had said,
4 "Do you have a key?"

5       And I said, "Well, actually, there is keys in
6 the door. Let me go back."

7   Q. So you made a decision that Alexa would stay with
8 Charlotte.

9   A. Yes.

10   Q. Do you go back to Pat and R.D.'s house?

11   A. Yes.

12   Q. Are you by yourself at that point?

13   A. Yes.

14   Q. Are you able to open the door with the key?

15   A. Eventually, yes.

16   Q. Once you get the door open, what do you do next?

17   A. I open it just a little bit, kind of take one step
18 in, and I -- I put one foot in and yelled their name several
19 times. I immediately -- there was a really bad smell. One of
20 their little dogs, I could see, came forward a little bit and
21 kind of ran back.

22       And I could just see -- I could hear the TV on,
23 there was like one light coming from the hallway, and I noticed
24 some things knocked over over here just kind of like.

25       So, you know, immediately I thought something

Page 37

1 was terribly wrong, and at that point Michael and Charlotte
2 were approaching back towards the house --
3    Q. Let me ask you, who is Michael?
4    A. Michael was Charlotte's son who lives with her.
5    Q. So they are coming around the front of the house?
6    A. Right, up towards the porch. I told them to stop,
7 don't come any closer. Alexa had also come out of the house,
8 and I told them to call 911, something was wrong.
9    Q. At that point what are you thinking it looked like
10 had happened?
11    A. My first thought was a burglary.
12    Q. Because of --
13    A. Things knocked over.
14    Q. Did you yourself call 911?
15    A. I attempted to at that point on my cell phone. It
16 would not go through.
17    Q. What did you do at that point?
18    A. I walked back towards Charlotte. Charlotte then got
19 her phone and called.
20    Q. And did you speak with the dispatch operator in the
21 911 call?
22    A. Yes, I did.
23    Q. Did you ask for the police to come out?
24    A. Yes.
25    Q. Did you receive any indication that it was going to

Page 38

1 take a while for the police to get out there?
2    A. I don't recall. She just wanted all the information
3 that I could give her. I said, "It looks like a burglary. I'm
4 not for sure."
5    Q. At some point, did you want to -- did you get
6 concerned about whether or not Pat and R.D. were inside and
7 might need help?
8    A. Right.
9    Q. And did you tell the 911 operator you wanted go in
10 and check on them?
11    A. She actually asked me, "Is there anybody inside?"
12        I said, "I don't know, I just -- I have got my
13 daughter with me. I just started to step in, got scared and am
14 calling."
15    Q. All right. Did you get anyone to go inside the house
16 with you?
17    A. Yes, we did. Michael went across the street to one
18 of the neighbor's, Bob, and I stayed on the sidewalk and kind
19 of motioned for him to come over.
20    Q. Is that Robert Greer?
21    A. Yes.
22    Q. And he goes by Bob?
23    A. Yes.
24    Q. Did Bob meet with you there on the porch?
25    A. Yes, he did.

Page 39

1    Q. Did you tell him what you had observed --
2    A. Yes.
3    Q. -- and why you were asking him to be there with you?
4    A. Yes.
5    Q. Did the two of you go into the house itself?
6    A. Yes, we did.
7    Q. Who went in first?
8    A. Bob.
9    Q. Did you ask him to go in first?
10    A. (Witness nods head).
11    Q. Is that yes?
12    A. Yes.
13    Q. Okay. And how far did you all get into the house
14 before you were able to get some additional information to the
15 911 operator?
16    A. We walked toward the dining room maybe four or five
17 steps.
18    Q. And you were able to at that point give the 911
19 operator some additional information?
20    A. Right.
21    Q. Did you then leave the house at that point?
22    A. Once I saw what it appeared to be my godmother from
23 behind in the hallway, I became very upset and stepped back.
24 And the operator asked me -- wanted to know if they were
25 breathing, and so I asked Bob if he would check.

Page 40

1    Q. All right. And did Bob come back out of the house --
2    A. He had just taken a couple of steps, but he stayed in
3 the house, and he went forward and came back out of the house
4 and was shaking his head no.
5    Q. At some point soon after that, did the police arrive?
6    A. Yes.
7    Q. Was it discovered that -- were you present when it
8 was discovered that Pat's Cadillac was missing?
9    A. Yes.
10    Q. Do you know whether or not Pat had a cell phone?
11    A. She did.
12    Q. When would Pat use the cell phone?
13    A. Only when traveling usually.
14    Q. Okay.
15    A. Not very frequently.
16    Q. Not frequently?
17    A. No.
18        MS. HARTMANN: May I approach the witness?
19        THE COURT: Yes.
20    Q. April, I am going to show you what has been
21 previously marked for identification purposes as State's
22 Exhibit No. 1 --
23    A. Okay.
24    Q. -- and No. 2. Do you recognize those?
25    A. Yes, I do.

1  Q. Do State's Exhibits 1 and 2 fairly and accurately
2 depict the scene out there off of Scott Avenue back on April 8,
3 2003?
4  A. Yes, they do.
5     MS. HARTMANN: Your Honor, at this time the
6 State would offer State's 1 and 2.
7     MR. RAY: No objection.
8     THE COURT: 1 and 2 are admitted.
9     (State's Exhibit No. 1 and 2 received)
10    MS. HARTMANN: Permission to publish to the
11 jury?
12    THE COURT: All right.
13  Q. I'm going to show State's Exhibit No. 1. If you can
14 tell the members of the jury what is depicted there.
15  A. Pat and R.D.'s house.
16  Q. Is it the front of the house?
17  A. Yes, it is.
18  Q. State's Exhibit No. 2?
19  A. That's my truck.
20  Q. The white truck --
21  A. Yes.
22  Q. Is it parked at the location that you parked when you
23 and Alexa drove up?
24  A. Yeah, we parked in the driveway.
25  Q. Can you see R.D.'s green Ford Taurus? Do you need to

1 see it again?
2  A. Yes.
3  Q. So you pulled up right behind her Taurus?
4  A. Right.
5  Q. Can you also see one of the papers that you mentioned
6 to the jury?
7  A. Yes.
8  Q. I'm now going to show you what's been previously
9 marked as State's Exhibit No. 3. Do you recognize State's 3?
10  A. Yes.
11  Q. And does State's 3 fairly and accurately depict Pat
12 and R.D.?
13  A. Yes.
14    MS. HARTMANN: Your Honor, at this time the
15 State would offer State's 3.
16    MR. RAY: May I see it?
17    No objection.
18    THE COURT: 3 is admitted.
19    (State's Exhibit No. 3 received)
20    MS. HARTMANN: Permission to publish?
21    THE COURT: Yes.
22  Q. Did R.D. have any other children?
23  A. No, she did not.
24  Q. So it was just she and Pat?
25  A. Yes.

1  Q. Do you know if she had that cell phone with Cingular
2 Wireless?
3  A. Yes, she did.
4     MS. HARTMANN: We pass the witness at this time.
5     MR. RAY: May I proceed?
6     THE COURT: Yes.
7        CROSS-EXAMINATION
8 BY MR. RAY:
9  Q. April, tell me again your relationship with Pat and
10 R.D. How are y'all related?
11  A. She was married to my biological father.
12  Q. So did you know them all of your life?
13  A. Yes.
14  Q. Really nice folks?
15  A. Yes.
16  Q. I'm sorry for your loss.
17  A. All right.
18     MR. RAY: That's all I have.
19     MS. HARTMANN: We have nothing further.
20     THE COURT: You may step down, ma'am.
21     MS. CALLAGHAN: At this time, Your Honor, the
22 State would call Mr. Robert Greer.
23     MR. MOORE: Judge, could we approach real
24 briefly?
25     (Outside the hearing of the jury)

1     MR. MOORE: We have decided that this
2 newspaper -- we are going to object to them introducing even
3 this because it still has some information about it. If they
4 want to ask him if he saw a picture in the newspaper, that's
5 fine, but I just wanted to let you know ahead of time we will
6 object to it.
7     MS. CALLAGHAN: I need to ask Mr. Greer
8 questions about the 911 tape, so it might be a opportune moment
9 to take that up.
10     THE COURT: We can take the 911 tape up at the
11 conclusion of business today --
12     MS. CALLAGHAN: I have to ask Mr. Greer about
13 all the voices on --
14     THE COURT: Ask him.
15     MS. CALLAGHAN: Okay. So I'm going to have to
16 show it to him.
17     THE COURT: That's fine.
18     (In the hearing of the jury)
19     (Witness Sworn)
20 Whereupon,
21        ROBERT GREER,
22 having been first duly sworn, testified as follows:
23        DIRECT EXAMINATION
24 BY MS. CALLAGHAN:
25  Q. Would you please state your name for the ladies and

Page 45

1 gentlemen of the jury?

2   A. Robert L. Greer, Jr.

3   Q. Okay. You can bring that microphone up a little bit

4 so you won't have to lean forward.

5      Okay. And how old are you, sir?

6   A. 55.

7   Q. What do you go for a living?

8   A. I am a registered nurse and a respiratory therapist.

9   Q. How long have you been doing that?

10   A. 37 years.

11   Q. Where do you do that?

12   A. Right now I work at Kent's Nursing Center, 900 West

13 Leuda Street in Fort Worth.

14   Q. Is that like a nursing home?

15   A. Yes.

16   Q. What neighborhood do you live in?

17   A. I live in Meadowbrook at 2721 Scott Avenue, Fort

18 Worth, Texas.

19   Q. How long have you lived in that house?

20   A. About six years.

21   Q. Okay. Is it yours or do you rent it or --

22   A. No, I'm buying it now. I was renting it for five

23 years, and now for the last year I've been buying it.

24   Q. Okay. What kind of neighborhood is that? What is it

25 like?

Page 46

1   A. It's a nice neighborhood. It is an up-and-coming --

2 it was an older neighborhood, but it's -- you know, it's coming

3 back. People are moving back into it and restoring the homes,

4 and it's, you know, just a very nice neighborhood now.

5   Q. Okay. Does that neighborhood have a lot of people

6 who have lived there a long time?

7   A. Yes. It is an established neighborhood, and a lot of

8 the residents have been there for many years.

9   Q. Do people tend to know each other in that

10 neighborhood?

11   A. Yes, very well.

12   Q. Did you know Patricia Syren and Pearl Magouirk?

13   A. Yes, I did.

14   Q. How did you know them?

15   A. They lived right across the street from me.

16   Q. How long had you known them at the time of their

17 death?

18   A. The whole time that I have lived there for -- you

19 know, since I moved in there. They were some of the first

20 people that I met. Very friendly people, and they were, like I

21 said, the first two that welcomed me to the neighborhood.

22   Q. They were the Welcome Wagon?

23   A. Yes.

24   Q. Okay. Why don't we put the microphone back down?

25   A. Is it a little loud?

Page 47

1   Q. Yeah, you keep -- that's fine.

2      Did you go over there from time to time and talk

3 to the ladies?

4   A. All the time. I would go over there and sit and

5 drink coffee with them on their front porch from time to time,

6 and they were -- they were probably my best friends in the

7 whole -- out of everybody in that whole neighborhood.

8   Q. Okay. Now, what did you call Pearl Magouirk?

9   A. R.D.

10   Q. She didn't like to go by Pearl, right?

11   A. No.

12   Q. Okay. When you would go over there and talk with

13 R.D., what did you usually talk to her about?

14   A. Things in general. Most of the time it was

15 gardening.

16   Q. Was she a big gardener?

17   A. Yes. She had a big garden in the back of her house.

18   Q. Was she pretty much the queen of neighborhood

19 gardening if you needed a tip?

20   A. Right. Gardening, plants, things like that.

21   Q. Okay. Let me show you what is marked State's Exhibit

22 No. 1 for identification, which has already been admitted in

23 this case. Do you recognize this?

24   A. Yes. That's their front porch.

25   Q. And that's where Pat and R.D. lived together; is that

Page 48

1 correct?

2   A. Correct.

3   Q. Now, in relationship to this photo, where is your

4 house?

5   A. Directly across from it.

6   Q. Okay. Their house, which is pictured in State's

7 Exhibit No. 1, is that located in Fort Worth, Tarrant County,

8 Texas?

9   A. Yes.

10   Q. Now, can you tell us about the last time that you saw

11 the ladies?

12   A. Yes.

13   Q. Let's go back to April 6, 2003. Would that have been

14 a Sunday?

15   A. Yes, first day of Daylight Savings Time.

16   Q. So at 2:00 o'clock that morning, it had turned to

17 Daylight Savings?

18   A. Right.

19   Q. And about what time of day was it when you saw them?

20   A. I saw R.D. that morning. I had been -- I have an

21 Austin Stone house, and it had some mildew on it, and I had

22 been bleaching the stone.

23      So I walked across the street about 10:00 that

24 morning, and I was kind of getting R.D.'s opinion to see what

25 it looked like from her side of the street. So --

CondenseIt™

## Page 49

1   Q. What were you getting her opinion about, should you
2 do it some more or --

3   A. What it looked like in general after I had finished
4 that part of the house -- that front part of my house. And she
5 asked me to sit down and have some coffee with her that
6 morning, and I told her I didn't have time, I wanted to finish
7 up that part and get back because later that afternoon I had to
8 go see my tax man.

9   Q. So you had things you had to do.

10   A. Right.

11   Q. You said that was in midmorning?

12   A. Right.

13   Q. Did you happen to look out your window or look in
14 that direction later in the day?

15   A. Yes.

16   Q. About what time was it when you looked out there
17 again?

18   A. It was around 2:00, 2:30ish or so.

19   Q. So it was sometime at the beginning of the afternoon?

20   A. Right.

21   Q. Okay. Did you notice anything when you were looking
22 towards their house?

23   A. Yes. I saw Pat and R.D. sitting up on the front
24 porch when this gentleman had stepped on their porch with them.
25 And the three of them -- well, Pat and R.D. were sitting down.

## Page 50

1 And Pat and R.D. both got up, and the three of them went inside
2 the house, and then I left in my car.

3   Q. Okay. About how long did you look and see the man in
4 front of their house?

5   A. 30 seconds, 45 seconds to a minute maybe, not a real
6 long time, but -- because I thought it was unusual that Pat and
7 R.D. would have somebody come into their house. It's not
8 common for them to bring somebody in that -- that I thought
9 might be a stranger, you know, for them to come -- to go into
10 their house. So I kind of maybe dismissed it as maybe somebody
11 that went to their church or something like that.

12   Q. Okay. Now, you said this was a man that you saw?

13   A. Uh-huh.

14   Q. White, black, Hispanic?

15   A. White.

16   Q. A white male?

17   A. Uh-huh.

18   Q. Do you have any idea of his approximate age from what
19 you saw?

20   A. From what I saw I thought he looked around 60 or so.

21   Q. Did you notice anything about the appearance of his
22 hair?

23   A. It looked graying to white.

24   Q. Do you remember anything about his general build?

25   A. He was stocky built and appeared not real tall.

## Page 51

1   Q. Okay. You have said that he went -- followed them
2 into the house.

3   A. Right.

4   Q. And then that was on the 6th, which was a Sunday.

5   A. Right.

6   Q. All right. Let's go to the 8th of April, two days
7 later, Tuesday. Between that afternoon on the 6th and April 8,
8 do you recall ever seeing them?

9   A. No.

10   Q. Okay. On the 8th did something unusual happen when
11 you got home from work?

12   A. Yes. I was -- pardon me. I was sitting in my chair
13 in the living room when Michael Combs, one of the neighbors on
14 the other side of Pat and R.D., came knocking hard on my front
15 door and said there is something wrong over at Pat and R.D.'s.,
16 and he wanted me to come over.

17   So I did, and April was -- April's the
18 Goddaughter of Pat, and she said something is wrong, something
19 is not right; that she said she started going into the house,
20 and things were not right, like the house had been robbed or
21 something to that effect, and she asked me to go in and Pat
22 didn't -- that Pat didn't come pick up her daughter from school
23 that day.

24   Q. What was her emotional state when she was telling you
25 this?

## Page 52

1   A. She was very upset and nervous, and she was very
2 worried that -- she just knew something wasn't right in the
3 house, but she was afraid to go into the house.

4   And that's why she sent Michael over to come
5 pick me up -- I mean to get me to go in.

6   Q. And what happened once you got over there to the
7 house?

8   A. I went to the -- into the front door, and I noticed
9 there were some -- first thing I noticed, looked like there was
10 some blood drops right at the entry hallway.

11   And I went on in and entered past the formal
12 living room and the more casual living room. And I took a
13 look, and I saw both Pat and R.D.'s bodies in the short hallway
14 there by the bathroom inside, and then I just kind of backed
15 myself back out of the house.

16   And April -- I told April they were in the
17 house, and --

18   Q. April was able to understand what you were saying?

19   A. Yes. She -- I didn't go into any detail or anything
20 like that, but she got what I was saying.

21   Q. Now, you said that you noticed in the front hallway
22 there were some droplets of blood?

23   A. Right. There is a Terrazzo tile entry hall there,
24 and it looked like about a quarter-size blood drops. That's
25 what it appeared.

Page 53

1 Q. And as you go into the house, there is an informal
2 living room on the left and on the right.
3 A. Yes.
4 Q. And straight ahead of you is the dining room.
5 A. Right.
6 Q. Okay.
7 A. And then there is the kitchen. Then you can take a
8 left, and it's just a little short walk, and then there is a
9 real short hallway there and there is a bathroom right there
10 in that little short hallway.
11 Q. And their bodies were located in that hallway in
12 front of the bathroom.
13 A. Right.
14 Q. That's what you were saying.
15 A. Right.
16 Q. When you went into the house and saw this, did you
17 notice any odor in the house?
18 A. Yes. There was a very strong odor. Working in the
19 hospital field, I have smelled that smell before of someone who
20 had died, that death smell, and it was quite obvious.
21 Q. Was it pretty apparent to you that they were dead
22 when you came in?
23 A. Yes.
24 Q. Did you ever touch their bodies when you --
25 A. No, I did not touch any walls or touch the bodies or

Page 54

1 disturb anything as I entered or left the house.
2 Q. Now, when you told April what you had to tell her,
3 what was her emotional state at that time?
4 A. She became even more upset, and I think, if I'm not
5 mistaken, she sat down in one of the ambulance -- one of the
6 ambulances, if I'm not mistaken. She was so distraught over
7 everything.
8 Q. Okay. Now, at some point during that, was a 911 call
9 made?
10 A. Yes.
11 Q. And when was that approximately?
12 A. I think that she was calling 911 about the same time
13 I was coming over to the house and going into the house.
14 Q. Okay. And subsequently was a call made where you
15 were also on the phone?
16 A. Yes.
17 Q. All right. So both April and you spoke to 911?
18 A. I didn't actually speak to -- I was in the -- I
19 think --
20 Q. Your voice can be heard in the background?
21 A. Right.
22 Q. You didn't literally take the phone, but your voice
23 could be heard.
24 A. Right.
25 MR. RAY: Excuse me. I'm going object to

Page 55

1 what -- sounds to me like she's telling him what to say, and I
2 object to that. Maybe she's not intentionally doing --
3 THE COURT: Sustained.
4 MR. RAY: Thank you.
5 Q. Can you tell us how it was?
6 A. My voice is heard in the background of the 911 call.
7 MS. CALLAGHAN: Approach the witness, Your Honor?
8 THE COURT: Yes.
9 Q. Let me show you what is marked State's Exhibit No. 6
10 for identification in this cause. Did you have an opportunity
11 to listen to this tape and listen to the 911 call we just
12 discussed?
13 A. Yes.
14 Q. Were you able at that time on this tape to recognize
15 any voices on that tape in the 911 call?
16 A. Yes.
17 Q. Whose voices do you recognize?
18 A. April and mine.
19 Q. All right.
20 A. And, of course, the 911 lady?
21 Q. The --
22 A. The dispatcher. And then -- yeah.
23 Q. The 911 dispatcher, do you remember the voice you
24 heard of the 911 dispatcher as being the same person?
25 A. Yes. Because she gave a number to reach her back if

Page 56

1 she got -- to get off the line, to give her a code to contact
2 her back again.
3 Q. Okay. But you are able -- you are familiar with
4 April Syren's voice and your own voice, and you can identify
5 them as being on this tape --
6 A. Yes.
7 Q. -- that is marked State's Exhibit No. 6.
8 A. Yes.
9 Q. Okay. Thank you.
10 Now, obviously during the 911 call, the police
11 were contacted, correct?
12 A. Correct.
13 Q. And also ambulance?
14 A. Correct.
15 Q. That evening did you have an opportunity to speak to
16 the police?
17 A. Yes.
18 Q. Were you able to make a written statement that
19 evening?
20 A. Yes.
21 Q. Did anybody look at any of your personal clothing?
22 A. Yes. I had to take my shoe off, and they took my
23 shoe inside to -- you know, just to verify me from the print,
24 you know, and they shortly gave me my shoe back.
25 Q. Okay. Now, in the days after this happened, you are

## Page 57

1 saying you gave your statement the same evening that happened?

2 A. Correct. I went down to the police station.

3 Q. And you gave a statement.

4 A. Right.

5 Q. In the days after that happened, did you read the

6 newspapers?

7 A. Yes.

8 Q. Why did you read the newspapers?

9 A. Well, because two of my best friends in the

10 neighborhood were killed. I wanted to keep up with any other

11 news that I could learn, anything about the situation. And --

12 Q. I'm sorry?

13 A. That's all. Just anything I could possibly find out,

14 you know, if they apprehended anybody or any more details that

15 I didn't know about.

16 Q. Okay. And in the course of reading the newspapers --

17 do you get the Fort Worth Star Telegram?

18 A. Yes, ma'am.

19 Q. And those are the newspapers you were reading.

20 A. Yes, ma'am.

21 Q. In the course of reading the newspaper on any of the

22 days on which you read articles about what happened, was there

23 ever a picture of the person who was apprehended?

24 A. Yes.

25 Q. Did you notice anything about that picture?

## Page 58

1 A. Yes.

2 Q. What did you notice?

3 A. I noticed that it looked like the gentleman that went

4 up on the front porch of the house that Sunday.

5 Q. So you were able to look at the picture in the

6 newspaper and tell that that looked like the man you had

7 seen --

8 A. Correct.

9 MS. CALLAGHAN: Approach the witness, Your

10 Honor?

11 Q. Let me show you what is marked State's Exhibit No. 4

12 for identification, which is a newspaper, Star Telegram,

13 Friday, April 11, 2003 edition. If you can open it up and go

14 to the Metro Section.

15 A. (Witness complies) Okay.

16 Q. Go ahead and take a look at that for a moment.

17 A. (Witness complies)

18 Q. Now, referring specifically to the section entitled

19 Fort Worth and Region, the Metro Section, is there an article

20 in there relating to this offense entitled, "Message Leads to

21 Suspect Slaying" -- or I'm sorry -- "to Slaying Suspect"?

22 A. Yes.

23 Q. And there is a photograph included in that; is that

24 correct?

25 A. Correct.

## Page 59

1 Q. Is that the photograph that you saw in the

2 newspaper --

3 A. Yes.

4 Q. -- that appeared to you to be the same person you saw

5 on the porch on April 6, 2003?

6 A. Yes.

7 MS. CALLAGHAN: At this time, Your Honor, the

8 State would offer State's Exhibit No. 4 in its entirety

9 subject to tendering it to Defense counsel for any objection.

10 MR. RAY: Judge, first of all, we had motion in

11 limine on this, that they weren't supposed to take this up

12 unless the jury's excused, so I would like to do that now, that

13 the Court granted.

14 THE COURT: Do you have objection?

15 MR. RAY: The objection is it's hearsay.

16 THE COURT: May I see it, please.

17 (Pause in the proceedings)

18 THE COURT: Sustained.

19 Q. Now, you said that you lived in the neighborhood for

20 six years?

21 A. Yes.

22 Q. Had you had an opportunity at various times to walk

23 around the neighborhood and look at other parts of the

24 neighborhood around Scott Avenue?

25 A. Uh-huh.

## Page 60

1 Q. Did you become familiar with the alleyway behind R.D.

2 and Patricia's house?

3 A. Right.

4 MS. CALLAGHAN: Approach the witness, Your

5 Honor?

6 THE COURT: Yes.

7 Q. Let me show you what is marked State's Exhibit No. 5

8 for identification in this cause. Do you recognize it?

9 A. Yes. This is the garage for Pat and R.D.'s house.

10 They had a detached garage, and this is where she kept her

11 Cadillac.

12 Q. Okay. Now, State's Exhibit No. 5, there is three

13 pictures. There is a single one at the top and at the

14 bottom --

15 A. Right.

16 Q. You are pointing to the top one saying that's Pat and

17 R.D.'s detached garage.

18 A. Right. And this is the alleyway. You had to drive

19 down the alley to get to their garage.

20 Q. So there is also a picture in the top picture in

21 State's Exhibit No. 5 of the alley itself.

22 A. Right.

23 Q. So if you went into the garage and backed out in the

24 car, you could completely leave the house without going to the

25 front of the house?

Page 61

1   A. Right.

2   Q. You could leave from the back.

3   A. Right.

4       MS. CALLAGHAN: At this time the State would
5   offer State's Exhibit No. 5 for all purposes subject to
6   tendering it to Defense Counsel for inspection.

7       MR. MOORE: We have no objection.

8   THE COURT: 5 is admitted.

9       (State's Exhibit No. 5 received)

10      MS. CALLAGHAN: May I publish it to the jury by
11  walking in front of them with it?

12  THE COURT: Yes.

13      MS. CALLAGHAN: Pass the witness. Thank you.

14          CROSS-EXAMINATION

15  BY MR. MOORE:

16  Q. Mr. Greer, you discovered your neighbors on April 8,
17  correct?

18  A. Yes, sir.

19  Q. And on April 9, you went down to the Fort Worth
20  Police Department and gave a written statement, correct?

21  A. It was around -- I can't remember the exact time, but
22  it was either very late on the 8th or early morning on the 9th.

23      MR. MOORE: May I approach the witness, Your
24  Honor?

25  THE COURT: Yes.

Page 62

1   Q. And just so we are on the same page; is that the
2   typed statement that looks like it has your signature on there
3   that you gave to the police department?

4   A. Yes, sir.

5   Q. Have you read that before you testified today?

6   A. Yes, sir.

7   Q. Okay. The person that you saw walk into the house of
8   R.D. and Pat, had you ever seen that person before?

9   A. No.

10  Q. Back around April, you were working in the same place
11  you are working now?

12  A. No. I was working at Osteopathic Medical Center.

13  Q. What hours were you working back then?

14  A. Back then? 8:00 a.m. to 5:00 p.m.

15  Q. Okay. When you talked to the police, you told them
16  that the last time that you saw Pat and R.D. was Sunday, April
17  6 around 11:00 a.m., correct?

18  A. No, I saw -- it was around 10:00 or 11:00 that
19  morning. And I -- it was R.D.

20  Q. Okay. Pat wasn't with her?

21  A. I think Pat had gone to church that morning.

22  Q. About 1:00 o'clock that afternoon of April 6, you
23  told the police that you saw an early model '70 or '80 blue
24  Chevy pickup that needed polish, correct?

25  A. Correct.

Page 63

1   Q. And you told them there was a -- you gave a
2   description of a perpetrator that was driving that vehicle,
3   correct?

4   A. I -- well, I said there was that one pickup was there
5   because I had never seen it before.

6   Q. Okay.

7   A. But I didn't -- I didn't say -- anybody that I saw
8   driving it. It was just parked out --

9   Q. Okay.

10  A. -- out front.

11  Q. Okay. Let me show you your -- this is the statement
12  that you signed, correct? Just read the last paragraph, if you
13  can, to yourself.

14  A. (Witness complies)

15  Q. You told the police that you saw the man driving the
16  vehicle, correct?

17  A. Well, to be honest, I'd say -- what I meant to say is
18  it could have been that gentleman, but, no, there was actually
19  nobody in the truck.

20  Q. So when in your written statement when you tell the
21  police that the driver was white male with gray hair about 65
22  years old, that was incorrect?

23  A. Correct.

24  Q. That wasn't what happened?

25  A. No.

Page 64

1   Q. Did you read this statement before you signed it?

2   A. Yes, but at the time it was late at night, early
3   morning, and with the death of Pat and R.D. --

4   Q. I understand. Okay. Did you talk to Detective
5   McCaskill after this happened?

6   A. Yes.

7   Q. Did you give Detective -- before you had talked to
8   Detective McCaskill, you had told the police that the person
9   you saw on the porch was 65 -- about 65 years old, correct?

10  A. From across the street that's what it appeared -- he
11  had graying hair.

12  Q. Did you also talk to Detective Hardy about this?

13  A. Yes, I believe that was his name.

14  Q. In fact, Detective Hardy was the one that you gave
15  this written statement to, wasn't it?

16  A. Right, I believe so.

17  Q. Did you see a vehicle parked in front of Pat and
18  R.D.'s house?

19  A. Yes.

20  Q. Would you tell the jury what it looked like?

21  A. It was a blue pickup, the older model before they
22  changed the body style.

23  Q. When you went -- I assume you left after you
24  witnessed that -- them going in the house, correct?

25  A. Correct.

Page 65

1   Q. And that pickup was still parked out in front of
2 their house?
3   A. No.
4   Q. It was gone?
5   A. It was gone when I came back.
6   Q. What time did you come back?
7   A. About 5:00 p.m.
8   Q. And that -- so you were gone several hours?
9   A. Right. I had to go pick up my income tax.
10   Q. When did you realize that you didn't actually see
11 anybody driving that pickup truck?
12   A. I can't place that.
13   Q. Do you remember what -- the person that you saw, do
14 you remember what he was wearing?
15   A. I believe he had a white T-shirt and khaki pants.
16   Q. White T-shirt and khaki pants?
17   A. Correct.
18         MR. MOORE: Thank you, sir. Pass the witness.
19         MS. CALLAGHAN: The State has no further
20 questions.
21         THE COURT: You may step down, sir.
22         Ladies and gentlemen of the jury, we are going
23 to take a break at this point, a stretch break. Throughout the
24 trial we will take breaks at certain points, and at those
25 points I'm going to ask you to remember and follow your

Page 66

1 instructions. These are the instructions to which I will be
2 referring.
3         Do not mingle with or talk to the lawyers, the
4 witnesses, the parties or any other person who might be
5 connected with or interested in this case except for casual
6 greetings. All of these other persons are under the same
7 instructions, and they will understand it when you follow
8 them.
9         Do not accept from nor give to any of these
10 persons any favors, however slight, such as rides, food or
11 refreshments.
12         Wear your juror badge at all times you are in or
13 around the courthouse. Do not discuss anything about the case
14 or even mention it to anyone whomsoever, including your wife or
15 your husband; nor permit anyone to mention it in your hearing
16 until you are discharged as jurors. If anyone attempts to
17 discuss the case with you, please report it to me at once.
18         Do not make personal inspections, observations,
19 investigations or experiments related to the issues that may be
20 a part of this case. Do not personally view premises, things
21 or articles which may be a part of the case but are not
22 introduced into evidence.
23         Do not seek information contained in law books,
24 dictionaries, public or private records or elsewhere which is
25 not admitted into evidence. Do not let anyone else do any of

Page 67

1 these things for you.
2         All evidence must be presented in open court so
3 that each side may question witnesses and make proper
4 objections. If you know or learn anything about this case
5 except from the evidence admitted during the course of this
6 trial, you should tell me about it at once.
7         Do not discuss the case among yourselves until
8 after you have heard all of the evidence, the Court's Charge,
9 the attorneys' summations and until I have sent you to the jury
10 room to conduct your deliberations.
11         Do not tell other jurors of your own personal
12 experiences or those of other persons nor relate to them any
13 special knowledge you may have, such as business, technical or
14 professional matters.
15         Texas law permits proof of any violation of the
16 rules of proper jury conduct. By this I mean that jurors and
17 others may be called upon to testify in open court about acts
18 of jury misconduct. I instruct you, therefore, to follow
19 carefully all the instructions which I have given you as well
20 as any others which you may later receive while the case is on
21 trial.
22         I need to introduce you to the rest of the folks
23 that you will work with this week that you haven't already met.
24 We have three deputy sheriffs assigned as bailiffs. This is
25 Mr. Dennis Cook over here to your right. Mr. Dave Derusha is

Page 68

1 directly across from you. Mr. James Thomas is in the back of
2 the courtroom, and they are the officers that will have you in
3 charge.
4         With those instructions, let's go ahead and take
5 your break back into the jury room, and please remember and
6 follow these instructions. During our stretch break, we will
7 normally break for about 15 minutes.
8         (Jury not present)
9         MS. HARTMANN: Judge, can we take up something
10 for just a moment? The State's next witness will finish the
11 predicate for the 911 tape. We can reserve offering it until
12 the Court hears it, but she's the next witness. So in light
13 of the prior ruling --
14         THE COURT: How long is the tape?
15         MS. HARTMANN: Five or six minutes.
16         THE COURT: We can listen to it now.
17         MS. HARTMANN: All right. Fair enough.
18         (Recess taken)
19         (Jury not present)
20         MR. RAY: Our objection, first of all, is they
21 are not relevant; they don't relate to any facts that the State
22 is required to prove.
23         Second of all, there are two tapes -- or there
24 are two calls. The first call -- maybe the Court has a
25 different version of this than I do. What I heard in the first

Condensed!

Page 69

1 call there is not any excitement that would authorize the Court
2 to make that finding. So we would object to that additionally
3 in that way.

4          THE COURT: That objection is sustained as to
5 the first part of the tape I just heard.

6          MR. RAY: That's all I have.

7          THE COURT: The rest of it is relevant.

8          MR. MOORE: Just for the record, the rest of it
9 we would object to under 403.

10          THE COURT: Sustained on 403 grounds. It has
11 virtually no probative value. It's highly prejudicial.

12          (Recess taken)

13          (Jury not present)

14          THE COURT: Are y'all ready for the jury?

15          MS. HARTMANN: State's ready, Your Honor.

16          MR. RAY: We are ready, Judge.

17          THE COURT: Call your next witness, please.

18          (Jury present)

19 Whereupon,

20          THOMAS O'BRIEN,

21 having been first duly sworn, testified as follows:

22          DIRECT EXAMINATION

23 BY MS. CALLAGHAN:

24     Q. Please state your name for the ladies and gentlemen
25 of the jury.

Page 70

1     A. Thomas O'Brien.

2     Q. How are you employed?

3     A. Fort Worth Police Department, police officer.

4     Q. How long have you been so employed?

5     A. Just under two years.

6     Q. What do you do for them?

7     A. Patrol officer.

8     Q. What does a patrol officer do?

9     A. Answer calls, basically doing self-initiated --

10     Q. I am having a hard time hearing you. Could you pull
11 that microphone up?

12     A. Answering calls, day-to-day calls, investigative
13 work, self-initiated stuff, just looking for crimes.

14     Q. So what people see on television about police
15 officers and squad cars, that's what you do.

16     A. Yes.

17     Q. Did you get a call on April 8, 2003, to go to an
18 address on Scott Avenue?

19     A. Yes, ma'am.

20     Q. What was the address you were sent to?

21     A. 2716 Scott.

22     Q. Is that location in Tarrant County, Texas?

23     A. Yes, ma'am.

24     Q. What time were you dispatched?

25     A. I don't remember the time exactly.

Page 71

1     Q. Okay. Do you recall the time you arrived?

2     A. For some reason I'm blank on it. It was
3 approximately four minutes after I got the dispatch.

4          MS. CALLAGHAN: May I approach the witness, Your
5 Honor?

6          THE COURT: Yes.

7     Q. Did you make a written statement in this case?

8     A. Yes, ma'am.

9     Q. Would it help to refresh your memory to review that?

10     A. Yes, ma'am.

11     Q. Go ahead and take a look at that.

12     A. (Witness complies) Do you want me to go ahead and
13 answer?

14     Q. Yes. What time were you dispatched?

15     A. 18:51 hours.

16     Q. In real-person time, that's what time?

17     A. 6:51.

18     Q. And you said it was about four minutes later when you
19 arrived at Scott.

20     A. Yes.

21     Q. You got there pretty quick?

22     A. Yes.

23     Q. What type of call was it?

24     A. And investigative call. I believe it initially came
25 out as a Signal 10, which is burglary investigation; and then

Page 72

1 after reading the details, I think the dispatcher turned it
2 into a 51, which is just an investigative call.

3     Q. Now, when you arrived, who was the first person you
4 spoke to?

5     A. I believe it was April -- I can't remember her last
6 name.

7     Q. All right.

8     A. Actually I have got it here, if I could look.

9     Q. Okay.

10     A. Ms. Syren, I believe.

11     Q. Ms. Syren?

12     A. Syren, yes.

13     Q. Okay. Can you tell me what April Syren's emotional
14 behavior was like at the time you saw her?

15     A. She was very distraught, shaking, crying. It was
16 obvious to me that something of a large magnitude had happened.

17     Q. Okay. And did you become aware that it was something
18 that she had just then discovered prior to calling --

19     A. Yes.

20     Q. -- that was causing her --

21     A. Yes, ma'am.

22     Q. What did she say to you?

23     A. I am not a hundred percent as to the actual verbiage
24 she used, but I believe it was something to the extent of,
25 "They are both dead," or "They are both murdered."

Page 73

1    Q. Okay. It was clear to you when you spoke to her that
2  she was aware that there were some dead people at that address.
3    A. Yes, ma'am.
4    Q. Did she explain to you what the relationship between
5  herself and those individuals was?
6    A. I believe she said she was the Goddaughter. At that
7  time I wasn't a hundred percent paying attention to that. I
8  was kind of more concerned about the actual -- what was going
9  on inside the house. But I believe she said she was the
10  Goddaughter.
11    Q. Was there also another witness there, a man?
12    A. Yes, ma'am. There was a Mr. Greer, who was a
13  neighbor who lives across the street.
14    Q. Okay. Now, did you take a few moments to calm them
15  down and take care of them?
16    A. Yes, ma'am.
17    Q. Did some other officers arrive on the scene?
18    A. Officer Soliz (phonetic) arrived a couple of minutes
19  after I did.
20    Q. And that's Officer M.E. Soliz?
21    A. Yes, ma'am.
22    Q. Did you at some point go into the house?
23    A. Yes.
24    Q. Did Officer Soliz arrive before or after you went in
25  the house?

Page 74

1    A. Both. I went in initially to observe the scene, and
2  right away as I walked in, I saw the two ladies. I also saw a
3  dog, and right away my first thought was to get the dog out of
4  there. I didn't want him stomping all over the crime scene.
5    Q. Okay.
6    A. I'm sorry. That was the first time I went in there.
7  I went in there again after he arrived with the paramedics and
8  once again with Sergeant Holshoe to do a protective sweep of
9  the house.
10    Q. So the first time you went in, you were still by
11  yourself.
12    A. Yes, ma'am.
13    Q. And at that time you saw a dog in there and you
14  picked up the little dog and got it out of the house.
15    A. Yes, ma'am.
16    Q. And you said that was to preserve the crime scene.
17    A. Yes, ma'am.
18    Q. Where did you take the dog?
19    A. Right away I just brought him outside. There wasn't
20  any area right away to put him. Approximately five minutes
21  later, I asked the neighbors if I could put him in their back
22  yard, and that's where I put the dog.
23    Q. Okay. So you were in the house that time just a
24  moment or so?
25    A. Yes, ma'am.

Page 75

1    Q. And then how long was it after the first time you
2  went in the house that you went in the second time?
3    A. I would probably say just a couple minutes, just when
4  Medstar got there.
5    Q. And when you went in the house the second time, did
6  you and the other officers do anything?
7    A. No.
8    Q. Okay. What was your purpose in going in the second
9  time?
10    A. The second time that I went in was with Medstar.
11  Officer Soliz was basically at the front door to make sure
12  nobody else come in. I just walked Medstar to the bodies to
13  make sure they weren't stepping on anything that might have
14  been important. And Medstar basically just looked at the scene
15  and decided that they didn't need to be there, so --
16    Q. Okay.
17    A. -- I escorted them out.
18    Q. Let me make sure we understand all this. At any
19  point did you-all clear the house to make sure there was no one
20  else in there?
21    A. Yes.
22    Q. When was that?
23    A. That was after that approximately -- I'd say another
24  minute after that when my sergeant arrived.
25    Q. So first of all, you went in with Medstar to help

Page 76

1  attend to the victims.
2    A. Yes.
3    Q. And you said Officer Soliz was there at the door to
4  help control who went in the house --
5    A. Yes, ma'am.
6    Q. Were there some people in the neighborhood who were
7  getting in?
8    A. Not at that point, I don't remember. Basically Ms.
9  Syren and Mr. Greer were the only two that I was aware of that
10  were out front.
11    Q. Okay. So Officer Soliz is controlling the crime
12  scene at the door, and you go in with Medstar. You say it was
13  pretty clear to them they were not needed?
14    A. Yes.
15    Q. Was it obvious to you that the victims were deceased?
16    A. Yes, ma'am.
17    Q. And then you said shortly after that, your sergeant
18  arrived.
19    A. Yeah. Approximately just a few minutes after, he
20  arrived, and at that point he asked if we had done a protective
21  sweep of the house to make sure there were no other victims or
22  possible suspects.
23       And I informed him that we hadn't, so at that
24  point Sergeant Holshoe, Officer Soliz and I swept the entire
25  house, upstairs, downstairs except for a back portion of the

Page 77

1 room which we were unable to get to due to where the bodies
2 were.
3    Q. So you cleared the house to make sure there were no
4 other individuals or anything dangerous in there.
5    A. Yes, ma'am.
6    Q. And there was none?
7    A. Right.
8    Q. At that time had you touched the victims' bodies?
9    A. No, ma'am.
10    Q. Were they touched in any way?
11    A. No, ma'am.
12    Q. Okay. Did Medstar touch them?
13    A. No, ma'am.
14    Q. Now, did you go in again a third time after that?
15    A. That was the third time. The first time was when I
16 went in to observe the scene, and that's when I got the dog
17 out; the second time was with Medstar; and the third time was
18 the last time, in which was done the protective sweep.
19    Q. You didn't remain in the house?
20    A. No, ma'am.
21    Q. You went out and came back --
22    A. Yes, ma'am.
23    Q. All right. Now, after that did you have an
24 opportunity to speak to any of the neighbors in that
25 neighborhood?

Page 78

1    A. Yes, ma'am.
2    Q. What was your purpose in doing that?
3    A. Basically just canvassing the neighborhood, the
4 immediate area to see if there were any witnesses or anybody
5 had seen anything that was out of the ordinary. At that point
6 we really had nothing, so we were trying to get something.
7    Q. So you-all talked to neighbors. Did you make that
8 information into a report?
9    A. I didn't. I -- somewhat of a report. I wrote what
10 in the Fort Worth Police Department is called an IOC, an
11 Interoffice Correspondence. That would have been my report to
12 the detective with all information --
13    Q. And all the information you got from neighbors was in
14 that IOC, in that statement.
15    A. Yes, ma'am.
16    Q. Did you-all help to preserve the crime scene? Did
17 you put up tape or anything like that?
18    A. I didn't, but while I was actually -- almost
19 simultaneously as I was going to canvass the area, there were
20 already officers putting the tape out. One of the sergeants
21 had instructed them to do that.
22    Q. So they were putting the tape out making sure nobody
23 disturbed the crime scene --
24    A. Yes, ma'am.
25    Q. Now, you said later in the evening you prepared this

Page 79

1 IOC to give to the detective, correct?
2    A. Yes, ma'am.
3    Q. And you wrote down all the steps that you took in
4 that statement.
5    A. Yes, ma'am.
6        MS. CALLAGHAN: Thank you, Officer. Appreciate
7 it.
8        Pass the witness.
9        MR. RAY: Can I approach the witness?
10        THE COURT: Yes.
11        CROSS-EXAMINATION
12 BY MR. RAY:
13    Q. Officer, do you have your report up there with you?
14    A. Yes, sir.
15        MR. RAY: Judge, can I have just a second?
16        THE COURT: Yes.
17        (Pause in the proceedings)
18    Q. Officer, how long have you been with the police
19 department?
20    A. Just under two years.
21    Q. Why did you become a police officer?
22    A. Well, it's basically been my life for quite some
23 time. My stepfather was a highway patrolman, my grandfather
24 was a police officer. Just interacting with them, talking with
25 them, it seemed like a job that something happened -- something

Page 80

1 that I could do and be happy with.
2    Q. Are you from Fort Worth?
3    A. No, sir.
4    Q. Where did you grow up?
5    A. Los Angeles.
6    Q. So you grew up in Los Angeles. Did you come here
7 when Chief Windham was the Fort Worth police chief?
8        MS. CALLAGHAN: Your Honor, the State would
9 object to relevance.
10        THE COURT: Sustained.
11    Q. Do you like being a police officer?
12    A. Yes, sir.
13        MS. CALLAGHAN: The State would object to
14 relevance.
15        THE COURT: Sustained.
16    Q. If you have been working for the police department
17 for two years, that means you have been out of the academy
18 about a year and a half. Is that about right?
19    A. Well, I have been on the police department for under
20 two years, so just under that, yes.
21    Q. Back in April then, how long had -- what I'm getting
22 to is, how long had you been actually out of the academy and
23 taking calls, doing what you do now, back in April of this
24 year?
25    A. Doing what I do now?

Condenselt™

Page 81

1  Q. Yes.

2  A. Approximately four months.

3  Q. And generally what part of the city do you patrol and
4  what is your shift?

5  A. It is second shift. At that time it was from 2:30 in
6  the evening -- 2;30 in the afternoon to 10:30 at night. Ever
7  since I've been cut loose, I have been on the east side of Fort
8  Worth. My immediate beat or district area was -- the main
9  artery there is East Lancaster going from 287 all the way to
10  820 and then from approximately Rosedale up to about East
11  Freeway, right in that general area.

12  Q. So if I'm at the intersection of Beach Street and
13  Lancaster at 4:00 o'clock in the afternoon and I call the
14  police department and ask for service, there is a pretty good
15  chance you are going to come and see me.

16  A. Yes, sir.

17  Q. How many homicide calls had you been to prior to the
18  one you testified about today?

19  A. Zero.

20  Q. How did you feel when you walked inside that house
21  and saw those people laying there?

22  A. Well, my immediate feeling was basically I didn't
23  want to screw up -- I didn't want to screw up any of the crime
24  scene. I wanted to make sure everything was left the way it is
25  just to basically help find any type of evidence or anything

Page 82

1  left behind.

2  Q. How did you feel as a person when you saw it? Not as
3  a police officer trying to secure the crime scene and do your
4  job, which I am sure you did. How did you feel when you were
5  looking at that? What was going through your mind when you saw
6  that?

7  A. Well, it -- unfortunately, I guess, in some ways I
8  somewhat blocked it out. I knew it was the feeling of it. I knew it was
9  there, but I just kind of went about my business and did what I
10  had to do.

11  Q. Did you feel like regardless of what feelings you
12  had, you kind of had to keep them to yourself so that you could
13  do your job?

14  A. To tell you the truth, it really never came up, not
15  in my head at that moment, no.

16  Q. Okay. When you were dealing with the other people
17  there, you listed several people in the report here. Did any
18  of them seem disturbed? I think you said one of them did.

19  A. Yes, sir.

20  Q. Were they upset?

21  A. I'm sorry?

22  Q. Were they upset?

23  A. The very first person that I came across, which is
24  Ms. Syren, was very upset, yes.

25  Q. How about Mr. Greer?

Page 83

1  A. Didn't seem very upset.

2  MR. RAY: All right. I'll pass the witness.
3  Thank you, Officer.

4  MS. CALLAGHAN: The State has no further
5  questions, Your Honor.

6  THE COURT: You may step down, sir.

7  MS. HARTMANN: The State calls Sergeant
8  Plowman.

9  MS. HARTMANN: Before we start, may Officer
10  O'Brien be excused?

11  MR. RAY: No objection.

12  THE COURT: He may.

13  Whereupon,

14  TODD PLOWMAN,

15  having been first duly sworn, testified as follows:

16  DIRECT EXAMINATION

17  BY MS. HARTMANN:

18  Q. State your name, please.

19  A. Todd Plowman.

20  Q. How are you employed?

21  A. I'm a police sergeant with the City of Fort Worth.

22  Q. How long have you been a police officer for Fort
23  Worth?

24  A. Almost 12 years, and 2 1/2 years as a sergeant.

25  Q. Are you a certified peace officer?

Page 84

1  A. Yes.

2  Q. To what division are you currently assigned?

3  A. East Division, Neighborhood Police District Five,
4  second shift.

5  Q. How long have you been in that assignment?

6  A. 2 1/2 years as a supervisor of that.

7  Q. So you would have been on that assignment back in
8  April of this year.

9  A. That's correct.

10  Q. Just in general what is your duty?

11  A. I supervise patrol officers in the street, make sure
12  that they are doing what they need to be doing. I assist on
13  big investigations, making notifications, discipline matters
14  with police officers, just various different supervisory tasks.

15  Q. All right. I want to direct your attention back to
16  the date of April 8 of this year and ask you if you were
17  dispatched or sent out to the address of 2716 Scott Avenue on
18  the east side of Fort Worth.

19  A. Yes. I was contacted by Officer O'Brien on the
20  telephone.

21  Q. All right. After speaking with Officer O'Brien, did
22  you travel to that location?

23  A. Yes, I did.

24  Q. When you got to 2716 Scott Avenue, what was going on
25  at that house?

Page 85

1   A.  Officer O'Brien and Officer Soliz were on the scene,
2 and Officer O'Brien notified me that there were two deceased
3 females inside the residence at that location.
4   Q.  What steps did you take that point upon being given
5 that information?
6   A.  Sergeant Tim Holshoe was also with me.  He went to
7 that location with me.  We made the determination to go ahead
8 and make what we call a protective sweep of the residence to
9 make sure that there was no other person inside the residence
10 who needed attention or possible suspect or anything like that.
11   Q.  Is that a standard procedure on a scene such as this?
12   A.  Yes, it is.
13   Q.  Is that done for the safety of potential other
14 victims?
15   A.  It could be to find other victims or to find a
16 perpetrator if they were still on the premises.
17   Q.  And was that sweep done?
18   A.  Yes.
19   Q.  Who conducted that protective sweep?
20   A.  Sergeant Holshoe along with Officer O'Brien and
21 Officer Soliz conducted the protective sweep.
22   Q.  How long did it take them to do that approximately?
23   A.  Probably three or four minutes.
24   Q.  Where were you when the protective sweep was being
25 conducted?

Page 86

1   A.  I maintained just outside the residence at the front,
2 at the front door on the porch.
3   Q.  What was your purpose in staying at the door on the
4 porch?
5   A.  To ensure that if there were any other officers that
6 arrived on the scene, that they didn't go in while the
7 protective sweep was being done.  For safety reasons and also
8 to preserve the crime scene that was inside, we don't want too
9 many people going inside.
10   Q.  Did anyone else other than Officer O'Brien, Officer
11 Soliz and Sergeant Holshoe go into that house to do the
12 protective sweep?
13   A.  No.
14   Q.  Once they -- did they, in fact, exit out the house
15 after they were done?
16   A.  Yes, they did.
17   Q.  Did anybody stay there at the door to maintain the
18 crime scene to make sure people weren't going in and out?
19   A.  Yes.  I assigned Officer Soliz as the crime-scene-log
20 officer, and he stayed at the front of the residence with the
21 crime-scene log to report any persons who came up to the crime
22 scene, and then we -- the yard and residence, we put out crime
23 scene tape to keep all other persons outside.
24   Q.  All right.  And the crime-scene-log officer keeps
25 track of which officers are actually on the scene?

Page 87

1   A.  Yes.  We record anybody that even walks up to the
2 scene.  Probably -- not everybody recorded on the crime scene
3 log there actually went inside the residence.
4   Q.  But there is a -- there is documentation of which
5 officers appear and perhaps what their duties are at the
6 scene.
7   A.  Yes.
8   Q.  Who was the next person that entered that house after
9 the protective sweep had been done?
10   A.  It was probably Detective McCaskill along with
11 Officer Wilson, the Crime Scene officer.
12   Q.  Is it -- and let me ask you this.  Were you acting as
13 supervisor out there at this crime scene?
14   A.  Generally I am a supervisor.  I'm in charge of my
15 personnel on the scene.  When a homicide investigator arrives
16 on the scene, generally he will take control of the scene, but
17 I still have supervisory responsibilities.
18   Q.  Up until the time Detective McCaskill arrived to take
19 over the investigation, was that house closed to people going
20 in and out?
21   A.  Yes, it was.
22   Q.  You said there was crime scene put up around the
23 perimeter?
24   A.  Yes, the front yard of the residence, crime scene
25 tape.

Page 88

1   Q.  All right.  Were you involved in any type of evidence
2 collection or interviewing of witnesses?
3   A.  No, I was not.
4       MS. HARTMANN:  The State will pass the witness.
5           CROSS-EXAMINATION
6 BY MR. MOORE:
7   Q.  Officer Simon -- is it Sergeant Simon?
8   A.  Sergeant Plowman.
9   Q.  Plowman.  I'm sorry.
10   A.  That's okay.
11   Q.  Did you make a report of this incident?
12   A.  No, I didn't make a report on it.
13   Q.  Didn't make any interoffice correspondence or written
14 report?
15   A.  No.  Generally on a major incident like this, I would
16 e-mail my chain of command, my lieutenant, my captain, the
17 deputy chief; however, they all eventually made the scene that
18 evidence and I spoke to them personally, so I did not make any
19 written correspondence to anyone.
20   Q.  Okay.  How many Fort Worth police officers responded
21 to that scene on April 8?
22   A.  Usually just two officers.  I think we had one other
23 officer came out shortly after I arrived there that assisted in
24 the general investigation.  The police information officer
25 arrived later for media purposes.  Captain Gillespie, who was

CondenseIt™

Page 89

1 acting deputy chief that week, arrived later just to see what
2 was going on in the investigation. I think Sergeant Pete Ross,
3 who was acting commander for the district, arrived later
4 because it was his district he was commanding. That's about
5 all the personnel I can remember.

6    Q. How long did you stay there?

7    A. Probably about three hours.

8    Q. Were you the one responsible for having other Fort
9 Worth police officers canvass the neighborhood?

10    A. Yes.

11    Q. How many police officers canvassed the neighborhood?

12    A. I had officer Robert Phillips and Officer O'Brien
13 canvass the neighborhood. Sergeant Holshoe also assisted them.

14    Q. By canvass the neighborhood, we are talking about
15 going up to people, open doors and knocking on them and asking
16 if they had seen anything?

17    A. That's correct.

18    Q. And to your knowledge -- well, let me ask it this
19 way. Did they make a thorough canvass of the neighborhood?

20    A. I believe so, yes.

21    Q. Did any material witness develop out of the
22 canvassing of the neighborhood?

23    A. The best I remember we didn't get any real good
24 information from any person we talked to in the neighborhood
25 that day.

Page 90

1    Q. Did you yourself actually go in 2716 Scott?

2    A. No, I did not.

3    Q. Never went in and saw the interior of that house.

4    A. I did see the interior of the house from standing in
5 the front doorway. I stood in the front doorway. I did see
6 the interior of the house.

7    Q. Did you talk to Mr. Robert Greer?

8    A. I don't recall.

9    Q. Okay.

10    A. I don't even know who that is.

11    Q. All right.

12       MR. MOORE: Thank you, sir. That's all.

13       MS. HARTMANN: Nothing further from the State.

14       THE COURT: You may step down, sir.

15       MS. HARTMANN: May Sergeant Plowman be excused?

16       THE COURT: He may.

17       MS. HARTMANN: Your Honor, the State calls
18 Officer McClenny.

19 Whereupon,

20       BRIAN MCCLENNY,
21 having been first duly sworn, testified as follows:

22       DIRECT EXAMINATION

23 BY MS. HARTMANN:

24    Q. Would you state your name for the jury?

25    A. Brian McClenny.

Page 91

1    Q. How are you employed?

2    A. As a Fort Worth police officer.

3    Q. And which division are you assigned?

4    A. I'm assigned to north side Baker District.

5    Q. How long have you worked for the Fort Worth Police
6 Department?

7    A. Seven years.

8    Q. Are you a certified peace officer?

9    A. Yes.

10    Q. Directing your attention back to April 8 of 2003,
11 what shift did you work that day?

12    A. Second shift, 2:00 p.m. to 10:00 p.m.

13    Q. What were your specific duties on that day?

14    A. At that time I was in patrol. Answering calls was my
15 main function.

16    Q. So anytime someone would call into the police
17 department, if it was in your area, you might be dispatched.

18    A. Correct.

19    Q. I want to direct your attention specifically to about
20 6:45 p.m. on April 8, 2003. Did you receive a call out to 3116
21 North Main here in Fort Worth?

22    A. Yes, I did.

23    Q. What was the nature of that call?

24    A. It was an abandoned-vehicle call left in a parking
25 lot.

Page 92

1    Q. What is located at 3116 North Main?

2    A. The El Triangulo bar.

3    Q. Is that a drinking establishment?

4    A. Yes.

5    Q. And can you, for the benefit of the members of the
6 jury, describe what type of area is there at 3116 North Main?
7 By that I mean is it primarily business, is it residential,
8 what is up and down that part of North Main?

9    A. Up and down Main Street is primarily business. There
10 are also several -- how do I put it -- low-key motels,
11 prostitution.

12    Q. Is the Cowboy Inn located on North Main?

13    A. Yes.

14    Q. Is the Cowboy Inn a short distance and across the
15 street from El Triangulo bar?

16    A. Yes.

17    Q. Is there also a Kentucky Fried Chicken located on
18 North Main in that general area, if you recall?

19    A. A Kentucky Fried Chicken?

20    Q. That's correct.

21    A. Not that I'm aware of.

22    Q. Could be; you are just not aware of it?

23    A. Could be.

24    Q. Approximately what time did you get to El Triangulo
25 bar?

Page 93

1   A. It was about 6:45 p.m.
2   Q. And did you meet with someone there associated with
3 the bar?
4   A. Yes.  He was part of the cleaning crew, I think.  He
5 was cleaning up bottles.
6   Q. Did that man speak any English or very little?
7   A. Very, very little.
8   Q. All right.  Were you able to determine which vehicle
9 you had been dispatched to check into?
10   A. Yes.  He pointed out the vehicle, and it was the only
11 one on the south side of the parking lot.
12   Q. What type of vehicle was that?
13   A. It was a '96 Cadillac, four-door, gold in color.
14   Q. A Cadillac?
15   A. Yes.
16   Q. Did you notice anything about the state of either the
17 driver's side window or the passenger side window?
18   A. The passenger-side window was broken out.
19   Q. Was there glass there on the ground?
20   A. Yes, there was.
21   Q. Did you -- did this vehicle have a license plate
22 attached to it?
23   A. Yes, it did.
24   Q. Were you able to read the license plate that was on
25 that vehicle?

Page 94

1   A. I did.
2   Q. Were you able to determine whether or not on April 8,
3 2003, at about 6:45 in the evening whether or not that license
4 plate showed that car to be either stolen or missing?
5   A. It did not show stolen or missing.
6   Q. At that point in time?
7   A. Correct.
8   Q. Were you able to determine from the information
9 available to you as a Fort Worth police officer who the
10 registered owner of that vehicle was?
11   A. Yes, I was.
12   Q. What name was that?
13   A. Patricia Syren.
14   Q. And did you notice anything by looking into the
15 vehicle about the glove box?
16   A. Yeah.  There was -- the glove box was opened and -- I
17 didn't know.  I thought the car was out of place for one
18 because it belonged to somebody on the east side and the
19 location where it was, I wanted to find the owner.  I did find
20 a piece of paper that did match the same name as the registered
21 owner.
22   Q. Were you able -- upon going to the glove box or the
23 car able to locate any paperwork that had a phone number?
24   A. The phone number I believe I got from our police
25 information center.  I did find a name and address on a piece

Page 95

1 of paper.
2   Q. Was that for Patricia Syren?
3   A. Yes.
4   Q. Were you able to get a phone number through dispatch?
5   A. Yes.
6   Q. Did you call that phone number?
7   A. I did.
8   Q. Did anybody answer that phone number?
9   A. No, I got an answering machine.
10   Q. Did you leave a message?
11   A. I did leave a message.
12   Q. What did you do at that point once you had left a
13 phone message at the number that you believed to belong to
14 Patricia Syren?
15   A. At that point being that the car was not showing
16 stolen and it was on private property, I left the car there,
17 cleared the call.
18   Q. Cleared the call?
19   A. Cleared the call.
20   Q. Were you dispatched to a different call at that
21 point?
22   A. No, not at that point.
23   Q. All right.  Well, did you leave the scene there?
24   A. I did leave the scene, yes.
25   Q. All right.  At some point after you left El Triangulo

Page 96

1 bar leaving the car there because you said it was on private
2 property and there was no indication it was missing or stolen
3 at that point --
4   A. Correct.
5   Q. -- did you receive any information subsequent to your
6 departure from the El Triangulo bar that focused your attention
7 back on that Cadillac?
8   A. I did about an hour and 15 minutes later.
9   Q. Where did that information come from?
10   A. It came from an East Division sergeant.  It was an
11 all broadcast for that particular vehicle.
12   Q. How did you recognize that the vehicle in the
13 broadcast matched the vehicle you had seen an hour earlier at
14 the El Triangulo bar?
15   A. Same type of the vehicle, same color, same license
16 plate number.
17   Q. Once you realized you knew where that car was, the
18 description of which had been broadcast, what did you do at
19 that point?
20   A. At that point being as I had been dispatched to
21 another call, I keyed up my dispatcher and canceled the call
22 she was sending me to, another call, and then went to east
23 patrol and notified the east patrol sergeant that I knew where
24 the vehicle was that he was looking for, knew where it had been
25 an hour and 15 minutes prior.

**Condenselt™**

1  Q. What did you do at that point?

2  A. We want back to 3116 North Main.

3  Q. Why did you go back there?

4  A. To secure the vehicle.

5  Q. Was the vehicle still in the same place it had been

6 an hour earlier?

7  A. Yes.

8  Q. Did it appear to be in relatively the same condition?

9  A. Yes.

10  Q. Was there anyone around the vehicle?

11  A. No.

12  Q. Did you remain at the vehicle there at 3116 North

13 Main until Officer Ball with the Fort Worth Police Department

14 Crime Scene Unit arrived?

15  A. Yes.

16  Q. Did you remain there at the scene while he processed

17 that vehicle?

18  A. I did.

19  Q. Once he finished processing the exterior of the

20 vehicle, was the vehicle then towed?

21  A. Yes, it was.

22  Q. Where was it towed to?

23  A. Down to the auto pound at -- on North Side Drive.

24  Q. Is that 1301 East North Side?

25  A. Yes.

1  Q. Did you follow the Cadillac as it was being towed?

2  A. I did.

3  Q. Did you remain with the vehicle until it was secured

4 at a bay facility at 1301 North Side?

5  A. I did until the door shut.

6  Q. Is that a secure facility in that no one other than

7 authorized Fort Worth police officers can get in?

8  A. Correct.

9  Q. When the tow truck gets there, does someone have to

10 open that facility up for them to actually drive in --

11  A. Yes.

12  Q. -- and unload the vehicle?

13  A. Right.

14  Q. I'm going to show you what has been previously

15 marked for identification purpose as State's Exhibit No. 80.

16 Can you take a look at that?

17  A. Yes.

18  Q. Do you recognize State's Exhibit 80?

19  A. Yes.

20  Q. Is it a fair and accurate description of the car you

21 saw out at the El Triangulo bar?

22  A. Yes.

23      MS. HARTMANN: The State would offer State's

24 Exhibit 80.

25      MR. RAY: No objection.

1      MS. HARTMANN: Permission to publish to the

2 jury?

3      THE COURT: You may. 80 is admitted.

4      (State's Exhibit No. 80 received)

5      MS. HARTMANN: The State will pass the witness.

6          CROSS-EXAMINATION

7 BY MR. RAY:

8  Q. How are you doing, Officer McClenny?

9  A. Fine.

10  Q. You said it was about -- what time was it when you

11 first saw the car, 18:46?

12  A. Correct.

13  Q. That's about 6:46 in the evening?

14  A. Right.

15  Q. On April 8 of this year at 6:46 in the evening, was

16 the sun still up? Was it light?

17  A. I don't remember.

18  Q. Okay.

19  A. I believe it was.

20  Q. Okay. You went and talked to this fellow, and he

21 didn't speak much English and you didn't speak much Spanish.

22  A. Correct.

23  Q. But you understood him enough to know that was the

24 call you were there for and this was the car somebody had been

25 talking about.

1  A. Right.

2  Q. I guess you are not even sure if he was the one that

3 called the police; he just happened to be the one standing

4 there.

5  A. He said he called.

6  Q. So I am guessing he spoke a little English?

7  A. Very little.

8  Q. What did this car look like? I'm not asking you

9 what -- I'm asking you -- was there anything out of the

10 ordinary about this car?

11  A. The window was broken out of it.

12  Q. Which window?

13  A. The front-right side.

14  Q. The right-front passenger side?

15  A. That would be correct.

16  Q. When you break a car window, if it's not the

17 windshield, that glass goes in little bitty pieces.

18  A. Right.

19  Q. That's tempered glass, right?

20  A. Right.

21  Q. Did you check to see if the car was unlocked?

22  A. I didn't -- no, I didn't try to pop the door, no.

23  Q. Okay. Did you check and see if there was any -- I

24 think you said you tried -- you looked in the glove box, and I

25 understood you to say the glove box was open?

Page 101

1    A. Correct.

2    Q. So it was laying open and you could see that it was
3 open since you were on the passenger side.

4    A. Right.

5    Q. Did this fellow point out the broken window, or did
6 you just find it on your own?

7    A. That was part of the reason he was calling. He said
8 that window was broken out and the alarm had sounded. He
9 didn't want anybody to think he did it.

10   Q. Okay.

11   A. That's the information I gathered.

12   Q. This little area, you described it as substandard
13 hotels; is that a fair description of what is out there?

14   A. Substandard?

15   Q. Yes.

16   A. As in --

17   Q. Well, if my -- if I had a good friend coming to Fort
18 Worth, would I want to take him out to that part of town and
19 show him a good time?

20   A. I wouldn't want to take my friend. I can't answer
21 for you.

22   Q. All right. I guess I'll move on.

23         Was there anything out of the ordinary about
24 this car? Were the fender dented or paint on it or blood on
25 it or --

Page 102

1    A. I didn't notice.

2    Q. How long do you think you spent talking to this
3 fellow?

4    A. Maybe five minutes.

5    Q. And then y'all don't tow cars if they are on private
6 property; is that right?

7    A. If they are not stolen or if we don't have a reason
8 to.

9    Q. What did you tell him, "Tough luck, we'll come get it
10 later," or -- I mean, he wanted you to move the car, didn't he?

11   A. Like I said, he didn't want anyone to blame him for
12 breaking the window.

13   Q. Okay.

14   A. He didn't know where the car came from.

15   Q. And it was in front of the bar, right?

16   A. Beside the bar.

17   Q. Was the bar open or was --

18   A. It looked as if it was prepping it to open.

19   Q. Maybe open a little later?

20   A. Right.

21   Q. Was it in a parking place or --

22   A. It's a gravel parking lot.

23   Q. So it's kind of park wherever you want.

24   A. Right.

25   Q. And it wasn't too long after that, I think you said

Page 103

1 an hour or so, that you got a call on your little computer
2 there?

3    A. Right.

4    Q. That's actually a little computer terminal kind of
5 like what I have got here.

6    A. Correct.

7    Q. You can get information from the police department
8 about license numbers and various things over a computer.

9    A. Correct.

10   Q. And somebody sent a dispatch or message or something
11 that said that the car might be involved in a homicide,
12 correct?

13   A. Correct.

14   Q. You remembered the car and you called them back and
15 said, "Hey, I remember it," and they said to go take it to the
16 pound.

17   A. Well, they said secure it until Crime Scene got
18 there.

19   Q. When you got back over there, did it appear to be in
20 the same condition as when you left?

21   A. Yes.

22       MR. RAY: I believe that's all. Thank you,
23 Officer McClenny.

24       THE COURT: You may step down, sir.

25       MS. HARTMANN: May the officer be excused?

Page 104

1        MR. RAY: No objection.

2        THE COURT: Thank you.

3        MS. HARTMANN: May we approach, Your Honor?

4        THE COURT: Yes.

5        (Outside the hearing of the jury)

6        MS. CALLAGHAN: The next witness is our
7 investigator, Elvis Wells, from our office. He brought some
8 items from the ME's office, and they just arrived a short time
9 ago. The plastic bags are locked in Steve's office. Can we
10 take a brief break so we can mark them and --

11       THE COURT: Just go get the stuff out of Steve's
12 office.

13       (Pause in the proceedings)

14       (In the hearing of the jury)

15       MS. HARTMANN: Your Honor, at this time the
16 State would call Elvis Wells.

17       (Witness Sworn)

18 Whereupon,

19            ELVIS WELLS,

20 having been first duly sworn, testified as follows:

21            DIRECT EXAMINATION

22 BY MS. CALLAGHAN:

23   Q. Could you please state your name for the ladies and
24 gentlemen?

25   A. Elvis D. Wells, Jr.

Page 105

1  Q. How are you employed?
2  A. Criminal investigator for the Tarrant County District
3  Attorney's Office.
4  Q. How long have you worked with the DA's office?
5  A. Four years.
6  Q. Where did you work before you worked for Tarrant
7  County?
8  A. Dallas County.
9  Q. And Dallas County what?
10  A. Dallas County District Attorney's Office.
11  Q. Were you an investigator for them?
12  A. Yes, ma'am.
13  Q. How long did you work for them?
14  A. I worked there five years. Prior to that, five with
15  the sheriff's office.
16  Q. Okay. Are you a peace officer?
17  A. Yes, ma'am.
18  Q. All right. And were you working on this case we are
19  presently in trial on with our investigator, Rizzy?
20  A. Yes, ma'am.
21  Q. Who is seated here in the courtroom?
22  A. Yes, ma'am.
23  Q. Did you have an opportunity on July 24, 2003, to go
24  to the residence of a Geraldine Suggett?
25  A. Yes, ma'am.

Page 106

1  Q. And was Investigator Rizzy with you?
2  A. Yes.
3  Q. What did you go there for?
4  A. We went there to recover possible evidence in this
5  case.
6  Q. Were these some documents that is Ms. Suggett had for
7  us?
8  A. Yes, ma'am.
9  Q. Where is it that you went to get these --
10  A. We went to Hillsboro, Texas.
11  Q. She listed an address down in Hillsboro?
12  A. Yes, ma'am.
13  MS. CALLAGHAN: May I approach the witness, Your
14  Honor?
15  THE COURT: Yes.
16  Q. Now, let me show you a Manila envelope marked
17  State's Exhibit No. 116 for identification in this cause. Do
18  you recognize that envelope?
19  A. Yes, ma'am.
20  Q. Does this document contain some of the documents that
21  Ms. Suggett gave you on July 24, 2003?
2  A. Yes, ma'am.
23  Q. Go ahead and open that.
24  A. (Witness complies)
25  Q. Now, you previously identified State's Exhibit 116 as

Page 107

1  an envelope containing the documents -- a portion of the
2  documents that were recovered from Ms. Geraldine Suggett in
3  Hillsboro, correct?
4  A. Yes, ma'am.
5  Q. Can you tell the jury what State's Exhibit 116-A is?
6  A. It's a piece of paper with a name and an address on
7  it.
8  Q. Is this one of the many documents that was recovered
9  from Geraldine Suggett?
10  A. Yes, ma'am.
11  Q. And 116-B is an envelope containing the remainder of
12  the documents that were with 116-A in State's Exhibit 116; is
13  that correct?
14  A. Yes, ma'am.
15  Q. All right. Now, when these documents were recovered
16  from Ms. Suggett -- hold onto that.
17  A. Okay.
18  Q. Now, when you recovered these documents from Ms.
19  Suggett, how did you preserve them?
20  MR. RAY: I'm sorry. Could you repeat the
21  question?
22  Q. When you recovered these documents from Ms. Suggett,
23  how did you preserve them?
24  A. She presented us in a -- I guess a grocery, plastic
25  type plastic bag. We had them, and we took them from there to

Page 108

1  Investigator Rizzy's car and we put them in a sealed evidence
2  bag that he had in his vehicle.
3  Q. And were these maintained under lock and key at the
4  DA's office until such time as they were taken to the Tarrant
5  County Medical Examiner's Office?
6  A. Yes, ma'am.
7  Q. And it was the Medical Examiner's Office that you
8  recovered them from today to bring them here?
9  A. Yes, ma'am.
10  MS. CALLAGHAN: At this time, Your Honor, the
11  State would offer State's Exhibit 116 and 116-B for the record
12  only.
13  MR. RAY: No objection for the record.
14  THE COURT: So admitted.
15  (State's Exhibit No. 116 and 116-B received)
16  MS. CALLAGHAN: Thank you.
17  Q. Now, that was July 24, 2003, those items were
18  recovered from Ms. Suggett; is that correct?
19  A. Yes, ma'am.
20  Q. Let's go to August 29, 2003. Did you then go out
21  with Investigator Rizzy to a location on North Main?
22  A. Yes, ma'am.
23  Q. Where was it that you were going that day?
24  A. We were going to go to a tire shop up on North Main.
25  Q. Do you recall the address of the tire shop?

Page 109

```
1    A. Well, can I look at my note --
2    Q. Your report?
3    A. Yes.
4    Q. Go right ahead if it will refresh your memory.
5    A. It would be 3025 North Main.
6    Q. What was your purpose in going there?
7    A. To go and try to find a pair of car keys at that
8  location.
9    Q. What is at that location?
10   A. What appeared when we saw it looked like an old gas
11 station that someone had changed into a Notary Public, had a
12 Notary Public sign on the side and maybe an office in that
13 location, from what I remember.
14   Q. Okay. And where was it that you were going to look
15 for the keys?
16   A. Up on the roof --
17   Q. Okay.
18   A. -- of the building.
19   Q. Okay. And how did you get up on there?
20   A. At the location in the back of the building was a
21 ladder among some other pieces of junk that were there, and
22 that's how we got up on the roof.
23   Q. When you got up on the roof, did you-all locate a set
24 of keys?
25   A. Yes, ma'am.
```

Page 110

```
1    Q. About where on the roof were they?
2    A. Towards the front part of the building closest to the
3  street.
4    Q. Who secured those keys?
5    A. Myself and Investigator Rizzy.
6    Q. How did you preserve them?
7    A. We put them in a sealed -- once again, once we got
8  off the roof, we put them in a sealed evidence bag and dated
9  and timed them.
10   Q. Okay.
11      MS. CALLAGHAN: May I approach the witness, Your
12 Honor?
13      THE COURT: Yes.
14   Q. Now, let me show you what is marked State's Exhibit
15 No. 117 for identification in this cause and its contents. Can
16 you identify it?
17   A. Yes, ma'am.
18   Q. What is that?
19   A. It's a set of car keys with a remote attached to it.
20   Q. Okay. Are those the same car keys that were
21 recovered from the roof of the tire shop at North Main that you
22 and Investigator Rizzy went to?
23   A. Yes, ma'am.
24   Q. Did you maintain them in your possession after you
25 got these car keys?
```

Page 111

```
1    A. Yes, ma'am.
2    Q. Are you the one that packaged them in this envelope?
3    A. Yes, ma'am. We both put them in there, but
4  Investigator Rizzy timed and dated it, but we did put them in
5  there.
6    Q. Okay. So you were present and you were part of that
7  when they were put in the bag.
8    A. Yes, ma'am.
9    Q. Let me show you what has previously been marked as
10 State's Exhibit No. 115 for identification in this cause. Do
11 you recognize these two photographs?
12   A. Yes, ma'am. It appears to be the building we went
13 to.
14   Q. And this is the tire shop on North Main?
15   A. Yes, ma'am, it looks like the one.
16   Q. Is this a true and accurate depiction of the way that
17 building appears?
18   A. Yes, ma'am.
19      MS. CALLAGHAN: At this time the State would
20 offer State's Exhibit No. 115 for all purposes subject to
21 tendering it to Defense Counsel for inspection.
22      MR. MOORE: No objection.
23      THE COURT: 115 is admitted.
24      (State's Exhibit No. 115 received)
25      MS. CALLAGHAN: If I may walk in front of the
```

Page 112

```
1  jury and publish it, Your Honor?
2       THE COURT: Yes.
3    Q. Investigator Wells, you will note that the building
4  is here and there are two street signs in the center of the
5  bottom picture of State's 115, correct?
6    A. Say again?
7    Q. There are two street signs right here --
8    A. Yes, yes.
9    Q. The second of the two street signs is for an
10 establishment called the Cowboy Inn, correct.
11   A. Yes.
12   Q. And that is a small hotel right there on North
13 Main --
14   A. Yes, ma'am, it is.
15   Q. Okay. Thank you.
16      Now, after the keys in State's Exhibit 117 --
17 after the keys were recovered by you and placed in that bag,
18 did you have to unseal the bag and take the keys out for any
19 purpose?
20   A. Yes, ma'am.
21   Q. What purpose was that?
22   A. To go to the vehicle that was in possession of one of
23 the relatives and test the keys on the car, see if those were
24 the keys.
25   Q. What you wanted to do is take those keys to the
```

Page 113

1 victim's car and find out if they were, in fact, the keys to
2 the victim's car?
3    A. Yes, ma'am.
4    Q. Did you meet with the victim's Goddaughter at an
5 address on Scott Avenue?
6    A. Yes, ma'am, we did.
7    Q. Did you at that time have the keys in order to gain
8 entrance and turn on a Cadillac?
9    A. Yes, ma'am.
10   Q. Let me show you what has been marked as State's
11 Exhibit No. 80 in this cause.
12   A. All right.
13   Q. Is that the same Cadillac that you attempted to gain
14 entry with those keys?
15   A. Yes, ma'am.
16   Q. Were you able to get in the car?
17   A. Yes, ma'am.
18   Q. Were you able to turn it on?
19   A. Yes, ma'am.
20   Q. Was it apparent to you that those keys did, in fact,
21 belong to that vehicle at that point?
22   A. Yes, ma'am.
23   Q. Did you then place the keys back in the bag and
24 reseal it?
25   A. Yes, I did.

Page 114

1    MS. CALLAGHAN: At this time, Your Honor, the
2 State would offer State's Exhibit No. 117 and its contents
3 provisionally subject to connecting it up later with additional
4 evidence.
5    MR. RAY: Your Honor, we would renew our
6 objection we made pretrial in relation to the keys and where
7 they came from and how they found them.
8    THE COURT: They are overruled. It is admitted.
9    (State's Exhibit No. 117 received)
10   MR. RAY: Can we have a running objection so
11 every time they mention the keys, I don't have to make that
12 objection?
13   THE COURT: You may.
14   Q. Did you go to the Tarrant County Medical Examiner's
15 Office this morning in order to bring some of the evidence we
16 have already seen?
17   A. Yes, ma'am.
18   Q. And did you also bring some other items from that
19 location?
20   A. Yes, ma'am, I did.
21   Q. All right, Investigator Wells. Let me show you what
22 are marked State's Exhibit No. 118, 119, 120, 121, 122, and
23 123. These are all paper bags containing specific items of the
24 victim's clothing; is that right?
25   A. Yes, ma'am.

Page 115

1    MR. RAY: I will object to the prosecutor
2 telling the witness what's contained in the exhibits.
3    THE COURT: Sustained.
4    Q. Can you tell us what is in State's Exhibits 118
5 through 123?
6    A. The victim's clothing in this case.
7    Q. Did you bring these to us from the Tarrant County
8 Medical Examiner's Office?
9    A. Yes, ma'am.
10   MS. CALLAGHAN: The State would offer State's
11 Exhibit 118 through 123 for record purposes only at this time.
12   MR. RAY: No objection for just the record.
13   THE COURT: So admitted.
14   (State's Exhibit No. 118 through 123 received)
15   Q. Now, Investigator Wells, are you scheduled to be out
16 of town tomorrow?
17   A. Yes, ma'am.
18   Q. Then we needed to go ahead and do you today a little
19 bit out of order.
20   A. Correct.
21   MS. CALLAGHAN: Thank you.
22   The State passes the witness, Your Honor.
23   CROSS-EXAMINATION
24 BY MR. MOORE:
25   Q. Investigator Wells, Elvis?

Page 116

1    A. Yes, sir.
2    Q. Is that a copy of the report that you made about your
3 and Rizzy's participation in this matter?
4    A. Yes, sir.
5    Q. Did you make any other kind of report or --
6    A. No.
7    Q. Notes or anything?
8    A. Huh-uh.
9    Q. And you went down to Hillsboro and found Geraldine
10 Suggett, right?
11   A. Yes, sir.
12   Q. Wasn't hard to find, was she?
13   A. Well --
14   Q. Kind of?
15   A. Kind of. It's kind of in the sticks.
16   Q. But you did find her?
17   A. Yes, sir.
18   Q. And as far as you know, she's still down there,
19 correct?
20   A. No, sir, I saw her here today.
21   Q. Is she here today?
22   A. Yes, sir.
23   Q. Okay. I made a note here that it was on August 29 of
24 this year that you and Rizzy went over to the tire shop on
25 North Main and climbed up there and found the keys, right?

1   A. Yes, sir.

2       MR. MOORE: Thank you, sir.

3   That's all I have, Judge.

4       MS. CALLAGHAN: The State has no further
5 questions, Judge.

6       THE COURT: You may step down, sir.

7       MS. CALLAGHAN: Your Honor, at this time the
8 State would call Geraldine Suggett.

9       (Witness Sworn)
10 Whereupon,

11          GERALDINE SUGGETT,
12 having been first duly sworn, testified as follows:

13          DIRECT EXAMINATION
14 BY MS. CALLAGHAN:

15   Q. Could you please state your name for the ladies and
16 gentlemen of the jury?

17   A. Excuse me?

18   Q. Could you state your name for the ladies and
19 gentlemen of the jury?

20   A. Yes, ma'am. Geraldine Suggett.

21       MR. MOORE: Judge, could we real quick approach?

22       THE COURT: Yes.

23       (Outside the hearing of the jury)

24       MR. MOORE: Just to be real cautious, we have a
25 note or something that she knew Billy when he had been in jail

1 about that time. I just want to caution them to --

2       MS. CALLAGHAN: I specifically cautioned her
3 earlier today not to mention that. That's all -- I'll caution
4 her again.

5       (In the hearing of the jury)

6   Q. Now, can you tell the ladies and gentlemen your name?

7   A. Geraldine Suggett.

8   Q. How old are you, ma'am?

9   A. I'll be 63 in December.

10   Q. Where is it that you live?

11   A. 157 P.O.R. 77, Hillsboro, Texas.

12   Q. Is that on a rural route?

13   A. Well, it's about four miles out of town.

14   Q. Are you presently employed?

15   A. No, I'm on disability.

16   Q. Okay. All right. And do you know a person named
17 Billy Jack Crutsinger?

18   A. Yes, ma'am.

19   Q. Do you see that person in the courtroom today?

20   A. Yes, ma'am.

21   Q. Can you point to him and tell me something he's
22 wearing?

23   A. Excuse me?

24   Q. Can you point to him and tell me something he's
25 wearing?

1   A. Looks like kind of a striped shirt on the end of the
2 table.

3       MS. CALLAGHAN: May the record reflect, Your
4 Honor, that she's identified the Defendant?

5       THE COURT: It will.

6   Q. Now, can you tell us approximately when you first got
7 to know Billy Jack?

8   A. It's been a couple of years, but I can't pinpoint the
9 date exactly. Sometime in July, I believe, in 2001, somewhere
10 in there, I think, approximately.

11   Q. In the summer of 2001 you first came to know him?

12   A. I think so.

13   Q. All right. And then when was the last time you saw
14 him before today in the courtroom?

15   A. About July of 2002, I believe.

16   Q. All right. So you knew him for about a year.

17   A. Approximately, uh-huh.

18   Q. And during a portion of that time, a month or six
19 weeks or so, did he actually live in your home with you?

20   A. Yes, ma'am.

21   Q. Did you let him use things in your home and use your
22 vehicle?

23   A. Yes.

24   Q. And at one point was he making payments on a truck
25 you had?

1   A. He never made any payments on it, but he took it --

2   Q. To be his eventually.

3   A. Uh-huh. We made arrangements for it.

4   Q. Okay. Now, at any point after he had left your home,
5 did you get that truck back?

6   A. Yes, I did.

7   Q. Okay. And when you got the truck back, did you go
8 through the contents of the truck?

9   A. Yes. I had thought about returning it to him at one
10 time or another and I debated on it. After long thinking about
11 it, I decided not to go and find him.

12   Q. So you kept these items belonging to him from the
13 inside of the truck.

14   A. Just some I accidentally kept. I had thrown some
15 away a couple of months prior to that, and I had left these
16 accidentally in my van after I had picked up the truck.

17   Q. So you kept some items belonging to Billy Jack --

18   A. Yes, to return to him, and I never did go see him,
19 didn't know where he was.

20   Q. Included in those items were there some pieces of
21 paper?

22   A. There were just some -- it was just some scribbling
23 and stuff on some papers that looked like his handwriting to me
24 and what he would do on his jobs.

25   Q. So you had known him while he lived with you to make

## Page 121

1 notes on the various jobs that he did?

2  A. Yes.

3  Q. And he was an asbestos worker; is that right?

4  A. Excuse me?

5  Q. He was an asbestos -- I'm sorry, asphalt --

6  A. Asphalt.

7  Q. He was in asphalt work.

8  A. Yes.

9  Q. And you would see him make notes on the job?

10  A. Occasionally, yes. I never watched him do it all the

11 time, but I had seen him do it once or twice.

12  Q. And you recognized the handwriting?

13  A. I think I would. It looked like his handwriting, and

14 I kept them for him. I was going to give the notes to him.

15  Q. Okay. And at some point during the preparation of

16 this case, I called you, correct?

17  A. After long thinking about it, I didn't want to

18 encounter seeing him again --

19  Q. Okay, ma'am. Hold on. Listen to my question. In

20 the past couple of months, I called you about this case; is

21 that right?

22  A. Yes.

23  Q. And you mentioned to me that you had some pieces of

24 paper belonging to him.

25  A. Yes. I had thrown them in the trash and was going to

## Page 122

1 burn them, and my daughter called me, and I removed them and

2 looked at them.

3  Q. Okay. That's fine. But you went ahead and gave

4 these pieces of paper to our investigator.

5  A. Yes, I did.

6  Q. Mr. Elvis Wells?

7  A. Uh-huh.

8  Q. In order for them to be brought up here, correct?

9  A. Yes, whatever I was -- right.

10  Q. Okay. Now, let me show you what is marked State's

11 Exhibit 116-A for identification in this cause.

12  A. Yes, ma'am, I saw that in there.

13  Q. Okay.

14  A. I didn't know who it was pertaining to or nothing.

15  Q. You didn't recognize the name on the note.

16  A. I didn't, no.

17  Q. But this is one of the documents you said you

18 recognized --

19  A. It's one of the documents that my daughter told me

20 was the name of someone that was in the case or something.

21  Q. This was one of documents where you recognize his

22 handwriting, one of his work documents where he made notes?

23  A. Yes, it does look kind of like it. Appears --

24      MS. HARTMANN: At this time, Your Honor, the

25 State would offer State's Exhibit 116-A for identification for

## Page 123

1 all purposes.

2      MR. MOORE: Well, we'd have to object. She said

3 it kind of looks like it. She didn't positively identify it as

4 being his.

5      THE COURT: Sustained.

6  Q. Is State's Exhibit 116-A one of the items you got

7 from the inside of your truck.

8  A. Yeah. They were in -- I had put them in a Ziplock

9 bag to keep them from getting wet or anything or be messed up

10 before I returned them to him. That's just one of the many

11 items I found.

12  Q. And you said you are familiar with his handwriting.

13  A. Well, that -- some of it looks like his, but some of

14 it don't.

15  Q. Can you tell me which items look like his

16 handwriting?

17  A. The one that says C-a-r-t-e-r.

18  Q. I'm sorry, what?

19  A. The word "Carter."

20  Q. Carter?

21  A. Looks like his writing and this address right there,

22 but that's all.

23  Q. The address does appear to be in his handwriting to

24 you?

25  A. This other one right here.

## Page 124

1  Q. All right.

2  A. The name and street. But the rest I don't know

3 anything about.

4  Q. Okay. The address, though, does appear to be in his

5 handwriting right here.

6  A. The top one there that says 2716.

7  Q. Scott Avenue.

8  A. I'm not sure about --

9      MR. RAY: I will object to the prosecutor --

10 excuse me, ma'am. I will object to the prosecutor reading

11 from a document not in evidence.

12      THE COURT: Sustained.

13      MR. RAY: Ask that the jury be instructed to

14 disregard.

15      THE COURT: The jury is instructed to disregard

16 that portion of the question.

17      MR. RAY: Thank you.

18  Q. Now, you recall when we had our conversation over the

19 telephone; is that right?

20  A. Yes.

21  Q. You told me that all of the items you were sending

22 up, the pieces of paper, were all in his handwriting.

23      MR. RAY: I'm going to object --

24      THE WITNESS: The biggest part of them that I

25 paid any attention to --

Page 125

1    MR. RAY: Excuse me, ma'am. Excuse me just a
2 second.
3    I'm going to object first of all to leading;
4 second of all to hearsay.
5    THE COURT: Sustained.
6    MS. CALLAGHAN: The State has no further
7 questions.
8    MR. RAY: Can we have just a second?
9    (Pause in the proceedings)
10    MR. RAY: We don't have any questions.
11    THE COURT: You may step down, ma'am.
12    MS. HARTMANN: The State calls Tammy Crowell.
13    (Witness Sworn)
14 Whereupon,
15        TAMMY CROWELL,
16 having been first duly sworn, testified as follows:
17        DIRECT EXAMINATION
18 BY MS. HARTMANN:
19    Q. State your name for the record.
20    A. Tammy Crowell.
21    Q. I'm going to direct your attention, Ms. Crowell, back
22 to the year 2002 and ask you where you were working in that
23 year.
24    A. At Meadowbrook United Methodist Church.
25    Q. Where is that church located?

Page 126

1    A. In east Fort Worth.
2    Q. As a member of that congregation, did you know
3 someone by the name of Patricia Syren?
4    A. Yes, ma'am.
5    Q. What were your duties there at the church?
6    A. I was the business administrator in the office.
7    Q. And that requires you to do what?
8    A. Payroll, membership, bulletins, newspaper.
9    Q. Do you have the authority to disperse checks to
10 people?
11    A. On a limited basis.
12    Q. All right. And did you know Patricia Syren to have
13 any type of volunteer or job duties there at the church?
14    A. Yes.
15    Q. What specifically did she do?
16    A. She helped me keep all the membership records up to
17 date.
18    Q. All right. And did she volunteer as receptionist?
19    A. Yes, that was part of the duties.
20    Q. Okay. And how long have you -- how long have you
21 been working -- or how long did you work there at the church?
22    A. Almost nine years.
23    Q. And are you employed elsewhere now?
24    A. Yes.
25    Q. I want to direct your attention specifically to a day

Page 127

1 in February of 2002 and ask you at that time were you working
2 there at the church?
3    A. Yes.
4    Q. And was there an occasion on that date where you and
5 Patricia Syren were both at the church and a man came in
6 looking to bid an asphalt job?
7    A. Yes.
8    Q. Did you speak with that person, did Patricia speak
9 with that person?
10    A. She was the first one to speak to him, and I was in
11 my office, and I was -- she called me out to talk to him.
12    Q. All right. And what was the approximate age of this
13 individual?
14    A. I thought somewhere in his 50s.
15    Q. Was he a white male?
16    A. Yes.
17    Q. And did you have to call anybody to get authorization
18 in regards to whether or not you would, in fact, hire the
19 person to do some work?
20    A. The board of trustees chairperson.
21    Q. Did you, in fact, speak with someone?
22    A. Jim Shoop.
23    Q. Did you speak and obtain approval for this asphalt
24 repair job?
25    A. Yes, ma'am.

Page 128

1    Q. While you were talking with the trustee, was this
2 individual with Patricia Syren?
3    A. Yes.
4    Q. In the same area, waiting area?
5    A. There was a glass wall between them.
6    Q. All right. And was this individual, in fact, given
7 the job to go out and repair the asphalt in the parking lot?
8    A. Yes.
9    Q. Did you at some point verify that that work had been
10 done?
11    A. Yes, we did.
12    Q. Was there an agreement prior to the work being done
13 about how much money would be paid out to that individual?
14    A. Yes.
15    Q. What amount was that?
16    A. 300.
17    Q. Did you go out and make sure that the work had, in
18 fact, been done there in the lot?
19    A. Yes.
20    Q. Did you issue a check?
21    A. Yes, ma'am.
22    MS. HARTMANN: May I approach the witness?
23    THE COURT: Yes.
24    Q. Did you have to sign off on that check?
25    A. Yes.

Condense It!™

Page 129

1  Q. I am going to show you what's been previously marked
2 for identification purposes as State's Exhibit No. 94, and if
3 you would take a look at the paperwork in that exhibit and see
4 if you recognize the information therein.
5  A. Yes, I do.
6  Q. Okay. Do you recognize all of the information, the
7 items contained in State's Exhibit No. 94?
8  A. Yes.
9  Q. Do they appear -- is State's Exhibit 94 a fair and
10 accurate copy of a number of documents?
11  A. Yes.
12  Q. Were these documents created at the time that this
13 asphalt job bid was done by the individual who had walked in?
14  A. Yes.
15  Q. Let me ask you this. Have there been any
16 alterations, changes or deletions made to any of the copies
17 other than the addition of the State's Exhibit sticker up there
18 at the top?
19  A. No.
20    MS. HARTMANN: Your Honor at this time the State
21 would offer State's 94.
22    MR. MOORE: No objection.
23    THE COURT: 94 is admitted.
24    (State's Exhibit No. 94 received)
25  Q. Page 1 of State's 94, is that a copy of the check

Page 130

1 that was issued to this individual?
2  A. Yes.
3  Q. What is the name of the individual to whom it was
4 issued?
5  A. Billy Jack Crutsinger.
6  Q. That is for an amount of what?
7  A. 300.
8  Q. The second page of this exhibit is what?
9  A. The back side of the check.
10  Q. Has it been endorsed?
11  A. Yes. It's been canceled by the bank.
12  Q. So the check was paid?
13  A. Yes.
14  Q. And the name of the person endorsing the check?
15  A. Billy Jack Crutsinger.
16  Q. The third page in State's 94 is what?
17  A. A check voucher.
18  Q. What is the purpose of a check voucher?
19  A. Every time we issue a check, there has to be a
20 voucher and it has to have the approval on it.
21  Q. Is there a date that the check was issued?
22  A. February 1.
23  Q. Of 2002?
24  A. 2002.
25  Q. All right. And the final page in State's 4 is what?

Page 131

1  A. Handwritten invoice as to how much we were supposed
2 to pay him from Billy Jack.
3  Q. And this is an invoice that was written out by Billy
4 Jack Crutsinger --
5  A. Yes.
6  Q. -- and given to you?
7  A. Yes.
8  Q. I'm showing you State's Exhibit No. 3. Is Patricia
9 Syren in State's Exhibit No. 3?
10  A. Yes.
11  Q. Okay. Was she there with you at the church when
12 Billy Jack Crutsinger came into the church to bid the asphalt
13 job?
14  A. Yes.
15    MS. HARTMANN: We pass the witness at this
16 time.
17    CROSS-EXAMINATION
18 BY MR. MOORE:
19  Q. Just very briefly, Ms. Crowell. Are you okay?
20  A. Yes.
21  Q. The person that did the asphalt work, is that him?
22  A. Yes.
23  Q. Are you sure?
24  A. Yes.
25  Q. Okay. He actually performed the service?

Page 132

1  A. I went out and checked it, yes.
2  Q. Okay.
3  A. Walked out with him.
4  Q. And you were also with another employee of the
5 church?
6  A. Custodian.
7  Q. Has he ever done any work for you before?
8  A. No.
9  Q. And he did a satisfactory job and you paid him his
10 money that he asked, and that was it, correct?
11  A. Yes.
12    MR. MOORE: Okay. Thank you, ma'am.
13    MS. HARTMANN: The State has nothing further at
14 this time.
15    THE COURT: You may step down, ma'am.
16    MS. HARTMANN: May Ms. Crowell be excused?
17    THE COURT: she may.
18    MS. HARTMANN: May we approach, Judge?
19    THE COURT: Yes.
20    (Outside the hearing of the jury)
21    MS. HARTMANN: The next witness is a crime scene
22 officer from the house. We can start on him, but it is going
23 to be pretty lengthy. If you want to start we will, or we can
24 do it in the morning.
25    THE COURT: Do about 30 minutes worth.

1     MS. HARTMANN: All right.

2     (In the hearing of the jury)

3     MS. CALLAGHAN: At this time, Your Honor, the

4 State calls Officer Wilson.

5 Whereupon,

6     GLENN WILSON,

7 having been first duly sworn, testified as follows:

8     DIRECT EXAMINATION

9 BY MS. CALLAGHAN:

10     Q. Could you please state your name for the ladies and

11 gentlemen of the jury?

12     A. Glenn Wilson.

13     Q. How are you employed?

14     A. Fort Worth Police Department.

15     Q. What do you do for them?

16     A. Crime Scene officer.

17     Q. What is a Crime Scene officer?

18     A. Beg pardon?

19     Q. What is a Crime Scene officer?

20     A. I record and search and photograph evidence.

21     Q. Okay. Do you belong to the unit that does that for

22 the Fort Worth Police Department?

23     A. Yes.

24     Q. How many people are in that unit?

25     A. 15.

1     Q. Okay. And how long have you been doing that?

2     A. Almost -- well, a little over 11 years.

3     Q. Okay. Did you learn how to do that basically in

4 training at the Fort Worth Police Department?

5     A. I had on-the-job training.

6     Q. Do you also take seminars or have continuing

7 education?

8     A. Yes, ma'am.

9     Q. What kinds of seminars have you been to pertaining to

10 obtaining and preserving evidence?

11     A. I've been to a photography school, been to

12 fingerprinting for -- on skin type school, a couple of just

13 continuing education classes in our academy that have a little

14 bit of crime scene to them.

15     Q. How many crime scenes do you estimate that you have

16 examined or obtained evidence from in the course of your

17 career?

18     A. Several hundred.

19     Q. Okay. All right. Now, were you dispatched to an

20 address on Scott Avenue?

21     A. Yes.

22     Q. What address is that?

23     A. That was 2716.

24     Q. Is that location in Fort Worth, Tarrant County,

25 Texas?

1     A. Yes.

2     Q. What time were you dispatched?

3     A. At 17 -- 19:17 hours, 7:17 p.m.

4     Q. Okay. All right. Thank you for putting it in normal

5 person time.

6     And what time did you arrive?

7     A. At 9:29 -- 7:29, excuse me.

8     Q. About 12 minutes later?

9     A. Yes.

10     Q. When you arrived at the scene, what is the very first

11 thing you did?

12     A. Well, I'll meet with one of the officers or whoever

13 is out there trying to coordinate the scene, which at this time

14 was Sergeant Plowman.

15     Q. Okay. So you went out there and you spoke to

16 Sergeant Plowman.

17     A. Yes.

18     Q. Were you trying to get some kind of information about

19 of what had happened before you arrived?

20     A. Yes.

21     Q. What is your purpose in getting information of that

22 nature?

23     A. Well, we kind of see what kind of call we have, and

24 depending on what type of call it is, then in this case we

25 would want to wait for a homicide detective to make the scene

1 before we go into the actual scene.

2     Q. Did you actually wait for a homicide detective to

3 arrive?

4     A. Yes.

5     Q. Who was it that finally arrived?

6     A. Detective McCaskill.

7     Q. And did you talk to him?

8     A. Yes.

9     Q. What happened after you talked to him?

10     A. After we met, then -- we met with Sergeant Plowman

11 and Officer O'Brien, we started a -- we entered the residence,

12 did a little walk-through.

13     Q. When you started to go into the house, did you notice

14 whether or not there was an officer restricting access to the

15 house?

16     A. Yes, there was.

17     Q. Do you recall which officer that was?

18     A. No.

19     Q. Did you notice whether the crime scene had been

20 preserved?

21     A. Yes, it had been.

22     Q. Okay. Now, when you very first went in the house,

23 did you notice anything about the lighting and the temperature?

24     A. The only light that was on was in the bathroom, and

25 all the other lights were off.

Page 137

1 Q. Okay. What was the approximate temperature at that
2 time? Was it cool or very warm?

3 A. It was a little bit chilly. I had a coat on.

4 Q. So this was April, correct?

5 A. Yes.

6 Q. So it wasn't hot yet.

7 A. No.

8 Q. When you walked into the house, what is the first
9 thing you looked at or noticed?

10 A. Well, after noticing that the door was open, I
11 noticed there was a little drop of blood right there on the
12 front entry tile, was the very first thing I noticed.

13 Q. What did you look at next?

14 A. There was a bloody shoe print -- what appeared to be
15 a bloody shoe print on the other tile -- couple of tiles that
16 were in the little tile entry area, is the first thing that we
17 saw.

18 Q. Okay. Did you take care to make sure those were
19 preserved?

20 A. Yes.

21 Q. What did you notice as you went through the remainder
22 of the house?

23 A. Noticed there was a lot of blood in just about every
24 room we walked into. Noticed there were drops of blood and
25 then a large amount of blood in the hallway and bathroom.

Page 138

1 Q. Okay. Were the victims still there in the hallway
2 when you arrived?

3 A. Yes, ma'am.

4 Q. Now, did you take note of the layout of the house,
5 how it was organized?

6 A. Yes, we did.

7 Q. And you took note of where the bodies were and where
8 the evidence was located?

9 A. Yes.

10 Q. Did you prepare a diagram based on your observations?

11 A. Yes, we did.

12 Q. Let me show you what has been marked as State's
13 Exhibit No. 8 for identification. Do you recognize it?

14 A. Yes, I do.

15 Q. What is it?

16 A. It is the layout of the residence.

17 Q. Does this also have noted on it the location of
18 various pieces of evidence that you recovered?

19 A. Yes, ma'am.

20 MS. CALLAGHAN: At this time the State would
21 offer State's Exhibit No. 8 subject to --

22 MR. RAY: No objection, I've seen it.

23 THE COURT: 8 is admitted.

24 (State's Exhibit No. 8 received)

25 MS. CALLAGHAN: If I may briefly publish it to

Page 139

1 the jury, Your Honor, and we'll make reference to it later.

2 Q. Now, after you prepared the diagram, did you have an
3 opportunity -- I'm sorry. After you did the walk-through which
4 your diagram was based on, did you have an opportunity to
5 photograph the scene?

6 A. Yes. I had the assist officer with me, and myself
7 and Officer Wallace began to take photographs at the scene.

8 Q. Officer Wallace is another crime scene officer; is
9 that correct?

10 A. Yes, uh-huh.

11 Q. And the two of you photographed the entire scene
12 within the house; is that correct?

13 A. Yes.

14 Q. Okay. I'm going to separate these photographs into
15 stacks, and we will go over one stack at a time since there are
16 quite a few of them. Okay?

17 A. Yes.

18 Q. Let me show you first stack No. 1 which contains
19 State's Exhibits 9 through 25 for identification. Could you go
20 ahead and take a look at those.

21 A. (Witness complies)

22 Q. All right. Do you recognize State's Exhibits 9
23 through 25?

24 A. Yes.

25 Q. With regard to State's Exhibit 9 or 10, are those

Page 140

1 aerials of the victims' house on Scott Avenue?

2 A. Yes.

3 Q. Are these true and accurate depictions of the way
4 that area appeared, including the victims' house?

5 A. Yes.

6 Q. Now, with regard to State's Exhibit 11 through 25 for
7 identification, are these true and accurate depictions of the
8 way the house and its interior looked on April 8, 2003?

9 A. Yes.

10 Q. And these were photographs actually made by you and
11 Officer Wallace.

12 A. Correct.

13 Q. Only they are blown up and enlarged.

14 A. Yes.

15 MS. CALLAGHAN: At this time, Your Honor, the
16 State would offer State's Exhibits 9 through 25 inclusive
17 subject to tendering them to Defense Counsel for their
18 inspection.

19 MR. RAY: We don't have any objection to 9
20 through 25.

21 THE COURT: 9 through 25 are admitted.

22 (State's Exhibit No. 9 through 25 received)

23 Q. Okay, Officer. Do you want to step down for just a
24 minute?

25 A. (Witness complies)

1      MR. RAY:  With the Court's permission, can I --
2      THE COURT:  Yes.
3    Q.  Here is what we are going to do.  We are going to cut
4  the jury in half like this and start with this half.  Let me
5  get on this side so that you are facing Steve.
6      Let's show State's Exhibit No. 9 and 10 for
7  identification, which are the aerials.  Can you give the jury
8  an idea where the victims' house is located?
9    A.  Right here with the detached apartment and detached
10  garage.
11    Q.  And you are pointing to the house with the red roof
12  in the center of State's Exhibit 10?
13    A.  Right here.
14    Q.  Okay.  And you can see the house with the red roof in
15  State's Exhibit No. 9 as well easily, correct?
16    A.  Uh-huh.
17    Q.  All right.
18    A.  That's right here, the detached apartment and
19  detached garage.
20    Q.  Behind the garage you can see an alley; is that
21  correct?
22    A.  Yes.
23    Q.  Okay.  Now, if you want to stay down --
24    A.  Okay.
25    Q.  Let's move over here.

Page 142

1      Let's start off with State's Exhibit No. 11,
2  and can you tell me what that is?  Stand over here so you are
3  facing Steve and the jury.
4    A.  Here is the front entry door, and this was just a
5  vehicle that was parked in the driveway.  We take a general
6  outside layout picture.  We wanted to put that in there to make
7  sure we get the license plate.
8    Q.  Now, before we pass on from this particular
9  photograph, let me go ahead and show you State's Exhibit 1,
10  which is a montage, and 2 for identification.  Are those also
11  made from crime scene photos taken by you?
12    A.  Well --
13    Q.  You or Officer Wallace?
14    A.  Probably Officer Wallace.  These were made in the
15  daytime, and when we were out there on the call, it was dark.
16    Q.  Okay.  Is this a true and accurate depiction of the
17  way the house appeared though?
18    A.  Yes, it is.
19    Q.  Now let's go on to State's Exhibit No. 12 and 13, 14
20  and 15.  Can you go ahead and tell us what these photographs
21  are?
22    A.  This right here is the front entry.  As we first made
23  entry through the front door, this was that blood I was saying
24  I first observed when I first made entry through this little
25  tile area right here.  There were a couple of bloody shoe

Page 143

1  impressions, and that's this area right in here.
2      And then this is just a -- this is actually
3  taken from inside looking back toward the front door.  This is
4  that front tile area, with this being the hardwood floor.  As
5  you walk in, it opened up to a very large living room kind of
6  dividing the two sections, and this is the hardwood flooring
7  part of that living room.  This is the carpet part of the other
8  half living room.
9    Q.  Okay.
10    A.  This is just a closeup of this right here after we
11  finally put some numbers down.  This is when we first walked,
12  we wanted to take some pictures, and then when we see that we
13  want to collect this blood, we will put a marker by it to
14  identify where we got the blood from.
15    Q.  Okay.  Now, do you want to go ahead and get the large
16  diagram for me?
17    A.  All right.
18    Q.  Okay.  Why don't we come over here.  Now, if you can
19  show us on State's Exhibit No. 8 -- why don't you change places
20  with me.
21    A.  All right.
22    Q.  Now, looking at the diagram, can you show us where
23  the front door is on this diagram?
24    A.  Front door is right here, front entry.  Little tile
25  area is right here.  And this would be that 1 marker and this

Page 144

1  was the number 2 marker.  This is the living room with the
2  hardwood flooring and this is the other half of the living room
3  that was the carpet area.
4    Q.  So the living room extends to both directions once
5  you come in the front door, correct?
6    A.  Yes.
7    Q.  And then straight on this would be the dining room?
8    A.  Correct.
9    Q.  And to the left here is a hallway and a bath.
10    A.  Right.
11    Q.  Okay.  Now, if I --
12      MS. CALLAGHAN:  Now, if I may inquire, Your
13  Honor, can the jury see the exhibits as they are placed up
14  here?
15      A JUROR:  They have a glare on them.
16    Q.  Well, we are going to walk in front again and explain
17  to the jury what those are.
18    A.  This is the front entry door.  This was the tile area
19  and this was the blood before we marked it when we first came
20  in there.  This was the bloody shoe impressions that are on a
21  couple of these tiles.
22    Q.  Okay.  Why don't we move down here and show these to
23  the jury.
24    A.  Front entry door, tile area, blood and then these
25  bloody shoe impressions are a couple here and a couple right

**Page 145**

1 over here.
2   Q.  And for the record you are referring to State's
3 Exhibits 12 and 13?
4   A.  Yes.
5   Q.  Why don't we go on to State's Exhibits 14 and 15.  Go
6 back to the other side of the jury and begin there.
7   A.  Okay.  What do you want me to show them?
8   Q.  Show them those two photographs and explain what they
9 are.
10   A.  This is just coming into the house a little part.
11 This is the living room.  This is the half that has the
12 hardwood flooring, which would be this half, and this is just
13 after we decided we want to collect blood here.  We will put a
14 marker down so we will know where we are getting our blood
15 samples from.
16   Q.  Okay.  Start with this half and explain what they
17 are.
18   A.  This is the front entry door, tile area, and just a
19 closeup of this right here, and this is the hardwood floor,
20 half of the living room, and this would be the carpet part of
21 the living room.
22   Q.  Okay.  Now, let me show you what are marked State's
23 Exhibits 16 and 17 for identification.  Starting with this half
24 of the jury, why don't you explain what these show.
25   A.  This is the second blood sample that we wanted to

**Page 146**

1 collect.  It was right here.  Just has -- this is the little
2 front tile area.  This is just a little more into the living
3 room with the half that had the hardwood flooring.
4   Q.  And it is marked on the diagram?
5   A.  Yes, ma'am.  And this is the area -- this is a
6 picture taken from about right here.  This is a stairway that
7 goes upstairs to actually the east side of the house looking
8 across the carpeted part of the living room to the hardwood
9 flooring part of the living room.  This was all just one big
10 room.  It looks like two big rooms, but it's actually one big
11 living room.
12   Q.  Why don't we go to the second part of the jury and
13 show them.  First of all, State's Exhibit No. 16, tell them
14 what that is.
15   A.  This is just another marker, some more blood in the
16 living room.  The hardwood floor half.  This is a picture from
17 the east side of the living room by the stairwell taken
18 toward -- just showing the carpet area and the hardwood floor
19 area of the living room.
20   Q.  Okay.  Now, let's start with State's Exhibit No. 18
21 and 19.
22   A.  All right.  This is all on the carpeted part of the
23 living room, which would be this area.  Here is the chairs,
24 here is the TV.
25   Q.  The chairs in State's Exhibit No. 18, those are

**Page 147**

1 marked as squares here in the diagram?
2   A.  These two chairs right here.
3   Q.  And you can see the table in between them --
4   A.  Yes.
5   Q.  Okay.
6   A.  And this is a picture of the TV area and then the
7 entry of the stairway, which is right here going up to the
8 stairs.
9   Q.  Let me go ahead and put this up here and refer to it.
10       Now let's split the jury in half and come down
11 here.  And State's Exhibit No. 18 and 19 for identification?
12   A.  Two chairs right here, carpeted part of the living
13 room and then the second picture is a picture showing the
14 entryway to the stairwell that goes up to the upstairs rooms.
15   Q.  All right.  Let's go to State's Exhibit 20 and 21.
16   A.  This is the front entry door, and it is a picture
17 actually taken from about right here aiming back towards the
18 front door.  Here is the dining room and then the living room
19 that's the hardwood floor half.  And that's just a picture
20 standing in the dining room taken towards the kitchen kind of
21 just showing -- trying to show the layout of kind of the house.
22   Q.  In the photograph can you see additional drops of
23 blood?
24   A.  Yes.  There is some on the table, some on the floor,
25 some on this little piggy bank that was knocked over, some in

**Page 148**

1 the kitchen.
2   Q.  Okay.  Now move down and show the second half of the
3 jury.
4   A.  Okay.
5   Q.  Starting with State's Exhibit 20.
6   A.  This is a picture from inside the dining room facing
7 the front door, which is about like right here facing this
8 way.  And then the second picture is taken about right here in
9 the dining room looking toward the kitchen.  And then you can
10 see some blood on the kitchen floor and then right here is
11 blood on the table and blood right here on the piggy bank right
12 here that we collected that had blood on it.
13   Q.  Okay.  Let's go to State's Exhibits 22 and 23.
14   A.  Okay.  22 is standing just about right here at this
15 threshold and taking a picture toward the doorway and into the
16 hallway right here where the two complainants were lying.  And
17 that's this area right here.
18       And then this picture is -- it is just a little
19 bit different -- it is a little different angle taken after --
20 this is the second picture taken after we -- we do first a
21 general walk-through.  We want to take it through the house and
22 then we say okay we want to collect evidence here and here, and
23 we put our markers down and take a picture.
24   Q.  Both of the photographs in the hallway to the left,
25 you can begin to see the victims.

Page 151

1  A. Yes.

2  Q. And they were still there at the time you took these

3 photographs?

4  A. Yes.

5  Q. Now, let's go ahead with the second part of the jury.

6  A. Okay.

7  Q. Tell them about State's Exhibit 22 and 23.

8  A. These pictures are standing just about in the same

9 place, which is right here taking the picture back this way.

10 The victims were lying in this area right in here.

11  Q. And --

12  A. And you take this picture first and then after we

13 decide we want to take blood from certain areas, then we put

14 markers down and take another picture.

15  Q. Let me show you what is marked State's Exhibits 24

16 and 25 for identification in this cause. Let's start with

17 State's Exhibit 24 and with this half of the jury.

18  A. Okay. This is standing just about right here because

19 we just -- that is the piggy bank right here. You can see that

20 it is knocked over. And then this picture right here is taken

21 standing right about right here facing this way.

22     Here is No. 4, and you can see a little bit into

23 the hallway basically showing that there was blood. And that's

24 an item we wanted to collect, so we wanted to show that to show

25 the blood on the scene and then where we were going to collect

Page 150

1 blood.

2  Q. Now, you notice that the victims once again are here

3 in the hallway?

4  A. Yes.

5  Q. And there is a dark patch of blood right out here in

6 front of the door which is in front of --

7  A. Yes, ma'am.

8  Q. On the hardwood.

9  A. Yes.

10  Q. Go ahead and take a seat, and we'll start on stack

11 No. 2.

12  A. (Witness complies)

13  Q. If you want to take a moment to review State's

14 Exhibits 26 through State's Exhibit 41?

15  A. All right.

16  Q. Okay. Are State's Exhibits No. 26 through State's

17 Exhibit 41 inclusive all true and accurate depictions of the

18 way the scene appeared on --

19  A. Yes.

20  Q. Are those the same photographs made by you and

21 Wallace --

22  A. Yes.

23     MS. CALLAGHAN: The State would offer State's

24 Exhibits 26 through 41 inclusive subject to tendering them to

25 Defense Counsel for inspection.

Page 151

1     (Pause in the proceedings)

2     MR. RAY: No objection.

3     THE COURT: 26 through 41 are admitted.

4     (State's Exhibit No. 26 through 41 received)

5     MS. CALLAGHAN: If you would step down again,

6 Officer.

7  A. (Witness complies)

8  Q. Now, why don't I go ahead and stand over here. And I

9 will show you State's Exhibit No. 26 and 27 for

10 identification. Can you go ahead and explain for the jury what

11 these two photographs are?

12  A. This is a picture taken from right here this way

13 showing the two victims lying in the hallway, and this victim

14 right here was partially in the hall and partially in the

15 bathroom. This is just another picture of them -- this is

16 actually taken from this bedroom right here, right in here.

17  Q. At the very top of State's Exhibit No. 8, the

18 diagram, that's a bedroom, correct?

19  A. Yes. This would be the -- it is downstairs and it

20 would be the south bedroom.

21  Q. And you photographed that bedroom as well.

22  A. Yes.

23  Q. All right. Why don't we come down and show the

24 second half of the jury.

25  A. This picture is standing right here taking the two

Page 152

1 victims and the picture is taken from about this point right

2 here showing them from the south to the north.

3  Q. From the south to the north you say?

4  A. Yes. This way here is south and this way is north.

5  Q. Now let me show you what is marked State's Exhibits

6 28 and 29 for identification. Start with this half of the jury

7 and tell us what we are looking at here starting with 28.

8  A. This is the blood we took off of the doorway -- off

9 the door actually right here, actually kind of -- it opens like

10 this or like that so it was kind of like this right here.

11 That's the door. This would be the south bedroom. The hallway

12 would be back this way where our victims were lying.

13  Q. So this was the door that opens into the hallway

14 where the victims were lying and this is some blood right

15 there.

16  A. Yes.

17  Q. That's pictured with the No. 12 in State's Exhibit

18 No. 28?

19  A. Yes.

20  Q. And State's Exhibit No. 29 is what?

21  A. It is the blood we were wanting to show here, and it

22 was on the door jamb here.

23  Q. Can you show where the door jamb was on State's

24 Exhibit No. 8?

25  A. Right here on this side right here going into the

Page 153

1 dining room.

2    Q.  Okay.  Why don't we repeat that.

3    A.  12 is -- the door is not on the diagram, but it would

4 open like this and it was -- it was like that right there and

5 the blood was on the end of the door.  And 14 is the blood that

6 was on this door jamb that's in the hallway right here.

7    Q.  Let's go over State's Exhibits No. 30 and 31.

8    A.  11 is a picture of blood that is on this door jamb

9 right here, and 13 is blood that's on that door jam.

10    Q.  For the record, there is a picture of a yellow No. 11

11 in State's Exhibit 31, and you have pointed out where that is

12 on the diagram 8; and State's Exhibit No. 30 is a picture of

13 the blood marked 13, and you have also pointed out where that

14 is on the diagram.

15    A.  Yes.

16    Q.  Okay.

17    A.  Blood on this door jamb right here.  The door would

18 be right here.  This is the blood on that door jamb and blood

19 on this door jamb right here.

20    Q.  Okay.  Now let's go to State's Exhibits No. 32 and

21 33.  Can you show us what State's Exhibit No. 32 is?

22    A.  This is a picture of -- standing basically right here

23 showing into the bathroom with the one victim that was lying

24 partially in the bathroom and partially in the hallway.  And

25 this is the bathroom right there.  This is after -- there is

Page 154

1 her head right there and this was all this area right here.

2 Just another picture kind of closer up.

3    Q.  Of that area there?

4    A.  Kind of showing a little more detail.

5    Q.  All right.  Let's show the second half of the jury

6 State's Exhibits No. 32 and 33.

7    A.  As you are looking at the picture, this is the same

8 picture.  She hadn't been moved.  This is her hair right here

9 which would be -- just a little bit of a given angle of a

10 picture shown a little more in the bathroom, and it was taken

11 from right here showing this way showing her lying here and

12 then what was in the bathroom.

13    Q.  Now let's go over State's Exhibits 34 and 35.

14    A.  This is the bathroom, and this is just the corner of

15 the bathroom right in here, and this is just back there in

16 front of the commode right there.

17    Q.  Okay.  Now let's go over State's Exhibits 36 and 37

18 for identification.

19    A.  This is in the bathroom.  This is the knife blade

20 that was found, and it was found right here in the corner.

21 This is actually blood on the door jam right here, and this was

22 inside the bathroom back in the corner right behind -- it

23 would be like a little door -- where the door would shut it was

24 stuck right back in this corner.

25    Q.  The knife blade that you are referring to is marked

Page 155

1 with a plain dot on State's Exhibit No. 8 and this is a line to

2 it that says knife blade.

3    A.  Yes.

4    Q.  And State's Exhibit No. 37 is a photograph of the

5 knife blade.

6    A.  Yes.

7    Q.  And it was not moved prior to this photograph being

8 taken.

9    A.  No.

10    Q.  Now, let's go over State's Exhibits No. 38 and 39.

11    A.  Okay.

12    Q.  Go ahead and tell them --

13    A.  This is the sink and this would be the bathroom door.

14    Q.  Okay.

15    A.  And it's got blood on it --.

16    Q.  You can see the blood marks on it --

17    A.  Yeah.

18    Q.  Okay.  State's Exhibit 40 and 41 for identification?

19    A.  These are shoe impressions that were taken right

20 here, which is 31 right here in front of the commode.  They

21 were done at a little bit later time because we took a chemical

22 process in there and we didn't see those at first and we just

23 thought maybe there might be some there.  We chemically

24 processed those and got those to come out.  Just like at 30 and

25 31-B, these two tiles.

Page 156

1    Q.  Was that a substance called (inaudible) that you

2 used --

3    A.  Yes.  This was just a closeup of the rag --

4 Kleenex-type thing that was on the counter.

5    Q.  Now let me show you the next stack.

6        THE COURT:  We can go ahead and break for the

7 evening at this point.

8        Ladies and gentlemen, we are going to break

9 until 9:00 o'clock tomorrow morning.  Please remember and

10 follow your instructions that you were given earlier, and the

11 bailiffs will meet you outside the courtroom door just before

12 9:00 o'clock tomorrow morning.  Have a good evening.

13        (Proceedings recessed)

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF TEXAS

2  COUNTY OF TARRANT

3      I, Steve Schiller, Official Court Reporter for the

4  213th District Court of Tarrant County, Texas, do hereby

5  certify that the above and foregoing contains a true and

6  correct transcription of all portions of evidence and other

7  proceedings requested in writing by counsel for the parties to

8  be included in this volume of the Reporter's Record, in the

9  above-styled and numbered cause, all of which occurred in open

10  court or in chambers and were reported by me.

11

12

13      I further certify that this Reporter's Record of the

14  proceedings truly and correctly reflects the exhibits, if any,

15  admitted by the respective parties.

16

17

18

19  WITNESS MY OFFICIAL HAND this the 27th day of April, 2004.

20

21      STEVE SCHILLER, CSR
        Official Court Reporter
22      213th District Court
        401 West Belknap
23      Fort Worth, Texas 76196
        (817) 884-2687
24      State Certification No. 4665

25      Certification Expires: 12-31-05