REPORTER'S RECORD
VOLUME 28 OF 36 VOLUMES
TRIAL COURT CAUSE NO. 0885306D

| | | |
|---|---|---|
| THE STATE OF TEXAS | X | IN THE DISTRICT COURT |
| VS. | X | TARRANT COUNTY, TEXAS |
| BILLY JACK CRUTSINGER | X | 213TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRIAL ON THE MERITS CONTINUED

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On September 23, 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Robert K. Gill, Judge presiding, held in Fort Worth, Tarrant County, Texas.

Proceedings reported by computerized stenotype machine.

## A P P E A R A N C E S

HONORABLE MICHELE HARTMANN                    SBOT NO.09167800
    and
HONORABLE LISA CALLAGHAN                       SBOT NO.  0116700
Assistant District Attorneys
401 W. Belknap
Fort Worth, Texas 76196
Phone: (817) 884-1700                          FOR THE STATE


HONORABLE WILLIAM H. RAY                       SBOT NO. 16608700
5041 Airport Freeway
Fort Worth, Texas 76117
Phone: 817-831-8383
    And
HONORABLE TIM MOORE                            SBOT NO. 14378300
115 West 2nd Street
Suite No. 202
Fort Worth, Texas 76102
817-332-3822                                   FOR THE DEFENDANT

## INDEX - VOLUME 28
## TRIAL ON THE MERITS CONTINUED

**September 23, 2003**                                                              **PAGE**

### STATE'S EVIDENCE

| NAME | DIRECT | CROSS | VOIR DIRE |
|---|---|---|---|
| Wilson, Glenn | 6, 58, 63 | 48, 62 | 7, 32, 40 |
| Ball, Mark | 64, 89 | 87 | 83 |
| McCaskill, John | 89, 153 | 133, 157 | |
| Johnson, Cheryl | 158, 179 | 172 | |
| Fuller, Randy | 182, 188 | 187, 189 | 185 |
| Turner, Harvey | 190 | 204 | |
| Angram, Loretta | 210 | | |
| Shrader, Denise | 215 | 220 | 218, 219 |
| Daley, Rosalee | 221 | 224 | |
| White, Lynn | 226 | | |

Reporter's Certificate..................................................................................... 239

## INDEX OF EXHIBITS - VOLUME 28
## STATE'S EXHIBITS

| No. | Description | Offered | Received |
|---|---|---|---|
| 42-62 | Large Mounted Photographs | 7 | 8 |
| 64-72 | Large Mounted Photographs | 18 | 18 |
| 73 | Bag | 30 | 30 |
| 73-A | Envelope | 30 | 30 |
| 73-B | Sample 1 | 31 | 31 |
| 73-C | Sample 7 | 31 | 31 |
| 73-D | Sample 8 | 31 | 31 |
| 73-E | Sample 23 | 31 | 31 |
| 73-F | Remainder of Samples | 30 | 31 |
| 73-G | Envelope | 30 | 30 |
| 73-H | Control Sample 1 | 31 | 31 |
| 73-I | Control Sample 7 | 31 | 31 |
| 73-J | Control Sample 8 | 31 | 31 |
| 73-K | Control Sample 23 | 31 | 31 |
| 73-L | Remainder of Control Samples | 30 | 31 |
| 74 | Envelope | 37 | 37 |
| 74-A | Blade | 37 | 37 |
| 75 | Sack | 39 | 39 |
| 75-A | Tile in Baggie | 41 | 41 |
| 76 | Bag | 35 | 35 |
| 76-A | Bag | 33 | 33 |
| 76-B | Eyeglasses | 33 | 33 |
| 76-C | Envelope | 33 | 33 |
| 76-D | Necklace | 33 | 33 |
| 76-E | Envelope | 34 | 34 |
| 76-F | Photo | 34 | 34 |
| 77 | Brown Paper Sack | 41 | 41 |
| 78 | Brown Bag with Comforter | 41 | 41 |

| No. | Description | Offered | Received |
|---|---|---|---|
| 79 | Box | 41 | 41 |
| 80 | Photo | 97 | 98 |
| 81-89 | Photos | 67 | 67 |
| 99 | Hospital Records | 232 | -- |
| 100 | Vehicle Inquiry | 235 | 235 |
| 101 | Photo Answering Machine | 115 | 115 |
| 102 | Photo | 109 | 109 |
| 103 | Photo | 110 | 110 |
| 104 | Photo | 109 | 109 |
| 106-112 | Photo | 162 | 162 |
| 113 | Photo | 203 | 203 |
| 114 | Composite of Photos | 114 | 114 |
| 124 | Sack | 166 | 166 |
| 124-A | Denim Shirt | 167 | 167 |
| 125 | Bag | 168 | 168 |
| 125-A | Cuttoff Jeans | 168 | 168 |
| 126 | Bag with white socks | 170 | 170 |
| 127 | Bag with t-shirt | 170 | 170 |
| 128 | Bag with towel | 170 | 170 |
| 129 | Paper Bag | 81 | 83 |
| 129-A | Paper Bag | 81 | 83 |
| 129-B | Seatbelt | 83 | 83 |
| 129-C | Remainder of Swabs | 81 | 83 |
| 129-D | Various Items | 84 | 84 |
| 129-E | Swab | 83 | 83 |
| 129-F | Swabs | 81 | 83 |
| 130 | Miranda Warning | 112 | 112 |
| 131 | Audio cassette tape | 113 | 113 |
| 132 | Factory Brand Shoes Reeipt | 217 | 217 |
| 133 | Permission to Collect Bio Sample | 122 | 122 |
| 134 | Cheek Swab Kit | 127 | 127 |
| 135 | Receipt from Razoo's | 222 | 222 |
| 136 | Set of Buccal Swabs | 132 | 132 |
| 137 | Bluejean Cuttings | 170 | 170 |
| 139 | Credit Card Records | 185 | 185 |

### DEFENDANT'S EXHIBITS

| No. | Description | Offered | Received |
|---|---|---|---|
| 2 | Box | 175 | 175 |
| 4 | Search Warrant and Affidavit | 158 | 158 |

## ALPHABETICAL INDEX OF WITNESSES - VOLUME 28

| NAME | DIRECT | CROSS | VOIR DIRE |
|------|--------|-------|-----------|
| Angram, Loretta | 210 | | |
| Ball, Mark | 64, 89 | 87 | 83 |
| Daley, Rosalee | 221 | 224 | |
| Fuller, Randy | 182, 188 | 187, 189 | 185 |
| Johnson, Cheryl | 158, 179 | 172 | |
| McCaskill, John | 89, 153 | 133, 157 | |
| Shrader, Denise | 215 | 220 | 218, 219 |
| Turner, Harvey | 190 | 204 | |
| White, Lynn | 226 | | |
| Wilson, Glenn | 6, 58, 63 | 48, 62 | 7, 32, 40 |

## Page 1

```
1              REPORTER'S RECORD

2            VOLUME 28 OF 36 VOLUMES

3          Trial Court Cause No. 0885306D

4    THE STATE OF TEXAS   X   IN THE DISTRICT COURT

5    VS.                  X   TARRANT COUNTY, TEXAS

6    BILLY JACK CRUTSINGER X   213TH JUDICIAL DISTRICT

7    -------------------------------------------

8         TRIAL ON THE MERITS CONTINUED

9    -------------------------------------------

10       On the 23rd day of September, 2003, the following

11   proceedings came on to be heard in the above-entitled and

12   -numbered cause before the Honorable Bob Gill, Judge presiding,

13   held in Fort Worth, Tarrant County, Texas:

14

15       Proceedings reported by computerized stenotype

16   Machine; Reporter's Record produced by Computer-Assisted

17   Transcription.

18

19

20

21

22

23          STEVE SCHILLER, Texas CSR No. 4665
24             Official Court Reporter
               213th Judicial District Court
25               Tarrant County, Texas
```

## Page 2

```
1            P R O C E E D I N G S

2              (September 23, 2003)

3              (Morning Session:)
```

4       MS. HARTMANN: Your Honor, at this time the State
5  would ask for an oral motion in limine.  Mr. Ray, during his
6  opening statement yesterday afternoon, gave information to the
7  jury that he anticipated that they would be seeing an affidavit
8  for a search warrant.

9       In addition, he told the jury that he believed
10 that the search warrant was obtained as a result of concern on
11 behalf of personnel of the district attorney's office.

12       And the State's position is that whether there is
13 probable cause is a legal issue, not a fact issue for the jury's
14 determination, so it's not relevant from that standpoint.

15       Second of all, the affidavit and search warrant,
16 in and of themselves, are hearsay and are inadmissible, and I
17 know of no exception in the rules of evidence that would allow
18 their introduction before the jury.

19       Any statements that I, Ms. Callaghan or any other
20 member of the district attorney's staff made to Detective
21 McCaskill in the course of preparation for this case would be
22 hearsay, they're not relevant; and even if the Court found them
23 to be relevant, their probative value would be substantially
24 outweighed by any prejudicial effect on this jury.

25       MR. RAY: May I respond?  It is my understanding

## Page 3

1  what Ms. Hartmann doesn't want in front of the jury is the fact
2  that Detective McCaskill went and got a subsequent search
3  warrant for the Defendant's DNA sample which was signed about
4  halfway through jury selection.

5       Detective McCaskill in a prior hearing testified
6  that the reason he did that, as the Court is aware, is because
7  the District Attorney's Office was worried about the Court's
8  ruling on the admissibility of the search.  It is my
9  understanding that's what Ms. Hartmann doesn't want us to go
10 into.

11       In response to her three statements, as I
12 understand it, her three reasons are that, number one, probable
13 cause is not a legal issue; the second being hearsay; and the
14 last one, statements of the district attorney's office wouldn't
15 be admissible.

16       First of all, as far as probable cause goes, we
17 are entitled to a jury question if the issue -- a legal issue as
18 to whether or not the evidence was legally obtained is
19 proper.  As the Court is well aware, we voir dired on that, and
20 as I remember, the State asked every single prospective juror
21 that, even the ones that aren't on the jury.

22       The way this case has played out with that
23 subsequent search warrant, as the Court is aware, the way that
24 search warrant was worded -- or the affidavit was worded, it
25 deleted a lot of the facts that Detective McCaskill was aware of

## Page 4

1  in order to justify a finding of probable cause outside the
2  Defendant's arrest.

3       It's our position that if that search was
4  illegal, which we are certainly entitled to contest under the
5  Fourth Amendment, whether or not probable cause is a
6  determination that the jury has to make or not make.  The fact
7  that it is a legal or illegal search would render that
8  admissible at the proper time.

9       As far as being hearsay, the fact that those
10 statements are hearsay is really -- I really don't believe that
11 enters into the equation.  Detective McCaskill -- and Judge
12 Sharen Wilson, when she signed that warrant, had to make that
13 determination, but this jury is entitled to view that and see if
14 the search was, in fact, proper.

15       Lastly, as far as statements of the prosecutor
16 are concerned, what she really doesn't want is the fact that
17 they were concerned about your ruling, which hadn't taken place
18 yet.  That's an admission of a party opponent to the extent that
19 they made any statements.  It also goes to the detective's bias
20 and our ability to cross-examine him completely under the Sixth
21 Amendment.

22       We believe that every fact in this case that
23 Defendant McCaskill, who was the chief case agent in this case,
24 was aware of or used in his expertise and in his investigation
25 would be a proper subject of cross-examination, and we believe

1 we are entitled to go into it. That's my response.

2     THE COURT: The Motion in Limine is granted.

3     We'll take the matter up more fully before the

4 Defense goes into it.

5     MS. HARTMANN: Thank you, Your Honor.

6     THE COURT: Are both sides ready for the jury?

7     MS. HARTMANN: State's ready, Your Honor.

8     MR. RAY: We are ready.

9     (Jury present)

10 Whereupon,

11     GLENN WILSON,

12 having been first duly sworn, testified as follows:

13     DIRECT EXAMINATION

14 BY MS. CALLAGHAN:

15   Q. I believe, Officer Wilson, that we ended yesterday

16 with my completing showing the jury stack 2, which ended with

17 photograph No. 41; is that correct?

18   A. Yes.

19   Q. All right. Let's go ahead and start with the next

20 stack. If you want to, go ahead and take a look at what I have

21 separated into stack 3 here.

22   A. (Witness complies)

23   Q. Have you had chance to review State's Exhibit 42

24 through 62 --

25   A. Yes, ma'am.

---

Page 6

1   Q. -- inclusive? Are all of these photographs true and

2 accurate depictions of how the victims' house appeared when you

3 were out there on --

4   A. Yes, ma'am.

5     MS. CALLAGHAN: The State would offer State's

6 Exhibit 42 through 62 inclusive subject to tendering them to

7 Defense counsel for inspection.

8     VOIR DIRE EXAMINATION

9 BY MR. RAY:

10   Q. Officer, there was a dishwasher that's in one of these

11 photographs, State's Exhibit 58. The door is open to the

12 dishwasher. Is that the way it was when you saw it?

13   A. No, sir.

14   Q. You opened it yourself?

15   A. Yes, sir.

16   Q. In 59 there was a drawer that was open when you took

17 pictures of it. Was that open when you --

18   A. No, it was closed.

19   Q. Here in several of these photographs there are doors

20 to closets, hallways, looks like there was one by a washing

21 machine that are open. Is that the way you saw them?

22   A. No.

23   Q. So some of them were closed and some of them were not?

24   A. Well, we would have first took general pictures of the

25 layout of everything; and then, like I say, some of those that

---

Page 8

1 were opened, we would open and put a number --

2   Q. Did you move anything else around in any of these

3 photographs other than the doors?

4   A. No.

5     MR. RAY: No objection to 42 through 62.

6     THE COURT: 42 through 62 are admitted.

7     (State's Exhibit No. 42 through 62 received)

8     DIRECT EXAMINATION CONTINUED

9 BY MS. CALLAGHAN:

10   Q. Why don't you go ahead and stand up there.

11   A. (Witness complies)

12   Q. First of all, let's start off with State's Exhibit No.

13 42. Can you show us what area of the house is depicted here?

14   A. This is the -- this is the southeast bedroom with --

15 this is the bed, this is the chest --

16   Q. Clothing chest?

17   A. Yes. Chest, bed, south bedroom downstairs.

18   Q. Now, in State's Exhibit No. 42, what you are referring

19 to on State's Exhibit No. 8, the diagram, is there is a large

20 square in the middle of this bedroom. There is some words here,

21 "small photograph, pieces of carpet and comforter." These all

22 refer to this long square, which is the bed, correct?

23   A. Yes.

24   Q. And the clothes chest at the foot of the bed is the

25 smaller square?

---

Page 8

1   A. Yes.

2   Q. And then there is other furniture here that's

3 depicted, dressers and --

4   A. Yes.

5   Q. Let's go to the next two, which are 43 and 44. Now,

6 for the record can you tell us, State's Exhibit 43, what this

7 depicts?

8   A. These are -- Item 9 and 10 was the blood on the carpet

9 and we collected the piece of carpet. And this is blood on the

10 comforter that was on the bed, and that's just the first picture

11 we see before.

12   Q. Referring now to State's Exhibit No. 44, you can see

13 that there are numerous small, dark stains right here by the

14 side of the bed, correct?

15   A. Yes.

16   Q. And there are dark stains on the comforter itself.

17   A. Yes.

18   Q. These are bloodstains that ultimately were collected?

19   A. Yes.

20   Q. Now, let me show you State's Exhibits 45 and 46.

21 These are even closer photographs of the same items, correct?

22   A. Yes.

23   Q. And for the record, State's Exhibit No. 45 contains

24 the number 9, which is what you used to mark that.

25     And State's Exhibit 46 contains the number 10,

Page 9

1 which is what you used to mark the piece of carpet you
2 collected.
3    A. Yes.
4    Q. Okay. Now let's move along to a different area of the
5 house. Can you tell us what State's Exhibits 47 and 48 are?
6    A. This is the kitchen, this area right here.
7    Q. For the record you are pointing at the upper
8 right-hand section of State's Exhibit No. 8 in the big square
9 marked picture?
10    A. Yes.
11    Q. From what vantage point would you be looking at
12 State's Exhibit 47?
13    A. This is in the front entry. The picture was taken
14 about in this area right here viewing this way. This is the
15 back door right here.
16    Q. Okay. You are standing in the kitchen photographing
17 the back-door area.
18    A. Yes.
19    Q. What about this one, State's Exhibit 48?
20    A. This is standing in this area right here and taking a
21 picture back this way.
22    Q. Okay. So you are standing in the doorway and looking
23 towards the -- what would you call that?
24    A. We called it an island.
25    Q. The island containing the stove top.

Page 10

1    A. Right.
2    Q. Okay. Let's go to State's Exhibits 49 and 50. Can
3 you tell us what 49 is?
4    A. This is a picture of this area right here taken
5 from standing about right here.
6    Q. The area you just put your finger on in State's
7 Exhibit No. 8 is marked by dot 6, in the picture, correct?
8    A. Yes.
9    Q. What State's Exhibit No. --
10    A. This is a picture of -- this is the refrigerator and
11 this is a picture going back into the hardwood flooring of this
12 formal dining room. So this is looking down kind of like this
13 from this area looking back this way.
14    Q. Okay. So there is piece of carpeting on the floor in
15 front of the refrigerator, which is depicted right inside the
16 door of the kitchen to the left, correct?
17    A. Yes.
18    Q. And it shows some bloodstains on that, correct?
19    A. Yes.
20       MS. CALLAGHAN: If I may inquire of the jury,
21 Your Honor, can everyone see; there is no glare?
22       (No response)
23    Q. Okay. Let's go to State's Exhibits 51 and 52 for
24 identification. These are pictures, correct?
25    A. Yes.

Page 11

1    Q. Can you tell us what area it is in 51?
2    A. This is the island right here and this is the carpet
3 that was right here and this is the dishwasher that was right
4 here. So it is taken from standing right here aiming down like
5 that to show all of the -- this area right in here.
6    Q. Okay. And there are dots of blood on the floor that
7 are depicted in State's Exhibit 51, correct?
8    A. Yes.
9    Q. And the general area is shown by these three red dots,
10 23, 24 and 25.
11    A. This blood right here would be on the ground right
12 here. These were actually some items that we took from that
13 area --
14    Q. What I'm saying is the area that is shown in here
15 is --
16    A. Yes.
17    Q. They are the same area as the photograph.
18    A. Yes.
19    Q. All right. And State's Exhibit 52?
20    A. Just a picture of the refrigerator.
21    Q. Okay. Let's go on to 53 and 54.
22    A. Direct picture of the dishwasher standing about right
23 here directly at it showing the blood on the dishwasher and on
24 the floor.
25    Q. There is blood on the surface of the dishwasher?

Page 12

1    A. Yes.
2    Q. What about 54?
3    A. That is the same area, but now it's got a marker.
4    Q. And I am referring to State's Exhibit No. 54, which
5 has a number "5" in the center of the dots of blood.
6    A. And that's right in front of the dishwasher.
7    Q. Let's go to State's Exhibit 55 and 56.
8    A. This is depicting blood on the dishwasher handle in
9 front here.
10    Q. That's State's Exhibit 55?
11    A. Yes.
12    Q. That is where on this diagram?
13    A. Right here.
14    Q. What about State's Exhibit No. 56?
15    A. This is the -- there was -- right here is Item 6
16 marked six, and that was this area right in here, a closeup of
17 it.
18    Q. State's Exhibit 56, there is a yellow number where you
19 marked an item retrieved, No. 6 --
20    A. Yes.
21    Q. -- and it corresponds to No. 6 in the diagram.
22    A. Yes.
23    Q. Okay. Let's go to State's Exhibits 57 and 58.
24    A. There was some blood on this drawer, so we took a
25 picture of it and then we'll put a marker there.

1  Q. In State's Exhibit 8, the diagram, there is a red dot
2  on one of the counter surfaces marked 7, and that corresponds
3  with the 7 in the photograph, correct?
4  A. Yes.
5  Q. What about State's Exhibit 58?
6  A. After we found the blood on the dishwasher in front,
7  we opened it up and we found the blood inside the dishwasher.
8  Q. Okay. Let's go to State's Exhibit 59 and 60.
9  A. This is just a drawer that we pulled out just to -- in
10  the process of looking through things, we pulled it out and took
11  a picture of it. It's right here in this corner area, and -- we
12  didn't -- I don't believe that -- well, the towel was not
13  collected.
14  Q. And State's Exhibit No. 60?
15  A. This is a picture of the rear door, which is this area
16  right here.
17  Q. All right. Now, there is a small room at the very top
18  marked "back porch."
19  A. Yes.
20  Q. Is that a sun-room type deal?
21  A. Yes, uh-huh, enclosed with an exit out towards the
22  south of the residence.
23  Q. Okay. Now, State's Exhibits 61 and 62, can you tell
24  the jury what these are?
25  A. These are the upstairs -- it's been a long time since

Page 14

1  I have been up there, but if I remember correctly, I believe it
2  is upstairs, two upstairs bedrooms.
3  Q. There were two bedrooms?
4  A. Yes, two upstairs bedrooms and one bathroom.
5  Q. And you took one general picture of each room just to
6  document it?
7  A. Yes.
8  Q. But there was nothing of significance found.
9  A. No.
10  Q. Okay. You can go ahead and have a seat.
11  A. (Witness complies)
12  Q. Now, let me ask you to go ahead and take a look at
13  State's Exhibits 7 and 63 for identification. Do you recognize
14  these?
15  A. Yes.
16  Q. What is State's Exhibit No. 7?
17  A. Front entry.
18  Q. That's the front door of the house?
19  A. Front door of the residence and this is the front of
20  the detached -- it was like -- had a little mini garage like a
21  little apartment kind of.
22  Q. Are these true and accurate depictions of the way the
23  front and back of the house appeared on --
24  A. Yes.
25  MS. CALLAGHAN: The State would offer State's

1  Exhibits 7 and 63.
2  MR. RAY: No objection.
3  THE COURT: 7 and 63 are admitted.
4  (State's Exhibit No. 7 and 63 received)
5  Q. Come on down here. I'm just running you ragged.
6  Come on over here.
7  A. This is the front entry.
8  Q. The front door?
9  A. Yes.
10  Q. Even though it was April, it appears somebody still
11  had their Christmas decorations, didn't they?
12  A. Yes.
13  Q. There is a snowman on the front door.
14  Let's look at State's Exhibit 63. This is kind
15  of a montage, correct?
16  A. Yes. This is -- it is the detached -- I called it a
17  garage apartment. There was not anybody living in there, and it
18  was just directly south of this area right here. It would be
19  sitting right here.
20  Q. Now and you are referring to the very top left-hand
21  portion of the State's Exhibit 8, the diagram, correct?
22  A. Yes.
23  Q. Now, if you will come back over here, right outside
24  that sun room where the door to the sun room is, there is kind
25  of a deck, right?

Page 16

1  A. Yes, ma'am.
2  Q. And this comes directly out the back of the house?
3  A. Yes.
4  Q. And there is a sidewalk on the bottom of State's
5  Exhibit 63, and when you reached the end of the sidewalk, what
6  is back here?
7  A. That's the detached garage.
8  Q. Okay.
9  A. Behind -- it is detached.
10  Q. So there is actually another building behind the
11  yellow building -- another building --
12  A. Right. Completely detached. Each building is
13  separated.
14  Q. Okay. Let's go ahead and show over here. There is a
15  deck that is in the back of the house depicted on the left hand
16  side as you are facing State's Exhibit 63, right?
17  A. Yes.
18  Q. And you are coming out that back door of the house,
19  you would come down here and at the bottom there is a sidewalk
20  that goes around.
21  A. Yes.
22  Q. This is kind of the detached apartment in front but
23  there is also a detached garage behind that, correct?
24  A. Correct.
25  Q. Okay. Now let me show you some more photographs in

Page 17

1  stack 4. Go ahead and take a look at those for me.
2  A. (Witness complies)
3  Q. Now, have you examined State's Exhibits No. 64 through
4  72 inclusive?
5  A. Yes.
6  Q. Are they true and accurate depictions of the way the
7  victims' house appeared on April 8, 2003?
8  A. Yes.
9  MS. CALLAGHAN: State would tender State's
10  Exhibits 64 through 72 to Defense Counsel for their inspection,
11  and we would also offer them into evidence.
12  MR. MOORE: No objection.
13  THE COURT: 64 through 72 are admitted.
14  (State's Exhibit No. 64 through 72 received)
15  Q. Come on over here and start with State's Exhibits 64
16  and 65. Starting with this half of the jury, let's show them
17  what these are.
18  A. This is the rear door.
19  Q. You are referring to State's Exhibit 64?
20  A. 64 is the rear door. That is what I am referring to
21  as the rear door. This is just to that back porch area.
22  Q. You are talking about the door that leaves the kitchen
23  and goes into the sun room, correct?
24  A. Yes.
25  Q. Okay. And this is just an area showing the rear entry

Page 18

1  door would be back inside here. This is that deck area to the
2  rear of the residence?
3  A. Okay.
4  Q. Okay. And in State's Exhibit No. 65 what you are
5  seeing is the door on the -- going from the outside to the back
6  room?
7  A. That picture is taken from this area showing this area
8  right here.
9  Q. And you are referring to the upper left-hand corner of
10  State's Exhibit No. 8 where there is a space for the door.
11  A. Yes.
12  Q. All right.  State's Exhibits 66 and 67, if we can
13  start with this half of the jury, can you tell us what this is?
14  A. This is just standing in front of that deck, rear --
15  that rear sun room and showing back towards the residence, and
16  this is -- 67 is the -- this is actually the detached apartment
17  garage. The detached garage is actually behind that, and it is
18  just showing back towards the residence.
19  Q. Okay. Okay. Now, State's Exhibit No. 68, starting
20  with this half of the jury, can you tell us what that is?
21  A. This is the doorway leading into the detached garage
22  which is the southern building. The apartment garage is right
23  in this area right here. There is a walkway that goes around to
24  it. And 69 is inside the garage.
25  Q. Now let's show them State's Exhibits 70 and 71.

Page 19

1  A. In 70 this is just another picture of the garage, just
2  from another angle.
3  Q. This is taken from the doorway looking in?
4  A. Yes. And this is another picture of -- we found some
5  blood right here, and this is a picture of it.
6  Q. Now, on the right-hand side of State's Exhibit No. 71
7  there is a door frame. Is this the door where you come into the
8  garage?
9  A. Yes --
10  Q. And then there is blood on the floor that's a few feet
11  in front of the garage door, correct?
12  A. Yes.
13  Q. If you were parking a car pulling it in directly to
14  that door, which side of the garage would the driver's door be
15  on?
16  A. If they were pulling a car --
17  Q. Front first.
18  A. Front first, then that would be where the driver's
19  area would be.
20  Q. Where you see this blood, correct?
21  A. Yes.
22  Q. Okay. All right. Let's reexplain that over here to
23  this half of the jury.
24  A. Okay. This is just another view of inside the
25  garage. There was only one doorway into the garage that you saw

Page 20

1  last picture. This is just another view of that and then
2  looking right down the side of the garage in 71 here, there was
3  blood found right here. And if a vehicle were pulled head-in,
4  then that would be approximately right where the driver's door
5  area would be.
6  Q. Okay. So here is the doorway on the right-hand side
7  of State's Exhibit 71, the doorway where you come into the
8  garage. You can see the door post here. And if you pull the
9  car in directly nose-first into the garage, the driver's door
10  would be approximately where the blood drops are on the ground,
11  correct?
12  A. Yes.
13  Q. Okay. And State's Exhibit No. 72, is this a closeup
14  of the --
15  A. Closeup of Item 8.
16  Q. Item 8 was a blood drop where a sample was on the
17  garage floor?
18  A. Yes.
19  Q. And this is a closeup of that marked by the plastic
20  number 8.
21  A. Yes.
22  Q. Now, it appears from looking at all the State's
23  exhibits that we introduced and talked about, there are a number
24  of photographs in there of dots of blood in various areas of the
25  house.

Page 17 - Page 20

1   A. Yes.

2   Q. Why were those dots of blood, those trails of blood,

3 significant to you?

4   A. It appears that -- during the victims were

5 injured, that -- after we found the knife blade, it's pretty

6 common that when someone is stabbed and a knife blade -- and

7 that one was bent also and broken -- that it probably struck

8 bone, which would lead -- a person who was stabbing that person,

9 their hand will slip. As the blade stops, their hand keeps

10 going, they are cut.

11      So it was pretty obvious from working many a many

12 a scene that that was probably not our victims' blood; it was

13 the actor's blood.

14      So that's when we go back and put cones down

15 throughout various locations hoping to find the actor's blood.

16   Q. The trail of drops itself, the fact that it was mobile

17 and was all over the house including the garage, suggested

18 moving when a person left those drops, correct?

19   A. Yes.

20   Q. And it is common, you said, for people in the course

21 of an attack if the knife has no guard, for them to cut

22 themselves.

23   A. Yes.

24   Q. So you felt like that was a significant piece of

25 evidence you needed to record.

Page 22

1   A. Very.

2   Q. Now, after you photographed the scene, what did you do

3 next?

4   A. After the photographs -- like I said, there was a --

5 on a scene this extensive, there are a number of things that

6 have to be done. And as we are finishing photographing, then we

7 want to try to get measurements before we do anything else. We

8 don't want to move anything until we get everything recorded as

9 it's laying on the ground, so we'll start taking measurements.

10      And Officer Wallace began taking measurements,

11 and then later I believe Officer Sullivan was assisting him

12 doing that. And as Officer Wallace was beginning the

13 measurements, myself and Detective McCaskill would probably be

14 doing a little other searching for more evidence that we can

15 photograph before anything gets moved. We would like to try to

16 find evidence anywhere we can and photograph it before anything

17 gets moved. So that was probably that process.

18      At a scene like this -- and I have worked many --

19 you have got an assist officer or a couple of assist officers,

20 crime scene officers, and you ask them to do something; and then

21 while they're doing that, I'm doing something else.

22   Q. Okay. Well, let me ask you this. What is your

23 purpose in taking measurements?

24   A. Well, you want to record where everything is as it

25 lays on the ground. That is my job, and that's what we do. So

1 we want to record where evidence is if it is -- you know, if

2 it's significant that a measurement get made on it, we want to

3 tie that into the scene, into a location.

4   Q. So you record the measurements where evidence is

5 physically located, you make measurements so that that can be

6 preserved later in the event it becomes significant.

7   A. Yes.

8   Q. It isn't always meaningful, but sometimes it is.

9   A. Correct.

10   Q. Then do you go through the process of collecting

11 evidence?

12   A. Yes.

13   Q. Can you give the ladies and gentlemen an idea of how

14 you go about collecting evidence?

15   A. Okay. When I was collecting blood evidence, what I

16 will do is I will take two swabs of cloth and -- sterile cloth,

17 and we use distilled water. We put a little distilled water on

18 one cloth, and we'll call that a control sample.

19      So if I have blood on this piece of wood, I am

20 going to take a couple of drops of distilled water. Here is my

21 blood sample. I am going to wipe close to it and let that dry

22 and put it in an envelope. That's a control. I will tell you

23 what that does in just a second.

24      Then I will take my other cloth. And if the

25 blood is wet, I will just dip it in there, get a good sample.

Page 24

1 If it's dried blood, I will put a little distilled water on my

2 cloth, rub it and -- because sometimes you have to wipe it off

3 there. I will let that dry and put that in an envelope.

4      The control tells whoever is looking at the blood

5 what all is on the surface of this because it may have cleaner,

6 they may have spilled Coke, there may be all kinds of elements

7 in that blood when I wipe it off, and a control will tell them

8 what all is in there and they can subtract that from what all is

9 in the blood to find what they need to find.

10   Q. Okay. So that's how you recover blood evidence at the

11 scene?

12   A. Yes.

13   Q. And how do you obtain and preserve other items of

14 evidence?

15   A. The other items -- like I say, after they have been

16 photographed, measured, we will -- always, of course, wearing

17 gloves -- just pick them up, place them in a bag, and they are

18 packaged -- everything is packaged separately, and we will just

19 put it in a property-storage area inside the residence until at

20 one time I and my assist officers can take that all out to my

21 van.

22   Q. Okay. And what do you do with the evidence once you

23 have physically taken it, preserved it and placed it in the van?

24   A. After I get back to my processing room at the crime

25 scene office, then I will -- if I can, I'll mark it. If it is

Page 25

1 going to contaminate -- and usually you won't mark blood
2 evidence because you don't want your marking pen to contaminate
3 anything.
4      So you just package it and seal it, which is as
5 good, and then you can mark the package, which is just as good
6 as marking an item because that's another way of marking
7 something without actually physically marking it to know that it
8 has been properly maintained.
9      Q. Okay. Looking at your list there, do you have your
10 report with you?
11     A. Yes.
12     Q. Okay. Go over your list and tell the ladies and
13 gentlemen all of the physical evidence that you recovered from
14 the scene.
15     A. Okay. Well Items 1 through 8 and -- and they are all
16 on that board except for Item 8. And Item 8 was the blood
17 sample from the garage. We just didn't have room to put that on
18 there. But Items 1 through 8 were blood samples and -- of
19 course, I collected all the blood and all the controls and then
20 11 -- 1 through 8 are blood samples, and I just go 1 through 31
21 because we had 31 items we collected.
22     Item 9 was the comforter in the south bedroom,
23 state's Exhibit No. 10 was the -- a piece of carpet by the bed
24 by that comforter, and then Items 11 through 14 were more blood
25 samples.

Page 26

1      Items 15, 16, 17-A and 17-B were tile that we
2 found that were -- had bloody shoe prints on them that were
3 collected, and then Item 18 was the piggy bank, and then 19 was
4 a pair of eye glasses that were bloodstained, and they were
5 between -- Items 19 and 20 was a necklace. They were
6 bloodstained and they were by the two victims.
7      And Item 21 was a small picture on that bed, and
8 Item 22 was the blade in the bathroom that was blood covered.
9 And Items 23 and 24 were more blood samples. Then 25-A and B,
10 26, 27, 28 and 29 were processed tiles from that first front
11 entryway that we later picked up and processed them chemically
12 out on the scene, and then Items 30 and 31 were the bathroom
13 tiles that we processed on the scene.
14     Q. Okay. Well, let's go back and talk about some of the
15 specific blood samples that were taken. Okay?
16     A. Okay.
17     Q. Let's talk about blood sample No. 7. Can you tell us
18 where that came from? And if you could, step down and show us
19 on the diagram where item 7 was taken.
20     A. That was taken from the second drawer -- there was a
21 row of -- I believe it was four drawers. And it was on the
22 front of the second drawer of this row of drawers right here in
23 the kitchen.
24     Q. What about Item No. 8, blood sample No. 8?
25     A. It was out in the garage, the detached garage on the

Page 27

1 side where if a vehicle were pulled head-in, it would be on the
2 driver's side.
3      Q. What about sample 1?
4      A. Sample 1 was taken from right in the front entry right
5 here on this front entry tile.
6      Q. What about item No. 23?
7      A. 23 -- let me check my report.
8      Q. Go ahead.
9      A. Yeah, it was on the front of the dishwasher.
10     Q. Can you show where that was?
11     A. That would be right here. It was kind of on that
12 knob. I believe the picture showed it was on the knob.
13     Q. Okay. So there were specific samples that were taken
14 from the drawer, that were taken from the dishwasher, that were
15 taken from the tiles in the front and one from the floor in the
16 garage that's marked 8, correct?
17     A. Uh-huh.
18     Q. And you took both a blood sample and a control sample;
19 is that correct?
20     A. Yes.
21     Q. Now, why don't you come over here. Did you have an
22 opportunity to bring the physical evidence from the property
23 room that you collected yesterday morning?
24     A. Yes.
25     Q. And did I open the bags and mark them in for you?

Page 28

1      A. Yes.
2      Q. Did we mark this in the presence of the court
3 reporter?
4      A. Yes.
5      Q. Let me show you what's been marked as State's Exhibit
6 No. 73 for identification in this cause.
7      A. Yes.
8      Q. What is it?
9      A. It is a plastic bag I put all these blood samples.
10     Q. Let me show you what's been marked as 73-A. Can you
11 identify it?
12     A. Yes. It is a bag where I put the blood samples.
13     Q. Was 73-A inside the larger bag, State's Exhibit 73?
14     A. Yes.
15     Q. Do you recognize these by your writing which appears
16 on the front of these bags?
17     A. Yes.
18     Q. Does your writing also appear on the back?
19     A. Yes. On this right here, this is my mark.
20     Q. Now, let me show you items that we removed yesterday,
21 State's Exhibit 73-B, 73-C, 73-D and 73-E. Are these the
22 packaging that contains Sample 1, Sample 7, Sample 8 and Sample
23 23 for identification?
24     A. Yes.
25     Q. All right. And Sample 1 is State's Exhibit 73-B, and

**Page 31**

1 Sample 7 is 73-C and Sample 8 is 73-D and that's 73-E?
2 A. Correct.
3 Q. These contain blood samples that you collected.
4 A. Yes.
5 Q. Do you recognize them by your handwriting on those
6 bags?
7 A. Yes.
8 Q. Can you tell us what State's Exhibit 73-F are?
9 A. These are the control samples -- no, these are the
10 remainder -- of the other blood samples, these are the remaining
11 blood samples.
12 Q. So of all the remaining blood samples -- not 1, 7, 8
13 and 23 -- all the remainder are inside State's Exhibit 73-F,
14 correct?
15 A. Yes.
16 Q. Let me show you 73-G. Can you tell the ladies and
17 gentlemen what that is?
18 A. These are where I placed all the control samples.
19 Q. And do you recognize this bag, 73-G, by your
20 handwriting on it?
21 A. Yes.
22 Q. Was it also placed inside with the control samples
23 inside State's Exhibit 73?
24 A. Yes.
25 Q. Now, can you identify State's Exhibit 73-H?

1 bags, for the record only.
2 MR. RAY: No objection.
3 THE COURT: They are admitted for the record
4 only.
5 (State's Exhibit No. 73-F And 73-L received)
6 MS. CALLAGHAN: At this time the State would
7 offer 73-B, 73-C, 73-D and 73-E, which are all the packaging
8 which contains all the blood samples for all purposes.
9 MR. RAY: No objection.
10 THE COURT: They are admitted.
11 (State's Exhibit No. 73-B, 73-C, 73-D, 73-E received)
12 MS. CALLAGHAN: The State would offer 73-H, 73-I,
13 73-J and 73-K, which are the packaging containing the control
14 samples for all purposes.
15 MR. RAY: Can I ask him a question about those?
16 VOIR DIRE EXAMINATION
17 BY MR. RAY:
18 Q. Those are control samples that you took from the
19 house?
20 A. Yes, sir.
21 MR. RAY: No objection.
22 THE COURT: They are admitted.
23 (State's Exhibit No. 73-H, 73-I, 73-J, 73-K received )
24 DIRECT EXAMINATION CONTINUED
25 BY MS. CALLAGHAN:

**Page 30**

1 A. Yes. That's a control of blood Sample 1.
2 Q. What is 73-I?
3 A. A control sample of blood sample 7.
4 Q. And can you identify 73-J?
5 A. Control sample of blood sample 8.
6 Q. And what is 73-K.
7 A. Control of blood sample 23.
8 Q. And these are the packages into which you placed those
9 blood samples when you collected them in the way that you
10 described earlier?
11 A. Yes, the control sample.
12 Q. And what is 73-L?
13 A. This is the remainder of all the control samples from
14 the blood samples we took.
15 Q. Do you recognize those by your handwriting on the
16 packaging
17 A. Yes.
18 MS. CALLAGHAN: At this time the State will
19 offer State's Exhibits 73, 73-A and 73-G for the record only.
20 MR. RAY: No objection.
21 THE COURT: They're admitted for the record
22 only.
23 (State's Exhibit No. 73, 73-A, 73-G received)
24 MS. CALLAGHAN: The State would offer 73-F and
25 73-L, which are the remainders all contained within discrete

**Page 32**

1 Q. Now, you indicated there were some items found in the
2 bathroom that you also retained. A pair of glasses, a necklace
3 and one other item, I believe. I'm sorry. Just the glasses and
4 the necklace.
5 A. The glasses and the necklace were actually in the
6 hallway.
7 Q. I'm sorry. Can you show the jury on the diagram where
8 they were?
9 A. The pair of glasses were found right in this area
10 here.
11 Q. I'm sorry. You said before they were found near the
12 victims' bodies?
13 A. Yes.
14 Q. And they were in the hallway area.
15 A. Yes.
16 Q. Now, you collected those. Can you take a look at
17 76-A?
18 A. Yes.
19 Q. Can you tell the ladies and gentlemen what that is?
20 A. A pair of eyeglasses.
21 Q. First of all, let's describe 76-A. Is that the
22 envelope into which you placed the eyeglasses?
23 A. Yes.
24 Q. Do you recognize that by your handwriting?
25 A. Yes.

Page 33

1    Q. Is the contents, the eyeglasses themselves, in the
2  bag marked 76-B?
3    A. Yes.
4    Q. In regard to the necklace, do you recognize the bag
5  marked 76-C?
6    A. Yes, it is my writing.
7    Q. Is that the bag that contains 76-D, the necklace?
8    A. Yes.
9    Q. And 76-D is the actual necklace you recovered at the
10 scene which is marked on State's Exhibit No. 8.
11   A. Yes.
12     MS. CALLAGHAN: At this time, Your Honor, the
13 State would offer 76-A and C, the bags, for the record only.
14     MR. RAY: No objection.
15     THE COURT: So admitted.
16     (State's Exhibit No. 76-A and 76-C received)
17     MS. CALLAGHAN: And the State would offer 76-B
18 and D, which are the eyeglasses themselves and the necklace, for
19 all purposes.
20     MR. RAY: B is the glasses?
21     MS. CALLAGHAN: Yes.
22     MR. RAY: D is the necklace?
23     MS. CALLAGHAN: Yes.
24     MR. RAY: No objection.
25     THE COURT: They're admitted.

Page 34

1    (State's Exhibit No. 76-B and 76-D received)
2      MS. CALLAGHAN: If I may publish them by walking
3  in front of the jury?
4      THE COURT: Okay.
5    Q. Now, you have examined the necklace, correct, Officer?
6    A. Yes.
7    Q. The necklace is broken, is it not?
8    A. Yes.
9    Q. Now, let me show you the small bag marked Item 21,
10 76E?
11   A. Okay.
12   Q. Do you recognize this bag?
13   A. Yes, my handwriting.
14   Q. Does this baggie contain the small photograph that is
15 marked on 76-F?
16   A. Yes.
17   Q. Can you show us on the diagram where that was found?
18   A. It was found right here on the bed in the south
19 bedroom.
20     MS. CALLAGHAN: At this time, Your Honor, the
21 State would offer 76-E for the record only.
22     MR. RAY: No objection.
23     THE COURT: It's admitted for the record
24     (State's Exhibit No. 76-E received)
25     MS. CALLAGHAN: And would offer 76-F for all

Page 35

1  purposes.
2      MR. RAY: No objection.
3      THE COURT: It's admitted.
4      (State's Exhibit No. 76-F received)
5      MS. CALLAGHAN: May I publish it by walking in
6  front of the jury?
7      THE COURT: You may.
8    Q. Now, for the record only, State's Exhibit 76 was the
9  original bag that all those items came out of?
10   A. Yes.
11   Q. And you recognize this by your markings on the front?
12   A. Yes.
13     MS. CALLAGHAN: State offers 76 for the record
14 only.
15     MR. RAY: No objection.
16     THE COURT: It's already in.
17   Q. Now, there were some other items you recovered, one of
18 which was a knife blade, correct?
19   A. Yes.
20   Q. Can you show the ladies and gentlemen where on the
21 diagram the knife blade was recovered?
22   A. In the bathroom just inside the door -- the little
23 door facing. It the bathroom right there.
24   Q. Let me show you what's been marked as State's Exhibit
25 No. 74 for identification. Do you recognize this?

Page 36

1    A. Yes.
2    Q. What is it?
3    A. It is the bag I put the blade in.
4    Q. You recognize it by your markings on the surface of
5  it?
6    A. Yes.
7    Q. Let me show you the contents of 74-A.
8    A. Yes.
9    Q. What is it?
10   A. It is the knife blade I collected.
11   Q. All right. And why is it in a tube unlike the other
12 pieces of evidence?
13   A. It is strictly for safety.
14   Q. Okay. Because it is a pointed object with blood on
15 it?
16     MR. RAY: Excuse me. I am going to object to
17 the prosecutor's question assuming facts not in evidence, that
18 being it's a pointed object with blood.
19     THE COURT: Sustained.
20     MR. RAY: Thank you. I would ask the jury be
21 instructed to disregard the prosecutor's question.
22     THE COURT: Denied.
23   Q. You recovered this blade.
24   A. Yes.
25   Q. Does it appear to be pointed?

1  A. Yes.

2  Q. Does it appear to be covered with a dark red

3  substance?

4        MR. RAY: Excuse me. Before he answers that, I

5  would like to take the witness on voir dire for that particular

6  question -- I'll withdraw it.

7  Q. Is this the same knife blade that you recovered from

8  the same location in the diagram that is marked knife blade?

9  A. Yes.

10       MS. CALLAGHAN: State would offer State's Exhibit

11 74 for the record only.

12       MR. RAY: No objection.

13       THE COURT: It's admitted for the record.

14       (State's Exhibit No. 74 received)

15       MS. CALLAGHAN: State would offer 74-A and its

16 contents, the knife blade, for all purposes.

17       MR. RAY: No objection.

18       THE COURT: It is admitted.

19       (State's Exhibit No. 74-A received)

20       MS. CALLAGHAN: If I may walk in front of the

21 jury with it, Your Honor?

22       THE COURT: You may.

23  Q. Now, Officer, it is apparent that this knife blade

24 does not have a handle, correct?

25  A. Yes.

---

**Page 38**

1  Q. And it did not have a handle when you found it.

2  A. No.

3  Q. Did you-all look for the handle?

4  A. Yes, we did.

5  Q. Did you ever find the handle?

6  A. No.

7  Q. Now, finally, you indicated that you -- you removed

8  some of the tiles from the front entryway --

9  A. Yes.

10  Q. -- and processed them for footprints and processed

11 them for blood.

12  A. Yes.

13  Q. Let me show you a package marked State's Exhibit 75.

14 Do you recognize this?

15  A. Yes.

16  Q. What is it?

17  A. This is a bag I placed that tile in.

18  Q. Okay. And you are saying that you placed 75-A, which

19 is the tile, inside State's Exhibit 75?

20  A. Yes.

21  Q. And did you remove this tile from the front hallway of

22 the victims' home?

23  A. Yes.

24  Q. Did you place it in this item for safe keeping?

25  A. Yes.

---

1  Q. Do you recognize this bag by your writing on the

2  front?

3  A. Yes.

4        MS. CALLAGHAN: At this time the State would

5  offer State's Exhibit No. 75 for the record only.

6        MR. RAY: No objection.

7        THE COURT: Admitted for the record only.

8        (State's Exhibit No. 75 received)

9        MS. CALLAGHAN: State would offer 75-A and its

10 contents, which is the actual tile, for all purposes.

11       VOIR DIRE EXAMINATION

12 BY MR. RAY:

13  Q. Did that come from the back or the front?

14  A. Front entryway.

15       MR. RAY: Okay. No objection.

16       THE COURT: 75-A is admitted.

17       (State's Exhibit No. 75-A received)

18       MS. CALLAGHAN: If I may walk in front of the

19 jury, Your Honor.

20       THE COURT: Okay.

21       DIRECT EXAMINATION CONTINUED

22 BY MS. CALLAGHAN:

23  Q. Now there appears to be what is a pattern on the

24 left-hand side.

25       MR. RAY: Excuse me, Judge. I am going to object

---

**Page 40**

1  to the prosecutor continually interjecting her opinions about

2  what something appears to be or the way something is. I don't

3  have any objection to her asking the witness what this means to

4  him or what he found or the symbolism of it, but I object

5  strongly to the Prosecutor doing it. She's done it two or three

6  times.

7        THE COURT: Sustained.

8        MR. RAY: Thank you.

9  Q. This thing that I have my finger on, can you tell the

10 jury what that is.

11  A. It appears to be a type of pattern of some type of

12 shoe, a tennis shoe more than likely.

13  Q. So it appears to be footprint for a shoe pattern?

14  A. A shoe impression is what we call them.

15  Q. Right. Okay. Thank you.

16       Now, the other items that you collected, did you also

17 bring them here to court?

18  A. Yes.

19  Q. And were they also specifically marked?

20  A. Yes.

21  Q. For example, State's Exhibit 77, the piggy bank that

22 was brought to court, the bag was marked?

23  A. Yes.

24  Q. And State's Exhibit 78, the comforter was bought to

25 court and marked.

Page 41

1   A. Yes.

2   Q. And State's Exhibit 79, which is a large box

3 containing the remainder of the evidence was marked.

4   A. Yes.

5   Q. And that was checked in with the court reporter back

6 in his office.

7   A. Yes.

8       MS. CALLAGHAN: At this time the State would

9 offer those three items for the record only.

10      MR. RAY: I don't have any objection.

11      THE COURT: Could I have the numbers again,

12 please?

13      MS. CALLAGHAN: State's Exhibits 77, 78 and 79.

14      THE COURT: They are admitted.

15      (State's Exhibit No. 77, 78, 79 received)

16      MS. CALLAGHAN: For the record only, Your Honor.

17      THE COURT: Correct.

18      MS. HARTMANN: They are present here in court and

19 available should anyone need them.

20   A. Yes.

21   Q. Now, did you then examine the house for fingerprints?

22   A. Yes, we did.

23   Q. How did you do that?

24   A. Officer Wallace processed -- began at the front of the

25 residence and processed the front door -- front screen door --

Page 42

1 we call it a screen door, but it was a glass with iron bars.

2 And glass is the best surface we can have to print, so he

3 started there. And the same type of door was at the rear of the

4 residence, so I started at the rear. And those were the only

5 two places we got any prints of value.

6   Q. That was on the glass in the front door?

7   A. Interior of the front door and on the interior of the

8 rear glass screen door.

9   Q. Can you tell the ladies and gentlemen what kind of

10 surface is best for recovering prints?

11   A. Well, glass is the best.

12   Q. Why is that?

13   A. It is as nonpourous as you can get for fingerprinting

14 with carbon black powder.

15   Q. In other words a smooth surface that is not rough or

16 textured is better for prints.

17   A. Yes.

18   Q. If a surface is textured or rough, it might be

19 difficult?

20   A. Yes.

21   Q. In collecting prints do people necessarily leave a

22 print just because they have touched something?

23   A. No.

24   Q. Why not?

25   A. Many factors. Some people just do not leave

Page 43

1 fingerprints. There is a minor part of the population that does

2 not. Their hands do not secrete oil well, but most of us do.

3 But if we were to wash our hands real good and dry them real

4 good and then touch a glass in a pretty quick point of time, it

5 probably wouldn't leave a print; or it would be of such a minor

6 magnitude that you couldn't even -- you might get a trace of

7 somebody touched it, but you couldn't get a print of any value.

8   Q. When people sometimes touch items and leave prints, do

9 they necessarily leave them in a usable condition?

10   A. No.

11   Q. Why not?

12   A. Most of the time it is smeared because of -- anything

13 that's on your hands, if you are excited you are going to be

14 sweating a little more. Whatever you have eaten, it is going

15 to -- microscopically, if you will, all those items will be on

16 your hands if you haven't washed your hands.

17       So when you touch something, the temperature

18 probably has more to do with it than anything, and the hotter it

19 is, the less -- the more likely a print will smear because it

20 has got a lot of oil in it.

21       The colder it is -- from 78 degrees is the

22 perfect temperature. If it is below 78, you won't leave as much

23 of a print because you won't be secreting as much oil. So it is

24 kind of bad if it's cold and bad if it's real hot.

25   Q. So all the stuff you see on Perry Mason about

Page 44

1 fingerprints is bunk, right?

2   A. Yes.

3   Q. And you don't necessarily expect to recover usable

4 prints all the time.

5   A. No.

6   Q. How many total usable fingerprints did you recover at

7 this site?

8   A. I believe we got five.

9   Q. Five out of everything you looked at in the house?

10   A. Yes.

11   Q. How do you preserve those once you have taken them?

12   A. After we have put our powder on the print, we will put

13 a piece of tape -- it is Scotch tape, but perfect lifting tape;

14 and we will lift the print off and put that on a fingerprint

15 card this's like this, and then we turn it into

16 the ID bureau, and a fingerprint expert will look at it.

17   Q. To your knowledge, in this case none of those

18 fingerprints were identified to any person; is that correct?

19   A. No.

20   Q. But they were examined.

21   A. Yes.

22   Q. Now, you indicated you also processed various tiles in

23 the house for footwear impressions?

24   A. Yes.

25   Q. Can you tell the ladies and gentlemen how you did

**Page 45**

1 that?

2 A. Well, on the -- we collected -- I believe it was four

3 tiles -- the ones that were -- the initial when we first walked

4 into the front entryway, that tile area, there were -- there was

5 a couple -- it was Item 15 and 16 and then 17-A and B. It was

6 four tiles, and it had those footwear impressions on

7 there. Looked like blood footwear impressions. We collected

8 those, and we were going to let the lab have those to process.

9        Then -- and so we just collected those, and

10 that's what was --

11 Q. You mean 17-A?

12 A. Yes, ma'am. Excuse me.

13 Q. And I think that was marked State's Exhibit 75-A.

14 A. Yes. Sorry about that.

15 Q. No problem.

16        In order to be able to compare, though, footwear

17 with a footwear impression, you have to have the actual shoe,

18 correct?

19 A. Correct.

20 Q. Were you ever able to recover an actual shoe to

21 compare it?

22 A. To my knowledge, it was never found anywhere.

23 Q. Now, a lot of items you mentioned before when you

24 collected them, they were wet with blood.

25 A. Yes.

**Page 47**

1 and did the sergeant take this evidence for you to the property

2 room?

3 A. Yes.

4 Q. And then the next time you saw it was when you got it

5 from the property room yesterday morning to bring it to court.

6 A. Yes.

7 Q. Officer Wilson, thank you very much. I appreciate

8 it.

9        MS. CALLAGHAN: Pass the witness.

10        CROSS-EXAMINATION

11 BY MR. RAY:

12 Q. How are you doing, Officer Wilson?

13 A. Okay.

14 Q. You said that the prints were examined. Do you

15 remember saying that a few minutes ago?

16 A. The fingerprints?

17 Q. Fingerprints, yeah. Or somebody at the police

18 department told us they were examined and they weren't able to

19 find that they were --

20 A. Right.

21 Q. -- that they matched anybody. Is that basically what

22 you were told?

23 A. Well, when we get a hit, a match, they will send us a

24 latent tip sheet.

25 Q. They send you some sort of record back that tells you

**Page 46**

1 Q. How do you go about drying those, making sure they

2 are properly preserved in order to submit them to a lab?

3 A. We have a blood drying room that that's what that is

4 for. We will lay out all of the bloody items on a table and let

5 them air dry. Before we can submit anything to the property

6 room, it has to be completely dry just for the integrity of the

7 item that's bloodstained, and then also for just the safety

8 biohazard safety of anybody in the property room.

9        So it has to be completely dry, so that's why a

10 couple of times you have to wait a day or two before you can

11 submit a bloody item because it has to dry out completely first.

12 Q. So with some of the bloody items, there was a delay in

13 drying between the time you received those in the house and the

14 time they were actually submitted to the property room.

15 A. Yes.

16 Q. In order to let them fully dry so that the property

17 room would accept them.

18 A. And also in this case we were back out there the next

19 day. It was two days out on the scene, so it would have been a

20 day delay anyway. So after you get your evidence and lay it

21 out, it would take it a day or two probably to dry.

22 Q. But while they were drying, they were secured in a

23 secure area?

24 A. Locked and alarmed.

25 Q. Okay. All right. And then finally you packaged them,

**Page 48**

1 that fingerprint raps back to somebody?

2 A. Yes.

3 Q. But the point is if you don't send those prints, if

4 you don't turn them in, or if you turn them in and they don't

5 examine them, you wouldn't know it, right.

6 A. The only way I would know it is if I got a hit sheet

7 or if I spoke to them.

8 Q. But if you didn't get anything, either they didn't

9 find anything and didn't tell you, or they didn't look at them.

10 A. That would be correct.

11 Q. And unless you talk to them, you wouldn't know which

12 one of those the situation was, correct?

13 A. Correct.

14 Q. When you go out there and gather all this stuff up,

15 y'all have a procedure, do you not, the way you bag everything

16 up?

17 A. There is a procedure -- there would be a procedure as

18 far as to seal items and mark them.

19 Q. What I'm getting at is if we went through every little

20 bag up there and looked at that, even the ones she's offering

21 for the record only, there is a pattern in the way you do that.

22 A. Yes.

23 Q. And the reason for that pattern is so you have some

24 consistency in your working, right?

25 A. Yes.

Page 49

1  Q. It wouldn't matter if you had a toothpick or an engine
2  block; you are still going to label it the same way, right?
3  A. Sometimes we can't. If it contaminates the item or
4  because of the size, there would be a few constraints, but if we
5  can possibly mark something, we try to mark it.
6  Q. And within the terms of safety like the knife in the
7  little plastic tube, you generally try to do everything the same
8  way?
9  A. Try to; yes.
10  Q. And you submitted all this stuff to the property room,
11  right?
12  A. Well, actually the sergeant did.
13  Q. When I say you, I mean the police department.
14  A. Yes.
15  Q. Right.
16  A. Yes.
17  Q. And the property room is a place that's secure, right?
18  A. Yes.
19  Q. I can't go over there and get something out of
20  property room.
21  A. No.
22  Q. If I walk over there and say, "Hey, I want to check
23  out State's Exhibit 42," they're not going to just let me have
24  it, right, or walk off with it?
25  A. You know, I don't know.

Page 50

1  Q. Okay. Trust me, they probably won't.
2  A. Okay.
3  Q. And where it goes from there you don't have any
4  control over do you?
5  A. In the property room?
6  Q. Yes.
7  A. No.
8  Q. It may go up to the crime lab, might go to the Medical
9  Examiner's Office?
10  A. Yes.
11  Q. Might go somewhere else?
12  A. Yes.
13  Q. The Defense attorney might be able to get an order to
14  have it sent somewhere, right?
15  A. Yes.
16  Q. You labeled these things with a service number,
17  correct?
18  A. Well, actually if I can label the item, I will put a
19  "J" on it. That's my mark.
20  Q. Okay.
21  A. And if I can't label an item because of contamination
22  reasons, I will try to label the package I put it in -- I mean,
23  I will label the package.
24  Q. What I'm getting at, over -- when it gets over to the
25  property room, all of those bags over there that you or someone

Page 51

1  else collected, whether Officer Wallace or anybody else that was
2  out there, they are going to be able to be located and somebody
3  can look at them and tell they all came from the same place.
4  A. Yes.
5  Q. Whether it is the address or service number --
6  A. Yes.
7  Q. -- or a variety of things.
8  A. Yes.
9  Q. The numbers that you use aren't necessarily the
10  numbers that the crime lab uses, correct?
11  A. I'm really not for sure what --
12  Q. And they are certainly not the numbers that Ms.
13  Callaghan used when she marked these exhibits, right?
14  A. No, they will not correspond.
15  Q. In other words, State's Exhibit 75 is certainly not
16  your Exhibit 75.
17  A. Right.
18  Q. So it is real important to keep up with all those
19  numbers so you can compare them later if you need to, right?
20  A. Yes.
21  Q. If you don't do that, that could make your work in
22  some cases quite meaningless, couldn't it?
23  A. Well, I have got -- I have my report and my items were
24  1 through 31.
25  Q. Right.

Page 52

1  A. And once we have to put these items into the record --
2  I mean, we definitely have to label each picture. So we have
3  got 50 pictures, and already we are at 50. Then when we start
4  labeling our 30s, then we are going to be in the 80s, so no
5  numbers would match.
6  Q. Let me ask it this way. Let's suppose you went to a
7  crime scene and you found some blood there and you picked it up
8  with one of your procedures, either it was wet and you
9  dipped it or it was dry and you put water on it and dipped it,
10  and you labeled that with a number, maybe Exhibit 25, but
11  somehow you made a mistake in that numbering. That could
12  happen, right?
13  A. You know, it could happen. It has not happened.
14  Q. But would you agree with me that if it did happen or
15  if you made a mistake and you didn't catch it, depending on
16  where you found some blood, for example, if it was mislabeled,
17  which might lead someone to the conclusion it came from
18  somewhere else, that could seriously impact your findings.
19  Would you agree with that?
20  A. If --
21  Q. If you did that.
22  A. If that happened, it sure could.
23  Q. And that's why you can pretty affirmatively state that
24  didn't happen in this case, at least as far as you are
25  concerned.

A. Right.

Q. Okay. You said all the footprints you found in the front and in the bathroom, they were never compared and if they were, there was never a match to anybody's shoes.

A. That's correct.

Q. Was the blood in the entryway -- specifically I'm talking about the blood that had the footprint on it or what you thought was a footprint -- was that dry when you got there?

A. Was it dry.

Q. Yes.

A. No. I would assume that it was only because after we covered it with some paper, when you pull paper off to collect it, there was nothing like leakage --

Q. Why did y'all put paper on it? So y'all could walk across it?

A. You can step across most of it, but there were people that were beginning to have to come in that were going to have to step on this, and we just wanted try to protect the integrity of it.

Q. What about the blood on the same tiles that are not part of the footprint? Did it appear to be dry?

A. It appeared to be dry.

Q. For kind of the same reason?

A. Yes.

Q. Did you find -- first of all, you have probably done

---

**Page 54**

hundreds of -- you have been in hundreds of houses where there has been a crime committed.

A. Thousands, actually.

Q. Lots of burglaries?

A. Yes.

Q. Did this house appear to have been burglarized?

A. No, it did not.

Q. Why do you say that?

A. I didn't see any ransacking. That's about -- you know, TV missing, microwave missing --

Q. TV missing with the cables laying on top, there wasn't any of that?

A. Upstairs there appeared not to be any -- there were valuables, rings and this kind of things setting out. Nothing appeared to be moved.

Q. Did you find even some jewelry in the house?

A. Yes.

Q. Valuable jewelry?

A. Yes.

Q. More than just cosmetic jewelry?

A. It looked more cosmetic, or costume, I mean.

Q. The point is this was not a situation where someone came in and took a bunch of property, or that is it didn't appear that way.

A. No, it did not appear that way.

---

Q. This knife that you found -- and I forget what exhibit -- you know the knife I'm talking about?

A. Yes.

Q. Did you compare that to other knives in the house, you know, like over in the steak knife drawer?

A. No.

Q. So you can't say that knife didn't come from the house or it did --

A. Yes.

Q. Can't even say this is similar to other knives that were in the house?

A. Yes.

Q. The piggy bank, the stuff she's got over here in the Court Reporter's office, all that stuff went to the property room, right?

A. Yes.

Q. Okay. Some of that stuff had what you thought was blood on it, right?

A. Correct.

Q. Would you agree with me that when you think something is blood, that doesn't necessarily mean it is blood, right?

A. Correct.

Q. There is a procedure to see -- figure out if it is blood.

A. Correct.

---

**Page 56**

Q. You don't do that in your crime scene work, right?

A. No.

Q. That's something somebody in the crime lab or the Medical Examiner's office can do and routinely do?

A. Correct.

Q. Fingerprints, you can get them from glass, but you can also get them off paper, can't you?

A. You can.

Q. You can get them off of a $20 bill.

A. Yes.

Q. Y'all have solved a lot of crimes out of getting fingerprints off of money.

A. I would imagine so.

Q. The thing about fingerprints, though, if I touch this pad and I leave my fingerprints on it and I let it sit there on the table and we all leave this room and you come back six months from now and nobody comes in here between now and then, you could pick this up and you could still get a fingerprint potentially off this paper, right?

A. Yes, sir.

Q. Fingerprints are not time-sensitive; in other words, they hang around until somebody wipes them off, right?

A. To a point, yes.

Q. Have you ever run into one of those guys who didn't have fingerprints that was a burglar?

Page 57

1   A. Probably have because there is many times I can't find
2 anything.
3   Q. That would be a pretty good thing to have if you were
4 a crook, wouldn't it?
5   A. Yes, it would.
6       MR. RAY: I believe that's all. Thank you.
7       Pass the witness.
8       REDIRECT EXAMINATION
9 BY MS. CALLAGHAN:
10   Q. All of the blood that you collected in this crime
11 scene was from inside the house or inside the garage, right?
12   A. Correct.
13   Q. It wasn't from a neighbor's house or out on the lawn,
14 out on the front sidewalk.
15   A. No.
16   Q. It was all within the victims' home or --
17   A. Yes.
18   Q. Now, all the bags that you brought over that contained
19 physical evidence, you examined those bags, correct?
20   A. Yes.
21   Q. Both back in the Court Reporter's office and in here.
22   A. Yes.
23   Q. And you can recognize when the Medical Examiner's
24 office has opened those bags because they reseal it with their
25 tape and --

Page 58

1   A. Yes.
2   Q. Other than that, were there any signs that this
3 evidence had been tampered with in any way?
4   A. No.
5   Q. Now, you said there were some people that came in that
6 had to step on that paper covering the blood spots.
7   A. Yes.
8   Q. Were there people that had to come in and move the
9 body --
10   A. Yes.
11   Q. -- for example?
12       The bodies were still there when you photographed
13 them, correct?
14   A. Yes.
15   Q. And then they were removed from there by whom?
16   A. By the -- after the medical investigator comes out and
17 examines the body and -- we have to take pictures of each side.
18 Then the transport people come out, and they will collect the
19 victims and transport them on a stretcher out of the residence
20 into their vehicles and then to the morgue.
21   Q. So they have special vehicles to transport bodies to
22 the morgue?
23   A. Yes.
24   Q. When the bodies are removed, they have their own
25 clothing still on them, correct?

Page 59

1   A. Yes.
2   Q. And they are taken to the Medical Examiner's office
3 still clothed in their own clothing they wore at the time of
4 their death.
5   A. Yes.
6   Q. And they are preserving that clothing for the Medical
7 Examiner.
8   A. Yes.
9   Q. And that was done in this case, correct?
10   A. Yes.
11   Q. Your evidence that you retrieved was contained within
12 large paper bags that were marked on the surface by you,
13 correct?
14   A. Yes.
15   Q. And they are kept separately in those bags in the
16 property room, correct?
17   A. Yes.
18   Q. For example, if an officer found something at a crime
19 scene, even in this case, but at a different location, different
20 crime scene, those are separately, discretely bagged.
21   A. Yes.
22   Q. They would have nothing to do and would never be
23 placed in the same bag as yours.
24   A. Yes.
25   Q. Yours contain only the evidence that you collected?

Page 60

1   A. That's correct.
2   Q. Now, Defense Counsel asked you a couple of questions
3 about whether the house appear to be burglarized. From what you
4 said before, it is correct that there were no VCR's,
5 televisions, anything of that nature that appeared to be
6 missing, correct?
7   A. Correct.
8   Q. You were aware, however, that a 1996 Cadillac was
9 missing.
10   A. Yes.
11   Q. So that one large item of evidence or property
12 certainly was stolen?
13   A. That's what I was informed, that there was a car there
14 that was not there then.
15   Q. But you wouldn't know that just from looking at the
16 garage, correct?
17   A. Yes.
18   Q. And were you aware in this case that the victim's
19 purse was missing?
20   A. We did look for that just for identification, and we
21 couldn't find it.
22   Q. Okay. So you were aware that it may be missing.
23   A. Yes.
24   Q. And then there were some signs within the residence
25 of disarray, right?

Page 61

1    A. Yes.

2    Q. For example, the piggy bank was knocked over on the
3  floor.

4    A. Yes.

5    Q. And there were some other signs.

6    A. Yes.

7         MS. CALLAGHAN: Thank you.

8         Pass the witness, Your Honor.

9              RECROSS-EXAMINATION

10 BY MR. RAY:

11   Q. The piggy bank and the necklace which the jury has
12 seen and the eyeglasses which were found in the hallway -- the
13 eyeglasses and necklace being found in the hallway, all three of
14 those items you determined apparently had blood on them; is that
15 correct?

16   A. Correct.

17   Q. When you saw this crime scene, what did it appear like
18 had happened to you?  What did you think happened?

19   A. It appeared from my entry point and then seeing the
20 blood and the two victims lying in the hall and the bathroom,
21 that they had been severely -- I can say mutilated now, but
22 severely killed, if you will.

23   Q. Would the word rage fit into the -- be an adjective
24 that could describe it, killed in a rage?

25   A. No, I really don't think so.  Maybe my rage, but --

Page 6

1         MR. RAY: Nothing further.

2         THE COURT: You my step down, sir.

3         Ladies and gentlemen, let's take a stretch break.

4  Please retire to the jury room and remember and follow your

5  instructions.

6         (Recess taken)

7         (Jury present )

8         THE COURT: Are both sides ready for the jury?

9         MS. HARTMANN: State's ready, Your Honor.

10        MR. RAY: We are ready, Judge.

11        THE COURT: Call your next witness, please.

12        MS. CALLAGHAN: The State will call Officer

13 Ball.

14        (Witness Sworn)

15 Whereupon,

16              MARK BALL,

17 having been first duly sworn, testified as follows:

18             DIRECT EXAMINATION

19 BY MS. CALLAGHAN:

20   Q. Would you please state your full name for the ladies

21 and gentlemen of the jury?

22   A. My name is Mark Ball.

23   Q. Do you want to move that microphone up?

24   A. How is that?

25   Q. All right.  How are you employed?

Page 62

1    Q. What did you think?  What were you thinking when you
2  saw this?

3    A. I thought it was a pretty sad day when two old ladies
4  get mutilated like this.

5    Q. Didn't seem to be much of a reason for it, did there?

6    A. No, it didn't.

7    Q. It didn't -- you didn't see any kind of -- anything
8  that would lead to a self-defense-type deal where two people or
9  three people or four people had gotten in a confrontation with
10 each other and everybody was defending themselves.  It didn't
11 appear that way; is that right?

12   A. It just looked like they had no defense.

13   Q. Okay.  What did you think about that?

14   A. To put it real politely, I thought it stunk.

15        MR. RAY: Thank you.

16           REDIRECT EXAMINATION

17 BY MS. CALLAGHAN:

18   Q. Officer Wilson, from what you saw at the crime scene
19 and what you saw of the victims, is there anything in there that
20 you saw that was worth one 1996 Cadillac and some credit cards?

21   A. I'm sorry.  Would you -- was there what?

22   Q. Was it worth leaving the two victims that way, a 1996
23 Cadillac and a bunch of credit cards?

24   A. Absolutely not.

25        MS. CALLAGHAN: Pass the witness.

Page 64

1    A. I'm a police officer for the city of Fort Worth.

2    Q. What do you do for them?

3    A. I am one of the crime scene officers.

4    Q. Do you work with Officers Wilson and Johnson?

5    A. Yes, I do.

6    Q. How many crime scene officers are there total?

7    A. There are 14 of us.

8    Q. How long have you been doing that?

9    A. I have been a crime scene officer since March of 2000.

10   Q. What did you do before March of 2000?

11   A. I was a patrol officer.

12   Q. Were you dispatched in this case to an address on

13 North Main?

14   A. Yes, I was.

15   Q. What day and time were you dispatched?

16   A. April 8 at 8:05 p.m.

17   Q. Okay.  And what address did you go to?

18   A. It was 3116 North Main.

19   Q. What is at that address?

20   A. That is the El Triangulo Bar.

21   Q. Can you give the ladies and gentlemen some idea of

22 what kind of business the El Triangulo Bar is?

23   A. The El Triangulo Bar is kind of like an old small

24 hole-in-the-wall bar on the north side of Fort Worth.

25   Q. Was it open when you arrived there at 8:05?

Page 65

1   A. I believe so. I'm not for certain. It usually is,
2 but I don't recall if it was open or not.
3   Q. You have had business at the El Triangulo Bar before,
4 and you know it.
5   A. Yes.
6   Q. Did you see many people in or around the bar?
7   A. No.
8   Q. Were there a lot of cars parked around there?
9   A. No.
10   Q. Who did you meet there when you arrived?
11   A. I meet with Officer McClenny.
12   Q. Did he relate to you why it was you were called out?
13   A. Yes.
14   Q. Was Officer McClenny standing near or guarding
15 anything when you arrived?
16   A. Yes, he was.
17   Q. What was he guarding?
18   A. He was guarding a Cadillac, a gold Cadillac.
19   Q. Were you directed to that car?
20   A. Yes, I was.
21   Q. What is the first thing you did when you were directed
22 to it?
23   A. First thing I did is I observed what appeared to be
24 blood on the left back passenger door of the vehicle, the
25 exterior left-back passenger door. That was obvious when I

Page 66

1 first walked up to it.
2   Q. Did you circle the car and look at it?
3   A. Yes, I did.
4   Q. Did you notice anything about any of the windows?
5   A. Yes. The right-front passenger window was broken out.
6   Q. Did there appear to be glass in the immediate area?
7   A. Yes. There was glass on the ground next to the
8 vehicle and inside of the vehicle.
9   Q. Okay. What did you do after you visually examined the
10 car?
11   A. I completed a series of photographs of the vehicle as
12 I observed it and --
13   Q. Why did you do that?
14   A. To document the scene with photographs.
15   Q. Was this before you touched the car --
16   A. Yes, it is.
17   Q. -- or took anything off of it?
18   A. Yes.
19     MS. CALLAGHAN: Okay. May I approach the
20 witness, Your Honor?
21     THE COURT: Yes.
22   Q. Let me show you what has previously been admitted as
23 State's Exhibit No. 80 for identification. Do you recognize
24 that?
25   A. Yes, I do.

Page 67

1   Q. What is it?
2   A. That is a photograph I took of the Cadillac at the El
3 Triangulo Bar.
4   Q. Now, let me show you a series of photographs that have
5 not yet been admitted starting with State's Exhibit No. 81
6 through State's Exhibit No. 89 inclusive. Will you take a
7 moment and review those photographs.
8   A. (Witness complies)
9   Q. Have you had an opportunity to look at State's Exhibit
10 81 through 89?
11   A. Yes, I have.
12   Q. Are these the photographs that you took on April 8
13 after 8:05 p.m. of the 1996 Cadillac that was out at the El
14 Triangulo Bar?
15   A. Yes, they are.
16   Q. Are those true and accurate depictions of the way the
17 car appeared?
18   A. Yes.
19     MS. CALLAGHAN: The State would offer State's
20 Exhibits 81 through 89 inclusive subject to tendering them to
21 Defense for their inspection.
22     (Pause in the proceedings)
23     MR. RAY: Did you say 81 through 89?
24     MS. CALLAGHAN: Yes.
25     MR. RAY: No objection.

Page 68

1     THE COURT: 81 through 89 are admitted.
2     (State's Exhibit No. 81 through 89 received)
3     MS. CALLAGHAN: If I can ask the officer to step
4 down?
5     THE COURT: You may.
6   Q. Starting with this half of the jury, we are going to
7 start with State's Exhibit 81 and 82. Let's start with 81
8 first.
9     MS. CALLAGHAN: If I may inquire, Your Honor, can
10 all of the jurors see, or at least this half?
11   Q. What is depicted in State's Exhibit 81?
12   A. State's Exhibit 81 is a photograph of the left-back
13 passenger door where I had observed the blood on the door when I
14 was walking up to the vehicle.
15   Q. Now, this is the left-hand side of the car as you are
16 standing there behind it?
17   A. Correct.
18   Q. So the driver's door is directly in front?
19   A. Yes.
20   Q. And the passenger door had a dark stain right here in
21 the door handle where you open the door.
22   A. Correct.
23   Q. What is State's Exhibit 82?
24   A. It is a closeup photograph of the stain.
25   Q. Let's move down in this direction and talk to the

1 second half of the jury. Can you tell them what State's Exhibit
2 81 is?
3    A. This is picture of the left-back passenger door of the
4 vehicle showing the stain I observed when I approached the
5 vehicle.
6    Q. What about 82?
7    A. It is a closeup photograph of the stain that is on the
8 door.
9    Q. Okay. Now let's go to State's Exhibit 83 and 84.
10 Starting with this half of the jury, and let's start with the
11 top photograph, State's Exhibit 83.
12    A. State's Exhibit 83 is a photograph of the trunk of the
13 vehicle showing also a stain I observed on the trunk. State's
14 Exhibit 84 is a closeup of the stain on the trunk of the
15 vehicle.
16    Q. Okay. Let's move down and show this half.
17    A. This is a picture of the trunk of the vehicle
18 depicting a stain I observed on the vehicle -- State's Exhibit
19 83 -- excuse me. State's Exhibit 84 is a closeup of the stain.
20    Q. Now let's go to State's Exhibit 85 and 86 for
21 identification. Starting with 85.
22    A. State's Exhibit 85 is a photograph of the steering
23 wheel of the vehicle. State's Exhibit 86 is a photograph on the
24 back side of the vehicle shooting through the windshield at the
25 stain on the steering wheel.

1    Q. Is this the top or bottom of the steering wheel?
2    A. That would be the top of the steering wheel.
3    Q. As you were looking through the front windshield, you
4 saw the back of the steering wheel?
5    A. Correct.
6    Q. And that's depicted in State's Exhibit No. 86.
7    A. Correct.
8    Q. Start with 85 --
9    A. 85 is a picture of the steering wheel of the vehicle.
10 86 is a picture of the same steering wheel shot through the
11 windshield onto the back of the steering wheel, the top portion
12 of it.
13    Q. And what about State's Exhibit No. 87 and 88?
14    A. State's Exhibit No. 87 is a picture of the steering
15 column of the vehicle with little stains on the steering column
16 itself.
17       State's Exhibit No. 88 is a photograph of the
18 driver's seatbelt with a stain on the driver's seatbelt.
19    Q. Okay.
20    A. State's Exhibit No. 87 is a picture of the steering
21 column of the vehicle with little stains on the steering
22 column.
23       Exhibit 88 is a photograph of the driver's
24 seatbelt with a stain on the seatbelt.
25    Q. Here?

1    A. State's Exhibit No. 89 is a photograph again of the
2 driver's seatbelt with another photograph of the stain on the
3 seatbelt itself.
4       State's Exhibit No. 89, once again, a photograph
5 of the driver's seatbelt with a stain on the seatbelt.
6    Q. Okay. Now, before you sit down, let me ask you one
7 other. Going back to State's Exhibit No. 80, you said that the
8 right-passenger window was broken out.
9    A. Uh-huh.
10    Q. Can you point out which window that was on State's
11 Exhibit No. 80?
12    A. On State's Exhibit 80 it's this right here.
13    Q. The other windows appear to be tinted, correct?
14    A. Yes.
15    Q. You can identify it by the one that doesn't appear to
16 be tinted.
17    A. Correct pretty clear.
18    Q. Okay. So this would be the window that was broken
19 out?
20    A. Yes.
21    Q. Okay. And there is obviously glass on the pavement.
22    A. Yes, on the pavement right next to the vehicle.
23    Q. Was that the only significant damage you observed to
24 that car?
25    A. Yes, it is.

1    Q. Did you make a note when you observed the car
2 initially of the license plate number and the make and model of
3 the car?
4    A. Yes, I did.
5    Q. What was the license plate number?
6    A. The license plate number -- if I may refer -- I don't
7 remember it. Victor Paul Frank 81 X-ray.
8    Q. VPF?
9    A. Yes. VPF-81X. Sorry.
10    Q. That's okay.
11    A. I'm stuck in police lingo.
12    Q. There is police language and then there is normal-
13 person language.
14    A. Yes.
15    Q. Now, after you looked at the car, walked around it and
16 photographed it, what happened next?
17    A. I instructed Officer McClenny to have the vehicle
18 towed to our auto-pound security bay for further processing due
19 to condensation starting to set up on the vehicle.
20    Q. Dew falling?
21    A. It was starting to. It was starting to get on top of
22 the vehicle.
23    Q. Okay. You don't want any water or fluids or
24 liquids --
25    A. Not -- with the window being busted out, I couldn't

Page 73

1 have it inside the vehicle either.
2    Q. You said you instructed Officer McClenny to get it
3 taken to the auto pound.
4    A. Correct.
5    Q. Where is that?
6    A. It's a 1301 East North Side Drive.
7    Q. What is the auto pound?
8    A. It is a facility where police impound vehicles for
9 various reasons.
10    Q. Okay. So this is a police-controlled area?
11    A. Yes, it is.
12    Q. At times when vehicles are being searched and examined
13 by crime scene, are vehicles taken there for that purpose so
14 they will be secure during that process?
15    A. Yes, ma'am.
16    Q. When you got to the auto pound, what did you do?
17    A. When I got there Officer McClenny was shutting the
18 doors to the security bay when I arrived on the scene, and when
19 I -- after it was secured in the bay, I entered the bay and
20 opened the driver's door and made observations of what was
21 inside the vehicle.
22    Q. Did you examine the driver's-seat area?
23    A. Yes, I did.
24    Q. Were there some items in there in the front seat area?
25    A. Yeah. On the front seat I observed what appeared to

Page 74

1 be blood along with two pens, writing pens, and a lighter in the
2 seat itself.
3    Q. Did you collect any or all of those items?
4    A. Yes, I did.
5    Q. What did you collect?
6    A. I collected a blue pen from the seat, a pink pen from
7 the seat, a lighter; and I also collected swabs from the stain
8 in the seat.
9    Q. Okay. Referring to your report, which item numbers
10 did you collect from that area?
11    A. From the driver's seat I collected Items No. 3, 4 and
12 5, and items No. 21, 22 and 23.
13    Q. Okay. And what area did you examine next?
14    A. The area I examined next was the steering wheel --
15 dash area of the vehicle, and I observed what appeared to be
16 blood on the dash, the steering column, the steering wheel, the
17 radio, all along the front-dash area.
18    Q. Is that area depicted in some of those crime scene
19 photos?
20    A. Yes, they are.
21    Q. Did you recover samples from the steering wheel and
22 from the deck?
23    A. Yes.
24    Q. Which samples are those referring to?
25    A. Samples -- I mean Item No. 6, No. 7, No. 8, No. 9 and

Page 75

1 No. 10 were all obtained from the steering wheel of the vehicle.
2 Item No. 11 was obtained from the dash. Item No. 12 was
3 obtained from the steering column. Item No. 13 from the stereo
4 tuning button, and State's Exhibit No. No. 14 from the stereo
5 itself below the tuning button.
6    Q. What area did you examine next?
7    A. I examined the center-console gear-shift area. I
8 observed what appeared to be blood on the top of the gear shift
9 and inside of the gear shift slot.
10    Q. Did you recover swabs from those items?
11    A. Yes, I did.
12    Q. What numbers were those, referring to your report?
13    A. That would be Item No. 15 and item No. 16.
14    Q. What area did you examine next?
15    A. The other area I examined was the back-seat area where
16 I observed notebooks, a book, sun shade, film negatives and
17 other miscellaneous papers.
18    Q. In examining those, did you take a look at them?
19    A. Yes, I did.
20    Q. Did you become aware of who owned the vehicle at some
21 point?
22    A. Yes.
23    Q. Did those items appear to be pertaining to the victim
24 and owner of the car?
25    A. Yes, they did.

Page 76

1    Q. Did you collect any of those?
2    A. No, I did not.
3    Q. What area did you examine next?
4    A. The next area I examined was the trunk area of the
5 vehicle. I opened the trunk and I observed just numerous
6 miscellaneous items. Clothing, blankets, car-repair equipment,
7 other things inside the trunk.
8    Q. Okay. Usual kind of junk people have in their trunk?
9    A. Yes.
10    Q. Nothing unusual?
11    A. Nothing unusual.
12    Q. Did you recover any evidence items from there?
13    A. No.
14    Q. Did you recover any swabs from that area?
15    A. Not from inside the trunk, no.
16    Q. What area did you look at next?
17    A. Then I examined the right front passenger seat. I
18 observed -- basically what it was was papers, owner manuals for
19 the vehicle lying in the seat.
20    Q. Okay. Anything there that -- did it all seem to
21 pertain to the victim?
22    A. Yes.
23    Q. Or to the vehicle itself?
24    A. Yes.
25    Q. Anything there unusual?

Page 77

1   A. No.
2   Q. Did you collect anything?
3   A. No.
4   Q. What did you examine next?
5   A. After that part, I stopped the inspection of the
6   vehicle and started processing the vehicle for prints.
7   Q. Okay. Did you recover a swab from that exterior
8   left-back passenger --
9   A. Yes.
10   Q. That's the bloodstain that you showed us on the
11   back-passenger-door door handle?
12   A. Yes.
13   Q. And also that bloodstain on the back of the trunk, did
14   you recover that?
15   A. Yes. Those were both done before the vehicle was
16   towed to the auto pound.
17   Q. Okay. I'm sorry. Those were --
18   A. Those were done before it went to the pound because I
19   wanted to recover that -- with the condensation setting up on
20   the vehicle, I wanted to recover that so it was not damaged in
21   the processing or transporting of the vehicle.
22   Q. Okay. Also Item No. 17, a sample from the driver's
23   door frame.
24   A. Yes.
25   Q. When did you recover that?

Page 78

1   A. It would be the same time as I recovered -- it would
2   be right after I recovered the swab from the gear-shift slot.
3   Q. At any point did you remove a section of the actual
4   seatbelt that actually appears in the photograph?
5   A. Yes, I did.
6   Q. How did you do that?
7   A. I used a carpet-cutting knife, pulled the seatbelt
8   out, cut from the base and pulled it down and cut from the top.
9   Q. So you literally cut a section of the seatbelt out?
10   A. Yes, I did.
11   Q. And preserved that?
12   A. Yes, I did.
13   Q. Why did you do that?
14   A. It would keep the evidence in its purest state by
15   taking the whole section out. You have all of the evidence
16   instead of swabbing it and just having a little.
17   Q. Okay. There was obviously blood on the belt, correct?
18   A. It appeared to be, yes.
19   Q. And you wanted to preserve it as well as possible in
20   its original setting.
21   A. Correct.
22   Q. Okay. Now, once you removed these items, how did you
23   preserve them, the blood swabs and seatbelt?
24   A. I placed them in packages -- actually the blood swabs
25   I have a system set up that I put a plastic covering over them

Page 79

1   so it doesn't get on your envelope. I put them in the
2   envelopes. And then the seatbelt was placed in a paper sack,
3   and they are set to the side until I can transport them to where
4   I can have them dried -- or where they can sit out to dry.
5   Q. Okay. With blood items that are wet, you need to let
6   them dry before you submit them, correct?
7   A. Correct.
8   Q. Could you step down for a moment?
9   A. (Witness complies)
10   Q. Did you bring some items of evidence to court this
11   morning?
12   A. Yes.
13   Q. And did we open those in the Court Reporter's office
14   and mark them?
15   A. Yes, I we did.
16   Q. Can you tell us what State's Exhibit No. 129 is?
17   A. State's Exhibit No. 129 is a paper sack that I had
18   placed evidence collected from the vehicle into.
19   Q. Okay. State's Exhibit 129, if you want to go ahead
20   and put -- State's Exhibit 129, do you recognize that by your
21   handwriting on it?
22   A. I recognize it by my name being on it and my initials
23   and ID on the back of the sack.
24   Q. You personally marked that?
25   A. Yes, I did.

Page 80

1   Q. Now, let's show you what is marked State's Exhibit
2   129-A and what is this?
3   A. State's Exhibit 129-A is a paper sack which I had
4   placed the driver's seatbelt that I had cut out into, and it is
5   verified by my initials and ID on the back of the sack.
6   Q. The sack itself contains the driver's seatbelt, Item
7   No. 19.
8   A. Right.
9   Q. And then you also marked on the back of it.
10   A. Correct.
11   Q. Now, let me show you what is marked State's Exhibit
12   No. B and C for identification. Can you tell the ladies and
13   gentlemen what State's Exhibit 129-B is?
14   A. State's Exhibit 129-B is the section of the seatbelt I
15   had cut out from the vehicle.
16   Q. Okay. And we removed that from the inside of State's
17   Exhibits 129 and 129-A and placed it in this plastic bag back in
18   the Court Reporter's office.
19   A. Correct.
20   Q. Can you tell us what State's Exhibit 129-C is?
21   A. State's Exhibit 129-C is envelopes that I had placed
22   swabs that I had collected from the vehicle into.
23   Q. All right. Can you tell us what State's Exhibit 129-E
24   is?
25   A. 129-E is an envelope that contained one of the swabs

Page 81

1  that I had collected from the vehicle.

2  Q. Okay. Specifically this is Item No. 8, correct?

3  A. Correct.

4  Q. And this came from the steering wheel.

5  A. Correct.

6  Q. And the bloody section behind the steering wheel

7  appears in one of the photographs.

8  A. Correct.

9  Q. And then can you tell me what State's Exhibit 129-F

10 is?

11 A. State's Exhibit 129-F is the packages of the four

12 other swabs I had collected from the steering wheel.

13 Q. And do you recognize 129-E and F because of your

14 writing on the envelopes and the way they are packaged?

15 A. Yes. All of them have my initials and ID on the back

16 of the package.

17 Q. Did you recover 129-E and 129-F this morning from the

18 Tarrant County Medical Examiner's office?

19 A. Yes.

20 Q. Did you bring them back for the purpose of introducing

21 them here at trial?

22 A. Yes, I did.

23 MS. CALLAGHAN: At this time, Your Honor, the

24 State would offer State's Exhibit 129, 129-A, 129-C, and 129-F

25 for the record only.

Page 82

1  MR. RAY: Can I see those for just a second,

2  please?

3  MS. CALLAGHAN: Yes.

4  MR. RAY: Could I have just a second, Judge?

5  THE COURT: You may.

6  (Pause in the proceedings)

7  MR. RAY: Can I ask a couple of questions?

8  THE COURT: Yes.

9  VOIR DIRE EXAMINATION

10 BY MR. RAY:

11 Q. Officer Ball -- if you can come over here?

12 A. Yes, sir.

13 Q. Did 129-C come out of 129?

14 A. Yes.

15 Q. And likewise, did 129-F?

16 A. Yes.

17 Q. Come out of 129?

18 A. Yes.

19 Q. And then 129-A also came out of there, or was this

20 separate?

21 A. This was packaged inside of that.

22 MR. RAY: Judge, I don't have any objection. I

23 would ask maybe that Ms. Callaghan identify -- there were

24 several envelopes, maybe about 10 or 12, the item numbers that

25 are contained in 129-C. With that proviso, I don't have any

Page 83

1  objection.

2  THE COURT: They are admitted for the record.

3  (State's Exhibit No. 129, 129-A, 129-C

4  and 129-F received)

5  MS. CALLAGHAN: For the record then, Your Honor,

6  State's Exhibit 129-C contains Items 2, 3, Item 4, 5, 11, 1, 12,

7  13, 14, 15, 16, 17 and Item 18, control.

8  DIRECT EXAMINATION CONTINUED

9  BY MS. CALLAGHAN:

10 Q. And these are all samples of blood and control samples

11 that you took from the interior of the car?

12 A. Correct.

13 Q. And that's contained within 129-C?

14 A. Correct.

15 MS. CALLAGHAN: At this time, Your Honor, the

16 State would offer 129-B and 129-E for all purposes.

17 MR. RAY: No objection to 129-B. No objection to

18 129-E.

19 THE COURT: They are admitted.

20 (State's Exhibit No. 129-B, 129-E received)

21 MS. CALLAGHAN: If I may publish them by walking

22 in front of the jury with them, Your Honor.

23 THE COURT: You may.

24 Q. Now, Officer, 129-E contains the sample that was taken

25 from the steering wheel, the back portion that you see in the

Page 84

1  photograph through the window.

2  A. Yes.

3  Q. And State's Exhibit No. 129-B is the actual section of

4  the seat belt that you collected?

5  A. Correct.

6  Q. Now, you stated that there were some other items that

7  you recovered, I believe, a purple cloth, a lighter, a blue pin

8  and pink pen from the driver's seat; is that correct?

9  A. The red lighter and blue pen and pink pen was from the

10 driver's seat. The purple cloth was from the driver floorboard.

11 Q. You say the bag 129-D, it contains all of these items?

12 A. Correct.

13 Q. At this time the State would offer 129-D for the

14 record only.

15 A. Okay.

16 MR. RAY: No objection for the record.

17 THE COURT: Admitted.

18 (State's Exhibit No. 129-D received)

19 Q. Now, except for the blood swabs that you took from

20 the outside of the car, okay, the outside door handle and the

21 trunk, all of the other blood, where was that found in the car?

22 A. All the other blood was located in the driver's seat

23 or all in the driver's area.

24 Q. Some of it was on the gear shift, some on the radio,

25 some on the steering wheel?

## Page 85

1   A. Correct.

2   Q. But it was all centering behind the driver's seat

3   behind the steering wheel.

4   A. Correct.

5   Q. You said that you processed the vehicle for prints?

6   A. Correct.

7   Q. Basically how do you do that?

8   A. The exterior of the car is processed for prints using

9   black powder, and various items are -- or different powders are

10  used for different items. It depends on what specific item you

11  are processing.

12  Q. Were you able to obtain any usable fingerprints from

13  the car?

14  A. No, I was not.

15  Q. Is that common or uncommon?

16  A. It is pretty common.

17  Q. You don't necessarily expect to find fingerprints?

18  A. No.

19  Q. Now, once you got all this evidence, how did you

20  secure it?

21  A. I secured it in our blood-drying room and packaging

22  room.

23  Q. Once it dried, was it submitted into property?

24  A. Yes, it was.

25  Q. The property room is a secured area where evidence is

## Page 86

1   maintained by the Fort Worth Police Department?

2   A. Correct.

3   Q. People can't walk in willy-nilly and take it out.

4   A. No.

5   Q. You have to be a police officer to get it.

6   A. Correct.

7   Q. Or be operating with a Court order.

8   A. Correct.

9        MS. CALLAGHAN: Thank you, Officer Ball.

10       Pass the witness, Your Honor.

11            CROSS-EXAMINATION

12  BY MR. RAY:

13  Q. Officer Ball, there were some items that you went and

14  got and brought over here today; is that correct?

15  A. That's correct.

16  Q. When you go get something from the property room, do

17  they just hand it to you? Do you just say, "Hey, I'm Officer

18  Ball"?

19  A. No, you have to sign it out.

20  Q. I notice there is some writing on there that appears

21  to be your name. Did you write your name on some of --

22       MR. RAY: Could I approach the witness?

23       THE COURT: Yes.

24       MS. CALLAGHAN: The items admitted for the record

25  only are down in the box; the items for all purposes are sitting

## Page 87

1   on top.

2        MR. RAY: Could I approach the witness?

3        THE COURT: Yes.

4   Q. This item here, State's 129 admitted for the record

5   only, is that an item you retrieved from the property room

6   today?

7   A. An item I retrieved last night.

8   Q. Okay. And it's got your name on it, doesn't it?

9   A. Right, when I checked it out for court.

10  Q. You always do that?

11  A. Yes.

12  Q. When I say you always do that, you wrote your name and

13  other stuff on there, did you not?

14  A. Yeah, I wrote the date, time when I checked it out.

15  Q. Why did you do that?

16  A. Just to keep record of when I took it out.

17  Q. So if somebody came over here to court and showed it

18  to you, you would be able to look at it and say, "That's when I

19  took it out and brought it to court."

20  A. Correct.

21  Q. Just like Ms. Callaghan asked you.

22  A. Right.

23  Q. If you didn't do that, you might not know when you did

24  it.

25  A. Correct.

## Page 88

1   Q. Kind of supports your story, what you said, right?

2   A. Correct.

3        MR. RAY: I'll pass the witness. Thank you,

4   Officer Ball.

5            REDIRECT EXAMINATION

6   BY MS. CALLAGHAN:

7   Q. When you obtain evidence from the property room, you

8   are aware that sometimes the Medical Examiner's office or the

9   lab has examined it.

10  A. Correct.

11  Q. And you are able to recognize their seal and where

12  they have closed bags after they have reviewed evidence,

13  correct?

14  A. Correct.

15  Q. Other than that, do these bags show any kind of

16  tampering from any other source?

17  A. No.

18  Q. Except from the Medical Examiner's office opening them

19  to examine them?

20  A. Correct.

21       MS. CALLAGHAN: Pass the witness.

22       MR. RAY: Nothing further.

23       THE COURT: You may step down, sir.

24       MS. HARTMANN: The State calls Detective John

25  McCaskill.

Page 89

1     (Conference at the bench)
2     (Witness Sworn)
3  Whereupon,
4           JOHN MCCASKILL,
5  having been first duly sworn, testified as follows:
6           DIRECT EXAMINATION
7  BY MS. HARTMANN:
8     Q. Would you introduce yourself to the members of the
9  jury?
10    A. My name is John McCaskill.
11    Q. How are you employed?
12    A. I am a detective with the Fort Worth Police
13 Department.
14    Q. How long have you been a Fort Worth Police Department
15 detective?
16    A. For 17 years.
17    Q. How long in total have you been with the Fort Worth
18 Police Department?
19    A. For 21 years.
20    Q. And which Division are you currently assigned to work
21 as a detective?
22    A. I am assigned to the homicide unit.
23    Q. As a homicide detective with the Fort Worth Police
24 Department, what are your specific duties?
25    A. We investigate murders and we also investigate

Page 90

1  suspicious deaths that might occur within the city limits of
2  Fort Worth.
3     Q. And how long have you specifically been in the
4  homicide unit?
5     A. A little over three years.
6     Q. Are you a certified peace officer?
7     A. Yes, ma'am.
8     Q. I want to direct your attention back to the date of
9  April 8, 2003, and ask if you were so employed as a homicide
10 detective on this date.
11    A. Yes, ma'am, I was.
12    Q. Did you receive a call or were you requested to go to
13 an address of 2716 Scott Avenue here in Fort Worth?
14    A. Yes, ma'am, I was.
15    Q. Is that an address and location in Fort Worth, Tarrant
16 County, Texas?
17    A. Yes, ma'am, it is.
18    Q. Was there a house at that address?
19    A. Yes.
20    Q. Approximately what time did you get to that address?
21    A. I actually arrived at about 7:40 p.m.
22    Q. When you arrived at the house at 2716 Scott, what was
23 going on at that point?
24    A. There was a lot of police activity there.  There were
25 several uniformed police officers there, some crime scene tape

Page 91

1  had been set up around the periphery of the residence or the
2  parking lot there; and about the same time I arrived, one of the
3  crime scene officers arrived also.  I believe Officer Wallace
4  and Officer Wilson arrived at pretty close to the same time I
5  did.
6     Q. All right.  And was the entrance and exits -- was the
7  entrance into the house being maintained by a Fort Worth police
8  officer?
9     A. Yes.
10    Q. What is the purpose of that person maintaining or
11 standing guard at the entrance of the crime scene?
12    A. To make sure no unauthorized persons exit or enter the
13 residence, and it is mainly to maintain evidence.
14    Q. So prevent evidence from being contaminated or
15 destroyed --
16    A. Yes, ma'am, that's correct.
17    Q. -- or lost?
18    A. Yes, ma'am.
19    Q. And based upon your years as a homicide detective, let
20 me ask you this.  I'm not going to ask you for an exact number
21 because I don't know if you can give me that, but approximately
22 how many homicide crime scenes have you been present at and
23 investigated?
24    A. I've probably had about 25 or so cases that were
25 actually assigned to me, but I have responded to assist on other

Page 92

1  homicides with other detectives and I would -- several dozen if
2  not maybe into the low hundreds.
3     Q. And in your observation and understanding of how the
4  crime scene had been maintained, you as an investigating
5  detective, were you satisfied with that?
6     A. Yes, I was.
7     Q. When you got to the house itself, did you actually go
8  inside the house?
9     A. Not immediately, but shortly after arrival, I did,
10 yes.
11    Q. What did you do once you arrived?
12    A. I spoke with some of the responding officers and I
13 wanted to get some details about what their actions were when
14 they arrived and to get some information about what they knew
15 about the homicide or homicides.
16    Q. And once you got that preliminary information, what
17 did you do next?
18    A. I then went into the residence along with officers
19 Wallace and Wilson.
20    Q. Why did Officer Wallace and Wilson accompany you into
21 the house?
22    A. That's crime scene officers and that's a personal
23 policy that I like to go in if possible at the same time crime
24 scene officers do.  It doesn't always work that way in reality,
25 but in this case it did.

Page 93

1  Q. So crime scene didn't go in before you did?
2  A. I don't recall that they did, no.
3  Q. When you went into the home, where was the first place
4  that you went?
5  A. We went through the front door which led into a living
6  room type of area. There was a hallway that led to a restroom
7  and a bedroom that was off of that, and then also there was
8  dining room that was adjacent to that living room.
9  Q. Were you able to notice -- immediately upon entering
10 the house and seeing these rooms, did you notice anything that
11 appeared to be blood upon your immediate entrance?
12 A. Yes.
13 Q. Where were you seeing signs of that?
14 A. There were several large droplets of blood that were
15 on the entryway that was just inside the front door of the
16 residence.
17 Q. All right. And as you continued on into the house and
18 went into the dining room area, did you see anything in addition
19 to the -- to what you had seen in the entryway?
20 A. Yes. There were quite a few more large droplets of
21 blood in the living room -- I'm sorry, in the dining room; and
22 there appeared to be a trail of blood drops that led into the
23 kitchen of the residence, which was on the other side of the
24 dining room.
25 Q. All right. And did you find a location where the two

Page 94

1  victims, Pearl, R.D. Magouirk and Patricia Syren were located?
2  A. Yes.
3  Q. And where were they located?
4  A. They were in the hallway that led from the living room
5  to a bedroom, and it was just outside of a bathroom on one side;
6  and then there was another entry that went from that hallway
7  into the dining room that was just opposite the bathroom door.
8  Q. Okay. And was there a significant amount of blood
9  surrounding the location of their two bodies?
10 A. Yes, ma'am.
11 Q. Were you able to look at the bodies of Patricia Syren
12 and Pearl R.D. Magouirk and see any signs of obvious injury?
13 A. Yes.
14 Q. And what specific signs of obvious injury did you
15 notice?
16 A. Well, there was a large amount of blood, and we
17 couldn't immediately tell the exact nature of all the injuries,
18 but it was obvious that their throats had been cut at that
19 point. And it wasn't until later when the Medical Examiner's
20 office arrived that I was able to observe some stab wounds to
21 the torso of both these ladies.
22 Q. All right. And when you say torso, are you talking
23 about the chest down to the abdomen?
24 A. Yes, ma'am.
25 Q. Were you ever able to notice any wounds on the back of

Page 95

1  at least one of the victims?
2  A. I don't specifically recall at that point, no.
3  Q. All right. Would it be fair to say that the scene was
4  significantly bloody, that there was a lot of blood surrounding
5  the two bodies?
6  A. Yes, ma'am, most definitely.
7  Q. All right. The blood, or what you believed to be
8  blood, evidence that was in the entryway, the kitchen, the
9  dining room, did that have any significance to you as a homicide
10 detective after looking at the location of the bodies and the
11 location of what appeared to be other blood elswhere in the
12 house?
13 A. Yes, it did.
14 Q. And what significance did it have to you?
15 A. After observing the scene in the totality of it as I
16 observed it, I did not believe that those blood drops could have
17 originated from either of the two victims. At that point I
18 believed that those blood drops belonged to a suspect.
19 Q. Why did you form that opinion?
20 A. Well, the blood droplets led away from the bodies.
21 No. 1 led to the front door of the residence. There was the
22 blood drops at the entryway, then led away from the bodies
23 through the dining room into the kitchen to a drawer. There was
24 a smear of blood on the front of that drawer.
25      And then we opened the drawer and there were some

Page 96

1  towels located inside that drawer. The blood trail or blood
2  droplets stopped at that point.
3  Q. Was there also what appeared to be blood located in a
4  detached garage at the back of the property at 2716 Scott?
5  A. Yes, ma'am, it was.
6  Q. Was that blood -- well, let me ask you this. Was
7  there a vehicle in that detached garage at the time you were in
8  there?
9  A. No.
10 Q. Was there anything on the floor of that garage that in
11 your common life experience you formed an opinion about as far
12 as stains?
13 A. Yes.
14 Q. What was that?
15 A. There were several large droplets of blood that were
16 on the floor that would have been in about the same position
17 where the driver door would have been had there been a vehicle
18 there.
19      And I came to believe that because there were
20 some oil or grease stains in the garage that seemed to indicate
21 that the vehicle was pulled -- typically parked in the garage
22 facing forward. And the location of the drops in relation to
23 that made me believe that it was near where the driver's door
24 would have been.
25 Q. And then the -- noting what appeared to be blood drops

Page 97

1 there in the garage near where a driver's side door may have
2 been at one time, did that factor in as well into your
3 determination that that blood may not have come from the
4 victims?
5     A. Yes, ma'am.
6     Q. Did you form a belief about who that blood might have
7 been from?
8     A. Yes.
9     Q. What type of belief did you form?
10     A. Well, I believed that was -- that it probably
11 originated from the suspect in this offense.
12     Q. Did you form any type of opinion as to whether or not
13 the suspect involved in this offense may have been injured?
14     A. Yes.
15     Q. Did you notice an answering machine there in the
16 house?
17     A. Yes.
18     Q. Where was that answering machine located?
19     A. It was in the hallway where the victims were located.
20     Q. Was there anything of significance about the answering
21 machine that, just by looking at it, drew your attention to it?
22     A. Yes, ma'am. There was a flashing light that I
23 believed was an indicator that there were some messages on the
24 answering machine.
25     Q. Did you, in fact, listen to the messages on the

Page 98

1 answering machine?
2     A. Yes, I did.
3     Q. Were there any messages from -- or was there a message
4 from Officer McClenny?
5     A. Yes.
6     Q. Were there any messages from a person named April
7 Syren?
8     A. Yes.
9     Q. Were there any messages from a fraud detection agency
10 affiliated with a credit card company?
11     A. Yes, ma'am.
12     Q. Were you, in fact, able to view some of the
13 information on the answering machine to contact the appropriate
14 credit card company for the investigation of your case?
15     A. Yes, ma'am. I actually called -- there was a 1-800
16 number left on the answering machine, and I called that number
17 and was able to speak with an individual who actually
18 represented the fraud detection agency.
19     Q. All right. And that fraud detection agency, were they
20 affiliated with or connected to the Morgan Stanley Master Card
21 Company?
22     A. Yes, ma'am.
23     Q. And were you able to speak with the Morgan Stanley
24 Master Card personnel over the phone?
25     A. The person I actually spoke with that night worked for

Page 99

1 the fraud detection service. It wasn't until later that other
2 detectives in our office actually spoke with Morgan Stanley.
3     Q. All right. Were you able to learn during the course
4 of your investigation that one of the victims, Patricia Syren,
5 had a credit card, a Master Card, through Morgan Stanley?
6     A. Yes, ma'am.
7     Q. Were you also through your investigation able to
8 determine or receive information about where Patricia Syren's
9 Morgan Stanley credit card or Master Card had been used from
10 Sunday April 6 up until the current date of April 8 and April 9,
11 2003?
12     A. Yes, ma'am.
13     Q. Was that information helpful to you in attempting to
14 focus a direction in which to move the investigation?
15     A. Yes, ma'am, it was.
16     Q. Did you, in fact, continue your investigation of this
17 case outside the city limits of Fort Worth?
18     A. Yes.
19     Q. And what city did you go to or continue your
20 investigation?
21     A. We drove to Galveston.
22     Q. Why Galveston as opposed to any other city here in the
23 state of Texas?
24     A. I was advised that particular credit card that
25 belonged to Ms. Syren had been used most recently in Galveston,

Page 100

1 particularly at about 6:40 p.m. on the evening of the 8th, which
2 was the same night that we were out there at the house, and then
3 also to rent a motel room down there the previous night.
4     Q. All right. Were you also able to determine -- well,
5 let me ask you this. Did it appear from the bodies and the -- I
6 guess the condition of the blood evidence, did it appear that
7 Patricia Syren and Pearl R.D. Magouirk had been dead for a day
8 or two?
9     A. Yes.
10     Q. Were you interested as well in the charges that were
11 made on April 6, 2003, and April 7, 2003?
12     A. Yes, ma'am.
13     Q. Were leads followed up in regards to charges made on
14 those two days?
15     A. Yes, ma'am.
16     Q. Were there charges made on that credit card here in
17 Fort Worth?
18     A. Yes.
19     Q. When you went to Galveston, were you accompanied by
20 anybody?
21     A. Yes, ma'am, my partner Detective Matt Hardy.
22     Q. Did you notify the police department in Galveston that
23 you were on your way down?
24     A. Yes.
25     Q. What day, in fact, did you and Detective Hardy travel

1 to Galveston?

2    A. We left on the morning of the 9th.

3    Q. And that would be Wednesday?

4    A. Yes, ma'am.

5    Q. So Tuesday evening sometime after 7:00 p.m. you are

6 actually at the house investigating the death, and then

7 Wednesday morning you go to Galveston.

8    A. That's correct.

9    Q. All right. When you go to the city of Galveston,

10 where did you go first?

11    A. To the Galveston Police Department.

12    Q. When you got to the Galveston Police Department, did

13 you meet with an individual by the name of Billy Jack

14 Crutsinger?

15    A. Yes, ma'am.

16    Q. Do you see anybody here in the courtroom today that

17 you recognize to be Billy Jack Crutsinger?

18    A. Yes, ma'am, I do.

19    Q. Can you tell us where that person is located and

20 something they are wearing?

21    A. Sitting at the far right of the tables as I face them,

22 and he's wearing pinkish long-sleeve dress shirt, and it looks

23 like blue or grayish-blue pants.

24    Q. Just for clarification, if I'm Person 1, continuing on

25 down the line, what number of person would that person be?

1    A. Five.

2       MS. HARTMANN: At this time may the record

3 reflect that Detective McCaskill has identified the Defendant?

4       THE COURT: It will.

5    Q. When you met with Mr. Crutsinger, did you introduce

6 yourself?

7    A. Yes.

8    Q. Did you tell him what your name was?

9    A. Yes, I did.

10    Q. Did you tell him what your job title was?

11    A. Yes. I told him I was a detective with the Fort Worth

12 police.

13    Q. And once you initially introduced yourself to Mr.

14 Crutsinger, did you then leave Mr. Crutsinger and go speak with

15 some police personnel outside --

16       MR. MOORE: Excuse me. Your Honor, we're going

17 to have to object to her leading the witness.

18       THE COURT: Overruled.

19    Q. After you introduced yourself to the Defendant, Mr.

20 Crutsinger, did you stay there or did you go someplace else at

21 that point?

22    A. No, I stepped out of the room and went and talked to

23 some Galveston officers.

24    Q. All right. At any time were you notified by a

25 Galveston officer that the Defendant, Mr. Crutsinger, wanted to

1 speak with you.

2    A. Yes, ma'am.

3       MR. RAY: Objection to leading.

4       THE COURT: Overruled.

5       MR. RAY: Thank you.

6       THE WITNESS: Yes, ma'am, I was.

7    Q. When you were notified by a Galveston police officer

8 that the Defendant wanted to speak with you, what did you do at

9 that point?

10    A. I asked if we could be provided with an interview

11 room, and we were. It was actually located upstairs on the

12 second floor of the Galveston Police Department.

13    Q. All right. And did you, in fact, go to that

14 particular room?

15    A. Yes, ma'am.

16    Q. Was Mr. Crutsinger taken to that room?

17    A. Yes, he was.

18    Q. When you met with Mr. Crutsinger, did you advise him

19 of his Miranda Warnings?

20    A. Yes, ma'am, I did.

21    Q. Can you tell the members of the jury specifically what

22 those Miranda Warnings were that you spoke -- or gave to the

23 Defendant, Mr. Crutsinger?

24    A. Yes, ma'am. Would you like for me to read them

25 verbatim.

1    Q. Absolutely.

2    A. You have the right to remain silent and not make any

3 statement at all, and any statement you make may be used as

4 evidence against you at your trial. Any statement you make may

5 be used as evidence against you in court.

6       You have the right to have a lawyer present to

7 advise you prior to and during any questioning. If you are

8 unable to employ a lawyer, you have the right to have a lawyer

9 appointed to advise you prior to and during any questioning.

10       You have to right to terminate the interview at

11 any time.

12    Q. And when you advised Mr. Crutsinger of his Miranda

13 Warnings, did Mr. Crutsinger indicate to you that he understood

14 those warnings?

15    A. Yes, he did.

16    Q. Did he have any questions regarding them?

17    A. No, ma'am.

18    Q. Did he ever ask to speak with a lawyer?

19    A. No, ma'am.

20    Q. Did he ever at that point tell you that he no longer

21 wished to speak with you?

22    A. No, ma'am.

23    Q. Could you tell the members of the jury what Mr.

24 Crutsinger's demeanor was when you met with him on April 9,

25 2003?

## Page 105

1  A. He seemed to be from time to time emotional, upset.
2  At other times he appeared to be very calm and matter of fact.
3  His demeanor actually varied back and forth several times.
4  Q. All right. Did he appear to continue to want to be
5  voluntarily present with you and talk with you?
6  A. Yes, ma'am.
7  Q. Did you speak with the Defendant about your
8  investigation into the murders of Patricia Syren and Pearl R.D.
9  Magouirk?
10 A. Yes, ma'am.
11 Q. After talking with Mr. Crutsinger, did you ask him if
12 he would be willing to give you a tape-recorded or oral
13 statement?
14 A. Yes, ma'am.
15 Q. Did he indicate that he would want to do that?
16 A. Yes.
17 Q. Did you, in fact, have a tape recording device with
18 you there in Galveston?
19 A. Yes, ma'am.
20 Q. And a tape?
21 A. Yes, ma'am.
22 Q. Did you, in fact, record an oral statement from Mr.
23 Crutsinger?
24 A. Yes, I did.
25 Q. Who was present at the time of that statement?

## Page 106

1  A. Detective Hardy, myself and Mr. Crutsinger.
2  Q. When you began to take the oral statement, did you
3  Mirandize Mr. Crutsinger again for a second time?
4  A. Yes, ma'am.
5  Q. Again, if you would for the jury, what rights did you
6  read to Mr. Crutsinger?
7  A. The Miranda warnings which I read to you a second ago.
8  Q. The exact same ones?
9  A. Yes, ma'am.
10 Q. Are those Miranda warnings actually heard on that tape
11 recording of the Defendant's statement?
12 A. Yes, ma'am, they are.
13 Q. Did you in addition ask the Defendant to sign a
14 Miranda card?
15 A. Yes.
16 Q. Tell the members of the jury what a Miranda card is.
17 A. It is just a preprinted form that has the Miranda
18 warnings actually written on them. And we would provide that --
19 after their being read, we would provide them to an individual
20 and asked that they read over them and if they understand them
21 and agree to them, to then sign and date the form.
22 Q. The Miranda card that you Provided to this Defendant,
23 did you give him an opportunity to read those?
24 A. Yes.
25 Q. Did he have any questions for you?

## Page 107

1  A. No, ma'am.
2  Q. Did he have any questions for you when you advised him
3  of his Miranda rights on the oral recording?
4  A. No.
5  Q. Did he ever invoke any of those rights at any time?
6  A. No, ma'am.
7  Q. Did the Defendant, Mr. Crutsinger, sign that Miranda
8  card?
9  A. Yes, he did.
10 Q. In your opinion, did the Defendant knowingly,
11 intelligently and voluntarily waive his rights and agree to talk
12 with you?
13 A. Yes, ma'am.
14 Q. Did the Defendant appear intoxicated to you?
15 A. No, ma'am.
16 Q. Did he appear high?
17 A. No.
18 Q. Did he appear to be under the influence of anything?
19 A. No, ma'am.
20 Q. Was Mr. Crutsinger promised anything in exchange for
21 talking with you?
22 A. No, ma'am.
23 Q. Was Mr. Crutsinger threatened by either you or
24 Detective Hardy in order to get the statement?
25 A. No, ma'am.

## Page 108

1  Q. Was Mr. Crutsinger denied the use of any type of
2  bathroom facilities?
3  A. No.
4  Q. Was Mr. Crutsinger denied refreshments, such as water?
5  A. No, ma'am.
6  Q. So to be clear on your testimony, Detective, the
7  Defendant was Mirandized at least three separate times by you?
8  A. Well, twice.
9  Q. Okay. Once orally when you first met with him.
10 A. No. No, ma'am, I --
11 Q. In the interview room.
12 A. In the interview room, yes. When I first met with him
13 earlier, I just introduced myself, and that was it.
14 Q. Is that the point where you provided the written
15 Miranda card, or was that at the time of the tape recording?
16 A. That was earlier when he first stepped into the
17 interview room.
18 Q. Okay. So you gave him the card?
19 A. Yes, ma'am.
20 Q. You orally advised him of his Miranda rights?
21 A. Yes, ma'am.
22 Q. And then you advised him of his Miranda rights during
23 the oral recording of his statement?
24 A. Yes, ma'am. I considered the first time to be one
25 time. I'm sorry if I misunderstood.

1   Q. That's okay. Is the Defendant's waiver of his Miranda
2 rights heard on that oral recording?
3   A. Yes.
4       MS. HARTMANN: May I approach the witness?
5       THE COURT: Yes.
6   Q. Let me ask you this, Detective. Do you recall what
7 Mr. Crutsinger was wearing as far as his shirt at the time that
8 you interviewed him?
9   A. Yes, ma'am.
10   Q. What was he wearing?
11   A. He was wearing a white Joe's Crab Shack t-shirt.
12   Q. What condition did it appear to be in?
13   A. It looked brand new to me.
14   Q. I'm going to show you what's been previously marked
15 for identification purposes as State's Exhibits 102 and 104 and
16 ask you to take a look at those, please?
17   A. (Witness complies) Yes, ma'am.
18   Q. Do those exhibits fairly and accurately depict what
19 they purport to depict?
20   A. Yes, ma'am.
21       MS. HARTMANN: Your Honor, at this time the State
22 would offer State's 102 and 104.
23       MR. MOORE: No objection.
24       THE COURT: 102 and 104 are admitted.
25       (State's Exhibit No. 102 and 104 received)

1   Q. And do these fairly and accurately depict the way Mr.
2 Crutsinger appeared at the time that you interviewed him?
3   A. Yes, ma'am.
4       MS. HARTMANN: Permission to publish to the jury?
5       THE COURT: You may.
6   Q. While you were with Mr. Crutsinger, did you also look
7 to see if he had any injuries?
8   A. Yes.
9   Q. Did you notice any type of injury on Mr. Crutsinger?
10   A. Yes, ma'am.
11   Q. What type of injury did you notice?
12   A. He had a laceration to his right forefinger.
13   Q. And was a photograph taken of that?
14   A. Yes, ma'am.
15   Q. By you?
16   A. Yes, ma'am.
17   Q. I am showing you what's been marked for identification
18 purposes as State's Exhibit No. 103. Do you recognize that?
19   A. Yes, ma'am.
20   Q. Does it fairly and accurately depict what it purports
21 to depict?
22   A. Yes.
23       MS. HARTMANN: The State would offer State's
24 Exhibit 103.
25       MR. MOORE: No objection.

1       THE COURT: No. 103 is admitted.
2       (State's Exhibit No. 103 received)
3       MS. HARTMANN: Permission to publish?
4       THE COURT: You may.
5   Q. Where did you observe -- where was this injury on the
6 Defendant?
7   A. It was on his right forefinger.
8   Q. Were you also asked to bring with you today,
9 Detective, the original Miranda sheet that the Defendant was
10 given to read and sign?
11   A. Yes, ma'am.
12   Q. I'm showing you what's been marked for identification
13 purposes as State's Exhibit No. 130. Can you identify that?
14   A. Yes. That's the original Miranda warning sheet that I
15 used to advise Mr. Crutsinger of his rights that particular day.
16   Q. Does that contain the exact same rights that you have
17 previously read or explained to the jury?
18   A. Yes, ma'am.
19   Q. Has the Defendant signed State's No. 130?
20   A. Yes.
21   Q. Is it dated?
22   A. Yes.
23   Q. Is there a time?
24   A. Yes.
25   Q. What time?

1   A. 13:14 hours, which would 1:14 p.m.
2   Q. On what date?
3   A. April 9, 2003.
4   Q. All right. And is your signature also on State's
5 Exhibit 130?
6   A. Yes, ma'am.
7   Q. Have there been any alterations, changes or deletions
8 other than the State's Exhibit sticker?
9   A. No, ma'am.
10       MS. HARTMANN: State would offer State's Exhibit
11 130.
12       MR. MOORE: No objection.
13       THE COURT: 130 is admitted.
14       (State's Exhibit No. 130 received)
15   Q. Were you also asked to bring the tape recording of the
16 statement that you took from the Defendant?
17   A. Yes, ma'am.
18   Q. Could you get that out, please?
19   A. (Witness complies)
20   Q. I'm showing you what's been marked for identification
21 purposes as State's 131, ask if you recognize that.
22   A. Yes, I do.
23   Q. How do you recognize it?
24   A. That's the original tape that I recorded the statement
25 from Mr. Crutsinger on that day.

Page 113

1    Q. Have you had an opportunity prior to coming into court
2    today to listen to that tape?
3    A. Yes, ma'am.
4    Q. After listening to it, does it fairly and accurately
5    depict the conversation that you recorded between yourself, the
6    Defendant, Mr. Crutsinger, and Detective Hardy back on April 9
7    of 2003 there in Galveston?
8    A. Yes, ma'am.
9    Q. Have there been any alterations, changes, additions or
10   deletions made to that exhibit?
11   A. No, ma'am.
12       MS. HARTMANN: At the time the State would offer
13   State's Exhibit 131.
14       MR. MOORE: Judge, we would object to State's
15   Exhibit 131 based on the prior proceeding that was had in this
16   court.
17       THE COURT: Overruled. 131 is admitted.
18       (State's Exhibit No. 131 received)
19       MR. RAY: Judge, may we have a running objection
20   so we don't have to --
21       THE COURT: You may.
22       MS. HARTMANN: Permission to publish?
23       THE COURT: You may.
24   Q. Detective, while we are getting the boom-box set up
25   here to put the tape in, let me ask you this. Can you identify

Page 114

1    all the voices that appear on State's 131?
2    A. Yes, ma'am.
3    Q. Were your batteries old in the tape-recording device?
4    A. Well, I don't know that they were old, but it recorded
5    a little bit fast for some reason. It may be because they were
6    a little bit low.
7       (Tape played to the jury)
8       THE COURT: Ladies and gentlemen of the jury, we
9    are going to break for the lunch hour until 1:30. Please
10   remember and follow your instructions, and the bailiffs will
11   meet you as usual. Have a good lunch.
12      (Lunch recess taken)
13      (Recess for lunch)
14      (Afternoon Session:)
15      (Jury present)
16      THE COURT: You may proceed.
17      MS. HARTMANN: May I approach the witness?
18      THE COURT: Yes.
19   Q. Let me show you what's been marked for identification
20   purposes as State's Exhibit 101 and ask you if you recognize
21   that.
22   A. Yes, ma'am, I do.
23   Q. Does State's 101 fairly and accurately depict what it
24   purports to depict?
25   A. Yes, ma'am.

Page 115

1       MS. HARTMANN: Your Honor, at this time we offer
2    State's 101.
3       MR. RAY: No objection.
4       THE COURT: 101 is admitted.
5       (State's Exhibit No. 101 received)
6       MS. HARTMANN: May I publish?
7       THE COURT: You may.
8    Q. Does State's 101 show the answering machine?
9    A. Yes, ma'am.
10   Q. And is there a little No. 9 in the window?
11   A. I believe so.
12   Q. Okay. I will walk it over to you in just a second.
13      Is there a window that indicates how many
14   messages were waiting on that machine?
15   A. I believe so, yes.
16   Q. And this is the answering machine you testified to
17   that was in Pat Syren and Pearl R.D. Magouirk's house?
18   A. Yes, ma'am.
19   Q. And that you listened to?
20   A. Yes, ma'am.
21   Q. Is there a 9?
22   A. Yes, there is.
23   Q. All right. Okay. I think before we broke for lunch,
24   we had published the Defendant's orally recorded statement to
25   you down in Galveston.

Page 116

1    A. Yes, ma'am.
2    Q. In that statement does the Defendant admit to killing
3    Patricia Syren?
4    A. Yes, ma'am.
5    Q. Does he admit to killing Pearl R.D. Magouirk?
6    A. Yes, ma'am.
7    Q. Does he admit to doing that by cutting their throat
8    and stabbing them?
9    A. Yes, ma'am.
10   Q. Does he admit to using Patricia Syren's credit card?
11   A. Yes.
12   Q. And taking money out of her purse?
13   A. Yes, ma'am.
14   Q. As well as taking the purse itself?
15   A. That's correct.
16   Q. Does he admit to purchasing a pair of shoes up here in
17   Fort Worth --
18      MR. MOORE: Your Honor, I am going to have to
19   object not only to the leading nature of the questions, but the
20   tape is in evidence itself, and it is not relevant to go over it
21   with this detective.
22      THE COURT: Overruled.
23      MR. RAY: Plus, Your Honor, it is his editorial
24   comment about what was meant. The statement speaks for itself.
25      THE COURT: Overruled.

Page 117

1  MR. RAY: Thank you.

2  Q. Did he admit to you that he used Patricia Syren's
3  credit card to purchase things here in Fort Worth?

4  A. Yes, ma'am.

5  Q. Were you able to follow up on this information here in
6  Fort Worth?

7  A. Yes.

8  Q. As a result, did you meet with a young lady by the
9  name of Loretta Angram?

10  A. Yes, I did.

11  Q. Where did Loretta Angram work or did she work back at
12  that time?

13  A. At the time I believe she was working at the Factory
14  Brand Shoes located in Tandy Outlet Mall just basically right
15  across the street from this building.

16  Q. And you went and visited with her?

17  A. Yes.

18  MS. HARTMANN: May I approach the witness?

19  THE COURT: Yes.

20  Q. Did I ask you the bring some items with you here today
21  to court?

22  A. Yes, ma'am.

23  Q. Can you pull out that envelope that you had with you
24  earlier?

25  A. (Witness complies)

Page 118

1  Q. I am showing you what's been marked for identification
2  purposes as State's Exhibit 132. Do you recognize it?

3  A. Yes, I do.

4  Q. Is State's Exhibit No. 132 an item that you collected
5  after visiting with Loretta Angram at the Factory Brand Shoe
6  Store in Fort Worth Outlet Square?

7  A. Yes.

8  Q. Did the Defendant admit to you that he had used
9  Patricia Syren's credit card to rent a motel down in Galveston?

10  A. Yes, ma'am.

11  Q. Did the Defendant admit he'd used Patricia Syren's
12  credit card to purchase a Joe's Crab Shack T-shirt?

13  A. Yes, ma'am, I believe so.

14  Q. Was he, in fact, wearing a Joe's Crab Shack T-shirt?

15  A. Yes.

16  Q. And he was able to tell you that he had taken
17  Patricia's Syren's Cadillac vehicle?

18  A. Yes, ma'am.

19  Q. Was he able to tell you where he had disposed of the
20  keys to that Cadillac?

21  A. Yes.

22  Q. Were you able to notify some police officers up here
23  in Fort Worth about places to search for those keys?

24  A. Yes, I was.

25  Q. Did he tell you he had left the vehicle, the Cadillac,

Page 119

1  at a Mexican bar --

2  A. Yes, ma'am.

3  Q. -- on Main Street?

4  A. Yes, ma'am.

5  Q. At some point during the interview, did Detective
6  Hardy step out and give Mr. Crutsinger a glass of water?

7  A. Yes.

8  Q. Was that at the Defendant's request? Did he ask for
9  water?

10  A. Yes, ma'am.

11  Q. Did you at several points in your conversation with
12  Mr. Crutsinger give him an opportunity to give you any
13  additional information that he wanted to?

14  A. Yes.

15  Q. Did you offer him an opportunity to add anything he
16  wanted to before you stopped the tape?

17  A. Yes, ma'am.

18  Q. And were we able to hear on that tape or is it present
19  on that tape that you notified the Defendant he was being tape
20  recorded?

21  A. Yes.

22  Q. In fact, was there a discussion about having to turn
23  the tape off and make sure it was working correctly before you
24  proceeded.

25  A. Yes, ma'am.

Page 120

1  Q. You told this jury earlier that the Defendant was
2  willing to speak with you. Did that demeanor continue
3  throughout the duration of your conversations with him?

4  A. Yes, ma'am, it did.

5  Q. Did he periodically thank you during the course of
6  your conversation with him for the water and giving him the
7  opportunity to add anything he wanted to?

8  A. Yes.

9  Q. Did you also ask or request of Mr. Crutsinger's
10  consent to take some buccal swabs?

11  A. Yes, I did.

12  Q. And buccal is b-u-c-c-a-l?

13  A. I believe that's how it spelled.

14  Q. Did that refer to epithelial cells on the inside of
15  the cheek portion of the mouth?

16  A. Yes, ma'am, it does.

17  Q. When you ask for a person's consent to take an item
18  like that, do you document that consent in a written form?

19  A. Yes, ma'am.

20  Q. Did you do so with Mr. Crutsinger?

21  A. Yes, ma'am.

22  Q. What was the purpose in asking Mr. Crutsinger if he
23  would be willing to give you a sample of, in essence, his DNA?

24  A. Because I was of the belief that the person
25  responsible for this offense had been injured and bled on the

1 scene, the reason for doing that was so that qualified persons
2 could make a DNA comparison, and they would be able to tell us
3 with a pretty great amount of certainty if that person had
4 actually contributed the blood that was on the scene.
5    Q. And you previously testified to the jury that you
6 noticed a fresh injury on Mr. Crutsinger?
7    A. Yes, ma'am.
8    Q. Or what appeared to be a fresh injury?
9    A. Yes, ma'am.
10    Q. I am showing you what's been marked for identification
11 purposes as State's Exhibit No. 133. Do you recognize that?
12    A. Yes, I do.
13    Q. Have there been any alterations, changes or deletions
14 made to that document other than the placing of the State's
15 exhibit sticker in the corner?
16    A. No, ma'am.
17    Q. Is this the original consent form that you used with
18 Mr. Crutsinger back on April 9 of this year?
19    A. Yes, that is the original.
20       MS. HARTMANN: The State would offer State's 133.
21       MR. MOORE: No objection.
22       MR. RAY: Well, excuse me, Judge. We make the
23 same objection that we made outside the presence of the jury.
24       THE COURT: Noted and overruled.
25       MR. RAY: Thank you. Can we have a running

1 objection?
2       THE COURT: You may.
3       (State's Exhibit No. 133 received)
4    Q. Did the Defendant sign State's Exhibit No. 133?
5    A. Yes, ma'am.
6    Q. Who else signed on State's 133?
7    A. Detective Hardy.
8    Q. And does it show you as the person doing the
9 collecting?
10    A. That's correct.
11    Q. And did you read State's 133 to Mr. Crutsinger, or did
12 you give it to him to read to himself?
13    A. I gave to it him and asked him to read it to himself
14 and asked him if he understood it.
15    Q. Did he indicate he did?
16    A. Yes, ma'am.
17    Q. Could you publish the top paragraph of State's 133 by
18 orally reading it?
19    A. Yes, ma'am.
20       "I, Billy J. Crutsinger, having been informed by
21 Detective J.T. McCaskill of my Constitutional right not to have
22 an intrusion made into my body for the purpose of conducting a
23 buccal (cheek) swab test, blood test, or hair comparison,
24 knowing my lawful right to refuse to consent to such an
25 intrusion, I willingly give my permission to any qualified

1 person to make such intrusion and to withdraw a sufficient
2 quantity of my buccal cheek cells and/or blood and/or hair with
3 which to perform any necessary analysis.
4       I give my written permission for a buccal cheek
5 swab test and/or blood and/or hair test to the above officer
6 voluntarily and without any threats or promises of any kind. At
7 13:30 hours on 4-9 of '03 at Galveston Police Department,
8 Galveston, Texas.
9    Q. All right. And the document mentioned permission for
10 intrusive procedures. When we are talking about collecting
11 buccal swabs, are we talking about any type of drawing of blood?
12    A. No.
13    Q. What are we talking about?
14    A. Basically to collect those, it's a long Q-Tip probably
15 about six inches long. And the subject of the test actually --
16 we prefer they actually swab the inside of their own cheek.
17       So in this particular case, as in every case
18 where I have ever collected these type of samples, I just hand
19 the swab to the individual and they swab the inside of each
20 cheek about 12 to 15 times.
21       And then a second swab is provided, and they'll
22 swab the inside of the other check about 12 to 15 times.
23    Q. All right. And is that, in fact, the way it took
24 place with Mr. Crutsinger?
25    A. Yes, ma'am.

1    Q. Did you wear anything to prevent any of your skin
2 cells from getting onto the Q-Tip or the swabs?
3    A. Yes, ma'am. I just wore Latex gloves.
4    Q. Did Mr. Crutsinger, in fact, swab the insides of his
5 cheeks with two swabs?
6    A. Yes, ma'am.
7    Q. What did you do with them at that point?
8    A. At that point I had Mr. Crutsinger place the swab
9 itself into an envelope that I held open, and then he repeated
10 the procedure with the other swab and placed that swab back into
11 the envelope, and then they are allowed to air dry for about a
12 half hour, and then they are sealed up.
13    Q. Where do these swabs come from? Did you stick your
14 head out the door and say does anyone have any Q-Tips or --
15    A. We typically carry three or four of these kits in the
16 vehicles with us.
17    Q. When you talk about the kits, are these -- describe
18 how these swabs are packaged prior to your presenting them to
19 someone to start swabbing their cheek?
20    A. Actually the whole kit is in an envelope which
21 contains the permission form, instructions for us to do; and
22 then the swabs themselves are sealed in a paper-type envelope
23 that is sealed up. We have to break that seal and then allow
24 the subject of the test to take the swab out themselves.
25    Q. Is that what was done with Mr. Crutsinger?

Page 125

1  A. Yes, ma'am.

2  Q. So you have a sterile kit that you then open, and the

3  person who is taking the swab -- or the person that's providing

4  the sample takes the swab out themselves, swabs their mouth and

5  puts them back in the envelope.

6  A. That's correct.

7  Q. And you were wearing Latex gloves?

8  A. Yes, ma'am, I was.

9      MS. HARTMANN: May I approach the witness?

10     THE COURT: Yes.

11  Q. Did you bring with you today the envelope in which the

12  swabs from April 9 of 2003 were packaged?

13  A. Yes, I did.

14  Q. Could you hand that to me, please?

15     (Pause in the proceedings)

16  Q. I'm going to show you what's been marked for

17  identification purposes as State's Exhibit No. 134. Do you

18  recognize it?

19  A. Yes, I do.

20  Q. How do you recognize State's 134?

21  A. That is the original cheek-swab kit that was used on

22  that day, on April 9.

23  Q. All right.

24  A. Or the envelope that it was packaged in.

25  Q. So that envelope was down with you in Galveston, and

Page 126

1  that's where the buccal swabs were placed?

2  A. That's correct.

3  Q. Once the swabs were dried, did you seal it up?

4  A. Yes.

5  Q. How did you seal it?

6  A. I sealed it with tape and put my initials over the

7  seal and my ID number.

8  Q. Your initials would be?

9  A. JTM 1895 is my ID number.

10  Q. Are you -- let me ask you this. When you sealed it

11  up, what did you do with it at that point?

12  A. I kept it in my possession until it was submitted into

13  evidence at the Fort Worth Police property room.

14  Q. All right. And are you familiar as a homicide

15  investigator -- in working with evidence and Tarrant County

16  Medical Examiner's Office, are you familiar with the tape they

17  use when they retrieve evidence for testing purposes and then

18  seal it back up?

19  A. Yes, ma'am.

20  Q. Do you recognize any such tape on State's 134?

21  A. Yes, I do.

22  Q. Other than the tape from the Tarrant County Medical

23  Examiner's Office, does it appear in any way that the envelope

24  has been tampered with or opened by anyone else?

25  A. No, ma'am.

Page 127

1  Q. Is it required by law enforcement and the scientific

2  community that anytime a bag or envelope with evidence is

3  opened, when it is resealed, there has to be some type of

4  notation at the point of sealing?

5  A. That's the standard that I've been taught. I'm

6  assuming that is required or we wouldn't be doing it.

7      MS. HARTMANN: The State would offer State's

8  Exhibit 134.

9      MR. RAY: Can I see it? Can we have just a

10  second?

11     THE COURT: Yes.

12     MR. RAY: Subject to them being able to tie it

13  up, we don't have any objection.

14     THE COURT: 134 is conditionally admitted.

15     (State's Exhibit No. 134 conditionally received)

16     MR. MOORE: Well, for the record, we would also

17  object to the admission of that based on the prior ruling of the

18  Court at the prior hearing.

19     THE COURT: Overruled.

20     MR. RAY: May we have a running objection to that

21  also?

22     THE COURT: You may.

23  Q. Did the Defendant also admit to you during his

24  statement that he had taken a bus --

25  A. Yes.

Page 128

1  Q. -- down to Galveston

2      And that prior to leaving for Galveston, he had

3  stayed at the Cowboy Motel?

4  A. Yes, the Cowboy Inn or Cowboy Motel. I'm not sure.

5  Q. Did he also tell you that the clothes that he had been

6  wearing at the time of killing Patricia Syren and Pearl

7  Magouirk, those clothes had been disposed of in a dumpster at

8  the Cowboy Inn?

9  A. Yes.

10  Q. Did you relay that information up here to Fort Worth

11  to officers up here?

12  A. Yes.

13  Q. Were you all ever able to -- strike that.

14      At some point did you return back here to Fort

15  Worth?

16  A. Yes, ma'am.

17  Q. Did you also have a chance to visit the Razoo

18  Restaurant located here in downtown Fort Worth?

19  A. Yes, I did.

20  Q. Did you meet with a young woman by the name of Denise

21  Schrader?

22  A. Yes, I did.

23  Q. And was that meeting pursuant to your investigation of

24  this homicide case?

25  A. Yes, it was.

Page 129

1    MS. HARTMANN: May I approach the witness?

2    THE COURT: Yes.

3    Q. All right. I'm showing you what's been marked for

4 identification purposes as State's Exhibit No. 135. Do you

5 recognize that?

6    A. Yes, I do.

7    Q. Is that an item that you retrieved from that Razoo's

8 here in downtown Fort Worth?

9    A. Yes, it is.

10    Q. After having a conversation with Denise Schrader and

11 the management there at Razoo's?

12    A. Yes, ma'am.

13    Q. All right. Now, directing your attention to the date

14 of August 26 of this year.

15    A. Yes, ma'am.

16    Q. Are you with me?

17    A. Yes, ma'am, I am.

18    Q. Did you execute a search warrant to obtain additional

19 DNA from the Defendant, Billy Jack Crutsinger?

20    A. Yes, ma'am.

21    Q. And did you, in fact, execute that search warrant?

22    A. Yes, I did.

23    Q. Did you take additional buccal swab samples from the

24 Defendant on that date?

25    A. Yes, ma'am.

Page 130

1    Q. Was the procedure that you have already described to

2 the jury that was done down in Galveston, was that same

3 procedure done here in Fort Worth?

4    A. Yes, it was.

5    Q. And once you took the buccal swabs from the Defendant,

6 did you package them up in the same manner as you previously

7 described?

8    A. Yes, I did.

9    Q. Did you seal those items up in an envelope?

10    A. Yes, I did.

11    Q. What did you do once you had sealed those additional

12 buccal swabs?

13    A. I drove them directly to the Medical Examiner's Office

14 that same morning.

15    Q. And turned them over to personnel there?

16    A. Yes.

17    Q. Do you know specifically who it was you turned them

18 over to? Was it one of the evidence custodians?

19    A. I believe so, yes.

20    Q. Was it sealed?

21    A. It was actually sealed there at the ME's office.

22    Q. Did you bring that original packaging with you here

23 today?

24    A. Yes, I did.

25    MS. HARTMANN: May I approach the witness?

Page 131

1    THE COURT: Yes.

2    Q. I'm showing you what's been marked for identification

3 purposes as State's Exhibit No. 136. Do you recognize that?

4    A. Yes, I do.

5    Q. Is that the packaging from the second set of buccal

6 swabs that you took from the Defendant, Billy Jack Crutsinger?

7    A. Yes, ma'am.

8    Q. Does it as well show your initials and ID?

9    A. Yes.

10    Q. And was that -- when were your initials and

11 identification number put on that exhibit?

12    A. When they were sealed at the Medical Examiner's office

13 that morning.

14    Q. All right. And does State's Exhibit No. 136 also show

15 signs that the Tarrant County Medical Examiner has opened and

16 then resealed that item?

17    A. Yes.

18    MS. HARTMANN: Your Honor, at this time we'd

19 offer State's 136.

20    MR. RAY: Same objection -- well, actually it's a

21 different objection, different hearing; but we object to it on

22 that basis.

23    THE COURT: Overruled. 136 is admitted.

24    (State's Exhibit No. 136 received)

25    MR. RAY: Can we have a running objection?

Page 132

1    THE COURT: You may.

2    MS. HARTMANN: Can I have just a moment, Your

3 Honor?

4    THE COURT: Yes.

5    (Pause in the proceedings)

6    MS. HARTMANN: May I approach the witness?

7    THE COURT: Yes.

8    Q. Detective I'm going to show you what's already been

9 admitted into evidence as State's Exhibit No. 9 and ask you to

10 take a look at that, please.

11    A. Yes, ma'am.

12    Q. That's an aerial photograph, is it not?

13    A. That's correct.

14    Q. Are you able to locate on State's 9 the location of

15 Pat and R.D.'s house?

16    A. I don't know that I can point the exact house out to

17 you, but it is in this area right in here.

18    Q. And are you able to see in State's 9 Interstate 30?

19    A. Yes.

20    Q. Are you able to see the Beach Street area?

21    A. Yes, ma'am.

22    Q. Can you -- why don't you show me first --

23    A. This is Interstate 30 and this is Beach Street running

24 north and south.

25    Q. Okay. So is this 30?

1   A. Yes, ma'am.

2   Q. And then you said Beach Street is this street here?

3   A. Yes, ma'am.

4   Q. Running this way?

5   A. Yes, ma'am.

6   Q. Okay. Beach Street and I-30, is that within walking

7 distance of 2716 Scott Avenue?

8   A. Yes, ma'am.

9       MS. HARTMANN: We pass the witness at this time,

10 Your Honor.

11       CROSS-EXAMINATION

12 BY MR. MOORE:

13   Q. Detective McCaskill, you are what they call the lead

14 detective on this case, correct?

15   A. Yes, sir.

16   Q. You have been with the Fort Worth Police Department

17 for 21 years and 17 years of that as a detective, correct?

18   A. Yes, sir.

19   Q. And the way that offenses usually are -- kind of play

20 out is that somebody discovers that an offense has been

21 committed, correct?

22   A. Yes, sir, that's correct.

23   Q. And they call 911 and the police -- patrol officers

24 are sent out to the scene, correct?

25   A. Yes, sir, that's correct.

1   Q. And they assess the situation and they talk to

2 witnesses and protect the crime scene; and then if it is serious

3 enough, they call in someone like you, correct?

4   A. Yes, sir.

5   Q. Because you have had a lot more experience in dealing

6 with these kind of things than a patrol officer.

7   A. Not always, but typically more than likely.

8   Q. Well, 90 percent of the time.

9   A. Yes, sir.

10   Q. Like some of these officers that responded to this

11 scene were less than two years on the police force, correct?

12   A. That would probably be correct.

13   Q. And you are kind of responsible for overseeing the

14 entire investigation?

15   A. Once I arrive on the scene, it becomes my

16 responsibility at that point.

17   Q. How is that assigned with the Fort Worth Police

18 Department. Were you just at home that night or --

19   A. I was on my way home. I was on call. We typically

20 rotate a callback responsibility, and it's usually one night a

21 week and about every tenth weekend. And that Tuesday night was

22 my night on call.

23   Q. Okay. So whatever happens that Tuesday night is your

24 baby.

25   A. Yes, sir, if it falls within what we are supposed to

1 be assigned, yes.

2   Q. All right. And you responded over here to the scene

3 of this offense about 4:40 p.m. on April 8 of this year,

4 correct?

5   A. Yes, sir.

6   Q. Already some officers there, had the crime scene

7 secured, correct?

8   A. Yes, sir.

9   Q. And they do what is typical. They start canvassing

10 the neighborhood to see if anybody was a witness to anything,

11 correct?

12   A. Yes, sir.

13   Q. That's normal police procedure, isn't it?

14   A. Yes, sir.

15   Q. You look around the house to see if maybe the

16 perpetrator is still there, correct?

17   A. Yes, sir.

18   Q. And no one was in this house, correct?

19   A. That's correct.

20   Q. Canvass the neighborhood and -- did you talk to Robert

21 Greer?

22   A. Yes, sir.

23   Q. And did he give you a description of somebody he may

24 have seen over at that house?

25   A. Actually I briefly spoke with him at the -- out there

1 at the scene, and he went to our offices downtown and Detective

2 Hardy, I think, actually interviewed and took a statement from

3 him.

4   Q. Did you ever read that statement that he gave?

5   A. Yes, sir.

6   Q. When did you read that?

7   A. It was shortly after this occurred. It would have

8 been back in April.

9   Q. After you got back from Galveston?

10   A. Yes, sir. And I may have scanned it briefly before we

11 left.

12   Q. Okay. But needless to say, you weren't there at the

13 house when the credit card company called, correct?

14   A. No, sir.

15   Q. Who was at the house?

16   A. That was -- the message was left on the answering

17 machine.

18   Q. Okay.

19   A. I don't know exactly when the call came in. The call

20 did not come in while we were there.

21   Q. Do you have any idea when the call came in?

22   A. No, sir, I don't.

23   Q. When were you made aware of that call?

24   A. I was made aware of the call when I listened to the

25 messages on the answering machine, which is on the evening of

Page 137

1  the 8th.

2  Q. Okay. And I guess that's -- you got a picture of that
3  answering machine in evidence. Was it blinking?

4  A. It wasn't blinking when I saw it. The photograph --
5  in all likelihood, after I listened to the messages, the light
6  quit blinking when I listened to messages.

7  Q. Safe to say you were the first person to listen to
8  those messages?

9  A. Yes, as far as I know, I was.

10  Q. Because it would quit blinking after that, wouldn't
11  it?

12  A. Yes, sir.

13  Q. So you knew on April 8 that the lady's credit card was
14  being used in Galveston, Texas?

15  A. Yes, sir.

16  Q. And up until that point in time, you didn't have one
17  single lead on who committed this offense, did you?

18  A. No, sir, I did not.

19  Q. Didn't have anyone who was able or could give you a
20  description, did you?

21  A. No.

22  Q. But actually, you did know at that point in time where
23  the vehicle was recovered, correct?

24  A. I found out while I was there on the scene that it was
25  recovered on North Main, yes.

Page 138

1  Q. Okay. And so on the morning of April 9, you head down
2  to Galveston, correct?

3  A. Yes, sir.

4  Q. At that point in time, where did you know that credit
5  card had been used?

6  A. When I actually left for Galveston, I was only aware
7  at that time that it had been used at a liquor store and a hotel
8  in Galveston. I didn't become aware until later that it had
9  been used several times in Fort Worth.

10  Q. So when you headed to Galveston, you were not aware of
11  Razoo's or the Factory Shoe Outlet, that the credit card had
12  been used there?

13  A. That's correct.

14  Q. Just the liquor store and the motel in Galveston.

15  A. Yes, sir.

16  Q. And you called the Galveston Police Department
17  yourself?

18  A. Yes. I had several phone conversations with them.

19  Q. To let them know that there is somebody down there
20  using a credit card that came out of a double homicide in Fort
21  Worth?

22  A. The initial call to Galveston was made by my
23  supervisor, Sergeant David Thornton, who stayed back in the
24  on-site office while I was on the scene, and he began to
25  coordinate a few things with Galveston on the telephone while I

Page 139

1  was still on the scene. I later had some phone conversations
2  with Galveston.

3  Q. But would it be fair to say that the only information
4  that was conveyed to the Galveston Police Department at that
5  time was just the fact that there was a credit card being used?

6  A. I was able to get the name of the motel that was used
7  and -- and that was provided to Galveston.

8  Q. But you couldn't provide Galveston -- that Galveston
9  Police Department with any kind of a description of the person
10  that may be using that credit card?

11  A. That's correct.

12  Q. You didn't know whether it was a male or female or
13  black, white or what?

14  A. At that point I did not know.

15  Q. Okay. So you head down to Galveston about 8:00
16  o'clock in the morning on the 9th, and it takes you until about
17  12:38 to get there at the Galveston Police Department?

18  A. Yes, sir, that would be correct.

19  Q. And by the time you get there at 12:38, the Galveston
20  Police Department has already arrested Billy Jack Crutsinger,
21  correct?

22  A. Yes, sir.

23  Q. Okay. He was at the Galveston Police Department when
24  you arrived?

25  A. Yes, he was.

Page 140

1  Q. And you were in contact with the Galveston Police
2  Department on your ride down from Fort Worth to Galveston,
3  correct?

4  A. Only a couple of times. I called them when we left
5  about 8:00 o'clock or shortly afterwards, and I don't recall
6  that I had any more contact with them until about 12:20. As we
7  were getting into Galveston I was contacted by a lieutenant with
8  the Galveston police.

9  Q. About what time was that?

10  A. About 12:20.

11  Q. About 12:20?

12  A. Yes, sir.

13  Q. You were on the outskirts of Galveston. Did he tell
14  you he had just arrested a suspect?

15  MS. HARTMANN: Objection to hearsay.

16  THE COURT: Sustained.

17  Q. Okay. Did -- well, when you got to the Galveston
18  Police Department, Mr. Crutsinger was arrested and you went in
19  and talked to him, correct?

20  A. Yes, sir.

21  Q. And you didn't have any information from any source
22  about the circumstances and the facts surrounding his arrest in
23  Galveston, did you?

24  A. Not immediately, no.

25  Q. You weren't involved with his arrest in Galveston,

Page 141

1 were you?

2 A. No, sir, I was not.

3 Q. That was all the Galveston Police Department, correct?

4 A. Yes, sir.

5 Q. And there were many officers involved in that arrest.

6 A. There were several that were involved in that whole

7 investigation. I don't know how many were actually present when

8 Mr. Crutsinger was taken into custody.

9 Q. Okay. And when you went in to see Mr. Crutsinger,

10 that's the first time you had ever laid eyes on him, wasn't it?

11 A. Yes, sir.

12 Q. Did he have a red ball cap on?

13 A. I don't recall seeing any caps or anything.

14 Q. Did he have -- well, let me just ask you this. You

15 had learned of a description of a person using that credit card

16 in Galveston, hadn't you?

17 A. I had been given some information over the telephone

18 by one of the Galveston officers that they had gotten from

19 somebody. I'm not-- still to this day not certain where that

20 information came from.

21 Q. But that description that was given to you by the

22 Galveston Police Department did not fit the description of Billy

23 Jack Crutsinger, did it?

24 A. There was a subject as being described as quite a bit

25 younger.

Page 142

1 Q. Didn't fit him, did it?

2 A. No.

3 Q. And I believe you testified that at 12:38, you are at

4 the Galveston Police Department, and what time do you first make

5 contact with Billy Jack Crutsinger?

6 A. It would have been within five minutes of our arrival.

7 Q. Okay. And you took the swab from his cheek shortly

8 thereafter?

9 A. A little bit later, yes.

10 Q. And are you trained -- does the Fort Worth Police

11 Department train you in how to take a sample like that and

12 package it up so it is not contaminated?

13 A. Yes, sir.

14 Q. And did you follow the proper procedures on April 9

15 when you took that swab?

16 A. Yes, sir.

17 Q. And that swab was taken to the Tarrant County Medical

18 Examiner's Office, correct?

19 A. Eventually. It went to our property control or

20 property room, and then it was later taken to the Medical

21 Examiner's office.

22 Q. To your knowledge, was it tested?

23 A. Yes.

24 Q. And to your knowledge was that a valid test that was

25 done on that?

Page 143

1 A. Yes, sir.

2 Q. But yet on August 26 of this -- last month, you

3 created a search warrant to get the very same exact swab from

4 Mr. Crutsinger, correct?

5 A. Yes, sir.

6 MR. MOORE: May we approach?

7 (Outside the hearing of the jury)

8 THE COURT: Is this about the matter we talked

9 about earlier?

10 MR. MOORE: Yes, sir.

11 (In the hearing of the jury)

12 THE COURT: Ladies and gentlemen of the jury,

13 there is a matter I have to take up outside your presence.

14 Would you please retire to the jury room and remember and follow

15 your instructions.

16 (Jury not present)

17 MR. MOORE: Judge, at this time, we feel that we

18 are entitled to inquire of this detective the reason that he

19 executed a second -- or got another search warrant and collected

20 the same exact sample that he collected in Galveston that has

21 been tested and as far as he knows is a valid test and it was a

22 good sample.

23 The State brought it up. They asked him about

24 it. And to not allow us to go into it would give a false

25 impression to this jury or make them wonder to the detriment of

Page 144

1 my client.

2 THE COURT: They never asked why he did it; they

3 just asked if he did it.

4 MR. RAY: Well, Judge, as the Court is aware,

5 there is an issue over whether or not the Defendant was legally

6 arrested that we hashed out, without going back through all that

7 again. And depending on how the evidence plays out, the Court

8 may or may not give a charge on that issue.

9 If the jury is given the charge and if the jury

10 finds that the arrest was invalid or improper or illegal,

11 whatever you want to call it, potentially they would be

12 instructed to not consider any of that evidence, which would

13 include Detective McCaskill's first buccal swab of the Defendant

14 in Galveston.

15 Then the jury is going to have to look to the

16 second buccal swab to see whether or not they can consider that,

17 which is a completely unrelated reason; and it calls into

18 question the validity of that swab as far as the search warrant

19 issue.

20 It is an admission by the State -- just like if

21 the Defendant -- he's a party to the lawsuit and they are a

22 party to the lawsuit. It's an admission of a party opponent.

23 THE COURT: He's not a party opponent.

24 MR. RAY: He's not, but they are, and they are

25 the ones that gave him the reason, as you'll remember from the

Page 145

1 testimony in the Motion to Suppress hearing that we had one day
2 last week. Their reason --
3     THE COURT: So what you are seeking to offer is
4 not his reason for going into it, but the State's reason for --
5     MR. RAY: That's right.
6     MR. MOORE: Well, he was instructed by the State
7 to do it. He wasn't going to do it on his own --
8     THE COURT: That's not what you said to start
9 with.
10     MR. RAY: It's what he testified to last week.
11     THE COURT: Okay.
12     MS. HARTMANN: It is not relevant to any fact
13 issue in this case. I mean, if we go into that, then I am
14 assuming we can go into what the Court's final ruling was. It
15 just opens up a whole can of worms. It is allowing inadmissible
16 hearsay in. It is prejudicial in effect, which is the absolute
17 intent of the Defense.
18     THE COURT: It's not hearsay.
19     MS. HARTMANN: Him testifying to a statement that
20 I made?
21     THE COURT: Right.
22     MS. HARTMANN: How is that not hearsay?
23     THE COURT: Because you are a party opponent.
24     MR. MOORE: And if I may, she said there's not
25 a -- it doesn't go to any fact issue. There could be a big fact

Page 146

1 issue as to whether or not this was an illegal arrest, and then
2 this would definitely go to that.
3     THE COURT: Well, is it going to be or not?
4     MR. RAY: I believe there is going to be an
5 issue. We can represent to you I believe there is.
6     MS. HARTMANN: There is an additional issue,
7 which is they are trying to attack the probable cause of this
8 warrant. That's already been decided. That's a legal issue.
9     THE COURT: Well, it has been decided by me, but
10 under 38.23 if the arrest was illegal, they have the right to
11 have the jury charged on that, so they have a right to show
12 whether or not the arrest was illegal; and there was no probable
13 cause for the arrest, then the arrest was illegal.
14     MS. HARTMANN: Well, I'm not talking about the
15 arrest; I'm talking about them attacking the warrant itself for
16 the DNA. And there has been a legal determination about that --
17     THE COURT: There has been a legal determination,
18 but if there were factual issues raised, then they would be
19 entitled to have the jury instructed on that.
20     MR. RAY: Judge, maybe I am not being clear. We
21 anticipate -- and I will represent to the Court that we are
22 going to offer evidence that the Defendant's arrest was illegal,
23 and we are also going to offer evidence that the search warrant
24 that Judge Sharen Wilson issued --
25     THE COURT: That's what I understood from your

Page 147

1 opening statement.
2     MR. RAY: Okay.
3     THE COURT: If there is a factual issue, then
4 they are entitled to have the jury instructed on that under
5 38.23.
6     MS. HARTMANN: But the jury doesn't determine
7 probable cause.
8     THE COURT: If there's a factual issue as to
9 probable cause, then the jury will determine whether or not the
10 arrest was illegal and whether or not the seizure of any
11 evidence from the Defendant was illegal.
12     MS. HARTMANN: Well, then would we be entitled to
13 go into the circumstances surrounding the fact that there was a
14 court ruling that was -- had not yet been handed down?
15     THE COURT: Yeah, I think you can go into that.
16     MS. HARTMANN: All right.
17     THE COURT: Anything else?
18     MR. RAY: I just want to make sure we understand
19 the ruling. Are you going to allow us to ask him why he got the
20 subsequent search warrant?
21     THE COURT: I am.
22     MR. RAY: And then I'm assuming --
23     THE COURT: If the answer is what was proffered
24 to me a minute ago, which is that there was a statement by a
25 party opponent is what you are seeking to offer --

Page 148

1     MR. RAY: That's correct.
2     MR. MOORE: Well, just to make it clear, Ms.
3 Hartmann asked if she could get into the pending Court ruling.
4 Are you going to allow them to go into what the Court's ruling
5 was? Which we would object to.
6     THE COURT: The fact of the matter is it was done
7 when there was a pending ruling. The ruling had not been made,
8 so what the ruling was is not relevant to this inquiry. The
9 ruling hadn't been made at that time.
10     (Jury present)
11     THE COURT: You may proceed.
12     MR. MOORE: Thank you.
13 Q. Detective McCaskill, I believe we were talking about
14 the two buccal swabs that you obtained from Mr. Crutsinger
15 before we had a break. Is that your recollection?
16 A. Yes, it is.
17 Q. And you testified that you got the first swab at the
18 Galveston Police Department on April 9 shortly after his arrest,
19 correct?
20 A. Yes, sir.
21 Q. And then on August 26 of this year, you drafted out a
22 search warrant to get a buccal swab from Mr. Crutsinger again,
23 correct?
24 A. Yes, sir.
25 Q. And who requested you to get that search warrant to

Page 149

1 obtain another swab from Mr. Crutsinger?
2    A. Ms. Hartmann and Ms. Callaghan.
3    Q. Okay. Why did they request you to get another swab?
4    A. It was my understanding that a question had been
5 brought up about the legality of Mr. Crutsinger's arrest.
6    Q. Okay.
7    A. And I believe it was a precautionary measure to try to
8 address that subject even though it was my understanding that
9 because the --
10    Q. It was a precautionary measure.
11      MS. HARTMANN: Objection to Counsel interrupting
12 and not letting --
13      THE COURT: Sustained.
14      MR. MOORE: object to his narrative answer.
15      THE COURT: Overruled.
16      MS. HARTMANN: I'm going to object and ask that
17 counsel let the witness finish his answer.
18      MR. RAY: His answer is nonresponsive too, Judge.
19      THE COURT: Have you finished your answer?
20      THE WITNESS: I understood that it was a
21 precautionary measure because the question had been brought up
22 and had not been answered at that time.
23    Q. A question about the legality of the arrest, correct?
24    A. Yes, sir.
25    Q. And you know as a police officer of 21 years, you are

Page 150

1 taught basic criminal procedure in the academy, aren't you?
2    A. Yes, sir.
3    Q. And you are taught about the penal code in the
4 academy.
5    A. Yes, sir.
6    Q. The penal code contains the laws that our legislature
7 passes, correct?
8    A. Yes, sir.
9    Q. And it is pretty axiomatic that police officers, to
10 arrest somebody on the street, have to have probable cause to
11 arrest, don't they?
12    A. Yes, sir.
13    Q. You can't just be walking down the street as a police
14 officer and arrest somebody for just walking down the street,
15 can you?
16    A. No, sir.
17    Q. There has to be something that that person is doing to
18 indicate to the police officer that he's violating the law,
19 correct?
20    A. Yes, sir.
21    Q. When you interviewed Mr. Crutsinger down in Galveston
22 on April 9, how long did you talk to him before you turned the
23 tape recorder on?
24    A. Probably around a half hour.
25    Q. Okay. And the tape recorder was turned on, I believe,

Page 151

1 about 1:15?
2    A. I believe that's correct, sir.
3    Q. Okay.
4    A. No, sir. I'm sorry. It was not. It was turned on
5 around 1:45.
6    Q. 1:45. So you had talked to him for approximately an
7 hour before you turned on the tape recorder?
8    A. No, sir, about 30 minutes.
9    Q. 30 minutes? Okay. Ms. Hartmann asked you if he was
10 high or anything like that. Do you remember that?
11    A. Yes, sir, I do.
12    Q. In your opinion had he been drinking alcohol?
13    A. Yes, sir.
14    Q. What do you base that opinion on?
15    A. I smelled it.
16    Q. Okay. Did you ask him if he had been drinking?
17    A. I don't recall that I did, no.
18    Q. Okay. When you -- as a lead detective on a homicide
19 case like this, you generate several documents, correct?
20    A. Yes, sir.
21    Q. One of them is the probably, I guess, your case notes
22 that you take while you are out on the scene initially.
23    A. Yes.
24    Q. And did you take some of those?
25    A. Yes.

Page 152

1    Q. Then did you reduce that to writing -- not reduce it
2 to writing. It is put down in a typed report, correct?
3    A. Yes, sir.
4    Q. And you call that the -- what do you call that?
5    A. I just call it the case details.
6    Q. Okay. And then when you arrived back from Galveston,
7 you actually generated an arrest warrant and an arrest warrant
8 affidavit, didn't you?
9    A. Yes, sir.
10    Q. And the arrest warrant affidavit, just like a search
11 warrant affidavit, is a means for you to go to a Judge like this
12 Judge and say, "I have got enough probable cause for you to
13 issue this search or arrest warrant," correct?
14    A. Yes, sir.
15    Q. And you swore to it and you say, "I swear everything
16 in here is true and correct," right?
17    A. Yes, sir.
18    Q. And that's what you did with the search warrant on
19 August 26, correct?
20    A. Yes, sir.
21    Q. Went over to Judge Sharen Wilson across the hall and
22 had her read it and sign it, correct?
23    A. Yes, sir.
24    Q. And you had an arrest warrant when you got back from
25 Galveston, correct?

Page 153

1  A. Well, I obtained the warrant after I got back, yes.
2  Q. And it had an affidavit attached to it?
3  A. Yes, it did.
4  Q. And your case report?
5  A. I didn't have the case report until much later, but I
6  had the facts.
7  Q. Your case report would accurately reflect the facts
8  that you gathered about this offense, correct?
9  A. Yes, sir.
10  Q. Any other documentation besides what we talked about
11  that you generated during this investigation?
12  A. That I generated?
13  Q. Yes.
14  A. I don't recall any.
15      MR. MOORE: Thank you, Detective. I'll pass the
16  witness.
17          REDIRECT EXAMINATION
18  BY MS. HARTMANN:
19  Q. Judge Sharen Wilson signed the search warrant?
20  A. Yes, ma'am.
21  Q. And she's a Criminal District Court Judge of Criminal
22  District Court No. 1 on the other side of this building.
23  A. Yes, ma'am.
24  Q. She's been on the bench for how long? Do you know?
25  A. I recall that she was a prosecutor when I first became

Page 154

1  a detective in '86, and it was shortly after that that she
2  became a District Court Judge; so I would say 16 years, but I
3  don't know if that's entirely accurate.
4  Q. So she's been on the bench for some 16 years in a
5  District Court.
6  A. As far as I know, yes.
7  Q. And at the time that you obtained that search warrant,
8  was it your understanding that there -- there were some Court
9  rulings that had not yet been made?
10  A. Yes, ma'am.
11  Q. And that that search warrant was obtained in an
12  abundance of caution?
13  A. Yes, ma'am.
14  Q. Because we were dealing with the deaths of two women
15  here.
16  A. Yes, ma'am.
17      MS. HARTMANN: May we approach the bench?
18      THE COURT: Yes.
19      (Outside the hearing of the jury)
20      MS. HARTMANN: Since the Defense has raised the
21  issue, I think I am entitled to ask the detective if this whole
22  issue is raised by the Defense and that's why the action was
23  being taken.
24      THE COURT: I think it's not --
25      MR. RAY: I didn't hear what she said.

Page 155

1      MR. MOORE: That this whole issue was raised by
2  the Defense. Well, I guess that's a legal opinion again.
3      MS. HARTMANN: Well, if you can ask him to make
4  legal opinions --
5      MR. RAY: I don't think it is up to her or
6  anybody else to comment on our strategy by a rule --
7      THE COURT: Which rule?
8      MS. HARTMANN: How about admission of a party
9  opponent?
10      MR. MOORE: In filing the Motion to Suppress?
11      MS. HARTMANN: Yes.
12      MR. RAY: I'm not a party to the lawsuit.
13      MS. HARTMANN: Well, I'm not either, but that
14  didn't stop --
15      THE COURT: You all are.
16      I don't think there is any kind of false
17  impression or -- I don't think there has been a question
18  raised. I am not going to let you go into it.
19      (In the hearing of the jury)
20  Q. You were asked questions, Detective McCaskill, about
21  the Defendant and smelling alcohol on his breath.
22  A. Yes, ma'am.
23  Q. How long have you been a peace officer?
24  A. 21 years.
25  Q. And in that time period, have you dealt with few or

Page 156

1  many intoxicated individuals?
2  A. Many.
3  Q. Did Mr. Crutsinger fall into the category of being an
4  intoxicated individual?
5  A. No.
6  Q. Do you think if he had been intoxicated, it would be
7  clearly evident on that oral statement that's been recorded?
8  A. Yes, I believe so.
9  Q. Was it your understanding, Detective McCaskill, that
10  the Defendant wanted to speak with you?
11  A. Yes, ma'am.
12  Q. That he had, in fact, asked other officers to get you
13  back to that room?
14  A. Yes, ma'am.
15  Q. Because he wanted to talk to you?
16  A. That's correct.
17  Q. And does he even in his statement say to you something
18  to the effect of, "I kept telling myself just go ahead and tell
19  the police what you did"?
20  A. Yes, ma'am.
21  Q. "And get it behind you"?
22  A. Yes, ma'am.
23  Q. "Go to the FBI"?
24  A. Yes, ma'am.
25  Q. And when people who are suspects in capital murder

CondenseIt™

Page 157

1 cases express a wish to talk to the police, are you going to
2 talk to them?
3    A. Absolutely.
4    Q. Are you going to tell them no?
5    A. No.
6    Q. Are you going to refuse to talk to someone if they
7 want to talk with you?
8    A. No, ma'am.
9       MS. HARTMANN: Pass the witness.
10         RECROSS-EXAMINATION
11 BY MR. MOORE:
12    Q. But the truth of the matter is that he was in custody
13 in the Galveston Police Department, correct, when you talked to
14 him?
15    A. Yes, sir.
16    Q. He was -- and just so we are clear, you didn't have
17 him under arrest for anything, did you?
18    A. No, sir.
19    Q. You didn't have enough probable cause as we were
20 talking about to get an arrest warrant for anybody at that point
21 in time, did you?
22    A. No.
23       MR. MOORE: Thank you, Detective.
24       That's all I have, Your Honor.
25       MS. HARTMANN: we have nothing further at this

Page 158

1 time.
2       THE COURT: You may step down, sir.
3       MS. CALLAGHAN: At this time, Your Honor, the
4 State would ask the Court to take judicial notice of date of
5 return of the indictment in this case, that being June 19 of
6 2003.
7       THE COURT: I will take judicial notice that the
8 indictment in this case was presented on June 19, 2003.
9       MS. CALLAGHAN: At this time, Your Honor, the
10 State would call Officer Johnson.
11       (Witness sworn)
12 Whereupon,
13         CHERYL JOHNSON,
14 having been first duly sworn, testified as follows:
15         DIRECT EXAMINATION
16 BY MS. CALLAGHAN:
17    Q. Would you please state your name for the ladies and
18 gentlemen of the jury?
19    A. Cheryl Johnson.
20    Q. And how are you employed?
21    A. I am a homicide detective with the Fort Worth Police
22 Department.
23    Q. What do you do as a homicide detective?
24    A. Normally when we are called out to a homicide, we
25 investigate the case. We also assist other Defendants on any

Page 159

1 murder, suspicious deaths, suicides.
2    Q. How long have you been doing this?
3    A. Two years.
4    Q. What did you do before that?
5    A. The two years prior to that, I was a crime scene
6 detective.
7    Q. And you worked in the Crime Scene Search unit?
8    A. Yes, ma'am.
9    Q. How long did you work in Crime Scene Search unit?
10    A. Almost two years.
11    Q. So you received the training that crime scene officers
12 receive and actually participated in obtaining and preserving
13 evidence from crime scenes for two years before you became a
14 homicide detective.
15    A. Yes, ma'am.
16    Q. Were you on duty April 9, 2003?
17    A. Yes, ma'am.
18    Q. Were you dispatched to an address on North Main?
19    A. My sergeant asked me to go there, yes.
20    Q. Do you recall what address you went to?
21    A. I don't know the exact address. It was the Cowboy Inn
22 in the 3100 block of North Main.
23    Q. Why did you go there?
24    A. My sergeant advised me that there could be some
25 clothing in a dumpster.

Page 160

1    Q. And what time did you arrive?
2    A. It probably was about 3:30 because he notified me at
3 3:10.
4    Q. He notified you about 3:10, so you would have gotten
5 there about 3:30?
6    A. Yes, ma'am.
7    Q. It took you about 20 minutes to get out there.
8    A. Yes, ma'am.
9    Q. What's the very first thing you did when you arrived
10 at the Cowboy Inn motel?
11    A. At the time I got there, my partner, Detective
12 Carroll, was already on the scene. He had spoken to the manager
13 and gotten consent for us to go through the dumpster. He
14 advised that it had been approximately a week since the trash
15 had been picked up.
16    Q. So you felt like items from the previous week might
17 still be in there.
18    A. Yes, ma'am.
19    Q. Did you go to the dumpster and look?
20    A. Yes, ma'am.
21    Q. Did you photograph it?
22    A. Yes, ma'am.
23       MS. CALLAGHAN: Approach the witness, Your Honor?
24    Q. Let me show you what is marked State's Exhibits 106,
25 107, 108, 109, 110, 111 and 112 for identification in this

Page 161

1 cause. If you will take a moment and review those.

2 A. (Witness complies)

3 Q. Okay. Are these true and accurate depictions of the

4 way the Cowboy Inn motel, the dumpster and the contents of the

5 dumpster appeared on April 9, 2003, when you went out there?

6 A. Yes.

7 MS. CALLAGHAN: At the time the State would offer

8 State's Exhibits 106 through 112 for all purposes and tender

9 them to Defense Counsel for their inspection.

10 MR. RAY: No objection.

11 THE COURT: 106 through 112 are admitted.

12 (State's Exhibit No. 106 - 112 received)

13 MS. CALLAGHAN: Thank you. If I may publish them

14 to the jury, Your Honor?

15 THE COURT: You may.

16 Q. Do you want to step down?

17 A. (Witness complies)

18 Q. Okay. Let's start with this half of the jury, and if

19 you can tell them what State's Exhibit 106 is.

20 A. This is the outside of the Cowboy Inn from the front

21 of the building along the side. This is another photograph.

22 This is north of this photograph where the dumpster was on the

23 north edge of the Cowboy Inn.

24 Q. There are three photographs in State's Exhibit 106.

25 Can you point to where the dumpster is depicted in these three

Page 162

1 photographs?

2 A. (Witness complies)

3 Q. That's the center of the lowest picture, correct?

4 A. Yes, ma'am.

5 Q. And to this half of the jury, could you explain --

6 A. This is the outside of the Cowboy Inn showing a sign

7 in front of the building. This is a little farther north, the

8 same view, and this is the north end of the building, the side

9 where the dumpster is located.

10 Q. Okay. Let's go ahead and take a look at State's

11 Exhibit 107, which contains two photographs. If you could

12 explain this exhibit starting with the top photograph.

13 A. Both of these photographs are actually photographs of

14 the dumpster before we began moving things around. This is how

15 it appeared as we approached it.

16 Q. Okay.

17 A. Both of those are photographs of the dumpster, how we

18 saw it before we disturbed anything inside the dumpster, how we

19 saw it.

20 Q. All right. Let's at this time show the jury 108 and

21 109 starting with State's Exhibit 108 first.

22 A. As we began to move things around in the top of the

23 dumpster, this is the first view of what we found, which was

24 some clothing wadded up together. Here is a closer-up

25 photograph of that clothing as we found it.

Page 163

1 Q. Okay.

2 A. As we moved the very top area of the trash out of the

3 way, we found a clump of clothing, and this is a closer

4 photograph of that clothing, how we found it.

5 Q. And then let's explain to the jury 110 and 111

6 starting with the top one first.

7 A. All right. Once we collected that first clump of

8 clothing, I began to move the trash around, and I could see the

9 denim. At this point this is the photograph as we saw the

10 denim and this is the cutting that we pulled out for a closer

11 photograph of those.

12 Q. To explain 110, there was a pair of denim cutoffs that

13 you found in the dumpster, correct?

14 A. Yes, ma'am.

15 Q. And then there were two sections that were cut from

16 the legs of a pair of jeans.

17 A. Yes, ma'am.

18 Q. Okay.

19 A. This photograph is showing the denim cutoffs that we

20 found, and then farther down we found two cutoffs --

21 Q. You found sections of legs of denim jeans --

22 A. Yes, ma'am.

23 Q. But these were the pants.

24 A. Those were the pants, and these were the legs that

25 were cut off.

Page 164

1 Q. And finally if you could go ahead and explain to the

2 jury 112, which contains four photographs, starting, as you face

3 the photograph, with the top left.

4 A. These photographs are from our blood drying room.

5 Anytime there is material or evidence with blood, it has to be

6 dried before we can submit that. So this is the table in the

7 blood drying room. And there is the shirt that's been laid out

8 to dry, the towel, the denim cutoffs and the denim shirt.

9 Q. Okay.

10 A. This is the blood drying room, and each one of these

11 are tables. The shirt, the towel and the denim cutoffs and the

12 denim shirt.

13 Q. Now, after you photographed the contents of the

14 dumpster, did you recover the clothing and items that were

15 contained inside the dumpster?

16 A. Yes, ma'am.

17 Q. And how did you package them?

18 A. They were taken in brown paper bags, each item in a

19 separate bag. At that point they were secured in my trunk and

20 taken up to the office and the blood drying room.

21 Q. Did you permit those items to dry in the blood drying

22 room?

23 A. Yes, ma'am.

24 Q. Did you then package them?

25 A. Yes, ma'am.

Page 165

1   Q. How did you pack them?

2   A. Once again, in brown paper bags; then I would seal

3   them with tape and initial with my initials and ID number.

4   Q. Were they then submitted to the property room?

5   A. Yes, ma'am.

6   Q. Did I ask you to bring over the items of evidence that

7   you recovered from the property room this morning?

8   A. Yes, ma'am.

9   Q. And did you do so?

10   A. Yes.

11   Q. Could you step down for a minute?

12   A. (Witness complies)

13   Q. Let me show you first what is marked State's Exhibit

14   124 for identification in this cause. Do you recognize that

15   bag?

16   A. Yes, ma'am.

17   Q. And what is it?

18   A. It is a package that I sealed the denim shirt in.

19   Q. How do you recognize this bag?

20   A. Because when it is folded down, it would have my

21   initials and my ID number.

22   Q. Your Fort Worth Police Department ID number is on

23   there?

24   A. Yes.

25   Q. If you could go ahead and reach in and pull out the

Page 166

1   contents of State's Exhibit 124.

2   A. (Witness complies)

3   Q. Earlier today in the court reporter's office, did we

4   go ahead and open State's Exhibit 124 and remove the contents?

5   A. Yes, ma'am.

6   Q. Is State's Exhibit 124-A the contents of 124?

7   A. Yes, ma'am.

8   Q. So this is the denim shirt that you recovered from the

9   dumpster on April 9, 2003.

10   A. Yes.

11   Q. Other than obvious marks where testing from the

12   Tarrant County Medical Examiner's office was done, does the bag

13   or contents appear to have been in any way being tampered with?

14   A. No.

15   MS. CALLAGHAN: Your Honor, the State will offer

16   124 for the record and 124-A for all purposes.

17   THE COURT: 124 is admitted for the record; 124-A

18   for all purposes.

19   (State's Exhibit No. 124, 124-A received)

20   MS. HARTMANN: If I may publish by walking in

21   front of them with it?

22   THE COURT: You may.

23   Q. Referring back to State's Exhibit 112, can you point

24   out where the denim shirt is pictured in that exhibit?

25   A. The bottom there.

Page 167

1   Q. You can see that the denim shirt was sleeveless; the

2   sleeves had been cut off.

3   A. Yes.

4   Q. It appears to have stains on a considerable portion of

5   the front.

6   A. Yes.

7   Q. In fact, State's 124-A you can see the stains on the

8   pocket and the -- what do you call that?

9   A. I don't know.

10   Q. All right. So you can see stains on the front then?

11   A. Yes, ma'am.

12   Q. Okay. Thank you. Go down and show the rest of the

13   jury.

14   A. All right. Here is a picture from my side. It is the

15   right as you are looking at it. Denim shirt, the same denim

16   shirt.

17   Q. Okay. Now let's go to State's Exhibit No. 125. Do

18   you recognize this?

19   A. Yes, ma'am, it is a package where I submitted the

20   cutoff jeans.

21   Q. How do you recognize this bag?

22   A. Through my initials.

23   Q. That appear on the bag?

24   A. Yes, ma'am.

25   Q. Could you reach in and pull out the contents.

Page 168

1   A. (Witness complies).

2   Q. Now, let me show you what is marked State's Exhibit

3   125-A for identification. Are these the cutoff jeans that you

4   recovered from the dumpster April 9, 2003?

5   A. Yes, ma'am.

6   Q. The same cutoffs that you secured in the bag marked

7   State's Exhibit 125?

8   A. Yes.

9   Q. Except for obvious areas where the bag was opened by

10   the Tarrant County Medical Examiner's office, does the bag

11   appear to have been tampered with in any way?

12   A. No.

13   Q. Does the bag, State's Exhibit 125, appear to be

14   tampered with?

15   A. No.

16   MS. CALLAGHAN: We offer 125 for the record only

17   and 125-A for all purposes.

18   THE COURT: 125-A is admitted; 125 for the record

19   only.

20   (State's Exhibit No. 125, 125-A received)

21   MS. CALLAGHAN: If I may publish it to the jury?

22   THE COURT: You may.

23   Q. Referring to State's Exhibit 112 again, which pictures

24   the evidence --

25   A. It would be right there.

Condenselt™

Page 169

1   Q. And that's in the lower left-hand corner.

2   A. Yes.

3   Q. You can see that the jeans appear also to have a

4   considerable number of stains on the --

5   A. Yes.

6   Q. And you can see that in State's Exhibit 125?

7   A. Yes, a photograph of the cutoff jeans, the lower left

8   of the photograph --

9   Q. These stains that appear on the clothing, both the

10  denim shirt and denim cutoffs, these stains are why you had to

11  leave it in the drying room to dry, correct?

12  A. Yes, ma'am.

13       MS. CALLAGHAN: One moment, please, Your Honor.

14  Q. Now, you brought a number of other items over today;

15  is that correct?

16  A. Yes, ma'am.

17  Q. And that would include -- if you want to step over

18  here?

19  A. (Witness complies)

20  Q. Some white socks, which are in a bag marked State's

21  Exhibit 126; is that correct?

22  A. Yes, ma'am.

23  Q. And these were also recovered from the inside of the

24  dumpster.

25  A. Yes.

Page 170

1   Q. Did you also bring State's Exhibit No. 127, which

2   contain a gray t-shirt which was recovered from the inside of

3   the dumpster?

4   A. Yes.

5   Q. Did you bring State's Exhibit 128, which contains a

6   white towel recovered from the inside of the dumpster?

7   A. Yes.

8   Q. And finally, did you bring State's Exhibit No. 129,

9   which contains the pieces of denim cutting from the legs of the

10  pair of pants?

11  A. Yes.

12  Q. Did you also recover these from the dumpster?

13  A. Yes.

14  Q. Did you package them each in the bags that they are

15  presently in?

16  A. Yes, ma'am, I did.

17       MS. CALLAGHAN: At this time the State would

18  offer State's Exhibit 126 through 129 for the record only.

19       MR. RAY: You said 126 through 129?

20       MS. CALLAGHAN: Yes.

21       MR. RAY: No objection.

22       THE COURT: They are admitted for the record

23  only.

24       (State's Exhibit No. 126 - 129 received)

25  Q. Now, just to clarify one thing, other than the fact

Page 171

1   that they were found in the same dumpster, the two leg cuttings

2   that you recovered, you had no other indication that they

3   belonged to the same pair of pants, correct?

4   A. No, I did not.

5   Q. And they are, obviously looking at them, different

6   colors from the denim pants themselves.

7   A. Yes.

8   Q. Did you make an attempt out there in that area around

9   the Cowboy Motel to locate some car keys?

10  A. Yes, ma'am, we did.

11  Q. And what buildings did you go to?

12  A. We went to three buildings:  the Car Care car wash,

13  the Auto Tire City, which is at 3221 North Main; and the Instant

14  Loan at 3025 North Main.  And the Car Care is just south of the

15  Cowboy Inn, but there were no numbers that I noticed to give an

16  exact address.

17  Q. Can you step down for just a moment?

18  A. (Witness complies)

19  Q. Now, referring with this half of the jury to State's

20  Exhibit 115, which has previously been admitted, is this one of

21  the doors that you examined in order to find the keys?

22  A. Yes, ma'am.

23  Q. What end of the building did you go up in order to get

24  on top of the building?

25  A. The right top of the building right above the bay and

Page 172

1   searched the area of the actual building.

2   Q. But you did not search the area above the overhang; is

3   that correct?

4   A. Correct.

5   Q. Not here.

6   A. No.

7   Q. And you have no knowledge of whether keys were

8   eventually discovered there.

9   A. No, I don't.  We took the ladder up above the bay and

10  searched the rooftop of the building?

11  Q. But you-all did not search the overhang?

12  A. No.

13  Q. And you have no knowledge of whether or not keys were

14  eventually recovered on this overhang.

15  A. Correct.

16  Q. Okay.  Thank you.  So you did not find any keys or any

17  of the other buildings?

18  A. No, we did not.

19       MS. CALLAGHAN: Thank you very much.

20       I'll pass the witness.

21       CROSS-EXAMINATION

22  BY MR. RAY:

23  Q. Officer Johnson, all these sacks, which I believe are

24  State's Exhibit 124 through 129 --

25  A. Yes, sir.

## Page 173

1  Q. -- have I got the numbers right? Seems like that's
2  what they -- the ones she showed you.
3  A. The ones she showed me, yes.
4  Q. When you bagged up things in those individuals bags,
5  did those bags just go to the property room like they were, or
6  were they contained in something else?
7  A. They were actually contained in a box.
8      MR. RAY: Can I approach the witness?
9      THE COURT: Yes.
10  Q. Is this the box? And I want you to look at it and
11  tell me if it is. Feel free to look around there.
12  A. Yes, sir.
13      MR. RAY: And if I could, Mr. Court Reporter,
14  could I have a sticker?
15      Okay. I'm going to put my little bitty sticker
16  on this big box. Defendant's Exhibit 2. That's on this box; is
17  that correct?
18  A. Yes, sir.
19      MR. RAY: First of all, I will offer the box.
20  Madam Prosecutor, I will offer Defense Exhibit 2, this box.
21      MS. CALLAGHAN: That's fine for the record only.
22      THE COURT: For all purposes or for the record
23  only?
24      MR. RAY: I want it for all purposes. Maybe I
25  wasn't clear for the prosecutor.

## Page 174

1      MS. CALLAGHAN: The State has no objection.
2      THE COURT: Defense 2 is admitted.
3      (Defendant's Exhibit No. 2 received)
4  Q. In regards to Defendant's Exhibit 2 -- you can
5  probably answer this without me standing here in front of
6  everybody.
7      These other sacks, for instance, 129, that would
8  have been inside of that.
9  A. Yes, sir.
10  Q. As well as the other sacks that you had, right?
11  A. Yes, sir.
12  Q. What did you do with that box?
13  A. This box was submitted to the property room with the
14  evidence.
15  Q. And about how long did it take to get to the property
16  room after you went out to the dumpster? In other words, from
17  the time you got the evidence out of the dumpster and finished
18  looking around out there, how long was it after that before all
19  this stuff got packaged up and stuck in that box and given to
20  the property room?
21  A. Okay. It was submitted to the property room on the
22  11th at 9:20, so approximately 40 hours, maybe.
23  Q. And what was it that took so long -- why 40 hours?
24  A. It is because the clothing was still wet and it needed
25  to totally dry before it was submitted.

## Page 175

1  Q. I think you showed the jury some photographs of what
2  you call your drying room.
3  A. Yes, sir.
4  Q. Is the drying room just a secure area that's got paper
5  laid out on the tables that you lay stuff on it for it to dry?
6  A. No, sir.
7  Q. Tell me what the drying room is.
8      MS. CALLAGHAN: Your Honor, before the witness
9  goes on, could we move the box? Because I can't see her at all,
10  and I'm not sure the jury can.
11  Q. Go ahead and finish.
12  A. The drying room is a secure room. It has key access
13  but also security-code access. The room has multiple metal
14  tables. Prior to any evidence being dried on those tables, we
15  wash the tables with bleach and water and then lay down fresh
16  butcher paper and then lay the items on there to dry. And once
17  they are packaged, we remove the butcher and wash the tables
18  with bleach and water.
19  Q. I can't go over to the drying room, can I?
20  A. No.
21  Q. If I go over there and say, "Hey, I want to look in
22  the drying room," they're not going to let me in there. It's a
23  secure area.
24  A. Right.
25  Q. Of that 40 hours, how long were these things spent in

## Page 176

1  the drying room?
2  A. It would have been from the time I took them up there,
3  which was probably about 4:30 or 5:00 o'clock on the 9th; and
4  they would have been packaged about 8:00 a.m. on the 11th.
5  Q. Were all of these items wet or just some of them?
6  A. They were all wet.
7  Q. If you had had some items that weren't wet, would they
8  have gone straight to the property room, or would they have
9  maybe waited until you got everything dried out?
10  A. You can do it either way. A lot of times I will
11  submit them.
12  Q. Sometimes you submit them; sometimes you don't, just
13  depending on the situation?
14  A. Yes, sir.
15  Q. But if everything was dry, you wouldn't have gone
16  through the step of going to the drying room, correct?
17  A. No, sir.
18  Q. That's a correct statement?
19  A. That's correct.
20  Q. So just as an example, if I get arrested and I have
21  got a gun, maybe, in my car that the police want to confiscate;
22  you come out and confiscate the gun, it goes in a bag or a box,
23  and it goes straight to the property room.
24  A. Yes, sir.
25  Q. And the only time constraint is just however long it

Page 177

1 took for you to get off your shift -- you turn it in at the end
2 of your shift; is that correct?
3    A. Normally you would package it and submit it right
4 then.
5    Q. Okay. So it is conceivable that if you were called to
6 a scene and you picked up some items -- and maybe not very many
7 items -- you picked up some items and you packaged them, they
8 could get to the property room within an hour.
9    A. Yes, sir.
10    Q. Is there a reason that you do that?
11    A. To preserve the integrity and the chain of custody.
12    Q. You are not supposed to have stuff just laying around
13 in your car, right?
14    A. Correct.
15    Q. I mean longer than is necessary.
16    A. Yes, sir.
17    Q. And if you seal up something, do you seal it up right
18 when you get it, or do you maybe just get one of those bags and
19 throw the shirt in it and stick it in the back of the van until
20 you get down to the police department?
21    A. It would depend. I did not seal these prior to taking
22 them to the police department.
23    Q. But these were wet.
24    A. Right.
25    Q. Back to my example. If you had something that was

Page 178

1 dry, would you need -- are you supposed to seal that
2 immediately?
3    A. We normally do not seal it until we got down to our
4 evidence room.
5    Q. So if I go to some crime scene van right now, might
6 there be stuff unsealed just laying around in the back of it?
7 Is that possible?
8    A. It's possible if they're still at the scene of the
9 crime, yes.
10    Q. Well, is it possible for a crime scene officer to go
11 to more than one crime scene with open bags and boxes in the
12 back of his truck?
13    A. It normally doesn't happen, but I guess it's possible.
14    Q. If you don't seal it until you get downtown, it's
15 certainly possible, is it not?
16    A. It is possible. Normally we would make one call, take
17 the evidence down.
18    Q. I understand. But what I am hearing you say -- and
19 maybe I just need to ask you directly. Is there a rule or a law
20 or procedure or general order or whatever you want to call it
21 that says that at the time you pick up a piece of evidence,
22 assuming it's not wet and has to go to the drying room -- if you
23 pick up a piece of evidence, that you have to seal it right on
24 the spot? Anything that says that?
25    A. Not that I'm aware of.

Page 179

1    Q. It would just make better sense to do it that way,
2 though, for contamination purposes, correct?
3    A. Depending on the situation. I hate to give a definite
4 answer. Every situation is different.
5    Q. Can you tell from looking at the box -- and maybe you
6 need to look around at it if you need to or it may be in your
7 notes. Can you tell who turned that in to the property room?
8    A. It's not on the box.
9    Q. There is a document that supports when you turned it
10 in, correct?
11    A. Yes, sir.
12    Q. You don't just put things in the box and throw it in
13 the property room. You fill out a form, and there is somebody
14 there to sign for it. If not, you turn it in to the --
15    A. Yes, sir.
16    Q. But for whatever reason might keep you from getting it
17 to the property room, you are not supposed to drive around for
18 two or three days --
19    A. No, sir.
20    Q. That's -- that goes back to the contamination problem
21 or it may get lost -- you may lose it.
22    A. Yes, sir.
23        MR. RAY: I'll pass the witness. Thank you.
24            REDIRECT EXAMINATION
25 BY MS. CALLAGHAN:

Page 180

1    Q. Officer Johnson, a crime scene search unit van
2 contains a lot of items that you need to recover and preserve
3 evidence, correct?
4    A. Yes, ma'am.
5    Q. But it is not a full facility in the same way that
6 your office or property room is, correct?
7    A. No, it is not.
8    Q. So customarily do you retrieve the evidence, put it in
9 the crime scene search unit van and then carry it down to the
10 police department where it is then further processed and
11 packaged in the facilities you have in the police department --
12    A. Yes, ma'am.
13    Q. In terms of submitting things to the property room, is
14 the property room open 24 hours?
15    A. No ma'am.
16    Q. What are its general hours?
17    A. I believe it is 6:0 a.m. to 10:00 p.m. It's day shift
18 and evening shift, but not midnights.
19    Q. All right. If someone brings in evidence at an hour
20 other than that which they are open, what is the procedure for
21 preserving the evidence until the property room is open?
22    A. Okay. For officers -- in our captain's office we have
23 lockers where evidence can be submitted and kept secure. The
24 crime scene office for crime scene officers is also secured with
25 a lock and a key pad to secure the evidence.

Q. So you have temporary holding facilities where evidence may wait for a period of time before actually going to the property room.

A. Yes.

Q. Depending on what hour it was given and the circumstances going on.

A. Yes, ma'am.

MS. CALLAGHAN: Thank you very much. Pass the witness.

MR. RAY: I don't have anything further.

THE COURT: You may step down, ma'am.

THE COURT: Ladies and gentlemen, let's take a stretch break. Please retire to the jury room and remember and follow your instructions.

(Recess taken)

(Jury not present)

THE COURT: Are both sides for the for the jury?

MS. CALLAGHAN: With the Court's permission, I would like to replace the number on State's Exhibit 129, which is the denim cutting that was recovered by Detective Johnson, with the number "137."

MR. RAY: Okay.

MS. CALLAGHAN: And if I may notify the jury of that?

MR. RAY: That's fine

---

A. Yes, ma'am.

Q. Can you tell the members of the jury if an individual by the name of Patricia Syren had a Morgan Stanley credit card?

A. Yes, she did.

Q. Did you bring any records pertaining to her account that specifically addressed the period of April, 2003?

A. Yes, I did.

MS. HARTMANN: May I approach the witness?

THE COURT: Yes.

Q. I'm showing you what has been marked for identification purposes as State's Exhibit No. 138. Do you recognize this exhibit?

A. Yes, ma'am.

Q. Are these the records that pertain to Patricia Syren's Morgan Stanley credit card account?

A. Yes, ma'am, for the month of April.

Q. All right. Now that you have had a chance to look at what's been marked for identification purposes as State's Exhibit No. 138, does that actually belong to somebody else?

A. No, that is a mistake.

Q. Do you have the records belonging to Patricia Syren's Morgan Stanley credit card account?

A. Yes, ma'am, I do.

Q. I'm showing you what's been marked for identification purposes as State's Exhibit No. 139. Are those the records that

---

Page 182

(Jury present)

MS. CALLAGHAN: Your Honor, for the record, it appears that there are two items inadvertently labeled State's Exhibit 129, so the denim cuttings recovered by Detective Johnson have been relabeled 137.

MS. HARTMANN: The State calls Randy Fuller.

(Witness Sworn)

Whereupon,

RANDY FULLER,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. HARTMANN:

Q. Would you state your name, please?

A. Randy Fuller.

Q. How are you employed?

A. By Morgan Stanley.

Q. And does the company Morgan Stanley have credit cards that they issue to individuals?

A. They do. They are debit cards based on the person's account at Morgan Stanley.

Q. Are you the custodian of records for various Morgan Stanley charge card accounts?

A. Yes.

Q. Were you, in fact, requested to bring some records with you here today?

---

Page 184

pertain to Patricia Syren?

A. Yes, they are.

Q. Who resided at 2716 Scott Avenue here in Fort Worth?

A. Correct.

Q. State's Exhibit No. 139, are those records that are kept in the regular course of Morgan Stanley's business?

A. Yes, ma'am.

Q. Do they document activity on Ms. Syren's account at or about the time that the activity actually takes place?

A. Yes, ma'am, they do, beginning here and one here.

Q. And these records cover a period from April 6 through April 8 --

A. Correct.

Q. -- as far as debit card charges?

A. Correct.

Q. Are these a fair and accurate copy of the record that Morgan Stanley maintains?

A. Yes, ma'am.

MS. HARTMANN: The State would offer State's 139.

MR. RAY: Can I have just a second, Judge?

THE COURT: Yes.

(Pause in the proceedings)

MR. MOORE: Can I ask him one question, Your Honor?

| Page 185 |
| --- |

1 THE COURT: Yes.

2 VOIR DIRE EXAMINATION

3 BY MR. MOORE:

4 Q. There actually appears to be some ink on this State's

5 Exhibit 139. Is that -- did you put that on there?

6 A. I did.

7 Q. For what purpose?

8 A. Just for my notes here today.

9 Q. Okay.

10 A. Actually I would be more than happy to provide the

11 Court with clean, unmarked copies.

12 MR. MOORE: We don't have any objection.

13 THE COURT: 139 is admitted.

14 (State's Exhibit No. 139 received)

15 DIRECT EXAMINATION CONTINUED

16 BY MS. HARTMANN:

17 Q. State's Exhibit 139, does it detail or give the

18 information of a transaction date when there was an activity

19 with the debit card?

20 A. Yes, ma'am.

21 Q. Is there -- what is a transaction date? What is that

22 documenting?

23 A. That would be the date that the charge was incurred.

24 Q. Is there a column for "Date Paid"?

25 A. Yes, ma'am.

| Page 186 |
| --- |

1 Q. What does that mean?

2 A. That would be the date that Morgan Stanley actually

3 paid the money out for the charge.

4 Q. All right. And is there a column for "Description"?

5 A. Yes, ma'am.

6 Q. What would fall into the column labeled "Description"?

7 A. That would tell us what business establishment the

8 charge was made at.

9 Q. All right. And then also a column for "Location," and

10 what is that referring to?

11 A. That would simply tell us what city and state that the

12 business location was at.

13 Q. All right. And also a column for "Amount." Would

14 that be the amount of the debit?

15 A. Yes, ma'am.

16 Q. And also a final column that says "Merchant Category,"

17 and what falls into that category?

18 A. For the purposes of our clients' annual statement, the

19 charges are broken down into various categories, such as

20 restaurants, clothing. It helps them at the end of the year to

21 tell them where the charges are, where the money has been used.

22 Q. All right. Do you also have records which are more

23 detailed in nature such that you can tell what time of day the

24 debit card is actually used?

25 A. These records do not show that, the exact time of day;

| Page 187 |
| --- |

1 or at least if they do, I don't know how to read them.

2 Q. Okay.

3 A. It just gives a reference number, which the business

4 establishment gets back saying that the credit card is good,

5 just a little more detail.

6 Q. State's Exhibit 139, Mr. Moore asked you about some-

7 purple writing that's on here, and you said that you put that on

8 here?

9 A. I did.

10 Q. Does that include the actual Master Card debit number?

11 A. It does.

12 MS. HARTMANN: We'll pass the witness.

13 CROSS-EXAMINATION

14 BY MR. MOORE:

15 Q. Mr. Fuller, you testified that your records won't tell

16 the time that the transaction was made?

17 A. The records I have with me today will not tell that.

18 Q. Do you have some records at Morgan Stanley that would?

19 A. I would have to get those from the credit card

20 company, but, yes, they are easily obtainable.

21 Q. What -- how does the credit card company -- if there

22 is some suspicious activity on a credit card, how do you red

23 flag that?

24 A. The credit card company, or Morgan Stanley's active

25 asset department, monitors accounts. So if anything comes

| Page 188 |
| --- |

1 through that looks unusual -- and that's actually pretty

2 often -- then the credit card company will make a phone call to

3 the client directly. And they will use all phone numbers that

4 they have records of, whether it be home, business or cell; and

5 they will make every effort and attempt to reach that customer

6 to verify the charges.

7 Q. Is that fairly -- a fairly new service that y'all

8 provide?

9 A. It started, I believe, in 1999 that we started that,

10 and it's a very good service.

11 MR. MOORE: I agree. Pass the witness.

12 MS. HARTMANN: Just a few more additional

13 questions, Your Honor.

14 REDIRECT EXAMINATION

15 BY MS. HARTMANN:

16 Q. By looking at State's Exhibit No. 139, is there a

17 charge on April 6 of this year?

18 A. Yes, ma'am.

19 Q. All right. And what is the description?

20 A. Kentucky Fried Chicken. And then there the letter

21 D-301-036, which I understand to be -- to tell us what exact KFC

22 that's at.

23 Q. All right. On April 4, the first charge is to where?

24 A. Greyhound line -- Greyhound Bus Lines.

25 Q. That's a transportation business?

## Page 189

1     A. Correct.

2     Q. As well as on April 4, is there a charge for Razoo's

3 Cajun cafe?

4     A. Yes, ma'am there is.

5     Q. Is there a charge on April 8 for a Joe's Crab in

6 Galveston?

7     A. Yes, ma'am, there is.

8     Q. Is there a charge on April 7 for Factory Brand Shoes?

9     A. Yes, ma'am, there is.

10     Q. And those are just a few of the charges; there is

11 actually more than that.

12     A. Correct.

13     Q. And that first one is a Kentucky Fried Chicken.

14     A. That's correct.

15     Q. On April 6.

16     A. Correct.

17        MS. HARTMANN: Pass the witness.

18        RECROSS-EXAMINATION

19 BY MR. RAY:

20     Q. Let me ask you a quick question. Actually, there

21 is -- there is 12 transactions in Galveston, Texas, on March 8,

22 correct?

23     A. Actually it is showing April 8.

24     Q. I'm sorry, April 8.

25     A. Yes, sir.

## Page 190

1     Q. Thank you.

2     A. Yes, sir.

3        MR. MOORE: We'll pass the witness.

4        MS. HARTMANN: We have nothing further.

5        THE COURT: You may step down, sir.

6        MS. HARTMANN: The State calls Harvey Turner.

7        MR. RAY: Judge, can we approach just briefly?

8        THE COURT: Yes.

9        (Outside the hearing of the jury)

10        MR. RAY: Maybe she knows the answer to this. Do

11 you want to inquire if he has a pending case.

12        MS. HARTMANN: We benched him back from the --

13        MR. RAY: Okay. Never mind.

14        (In the hearing of the jury)

15        (Witness Sworn)

16        MS. HARTMANN: May I approach the witness for

17 just a brief moment?

18        THE COURT: Yes.

19 Whereupon,

20          HARVEY TURNER,

21 having been first duly sworn, testified as follows:

22        DIRECT EXAMINATION

23 BY MS. HARTMANN:

24     Q. Could you introduce yourself to the members of the

25 jury?

## Page 191

1     A. I'm sorry?

2     Q. Could you tell the members of the jury what your name

3 is?

4     A. Harvey Turner.

5     Q. Mr. Turner, you are obviously wearing jail clothing.

6     A. Yes.

7     Q. Were you benched back from a state jail facility to

8 come to court to testify today?

9     A. Yes.

10     Q. What -- which particular state jail were you benched

11 back from?

12     A. The John L. Lindsey Unit in Jacksboro, Texas.

13     Q. Can you tell the members of the jury what type of

14 sentence you are doing?

15     A. I am doing a six months' sentence for delivery of a

16 controlled substance.

17     Q. Is that a state jail felony offense?

18     A. Yes, it is.

19     Q. How far into your sentence are you?

20     A. Four months. I have two months remaining.

21     Q. All right. I want to talk to you about a weekend back

22 in April of this year here in Fort Worth. All right? In the

23 early part of April, the weekend of the 4th, 5th and 6th of

24 April of this year, were you staying at the Cowboy Inn motel?

25     A. Yes, I was.

## Page 192

1     Q. What city is the Cowboy Inn Motel in?

2     A. Fort Worth, Texas.

3     Q. Do you know what street it is on?

4     A. Main Street. 3100 North Main Street.

5     Q. All right. And did you meet anyone while you were

6 there at the Cowboy Inn Motel that you knew to have the name of

7 Billy Jack?

8     A. Did I meet someone?

9     Q. That's correct.

10     A. Yes, ma'am.

11     Q. Did you become familiar with somebody?

12     A. We conversed, yes.

13     Q. All right. And what part of that weekend was the

14 first time that you saw this person named Billy Jack?

15     A. The first time I saw him was that Friday afternoon,

16 Friday evening, early evening.

17     Q. Where were you located when you saw him?

18     A. I was at the car wash next door.

19     Q. What were you doing at the car wash?

20     A. I was more or less sitting on the back reading a

21 newspaper when I saw him come up into the parking lot.

22     Q. Do you see anybody in the courtroom that you would

23 recognize to be that person that is named Billy Jack?

24     A. Yes, ma'am.

25     Q. Can you tell us where that person is located and

Page 193

1  describe something they are wearing?

2     A. I guess that's a lavender shirt.

3     Q. Okay. If I'm person 1, 2, 3, 4, 5, 6, and the

4  bailiff --

5     A. No. 5.

6        MS. HARTMANN: Your Honor, may the record reflect

7  that Mr. Turner has identified the Defendant?

8        THE COURT: It will.

9     Q. Had you known Mr. Crutsinger, or Billy Jack, before

10 that Friday?

11    A. No, ma'am.

12    Q. Had you ever seen him before?

13    A. No, ma'am.

14    Q. And you said that you were at the car wash. Where did

15 you first see the Defendant?

16    A. He was coming across the parking lot at the car wash.

17    Q. Was he coming towards you or walking away from you?

18    A. He was walking like towards the Coke machine.

19    Q. Was he doing anything as he walked toward the Coke

20 machine?

21    A. He had his hand in his shirt pocket separating some

22 money.

23    Q. Did you have any conversation with him at that point?

24    A. No.

25    Q. What happened? Did he continue on towards the Coke

Page 194

1  machine or not?

2     A. No, he stopped to turn around and went back to the

3  motel, the motel office.

4     Q. Is the Cowboy Inn and car wash, are they located right

5  next to each other?

6     A. They are adjacent to each other, yes.

7     Q. Okay. Do you know whether or not the Defendant rented

8  a room there at the Cowboy Inn?

9     A. Yes, I do. He did rent a room.

10    Q. Which room did he rent?

11    A. Room No. 12.

12    Q. In regard to the setup of the Cowboy Inn Motel, is

13 that close to the front office or far away from it?

14    A. It is sort of catty corner from the office near the --

15 near Main street. It's right on Main Street.

16    Q. All right. And did you see Mr. Crutsinger later on

17 that Friday evening?

18    A. Yes, in his room in the doorway.

19    Q. All right. When you first noticed the Defendant, how

20 did he appear as far as his appearance to you?

21    A. He stood out because he didn't -- it wasn't -- he

22 wasn't the normal Main Street motel visitor. He didn't -- just

23 didn't fit.

24    Q. All right. And did you see the Defendant on Saturday

25 at any time?

Page 195

1     A. Yes, I saw him.

2     Q. Okay. And the times that you saw the Defendant, did

3  you ever talk or speak with him, or was it just seeing him in

4  the area?

5     A. That Friday and Saturday we saw each other -- I saw

6  him in passing and standing in the doorway of his room. We had

7  not -- we never conversed during that time.

8     Q. During Friday or Saturday?

9     A. Right, Friday or Saturday.

10    Q. Did you see the Defendant on Sunday, the 6th of April?

11    A. Yes, I did.

12    Q. Was that early in the morning, afternoon --

13    A. It was afternoon.

14    Q. Did you have a conversation with him?

15    A. Yes, I did.

16    Q. And did he appear to be intoxicated or drunk to you

17 when you saw him?

18    A. No.

19    Q. Did he make any comments to you about money?

20    A. Yes, he did.

21    Q. What comments did he make to you?

22    A. That he had run out of money.

23    Q. All right. How long a conversation did you have with

24 him?

25    A. We talked for quite a few minutes. We talked about

Page 196

1  what was happening around the area and how he had noticed me

2  and --

3     Q. Okay. Was it just general conversation?

4     A. Just general conversation.

5     Q. Nothing specific about families or --

6     A. No.

7     Q. Or problems?

8     A. No.

9     Q. All right. Did the Defendant stay there at the Cowboy

10 Inn Motel, or did he leave at that point?

11    A. He was at the -- you mean on that Sunday?

12    Q. That Sunday, yes, sir.

13    A. He left for a while that Sunday evening.

14    Q. All right.

15    A. It was like later evening.

16    Q. Did you see him ever come back Sunday evening to the

17 Cowboy Inn?

18    A. Yes, I did.

19    Q. When he came back, was he walking or in a vehicle?

20    A. He was walking and carrying a sack.

21    Q. Did the sack have any labeling on it?

22    A. Yes, it did.

23    Q. What labeling was on that sack?

24    A. Kentucky Fried Chicken.

25    Q. Did he walk, in fact, back into the Cowboy Inn back to

1 his room No. 12?

2   A. Yes, he did.

3   Q. When we talk about a sack of Kentucky Fried Chicken,

4 are we talking about a small carry-out bag or --

5   A. No, a shopping bag, a big bag.

6   Q. A big bag.

7   A. A large bag.

8   Q. Did you see him anymore later that evening, Sunday

9 evening, after he had come back with his shopping bag from

10 Kentucky Fried Chicken?

11   A. I saw him in his room but not outside anymore, no.

12   Q. When you saw him coming back with the Kentucky Fried

13 Chicken, were you able to notice whether or not he appeared to

14 be angry, upset or crying or anything like that.

15   A. The same as he had been the whole weekend, very kind

16 of laid back.

17   Q. Did you see the Defendant, Mr. Crutsinger, that next

18 morning, Monday April 7, 2003?

19   A. Yes, I did.

20   Q. Where did you see him?

21   A. In his room.

22   Q. And did you have a reason for being in his room?

23   A. Yes. I was -- I stopped in his room. As a matter of

24 fact, I did not rent a room that Saturday night -- I mean that

25 Sunday night. And when I saw him that Sunday morning, he

1 offered myself and this young lady the use of his room because

2 he was leaving and he said it was paid up -- paid in full until

3 11:00 o'clock.

4   Q. Did he indicate where he was going to you?

5   A. He said he was going to work.

6   Q. Did he say anything about any type of transportation?

7   A. He had to catch a bus.

8   Q. The time at which you and -- let me back up just a

9 moment. When you see him with the Kentucky Fried Chicken is

10 that Sunday evening?

11   A. Uh-huh.

12   Q. Is that a yes?

13   A. Yes.

14   Q. You just have to answer out loud --

15   A. Yes.

16   Q. And next time you see him is Monday morning, the 7th,

17 when you go to his room; is that correct?

18   A. Yes.

19   Q. All right. Is that the time where he offered to let

20 you have the room for the rest of the day?

21   A. Right, until 11:00 a.m.

22   Q. Until 11:00 a.m.

23   A. Yes.

24   Q. And he told you he was going to work and had to catch

25 the bus.

1   A. Yes.

2   Q. What was his demeanor like Monday morning?

3   A. That of someone getting ready to start a work week,

4 getting ready to leave for work.

5   Q. Did you notice any particular smell about the

6 Defendant?

7   A. Freshly shaved, aftershave and --

8   Q. Did the Defendant, in fact, leave room No. 12 at the

9 Cowboy Inn?

10   A. He left and came back.

11   Q. How long a period of time between the time that he

12 left Monday morning and then came back?

13   A. Less than ten minutes.

14   Q. And when the Defendant came back to room No. 12, did

15 he retrieve anything?

16   A. Yes, ma'am. He had left his cell phone. I had picked

17 it up and was going to try and catch him, but he came back and I

18 gave it to him, and he said that he was on his way to work.

19   Q. Okay. And was that the only thing that he returned

20 for was the cell phone? Is that the only item that he picked

21 up?

22   A. Yes, ma'am.

23   Q. Did you notice any change in the Defendant's behavior

24 or demeanor from Friday evening to Monday morning?

25   A. No, none whatsoever.

1       MS. HARTMANN: May I approach the witness?

2       THE COURT: Yes.

3   Q. Mr. Turner, I'm going to show you what's been marked

4 for identification purposes as State's Exhibit No. 113 and ask

5 you to take a look at that, if you would.

6   A. Okay.

7   Q. Do you recognize what is depicted in two photographs

8 in State's 113?

9   A. That's the Cowboy Inn Motel.

10   Q. Do those pictures fairly and accurately depict the way

11 the Cowboy Inn looks and its setup?

12   A. Yes.

13       MS. HARTMANN: Your Honor, at this time the State

14 would offer State's Exhibit 113.

15       MR. RAY: No objection.

16       THE COURT: 113 is admitted.

17       (State's Exhibit No. 113 received)

18   Q. All right. Mr. Turner, State's Exhibit 113, the top

19 photograph, is that a view looking in off of Main Street into

20 the Cowboy Inn?

21   A. Yes, it is.

22   Q. As you look at the top photograph on our left-hand

23 side, would that be where the front office is?

24   A. Yes.

25   Q. On the opposite side, which would be the right of the

Page 201

1 photograph as we look at it, you can see a Dr. Pepper machine?

2   A. Yes.

3   Q. And there is a doorway that's just visible on the

4 first floor. Is that Room No. 12?

5   A. That's Room No. 12.

6   Q. The bottom photograph is a shot looking straight at

7 room No. 12, is it not?

8   A. Yes, from the car-wash side.

9   Q. From the car-wash side. Can you see the dumpster that

10 belongs to the Cowboy Inn?

11   A. Yes.

12   Q. Can you see the Dr. Pepper machine?

13   A. Yes.

14   Q. Is there actually a No. 12 attached to the doorway?

15   A. On the door frame, yes, ma'am.

16     MS. HARTMANN: Permission to publish to the jury?

17     THE COURT: Yes.

18   Q. All right. I'm showing you what's been marked for

19 identification purposes as State's Exhibit No. 114. Do you

20 recognize the four pictures that make up 114?

21   A. Yes, I do.

22   Q. All right. Do they fairly and accurately depict the

23 scenes that they are purporting to depict?

24   A. Sure.

25     MS. HARTMANN: Your Honor, at this time the State

Page 202

1 would offer State's Exhibit 114.

2     MR. RAY: No objection to 114.

3     THE COURT: 114 is admitted.

4     (State's Exhibit No. 114 received)

5   Q. Let me ask you, sir, on Main Street down from Cowboy

6 Inn, is there a Kentucky Fried Chicken?

7   A. Yes, going south.

8   Q. For the record, the top photograph in State's 114,

9 what is that showing?

10   A. The El Triangulo nightclub.

11   Q. All right. And in the distance in the top photograph,

12 can you see the sign for the Cowboy Inn and the car wash --

13   A. Yes, ma'am.

14   Q. -- just down the road?

15   A. Yes.

16   Q. The second photograph in State's 114, is that a

17 closeup of the Cowboy Inn and car wash?

18   A. Yes.

19   Q. This Car Care car wash, is that where you were located

20 when you first saw the Defendant?

21   A. Yes, ma'am.

22   Q. These bottom two photographs depict two views of the

23 car wash itself?

24   A. Yes.

25   Q. Where you were located when you saw the Defendant, can

Page 203

1 you see that in these pictures, or not?

2   A. Yes. I was more or less right in the second picture

3 here sitting where this vacuum is sitting right behind that

4 fence there.

5   Q. Were you sitting on -- if we are looking -- if we are

6 at the scene and we see this view and you were standing there,

7 would we be able to see you, or would you be completely on the

8 other side of the fence?

9   A. I would be on the other side of the fence. You would

10 have to come past the fence for me to see -- to see me.

11   Q. There is a Coke machine in the bottom photograph. Is

12 that the direction that the Defendant was going?

13   A. Yes.

14   Q. So this bottom photograph has the Coke machine where

15 the Defendant was walking.

16   A. Right. And I am standing more or less over here.

17   Q. Close to the fence.

18   A. No, on the other side of the fence right here.

19   Q. Okay.

20   A. It is more towards the street side. There is a vacuum

21 right there, you can see the top of it. I was sitting there

22 reading the newspaper.

23     MS. HARTMANN: All right. Permission to publish

24 to the jury?

25     THE COURT: You may.

Page 204

1     (Pause in the proceedings)

2     MS. HARTMANN: May I have just one moment, Your

3 Honor?

4     (Pause in the proceedings)

5   Q. Let me ask you this, Mr. Turner. Monday morning when

6 you went into his room, did he offer you and the lady that you

7 were with, did he offer either one of you any of the remnants of

8 the chicken?

9   A. Yes, he did. There was a lot of chicken left, and he

10 told us we were more than welcome to have it.

11   Q. Do you know whether or not that evening before, other

12 people were carrying any food or eating -- had he offered it to

13 other people?

14   A. This one girl told me --

15   Q. Okay. You can't say what other people said. Did you

16 see other people coming out of his room with food?

17   A. Yes, Sunday night.

18     MS. HARTMANN: Okay. Thank you, Mr. Turner.

19     We'll pass the witness.

20     CROSS-EXAMINATION

21 BY MR. RAY:

22   Q. How are you doing there, Mr. Turner?

23   A. I'm fine.

24   Q. You are up there in the state jail right now; is that

25 right?

Page 205

1   A. Yes, sir.

2   Q. You said you were up there for selling drugs or

3 possession of drugs?

4   A. Delivery of a controlled substance.

5   Q. Delivery?

6   A. Yes, sir.

7   Q. And you got a 180 day sentence for that crime, right?

8   A. Yes, sir,

9   Q. And you said you were due to get out in two months or

10 four months?

11   A. Two months.

12   Q. Two months. And in state jail felonies, you have to

13 do them day for day. Do you understand that?

14   A. Day for day.

15   Q. Did you get out of jail after you committed that

16 offense before you got sentenced? In other words -- well, what

17 I am leading up to is when did you get arrested for that

18 offense?

19   A. In June, sir.

20   Q. Where were you when you got arrested?

21   A. At the Cowboy motel.

22   Q. Okay. Now, you were at the Cowboy motel. Do you

23 remember exactly what day it was?

24   A. When I got arrested?

25   Q. Yeah.

Page 206

1   A. It was on a Thursday day, I believe.

2   Q. Do you remember what number the day was?

3   A. June 8.

4   Q. Okay. Got arrested on June 8, and you have been in

5 jail ever since then, right?

6   A. Yes.

7   Q. When did you settle your case with the District

8 Attorney?

9   A. July.

10   Q. Do you remember about what day that was?

11   A. July 8.

12   Q. Do you remember when it was you first talked to the

13 DA's office and maybe an investigator or some police officer

14 about testifying for the State?

15   A. I don't remember the exact date, no, sir.

16   Q. About when was it?

17   A. About five or six weeks ago -- about five weeks ago.

18   Q. Was it before your case was disposed of?

19   A. No.

20   Q. It was after your case was disposed of?

21   A. Yes, sir.

22   Q. Okay. You -- how did you communicate with the DA's

23 office? Did they call you, or did you call them?

24   A. They contacted me.

25   Q. Had you sent any kind of message to them?

Page 207

1   A. No, sir.

2   Q. Did they tell you how it was that they knew about you?

3 How did they know you were -- how did they know you knew Billy

4 Jack?

5   A. You know, I never asked that question, sir.

6   Q. Did it seem kind of odd you were just sitting over

7 there in jail one day and somebody shows up from the DA's

8 office, says, "We had a big camera on you, and we saw you and

9 Billy Jack together"?

10   A. Not really, sir.

11   Q. Okay.

12   A. Because for the last two years, my wife and I have

13 been separated and I have been in and around the motel for the

14 last two years. And almost anything that goes on around there,

15 I'm usually aware of what goes on.

16   Q. Where are you from?

17   A. Originally from Indiana.

18   Q. How did you get to Fort Worth?

19   A. Job, employment.

20   Q. Okay. Well, were you working when you got arrested

21 for selling drugs?

22   A. No, sir, I wasn't.

23   Q. How long had it been since you had a job until you got

24 arrested for selling drugs?

25   A. Well, I had been working off and on. I do temp work,

Page 208

1 contract labor.

2   Q. Do a lot of people that live on the street kind of

3 funnel in and out of the Cowboy Motel?

4   A. Yes, they do.

5   Q. Tell the jury what kind of hotel this is. We have

6 seen some pictures of it. Who stays there, what kind of folks

7 are there, do they stay a long time --

8   A. It's a mix of people that stay there. You have a lot

9 of homeless -- you have some homeless people, you have some

10 transient people, you have people that have circumstances that

11 require them to seek temporary housing daily, weekly or

12 monthly. So it is a mix of people.

13   Q. The day Billy Jack here left and went to work, that

14 was on a Monday, right?

15   A. Yes, sir.

16   Q. And he was leaving and you were there with some lady,

17 right?

18   A. Yes, sir.

19   Q. And he told you y'all could have the room until 11:00

20 o'clock.

21   A. Yes, sir.

22   Q. And what time was it that y'all had that conversation?

23   A. It was a little before 7:00.

24   Q. Okay. And what are you and that lady doing?

25   A. What were we doing?

Page 209

1  Q. Yeah.
2  A. We were just hanging out at that time.
3  Q. Okay. Well, what were you going to do with the motel
4  room?
5  A. Eat and sleep.
6  Q. Okay. Eating chicken and sleep.
7  A. Okay.
8  Q. Were you tired?
9  A. I had been up all night, yes, sir.
10 Q. Okay. Now, you said you were going to take Billy Jack
11 his cell phone, right?
12 A. Yes, sir.
13 Q. Where were you going to take it?
14 A. If he was going to catch a bus, I knew where the bus
15 was, and he had to walk downhill approximately four blocks --
16 Q. Okay?
17 A. -- so I could have caught him and given him his cell
18 phone.
19 Q. But you didn't, and he just eventually came back --
20 A. It was just a matter of a couple of minutes. He came
21 right back to the room.
22 Q. Okay. Is -- did you have any correspondence with the
23 DA's office --
24 A. I'm sorry. I can't hear you, sir.
25 Q. I'll repeat the question. I'm sorry I didn't speak

Page 210

1  loud enough.
2         Did you ever talk to the DA's office other than
3  in person? Did you ever give them any kind of written statement
4  or talk to them?
5  A. No, sir.
6  Q. Okay. And is there any kind of deal for your
7  testimony?
8  A. No, sir.
9         MR. RAY: I believe that's all. Pass the
10 witness.
11        MS. HARTMANN: The State has nothing further.
12 Thank you.
13        THE COURT: You may step down, sir.
14        MS. HARTMANN: The State calls Loretta Angram.
15        (Witness Sworn)
16 Whereupon,
17        LORETTA ANGRAM,
18 having been first duly sworn, testified as follows:
19        DIRECT EXAMINATION
20 BY MS. HARTMANN:
21 Q. Could you state your name, please?
22 A. Loretta Angram, A-n-g-r-a-m.
23 Q. I want to direct your attention back to April of this
24 year and ask you where you were working.
25 A. Factory Brand Shoes.

Page 211

1  Q. Where is that located?
2  A. Downtown Fort Worth.
3  Q. Is that, in fact, located in the Tandy Center?
4  A. Yes.
5  Q. What were your duties back in April of this year at
6  the Factory Brand Shoe Store?
7  A. I am an assistant manager there.
8  Q. I want to direct your attention specifically to Monday
9  morning at about 10:30, 10:40 in the morning. Were you working
10 on that day?
11 A. Yes, I was.
12 Q. What time actually does the Factory Brand Shoe Store
13 open?
14 A. 10:00 o'clock.
15 Q. And I will direct your attention specifically to April
16 7 of this year. Did you have a -- well, let me ask you this.
17 In the mornings is it generally -- is there generally a lot of
18 business, or is it kind of slow?
19 A. It is kind of slow.
20 Q. All right. Did you have an older man come into your
21 store looking to purchase a pair of tennis shoes?
22 A. Yes.
23 Q. Okay. And did this man eventually pick out, or
24 select, a pair of shoes?
25 A. Yes.

Page 212

1  Q. And did he purchase a pair of shoes?
2  A. Yes, he did.
3  Q. How did he pay for those shoes?
4  A. Credit card.
5  Q. Did you notice anything unusual about the man and the
6  name on the credit card?
7  A. It was a female's name, and other than that he had
8  like a duffle bag with him.
9  Q. All right. And did you ask him -- when you noticed
10 the fact that the credit card had a woman's name on it and he
11 was a man, did you ask anything in particular about
12 identification?
13 A. Yes, I did.
14 Q. What did you ask for?
15 A. I asked, "Can I see your identification?"
16 Q. And did he provide any identification to you?
17 A. No, he did not.
18 Q. Did he give you an explanation for why he didn't have
19 any ID?
20 A. Yes. He said something about he left it in his
21 other -- like he changed clothes or something like that.
22 Q. All right. Did he make any comments to you about why
23 he was getting this pair of shoes?
24 A. He said something about -- I'm not sure if he meant
25 somebody and him were in earlier and I wasn't there, or the fact

1 that somebody was supposed to be letting him get some shoes or
2 something and he figured since he was downtown, he would go
3 ahead and get them himself.
4     Q. Did he mention anything about his aunt?
5     A. Yes, something about -- he said, "My aunt said I could
6 get these," or something like that.
7     Q. All right. Do you see anybody here in the courtroom
8 that you recognize to be the man who walked in the Factory Brand
9 Shoe Store in the Tandy Center back on April 7 of this year?
10     A. Right there.
11     Q. And you pointed. Can you describe where that person
12 is located and something they are wearing?
13     A. On the end with that pinkish, purplish looking shirt.
14         MS. HARTMANN: Your Honor, at this time may the
15 record reflect that the witness has identified the Defendant?
16         THE COURT: It will.
17         MS. HARTMANN: May I approach the witness?
18         THE COURT: Yes.
19     Q. I am going to show you, Ms. Angram, what's previously
20 been marked for identification purposes as State's Exhibit No.
21 132 and ask you to take a look at that, please.
22     A. Okay.
23     Q. Do you recognize State's Exhibit 132?
24     A. Yes.
25     Q. What do you recognize it to be?

1     A. It is our receipt from when you make a purchase.
2     Q. All right. And do you recognize this receipt as being
3 the one that was issued -- or I guess a copy of -- to the
4 Defendant who you just identified?
5     A. Yes.
6     Q. Other than the State's Exhibit sticker that's been put
7 here at the top, is it an exact duplicate or copy?
8     A. Yes. This is my employee number right here; and also,
9 we don't have the machine that lets you print the credit card,
10 so I scratched it with a pencil.
11         MS. HARTMANN: All right. Your Honor, at this
12 time the State would offer State's Exhibit 132.
13         MR. MOORE: No objection.
14         THE COURT: 132 is admitted.
15     (State's Exhibit No. 132 received)
16     Q. Did you, in fact, give State's Exhibit 132 to a
17 Detective McCaskill with the Fort Worth Police Department?
18     A. Yes, I did.
19     Q. And other than what you have just testified to, you
20 have no knowledge of the Defendant either before or after.
21     A. No, I do not.
22         MS. HARTMANN: We pass the witness at this time.
23         MR. MOORE: We don't have any questions.
24         THE COURT: You may step down, ma'am.
25         MS. HARTMANN: May this witness be excused?

1         THE COURT: You may.
2         MS. HARTMANN: Thank you.
3         The State calls Denise Schrader.
4     (Witness Sworn)
5 Whereupon,
6         DENISE SCHRADER,
7 having been first duly sworn, testified as follows:
8         DIRECT EXAMINATION
9 BY MS. HARTMANN:
10     Q. Could you state your name for the jury?
11     A. Denise Schrader.
12     Q. I want to direct your the attention back to the date
13 of April 7 of this year, 2003. Where were you working?
14     A. At Razoo's on Third and Main.
15     Q. Third and Main here in Fort Worth?
16     A. Uh-huh.
17     Q. Is that yes?
18     A. Yes.
19     Q. I just need you to answer out loud because there is a
20 court reporter here, and he can only take down spoken words.
21 Okay?
22     A. Yes.
23     Q. All right. Let me ask you, did you work at Razoo's
24 back on April 7 of this year?
25     A. Yes, I did.

1     Q. Do you recall what hours you worked --
2     A. I have always worked 9:00 to 6:00.
3     Q. Would that be 9:00 a.m. to 6:00 p.m.?
4     A. Yes.
5     Q. Did a man come into the bar area of Razoo's and sit
6 down to place an order?
7     A. Yes.
8     Q. And were you busy at that time or was it slow or what?
9     A. No, it was slow.
10     Q. Did you yourself take an order from this gentleman?
11     A. Yes, I did.
12     Q. Do you recall what this particular gentleman ordered?
13     A. It was a draft beer and something to go.
14     Q. Did this man introduce himself to you?
15     A. Yes, he did.
16     Q. What name did he give you?
17     A. Billy.
18     Q. The name Billy?
19     A. Yes.
20     Q. Did he tell you any information about what his plans
21 were as far as staying in town or leaving or what?
22     A. He was catching a bus out of town.
23     Q. What was his general demeanor when you dealt with
24 him?
25     A. He was calm and collected and just drank his beer.

Page 217

1    Q. Drank his beer?
2    A. Uh-huh.
3    Q. Is that yes?
4    A. Yes.
5    Q. Okay. Do you see anybody here today in the courtroom
6  that you recognize to be the man who came in and placed this
7  order for a cheeseburger and a draft beer?
8    A. Yes.
9    Q. Where is that person located?
10    A. Right there.
11    Q. And you are pointing -- you are pointing in that
12  direction?
13    A. In the pink shirt.
14    Q. Okay. Is this the person that you served --
15    A. I believe so.
16    Q. Does it look like him?
17    A. A little cleaner.
18    Q. Cleaner now?
19    A. Yes.
20    Q. Other than that, is that him?
21    A. Yes.
22        MS. HARTMANN: Your Honor, at this time I would
23  request the record reflect that she has identified the
24  Defendant.
25        MR. RAY: I would like to take her on voir dire.

Page 218

1        THE COURT: You may.
2            VOIR DIRE EXAMINATION
3  BY MR. RAY:
4    Q. Ma'am, it ultimately comes down to this. You have
5  identified the man here to my left. What the prosecutor is
6  asking you and what I want to know is are you absolutely sure
7  that he's the person that you are talking about.
8    A. Pretty sure, yes.
9    Q. Okay. Well, I don't want to mince words with you, but
10  are you absolutely sure or something else? Can you say for
11  certain?
12    A. Yes.
13        MS. HARTMANN: May I approach the witness?
14        THE COURT: Yes.
15        DIRECT EXAMINATION CONTINUED
16    Q. Ms. Schrader, I'm going to show you what's been
17  previously marked for identification purposes as State's Exhibit
18  135 and ask you to take a look at that. Can you identify
19  State's Exhibit 135?
20    A. Yes.
21    Q. How do you recognize it?
22    A. The time and the date and the amount.
23    Q. Is there any identification -- like the employee
24  number, does that appear on this sheet?
25    A. Yes.

Page 219

1    Q. Does your employee number appear?
2    A. No.
3    Q. Okay. Do you recognize the receipt as being -- this
4  receipt as being the one that was generated for the transaction
5  involving the Defendant?
6    A. Yes.
7    Q. Other than the State's Exhibit sticker, 135, is it a
8  fair and accurate copy?
9    A. Yes.
10        MS. HARTMANN: Your Honor, at this time we'd
11  offer State's 135.
12            VOIR DIRE EXAMINATION
13  BY MR. RAY:
14    Q. You are telling us that this receipt that's dated
15  April 7 of this year represents the food that you sold to this
16  man that morning?
17    A. Yes.
18    Q. And you are absolutely sure of that?
19    A. Yes.
20        MR. RAY: No objection.
21        THE COURT: No. 135 is admitted.
22        (State's Exhibit No. 135 received)
23        MS. HARTMANN: May I proceed?
24        THE COURT: You may.
25            DIRECT EXAMINATION CONTINUED

Page 220

1  BY MS. HARTMANN:
2    Q. Is there a name listed for the guest -- I guess the
3  person who is being served?
4    A. Always.
5    Q. What name appears on State's Exhibit 135?
6    A. Billy.
7    Q. All right. And did you turn in State's 135 to a
8  Detective McCaskill with the Fort Worth Police Department?
9    A. Yes.
10        MS. HARTMANN: We'll pass the witness.
11            CROSS-EXAMINATION
12  BY MR. RAY:
13    Q. How long had you been working at Razoo's back in
14  April?
15    A. Two years.
16    Q. Doing the same thing that you were doing then?
17    A. Yes.
18    Q. If a person walks in and gives you a credit card, do
19  y'all look at it when they give it to you?
20    A. No.
21    Q. Okay. So if I walk in with a card that says Mary
22  Wilson on it, you just take the card anyway?
23    A. Usually, yes.
24        MR. RAY: I'll pass the witness.
25        MS. HARTMANN: We don't have anything further.

Page 217 - Page 220

Page 221

1    THE COURT: You may step down, ma'am.
2    MS. HARTMANN: May she be excused?
3    THE COURT: She may.
4    MS. HARTMANN: Thank you.
5    MS. CALLAGHAN: The State would call Rosalee
6 Dailey.
7    (Witness Sworn)
8 Whereupon,
9       ROSALEE DAILEY,
10 having been first duly sworn, testified as follows:
11       DIRECT EXAMINATION
12 BY MS. CALLAGHAN:
13    Q. Could you state your name for the ladies and
14 gentlemen?
15    A. Rosalee Dailey.
16    Q. You can move that microphone back a little bit so you
17 don't have to lean right into it.
18    A. All right.
19    Q. How are you employed?
20    A. At the Elbow Room in Galveston.
21    Q. What is the Elbow Room?
22    A. A bar.
23    Q. Does it have individual bars within that bar?
24    A. Yes.
25    Q. How many are inside?

Page 222

1    A. Three.
2    Q. Do they have separate names or --
3    A. Yes, they do.
4    Q. We have to talk one at a time. So if you will
5 hesitate just a minute after I ask the question and then go
6 ahead and answer.
7    A. Okay.
8    Q. These three individual bars within the Elbow Room,
9 what are they called?
10    A. There's the Elbow Back Bar, Elbow Restaurant and Elbow
11 Club.
12    Q. Okay. How long have you worked there?
13    A. A year, over a year.
14    Q. And what do you do for them?
15    A. I'm a bartender.
16    Q. Were you working at the Elbow Room in April of 2003?
17    A. Yes.
18    Q. Let's go to April 8 of 2003. Were you working at one
19 of those bars on April 8?
20    A. Yes.
21    Q. Which of the bars were you working on that day?
22    A. In the restaurant.
23    Q. Did you see a man that day that caught your attention?
24    A. Yes.
25    Q. Can you give me a general idea for the jury of what he

Page 223

1 looked like?
2    A. About five-foot-nine, about 175 pounds, silver-grayish
3 hair.
4    Q. Okay. Could you tell about what age he was?
5    A. I would say maybe in his 50s, late 50s.
6    Q. Was he black, white, Hispanic, Asian?
7    A. Caucasian, yes.
8    Q. What did you see him doing there in the restaurant?
9    A. He arrived and he asked if he could use a credit card
10 to buy a drink. And we do not accept credit cards, so he asked
11 if anyone would like some cigarettes. He said he was going to
12 take an order for some cigarettes and that he would be back.
13    Q. Okay. After taking orders, did he then leave?
14    A. Yes, he did.
15    Q. Now, the next day, April 9 of 2003, did you also see
16 him in the Elbow Room?
17    A. Yes, in the club.
18    Q. That's a different bar altogether?
19    A. That's a different bar, yes.
20    Q. Could you tell the ladies and gentlemen what he was
21 wearing?
22    A. He was wearing a white t-shirt that said, "Joe's Crab
23 Shack" on it in black letters.
24    Q. Now, do you see the person that you saw in the Elbow
25 Room April 8 of 2003 and April 9 of 2003 in the courtroom here

Page 224

1 today?
2    A. Yes.
3    Q. Can you point to him and describe an article of
4 clothing he's wearing?
5    A. Pink shirt.
6    Q. Could you point to him?
7    A. Right there.
8       MS. CALLAGHAN: May the record reflect that she's
9 identified the Defendant, Billy Jack Crutsinger?
10       THE COURT: It will.
11    Q. Now, on April 8 when you talked to him about the
12 credit card and he was in there taking cigarette orders, did he
13 appear intoxicated to you?
14    A. No.
15    Q. What was his emotional state like?
16    A. It was fine as far as -- he looked fine, no emotional
17 state at all. Happy go lucky and just a regular, you know,
18 patron.
19       MS. CALLAGHAN: Pass the witness.
20       CROSS-EXAMINATION
21 BY MR. MOORE:
22    Q. Ms. Dailey, had you ever seen this person before?
23    A. No, sir.
24    Q. How long had you worked at the Elbow Room as of April
25 8?

## Page 225

1    A. Prior to that, about six months, seven months.

2    Q. Are you from Galveston?

3    A. Yes, sir.

4    Q. And that Elbow Room, it is one building that's just --

5 you can just walk right through a door, and there is another

6 bar, right?

7    A. Yes, sir.

8    Q. Why is it separated into three different

9 establishments?

10    A. I have no idea. That's the way it is. I have no

11 idea.

12    Q. When this person presented the credit card, did you

13 look at it?

14    A. No, he did not show it.

15    Q. He just asked if you took credit cards?

16    A. Yes.

17    Q. I got you.

18        And what time on April 9 did you see him in

19 there?

20    A. It was in the morning time. I would say before 12:00,

21 12:30.

22        MR. MOORE: Thank you, ma'am.

23        Pass the witness.

24        MS. CALLAGHAN: The State has no further

25 questions.

## Page 226

1        Your Honor, this witness has come up to attend

2 from Galveston. May she be released to return to Galveston?

3        THE COURT: She may.

4        MS. HARTMANN: The State calls Lynn White.

5        (Witness Sworn)

6 Whereupon,

7                LYNN WHITE,

8 having been first duly sworn, testified as follows:

9            DIRECT EXAMINATION

10 BY MS. HARTMANN:

11    Q. Would you state your name, please?

12    A. Lynn White.

13    Q. What city do you live in?

14    A. Galveston.

15    Q. And what do you -- how are you employed?

16    A. I work at the Elbow Room. I'm a bartender.

17    Q. The Elbow Room, is that a bar?

18    A. Yes.

19    Q. In Galveston?

20    A. Yes, ma'am.

21    Q. How long have you worked at the Elbow Bar at

22 Galveston?

23    A. I have worked there for about a month.

24    Q. I want to direct your attention back to April 8 and 9

25 of this year.

## Page 227

1    A. Okay.

2    Q. Were you working at the Elbow Room as a bartender

3 then?

4    A. I was working there then, yes.

5    Q. Specifically directing your attention to the day of

6 April 8, were you in the Elbow Room with your ex-husband?

7    A. Yes.

8    Q. And what had you-all just done?

9    A. We had wired money to my son.

10    Q. Where does your son live or where did he live at that

11 time?

12    A. He still does. He lives in Arizona.

13    Q. Does he live in Phoenix?

14    A. Yes.

15    Q. And you had to wire him some money?

16    A. Yes, ma'am.

17    Q. Were there any arrangements for you to check in with

18 him to see if, in fact, he had gotten the money?

19    A. I made arrangements to let him know he could pick up

20 the money because I wasn't for sure how long it would take.

21    Q. How were you going to do that?

22    A. I was going to call him and let him know.

23    Q. And did you have a cell phone?

24    A. No, I did not.

25    Q. Did your ex-husband have a cell phone?

## Page 228

1    A. No, ma'am.

2    Q. Did either one of you have any type of calling card or

3 way to make that long distance phone call to your son in

4 Phoenix, Arizona?

5    A. My ex-husband had a phone card he was going to let me

6 use, but he couldn't find it.

7    Q. While you were at the bar, were you sitting at a table

8 or at the bar itself?

9    A. At the bar.

10    Q. Was there anybody else in the bar in addition to you

11 and your ex-husband?

12    A. Yes, ma'am.

13    Q. Was it a man, woman?

14    A. Man.

15    Q. Was there anybody else sitting next to you-all?

16    A. No, ma'am.

17    Q. How were you-all seated, in what order?

18    A. It was a gentleman as you come -- as you would be

19 leaving the bar, there was a gentleman, there was my husband

20 and there was myself.

21    Q. All right. When you and your husband --

22    A. Ex-husband.

23    Q. I'm sorry?

24    A. I keep doing it too.

25    Q. Were you and your ex-husband discussing how you were

Page 229

1 going to make this call to your son?
2   A. Right. He was searching for the card for me to use
3 because I needed to let him know.
4   Q. Did he ever find it?
5   A. No. He found one, but he wasn't for sure if it had
6 any minutes on it.
7   Q. The gentleman that was sitting next to your husband,
8 did he offer anything to you and your ex-husband?
9   A. Yes, ma'am. He offered to let me use his cell phone.
10   Q. Let me ask you this. Do you know Rosalee Dailey who
11 was just in here?
12   A. Yes, ma'am.
13   Q. Was she there at the bar on April 8, 2003?
14   A. Yes.
15   Q. The same day that this gentleman offered you use of
16 the phone?
17   A. Yes.
18   Q. Did you, in fact, use the cell phone that this man
19 offered?
20   A. Yes, I did.
21   Q. Did you, in fact, make a phone call to your son in
22 Phoenix, Arizona?
23   A. Yes.
24   Q. Is that number 480-430-4144?
25   A. Yes, ma'am.

Page 230

1   Q. How much time passed -- I guess what period -- well,
2 let me ask you this. Did you, in fact, put a completed call to
3 your son and talk to him?
4   A. Yes, I did.
5   Q. On this cell phone?
6   A. Yes.
7   Q. All right. And how much contact or how long a period
8 of time were you around this man who loaned you the phone?
9   A. Ten or 15 minutes, if that. I really didn't talk to
10 him.
11   Q. All right. Do you -- I know it's been since April and
12 it was a short period of time. Do you see anybody in the room
13 that you recognize to be the person who loaned you that phone?
14   A. Yes, ma'am.
15   Q. Where is that person located, and can you tell me
16 something they are wearing?
17   A. That they are wearing? I am a little color blind, so
18 I --
19   Q. Well, tell me what position they are, where they are
20 located in the courtroom?
21   A. Sitting over there.
22   Q. And you are indicating the table to your right and my
23 left?
24   A. Yes.
25   Q. There are three gentlemen sitting at the table.

Page 231

1   A. The one at the end.
2   Q. The far end?
3   A. Far end.
4   Q. Does he have a suit jacket on or not?
5   A. No, he doesn't.
6       MS. HARTMANN: Your Honor, at this time may the
7 record reflect the witness has identified the Defendant?
8       THE COURT: It will.
9       MS. HARTMANN: Thank you. We'll pass the
10 witness.
11       MR. RAY: No questions.
12       THE COURT: You may step down, ma'am.
13       MS. HARTMANN: May this witness be released to
14 return to Galveston?
15       THE COURT: She may.
16       MS. HARTMANN: Thank you.
17       MR. RAY: No objection.
18       MS. HARTMANN: Your Honor, at this time the State
19 would offer State's Exhibit No. 98, business records.
20       MR. RAY: Can I have just a second, Judge?
21       THE COURT: Yes.
22       MR. RAY: Judge, we have a matter we would like
23 to take up outside the presence of the jury just briefly.
24       THE COURT: Can it wait?
25       MR. RAY: It's about this -- it's about State's

Page 232

1 Exhibit 98.
2       THE COURT: We'll take that up at the end of the
3 day.
4       MS. HARTMANN: The State would offer State's
5 Exhibit 100.
6       MR. RAY: No objection to 100.
7       THE COURT: 100 is admitted
8       (State's Exhibit No. 100 received)
9       MS. HARTMANN: May I publish by reading orally
10 parts of State's Exhibit 100 to the jury?
11       THE COURT: You may.
12       MS. HARTMANN: State's Exhibit 100 is a Texas
13 Department of Transportation Vehicle Inquiry Receipt regarding
14 Patricia Lee Syren, 2716 Scott Avenue, Fort Worth, Texas 76103,
15 for a 1996 Cadillac with a plate number VPF81X.
16       MS. HARTMANN: At this time, Your Honor, the
17 State would offer State's Exhibit No. 99, which is also business
18 records.
19       MR. RAY: We have an objection to this we would
20 like to take up outside the presence of the jury.
21       THE COURT: We'll do it at the end of the day.
22       MS. HARTMANN: May we approach briefly, Your
23 Honor?
24       THE COURT: Yes.
25       (Outside the hearing of the jury)

Condenseit™

## Page 233

1 MS. HARTMANN: We have run out of witnesses. The
2 next witness is from the Medical Examiner's office, and his
3 testimony will be pretty lengthy and they are not here at this
4 point. So if we can finish for the day --
5 THE COURT: How many more witnesses?
6 MS. HARTMANN: I would anticipate two.
7 (In the hearing of the jury)
8 THE COURT: Ladies and gentlemen, that is as far
9 as we are going to be able to work today. We going to break
10 until 9:00 o'clock in the morning.
11 Please remember and follow your instructions and
12 meet the bailiffs outside tomorrow morning as usual. Have a
13 good evening.
14 (Jury not present)
15 MR. RAY: Our objection to 98, Judge, which is
16 the Cingular Wireless phone records, is that the Court
17 previously suppressed pursuant to our Motion to Suppress the
18 cellar telephone that was found in the Defendant's bag at the
19 Tonis Bar by Officer Garcia, III. And for those reasons, we
20 believe that the telephone records are not relevant.
21 MS. HARTMANN: May I respond?
22 THE COURT: Yes.
23 MS. HARTMANN: Those are telephone records of
24 Patricia Lee Syren. The last witness testified that she
25 borrowed -- or that the Defendant offered her a cell phone which

## Page 234

1 we know was the victim's cell phone because there's a phone call
2 to Phoenix, Arizona. She confirmed the number, and we have
3 proved up independently of any arrest or seizure of a cell
4 phone -- we are entitled to prove up any other way that he was
5 in possession of her cell phone.
6 We're not going to introduce the cell phone
7 itself or anything that he was caught with at the time of his
8 arrest, but the fact that he was using the cell phone, that he
9 loaned it to someone else in the bar is relevant.
10 THE COURT: Is that the extent of your objection?
11 MR. RAY: Yes, sir.
12 THE COURT: It's overruled.
13 MR. RAY: And in regard to State's Exhibit 99,
14 State's Exhibit No. 99 is a business record from the Galveston
15 jail. The gist of our objection is they are offering this
16 objection (sic) without any sponsoring testimony of the -- not
17 the custodian, which happens to be the same witness. My
18 objection is not a custodial -- or a business records objection
19 because we have that agreement that they can do that.
20 My objection is this contains a confession of the
21 Defendant therein, and I am not in a position to cross-examine
22 this writing without the State bringing this witness to
23 testify. So until such time as the state brings Ms. Cheryl
24 Moffett, it is our position that this violates our right to
25 effectively cross-examine this witness. I have turned it to the

## Page 235

1 part.
2 MS. HARTMANN: Our response is that is Ms.
3 Moffett is not law enforcement. The Court has ruled that the
4 statement is admissible. Defense Counsel uses the word
5 confession. I think basically it is just documenting in the
6 course of her capacity of her duties the statements the
7 Defendant made to her. She's not law enforcement, and they are
8 certainly probative and relevant to the issues here at trial.
9 THE COURT: Well, it is hearsay in this form.
10 The question is can you get by the hearsay objection.
11 MS. HARTMANN: Admission of party opponent,
12 statement against interest.
13 THE COURT: I'll look at it overnight and let
14 y'all know in the morning.
15 MS. HARTMANN: Is State's Exhibit 98, then, the
16 Cingular records, have they been admitted?
17 THE COURT: I have told you I will admit them,
18 but I haven't done so in front of the jury yet.
19 MS. HARTMANN: All right.
20 THE COURT: Anything else?
21 MR. RAY: I think that's it.
22 MS. HARTMANN: That's all from the State.
23 THE COURT: All right. I would like both sides
24 to have with them tomorrow morning any proposed jury charges
25 that they wish to have in the Court's Charge other than the

## Page 236

1 normal and ordinary charges you would expect to find for this
2 type of offense.
3 With regards to 99, there are two hearsay hurdles
4 you have to get by on this document.
5 MS. HARTMANN: All right.
6 THE COURT: The first hearsay objection is
7 statements made to the witness and your party opponent gets you
8 by -- your party-opponent theory gets you by that, but all we
9 have here is a piece of paper. You don't have your witness in
10 court. So that's another hearsay hurdle.
11 MS. HARTMANN: Well, I think under the business
12 records exception and hearsay provisions.
13 THE COURT: But is this a business record?
14 MS. HARTMANN: It is the State's position it is.
15 THE COURT: What is it?
16 MS. HARTMANN: They are records that are kept by
17 the sheriff's office, but it is the medical division.
18 MR. RAY: I think what she testified to was that
19 she was a nurse -- this lady has testified here before.
20 THE COURT: Right.
21 MR. RAY: I think what she testified to was she
22 was a person sent over to a jail to do a medical or
23 psychological evaluation, is my understanding of what was said.
24 THE COURT: Okay.
25 MR. RAY: So while they may get past the business

Page 237

1  records exception, the problem is that she's over there -- and
2  she said this was the first confession, or statement against
3  interest or whatever you want to call it, that she'd ever gotten
4  because her normal deal was to go interview people and see how
5  they were feeling. And this was something that was kind of
6  blurted out, if I remember her testimony correctly.
7          And if they don't call her as a witness, I am not
8  in a position to cross-examine all of those things. That's the
9  problem I have. The fact that they have got a bunch of records
10  from the sheriff's department and stuck labels on them is a
11  different story.
12          THE COURT: That's my question, is it really a
13  business record. Sure, it's kept by the sheriff's department,
14  but witness statements are kept by police departments too. That
15  doesn't make them admissible as business records.
16          MS. HARTMANN: But this is more than just a
17  statement. This is an actual medical record. Those are medical
18  records, and that's different from a witness statement where
19  someone goes into a police department and --
20          THE COURT: Is it in the regular course of
21  business for someone to record that type of information on a
22  medical record?
23          MS. HARTMANN: Yes. She's in there performing
24  her duty, which is to do screening; and in the course of that,
25  he makes these admissions to her.

Page 238

1          THE COURT: I'll look at it overnight.
2          MS. HARTMANN: All right.
3          (Proceedings recessed)

---

Page 239

1  STATE OF TEXAS
2  COUNTY OF TARRANT
3          I, Steve Schiller, Official Court Reporter for the
4  213th District Court of Tarrant County, Texas, do hereby certify
5  that the above and foregoing contains a true and correct
6  transcription of all portions of evidence and other proceedings
7  requested in writing by counsel for the parties to be included
8  in this volume of the Reporter's Record, in the above-styled and
9  numbered cause, all of which occurred in open court or in
10  chambers and were reported by me.
11
12          I further certify that this Reporter's Record of the
13  proceedings truly and correctly reflects the exhibits, if any,
14  admitted by the respective parties.
15
16
17
18
19  WITNESS MY OFFICIAL HAND this the 25th day of April, 2004.
20
21          STEVE SCHILLER, CSR
         Official Court Reporter
22          213th District Court
         401 West Belknap
23          Fort Worth, Texas 76196
         (817) 884-2687
24          State Certification No. 4665
25          Certification Expires: 12-31-05