REPORTER'S RECORD

**ORIGINAL**

VOLUME 20 OF 3̶6̶ VOLUMES

TRIAL COURT CAUSE NO. 0885306

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE 213TH JUDICIAL |
| | ) | |
| VS. | ) | DISTRICT COURT OF |
| | ) | |
| BILLY JACK CRUTSINGER | ) | TARRANT COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOIR DIRE PROCEEDINGS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On 12th day of September, 2003, the voir dire proceedings came on to be heard, in the above-entitled and -numbered cause; and the following proceedings were had before the Honorable David Richards, Judge Presiding, held in Fort Worth, Tarrant County, Texas.

Proceedings reported by computerized stenotype machine; Reporter's Record produced by computer-aided transcription.

SHELLEY S. CURTIS, CSR #4557
Deputy Official Reporter
213th Judicial District Court
CURTIS SHORTHAND REPORTING
200 Menlo Park Drive
Arlington, Texas   76002
(817)467-4556

1                          A P P E A R A N C E S:

2      HONORABLE MICHELE HARTMAN - SBOT NO. 09167800
       -AND-
3      HONORABLE LISA CALLAGHAN - SBOT NO. 01160700
       Assistant District Attorneys
4      Tarrant County Justice Center
       401 West Belknap Street
5      Fort Worth, Texas  76196
       Telephone No. (817) 884-1684
6           ATTORNEYS FOR THE STATE

7      HONORABLE WILLIAM H. RAY - SBOT NO. 16608700
       Attorney at Law
8      5041 Airport Freeway
       Fort Worth, Texas  76117
9      Telephone No. (817) 831-8383
            ATTORNEY FOR THE DEFENDANT
10
       -AND-
11
       HONORABLE TIM MOORE - SBOT NO. 14378300
12     Attorney at Law
       115 West 2nd Street
13     Fort Worth, Texas  76102
       Telephone No. (817) 332-3822
14          ATTORNEY FOR THE DEFENDANT

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CHRONOLOGICAL INDEX

 2               JURY VOIR DIRE PROCEEDINGS

 3    SEPTEMBER 12, 2003                   Page       Vol.

 4    Caption...........................     1         20
      Appearances.......................     2         20
 5    Chronological Index...............     3         20
      Alphabetical Index................     4         20
 6    VENIREPERSON           STATE      DEFENDANT     VOL.
      GREENE, Susan Lynette     12,80     62,82        20
 7    Defendant's Challenge for Cause.....    80        20
      Challenge Denied....................    83        20
 8    Venireperson Greene Accepted........    94        20
      Agreement to Excuse Venireperson
 9    Nos. 96 and 97......................    95        20
      REASONER, Michael Ray       100        --        20
10    Defendant's Challenge for Cause.....   135        20
      Challenge Granted...................   135        20
11    MORETZ, Glenn Robert       141         --        20
      Agreement to Excuse Venireperson Moretz 143       20
12    HITTE, David Michael       149        191         20
      Reporter's Certificate..............   210        20

13
                       EXHIBIT INDEX
14                  (NONE IN THIS VOLUME)

15

16

17

18

19

20

21

22

23

24

25
```

| ALPHABETICAL LIST OF VENIREPERSONS | | | |
|---|---|---|---|
| VENIREPERSON | STATE | DEFENDANT | VOL. |
| GREENE, Susan Lynette | 12,80 | 62,82 | 20 |
| HITTE, David Michael | 149 | 191 | 20 |
| MORETZ, Glenn Robert | 141 | -- | 20 |
| REASONER, Michael Ray | 100 | -- | 20 |

**PROCEEDINGS**

Friday, September 12, 2003

* * * * * * * * * * * * * * * * * *

(Open court, Defendant present.)

MR. RAY: Judge, at this time, we would ask the Court to grant us five additional peremptory challenges. I am not sure at what number -- maybe you can enlighten me -- at what number you took over for Judge Gill. Do you remember?

THE COURT: I don't remember. I believe, you had used nine when I took over, I believe.

MR. RAY: So I think we are all past -- I think all of these errors, other than one of them, or, excuse me, two of them -- six peremptory challenges is what I'm asking for, and I'm not sure when you took over. Anyway, if I could elaborate on that.

First of all, in regards to Juror No. 28, named Reeves, the Court denied our challenge for cause for that particular juror. We had to exercise a peremptory challenge. That's the same complaint that we have about Prospective Juror No. 43, Gordon. We had made a challenge for cause, which was denied, as well as 89, Ms. Weems, our challenge for cause was denied, and we had to use a peremptory challenge on each of those three jurors.

In the next portion, we objected to the state's challenge for cause, which was granted, on Juror No. 88,

CURTIS SHORTHAND REPORTING - 817/467-4556

---

And I would just point out that we're not just asking for these causes just to be asking for them. Juror No. 17, Umpstead; Juror No. 37, Burns; Juror No. 24, Walker; Juror No. 29, Crawford; 59, Martin; 75, Allen; and 74, Harris; and 61, Howard are all jurors that the Court excused, based on the state's challenge for cause, and we didn't object to those jurors that I just listed. They all had -- I forget exactly what their reasons were, but they were all excused after the state had questioned these jurors and we feel like we've been fair and just in our requests for the Court to deny the state's challenges. So for those reasons, we would ask for five additional peremptory challenges.

MS. HARTMAN: May I respond just briefly, Your Honor?

THE COURT: I'm going to deny it, but --

MS. HARTMAN: I was just going to say that it's not timely at this time, since there are remaining strikes available to the defense.

THE COURT: Right. My understanding is we have an agreement that there are three -- you have three peremptory challenges left at this point.

MR. RAY: I believe that's correct, Judge.

THE COURT: Okay.

MR. RAY: In fact, I know that's correct.

THE COURT: I will withhold ruling on your

CURTIS SHORTHAND REPORTING - 817/467-4556

---

6

Ms. Vitek.

And finally -- I only have five. I'm requesting for five. I just read my notes.

And, finally, Juror No. 36, Enlow -- and I know this was Judge Gill's act, Judge Gill excused this juror, prior to any conversation with the state or the defense, excused her based on 35 -- excuse me -- based on 35.03. The juror called, and Judge Gill had a conversation with him. I don't know what the particulars are, but he excused the juror, but it was my position that, at the time, which I voiced it to Judge Gill, that what he said at the time was I'll run out of peremptories, if I remember correctly, but it was my position that she was excused, because she could not be here at her designated time to be interviewed by the Court, not that she couldn't be here during the trial.

And she was excused without any input from us and my position was then and now is that we could have taken her out of order and exercised peremptory challenges at the time that she would have been needed. In other words, we could have brought her in the next morning, because she was excused pretty much before the jury selection process started. She could have come in -- he or she -- I don't know if it was a man or women -- could have come in at a different time, and we could have exercised a peremptory challenge when we got to that point. So that was -- that was my complaint about that.

CURTIS SHORTHAND REPORTING - 817/467-4556

---

8

request until such time as you have exercised those additional peremptories and after I've had a chance to confer with Judge Gill, because I'm, frankly, unfamiliar with some of the earlier --

MR. RAY: I understand.

THE COURT: So I'll -- I'll take it up next week with Judge Gill.

MR. RAY: What day did you begin jury selection? Was it the 25th, Judge, or was it the 2nd? You started on the 2nd, didn't you?

MR. RICHARD: I believe it was the 2nd, Tuesday, yes.

MR. RAY: I'll try to backdate that and see what prospective juror you started on.

MR. RAY: My guess is that it was somewhere in the 50s.

THE COURT: Well, I'll withhold the ruling until later next week or until such time as you've exhausted all of your peremptories.

MR. RAY: Okay. Thank you, Judge.

THE COURT: Are we ready for Ms. --

MS. HARTMAN: Greene.

THE COURT: -- Greene?

MS. HARTMAN: The state is ready.

MR. MOORE: We're ready.

CURTIS SHORTHAND REPORTING - 817/467-4556

09:19:38 1    THE COURT: Okay. Susan Greene.
09:19:38 2    (Venireperson Greene enters the proceedings.)
09:20:00 3    THE COURT: Ms. Greene, right up here, please.
09:20:02 4    Okay. How are you this morning?
09:20:04 5    VENIREPERSON GREENE: Good. How are you?
09:20:06 6    THE COURT: That chair does not move forwards or
09:20:08 7    backwards, but it does swivel, so kind of bend yourself in
09:20:12 8    there.
09:20:12 9    VENIREPERSON GREENE: Okay.
09:20:12 10    THE COURT: You might need to pull that
09:20:14 11    microphone up to you.
09:20:18 12    VENIREPERSON GREENE: Okay. How is that?
09:20:18 13    THE COURT: That's good, yeah.
09:20:22 14    Let me begin, Ms. Greene, by introducing myself.
09:20:24 15    My name is David Richards, and I'm a visiting judge here in
09:20:30 16    Fort Worth. I'm not the elected judge of this court. That
09:20:30 17    would be Judge Bob Gill, and he's going to be presiding over the
09:20:34 18    trial of this case. I'm just helping with the jury selection
09:20:36 19    process.
09:20:38 20    VENIREPERSON GREENE: Okay.
09:20:38 21    THE COURT: Don't be intimidated by the fact
09:20:40 22    that there is someone looking down at you in the witness box and
09:20:44 23    there are lawyers present in the courtroom. This is a very
09:20:48 24    informal procedure that we go through in death penalty cases to
09:20:52 25    pick the jurors for that case.

CURTIS SHORTHAND REPORTING - 817/467-4556

10

09:20:56 1    Normally, in a non-death penalty case, we bring
09:20:58 2    all of the prospective jurors in at one time and talk to them as
09:21:04 3    a group, but because of the serious nature of the potential
09:21:08 4    punishment in this type of case, we bring the prospective jurors
09:21:10 5    in one at a time and talk to them.
09:21:12 6    What's going to happen this morning is the DA's
09:21:16 7    office is going to have a chance to talk to you and tell you a
09:21:20 8    little bit about the law that would apply in a capital murder
09:21:22 9    case and find out whether you would make a fair and impartial
09:21:26 10    juror and be able to comply with that law. Then the defense
09:21:30 11    will have a similar opportunity to be talking to you.
09:21:34 12    A couple of ground rules. You may have noticed
09:21:34 13    that the court reporter is taking down everything that I say.
09:21:38 14    She is going to need to also take down everything that you say
09:21:42 15    and that the attorneys say. So try to make all of your answers
09:21:46 16    audible. Try to avoid the shaking of the head and nodding of
09:21:50 17    the head, yes or no and, also, try to avoid the uh-huhs and
09:21:58 18    huh-uh answers, because that's very difficult to read, even if
09:22:04 19    she's able to take it down correctly.
09:22:04 20    VENIREPERSON GREENE: Okay.
09:22:06 21    THE COURT: In addition, try to avoid talking
09:22:10 22    over the attorneys' questions. In normal conversation, you know
09:22:14 23    what it is you're being asked. Sometimes, if you're like me,
09:22:20 24    you'll go ahead and give an answer before the question is out.
09:22:22 25    Try to avoid that. Put a little bit of a pause between their

CURTIS SHORTHAND REPORTING - 817/467-4556

09:22:26 1    question and your answer, and that will be easier for the court
09:22:30 2    reporter, because she can't take down two people talking at the
09:22:34 3    same time. Okay?
09:22:34 4    VENIREPERSON GREENE: (Nods.)
09:22:36 5    THE COURT: Let me begin by introducing the
09:22:38 6    attorneys that you'll be hearing from this morning. These will
09:22:42 7    be the same attorneys at the trial of the case.
09:22:44 8    Tim Curry is the elected District Attorney for
09:22:48 9    Tarrant County. He's not present here. That's more of an
09:22:50 10    administrative-type position. He's normally represented in the
09:22:54 11    courtroom by an assistant district attorney, and today we have
09:22:58 12    two of his assistants, Ms. Michele Hartman --
09:23:00 13    MS. HARTMAN: Good morning.
09:23:02 14    THE COURT: -- and Ms. Lisa Callaghan.
09:23:04 15    MS. CALLAGHAN: Good morning.
09:23:04 16    THE COURT: And they are going to be the
09:23:06 17    prosecutors in this case.
09:23:08 18    The defense attorneys are two Fort Worth area
09:23:10 19    attorneys, Mr. Tim Moore --
09:23:12 20    MR. MOORE: Good morning.
09:23:12 21    VENIREPERSON GREENE: Good morning.
09:23:14 22    THE COURT: -- and Mr. Bill Ray.
09:23:14 23    MR. RAY: Hi, Ms. Greene. How are you?
09:23:14 24    VENIREPERSON GREENE: Good morning.
09:23:18 25    THE COURT: And the defendant in this case is

CURTIS SHORTHAND REPORTING - 817/467-4556

12

09:23:18 1    Mr. Billy Jack Crutsinger. And, again, this is a case in which
09:23:26 2    the state is seeking the death penalty. They're going to talk
09:23:30 3    to you about the law. Your only obligation really is to give
09:23:36 4    honest and fair answers to their -- to their questions. It's
09:23:40 5    not a test. There is no right or wrong answer, so just be
09:23:44 6    honest with the attorneys.
09:23:46 7    This procedure is part of a trial that's called
09:23:48 8    voir dire, which is the Texas pronunciation of the French term,
09:23:54 9    which means to speak the truth, and they are interviewing all of
09:23:58 10    the prospective jurors who were in that room with you initially,
09:24:02 11    so this is a very lengthy process. So it also gives you an
09:24:08 12    opportunity, if you have any questions about what's going on
09:24:10 13    here, to ask them about that and get your questions answered.
09:24:14 14    Okay?
09:24:14 15    VENIREPERSON GREENE: (Nods.)
09:24:16 16    THE COURT: There is an oath that I need to give
09:24:18 17    you that's required of all perspective jurors, so if you would,
09:24:22 18    raise your right hand.
19    SUSAN LYNETTE GREENE,
20    having been duly sworn to make true answers to such questions as
21    may be propounded by the Court or under its direction, touching
22    upon her service and qualification as a juror, gave answers as
23    follows:
09:24:32 24    THE COURT: Okay. Very good. With that, I will
09:24:34 25    turn it over to the DA's office.

CURTIS SHORTHAND REPORTING - 817/467-4556

13

09:24:36 1    MS. CALLAGHAN: Thank you, Your Honor.
09:24:36 2          VOIR DIRE EXAMINATION
09:24:38 3 BY MS. CALLAGHAN:
09:24:38 4    Q.   Ms. Greene, how are you doing this morning?
09:24:40 5    A.   Good.
09:24:40 6    Q.   As the Judge told you, my name is Lisa Callaghan and
09:24:42 7 together with Michele Hartman, we represent the State of Texas,
09:24:46 8 and what we're here doing today is we're selecting a capital
09:24:50 9 murder jury in a case in which the state is seeking the death
09:24:52 10 penalty. Okay?
09:24:54 11    Now, what we're going to be doing this morning
09:24:56 12 is we're going to be -- I'm going to put up some stuff here
09:25:00 13 relating to the law of capital murder, and we're going to be
09:25:02 14 talking about that law to make sure, first of all, that if you
09:25:06 15 are a juror, you understand that law and you're comfortable with
09:25:08 16 it. Okay? It's not like a high school test. You would still
09:25:12 17 get a charge with all of the law in it. You don't have to
09:25:14 18 memorize it, but just to make sure you understand it and that
09:25:18 19 you're comfortable with it at such time. Okay? And we're going
09:25:22 20 to find out if you agree with the law and if not, if you
09:25:24 21 disagree with it, would that prevent you from being able to
09:25:28 22 follow the law. Okay?
09:25:28 23    A.   Okay.
09:25:30 24    Q.   We're also going to find out if you've had any
09:25:30 25 personal experiences or personal feelings that might impact you
CURTIS SHORTHAND REPORTING - 817/467-4556

14

09:25:32 1 in being a fair and impartial juror in this case. Okay?
09:25:36 2    A.   Okay.
09:25:38 3    Q.   So it's very important, two things; make sure before
09:25:40 4 you leave here that you understand all of this law, okay,
09:25:42 5 because you won't have a chance to talk to us about it; and the
09:25:46 6 second thing is, even -- if something is bugging you or you
09:25:50 7 think it might affect you, even if I don't ask, be sure and
09:25:52 8 volunteer it. Let us know, and we'll talk about it. Okay?
09:25:56 9    A.   Okay.
09:25:58 10    Q.   Let's talk a little bit about timing. We anticipate
09:26:00 11 this case will go to trial the week of September 22nd, and it
09:26:04 12 could take anywhere from five days to two weeks to try. Is
09:26:08 13 there anything about that time period that would be a problem
09:26:10 14 for you?
09:26:12 15    A.   Not that I'm aware of at this time.
09:26:14 16    Q.   Okay. Could you pull the microphone a little closer
09:26:18 17 to your mouth? Your voice is a little soft.
09:26:22 18    THE COURT: The chair won't move. It's stuck to
09:26:26 19 the floor.
09:26:20 20    VENIREPERSON GREENE: Is that better?
09:26:26 21    Q.   (By Ms. Callaghan) That's much better. I've got
09:26:22 22 some upper respiratory mess this morning. If my voice gets too
09:26:32 23 low, let me know, and I'll try to raise it. Okay?
09:26:34 24    The second thing is some portion of the trial,
09:26:36 25 the jury might be sequestered, meaning that you would have to
CURTIS SHORTHAND REPORTING - 817/467-4556

15

09:26:38 1 stay in a hotel and not communicate much with the outside world.
09:26:44 2 Usually, that's during deliberations, not when the evidence is
09:26:46 3 coming in. Okay. Do you feel like that would be a problem for
09:26:50 4 you?
09:26:50 5    A.   I have four children at home, but they're all
09:26:52 6 teenagers. I have one in second grade but, you know, I could
09:26:56 7 probably make arrangements.
09:26:56 8    Q.   Okay. You're married?
09:26:58 9    A.   Uh-huh, I am.
09:27:00 10    Q.   If you would have to be on jury service and have to
09:27:02 11 be deliberated -- or sequestered during deliberations, would
09:27:06 12 your seven-year-old be unsupervised or improperly supervised
09:27:10 13 during that period of time, or would you be able to make
09:27:14 14 arrangements for the child's proper supervision?
09:27:18 15    A.   I could make arrangements.
09:27:18 16    Q.   You feel like you could?
09:27:20 17    A.   Yes.
09:27:20 18    Q.   All right. The order of trial, basically, is like
09:27:22 19 this -- have you been a juror before?
09:27:28 20    A.   No.
09:27:28 21    Q.   No, you haven't. Okay. Well, this is the way it
09:27:30 22 goes, then. The trial process is separated, basically, into two
09:27:36 23 mini-trials. Okay?
09:27:40 24    The first mini-trial, the first section, has to
09:27:40 25 do with guilt or innocence, and in that section of the trial,
CURTIS SHORTHAND REPORTING - 817/467-4556

16

09:27:44 1 all you hear is evidence relating to whether the person
09:27:46 2 committed the crime or not. Okay?
09:27:48 3    A.   Okay.
09:27:50 4    Q.   There is argument, opening statement, evidence comes
09:27:52 5 in, closing argument and the jury deliberates on that portion.
09:27:56 6 If you find him not guilty, of course, that's it; but if they
09:28:00 7 find him guilty, then the exact same procedure is followed the
09:28:04 8 second time in the punishment phase. Okay?
09:28:06 9    A.   Okay.
09:28:08 10    Q.   In that phase of the trial, you get to hear evidence
09:28:10 11 of the person's background or history, their character, whether
09:28:14 12 or not they've had a previous criminal history, that sort of
09:28:18 13 thing. It's like the first part is a snapshot of one period of
09:28:22 14 time, but the second part is the whole photo album, so you can
09:28:26 15 place that crime in the context of their whole life. Does that
09:28:30 16 make sense to you?
09:28:30 17    A.   Yes.
09:28:30 18    Q.   Okay. All right. The state goes first in
09:28:32 19 everything. We go first in argument, first in evidence, because
09:28:36 20 we have the burden of proof. We must prove that the defendant
09:28:40 21 is guilty beyond a reasonable doubt.
09:28:42 22    The defendant has a presumption of innocence.
09:28:46 23 He is cloaked in that presumption. It doesn't mean he is
09:28:50 24 factually innocent. It means he is presumed to be so, unless
09:28:52 25 and until the state can meet its burden of proving the case
CURTIS SHORTHAND REPORTING - 817/467-4556

19

**Page 17**

09:28:58 1 beyond a reasonable doubt and, at that point, and only at that
09:29:00 2 point can you find him guilty. Okay? Does that make sense to
09:29:02 3 you?
09:29:02 4    A.   Yes.
09:29:02 5    Q.   Okay. Now, there is no set definition of beyond a
09:29:06 6 reasonable doubt, but what we know about it is that it does not
09:29:10 7 mean beyond any doubt, all doubt or 100 percent doubt. Does
09:29:10 8 that make sense to you?
09:29:18 9    A.   Could you say that again?
09:29:22 10   Q.   Okay. All right. What we know about beyond a
09:29:24 11 reasonable doubt is that it's not the same thing, that it's not
09:29:28 12 the state's burden to prove something beyond any doubt, all
09:29:32 13 doubt, 100 percent doubt.
09:29:34 14   A.   Okay. I understand.
09:29:34 15   Q.   In order to know something 100 percent, how would you
09:29:38 16 have to know?
09:29:42 17   A.   I guess by the evidence or what's in front of me to
09:29:46 18 see, you know --
09:29:46 19   Q.   Okay. You don't think to know something beyond any
09:29:50 20 doubt at all, you would have to see it yourself, because when
09:29:54 21 you're taking in evidence, you're basically taking in what other
09:30:00 22 people tell you, people who generally do not know? Do you see
09:30:00 23 what I mean?
09:30:02 24   A.   Yes, I do.
09:30:02 25   Q.   Does that make sense to you?

CURTIS SHORTHAND REPORTING - 817/467-4556

18

09:30:04 1    A.   Yes, I do.
09:30:04 2    Q.   Okay. You see the distinction?
09:30:06 3    A.   Yes.
09:30:06 4    Q.   Okay. Beyond a reasonable doubt to you is what you
09:30:06 5 define it as. Okay. There is no set definition, but what it is
09:30:12 6 not is all the way to 100 percent, beyond any doubt or all
09:30:16 7 doubt. Okay. Does that make sense to you?
09:30:18 8    A.   Yes.
09:30:18 9    Q.   Okay. Do you think that you could follow that burden
09:30:20 10 and require the state to prove its case to you beyond a
09:30:24 11 reasonable doubt?
09:30:26 12   A.   Yes.
09:30:26 13   Q.   Okay. Do you think you would require that the state
09:30:28 14 prove the case to you to 100 percent beyond any doubt or all
09:30:34 15 doubt?
09:30:38 16   A.   I would like for it to be that, but I -- you know,
09:30:44 17 I'm not sure, I guess.
09:30:46 18   Q.   Okay. What?
09:30:48 19   A.   Yes. I guess, I -- I don't have a -- I would have to
09:30:52 20 see, you know.
09:30:52 21   Q.   Okay. Here is -- let me go through that one more
09:30:56 22 time. Okay?
09:31:00 23        Do you think it would be possible for me to
09:31:02 24 prove anything in the world to you to 100 percent?
09:31:06 25   A.   No.

CURTIS SHORTHAND REPORTING - 817/467-4556

20

09:31:06 1    Q.   Okay. Would you require, though, even though you
09:31:10 2 know that's not the state's burden, that I prove it to you to
09:31:12 3 100 percent in order for you to believe it?
09:31:18 4    A.   No.
09:31:20 5    Q.   Does that make sense to you?
09:31:22 6    A.   Yes.
09:31:22 7    Q.   Okay. Do you understand what I'm talking about?
09:31:24 8    A.   Yes.
09:31:24 9    Q.   Okay. Because it's not fair to place on the state an
09:31:30 10 impossible burden. Do you see what I mean?
09:31:30 11   A.   Yes.
09:31:32 12   Q.   Beyond a reasonable doubt means a doubt that is based
09:31:32 13 on reason and on the evidence in the case. Some people might
09:31:36 14 say -- and I'm not making fun, just by way of example -- you
09:31:44 15 know, it's always possible that aliens from another planet were
09:31:48 16 x-raying messages into that person's mind and making them act
09:31:48 17 the way they were, you know. It's possible that person has the
09:31:52 18 same problem as my cousin, Joe, and he's mentally ill, you know.
09:31:54 19 It's possible -- do you see what I mean?
09:31:56 20   A.   Yes.
09:31:58 21   Q.   That's got nothing to do with the evidence. Is it a
09:32:04 22 doubt based on the evidence which you heard? Does that make
09:32:04 23 sense to you?
09:32:04 24   A.   Yes.
09:32:04 25   Q.   Is that a problem for you?

CURTIS SHORTHAND REPORTING - 817/467-4556

09:32:06 1    A.   No.
09:32:06 2    Q.   Okay. All right. Do you feel like you understand
09:32:08 3 that?
09:32:08 4    A.   Yes.
09:32:08 5    Q.   Okay. All right. Now, did you get a witness list
09:32:14 6 outside?
09:32:16 7    A.   I did.
09:32:16 8    Q.   You did. Did you know anyone on that list?
09:32:18 9    A.   No.
09:32:18 10   Q.   Okay. All right. Let's talk a little bit about the
09:32:18 11 elements of capital murder. I don't know if you know this or
09:32:22 12 not -- most people not involved with the legal system usually
09:32:24 13 don't -- but murder is actually a different offense than capital
09:32:28 14 murder. They are two completely different offenses really,
09:32:42 15 because most people basically know what murder is, but they
09:32:46 16 don't necessarily know that a capital murder is a regular
09:32:50 17 murder, plus an aggravating or special circumstance. Of the --
09:32:54 18 of the whole body of murders that occur in Tarrant County in any
09:32:58 19 given year, only a very small percentage are capital, because it
09:33:04 20 requires that aggravating or special circumstance. Okay?
09:33:06 21   A.   Yes.
09:33:06 22   Q.   Does that make sense to you?
09:33:06 23   A.   Yes.
09:33:06 24   Q.   Okay. Now, here are the elements of a regular
09:33:06 25 murder. This isn't capital. This is just a regular murder

CURTIS SHORTHAND REPORTING - 817/467-4556

21

09:33:20 1　statute. Okay? A defendant in Tarrant County, Texas, on or
09:33:22 2　about a certain date, intentionally caused the death of an
09:33:24 3　individual by -- fill in the blank -- shooting them, stabbing
09:33:28 4　them, drowning them, whatever you did to cause their death.
09:33:32 5　Okay? That's a regular murder, for lack of a better term. I
09:33:38 6　don't mean to say it's not important or not significant, but to
09:33:42 7　distinguish it from capital murder. Okay?
09:33:46 8　　　　So what makes a murder capital? Well, this
09:33:50 9　isn't the whole list of how a capital murder can be committed,
09:33:54 10　but it's a part of it to give you an idea basically of what
09:33:56 11　we're talking about. Okay? Intentionally killing a child under
09:34:00 12　six years of age is a capital murder. Intentionally killing a
09:34:02 13　police officer or fireman in the line of duty is a capital
09:34:06 14　murder.
09:34:08 15　　　　Do you remember reading about the Texas Seven
09:34:10 16　when they escaped from the penitentiary and murdered that police
09:34:16 17　officer when they were robbing the Oshman's?
09:34:18 18　　　A. Yes.
09:34:18 19　　　Q. That's an example of a capital murder case, because
09:34:20 20　he was in the line of duty and trying to do his duty and stop
09:34:24 21　them from robbing the Oshman's when they committed the offense.
09:34:28 22　Okay? Intentionally killing during the course of aggravated
09:34:32 23　robbery, kidnapping or sexual assault. An example of this might
09:34:34 24　be a convenience store robbery where someone murdered the clerk
09:34:38 25　during the course of robbery. Okay? That's an example of that.
　　　　　CURTIS SHORTHAND REPORTING - 817/467-4556

22

09:34:40 1　Intentionally killing more than one person in the same criminal
09:34:44 2　transaction. That's the one we're going to focus on here.
09:34:46 3　Okay?
09:34:48 4　　　　What we mean is a person intentionally killed
09:34:50 5　one person, and by intent, we mean it was their conscious
09:34:54 6　objective or desire to cause the result. They meant to do it,
09:34:58 7　no self-defense, no accident, nothing like that. They meant to
09:35:04 8　do it. Okay?
09:35:06 9　　　A. Okay.
09:35:06 10　　　Q. Intentional -- intentionally killed one person and in
09:35:10 11　the same course of the same criminal transaction, they killed a
09:35:14 12　second person. Okay?
09:35:16 13　　　A. Okay.
09:35:16 14　　　Q. Okay. So let's go on to the elements of capital
09:35:22 15　murder. Okay? There we go. So as you can see, it's kind of a
09:35:26 16　combination of the two.
09:35:36 17　　　　Defendant, Tarrant County, Texas, on or about a
09:35:38 18　certain date, intentionally caused the death of more than one
09:35:30 19　person in the same criminal transaction by, boom, fill in the
09:35:34 20　blank. Okay?
09:35:36 21　　　　Now, let me explain this. In each criminal
09:35:42 22　case, we have a piece of paper, not this one, but just a piece
09:35:48 23　of paper, okay, in which these charges against a person are
09:35:52 24　spelled out, the victim's name, how they were killed,
09:35:56 25　everything. This is called an indictment, and we spell it out
　　　　　CURTIS SHORTHAND REPORTING - 817/467-4556

23

09:35:58 1　like that so that both sides, the state and the defense, will
09:36:02 2　have notice of what it is the state is required to prove beyond
09:36:08 3　a reasonable doubt in order to convict the person. Okay?
09:36:12 4　　　A. Okay.
09:36:12 5　　　Q. And that piece of paper, that indictment, is returned
09:36:16 6　by a Grand Jury on a certain day. When they true bill it and
09:36:20 7　they say, Okay, we can go on to the trial courts to be tried,
09:36:24 8　they return it that day. In order to prove -- do you see where
09:36:28 9　it says, On or about a certain date? That indictment will have
09:36:32 10　a certain date, okay, on it; on or about X date, 2003, in
09:36:36 11　Tarrant County, Texas, this person did this. Okay?
09:36:40 12　　　A. Okay.
09:36:42 13　　　Q. We're not required to prove any particular date.
09:36:44 14　We're not even required to prove the date that's in the
09:36:48 15　indictment. All we have to prove is that the offense occurred
09:36:52 16　before the date that that Grand Jury returned that indictment
09:36:54 17　and within the statute of limitation. Okay?
09:36:58 18　　　A. Okay.
09:36:58 19　　　Q. A statute of limitations is a set number of years
09:37:04 20　after which a crime is committed that we have to prosecute or
09:37:06 21　we're out. Okay?
09:37:06 22　　　A. Okay.
09:37:06 23　　　Q. There is no statute for murder, though. It's -- it's
09:37:08 24　really the only offense in the Code that doesn't have a statute
09:37:12 25　of limitation. Okay? So all we have to prove in a murder case
　　　　　CURTIS SHORTHAND REPORTING - 817/467-4556

24

09:37:14 1　is that it occurred before the date of the return of the
09:37:16 2　indictment.
09:37:18 3　　　　So if an indictment was returned today,
09:37:20 4　September 12th, 2003, any day before that is fine, as long as
09:37:26 5　it's physically possible, if you see what I mean.
09:37:30 6　　　A. Yes.
09:37:30 7　　　Q. You know, if the defendant hadn't been born yet, that
09:37:34 8　might be a problem, but you see what I mean?
09:37:34 9　　　A. Yes.
09:37:34 10　　　Q. As long as it's possible it occurred on that date,
09:37:36 11　you don't have to pick any particular date. Does that make
09:37:40 12　sense to you?
09:37:40 13　　　A. Yes.
09:37:40 14　　　Q. Okay. I told you about intentionally. Okay? Their
09:37:44 15　conscious objective or desire to cause the result. They meant
09:37:46 16　to do it. Suppose I come up to you and do this(gestures). What
09:37:52 17　does that mean?
09:37:52 18　　　A. It's a handshake.
09:37:54 19　　　Q. Suppose I sit here and go back like this(gestures).
09:37:56 20　What does that mean?
09:37:56 21　　　A. You raise your hand to ask a question.
09:38:02 22　　　Q. Okay. Would you agree that sometimes you can tell a
09:38:02 23　person's intent by what they do, even though they don't say it?
09:38:06 24　　　A. Yes.
09:38:06 25　　　Q. Does that make sense to you?
　　　　　CURTIS SHORTHAND REPORTING - 817/467-4556

27

09:38:06 1    A.   Yes.

09:38:08 2    Q.   All right.  Now, do you watch the law shows?

09:38:10 3    A.   All the time.

09:38:12 4    Q.   All right.  Then -- okay.  We've got a good one here.
You know what I'm talking about, then, when I say that -- you
know on all the law shows, they talk about premeditated murder?

09:38:22 7    A.   Right, yes.

09:38:22 8    Q.   Okay.  And by premeditation, what I'm talking about
is something that you planned out or had forethought about in
advance..

09:38:28 11   A.   Yes.

09:38:32 12   Q.   Okay.  It may be 15 minutes in advance, it may be
three hours in advance, it may be three days or three years in
advance, but it means in advance of the crime.  Does that make
sense to you?

09:38:40 16   A.   Yes.

09:38:40 17   Q.   Okay.  You'll notice premeditation is not on that
list, neither is motive.  That's because these are the elements
of the crime that we have to prove beyond a reasonable doubt.
Okay?  We have to prove these elements to you, but we don't have
to prove anything else.  We don't have to prove premeditation.
That's not required of us.

09:39:08 23         We have to prove intent, that they intentionally
did it, but intent, in certain circumstances, can arise like
that(snaps fingers).  Okay?

CURTIS SHORTHAND REPORTING - 817/467-4556

26

09:39:18 1          Suppose you and I are driving down the road in
our separate cars and a road-rage case happens.  Somebody gets
mad at the other person or I get mad at you because of something
you did on the road and I have a gun in the car and I pull it
out and, boom, kill you.  Okay?  Can you see where in certain
circumstances intent can arise very quickly and be acted on just
as quickly?

09:39:38 8    A.   Yes.

09:39:40 9    Q.   Okay.  The law requires that we prove intent, but it
doesn't require that we prove preplanning or forethought.  Okay?
Now, that's not to say that you can't hear evidence of
premeditation.  You may hear it and be able to use it in
deciding, well, yes, the element was -- the intentional element
is satisfied, because this person planned it out in advance.
Okay.  Do you see what I mean?

09:40:04 16   A.   Yes.

09:40:04 17   Q.   Or you might be able to consider it in the punishment
phase because, to you, it might make the crime worse or it might
make the crime not as bad depending on how you see it.  Do you
see what I mean?

09:40:12 21   A.   Yes.

09:40:12 22   Q.   Okay.  But the state is not required to prove it as
an element.  Can you follow that law?

09:40:18 24   A.   Yes.

09:40:18 25   Q.   Okay.  You'll notice motive, no requirement that we

CURTIS SHORTHAND REPORTING - 817/467-4556

09:40:22 1  prove the person's motive in doing what they did.  Do you think
we always know why a person commits a criminal act?

09:40:30 3    A.   No.

09:40:30 4    Q.   Okay.  An example, many years ago, probably before
your -- yeah, before you were even born, do you remember there
was a man got gown at UT got in the UT tower and shot a bunch of
people, Charles Whitman?  Do you think we ever really will know
why he did that?

09:40:46 9    A.   No.

09:40:46 10   Q.   That's why the state has no burden of proving motive.
It just isn't always possible to prove why a person did that, as
long as you can prove that they intentionally did it.  Does that
make sense to you?

09:40:56 14   A.   Yes.

09:40:56 15   Q.   Okay.  All right.  Now, I think we've pretty much
gone over the law that relates to capital murder.  Is there
anything that you need to ask about or that you're unsure of?

09:41:06 18   A.   No.

09:41:08 19   Q.   Okay.  Everything seems fairly clear to you?

09:41:10 20   A.   Yes.

09:41:10 21   Q.   Okay.  Very good.

09:41:10 22         Now, if you find someone not guilty of capital
murder, that, of course, is the end of it.  They go home.

09:41:20 24         If you find someone guilty of capital murder,
though, that's when you proceed to the punishment phase.  That's

CURTIS SHORTHAND REPORTING - 817/467-4556

28

09:41:24 1  your second trial, where everything starts all over again.
Okay?

09:41:30 3          Let's talk a little bit about the possible
punishments in a capital murder case.  Okay?  Capital murder is
different than regular offenses in this state for a number of
reasons, but one reason it's different is because there is only
two possible punishments, life or death.  Okay?  There is no
range, no possibilities in the middle like most offenses.
There is just life or death.  Okay?

09:42:00 10         By death, what we're talking about is lethal
injection.  Okay?  By life, what we're talking about is that the
person must serve 40 calendar years, day for day, no good time,
no getting out, and at the end of 40 years, then they are
eligible for parole.  Okay?

09:42:16 15   A.   Yes.

09:42:16 16   Q.   The Board of Pardons and Paroles, at that time, can
look at them and they may decide yes and they may decide no, but
at that point, they can at least be looked at.  Okay?

09:42:30 19   A.   Okay.

09:42:30 20   Q.   Does that make sense to you?

09:42:32 21   A.   Yes.

09:42:32 22   Q.   Okay.  So those are the choices.  Here is how you go
about it:  In the punishment phase, after all of the evidence
comes in and both sides -- if the defense desires to put on any
evidence -- they don't have to, they have no burden, but after

CURTIS SHORTHAND REPORTING - 817/467-4556

29

1  all of the evidence has come in and closing arguments are
2  finished and all of the evidence part is done, then the judge
3  gives you a document, some papers that are called the court's
4  charge, and those documents have in them all of the law that you
5  will need to govern your deliberations and their background.
6  Okay? And in those pieces of paper are two questions. They're
7  called special issues. Okay? And if you answer those questions
8  one way, the judge has to impose a life sentence; if you answer
9  those questions another way, the judge has to impose the death
10  sentence. Okay?
11      A.   Okay.
12      Q.   He doesn't have any leeway in that or personal
13  choice. He has to do it based on the jury's decision. Okay?
14      A.   Okay.
15      Q.   So I'm going to present to you the questions in the
16  same order they would be presented to you in the jury room.
17  Okay?
18      A.   Okay.
19      Q.   And I want you -- this first one, go ahead and read
20  it to yourself, and then we'll talk about it.
21      A.   Okay.
22      Q.   Does that make sense?
23      A.   Yes.
24      Q.   Okay. What does that mean to you?
25      A.   That if they were to be released, would they harm

CURTIS SHORTHAND REPORTING - 817/467-4556

30

1  others again or would they commit the same acts of crime. I
2  mean, would they be a threat.
3      Q.   Would they be a continuing threat to society?
4      A.   Right.
5      Q.   Okay. All right. Well, let's talk about some of the
6  underlying terms in there.
7      A.   Okay.
8      Q.   Do you find beyond a reasonable doubt, you'll notice
9  that the state has the same burden of proof in this question as
10  they did back in guilt/innocence. We must prove that to you
11  beyond a reasonable doubt, okay, that there is a probability.
12  Probability is not directly defined for you. What we know about
13  it is that it's more than a possibility, but less than a
14  certainty. Okay?
15          Have you ever flown on an airplane before?
16      A.   Yes.
17      Q.   Okay. Did you consider it a possibility when you got
18  on that airplane that it would crash?
19      A.   Yes.
20      Q.   Did you consider it a certainty when you got on that
21  airplane it would crash?
22      A.   No.
23      Q.   Are you kind of a nervous flyer?
24      A.   Yeah.
25      Q.   Me, too.

CURTIS SHORTHAND REPORTING - 817/467-4556

31

1      A.   Very much so.
2      Q.   All right. So probability is somewhere in between
3  those two. Okay? Where in there it is is up to you. That the
4  defendant would commit criminal acts of violence. The law
5  contemplates that a criminal act of violence can be anything
6  from a property crime like arson, if you find setting, you know,
7  on fire things to be violent, all the way up to capital murder
8  and anything in between, simple assault, aggravated assault,
9  robbery, aggravated robbery, kidnapping, injury to a child,
10  injury to the elderly, whatever, sexual assault, aggravated
11  sexual assault. It's up to you which of those or any of those
12  that you find to be a criminal act of violence. Okay?
13          That would constitute a continuing threat to
14  society, now, the law contemplates that you may define society
15  any way you like. Okay? You could consider it the people in
16  this room, Tarrant County, the State of Texas. You could even
17  consider it to be people in the penitentiary, where a person
18  might be likely to serve time, including other prisoners,
19  guards, administrative personnel, like secretaries, people who
20  are medical personnel, food handlers, psychiatric or
21  psychological workers, the clergy or people who go in to give
22  religious instruction to prisoners. Do you see what I mean?
23  Anyone who keeps the penitentiary running.
24      A.   Yes.
25      Q.   Does that make sense to you?

CURTIS SHORTHAND REPORTING - 817/467-4556

32

1      A.   Yes.
2      Q.   Okay. So you could include them as part of society,
3  as well.
4          If you answer this question yes, then you go on
5  to the second question, because that brings you one step closer
6  to the death sentence. Okay?
7          So in order to answer this question yes, all 12
8  of you on the jury must agree, it must be unanimous. Okay?
9  However, if you answer this question no, then the judge must
10  impose a life sentence, and that's the end of it. Okay?
11      A.   Okay.
12      Q.   In order to answer the question no, only 10 of you
13  must agree, but you must agree. Okay?
14      A.   Okay.
15      Q.   Is all that pretty clear to you?
16      A.   Yes.
17      Q.   Okay. Well, then let me go back -- oh, wait a
18  minute. There is one thing I want to tell you.
19          In deliberating on the issue, with regard to
20  this special issue, the judge would give you a charge that
21  basically goes as follows. Okay? All right. In deliberating
22  on the issue, the jury shall consider all evidence admitted at
23  the guilt or innocence stage and the punishment stage, including
24  evidence of the defendant's background or character or the
25  circumstances of the offense that militate for or mitigate

CURTIS SHORTHAND REPORTING - 817/467-4556

35

against the imposition of the death penalty. Okay?

A. Okay.

Q. So what it's asking you do to do, basically, is to consider everything that comes in as evidence in deliberating on this special issue, not just from the first part, from the crime itself, but also in the second part. Okay?

A. Okay.

Q. And to illustrate my point, let me give you an example. Okay? This has nothing to do with the facts of this case. We can't talk about the facts of this case. It's just an example. Okay?

A. Okay.

Q. Suppose you had an individual who, when he was a child, was sexually abused by two of his uncles. Okay? And he grew up and got out of that and went on with his life and his family and his job and everything else, but years later, as an adult, he kept thinking about what his uncles had done to him and it was very difficult for him to get beyond and, finally, he couldn't get beyond it and he drove back hundreds of miles to his uncles' house with a shotgun and they were both there and he blew them away. Okay?

A. Okay.

Q. That, of course, meets the definition of capital murder, because he killed two individuals in the same transaction at the same time. Okay. Make sense to you?

34

A. Yes.

Q. Okay. Now, in looking at the future dangerousness issue, one individual juror might look at that set of circumstances and say, You know what, I find that to be a singular enough circumstance that I don't think that person would be a future danger to society. Do you see what I mean?

A. Yes.

Q. Okay. On the other hand, punishment phase evidence might come in that tells you, you know, this person has been threatening anyone he thinks is a sex offender. You might look at that same set of circumstances and say, Well, yeah, I think this person is a future danger to society. Does that make sense to you?

A. Yes.

Q. Okay. Do you see where any individual juror could view that both ways? It's an open question basically. Okay. Does that make sense to you?

A. Yes.

Q. Okay. So the question I have for you here is: Can you envision a possible set of circumstances -- well, before I go into that question, let me go back and ask you something. Do you see this list of aggravating elements?

A. (Venireperson nods.)

Q. Do you agree with those aggravating elements? Do you think it's proper that those people who commit murders like that

36

should stand in jeopardy of the death penalty?

A. Yes.

Q. Suppose you were queen for a day here in Texas, could change the laws, adds the laws, didn't have to worry about the legislature, presuming they're all in town. Anyway, but didn't have to worry about any of that. You could just make the law as you saw fit. Okay?

A. Uh-huh.

Q. Would you change anything about this?

A. No.

Q. Would you add anything or should anything be different to you?

A. Not right off the top of my head, no. I just --

Q. Okay. That's a little much to throw at you at this hour of the morning, isn't it? Okay.

A. With one cup of coffee, yes.

Q. Generally, how do you feel about the death penalty?

A. Depending on the circumstance, I'm for it. I agree with it.

Q. Okay. But you said depending on the circumstance.

A. Yeah.

Q. Do you think anyone who commits something on this list necessarily should get the death penalty, or are you open to considering whether the individual case merits it?

A. Open to consideration.

36

Q. Okay. All right. Okay. Now, back to the question I was going to ask you. Okay? Can you conceive in your mind of a fact circumstance where having convicted someone of committing a capital murder, intentionally killing one person and then a second person in the same transaction --

A. Uh-huh.

Q. -- they killed at least two people, can you then envision a situation where you would consider all of the guilt/innocence evidence and all of the punishment evidence and after your consideration decide, you know, my answer to this is, no, I think that the facts of this circumstance and the punishment facts here are unique enough that this person is not generally going to be, in all probability, a future danger to society. Could you envision the possibility of answering the question that way?

A. Yes.

Q. If the facts were proper, do you think you could actually vote that way?

A. Yes.

Q. Okay. Now, on the other hand, can you envision a circumstance where having convicted someone and having considered all of facts, you would then answer that question, yes, I think based on the facts of this crime, I think this person is a future danger?

A. I guess. I -- I'm not sure. Depending on the

37

39

09:53:10 1  circumstances, I guess, yes.

09:53:12 2  Q.  Okay.  Can you tell me why you're not sure?

09:53:16 3  A.  Well, you're throwing it at me from both sides and

09:53:18 4  I'm trying to say -- my mind set is going one way and then

09:53:22 5  you're swinging me the other way, so I'm trying to --

09:53:24 6  Q.  Lawyers are tricky that way.

09:53:26 7  A.  Yeah, I'm just going --

09:53:28 8  Q.  Okay.  Let me tell you why I'm asking you this, and

09:53:30 9  maybe we can just cut through all the mess and get going.  Okay?

09:53:32 10  A.  Okay.

09:53:34 11  Q.  My question is:  Are you open to answering that

09:53:36 12  question either way depending on the facts?

09:53:38 13  A.  Yes, absolutely.

09:53:38 14  Q.  Okay.  You don't feel like you're leaning one way or

09:53:40 15  the other right now?

09:53:42 16  A.  No.

09:53:42 17  Q.  Okay.  Can you see why it's important to the

09:53:46 18  functioning of the system that you not be on anybody's side

09:53:50 19  really?

09:53:50 20  A.  Yes.

09:53:52 21  Q.  But that you be willing to consider openly and fairly

09:53:54 22  all the facts?

09:53:54 23  A.  Yes.

09:53:56 24  Q.  Does that make sense to you?

09:53:56 25  A.  Absolutely.

CURTIS SHORTHAND REPORTING - 817/467-4556

09:55:26 1  Q.  Okay.  Well, let me clarify one thing.  If a person

09:55:30 2  is insane, they cannot be --

09:55:34 3  A.  Tried.

09:55:34 4  Q.  -- tried, yeah, or certainly not executed.

09:55:40 5  If a person is mentally retarded, they cannot be

09:55:42 6  executed.  Okay?

09:55:46 7  Mental illness sometimes can be a factor and

09:55:48 8  introduced into evidence with a person, understanding that it

09:55:52 9  doesn't rise to the level of insanity or mental retardation.

09:55:56 10  Okay.  Does that make sense to you?

09:55:58 11  A.  Yes.

09:55:58 12  Q.  Okay.  But I think what you're telling me is that

09:56:00 13  you're getting the drift of where this question is heading.

09:56:04 14  Now, you'll notice in this that there is no beyond a reasonable

09:56:08 15  doubt.  There is no burden of proof on this question.  Okay?

09:56:12 16  A.  Okay.

09:56:12 17  Q.  There is no burden of proof on the state and, of

09:56:14 18  course, there is never a burden of proof on the defense.  Okay?

09:56:18 19  A.  Okay.

09:56:20 20  Q.  What this question is basically asking you is to

09:56:24 21  reconsider all of the evidence that you considered before in

09:56:28 22  answering Question No. 1.

09:56:30 23  A.  Uh-huh.

09:56:30 24  Q.  Because it's the same body of evidence you're looking

09:56:30 25  at, but to look at it from the different viewpoint towards

CURTIS SHORTHAND REPORTING - 817/467-4556

38

40

09:53:58 1  Q.  Is that more direct?

09:53:58 2  A.  Yes, yes.

09:54:00 3  Q.  All right.

09:54:02 4  A.  Yes, absolutely.

09:54:02 5  Q.  Okay.  I can see that you're a direct sort of person.

09:54:10 6  All right.

09:54:12 7  Okay.  Anything else about this question that

09:54:18 8  you want to ask?  All right.  Now, I'm not bugging you now, am

09:54:16 9  I?

09:54:18 10  A.  No, no.  My pager is -- can I turn it off real quick,

09:54:22 11  please?

09:54:22 12  Q.  Oh, yeah, sure.

09:54:24 13  A.  Thank you.

09:54:24 14  (Off-the-record discussion.)

09:54:26 15  Q.  (By Ms. Callaghan)  By the way, would you like some

09:54:30 16  coffee or water or anything?

09:54:32 17  A.  No, I'm fine.  Thanks.

09:54:34 18  Q.  All right.  Now, why don't you read the second one to

09:54:36 19  yourself.

09:55:00 20  A.  (Venireperson complies.)

09:55:16 21  Q.  Okay.  What does that mean to you?

09:55:18 22  A.  If there was mental illness or if there was a problem

09:55:18 23  that would say that that person didn't deserve to die, you know,

09:55:22 24  based on his mental capabilities, I guess, or something like

09:55:26 25  that.

CURTIS SHORTHAND REPORTING - 817/467-4556

09:56:38 1  answering a different question.  Before it was are they going to

09:56:42 2  be a future danger; now, what you're looking at is the question

09:56:46 3  of mitigation, and by mitigation, what we mean is something that

09:56:50 4  reduces or lessens the person's moral responsibility for what

09:56:54 5  they did, their moral blameworthiness.  Okay?

09:56:56 6  A.  Okay.

09:56:56 7  Q.  And when you were talking about mental illness, you

09:57:00 8  were on the right track.  That's what we're talking about.  We

09:57:04 9  talk about mental illness.  If you find it to be mitigating,

09:57:08 10  that's up to you, but that may be one type of evidence that

09:57:10 11  might be admitted arguing that there is mitigation.  Do you see

09:57:12 12  what I mean?

09:57:14 13  A.  Yes.

09:57:14 14  Q.  Okay.  What this question basically is, is a

09:57:18 15  fail-safe.  That's why there is no burden of proof on it.  It's

09:57:22 16  one last chance before the death penalty is imposed for a jury

09:57:26 17  to step back, take a look at everything once again and ask

09:57:30 18  themselves, even though I've convicted this person, even though

09:57:32 19  I've decided this person is a future danger, is there some fact

09:57:38 20  in there, some piece of evidence that still says the just

09:57:42 21  sentence here would be life instead of death.  Okay.  This is

09:57:46 22  the one last time to reconsider and take a deep breath.  Okay?

09:57:52 23  A.  Okay.

09:57:54 24  Q.  Does that make sense to you?

09:57:54 25  A.  Yes.

CURTIS SHORTHAND REPORTING - 817/467-4556

**41**

09:57:54 1     Q. Okay. And, at this point, if you answered this yes,
09:57:58 2 that you think there is such a mitigating factor in there
09:58:02 3 somewhere, this gives you an opportunity to give that effect, to
09:58:10 4 bring it into light, because if you make this choice,
09:58:16 5 that -- then it stops there again and the person will be given a
09:58:16 6 life sentence. Okay?
09:58:16 7     So in order to answer it yes, only 10 of you,
09:58:22 8 once again, must agree, but you must agree. Okay?
09:58:26 9     However, if you take another look at the
09:58:28 10 evidence and decide, no, I don't think there is anything
09:58:30 11 mitigating here, then once you vote no, the judge must impose
09:58:36 12 the death penalty. Okay? That's that end of the questions. So
09:58:38 13 in order to vote no, all 12 of you must agree. It must be
09:58:44 14 unanimous. Okay. Does that make sense to you?
09:58:46 15     A. Yes.
09:58:48 16     Q. Okay. So let me ask you this: Can you -- and here
09:58:52 17 is the complicated question again. Okay? Sorry. Do you think
09:58:58 18 it's possible there is a fact circumstance out there somewhere,
09:59:01 19 facts that might be presented to you that would enable you to
09:59:04 20 answer this question yes, there is mitigation here,
09:59:10 21 understanding you've already found him guilty of killing at
09:59:16 22 least two people and you've already found they are a future
09:59:16 23 danger? Do you think it's possible for evidence to be presented
09:59:18 24 to you that would cause you to answer this question yes?
09:59:22 25     A. Yes.
CURTIS SHORTHAND REPORTING - 817/467-4556

**42**

09:59:22 1     Q. Okay. On the other hand, do you think there is
09:59:24 2 evidence out there that might be presented to you that would
09:59:28 3 cause you to answer this question no?
09:59:30 4     A. Yes.
09:59:32 5     Q. Okay. So you're pretty much open to answering it yes
09:59:34 6 or no, depending on the evidence?
09:59:36 7     A. Yes, correct.
09:59:38 8     Q. Okay. Now, two other questions, and then I think
09:59:42 9 we'll be done with the death penalty stuff.
09:59:46 10     Does it seem fair to you that the death penalty
09:59:50 11 should be imposed this way, by the answering of these questions?
09:59:56 12     A. It's almost like a safeguard, to me, is what I'm
10:00:00 13 looking at it as.
10:00:04 14     Q. And does that seem proper to you or appropriate?
10:00:04 15     A. It does.
10:00:04 16     Q. Okay.
10:00:04 17     A. It's like say here it is, you've got an option.
10:00:04 18     Q. Okay. Because it isn't like you just go back and
10:00:08 19 vote life or death without any guidance.
10:00:16 20     A. Right.
10:00:16 21     Q. It's very narrowly defined. Okay?
10:00:16 22     A. Right.
10:00:16 23     Q. And that seems fair to you?
10:00:16 24     A. Yes.
10:00:16 25     Q. Okay. The second thing is this: Now, are you a
CURTIS SHORTHAND REPORTING - 817/467-4556

**43**

10:00:20 1 native Texan?
10:00:20 2     A. Uh-huh, yes.
10:00:20 3     Q. You are. Okay. Boy, we've had a lot of native
10:00:24 4 Texans here in the past couple of days. You know, then, that
10:00:28 5 the death penalty in this state is a reality?
10:00:30 6     A. Yes.
10:00:30 7     Q. People are -- are executed here every year.
10:00:32 8     A. Uh-huh.
10:00:34 9     Q. Okay? It's one thing to talk about this
10:00:36 10 intellectually; it's another thing to be part of making the
10:00:40 11 decision personally.
10:00:42 12     A. Right.
10:00:42 13     Q. Are you the kind of person who could do that?
10:00:48 14     A. I don't know. I've thought about it and, you know, I
10:00:52 15 agree with it, but when it comes down to it, your heart weighs
10:00:56 16 heavy on that sort of stuff. So I'm sure I could. It's just a
10:01:00 17 hard -- it's a hard decision to make.
10:01:04 18     Q. Okay. Let me see if I understand you correctly. I
10:01:06 19 don't want to put words in your mouth, but let me make sure I
10:01:06 20 understand.
10:01:10 21     Are you saying you feel like you could do it?
10:01:11 22 It would not be an easy decision to make, but you feel like you
10:01:14 23 could ultimately do it?
10:01:16 24     A. Yes.
10:01:18 25     Q. All right. Fair enough. Is there any other
CURTIS SHORTHAND REPORTING - 817/467-4556

**44**

10:01:24 1 questions you have about the way the death penalty is set up or
10:01:28 2 the questions or anything we've gone over?
10:01:30 3     A. No.
10:01:30 4     Q. Do you feel like you understand the law pretty
10:01:32 5 clearly?
10:01:32 6     A. Yes.
10:01:34 7     Q. Okay. Well, then I'm going to ask you a few more
10:01:36 8 legal questions and some off your sheet, and I'll be done.
10:01:46 9     Q. Yeah, there is something I usually talk about that I
10:01:50 10 forgot this time and my co-counsel reminded me of it.
10:01:52 11     When you're considering this Special Issue
10:01:56 12 No. 2, the second special issue, what you look at in terms of
10:01:58 13 making your decision here is you look at the evidence that has
10:02:02 14 come in and you ask yourself basically three questions about it.
10:02:06 15 First of all, do you believe it? Do you think it's true? If
10:02:10 16 you do believe it, then you ask yourself, is this piece of
10:02:16 17 information mitigating? Okay? Because you remember back to the
10:02:18 18 example I gave you concerning the guy that shot his uncles?
10:02:24 19     A. (Venireperson nods.)
10:02:30 20     Q. Okay. You might hear that evidence and think to
10:02:30 21 yourself, you know, the history of child abuse between them, I
10:02:32 22 think that's mitigating. I think that lessens his moral
10:02:34 23 responsibility. The same person might look at that and say, You
10:02:38 24 know what, he served in the military during his lifetime. He
10:02:42 25 CURTIS SHORTHAND REPORTING - 817/467-4556

45

10:02:44 1 could obviously control his conduct. He had grown up and gotten
10:02:48 2 out of this. He could control his conduct. He was an adult.
10:02:52 3 He could have called the police. He could have done a lot of
10:02:54 4 things. He could have filed a lout against them. I don't think
10:02:56 5 that's mitigating. Do you see what I mean?
10:03:00 6    A.   Yes.
10:03:00 7    Q.   Two people -- and suppose in this punishment phase
10:03:02 8 you heard evidence that this person had served honorably in the
10:03:06 9 military during his life. One person could say, You know,
10:03:08 10 that's mitigating. He served his country. Another person could
10:03:12 11 say, You know what, he could control his conduct. He knew right
10:03:14 12 from wrong. I don't think that really is fair or mitigating.
10:03:18 13 Do you see how an individual person could view that either way?
10:03:20 14    A.   Yes.
10:03:22 15    Q.   What you think is mitigating is up to you. Okay? So
10:03:26 16 you ask yourself, do I believe it? If I do believe it, is it
10:03:28 17 mitigating in my mind, because you don't have to agree with
10:03:32 18 other jurors about that. What's mitigating is up to you, and if
10:03:38 19 I think it's mitigating, do I think it's sufficiently
10:03:40 20 mitigating, mitigating enough to warrant a life sentence, as
10:03:44 21 opposed to death. Okay. Does that make sense to you?
10:03:48 22    A.   Yes.
10:03:48 23    Q.   Okay. Do you feel comfortable with that?
10:03:50 24    A.   Yes.
10:03:50 25    Q.   Okay. Anything else or did I -- okay. This cold is

CURTIS SHORTHAND REPORTING - 817/467-4556

46

10:03:58 1 driving me nuts. I'm not working on all -- all four cylinders
10:04:02 2 this morning or whatever.
10:04:04 3    Okay. Now, let's talk a little bit about some
10:04:06 4 other laws. Voluntary intoxication, if I voluntarily take drugs
10:04:12 5 or alcohol, that is not a defense to my committing a crime. I
10:04:14 6 can't say, King's X, I'm not responsible for it now. Okay? You
10:04:18 7 may consider it as mitigating or aggravating circumstance in the
10:04:22 8 punishment phase for whatever weight you think it has. Okay?
10:04:26 9    A.   Okay.
10:04:26 10    Q.   It's admissible, but it's not a defense to the
10:04:30 11 commission of a crime. Does that make sense to you?
10:04:34 12    A.   It's not a defense? What is that?
10:04:36 13    Q.   If something was a defense, that would mean the
10:04:38 14 person basically would be found not guilty if you prove that
10:04:42 15 that factor was present.
10:04:42 16    A.   Oh, okay. Yes.
10:04:44 17    Q.   Do you see what I mean?
10:04:44 18    A.   Yes.
10:04:46 19    Q.   Okay. All right. Can you follow that law?
10:04:46 20    A.   Yes.
10:04:48 21    Q.   Okay. 3823 Code of Criminal Procedure says that if
10:04:52 22 the police violate the law in how they obtain evidence and how
10:04:56 23 they get evidence, that evidence cannot be used by a jury for
10:05:02 24 any purpose. Okay. Have you ever seen that on the police shows
10:05:06 25 you've seen on TV?

CURTIS SHORTHAND REPORTING - 817/467-4556

47

10:05:08 1    A.   Yes.
10:05:08 2    Q.   You're familiar with the concept?
10:05:10 3    A.   Uh-huh.
10:05:12 4    Q.   Okay. What happens is in your charge, the jury
10:05:16 5 charge that you get, you may be asked a question, which
10:05:18 6 basically says this: If you find that evidence was taken
10:05:22 7 illegally, you may not consider it for any purpose. Okay?
10:05:26 8    So you may have a piece of evidence come in. If
10:05:28 9 you look at all of the facts surrounding that and you decide it
10:05:32 10 was taken illegally, what you have to do as a juror is put that
10:05:36 11 piece of evidence aside, put it aside and not consider it for
10:05:40 12 any purpose and turn around and look at what you've got left.
10:05:44 13 If you've got enough left to find the person guilty, then so be
10:05:48 14 it, but if you don't, if basically the majority of the state's
10:05:52 15 evidence was there, there is not enough, then you must find the
10:05:56 16 person not guilty. Does that make sense to you?
10:05:58 17    A.   Yes.
10:06:00 18    Q.   Can you understand why we have such a rule?
10:06:02 19    A.   Yes.
10:06:02 20    Q.   People will not follow the law, unless the law has
10:06:06 21 teeth. Do you see what I mean?
10:06:06 22    A.   Yes.
10:06:06 23    Q.   It's like kids. You have to make rules for your
10:06:10 24 kids, right?
10:06:10 25    A.   Right.

CURTIS SHORTHAND REPORTING - 817/467-4556

48

10:06:12 1    Q.   If they don't have any teeth, your kids won't respect
10:06:16 2 them. Does that make sense to you?
10:06:16 3    A.   Yes.
10:06:16 4    Q.   Okay. Well, do you think you could follow such a
10:06:18 5 law?
10:06:20 6    A.   Yes.
10:06:20 7    Q.   Okay. Understanding it might be difficult to
10:06:22 8 disregard something you know is there, but you feel like you
10:06:24 9 could do that?
10:06:26 10    A.   Yes.
10:06:26 11    Q.   Okay. Well, now let me -- let me test to that a
10:06:28 12 little bit. Okay?
10:06:30 13    You understand that might place you emotionally
10:06:32 14 in a very difficult situation. We might be talking about a full
10:06:36 15 confession given by a child molester or someone who murdered a
10:06:42 16 child, and if that piece of evidence is put aside, there might
10:06:46 17 not be enough left to convict them, someone who killed a child.
10:06:52 18 I liked it. I'll do it again. I've done it before, and you
10:06:56 19 don't even know about it. Do you see what I mean?
10:06:58 20    Q.   It could be a very brutal situation personally. Do
10:07:00 21 you feel like, despite that, you could follow the law as given
10:07:04 22 to you by the judge?
10:07:04 23    A.   You'd have to.
10:07:06 24    Q.   You have to. I mean, you don't have an option, other

CURTIS SHORTHAND REPORTING - 817/467-4556

51

10:09:18 1   given some options with regard to what to convict a person of.
10:09:22 2   Okay? For example, in a capital murder case, you might be given
10:09:28 3   the option of the lesser offense of murder. Okay? Suppose you
10:09:32 4   looked at a fact circumstance, and although you found that an
10:09:38 5   intentional murder was committed, you weren't for sure about the
10:09:40 6   aggravating element. You weren't so sure there was a robbery
10:09:42 7   going on, or you weren't so sure the second person was killed
10:09:48 8   intentionally. Okay? So you said, Okay, state, we'll go -- and
10:09:48 9   understand something, in order to consider a lesser included
10:09:54 10  offense, you must first agree that the person is not guilty of
10:09:56 11  the greater offense. Only then do you proceed to consider the
10:10:02 12  lesser included offense, okay, but you would then go to a lesser
10:10:04 13  included offense and you might say, Hey, state, okay, we'll
10:10:06 14  convict of regular murder, regular intentional murder. Okay?
10:10:10 15        A.   Okay.
10:10:16 16        Q.   The range of punishment there is from five years to
10:10:12 17  99 years or life and a $10,000 fine. Okay?
10:10:18 18             Now, the law says in order to be fair and
10:10:22 19  impartial, in order to be a juror in a case, you must be able to
10:10:28 20  consider the full punishment range, from a minimum of five to a
10:10:28 21  maximum of life and anywhere in between and be able to wait for
10:10:32 22  it? Okay. Like a car in neutral, wait for your facts, and then
10:10:36 23  make your decision based on the facts you hear. Okay?
10:10:44 24             Does that make sense to you, where you wouldn't
10:10:44 25  want to foreclose or refuse to consider any part of the

CURTIS SHORTHAND REPORTING - 817/467-4556

---

10:07:10 1   than emotionally in, you know, having that evidence out there.
10:07:16 2        A.   Can I ask, would you -- would it be something that's
10:07:20 3   brought in and then it's just dismissed, I mean -- I mean,
10:07:26 4   during the trial?
10:07:28 5        Q.   You're wondering how it happens?
10:07:30 6        A.   Yeah. I'm curious why -- why is it brought in and
10:07:32 7   then dismissed.
10:07:34 8        Q.   Well, Texas is a little different than most states in
10:07:38 9   that we provide for a jury making decisions about facts even on
10:07:42 10  issues like that. Okay? Texas, generally, tends to give juries
10:07:46 11  a great deal of leeway in making decisions. Okay? So what the
10:07:50 12  procedure is is that evidence is presented to you, and you are
10:07:52 13  given an opportunity to pass on the facts, if you see what I
10:07:54 14  mean, to decide if the facts are there which indicate that that
10:08:00 15  evidence was taken illegally. Okay? The law -- the judge is
10:08:06 16  the judge of the law.
10:08:06 17        A.   Right.
10:08:06 18        Q.   They give you the law and the law tells you what you
10:08:08 19  have to do if you find from the facts that that evidence was
10:08:12 20  taken illegally. Okay? Does that make sense to you?
10:08:14 21        A.   Yes. I didn't realize that was the jury's
10:08:16 22  responsibility on that point.
10:08:18 23        Q.   In many states it's not, but in this state, it is.
10:08:22 24  Texas, generally, is very trusting and very dependent on jurors.
10:08:22 25  Okay?

CURTIS SHORTHAND REPORTING - 817/467-4556

---

52

10:10:46 1   punishment range before you knew what the evidence was?
10:10:48 2        A.   Yes, it makes sense.
10:10:50 3        Q.   Okay. Because some people might say, You know, it
10:10:54 4   would be a very rare case in which I could consider the minimum
10:10:56 5   of five in an intentional murder case. Another person might
10:11:00 6   say, You know, life is a long time; it's a very rare case where
10:11:06 7   I could consider the maximum in -- you know, in a case. And
10:11:10 8   that's okay to have strong feelings about the law or about
10:11:14 9   criminal justice, but what's not okay is to say, I don't care
10:11:18 10  what the facts are. I'm going to cut out the minimum or the
10:11:22 11  maximum just because I feel that way, regardless of what the
10:11:26 12  evidence is. Okay?
10:11:28 13        A.   Uh-huh.
10:11:28 14        Q.   Do you feel like you could consider the full range of
10:11:30 15  punishment from a minimum of five to the maximum of life?
10:11:34 16        A.   Yes.
10:11:34 17        Q.   And everything in between?
10:11:36 18        A.   Yes.
10:11:36 19        Q.   Okay. Now, a defendant has the right to an attorney.
10:11:40 20  He has the right to a trial by jury. He has a right to remain
10:11:46 21  silent, meaning that if he chooses to testify, you may consider
10:11:48 22  his evidence just as you would any other witness to decide
10:11:50 23  whether you think it's credible. Okay?
10:11:56 24             On the other hand, if he chooses not to testify,
10:11:56 25  if he invokes or chooses not to testify, not to get up on the

CURTIS SHORTHAND REPORTING - 817/467-4556

---

50

10:08:26 1        A.   Okay.
10:08:26 2        Q.   Which is absolutely proper, you know. It's our
10:08:26 3   community and -- and we ultimately decide how we live in it.
10:08:30 4   Does that make sense to you?
10:08:32 5        A.   Yes.
10:08:32 6        Q.   Okay. So that's the way it would proceed. So the
10:08:36 7   jury would receive the evidence, but then would be instructed,
10:08:38 8   if you find from these facts that it was illegally taken, that
10:08:42 9   you are not to consider it and you're to put it aside and
10:08:46 10  consider what you have left. That would be exactly the process
10:08:48 11  a judge would go through in considering a similar question.
10:08:52 12  Does that make sense to you?
10:08:54 13        A.   Yes.
10:08:54 14        Q.   Okay. Did I explain that well enough?
10:08:56 15        A.   Yes.
10:08:56 16        Q.   Okay. Good deal. Do you think, as hard as it was,
10:09:00 17  that you could follow that law?
10:09:00 18        A.   Yes.
10:09:02 19        Q.   Okay. Now, you might want to go home and get under
10:09:04 20  the bed in a fetal position later, but you feel like you could
10:09:06 21  follow that?
10:09:06 22        A.   Yes.
10:09:06 23        Q.   Okay. All right. Now, a couple of last legal issues
10:09:12 24  and then -- then we'll be done.
10:09:14 25             It might be that in a criminal case you would be

CURTIS SHORTHAND REPORTING - 817/467-4556

53

1 stand and talk, okay, you may not consider that for any purpose
2 against him?
3   A.   Uh-huh.
4   Q.   Does that make sense to you?
5   A.   Yes.
6   Q.   Do you think you could follow that?
7   A.   Yes.
8   Q.   And as a law, that makes sense, right?
9   A.   Uh-huh, it does.
10   Q.   Okay.  Because you have no idea why a person might or
11 might not testify.  It could be any one of a million things.  So
12 it makes sense not to make decisions based that you're guessing
13 or you don't know?
14   A.   Okay.
15       THE REPORTER:  Pardon me?  What did you say?
16 Pardon me?
17       MS. CALLAGHAN:  Based on guessing or you don't
18 know.
19   Q.   (By Ms. Callaghan)  Does that make sense to you?
20   A.   Yes.
21   Q.   Okay.  All right.  Do you know anything about an
22 offense that occurred, a murder that occurred out on the east
23 side of Fort Worth on Scott Avenue in April of this year?
24   A.   No.
25   Q.   No news accounts, nothing on the TV that you recall

CURTIS SHORTHAND REPORTING - 817/467-4556

55

1 legally to you?
2   A.   No, not -- not legally justified, no.  I understand
3 that that happens, though, and --
4   Q.   And that's an element you might consider in the
5 punishment?
6   A.   Right.
7   Q.   Okay.  All right.  You said you felt that eyewitness
8 accounts were somewhat reliable.  Can you tell me what you meant
9 by that?
10   A.   People change stories.  People, you know, years later
11 may not remember the same things they remember right after the
12 occurrence.  Things that can change.
13   Q.   Okay.  So you feel like in some cases, eyewitness
14 might be just fine.  From a different person or a different fact
15 situation, it would be a problem?
16   A.   Could you repeat that?
17   Q.   Okay.  Sorry.  I'm getting complicated here.
18       You think that one eyewitness in a case, in a
19 particular case, this eyewitness over here might be just fine,
20 they remember it clearly, it was --
21   A.   Right.
22   Q.   -- relatively -- over here, because of time or
23 because of this individual person, it may be a problem; it just
24 depends on the person?
25   A.   If the story changes or if they, you know, forget or

CURTIS SHORTHAND REPORTING - 817/467-4556

54

1 seeing about it?
2   A.   No.
3   Q.   All right.  Do you know any person named Crutsinger?
4   A.   No.
5   Q.   Okay.  You said in talking about the death penalty,
6 when it would be appropriate or not, you said if someone had
7 murdered someone, sometimes there are circumstances that could
8 have provoked the situation.  What did you mean when you were
9 saying that?
10   A.   Things get heated, people take it a little too far.
11 I mean, things are accidental sometimes, you know, not meaning
12 to do it.
13   Q.   Okay.  But when you say, Provocation -- let me see if
14 I understand correctly what you mean by that word.  Do you mean
15 that that person intentionally did it, that they were provoked
16 to do it?
17   A.   It's almost like you could say someone brought it
18 upon themselves sometimes by acting, you know --
19   Q.   By acting like a jerk?
20   A.   By acting a certain way and --
21   Q.   Yeah.  Someone -- the victim, for example, might have
22 acted like a jerk or been poorly behaved or caused other people
23 to act the way they did to some degree?
24   A.   Right.
25   Q.   Does that necessarily mean the murder is justified

CURTIS SHORTHAND REPORTING - 817/467-4556

56

1 if they've backed out on what they saw.
2   Q.   Okay.  So things can affect eyewitness testimony.  It
3 may be reliable sometimes or it may not.
4   A.   Right.
5   Q.   It just depends?
6   A.   Yes.
7   Q.   Okay.  All right.  Fair enough.  You are a Baptist?
8   A.   Yes.
9   Q.   Do you know if your church has any particular views
10 on the death penalty?
11   A.   No.  I don't go regularly.
12   Q.   Okay.
13   A.   I should, but I don't.
14   Q.   Well, I hear you.
15       Is there anything about that that would affect
16 you in being a juror, do you think?
17   A.   No.
18   Q.   Okay.  Some people have very strong religious
19 feelings that can influence that.
20   A.   I understand.
21   Q.   You indicated that your spouse perhaps had been
22 arrested for an expired driver's license.
23   A.   Yes.
24   Q.   Okay.  Do you think he was treated fairly?
25   A.   No.

CURTIS SHORTHAND REPORTING - 817/467-4556

59

10:16:38 1    Q.    Okay.  Why not or how come?
10:16:42 2    A.    Well, you know, you could give him a citation and let
10:16:44 3  them go get their driver's license renewed.
10:16:48 4    Q.    Okay.  Do you feel like that would affect you in
10:16:50 5  listening to the testimony of a police officer?
10:16:54 6    A.    I -- would it affect me in listening to the police
10:16:58 7  officer?  Is that what you -- what were you --
10:17:00 8    Q.    Yeah.  If a police officer were to testify during the
10:17:02 9  course of a capital case, would it affect you in listening to
10:17:08 10 that police officer?  Has that experience given you a distrust
10:17:10 11 of police officers?
10:17:10 12   A.    Oh, no, no.
10:17:14 13   Q.    Okay.  Do you basically feel like that related to
10:17:16 14 that one officer?
10:17:16 15   A.    Probably so.  I didn't know him at the time, but he's
10:17:20 16 a good person, so --
10:17:20 17   Q.    Oh, do you know the officer now?
10:17:22 18   A.    No, my husband.  I didn't know my husband at the time
10:17:26 19 of the -- when that happened, so --
10:17:30 20   Q.    Okay.  All right.  I would venture to guess he's far
10:17:34 21 more careful about his driver's license?
10:17:36 22   A.    Oh, yeah.
10:17:36 23   Q.    Okay.  All right.  You talk here about police
10:17:38 24 officers.  You said, More likely to tell the truth than most
10:17:42 25 witnesses.

CURTIS SHORTHAND REPORTING - 817/467-4556

58

10:17:44 1    A.    Yes.
10:17:44 2    Q.    Okay.  Now, do you know any police officers
10:17:46 3  personally?
10:17:48 4    A.    Years back, yes, you know.
10:17:50 5    Q.    You did?
10:17:52 6    A.    (Venireperson nods.)
10:17:52 7    Q.    Would you agree with me that police officers, before
10:17:56 8  they become police officers, are just regular human beings?
10:18:00 9    A.    Yes.
10:18:00 10   Q.    Put their pants on one leg at a time, nothing
10:18:04 11 different about them?
10:18:04 12   A.    Yes.
10:18:04 13   Q.    Okay.  And that when they put on those uniforms, when
10:18:08 14 they become police officers, they are still the same person they
10:18:10 15 were underneath that?
10:18:12 16   A.    Yes.
10:18:12 17   Q.    They don't necessarily change as human beings just
10:18:16 18 because they have a uniform on?
10:18:18 19   A.    Right.
10:18:18 20   Q.    Okay.  Do you think you could consider -- now, let me
10:18:22 21 tell you this before I ask you that question.  Is it proper in
10:18:24 22 considering the testimony of any witness to consider their
10:18:28 23 training or education?  That would be logical, right?
10:18:32 24   A.    Yes.
10:18:32 25   Q.    Do you feel like you could consider the testimony of

CURTIS SHORTHAND REPORTING - 817/467-4556

a police officer from a credibility standpoint, though, in terms
10:18:40 2  of whether you believe the person is telling the truth or is
10:18:42 3  accurate?  Do you think you could consider their testimony just
10:18:46 4  the same as any other witness and base it on what they're saying
10:18:50 5  to you?
10:18:50 6    A.    Yes.
10:18:50 7    Q.    You don't feel like you'd necessarily believe a
10:18:54 8  police officer just because they were a police officer?
10:18:56 9    A.    No.
10:18:58 10   Q.    Okay.  All right.  Does that make sense to you?
10:19:00 11   A.    Yes.
10:19:00 12   Q.    Okay.  Now, there is a question here, if the state
10:19:04 13 charges someone with murder, that person is probably guilty.
10:19:08 14 You understand the presumption of innocence, right?  We've gone
10:19:12 15 over that this morning.
10:19:16   A.    Yes.
10:19:16 17   Q.    What did you mean when you said you agreed with that,
10:19:18 18 because it says, If the state charges someone with murder, that
10:19:22 19 person is probable guilty?
10:19:24 20   A.    Well, if you listen to the evidence and the jury has
10:19:26 21 decided that they are guilty.
10:19:28 22   Q.    Okay.  So you were really kind of thinking ahead --
10:19:32 23   A.    Yes.
10:19:32 24   Q.    -- to that ultimate situation?
10:19:34 25   A.    Right.

CURTIS SHORTHAND REPORTING - 817/467-4556

60

10:19:34 1    Q.    Do you realize that just because we return an
10:19:36 2  indictment against someone, that indictment is not evidence?
10:19:38 3    A.    Right.  I mean, after today, yes, I understand more
10:19:42 4  of what this is all about.
10:19:44 5    Q.    Okay.  All right.  Okay.  If the evidence is such
10:19:52 6  that you cannot decide if a defendant is not guilty or guilty,
10:19:54 7  you should find the defendant not guilty.  Once again, that goes
10:20:00 8  back to the burden of proof.  The defendant is presumed
10:20:02 9  innocent, unless and until we can get above that level.  If the
10:20:06 10 state doesn't get to that level, we don't make it up there, then
10:20:10 11 the default is always not guilty.  Do you understand?
10:20:12 12   A.    Yes.
10:20:14 13   Q.    So if you can't decide whether a person is guilty or
10:20:18 14 not guilty, what do you do?
10:20:18 15   A.    Not guilty.
10:20:20 16   Q.    Right.  Okay.  Does that make sense to you?
10:20:22 17   A.    Yes.
10:20:22 18   Q.    Okay.  Do you feel like you could follow that?
10:20:26 19   A.    Yes.
10:20:28 20   Q.    Okay.  All right.  You can definitely tell a mother
10:20:40 21 when they say how often do you -- or how many hours a day do you
10:20:44 22 watch television and you say, 15 minutes.  Believe me, I
10:20:50 23 understand that.  I've been there, done that, got the T-shirt.
10:20:54 24   A.    At night, yeah.
10:21:01 25   Q.    Can you interpret something for us?  What word is

CURTIS SHORTHAND REPORTING - 817/467-4556

63

10:21:22 1  this?

10:21:26 2  A.  Leader.

10:21:26 3  Q.  Leader.  Okay.  Okay.

10:21:28 4  A.  Sorry.

10:21:30 5  Q.  It looked like teacher to us.

10:21:32 6  A.  No, leader.

10:21:34 7  Q.  Okay.  All right.  Now, before we finish up, is there

10:21:40 8  anything else you would like to ask me or think I ought to know?

10:21:44 9  A.  No.

10:21:44 10  Q.  Do you feel like everything is pretty clear?

10:21:48 11  A.  Yes, ma'am.

10:21:52 12  MS. CALLAGHAN:  Okay.  Well, then, Ms. Greene,

10:21:50 13  I'd really like to thank you for answering all of my impertinent

10:21:54 14  questions.  I appreciate it.

10:21:56 15  And at this time, the state would pass the

10:21:58 16  witness.

10:21:58 17  THE COURT:  Okay.  Thank you.  We're going to

10:22:00 18  take a five-minute recess.  Ms. Greene, if you would go out in

10:22:02 19  the hallway, there is restroom facilities, water out there, but

10:22:06 20  we'll be in recess for five minutes.

10:22:06 21  MS. GREENE:  Okay.

10:22:06 22  (Recess taken.)

10:38:16 23  (Venireperson Greene enters the proceedings.)

10:38:16 24  THE COURT:  Okay.  Ms. Greene, the defense is

10:38:18 25  now going to have an opportunity to talk to you.

CURTIS SHORTHAND REPORTING - 817/467-4556

---

62

VOIR DIRE EXAMINATION

10:38:18 1

10:38:22 2  BY MR. RAY:

10:38:22 3  Q.  How are you doing, Ms. Greene?

10:38:24 4  A.  Good.

10:38:26 5  Q.  Could you pull the microphone up a little closer?

10:38:30 6  A.  Is that better?

10:38:30 7  Q.  Yeah, that's fine.

10:38:32 8  I don't have as many questions for you as

10:38:36 9  Ms. Callaghan did.  She's pretty thorough.  I've got a few.

10:38:40 10  Okay?

10:38:40 11  A.  Okay.

10:38:44 12  Q.  The -- the impression that I get from just watching,

10:38:50 13  listening to you is that you -- you're ready, willing and able,

10:39:02 14  I guess, to be on this jury; is that right?

10:39:06 15  A.  I have never served on a jury, so I don't know what

10:39:08 16  it would be.

10:39:12 17  Q.  Well, do you want to serve on this jury?

10:39:14 18  A.  If you needed me to, I would.

10:39:16 19  Q.  I understand that, but you're kind of drafted, I

10:39:20 20  guess, but what I'm getting at is, if you had your druthers,

10:39:28 21  like Ms. Callaghan asked you if you could be the governor for

10:39:36 22  today, I'm asking you if you could be the jury selection person

10:39:36 23  for today, would you -- would you put yourself here or take

10:39:40 24  yourself out?

10:39:48 25  A.  I -- either way is fine with me, to be honest.

CURTIS SHORTHAND REPORTING - 817/467-4556

---

63

10:39:52 1  Q.  Why -- why do you feel that way?

10:39:54 2  A.  Well, if you need me, it's fine.  Death penalty is a

10:40:00 3  hard thing to have to think about, but, you know, I'm fine with

10:40:04 4  being on the jury.

10:40:06 5  Q.  What you do you think about giving somebody the death

10:40:10 6  penalty?

10:40:10 7  A.  It's appropriate in some circumstances.

10:40:12 8  Q.  I understand it's appropriate, but what I'm getting

10:40:16 9  at is not -- not so much whether or not you think somebody might

10:40:20 10  deserve it.  What do you think about you being on a jury that

10:40:24 11  answers those questions the way you have to answer them in such

10:40:30 12  a way, and I'm not talking about whether the proof or -- I'm

10:40:38 13  just saying, what do you think about when you think about being

10:40:42 14  in a position to make a decision based on some facts that

10:40:46 15  results in somebody else sitting in the courtroom with you

10:40:52 16  dying?  What do you -- how do you feel about that?

10:41:06 17  A.  I -- I've not had to think that way before, so I --

10:41:14 18  Q.  I'll give you some time to think about it if you --

10:41:18 19  A.  I agree with the death penalty.

10:41:20 20  Q.  I understand that.

10:41:22 21  A.  But I don't know -- I've never been in that

10:41:22 22  situation, so I don't know how I would feel.

10:41:28 23  Q.  You're kind of starting up your jury service at the

10:41:32 24  top of the ladder, as opposed to shoplifting or check forgery.

10:41:32 25  A.  Right.

CURTIS SHORTHAND REPORTING - 817/467-4556

---

64

10:41:40 1  Q.  Would you rather be on one of those kind of cases

10:41:42 2  than what we're trying here, or would you like to be on a death

10:41:42 3  penalty case?

10:41:44 4  A.  I've always be intrigue with law and I used -- I

10:41:48 5  worked for the county attorney's office when I was in high

10:41:50 6  school and I enjoyed it and it's interesting to me, so --

10:41:54 7  Q.  What county attorney's office did you work with?

10:41:58 8  A.  In Denison.  It was at the sub courthouse, and I've

10:42:02 9  just enjoyed it.  I've always enjoyed that kind of stuff.  It's

10:42:06 10  not something that I would personally like to be -- give someone

10:42:06 11  the death sentence or anything like that.

10:42:12 12  Q.  Four or five years from now, if you are on this jury,

10:42:20 13  and Billy Jack over here has been found guilty and he's laying

10:42:24 14  down there on the table in Huntsville and they come on

10:42:26 15  television with an announcement that he's going to be executed

10:42:30 16  next Tuesday.

10:42:30 17  A.  Right.

10:42:32 18  Q.  How do you feel about that?

10:42:36 19  A.  It would be hard.

10:42:38 20  Q.  What do you mean by that?

10:42:42 21  A.  It -- it would not give me a good feeling, but if we

10:42:42 22  made a decision and you have to -- you have to understand that

10:42:50 23  we made it because of certain circumstances or a decision of a

10:42:56 24  jury.

10:42:56 25  Q.  What -- you said -- it was your husband before you

CURTIS SHORTHAND REPORTING - 817/467-4556

10:43:04 1 got married that got a -- what kind of -- he went to jail for
10:43:08 2 not having his driver's license?
10:43:10 3     A.    Right, his driver's license was expired.
10:43:12 4     Q.    And you didn't know him then, right?
10:43:12 5     A.    (Venireperson nods.)
10:43:16 6     Q.    They took him to jail and made him post a bond or
10:43:18 7 made him pay his fine or whatever it was and what did you get
10:43:24 8 out of all that?
10:43:28 9     A.    I just felt like they could have given him another
10:43:32 10 option. His parents were with him, and he's an adult. They
10:43:36 11 could have drove.
10:43:38 12     Q.    Maybe they could have wrote him a ticket, and let his
10:43:40 13 mother drive a car and saved a lot less hassle?
10:43:44 14     A.    Right.
10:43:46 15     Q.    One of your answers you gave was that the -- if the
10:43:54 16 police -- excuse me -- if the state charges someone with murder,
10:44:00 17 that person is probable guilty.  Do you remember that question?
10:44:06 18          We had a bunch of -- we had a bunch of questions
10:44:10 19 that we gave you, and towards the back there was some -- the
10:44:16 20 question was: Please tell us your reaction to each of the
10:44:18 21 following statements.  And we gave you six statements, and we
10:44:22 22 asked you to agree or not agree or no opinion, disagree
10:44:26 23 strongly. It was kind of a check the box.  Do you remember
10:44:28 24 doing that?
10:44:30 25     A.    Vaguely.

CURTIS SHORTHAND REPORTING - 817/467-4556

66

10:44:32 1     Q.    Okay. Look over here on the screen. If the state
10:44:42 2 charges someone with murder, that person is probably guilty.
10:44:48 3 Look what you checked.
10:44:54 4     A.    Yes.
10:44:56 5     Q.    What were you thinking about that?
10:44:58 6     A.    That they had already been found guilty.
10:45:02 7     Q.    Okay.
10:45:04 8     A.    Their -- you know, if it had gone through a jury,
10:45:06 9 this is what -- you know, understanding how it works now, that's
10:45:12 10 a different situation.
10:45:14 11     Q.    Okay. Well, what that -- what that sentence means is
10:45:18 12 that if the state charges someone with murder, what that
10:45:22 13 insinuates is that if the police pick you up for a crime, it
10:45:28 14 doesn't matter what kind of crime it is and they haul you off to
10:45:32 15 jail and then the district attorney's office -- if it's a crime
10:45:36 16 that the district attorney's office gets involved with -- which
10:45:38 17 is all felonies and Class A and B misdemeanors, everything but
10:45:44 18 traffic tickets pretty much, that's the state.  That's who that
10:45:48 19 is, these two ladies sitting over here.
10:45:50 20          If they charge someone, and what we have is
10:45:52 21 murder. Okay? That's what that sentence means. They decided
10:45:56 22 to file charges against someone, based almost always on the
10:46:00 23 police having conducted some sort of investigation, which could
10:46:06 24 be anything from a policeman seeing a crime with his own eyes
10:46:12 25 and arresting him, to getting an arrest warrant for whatever

CURTIS SHORTHAND REPORTING - 817/467-4556

10:46:14 1 that person might have done, but in either event, the state
10:46:18 2 files charges, that person is probable guilty.  Now, that -- and
10:46:24 3 you understand that definition, what I mean in that question,
10:46:28 4 what that question means?
10:46:30 5     A.    Yes.
10:46:32 6     Q.    How would you answer that now, now that we're all on
10:46:34 7 the same sheet? You can answer the same way, if you want, or
10:46:38 8 you can answer it with one of the others.
10:46:40 9     A.    I don't know.
10:46:42 10     Q.    Okay. What do you think about when you read that?
10:46:48 11 What does that tell you? What do you -- I'm trying to find out
10:46:52 12 what you were thinking. I don't want to tell you --
10:46:54 13     A.    Probability that there is something there that has --
10:47:04 14 you know, that he has acted or he has --
10:47:04 15     Q.    Well, the sentence says that person is probably
10:47:06 16 guilty at the other end of it, the back end of it.
10:47:08 17     A.    Right.
10:47:08 18     Q.    Do you agree with that, or do you not a agree with
10:47:12 19 it?
10:47:12 20     A.    I don't know.
10:47:12 21     Q.    You don't know. Let's look here at something else.
10:47:36 22 Even though the law says the defendant has the right to remain
10:47:44 23 silent, an innocent person accused of murder would testify if he
10:47:48 24 was innocent. Okay? Do you remember that sentence? That was
10:47:52 25 just on the next page.

CURTIS SHORTHAND REPORTING - 817/467-4556

68

10:47:54 1     A.    I see it.
10:47:56 2     Q.    Okay. All right. You put, Don't know. What did you
10:47:58 3 think that sentence meant when you were looking at it?
10:48:06 4     A.    That he would testify in his own defense, but he
10:48:08 5 doesn't have to.
10:48:10 6     Q.    He doesn't have to. Everybody agrees with that. You
10:48:14 7 don't have to testify if you don't want to, right?
10:48:16 8     A.    Right.
10:48:16 9     Q.    But if you had an innocent person, that sentence says
10:48:22 10 he would testify if he was innocent.  An innocent person accused
10:48:28 11 of murder would testify if he was innocent. In other words, by
10:48:32 12 God, if I didn't do this, I'd get up there and testify.  That's
10:48:36 13 what that sentence says.  Okay? Do you understand what's
10:48:44 14 printed there? Does that change your answer at all?
10:48:48 15     A.    (Venireperson shakes head.)
10:48:48 16     Q.    You'd still answer it don't know?
10:48:50 17     A.    Well, I stated you don't have to either way.
10:48:52 18     Q.    Sure. You cannot testify if you're guilty.
10:48:56 19     A.    Right.
10:48:56 20     Q.    You cannot testify if you're innocent, and so your
10:49:02 21 answer is the same?
10:49:02 22     A.    He doesn't have to. No opinion. I don't know, I
10:49:12 23 guess.
10:49:18 24     Q.    Let's look at the next one. If you got some
10:49:26 25 evidence, but you can't decide if the defendant is not guilty or

CURTIS SHORTHAND REPORTING - 817/467-4556

10:49:30 1 guilty, you should find the defendant not guilty. In other
10:49:30 2 words --
10:49:40 3     A.   I'm sorry.
10:49:42 4     Q.   What's funny?
10:49:44 5     A.   I'm learning more today than I obviously knew
10:49:48 6 the other day.
10:49:52 7     Q.   When you get it up there on the screen, it brings
10:49:54 8 back a good memory, doesn't it?
10:49:56 9          What were you thinking when you wrote that down?
10:50:14 10    A.   I guess, I was looking at maybe just the evidence --
10:50:18 11    Q.   Okay.
10:50:20 12    A.   -- in that.
10:50:21 13    Q.   Let me tell you this: You've served your civic duty
10:50:28 14 when you came up here and answered Ms. Callaghan's questions and
10:50:31 15 listened to Judge Richards and you're answering mine. Okay?
10:50:36 16          When this is over with, you're going to go
10:50:40 17 out -- when I get through talking to you, you're going to go out
10:50:42 18 in the hall for about two minutes, and I'm not going to tell you
10:50:46 19 how the process works, but you're going to get called back into
10:50:50 20 the courtroom and Judge Richards is either going to tell you
10:50:51 21 you're going to be on the jury or you're not and the prosecutors
10:50:52 22 and myself and the judge -- and, actually, Judge Richards won't
10:50:53 23 get involved in it. The prosecutors and Mr. Moore and myself,
10:51:00 24 we will decide among yourselves through a little short process
10:51:02 25 that doesn't take very long whether or not you're going to be on

CURTIS SHORTHAND REPORTING - 817/467-4556

70

10:51:08 1 the jury.
10:51:08 2     A.   Okay.
10:51:08 3     Q.   And Judge Richards is going to tell you, and there is
10:51:12 4 no right or wrong answer. Okay? This questionnaire, which I
10:51:20 5 don't take credit for all of it, but I take credit for some of
10:51:24 6 it, my share, I guess, 84 questions that we asked you, and some
10:51:27 7 of them had five parts to them, so well over 100 things we asked
10:51:32 8 you. I could -- I could you tell you what the law is in a
10:51:38 9 particular case and you could repeat it back to me, but that's
10:51:40 10 not what I'm trying to do. Okay? I'm not trying to educate you
10:51:44 11 on what the law is or isn't, other than just to point out some
10:51:52 12 things to you, like what Ms. Callaghan did. She didn't expect
10:51:58 13 you, when you walked in here, to know the there were two
10:52:00 14 questions on this death penalty statute. So she's got to tell
10:52:04 15 to some extent what the law is.
10:52:06 16          But what I'm trying to find out is, based on
10:52:08 17 this questionnaire, okay, and based on your answers here, I want
10:52:12 18 to know how you feel about things, because this jury process
10:52:16 19 is -- it's a situation where we want to know what your personal
10:52:20 20 opinions are about a variety of things. Okay? We're having to
10:52:32 21 make a decision that we have to make on several people, but
10:52:42 22 ultimately on 12, okay, if you're going to be on the jury, based
10:52:42 23 on the way we feel that you might characterize the evidence
10:52:42 24 that -- we know what the evidence is going to be. I can't tell
10:52:52 25 you what it's going to be, and the district attorney knows what

CURTIS SHORTHAND REPORTING - 817/467-4556

10:52:54 1 the evidence is going to be. The way we characterize that
10:53:00 2 evidence and how you feel about certain things, we kind of plug
10:53:04 3 you into that. Does that make sense?
10:53:06 4     A.   Yes.
10:53:06 5     Q.   And the reason I say there is no right or wrong
10:53:08 6 answers is many times we'll ask you a question, and we're just
10:53:14 7 searching for your answer, not that you give us the right or
10:53:18 8 wrong answer. Okay?
10:53:20 9     A.   Uh-huh.
10:53:26 10    Q.   And we can take -- if we were doing it the other way,
10:53:26 11 then we'd bring you in and we'd say, How are you going to vote
10:53:28 12 if you hear this, this, this and this, okay, and then it would
10:53:32 13 be pretty simple. Okay? They would either like you or they
10:53:36 14 wouldn't and we would or we wouldn't. It would be the opposite
10:53:40 15 way every time. So that's not the way we do it.
10:53:41 16          So if I ask you something and it looks like I'm
10:53:47 17 asking you for a particular answer, don't read that into it.
10:53:48 18 I'm not trying to trick you. It's just that I'm not necessarily
10:53:52 19 looking for what you might think is the correct answer. I'm
10:53:56 20 looking for how you feel. Okay?
10:53:56 21          And when I saw these answers that you put on
10:54:00 22 here, I think you told me that you didn't really understand --
10:54:04 23 or you had a little different version of what the statement was
10:54:04 24 that's part of what this process is about, because if I could
10:54:11 25 change this questionnaire, there is probably 20 changes I'd make

CURTIS SHORTHAND REPORTING - 817/467-4556

72

10:54:18 1 to it, because I've seen over and over several people have read
10:54:22 2 a particular question a different way than it was intended when
10:54:24 3 it was written. Does that make sense?
10:54:26 4     A.   Yes.
10:54:26 5     Q.   So I'm going to change it before I do this again, but
10:54:30 6 I can't change those questions, but when I saw that question
10:54:34 7 about if the state charges someone with murder, that person is
10:54:38 8 probably guilty, and I see you say, I agree strongly with that,
10:54:44 9 okay, what that tells me -- that question is in there to talk a
10:54:52 10 little bit about the burden of proof. Okay?
10:55:00 11          Just because you answered agree strongly doesn't
10:55:02 12 mean you can't agree with the burden of proof. That's not what
10:55:04 13 I'm getting at. If I did that, I'd say, Do you agree the burden
10:55:10 14 of proof is beyond a reasonable doubt, yes or no. And if you
10:55:12 15 put yes, you're fine; and if you put no, you're -- you hadn't
10:55:16 16 answered it that way. That's not what I'm asking.
10:55:17 17          And I've kind of lead up to that, but what I'm
10:55:20 18 getting at is, on this question that's up there, okay, that I've
10:55:28 19 got up there, if you can't decide if a guy is guilty or not
10:55:32 20 guilty, you should find the person not guilty. And what you put
10:55:36 21 was disagree with that. And I'm just curious as to what your
10:55:42 22 thoughts are when you said that.
10:55:44 23          I think after Ms. Callaghan talked to you about
10:55:44 24 it a minute, you kind of realized that maybe you didn't read
10:55:52 25 that question the way it was intended like the other question

CURTIS SHORTHAND REPORTING - 817/467-4556

10:55:58 1 about if you find him guilty, but I'm trying to figure out what
10:56:06 2 you were thinking when you did it, because that might help me.
10:56:14 3     A.   Maybe I based it on murder and maybe I based it on
10:56:18 4 evidence and from that, I said, you know, maybe the evidence
10:56:28 5 wasn't there, but maybe there were many some kind of other
10:56:30 6 circumstances in there. I don't know.
10:56:32 7     Q.   Well, let me ask you this: Let's suppose that -- and
10:56:36 8 just like Ms. Callaghan, these are not the facts of this case.
10:56:40 9     A.   I understand.
10:56:40 10     Q.   And I'm going to make them way different. Let's
10:56:44 11 suppose that -- that you were kind of looking out your back yard
10:56:54 12 out there -- don't you live in Saginaw?
10:56:53 13     A.   Uh-huh.
10:56:58 14     Q.   You were looking out in your back yard and you see
10:57:00 15 somebody take his rifle out and shoot some little child, a
10:57:04 16 four-year-old child, you see it with your own eyes and you kind
10:57:12 17 of just put that in the back of your brain and it hurt you so
10:57:16 18 much that you don't even want to think about and you just kind
10:57:18 19 of block it out. You don't even tell the police. Okay? But
10:57:22 20 you know that happened, because you saw it. It's one of those
10:57:26 21 deals that it's been proven to you at 100 percent or 110
10:57:30 22 percent. Okay? Something happens and you go a year or so
10:57:36 23 later, you go to the mailbox and you get this jury summons and
10:57:40 24 you don't think about anything about that little kid getting
10:57:41 25 shot, and you come down here for jury service, just like what

10:59:22 1 after you heard all of the facts, you felt like in your heart
10:59:28 2 that arrest was not legal. Okay? Do you kind of see where I'm
10:59:36 3 going with this?
10:59:36 4     A.   Yes.
10:59:38 5     Q.   You knew absolute -- any doubt at all that this
10:59:42 6 person killed this little child. Maybe this child played with
10:59:46 7 your child, but you just knew that this person did it and you
10:59:52 8 also knew that the police, man, they just wrecked this train,
10:59:58 9 derailed it and it wasn't right and they had illegally arrested
11:00:02 10 this person and that whole conversation that the policeman had
11:00:06 11 told you about came after the fact. Okay? And if that's the
11:00:10 12 situation, the judge will tell you, you can't, under those
11:00:14 13 facts, use that testimony, if you found it was an illegal arrest
11:00:18 14 and you found it was an illegal arrest, so ultimately you can't
11:00:22 15 use what the policeman said. Okay?
11:00:26 16     So we get in the framework of this question I've
11:00:30 17 got up here. Do you see what I mean? And the evidence -- the
11:00:40 18 evidence in that question, the way it relates to this case, you
11:00:46 19 can only consider the evidence in the case that you hear in the
11:00:49 20 courtroom. Okay? So what you saw out there in Saginaw two
11:00:52 21 years ago, you can't use. Okay? The judge will tell you that
11:00:56 22 you've got to hear it coming from the witness stand, which is
11:01:00 23 where you're seated today. My screen is over there in the jury
11:01:04 24 box, but the only evidence that you hear from the witness stand,
11:01:08 25 whether it's from a -- from a witness or maybe a photograph or a

10:57:48 1 we're doing here, start talking about it and presumption of
10:57:50 2 innocence, burden of proof and all those things and you still
10:57:56 3 don't -- it still doesn't dawn on you that we're even talking
10:58:00 4 about the same case. Okay? Then they start trying the case,
10:58:04 5 start bringing the witness in, and you're on the jury. Okay?
10:58:06 6 You hadn't intentionally withheld anything. You just forgot,
10:58:10 7 okay, and let's suppose that the -- that the first policeman
10:58:16 8 comes in and says, You know what, I was out there in Saginaw.
10:58:20 9 I'm a Saginaw police officer and I saw something that looked
10:58:24 10 kind of funny one day and I looked over there and I saw
10:58:26 11 so-and-so shoot so-and-so's child and then it dawns on you, man,
10:58:32 12 he's talking about the same case I know about and I know he's
10:58:34 13 telling the truth, because it just happened. That's the way I
10:58:38 14 saw it. Okay?
10:58:42 15     A.   Uh-huh.
10:58:42 16     Q.   So you're convinced at that point. Okay? Maybe you
10:58:44 17 shouldn't -- and I don't want to go through the ethics of
10:58:48 18 whether or not you should have been on the jury or not, because
10:58:52 19 that's not what my question relates to. My point is: You know
10:58:52 20 that the crime has been committed, okay, and then let's just
10:58:56 21 suppose that -- that you later find out that, well, for whatever
10:59:04 22 reason -- and I'm not going to go into what the facts might be
10:59:08 23 to support this -- but let's suppose that the facts show that
10:59:12 24 there was an issue over whether or not there was a legal arrest,
10:59:16 25 whether or not the arrest of the person on trial was legal and

11:01:14 1 statement that's introduced, there is a variety of types of
11:01:18 2 evidence that is admitted here in the courtroom, maybe some
11:01:20 3 opinion from an expert witness, maybe, but any of it, you don't
11:01:26 4 hear, you've got nothing and you can't decide if this guy is
11:01:34 5 guilty or not guilty and the reason you can't decide is because
11:01:38 6 they didn't present anything and you know they don't have a
11:01:42 7 and yet, in your heart of hearts, you know this guy is guilty.
11:01:56 8 How do you vote?
11:01:56 9     MS. HARTMAN:  Well, I'm going to object to
11:02:00 10 binding. He's binding her to a specific set of facts and not to
11:02:02 11 whether she could follow the law if she was given the
11:02:04 12 appropriate instruction.
11:02:06 13     THE COURT:  Overruled.
11:02:08 14     Q.   (By Mr. Ray) How do you find? Also, no right or
11:02:16 15 wrong answer. I'm just --
11:02:18 16     A.   I mean, if I'm following the law, I would vote not
11:02:24 17 guilty.
11:02:24 18     Q.   All right. My question is, though, if you're not
11:02:26 19 following the law, are you going to vote guilty?
11:02:28 20     A.   And in the back of my mind, if you saw it, you should
11:02:32 21 have done something about it. I can't -- I'm -- I'm having a
11:02:36 22 hard time with -- I understand what you're asking me, and I
11:02:42 23 believe everybody -- everybody should abide by the law.
11:02:42 24     Q.   Well, it's like --
11:02:46 25     A.   People don't, but I believe that, you know --

79

11:02:50 1    Q.   In this question that Ms. Callaghan asked you, her
11:02:54 2  example was different, but her question has got the same logic.
11:03:00 3    A.   Yes.
11:03:00 4    Q.   You know he did it and --
11:03:02 5    A.   It would be hard.  That would be very hard.
11:03:06 6    Q.   Do you see it's a little different, though, just
11:03:08 7  asking you if you can follow the law versus how you --
11:03:12 8    A.   Yes, I do.  It would be very, very hard to -- to not
11:03:16 9  consider, I guess, the other side.  I mean --
11:03:20 10    Q.   What my example entails and what hers entails is
11:03:24 11  you've got -- maybe you didn't see -- maybe you just know.
11:03:28 12  Maybe you saw a confession that made the admission like her
11:03:32 13  example was, but the confession is no good for whatever reason.
11:03:36 14  Okay?  Maybe it's something real technical, like somebody didn't
11:03:40 15  say you've got a right to have a lawyer present.  Okay?
11:03:44 16    A.   Right.
11:03:44 17    Q.   But it's, you know, the kind of catch the phrase,
11:03:48 18  it's kind of like being pregnant, it's either good or it isn't.
11:03:52 19  You're not little bit pregnant.  Okay?  In some cases, it's not
11:03:54 20  a little bit right.  Sometimes it's just clear-cut, dead solid
11:04:00 21  perfect one way or the other.
11:04:02 22           And our purpose is here and the purpose of my
11:04:04 23  question is, are you going to be able to do that, if it -- if it
11:04:08 24  comes down to it?  Are you going to be able to vote not guilty
11:04:14 25  if the evidence in the case, in the legal evidence that you

CURTIS SHORTHAND REPORTING - 817/467-4556

78

11:04:20 1  you've seen and that you have determined that you could use,
11:04:22 2  because as Ms. Callaghan just very eloquently and very correctly
11:04:28 3  said, in Texas, sometimes you get that option.  Okay?  And that
11:04:32 4  may happen in this case, and it may not.  I'm not trying to tell
11:04:36 5  you it is or isn't, but if -- if you were put in a situation
11:04:40 6  where you found the evidence was not usable, okay, are you going
11:04:44 7  to be able to really disregard that?
11:04:46 8    A.   I'm supposed to.  I -- you know, you want to.
11:04:49 9    Q.   Sure.
11:05:10 10    A.   You want to, but as a group of jurors, maybe it would
11:05:11 11  help with all of us together being able to talk about it and
11:05:12 12  understand.
11:05:13 13    Q.   Well, but if you -- if in my example, you come back
11:05:14 14  to the same conclusion every time, whatever the evidence is, I'm
11:05:16 15  not trying to tell you that this fact changes or this fact
11:05:18 16  changes.  For the purpose of my question, whatever you've got --
11:05:18 17  whatever you've heard shows you that there is a piece of
11:05:19 18  evidence that you can't use.  Okay?
11:05:34 19    A.   Right.
11:05:34 20    Q.   And that is the only piece of evidence that points to
11:05:38 21  the guilt of the defendant.
11:05:38 22    A.   Uh-huh.
11:05:38 23    Q.   But you've seen it?  Okay.  And the example of I
11:05:42 24  confess to it.  I did it.  I'd do it 100 times again, if I got
11:05:48 25  the opportunity.  If you let me out, I'm going to do it five

CURTIS SHORTHAND REPORTING - 817/467-4556

80

11:05:50 1  more times than you know about, and I've done it 10 times you
11:05:54 2  don't even know about, pretty bad facts, okay, but whatever the
11:05:56 3  situation leading up to that is, is that you -- you know that
11:06:02 4  confession, okay, or those -- under our facts, that confession
11:06:06 5  was not legally obtained and the judge has told you you can't
11:06:12 6  use it, because that's what the law is.
11:06:14 7    A.   Right.
11:06:14 8    Q.   And that's the only evidence that you can use and
11:06:16 9  it's gut wrenching, like you can curl up underneath the bed and
11:06:22 10  cry for, you know, years, but my question is:  Are you going to
11:06:28 11  really be able to do it?
11:06:30 12    A.   If it was a confession, yes, because stories change
11:06:34 13  all the time.
11:06:34 14    Q.   Well --
11:06:34 15    A.   If the evidence, you know, I --
11:06:40 16    Q.   I'm not trying to make your answer based on if it was
11:06:42 17  a confession.  I've just simply used that as an example.
11:06:48 18    A.   I understand.
11:06:49 19    Q.   It could be something else, and I'm not trying to tie
11:06:50 20  you to the point specifically it's a confession.  It's just --
11:06:54 21  just kind of an easy way to explain it.
11:06:56 22           But whatever evidence it was, you know that you
11:07:00 23  if you considered it, it would overwhelmingly establish guilt;
11:07:04 24  and if you didn't, it would shift -- you would have no evidence
11:07:08 25  to convict the person on and you are convinced under the laws

CURTIS SHORTHAND REPORTING - 817/467-4556

80

11:07:12 1  and the facts that lead up to it that you can't use that only --
11:07:16 2  that only piece of evidence.  How do you vote?
11:07:16 3    MS. HARTMAN:  Your Honor, I'm going to object to
11:07:22 4  the lawyer's phrase.  He's not asking whether she can follow the
11:07:24 5  law or would she violate her oath.
11:07:26 6    THE COURT:  Overruled.
11:07:32 7    Q.   (By Mr. Ray)  How would you answer?
11:07:34 8    A.   I would -- I can't tell you.  I don't know.  I
11:07:38 9  haven't been put there yet.  If I was, I'm sure I would have to
11:07:40 10  come to some kind of a -- I just don't know.
11:07:41 11    MR. RAY:  Your Honor, we challenge for cause and
11:07:46 12  provided to the Court's ruling that I make my motion as near the
11:07:50 13  time as I can.
11:07:52 14    THE COURT:  Thank you.  Do you wish to question?
11:07:56 15    MS. CALLAGHAN:  Yes, Your Honor.
11:07:56 16    VOIR DIRE EXAMINATION
11:07:57 17  BY MS. CALLAGHAN:
11:07:58 18    Q.   Ms. Greene, the ultimate question here is can you
11:08:00 19  follow the law.  Okay?  If -- if you took an oath to follow the
11:08:06 20  law, you told the judge, I will follow the law --
11:08:08 21    A.   Right.
11:08:08 22    Q.   -- and I take an oath to do so, could you follow the
11:08:12 23  oath and disregard the evidence if you found it illegally
11:08:16 24  obtained?
11:08:16 25    A.   Yes.

CURTIS SHORTHAND REPORTING - 817/467-4556

**83**

11:08:16 1   Q.   And even if that means the person goes free?

11:08:22 2   A.   I take an oath and I say, I can, then that's what I

11:08:26 3   have to do even though personally, it might be hard to do that.

11:08:30 4   Q.   Okay. So you could follow the law, if the judge

11:08:34 5   instructed you --

11:08:34 6   A.   I could follow it, yes.

11:08:36 7   Q.   -- if the judge instructed you that -- that you must

11:08:38 8   disregard evidence that was obtained illegally?

11:08:40 9   A.   Yes.

11:08:42 10   Q.   Okay.

11:08:44 11       THE COURT: Ms. Greene, when you said you didn't

11:08:46 12   know what you would do before, what -- what did you mean by

11:08:50 13   that?

11:08:52 14       MS. GREENE: Your -- your personal feelings as a

11:08:54 15   human being. I mean, you have to -- you have to put that aside,

11:08:58 16   and it's not something that I can just sit here and make a

11:09:00 17   decision on instantly. I don't -- I don't know.

11:09:06 18       THE COURT: But in a situation where the law

11:09:08 19   required you, if you found evidence to have been illegally

11:09:12 20   obtained --

11:09:14 21       MS. GREENE: It can't be used, and that's not

11:09:16 22   something that we can base our decision on.

11:09:20 23       THE COURT: Okay. So your statement to me and

11:09:24 24   your statement to Mr. Ray about not knowing what you would do --

11:09:28 25       MS. GREENE: He said -- what I took it as is can

CURTIS SHORTHAND REPORTING - 817/467-4556

---

**84**

11:10:52 1   decision if you have a situation like what we're talking about.

11:10:54 2   We're not talking about when the trial is over. There is no

11:10:58 3   death penalty. There's no life sentence. There's no whatever

11:11:00 4   the sentence would be, and what I'm asking you, because I've,

11:11:06 5   quite frankly, have heard it both ways and this is just one of

11:11:10 6   these times that you have to pin somebody down. Are you really

11:11:12 7   going to be able to do it?

11:11:14 8   A.   Yes.

11:11:14 9   Q.   Okay. Can I rely on that?

11:11:16 10   A.   Yes.

11:11:20 11       THE COURT: Challenge for cause is overruled.

11:11:22 12   Q.   (By Mr. Ray) 100 percent?

11:11:24 13   A.   100 percent.

11:11:30 14   Q.   Hang on just a second.

11:11:56 15       Okay. Are you tired of talking about that?

11:12:00 16   A.   (Venireperson nods.)

11:12:04 17   Q.   Let's see here. How about some easy questions, do

11:12:08 18   you want some of them? Okay. Let's just make sure we're

11:12:14 19   comfortable on this.

11:12:26 20       These are the two special issue questions that

11:12:28 21   you've already seen. Okay? Ms. Callaghan -- I hated that she

11:12:32 22   gets to go first, because she pays attention to detail better

11:12:36 23   than me sometimes, but you get an additional instruction after

11:12:40 24   this first question and I just want to make sure that you're

11:12:44 25   comfortable with that.

CURTIS SHORTHAND REPORTING - 817/467-4556

---

**82**

11:09:30 1   you put that aside. It's hard for me to put that aside, even

11:09:34 2   though you have to. It's not something that, you know -- I

11:09:34 3   don't --

11:09:38 4       THE COURT: Could you -- could you put it aside?

11:09:40 5       MS. GREENE: You'd have to.

11:09:42 6       THE COURT: Okay. I'll -- do you wish to

11:09:44 7   question her any further before my ruling?

11:09:44 8       VOIR DIRE EXAMINATION

11:09:48 9   BY MR. RAY:

11:09:48 10   Q.   Just one question, and I'm not trying to argue with

11:09:50 11   you. Quite frankly, you've -- depending on the way the question

11:09:56 12   is phrased, there are two different answers. My question has got

11:10:00 13   a few more facts in it and, quite frankly, I'll admit to you it

11:10:04 14   is a -- it is a little bit more elaborate introduction of those

11:10:08 15   facts, as opposed to can you follow the law.

11:10:12 16   A.   Uh-huh.

11:10:12 17   Q.   Okay. It's real easy for anyone to say, I can follow

11:10:16 18   the law, and you can get the best -- and you're certainly an

11:10:20 19   example. You can get somebody that forges checks his whole life

11:10:24 20   and say, Could you follow the law, and he would say, Yes, and

11:10:26 21   then he will go right up here and forge a check.

11:10:28 22       What -- what I'm getting at is can you, not just

11:10:32 23   in a vacuum of the question, can you follow the law, okay, if

11:10:40 24   this situation arises, knowing that what -- what's going to

11:10:46 25   happen if you do that, because there is a consequence with the

CURTIS SHORTHAND REPORTING - 817/467-4556

---

**84**

11:12:44 1       In deliberating on this specific issue, that is

11:12:48 2   Special Issue No. 1, the one that we call future dangerousness

11:12:54 3   just because that's the easiest way to characterize it, you're

11:12:56 4   instructed to consider all evidence of the guilt/innocence and

11:13:00 5   the punishment phase stage, including any evidence you might

11:13:02 6   have heard about the defendant's background or character. Okay.

11:13:04 7   In other words, like Lisa said, you're going to hear most of the

11:13:10 8   time -- I can't promise you that you will just this particular

11:13:14 9   question, but you hear evidence that is limited basically in the

11:13:16 10   judge's finding of relevance.

11:13:20 11       If he thinks -- if the judge thinks it's

11:13:22 12   relevant, you're going to hear about it. It could be something

11:13:24 13   that happened when somebody is five years old. It could be

11:13:28 14   something when they've been in prison for something else or

11:13:30 15   maybe they've been a Boy Scout, a Marine Corps hero. It's a

11:13:34 16   variety of things you hear, but that's what that means,

11:13:38 17   defendant's background or his character. Some people have good

11:13:42 18   character. Some people have bad character. Some people don't

11:13:44 19   have any character. Some people have character if they're asked

11:13:48 20   too many pointed questions or the circumstances of the offense

11:13:52 21   that militate for, which means -- I don't know where they

11:13:54 22   thought up that word. I've only seen it in this question, but

11:13:58 23   it means give the death penalty, or mitigate against imposition

11:14:00 24   of the death penalty. Do you see all of that?

11:14:06 25   A.   (Venireperson nods.)

CURTIS SHORTHAND REPORTING - 817/467-4556

11:14:06 1     Q.  And what that means is in the context of the first
11:14:10 2 question, even though we have a separate question that we call
11:14:14 3 mitigation and that's what mine is entitled and that's what
11:14:18 4 hers -- you're going to consider mitigation in the context of
11:14:24 5 future dangerousness as well. Do you understand that?
11:14:26 6     A.  Yes.
11:14:28 7     Q.  And in this question, just like when the state has
11:14:30 8 the burden of proof to prove a person is guilty beyond a
11:14:36 9 reasonable doubt, you're going to consider that they have to --
11:14:40 10 they have to prove that with all the facts of the case, the
11:14:46 11 defendant's background and his character, okay, and any
11:14:50 12 mitigation that you've got, okay, and anything that suggests he
11:14:56 13 ought to get the death penalty, all of that together has to
11:15:00 14 prove to you, convince to you beyond a reasonable doubt that
11:15:02 15 he's going to be a future danger to society. Do you see how
11:15:06 16 that works?
11:15:06 17     A.  Yes.
11:15:08 18     Q.  And just because you found a person guilty of capital
11:15:14 19 murder beyond a reasonable doubt, killing two or more people, is
11:15:18 20 that particular question always going to have the same answer to
11:15:20 21 it?
11:15:24 22     A.  I -- no.
11:15:26 23     Q.  I'm sorry?
11:15:26 24     A.  No.
11:15:28 25     Q.  Okay. Might get a yes if they convince you, and you

CURTIS SHORTHAND REPORTING - 817/467-4556

86

11:15:30 1 might get a no if they don't.
11:15:42 2     The second question: The only -- that's not the
11:15:46 3 only -- there is an additional element that you have to consider
11:15:50 4 in this question. You've got circumstances of the offense,
11:15:54 5 you've got the defendant's character or background, then there
11:15:58 6 is one additional thing and that's the personal moral
11:16:00 7 culpability of the defendant. Okay? What's his moral blame or
11:16:08 8 responsibility? That's what -- that's in addition to everything
11:16:12 9 else. Is there a sufficient mitigating circumstance or
11:16:16 10 circumstances -- could be only one -- to warrant that a life
11:16:22 11 sentence be imposed? You could answer that either way?
11:16:26 12     A.  (Venireperson nods.)
11:16:26 13     Q.  Let me tell you a couple of things about that and
11:16:28 14 then I'll ask you that question again. Down here at the bottom,
11:16:32 15 you're going to be instructed that you shall consider mitigating
11:16:38 16 evidence to be evidence that a juror might regard as reducing
11:16:42 17 the defendant's moral blameworthiness, his moral responsibility.
11:16:46 18     A.  Right.
11:16:46 19     Q.  You could consider all of that?
11:16:48 20     A.  Yes.
11:16:48 21     Q.  A couple of things you need to know, number one, you
11:16:52 22 don't have to agree on what supports a yes answer to this with
11:16:58 23 the other jurors. Okay?
11:17:00 24     A.  Okay.
11:17:02 25     Q.  It only takes -- it only takes 10 to answer the

CURTIS SHORTHAND REPORTING - 817/467-4556

11:17:12 1 question yes. It takes all 12 to answer it no, and that's just
11:17:16 2 exactly the opposite of the first question. It takes all 12 to
11:17:20 3 answer the future dangerousness question yes and it takes 10 to
11:17:24 4 answer no, but anytime you're dealing with these 10 people in
11:17:28 5 either question, what you think supports that answer and what
11:17:30 6 the guy sitting next to you thinks supports that answer doesn't
11:17:34 7 have to be the same thing. You understand that?
11:17:36 8     A.  Yes.
11:17:38 9     Q.  You might think that guy is the fool for what he
11:17:40 10 thinks is mitigating. I would never think that's mitigating.
11:17:42 11 Okay?
11:17:44 12     A.  Okay.
11:17:44 13     Q.  And he could think the same thing about you.
11:17:46 14     A.  Right.
11:17:46 15     Q.  And one other thing, while those are the numbers that
11:17:50 16 are required to answer those questions, okay, you do not have to
11:17:56 17 have that answer and what I mean by that is before you can
11:18:00 18 answer the questions yes or no, it has to be 10 or 12, depending
11:18:04 19 on which question it is, but the jury, for instance, could have
11:18:06 20 a six/six vote. You understand that?
11:18:10 21     A.  Uh-huh.
11:18:10 22     Q.  And what that means is you wouldn't be able to answer
11:18:14 23 the question, but that does not mean that you can't have that
11:18:16 24 verdict. Do you understand that?
11:18:20 25     MS. CALLAGHAN: Your Honor, the state would

CURTIS SHORTHAND REPORTING - 817/467-4556

88

11:18:22 1 object. That's not the law. You would not have a verdict in
11:18:26 2 that case. That is not a verdict.
11:18:28 3     THE COURT: Sustained as phrased. If you would
11:18:30 4 just rephrase.
11:18:32 5     Q.  (By Mr. Ray) You wouldn't have an answer. Does that
11:18:34 6 make sense? If you have a six to six vote on Special Issue
11:18:38 7 No. 1, you just can't answer the question.
11:18:40 8     A.  Yes.
11:18:40 9     Q.  Okay. If you're sitting back in the jury room and
11:18:52 10 there is a -- and I'm not going to ask you -- my question is not
11:18:56 11 going to say which way you are, but if you were in a position
11:19:00 12 where it's one vote from being able to weigh the answer to the
11:19:04 13 question, whether it's yes or no and you are in the minority,
11:19:12 14 okay --
11:19:12 15     A.  Okay.
11:19:12 16     Q.  -- in other words, you change your vote, it's either
11:19:16 17 all yes or all -- or 10 no or however it is. I'm not talking
11:19:20 18 about which way it is, which side of the fence you're on, but
11:19:24 19 you really believe that way, okay, how do you ultimately end up
11:19:34 20 if that's the situation?
11:19:36 21     A.  With what I --
11:19:38 22     Q.  Okay. And I'm not saying that another juror can't --
11:19:44 23 might not be able to convince you, but I'm saying afterward, if
11:19:46 24 they haven't convinced you. There is nothing they can say to
11:19:50 25 convince you to change your vote. Does your vote stay or does

CURTIS SHORTHAND REPORTING - 817/467-4556

91

11:19:52 1  it change, because it's 7:30 on Friday night before
11:19:54 2  Thanksgiving?
11:19:58 3      A.  I have my own mind and my own decision. I can make
11:20:00 4  it on -- I can't base it on if I can listen to others.
11:20:04 5      Q.  Can I rely on that?
11:20:06 6      A.  Yeah, yes, yeah.
11:20:16 7      Q.  What do you like about the crime shows?
11:20:18 8      A.  The forensic stuff.
11:20:20 9      Q.  The forensics. Okay.
11:20:20 10     A.  I go to sleep listening to it. It just intrigues me
11:20:24 11  to find out about that kind of stuff.
11:20:26 12     Q.  Do you like David Caruso? Is that his name?
11:20:28 13     A.  No, no. I watch Court TV. That's mostly the one I
11:20:32 14  watch.
11:20:36 15     Q.  And my -- we don't have a device here that sends the
11:20:40 16  fingerprints around and makes them all -- you're not going to
11:20:44 17  see that. If that's what you're wanting to see, you're in the
11:20:46 18  wrong place.
11:20:48 19     A.  No.
11:20:50 20     Q.  Well, after you've heard all of that, do you still
11:20:56 21  want to be on this jury?
11:20:58 22     A.  If I'm needed, I'd like to.
11:21:04 23     Q.  We've got 150 people.
11:21:04 24     A.  I understand.
11:21:06 25     Q.  I can do with you or without you numberswise.

11:22:08 1      Q.  What do you do?
11:22:08 2      A.  I deal with problems. The --
11:22:08 3      THE REPORTER: Pardon me?
11:22:16 4      A.  -- the mayor's office, if something is not working
11:22:20 5  right, I have to get involved and make it happen, so I'm like a
11:22:24 6  liaison between the customers and us.
11:22:26 7      Q.  (By Mr. Ray) When the city power goes off, you have
11:22:28 8  to listen to the mayor's office?
11:22:28 9      A.  Anybody. You know, Hillwood, Alliance, I've got
11:22:32 10  them. I've got the Bureau of Engraving. I have my -- everybody
11:22:36 11  is important, you know.
11:22:36 12     Q.  What is that mayor's name out there, Robbins, Marty
11:22:36 13  Robbins?
11:22:40 14     A.  I just get the calls. I don't -- I'm not sure
11:22:42 15  what --
11:22:46 16     Q.  Hillwood, that's Ross Perot, right?
11:22:47 17     A.  Yes.
11:22:48 18     Q.  Okay. Tell me what you feel about a life sentence.
11:23:06 19  He told me to ask this. Giving somebody a life sentence for
11:23:12 20  capital murder, how do you feel about that?
11:23:16 21     A.  Well, their life is spared. They got a life
11:23:18 22  sentence.
11:23:18 23     Q.  But how do you feel about it? I mean, I know you
11:23:20 24  know what it is. Can you do it?
11:23:22 25     A.  Yeah.

90

11:21:10 1      A.  I didn't think it was my decision, to be honest.
11:21:12 2      Q.  Your opinion has a lot to do with my decision.
11:21:16 3      A.  That's -- either way is fine.
11:21:18 4      Q.  You know, you could have got -- if you -- maybe it's
11:21:22 5  a little late in the game now, but your seven-year-old child --
11:21:26 6     A.  He's eight.
11:21:26 7     Q.  Eight.
11:21:26 8     A.  He just turned eight, so --
11:21:28 9     Q.  If he's going to be left without adequate
11:21:32 10  supervision, you could have been gone two hours ago.
11:21:34 11     A.  But he's not. He's handled just fine, so --
11:21:40 12     Q.  Okay. Well --
11:21:42 13     A.  I've got a lot of teenagers in my house. I've got
11:21:44 14  three teenagers.
11:21:46 15     Q.  Maybe you're better off down here.
11:21:46 16     A.  Maybe.
11:21:48 17     Q.  There won't be any teenagers in the jury room.
11:21:52 18      What's a technical supervisor do for Oncor?
11:21:56 19     A.  My husband?
11:21:56 20     Q.  Is that what he does? I thought that's what you do.
11:21:58 21     A.  No. I'm an advisor.
11:21:58 22     Q.  Oh, I see.
11:21:58 23     A.  I'm just an advisor.
11:22:02 24     Q.  That's the power company, right?
11:22:06 25     A.  Yes, yes.

92

11:23:26 1      Q.  Do you understand what a life sentence is?
11:23:30 2      A.  Life in prison.
11:23:30 3      Q.  Do you understand what a life sentence really means?
11:23:34 4      A.  For the rest of their life.
11:23:40 5      Q.  It actually means 40 calendar years.
11:23:44 6      A.  Oh, that's right. She said that.
11:23:46 7      Q.  Which is, if you're my age, that's a life sentence.
11:23:52 8  Your son is --
11:23:52 9      A.  Okay. If it's a life sentence with no possibility of
11:23:56 10  parole, that's a life sentence.
11:24:00 11     Q.  Well, it's actually -- the law says it's a life
11:24:02 12  sentence with no possibility of parole until 40 calendar years
11:24:08 13  have been served.
11:24:08 14     A.  Oh, okay.
11:24:08 15     Q.  Do you see the difference?
11:24:10 16     A.  Yes.
11:24:10 17     Q.  I mean, there is such a thing as life with no parole,
11:24:14 18  which means if you do one year or 1,000 years, but that's not
11:24:18 19  what the law is and that's not what the law is in this case. As
11:24:20 20  a practical matter, a life sentence could be for the rest of
11:24:26 21  your life just depending on your age and your health.
11:24:30 22     MS. CALLAGHAN: Your Honor, I feel compelled t
11:24:32 23  object at this point. I don't think defense -- I think he was
11:24:34 24  trying to explain it, but it came out a little sideways, that
11:24:40 25  life without parole doesn't exist in this state.

MR. RAY: Well, it doesn't.

MS. CALLAGHAN: I think that's what he was trying to say. It just came out a little odd.

THE COURT: Okay. That's what I understood him to say.

MS. CALLAGHAN: Okay. All right.

THE COURT: Do you understand that there is no life without parole in the State of Texas?

MS. GREENE: Yeah, I gather that from what he just said.

MS. CALLAGHAN: Okay. It's just me, then.

MS. GREENE: I didn't know that.

MR. RAY: Judge, I would like to explain to Ms. Greene the specifics that the Court has prohibited me from talking about, as far as the parole board.

THE COURT: That will be denied.

MR. RAY: I'm sorry?

THE COURT: Denied.

Q. (By Mr. Ray) What I can tell you, Ms. Greene, is that if you get convicted of capital murder and you get a life sentence, you're going to serve 40 years before you are eligible for parole. Okay? And just because you're eligible, that doesn't mean you make parole. That just means you're eligible at that time, but there is not going to be any -- they can't let you out before then. You understand that?

CURTIS SHORTHAND REPORTING - 817/467-4556

94

A. Yes.

Q. Knowing all that, is a life sentence a viable option for you?

A. Yes.

Q. All other things considered?

A. Yes.

MR. RAY: All right. Thank you, Ms. Greene.

THE COURT: Okay. Ms. Greene, if you will wait in the hallway for about two minutes, we'll have a decision for you. Okay?

MS. GREENE: Okay.

(Venireperson Greene leaves the proceedings.)

MS. HARTMAN: The state accepts.

MR. RAY: We need just a second.

(Off-the-record discussion.)

MR. RAY: We'll take her, Judge.

THE COURT: Okay. If you will bring her back in, please.

(Venireperson Greene enters the proceedings.)

THE COURT: Okay. Ms. Greene, you can stay right there. You will be on the jury. You have been selected, so the contact information will remain the same, is that --

VENIREPERSON GREENE: My mobile number has changed since then, and that's the only number they have.

THE COURT: Well, what would the new number be?

CURTIS SHORTHAND REPORTING - 817/467-4556

VENIREPERSON GREENE: 817-301-5484.

THE COURT: Okay. The coordinator or somebody with the court will be in contact with you again. The trial is set for the 22nd, which is a Monday, but they'll be in contact with you before then. Okay? Kind of block out that week and potentially the next one.

VENIREPERSON GREENE: Okay.

THE COURT: Okay. Very good. Thank you.

(Off-the-record discussion.)

THE COURT: Let's go ahead and go back on the record, then.

Okay. It's my understanding that there has been an agreement between the state and defense that we will excuse Veniremember Nos. 96 and 97; 96 being Joan Katzenmeier; and 97, Robert Dunnam.

MS. CALLAGHAN: That's correct from the state, Your Honor.

MR. MOORE: That's correct.

THE COURT: Okay. Very well. They are excused. So if they should show up, I don't know -- it's probably too late to contact them.

(Off-the-record discussion.)

THE COURT: Ready for Mr. Reasoner?

MS. HARTMAN: State's ready.

MR. RAY: We're ready.

CURTIS SHORTHAND REPORTING - 817/467-4556

96

(Venireperson Reasoner enters the proceedings.)

THE COURT: Mr. Reasoner, right up here, please. How are you doing this morning?

VENIREPERSON REASONER: Fine. And you?

THE COURT: Thank for your patience in waiting out there. Okay. Mr. Reasoner, let me begin by introducing myself. My name is David Richards, and I'm a visiting judge here in Fort Worth. Judge Bob Gill is the elected judge of this court and he will be presiding in the trial and I'm just helping him select jurors in this case.

And I don't know whether or not you've ever been on jury service before, but in a normal type of case, we bring all the prospective jurors in in a big group and they question as you as a group, because this is a case in which the state is seeking the death penalty, we -- because of the nature of the case, we bring in prospective jurors one at a time and conduct this part of the trial, which is called voir dire, which is a French term meaning to speak the truth.

This is the one opportunity that the lawyers have to get familiar with your background, tell you a little bit about the law and find out whether you would be a -- make a good juror in this particular type of case.

It's also your opportunity if you have any questions of the attorneys about what you can expect in this case and questions about the law, you have an opportunity to do

CURTIS SHORTHAND REPORTING - 817/467-4556

11:37:36 1 that, too. Okay?

11:37:38 2     VENIREPERSON REASONER: Okay.

11:37:38 3     THE COURT: A couple of ground rules. You may

11:37:40 4 have noticed that the court reporter is taking down everything

11:37:44 5 that I say. She is required to take down everything that's said

11:37:46 6 in the courtroom, whether it's me, you or the lawyers. So try

11:37:50 7 to make your answers audible. Try to avoid shaking and nodding

11:37:54 8 of the head, because she can't take that down.

11:37:58 9     VENIREPERSON REASONER: Okay.

11:37:58 10     THE COURT: Also, try to avoid the uh-huh and

11:38:00 11 the huh-uhs. Those answers are very difficult to read and very

11:38:06 12 difficult for her to take down. A yes or no would be

11:38:10 13 preferable. Also, try not to talk over the questions and by

11:38:12 14 that, I mean, it's normal in conversation if someone is asking

11:38:18 15 you a question and before they get to the end of the question,

11:38:20 16 you know what your answer is and you know what they're getting

11:38:26 17 at, to go ahead and volunteer the answer. Try to avoid that

11:38:28 18 here. She -- for one thing, she can't take down two people

11:38:32 19 talking at the same time. So you want to try to avoid that. So

11:38:38 20 leave a one second or so interval between their questions and

11:38:40 21 your answers. That will be a good way to do that.

11:38:46 22     All right. This is the opportunity the

11:38:48 23 attorneys have to talk to you about the law in this case.

11:38:50 24 They're not going to be able to discuss the particular facts of

11:38:54 25 the case. You'll have a general idea of what it is that

---

98

11:38:58 1 defendant is charged with having done, but you're not going to

11:39:02 2 hear the state go into the details of the facts of the offense.

11:39:06 3 If anything, they'll talk to you generally about the death

11:39:10 4 penalty by talking in hypothetical fact situations that aren't

11:39:16 5 related to the facts that they expect to prove in this case.

11:39:18 6 Okay?

11:39:20 7     VENIREPERSON REASONER: Okay.

11:39:20 8     THE COURT: All right. Let me begin by

11:39:22 9 introducing the attorneys who are present. Tim Curry is the

11:39:24 10 elected District Attorney of Tarrant County, but he's not

11:39:24 11 present. That's more of an administrative-type position that he

11:39:32 12 holds. He is normally represented, as in this case, by

11:39:36 13 assistant criminal district attorneys and today we have two of

11:39:38 14 his assistants and they're going to be the same attorneys

11:39:42 15 prosecuting throughout the trial. They are Ms. Michele

11:39:46 16 Hartman --

11:39:46 17     MS. HARTMAN: Good morning.

11:39:46 18     THE COURT: -- and Ms. Lisa Callaghan.

11:39:46 19     MS. CALLAGHAN: Good morning.

11:39:48 20     VENIREPERSON REASONER: Good morning.

11:39:48 21     THE COURT: And the criminal defense attorneys

11:39:52 22 in this case are two Fort Worth criminal lawyers, Mr. Tim

11:39:52 23 Moore --

11:39:54 24     MR. MOORE: Hi.

11:39:56 25     THE COURT: -- and Bill Ray.

---

11:39:56 1     MR. RAY: Hi. How are you doing?

11:39:58 2     VENIREPERSON REASONER: Pretty good. You?

11:39:58 3     THE COURT: And the defendant is in this case is

11:40:00 4 on the far end. He is Mr. Billy Jack Crutsinger, and you can

11:40:04 5 see his name printed up there on the board.

11:40:08 6     VENIREPERSON REASONER: Okay.

11:40:16 7     THE COURT: Okay. I guess I've gone over

11:40:18 8 everything here. There is an oath that I need to give you which

11:40:20 9 is required of all prospective jurors in all criminal cases, so

11:40:24 10 if you would, raise your right hand.

11     MICHAEL RAY REASONER,

12 having been duly sworn to make true answers to such questions as

13 may be propounded by the Court or under its direction, touching

14 upon his service and qualification as a juror, gave answers as

15 follows:

11:40:38 16     THE COURT: Okay. There we go. Thank you.

11:40:40 17     The way we're going to proceed is the district

11:40:44 18 attorney's office, Ms. Hartman, I guess it is -- Ms. Callaghan

11:40:46 19 is not in the building, is going to ask you questions and then

11:40:52 20 after she is finished, we'll probably take about a five-minute

11:40:56 21 break and then the defense attorneys are going to have an

11:40:58 22 opportunity to question you. None of these questions are tests.

11:41:06 23 Even after they talk to you about the law and ask for your

11:41:06 24 impression, there is no right or wrong answer. They just want

11:41:08 25 to get an honest answer from you as to how you feel about the

---

100

11:41:12 1 law and whether or not you believe you could apply the law.

11:41:16 2     So with that, I'll turn it over to Ms. Hartman.

11:41:20 3     MS. HARTMAN: Thank you, Your Honor.

11:41:20 4     VOIR DIRE EXAMINATION

11:41:20 5 BY MS. HARTMAN:

11:41:20 6     Q. Good morning.

11:41:22 7     A. Good morning.

11:41:22 8     Q. How are you doing?

11:41:22 9     A. Fine. You?

11:41:24 10     Q. Fine. Thank you.

11:41:24 11     As the Judge has told you, we are in the process

11:41:28 12 of selecting a jury to hear a capital murder case in which the

11:41:32 13 State of Texas is going to ask that jury, in the event of a

11:41:34 14 conviction, to return a death sentence as the punishment in the

11:41:38 15 case, based on the law and the evidence, and it's important for

11:41:42 16 us, because of the serious nature of the -- the type of case and

11:41:46 17 the potential consequences, that we go over with you what the

11:41:50 18 law on capital murder is to make sure that you understand it and

11:41:54 19 that you're comfortable with it.

11:41:56 20     And the law that we'll be talking about with you

11:41:58 21 here today, you don't have to memorize it, because if you're a

11:42:02 22 juror, it's going to be given to you on paper at the time of

11:42:04 23 your deliberations, okay, but we need to make sure that that's

11:42:08 24 not going to be the first time you see it, that you know what it

11:42:12 25 is going into the trial, you know, you kind of have an

101

11:42:14 1 understanding of what's at play, basically. Okay?

11:42:18 2   A.   All right.

11:42:20 3   Q.   We anticipate that this trial will start the week of

11:42:22 4 September the 22nd and go anywhere from five days to two weeks,

11:42:26 5 depending upon how long it takes to put on the evidence and the

11:42:30 6 jury deliberations and so forth. Is there anything about that

11:42:34 7 particular time period that would cause a difficulty for you?

11:42:38 8   A.   Well, I'm closing on a house.

11:42:38 9   Q.   I'm sorry?

11:42:40 10   A.   I'll be closing on a house.

11:42:44 11   Q.   What day is that going to be?

11:42:44 12   A.   As soon as the title company can get us in.

11:42:44 13   Q.   Okay.

11:42:46 14   A.   Supposed to have been this week, but they're saying

11:42:50 15 next week now.

11:42:50 16   Q.   Okay. Well, if it's next week, obviously, there

11:42:51 17 wouldn't be any type of in interference, because we wouldn't be

11:42:56 18 starting the trial until week from Monday next. So are you

11:43:02 19 moving within the county? Let me ask you that first.

11:43:06 20   A.   Yes, ma'am.

11:43:06 21   Q.   Okay. So you're not moving out of Tarrant County?

11:43:08 22   A.   No, ma'am.

11:43:10 23   Q.   All right. Would it be possible for you to make a

11:43:14 24 phone call and find out, if you were to tell them that you might

11:43:18 25 be a juror in a case, would you be able to determine whether or

102

11:43:22 1 not --

11:43:22 2   A.   They can't tell you.

11:43:24 3   Q.   They can't tell you? Are you waiting on like

11:43:28 4 approval or --

11:43:28 5   A.   The people buying my house is waiting. They're

11:43:30 6 supposed to have been approved, and now they're going back and

11:43:32 7 checking them out.

11:43:34 8   Q.   Oh, okay. So there is a chance the whole thing could

11:43:36 9 fall through?

11:43:36 10   A.   Possibly.

11:43:38 11   Q.   I hope that doesn't happen, but, I mean, is that kind

11:43:40 12 of where you're at?

11:43:40 13   A.   No. They said it's going through. It's just he's

11:43:44 14 got to get written documentation, to fax something. There's

11:43:44 15 a --

11:43:46 16   Q.   Okay.

11:43:48 17   A.   It's been postponed. This is the third week.

11:43:48 18   Q.   Okay.

11:43:50 19   A.   They said for sure next week.

11:43:50 20   Q.   They said for sure next week?

11:43:52 21   A.   They said that the last two weeks, so I couldn't say

11:43:56 22 when it was.

11:43:56 23   Q.   All right. Well, here is the difficulty or here is

11:44:00 24 the dilemma, I guess. At the conclusion of your speaking with

11:44:06 25 us here today, you will know today whether you are a juror or

103

11:44:08 1 not. That -- you will have that information today. It's not

11:44:14 2 like you'll have to wait to hear from us. If you happen to be a

11:44:18 3 juror in this case, you would have to report for duty whenever

11:44:22 4 we start, which at this point, is going to be September the

11:44:26 5 22nd, that Monday. Obviously, things can change, but that's

11:44:32 6 kind of the target date at this point.

11:44:34 7   A.   Yes, ma'am.

11:44:36 8   Q.   If you are selected to be a juror, you will basically

11:44:38 9 be with us until the case is done. I mean, you will be working

11:44:44 10 with us Monday through Friday. General working hours are 9:00

11:44:46 11 in the morning until 5:00 in the evening. It could be a little

11:44:50 12 bit earlier, could be a little bit later, depending upon where

11:44:54 13 we're at and what type of evidence is being presented at the

11:44:56 14 time.

11:44:50 15   If your house closing were to -- I guess if the

11:45:06 16 title company called you up and said, Hey, the soonest we can

11:45:06 17 close is or the first opportunity we get to close is September

11:45:10 18 the 24th, okay, that's when we've got you set up. That's as

11:45:16 19 soon as we can get you in, and you're a juror, are you going to

11:45:22 20 be able to set aside the business about the house closing, or is

11:45:26 21 it going to interfere with your being able to sit and fairly and

11:45:32 22 impartially listen to the evidence and the testimony in this

11:45:34 23 trial?

11:45:34 24   A.   As far as being able to go to the closing?

11:45:36 25   Q.   I'm sorry?

104

11:45:38 1   A.   As far as being able to go to the closing?

11:45:40 2   Q.   Right. I mean, if you're down here with us, we don't

11:45:42 3 stop trial to let you go off and do your closing or whatever

11:45:44 4 might be going on.

11:45:50 5   A.   I guess, I'd have to postpone the closing if I was

11:45:52 6 here.

11:45:54 7   Q.   Okay. What are the possible consequences of that; do

11:45:54 8 you know?

11:45:56 9   A.   Delay of the sale or maybe not even going through.

11:45:58 10   Q.   I'm sorry?

11:45:58 11   A.   A delay of the sale or it maybe not even going

11:46:06 12 through. I don't know.

11:46:06 13   Q.   Okay. And only you can answer this question that I'm

11:46:06 14 putting to you and is the situation with the house closing and

11:46:16 15 it might be taking place while you're a juror and possibly

11:46:16 16 losing out on a house or what-have-you, I mean, I don't all of

11:46:22 17 the different possibilities, if you're sitting over in the jury

11:46:28 18 box, are you going to be able to focus on the evidence and the

11:46:28 19 testimony or are you going to be off kind of in your own world

11:46:32 20 wondering what's going on or, oh, my gosh, what if I lose my

11:46:38 21 house? I mean, are you going to be able to deal with that or

11:46:40 22 not?

11:46:40 23   A.   I'd focus on the trial, but I would be wondering

11:46:44 24 about the house also.

11:46:46 25   Q.   Okay.

105

11:46:44 1    A.   I could focus on it.

11:46:46 2    Q.   Okay.  So you don't think it would interfere with

11:46:48 3  your being able to sit as a juror?

11:46:50 4    A.   No.  I mean, if that's what I have to do, that's what

11:46:52 5  I have to do.

11:46:54 6    Q.   Okay.  Well, and when the defense talks to you, they

11:46:58 7  may let you know, and it's absolutely true that while you have a

11:47:02 8  civic duty to report down here for jury duty, you don't

11:47:04 9  necessarily have to serve on any particular case.

11:47:08 10          We need 12 people who are going to be able to

11:47:12 11  devote their time and attention to what's going on in the

11:47:16 12  courtroom and if you can do that, that's great and if you think

11:47:18 13  there is going to be a problem with that such that one side or

11:47:20 14  the other is going to not get a fair shake, so to speak, because

11:47:26 15  your mind is wondering off and you get back in the jury room and

11:47:30 16  instead of participating in -- in the deliberations, you're just

11:47:34 17  trying to get out, we need to know that, too.  So only you can

11:47:38 18  tell me what you're capable of doing.

11:47:40 19    A.   I'd like to take care of my own business first, but

11:47:44 20  if I don't have a choice, then I'll do what I have to do.

11:47:46 21    Q.   Okay.  So you're -- I guess what I'm hearing you

11:47:48 22  saying, and if this is incorrect, let me know, if you get chosen

11:47:52 23  to be on this jury, you're going to do the best you can to be a

11:47:56 24  fair and impartial juror --

11:47:56 25    A.   Yes, ma'am.

CURTIS SHORTHAND REPORTING - 817/467-4556

106

11:47:58 1    Q.   -- regardless of what happens with the house closing?

11:48:02 2    A.   Yes, ma'am.

11:48:02 3    Q.   Okay.  I also notice that you have a -- have a little

11:48:06 4  boy that's eight.

11:48:08 5    A.   Yes, ma'am.

11:48:08 6    Q.   All right.  If you are down here with us, like I

11:48:10 7  said, generally from 9:00 to 5:00, and there is also a chance

11:48:16 8  that in a serious case, juries can be sequestered during

11:48:20 9  deliberations.  Do you know what that means?

11:48:22 10    A.   No, ma'am.

11:48:22 11    Q.   Okay.  Would that pose any particular problems --

11:48:26 12  first of all, would it pose any problems just in general if you

11:48:30 13  had to be sequestered?

11:48:30 14    A.   No, ma'am.

11:48:32 15    Q.   Okay.  Would it pose any problems with your child

11:48:34 16  being left unsupervised or -- or not being taken care of

11:48:38 17  properly?

11:48:38 18    A.   No, ma'am.

11:48:40 19    Q.   All right.  I notice that you're married.  I'm

11:48:40 20  assuming your wife would step in and --

11:48:42 21    A.   Yes, ma'am.

11:48:46 22    Q.   All right.  Well, let me start then with the way --

11:48:52 23    A.   Excuse me.  I may have overlooked hearing if you went

11:48:56 24  over -- and I apologize.  Are you telling him it could be a

11:49:00 25  two-week trial?

CURTIS SHORTHAND REPORTING - 817/467-4556

107

11:49:02 1    Q.   I think I said five days to two weeks.  Is that what

11:49:06 2  you understood?

11:49:06 3    A.   Yes, ma'am.

11:49:06 4    Q.   Okay.  All right.

11:49:08 5    A.   I'm sorry.

11:49:08 6    Q.   Five days to two weeks, as far as business, Monday

11:49:12 7  through Friday type, 10 days, might be less, might be more; like

11:49:18 8  I said, it just depends on the number of witnesses and the

11:49:20 9  amount of evidence and how long deliberations take.

11:49:24 10    A.   Okay.

11:49:24 11    Q.   You have actually served as a juror in the past?

11:49:28 12    A.   Yes, ma'am.

11:49:30 13    Q.   So you are already familiar with the setup of -- of

11:49:34 14  how a felony case goes to trial, and you're probably familiar

11:49:40 15  with the rules that apply to every criminal case.  I'm going

11:49:44 16  to --

11:49:44 17    A.   It's been a few years.

11:49:48 18    Q.   I'm going to go over them with you.  I know you're

11:49:48 19  going to remember them, because they are pretty commonly kn

11:49:50 20          Probably you recollect that a trial is handled

11:49:56 21  in -- in two parts.  The first part is where the state puts on

11:50:00 22  evidence to prove that the person did what we've charged him

11:50:06 23  with or her with.  Okay?  We have a burden of proof.  We have to

11:50:12 24  prove our case beyond a reasonable doubt in order for the jury

11:50:14 25  to convict the person of the crime.  Do you remember that?

CURTIS SHORTHAND REPORTING - 817/467-4556

108

11:50:18 1    A.   Yes, ma'am.

11:50:20 2    Q.   That standard of proof does not have a legal

11:50:24 3  definition, and I like to tell people that the law anticipates

11:50:24 4  that you decide what is sufficient proof.  Okay?  And it's

11:50:32 5  whatever in your own heart and your own mind convinces you that

11:50:36 6  that person is, in fact, guilty.  All right?

11:50:38 7    A.   Okay.

11:50:40 8    Q.   If the state does its job, if we prove our case

11:50:44 9  beyond a reasonable doubt, the jury would be required under law

11:50:46 10  to return a guilty verdict.  If that happens, we would then move

11:50:50 11  into that second phase of the trial, which would be a punishment

11:50:54 12  phase, and that would be the time that the state can present any

11:50:58 13  other testimony or evidence about the person on trial.

11:51:02 14          If they've got any type of prior criminal

11:51:04 15  history, if they've got any type of bad character issues or

11:51:08 16  they've committed other bad acts, that would be the time at

11:51:12 17  which the jury could hear about that type of information.  You

11:51:16 18  might remember that the defense or the defendant never has a

11:51:22 19  burden.  They have no obligation at any time to put on any

11:51:26 20  evidence, okay, because the burden of proof rests solely with

11:51:28 21  the State of Texas.  They can put on evidence if they want to,

11:51:32 22  but they certainly don't have to.  Do you remember that?

11:51:34 23    A.   Yes, ma'am.

11:51:34 24    Q.   All right.  When you were a juror, did you sit

11:51:40 25  through both phases of trial?

CURTIS SHORTHAND REPORTING - 817/467-4556

109

11:51:42 1   A.  No, ma'am.  We found him guilty, and then they did
11:51:44 2  the punishment phase themselves.
11:51:46 3   Q.  The judge did the punishment?
11:51:48 4   A.  The judge did the punishment phase, yes, ma'am.
11:51:50 5   Q.  Okay.  Sometimes jurors will hang around and watch to
11:51:54 6  see what a person gets:  Did you do that or no?
11:51:56 7   A.  No, ma'am.
11:51:58 8   Q.  Okay.  So you only have participated in that first
11:52:02 9  phase?
11:52:02 10   A.  Yes, ma'am, and then they let us go.
11:52:04 11   Q.  And then they let you go.  Okay.  All right.
11:52:08 12     A couple of other rules in a criminal case that
11:52:10 13  you will probably remember is that a defendant has an absolute
11:52:16 14  right not to testify, and if they choose not to testify, the
11:52:20 15  jury can't hold that against them for any reason.  Do you
11:52:22 16  remember that?
11:52:24 17   A.  Yes, ma'am.
11:52:24 18   Q.  Okay.  If you were a juror in a criminal case and you
11:52:26 19  were instructed by the Court that that defendant in that case
11:52:30 20  had not testified, you could not consider that failure to
11:52:34 21  testify for any reason.  Could you follow that law?
11:52:38 22   A.  Yes, ma'am.
11:52:38 23   Q.  All right.  Criminal defendants have a presumption of
11:52:44 24  innocence and that goes back to if the state doesn't meet its
11:52:48 25  burden, if we don't prove our case beyond a reasonable doubt,

CURTIS SHORTHAND REPORTING - 817/467-4556

110

11:52:52 1  that presumption of innocence kicks in and the person is found
11:52:54 2  not guilty.  Could you follow that instruction?
11:52:58 3   A.  Yes, ma'am.
11:52:58 4   Q.  Okay.  Any questions about how a criminal trial just
11:53:02 5  in general works?
11:53:02 6   A.  No, ma'am.
11:53:04 7   Q.  All right.  Well, let's talk a little bit about
11:53:08 8  capital murder, and if you look over here on the screen, capital
11:53:12 9  murder is a combination of a couple of things.  First of all,
11:53:16 10  you have to have a murder, an intentional killing, and then to
11:53:22 11  elevate that -- that murder, that intentional killing, up one
11:53:26 12  degree higher to a capital offense, there has to be another
11:53:30 13  ingredient.  There has to be an aggravating or special
11:53:36 14  circumstance that surrounds that intentional killing.  Okay?
11:53:40 15     These are some examples of offenses that qualify
11:53:42 16  as capital murder.  In the first one, that special circumstance
11:53:44 17  is the age of the child.  Okay?  The age of the child can
11:53:52 18  aggravate or -- or pop that intentional killing up one degree if
11:53:56 19  the child happens to be under six.  Okay?
11:54:00 20     And the second one, if you kill a police officer
11:54:04 21  and that police officer or fireman is acting in their course of
11:54:06 22  their duty, they are on duty, the fact that they are on duty
11:54:12 23  when they were killed in the capacity of their profession bumps
11:54:14 24  them up to a capital offense.  Okay?
11:54:16 25   A.  Okay.

CURTIS SHORTHAND REPORTING - 817/467-4556

111

11:54:16 1   Q.  If you intentionally kill someone and you're
11:54:20 2  committing some other type of felony, and there is some specific
11:54:24 3  felonies that are listed and those are just a couple of them,
11:54:26 4  that bumps it up to a capital offense and an example of that
11:54:30 5  might be a convenience store robbery or a bank robbery.  Say you
11:54:36 6  go into rob a bank or a convenience store, and you shoot the
11:54:38 7  teller.  You shoot someone on your way out the door, whatever.
11:54:42 8  Okay?
11:54:44 9     The case that we are talking about involves this
11:54:46 10  last type of capital murder and that is where you intentionally
11:54:50 11  kill one person and then you intentionally kill at least another
11:54:56 12  person and maybe more.  Okay?  So if you kill two people -- at
11:55:00 13  least two people during the same criminal transaction or the
11:55:02 14  same course of criminal conduct, you get bumped up to a capital.
11:55:06 15  Does that make sense to you?
11:55:10 16   A.  Yes, ma'am.
11:55:10 17   Q.  Do you think that these are the types of offenses for
11:55:18 18  which a person should possibly face the death penalty?
11:55:18 19   A.  Yes, ma'am.
11:55:18 20   Q.  Okay.  In a capital murder case, the state has to
11:55:26 21  prove certain things beyond a reasonable doubt.  We have to
11:55:30 22  prove that the person on trial, the person in fact sitting in
11:55:34 23  the room, which in this case is Mr. Crutsinger, in Tarrant
11:55:36 24  County, Texas, on or about a particular date, intentionally
11:55:42 25  caused the death of more than one person and then we have to

CURTIS SHORTHAND REPORTING - 817/467-4556

112

11:55:46 1  prove how that person accomplished it, whether it was by
11:55:50 2  shooting, stabbing, drowning, strangling, whatever.  Okay?
11:55:56 3  These are the only things that we have to prove beyond a
11:56:00 4  reasonable doubt.
11:56:02 5     A couple of things I want to discuss with you.
11:56:04 6  When we talk about intentionally, we are talking about something
11:56:08 7  that someone intends to do.  Okay?  It's their conscious
11:56:12 8  objective or desire.  It's not an accident.  It's not
11:56:16 9  negligence.  It's not insanity.  It's not self-defense.  Okay?
11:56:20 10  They want to do the act and they, in fact, do the act.  Make
11:56:28 11  sense to you?
11:56:28 12   A.  Yes, ma'am.
11:56:28 13   Q.  Two things that you don't see up here that we often
11:56:32 14  hear about on TV, the state doesn't have to prove premeditation.
11:56:38 15  Do you know what that means?
11:56:40 16   A.  Planned ahead of time.
11:56:42 17   Q.  Pardon me?
11:56:42 18   A.  Planned ahead of time.
11:56:44 19   Q.  Correct, absolutely correct.  We are not required to
11:56:46 20  prove that that person intended to kill and an individual 15
11:56:52 21  minutes ahead of time, three hours ahead of time, three days,
11:56:56 22  three months, a year.  All we have to prove is that they had
11:57:00 23  that conscious objective or desire.  They had that intent in
11:57:04 24  their mind, and then they acted on it.  Okay?
11:57:06 25   A.  Okay.

CURTIS SHORTHAND REPORTING - 817/467-4556

115

```
11:57:06  1        Q.   Do you think that it is possible for people to form
11:57:08  2   the intent and act on it immediately?
11:57:12  3        A.   Yes, ma'am.
11:57:12  4        Q.   Without sitting around and thinking about it for an
11:57:16  5   hour or 20 minutes?
11:57:18  6        A.   Like, at some point in time, they have had to have
11:57:20  7   thought about it.
11:57:22  8        Q.   Okay.  Do you think it's possible for people to think
11:57:24  9   about it and then immediately act upon their -- their intent or
11:57:28 10   their thought?
11:57:30 11        A.   Say, in a fit of rage or something.
11:57:32 12        Q.   Okay.
11:57:34 13             MR. RAY:  I'm sorry.  I didn't hear your answer.
11:57:36 14             VENIREPERSON REASONER:  In a fit of rage or
11:57:38 15   intent, they could act on it.
11:57:40 16        Q.   (By Ms. Hartman)  Okay.  Do you think that there may
11:57:44 17   be circumstances where someone, because of the circumstances
11:57:48 18   falling the way that they do, they form the intent, and then
11:57:50 19   it's convenient to act upon that intent right then and there?
11:57:56 20        A.   I'm not real sure I understand.
11:57:58 21        Q.   Okay.  Let me throw out a hypothetical, and any
11:58:02 22   examples that I give you or the defense gives you don't have
11:58:04 23   anything to do with this particular case.  We can't tell you
11:58:08 24   what those facts are.  All right?
11:58:12 25             Let's say that -- let's see.  Let's say that I'm
```
CURTIS SHORTHAND REPORTING - 817/467-4556

114

```
11:58:24  1   going to commit a robbery of a convenience store, and my intent
11:58:30  2   when I am deciding to do this is I need some money.  All right?
11:58:34  3   Need some money, this is the quick way for me to do it and don't
11:58:40  4   intend to kill anybody, all right, because I know that that
11:58:46  5   probably makes things a lot worse for me, but at this point, all
11:58:48  6   I want is the money and so I stop into the local Stop 'N Go and
11:58:54  7   I happen to have a pen knife -- not a pen knife, but like a
11:58:58  8   pocket knife in my pocket that I normally carry with me.  It's
11:59:02  9   not anything I went out and got especially to go into this
11:59:06 10   convenience store, but it's something I carry with me and I go
11:59:08 11   in there and I demand the money.
11:59:14 12             The clerk doesn't want to give it to me, so I
11:59:16 13   pull out the knife, and the knife is being pulled out to
11:59:20 14   convince the clerk they need to give me the money.  I mean, it's
11:59:22 15   to scare them into giving me the money, and for whatever reason,
11:59:26 16   this clerk, whether it's because something similar happened
11:59:30 17   and -- and they didn't get hurt or if they give up the money,
11:59:34 18   it's going to get taken out of their salary or what-have-you.
11:59:38 19   That clerk decides they're going to buck me.  They're not going
11:59:40 20   to give me the money and I really want that money and the only
11:59:46 21   way I'm going to get it is if I hurt that clerk or I kill that
11:59:48 22   clerk.  All right?
11:59:48 23             And I form that intent right then and there
11:59:50 24   after I've walked in the store.  I mean, prior to that point, I
11:59:54 25   don't want to do that, okay, but at moment in time, I form the
```
CURTIS SHORTHAND REPORTING - 817/467-4556

115

```
11:59:58  1   intent I'm going to kill this person, because I can't believe
12:00:02  2   I'm threatening them with a knife and they're not handing that
12:00:04  3   money over and that's the only way I'm going to get it and so I
12:00:04  4   kill the clerk, formed the intent and acted on it.  Do you see
12:00:12  5   where that might be possible?
12:00:12  6        A.   Yes, ma'am.
12:00:14  7        Q.   All right.  Do you think it is possible to determine
12:00:18  8   someone's intent by their behavior or their conduct without them
12:00:24  9   actually verbalizing what their intent is going to be?
12:00:28 10        A.   No, ma'am.
12:00:28 11        Q.   You don't think that's possible?  Okay.  What if I
12:00:30 12   walked up to you like this(gestures)?
12:00:34 13        A.   Offer to shake your hand.
12:00:36 14        Q.   Okay.  I don't say a word to you, but I put my hand
12:00:38 15   out.  Do you think you can infer what my intent is by my
12:00:42 16   conduct?
12:00:42 17        A.   A gesture of good will.
12:00:46 18        Q.   Okay.  The hypothetical I used a moment ago, let's
12:00:50 19   say when I go in there and I say, Give me the money, all right,
12:00:54 20   the clerk doesn't do anything.  I pull the knife out, and do
12:00:58 21   like this to the clerk(gestures).  The clerk doesn't do anything
12:01:02 22   and I don't say a word, but I reach over and I stab that clerk.
12:01:04 23   Do you think it's possible to infer what my intent is by my
12:01:08 24   actions, even though I haven't verbally told the clerk, I am
12:01:12 25   going to kill you?
```
CURTIS SHORTHAND REPORTING - 817/467-4556

116

```
12:01:14  1        A.   Uh-huh, yes, ma'am.
12:01:14  2        Q.   Okay.  So do you see where there might be
12:01:16  3   circumstances where you could infer what someone's intent was by
12:01:20  4   what they've done, by their conduct?
12:01:24  5        A.   By their actions, yes, ma'am.
12:01:30  6        Q.   Okay.  Do you understand what I'm saying?
12:01:30  7        A.   Yes, ma'am.
12:01:32  8        Q.   Okay.  If you were standing here and I walk up and,
12:01:34  9   of course, actually, I ought to reverse this hypothetical where
12:01:38 10   I have the court reporter actually wanted to kill one of us a
12:01:42 11   number of times, because we get to talking too fast and that
12:01:44 12   wears her fingers out.  So I'll make her the person with the
12:01:50 13   gun, but let's say you're sitting there and I'm just going 90
12:01:54 14   miles an hour and she's had it, because you're -- you're Juror
12:01:56 15   No. 95, so we've gone through all those other people.  She's
12:01:58 16   been working hard and she pulls her gun out, which she can carry
12:02:04 17   under -- say she's got a permit and right in front of you -- she
12:02:08 18   doesn't say a word to me, but right in front of you, she pulls
12:02:10 19   out that gun.  She walks up to me, bang, and she shoots me.
12:02:14 20   Okay?  She hadn't said she's going to kill me, but do you think
12:02:18 21   from what you observed of her actions that you could infer that
12:02:22 22   her intent was to kill me by what she did?
12:02:26 23        A.   Yes, ma'am.
12:02:26 24        Q.   Pulling out a gun and shooting me?
12:02:28 25        A.   (Venireperson nods.)
```
CURTIS SHORTHAND REPORTING - 817/467-4556

117

12:02:28 1    Q.   Okay.  Do you understand that people may not
12:02:32 2  verbalize what their intent is, they may just act on it?
12:02:36 3    A.   Yes, ma'am.
12:02:36 4    Q.   And so, therefore, do you think it's possible to look
12:02:38 5  at their behavior and form an opinion or infer what that
12:02:44 6  person's intent was by what they've done?
12:02:48 7    A.   If you've actually seen it or seen what happened?
12:02:54 8    Q.   Well, whether you've seen it happen or if you're a
12:02:56 9  juror and you hear testimony about what has happened.
12:03:04 10   A.   If I had all of the facts, I could.
12:03:04 11   Q.   I'm sorry?
12:03:08 12   A.   If I had all the facts, I could.
12:03:08 13   Q.   Sure.  If you were able to sit and listen to
12:03:10 14  witnesses come in and talk about what they saw, what they
12:03:10 15  observed, do you think you could form some opinions about what a
12:03:16 16  person's intent was?
12:03:18 17   A.   Yes, ma'am.
12:03:18 18   Q.   Okay.  We don't have to prove premeditation.  The
12:03:18 19  other thing that you don't see up on this list that we have to
12:03:20 20  prove as an element is motive.  Do you know what motive is that?
12:03:24 21   A.   Yes, ma'am.
12:03:36 22   Q.   And what does that mean to you?
12:03:36 23   A.   A reason for them to do it.
12:03:36 24   Q.   Right.
12:03:36 25   A.   They had some reason to do it.

CURTIS SHORTHAND REPORTING - 817/467-4556

118

12:03:38 1    Q.   Okay.  And sometimes we know why people have done
12:03:40 2  things and sometimes we never know.  Okay?  Have you ever seen
12:03:44 3  things on TV that people have done and you've asked yourself,
12:03:48 4  you know, why in the world would someone ever do X?  I mean, it
12:03:54 5  just is inconceivable to you.  You can't think of any rational
12:03:58 6  reason why somebody might do something.
12:03:58 7    A.   Yes, ma'am.
12:04:00 8    Q.   All right.  Because we never -- because we don't
12:04:06 9  always know why someone has done something, the state doesn't
12:04:10 10  ever have to prove why someone has done it.  We have to prove,
12:04:11 11  though, that they intended to do it and, in fact, did it.  Okay?
12:04:18 12  The why might be important if it comes out in evidence later on
12:04:22 13  in punishment, all right, but it's not something that I have to
12:04:26 14  prove beyond a reasonable doubt for the jury to return a verdict
12:04:28 15  of guilty.  Make sense to you?
12:04:30 16   A.   Yes, ma'am.
12:04:32 17   Q.   Okay.  Any questions about the elements or what I
12:04:34 18  have to prove in a capital murder case?
12:04:36 19   A.   No, ma'am.
12:04:36 20   Q.   Okay.  If the defendant is found guilty in a capital
12:04:42 21  murder case, there are only two possible punishments, a life
12:04:44 22  sentence and the death sentence.  A death sentence is pretty
12:04:52 23  self-explanatory.  That's by lethal injection.
12:04:54 24   A life sentence, on the other hand, is 40 years,
12:04:56 25  day for day, before the person becomes eligible to be considered

CURTIS SHORTHAND REPORTING - 817/467-4556

119

12:05:02 1  for parole.  Okay?  We don't have life without parole in the
12:05:06 2  State of Texas.  They have to do at least 40 years before they
12:05:08 3  have a chance of coming up before the parole board.
12:05:12 4    A.   Okay.
12:05:12 5    Q.   Okay?  Defendant is found guilty, you would then get
12:05:18 6  to hear any additional evidence, okay, such as the defendant's
12:05:20 7  good or bad character, prior criminal history or record.  All
12:05:26 8  right?  If the defense wants to put evidence on, they can.  They
12:05:28 9  don't have to.
12:05:30 10   And at the conclusion of all the evidence, okay,
12:05:34 11  all of the evidence is in.  That's all the jury is going to hear
12:05:40 12  at that point.  The jury would go back to the jury room with
12:05:42 13  these two questions I'm getting ready to go over with you.  You
12:05:46 14  would not go back there and take a vote of like, okay, who wants
12:05:50 15  life and who wants death.  It doesn't work that way.
12:05:54 16   Instead, the way you get to that result of life
12:05:56 17  or death is by answering two questions.  Okay.  Clear up to
12:06:02 18  here?
12:06:04 19   A.   Yes, ma'am.
12:06:04 20   Q.   Clear up to this point?
12:06:06 21   A.   Yes, ma'am.
12:06:06 22   Q.   All right.  When you get to Special Issue No. 1,
12:06:10 23  remember, you've heard all the evidence, and you've convicted
12:06:14 24  that person of capital murder.  All right?  You've heard
12:06:16 25  additional punishment evidence, if you have, about anything else

CURTIS SHORTHAND REPORTING - 817/467-4556

120

12:06:20 1  that's relevant to that person.  Okay?
12:06:24 2   This first question would be one that the jurors
12:06:26 3  would have to ask themselves in considering all of the evidence.
12:06:30 4  Do you find beyond a reasonable doubt -- and, again, the state
12:06:34 5  has the burden of proof on this question.  We have the burden to
12:06:38 6  prove that the answer to the question should be yes, that there
12:06:44 7  is a probability, not a certainty, okay, but a probability that
12:06:48 8  the defendant would commit criminal acts of violence that would
12:06:52 9  constitute a continuing threat to society.  All right?
12:06:56 10   The words that are underlined, the phrases are
12:06:58 11  not defined in law for you.  Those are phrases and words that
12:07:04 12  you, as a juror, get to define for yourself.
12:07:08 13   Do you think that it is possible to look at a
12:07:12 14  person's crime and any past history they might have and make
12:07:16 15  some predictions about how they will probably behave in the
12:07:20 16  future?
12:07:20 17   A.   Yes, ma'am.
12:07:20 18   Q.   All right.  You think that that's a reasonable thing
12:07:22 19  for you to be able to do?
12:07:24 20   A.   Yes, ma'am.
12:07:24 21   Q.   And, again, like I said, probability is not
12:07:28 22  certainty, because obviously if we could forecast things for
12:07:32 23  certain, we'd all be winners of the lottery, right?
12:07:34 24   A.   Yes, ma'am.
12:07:34 25   Q.   Okay.  But the law anticipates that it's more than

CURTIS SHORTHAND REPORTING - 817/467-4556

121

12:07:38 1    just a mere possibility. So it's more than a possibility, but
12:07:42 2    less than a certainty and wherever in between there you think
12:07:44 3    probability lies, that's up to you, fair enough?
12:07:49 4        A.   Yes, ma'am.
12:07:52 5        Q.   All right. Criminal acts of violence, the law lets
12:07:56 6    each juror define for themselves what they think is a criminal
12:07:59 7    act of violence. It can be anything from simple assault, family
12:08:06 8    assault, terroristic threats, arson, all the way up to
12:08:10 9    capital -- another capital murder and anything in between,
12:08:14 10   kidnapping, sexual assault, robbery, anything that you think is
12:08:18 11   a criminal act of violence you get to define with that phrase.
12:08:22 12   Okay?
12:08:22 13       A.   Okay.
12:08:24 14       Q.   Society, the law allows you to consider anybody that
12:08:24 15   you want to to make up a society. It can be free society, the
12:08:36 16   people on he streets, the people in community. You can consider
12:08:41 17   people within the penitentiary system as part of society if you
12:08:44 18   so choose, not only guards and other prisoners, but anyone else
12:08:49 19   who would have access to a defendant who was confined in prison,
12:08:52 20   whether that's religious clergy, medical personnel, nurses and
12:08:56 21   doctors, teachers, counselors, administrative staff, people that
12:09:04 22   help to run the prison system and to keep it going. You can
12:09:08 23   consider those people if you so choose.
12:09:14 24            The reason that the law has those questions is
12:09:16 25   because the law says that not everyone who commits the offense

122

12:09:18 1    of capital murder deserves the death penalty. There ought to be
12:09:24 2    a way to separate people out, depending upon their
12:09:26 3    circumstances, the type of offense they commit, the motivation,
12:09:32 4    the background, things of that nature. Okay? If everyone who
12:09:38 5    was convicted of capital murder deserved the death penalty, we
12:09:42 6    wouldn't have these questions; do you see?
12:09:44 7        A.   Yes, ma'am.
12:09:44 8        Q.   Okay. If a person is going to sit on a capital
12:09:46 9    murder case, they must come into the process being fair and
12:09:52 10   open-minded to the possibility that they may hear facts that
12:09:58 11   determine -- that would require them to answer the question
12:10:00 12   either yes or no. In other words, we can't have people who are
12:10:04 13   always going to either find the person is a future danger each
12:10:08 14   and every time by virtue of the fact that they've been convicted
12:10:11 15   of capital murder; and on the other hand, we can't have people
12:10:14 16   who are always going to answer this question no and disregard
12:10:18 17   evidence that might indicate otherwise; do you follow?
12:10:22 18       A.   Yes, ma'am.
12:10:22 19       Q.   Okay. Do you think this is a question that you would
12:10:26 20   be able to, if you were a juror, of having an open mind and
12:10:30 21   being able to answer either yes or no based upon what evidence
12:10:34 22   you heard at the first phase of the trial and the second phase
12:10:38 23   of the trial?
12:10:38 24       A.   Yes, ma'am.
12:10:40 25       Q.   Do you feel like, at this point, that you are

123

12:10:42 1    inclined to answer this question one way or the other before
12:10:46 2    you've heard any facts?
12:10:48 3        A.   Yes, ma'am.
12:10:50 4        Q.   You are inclined to answer it one way or the other?
12:10:52 5        A.   To answer you one way or the other?
12:10:56 6        Q.   Well, maybe -- maybe I didn't phrase my question
12:10:58 7    right or you didn't understand it.
12:10:58 8             Are you -- at this point in time, you've not
12:11:04 9    heard any facts about this case, and we can't tell you what the
12:11:06 10   facts are.
12:11:06 11       A.   Okay.
12:11:08 12       Q.   Because then we would be sitting here saying, Well,
12:11:10 13   what would you do? Okay? And that would be improper. Right
12:11:16 14   now, as you sit here, without hearing any facts, you're
12:11:18 15   inclined -- do you want to answer this question one way, either
12:11:24 16   yes or no -- strike that.
12:11:28 17            Would you answer this question the same way each
12:11:32 18   and every time regardless of what the evidence was?
12:11:34 19       A.   No, ma'am.
12:11:36 20       Q.   Okay. Are you open to answering this question yes?
12:11:40 21       A.   Yes, ma'am.
12:11:42 22       Q.   Are you open to the possibility of answering this
12:11:42 23   question no?
12:11:44 24       A.   Yes, ma'am.
12:11:44 25       Q.   If I don't meet my burden of proof, if I don't prove

124

12:11:48 1    to you beyond a reasonable doubt that there was a probability
12:11:52 2    the defendant would continue to commit criminal acts of
12:11:54 3    violence, whatever that means to you, could you answer this
12:11:56 4    question no?
12:11:58 5        A.   Yes, ma'am.
12:12:00 6        Q.   All right. Was I confusing you earlier?
12:12:08 7        A.   No, ma'am.
12:12:08 8        Q.   Okay. We've been doing this -- this is what, our
12:12:12 9    third week? I think this is the end of our third week. So I
12:12:18 10   guess what I'm trying to find out is there are some people who
12:12:20 11   would always answer this question yes, because they would say,
12:12:24 12   If I've convicted someone of killing more than one person in the
12:12:26 13   same course of their conduct, I'm always going to answer this
12:12:30 14   question yes. I don't think care what the evidence is. There
12:12:34 15   are some people who say, You know what, I'm always going to
12:12:38 16   answer this question no, because I won't feel comfortable
12:12:40 17   predicting how someone might -- would probably behave in the
12:12:44 18   future. I'm just going to find out if you are in a camp that's
12:12:48 19   going to answer always yes or always no?
12:12:50 20       A.   I would be open, depending on the evidence.
12:12:52 21       Q.   Okay. Very good. If the jurors unanimously -- they
12:12:58 22   all agreed to answer this question yes, you would then move to
12:13:02 23   Special Issue No. 2. Anything that requires a person being
12:13:06 24   found guilty or moving them closer to a death sentence requires
12:13:10 25   a unanimous verdict. It requires everone in the jury room to

125

12:13:16 1   agree. Okay. Make sense to you?

12:13:18 2      A.   Yes, ma'am.

12:13:18 3      Q.   If at least 10 or more jurors agree that the answer

12:13:22 4   to this question should be no, you would stop there after

12:13:26 5   answering that question no, because the person is going to get a

12:13:28 6   life sentence. Okay?

12:13:30 7      A.   Okay.

12:13:36 8      Q.   If 10 or more -- 10 or more must agree to answer that

12:13:40 9   question no before you can answer it no. Make sense to you?

12:13:44 10      A.   For the -- as the group, the answer being no, 10 or

12:13:48 11   more?

12:13:48 12      Q.   It has to be at least 10 or more agree to answer it

12:13:52 13   no.

12:13:52 14      A.   Okay.

12:13:52 15      Q.   And all 12 to answer it yes.

12:13:54 16      A.   Okay.

12:13:54 17      Q.   Are we clear on that?

12:13:56 18      A.   Yes, ma'am.

12:13:56 19      Q.   Okay. Let's assume for the sake of our discussion

12:14:00 20   this morning that the jury agrees to answer this question yes.

12:14:06 21   We believe the state has proven to us based upon either the

12:14:06 22   offense or the person's background or their criminal history if

12:14:10 23   they have any or whatever, we believe there is a probability

12:14:14 24   this person is going to be a future threat. Okay? You would

12:14:16 25   then move to the second question. Take a moment to read that

CURTIS SHORTHAND REPORTING - 817/467-4556

126

12:14:22 1   one to yourself, if you will do that.

12:14:24 2      A.   (Venireperson complies.) Okay.

12:14:38 3      Q.   Okay. What do you think this question is asking you

12:14:44 4   and the other jurors?

12:14:46 5      A.   Is there enough evidence for us to give him the death

12:14:50 6   penalty versus life in prison.

12:14:52 7      Q.   Okay. Well, it's kind of the opposite. This

12:14:54 8   question is asking you to take a look, once again, at the

12:14:56 9   evidence that you've already looked at in Question No. 1, all

12:15:02 10   right, because you remember, at this point, you found the

12:15:04 11   defendant guilty, right?

12:15:04 12      A.   Yes.

12:15:06 13      Q.   And to get this to question, you've answered Special

12:15:08 14   Issue No. 1, yes, you think they are a future threat or future

12:15:12 15   danger. This question is asking you to step back and look again

12:15:16 16   at that evidence and consider it again. All right? Is there

12:15:22 17   something before the jury that you find sufficiently lessens

12:15:26 18   that person's responsibility for the offense? Okay. And let me

12:15:36 19   give you just some hypotheticals and examples that don't

12:15:40 20   necessarily have anything to do with this case. It's just to

12:15:42 21   help illustrate the point. Okay?

12:15:46 22      A.   Okay.

12:15:46 23      Q.   It might be that a jury sits on a case where the

12:15:48 24   person on trial that they convict is fairly young, okay, or had

12:15:58 25   a bad childhood growing up, came from a single-parent home, grew

CURTIS SHORTHAND REPORTING - 817/467-4556

127

12:16:02 1   up very poor, has had problems with some type of mental nature.

12:16:14 2   Okay? Let me just throw in here, in the State of Texas, we

12:16:18 3   don't execute people who are mentally retarded. Okay? So we're

12:16:22 4   not talking about mental retardation when I talk about mental

12:16:24 5   issues, but there might be evidence of any degree and type that

12:16:28 6   could be presented to a jury. It is up to the individual jurors

12:16:32 7   to decide what type of evidence you personally feel might lessen

12:16:38 8   a person's responsibility for the commission of their crime,

12:16:42 9   okay; do you follow?

12:16:46 10      A.   Yes, ma'am.

12:16:46 11      Q.   And any one of those things or -- or anything else

12:16:48 12   that could be presented, one person might personally feel like,

12:16:54 13   well, gosh, this person is 18 years old. They're very young.

12:16:58 14   To me, that's sufficiently mitigating. Okay? Another person

12:17:04 15   sitting next to them on the jury might look at the same evidence

12:17:08 16   and say, You know what, I personally don't find that to be

12:17:10 17   mitigating. That is not sufficiently mitigating to me. All

12:17:14 18   right? You don't have to agree with the other jurors what you

12:17:18 19   think is mitigating.

12:17:20 20       This question, though, is asking you, is there

12:17:24 21   any evidence that you find to be sufficiently convincing to you

12:17:28 22   that sufficiently mitigates or lessens that person's

12:17:32 23   responsibility for their crime, whether it's evidence of the

12:17:36 24   offense, the motive for the offense, the defendant's character

12:17:40 25   and background, their personal moral culpability, whatever it

CURTIS SHORTHAND REPORTING - 817/467-4556

128

12:17:46 1   is.

12:17:48 2       Jurors might need to ask themselves, number one,

12:17:50 3   the evidence that I have heard in this courtroom, number one, is

12:17:54 4   it credible? You ask yourself that with any evidence, right?

12:17:58 5      A.   Yes, ma'am.

12:17:58 6      Q.   Do I believe it, because people can claim anything?

12:18:02 7   It doesn't necessarily make it true. Do I believe the evidence?

12:18:04 8   No. 2, do I think it's mitigating? Is it something to me that

12:18:10 9   would lessen their responsibility? And No. 3, if it is

12:18:14 10   mitigating, is it of a sufficient quality or quantity that I

12:18:18 11   think this person deserves a life sentence over a death

12:18:22 12   sentence; do you follow?

12:18:24 13      A.   Yes, ma'am.

12:18:26 14      Q.   All right. The law anticipates that jurors have to

12:18:30 15   keep an open mind to the realistic possibility that they might

12:18:34 16   hear something that they think is sufficiently mitigating, and

12:18:38 17   if they do hear something that they think is sufficiently

12:18:40 18   mitigating, they would have to follow the law and answer this

12:18:44 19   question yes. Yes, I do find that a life sentence is deserved

12:18:48 20   over a death sentence, because of this particular factor that I

12:18:50 21   have heard in this case. Make sense to you?

12:18:54 22      A.   Yes, ma'am.

12:18:54 23      Q.   Okay. Do you think that's a fair way to go about it?

12:19:04 24      A.   Yes, ma'am.

12:19:06 25      Q.   Okay. And you don't have to agree with me if you

CURTIS SHORTHAND REPORTING - 817/467-4556

129

12:19:10 1 don't want to. I'm just -- I'm asking you, do you think it's
12:19:14 2 fair that the law asks the jury to step back and see if there is
12:19:18 3 any particular piece of evidence that makes this person maybe
12:19:20 4 more deserving of a life sentence than a death sentence.
12:19:24 5     A.    Yes, ma'am.
12:19:24 6     Q.    It might be something unique; it might be something
12:19:26 7 that sets them apart. Do you think that the possibility is out
12:19:30 8 there? And I can't ask you -- the defense can't ask you what
12:19:34 9 you think, would be a sufficiently mitigating circumstance.
12:19:36 10 Okay? We can't ask you that. What I am going to ask you is:
12:19:42 11 Do you think that there is a possibility that there is evidence
12:19:44 12 out there that you personally might feel would be sufficiently
12:19:48 13 mitigating --
12:19:48 14     A.    Yes, ma'am.
12:19:50 15     Q.    -- such that you could answer this question yes?
12:19:52 16     A.    Yes, ma'am.
12:19:52 17     Q.    Okay. By the same token, do you think that you
12:20:00 18 could, if you didn't hear any evidence that you found to be
12:20:02 19 sufficiently mitigating -- I mean, whatever that evidence was,
12:20:06 20 could you answer this question no --
12:20:08 21     A.    Yes, ma'am.
12:20:08 22     Q.    -- I don't find there to be sufficiently mitigating
12:20:12 23 circumstances?
12:20:12 24     A.    Yes, ma'am.
12:20:14 25     Q.    With the understanding that if all 12 of you agree to
CURTIS SHORTHAND REPORTING - 817/467-4556

130

12:20:16 1 answer that question no, that leads you to the court or that
12:20:20 2 leads the court to having to impose a death sentence?
12:20:24 3     A.    Yes, ma'am.
12:20:24 4     Q.    If at least 10 or more agree to answer that
12:20:28 5 question yes, then what happens?
12:20:30 6     A.    Life sentence.
12:20:32 7     Q.    Exactly. Okay. Something else that I don't want to
12:20:38 8 forget to mention. On the -- at the first phase of the trial
12:20:42 9 and on that first special issue, the state has the burden of
12:20:44 10 proof. We have to prove those things.
12:20:46 11     A.    Uh-huh.
12:20:48 12     Q.    The state on this question does not have to prove
12:20:50 13 that there are mitigating circumstances, and we don't have to
12:20:54 14 prove that there aren't mitigating circumstances. In other
12:20:56 15 words, we don't have to do any proving at all. All right? Does
12:21:00 16 that make sense to you?
12:21:00 17     A.    Yes, ma'am.
12:21:02 18     Q.    Okay. And, of course, the defense never has to prove
12:21:04 19 anything at any time. Okay?
12:21:10 20         So correct me if I'm wrong, but what I'm hearing
12:21:14 21 from you is you are open to the possibility of answering this
12:21:16 22 question either yes or no, based upon what evidence is presented
12:21:20 23 to you?
12:21:24 24     A.    Yes, ma'am.
12:21:24 25     Q.    Okay. Are you the type of person that would say,
CURTIS SHORTHAND REPORTING - 817/467-4556

131

12:21:28 1 Well, I've convicted someone of capital murder. I've found that
12:21:34 2 they are a future danger. There is never going to be anything
12:21:38 3 sufficiently mitigating such that a person deserves life, and so
12:21:40 4 I'm always going answer this question no? Are you that type of
12:21:44 5 person?
12:21:44 6     A.    No, ma'am.
12:21:44 7     Q.    Okay. Are you the type of person, though, that would
12:21:48 8 say, I've found someone guilty. I've found that they are a
12:21:52 9 future danger, but you know what, if I answer that question no,
12:21:56 10 that person is going to be put the death and I don't want to be
12:22:00 11 a part of that. So I'm going to say yes each and every time to
12:22:04 12 make sure that a life sentence is always imposed. Are you that
12:22:06 13 type of person?
12:22:08 14     A.    No, ma'am.
12:22:08 15     Q.    Okay. You have lived in Texas for --
12:22:16 16     A.    All my life.
12:22:16 17     Q.    -- a fairly significant period of time, and you know
12:22:20 18 that in this state, that the death penalty is an actual reality,
12:22:26 19 that people on death row get executed --
12:22:30 20     A.    Yes, ma'am.
12:22:30 21     Q.    -- every year? In fact, I think I heard on the radio
12:22:32 22 the other day that Texas had just executed its 21st death row
12:22:38 23 prisoner for the year. So, I mean, it happens. If a jury
12:22:44 24 answers these questions in such a way that the court imposes a
12:22:46 25 death sentence, at some point down the line, the person is going
CURTIS SHORTHAND REPORTING - 817/467-4556

132

12:22:52 1 to get executed.
12:22:54 2         Do you feel like you could personally
12:22:56 3 participate in a decision that could eventually result in a
12:23:00 4 person that you've been in the courtroom with being put to
12:23:06 5 death, if it was the appropriate thing to do?
12:23:08 6     A.    Depending on the evidence, yes, ma'am.
12:23:16 7     Q.    Okay. And we ask that, because there are some people
12:23:18 8 who, you know, agree with the law. They want to see the capital
12:23:22 9 punishment scheme on the books, but they personally cannot be a
12:23:26 10 part of making that decision.
12:23:28 11     A.    Unfortunately.
12:23:28 12     Q.    And I'm just trying to find out if you can actually
12:23:32 13 be a participant and follow through if that is the appropriate
12:23:36 14 thing that needs to happen?
12:23:38 15     A.    Yes, ma'am.
12:23:38 16     Q.    Okay. Well, obviously, with the understanding that
12:23:42 17 it's never a pleasant decision or a pleasant position to be put
12:23:44 18 in.
12:23:46 19     A.    No, ma'am.
12:23:46 20     Q.    I mean, we understand that. But I guess we need to
12:23:50 21 make sure that when push comes to shove, if you answer these
12:23:52 22 questions honestly and according to the law and a death sentence
12:23:58 23 is going to be the result, can you participate in that decision?
12:24:02 24     A.    Yes, ma'am.
12:24:02 25     Q.    Okay. All right. Any questions about anything that
CURTIS SHORTHAND REPORTING - 817/467-4556

12:24:08 1  we've gone over thus far?
12:24:08 2      A.  No, ma'am.
12:24:10 3      Q.  All right.  Voluntary intoxication is not a defense
12:24:16 4  to the commission of a crime.  That means that if a person goes
12:24:20 5  out and gets drunk or gets high, they can't be found not guilty
12:24:24 6  by virtue of the fact that they were drunk or high.  Make sense
12:24:28 7  to you?
12:24:28 8      A.  Yes, ma'am.
12:24:28 9      Q.  Can you follow that law?
12:24:30 10     A.  Uh-huh.
12:24:30 11     Q.  Is that yes?
12:24:32 12     A.  Yes, ma'am.
12:24:32 13     Q.  Okay.  Another area of the law has to do with the
12:24:38 14 rules that apply when a police officer or law enforcement make
12:24:44 15 an arrest or take a statement from somebody.  If the evidence is
12:24:48 16 presented to the jury that the rules have not been followed in
12:24:54 17 some way, the jury might get an instruction from the judge that
12:24:58 18 if they believe that the rules had not been followed, that the
12:25:02 19 evidence was obtained illegally, okay, that they would have to
12:25:06 20 disregard that particular piece of evidence and pull it out of
12:25:10 21 their consideration.  Okay.  Are you aware of that?
12:25:14 22     A.  Yes, ma'am.
12:25:18 23     Q.  Did that ever come up in your prior trial that you
12:25:20 24 sat on?
12:25:22 25     A.  No, ma'am.

CURTIS SHORTHAND REPORTING - 817/467-4556

---

12:24:46 1  was, you took an oath as a juror to follow the law and part of
12:26:52 2  that law given to you by the court was that if you believe that
12:26:56 3  it had been illegally obtained, you would have to disregard it,
12:27:00 4  would you violate your oath and still consider the evidence, or
12:27:04 5  would you follow your oath and pull it out of your
12:27:10 6  consideration, knowing it was there, but, I mean, if you had
12:27:10 7  taken on oath, could you follow your oath, or would you violate
12:27:14 8  it?
12:27:14 9      A.  I would probably violate it.
12:27:16 10             MR. MOORE:  We challenge him for cause at this
12:27:18 11 time, Judge.
12:27:20 12             THE COURT:  Your challenge for cause would be
12:27:20 13 granted.
12:27:22 14             MS. HARTMAN:  All right.
12:27:22 15             THE COURT:  Mr. Reasoner, thank you very much.
12:27:26 16 You're going to be able to make your closing, because you won't
12:27:26 17 be a juror on this case, and we appreciate your honesty in your
12:27:32 18 answers.
12:27:32 19             VENIREPERSON REASONER:  Okay.
12:27:34 20             MS. HARTMAN:  Thank you.
12:27:34 21             (Venireperson Reasoner leaves the proceedings.)
13:46:26 22             (Off-the-record discussion.)
13:46:26 23             THE COURT:  I guess we're ready for Mr. Moretz.
13:46:26 24             (Venireperson Moretz enters the proceedings.)
13:46:52 25             THE COURT:  Mr. Moretz, right up here, please.

CURTIS SHORTHAND REPORTING - 817/467-4556

---

134

12:25:22 1      Q.  Okay.  But you've heard about this type of procedure
12:25:26 2  in the law before?
12:25:28 3      A.  Yes, ma'am.
12:25:30 4      Q.  All right.  There are certain rules in regards to,
12:25:38 5  say, the taking of a statement.  A person has to be warned of
12:25:40 6  their Miranda rights.  The statement has to be voluntary.  All
12:25:44 7  right?  The person has to want to talk to law enforcement.  They
12:25:48 8  have to be cooperative.  Okay?  They can't be promised anything
12:25:52 9  or threatened in any way.  All right?  Those are all things that
12:25:56 10 go towards whether the statement is voluntary or not.  Make
12:26:00 11 sense to you?
12:26:00 12     A.  Yes, ma'am.
12:26:02 13     Q.  Okay.  If evidence is presented that the rules
12:26:08 14 haven't been followed and the court gave that instruction, the
12:26:12 15 jury would have to ask themselves, number one, do I believe the
12:26:16 16 rules were, in fact, not followed, because it's like any other
12:26:20 17 type of evidence, do you believe it.  Okay?
12:26:24 18             If you believe the rules had not been followed,
12:26:28 19 you would have to disregard the evidence.  Okay?  And it might
12:26:30 20 result in a guilty verdict, and it might result in a not guilty
12:26:34 21 verdict.  How do you feel about that?
12:26:38 22     A.  Having already seen the evidence?
12:26:38 23     Q.  That's correct?
12:26:44 24     A.  I probably couldn't disregard it all the way.
12:26:44 25     Q.  Okay.  If you took an oath that that was what the law

CURTIS SHORTHAND REPORTING - 817/467-4556

---

136

13:46:54 1  Am I pronouncing that right?  Is it Moretz?
13:46:58 2             VENIREPERSON MORETZ:  Yes.
13:46:58 3             THE COURT:  Have a seat.  That chair doesn't
13:47:04 4  move backwards or forwards, but it swivels, so you'll have to
13:47:04 5  actually -- yeah, sometimes that mic comes off.
13:47:08 6             Okay.  Mr. Moretz, let me begin by introducing
13:47:12 7  myself.  My name is David Richards, and I'm a visiting judge
13:47:16 8  here in Fort Worth.  Judge Bob Gill is the elected judge of this
13:47:18 9  court, and he will be conducting the trial of this case.  I'm
13:47:22 10 just here to help him with the jury selection process.
13:47:26 11             VENIREPERSON MORETZ:  Okay.
13:47:30 12             THE COURT:  Let me begin by telling you what it
13:47:32 13 is we're here for.  This is a jury selection in a capital murder
13:47:36 14 case in which the state is seeking the death penalty.  Were you
13:47:38 15 aware of that from your questionnaire that you filled out?
13:47:44 16             VENIREPERSON MORETZ:  Yes.
13:47:44 17             THE COURT:  Okay.  Unlike the typical jury
13:47:46 18 trial -- I'm not sure whether you've been involved in that or
13:47:48 19 not -- in a regular trial, we would bring all of the prospective
13:47:54 20 jurors in at one time and talk to them as a group, but in a
13:47:58 21 capital murder case where the state is seeking the death
13:48:02 22 penalty, the potential consequences are so serious that we do it
13:48:02 23 one at a time.  So everybody that was down there with you in the
13:48:04 24 central jury room on this case is being interviewed one at a
13:48:12 25 time.  That's why we're here.  I know it can seem to be a little

CURTIS SHORTHAND REPORTING - 817/467-4556

---

137

13:48:16 1 bit intimidating coming in to a group of lawyers and a robe
13:48:20 2 looking down on you in the witness stand, but this really isn't
13:48:24 3 a formal procedure. It's rather informal, and the only thing we
13:48:28 4 expect of you is just to be honest in your answers and tell the
13:48:34 5 truth.
13:48:34 6         The attorneys are going to explain a little bit
13:48:36 7 about the law in death penalty cases in Texas and then question
13:48:42 8 you about whether or not you believe you could follow that law,
13:48:46 9 but the ultimate goal is determining whether or not you would
13:48:50 10 make a fair and impartial juror in this particular type of case.
13:48:52 11 Okay?
13:48:52 12         A couple of ground rules, you may have noticed
13:48:58 13 that the court reporter in front of you is taking down
13:49:00 14 everything that I say. She's going to need to take down
13:49:06 15 everything you say and the lawyers say, as well. So try to make
13:49:06 16 your answers audible. She can't take down a nodding or shaking
13:49:10 17 of the head.
13:49:10 18         VENIREPERSON MORETZ: Right.
13:49:12 19         THE COURT: Try to avoid the uh-huh and huh-uh
13:49:40 20 answers, because that's very difficult to read if someone wants
13:49:18 21 to read back. Also, try to avoid talking over the questions,
13:49:22 22 and by that, I mean, it's normal for me, at least, in daily
13:49:26 23 conversation, if somebody is asking me a question and I know
13:49:30 24 what they're -- how they're going to end the question before
13:49:32 25 they get to the end of the question, I'll go ahead and volunteer

CURTIS SHORTHAND REPORTING - 817/467-4556

---

138

13:49:36 1 an answer. Try to avoid doing that for a couple of reasons.
13:49:42 2 Number one, the court reporter can't take down two people
13:49:44 3 talking at the same time.
13:49:44 4         VENIREPERSON MORETZ: Right.
13:49:46 5         THE COURT: And for another thing, it would just
13:49:48 6 be more clear if you would let them finish their question and
13:49:52 7 take a one-second pause or so and then answer the question that
13:49:54 8 they ask.
13:49:58 9         The attorneys that are going to be asking the
13:50:00 10 questions today are going to be the same attorneys that are
13:50:02 11 going to be prosecuting and defending this case, so let me begin
13:50:06 12 by introducing them.
13:50:08 13         Tim Curry is the elected District Attorney in
13:50:14 14 Tarrant County, but that's more of an administrative position
13:50:16 15 and he's represented in the trial courts by assistant criminal
13:50:18 16 district attorneys and today we have two of his assistants,
13:50:18 17 Ms. Michele Hartman --
13:50:22 18         MS. HARTMAN: Good afternoon.
13:50:22 19         THE COURT: -- and Ms. Lisa Callaghan.
13:50:26 20         MS. CALLAGHAN: Good afternoon.
13:50:26 21         MR. REASONER: And at the other table, Mr. Tim
13:50:28 22 Moore --
13:50:28 23         MR. MOORE: Hi.
13:50:30 24         THE COURT: -- and Mr. Bill Ray.
13:50:30 25         MR. RAY: How are you doing?

CURTIS SHORTHAND REPORTING - 817/467-4556

---

139

13:50:32 1         THE COURT: They are the Fort Worth criminal
13:50:32 2 defense attorneys, and they are representing Billy Jack
13:50:36 3 Crutsinger, who is at the far end of the table and who is on
13:50:40 4 trial in this case, and you can see his name up there on the
13:50:42 5 screen.
13:50:46 6         They're not going to be able to talk to you much
13:50:48 7 about the facts of the case. You're not going to come out of
13:50:52 8 here being educated --
13:50:52 9         VENIREPERSON MORETZ: Right.
13:50:54 10         THE COURT: -- on what it is, you know, the
13:50:54 11 time, place and manner that the allegations indicate occurred.
13:51:02 12 You're not going to hear an opening statement from the
13:51:04 13 prosecutor. You may hear a little bit about what it is that the
13:51:08 14 state expects to prove in this case, because they're going to
13:51:12 15 discuss the elements of the charged offense with you, but you're
13:51:16 16 not going to get a test at end of this as to whether or not
13:51:20 17 you're going to be a fair and impartial juror. All we want is
13:51:22 18 your honest opinions about the matters that they discuss with
13:51:26 19 you and then, ultimately, the attorneys and not me will decide
13:51:32 20 whether or not you will be on the case as a juror. Okay?
13:51:36 21         VENIREPERSON MORETZ: Okay.
13:51:38 22         THE COURT: Let's see if I've gone over
13:51:38 23 everything here.
13:51:40 24         VENIREPERSON MORETZ: I need to ask a questio
13:51:40 25 When does this trial begin?

CURTIS SHORTHAND REPORTING - 817/467-4556

---

140

13:51:44 1         THE COURT: Okay. The attorneys will go into
13:51:46 2 that, but we expect that it will begin on the 20 -- the week of
13:51:50 3 the 22nd. Is that going to be a problem for you?
13:51:52 4         VENIREPERSON MORETZ: Yes, it is. I'm going to
13:51:56 5 be leaving town Monday for three weeks.
13:51:58 6         THE COURT: Your leaving town on the 15th?
13:52:02 7         VENIREPERSON MORETZ: Yes.
13:52:02 8         THE COURT: And you're going to be gone for
13:52:04 9 three weeks?
13:52:08 10         VENIREPERSON MORETZ: After that and into
13:52:08 11 October, yes.
13:52:10 12         THE COURT: Okay. And is that a vacation or a
13:52:10 13 business trip?
13:52:12 14         VENIREPERSON MORETZ: Well, my wife's class
13:52:14 15 reunion, and my mother is sick. We have to go see her for a
13:52:16 16 while.
13:52:18 17         THE COURT: And where does she live?
13:52:20 18         VENIREPERSON MORETZ: In Tennessee, Mounta
13:52:22 19 City. She's in a nursing home right now, and she fell again.
13:52:26 20         THE COURT: Okay. I tell you what. I'm about
13:52:28 21 to turn things over to the attorneys, and that's going to be the
13:52:32 22 first thing that they're going to go over with you.
13:52:32 23         VENIREPERSON MORETZ: All right.
13:52:34 24         THE COURT: If we can't get past that, then we
13:52:38 25 can't get past that, so -- but let me begin by giving you an

CURTIS SHORTHAND REPORTING - 817/467-4556

**Page 137 to Page 140**

13:52:40 1   oath that's required of all prospective jurors, and if you
13:52:46 2   would, just raise your right hand.
3             GLENN ROBERT MORETZ,
4   having been duly sworn to make true answers to such questions as
5   may be propounded by the Court or under its direction, touching
6   upon his service and qualification as a juror, gave answers as
7   follows:
13:52:58 8            THE COURT: Okay. Very well.
13:53:00 9            And as I said, I expect that has been the
13:53:02 10  routine, that the first matter that's covered is your
13:53:06 11  availability for trial.
13:53:08 12           So, Ms. Callaghan, you may proceed.
13:53:10 13           MS. CALLAGHAN: Thank you, Your Honor.
13:53:10 14           VOIR DIRE EXAMINATION
13:53:12 15  BY MS. CALLAGHAN:
13:53:16 16  Q.   Mr. Moretz, my name is Lisa Callaghan, as the judge
13:53:16 17  mentioned, and Michele Hartman will be back here in a minute.
13:53:20 18  We represent the State of Texas in this case in which the
13:53:22 19  state -- yeah, it's a capital murder case in which the state is
13:53:26 20  seeking the death penalty. Okay?
13:53:26 21  A.   Yes.
13:53:28 22  Q.   And what we're here to do today is to go over some of
13:53:32 23  the law and talk to you about it and find out if you can follow
13:53:36 24  the law and, also, to find out if you have any personal
13:53:38 25  experiences that might affect you in being a juror. Okay?
CURTIS SHORTHAND REPORTING - 817/467-4556

13:54:42 1   Q.   Is she bedridden?
13:54:44 2   A.   She is -- she's getting around a little better, but
13:54:48 3   she is in a wheelchair right now.
13:54:48 4   Q.   Okay. If you were required to remain here and be on
13:54:56 5   our jury instead of going with your wife, would your concern and
13:55:00 6   worry for your mother be to such a degree that you would be
13:55:06 7   incapable of focusing on the evidence in this case and
13:55:10 8   deliberating on it fairly?
13:55:12 9   A.   Well, my wife cannot drive by herself, so that would
13:55:16 10  be out.
13:55:18 11  Q.   I see. Okay. So you -- neither of you could go in
13:55:22 12  in the event that you were instructed to be a juror?
13:55:26 13  A.   Right.
13:55:28 14  Q.   Well, then let me ask again. Would the situation
13:55:32 15  with your mother be to such a degree that you could not give
13:55:36 16  your full attention to the case and focus on it?
13:55:38 17  A.   I believe it would be. It would be.
13:55:48 18           MS. CALLAGHAN: One moment, please, Your Hon-
13:56:02 19           The state will agree, Your Honor.
13:56:02 20           MR. MOORE: We'll agree.
13:56:06 21           THE COURT: Mr. Moretz, thank you for coming. I
13:56:14 22  wish you the best of luck in your travels.
13:56:14 23           VENIREPERSON MORETZ: Thank you.
13:56:14 24           MS. CALLAGHAN: Thank you very much. We Wis
13:56:16 25  your mother well. Good luck.
CURTIS SHORTHAND REPORTING - 817/467-4556

142

13:53:42 1   A.   Yes.
13:53:42 2   Q.   But before we go into that, let's go back to the item
13:53:44 3   that you mentioned to the judge. You are going to be going out
13:53:48 4   of town the 15th, you said?
13:53:50 5   A.   Yes, ma'am.
13:53:52 6   Q.   To return when?
13:53:54 7   A.   October -- around the 1st of October.
13:53:54 8   Q.   Okay. And are you driving or going by --
13:53:58 9   A.   Driving.
13:53:58 10  Q.   Driving. Okay. And this is because you said, I
13:54:02 11  believe, your mother-in-law is ill?
13:54:04 12  A.   My mother.
13:54:04 13  Q.   Your mother is ill?
13:54:04 14  A.   My -- and my wife's class reunion.
13:54:10 15  Q.   Okay. So it's really two reasons?
13:54:12 16  A.   Yes.
13:54:14 17  Q.   I don't mean in any way to be too personal, but I
13:54:18 18  need to ask you about this. What kind of physical problems does
13:54:20 19  your mother have?
13:54:20 20  A.   She -- she's 97 and she broke a hip two years ago and
13:54:26 21  she fell again this -- just a couple of weeks ago and someone
13:54:32 22  has to be there with her and we're taking turns. The children
13:54:36 23  are taking turns staying there to --
13:54:40 24  Q.   Okay. And it's your turn to take care of her?
13:54:40 25  A.   Yes.
CURTIS SHORTHAND REPORTING - 817/467-4556

144

13:56:14 1            VENIREPERSON MORETZ: All right. Thank you.
13:56:20 2   Sorry I couldn't help you.
13:56:24 3            MS. CALLAGHAN: No, that's quite all right.
13:56:26 4   Thank you.
13:56:26 5            (Venireperson Moretz leaves the proceedings.)
13:56:26 6            (Off-the-record discussion.)
15:06:04 7            (Venireperson Hitte enters the proceedings.)
15:06:04 8            THE COURT: Okay. Mr. -- is it Hitte or Hitte?
15:06:08 9            VENIREPERSON HITTE: Hitte, sir.
15:06:08 10           THE COURT: Come right up here, please, this
15:06:10 11  chair right here. That chair doesn't move backwards or
15:06:12 12  forwards, so kind of swivel into it and then keep that
15:06:24 13  microphone kind of towards your face.
15:06:24 14           Okay. Mr. Hitte, I'll begin by introducing
15:06:30 15  myself. My name is David Richards, and I'm a visiting judge
15:06:32 16  here in Fort Worth. I'm assisting Judge Bob Gill, who is the
15:06:40 17  elected judge, to pick a jury, but Judge Gill is going to be
15:06:40 18  presiding at the trial of this case.
15:06:44 19           As you may have surmised from all of the
15:06:46 20  information you were provided in the central jury room, this is
15:06:50 21  a case, a capital murder case in which the state is seeking the
15:06:52 22  death penalty, and the attorney attorneys are going to go over
15:06:58 23  with you the scheduling. I appreciate you coming in this
15:07:02 24  afternoon. I understand that there has been a death in your
15:07:06 25  family?
CURTIS SHORTHAND REPORTING - 817/467-4556

147

1    VENIREPERSON HITTE: Yes, sir.
2        THE COURT: I appreciate your patience, and
3    you're leaving tomorrow?
4        VENIREPERSON HITTE: Yes, sir.
5        THE COURT: The attorneys will go over the trial
6    schedule to determine whether or not you have a potential
7    conflict there, as well, but I'll let them get into that.
8        Let me tell you a little bit about we're going
9    to do this afternoon. We're bringing all of the prospective
10   jurors in this case in one at a time and we only do that in
11   capital murder capital cases where the state is seeking the
12   death penalty, because of the potential serious consequences of
13   the verdict, we like to bring what we call the veniremembers in
14   one at a time for the process we call voir dire here. I don't
15   know if you have been a juror before.
16       VENIREPERSON HITTE: No, sir.
17       THE COURT: But this is the portion of the trial
18   you never see on television or the movies. This is the part
19   when the attorneys have a chance to ask you some questions,
20   explain the law to you and find out if -- if you're able to
21   follow the law in this type of case, if you are, in fact,
22   selected as a juror. They are trying to determine whether you
23   are a fair and impartial juror in this case. It may be that you
24   would be a fair and impartial juror in another type of case, but
25   for some reason there is something that would prevent you from

CURTIS SHORTHAND REPORTING - 817/467-4556

146

1    doing it in this case.
2        So let me begin by introducing the attorneys
3    that are here this afternoon. Tim Curry is the elected District
4    Attorney, but that's an administrative-type position and he's
5    represented in the trial courts by assistant district attorneys
6    and we have two of his assistants who are present here this
7    afternoon and they will be prosecuting the case at the time it
8    goes to trial, Ms. Michele Hartman --
9        MS. HARTMAN: Good afternoon.
10       THE COURT: -- and Ms. Lisa Callaghan.
11       MS. CALLAGHAN: Good afternoon.
12       THE COURT: And on the other side, the defense
13   side, Mr. Tim Moore --
14       MR. MOORE: Hi.
15       THE COURT: -- and Mr. Bill Ray.
16       MR. RAY: How are you doing?
17       THE COURT: Mr. Moore and Mr. Ray are Fort Wort
18   criminal defense attorneys. The defendant in this case is
19   Mr. Billy Jack Crutsinger. That's him over there on the end,
20   and that is his name up there on the screen.
21       The attorneys are going to have a chance to talk
22   to you this afternoon. If you have any questions of them
23   about -- about anything related to this case, just feel free to
24   speak up. I know it's a little intimidating when you walk in
25   and see the lawyers and I am looking down at you in a robe, but

CURTIS SHORTHAND REPORTING - 817/467-4556

148 (continued top right)

1    it's a really informal process we go through. So feel free to
2    speak up. If you have any questions of them or if you have --
3    or you don't understand a question that they have of you, you
4    have at it, okay, and just feel free to speak up.
5        A couple of ground rules. The court reporter
6    right in front of you, you may have noticed, is taking down
7    everything that I say. She's required to take down everything
8    that anyone says in the courtroom, including you. So as a
9    consequence, when they begin asking you questions, try to avoid
10   nodding of the head and shaking of the head and answer audibly,
11   because we need that for the record, yes or no, rather than
12   uh-huh and huh-uh. That will help us, too, because that's
13   really difficult to read, if somebody is having to read the
14   record.
15       VENIREPERSON HITTE: (Venireperson nods.)
16       THE COURT: Also, don't talk over the questions,
17   and by that, I mean, typically in normal conversation, a lot of
18   times you're going to be able to anticipate what the end of the
19   question is going to be that they ask. Okay? And if you're
20   just conversing with somebody and you know that's going to
21   happen and if you blurt out the answer even before they finish
22   the question, try to avoid that here in this courtroom. If
23   after they begin asking you a question, even if you know where
24   they are going with it, go ahead and let them get the whole
25   question out, take about a half-second pause, and then give the

CURTIS SHORTHAND REPORTING - 817/467-4556

148

1    answer. Among other things, the court reporter can't take down
2    two people talking at the same time. Okay? So we need to have
3    only one person in the courtroom talking at one time.
4        As I said, the attorneys are going to talk with
5    you about the law in this case, and to determine whether or not
6    you would be a fair and impartial juror. Don't expect them to
7    discuss the facts of the case with you. Don't expect them to
8    tell you the who, what, where and why and what they expect the
9    evidence to show. They're mainly going to be talking in
10   hypothetical fact situations about the law and explain what the
11   law is to you. You'll know a little bit about what they expect
12   to prove at trial, but don't expect to come away -- this isn't
13   the time when they are making an opening statement as to what
14   think the evidence is going to prove. Okay?
15       VENIREPERSON HITTE: I understand.
16       THE COURT: Okay. There is an oath that I need
17   to give to all prospective jurors, so if you would raise your
18   right hand.
19       DAVID MICHAEL HITTE,
20   having been duly sworn to make true answers to such questions as
21   may be propounded by the Court or under its direction, touching
22   upon his service and qualification as a juror, gave answers as
23   follows:
24       VENIREPERSON HITTE: I do.
25       THE COURT: Okay. Very good.

CURTIS SHORTHAND REPORTING - 817/467-4556

15:12:00 1      Okay. We'll begin with the DA's office asking
15:12:02 2  you some questions, and when they're done, then the defense will
15:12:04 3  have an opportunity to question you. Okay?
15:12:08 4      VENIREPERSON HITTE: Yes, sir.
15:12:08 5      THE COURT: We're not looking for -- you know,
15:12:10 6  there is no right or wrong answer here. You won't be given a
15:12:16 7  test over the law that you learn. So the important thing is
15:12:18 8  just to be honest and open about your feelings about the law
15:12:24 9  when the question calls for that.
15:12:26 10      You may proceed.
15:12:26 11      MS. HARTMAN: Thank you, Your Honor.
15:12:26 12      VOIR DIRE EXAMINATION
15:12:26 13  BY MS. HARTMAN:
15:12:26 14      Q.   Good afternoon, Mr. Hitte.
15:12:28 15      A.   Good afternoon.
15:12:28 16      Q.   As the judge just told you, we are in the process of
15:12:34 17  selecting a jury for a capital murder case in which the state is
15:12:36 18  seeking the death penalty.
15:12:38 19      We need to visit with you-all one on one to make
15:12:42 20  sure that you understand and are comfortable with the law, so
15:12:46 21  that if you're chosen as a juror, you'll have some understanding
15:12:50 22  of what the law is that's going to be applicable to the facts
15:12:52 23  and circumstances that you'll be hearing in the court.
15:12:54 24      We anticipate this trial will start the week of
15:13:00 25  September the 22nd and go anywhere from five days to two weeks,
CURTIS SHORTHAND REPORTING - 817/467-4556

150

15:13:04 1  in other words, two business weeks. Is that going to cause any
15:13:08 2  conflict for you?
15:13:10 3      A.   I don't believe so.
15:13:10 4      Q.   And we were given to understand and the reason that
15:13:14 5  we've gotten you in here early, we appreciate your willingness
15:13:18 6  to come in and see us ahead of your scheduled day. I think we
15:13:24 7  would all like to express our condolences. It's our
15:13:26 8  understanding you've lost your mother-in-law?
15:13:28 9      A.   Yes, ma'am, last night. Thank you for your kindness.
15:13:32 10      Q.   I think everyone in the room is -- you know, would
15:13:34 11  like to express our condolences to you and your family and we
15:13:38 12  appreciate your cooperativeness and willingness to come in today
15:13:43 13  and be interviewed and it may be that the way things work, we
15:13:52 14  may get to you as a juror, we may not, but if we do, at least
15:13:56 15  we've had the opportunity to visit with you, I guess out of
15:14:00 16  order, and we appreciate your willingness to come down here,
15:14:02 17  especially on a day like today and with the circumstances as
15:14:08 18  they are to see us.
15:14:10 19      It is possible, also, in addition to working
15:14:14 20  anywhere from five days to two weeks that during the
15:14:18 21  deliberation process, the jury might be sequestered overnight at
15:14:22 22  a hotel down here in Fort Worth. Would that particular
15:14:23 23  situation cause any difficulties for you and your family?
15:14:24 24      A.   I don't believe so.
15:14:34 25      Q.   Okay. Were you given a witness list to look at
CURTIS SHORTHAND REPORTING - 817/467-4556

15:14:40 1  outside?
15:14:40 2      A.   Yes.
15:14:40 3      Q.   Did you recognize anybody's name?
15:14:44 4      A.   Only the defendant's, now that I've seen him again.
15:14:42 5      Q.   I'm sorry?
15:14:46 6      A.   Only the defendant's. I notice that there was a
15:14:48 7  couple of people with that last name, but nobody I know or have
15:14:52 8  seen.
15:14:52 9      Q.   Okay. You don't know anybody with the last name of
15:14:56 10  Crutsinger?
15:14:56 11      A.   No.
15:14:56 12      Q.   All right. Well, what I'm going to do is -- start
15:15:00 13  off with how a criminal trial proceeds and how it works and then
15:15:06 14  I'm going to go in and start talking about what is capital
15:15:10 15  murder law and, specifically, how do we get to an ultimate life
15:15:16 16  sentence or death sentence, which are the two possible
15:15:18 17  punishments if someone is convicted of capital murder. Okay?
15:15:22 18      And I don't believe you had put down that you
15:15:26 19  have ever been a juror before.
15:15:26 20      A.   No, I have not.
15:15:28 21      Q.   All right. Basically, the trial process can be in
15:15:34 22  two parts. The first part is the state putting on evidence to
15:15:40 23  prove whether the person did what we say that they did. Okay?
15:15:44 24  And if the jury finds the person guilty, the second phase of the
15:15:48 25  trial would then start and that's that punishment phase, where
CURTIS SHORTHAND REPORTING - 817/467-4556

152

15:15:52 1  the jury would hear additional information about that person's
15:15:56 2  life that either side might feel was relevant or important for
15:15:58 3  that jury to know about.
15:16:02 4      Just some general rules. The only side that has
15:16:06 5  to present evidence is the State of Texas. The defense never
15:16:10 6  has to put on any evidence at all. Did you know that?
15:16:12 7      A.   Yes, I understand.
15:16:14 8      Q.   Okay. There is a presumption of innocence, a person
15:16:18 9  is presumed to be innocent, unless and until the state proves
15:16:22 10  that they are guilty beyond a reasonable doubt. Have you heard
15:16:26 11  that concept?
15:16:26 12      A.   Yes, I have.
15:16:28 13      Q.   If you were instructed that that was what the law
15:16:30 14  was, could you follow that law?
15:16:32 15      A.   Yes, I could.
15:16:32 16      Q.   So that if Lisa and I did not do our job, we did not
15:16:38 17  prove our case, that presumption of innocence would kick in and
15:16:40 18  the jury would have to find the person not guilty. Make sense
15:16:44 19  to you?
15:16:46 20      A.   Yes, it does.
15:16:46 21      Q.   Okay. Every criminal defendant has the right to
15:16:52 22  remain silent. Have you heard of that?
15:16:56 23      A.   Yes, I have.
15:16:56 24      Q.   If a person chooses to remain silent and not testify,
15:16:58 25  the jury would be given an instruction by the judge that they
CURTIS SHORTHAND REPORTING - 817/467-4556

153

1 could not consider that failure to testify for any reason.
2 Q. Could you follow that instruction?
3 A. Yes, I could.
4 Q. All right. Well, let's talk about capital murder.
5 Capital murder is where you have a murder, plus an extra
6 ingredient, an aggravating or special circumstance that
7 surrounds that murder. `A murder is an intentional killing.
8 Okay? When we have a capital murder case, we can have any one
9 of these circumstances and there are a couple of other ones that
10 aren't -- that don't happen near as often, but these are the
11 types of offenses that are labeled as capital murder: If you
12 kill a child under the age of six years of age, if you kill a
13 police officer or fireman while they are in the course of their
14 duty, if you kill someone during the course of committing some
15 other type of felony, and the law that we're talking about
16 specifically for this case, even though we can't talk to you
17 about the facts, we can tell you which law is in place, is
18 intentionally killing more than one person in the same criminal
19 transaction or the same course of criminal conduct. Does that
20 make sense to you?
21 A. Yes, it does.
22 Q. If a person is convicted of an offense, such as one
23 of these listed up here, there are only two possible
24 punishments, a life sentence and a death sentence. A life
25 sentence is 40 calendar years day for day before the person is

CURTIS SHORTHAND REPORTING - 817/467-4556

155

1 right. So in a capital murder case, the state would have to
2 prove certain things beyond a reasonable doubt. That is the
3 legal standard. Have you heard that before?
4 A. The term --
5 Q. Beyond a reasonable doubt?
6 A. Yes, I have.
7 Q. Okay. These are the things that we'd have to prove
8 and only these things beyond a reasonable doubt in order for a
9 jury to return a verdict of guilty. We'd have to prove the
10 person on trial, which in this case is Mr. Crutsinger, in
11 Tarrant County, Texas, on or about a particular date,
12 intentionally caused the death of more than one person in the
13 same criminal transaction, and then we would have to prove how
14 he went about doing that. Okay? Those are the only things that
15 we would have to prove beyond a reasonable doubt.
16 Beyond a reasonable doubt is not defined for you
17 in the law, and I like to tell people that it's whatever level
18 of evidence for your heart and your mind satisfies you that the
19 person is guilty. You get to determine how much or how little
20 that is. Okay?
21 Now, obviously, we're talking about a criminal
22 case where someone's life is at stake, so obviously it's a high
23 standard. It's higher than any other standard that we have in
24 the legal system, but you, yourself, get to determine how much
25 evidence is sufficient to prove that to you. Does that make

CURTIS SHORTHAND REPORTING - 817/467-4556

154

1 eligible for parole. Okay? In other words, in Texas there is
2 no life without parole. Make sense to you?
3 A. Yes, I understand.
4 Q. Understanding that the possible punishment options
5 for these types of offenses that are listed up here on the
6 screen are basically a life sentence of 40 years and a death
7 sentence. Do you think that these are the types of offenses for
8 which someone should stand in jeopardy of facing the death
9 sentence?
10 A. Are you asking my personal feelings?
11 Q. That's correct. Do you think that these are the type
12 of offenses for which a person should be subjected to a possible
13 death sentence, is what I'm asking?
14 A. Well, yes, I do, but I would be more concerned about
15 upholding my duties as a citizen and the laws of Texas.
16 Q. Okay. Well, it sounds like you think there is a
17 conflict there. What do you --
18 A. No. I mean, my personal feelings are -- I guess, I
19 can separate my personal feelings with my responsibilities to
20 uphold the laws of Texas.
21 Q. Okay. Well, I guess, what I -- it sounds to me like
22 there is a conflict between your personal feelings and the law.
23 What -- what is that?
24 A. No, in this case, there is not.
25 Q. There is not. Okay. I just misunderstood you. All

CURTIS SHORTHAND REPORTING - 817/467-4556

156

1 sense to you?
2 A. Yes, it does.
3 Q. All right. The law says that beyond a reasonable
4 doubt, while they don't define it for you, it is not that 100
5 percent level, beyond all possible doubt. Do you think that it
6 would be possible for the state to ever prove a case beyond all
7 possible doubt or 100 percent to the 12 people who are sitting
8 in the jury box who did not witness the crime itself?
9 A. Just to make sure I understand you, are you asking me
10 if I think that the possibility exists that all 12 people could
11 be 100 percent convinced of beyond a reasonable doubt?
12 Q. No. What I'm saying is the law says that I have to
13 prove my case beyond a reasonable doubt.
14 A. Yes, I understand.
15 Q. That any doubt that a juror has to be reasonable and
16 it has to be based upon the evidence. It can't be like pie in
17 the sky --
18 A. Yes, I understand.
19 Q. -- fanciful, theorizing, speculating, guessing. It
20 has to be -- it has to be reasonable, and it has to be based
21 upon the evidence.
22 A. Yes, I understand.
23 Q. And most people, to have things proved to them by a
24 100 percent certainty, would have to have it happen before their
25 own eyes, and that would obviously make you a witness, right?

CURTIS SHORTHAND REPORTING - 817/467-4556

157

15:23:00 1   A.   Correct.

15:23:00 2   Q.   And if you're a witness, you can't be a juror.

15:23:02 3   A.   Correct.

15:23:02 4   Q.   So jurors are going to be people who don't know
15:23:04 5   anything about the offense, and so that's why I think the law
15:23:08 6   says that my standard, as the state, is to prove it beyond a
15:23:16 7   reasonable doubt, not this impossible 100 percent standard.

15:23:28 8   A.   Yes, I understand.

15:23:29 9   Q.   Okay.

15:23:22 10   A.   I can work within those guidelines.

15:23:22 11   Q.   You can work from those guidelines?

15:23:26 12   A.   Yes, ma'am.

15:23:26 13   Q.   You're comfortable with that beyond a reasonable
15:23:26 14   doubt?

15:23:26 15   A.   Yes, I am.

15:23:36 16   Q.   Okay.  And I'm sorry if I'm confusing you.  We've
15:23:31 17   been through -- I know you're 115 and I think we -- on Monday
15:23:36 18   we'll start with 99, so we've been through almost 100 people, so
15:23:36 19   we've all been doing this over and over, so --

15:23:40 20   A.   I'm not trying to be difficult.

15:23:40 21   Q.   No, no.

15:23:42 22   A.   I'm just trying to make sure I understand what
15:23:42 23   you're --

15:23:44 24   Q.   No, no, no.  I'm apologizing.  You don't need to.
15:23:46 25        What I'm saying is that we've done this so much

CURTIS SHORTHAND REPORTING - 817/467-4556

---

158

15:23:50 1   in the last three weeks that it doesn't surprise me if I confuse
15:23:54 2   you.  So you're doing the appropriate thing by trying to clarify
15:23:56 3   to make your sure you understand.  So, no, I'm the one that
15:24:00 4   should apologize.

15:24:04 5        When we talk about intentionally, we are talking
15:24:08 6   about it is the person's conscious objective or desire to do the
15:24:12 7   act and to cause the result.  Does that make sense to you?

15:24:18 8   A.   Yes, it does.

15:24:20 9   Q.   Okay.  The state does not have to prove as an element
15:24:22 10   that the person acted in a premeditated fashion.  In other
15:24:30 11   words, we don't have to prove that they planned in advance to do
15:24:32 12   the killing.  Make sense to you?

15:24:36 13   A.   Yes, it does.

15:24:36 14   Q.   In other words, people can form the intent to kill
15:24:42 15   and act on it immediately.  Do you think that that's possible?

15:24:46 16   A.   Yes, I do.

15:24:46 17   Q.   All right.  Do you think it is possible for you to
15:24:18 18   infer or form an opinion about what someone's intent is by their
15:24:56 19   actions or their behavior?  And let me give you a hypothetical
15:25:00 20   maybe to --

15:25:18 21   A.   Well, the answer I would have to that would be my
15:25:18 22   ability to determine intent or behavior would rest upon your
15:25:18 23   ability to convince me of it.

15:25:24 24   Q.   All right.  And -- and how would I go about doing
15:25:24 25   that?

CURTIS SHORTHAND REPORTING - 817/467-4556

---

159

15:25:24 1   A.   Well, then we're basically talking in circles.  You'd
15:25:26 2   have to prove to me beyond a reasonable doubt.

15:25:28 3   Q.   Absolutely, but, I mean, as far as testimony from
15:25:32 4   witnesses, right?

15:25:32 5   A.   Yes.

15:25:32 6   Q.   Okay.  And evidence?

15:25:34 7   A.   Yes.

15:25:36 8   Q.   Okay.  And -- and I guess what I'm getting at is
15:25:40 9   there are many times people do not verbalize what their intent
15:25:46 10   is.  All right?  And jurors are required to listen to evidence
15:25:50 11   and listen to testimony and form opinions and draw inferences
15:25:54 12   from what they hear about what a person's intent was.

15:25:56 13        And let me give you an example.  Let's say the
15:26:00 14   case that's being tried is an aggravated robbery.  That's not
15:26:04 15   this case.  Okay?

15:26:06 16   A.   I understand.

15:26:08 17   Q.   But let's say a person walks into a convenience
15:26:10 18   store, and they don't say a word to the clerk.  All right.
15:26:12 19   There is nothing verbalized, but they come in.  They have a ski
15:26:20 20   mask on.  They have a jacket on.  They pull a gun out of their
15:26:22 21   jacket and they point it at the clerk and they lean over and
15:26:22 22   they gesture toward the cash register.

15:26:26 23   A.   That would prove to me beyond a reasonable doubt that
15:26:28 24   they intend to do it, rob the place.

15:26:32 25   Q.   Okay.  Well, what I'm getting at is that might be a

CURTIS SHORTHAND REPORTING - 817/467-4556

---

160

15:26:34 1   person where the person doesn't say a word, but you, as a juror,
15:26:36 2   might have to look at what their behavior was and form an
15:26:40 3   opinion as to what that person's intent was, and it may be that
15:26:42 4   you, as the juror, think, well, that shows me that this person
15:26:46 5   intended to rob the place, right?  Do you see where I'm going
15:26:50 6   with this?

15:26:52 7   A.   Yes, I do.

15:26:52 8   Q.   Okay.  I'm probably making it more complicated than
15:26:52 9   it is.

15:26:54 10   A.   I'm used to dealing with technical issues, so I
15:26:56 11   believe -- I believe I have the capability to work within these
15:27:00 12   guidelines.

15:27:00 13   Q.   Okay.

15:27:00 14   A.   I understand the concept.

15:27:02 15   Q.   You can listen to the testimony, listen to the
15:27:04 16   evidence and form an opinion about what someone's intent was or
15:27:08 17   wasn't?

15:27:08 18   A.   I believe I can.

15:27:08 19   Q.   Okay.  Great.  All right.  One other thing that you
15:27:14 20   don't see up on there that I have to prove other than -- I mean,
15:27:18 21   we already know that we don't have to prove premeditation.  I
15:27:22 22   have to prove intent, but not the preplanning as an element.
15:27:26 23   The state also doesn't have to prove motive, why somebody did
15:27:24 24   the act.  Okay?  It may be obvious from the evidence why someone
15:27:34 25   did the act; it may not be.  Sometimes we never know why people

CURTIS SHORTHAND REPORTING - 817/467-4556

161

15:27:38 1  do the things that they do, and so all the law requires Lisa and
15:27:44 2  I to do is to prove this person did the act and they intended to
15:27:48 3  do the act and cause the result, make sense?
15:27:50 4       A.   Yes, it does.
15:27:52 5       Q.   Okay.  Do you feel comfortable with those being the
15:27:56 6  types of things that we have to prove in a capital murder case?
15:28:02 7       A.   Yes, I do.
15:28:04 8       Q.   Okay.  In other words, can you think of anything else
15:28:06 9  that you would require me to prove beyond a reasonable doubt in
15:28:10 10  order to convict for capital murder?
15:28:14 11       A.   It sounds like an open-ended question, but based on
15:28:18 12  what you've explained to me today, I believe that I could work
15:28:22 13  within these guidelines.
15:28:24 14       Q.   Okay.  All right.  Very good.  Any questions about
15:28:26 15  what capital murder is or what the state has to prove in a
15:28:28 16  capital murder case?
15:28:30 17       A.   Not that I can think of right now.
15:28:38 18       Q.   Okay.  All right.  Well, like I mentioned before,
15:28:34 19  there is only two possibilities if someone is convicted of
15:28:38 20  capital murder; one is life, and one is death.  If the person is
15:28:42 21  found guilty, we then move into the punishment phase, and the
15:28:48 22  jury would then hear additional evidence if the person -- such
15:28:54 23  as if the person had any type of prior criminal history, which
15:28:58 24  they might have a lot, they might not have any, okay, good or
15:29:02 25  bad character, bad acts, good acts.  This would be the time that

CURTIS SHORTHAND REPORTING - 817/467-4556

162

15:29:06 1  that jury would hear about anything else that existed in that
15:29:08 2  person's life.  Make sense to you?
15:29:12 3       A.   Yes, I understand.
15:29:12 4       Q.   Okay.  At the conclusion of all of the evidence,
15:29:16 5  after all the evidence was completed and in, the jury would then
15:29:20 6  be asked to answer two questions.  In other words, the jury
15:29:26 7  would not go back to the jury room and you wouldn't take a poll
15:29:30 8  who wants life and what wants death.  Okay?  Instead, the law
15:29:34 9  has set up a process to determine what sentence the judge would
15:29:38 10  eventually give to that person.  This would be the first
15:29:44 11  question.  If you would just take a moment to read that to
15:29:48 12  yourself.
15:30:04 13       A.   (Venireperson complies.)  Okay.  I'm finished.
15:30:06 14       Q.   Okay.  When you get to this question, you have
15:30:08 15  already found somebody guilty of capital murder, all right,
15:30:12 16  killing at least two people in the same criminal transaction.
15:30:18 17  This question asks you to look at all of the evidence that's
15:30:22 18  been presented to you, the circumstances of the offense and
15:30:24 19  anything that's been presented to you at the punishment stage.
15:30:30 20  And it says:  Has the state proven to you, as the jury, beyond a
15:30:36 21  reasonable doubt -- you see that again -- that there is a
15:30:38 22  probability that the defendant would -- would commit criminal
15:30:42 23  acts of violence such that they would constitute a continuing
15:30:48 24  threat to society?
15:30:48 25       Do you think that it is possible to look at a

CURTIS SHORTHAND REPORTING - 817/467-4556

163

15:30:52 1  crime, the circumstances of a crime and to look at a person's
15:30:56 2  personal history, whether it's good or bad, and make some
15:31:00 3  predictions about how they will probable behave in the future?
15:31:04 4       A.   Well, I think that if you were ever faced with this
15:31:08 5  question, then you're obviously doing just that, and if you
15:31:12 6  don't feel comfortable with making a decision like that, then
15:31:16 7  you should have probably said something a lot earlier than right
15:31:18 8  now.
15:31:18 9       Q.   Okay.  And that's what I why we talk with people,
15:31:22 10  because there are a lot of people who get up there who say --
15:31:28 11  not a lot of people, but there are some people who say, I
15:31:28 12  understand this is the way the law is set up, but I personally
15:31:38 13  do not feel like I could make predictions about how someone
15:31:38 14  might behave in the future.  I don't think it's possible.  I
15:31:42 15  don't think it's fair and I can't do it.
15:31:42 16       A.   I understand that they're --
15:31:44 17       Q.   And I'm asking you:  Do you think that you are
15:31:48 18  capable of looking at evidence presented to you about an offense
15:31:50 19  and about a person's past history, if they have any, and
15:31:54 20  about -- and the person themself, do you feel comfortable in
15:32:00 21  being able to make predictions about how someone might behave in
15:32:06 22  the future or about how one probably will behave?
15:32:08 23       A.   Yes, I would feel comfortable making such a decision.
15:32:12 24       Q.   Okay.  The words and phrases that are underlined up
15:32:18 25  there, those are not defined in the law.  The law allows you,

CURTIS SHORTHAND REPORTING - 817/467-4556

164

15:32:20 1  the jurors, to define them in your own way.  All right?
15:32:24 2  Probability, what we know about that is it's more than a mere
15:32:28 3  possibility, because arguably, anything is possible, right?
15:32:34 4       A.   I understand the concept of probabilities.
15:32:34 5       Q.   Okay.  We also know that it doesn't mean a certainty,
15:32:38 6  because, obviously, if we could predict something with all
15:32:42 7  certainty, we would all be wealthy, because we would be picking
15:32:46 8  the lottery numbers, right?
15:32:48 9       A.   Sure.
15:32:48 10       Q.   Okay.  So probability is somewhere between
15:32:50 11  possibility and certainty.  Where it lies in there is up to you
15:32:52 12  as an individual juror.  Okay?
15:32:56 13       A.   Yes, I understand.
15:32:54 14       Q.   Okay.  And I'm sorry if this seems very basic to you
15:33:00 15  or easy to understand, but like I said --
15:33:06 16       A.   No, that's fine.
15:33:06 17       Q.   -- we go over this with everybody just to make sure
15:33:10 18  everyone is clear, because once you end up in the jury box, if
15:33:14 19  you do, we can't clarify or answer questions at that point, so I
15:33:16 20  certainly don't mean to insult your intelligence.
15:33:20 21       A.   No, no, no.
15:33:20 22       Q.   Okay.
15:33:20 23       A.   I'm not trying to be condescending.
15:33:24 24       Q.   No, no, no.  I didn't take it that way.  I just -- I
15:33:26 25  mean, I can tell from your questionnaire, you're obviously very

CURTIS SHORTHAND REPORTING - 817/467-4556

165

15:33:28 1  bright, very intelligent, and we just have to go through all of
15:33:34 2  this step by step to make sure there aren't any questions.
15:33:36 3          Criminal acts of violence can mean anything to
15:33:40 4  you that you want it to mean. It can be anything from simple
15:33:44 5  assault, terroristic threat, all the way up to another capital
15:33:48 6  murder and anything in between.
15:33:50 7          Society can be defined by you any way you
15:33:54 8  choose. It can mean free society, you know, out in our
15:33:58 9  community. You can include in that definition, if you so
15:34:02 10 choose, the people that make up the penitentiary system, not
15:34:06 11 only guards and other inmates, but religious clergy, teachers,
15:34:12 12 counselors, therapists, medical personnel, administrative
15:34:18 13 personnel, anyone with whom a defendant would potentially have
15:34:24 14 contact with. All right? It's up to you to decide who you want
15:34:28 15 to include in society, make sense?
15:34:30 16    A.  I understand.
15:34:32 17    Q.  Do you think that this is the question that you,
15:34:36 18 yourself, would be capable of answering either yes or no, based
15:34:40 19 upon what evidence was presented to you?
15:34:40 20    A.  Yes, I do.
15:34:42 21    Q.  Are you open to the possibility of answering it
15:34:44 22 either way?
15:34:48 23    A.  Do you mean would I be comfortable answering either
15:34:54 24 yes or no, based on the circumstances?
15:34:54 25    Q.  That's correct.

CURTIS SHORTHAND REPORTING - 817/467-4556

166

15:34:56 1     A.  Yes, I would.
15:34:56 2     Q.  Okay. And you would hold the State of Texas to its
15:35:00 3  burden of proving beyond a reasonable doubt whether that was --
15:35:02 4  with whatever evidence was presented, whether it was the offense
15:35:04 5  itself or any additional evidence, you would hold us to our
15:35:10 6  burden of proof?
15:35:10 7     A.  Absolutely.
15:35:10 8     Q.  Okay. If all 12 members of the jury unanimously
15:35:16 9  agree to answer this question yes, you would proceed to Question
15:35:16 10 No. 2. All right?
15:35:20 11    A.  Okay.
15:35:22 12    Q.  If 10 or more agree to answer the question no, that
15:35:28 13 answer would stand and everything would come to a stop and the
15:35:32 14 person would receive a life sentence from the judge.
15:35:36 15    A.  I understand.
15:35:36 16    Q.  Okay. Are you familiar with these -- with this
15:35:38 17 process? Have you heard about this before?
15:35:42 18    A.  No. Well, I mean, only vaguely. I'm not personally
15:35:54 19 familiar with this. I have never done anything like this
15:35:54 20 before.
15:35:54 21    Q.  Okay.
15:35:54 22    A.  I understand the concept of responsibility.
15:35:58 23    Q.  Okay. Anything that -- any verdict that either finds
15:36:06 24 someone guilty or moves them closer to a death sentence requires
15:36:16 25 a unanimous verdict, and that would make sense to you; would it

CURTIS SHORTHAND REPORTING - 817/467-4556

167

15:36:14 1  not?
15:36:14 2     A.  Yes.
15:36:16 3     Q.  Okay. Assume for the sake of our discussion here
15:36:16 4  that all 12 members have answered this question yes. You would
15:36:26 5  then move to the second issue -- second special issue or
15:36:30 6  question and, if you would, just take a moment to read that to
15:36:34 7  yourself.
15:36:48 8     A.  (Venireperson complies.) Yes, I understand.
15:36:50 9     Q.  Okay. A couple of things about this question. First
15:36:52 10 of all, unlike the first phase of the trial where you find the
15:36:56 11 person guilty or not guilty, in that first special issue, this
15:37:02 12 question does not have a burden of proof on it. You don't see
15:37:04 13 anywhere beyond a reasonable doubt, do you?
15:37:06 14    A.  No.
15:37:06 15    Q.  All right. And that means the State of Texas does
15:37:12 16 not have any burden to prove either the existence or lack of
15:37:16 17 mitigating circumstances.
15:37:18 18    A.  I understand.
15:37:18 19    Q.  Okay. And, of course, the defense never has a burden
15:37:22 20 at all at any time. This question asks you to step back and
15:37:30 21 take a look at the same exact evidence that you've already
15:37:32 22 looked at once before. All right? It is asking you, is there
15:37:38 23 anything in the evidence before you that you find to be credible
15:37:44 24 and that you find to sufficiently lessen the person's moral
15:37:50 25 responsibility for the commission of their crime.

CURTIS SHORTHAND REPORTING - 817/467-4556

168

15:37:52 1     A.  I understand the -- I understand what this is saying
15:37:58 2  to me, I believe.
15:37:58 3     Q.  Okay. And you, yourself, get to determine what a
15:38:02 4  mitigating circumstance is to you.
15:38:04 5     A.  I understand.
15:38:06 6     Q.  What is mitigating to you might not be mitigating to
15:38:10 7  me or to the person sitting next to you in the jury box.
15:38:12 8     A.  I understand.
15:38:14 9     Q.  It may be that you personally don't hear any evidence
15:38:16 10 that you find to be sufficiently mitigating to warrant the
15:38:22 11 person receiving a life sentence over a death sentence.
15:38:24 12    A.  I understand.
15:38:24 13    Q.  Because the question is asking you, though, that if
15:38:26 14 you do hear something in the evidence that you believe to be
15:38:32 15 true, that you think lessens that person's responsibility and
15:38:36 16 you think it lessons that person's responsibility sufficiently
15:38:40 17 that you would give them a life sentence over a death sentence.
15:38:44 18 Does that make sense to you?
15:38:46 19    A.  Yes, it does.
15:38:46 20    Q.  Do you think that this is a reasonable way for the
15:38:50 21 law to look at -- well, do you think this is a reasonable way
15:38:52 22 for the law to go about having the jury decide who gets a life
15:38:54 23 sentence and who gets a death sentence?
15:39:04 24    A.  Yes, it seems reasonable to me.
15:39:06 25    Q.  Okay. Do you think that this is a question that you

CURTIS SHORTHAND REPORTING - 817/467-4556

169

15:39:08 1 would be open to answering either yes or no, based upon the
15:39:12 2 evidence that was presented to you at the particular trial?
15:39:16 3     A.   Yes, I do.
15:39:18 4     Q.   Are you inclined to answer this question one way or
15:39:22 5 the other right now?
15:39:24 6     A.   No.
15:39:26 7     Q.   Okay.  And the reason I ask that is because we do
15:39:28 8 have people who come in and say, Because of my feelings about
15:39:32 9 the death penalty, I am always going to answer those questions
15:39:36 10 in such a way that a life sentence is always going to be the
15:39:40 11 result each and every time.
15:39:42 12     A.   I understand that.
15:39:42 13     Q.   And those people, it wouldn't be fair to the state to
15:39:46 14 have those people sitting on the jury.
15:39:48 15     A.   I understand.  If you're not willing to make a
15:39:50 16 reasoned choice in this matter, then you probably shouldn't be
15:39:52 17 here.
15:39:54 18     Q.   And on the other hand, we have people who have come
15:39:58 19 in and said, You know what, if I found someone guilty of capital
15:40:02 20 murder and I found that they are a future danger, I am never to
15:40:06 21 be open to the possibility of there being sufficiently
15:40:10 22 mitigating circumstances and I'm always going to answer this
15:40:14 23 question in such a way that the death sentence is going to be
15:40:16 24 the result and that certainly wouldn't be fair to the defense to
15:40:20 25 have someone of that mindset sitting over in the jury either,

CURTIS SHORTHAND REPORTING - 817/467-4556

170

15:40:20 1 right?
15:40:24 2     A.   Yes, I understand.
15:40:28 3     Q.   So when I ask those questions this way, I'm asking to
15:40:30 4 make sure that you would have an open mind to whatever evidence
15:40:32 5 might be presented to you and if that evidence dictated that
15:40:36 6 you -- that you answer these questions in such a way that a life
15:40:40 7 sentence is the result, then so be it and if the evidence
15:40:44 8 dictates to you that a death sentence is appropriate based upon
15:40:48 9 your answers, then so be it as well.  Does that make sense to
15:40:50 10 you?
15:40:52 11     A.   Yes, it does.
15:40:52 12     Q.   And what I'm hearing from you is that you would be
15:40:56 13 open to the possibility of answering these questions whichever
15:40:58 14 way the evidence indicates to you they should be answered.
15:41:02 15     A.   Well, that would be what I would consider to be truly
15:41:02 16 impartial.
15:41:08 17     Q.   Okay.  Absolutely.  Now, we have talked about this
15:41:10 18 from -- from kind of an intellectual standpoint.
15:41:14 19     A.   Okay.
15:41:14 20     Q.   Of this is what the law is, do you understand it, can
15:41:20 21 you follow it.  You're from Ohio, and you've lived in Tarrant
15:41:24 22 County for three years.  You lived down in Del Rio --
15:41:28 23     A.   Yes, I did.
15:41:28 24     Q.   -- for a period of time.  I would take it that you
15:41:32 25 are aware that in this state, that when people are sentenced to

CURTIS SHORTHAND REPORTING - 817/467-4556

171

15:41:36 1 death, that there is an actual reality, there is an actual
15:41:40 2 carrying out of a jury's verdict, basically.
15:41:44 3     A.   Yes, I understand that.
15:41:46 4     Q.   So while I understand that you personally say, yes, I
15:41:50 5 understand the law, and I can answer those questions in a fair
15:41:52 6 manner according to what the evidence is, do you feel that you
15:41:56 7 could personally participate in a decision that might result in
15:41:58 8 another person being executed?
15:42:04 9     A.   Yes, I do.
15:42:04 10     Q.   Okay.  And I ask that, because there are some people
15:42:08 11 who say, I agree with the law.  I want to keep it on the books,
15:42:12 12 but I personally cannot be a part of it.
15:42:14 13     A.   I understand.
15:42:14 14     Q.   Okay.  And that's why I ask that question, is because
15:42:18 15 sometimes there are people who don't have any problem with the
15:42:20 16 law; they personally just don't want to be a part of that
15:42:24 17 particular decision-making process?
15:42:26 18     A.   This is no small matter.
15:42:30 19     Q.   Absolutely not.  Absolutely not.  And that's why --
15:42:32 20 that's one of the reasons why we meet with you all individually
15:42:36 21 one on one, because we have to make important decisions about
15:42:38 22 who ends up in the jury box.  So you are absolutely right, this
15:42:42 23 is a very serious consideration and a very serious question, no
15:42:44 24 doubt about it.
15:42:50 25     Any questions about how a jury might arrive at a

CURTIS SHORTHAND REPORTING - 817/467-4556

172

15:42:54 1 life sentence or a death sentence?
15:42:56 2     A.   Not at this time.
15:42:58 3     Q.   Okay.
15:43:00 4     VENIREPERSON HITTE:  Sir, is there water in
15:43:00 5 there?
15:43:02 6     THE COURT:  Yes.
15:43:08 7     Q.   (By Ms. Hartman) I've got some cups here.
15:43:12 8     A.   Excuse me.
15:43:24 9     Q.   Okay.  Just a couple more things and then I'll be
15:43:26 10 done and the defense will be visiting with you shortly.
15:43:30 11     Voluntary intoxication, if somebody voluntarily
15:43:34 12 intoxicates themself on either alcohol or drugs, that is not a
15:43:40 13 legal defense to the commission of a criminal offense.  In other
15:43:44 14 words, they can't come in and ask the jury to find them not
15:43:48 15 guilty and the jury can't find them not guilty, because they
15:43:52 16 were drunk or high.
15:43:52 17     A.   I understand.
15:43:54 18     Q.   Can you follow that law?
15:43:56 19     A.   Yes.
15:43:56 20     Q.   Okay.  It is possible in any type of capital murder
15:44:04 21 case that a jury might have the opportunity to find someone
15:44:06 22 guilty of a lesser offense of just straight murder, and in that
15:44:16 23 case, the punishment range would become from five years to 99
15:44:16 24 years or life in the penitentiary.
15:44:20 25     A.   If it's something less than capital murder?

CURTIS SHORTHAND REPORTING - 817/467-4556

173

15:44:22 1    Q.   That's right.  If it it's murder.

15:44:24 2    A.   Okay.

15:44:26 3    Q.   Make sense?

15:44:26 4    A.   Yes, the difference between murder and capital

murder.

15:44:28 6    Q.   Right.  In other words, if the state fails to prove

15:44:30 7  to the jury's satisfaction that this aggravating or special

15:44:36 8  circumstance did not exist.

15:44:38 9    A.   Okay.

15:44:38 10   Q.   Are we with me?

15:44:40 11   A.   I think you've just lost me there.  Are we talking

15:44:42 12  about two different circumstances?

15:44:43 13   Q.   Let me give you a hypothetical.  Let's say -- one of

15:44:52 14  the capital murder offenses that you saw up on that screen

15:44:56 15  was -- was the intentional killing of a child under six.

15:44:58 16   A.   Yes.

15:44:58 17   Q.   Let's say that the State of Texas believed when they

15:45:02 18  went to trial that the child was five years of age, and that at

15:45:08 19  trial, the evidence actually showed that that child had turned

15:45:14 20  six.

15:45:14 21   A.   Okay.

15:45:16 22   Q.   Okay.  That special circumstance, which is the child

15:45:20 23  being younger than six years of age, would not be there.  Do you

15:45:24 24  see what I'm saying?

15:45:26 25   A.   I understand that, yes.

CURTIS SHORTHAND REPORTING - 817/467-4556

174

15:45:26 1    Q.   And so the jury in that situation, if they did not

15:45:30 2  believe that we had proven that that child at the time of that

15:45:32 3  child's death was under six, they would have to find the

15:45:36 4  defendant guilty in that particular case of murder.  Are you

15:45:44 5  with me?

15:45:44 6    A.   Murder, but not capital murder?

15:45:46 7    Q.   Right.

15:45:48 8    A.   Okay.  I understand the difference.

15:45:50 9    Q.   Do you -- do you see what I'm talking about?

15:45:52 10   A.   Yes.  The four circumstances that you put up there to

15:45:54 11  prove capital murder, if one of those cases is proven to be not

15:45:58 12  true or not applicable --

15:46:02 13   Q.   If it's just an intentional killing.

15:46:02 14   A.   Okay.

15:46:10 15   Q.   Okay.  One of the examples was like the policeman or

15:46:12 16  the fireman being killed in the line of duty.

15:46:16 17   A.   Yes.

15:46:16 18   Q.   Let's say at trial the state doesn't prove that when

15:46:18 19  that person was killed, they were actually acting in the course

15:46:22 20  of their duty.

15:46:22 21   A.   Okay.

15:46:22 22   Q.   That special aggravating circumstance would be

15:46:26 23  missing.  Do you see that?

15:46:36 24   A.   Yes, I understand.

15:46:36 25   Q.   And so the jury might say, Well, you know what, all

CURTIS SHORTHAND REPORTING - 817/467-4556

175

15:46:32 1  we have is an intentional killing.

15:46:36 2    A.   Okay.  I follow you.

15:46:36 3    Q.   And so we find the person guilty of murder.

15:46:40 4    A.   So you're saying that the jury has some leeway with

15:46:42 5  the degree of guilt?

15:46:44 6    Q.   I'm saying that if the state fails to prove -- let me

15:46:50 7  put this back up.  It will be easier if we actually look at it

15:46:56 8  maybe.

15:46:58 9         Remember when I told you that capital murder is

15:47:00 10  an intentional killing, which is a murder, plus that extra

15:47:04 11  ingredient?

15:47:04 12   A.   Yes.

15:47:04 13   Q.   Okay.

15:47:06 14   A.   I understand the difference between the two concepts.

15:47:08 15  What I don't understand is what my responsibility as a juror

15:47:10 16  would be if one of the special circumstances hadn't been

15:47:16 17  fulfilled.

15:47:16 18   Q.   Okay.  Well, in -- in a capital murder case -- let's

15:47:24 19  see.  Okay.  Let's take these elements up here.  These are the

15:47:30 20  things we have to prove beyond a reasonable doubt.

15:47:38 21   A.   Okay.

15:47:42 22   Q.   Let's say, hypothetically -- again, I'm not talking

15:47:50 23  about this case -- but the jury is convinced that the person on

15:47:52 24  trial intentionally killed one person.  All right?

15:47:56 25   A.   Yes.

CURTIS SHORTHAND REPORTING - 817/467-4556

176

15:47:56 1    Q.   But did not intentionally cause however many other

15:48:00 2  people they were charged with killing.

15:48:02 3    A.   I understand that.

15:48:02 4    Q.   Okay.  They didn't think we had met our burden.  All

15:48:10 5  right?  All we would have would be that intentional killing.

15:48:12 6    A.   Okay.

15:48:14 7    Q.   Which is murder.

15:48:14 8    A.   I understand.

15:48:16 9    Q.   We call that a lessor included offense of capital

15:48:20 10  murder.

15:48:20 11   A.   Okay.

15:48:22 12   Q.   Okay.  If the state had not proven all of its

15:48:26 13  elements of capital murder beyond a reasonable doubt, but we had

15:48:32 14  proven that the person intentionally caused the death of one

15:48:36 15  person, okay --

15:48:38 16   A.   Yes.

15:48:38 17   Q.   -- the jury might choose to find the person guilty of

15:48:40 18  the lesser offense of murder.

15:48:42 19   A.   Okay.  I understand that.

15:48:42 20   Q.   Are you with me now?

15:48:44 21   A.   Yes.

15:48:44 22   Q.   Okay.  And that's just a possibility in any capital

15:48:50 23  murder case.

15:48:50 24   A.   Okay.

15:48:52 25   Q.   All right?  The punishment range would then become

CURTIS SHORTHAND REPORTING - 817/467-4556

179

15:48:58 1   five years to 99 years or life.

15:49:00 2      A.   Okay. I understand where you're at now.

15:49:04 3      Q.   Okay. To be a juror, you would have to be able to go
15:49:08 4   into the trial with the entire range of punishment open and
15:49:12 5   available to you and to wait until you heard the specific facts
15:49:16 6   of a case before you decided what the appropriate punishment
15:49:20 7   might be.

15:49:20 8      A.   Obviously.

15:49:22 9      Q.   Okay. When you say, Obviously, are you surprised --

15:49:26 10     A.   I'm sorry.

15:49:26 11     A.   No, no, no. I was going to say you would be
15:49:26 12  surprised at the number of people who say, Well, gosh, if it's
15:49:30 13  an intentional taking of a human life, there is no way I would
15:49:34 14  ever consider the minimum of five.

15:49:36 15     A.   Okay. I understand where you're coming from. I
15:49:38 16  understand where you are going with the terminology.

15:49:40 17     Q.   Okay. And there are some people who say life in
15:49:42 18  prison is a long time. There is no way I would ever consider
15:49:46 19  the maximum.

15:49:40 20     A.   To the best of any knowledge, I have no prejudices or
15:49:52 21  prejudgments or anything like that.

15:49:54 22     Q.   Okay.

15:49:54 23     A.   If I would get chosen for this jury, I would do my
15:49:58 24  best to listen to the facts and to be comfortable in my own
15:50:04 25  judgments.

CURTIS SHORTHAND REPORTING - 817/467-4556

---

178

15:50:04 1      Q.   Okay. And that's exactly what we're looking for, is
15:50:00 2   people who will have an open mind to the facts and the evidence
15:50:10 3   and not prejudge things or come to a determination of what
15:50:16 4   they're going to do before they even hear anything, because that
15:50:20 5   wouldn't be fair to either side.

15:50:22 6      A.   Yeah, obviously. It would be least of all fair to
15:50:26 7   the defendant.

15:50:26 8      Q.   Well, and it wouldn't be fair to the people of this
15:50:30 9   county that the State of Texas represents and to the victims.

15:50:34 10     A.   Yes.

15:50:34 11     Q.   Okay. Do you think that both sides are owed a fair
15:50:38 12  trial?

15:50:40 13     A.   Absolutely.

15:50:40 14     Q.   Okay. So we've covered the punishment range for
15:50:54 15  murder. Let me talk to you about a last area of the law that
15:50:54 16  may or may not come into play in any criminal case. I'm not
15:50:58 17  saying it would come into play necessarily in this case, but we
15:51:02 18  have to go over any law --

15:51:04 19     A.   Possibilities.

15:51:06 20     Q.   Sure. There are certain rules that law enforcement
15:51:10 21  has to follow when they arrest people or seize evidence, and you
15:51:16 22  are probably aware of those things like Miranda rights.

15:51:20 23     A.   Vaguely, but --

15:51:22 24     Q.   Okay. You have the right to remain silent. You have
15:51:26 25  the right to not make any statement at all. You have the right

CURTIS SHORTHAND REPORTING - 817/467-4556

---

15:51:30 1   to have an attorney appointed to represent you. You have the
15:51:36 2   right to stop the interview at any time. You've probably heard
15:51:42 3   those things on TV.

15:51:42 4      A.   Yes, I don't usually watch legal shows, but, yes, I
15:51:42 5   have --

15:51:46 6      Q.   Okay.

15:51:46 7      A.   -- heard vaguely of that.

15:51:52 8      Q.   Sure. It is also important when statements are being
15:51:56 9   taken that they are voluntary, that the person --

15:51:58 10     A.   Isn't coerced?

15:52:02 11     Q.   -- isn't coerced, isn't promised anything, is not
15:52:04 12  threatened in any way, that that person wants to talk to law
15:52:08 13  enforcement. Okay? It is possible that a jury in a criminal
15:52:10 14  case may be called upon, based upon evidence that may be
15:52:14 15  presented to them, to make a determination about whether or not
15:52:16 16  evidence has been obtained legally. Okay? If evidence is
15:52:18 17  raised that the rules have not been followed, the jury might get
15:52:18 18  an instruction from the court that they would have to make a
15:52:18 19  determination about whether or not they thought the rules had
15:52:42 20  been followed, whether the evidence had been obtained legally.
15:52:46 21  Okay?

15:52:48 22     A.   Yes, I understand that.

15:52:52 23     Q.   And if they believed that it had been obtained
15:52:52 24  illegally, they would be instructed that they would have to
15:52:56 25  disregard that particular piece of evidence, remove it from

CURTIS SHORTHAND REPORTING - 817/467-4556

---

180

15:52:58 1   their deliberations and, I mean, obviously, you don't -- you
15:53:02 2   don't forget it. It's not like you erase it from your mind, but
15:53:08 3   it kind of becomes what I like to call the big pink elephant in
15:53:12 4   the corner.

15:53:14 5      A.   I understand this concept.

15:53:14 6      Q.   Okay. You know it's there, but you can't use it as a
15:53:18 7   factor in your determination of whether the person is guilty or
15:53:20 8   not guilty.

15:53:22 9      A.   I understand.

15:53:22 10     Q.   Okay. It may be that there is evidence presented to
15:53:26 11  you that the rules haven't been followed, and you don't think
15:53:30 12  that evidence is credible. You may think it is credible. Okay?

15:53:34 13     A.   The evidence that the rules weren't followed or the
15:53:36 14  evidence itself?

15:53:40 15     Q.   Any of that. Okay? It's like any other piece of
15:53:46 16  evidence that you look at as a juror. Do you believe it? Is it
15:53:48 17  credible?

15:53:48 18     A.   Okay.

15:53:50 19     Q.   Okay. And if you are a juror in a criminal case
15:53:54 20  where that instruction is given to you by the judge, in other
15:53:58 21  words, if you find that the evidence had not been obtained
15:54:02 22  legally, you must disregard that particular piece of evidence
15:54:06 23  and not consider it. Would you be able to follow that
15:54:08 24  instruction?

15:54:08 25     A.   Yes, I believe I could.

CURTIS SHORTHAND REPORTING - 817/467-4556

181

15:54:10 1    Q.   With the understanding that once that piece of
15:54:12 2   evidence was removed, there might be a sufficient amount of
15:54:16 3   evidence to convince you beyond a reasonable doubt that the
15:54:20 4   person was, in fact, guilty.
15:54:22 5    A.   Yes, I understand that.
15:54:22 6    Q.   Okay.  And in addition, there is the alternate
15:54:28 7   possibility, which is, once that particular piece of evidence is
15:54:32 8   removed, what is left does not satisfy you, and you'd have to
15:54:36 9   find the person not guilty.  Understanding those are the two
15:54:40 10   possible outcomes of following that instruction, can you
15:54:44 11   nevertheless follow the instruction?
15:54:44 12    A.   Yes, I can.
15:54:48 13    Q.   Okay.  Would it be difficult in any way?
15:54:58 14    A.   Well, I guess, I would have to say that would depend
15:55:00 15   on what it was, realistically.
15:55:00 16    Q.   Okay.
15:55:02 17    A.   I mean, but I understand that -- I understand the
15:55:06 18   concept of how evidence has to be legally obtained.
15:55:06 19    Q.   Sure.
15:55:10 20    A.   And if the judge said that something would have to be
15:55:14 21   disregarded, I would do my best to disregard that in my thoughts
15:55:18 22   on the case.
15:55:18 23    Q.   Sure, sure, absolutely.  And, like I said, it would
15:55:24 24   be a -- it would be a call that you, yourself, would get to
15:55:26 25   make.  I mean, it may be that whatever evidence is presented to

CURTIS SHORTHAND REPORTING - 817/467-4556

182

15:55:28 1   you, you choose not to believe.  You think that everything was
15:55:32 2   done properly.  All right?  I mean, you're entitled to go that
15:55:36 3   way, too.  It's just going to be based upon what the evidence
15:55:40 4   is.
15:55:40 5         The question I'm asking you is:  If you formed
15:55:42 6   the opinion that it was obtained illegally and you were
15:55:46 7   instructed to disregard, could you do that?  And it sounds like
15:55:50 8   you can.
15:55:50 9    A.   I believe I could.
15:55:52 10    Q.   Okay.  Any questions about any of the law that I've
15:56:00 11   gone over?
15:56:02 12    A.   No, I don't think so.
15:56:02 13    Q.   Any other questions?  Okay.  Well, I'm going to get
15:56:06 14   up and turn this projector off, so it can start cooling down.
15:56:12 15         You have a Bachelor's in polysci?
15:56:16 16    A.   Yes, I do.
15:56:18 17    Q.   Okay.  Any particular reason why -- and I've got a
15:56:24 18   degree in political science too, but I'm just curious, any
15:56:26 19   particular reason that you sought that particular degree?
15:56:34 20    A.   I'm trying to think of the most succinct answer.
15:56:38 21   I've always liked history.
15:56:38 22    Q.   Okay.
15:56:40 23    A.   Polysci is the natural lead-in for law, so I did have
15:56:44 24   a few law classes in school, but nothing on trial law.  That was
15:56:48 25   in Ohio, but, basically, I was on an Air Force scholarship for

CURTIS SHORTHAND REPORTING - 817/467-4556

183

15:56:52 1   engineering.
15:56:52 2    Q.   Okay.
15:56:54 3    A.   I got married when I was a freshman, and I couldn't
15:56:56 4   work third shift and pass college, too, so I downshifted to a
15:57:00 5   Bachelor of Arts in a subject that I liked and had a natural
15:57:02 6   ability for anyway.  My wife and I were able to get through
15:57:06 7   school in four years, and I was able to get my commission.
15:57:10 8    Q.   Okay.  And I noticed that you said you like history,
15:57:12 9   and that's pretty obvious with the people that you put down that
15:57:16 10   you admire the most.
15:57:16 11         What is it about Paul the Apostle that -- in 10
15:57:24 12   words or less?
15:57:32 13    A.   He wasn't afraid to -- to see the other side, and
15:57:38 14   then be just as passionate about it as he had been when he had
15:57:42 15   been a very passionate Jew.
15:57:46 16    Q.   Okay.
15:57:48 17    A.   I guess, I appreciated the intellectual aspects of
15:57:52 18   that.
15:57:56 19    Q.   Okay.  All right.  Constantine the Great, the same
15:57:56 20   question.
15:58:00 21    A.   10 words or less?
15:58:04 22    Q.   You can use 11 or 12 if you need to.
15:58:08 23    A.   The organizational ability to be able to pull off
15:58:12 24   what he was able to do in a secular vein.  The -- basically, if
15:58:18 25   it wasn't for him, Christianity would not only not have been an

CURTIS SHORTHAND REPORTING - 817/467-4556

184

15:58:24 1   Eastern religion, but it wouldn't have been a Western religion
15:58:24 2   either.
15:58:30 3    Q.   Okay.
15:58:30 4    A.   It would have been regionalized, and that would --
15:58:30 5   that, to me, would be the whole keystone for the Western
15:58:34 6   experience.
15:58:38 7    Q.   Okay.  Anything about -- and I probably know the
15:58:40 8   answer to this, but I'm going to ask it anyway.  Anything about
15:58:44 9   your religious convictions or your church that would prevent you
15:58:48 10   from participating in this type of a process?
15:58:52 11    A.   No.
15:58:54 12    Q.   What is -- one of the TV shows that you put down, is
15:59:00 13   it Epicurious?
15:59:04 14    A.   Yes.
15:59:04 15    Q.   What is that about?  What is that?
15:59:08 16    A.   It's a cooking show.
15:59:10 17    Q.   Do they do any particular types of food or --
15:59:12 18    A.   All kinds, baking, you name it.  I haven't tried most
15:59:18 19   of them, but I don't -- it's an interesting show.
15:59:22 20    Q.   Okay.  I always look -- if I watch those shows, I
15:59:26 21   always want the people that they have to prepare everything and
15:59:30 22   have them all sitting out in little bowls and stuff.
15:59:34 23    A.   Well, the prep work is most of it, but the website is
15:59:36 24   fantastic, because you can -- I'm sorry.
15:59:38 25    Q.   No, that's okay.

CURTIS SHORTHAND REPORTING - 817/467-4556

185

1  A.  You can pick something off of it, and they are
2  generally very easy to follow.
3  Q.  Easy to follow? You had indicated you had some
4  education or training in medicine, psychology, identification
5  procedures and firearms and weapons.
6  A.  I was a commissioned officer in the Air Force for
7  active duty for nine years, in the Reserves for a year and a
8  half and I'm currently in the process of being -- joining a
9  National Guard unit out of Missouri.
10  Q.  Okay.
11  A.  So we did our basic self-aid, buddy care, first-aid.
12  Q.  Okay.
13  A.  Basic command and control procedures. I'm also a
14  commercial pilot, so most of that stuff was in the military
15  background. It was difficult not to -- not to circle a lot of
16  those, because I have had what I consider a relatively thorough
17  training at the basic level on a lot of those subjects.
18  Q.  As far as the identification procedures, what
19  specifically are you talking about there that you've had
20  training in? Is that fingerprints?
21  A.  It's actually where you want to -- well, not
22  fingerprints, but as far as basic command and control
23  procedures, whether it's visual ID, procedural ID, electronic
24  ID.
25  Q.  Okay.

CURTIS SHORTHAND REPORTING - 817/467-4556

186

1  A.  But nothing -- I couldn't ask you to -- if you asked
2  me to read a fingerprint, I would be lost.
3  Q.  Okay. Well, I was just trying to figure out what
4  specific identification you were talking about.
5        You worked -- you were an American Airlines
6  pilot. Things have been really rough for your company.
7  A.  It's been rough for a lot of companies lately.
8  Q.  Yeah, it has.
9  A.  But things will get better.
10  Q.  Yeah, they are.
11        The situation with your wife's father, anything
12  about that that would prevent you from being fair and impartial?
13  A.  Not that I'm aware of. I simply answered that trying
14  to be as forthcoming as I could.
15  Q.  Okay.
16  A.  I certainly am not a medical expert when it comes to
17  that.
18  Q.  Okay.
19  A.  As far as how this would apply, his reaction to my
20  mother-in-law's death is -- is a big question. I don't believe
21  that if this is going to start on the 22nd, I can't foresee
22  anything that would keep me from doing that.
23  Q.  Okay.
24  A.  If any of my family responsibilities would infringe
25  on that.

CURTIS SHORTHAND REPORTING - 817/467-4556

187

1  Q.  All right. And normally -- I'll just tell you this.
2  Normally, when we've been meeting with people, we've been able
3  to tell them whether they are going to be on the jury or not
4  before they leave.
5  A.  Okay.
6  Q.  And since we're taking you kind of out of order,
7  you're not going to get a phone call until sometime next week to
8  let you know one way or the other, so --
9  A.  That's fine. It was just important to me to -- I
10  believe very highly in this country and the civic system and my
11  ability to participate in it was always tempered when I was an
12  active duty officer. There were certain -- certain realities
13  that just didn't lend itself to this process.
14  Q.  Right.
15  A.  And I've -- I love living in Tarrant County. I love
16  where I live, and I'm enthused to be a participant in the
17  process.
18  Q.  Okay. Very good. And I think -- I think that's
19  obvious to us by your -- unfortunately, we've run into a lot of
20  people that really kind of drag themselves down here and just
21  don't want to even be here. So it's nice to have someone
22  come in that is willing to be here and participate.
23        THE COURT: When are you going to be back into
24  town, what day, do you know? What day -- when do you come back?
25        VENIREPERSON HITTE: From the funeral, sir?

CURTIS SHORTHAND REPORTING - 817/467-4556

188

1        THE COURT: Yeah.
2        VENIREPERSON HITTE: I only have a very vague
3  understanding of that. As of two hours ago, the actual funeral
4  hadn't been set, but we're expecting probably the viewing early
5  Monday, which would make the funeral on Tuesday. So that's why
6  I was very nervous about trying to keep a 9:00 a.m. Wednesday
7  appointment, because it could very easily slip.
8        THE COURT: But it would be later in the week?
9        VENIREPERSON HITTE: I would imagine I'll be
10  home by Wednesday, Wednesday or Thursday at the latest. My wife
11  will probably stay there longer.
12  Q.  (By Ms. Hartman) Okay. Your brother, apparently,
13  had a DWI in Ohio.
14  A.  Yes, he's had -- he's had several. He would probably
15  be the expert on the law just with his interaction with that,
16  and it occurs to me that he was a corrections officer for a
17  couple of years in Ohio.
18  Q.  Okay.
19  A.  And I'm not sure if that was asked or if I put it
20  down, but it seems like it might be relevant, but --
21  Q.  Okay. Anything -- well, let me ask you this. And,
22  of course, we're talking about a completely different state, and
23  I don't know what the laws are in Ohio and how the criminal
24  justice system works there. From what you know, do you think he
25  was treated fairly, unfairly?

CURTIS SHORTHAND REPORTING - 817/467-4556

Page 185 to Page 188

A. Yes, I think it would be very safe to say he was treated fairly.

Q. Okay. Anything about his situation that would prevent you from being fair and impartial in a capital murder case here?

A. I don't believe so.

Q. Okay. What is the first thing that comes to your mind when you think about district attorney? You put suit.

A. That was the first thing that came to my mind.

Q. And a criminal defense attorney, briefcase. Anything significant about those or that just happened to be the first thing that came in?

A. No. I'm glad the question didn't ask for anything significant. It was just kind of like what came to mind. By the end of those, I was kind of tired.

Q. I know. At the end -- we tried to put, I think, the more important questions up at the front when we had your attention, because I know by the time you got to Page 14 and 15, it was just --

A. Well, that's the reason, because the first thing that comes to mind is usually a given. It's whatever pops in.

Q. Are these positive, negative or no particular --

A. I would call it neutral.

Q. Neutral? Okay.

A. What's the first thing that comes to your mind when

CURTIS SHORTHAND REPORTING - 817/467-4556

190

you say pilot?

Q. Plane.

A. There you go. It's not a good pilot or a bad pilot; it's a just a plane.

Q. Well, you'd be surprised at some of the other answers we've seen in the course of talking to people. You would understand why I asked that question.

Let's see. My co-counsel said to tell you that you have our forgiveness for wearing shorts.

A. Oh, my gosh. Yeah. Well, the first thing I see as soon as I crossed the door is the highlighted no shorts. I don't know why I didn't catch that in the house when I was --

Q. If it makes you feel any better, none of the attorneys like the rules down in that room either, because they wan us let us eat or drink down there, so we're on your side about the rules.

A. That's okay. I came in June. I really did try to get out of the house --

MS. HARTMAN: You're perfectly fine. No, we -- we got a chuckle out of that answer. So I appreciate your talking with me this afternoon and, again, I appreciate your coming in ahead of schedule and sorry about the circumstances.

Your Honor, at this time, the state would pass the veniremember.

THE COURT: Okay. Anybody need a break?

CURTIS SHORTHAND REPORTING - 817/467-4556

MR. MOORE: Do you need a break?

VENIREPERSON HITTE: No, sir, I'm fine.

THE COURT: Okay.

VOIR DIRE EXAMINATION

BY MR. MOORE:

Q. You're ready to go get this over with, aren't you?

A. I want to do as good a job as I can for you.

Q. I understand. My name is Tim Moore, again. This is Bill Ray, and we represent Billy Jack Crutsinger.

The bottom line, Mr. Hitte, is this -- it's Hitte, correct?

A. Yes, sir.

Q. And I also -- let me ask you this: Are you driving to Ohio?

A. No, sir. We'll be flying. My wife is already in Ohio. She made it there last evening before my mother-in-law passed.

Q. Was this kind of a sudden deal?

A. We found out she had cancer nine months ago. On Monday, they said she was probably down to her last month. On Wednesday, they said she was probably on her last week and she passed last night, so it was sudden in the end, but it had been going on for 10 months, if that makes any sense.

Q. We've been through that. Do you need -- do you feel a need to be with your wife instead of down here answering these

CURTIS SHORTHAND REPORTING - 817/467-4556

192

questions?

A. At this point in time?

Q. Yes, sir.

A. No. My family is taken care of, sir. I'll be with her tomorrow.

Q. Okay. Good. Here is the bottom line. The state has charged Mr. Crutsinger with a capital murder charge, and they've made it abundantly clear that if they get a jury to convict him, that they're going to be asking that jury to kill him, okay, to execute him. Our position is they do have that burden of proving him guilty of capital murder, and should they be successful, that a life sentence would be the appropriate sentence. Okay. So you can see we're pretty far apart in this position; wouldn't you agree?

A. Yeah. I would take that as a given, sir.

Q. And what we're looking for is people that come in here and don't think that either one's position is more righteous than the other. Could you be that kind of person?

A. I would do my best to be so, sir.

Q. Okay. And we try to get to know you in this short period of time in an individual capacity just to see if you can be a fair juror in a case where the death penalty is a possibility, and I think you understand that in the first stage of the trial, the state is the one that brings the charges, they are the ones that have the burden of proving each and every

CURTIS SHORTHAND REPORTING - 817/467-4556

193

1 element that they went over with you. Do you agree with that?
2 A. Yes, sir.
3 Q. And do you have any feelings, as far as a person's
4 guilt, because they've been arrested or indicted by a grand
5 jury?
6 A. No, sir. Actually, quite the opposite. If you don't
7 believe that they're innocent until proven guilty, then you
8 shouldn't probably be here.
9 Q. Okay. And very quickly or not, she just went over --
10 when we talk about them proving these elements, they have to
11 bring the proof that he's guilty. Okay? And what she was
12 talking about a minute ago involves 3823 of our Code of Criminal
13 Procedure, which will tell you that no evidence obtained by an
14 officer or other person in violation of the provision of the
15 constitution or laws of the State of Texas or the United States
16 of America will be admitted into evidence against the accused in
17 the trial of any criminal case. And what that's telling you
18 is that the police have to follow the rules, also. You understand
19 that?
20 A. Yes, sir.
21 Q. And so if you're sitting on the jury and there is an
22 issue as to some questionable or illegal police conduct, the
23 judge will tell you in that second paragraph that in any case
24 where legal evidence raises an issue entered hereunder, the jury
25 shall be instructed that if it believes or has a reasonable

194

1 doubt that the evidence was obtained in violation of the
2 provision of this article, then in such event, the jury shall
3 disregard any such evidence so obtained.
4 Now, let me explain that to you a little bit,
5 because sometime that's easy to do and sometimes it's kind of
6 hard to do.
7 Just take, for instance, a case where the police
8 get a tip that there is some drugs in somebody's house from some
9 unknown person. They just say they'll -- over there at 5229
10 St. James Place, there's -- somebody has drugs and they just run
11 in and kick the door and roust everybody out and find some --
12 some drugs in there and that person was on trial and you know
13 what the law is, that they would have to have a warrant that
14 established probable cause from a magistrate to enter that house
15 or they had to get some kind of consent from the owner. You
16 just can't go busting into somebody's house. Okay?
17 So you're sitting on the jury and you may be
18 faced with that and you may think, well, I think the police
19 weren't right. I'm going to throw out that evidence, and if
20 they don't have any evidence of drugs, you have to find that
21 person not guilty. Do you agree with that?
22 MS. HARTMAN: Well --
23 A. Well, I guess what I would say to that, sir, is that
24 if the judge instructed me to disregard a certain portion of
25 evidence or a certain line of evidence, then I would do my best

195

1 to disregard it and continue on in my responsibility.
2 Q. (By Mr. Moore) Okay. But my point is this: The
3 judge isn't going to tell you to disregard that himself. He's
4 going to tell you what that says. Okay? So that's a decision
5 that you have to make, whether you think that that evidence may
6 have been obtained by any kind of illegal police conduct. Do
7 you see that?
8 A. Okay. So if I understand you, then I would have to
9 make a judgment on my own whether it was done?
10 Q. Exactly. That's exactly right. You're kind of a
11 mini-judge of the law in that position. Okay. And if you're
12 explained the law and it says that you're to disregard anything
13 that was obtained in violation of the law or the Code, then you
14 can't consider it. Okay?
15 A. Okay.
16 Q. In my example to you, if you thought that the police,
17 in busting in somebody's house without cause, without a warrant,
18 without a reason and obtained those drugs illegally, then my
19 question to you is, could you set those drugs aside and find
20 that person not guilty, because you wouldn't have any evidence,
21 other than the drugs?
22 A. If I understand you correctly, if the only piece of
23 evidence that was presented, if it was arrived at in an illegal
24 way, then if there was nothing else -- if there was nothing else
25 involved in the case, no other lines of evidence, then, yeah, I

196

1 don't -- I don't understand how you could not -- or how you
2 could say guilty. I don't know.
3 Q. Okay. That's my question. The short and simple is:
4 Can you do that?
5 A. I believe I can.
6 Q. And in some cases, maybe a really bad murder case,
7 bad child killing or molestation case, the police could arrest a
8 person without probable cause. Do you understand that?
9 A. I think I understand the concept, yes.
10 Q. And they could take that person down to the police
11 station and they could give him the Miranda warnings all day
12 long, but you could still feel that it was an illegal arrest
13 and, therefore, that confession may not be considered. Do you
14 understand that concept?
15 A. Yes, I believe I understand the concept.
16 Q. Okay. And you would get the same instruction from
17 the judge as -- that's sitting right up there that we just went
18 over, just substitute the confession for the drugs. Okay?
19 A. Okay.
20 Q. And knowing that, it may be a little different
21 situation, wouldn't it be?
22 A. Yes. I --
23 Q. I mean, you've got a more serious offense than just
24 possessing drugs, correct?
25 A. Yes, I understand the rules of evidence. I don't

197

16:16:30 1  believe they change with the type of offense, do they?

16:16:34 2      Q.   That's exactly right. You'd still, if you thought

16:16:34 3  that confession was obtained illegally and that was the only

16:16:38 4  evidence that they had, then you would have to let that person

16:16:42 5  walk out of the courtroom also. You understand that?

16:16:48 6      A.   Assuming that there were no other -- if the only

16:16:52 7  evidence that was presented was obtained illegally, if it wasn't

16:16:58 8  allowed to be considered, the state would still have -- they

16:17:04 9  would still have the responsibility of proving beyond a

16:17:08 10  reasonable doubt.

16:17:08 11      Q.   Well, say that's all they had.

16:17:10 12      A.   Well, then I guess they would have nothing.

16:17:12 13      Q.   Right, you could follow it in that particular

16:17:16 14  situation?

16:17:16 15      A.   I think I understand the concept, yes, and I think I

16:17:20 16  could act accordingly within it.

16:17:22 17      Q.   Okay. The same thing with -- in a capital murder

16:17:34 18  case or any case where -- particularly a capital murder case

16:17:40 19  where the state does present enough evidence to your

16:17:44 20  satisfaction that a person is guilty, then you understand that

16:17:56 21  that second stage you go into, which is punishment. The first

16:17:52 22  stage is nothing more than can the state prove the elements of

16:17:54 23  the indictment that they brought. Okay?

16:17:54 24      And now you know that in a capital murder case,

16:18:04 25  that first question -- you go into the punishment stage and you

CURTIS SHORTHAND REPORTING - 817/467-4556

198

16:18:06 1  hear -- hear more evidence presented by the state, you hear

16:18:14 2  evidence presented by the defense and you imagine the state is

16:18:18 3  going to bring you everything bad that they can about the person

16:18:22 4  and the defense is going to try to bring you everything that is

16:18:26 5  good about the person. Then all 12 of you -- and it's

16:18:30 6  anticipated in our law that jurors are not on anybody's side.

16:18:36 7  Okay? And they're not on each other's side either. We're

16:18:42 8  looking for people that have their own individual mindset and, I

16:18:48 9  think, you're one of those type of people, aren't you?

16:18:52 10      A.   I'd like to think I am.

16:18:54 11      Q.   I believe you are, but you know what I mean?

16:18:56 12      A.   Yes, sir, I understand. You wouldn't want one to

16:19:00 13  sway another.

16:19:00 14      Q.   That's exactly right. So you've heard -- you've

16:19:04 15  heard enough evidence in the first phase that a person

16:19:06 16  intentionally, as you know that word now means, it was that

16:19:12 17  person's conscious objective and desire not only to engage in

16:19:14 18  the conduct, but to cause the result. So whether it's shooting

16:19:16 19  with a firearm or cutting with a knife or strangling with a

16:19:24 20  rope, that's what they want to do to two people. You've been

16:19:26 21  convinced beyond a reasonable doubt of that. You've returned a

16:19:30 22  verdict of guilty, and you've heard all of the evidence in the

16:19:34 23  punishment stage, so you go back with the charge that the judge

16:19:40 24  gives you and you sit down and you go, okay, now, we've got all

16:19:44 25  of this evidence before us, and we're faced with whether there

CURTIS SHORTHAND REPORTING - 817/467-4556

199

16:19:46 1  is a probability that the defendant would commit criminal acts

16:19:50 2  of violence that would constitute a continuing threat to

16:19:54 3  society. Okay. That's that first question that you're faced

16:19:58 4  with.

16:19:58 5      The judge will also tell you that in considering

16:20:02 6  that question, that whether taking into consideration all of the

16:20:06 7  evidence, including the circumstances of the offense, the

16:20:10 8  defendant's character and background and -- I'm sorry.

16:20:18 9  That's -- that's what I'm looking for. Okay.

16:20:22 10      So after you've read that first question, the

16:20:24 11  judge will tell you that in deliberating on this specific issue,

16:20:28 12  the jury is instructed to consider all evidence admitted at the

16:20:32 13  guilt/innocence stage and the punishment stage, including

16:20:36 14  evidence of the defendant's background or character or the

16:20:40 15  circumstances of the offense that militates for or mitigates

16:20:44 16  against the imposition of the death penalty, okay, and taking

16:20:48 17  into consideration everything that you've heard.

16:20:50 18      And then is there is that word mitigation in

16:20:54 19  there, mitigates, and I'm not going to ask you about -- you

16:21:00 20  know, we can't ask you about what you -- what you would consider

16:21:04 21  evidence of a continuing threat to society, but my question is

16:21:08 22  this: After you found somebody guilty of killing two people

16:21:12 23  intentionally, would you automatically answer that as a yes,

16:21:18 24  they would be a continuing threat to society?

16:21:24 25      A.   No, sir. I don't think I'm going to tell you that I

CURTIS SHORTHAND REPORTING - 817/467-4556

200

16:21:26 1  would automatically answer yes or no to anything.

16:21:26 2      Q.   Okay.

16:21:28 3      A.   I think as a juror you should be willing to answer

16:21:30 4  yes or no based on how -- what your perception of the evidence

16:21:36 5  is at the time.

16:21:36 6      Q.   Okay. And you've -- Ms. Hartman told you that

16:21:44 7  society can be a prison society. Is that where your brother

16:21:46 8  worked, in a prison?

16:21:48 9      A.   Yes, sir, he did. He doesn't currently and hasn't

16:21:50 10  for, I believe, seven to eight years, but I'm not quite sure on

16:21:58 11  that, something of that time frame.

16:21:58 12      Q.   Okay. Did he ever talk to you about his work there

16:22:02 13  in the prison?

16:22:04 14      A.   Yeah, some -- somewhat. I haven't lived in Ohio

16:22:08 15  since 1990, so the only time I get to go back is usually on

16:22:14 16  sporadic visits. Up until I separated from the Air Force, it

16:22:18 17  was usually on leave at two weeks at a time. So when we would

16:22:22 18  usually get together, it was usually family situations, but,

16:22:26 19  yeah, I would say from time to time, he would talk about it, but

16:22:28 20  it wasn't like -- it wasn't like we had -- we never had the

16:22:32 21  opportunity to -- to get together every Friday night and have

16:22:36 22  that continuing interpersonal relationship. It's always been,

16:22:42 23  you know, snapshots, you know, a day here, you know, 10 or 15

16:22:46 24  minutes on the phone there. So I can't say, no, we never

16:22:52 25  talked about work, but I would say that we never got to a level

CURTIS SHORTHAND REPORTING - 817/467-4556

201

of detail. He was always more interested in what I was doing at the time and was more -- we would talk about, you know, where I was flying, what I was doing, that kind of thing.

Q.   Okay.

A.   And he doesn't talk about it at all now that he doesn't do it, and so --

Q.   What do you think about that society being a prison society?  Do you have any thoughts about that?

A.   Do you mean do I consider a population in a prison to be part of society in general --

Q.   Right.

A.   -- or to be their own society?

Q.   Their own society.

A.   I'd say that would be a subset of society of ours within whatever -- whatever country they are a part of, but they would certainly operate under their own rules.

Q.   Right.  Okay.  All right.  So in our little example here you found somebody guilty of capital murder, you come to this -- and you understand that -- that the state has the burden of proving, again, beyond a reasonable doubt this future dangerousness question to you.  Okay?  Do you understand that?

A.   Yes, sir, I do.

Q.   So presuming that the person is not going to be a future danger, just like when they have the burden of proving -- and he's presumed innocent?

CURTIS SHORTHAND REPORTING - 817/467-4556

203

is that this seems to provide the juror with the ability to deal with the unforeseen possibilities of the individual.  The individual circumstances that couldn't be defined if you wrote a book of law that would fill this room, is what this seems to me.  I can't -- nothing really comes to mind.  Personal moral culpability, personal moral blameworthiness of the defendant, I'm not -- I'm sure there is probably a law thesis out there on what they meant when they wrote this code, but --

Q.   Kind of tough to get a grasp on, isn't it?

A.   Well, it's tough to be in a spot and give you a definition.

Q.   I understand.  And I think you know my purpose in asking you this is that here is our capital murder scheme, here is our death penalty scheme where you found somebody guilty of intentionally killing two or more people, you found beyond a reasonable doubt that future dangerousness -- that's pretty simple to understand, isn't it?

A.   Yes, I understand that concept.

Q.   And so we get to this last question and it's kind of hard to understand, isn't it?

A.   I'm trying to think of what I'm wanting to say and how to say it properly.  If I understand the words as you've described them to me, it would seem to me the personal moral capability would be my impression of what the defendant's -- responsibility is not quite the right word.  I'm sorry.  I can't

CURTIS SHORTHAND REPORTING - 817/467-4556

202

A.   Yes, sir, I understand that concept.

Q.   And they've got to convince you beyond a reasonable doubt that that's a yes answer.  If you say no, it's an automatically life sentence.  You know that?

A.   Yes, I've been made aware of that today.

Q.   So after you've answered that yes, if you answer that no, you don't even go to the next question; if you answered it yes, you go to that one last question and it also tells you that to look at the circumstances of the offense the defendant's character and background again and then it throws in the personal moral culpability of the defendant.  What does that personal moral culpability mean to you?

A.   I'm a little bit embarrassed to think that I can't think of Webster's definition for culpability right now.

Q.   Well --

A.   Is that --

Q.   Kind of blameworthiness, does that make any difference?

A.   Did you say blameworthy?

Q.   Blameworthiness.

A.   And what was your question again?  Do I understand it, or what does it mean to me?

Q.   What does it mean to you?

A.   The defendant's character and background and personal moral culpability of the defendant.  My initial reaction to this

CURTIS SHORTHAND REPORTING - 817/467-4556

204

really --

Q.   Well, let me ask you this:  You told Ms. Hartman that even though you found somebody guilty of capital murder, even though you found beyond a reasonable doubt they were a future danger to society, that in your mind, you would still be open to answering this question yes, correct?

A.   Yes or no.  This seems to me to cover -- this seems to be a mechanism to cover the bases that you've already said yes on the first question, but to give you -- to give you one last chance before you take that last step.

Sir, if -- if nothing else comes through here, I consider this to be an extremely serious situation and extremely serious responsibility to sit in that chair, and before I would answer yes to either of those questions, I would appreciate the ability to not have to answer yes to both of them.  That's what -- what I'm trying to get a point to you is would I be comfortable answering yes to the first one or no to the first one?  I certainly would.  Would I be comfortable with answering any combination of these two?  It would actually be my responsibility to answer them truthfully, so could I answer yes on the first one and no on the second one?  Yes, I could.  Could I conceive of a concept now that I've sat here for that scenario, I have to admit to you I can't right now, but I would appreciate the ability to have that option.

Q.   You would appreciate the ability to have that option

CURTIS SHORTHAND REPORTING - 817/467-4556

16:30:20 1 to say yes?

16:30:22 2     A.   To say yes or no.

16:30:22 3     Q.   Okay. You just can't think right now of any

16:30:24 4 situation where you would have a yes after considering all of

16:30:30 5 the other?

16:30:32 6     A.   No.

16:30:36 7          VENIREPERSON HITTE: What I can't -- I'm sorry,

16:30:36 8 Your Honor. I'm not trying to be difficult.

16:30:40 9     A.   What this seems to me to be, after having it -- after

16:30:44 10 digesting it for 30 minutes is it would give me the option of

16:30:50 11 arriving at a yes answer on the first question and still be able

16:30:58 12 to take into account the totality of everything that I have been

16:31:02 13 presented.

16:31:06 14     Q.   (By Mr. Moore) Exactly.

16:31:08 15     A.   So -- and if I got to that point and if I personally

16:31:12 16 felt that a no response was the proper response in that second

16:31:16 17 question, that I could quite comfortably say no. I would also

16:31:20 18 quite comfortably be able to say yes, and I wouldn't

16:31:24 19 particularly have any desire to say yes or no on either

16:31:26 20 question. Does that --

16:31:30 21     Q.   I just want to know how you feel, and I appreciate

16:31:34 22 that.

16:31:34 23     A.   I seem to have said a lot of words. I'm not sure

16:31:38 24 that I've actually --

16:31:40 25     Q.   Well, it's a tough concept, isn't it?

CURTIS SHORTHAND REPORTING - 817/467-4556

---

16:31:42 1     A.   I'd say it is. It's serious business.

16:31:46 2     Q.   Along those lines, Texas is allowed to accept a life

16:31:50 3 sentence in a capital murder case. You understand that?

16:31:54 4     A.   Yes.

16:31:56 5     Q.   And in that regard, our sentencing scheme is supposed

16:32:02 6 to be kind of a restrictive and, in fact, it gives you that last

16:32:08 7 question to say, life is okay, a life sentence in this

16:32:10 8 particular situation, if you look at it that way.

16:32:14 9     A.   Well, yeah. I wouldn't look at it as so much as life

16:32:18 10 is okay, but rather -- rather that the death sentence isn't

16:32:24 11 warranted, that the crime has been proven, that the punishment

16:32:32 12 should be severe, that this would give the juror the ability to

16:32:36 13 impose a severe punishment without going to that last step, is

16:32:42 14 how it comes across to me. I could be wrong on this, but that's

16:32:46 15 -- since it would be my judgment in the hypotheticals of that

16:32:52 16 that's how I would, on first blush, tend to apply this or apply

16:32:56 17 this.

16:33:00 18     Q.   The bottom line is, though, that that last question,

16:33:04 19 you're open to either answer?

16:33:04 20     A.   Yes.

16:33:04 21     Q.   What do you think about this life sentence in Texas?

16:33:10 22 What have you been told?

16:33:12 23     A.   As regards to --

16:33:14 24     Q.   You've been told that we really don't have life

16:33:16 25 without parole.

CURTIS SHORTHAND REPORTING - 817/467-4556

---

16:33:18 1     A.   Right. It's a 40-year sentence from the day it's

16:33:20 2 imposed, I believe, is what the counselor said.

16:33:22 3     Q.   And that's 40 calendar years, day for day, no matter

16:33:24 4 how good you are. You can't even been considered by the parole

16:33:34 5 board until 40 years goes by. Do you understand that?

16:33:36 6     A.   I believe now I do, as it's been explained.

16:33:40 7          MR. MOORE: And, Your Honor, at this point in

16:33:44 8 time, I'd like to explain the different procedures of parole

16:33:48 9 that we talked about earlier.

16:33:50 10          THE COURT: Denied.

16:33:51 11     Q.   (By Mr. Moore) And that's not guaranteeing after

16:33:52 12 those 40 calendar years that that person is going to walk out.

16:34:00 13 You understand that?

16:34:00 14     A.   Yes. That seems to me that it's just the opportunity

16:34:06 15 for a board evaluation.

16:34:06 16     Q.   That's exactly right.

16:34:20 17          One question I have for you is -- and I'll wrap

16:34:32 18 up here -- when Ms. Hartman was showing you that list of cases

16:34:36 19 that the State of Texas has said constitute capital murder or

16:34:40 20 death penalty cases, do you remember that?

16:34:44 21     A.   Yes, sir.

16:34:44 22     Q.   You said, and I didn't really understand, she asked

16:34:48 23 you that question, if you think that those are the kinds of

16:34:52 24 cases that subject a person to the death penalty and you said,

16:34:58 25 Well, I guess I could separate my personal feelings from the

CURTIS SHORTHAND REPORTING - 817/467-4556

---

16:35:00 1 law. Do you remember that?

16:35:02 2     A.   Well, yeah, I remember saying that, sir. I guess

16:35:04 3 what I was trying to -- if you're asking me for a judgement on

16:35:08 4 the laws of Texas, I don't really feel comfortable in this venue

16:35:12 5 to say or even schooled in the law enough to give you a

16:35:18 6 judgment.

16:35:20 7          My -- what I was trying to say is that I would

16:35:22 8 do my best to execute my responsibilities within the laws of

16:35:28 9 Texas, as they have been explained to me or as I could study

16:35:30 10 them myself.

16:35:31 11     Q.   Okay.

16:35:32 12     A.   I wasn't trying to imply that somehow I was -- had a

16:35:42 13 personal feeling that would imply or that would make me biased

16:35:46 14 in one way or the other. I wasn't trying to give a -- make a

16:35:52 15 statement on what I thought the laws of Texas were. To me, it's

16:35:56 16 more important for a juror to understand the laws. It's the law

16:36:02 17 that it is now that you get to be working within.

16:36:08 18     Q.   Well, I think -- I think you understand that this is

16:36:12 19 an awesome undertaking, isn't it?

16:36:16 20     A.   Yes, sir. I would say it's one of the most.

16:36:20 21     Q.   Do you have any questions for me or comments or

16:36:22 22 concerns before we wrap this up?

16:36:24 23     A.   I'd just like to say I appreciate your time and your

16:36:24 24 kindness and your flexibility.

16:36:25 25     Q.   Well, we certainly appreciate your time and

CURTIS SHORTHAND REPORTING - 817/467-4556

1 flexibility considering what's going on in your life.

2     A.   Thank you, sir.

3           MR. MOORE:  And we wish you the best.  Thank

4 you.

5           THE COURT:  Okay.  Mr. Hitte, we will let you

6 know something as soon as we know.  And, frankly, you are Number

7 115 on our list.  You're not likely to be reached, but one way

8 or the other, we will let you know and it will be as quickly as

9 we know.  It could be as late as next Friday, but it will

10 probably be earlier than that and we'll leave a message.

11           VENIREPERSON HITTE:  My cell phone should be

12 with me or I should be in regular contact with the messages on

13 my cell phone.

14           THE COURT:  Okay.  And that would have been on

15 your questionnaire?

16           VENIREPERSON HITTE:  Yes.  Well, the bailiff or

17 the deputy has called me on it several times today.

18           THE COURT:  Okay.  Very good.  Thank you, sir.

19 You may be excused.

20           VENIREPERSON HITTE:  Yes, thank you.

          (End of proceedings for the day.)

21

22

23

24

25

CURTIS SHORTHAND REPORTING - 817/467-4556

---

210

1             CERTIFICATE

2 STATE OF TEXAS   )

3 COUNTY OF TARRANT )

4       I, Shelley S. Curtis, Deputy Official Court Reporter

5 in and for the 213th District Court of Tarrant County, State of

6 Texas, do hereby certify that the above and foregoing contains a

7 true and correct transcription of all portions of evidence and

8 other proceedings requested in writing by counsel for the

9 parties to be included in this volume of the Reporter's Record,

10 in the above-styled and numbered cause, all of which occurred in

11 open court or in chambers and were reported by me.

12       I further certify that this Reporter's Record of the

13 proceedings truly and correctly reflects the exhibits, if any,

14 admitted by the respective parties.

15       I further certify that the total cost for the

16 preparation of this Reporter's Record is $840.00 and was

17 paid/will be paid by TARRANT COUNTY.

18       WITNESS MY OFFICIAL HAND this the _____ day of

19 _____, 2004.

20 _____

21 Shelley S. Curtis, CSR 4557
    Expiration Date:  12/31/04

22 Deputy Official Court Reporter
    213th District Court

23 Tarrant County, Texas

24 200 Menlo Park Drive
    Arlington, Texas  76002

25 (817)467-4556

CURTIS SHORTHAND REPORTING - 817/467-4556

1                           CERTIFICATE

2    STATE OF TEXAS      )

3    COUNTY OF TARRANT )

4              I, Shelley S. Curtis, Deputy Official Court Reporter

5    in and for the 213th District Court of Tarrant County, State of

6    Texas, do hereby certify that the above and foregoing contains a

7    true and correct transcription of all portions of evidence and

8    other proceedings requested in writing by counsel for the

9    parties to be included in this volume of the Reporter's Record,

10   in the above-styled and numbered cause, all of which occurred in

11   open court or in chambers and were reported by me.

12             I further certify that this Reporter's Record of the

13   proceedings truly and correctly reflects the exhibits, if any,

14   admitted by the respective parties.

15             I further certify that the total cost for the

16   preparation of this Reporter's Record is $_____   and was

17   paid/will be paid by TARRANT COUNTY.

18             WITNESS MY OFFICIAL HAND this the _____ day of

19   _____ , 2004.

20

21   Shelley S. Curtis, CSR 4557
     Expiration Date:  12/31/04
22   Deputy Official Court Reporter
     213th District Court
23   Tarrant County, Texas

24   200 Menlo Park Drive
     Arlington, Texas  76002
25   (817)467-4556