REPORTER'S RECORD
VOLUME 29 OF 36 VOLUMES
TRIAL COURT CAUSE NO. 0885306D

| | | |
|---|---|---|
| THE STATE OF TEXAS | X | IN THE DISTRICT COURT |
| VS. | X | TARRANT COUNTY, TEXAS |
| BILLY JACK CRUTSINGER | X | 213TH JUDICIAL DISTRICT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRIAL ON THE MERITS CONTINUED

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On September 24, 2003, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Robert K. Gill, Judge presiding, held in Fort Worth, Tarrant County, Texas.

Proceedings reported by computerized stenotype machine.

## APPEARANCES

| | |
|---|---|
| HONORABLE MICHELE HARTMANN  and | SBOT NO.09167800 |
| HONORABLE LISA CALLAGHAN  Assistant District Attorneys  401 W. Belknap  Fort Worth, Texas 76196  Phone: (817) 884-1700 | SBOT NO. 0116700  FOR THE STATE |
| HONORABLE WILLIAM H. RAY  5041 Airport Freeway  Fort Worth, Texas 76117  Phone: 817-831-8383  And | SBOT NO. 16608700 |
| HONORABLE TIM MOORE  115 West 2nd Street  Suite No. 202  Fort Worth, Texas 76102  817-332-3822 | SBOT NO. 14378300  FOR THE DEFENDANT |

## INDEX - VOLUME 29 - TRIAL ON THE MERITS CONTINUED

September 24, 2003                                                                    PAGE

### STATE'S EVIDENCE

| NAME | DIRECT | CROSS | VOIR DIRE |
|------|--------|-------|-----------|
| Moffett, Cheryl | 3, 17 | 11 | |
| Van Winkle, Carolyn | 18, 55 | 53, 87 | |
| Peerwani, Nizam | 91, 148 | 143 | |

State Rests................................................................................................ 149

Motion in Limine..................................................................................... 154

Motion for Instructed Verdict.................................................................. 154

### DEFENDANT'S EVIDENCE

| NAME | DIRECT | CROSS | VOIR DIRE |
|------|--------|-------|-----------|
| McCaskill, John | 155, 170, 175, 176 | | 162, 173, 176 |
| Simpson, George | 177, 188 | 186 | |
| Contenta, Peter | 188, 200 | 193 | |
| Garcia, Clemente Jr. | 201, 216, 217, 219 | | 209, 217, 218 |
| Garcia III, Clemente | 221, 258, 260 | 241, 259 | |

Reporter's Certificate............................................................................. 262

### INDEX OF EXHIBITS - VOLUME 29
### STATE'S EXHIBITS

| No. | Description | Offered | Received |
|-----|-------------|---------|----------|
| 98 | Phone Records | 2 | 2 |
| 140 - 148 | Medical Examiner Photos | 102 | 103 |
| 149 - 161 | Medical Examiner Photos | 128 | 128 |
| 162 | Diagram | 125 | 125 |
| 163 | Diagram | 125 | 125 |
| 164 | Diagram | 125 | 125 |
| 165 | Diagram | 103 | 103 |
| 167 | Stipulation | 96 | 96 |
| 168 | Photo of Defendant | 247 | 247 |
| 169 | Photo of Tony's Lazy Lounge | 243 | 243 |
| 170 | Photo of Tony's Lazy Lounge | 243 | 243 |

### DEFENDANT'S EXHIBITS

| No. | Description | Offered | Received |
|-----|-------------|---------|----------|
| 3 | Medical Records | 55 | 55 |

## ALPHABETICAL INDEX OF WITNESSES - VOLUME 29

| NAME | DIRECT | CROSS | VOIR DIRE |
|---|---|---|---|
| Contenta, Peter | 188, 200 | 193 | |
| Garcia III, Clemente | 221, 258, 260 | 241, 259 | |
| Garcia, Clemente Jr. | 201, 216, 217, 219 | | 209, 217, 218 |
| McCaskill, John | 155, 170, 175, 176 | | 162, 173, 176 |
| Moffett, Cheryl | 3, 17 | 11 | |
| Peerwani, Nizam | 91, 148 | 143 | |
| Simpson, George | 177, 188 | 186 | |
| Van Winkle, Carolyn | 18, 55 | 53, 87 | |

Page 1

```
 1              REPORTER'S RECORD

 2           VOLUME 29 OF  VOLUMES

 3         Trial Court Cause No. 0885306D

 4   THE STATE OF TEXAS    X   IN THE DISTRICT COURT

 5   VS.                   X   TARRANT COUNTY, TEXAS

 6   BILLY JACK CRUTSINGER X   213TH JUDICIAL DISTRICT

 7   ------------------------------------------

 8         TRIAL ON THE MERITS CONTINUED

 9   ------------------------------------------

10     On the 24th day of September, 2003, the following

11   proceedings came on to be heard in the above-entitled and

12   -numbered cause before the Honorable Bob Gill, Judge presiding,

13   held in Fort Worth, Tarrant County, Texas:

14

15     Proceedings reported by computerized stenotype

16   Machine; Reporter's Record produced by Computer-Assisted

17   Transcription.

18

19

20

21

22

23           STEVE SCHILLER, Texas CSR No. 4665
24               Official Court Reporter
                213th Judicial District Court
25                Tarrant County, Texas
```

Page 2

```
 1          P R O C E E D I N G S

 2           (September 24, 2003)

 3             (Morning Session:)

 4              (Jury not present )

 5     THE COURT:  Are both sides ready for the jury?

 6     MS. HARTMANN:  State's ready, Your Honor.

 7     MR. RAY:  Defense is ready, Your Honor.

 8     THE COURT:  Go ahead and call your next witness.

 9            (Jury present)

10     THE COURT:  Good morning, ladies and gentlemen.

11   The State may proceed.

12     MS. HARTMANN:  At this time the State would

13   reoffer State's Exhibit No. 98.

14     MR. RAY:  Objection to 98 is it's not relevant.

15   It relates to our objections that we previously made, and the

16   record does not sufficiently state what the records are

17   concerning.  In other words, these phone records, they don't

18   have the whole phone number on there.  I'm talking about the

19   affidavit.

20     THE COURT:  Overruled.  98 is admitted.

21          (State's Exhibit No. 98 received)

22     MS. HARTMANN:  Permission to orally publish

23   parts of State's Exhibit 98 to the jury?

24     THE COURT:  You may.

25     MS. HARTMANN:  State's Exhibit 98 are business
```

Page 3

```
 1   records from Cingular Wireless for the account of Patricia L.

 2   Syren.  It contains charges and phone numbers made from

 3   Patricia Syren's Cingular Wireless cell phone covering the

 4   dates of March 29 through April 9 and for one phone call made

 5   on April 8, 2003, at 2:56 p.m. to a Phoenix, Arizona number,

 6   480-430-4104.

 7     MS. HARTMANN:  May I proceed, Your Honor?

 8     THE COURT:  You may.

 9     MS. HARTMANN:  The State would call Cheryl

10   Moffett.

11          (Witness Sworn)

12   Whereupon,

13            CHERYL MOFFETT,

14   having been first duly sworn, testified as follows:

15            DIRECT EXAMINATION

16   BY MS. HARTMANN:

17     Q.  Would you state your name for the jury?

18     A.  Cheryl Moffett.

19     Q.  How are you employed?

20     A.  I'm an RN at the Galveston County jail.

21     Q.  How long have you been an RN at the Galveston County

22   jail?

23     A.  Since 1997.

24     Q.  And do you actually work for Galveston County Jail,

25   or do you work for a company that contracts with Galveston
```

Page 4

```
 1   County Jail?

 2     A.  We work for Correctional Medical Services as a

 3   contractor for the jail.

 4     Q.  And where is that company located?  Where are their

 5   offices.

 6     A.  Their main office is in St. Louis.

 7     Q.  St. Louis, Missouri?

 8     A.  Missouri.

 9     Q.  And there at the Galveston County jail, what are your

10   duties?

11     A.  I am also the administrator there, so my duty is

12   basically scheduling, making sure we have staff to run the

13   jail, responding to emergencies if we are shorthanded, making

14   sure it runs appropriately.

15     Q.  And are you a peace officer?

16     A.  No, ma'am.

17     Q.  Are you a law enforcement agent?

18     A.  No.

19     Q.  Just briefly, what is your educational background

20   that allowed you to work as an RN at the Galveston County jail?

21     A.  I completed an ADN program at Galveston College and

22   took the State boards for my RN license.

23     Q.  Are you currently licensed in the state of Texas?

24     A.  Yes, ma'am.

25     Q.  I want to direct your attention back to the date of
```

Page 5

1 April 10, 2003.

2     A. Okay.

3     Q. Were you so employed as an RN for the Galveston

4 County jail?

5     A. Yes, ma'am.

6     Q. Did you have occasion in the course of your duties to

7 come in contact with an individual by the name of Billy Jack

8 Crutsinger?

9     A. Yes, ma'am.

10     Q. Do you see anybody here in the courtroom that you

11 recognize to be that individual?

12     A. Yes, ma'am.

13     Q. Could you describe where that person is located and

14 describe something that they are wearing?

15     A. He's fifth from your left in the blue striped shirt.

16        MS. HARTMANN: Your Honor, may the record

17 reflect that Ms. Moffett has identified the Defendant?

18        THE COURT: It will.

19     Q. Ms. Moffett, if you would, when a person comes in the

20 Galveston County jail, is there some kind of initial intake

21 screening for them?

22     A. Yes, ma'am.

23     Q. When is that done?

24     A. When they are booked into our facility.

25     Q. What is the purpose of that?

Page 6

1     A. To make sure there is no medical problems that we

2 need to know about.

3     Q. And is that initial intake procedure done with every

4 single person who is going to be in the Galveston County jail?

5     A. Yes, ma'am.

6     Q. Do you have any type of second procedure or second

7 screening that is done on someone who is going to be an inmate

8 at the Galveston County jail?

9     A. Yes, ma'am. We have a 14-day mental health and

10 medical assessment to make sure we didn't miss anything at

11 intake.

12     Q. Is that kind of a safety type --

13     A. It's a safety net to make sure that -- when they

14 first come to jail, they are kind of in shock. They don't want

15 to tell you everything you want to know. After a little

16 adjustment period, we go into more detail about their family

17 history to make sure their family doesn't have high blood

18 pressure, seizures, that kind of stuff; more in depth on mental

19 illnesses also.

20     Q. Why is that information important for the jail staff

21 and personnel to be aware of?

22     A. Seizure patients you don't want on the top bunk. The

23 nurses have no control over jail bunk assignment, so that kind

24 of stuff the jail would know about for the safety of the

25 inmates to make sure they are housed appropriately. If they

Page 7

1 need to be segregated to 15-minutes check, or on FSP, that's

2 full suicide precautions, safety for inmates and safety and

3 security for the jail.

4     Q. And so there are some -- are there practical reasons

5 for why these various medical screens are done --

6     A. It's the standards we follow. We're nationally

7 accredited. Those are standards that the Galveston County Jail

8 follows.

9     Q. Is it for safety of the inmates as well as, I guess,

10 the safety of the people who work in the jail?

11     A. Yes, ma'am.

12     Q. Did you personally do the initial intake of Mr.

13 Crutsinger?

14     A. No, ma'am.

15     Q. Did somebody else do that?

16     A. Yes, ma'am.

17     Q. That initial intake, is that a -- describe how

18 lengthy that is.

19     A. It takes about five minutes or less. It depends on

20 how long you have worked there because you can -- if they have

21 any medical problem you need to know about, any recent

22 injuries, head injuries, it goes very quickly.

23     Q. As far as the second screening, is that more lengthy

24 in nature?

25     A. Probably about three minutes longer. They are

Page 8

1 basically yes or no questions.

2     Q. Okay. And the questions that are asked in the first

3 intake procedure, are those standards questions? In other

4 words, is the same set of questions asked of every single

5 person?

6     A. Yes.

7     Q. As far as the second screening -- medical screening,

8 are there a set of questions that are asked?

9     A. Yes, ma'am.

10     Q. Are the same set of questions asked of every single

11 person who comes through the Galveston County jail?

12     A. If they are there for 14 days, yes, ma'am.

13     Q. All right. Did you, in fact, do the second medical

14 evaluation on Mr. Crutsinger?

15     A. Yes.

16     Q. And again, the questions that you asked of him, are

17 they the same standard set of questions that are asked of

18 anybody coming through?

19     A. Yes.

20     Q. Does the person that you are speaking with, do they

21 have a right to refuse to speak with you?

22     A. Yes.

23     Q. With regards to your mental health or medical

24 evaluation of the Defendant on April 10, 2003, did he make any

25 admissions to you?

Page 9

1  A. Yes.
2  Q. Okay. Specifically what type of admissions did he
3 make to you?
4  A. When I asked about if he had been a victim of a
5 violent crime or committed a violent crime, he answered yes.
6 And I wanted to find out how long ago because had it been ten
7 years ago, we would have looked at the mental health that
8 detailed. And he said, "Last Sunday I was involved in a
9 murder."
10  Q. The question, "Have you been a victim of a violent
11 crime or have you committed a violent crime," is that a
12 standard question that you ask everybody?
13  A. Yes.
14  Q. Is that done for mental health and medical evaluation
15 reasons?
16  A. That's the mental health reason.
17  Q. And you said you asked about the time because if it
18 was 10 or 20 years ago, it might not be expressing as more --
19  A. Right.
20  Q. And is that to help you gauge and judge what services
21 might be necessary, what procedures should be taken?
22  A. Right. A lot of the red-flag signals for suicidal
23 inmates are 30 to 45, heinous crime, end-of-the-road white
24 male. That's your high suicidal rate. So that kind of judges
25 your --

Page 10

1  Q. Okay. Did the Defendant ever express any idea of
2 suicide to you?
3  A. No.
4  Q. In regard to the general medical information, when
5 you are asking about conditions they have, what medications
6 they are on, how they have been diagnosed, are those types of
7 questions asked in the mental health evaluation?
8  A. On the mental health part it's, "Have you used any
9 psychiatric medications or have you been diagnosed with any
10 psychiatric problems?"
11  Q. Okay. That information generally is private,
12 personal information as far as it's not generally distributed
13 to the general public; is that fair to say?
14  A. Correct.
15  Q. Is that information, however, made available to jail
16 staff?
17  A. If they need to know. On a schizophrenic that's
18 going to be violent, you don't want to put them in the
19 population. So security is aware of different inmates.
20  Q. All right. And so if there is any discussion or
21 question about confidentiality or privacy, what is that person
22 told?
23  A. We do not go into patient confidentiality with the
24 inmates.
25  Q. And if you received information that is necessary for

Page 11

1 security purposes, you disclose that; is that correct?
2  A. Yes.
3       MS. HARTMANN: Thank you. We'll pass the
4 witness.
5       CROSS-EXAMINATION
6 BY MR. RAY:
7  Q. How are you doing, Ms. Moffett?
8  A. Fine. Thank you.
9  Q. You just said you don't -- I think you said, "We --
10 "we don't go into the confidentiality with patients."
11  A. Yes, sir.
12  Q. What do you mean by that?
13  A. There is no formal written statement that -- it is
14 basically all consent. It's not private.
15  Q. Did you tell Mr. Crutsinger that whatever he told you
16 was going to be strictly confidential?
17  A. No.
18  Q. I want to direct your attention to August 22 of 2003
19 and ask you if you sat in that very same chair and testified in
20 a prior proceeding under oath for Judge Gill, myself and the
21 District Attorney. Do you remember testifying about that?
22  A. Yes.
23  Q. I want to ask you if you remember me asking you a
24 question, that very same question, "Did you tell Mr. Crutsinger
25 that whatever he told you was going to be strictly

Page 12

1 confidential?" Do you remember me asking you that question?
2  A. Yes.
3  Q. Do you remember what your answer was then?
4  A. I believe it was yes.
5  Q. Okay. What's different from August 22 and today?
6  A. On August 22 we also went back and we re-evaluated --
7 we went through the answers again, and I told you I did not
8 talk patient confidentiality with him.
9  Q. No question, though, that you said that it's --
10  A. I did say that. I got confused and I said yes,
11 thinking medical patient confidentiality is their private
12 patient confidentiality.
13  Q. Do you remember the question I asked you after that?
14  A. No.
15  Q. What I asked you after that was -- first I asked you,
16 "You told him it was confidential," and you said yes, right?
17  A. I believe so.
18  Q. Okay. Would you like to review your testimony?
19  A. I think it would help.
20  Q. Why don't you look at page 172 at about line 12.
21  A. (Witness complies) Okay.
22  Q. I asked you if you told him that it was going to be
23 confidential. You said yes, right?
24  A. Yes, sir.
25  Q. Then my next question was: "Well, it wasn't

Page 13

1 confidential, was it?"
2        And you said, "No, it wasn't."
3  A. Right.
4  Q. And that's essentially two questions asking you --
5 the subject matter was the same thing. One, you tell him it
6 was, and it wasn't.
7  A. Right.
8  Q. Anything confusing about those questions?
9  A. No.
10  Q. Anything that you misunderstood when you talked about
11 it?
12  A. I was thinking patient confidentiality medical. I
13 answered wrong.
14  Q. Okay. Later on in the conversation, you said you
15 didn't really remember; is that right?
16  A. That's right.
17  Q. And now today you told the jury that, in fact, you
18 never had that conversation with him?
19  A. Like I told you on the 22nd, I didn't.
20  Q. What else did y'all talk about?
21  A. We started the evaluation for his possibility of him
22 taking Zoloft.
23  Q. Let me stop you for just a second. Tell me what
24 Zoloft is -- you are not a doctor, but you know what that drug
25 is.

Page 14

1  A. It's for depression.
2  Q. Like Prozac is for depression a more common drug, or
3 that's more of a mood-swing drug, I guess.
4  A. I don't know off the top of my head.
5  Q. All right. Zoloft is for depression.
6  A. Yes.
7  Q. And y'all discussed that?
8  A. Yes.
9  Q. Did you ask him if he was taking it, or did he just
10 volunteer that?
11  A. On initial intake he had stated he took Zoloft, and
12 so I asked him about the history of his Zoloft use.
13  Q. What did y'all talk about?
14  A. He basically said -- can I look at my notes?
15  Q. Yeah.
16  A. He explained he took it after his sister died in a
17 car accident, he was driving, two of his children had
18 died, 14 years after birth, one in a swimming pool, one after
19 taking his girlfriend home, for treating for slight depression.
20  Q. Okay. After y'all talked about when this violent
21 crime was, you had indicated to Ms. Hartmann that your concern
22 was whether or not that was ten years old.
23  A. Yes.
24  Q. Tell me again what the reasoning for that was.
25  A. When inmates come into jail, you have red flags for

Page 15

1 suicidal precaution inmates. One of your high-risk factors are
2 35 to 45 years old, white male, heinous crime, they are at the
3 end of their road, there is no hope, there's nothing left for
4 them.
5  Q. Did he fit in that category?
6  A. Yes, he did.
7  Q. And why is that, because of what you just said --
8  A. Because of what I just said and also because of the
9 questions prior to that violent-history question. He's going
10 through a divorce after 15 years; he's been homeless for three
11 weeks, he's lost his job for three weeks. Those are high-risk
12 indicators.
13  Q. Do people snap when they get in that kind of
14 situation?
15  A. Yes, sir.
16  Q. So what else did y'all talk about?
17        MS. HARTMANN: I am going to object to vague.
18        THE COURT: Overruled.
19  Q. What else did y'all talk about?
20  A. After we went over what he did for a living, his
21 marriage, how far he went in school, if he had any history of
22 suicidal thoughts or hallucinating, then the question of
23 violence came up or committing a violent crime. He teared up
24 and dropped his head; he gave me the answer.
25        History of violent behavior or explosive

Page 16

1 behavior, he said no.
2  Q. That's the question about in the context of, "When
3 was the last time you had violent behavior in the past?" Is
4 that what you are talking about?
5  A. I'm not sure what you are asking.
6  Q. I guess what I'm asking you is -- and I ought to know
7 before I ask you -- if a person doesn't have a history of
8 violent behavior, that's a little less suicidal risk. Is that
9 what you -- or it's been a long time --
10  A. No. Where we have violent or explosive behavior, if
11 I tell you no, you are going to overreact and explode.
12  Q. Okay.
13  A. That's what we kind of grasp that as.
14  Q. Okay. Go on.
15  A. We asked if he heard voices, he indicated, "No, I
16 just keep telling myself it didn't happen, but I know I killed
17 them."
18        Right then when I asked him if he was suicidal;
19 he said no. I explained the 15-minute checks and the
20 availability of medical, inmate felt if he had no options or he
21 needed to talk, how to get hold of medical.
22        At the end of the conversation, he was thankful,
23 talking was rather courteous, "yes, ma'am," "no, ma'am"; his
24 eye contact improved. At the beginning of the evaluation he
25 had a very flat effect and he had no eye contact.

## Page 17

1   MR. RAY:  Thank you.  Nothing further.
2           REDIRECT EXAMINATION
3 BY MS. HARTMANN:
4   Q.  The Zoloft use, that was in the past?
5   A.  That was in the past.
6   Q.  Not current?
7   A.  Not current.
8   Q.  And Defense Counsel asked you a question in regards
9 to the Defendant being asked a question about having a history
10 of violent behavior.
11  A.  Yes.
12  Q.  And he denied that?
13  A.  Right.
14          MS. HARTMANN:  Nothing further.
15          MR. RAY:  I don't have anything else.
16          THE COURT:  You may step down, ma'am.
17          MS. HARTMANN:  May this witness be excused?
18          THE COURT:  She may.
19          MR. RAY:  Judge, I need to confer with her
20 outside just very briefly.
21          MS. HARTMANN:  The State calls Carolyn Van
22 Winkle.
23          (Witness Sworn)
24 Whereupon,
25          CAROLYN VAN WINKLE,

## Page 18

1 having been first duly sworn, testified as follows:
2           DIRECT EXAMINATION
3 BY MS. HARTMANN:
4   Q.  Could you state your name for the jury?
5   A.  Carolyn Van Winkle.
6   Q.  How are you employed?
7   A.  I'm employed here in Tarrant County at the Tarrant
8 County Medical Examiner's Office in the crime-lab section, and
9 there I serve as the quality manager of the crime laboratory
10 and senior forensic DNA analyst.
11  Q.  Explain those two titles to us.  What does that mean?
12  A.  The quality manager is essentially responsible for
13 the workings of the crime laboratory itself.  The senior
14 forensic DNA analyst is specifically in the biology section of
15 the crime laboratory, and in that capacity we analyze
16 biological evidence normally in regard to criminal cases.
17  Q.  How long have you been employed with the Tarrant
18 County Medical Examiner's Office?
19  A.  Approximately 3 1/2 years.
20  Q.  And have you worked in a similar capacity elsewhere?
21  A.  Yes.  I was 14 years at Dallas County at Southwestern
22 Institute of Forensic Sciences.
23  Q.  What do they do?
24  A.  There I was also in the biology section, and I
25 actually set up the DNA laboratory in the late '80s there in

## Page 19

1 Dallas, the laboratory that's still functioning.
2   Q.  Can you tell the members of the jury what your
3 educational background is that qualifies you to do that type of
4 work?
5   A.  I have a bachelor of science degree from University
6 of Texas at Arlington in medical technology.  I also have been
7 registered as a medical technologist as a specialist in blood
8 bank technology.  I also have a master's degree in biology from
9 the University of North Texas.
10  Q.  In the capacity of your duties at the Tarrant County
11 Medical Examiner's Office and Dallas County, have you had an
12 opportunity to perform DNA analysis?
13  A.  Many times.
14  Q.  Could you estimate how many times that's taken place?
15  A.  Thousands of cases.
16  Q.  Have you ever had the opportunity to testify as an
17 expert in the area of DNA analysis in court?
18  A.  Yes.  I testified in over 40 counties here in Texas.
19  Q.  Has that been on few or many occasions?
20  A.  Many.
21  Q.  Can you tell the members of the jury about the crime
22 lab at the Medical Examiner's Office by -- the regulations that
23 it has to comply with in its certifications?
24  A.  We certainly in the DNA laboratory have requirements
25 that we must meet to be able to do forensic DNA testing.  Also

## Page 20

1 the crime laboratory itself is accredited through an
2 association called ASCLD/Lab, the Association of Crime Lab
3 Directors; and through that accreditation process we are
4 audited, an extensive audit for approximately three days.
5       And we in specifically the DNA section undergo
6 annual audits of our DNA laboratory and its operations.
7   Q.  And what is the purpose of the audits and the
8 certification?
9   A.  Certainly it's to ascertain if we are meeting minimum
10 standards.  Also we have protocols and quality control measures
11 in place so that we again have to demonstrate the meeting of
12 our procedures and quality control measures.
13       Also we take proficiency tests more than two a
14 year.  We have to ascertain that those are being properly
15 administered and completed as expected.  And every aspect of
16 the operations in the laboratory from the accepting of evidence
17 to the reporting of casework is inspected.
18  Q.  All right.  And when DNA analysis testing is done, is
19 it reviewed there within the lab?
20  A.  Yes.  Part of our quality control process for DNA
21 testing is that a second qualified analyst independently
22 reviews all data for every case and every report that goes out
23 of our laboratory.
24  Q.  Do you have evidence submitted to you from a single
25 source or multiple sources?

Page 21

1   A. We receive evidence from many different sources.
2   Q. Do those sources include law enforcement agencies?
3   A. They do.
4   Q. Are there other sources besides law enforcement
5 agencies?
6   A. Yes.
7   Q. Such as what?
8   A. We may receive cases from private individuals. On
9 rare occasions we also receive defense requests for retesting
10 on occasion.
11   Q. We talked a moment about forensic DNA testing. What
12 does that mean?
13   A. Forensic DNA testing, again, the type case we get are
14 normally criminal in nature. These are cases that may go
15 before the court system. And what we are normally looking for
16 is to identify a body fluid whether it is human or blood or
17 perhaps saliva and perform DNA testing and ascertain an
18 exclusion of a particular individual or an inclusion of a
19 particular individual as the source of that stain.
20   Q. And let's talk a little bit about what DNA is just in
21 terms that we all can understand. First of all, what is DNA?
22   A. DNA stands for deoxyribonucleic acid, and it's
23 sometimes called the genetic blueprint for all living things.
24       And we as human beings have 23 chromosomes, and
25 in those chromosomes is packaged our DNA. Each individual

Page 22

1 would inherit their DNA approximately half from the biological
2 mother and half from the biological father.
3       So given that, we as human beings are the
4 majority the same -- that the DNA is the majority of the same
5 in each one of us being human.
6       However, the regions that we are looking at that
7 vary between individuals, there's no two individuals other than
8 perhaps identical twins or identical triplets that are going to
9 have the same DNA.
10   Q. All right. And you said a moment ago there is some
11 DNA that is similar to other people, are we talking about
12 characteristics such as two legs, two arms, ten fingers, blue
13 eyes, brown eyes, those general characteristics?
14   A. Yes. Our DNA is the code for all our body's
15 functions, whether we have eyes, ears, nose, whatever. So in
16 that regard the DNA is going to be the same for each of us.
17   Q. But there are portions of the DNA -- of that person's
18 DNA profile that are going to be unique to that individual?
19   A. Yes.
20   Q. Unless they have an identical twin or a triplet.
21   A. That's correct.
22   Q. And these specific parts of the DNA, are these the
23 portions or sites that you all do forensic DNA testing to
24 distinguish between samples?
25   A. Yes. These well characterized sites, either 9 or 13,

Page 23

1 that we look at vary between individuals. They have been
2 looked at very extensively in different population groups, and
3 those 13 loci -- 9 or 13 loci are used throughout the United
4 States.
5   Q. All right. What is PCR?
6   A. PCR stands for Polymerase Chain Reaction, and it's a
7 process which a Nobel Peace Prize was awarded, and basically
8 what it does is it copies those regions of the DNA that we're
9 interested in, those 13 or 9 regions that we are looking at
10 that vary between individuals. It allows us to make copies of
11 those regions and then type what we get from that particular
12 sample.
13       The reason it is so useful in forensics is a lot
14 of times the DNA we are going to receive is going to be
15 degraded, it's going to be very minimal in quality, so that
16 allows us to get a result from a very miniscule sample.
17   Q. Is the PCR DNA method of analysis, is that generally
18 accepted within the scientific community?
19   A. It is.
20   Q. Is DNA testing in general and specifically PCR
21 testing used in other areas besides forensics?
22   A. Yes.
23   Q. Is it used in paternity testing?
24   A. It is used in paternity.
25   Q. Is it used in, let's say, the recent World Trade

Page 24

1 disaster --
2   A. Yes.
3   Q. -- in trying to identify people?
4   A. Yes.
5   Q. Is it used in other areas?
6   A. Yes.
7   Q. And is this a type of testing that's done throughout
8 this country and throughout the world?
9   A. Yes.
10   Q. And is it generally accepted?
11   A. Yes.
12   Q. When your lab receives evidence for DNA testing, how
13 does that process work? Where is that evidence taken?
14   A. There are several different ways, but the most common
15 way is an evidence custodian will receive the evidence into the
16 Tarrant County Medical Examiner's system. And if a number has
17 not been assigned, when an autopsy has been done, then they
18 will assign a case number to that evidence.
19       Each item of evidence is then subsequently given
20 an additional number, and then they release that evidence to
21 the appropriate section. In our case they would be releasing
22 it to the biology DNA section.
23   Q. All right. And if you were to get samples or if you
24 were to get evidence to be analyzed that had to do with a
25 criminal case and you performed the appropriate analysis on the

## Page 25

1 samples, do you send those samples back to whoever submitted
2 it, or do you retain those?
3    A. The samples in which we identify biological evidence
4 and perform DNA testing on, we retain those in the laboratory.
5 Policy is to retain at least half the samples. If the Defense
6 or an individual requests retesting, the samples are retested
7 and preserved in a manner that they can be retested, and they
8 are retained in the laboratory.
9    Q. All right. And are there circumstances under which
10 by law you are required to maintain and preserve the biological
11 samples?
12    A. Yes.
13    Q. So if you were to keep as required by law or to
14 preserve evidence for future testing by anyone else, do you
15 return the packaging that the biological samples have been
16 submitted in to whoever submitted the items?
17    A. Oftentimes we will return the packaging. We maintain
18 them in a more easily fileable fashion, so oftentimes we will
19 return the packaging.
20    Q. Did you receive multiple items of evidence from the
21 Fort Worth Police Department by their service number 0303339?
22    A. Yes.
23    Q. Did that service number involve two individuals by
24 the name of Patricia Syren and Pearl Magouirk?
25    A. Yes.

## Page 26

1    Q. When a deceased person comes into the Tarrant County
2 Medical Examiner's Office, are they assigned a unique number?
3    A. They are.
4    Q. Is that a unique case number?
5    A. Yes.
6    Q. The case number that was assigned to Patricia Syren
7 was what?
8    A. Patricia's number was 0303339.
9    Q. And the number that was assigned to Pearl Magouirk?
10    A. Pearl's it was 0303340.
11    Q. So each person that comes through there, they have
12 their own unique number.
13    A. Correct.
14    Q. Are you aware of whether or not those individuals
15 were autopsied by Dr. Nizam Peerwani?
16    A. That's my understanding.
17    Q. In the course of an autopsy of an individual, are
18 biological samples taken and preserved?
19    A. Yes.
20    Q. Included in those samples is there an autopsy blood
21 sample that's taken and preserved?
22    A. Yes.
23    Q. What is the purpose of that?
24    A. Well, there are many purposes. A possibility of
25 paternity issue may arise at later date, which we retain the

## Page 27

1 samples for that; also for future comparison of evidentiary
2 material, we retain the samples for that, and also we do
3 toxicology on autopsy samples and other types of tests.
4    Q. Did you, in fact, in this case for purposes of your
5 testing receive autopsy blood samples from both Patricia Syren
6 and Pearl Magouirk?
7    A. Yes.
8       MS. HARTMANN: May I approach the board, Your
9 Honor?
10       THE COURT: Yes.
11    Q. Do you think it would be helpful for the jury in
12 order to understand your testimony to be able to see it kind of
13 summarized and written out on paper?
14    A. Yes.
15    Q. All right. When you look at an item, do you assign a
16 number to that particular item to help you for reference
17 purposes?
18    A. In the case of the autopsy samples, it's going to be
19 assigned by the medical examiner, but, yes, numbers are
20 assigned.
21    Q. Did you for purposes of this case receive Pearl
22 Magouirk's autopsy blood --
23    A. Yes.
24    Q. -- a sample of that?
25    A. Yes.

## Page 28

1    Q. And what Tarrant County Medical Examiner Office
2 number was assigned to that?
3    A. It was our Item No. 16 under their case number.
4    Q. Which is 0303340?
5    A. Correct.
6    Q. Okay. Did you also receive a sample of Patricia
7 Syren's autopsy blood?
8    A. Yes.
9    Q. And her unique number was 0303339
10    A. Correct.
11    Q. What number was that assigned?
12    A. Her autopsy sample was number 20.
13    Q. Were you able to analyze -- using the PCR DNA method,
14 analyze your Item 16 and your Item 20 and obtain DNA profiles
15 for Pearl Magouirk and Patricia Syren?
16    A. Yes.
17    Q. I want to show you State's Exhibits 134 and 136 and
18 ask you if you recognize those.
19    A. Yes.
20    Q. And how do you recognize State's 134 and 136?
21    A. Each one of those has our case number on it. In this
22 case it is under Patricia's number, 0303339, and specifically
23 under her case number is Item 21 and Item 52. And what this is
24 is packaging from which each of those items was submitted.
25    Q. All right. And did State's Exhibit 134 and 136

Page 29

1  contain buccal swabs?
2      A. They did.
3      Q. Are buccal swabs in this packaging right now?
4      A. No. Again, they are retained in our laboratory with
5  the remainder of the evidence.
6      Q. And that's done for legal reasons and preservation of
7  evidence?
8      A. Yes.
9      Q. So that if anybody else wants to request testing,
10 that can be done.
11     A. Correct.
12     Q. State's Exhibit 134 was assigned your No. 21?
13     A. Correct.
14     Q. And the information that you were given was that
15 those buccal swabs belonged to a person by the name of Billy
16 Jack Crutsinger.
17     A. Correct.
18     Q. State's Exhibit 136 was packaging that contained
19 swabs that were given -- or assigned as No. 52?
20     A. Yes.
21     Q. And again, the information was that those were from
22 Billy Jack Crutsinger.
23     A. Correct.
24     Q. Were you able to obtain a DNA profile using the PCR
25 DNA method for State's Exhibits -- well, for the buccal swabs

Page 30

1  of Billy Jack Crutsinger?
2      A. Yes.
3      Q. So at this point you have a DNA profile for Pearl
4  Magouirk, Patricia Syren and Billy Jack Crutsinger.
5      A. Correct.
6      Q. And, Ms. Van Winkle, the DNA profiles that you
7  obtained from each one of these sets of buccal swabs, were they
8  the same?
9      A. They were.
10     Q. Were you also asked to analyze using DNA analysis
11 some other items of evidence that were submitted to you?
12     A. Yes.
13     Q. Okay. Just for ease for myself and perhaps for the
14 jury, what I am going to do is go through these in order of
15 location. I have organized them by location. All right?
16     A. Okay.
17     Q. All right. Let's start with State's Exhibit 73-C and
18 ask you to take a look at that if you will, please.
19     A. (Witness complies)
20     Q. Do you recognize what is contained in State's 73-C?
21     A. Yes.
22     Q. And how do you recognize it?
23     A. Once again, it has the crime lab number -- Medical
24 Examiner No. 0303339, and this particular item number is 22.7,
25 and it has my initials and the fact that we have the evidence

Page 31

1  retained on the outside of the envelope.
2      Q. Okay. And that's 73-C?
3      A. Yes.
4      Q. And that was assigned your No. 22.7?
5      A. Correct.
6      Q. And again, the swabs that were initially contained in
7  73-C, where are those located?
8      A. They are retained at the laboratory.
9      Q. And were you able to perform the DNA PCR analysis on
10 the swabs contained in 73-C?
11     A. Yes.
12     Q. And were you able to obtain a DNA profile map?
13     A. Yes.
14         MR. MOORE: Judge, at this point we would
15 object to any opinion of Ms. Van Winkle about DNA results based
16 on our prior hearing.
17         THE COURT: Overruled.
18     Q. Did you obtain a DNA profile map after analyzing the
19 swabs contained in 73-C, which would have been from the
20 kitchen --
21     A. Yes.
22     Q. And what did that profile match, if anybody?
23     A. It was male DNA and it matched Billy Crutsinger.
24         MR. MOORE: Judge, may we have a running
25 objection so I won't have to object --

Page 32

1          THE COURT: You may.
2      Q. Let me show you State's Exhibit 73-D and ask you if
3  you recognize that.
4      A. Yes.
5      Q. And how do you recognize the contents of 73-D?
6      A. Once again, it has the crime lab number 0303339, Item
7  No. 22.8 and my initials and notations on them.
8      Q. Were there swabs contained in 73-D when it was
9  submitted to you?
10     A. Yes.
11     Q. Did you perform DNA PCR samples on these blood swabs?
12     A. Yes.
13     Q. And were you able to obtain a DNA profile --
14     A. Yes.
15     Q. -- from the swabs out of 73-D?
16     A. Yes. They were wipes, but, yes, similar to swabs.
17     Q. Wipes. Okay. I'm sorry. And you assigned that
18 22.8?
19     A. Correct.
20     Q. That was your ME number.
21     A. Correct.
22     Q. Did you get a DNA profile match on the items out of
23 73-D?
24     A. Yes.
25     Q. And what match was that?

Page 33

1    A. It was a male DNA profile, and it matched Billy
2 Crutsinger.
3    Q. And when you say it was a male DNA match, what are
4 you referring to?
5    A. Yes. Part of the STR PCR process that we use in
6 which we look at 13 different loci, we are also able to
7 determine the sex of the sample, whether it's from a male or
8 whether it's from a female, and we do this at a locus called
9 Amelogenin.
10    Q. I'm showing you State's Exhibit 73-E and ask you if
11 you recognize that.
12    A. Yes.
13    Q. How do you recognize the contents of 73-E?
14    A. Once again, it has the crime lab number 0303339,
15 24.1.
16    Q. All right. And the 24.1 is the Medical Examiner's
17 number?
18    A. Correct.
19    Q. And were you -- again, the swabs, have they been
20 retained -- the wipes been retained by you at the Tarrant
21 County Medical Examiner's Crime Lab?
22    A. They have.
23    Q. Did you get a DNA profile on what was contained in
24 73-E?
25    A. Yes.

Page 34

1    Q. Was there a match to anybody involved in this case?
2    A. There was a male DNA profile that matched Billy
3 Crutsinger.
4    Q. All right. State's 75-A. Do you recognize 75-A?
5    A. Yes, I do.
6    Q. How do you recognize it?
7    A. It is a piece of tile that again has our case number
8 on it and the item number.
9    Q. All right. And did you yourself take any type of
10 sample from State's 75-A?
11    A. I did.
12    Q. And where did you take that sample from?
13    A. From the center of the bloodstain. You can see the
14 perimeter of the stain is still remaining.
15    Q. So you referred to a dark spot on the tile, and there
16 is a pretty circular spot that's missing.
17    A. Correct.
18        MS. HARTMANN: Permission to publish by just
19 walking in front of the jury?
20        THE COURT: All right.
21    Q. And do your initials appear on the bag as well as the
22 case number?
23    A. They do.
24    Q. When you took your own sample from State's 75-A, did
25 you perform the DNA PCR analysis on it?

Page 35

1    A. 17-A, yes.
2    Q. Okay. It's our State's Exhibit 75-A, Fort Worth
3 Police Department 17-A and it is your 33?
4    A. Correct.
5    Q. Okay. Do we have enough numbers up here?
6        All right. And were you able to get a DNA
7 profile?
8    A. Yes.
9    Q. Did it match anybody involved in this case?
10    A. It was a male DNA profile that matched Billy
11 Crutsinger.
12    Q. And again, that sample, has that been retained by
13 your lab?
14    A. It has.
15    Q. I'm showing you State's Exhibit 74-A, ask you to
16 take a look at that, please.
17    A. (Witness complies)
18    Q. Do you recognize State's Exhibit 74-A?
19    A. Yes.
20    Q. How do you recognize it?
21    A. It has their case number on it and our number 32.
22    Q. I guess it's police department's Item 22?
23    A. Yes. Correct.
24    Q. Is that the knife blade?
25    A. Yes.

Page 36

1    Q. Did you perform -- take a sampling off of what was on
2 74-A and perform PCR DNA analysis?
3    A. Yes.
4    Q. Were you able to obtain a DNA profile?
5    A. Yes.
6    Q. Were you able to match the DNA profile from the knife
7 blade to anyone related to this case?
8    A. Yes.
9    Q. Who was that?
10    A. The DNA was from a female and it matched Patricia
11 Syren.
12    Q. And again, the sample that you took from 74-A, your
13 Item 32, the knife blade, has that sample been retained?
14    A. It has.
15    Q. By your lab?
16    A. It has.
17    Q. All right. And is there a sufficient sample left of
18 all of these items for anyone else to test?
19    A. Yes.
20    Q. Have you received any request from any other lab for
21 any additional testing?
22    A. No.
23    Q. Let's move to the clothing or items that were
24 retrieved from the dumpster. Are you with me?
25    A. Yes.

Page 37

1   Q. Okay. I'm going to show you State's Exhibit 124-A
2 and ask you if you recognize that.
3   A. Yes.
4   Q. How do you recognize State's Exhibit 124-A?
5   A. The case number and item No. 27 are on the collar of
6 the shirt.
7   Q. Is that something that you wrote on there?
8   A. It is.
9   Q. And that is your Item 27?
10   A. Correct.
11   Q. Okay. Now, did you perform some DNA PCR analysis on
12 State's Exhibit 124-A, the denim shirt?
13   A. Yes.
14   Q. And did you -- how did you go about selecting where
15 you were going to test?
16   A. Again, first it was examined for the presence of
17 blood. There were multiple bloodstains on the front of that
18 shirt, so I selected several different areas. I took stains
19 that were small in nature that may be from a spatter, also
20 larger stains that may be transfer type of blood. So several
21 areas of stains were tested.
22   Q. All right. And when you test multiple areas on a
23 single item, how do you differentiate those different areas?
24   A. The way I have differentiated in this case is test
25 areas. Test area 1, 2, 3, 26, 27, T-1 through T-3.

Page 38

1 And those stains were all -- two of them were on the bottom of
2 the right tail of the shirt, and the others near the front
3 right pocket.
4   Q. And do you take notes and draw diagrams in your notes
5 to indicate where specifically say 27 Test Area 1 and 27
6 Test Area 5 is?
7   A. Yes.
8   Q. Were you able to -- using the DNA PCR analysis able
9 to obtain a DNA profile for Test Areas 27-T1, 27-T2, and 27-T3?
10   A. Yes.
11   Q. Did the DNA profile that you retrieved from these
12 particular sites on the denim shirt match anybody involved in
13 this case?
14   A. Yes. Those three different areas were male DNA, and
15 they matched Billy Crutsinger.
16   Q. All right. As far as 27-T4, Test Site 4, were you
17 able to obtain a DNA profile from that site?
18   A. Yes.
19   Q. And did it match anybody involved in this case?
20   A. Yes. The DNA was only female from that particular
21 area, and it was consistent with a mixture of DNA from Patricia
22 and Pearl.
23   Q. So if multiple people are donating blood to a single
24 site, can you separate out the profile of each person?
25   A. That's a possibility. Oftentimes with an exclusively

Page 39

1 more prevalent amount, you are going to get additional peaks,
2 and there's normally going to be one peak or two peaks
3 representing from each parent.
4     If you have more than two, certainly at
5 different loci, it indicates you have more than one
6 contributor, and that was the case here.
7   Q. As far as 27 Test Area 5, were you able to obtain a
8 DNA profile from that particular area?
9   A. Yes. That area was swabbing from the collar of that
10 shirt, and I was able to extract some male DNA and female DNA;
11 and at all 13 loci that were tested, there were alleles and
12 types that were consistent with Billy Crutsinger.
13     There were minor alleles at four loci that were
14 consistent with Pat, and one minor allele that was not
15 consistent with any of the three at one loci.
16   Q. You say not consistent with anybody?
17   A. Of the three, Pat, Pearl or Billy Crutsinger.
18   Q. Can people leave their DNA on clothing just by
19 wearing it?
20   A. Certainly.
21   Q. If there was clothing that's shared amongst people or
22 that's left laying where other people are, is it possible for
23 other people's DNA --
24   A. DNA is in all of our nucleated cells, so any skin
25 contact, there will be a possibility of it being shared.

Page 40

1   Q. You said Test Area 5 was from the collar?
2   A. It was a swabbing from the collar of that shirt.
3   Q. And you said it was not necessarily blood?
4   A. Correct.
5   Q. Let me show you State's 125-A and its contents and
6 ask you to look at that and see if you recognize 125-A.
7   A. (Witness complies) Yes. It is our Item No. 30 with
8 the same lab number, 0303339.
9   Q. Are those the pair of bluejean shorts?
10   A. They are.
11   Q. Did you as well test a number of areas on the blue-
12 jean shorts?
13   A. Yes.
14   Q. And, in fact, there is a listing up here, 30-T1,
15 30-T2, 32-T3, 32-T4 and 30-T6.
16   A. Correct.
17   Q. Were you able to obtain, using DNA PCR analysis, DNA
18 profiles on each of those test areas?
19   A. Yes.
20   Q. Did any of the DNA profiles obtained match anyone
21 involved in this case?
22   A. Yes.
23   Q. For 30-T1 Test Area 1, what profile did that match?
24   A. 30-T1 was actually a stain from the pocket -- the
25 right pocket area, and it was a male and female DNA and it was

Page 41

1 consistent with all three contributors, Pearl, Pat and Billy.
2 At one locus, the 18 locus, was inconclusive.
3    Q. 30 Test Area 2?
4    A. 30-T2 it was a stain again from that same pocket area
5 on the opposite side of that pocket, and we had at least two
6 contributors at all 13 loci stains.  The alleles were
7 consistent with Billy, and there were additional minor alleles
8 at other loci that were inconclusive.
9    Q. 30 Test Area 3?
10   A. That was a stain from just below the crotch area of
11 those jeans, and that was male DNA that matches Billy
12 Crutsinger.
13   Q. 30-T4?
14   A. That was DNA at the lower left leg, and that was male
15 DNA that matches Billy Crutsinger.
16   Q. And when you say matches, does that mean that it is a
17 DNA profile match that exactly matches the DNA profile match
18 you got from the buccal swabs?
19   A. Correct.
20   Q. 30 Test Area 6?
21   A. That stain was on the lower right leg, again male DNA
22 that matches Billy Crutsinger.
23   Q. The samples that you used for testing purposes for
24 each one of these items, your item 27 and 30, have those been
25 retained?

Page 42

1    A. They have.
2    Q. Is there a sufficient remainder for someone else to
3 do testing if they so chose?
4    A. Yes.
5    Q. Have you received any request from any other lab
6 asking to test any of those items?
7    A. No.
8    Q. I'm showing you State's Exhibit 129-B.  Do you
9 recognize that?
10   A. Yes.
11   Q. And how do you recognize it?
12   A. Again, our crime lab number 0303339 is on there, and
13 it is Item No. 25.8 -- I'm sorry, it's .19.
14   Q. So the seat belt is 25.19?
15   A. Correct.
16   Q. That's your number, and it is our 129-B?
17   A. Correct.
18   Q. And it is the police department No. 19.
19   A. Correct.
20   Q. Were you able to take any type of sampling from any
21 stains that were on 129-B, your 25.19?
22   A. Yes.
23   Q. How did you do that?
24   A. On the fabric portion of the stain -- marked with
25 arrows, there are stains on this seat belt that were cut out

Page 43

1 and retained and tested.
2    Q. Did you use the DNA PCR method for testing?
3    A. Yes.
4    Q. Were you able to obtain any type of DNA profile from
5 the sample you took from State's 129-B?
6    A. Yes.
7    Q. The DNA profile that you obtained, did it match
8 anyone involved with this case?
9    A. Yes.
10   Q. And whose profile came up?
11   A. It was a male DNA profile that matched Billy
12 Crutsinger.
13   Q. All right.  State's Exhibit 129-E that's in front of
14 you -- were there blood swabs contained in that?
15   A. There was a swab, yes.
16   Q. Did you perform DNA PCR testing on that?
17   A. Yes.
18   Q. Did you obtain a profile?
19   A. Yes.
20   Q. Whose profile did you obtain?
21   A. A male DNA profile matching Billy Crutsinger.
22   Q. Did you retain these samples in your lab?
23   A. Yes.
24   Q. And was there a sufficient remainder of that sample
25 for further testing if it had been requested?

Page 44

1    A. Yes.
2    Q. Was there any requested testing by any other lab for
3 these samples?
4    A. No.
5    Q. Did you also receive into your lab the clothing that
6 accompanied Pearl Magouirk and Patricia Syren to the ME's
7 office?
8    A. Yes.
9    Q. And did you have an opportunity to examine that
10 clothing?
11   A. Yes.
12   Q. Did you have an opportunity to perform DNA PCR
13 testing on areas of that clothing?
14   A. Yes.
15   Q. That clothing is present here today in court, is it
16 not?
17   A. Yes.
18   Q. And you have had an opportunity to -- prior to coming
19 into court, to take a look at the bags those clothes are
20 contained in.
21   A. Yes.
22   Q. Is it practical for us to remove the clothing from
23 the bags?
24   A. No.
25   Q. And tell us why not.

Page 45

1 A. They are extremely blood-soaked. It would be a
2 biohazard; and to maintain the integrity of the evidence
3 itself, it should not be opened.
4 Q. If they were to be opened, are there certain items
5 that all of us in this room would probably need to put on and
6 wear?
7 A. Well, certainly gloves and probably some kind of mask
8 would be ideal.
9 Q. Okay. Did you receive -- what specific items of
10 clothing did you receive regarding Patricia Syren?
11 A. For Patricia I received a pair of shorts, blue
12 shorts, and a gray T-shirt.
13 Q. And on the blue shorts, did you perform DNA PCR
14 testing on any areas of the blue shorts?
15 A. Yes, I did.
16 Q. On how many areas did you do testing?
17 A. On the back of those shorts, I took two different
18 stains. One was a little bit larger than the other one.
19 Q. And would those be referenced in your report as
20 19.1T1?
21 A. Correct.
22 Q. And 19.1T2?
23 A. Correct.
24 Q. Were you able to obtain a DNA profile with regard to
25 19.1T1?

Page 46

1 A. Yes.
2 Q. Was the profile the profile of anyone involved in
3 this case?
4 A. Yes.
5 Q. And which person?
6 A. That DNA profile was male DNA, and it was Billy
7 Crutsinger.
8 Q. It was located where again?
9 A. It was located on the back of the shorts in the
10 middle area.
11 Q. In the buttocks area?
12 A. Correct.
13 Q. As far as 19.1T2, were you able to obtain a DNA
14 profile using the DNA PCR method on this area?
15 A. Yes.
16 Q. The DNA profile that you obtained, was it the same
17 DNA profile that belonged to someone in this case?
18 A. Yes.
19 Q. Who would that be?
20 A. That is female DNA that matched Patricia.
21 Q. Syren?
22 A. Correct.
23 Q. The light blue T-shirt, did you test an area
24 referenced as 19.2T1?
25 A. Yes.

Page 47

1 Q. And were you able to obtain a DNA profile using the
2 DNA PCR method?
3 A. Yes.
4 Q. The DNA profile that you obtained, did it match the
5 profile of anyone involved with this case?
6 A. Yes.
7 Q. Whose?
8 A. In the middle of the back area there was a stain that
9 matched Billy Crutsinger. It was male DNA.
10 Q. All right. And the testing areas that you used to
11 perform your test, is there a remainder left sufficient for
12 someone else to do testing if they so requested?
13 A. Yes.
14 Q. Did you receive any request by any lab to do any
15 additional testing on any of those items?
16 A. No.
17 Q. Going to the clothing worn by Pearl Magouirk, did you
18 have an opportunity to look at a pair of jeans and white top?
19 A. Yes.
20 Q. Were you able to perform DNA PCR testing on areas of
21 those jeans and white top?
22 A. Yes.
23 Q. Specifically with regard to Pearl Magouirk's jeans,
24 was there a site area designated by you in your report as
25 19.1T1?

Page 48

1 A. Yes.
2 Q. And again, each one of these individual ladies has
3 her own case number.
4 A. That's correct.
5 Q. Were you able to obtain a profile of DNA from 19.1T1?
6 A. Yes.
7 Q. And the profile that you obtained from Pearl
8 Magouirk's jeans, was it the same profile as anyone else
9 involved in this case?
10 A. Yes.
11 Q. And whose profile was it?
12 A. This DNA was obtained from the left pocket area, one
13 specific area, and that was male DNA and it matched Billy
14 Crutsinger.
15 Q. That would have been on the front?
16 A. It was actually on the side right near the pocket.
17 Q. In regards to Pearl Magouirk's white top, you
18 designated that as 19.3?
19 A. Correct.
20 Q. Did you test an area that you have designated as
21 19.3T1?
22 A. Yes.
23 Q. Were you able to obtain a DNA profile using the DNA
24 PCR method?
25 A. Yes.

CondenseIt™

1  Q. And the profile that you obtained at 19.3T1, was it
2 the same profile that belongs to anyone else involved in this
3 case?
4  A. Yes.
5  Q. And to whom did that belong?
6  A. Again, it was another very small stain. It was
7 female DNA, and it matched Patricia Syren.
8  Q. And again, the samples that you tested in regards to
9 Pearl Magouirk's clothing, the jeans, the white top, those
10 specific test areas, have those samples been retained?
11  A. Yes.
12  Q. Is there a sufficient quantity left over if anyone
13 else wanted to test those items?
14  A. Yes.
15  Q. Have you received any request from any lab for
16 retesting those items?
17  A. No.
18  Q. If somebody involved in a criminal case where there
19 has been DNA testing done -- if any other party would like to
20 have their own testing done, is that possible to accommodate
21 them?
22  A. Yes.
23  Q. Has that been done in the past?
24  A. Yes.
25  Q. Is it possible for you to make some statistical

1 calculations based upon the results of DNA testing in a
2 forensic DNA case?
3  A. Yes.
4  Q. And what specifically are those statistics? What do
5 they have to do with?
6  A. Once you determine that a sample is a match to a
7 particular individual, then the next question becomes how
8 common or rare is that DNA profile that you have on that
9 evidence sample.
10    And so the way that we determine that, there are
11 compiled databases of the common racial groups in this region.
12 And we're talking about Caucasians, African-Americans and
13 Southwest Hispanics. We look at what the commonality is of
14 that profile in each of the three racial groups of the area.
15  Q. And is it possible for you to take the results in a
16 particular case and make statistical calculations in regard to
17 the general population?
18  A. Yes.
19  Q. How do you go about doing that?
20  A. I, once again, would compare that to the three common
21 racial groups in this area. We have a database in which each
22 of the common real frequencies is determined, and we use a
23 routine statistical way of calculating that and determine that
24 probability as an overall probability to all nine or all 13.
25  Q. And the process that you used to obtain these

1 statistics, is it the same procedure that's used in DNA cases
2 across the country and throughout the world?
3  A. Yes. We do use the FBI's database. Some
4 laboratories choose to use their own database, but we use the
5 national database.
6  Q. Were you able to compute some statistics in regards
7 to Billy Jack Crutsinger's profile in regard to the general
8 population?
9  A. Once again, we are talking about how common the
10 evidence profile is. It does happen to match Billy Crutsinger,
11 but it's based on the data that we have from the evidence.
12  Q. And the statistical result that you came up with, can
13 you tell us what those were?
14  A. Yes. The probability of selecting an unrelated
15 individual that would have the same DNA profile as that that
16 was obtained from Pearl Magouirk's jeans and Patricia Syren's
17 shorts in which 13 loci were typed, each of those stains
18 matched Billy Crutsinger, that probability is approximately 1
19 in 86 trillion in Caucasians; 1 in 1.7 quadrillion in African-
20 Americans; and 1 in 243 trillion in Southwest Hispanics.
21  Q. So what we are talking about is this is a probability
22 of DNA of Billy Jack Crutsinger matching anyone else in these
23 particular populations?
24  A. In the profile and the evidence, we did happen to
25 have 13 loci that matched Billy.

1  Q. And those were very large numbers?
2  A. Absolutely.
3      MS. HARTMANN: May I approach the easel?
4      THE COURT: Yes.
5  Q. And your statistics again for the Caucasian?
6  A. It is one in 86 trillion.
7  Q. Okay. Can you tell me how many zeros that is?
8  A. That's 86 and 12 zeros.
9  Q. I'm sorry?
10  A. 12 zeros.
11  Q. And in the African-American?
12  A. It is 1.7 quadrillion, and that's 14 zeros.
13  Q. And the Southwest Hispanic?
14  A. In Southwest Hispanics it is 243 trillion. That's 12
15 zeros.
16  Q. And is that more in each case than the population on
17 the earth?
18  A. Yes, many times more. It is usually estimated to be
19 between 6 and 7 billion.
20  Q. All right. And as far as the percentage of people
21 being excluded as possible contributors, what is that number?
22  A. This is just a probability if given the alleles so
23 that any type of single source sample is not calculated, but it
24 is greater than 99.99 percent.
25  Q. Can you explain what that means?

Page 53

1   A. Well, bottom line is it is an extremely rare profile;
2 and to a reasonable degree of scientific certainty, he's the
3 contributor of that sample.
4       MS. HARTMANN: We pass the witness. Thank you.
5           CROSS-EXAMINATION
6 BY MR. RAY:
7   Q. How are you doing?
8   A. I'm fine.
9   Q. Did you bring your notes with you?
10  A. I did.
11  Q. Have you reviewed those notes before you testified
12 today?
13  A. Certainly.
14  Q. Did you review them while you are testifying?
15  A. Yes.
16  Q. Looks like they are sitting up there in front of you?
17  A. Yes.
18  Q. Could I see a copy of your notes?
19  A. Certainly.
20  Q. I have got two envelopes. Is this part of them too?
21  A. Yes. That's Pearl's case number.
22  Q. These are all stapled together. Is they not, some of
23 them are?
24  A. Some are.
25      MR. RAY: Mr. Court Reporter, I need a sticker,

Page 54

1 please.
2   Q. I'm showing you what I just marked as Defense
3 Exhibit 3 and ask you if that is your complete case file and
4 notes and personal writings and that sort of thing.
5   A. Yes.
6   Q. I noticed there was something in the back of it here
7 that's in an envelope. Is that photographs or something else?
8 And a CD.
9   A. Yes. There are some photographs, and the CD and this
10 is the data CD also.
11      MR. RAY: Judge --
12  Q. First of all, you reviewed these notes prior to
13 testifying.
14  A. Yes.
15  Q. And you have reviewed them during your testimony
16 today?
17  A. Yes.
18  Q. And all of your notes relate to the subject matter
19 that you have been talking about.
20  A. Correct.
21      MR. RAY: Your Honor, I would offer Defendant's
22 Exhibit 3. I don't necessarily have to have the CDs. We can
23 delete that from it. I'd like to make a copy at a future time
24 like when we're on a break or something. It's pretty thick and
25 it's got a lot of staples in it.

Page 55

1       MS. HARTMANN: The State doesn't have any
2 objection as long as Ms. Van Winkle can retain her originals.
3       MR. RAY: That's fine. I will make copies
4 during the break.
5       (Defendant's Exhibit No, 3 received)
6       THE WITNESS: May I watch the copying also?
7       MR. RAY: Yes.
8       THE WITNESS: In other words, I have to maintain
9 custody of those.
10      MR. RAY: Sure. When we take a break, I'll copy
11 them.
12      THE WITNESS: That's fine.
13      MR. RAY: I am going to give you your notes
14 back.
15  Q. You are a member of a scientific community. I mean
16 there is a scientific community that publishes and has certain
17 criteria as far as your quality control and that sort of stuff?
18  A. Yes.
19  Q. One of the first things you said, you were talking
20 about a peer review; is that right?
21  A. That's correct.
22  Q. Tell me what that is.
23  A. A peer review is, once again, reviewing the whole
24 case file notes, actually fully reviewing the computer data and
25 that the person that does the peer review is another qualified

Page 56

1 DNA analyst. It's also a case-working analyst.
2   Q. Do you from time to time peer review each other's
3 stuff? Sometimes you peer review that person's; sometimes they
4 review yours?
5   A. Certainly.
6   Q. Who did that in your case?
7   A. In this case was Connie Patton.
8   Q. And she has basically the same job you do at the
9 Medical Examiner's Office; is that right?
10  A. Similar, yes.
11  Q. And did you -- did you talk to Ms. Patton about your
12 peer review in this case, or did you just say, "Here are my
13 notes; look at it"?
14  A. What the normal procedure is is that once the report
15 is written, then that form is filled out concerning the peer-
16 review data, and she peer reviews it. There is normally no
17 conversation.
18  Q. In this particular case is that what happened?
19  A. Yes.
20  Q. Okay. In other words, what I am trying to get to,
21 Ms. Van Winkle, is you got all your notes and data and the
22 stuff that you have there, and you left it with Ms. Patton or
23 sent it to her; and she reviewed it and she signed off on that
24 little peer-review form. Is that right?
25  A. Well, once again, it's retained in the laboratory;

1 it doesn't go elsewhere.

2   Q. I understand, but y'all work in the same lab, right?

3   A. Correct.

4   Q. Back to my question. You didn't talk to her about
5 her peer review in this case, did you? Did y'all have any
6 conversations that you remember?

7   A. I don't have any recollection of any specific
8 conversations.

9   Q. She didn't come back to you and say, "Hey, I have a
10 question about this" or that sort of thing?

11   A. That does happen on occasion. I just don't recall if
12 that happened or not.

13   Q. Would you agree with me there is nothing in your
14 notes that indicates that happened in this case?

15   A. That's correct.

16   Q. Okay. And you used a couple of terms, and I want to
17 kind of make sure that everyone understands what these terms
18 mean in your report. You made some findings of the presumptive
19 tests.

20   A. That's correct.

21   Q. What do you mean by that? What does presumptive mean
22 in your business?

23   A. Presumptive testing is normally done after an item is
24 looked at visually and to ascertain particular areas that have
25 the appearance of blood. Some of the testing in this case we

1 are talking about bloodstains.

2       So once we have items that have the appearance
3 of blood, we use a chemical reagent that reacts very strongly
4 with even a weak dilution of blood to get a reaction.

5       Now, presumptive testing also means that it is
6 not confirmatory for blood; however, a few other things that
7 will test positive, such as perhaps rust, don't have the
8 appearance of blood. So even though they may react faintly
9 with this reagent, they don't have that appearance.

10   Q. Well, you did some presumptive testing in this case,
11 right?

12   A. Yes, that's correct.

13   Q. And you also went further to do a positive or a
14 conclusive test on some of what you tested for presumptive
15 testing.

16   A. Yes. Absolutely. There was additional testing to
17 determine, first of all, if the blood is of human origin; and
18 that's an additional type testing. That was done on some
19 samples in this case.

20   Q. If you have a presumptive test, just for example,
21 that's presumptive blood, does that tell you whether it is
22 human or dog blood?

23   A. No. However, if you do DNA, then you will get human
24 DNA detected.

25   Q. Well, you can get a masking effect, can you not? In

1 other words, if my blood and my sweat or my cheek cells or my
2 skin cells are all mixed together, you would get a match -- you
3 would get a DNA result from all those things, correct?

4   A. It is certainly possible; however, in this case all
5 the bloodstains were very concentrated, so I don't anticipate
6 that happened whatsoever, and there were no mixture samples in
7 the particular area that would indicate that happened.

8   Q. Well, I understand that, but what I'm getting at is
9 you did some presumptive testing for blood and those things
10 tested positive, correct?

11   A. That's correct.

12   Q. And then you did another test to determine if certain
13 things were conclusive, correct?

14   A. The second test determined that there was human
15 hemoglobin in those stains, yes.

16   Q. All right. And are you telling us that on the things
17 that you didn't do that conclusive test, you can't
18 absolutely say that is human blood on the stains?

19   A. No, it's the presumptive tests that were run.

20   Q. And specifically the knife that Ms. Hartmann was
21 talking about, Item 32, that's one of the things that you did
22 not do a conclusive test to determine if there was, in fact,
23 human blood.

24   A. Once again there was human DNA detected, and it
25 reacted with a subject test.

1   Q. I understand that.

2   A. Now --

3   Q. My question --

4       MS. HARTMANN: Excuse me. I'm going to object
5 to counsel not letting the witness finish her answer.

6       THE COURT: Overruled.

7   Q. My question is: Did you conclusively establish that
8 there was human blood on the knife?

9   A. There was no test for human hemoglobin on that
10 sample, correct.

11   Q. Were there any other items that would have that same
12 answer? In other words, were there some things that you did a
13 presumptive test that you later determined were blood that you
14 didn't do this conclusive test? Where there some other things?

15   A. There were other items that weren't tested for the
16 presence of human hemoglobin, yes.

17   Q. And the same answer would apply to them, that you
18 can't affirmatively say it was, in fact, human blood.

19   A. The test was not done, yes, that's correct.

20   Q. Now, there are -- you call them loci; is that right?

21   A. Correct.

22   Q. Tell the jury how you arrive at these astronomical
23 numbers kind of in layman's terms. I mean, you have 13 loci,
24 correct?

25   A. Correct.

1  Q.  Okay.  And if I match a sample at one loci, what does
2 that tell you?

3  A.  We typed in this case 9 or 13, and for each sample
4 that was typed, all 9 were typed or 13 were typed.  So at each
5 loci you are going to have one particular type whether it be a
6 single peak of type or what's called a heterozygous type where
7 you would have two alleles.

8  Q.  Well, maybe I didn't ask the question correctly.  If
9 you have a match at one loci with a sample, that doesn't tell
10 you a whole lot in and of itself, does it?

11  A.  That's correct.  You look at the overall profile.

12  Q.  And so if you had a match at two, then you'd have a
13 little greater probability, right?

14  A.  Correct.

15  Q.  And where you get these astronomical numbers is when
16 you have a match at 10, 11, 12 or all of them.

17  A.  That's correct.

18  Q.  In fact, correct me if I'm wrong, but the DNA profile
19 of everyone who has ever lived on the earth is exactly the same
20 except for a very small part of the DNA; is that correct?

21  A.  Right.  Percentagewise of the DNA it is a small part,
22 yes.

23  Q.  And these particular loci that you are checking, they
24 are parts of a person's DNA that don't control our hair color
25 or our eye color or -- I guess one of them is a notice of sex,

1 but other than that, how long our toes are, that sort of thing
2 that's not what these things all tell; is that correct?

3  A.  That's correct.

4  Q.  So the fact I'm a No. 28 and you're a No. 29, that
5 doesn't really mean anything --

6  A.  No.

7  Q.  -- other than we are different?

8  A.  Correct.

9  Q.  Now, when you start comparing people's numbers -- and
10 first of all, you inherit -- most people have at a particular
11 loci -- well, actually all people -- will have two numbers,
12 correct?

13  A.  No.  It will have either one or two.  If you inherit
14 the same one from each parent, it will be one.

15  Q.  You get one from your mom, one from your dad.  If
16 they are the same, you have one; if they are different, you
17 have two.

18  A.  Correct.

19  Q.  So when you look down in 13 places, there are a lot
20 of people that have maybe similar DNA at one place to another
21 person, but nobody has the same -- the uniqueness of all 13.
22 Is that what you are telling us?

23  A.  Other than an identical twin or triplet.

24  Q.  People who are children would have a very similar DNA
25 to their parents, correct?

1  A.  Certainly at each locus they are going to have half
2 of their DNA, yes.

3  Q.  You can tell from looking at Patricia Syren and Pearl
4 Magouirk that there is a pretty good chance they're related
5 because they have similar DNA, correct?

6  A.  Yes, that's correct.

7  Q.  In fact, at least one of Ms. Magouirk's numbers shows
8 up in every case as it relates to Ms. Syren's.

9  A.  Again, half of her DNA is in Ms. Syren's.

10  Q.  What that means is Ms. Magouirk was Ms. Syren's
11 mother.

12  A.  Yes, correct.

13  Q.  And Ms. Syren got a different number from her father.

14  A.  Correct.

15  Q.  Does that affect any of your statistical stuff in
16 that their DNA is at least similar halfway through?

17  A.  Once again, you won't be able to ascertain.  If you
18 do have a mixture, there will only be possibly three peaks
19 rather than a possibility of four.

20  Q.  Let me ask you this.  When you start comparing these
21 DNA's -- or these samples -- when you start comparing them, if
22 you have a person who is consistent at one but they don't match
23 at the other, what does that tell you?

24  A.  If it is a secal source sample, then that means it
25 wasn't a contributor of that sample.

1  Q.  Okay.  What if you have a person that matches in two
2 or three places but they don't match in as few as one place?
3 What does that tell you?

4  A.  Again, if you have a single-source sample, it's
5 possible to have a mutation.  Again, if the sample is a
6 different -- say you are using buccal sample and a blood
7 sample, that's a possibility to still be a match.

8  Q.  But what I'm getting at is the term "inconclusive" --
9 tell me what you mean by inconclusive in regards to whether or
10 not it is an actual match or not.

11  A.  There are several ways it can be considered
12 inconclusive.  For instance, the longest loci that we type for
13 is in the 300 to 400 base-pair range.  Given that it is longer
14 DNA, if you have a sample that has some amount of degradation,
15 then you may lose some information that you have at that loci,
16 so it may be inconclusive.

17  But just the loci alleles may be very low in
18 peak height, and when they are so low in peak height, there is
19 a possibility that you can get a dropout at another possible
20 allele.  So you may not be able to use it as an exclusion, but
21 it -- that data may not be useful to you.

22  Q.  I want you to look at what I have got up here on the
23 screen and I want you to check your notes.  I want you to look
24 at the profile that you generated for Billy Crutsinger, Pearl
25 Magouirk and Pat Syren.  And I'm going to ask you if what I

1 have got up here is the same as what you have got.

2      It is kind of off the page here. This is Billy
3 Jack, this is Pat Syren and this is Ms. Pearl Magouirk. Can
4 you see that all right?

5    A. Yes.

6      MR. RAY: Can I inquire if the jury can see
7 those? I'll make them a little bigger.

8      (Pause in the proceedings)

9      MR. RAY: And now can I inquire if the jury can
10 see those?

11      (Pause in the proceedings)

12    Q. Are they the same?

13    A. It will take me a few more moments --

14    Q. I'm sorry. Go ahead and take your time. I can move
15 it down.

16      (Pause in the proceedings)

17    Q. Are they all correct?

18    A. Yes.

19    Q. The a-m-e-l, that's the sexual one, correct?

20    A. Correct.

21    Q. And if you have got an XY, that means you're a male;
22 and if you have an X, that means you are a female, right?

23    A. Correct.

24    Q. And what I was asking you a minute ago, if you
25 compare the bottom two lines, which are Ms. Syren and Ms.

1 Magouirk, one can see that Ms. Syren, which is the middle in
2 each row, she has one of Ms. Magouirk's in every one of her.

3    A. That is correct, as you would expect.

4    Q. Okay. Now, let me ask you this first of all.

5      MR. RAY: Can I approach the witness?

6      THE COURT: Yes.

7    Q. All these results from Billy Jack -- you don't know
8 him, do you? This is Billy Jack sitting over here.

9    A. No.

10    Q. You didn't know him before you came in here, right?

11    A. No.

12    Q. These two envelopes, State's Exhibit 134 and 136, you
13 took the Q-tips out of there and you typed them, right?

14    A. A portion of one of the swabs --

15    Q. I didn't mean to be misleading. You got a DNA
16 profile for both of these, correct?

17    A. Correct.

18    Q. They were the same, were they not?

19    A. Correct.

20    Q. You don't know where they came from, do you?

21    A. I have no direct knowledge, no.

22    Q. Okay. And why is it that you don't seal these things
23 up when you are a police officer or a person until you get over
24 to the Medical Examiner's Office? Why do people do that?

25      MS. HARTMANN: I'm going to object to

1 speculation.

2      THE COURT: Sustained

3 BY MR. RAY:

4    Q. Is that a proper procedure, to seal these things up
5 at some time after you obtain the sample?

6    A. Well, certainly if they have been in your custody the
7 whole time, there is a possibility that they may not be sealed.

8    Q. Would you do that in your business, leave something
9 unsealed for a while if you went and took a sample from
10 someone?

11    A. Once again, if you're taking samples, oftentimes you
12 have to have an air dryer, so until they dry, they are not
13 going to be sealed, so that's not unusual.

14    Q. All right. It comes down, though, to the fact
15 that -- and first of all, the credibility of the person of
16 doing it; but also the person could make a mistake, or
17 something else could get in there; is that right?

18    A. I think it's possible.

19    Q. Now, I want to look at a page from your -- we'll come
20 back to this.

21      I want to look at the Item 27T5, and I think
22 the number you had on it was 2450. Do you want to refer to
23 your notes there?

24    A. (Witness complies)

25    Q. Are you looking at it?

1    A. Yes.

2    Q. And I -- I may have to read these off. This is 27T5,
3 and the collar that was inside of it, correct?

4    A. That's correct.

5    Q. That corresponds to the note that you are looking at,
6 right?

7    A. That's correct.

8    Q. Now, when you look, just as for an example, the VWA,
9 you got a result at the collar of 14, 17 and a 19, correct?

10    A. Correct.

11    Q. Okay. Now, what do those little stars mean? I have
12 it got off the page there.

13    A. Once again, they are peaks that are very low in peak
14 height, and so some of that -- actually that sample was
15 reinjected at some point.

16    Q. When you say "reinjected," what do you mean?

17    A. In other words, another portion was taken and
18 reinjected as far as analysis procedure.

19    Q. Now, if my DNA or someone's DNA is not a 14, a 17 or
20 a 19, then I am excluded at this loci, correct?

21    A. No, the 16 is a major contributor of that, so --

22    Q. Do I understand you to say that this is actually two
23 rows that really mean one?

24    A. Actually, yes, that's correct. Now, again, those
25 items in parenthesis are very, very minor alleles, and the peak

1 heights are very, very low. And again, a process can happen
2 where you get allele dropout at those particular loci. Those,
3 again, may be considered inconclusive.
4    Q. Let me ask you this. When you say "dropout at the
5 lower levels," is that a level that can vary depending on the
6 scientist that's evaluating?
7    A. Each laboratory certainly validates their own
8 procedures in their hands, so yes. The level in which you can
9 get that dropout has to be ascertained in each laboratory.
10    Q. Is there a scientific -- or is there an agreement in
11 the scientific community about at what level all these numbers
12 have to be at before you can call them actually the number
13 versus inconclusive or unable to determine.
14    A. No, there is no particular number. It's based on the
15 laboratory's instrumentation and validation of the system.
16    Q. Would you agree with me that in one scientific lab
17 and another scientific lab, although they might all be very
18 knowledgeable in the field of DNA, they might come to a
19 different result as to what is conclusively established between
20 the two of them?
21    A. It may be possible that they record it differently.
22 This type of sample, which is a swabbing from a collar, which
23 is a very low level Rnt DNA anyway, it clearly is a mixture of
24 DNA, so you may be limited in what you can say about it.
25    Q. Well, when you start mixing DNA, the more people's

1 DNA that you have in one particular mixture, your numbers
2 start coming way down because you can't say which number
3 belongs to which person in some cases.
4    A. That's correct.
5    Q. You start getting a mixture of four or five people,
6 that really kind of gets hard for you to tell, correct?
7    A. That's correct.
8    Q. All right. In your report -- I want you to look on
9 page 4, paragraph 3 -- first of all, you actually returned two
10 reports in this case, did you not?
11    A. That's correct.
12    Q. One on September 3 and one on July 23; is that right?
13    A. Yes. The lab did two reports also.
14    Q. Anything different about those two reports?
15    A. The reference sample is different.
16    Q. The only thing that was different, you had whichever
17 one of Billy Jack's samples came later; is that right?
18    A. Correct.
19    Q. Why did y'all do that?
20    A. It was requested to retype the sample.
21    Q. There was actually a concern from the DA's office --
22        MS. HARTMANN: Your Honor, I'm going to object
23 to relevance.
24        THE COURT: Overruled.
25        MS. HARTMANN: Speculation.

1        THE COURT: Sustained.
2    Q. Let me show you something here. Why don't you look
3 in your conversation log.
4        Have you had a chance to look at it?
5    A. Yes.
6    Q. There is a note that you wrote concerning a
7 conversation you had with Ms. Hartmann concerning there was a
8 question about whether or not the arrest was bad or illegal?
9    A. There was our conversation, yes, and new typing was
10 requested.
11    Q. That was the reason that you got a new type, the
12 Billy Jack's sample, right?
13    A. That is my understanding, yes.
14    Q. Okay. Let's go back to -- now, what I want you --
15 I'm going to read something out of this report, and I'm going
16 to ask you if I'm reading it correctly, and then I'm going to
17 ask you a question about it.
18    A. Okay.
19    Q. It says the DNA profile from the denim shirt collar,
20 which is 27T5, right?
21    A. Correct.
22    Q. It's a mixture of DNA from at least two contributors,
23 right?
24    A. Correct.
25    Q. The major DNA profile matches the DNA profile

1 obtained from Billy Crutsinger. He's item 52 in your book or
2 21, depending on which one you look at.
3    A. Correct.
4    Q. And minor DNA alleles detected at loci D3S1358, this
5 first one here; wVA; D21S11, which is the sixth one over; and
6 D13S17, which is my last one over there. Is that the
7 correct --
8    A. Correct.
9    Q. You said they were consistent with having originated
10 from Patricia Syren, correct?
11    A. Correct.
12    Q. Tell me what Patricia Syren is at VWA.
13    A. At VWA she's a 14, 16.
14    Q. Is that why she's consistent here?
15    A. Yes.
16    Q. But when you have -- and let me back up to another
17 graph right quick, and I am going to come right back to that.
18        These numbers represent peaks that you get when
19 you run this graph, correct?
20    A. Yes.
21    Q. Okay. Tell the jury what we are looking at at this
22 particular instance right here, just that 24 -- these numbers
23 right here. 14, 16, 18, 17 and 19. What does all that mean?
24    A. Those are the peaks. They're actually the allele
25 calls. In other words, the major peaks there are 16 to 18,

Page 73

1 which are Billy Crutsinger's types --

2   Q. And you have got three real low ones.

3     MS. HARTMANN: Excuse me. I'm going to object

4 to counsel not letting the witness finish her answer.

5     MR. RAY: I'm sorry.

6     THE COURT: Sustained.

7   Q. Go ahead and finish your answer.

8   A. And the minor peaks are at 14, 17 and 19. Now, the

9 17 and 19 are both in what's called stutter positions, so it

10 may be explainable as simply being a typing that -- possible

11 typing that's obtained in that sample. We don't know if it is

12 a true typing or if it's really what's called stutter which we

13 see in this type of testing.

14   Q. That comes back to where are you going to draw the

15 line for this, right?

16   A. Well, no. In the case of a mixture sample, since

17 stutter is a given and it is also very low in peak height, it

18 may be present and you may not able to be ever ascertain

19 whether it's stutter or if it's another contributor.

20   Q. Well, if it's another contributor and Patricia Syren

21 is 14 and a 16 -- and that's the same graph that we were

22 talking about a minute ago, right?

23   A. That's correct.

24   Q. Can you say for certain that Patricia Syren is

25 included in that particular graph and those levels?

Page 74

1   A. Well, again, certainly her allele 14 is there and 16

2 is there. But nowhere -- at that particular locus, we cannot

3 say that she is not there.

4   Q. But you can't say she is either other than she's

5 consistent.

6   A. Well, you cannot say she's not there.

7   Q. But you can't say she is --

8   A. She could be.

9   Q. She could be, but you're not saying --

10   A. That's correct.

11   Q. Okay. And that comes back to when you say consistent

12 with, that just means it's a possibility.

13   A. That's correct.

14   Q. You have the same situation at -- look at D3, that

15 first one. What is Patricia Syren at D3?

16   A. At D3 she's a 14, 15, and the major type is 16, 17;

17 and it says Billy Crutsinger --

18   Q. Might be there, might not though. Same set of --

19 same question, right?

20   A. No. We need to look at the data to ascertain that.

21   Q. Okay. That would be that graph right there. Is that

22 it right there?

23   A. Yes.

24   Q. What does that tell you?

25   A. Again, the minor contributors are 14, 15. The actual

Page 75

1 15 allele is in what's called a stutter position, which is four

2 base pairs prior to the 16, and once again, she cannot be

3 excluded as being there. She's a 14, 15.

4   Q. Let me ask you this. Over on the next one over,

5 which was the VWA, does it make sense that your level at 16 is

6 higher than 18 since Patricia Syren could have contributed to

7 the 16 as well?

8   A. Right. Again, if she's a 14, 16, normally those peak

9 heights, say from a 16, 18 contributor such as Billy

10 Crutsinger, are going to be more equivalent in peak heights.

11 But if you have an additional contributor, the 16 also -- 16 is

12 going to be higher peak height, which is what we have.

13   Q. In other words, if you have just one sample, I take

14 my blood and I type it, my two peaks, assuming I have two at

15 each loci, they are going the same all the way across the

16 board, right?

17   A. Roughly, at least 60 and 70 percent, yes.

18   Q. And what this tells you at this level, which is VWA,

19 is looks like somebody with maybe one of these minor spots,

20 either 15, 17 or 19 -- or maybe 15 if that's what that is,

21 might have had 16 --

22   A. It's possible, yes.

23   Q. That theory doesn't hold true over here when you

24 figure Patricia Syren into it, because she's a 14, 15 at D3,

25 right?

Page 76

1   A. Right. Again the 15 is a little higher peak height

2 which could be contributing from the stutter.

3   Q. But your 16 is higher than your 17.

4   A. Right, and that's well within the percentage. It

5 should be 60 to 70 percent, and that's well within that

6 percentage.

7   Q. Okay. Now, lastly, on your -- on your peer review --

8 why do you do peer reviews?

9   A. Again, it is a review from the administration

10 standpoint for typographical errors and also for a consistency

11 in reporting, an agreement in the way the data is recorded.

12   Q. But -- I mean, Ms. Patton doesn't just look to see if

13 you made a typographical error; she's looking to see if your

14 results came up right --

15   A. Yes, and reanalysis, yes.

16   Q. I'm going to show you one of your peer reviews. You

17 actually -- we have got a peer review here from July 23. Can

18 you read that okay?

19   A. Yes.

20   Q. Is that all right?

21   A. Yes.

22   Q. Okay. And Ms. Patton signed it down at the bottom of

23 the sheet. I just don't have it up there, correct?

24   A. Correct.

25   Q. Indicating that all of your results and all of your

1 worksheets and all of your conclusions are totally supported
2 and you did everything right basically --
3     A. Once again, each of those questions addresses an area
4 that is examined in the peer review.
5     Q. One of these things on here talks about just getting
6 all your I's dotted and your T's crossed, right?
7            Right here, No. 6. Can you see that all right?
8 This is just another peer review, correct?
9     A. Yes.
10     Q. And this one is actually dated -- that's September 8
11 of this year, right?
12     A. I'll take your word for it. I don't see a date on
13 it. I have one similar.
14     Q. Look here at No. 6. It says there is a case number
15 and analyst's initial on all pages. Why do y'all do that?
16     A. Once again, that's a quality-control measure that
17 every document we have in our file is initialed and has the
18 case number on it.
19     Q. But why is that important?
20     A. Well, again, so that a particular page, whatever it
21 may be, is associated with that case file.
22     Q. What happens if you don't have peer review? What
23 would that do to the validity of your results?
24     A. Everything we do is peer reviewed.
25     Q. Well, but if you didn't have a peer review -- would

1 you have a problem if another lab didn't do a peer review?
2     A. Absolutely.
3     Q. You would have a problem with another lab that didn't
4 do a peer review right, right?
5     A. Yes.
6     Q. Now, back to my question about the case number and
7 initials, where does the case number go?
8     A. It can go in different areas of the page.
9     Q. In some of your pages, like the one we have here,
10 there is actually a place for a crime lab number, and you wrote
11 that number, right?
12     A. Correct.
13     Q. There is a place for the primary analyst and the
14 reviewer, which is what you have got on this one.
15     A. Correct.
16     Q. Right at the top where it says "primary analyst"
17 where it says "CVW," that's you, right?
18     A. Yes.
19     Q. And then "CP," y'all have got almost the same
20 handwriting, that's Connie or Constance Patton, right?
21     A. Yes.
22     Q. And where do you put your initials on these pages?
23     A. In different locations.
24     Q. I want to ask you if typically you put them -- this
25 is a part of your file -- right up there in the top right-hand

1 corner, your case number, the date you did this and your
2 initials, right?
3     A. Yes.
4     Q. Okay. That's what you are supposed to do, right?
5     A. Well, again, they may be in different areas, but,
6 yes.
7     Q. Let's look at another one here. Same thing there on
8 another one of your results. Right up there in the very middle
9 where my little arrow is, you have got your initials, right?
10     A. Yes.
11     Q. This is a chain-of-custody form. Do you recognize
12 that?
13     A. Yes.
14     Q. Where are your initials there?
15     A. In two different places. Down at the bottom where it
16 is "received by" and then also at the top.
17     Q. Okay. Why would -- what is the importance of Ms.
18 Patton looking at your initials, looking to see if your
19 initials are there?
20     A. Well, once again, it is a quality-control process.
21 In other words, each page is initialed, so that's just
22 something that is reviewed for integrity of that case file.
23     Q. Would it make sense that if Ms. Patton saw one of
24 these pages as she was reviewing it and maybe your initials
25 weren't on there, she might say, "Hey, Carolyn, you didn't

1 initial this page"?
2     A. Absolutely, yes.
3     Q. It is not so much that you did or didn't put your
4 initials on it because that doesn't have anything to do with
5 the quality of your work, right? I mean, whether you are right
6 or not in your analysis is not -- it is not correct or
7 incorrect because you didn't put your initials on the page.
8     A. Correct.
9     Q. But it would lead one to believe that Ms. Patton
10 might or might not have seen that page if she didn't correct
11 you or ask you about it if, in fact, your initials weren't on
12 there.
13     A. I guess that's a possibility, although it would be
14 fairly easy to miss a page that may not have initials in
15 certainly an extremely large file you have such as this one.
16     Q. Do you know how many places you didn't put your
17 initials up there by the case number?
18     A. Again, it may not be in that same area or section.
19     Q. So it's all right if they're somewhere else on the
20 page as long as they are on there.
21     A. Correct.
22            MR. RAY: Can I approach the witness?
23            THE COURT: Yes.
24     Q. Okay. So what you are telling me is -- and this is
25 just a copy of a page that you have. You can look at it.

Page 81

1    A. Yes.

2    Q. You have got your initials up there -- in fact,
3 that's the page I just showed you, the one that's up there.

4    A. Right.

5    Q. You have got your initials up there at the top by the
6 case number.

7    A. Yes.

8    Q. And you are telling us that since you wrote your name
9 down here, that kind of would substantiate that even if you
10 forgot to put your initials at the top, right?

11    A. Certainly, but it's in both places.

12    Q. Same thing in this page which talks about there is a
13 whole lot of evidence transmitted to you.

14    A. Correct.

15    Q. Got that one right.

16       How about this one though? Excuse me. That's
17 the same one I just showed you. Tell me what that one --
18 actually this goes with it. First of all, is that a page out
19 of your notes?

20    A. No, I don't believe this is out of my notes because
21 it doesn't have my transmittal on it, so, no, it is not mine.

22    Q. It is part of the Medical Examiner's --

23    A. It is part of the Medical Examiner's file, which is
24 different than my file.

25    Q. All right. So somebody else didn't put their notes

Page 82

1 there.

2    A. Again, we are part of the crime laboratory. The
3 Medical Examiner has a different set of rules to see
4 whatever --

5    Q. Okay.

6    A. -- but that's not my note.

7    Q. So what you are saying then, this buccal swab from
8 Billy Jack -- this is part of your notes, is it not?

9    A. Yes, that's correct.

10    Q. The fact that your name is down at the bottom of it
11 kind of covers that.

12    A. Yes, absolutely. The case number and --

13    Q. Even though you don't have your initials up at the
14 top?

15    A. Yes.

16    Q. Have you and Ms. Patton ever talked about that?

17    A. I'm sorry. I don't quite understand what you are
18 asking.

19    Q. I'm just curious as to why if you are -- it may be a
20 very technical point, but your peer reviews say the case number
21 and analyst's initials on all pages.

22    A. Uh-huh.

23    Q. What I see from that is that you are supposed to put
24 the case number on the page, most pages there is a place for
25 it, and your analyst's initials are supposed to be there.

Page 83

1    A. Yes. Part of my signature is C. Van Winkle, which
2 is CVW, my initials.

3    Q. But had you not been the person that signed in those
4 particular items, your initials don't appear on several pages.

5    A. Every page you showed me my name or initials are on
6 there. If I had not signed for those items, I would initial
7 that case number, yes. But I could not do analysis on an item,
8 particularly a chain, unless I had received that evidence.

9    Q. And lastly, you also did some serology in this case.

10    A. Yes.

11    Q. Tell the jury what that is, why you did it and what
12 your results were.

13    A. Serology is just a term that's used for the evidence
14 examination. It's usually used to determine whatever body
15 fluids we are talking about, whether you are talking about
16 semen or blood or saliva. So it is information for those
17 fluids.

18    Q. Did you do that in this case?

19    A. Yes.

20    Q. What were your results?

21    A. Do you want me to read all of the results --

22    Q. Why don't you --

23    A. -- from this one report?

24    Q. Well, I think your results are -- and correct me if
25 I'm wrong -- is there is no evidence of sexual assault.

Page 84

1    A. Yes. Again, sexual assault, that evidence was
2 examined from both victims, and there was no evidence of semen,
3 correct.

4    Q. All right. There is nothing that would indicate to
5 you that there was a -- any evidence of sexual assault in this
6 case.

7    A. Correct.

8       MR. RAY: Can I have just a second, Judge?

9       THE COURT: Yes.

10       (Pause in the proceedings)

11    Q. Well, now here is one -- one more thing.

12       MR. RAY: May I approach the witness?

13    Q. Is this part of your form -- part of your work?

14    A. Yes.

15    Q. Okay. Got your initials or your name because you got
16 something from Detective McCaskill, right?

17    A. Actually, this is probably not my copy of it. It may
18 have been a copy you obtained from elsewhere, perhaps from
19 Detective McCaskill. Let me get my form with the same
20 information.

21    Q. Maybe you have one where you put the initials on it
22 later?

23    A. Yes. I don't have this copy in my forms.

24    Q. Okay.

25    A. Let me double-check for you.

Cona'enseIt™

Page 85

1    Q. This is your form.
2    A. Yes, and it has my initials.
3    Q. My mistake, and it looks like you have blue ink that
4 you put up on --
5    A. Yes.
6        MR. RAY: I'll pass the witness.
7        THE COURT: Ladies and gentlemen, let's take a
8 stretch break. Please retire to the jury room and remember and
9 follow your instructions.
10       (Recess taken)
11       (Jury not present)
12       THE COURT: Are both sides ready for the jury?
13       MS. HARTMANN: State's ready, Your Honor.
14       MR. RAY: We are ready, Judge.
15       (Jury present)
16           REDIRECT EXAMINATION
17 BY MS. HARTMANN:
18    Q. Just very, very briefly. Mr. Ray asked you about
19 your Item No. 32, which is State's Exhibit 74-A. That's the
20 knife blade.
21    A. Yes.
22    Q. Okay. And he asked you whether or not you had done
23 the hemoglobin test on that particular item, correct?
24    A. Correct.
25    Q. You have previously testified that you obtained a DNA

Page 86

1 profile from State's Exhibit 74-A.
2    A. Correct.
3    Q. Does the fact that you did not do a test for human
4 hemoglobin affect in any way your ability to obtain a profile?
5    A. Not if human DNA is present.
6    Q. In other words, if that had been anything other than
7 human blood, you wouldn't have -- if it had not been human
8 blood, you would have not gotten a DNA profile.
9    A. That's my opinion, yes.
10    Q. And you did, in fact, get a DNA profile?
11    A. Correct.
12    Q. In other words, if it was dog blood, cat blood,
13 leopard's blood, would you have gotten a DNA profile?
14    A. No.
15    Q. So whether there was a human hemoglobin test or not
16 really doesn't make any difference in regards to your being
17 able to perform a DNA test.
18    A. Correct.
19    Q. Mr. Ray also put up on his screen a portion of some
20 notes from a telephone conversation that you and I had.
21    A. Correct.
22    Q. You recall that? And part of that notation was the
23 Judge had not yet made any ruling, correct?
24    A. I believe that was what it says.
25    Q. In regard to the swabs from the Defendant.

Page 87

1    A. Correct.
2    Q. And both the State of Texas, myself, and Mr. Ray have
3 asked you questions about those swabs today.
4    A. Correct.
5    Q. We have been talking, both of us, about those swabs.
6    A. Correct.
7    Q. And finally, the items that we have previously
8 discussed that we went through item by item here in court, when
9 you received them from the evidence custodian or Detective
10 McCaskill, were they in a sealed condition?
11    A. Yes.
12    Q. Was there any appearance or evidence that they had
13 been opened and entered into before you received them?
14    A. No.
15        MS. HARTMANN: We'll pass the witness.
16           RECROSS-EXAMINATION
17 BY MR. RAY:
18    Q. Well, when you said there is no way it could be
19 anything other than blood on this knife, isn't it possible that
20 you could have had some other DNA besides blood?
21    A. Once again, that particular knife blade was totally
22 covered on both sides with appearing blood. It tested very,
23 very strongly with a presumptive reagent. The only other type
24 of things that could come up as possible positives are
25 vegetable material or perhaps rust, and it did not have the

Page 88

1 appearance of that type of sample.
2    Q. Well, but you get DNA from other things besides
3 blood, do you not?
4    A. Yes, that's correct. A large amount of human DNA
5 was, however, detected from that stain. That particular stain
6 is characterized.
7    Q. I understand that, but --
8    A. It was a presumptive test, yes.
9    Q. Okay. And presumptive does not mean conclusive. Am
10 I missing something, or is that right?
11    A. It isn't conclusive for human hemoglobin, correct.
12    Q. You did not perform that test.
13    A. Correct.
14    Q. Are you telling the jury that absolutely, as far as
15 you can tell based on your best scientific knowledge and
16 inquiry, that what was on that knife was, in fact, blood?
17    A. It was presumptive test positive, and that is it.
18    Q. The answer to my question is: Can you conclusively
19 say it was blood?
20    A. Again, it was not confirmed to be human.
21    Q. So the answer to my question is you cannot say it is
22 conclusively blood?
23    A. I did not confirm it, yes.
24    Q. The answer to my question is, just a real simple yes
25 or no, is you cannot say that what is on the knife is human

1 blood, yes?

2   A. Because I did not test it, that's correct.

3   Q. All right. And you only found one person's DNA --

4   A. That's correct.

5   Q. Finally, I want you to look back if you can -- I know

6 I was making copies of your notes -- back to the conversation

7 log that Ms. Hartmann and I just referred about. I want to ask

8 you to look on the next page and see if you had a conversation

9 with Greg Miller, if you have got that note handy.

10   A. (Witness complies) I did not have a conversation

11 with Greg Miller. There is a notation that Connie Patton did.

12   Q. Okay. Well, Greg Miller is a prosecutor.

13   A. Correct.

14   Q. And that note which is part of your file refers -- he

15 was wanting some DNA testing done; is that a fair statement?

16   A. Correct.

17   Q. That's a normal procedure. The DA's office calls

18 over to y'all's office and says, "Hey, we are going to send you

19 a bunch of stuff, and we want some testing done."

20   A. Correct.

21   Q. And that conversation, your note indicates, occurred

22 on June 18.

23   A. Yes, that's correct.

24   Q. So there wasn't any testing done up until that time;

25 is that right?

Page 90

1   A. Yes, that's correct.

2     MR. RAY: Can I approach the bench just a second

3 to see the clerk's file?

4     (Pause in the proceedings)

5   Q. Was there any testing done prior to June 19 at 12:30

6 in the morning -- 12:30 noon, any testing that you are aware

7 of?

8   A. In the biology laboratory, not that I'm aware of.

9   Q. Y'all didn't even find out about it until the 18th,

10 and you didn't have any of the stuff to analyze until well

11 after the 19th. Is that a fair statement?

12   A. Well, we may have picked up blood cards on autopsy

13 samples. I don't have that immediately available to me, but

14 that's a possibility that no testing was done at that point.

15   Q. Everything that was tested and every result you came

16 up with was all after noon on June 19; is that right?

17   A. As far as I know, yes.

18     MR. RAY: That's all I have. Thank you.

19     MS. HARTMANN: We don't have anything further.

20     THE COURT: You may step down, ma'am.

21     MS. HARTMANN: May Ms. Van Winkle be excused?

22     MR. RAY: No objection.

23     MS. CALLAGHAN: Your Honor, at this time the

24 State would call Dr. Nizam Peerwani.

25     (Witness Sworn)

1 Whereupon,

2       DR. NIZAM PEERWANI,

3 having been first duly sworn, testified as follows:

4       DIRECT EXAMINATION

5 BY MS. CALLAGHAN:

6   Q. Could you please state your name for the ladies and

7 gentlemen of the jury?

8   A. My name is Nizam Peerwani.

9   Q. How are you employed?

10   A. I'm employed as Medical Examiner for the county of

11 Tarrant, State of Texas.

12   Q. All right. How long have you been doing that?

13   A. About 25 years.

14   Q. All right. Are you a physician licensed in the state

15 of Texas?

16   A. Yes, ma'am.

17   Q. When did you become licensed?

18   A. I obtained my license in 1976.

19   Q. All right. And can you explain to the ladies and

20 gentlemen what the Medical Examiner does?

21   A. A medical Examiner is a pathologist that's trained in

22 forensic pathology, and the main job of a medical examiner is

23 to conduct death investigations in order to decide or

24 adjudicate on the cause and manner of death.

25   Q. And can you give the ladies and gentlemen the

Page 92

1 benefit of your background and experience in order to hold this

2 position?

3   A. Certainly. I did my undergraduate schooling through

4 the American University graduating in 1972 with a bachelor of

5 science degree in biology and chemistry and then M.D. in 1976.

6     Following that, I did four years of training in

7 pathology at Baylor Hospital in Dallas, and then I subsequently

8 got certified in three branches of pathology including anatomic

9 pathology, clinical pathology, and forensic pathology.

10   Q. Now, when we are talking about the Tarrant County

11 Medical Examiner's Office, you have jurisdiction over certain

12 areas; is that correct?

13   A. Yes, ma'am.

14   Q. What areas do you have jurisdiction over?

15   A. As a matter of fact, we are a district office, and we

16 have jurisdiction over three counties, three adjoining

17 counties, including Tarrant County, Parker County, and Denton

18 County.

19   Q. Okay. And specifically what kind of work do you do

20 in your day-to-day job?

21   A. Besides my administrative responsibilities in

22 providing oversight to labs and the morgue, I conduct actual

23 death investigations. I perform examinations and autopsies on

24 human remains.

25   Q. All right. How many assistants work with you?

## Page 93

1   A. I have three Deputy Medical Examiners who work for
2 Tarrant County.
3   Q. All right. So all the autopsies that are performed,
4 all the death investigations in the three-county area are done
5 either by you or by your three assistants.
6   A. Yes, ma'am.
7   Q. In the course of your job, do you perform autopsies?
8   A. Yes, I do.
9   Q. How many autopsies would you estimate you do in a
10 year?
11   A. Approximately 350 autopsies per year.
12   Q. Can you estimate how many you have done over the
13 course of your career?
14   A. Probably over six or seven thousand autopsies.
15   Q. Now, can you tell the ladies and gentlemen under what
16 circumstances autopsies are performed? Is it in the case of
17 every death or just certain types?
18   A. No. As a matter of fact, state law does not state
19 what cases need to be autopsied. The law only says that the
20 Medical Examiner shall conduct an inquest or inquiry into
21 death, and the law defines what kind of cases the medical
22 examiner must conduct inquests on.
23       And these include all people who die unattended,
24 those that die of unnatural causes as well as those people who
25 die within 24 hours of admission to a hospital. Obviously in

## Page 94

1 all cases of traumatic death and all cases where there is
2 unnatural or suspected unnatural cause, we as medical examiners
3 will conduct a thorough autopsy.
4   Q. All right. And in making your ruling about the cause
5 or death and the manner of death, what are your options?
6   A. Well, actually, the State provides those options.
7 The State has given us basically four choices plus one. The
8 four choices are: The Medical Examiner may categorize death as
9 due to natural causes; obviously diseases, heart diseases,
10 cancer, whatever.
11       The second category is one where a person dies
12 of injuries or any cause which is unnatural but as a result of
13 an accident, and that's the accidental death.
14       The third category is where a person takes his
15 or her own life with the intention of dying. That category
16 would be classified as a suicide, which is the third type.
17       And the final type is a homicide where a
18 person's life is taken by another person either intentionally
19 or through criminal negligence.
20       The fifth category that I alluded to, four plus
21 one, is really a category where the Medical Examiner cannot
22 really decide whether it is an accidental overdose or a
23 suicide. Then he has the right to classify that death as
24 undetermined. So there are basically five types.
25   Q. So natural is like a person dying from illness or --

## Page 95

1   A. Yes.
2   Q. Accidental, as the result of a trauma resulting from
3 an accident?
4   A. Yes.
5   Q. Suicide is self-inflicted.
6   A. Yes.
7   Q. Not an accident, but they intend to die?
8   A. Yes.
9   Q. Homicide, in the event a person kills someone either
10 intentionally or through negligence.
11   A. Yes.
12   Q. And then finally undetermined if it is not clear what
13 happened.
14   A. That's right.
15   Q. Have you testified before in courts in this county,
16 Parker County or Denton County?
17   A. I have, yes.
18   Q. How often would you estimate you testify?
19   A. I probably testify two or three times a month.
20   Q. All right. In the total amount of your career, how
21 many times do you think you have testified?
22   A. Many hundreds of times.
23   Q. Have you been recognized as an expert in the courts
24 of all of those counties?
25   A. Yes.

## Page 96

1   Q. Have you also testified in other counties?
2   A. Yes.
3   Q. What other counties have you testified in?
4   A. Multiple counties both north and west and south of
5 us, including Wichita County, Taylor County, Hood County,
6 McLennan County and adjoining other counties.
7   Q. Has all your testifying been in the state of Texas?
8   A. Yes.
9   Q. Have you testified in other states as well?
10   A. Yes, ma'am.
11   Q. What other states?
12   A. I have testified in Louisiana as well as Oklahoma.
13   Q. Now, did you have an opportunity on April 9 of 2003
14 to perform autopsies on the bodies of two individuals named
15 Patricia Syren and Pearl Magouirk?
16   A. I did, yes, ma'am.
17       MS. CALLAGHAN: At this time I believe we have a
18 stipulation between State and Defense which is marked State's
19 Exhibit 167 for identification.
20       MR. RAY: We have seen it, no objection.
21       THE COURT: It is admitted.
22       (State's Exhibit No. 167 received)
23       MS. CALLAGHAN: If I may publish it, Your Honor,
24 by reading it to the jury?
25       THE COURT: You may.

1    MS. CALLAGHAN: With the Court's permission,
2 I'll leave out the heading and just go to the body of it.
3         "It is hereby agreed and stipulated between the
4 State and the Defense that the two victims, Pearl Magouirk and
5 Patricia Syren, who are named in the indictment, are one and
6 the same as the two individuals who were autopsied by Tarrant
7 County Medical Examiner Dr. Nizam Peerwani in Lab Nos. 0303339
8 and 0303340 on April 9, 2003."
9         So stipulated and agreed, signed by the
10 attorneys for the State, signed by the attorneys for the
11 Defense and signed by the Defendant.
12    Q. Now, Doctor, going first to Pearl Magouirk's
13 autopsy --
14    A. Yes, ma'am.
15    Q. -- did you -- when this case came into the Medical
16 Examiner's Office, was it assigned a unique laboratory number?
17    A. It certainly was, yes.
18    Q. What is the purpose of having that unique laboratory
19 number?
20    A. This is in order to maintain custodial care of the
21 body as well as any evidence that is collected from the body
22 and assigned to a unique number for tracking purposes so that
23 there is never a mixup of evidence or evidence related to blood
24 or trace evidence that's collected from the body.
25    Q. So all evidence that's obtained and held there at the

1 Medical Examiner's Office for use would be filed under these
2 discrete lab numbers so you know which case they are related
3 to.
4    A. Yes, ma'am.
5    Q. So everything pertaining to this case would be
6 labeled with that number.
7    A. That's right.
8    Q. When did you perform the autopsy?
9    A. I performed the autopsy on the 9th day of April
10 sometime in the morning.
11    Q. When Pearl came in, was she clothed?
12    A. Yes.
13    Q. Was that clothing removed and filed under that
14 laboratory number that you mentioned?
15    A. Yes.
16    MS. CALLAGHAN: Approach the witness, Your
17 Honor?
18    Q. Let me show you some items that are marked State's
19 Exhibit 118, State's Exhibit 120 and State's Exhibit No. 120
20 (sic) for identification in this cause. These items are marked
21 with the discrete laboratory number pertaining to Pearl
22 Magouirk's case, correct?
23    A. That's right.
24    Q. And they are also marked specifically which items of
25 clothing they are, correct?

1    A. That's correct.
2    Q. And so it is correct that State's Exhibit No. 118,
3 the paper bag, contains Pearl Magouirk's clothing, correct?
4    A. Yes.
5    Q. And specifically State's Exhibit 120 contains her
6 T-shirt.
7    A. That's correct.
8    Q. And State's Exhibit 121 contains her blue jeans.
9    A. That's correct.
10    Q. Would it be fair to say, Doctor, that it would be
11 unwise to open those items here in court?
12    A. Yes.
13    Q. Why?
14    A. These clothing items are all biologically
15 contaminated.
16    Q. Meaning that they are covered in blood?
17    A. Meaning that it is unsafe to open it in open court.
18    Q. This may sound like an odd question, Dr. Peerwani,
19 but with regard to Pearl Magouirk and also the autopsy you
20 performed on Patricia Syren, are you able, within a reasonable
21 certainty, to tell us what species they are?
22    A. Yes, ma'am.
23    Q. And what species are they?
24    A. They are Homo sapien sapien.
25    Q. Human?

1    A. Yes.
2    Q. Now, with regard to the individual sitting at the end
3 of counsel table here in the blue and white striped shirt, can
4 you tell us within reasonable medical certainty what species
5 that gentleman is?
6    A. Yes.
7    MR. MOORE: We will agree to stipulate that he's
8 a human being.
9    Q. That would be a homo sapien sapien as well, correct?
10    A. Yes.
11    Q. Now, when you first examined Pearl's body, were you
12 able to determine her age?
13    A. I did note that, in fact, she was an elderly lady,
14 and we suspected her age based on the driver's license that was
15 present at the time of autopsy.
16    Q. What age was she?
17    A. She was listed as 89 years of age.
18    Q. Did you determine what her height and weight were?
19    A. Yes, ma'am.
20    Q. What was her height and what was her weight?
21    A. Her height was 65 and a half inches, which is five
22 feet, five and a half inches; and she weighed 164.6 pounds.
23    Q. In terms of the condition that the body came in, what
24 condition was it?
25    A. The body depicted signs of early postmortal

1 decomposition. There was discoloration of the body, focal
2 slippage of skin as well as what we call postmortal blisters on
3 the body surface. And the body had fading rigor, which is
4 consistent with the early stages of decomposition.
5    Q. Can you tell the jury what rigor is?
6    A. Rigor is a stiffening of the body after death.
7    Q. Approximately how soon after death does that start to
8 happen?
9    A. Rigor begins pretty shortly after death. It begins
10 about 2, 2 1/2 hours after a person dies. It starts in the
11 small muscle groups and within about eight to ten hours, the
12 entire body is stiff. And rigor will stay for another 24 hours
13 or so depending on the temperature and the environmental
14 conditions and then fade away as the body begins to decompose.
15    Q. The appearance and state of rigor, does it tell you
16 anything about approximately how long she had been dead?
17    A. In an ambient environment, about 70 or 75 degrees
18 temperature, bodies are known to go into that stage of early
19 decomposition within a couple of days' time.
20    Q. Okay. So it was apparent to you that she had been
21 dead somewhere around two days?
22    A. Yes, ma'am.
23    Q. But it's not possible to say that more specifically?
24    A. No, one cannot give a precise time.
25    Q. The whole Quincy thing where he's able to say down to

1 the minute how long someone's been dead, that's not true.
2    A. It's true for Quincy, ma'am.
3    Q. Fair enough. Ain't television grand?
4        Well, let's go over and talk about the injuries
5 that you observed on the body. Starting off with State's
6 Exhibit No. 140 and inclusively through State's Exhibit 148,
7 will you examine these photographs, please.
8    A. (Witness complies) Yes, ma'am.
9    Q. Do you recognize these photos?
10    A. Yes, I do.
11    Q. Do you know who made them?
12    A. They were made either by me or directly under my
13 supervision at the time of autopsy.
14    Q. All right. And are these true and accurate
15 depictions of the way Pearl Magouirk appeared when you first
16 saw her April 9, 2003, and while the autopsy was being
17 performed?
18    A. Yes, ma'am.
19        MS. CALLAGHAN: At this time, Your Honor, the
20 State would offer State's Exhibits No. 140 through 148
21 inclusive.
22        MR. RAY: Judge, I have seen the pictures.
23 We're going to object based on the inflammatory nature of the
24 pictures; and we have entered into a stipulation. It's not
25 contested that Dr. Peerwani performed autopsies on the two

1 ladies who were the alleged victims in this case.
2        THE COURT: May I see the exhibits?
3        (Pause in the proceedings)
4        THE COURT: The objections are overruled. 140
5 through 148 are admitted.
6        (State's Exhibit No. 140 through 148 received)
7    Q. Let me also show you what is marked State's Exhibit
8 165 for identification in this cause. Do you recognize it?
9    A. Yes, I do.
10    Q. What is it?
11    A. It is a body diagram that was prepared by me at the
12 time of autopsy.
13    Q. And this is a diagram of the body of Pearl Magouirk?
14    A. That's correct.
15    Q. And it depicts the injuries that were discovered on
16 the surface and in some instances the interior of her body.
17    A. Yes.
18        MS. CALLAGHAN: At this time, Your Honor, the
19 State would offer State's Exhibit 165 for identification
20 subject to tendering it Defense Counsel for inspection.
21        MR. MOORE: No objection.
22        THE COURT: No. 165 is admitted.
23        (State's Exhibit No. 165 received)
24        MS. CALLAGHAN: If I may ask Dr. Peerwani to
25 step down for a minute?

1        THE WITNESS: If I may, Your Honor?
2        THE COURT: You may.
3        MS. CALLAGHAN: Your Honor, if I may ask if the
4 jury can see?
5        Now, Dr. Peerwani, starting off first with the
6 diagram before we go to the pictures, if you can describe the
7 injuries you saw to Pearl Magouirk's body when you examined
8 her.
9    A. Certainly. Pearl had multiple stab wounds and
10 multiple cut wounds. She had seven stab wounds of the torso
11 including five of the chest and abdomen and two of the left
12 side.
13        In addition, she had cut wounds of the neck in
14 both the left and right side of the neck as well as the
15 anterior surface of the neck.
16    Q. Now, starting off with the stab wounds, on State's
17 Exhibit No. 165, how are they shown?
18    A. On the State's 165 they are marked in a sequential
19 fashion starting from Stab Wound, or SW, 1; and going all the
20 way down to SW No. 7. These are sequentially numbered for
21 purpose of description only.
22        As far as the cut wounds are concerned, they are
23 numbered as CW, or Cut Wound, No. 1, all the way to No. 4.
24 They also are numbered in a sequential fashion only for the
25 purpose of description.

1     Q. So sw 1 here on the left-hand side as you face
2 State's Exhibit 165 is stab wound No. 1, and there is a direct
3 line drawn between that and the wound itself?
4     A. That's correct.
5     Q. Could you describe that location for the ladies and
6 gentlemen?
7     A. Yes. Stab Wound No. 1 is localized to the right
8 chest, approximately mid chest area, 50 inches above the right
9 heal and 1 1/2 inches to the right of the midline of the body.
10     Q. What about Stab Wound No. 2?
11     A. Stab Wound No. 2 is in the right lower chest below
12 the right breast also along the main anterior midline of the
13 body.
14     Q. What about Stab Wound No. 3?
15     A. Stab Wound No. 3 is localized to left mid chest just
16 at the nipple of her left breast.
17     Q. Were is Stab Wound 4?
18     A. Stab Wound No. 4 is the abdominal area of the
19 decedent. If you will imagine this is the midline and this is
20 a midline through her belly button, then this would be the left
21 upper abdominal quadrant. Stab Wound No. 4 is along the left
22 upper abdominal quadrant of the abdomen.
23     Q. Where is No. 5?
24     A. No. 5 is the left lower abdominal quadrant.
25     Q. And where is Stab Wound No. 6?

1     A. Stab Wound No. 6 is left upper back.
2     Q. And where is Stab Wound No. 7?
3     A. No. 7 is left lower back along the flank area
4 overlying her left buttock.
5     Q. Now, when you say stab wound, what's the difference
6 between a stab wound and a cut wound?
7     A. A stab wound is produced when a sharp object is
8 thrust in the body or a body falls onto a sharp object. In
9 other words, the object is piercing the body, and usually the
10 depth of insertion in the body is greater than that of the
11 surface injury.
12         A cut wound is produced when any kind of sharp
13 object, a knife or even a broken piece of glass, causes the
14 skin and underlying tissue to be cut. It is a slicing motion
15 that slices the issue instead of a piercing motion that causes
16 the weapon to be inside the depth of the body. Usually a cut
17 wound is much greater in surface length than the depth of
18 penetration.
19     Q. All right. If you could describe the cut wounds found
20 on her body?
21     A. Certainly. She had a very large, gaping cut wound of
22 her anterior neck which is marked as Cut Wound No. 1 of the
23 left and right side.
24         Then she has Cut Wound No. 2, which is along the
25 right lateral neck. This was a superficial cut wound. And she

1 has a cut wound of the left lateral neck extending across her
2 left mandible, or left jaw bone, into the left cheek area; and
3 that was also a superficial type wound. And then she had sort
4 of a horizontal superficial cut wound of the left side of her
5 collar bone.
6     Q. All right. Thank you.
7         So there were a total of seven stab wounds and
8 four cut wounds.
9     A. That's correct.
10     Q. So a total of 11 wounds that you observed.
11     A. Yes, ma'am.
12     Q. Let's go to Stab Wound No. 1.
13     A. Yes, ma'am.
14     Q. If you could go ahead and describe that injury to the
15 ladies and gentlemen. First of all, its shape.
16     A. Stab Wound No. 1 had what we call a triangular
17 shape. By triangular we imply it is produced by an object such
18 as a knife with one sharp edge and the other edge is blunted.
19 This was localized to the right mid chest, and it penetrated
20 the chest wall to the third space, the third right space
21 between the third and fourth rib. It was directed front to
22 back downwards and into the middle portion of the body, and it
23 perforated the chamber of the heart, including the right
24 ventricle, the septum between the left and right ventricle, and
25 the left chamber of the heart.

1     Q. All right. If I could ask you to step down again.
2     A. Certainly.
3     Q. Let me show you what is marked State's Exhibit No.
4 166, which is a rubber anatomical body. Would this be useful
5 to you in demonstrating to the jury the wound track that you
6 just described from Stab Wound No. 1?
7     A. Yes.
8     Q. If you want to step over; and facing the jury,
9 describe what it is that you just told us.
10     A. The Stab Wound No. 1 was localized approximately in
11 this location overlying the third space -- this is the first,
12 second and third space -- the space between the third and
13 fourth rib.
14         This wound is directed from front to back
15 downward and medially into the mid portion of the chest cavity
16 where, in fact, you see the heart is located.
17         The stab wound continued in a medial and
18 downward direction. It pierced the right lower chamber of the
19 heart. The septum that divides the lower chambers left to
20 right, and pierced the posterior wall of the left lower
21 chamber. This is where the track ended. It measured four
22 inches in length from the surface of the body to the point
23 where it terminated.
24     Q. Now, you described the triangular shape of the wound,
25 indicating that the knife was single-edged.

1   A. That's right.

2   Q. Meaning there was a sharpened edge on one side, but

3 the other edge is blunt.

4   A. That's right.

5   Q. Let me show you what's been previously marked and

6 admitted as State's Exhibit 74-A. Would you take a moment to

7 look at that knife.

8   A. Yes.

9   Q. Now, this knife is a one-sided knife, correct?

10   A. That's correct.

11   Q. Is this consistent with the type of wounds you saw on

12 Pearl Magouirk's body?

13   A. It certainly is.

14   Q. And this knife and other knives like it, are they

15 deadly weapons?

16   A. Yes, they are.

17   Q. In the manner of their use and intended use, can they

18 cause death and serious bodily injury?

19   A. Yes, ma'am.

20   Q. Thank you.

21       Now, in terms of the damage done to Pearl by

22 this particular stab wound, can you tell us how long as a

23 result of a wound -- well, first of all, let me ask this. What

24 kind of damage would be done to her body by an injury of this

25 type?

1   A. I'm sorry. Could you repeat the question?

2   Q. I'm sorry. What kind of damage ultimately would be

3 done to her body once her heart was perforated in this way?

4   A. Obviously the heart would cease to function, she

5 would go rapidly into what is called cardiogenic shock, a

6 nonfunctional heart, a heart that has got holes that is

7 literally pouring out blood as it contracts. Eventually she

8 would go into rhythm abnormality, her heart would begin to

9 fibrillate, or quiver, and she would have a cessation of the

10 heartbeat and die.

11   Q. All right. But this is definitely what you would

12 call a fatal wound.

13   A. Yes, ma'am.

14   Q. How long would she have been conscious with a wound

15 like this?

16   A. She would be conscious for a short while, minutes

17 rather than hours.

18   Q. Are we talking five minutes, 30 minutes, 40 minutes?

19   A. No, probably much less than that. She probably would

20 succumb and become unconscious as she loses blood within three

21 to five minutes' time. She would not die necessarily

22 instantaneously, but she would have lost sufficient blood

23 whereby she would not get blood going to the brain, and she

24 would become unconscious and then die.

25   Q. All right. Waiting until the second hand on that

1 clock gets to the "3," at that time I want you to mark that by

2 saying, "go."

3   A. Go.

4   Q. When it reaches the "3" again, if you can mark it by

5 saying stop.

6   A. Stop.

7   Q. Now, that was just the passage of one minute,

8 correct?

9   A. That's correct.

10   Q. And she would have been conscious for three to five

11 minutes?

12   A. That's correct.

13   Q. Thank you.

14       Now let's go to Stab Wound No. 2. Can you

15 describe that?

16   A. Stab Wound No. 2 was localized to the right lower

17 chest. This was also a triangular wound measured about half an

18 inch in width, and the track was directed from front to back

19 slightly upwards and away from the midline laterally. I traced

20 the track through the track space, which is the space between the

21 8th and the 9th rib on the right chest wall. And the track led

22 into the right lower lobe of the lung, where it terminated, and

23 I measured the track as about 2 1/2 inches in length.

24   Q. All right. If you could step down again, and using

25 our little rubber friend here, if you could show us about that,

1 referring again to State's 166.

2   A. Yes, ma'am. I'm counting the spaces, which is 1, 2,

3 3, 4, 5, 6, 7, 8; and this is where approximately the Stab

4 Wound No. 2 was localized. It penetrated the chest cavity to

5 the 8th space and was directed slightly upwards and away from

6 the body, midline of the body, and it was directed from front

7 to back.

8       And, of course, just beneath this is the right

9 lower lobe of the lung as you go upward, and that's what it

10 penetrated.

11   Q. Okay. Why don't you go ahead while we are here and

12 describe the remainder of the stab wounds starting with Stab

13 Wound No. 3?

14   A. Stab Wound No. 3 was, in fact -- if I may get my --

15 was, in fact, not a very significant stab wound. It was

16 localized to the left mid chest approximately here. It was a

17 superficial stab wound and did not cause any injuries to the

18 internal chest organs.

19       Stab Wound No. 4 was along the left upper

20 abdominal quadrant as we talked. It entered the chest

21 abdominal cavity, and the attachment of the small bowel where

22 the small bowel loops, the mesentery, it lacerated the

23 mesentery of the small bowel.

24       This next wound, Wound No. 5, was, in fact,

25 localized to the left lower quadrant, and this wound also went

1 right through the abdominal wall, penetrated the abdominal
2 cavity and lacerated the mesentery, or the attachment of the
3 large bowel.
4        Then we have two wounds to the back, wound No. 6
5 and 7. Wound No. 6 was up in the left upper back, and that was
6 really a superficial wound that went from back to front but did
7 not penetrate the chest cavity or cause any damage to the chest
8 organs.
9        And Wound No. 7, the last wound, is localized
10 along the left lower back and the flank area of her left
11 buttock, and this directed from back and upwards. It was a
12 large gaping defect, but it really did not cause any
13 significant injuries to the internal organs.
14    Q. All right. Now, going back to Stab Wound No. 2, you
15 said it perforated her lung?
16    A. Yes, ma'am.
17    Q. Can you describe what the effect of an injury of that
18 nature would be?
19    A. First of all, it is a very painful injury when you
20 penetrate the pleural cavity, or chest cavity, it is
21 excruciatingly painful. But perhaps physiologically what is
22 more significant is that as soon as the chest wall is ruptured,
23 the negative pressure within the chest cavity that allows the
24 lungs to breathe is destroyed, and therefore the air would just
25 be gushing inside the free chest cavity.

1 They have the potential of infecting the abdominal cavity
2 because your structure is now interrupted and germs get into
3 the free belly or free abdomen.
4        In addition, they have lacerated the mesentery,
5 so she would have a small bleed wound, so she would need some
6 medical care. So they are certainly problematic injuries, but
7 they would not be instantaneously fatal or as quickly fatal as
8 the stab wound to the chest.
9    Q. All right. Now, starting with the cut wounds, if you
10 could demonstrate them on State's Exhibit 166.
11    A. Cut Wound No. 1 was, in fact, at approximately this
12 level here. It was horizontally oriented with a rather large
13 gaping defect measuring four inches in length. And it
14 transected partially the two muscles in the anterior, or the
15 front portion of the neck, what we medically call the
16 sternocleidomastoid muscle, the muscle that allows your neck to
17 move from side to side and up and down.
18        But it did not go any further than that. It did
19 not cause any injuries to the vascular structures, and the
20 spine was essentially intact. So it was a deep cut wound
21 certainly of some concern but not fatal by any chance.
22    Q. Now, this cut was directed from what direction to
23 what direction?
24    A. It goes from the right side to the left side of the
25 body.

1        This sudden gushing of air in the cavity would
2 cause the lungs to collapse, so she cannot use the right lung.
3 And, of course, this is potentially a very serious injury
4 unless she gets medical care and the air is again suctioned out
5 of the free chest cavity and that wound is sealed so that she
6 can breathe freely.
7        In addition to that, of course, she had a stab
8 wound of the lung itself, which was bleeding as a result. So
9 she had a potentially serious wound of her right lower chest.
10    Q. Would you describe Stab Wound No. 2 as being fatal
11 or potentially fatal?
12    A. I would say potentially fatal. In other words, if it
13 were not medically treated, given her age and her medical
14 condition, she would have died as a result, but not
15 instantaneously or as quickly as Wound No. 1.
16    Q. All right. What about Stab Wound No. 3?
17    A. Stab Wound No. 3 was really of no great significance
18 at all.
19    Q. Had she received medical attention to that, it would
20 not have killed her.
21    A. It would not have killed her at all, just a soft-
22 tissue cut.
23    Q. What about the remainder of the wounds?
24    A. Wounds No. 4 and 5 are certainly more serious
25 injuries because they have gone into the abdominal cavity.

1    Q. All right. Is there anything about that that
2 suggests to you the position of the person doing the cutting,
3 depending, of course, on which hand they had the weapon in?
4    A. Obviously he could be standing in front of the victim
5 and slicing her -- if I may, Your Honor -- in this fashion; or
6 he could be in this direction and slicing her this way. Or he
7 could be standing behind and slicing her with his left hand or
8 the right hand depending on whether he's left or right handed.
9    Q. Now, you indicated, first of all, in slicing when you
10 are face to face, you indicated your left hand, correct?
11    A. Yes.
12    Q. So if you are face to face, that would indicate
13 possible use of the left hand if you are face to face?
14    A. That's certainly a distinct possibility if you are
15 left-handed facing the victim from the front.
16    Q. If you were right-handed, on the other hand, you
17 would have to go to a different angle, for example, behind.
18    A. That's right.
19    Q. Now, if you'd go ahead and describe the remainder of
20 the wounds.
21    A. The remainder of the wounds were of no great
22 significance. She had a stab wound on the right lateral neck
23 that sort of terminated into this large gaping defect here. It
24 was a superficial stab wound.
25        Then she had another stab wound along the left

1 side of the lateral neck across the left mandibular, or the jaw
2 bone, and went into the left cheek area. This, too, was a
3 superficial wound.
4        And then she had a wound that straddled the left
5 collar bone, or left clavicle; and this, too was a superficial
6 cut wound of no great medical significance at all.
7    Q. All right. Did you have an opportunity to examine
8 her hands both front and back?
9    A. I did.
10   Q. Did you note whether or not she had any wounds on her
11 hands?
12   A. No, she had no defensive wounds.
13   Q. Okay. When you talk about defensive wounds, what do
14 you mean?
15   A. A defensive wound is incurred when a victim tries to
16 protect him or herself either by causing the fatal injury to
17 occur on her exposed body, the surfaces of the palms or outer
18 surface or perhaps in attempting to grab a weapon away from an
19 assailant. In any of these cases the defensive posture would
20 present injuries to the outer areas of the hands as well as
21 forearms of the body.
22   Q. Did you note any defensive wounds to her body either
23 front or back?
24   A. No, there were no defensive wounds.
25   Q. Let's go ahead and put this down.

1        Turning first to State's Exhibit 140 and 141 for
2 identification in this cause, start with this half of the jury;
3 and very briefly, if you can tell us what these depict.
4    A. State's 141 is a picture of the decedent showing her
5 exposed anterior or front position. It basically shows the
6 different stab wounds and some of the cut wounds of the right
7 side of the neck.
8    Q. Now, State's Exhibit No. 140 is her clothing and the
9 way she appeared in her clothing, correct?
10   A. That's absolutely correct.
11   Q. Before we go to that side, can you just with your
12 finger show where the stab wounds are and where the cut wounds
13 are?
14   A. Yes. I think I can show most of the stab wounds.
15 I'm not sure about the cut wounds. She had Stab Wound No. 1
16 here; No. 2, right lower chest; No. 3, at the nipple; No. 4,
17 left upper abdomen; and No. 5, left lower abdomen. And then
18 you can -- I think you can barely see this defect of the
19 anterior neck, and then you see this superficial cut wound
20 toward the collar bone of her left side and --
21        MS. CALLAGHAN: May I inquire, Your Honor, if
22 the jury can all see?
23   Q. Okay. For this end of the jury, show where the
24 injuries are.
25   A. All right. One more time, Stab Wound No. 1, the

1 right chest; Stab Wound No. 2, the right lower chest; No. 3,
2 along the left breast; Stab Wound No. 4 is the left upper
3 abdominal quadrant; and No. 5, the left lower abdominal
4 quadrant.
5        And then you have Cut Wound No. 1, which is the
6 anterior neck, and then Cut Wound No. 4, which is the left
7 collar bone.
8    Q. Now, if you can come down to this side of the jury.
9 Referring to State's Exhibit No. 142, can you tell us what this
10 depicts?
11   A. Yes. In fact, this is the front portion of her
12 neck. Her neck is tilted upwards. This is the chin area, and
13 this picture shows three of the four cut wounds rather
14 clearly.
15        The ones that are marked as No. 1 is this very
16 large gaping defect in the front portion of her neck. We don't
17 see the 2, but you see the 3 that is along the right lateral
18 neck extending across the jaw bone into the cheek, and this is
19 the Cut Wound No. 4 of the left side of her collar bone.
20   Q. If you can show the other half of the jury.
21   A. Cut Wound No. 1, Cut Wound No. 3 and Cut Wound No. 4.
22   Q. If we could start down here with State's Exhibit
23 143.
24   A. State's 143 is a picture of the back, and this is the
25 left upper back. This was Stab Wound No. 6, and this was a

1 rather large gaping stab wound in the left lower back along the
2 flank area. Stab Wound No. 6 and Stab Wound No. 7.
3    Q. And then finally, Dr. Peerwani, we have State's
4 Exhibit No. 144, 145, 146 and 148, all of which depict her
5 hands, front and back, correct?
6    A. Yes, 144 and 145 and 146 are photographs of the hands
7 as I saw them after they were in protective paper bags.
8    Q. And there are no defensive wounds shown.
9    A. No, they just show dried or congealed blood on the
10 hands.
11   Q. And State's Exhibit No. 147 would just be a
12 photograph of the bottom of her feet?
13   A. That's right.
14   Q. Which shows her feet in tennis shoes.
15   A. That's correct.
16   Q. All right. Thank you.
17        Now, how much bleeding did she have internally?
18   A. Internally I examined the chest cavity and abdominal
19 cavities. She certainly had a tremendous amount of blood that
20 had collected in the right chest cavity. We measured 1,000
21 cc's of blood, which is one liter of blood. Four liters of
22 blood make one gallon approximately. So she had a very large
23 quantity of blood in the right chest cavity.
24        She also had blood in the cavity around the
25 heart, or the pericardial cavity, about 150 cc's of blood, and

Page 121

1 then she had small bleeding in the abdominal cavity because of
2 the laceration of mesentery of the small and large bowels.
3    Q. You mentioned previously that the lung injury would
4 have been painful?
5    A. Yes, indeed.
6    Q. Would the entirety of these injuries be very
7 painful --
8    A. Yes. Anytime you cut across the body surface, it is
9 painful, and we all have experienced that.
10    Q. So she would have experienced that pain during the
11 period she was conscious?
12    A. Absolutely.
13    Q. Her health, other than the physical injuries, was her
14 health pretty good?
15    A. Generally, yes. She had a slightly enlarged heart,
16 but then she was about 89 years of age. She had some hardening
17 of the arteries, not very significant, 40 or 50 percent
18 narrowing; and the rest of the organs was of no great
19 significance as far as pathology was concerned.
20    Q. There was nothing specifically to indicate, other
21 than her age, that she might not live on a considerable number
22 of years.
23    A. Yes, that's true.
24    Q. Among other things, do you take samples of tissue and
25 blood from the body?

Page 122

1    A. Yes.
2    Q. And was that done in this case?
3    A. Yes.
4    Q. And also do you perform a toxicology screen?
5    A. Yes, ma'am.
6    Q. Can you tell the ladies and gentlemen what it is
7 you're screening for?
8    A. A forensic postmortem toxicology is rather complex
9 where we study the blood for drugs of abuse, we study the blood
10 for different types of drugs that the patient may have been
11 prescribed, and that includes different categories of drugs.
12          And then in addition to that, we also study the
13 blood and the eye fluid for alcohol, ethanol.
14    Q. All right. What did the toxicology screen reveal?
15    A. The toxicology screen was absolutely negative for
16 drugs of abuse or any other drugs, but we did pick up a rather
17 slight amount of alcohol or ethanol in the blood, approximately
18 0.03 gram percent.
19    Q. All right. Would you expect to find that in a person
20 who had been dead as long as she was?
21    A. Yes, it was absolutely consistent with postmortem
22 formation of sugars in the body. I am absolutely confident
23 that this is nothing but a postmortem ethanol production in the
24 body.
25    Q. But there was no indication that she had been

Page 123

1 drinking alcohol or was intoxicated.
2    A. That's right.
3    Q. Now, we talked briefly about the various options you
4 have as a medical examiner in making your ruling. Were you
5 able to determine a cause of death in this case?
6    A. Yes.
7    Q. What was the cause of death?
8    A. The cause of death was certified as multiple cut and
9 stab wounds.
10    Q. This is what caused Pearl's death?
11    A. That's right.
12    Q. Did you make a finding as to manner of death?
13    A. I did.
14    Q. What was that finding?
15    A. I ruled the death as homicide.
16    Q. Now, let's go on to the autopsy you performed on
17 Patricia Syren. Was that autopsy also assigned a unique
18 laboratory number?
19    A. Yes, it was.
20    Q. What was that number?
21    A. The number was 0303339.
22    Q. And so everything pertaining to that case was also
23 filed under that number, correct?
24    A. That's correct.
25    Q. Let me show you what has been marked State's Exhibit

Page 124

1 119, 122 and 123 for identification in this cause. Are these
2 the victim's clothing, including the shorts -- I'm sorry -- and
3 T-shirt and various other clothing that were recovered from
4 Patricia Syren's body?
5    A. Yes, ma'am, they are.
6    Q. Now, in the same fashion that you did with Pearl,
7 were you able to determine what her age was?
8    A. Yes.
9    Q. What was her age?
10    A. She was 71 years of age at the time of her death.
11    Q. What was her height and weight?
12    A. She was 65 inches tall, or five foot, five inches.
13    Q. And what was her weight?
14    A. She weighed 180.4 pounds.
15    Q. Was the state of decomposition that you observed in
16 her body the same as for Pearl?
17    A. Approximately the same.
18    Q. They were consistent.
19    A. Yes.
20    Q. All right. Now, if I may, let me show you what is
21 marked State's Exhibit 162, 163 and 164 for identification in
22 this cause. Do you recognize these three diagrams?
23    A. Yes, I do.
24    Q. Are those diagrams you prepared of the injuries to
25 Patricia Syren?

Page 125

1 A. Yes, ma'am.

2 Q. Are they marked with the unique laboratory number

3 that pertains to her case?

4 A. Yes, ma'am.

5 MS. CALLAGHAN: The State would offer State's

6 Exhibit 162, 163 and 164 for identification in this cause

7 subject to tendering them to Defense counsel for their

8 inspection.

9 MR. MOORE: No objection.

10 THE COURT: 162, 163 and 164 are admitted.

11 (State's Exhibit No. 162, 163, 164 received)

12 Q. And if I could ask you to step down.

13 THE WITNESS: If I may, Your Honor?

14 THE COURT: Yes.

15 Q. Now, if you want to go ahead and describe for the

16 ladies and gentlemen the injuries that you observed on Patricia

17 Syren's body.

18 A. Certainly. Patricia had, in fact, more wounds than

19 Pearl had. She had nine stab wounds of the body. She had six

20 cut wounds, and then she had multiple defensive wounds of her

21 left and right hands.

22 The stab wounds were mostly of the torso, the

23 anterior torso, as well as one each of the arms, the back side

24 of the arms. And I again numbered them in sequential fashion

25 just for purposes of description.

Page 126

1 She had Stab Wound No. 1, which was at the base

2 of the left neck, as you can see in this diagram here labeled

3 as Stab Wound No. 1.

4 She had a stab wound of the right upper chest, a

5 small, rather insignificant stab wound.

6 Then she had Stab Wound No. 3 of the right upper

7 chest along the lateral area.

8 Then Stab Wound No. 4 along the right breast.

9 She had Stab Wound No. 5, which is the left

10 lateral chest that you see here just in front of her left

11 armpit.

12 Stab Wound No. 6 of the left breast.

13 Stab Wound No. 7 was localized just below her

14 sternum or mid chest.

15 Stab Wound No. 8 -- that was -- Stab Wound No. 8

16 was the right posterior arm. This was a rather large, gaping

17 defect, and she was stabbed in an upward motion. In fact, the

18 knife made an exit along the medial or the inner surface of the

19 right posterior arm. So this is an exit stab wound. These two

20 wounds are produced from just one thrust on the body surface.

21 And finally -- the exit wound is labeled as 9,

22 and then she had another stab wound of the left posterior arm,

23 which is Stab Wound No. 10.

24 Q. Would it be correct to say then that the large stab

25 wound here, State's Exhibit No. 8, is an entry stab wound?

Page 127

1 A. That's right.

2 Q. And the small one up here is the exit?

3 A. That's correct.

4 Q. So the knife would have gone through.

5 A. It went through and through the soft tissue of the

6 posterior right arm.

7 Q. And Stab Wound No. 10 is also an entry stab wound.

8 A. That's correct.

9 Q. Would this be consistent, the way these injuries

10 appear, with someone stabbing someone from behind as they are

11 walking away or stabbing them as they are face down?

12 A. Either one of them is possible. Obviously she would

13 be running away and somebody is following her or walking away,

14 or as one is falling down and facing downward, she's being

15 stabbed.

16 Q. All right. If you will go ahead and take a seat.

17 A. (Witness complies).

18 Q. Now, I have shown you what is marked State's Exhibit

19 No. 149 through 161 inclusive. Do you recognize these

20 photographs?

21 A. I do.

22 Q. Are they true and accurate depictions of the way Pat

23 Syren's body appeared at the time you did the autopsy?

24 A. Yes, ma'am.

25 MS. CALLAGHAN: The State would offer 149

Page 128

1 through 161 for identification subject to tendering them to

2 Defense Counsel for their inspection.

3 (Pause in the proceedings)

4 MR. MOORE: Judge, we would object under 403.

5 MR. RAY: And the same objections we made

6 previously, Judge, to the last set of photographs.

7 THE COURT: Overruled. 149 through 161 are

8 admitted.

9 (State's Exhibit No. 149 - 161 received)

10 Q. Dr. Peerwani, if you could go ahead and start

11 describing -- start describing the stab wounds that you

12 observed.

13 A. Certainly. As I mentioned, there were actually nine

14 stab wounds, and the one on the left posterior arm was an

15 entry-exit, or complex wound, consisting of two wounds

16 together. The first stab wound described numerically as No. 1

17 along the base of the left neck was, in fact, the most fatal

18 stab wound. This wound was a rather large, gaping defect

19 measuring two inches in length.

20 Again, all the stab wounds were triangular in

21 shape implying that they were produced by a knife with one

22 sharp edge. Stab Wound No. 1 was directed from font to back

23 and downwards into the chest area. It went through the left

24 muscle, the anterior portion of the neck, or the left

25 sternocleidomastoid muscle; and then it transected two rather

Page 125 - Page 128

Condenselt!™

Page 129

1 large blood vessels, the left carotid artery in the front and
2 the accompanying left jugular vein, and then it entered into
3 the free chest cavity and pierced the body of the first
4 thoracis vertebrae. It did not go any further. It just nicked
5 superficially the body, and the track ended there. And the
6 entire track from the surface of the neck ending along the body
7 of the first thoracis vertebrae measured about two and a half
8 inches.
9    Q. All right. If you want to step down for a moment,
10 we will use the rubber body so you can describe the wound
11 track or show it to the ladies and gentlemen.
12    A. The Stab Wound No. 1 was localized to the base of the
13 left neck. It was directed in a front-to-back and downward
14 direction. This is -- what is marked in blue color in this
15 model is, in fact, the jugular vein. You can see that the
16 jugular vein is right in the path of the stab wound. It
17 perforated the jugular vein and transected it.
18        And then the red vessel behind the jugular vein
19 is the left common carotid artery. It also transacted that
20 particular artery, and then it penetrated behind into the
21 posterior portion of the upper chest cavity and pierced the
22 first vertebra.
23    Q. What kind of bleeding would this kind of wound cause?
24    A. This would be very profound bleeding. There would be
25 a lot of external bleeding because these are blood vessels that

Page 130

1 are on the surface of the body, and there would be a lot of
2 bleeding also in the area of the thoracic inlet of the neck and
3 base of the neck area.
4    Q. So unlike some injuries where you may get a lot of
5 internal bleeding but not a lot of blood outside the body, in a
6 wound of this nature you are going to see more blood on the
7 inside of the body.
8    A. That's correct.
9    Q. With an injury of this nature, how long would a
10 person remain conscious?
11    A. Again this is a rather severe injury. This is one of
12 the major blood vessels of the body, and the person would bleed
13 profusely to the outside. I would daresay that she would
14 probably succumb within five to ten minutes at most unless she
15 was medically attended.
16    Q. So she would have died within five to ten minutes.
17    A. She would collapse within five to ten minutes, and
18 she may have taken longer to die because in this particular
19 case, the heart is not injured. She's just losing blood and
20 she's dying from hemorrhagic shock.
21    Q. What percentage of that time do you think she would
22 be conscious?
23    A. I would daresay that up to five minutes she would be
24 conscious before she would have lost sufficient blood to become
25 unconscious.

Page 131

1    Q. Now, once again showing you the knife that is marked
2 State's Exhibit 74-A, is this knife consistent with the type of
3 injury that you saw?
4    A. Yes, ma'am, it is.
5    Q. Go ahead and describe Stab Wound 2.
6    A. Stab Wound No. 2 all the way down to Stab Wound No. 6
7 did not penetrate the chest cavity. They were localized to the
8 chest wall.
9        Stab Wound No. 2 was the right upper chest;
10 Stab Wound No. 3 was the right lateral chest; Stab Wound No. 4
11 was the right mid-chest area; 5 was, in fact, the left upper
12 chest; and 6 was the left mid-chest along the breast area. And
13 these did not, as I mentioned, penetrate the chest cavity or
14 the space through the chest wall. They were just soft tissue
15 stand wounds.
16    Q. So these were superficial and were not by any means
17 fatal.
18    A. That's correct.
19    Q. All right. Going to Stab Wound No. 7:
20    A. Stab Wound No. 7 was localized below the sternum
21 along the midline approximately this direction. It was
22 directed from front to back. And this is the stomach. It
23 perforated the stomach wall.
24    Q. Would an injury of that nature be painful?
25    A. Yes, it would be excruciatingly painful but not

Page 132

1 fatal.
2    Q. Would it, if left untreated, be fatal eventually?
3    A. Just like the injuries of Pearl, these are
4 potentially fatal because of complications that can occur,
5 infections and other things that could occur, but a person
6 would not die quickly as a result of this wound.
7    Q. And Stab Wounds 8, 9 and 10 are on the back, correct?
8    A. Yes. Stab Wound No. 8, in fact, was a little further
9 down just before the left elbow, a large gaping defect, and it
10 went upward and produced a small exit wound along the inner
11 surface of the left arm.
12        Stab Wound No. 10 was along the back surface of
13 the left arm, and this did not have an exit defect. It was
14 also a soft tissue injury and did not cause any significant
15 trauma as far as her death is concerned.
16    Q. Okay. Now, going on to the cut wounds -- before we
17 do go on to that, let's go back to our diagram here. You made
18 a separate diagram to show the cut wounds on the neck; is that
19 correct?
20    A. That's correct.
21    Q. Let's refer to that, which is marked State's Exhibit
22 No. 163. Using the diagram, could you go ahead and describe
23 for the ladies and gentlemen -- and let me move this up a
24 little bit -- the cut wounds you observed.
25    A. As I mentioned, there were six cut wounds of the

Page 133

1 body, and these are cut wounds that were localized to the neck,
2 the right cheek and the left upper-chest area. These were
3 numbered again 1 through 6 for the purpose of description only.
4      Wound No. 1 was along the right cheek. This was
5 a very superficial cut wound, had no significance at all even
6 without medical care or treatment. It measured about an inch
7 and a half.
8      Wound No. 2 was a cut wound of the mid-portion
9 of the upper neck. It was a slicing cut wound but did not
10 really go to any significant depth in the soft tissues. It
11 measured about 4 1/2 inches in length.
12      Wound No. 3 was, in fact, a more serious wound.
13 This is the large gaping defect that you see here along the
14 right side of the neck going to the front of the neck. This
15 was a very large wound that went deep inside the soft tissues
16 to a depth of nearly three inches; measured from one end to the
17 other end eight inches in length and had, in fact, caused
18 injuries of the soft tissue as well as it had severed the
19 membrane that separates the hyoid bone to the thyroid
20 cartilage, in fact, exposing the inlet of the trachea. This
21 was a significantly more serious wound and would be potentially
22 fatal if untreated.
23      Then she had two additional stab wounds, No. 4
24 No. 5, of the anterior neck; and these were again superficial
25 stab wounds. No. 4 was clearly invasive, and No. 5 was a

Page 134

1 somewhat deeper stab wound but again did not cause any injuries
2 to the blood vessels of the neck.
3      And then finally the last stab wound is a large
4 gaping defect here of the left upper chest area. This was
5 about two inches in length but did not go into the chest cavity
6 and was not a fatal cut wound.
7      Q. So Cut Wound No. 6 was fairly superficial.
8      A. That's right.
9      Q. Let me ask you about the cut wounds to the neck area,
10 which would be 2, 3, 4 and 5. Is there anything about that
11 pattern or grouping of cut wounds that suggests anything?
12      A. Yes. In fact, these are geographically clustered in
13 a very tight area. Generally the implication of such a tight
14 geographical cluster implies that they occurred at or near the
15 same time one after the other as there was a motion to slice
16 the neck open.
17      Q. So it implies essentially a sawing motion.
18      A. That's right.
19      Q. Why don't we go ahead once again and use the rubber
20 half body over here to show the injuries that were inflicted
21 particularly by the large gaping wound.
22      A. Obviously Wounds No. 2, 3, 4 and 5 are clustered in
23 the neck area as we mentioned. Wound No. 3 was up here. This
24 is the thyroid cartilage in front of the neck, and this is the
25 hyoid bone that you see in white color. This is the membrane

Page 135

1 that connects the thyroid cartilage, which is in blue, to the
2 hyoid bone, which is in white.
3      This membrane was severed, which would mean that
4 the trachea is now exposed to the outside. Obviously foreign
5 material, blood can all go into the lungs. This is a
6 potentially fatal wound.
7      Cut Wound No. 1 was on the right cheek, and was
8 very superficial. So 1 through 5 are of no great significance
9 except for the 3; and then she had a cut wound along the left
10 upper chest, and this was a superficial cut wound.
11      Q. Can you describe the impact of the large cut wound to
12 the neck in terms of bleeding and consciousness?
13      A. She would not bleed profusely because that is not a
14 very vascular structure, but she would suck in air through that
15 open defect. She would suck in blood into the open defect into
16 the lungs, and it would be, of course, excruciatingly painful.
17      Q. Would this ultimately be a fatal wound?
18      A. Yes. If untreated it would be a fatal cut wound.
19      Q. Now, going to the photographs, starting with State's
20 Exhibits 150 and 151 with this half of the jury, can you show
21 us what is depicted in these photographs?
22      A. Yes. State's 150 is the front portion of the face,
23 the neck and the body; and State's 151 is the right lateral
24 profile of the body. You can see that, in fact, on the State's
25 151 there is a very large defect that comes around the jaw bone

Page 136

1 and ends up in the front of the neck. This is a rather long
2 eight-inch cut wound that went deep inside the neck and severed
3 the membrane between the hyoid bone and the thyroid cartilage.
4      And then you are seeing the superficial cut
5 wound of the left cheek on here, and then you are seeing a
6 superficial cut wound below this cut wound, and a little deeper
7 cut wound, No. 5, and then this cut wound along the right upper
8 chest, which is located here as No. 6.
9      Q. And are the stab wounds depicted on here?
10      A. Yes. There were, of course, multiple stab wounds as
11 we have already talked. Again, this is Stab Wound No. 1 of the
12 left cheek, No. 2, No. 3, No. 4, No. 5 and No. 6, the right
13 upper chest.
14      Q. Thank you. Now, if you can show the jury State's
15 Exhibit No. 149 for identification.
16      A. State's 149 is the face of the decedent with all of
17 the wounds to the anterior neck and stab wounds that we just
18 described.
19      Q. And then State's Exhibit 152 and 153 for
20 identification?
21      A. State's Exhibit 153 is, in fact, the large gaping
22 stab wound of the left posterior arm with an exit stab wound
23 just about there.
24      And then State's Exhibit 142 is the right
25 posterior arm, which is the stab wound that you see here, a

Page 137

1 rather large gaping stab wound.

2   Q.   Okay.  Let us go through one more series of

3 photographs before I ask you the -- I'm sorry.  State's Exhibit

4 154, 155 and 156 depict the victim's clothing and her feet and

5 the shoes on her feet, correct?

6   A.   That's correct.  You are seeing that she still has

7 her left shoe on, which is bloody, but she has lost the right

8 shoe at some point in the house, and her feet are bloody, so

9 she was running away or trying to defend herself and she had

10 blood on the soul of her right foot.

11   Q.   This would indicate that at some point she was

12 standing in blood --

13   A.   Absolutely, yes.

14   Q.   -- in some fashion or another?

15   A.   In some fashion or another.  And these are her

16 pictures -- No. 153 and 154, they show the tremendous amount of

17 blood that was on the clothing that she was wearing, the shirt

18 and the light blue colored shorts she had on at the time she

19 was stabbed and cut.

20   Q.   Okay.  Now, before we proceed on to photographs of

21 the hand, you made a diagram of the defensive wounds which you

22 found on her hand.

23   A.   Yes, ma'am.

24   Q.   If we could refer to that diagram.  For the record I

25 am referring to State's Exhibit 164 for identification, which

Page 138

1 is the diagram of the front and back of her hands.

2   A.   All right.  The upper portion of the diagram is the

3 right hand showing the outer, or dorsal, surface and the palmer

4 surface, and the lower part is the left hand.  Again this is

5 the dorsal surface and the palmer surface.  You can see that

6 she had multiple cut wounds that I have described and measured

7 on the hands and I have documented with photographs.

8 Essentially she had 11 cut wounds of the palmer surface

9 including the thumb, the first, second, third and small finger

10 of her right hand; and then she had four cut wounds of her

11 dorsal surface, the middle finger, the index finger and the

12 base of her right thumb.

13        Then the left hand has a defensive wound along

14 the palmer surface.  She has been cut at the tip of her left

15 thumb and then the index finger, the ring finger and the little

16 finger here.  Altogether you can see that she had, in fact, 16

17 cut wounds of the right hand and four cut wounds of the left

18 hand.

19   Q.   Some of these cut wounds are on the surface of the

20 fingers that would be used for gripping, correct?

21   A.   Yes.  They are suggestive that she tried or perhaps

22 tried to grab the knife.  And you can see the -- they are not

23 necessarily produced by multiple cuts or stabs, but they may be

24 produced by single strokes.  Perhaps he was switching the blade

25 and it produced multiple cuts in the fingers which are next to

Page 139

1 each other, or she tried to grab the knife and the sharp

2 surface of the knife cut her hand as she was trying to take the

3 weapon away from the assailant.

4   Q.   Grabbing a knife would be very painful, would it not?

5   A.   Yes.  Cut wounds to the hands are usually very

6 painful.

7   Q.   Now, referring to the rest of the pictures which show

8 the defensive wounds, let's start off with State's Exhibit 160

9 and 161 for identification.

10   A.   This is, of course, the right hand of the decedent,

11 and what we are seeing in State's 160 and 161 are palmer

12 surface.  You can still see the blood on the hand, although

13 they have been washed away to show the wounds more clearly.

14        This is the multiple cut wounds along the palmer

15 surface as well as the first finger, middle finger as well as

16 the ring finger and small finger.

17   Q.   If you want to show them 157 --

18   A.   157 is her left hand, and it shows that long palmer

19 surface just along the edge of the distal digit, or the tip of

20 the left thumb, also a cut wound there.

21   Q.   And then State's Exhibit 158 and 159?

22   A.   State's 158 is the left hand of the decedent, the

23 palmer surface, and you are seeing the cut wound that we have

24 already described along -- the thumb, the index finger, the

25 ring finger and the little finger.

Page 140

1        And finally the State's Exhibit 159 is the

2 right hand of the decedent.  And you are seeing the four cut

3 wounds that we had earlier described along the base of the

4 thumb, the index finger, the middle finger, and the ring finger

5 and the dorsal surface of the right hand which you see here.

6   Q.   The injuries that you have described to this jury on

7 both Pearl and Patricia, the number of wounds and the type of

8 wounds, do they suggest anything about the strength of the

9 attacker or strength that would be required to inflict

10 injuries like that?

11   A.   Obviously there were multiple injuries produced.

12 There was a tremendous amount of physical activity that

13 occurred in causing these injuries.  Many of the cut wounds

14 are, of course, superficial cut wounds, soft-tissue cut wounds

15 and do not require a lot of strength.  They can be produced by

16 a person with average strength.  None of these injuries went

17 through any bony structures.  They basically went space that

18 could be produced with moderate strength and can be caused by

19 any average person.

20   Q.   So no huge amount of strength required to inflict

21 them.

22   A.   That's right.

23   Q.   You described before the pain of the stomach injury.

24 Would the stomach injuries plus all the other injuries cause

25 the victim pain?

Page 141

1    A.  Yes.  When you interrupt the abdominal cavity, there
2 is excruciating pain, and you buckle up and moan and grown in
3 tremendous pain.
4    Q.  And this would have lasted, by your estimate, at
5 least five minutes.
6    A.  Until she lost consciousness after loss of sufficient
7 blood.  Obviously we don't know the sequence of the stab
8 wounds, so we don't know at what stage she got the fatal stab
9 wound, but if it was, in fact, the first stab wound, then
10 probably within five minutes' time after that wound, she would
11 have succumbed and become unconscious, not necessarily dying at
12 that point.
13    Q.  Why would there be a distance in time between the
14 time she became unconscious and the time she actually died?
15    A.  But her heart function would continue.  She had no
16 injury to her heart.  And she had a fairly good heart.
17 Although she was 71 years of age, she had essentially a good
18 heart.  The heart kept on beating, and she would die once she
19 had lost all of her blood, most of her blood, maybe two-thirds
20 of her blood, and then she would go into deep coma and die.
21        And that would not happen instantaneously.  She
22 would continue to get blood to the brain since the carotid
23 artery is intact and the vertebral arteries are intact, so
24 there would some blood going to the brain, and during that time
25 she would be conscious.

Page 142

1        Only when she has lost large quantities of
2 blood, although the heart isn't pumping, although there is some
3 blood going to the brain, it is not sufficient to maintain a
4 state of consciousness.  At this time she would be in coma.
5    Q.  So her health was otherwise good?
6    A.  Yes.
7    Q.  And the toxicology results on her, were they pretty
8 much the same as they were for Pearl?
9    A.  That's right.  She just had a trace amount of
10 postmortem alcohol in the blood.
11    Q.  And the amounts were actually consistent between the
12 two of them.
13    A.  That's correct.
14    Q.  Were samples of blood and tissue taken and preserved
15 in this case?
16    A.  Yes, ma'am.
17    Q.  Now, the whole body of injuries you saw to Pearl and
18 to Patricia, were they consistent with being caused by the same
19 knife?
20    A.  Yes, they have similar patterns.
21    Q.  Now, once again, Dr. Peerwani, did you have an
22 opportunity to make an assessment of the cause of death in this
23 case?
24    A.  Yes.
25    Q.  What was the cause of death?

Page 143

1    A.  I entered the cause as multiple cut and stab wounds
2 as the cause of death.
3    Q.  And these are what killed Patricia Syren.
4    A.  That's right.
5    Q.  And what was the manner of death in this case?
6    A.  I ruled the case as homicide.
7        MS. CALLAGHAN:  Dr. Peerwani, we thank you very
8 much.
9        THE COURT:  How long will cross-examination
10 take?
11        MR. MOORE:  Probably not very long.
12        THE COURT:  Go ahead.
13        CROSS-EXAMINATION
14 BY MR. MOORE:
15    Q.  Dr. Peerwani, you have performed over 6,000
16 autopsies; is that correct?
17    A.  That's right, sir.
18    Q.  That's been over a period of 25 years?
19    A.  That's right.
20    Q.  And one thing that you -- well, let's put it this
21 way.  You can look at some wounds on people and kind of to a
22 medical certainty, determine what happened at the scene,
23 correct?
24    A.  Yes, as far as the wounding is concerned.
25    Q.  Right.  In other words, a wound track, you can kind

Page 144

1 of tell where a person may have been standing when the wound
2 was inflicted.
3    A.  Generally, yes, if one has good pictures or goes to
4 the scene.
5    Q.  Could you do that in this case on either one of them?
6    A.  I did not go to the scene, no, sir.
7    Q.  Did you look at photographs of the scene?
8    A.  I have some pictures but not the entire set since I
9 did not do the scene investigation.
10    Q.  Your assessment is based strictly on the autopsies
11 that you conducted on both women.
12    A.  That's right.
13    Q.  Okay.  And I believe you testified that there was
14 seven stab wounds and four cut wounds on Ms. Magouirk.
15    A.  Yes, that's correct.
16    Q.  And in your opinion, were those all separate wounds?
17    A.  Yes, indeed.
18    Q.  That would have been -- that would have been taking a
19 knife and stabbing her and cutting her at least 11 different
20 times.
21    A.  That's right, sir.
22    Q.  I believe you testified that on Ms. Syren, there were
23 nine stab wounds, six cut wounds, correct?
24    A.  That's right.
25    Q.  So that would have been at least 15 times -- separate

Page 145

1 times that she was either cut or stabbed, correct?

2   A. That's right, sir.

3   Q. I believe some of the wounds on her hands probably

4 were related to those stabbings and cuttings, wouldn't you

5 think?

6   A. It's certainly possible that she put up her hand to

7 ward off a blow and she got cut as a result, that's true, sir.

8   Q. You have seen autopsies where the cause of death was

9 maybe a single gunshot wound to bodies being dismembered,

10 haven't you?

11   A. Yes, sir.

12   Q. You have seen all kinds of different cases of a

13 person who has been stabbed multiple times, haven't you?

14   A. Yes, sir.

15   Q. In your medical opinion with these amounts of wounds

16 are inflicted, this number of wounds are inflicted, that that

17 person who is inflicting these wounds is in some kind of a

18 rage, wouldn't you agree?

19   A. Well, I usually stay away from making that

20 conclusion. I can only speak about the actual death. I can

21 say this was a brutal killing. And I am not a psychiatrist,

22 and I try to stay away from the mental status of the assailant.

23   Q. Okay. And I believe you testified that in your

24 opinion, that Ms. Syren, because she had blood on her tennis

25 shoe, would be running away?

Page 146

1   A. One can say with at least one degree of certainty, a

2 great degree of certainty about one thing, that she was upright

3 after having sustained some of those injuries. It's quite

4 possible that she was running away, and this would explain why

5 she had stab wounds to the back of her arm.

6   So, yes, I would say there is a strong

7 possibility she was running away from the assailant.

8   Q. And again, you didn't look at any pictures of the

9 crime scene, did you?

10   A. Well, I did look at the pictures, but I did not do

11 any crime scene assessment. It was outside my scope of work.

12   Q. Okay. But saying that she was running away is not

13 outside your scope of expertise?

14   A. I can say that based on the autopsy, yes.

15   Q. Based on the autopsy that she was running away?

16   A. Yes.

17   Q. Okay. When you say a superficial wound, what do you

18 mean by "superficial"?

19   A. By that I mean, Counselor, that this is a wound that

20 is confined to skin and the soft tissue.

21   Q. Okay. And out of all the wounds and cuts that we

22 have talked about, I believe No. 1 on Ms. Magouirk was the

23 fatal wound, correct?

24   A. The fatal stab wound of the right chest, yes, sir.

25   Q. Again, we don't know the order of these wounds, do

Page 147

1 you? Let me make that a little clearer. You can't tell from

2 conducting the autopsy which wound was inflicted first, second,

3 third or so on.

4   A. No, sir, I clearly stated that. These numbers were

5 for description only.

6   Q. Right. But you can tell when a wound is -- you can

7 tell when a wound is going to be fatal and not going to be

8 fatal, can't you?

9   A. Yes, sir.

10   Q. And you testified that in your opinion, Stab Wound

11 No. 1 of Ms. Magouirk, that she would have lived for three to

12 five minutes?

13   A. Yes, sir.

14   Q. What do you base that on?

15   A. I base that on past medical training, experience and

16 past evaluation of the cases.

17   Q. Have you ever seen somebody die after they have been

18 stabbed?

19   A. No, I have not had a chance to observe somebody being

20 killed.

21   Q. And, you know, I don't mean to be facetious, but to

22 say that she would have lived for three to five minutes in your

23 opinion, she could have lived for as little as a minute,

24 couldn't she?

25   A. I really doubt that. I would think that it was not

Page 148

1 an instantaneously fatal wound. We classify fatal wounds or

2 nearly fatal wounds or potentially seriously fatal wounds

3 depending on what kind of injury a person has.

4   And it might -- if I may give you an example, a

5 high cervical cord transection is rather instantaneously fatal

6 because a person would quit breathing at the time of injury.

7   In this particular case, the person would go on

8 breathing for a while and would have some heartbeat, but then

9 die within a short time because the heart would become

10 nonfunctional. And it is not instantaneous.

11   Q. And I believe you testified that Ms. Syren, the fatal

12 injury to her would have been the wound to the left anterior

13 neck.

14   A. Yes, sir.

15   Q. Okay. And those two injuries, would you say, were

16 the major contributors to these women's death?

17   A. Yes. The right chest as far as Pearl and the left

18 anterior neck as far as Patricia is concerned, yes, sir.

19   Q. Okay. Would the other wounds that they suffered,

20 would they have been fatal?

21   A. Yes. The one that we mentioned for Pearl, she had a

22 stab wound of the right lower chest. This had the seriousness

23 of being potentially fatal because of the stab wound to the

24 lungs and would have required medical attention as quickly as

25 possible.

Page 149

1      MR. MOORE: Thank you, sir. That's all I have.

2           REDIRECT EXAMINATION

3 BY MS. CALLAGHAN:

4   Q. A few more questions. I forgot to ask you one

5 question concerning Patricia Syren. On the throat wound, can

6 you tell us what the direction of that wound was?

7   A. She has multiple defects of the anterior neck. One

8 can say that No. 3, in fact, starts way out in the lateral

9 border, and this is most probably the beginning point of

10 slicing the anterior neck going from the right side of the

11 mid-portion of the neck.

12   Q. Right side -- starting this side?

13   A. Yes, ma'am.

14   Q. So once again, it would start with this side and go

15 to the left side?

16   A. That's right.

17   Q. So the information that you gave us concerning the

18 position of the attacker with regard to Pearl's would also

19 apply to Patricia.

20   A. That's correct.

21   Q. Defense Counsel asked you a question concerning

22 whether or not the injuries that you saw would be consistent

23 with rage.

24   A. Yes, he did.

25   Q. And, of course, not being a psychiatrist, you were

Page 150

1 hesitant to go into that?

2   A. I did not want to go period.

3   Q. All right. Would you say, though, that the injuries

4 that you saw on both of these victims, the number of injuries

5 and the seriousness of the injuries, was consistent with

6 achieving the goal of making sure they were dead?

7   A. Yes. As a matter of fact, she had what we call coup-

8 de-gras wounds of the neck, which are usually wounds that occur

9 at the end, and they would -- they are caused to make sure the

10 person does, in fact, die.

11   MS. CALLAGHAN: Thank you, Dr. Peerwani.

12   Pass the witness.

13   MR. MOORE: I don't have any questions.

14   THE COURT: You may step down, sir.

15   THE WITNESS: Thank you, Your Honor.

16   MS. HARTMANN: Your Honor, at this time the

17 State of Texas would rest its case in chief.

18   (The State rests)

19   THE COURT: Ladies and gentlemen of the jury,

20 let's take our lunch break until 2:30. Please remember and

21 follow your instructions. The bailiffs will meet you as

22 usual. Have good lunch.

23   (Recess for lunch)

24   (Afternoon Session:)

25   (Jury not present)

Page 151

1   MS. HARTMANN: Your Honor, it is the State's

2 understanding that the Defense is going to call James Rizy, the

3 investigator with the Tarrant County District Attorney's office

4 that has been assisting us in preparing this case for

5 prosecution.

6   My understanding from speaking with Mr. Ray

7 yesterday evening was the purpose in putting Mr. Rizy on was to

8 introduce some videotape about the contents of

9 these tapes, and all we would ask at this point is prior to the

10 jury being brought in and those tapes being talked about or

11 shown is the Defense make a good faith proffer of how they are

12 going to lay the predicate for the admissibility of those tapes

13 and the relevance of those tapes.

14   MR. RAY: Judge, the officers that seized the

15 tapes that were from Galveston are in the hallway. They are

16 here to testify if they need to be.

17   Also, Detective McCaskill, who is the homicide

18 detective in this case, it is my understanding those tapes were

19 sent to him and provided to the DA's office. And quite

20 frankly, one of the packages that Mr. Rizy had with him

21 yesterday that he showed me has the credit card receipt from

22 the hotel. So I think Officer Simpson, as the Court will

23 remember, testified he gathered all that up from the hotel.

24 I'm not going to offer the tapes.

25   THE COURT: You are not going to offer the

Page 152

1 tapes?

2   MR. RAY: I hadn't planned on offering the

3 tapes.

4   MS. HARTMANN: Well, but he is going to try to

5 elicit testimony about what is on those tapes.

6   MR. RAY: I am going to do that.

7   MS. HARTMANN: And without satisfying the

8 predicate whether or not those tapes fairly and accurately

9 depict events, whether someone has personal knowledge of those

10 events, what dates those events depicted portray.

11   I mean, what we have is tapes that were seized

12 by police, but there is no one to verify the authenticity or

13 whether or not there has been any alterations, changes or

14 deletions made to the tapes or when those tapes were recorded

15 and what they were recording.

16   MR. RAY: Well, in that regard, those tapes and

17 some of the events that are -- supposedly transpired, which

18 actually turns out they don't, would bear on the probable cause

19 that Detective McCaskill had when he obtained his search

20 warrant and when he conducted his investigation in this case.

21   And in that regard, even if they are not

22 admissible, he's testified as an expert witness, they would

23 have to be admissible. Those are the tapes that he supposedly

24 developed his probable cause from; and what's on them, right

25 wrong or otherwise, could bear on that.

CondenseIt™

1   In other words, if he got a tape and he looked
2 at it and he said, "I didn't see anything" or "I did," that
3 might substantiate his -- that might substantiate his probable
4 cause that he had when he got his search warrant signed to get
5 the buccal swabs of the Defendant.
6   THE COURT: I can't rule without hearing the
7 testimony. If you're not going to offer them, I guess we will
8 have to have another hearing after we get some of the testimony
9 developed and we get to the point of the objection.
10   MS. HARTMANN: We would like a motion in limine
11 before Defense Counsel asks about the contents of those tapes.
12   THE COURT: Granted.
13   MR. RAY: Well, then we need to hash that out.
14 Mr. Rizy can do that because -- he's seen the tapes.
15   THE COURT: It doesn't make any difference if
16 he's seen the tapes, the way I understand it. The question is
17 what McCaskill did or didn't see.
18   MR. RAY: I think McCaskill would say he didn't
19 see anything.
20   THE COURT: Is he going to come in here and say
21 that?
22   MR. RAY: I think that's what he's going to
23 say.
24   THE COURT: Are you going to call him as a
25 witness?

1   MR. RAY: I was going to call him. I don't know
2 that personally, but I anticipate that's what he will say.
3   THE COURT: All right. Until we get to that
4 point --
5   MR. RAY: Well, we'll call Detective McCaskill
6 first.
7   THE COURT: All right. Are both sides ready for
8 the jury? Your motion in limine is granted.
9   MR. RAY: I want to make sure what you don't --
10 you don't want me to ask someone about the contents of what is
11 on the tape?
12   THE COURT: Correct. Are you ready for the
13 jury?
14   MR. RAY: Yes. May we approach just briefly?
15   THE COURT: Yes.
16   (Outside the hearing of the jury)
17   MR. RAY: We'd move for an instructed verdict
18 in that the State has wholly failed to make a prima facie case
19 specifically in light of the outcome of the lack of probable
20 cause.
21   The Court -- that evidence, it is our position,
22 was not relevant and should not have been admitted and would
23 not have substantiated the Defendant's guilt without that, so
24 we would move for an instructed verdict on that basis.
25   THE COURT: Denied.

1   (In the hearing of the jury)
2   MR. RAY: The Defense calls Detective McCaskill.
3 Whereupon,
4   JOHN MCCASKILL,
5 having been first duly sworn, testified as follows:
6   DIRECT EXAMINATION
7 BY MR. RAY:
8   Q. State your name please, sir, for the record.
9   A. Detective John McCaskill.
10   Q. Are you the same John McCaskill that testified
11 previously?
12   A. Yes, sir, I am.
13   Q. Detective McCaskill, I want to direct your attention
14 to the time period that you went to Galveston.
15   A. Yes, sir.
16   Q. Did it ever come to your attention that in one or
17 more places in Galveston, there were some security or
18 videotapes that might substantiate some of the things you
19 thought you knew as far as where the Defendant was or wasn't?
20   A. Yes.
21   Q. Where were those places?
22   A. I don't recall the names of all of them, but I know
23 there was probably two to four different locations that might
24 have had surveillance tapes.
25   Q. Would one of them have been the Seahorse Hotel?

1   A. I don't know which facilities had security tapes and
2 which didn't. I'm sorry.
3   Q. Did you ever come in contact -- did you ever receive
4 those tapes?
5   A. No, sir.
6   Q. Then it would follow you have never looked at them?
7   A. That's correct.
8   Q. Assuming there is more than one.
9   A. Yes, sir.
10   Q. If there was a tape and it was a surveillance tape of
11 the hotel or a liquor store or cab stand or Diamond Shamrock or
12 any of those places, you don't have any way of knowing whether
13 or not the Defendant, Billy Jack Crutsinger, is on those tapes
14 at the appropriate time.
15   A. I personally don't, no.
16   MR. RAY: May I approach the witness?
17   THE COURT: Yes.
18   Q. I'm going to show you what I have had marked as
19 Defendant's Exhibit 4 and ask you if you recognize that.
20   A. Yes, sir, I do.
21   Q. Tell the jury what it is.
22   A. This is a copy of the search warrant that was
23 obtained on August 26 of this year.
24   Q. It's also got the affidavit with it, does it not?
25   A. Yes, it does.

1    Q. Did you review Defendant's Exhibit 4 prior to coming
2 in and testifying in this case?
3    A. Yes.
4    Q. And did you, in fact, review it while you were
5 testifying in this case?
6    A. No, I did not review it while I was testifying.
7    Q. But you did review it before you gave your direct
8 examination for the State the other day.
9    A. Yes, sir.
10    Q. And does it, in fact, relate to the subject matter of
11 this case?
12    A. Yes.
13    Q. There is not some extraneous, unrelated matter there,
14 is there?
15    A. Not that I'm aware of, no.
16    Q. And that's the search warrant that -- when it was
17 signed, it was signed by Judge Sharen Wilson across the hall,
18 correct?
19    A. Yes, sir, that's correct.
20    Q. This was for the specific purpose to obtain the
21 buccal swabs of the Defendant, Billy Jack Crutsinger.
22    A. Yes, sir.
23        MR. RAY: I will offer Defendant's Exhibit 4.
24        MS. HARTMANN: We'd object on the grounds of
25 hearsay.

1        THE COURT: Overruled. Defense 4 is admitted.
2        (Defendant's Exhibit No. 4 received)
3 BY MR. RAY:
4    Q. Let me ask you -- and I will show it to you if I need
5 to. A couple of things in here talk about what went on down in
6 Galveston; is that right?
7    A. Yes, sir, it is.
8    Q. And it talks about the Seahorse Inn, correct?
9    A. Yes, sir.
10    Q. And it talks about the Yellow Cab stand, correct?
11    A. Yes, sir.
12    Q. And I will show this to you if you need it.
13    A. Please.
14    Q. It talks about the Yellow Cab stand, correct?
15    A. Yes, sir.
16    Q. And it was your understanding that the Defendant had
17 checked into the Seahorse Inn.
18    A. Yes, sir.
19    Q. Or someone had checked into the Seahorse Inn.
20    A. That's correct.
21    Q. You didn't know who that was, right?
22    A. Not specifically at that time, no.
23    Q. You certainly didn't know Billy Jack Crutsinger had
24 checked into that hotel at that point in time.
25    A. When the warrant was written, yes, sir, I was under

1 the definite belief that he did -- that it was him.
2    Q. When this warrant was written -- because this was
3 written in August, right?
4    A. That's correct.
5    Q. In fact, you -- tell the jury what you were doing
6 when you wrote this warrant.
7    A. I'm not sure that I understand --
8    Q. Let me make it a little clearer. When you got that
9 warrant, you were trying to come up with facts --
10        MS. HARTMANN: Object to Counsel leading the
11 witness.
12        MR. RAY: He's an adverse witness, Judge.
13        MS. HARTMANN: There has been no establishment
14 he's an adverse witness.
15        THE COURT: Overruled.
16    Q. When you got that warrant, were you trying to put
17 facts in that warrant that would operate outside of the facts
18 that you found after the Defendant was arrested? Do you
19 understand my question?
20    A. Yes, sir, I do. And I was -- if I can go into what I
21 was -- I was attempting to establish probable cause based on
22 information that was provided to me by the Galveston Police
23 Department as well as what I personally knew from my own
24 observations.
25        And it would have been to the point -- the

1 stopping point would have been when I actually met with Mr.
2 Crutsinger, if I answered that correctly.
3    Q. There is nothing in that affidavit that talks about
4 his statement to you or the results of DNA testing that you
5 already knew about or his statement to the lady in the jail,
6 Ms. Cheryl Moffett. None of that is in there, right?
7    A. No, sir, it is not.
8    Q. You specifically left that out so you could attempt
9 to establish probable cause outside or from before the arrest.
10 Is that a fair statement?
11    A. Yes, sir, it is.
12    Q. Okay. And the reason for that is like what you said
13 before; there was some concern about the legality of the
14 arrest. That's why you did that.
15    A. I knew the question had been raised and I knew the
16 question had not been answered at that time.
17    Q. Okay. Now, at that point in time did you know that
18 these videotapes were floating around out there?
19    A. I'm sorry, sir. I'm not sure which point in time --
20    Q. When you got that arrest warrant.
21    A. When I got the arrest warrant?
22    Q. Excuse me. When you got the search warrant from
23 Judge Wilson.
24    A. I was aware that the Galveston Police Department was
25 in possession of some tapes, yes.

1 Q. When did those tapes get sent up here?

2 A. I don't know.

3 Q. You never saw those, right?

4 A. That's correct.

5 Q. Why did you never try to look at those tapes?

6 A. It was agreed with Galveston police while we were

7 down there that they would maintain any evidence of any kind of

8 offense that occurred in their city, they would maintain that

9 evidence and that it would be made available to the District

10 Attorney's office here at a later time.

11 Q. Well, would you agree with me that when you take out

12 everything that involved the fact after the arrest, that at

13 least limits some of the facts you have as far as getting the

14 search warrant?

15 A. Well, no, sir, I don't believe so.

16 Q. Well, maybe I didn't explain my question. When you

17 take out the facts of the arrest, that takes away some of the

18 things that you might have been able to use for Judge Wilson to

19 get your search warrant. Is that a fair statement?

20 A. Well, the information could have been added to the

21 warrant affidavit.

22 Q. Well, wouldn't it have made sense -- when you get a

23 warrant, and in this case when you got this warrant, do you try

24 to allege as many facts as you can to support your contention,

25 support probable cause?

1 A. Yes, sir.

2 Q. Okay. And you knew those tapes existed when you got

3 that warrant.

4 A. Yes, sir.

5 Q. So my question is: Why did you not attempt to look at

6 the tapes before you got that search warrant?

7 A. Because I didn't have the tapes and they weren't

8 available to me.

9 Q. Okay. Were you in a hurry to get the search warrant?

10 A. Well, not a terribly big hurry. I discussed the

11 matter with Ms. Callaghan and Ms. Hartmann, and we agreed that

12 once the -- we'd go ahead and obtain the warrant and execute it

13 in a timely manner within a couple of days, and that's what we

14 did -- or what I did.

15 Q. Worst case, you could have got those tapes within a

16 day, could you not?

17 A. I'm not sure that they were even here at the time,

18 so I don't know.

19 Q. Well, I mean, if they were in Galveston, you could

20 have gotten them within a day.

21 A. Possibly, if I had gone to Galveston and gotten

22 them.

23        MR. RAY: I'll pass the witness.

24        CROSS-EXAMINATION

25 BY MS. HARTMANN:

1 Q. Detective McCaskill, did you get notified to come

2 here to court to testify on behalf of the Defense?

3 A. Yes, ma'am.

4 Q. Did you come when you were called?

5 A. Yes, ma'am.

6 Q. Have there been any disagreements between you and Mr.

7 Ray and Mr. Moore?

8 A. No, ma'am.

9 Q. Do you know where this term "adverse witness" comes

10 from?

11 A. I don't know. I know what it means --

12        MR. RAY: I'm going to object. It's not

13 relevant.

14        THE COURT: Sustained.

15 Q. You came when they called you; is that correct?

16 A. Yes, ma'am.

17 Q. And the -- where is the Defense exhibit? Defendant's

18 Exhibit No. 4, you got that signed by a District Court judge in

19 this courthouse.

20 A. Yes, ma'am.

21 Q. A judge, you have previously testified, who had been

22 on the bench for 16 years?

23 A. I think it's been about that long.

24 Q. She oversees cases just like this type of case,

25 doesn't she?

1 A. Yes, ma'am.

2 Q. Capital murder death penalty cases?

3 A. Yes, ma'am.

4 Q. Her docket handles all felony cases, does it not?

5 A. Yes, ma'am, I believe so.

6 Q. In your search warrant, your affidavit -- excuse me,

7 the affidavit portion, you have information containing the

8 circumstances surrounding the homicide of Patricia Syren and

9 Pearl Magouirk, correct?

10 A. Yes.

11 Q. And you detail the evidence that was found there at

12 the scene.

13 A. Yes, ma'am.

14 Q. And the fact that she had a missing vehicle.

15 A. That's correct.

16 Q. That there were blood drops throughout the house.

17 A. Yes, ma'am.

18 Q. That, quote, "this information led affiant to believe

19 that the person responsible for the victim's death was

20 injured," unquote?

21 A. That's correct.

22 Q. The information in regards to the light on the

23 telephone --

24 A. That's correct.

25 Q. -- indicating messages?

Page 165

1    A. That's correct.

2    Q. And your investigation into the credit card abuse?

3    A. Yes, ma'am.

4    Q. That the card was being used down in Galveston,
5 Texas?

6    A. Yes.

7    Q. You have got in here that you learned from the
8 Galveston Police Department officers that an Officer Simpson
9 proceeded to the Seahorse Inn and spoke with the night manager,
10 Daniel Teo?

11   A. Yes, sir.

12   Q. Who was personally known to him?

13   A. Yes.

14   Q. That they discovered the credit card had been used by
15 a white male to rent Room No. 101.

16   A. Yes, ma'am.

17   Q. That this person identified himself on the
18 registration card as David Jones.

19   A. Yes, ma'am.

20   Q. That the person registering had arrived by Yellow Cab
21 and appeared to have been drinking at Club 23; is that correct?

22   A. I believe so, yes.

23   Q. The officers went to Room 101, which appeared to be
24 abandoned because there were no personal possessions in the
25 room and the key had been left inside.

Page 166

1    A. Yes, ma'am.

2    Q. That an officer went to the Diamond Shamrock
3 convenience store close to the Seahorse Inn and talked to the
4 store clerk, Loretta Rouse, who stated that a white male had
5 tried to purchase a chili cheese dog and chips with a credit
6 card, but the credit card had been declined.

7    A. Yes.

8    Q. That -- and by the way, was Patricia Syren's credit
9 card, do you know whether or not it was being used frequently
10 down in Galveston?

11   A. I believe it was, yes.

12   Q. So the initial description at that point was a white
13 male, 25 to 35, with a yellow shirt?

14   A. Yes.

15   Q. That Officer Contenta proceeded to the Yellow Cab
16 where he spoke to the dispatcher.

17   A. Yes.

18   Q. The dispatcher indicated they had a person walk in
19 and request service at 1:19 and the dispatcher had broadcast
20 the information in an attempt to learn who had picked up that
21 particular fare; is that correct?

22   A. Yes, it is.

23   Q. That Officer Garcia, Jr., was notified at
24 approximately 11:15 the next morning that driver Donald Epps of
25 Yellow Cab wanted speak with him.

Page 167

1    A. Yes, ma'am.

2    Q. That Mr. Epps, who was known to Officer Garcia,
3 related he had picked up a fare fitting the suspect's
4 description at the Waffle House on 61st Street and had taken
5 him to Tonis Lazy Lounge.

6    A. Yes, ma'am.

7    Q. That this person was a white male in a white Joe's
8 Crab Shack T-shirt, blue jeans, a red cap, glasses who said he
9 was from Dallas, Texas.

10   A. Yes, ma'am.

11   Q. Mr. Epps also passed on information from another cab
12 driver that he had driven the same individual to the Elbow
13 Room; is that correct?

14   A. Yes, it is.

15   Q. That Officer Garcia, III, then went to these bars in
16 an attempt to locate the suspect; is that correct?

17   A. Yes, it is.

18   Q. He and other Galveston officers went to the Elbow
19 Room, but no one was there.  They notified the bartender of the
20 description of their suspect.

21        And was it your understanding at that point the
22 suspect was wearing a white Joe's Crab Shack T-shirt, some type
23 of blue jeans and was possibly from the area of Dallas, Texas?

24   A. Yes.

25   Q. While at another bar, the bartender at the Elbow

Page 168

1 Room called to say he remembered seeing the individual in
2 question and that he was a white male in his mid 40s with wavy
3 gray hair, about 220 to 250 pounds with a pot belly dressed in
4 blue jeans, a Joe's Crab Shack T-shirt and brand new white
5 tennis shoes.

6    A. Yes.

7    Q. That Officer Garcia remembered he had seen a man
8 fitting that description shortly before when he looked in Tonis
9 Lazy Lounge, but he had discounted him because he seemed too
10 old; is that correct?

11   A. Yes

12   Q. Officer Garcia, III, returned to Tonis Lazy Lounge
13 and saw Billy Jack Crutsinger in the bar; is that correct?

14   A. Yes, ma'am.

15   Q. Mr. Crutsinger appeared to be in his mid 40s with
16 wavy gray hair wearing a Joe's Crab Shack T-shirt, new looking
17 white tennis shoes and blue jeans; is that correct?

18   A. Yes, it is.

19   Q. He also appeared to have a fairly recent cut on his
20 finger.  Was that true information?

21   A. Yes, ma'am.

22   Q. That Officer Garcia, III, asked him his name, and he
23 refused to answer and cut his eyes towards the door.  Is that
24 information that you had?

25   A. Yes, it is.

Page 169

1  Q. It appeared as though he was looking for an exit to
2  Officer Garcia, III, so Officer Garcia, III, then detained this
3  individual.
4  A. Yes.
5  Q. And that's the information that you had.
6  A. Yes, ma'am.
7  Q. And that is the information that was contained in the
8  affidavit that you submitted to Judge Sharen Wilson of Criminal
9  District Court No. 1?
10  A. Yes, ma'am, it is.
11  Q. And that you were requesting a search warrant to be
12  issued to collect epithelial cell samples for Billy Jack
13  Crutsinger for the purpose of making a DNA comparison with
14  Crutsinger's DNA and blood left on the scene of the offense
15  that you believed had been left by the actor.
16  A. Yes, ma'am, it is.
17  Q. You are aware that modern scientific testing
18  procedures are available that would allow a comparison to be
19  made and you believed that such testing was necessary in the
20  investigation of the offense.
21  A. Yes.
22  Q. And you were sworn to this information, were you not?
23  A. Yes, ma'am, I was.
24  Q. And at the time that you sought the search warrant,
25  the rulings by the Court were still pending, correct?

Page 170

1  A. As far as I know, that's correct.
2  Q. How many chances does the State get to try someone
3  for capital murder?
4  A. One time.
5  Q. That's it, isn't it?
6  A. Yes, ma'am.
7      MS. HARTMANN: Pass the witness.
8      REDIRECT EXAMINATION
9  BY MR. RAY:
10  Q. How many times did they try Cullen Davis?
11  A. I don't know.
12  Q. They tried him more than once.
13  A. I wasn't aware of that.
14  Q. Okay. In your conversations with the credit card
15  guy --
16  A. Yes, sir.
17  Q. -- credit card people, and they sent you a list of
18  the places the credit card had been used, correct?
19  A. Yes.
20  Q. There wasn't any use of that credit card that is
21  indicated here where the lady took the credit card and it
22  wasn't used; is that right?
23  A. If I could have a minute to go through and find that?
24  Q. You sure can.
25  A. And I'm sorry, sir, is that at a Diamond Shamrock?

Page 171

1  Q. Diamond Shamrock.
2  A. I do have a printout indicating that a Diamond
3  Shamrock No. 2644 dated April 8, 2003 at 2307.04 hours.
4  Q. Look back, if you would and see when the credit card
5  was used at the Seahorse.
6  A. (Witness complies) It indicates same date, April 8
7  at 01:39, which would be 1:39 in the morning, hours.
8  Q. And then the -- it wasn't used at the Diamond
9  Shamrock until how much later in the day?
10  A. It lists a couple of times. It lists 23:07, which
11  would be 11:07 p.m. There is another at the same Diamond
12  Shamrock at 7:50 a.m.; and then another at 17:45, which would
13  be 5:45 p.m.
14  Q. So if you compare -- looking at those times, when was
15  the first time the card -- your understanding that the card was
16  used at the Diamond Shamrock after it was used at the motel?
17  Four or five hours later, six or --
18  A. If I am reading this correctly, it would be
19  7:50 in the morning as opposed to 1:39 in the morning, so about
20  six hours and some-odd minutes later.
21  Q. But what my point is that as far as your records
22  are concerned and what you understood, somebody used the credit
23  card at the Seahorse, right?
24  A. Yes, sir.
25  Q. And then your search warrant affidavit says somebody

Page 172

1  went to purchase a chili-dog and that was declined, right?
2  A. Yes, sir.
3  Q. And then you've got the cab company picking up
4  somebody at 1:19, according to their log. Does that sound
5  right?
6  A. From what I understand, yes.
7  Q. That's in the search warrant, not maybe --
8  A. I'm just looking at the printout from the credit card
9  company.
10  Q. My point, Detective McCaskill, is there is no
11  indication from what the credit card company provided you that
12  the credit card was used at the Diamond Shamrock at or near the
13  time that the motel room was rented or the cab was actually
14  fared or driven or whatever.
15  A. That's correct.
16  Q. Okay. And also this description that you got, until
17  we got over to Tonis Bar and the phone calls that led the
18  Galveston police to get to Tonis Bar, your understanding of the
19  description of that person was not somebody 45 years old with a
20  pot belly; it was a 25- to 35-year-old person with blond hair.
21  A. Yes.
22  Q. Now, what was it that changed from that description
23  to the description that you later got? I mean, the guy got
24  bigger and older.
25  A. Well, if I can go into a little bit of detail --

Page 173

1   Q. Sure.

2   A. -- it's been my experience over the years that

3 people's perceptions or descriptions of anybody can vary

4 greatly.

5   Q. Okay.

6   A. And, yes, there was quite a bit of difference --

7 there was a discrepancy in the description that the lady at the

8 Diamond Shamrock gave. I mean, if that's the question you are

9 asking, absolutely.

10        MR. RAY: That's all! I don't have anything

11 further. Thank you.

12        RECROSS-EXAMINATION

13 BY MS. HARTMANN:

14   Q. Did you receive information speaking with Morgan

15 Stanley Credit Card company that the credit card company had

16 deactivated Patricia Syren's card at some point?

17   A. Yes.

18   Q. So if anyone attempted to use it, it would be

19 declined.

20   A. Yes.

21   Q. And if the charge doesn't go through, then the credit

22 card company probably wouldn't have a record of that. Would

23 that be fair --

24        MR. RAY: I'm going to object to speculation.

25        THE COURT: sustained.

Page 174

1   Q. Well, if a card is declined, it is not going through

2 the company, right?

3   A. I would --

4        MR. RAY: I'm going to object to speculation.

5 He doesn't know.

6        THE COURT: Sustained.

7   Q. Do you have a credit card, sir?

8   A. Yes.

9   Q. If your credit card is declined, is there going to be

10 a charge on your bill?

11        MR. RAY: I'm going to object again. It's

12 speculation, and it is a different question. It is not a

13 question of whether or not it's on the bill; it's a question of

14 whether or not it's on their internal business records.

15        THE COURT: Sustained.

16        MS. HARTMANN: I'm going to object to counsel's

17 speaking objection.

18   Q. When people give descriptions -- let me ask you

19 this. How long have you been an investigator again?

20   A. 17 years and a few months.

21   Q. And you have had your fair share of investigating

22 offenses where the suspect involved is unknown?

23   A. Yes.

24   Q. And have you -- has it been your experience that when

25 you interview people who have seen the same person, that the

Page 175

1 descriptions are going to vary?

2   A. Yes.

3   Q. Is that unusual or common?

4   A. No, that's probably the rule as opposed to the

5 exception. It almost always varies.

6   Q. As you investigate a case, are you able to narrow and

7 focus on specifics on what the person looks like or where they

8 live or things of that nature.

9   A. Yes.

10   Q. So the process that we see documented in your search

11 warrant affidavit where you detail the Galveston Police

12 Department's work, that's the way most cases work, is it not?

13   A. Yes, it is.

14   Q. There is nothing uncommon about that, is there?

15   A. No, ma'am.

16   Q. The more people that the officer spoke to, the

17 clearer the description became.

18   A. Yes.

19   Q. The more commonality was discovered?

20   A. Yes, ma'am.

21   Q. And when you are conducting an investigation, is it

22 the accumulation of all the information out there that helps

23 you get from Point A to Point B?

24   A. Yes.

25        MR. RAY: Just one last question.

Page 176

1        FURTHER REDIRECT EXAMINATION

2 BY MR. RAY

3   Q. That credit card was used a whole lot more after he

4 rented the room in Galveston than before; is that right?

5   A. Yes, sir.

6        MR. RAY: okay. Nothing further.

7        MS. HARTMANN: One thing, Your Honor, if I can

8 approach the court reporter, please?

9        (Pause in the proceedings)

10        FURTHER RECROSS-EXAMINATION

11 BY MS. HARTMANN:

12   Q. The person who registered at the Seahorse Inn, the

13 information you had was that the name David Jones was used?

14   A. Yes.

15   Q. The credit card slips that you obtained from Razoo's

16 and the Fort Worth Outlet Square, what names were used on those

17 credit cards receipts?

18   A. David Jones.

19        MS. HARTMANN: we'll pass the witness.

20        FURTHER REDIRECT EXAMINATION

21 BY MR. RAY:

22   Q. You, of course, got those receipts a long time after

23 the Defendant was arrested.

24   A. Yes.

25        FURTHER RECROSS-EXAMINATION

1 BY MS. HARTMANN:

2    Q. But you had those receipts before you did the
3 affidavit for the search warrant, did you not?

4    A. Yes, ma'am, I did.

5         MS. HARTMANN: Pass the witness.

6         MR. RAY: Nothing further.

7         THE COURT: You may step down, sir.

8         MR. RAY: We'll call Officer Simpson.

9         (Witness Sworn)

10 Whereupon,

11         GEORGE SIMPSON,

12 having been first duly sworn, testified as follows:

13         DIRECT EXAMINATION

14 BY MR. MOORE:

15    Q. Would you state your name for the jury, please?

16    A. George Simpson.

17    Q. Mr. Simpson, how are you employed?

18    A. I am gainfully employed with the Galveston Police
19 Department.

20    Q. How long have you been gainfully employed with the
21 Galveston Police Department?

22    A. 13 years. In addition, five with the Dallas County
23 Sheriff's Department.

24    Q. On April 8 of this year, were you employed with the
25 Galveston Police Department?

1    A. Yes, sir, I was.

2    Q. Do you recall what shift you were working on April 8?

3    A. I was assigned to night watch patrol.

4    Q. Galveston is kind of a small island. Do you patrol
5 the whole island?

6    A. You are assigned a district on the island.

7    Q. And the district that you were assigned to on April
8 8, did that include a place called the Seahorse Inn?

9    A. Yes, at the time particular time, yes, sir.

10    Q. All right. And were you asked to go to the Seahorse
11 Inn in relation to an investigation of a murder here in Fort
12 Worth?

13    A. Yes, sir.

14    Q. Okay. And did you go to the Seahorse Inn?

15    A. Yes, sir, I did.

16    Q. Did any other officer make the location at the
17 Seahorse Inn that day?

18    A. Eventually there were two other officers that made
19 the scene.

20    Q. Who were they?

21    A. Sergeant Pena and also Officer Contenta.

22    Q. Do you recall what time you went to the Seahorse Inn
23 on April 8?

24    A. Based on my report it was 23:32, hours which is
25 11:32.

1    Q. 11:32 p.m.?

2    A. Yes, sir.

3    Q. Did you receive -- there was concern about a credit
4 card being used down there, correct?

5    A. Yes, sir.

6    Q. And the credit card owner was a Patricia Syren,
7 correct?

8    A. Patricia Lee, correct.

9    Q. And that credit card had been used at the Seahorse
10 Inn, right?

11    A. That's correct.

12    Q. Did you -- when you went to the Seahorse Inn, did you
13 interview the person who worked there registering people?

14    A. The night watch manager, yes, I did.

15    Q. And did you get a description of the person who
16 rented the room with that credit card?

17    A. The description did not come at that particular time;
18 it came later.

19    Q. Okay. So the night registration man couldn't give
20 you a description of the person that rented that room, could
21 he?

22    A. No.

23    Q. Was there a videotape that was secured by the
24 Galveston police from the lobby of the Seahorse Inn?

25    A. Yes, there was.

1    Q. Okay. Did that -- did you ever view that videotape?

2    A. No, sir, I did not.

3    Q. Did you eventually -- were you eventually involved in
4 a search of one of the rooms there at the Seahorse Inn?

5    A. Yes, I was.

6    Q. And that's the room that was rented with a credit
7 card, correct?

8    A. Correct.

9    Q. Was anything found in that room?

10    A. There were a few items noted inside the room.

11    Q. What was noted inside the room?

12    A. The key with a Seahorse Inn tag was noted. Also an
13 empty bag of potato chips was located on the table that
14 was located next to the nightstand, and also the chili-and-
15 cheese that was found inside the potato chip bag.

16    Q. Okay. Did the Galveston Police Department collect
17 that evidence?

18    A. That was a question that would have to be directed to
19 Officer Catenta because he processed the scene.

20    Q. Did you watch him process the scene?

21    A. No, sir, I left prior to.

22    Q. When you left, where did you go?

23    A. I proceeded to 3428 Seawall Boulevard.

24    Q. And what was the purpose of going there?

25    A. Well, I was trying to track down to see where the

CondenseIt™

Page 181

1 chili dog and the potato chips were purchased from, and that
2 was the nearest store.
3    Q. All right. And was that -- what was at that address?
4    A. It's a convenience store that's going to be
5 southwest of the hotel. I don't recall the specific name, but
6 it is right there on the corner, 3428 Seawall.
7    Q. And you didn't find out any information there,
8 correct?
9    A. I did interview the clerk that was there.
10    Q. Okay. And the clerk couldn't help you?
11    A. No, sir, he could not help me.
12    Q. Then where did you go after that convenience store?
13    A. Approximately 12:10 a.m. of 4-9-2003, I proceeded to
14 3228 Seawall Boulevard, which is a Diamond Shamrock.
15    Q. Okay. And did you find that a chili dog and bag of
16 potato chips had been purchased there?
17    A. That's correct.
18    Q. And a credit card had been tried to have been used at
19 that place?
20    A. Yes. The individual came in, did attempt to use a
21 credit card, but it was declined.
22    Q. And did you get a description from the clerk of what
23 that person looked like?
24    A. A basic description was white male 25 to 35 years of
25 age with a yellow shirt.

Page 182

1    Q. And that -- was that a description that you kind of
2 broadcast out for the Galveston police to be looking for?
3    A. Yes, on the back channel.
4    Q. I'm sorry?
5    A. On the back channel. The majority of the officers
6 was on the back channel, monitoring the back channel, so the
7 information was relayed to the officers.
8    Q. Of a white male 25 to 35 years of age wearing a
9 yellow shirt, is the only description you had?
10    A. That's the only information I could obtain.
11    Q. Was there a videotape collected by the Galveston
12 Police Department at the Diamond Shamrock?
13    A. I don't know at what point it was collected. I
14 attempted to retrieve the videotape at that particular time but
15 was instructed that the manager is the only one that had sole
16 access to turning over the videotape to me.
17    Q. So you at least knew they had a videotape.
18    A. Yes.
19    Q. After you got that description and broadcast it to
20 the rest of the Galveston Police Department, did you go
21 anywhere else?
22    A. I also proceeded to 1911 23rd Street, which is
23 Economy Liquor Store, and that was approximately 12:57.
24    Q. And we are talking April 9 now in the wee morning
25 hours.

Page 183

1    A. That's correct.
2    Q. Did you discover that the credit card had been used
3 there?
4    A. That's correct.
5    Q. Do you know what time it was used?
6    A. Approximately 18:41, but the receipt time showed
7 19:41.
8    Q. Did you get a description of the person who used the
9 credit card at the liquor store?
10    A. Basic information I got was someone came in, used a
11 credit card and they had a package with the name of Patricia Lee Syren and was
12 amount of 58.74 with the name of Patricia Lee Syren and was
13 signed as Dan Taylor. Went to attempt to look at the video, we
14 started receiving many calls, so we just obtained the receipts,
15 videotape and then turned it in as evidence.
16    Q. So that receipt was signed Dan Taylor.
17    A. That's correct.
18    Q. And I guess my first question was did anybody at that
19 store give you a description of the person who had used that
20 credit card?
21    A. No.
22    Q. And you didn't -- nobody, to your knowledge,
23 especially you and the Galveston Police Department, viewed any
24 kind of videotape from the liquor store to see if that person
25 who used the card was on it.

Page 184

1    A. No, sir.
2    Q. Okay. So you went to the Seahorse Inn and the
3 Diamond Shamrock and Economy Liquor Store where that credit
4 card definitely had been used that night.
5    A. We don't know if it was used at the Diamond Shamrock
6 because the clerk could not verify the name on that credit
7 card.
8    Q. Okay.
9    A. But all I can tell you is that it was declined.
10    Q. But you knew that Diamond Shamrock was the place
11 where a chili dog and some chips had been purchased?
12    A. That's correct.
13    Q. That was found in the room at the Seahorse Inn?
14    A. Yes, sir.
15    Q. And after visiting those places, the only thing that
16 you had as far as the description was a white male, 25 to 35
17 years of age with a yellow shirt on?
18    A. Yes, sir.
19    Q. Were you -- did you have any other involvement with
20 this case after that?
21    A. No, just to prepare a report and turn in all the
22 evidence, and that was basically it as far as my interest in
23 the case.
24       MR. MOORE: May I approach the witness?
25       THE COURT: Yes.

1        MS. HARTMANN: May we approach, Your Honor?

2        THE COURT: Yes.

3        (Outside the hearing of the jury)

4        MS. HARTMANN: It was the State's understanding

5 there was a motion in limine in regard to these. Am I

6 mistaken?

7        MR. RAY: Yeah, I think you are. It was my

8 understanding we can ask him about the --

9        THE COURT: What are we doing now?

10        MR. MOORE: I'm just going to ask him if he

11 collected them.

12        THE COURT: Ask him. You don't need to approach

13 him with the stuff in your hand if he answers no.

14        MR. MOORE: I'm sorry?

15        THE COURT: If you ask him if he collected any

16 videotapes and the answer is no, there is no reason to approach

17 him with anything in your hand.

18        MR. RAY: His name is on the receipt.

19        MR. MOORE: Okay. I will ask him, but I think

20 he did.

21        THE COURT: Okay.

22        (In the hearing of the jury)

23 BY MR. MOORE:

24        Q. Officer Simpson, did you actually yourself collect a

25 couple of the videotapes from some of these stores?

1        A. Yes, sir.

2        Q. And is that your handwriting on these two packages?

3        A. That is my handwriting.

4        Q. Okay. Where did you collect that videotape from?

5        A. This was collected at Economy Liquor.

6        Q. Where did you collect this videotape?

7        A. This was collected at the Seahorse.

8        Q. Okay. Are those the only two videotapes that you

9 collected?

10        A. Yes, sir.

11        MR. MOORE: I'll pass the witness.

12        CROSS-EXAMINATION

13 BY MS. HARTMANN:

14        Q. Just very briefly, Officer Simpson. How are you?

15        A. Fine.

16        Q. How long have you been a police officer?

17        A. I've been a police officer 18 years total.

18        Q. A fairly significant period of time.

19        A. Yes, sir -- yes, ma'am. I'm sorry.

20        Q. That's all right. And during that 18 years, have you

21 had sufficient opportunity to investigate criminal offenses?

22        A. Yes, I have.

23        Q. To deal with those people who commit crimes?

24        A. Yes.

25        Q. Is it common for people who are evading law

1 enforcement or police to use aliases or false names?

2        A. In some instances they do.

3        Q. And are you aware that -- you said Officer Contenta

4 met with you there at the Seahorse Inn?

5        A. Yes.

6        Q. And he actually processed Room 101?

7        A. That is correct.

8        Q. Is it your understanding that he received a

9 description from Mr. Teo, the night manager at the Seahorse

10 Inn, of the individual who rented Room 101?

11        A. I don't recall, in all honesty.

12        Q. All right. Is it common when police are

13 investigating an offense for them to receive information from

14 different people?

15        A. Yes.

16        Q. And that's because we are all human, we all perceive

17 things differently, different things are important to different

18 people, descriptions can vary somewhat.

19        A. Yes, they do.

20        Q. Is that pretty common?

21        A. In some cases, yes.

22        Q. All right. And is it common for an initial

23 description to end up being somewhat different from the end-

24 result description?

25        A. Yes.

1        Q. That's a pretty common thing, isn't it?

2        A. Yes.

3        MS. HARTMANN: Thank you, sir.

4        We'll pass the witness.

5        REDIRECT EXAMINATION

6 BY MR. MOORE:

7        Q. Is it common when people give a description of a

8 person who has recently been in that store to miss it by about

9 30 years?

10        A. I haven't seen that one --

11        Q. Okay.

12        A. -- but I have seen in some other cases in which other

13 things were involved, for instance, race.

14        MR. MOORE: That's all, Judge.

15        MS. HARTMANN: The State doesn't have anything

16 further.

17        THE COURT: You may step down, sir.

18        THE WITNESS: Thank you, Your Honor.

19        MR. RAY: Defense calls Pete Contenta.

20        (Witness Sworn)

21 Whereupon,

22        PETER CONTENTA,

23 having been first duly sworn, testified as follows:

24        DIRECT EXAMINATION

25 BY MR. RAY:

**CondenseIt™**

1    Q. State your name please, sir.

2    A. Peter Contenta.

3    Q. Where do you work?

4    A. Galveston Police Department.

5    Q. Do you have the same job as Officer Simpson here?

6    A. Yes, sir, I do now.

7    Q. How long have you been a police officer?

8    A. Almost 20 years.

9    Q. I'm going to ask you if you were employed by

10   Galveston Police Department in April of this year.

11   A. Yes, sir, I was.

12   Q. Did you have occasion to be involved on the evening

13   of the 8th or the morning hours of the 9th of April to be

14   present at the Seahorse Inn there on Seawall Boulevard?

15   A. Yes, sir.

16   Q. What were you doing there, why were you there?

17   A. I was called to the scene by Sergeant Pena and George

18   Simpson.

19   Q. George Simpson, that's the man who just testified out

20   here?

21   A. Yes.

22   Q. What was nature the of the call?  Why did they call

23   you?

24   A. Originally when I got to the scene, they explained to

25   me that Fort Worth Police Department had called and said they

1    were working a double homicide in this area and that the credit

2    cards from the victim were being used in Galveston,

3    specifically at the Seahorse Motel.

4    Q. Fort Worth had called and said somebody -- we have a

5    victim in a homicide and that person's credit card is being

6    used, and they wanted you to go look -- to go see if you could

7    find out anything.

8    A. Yes, sir.

9    Q. Okay.  What did you find out?

10   A. Well, we found that the room had been vacated, or at

11   least appeared to be; there was a little bit of physical

12   evidence within the room.  My job as crime scene investigator

13   was to process it for latent fingerprints and anything else

14   that could be found that maybe would help in identifying where

15   the perpetrator in the crimes, the credit card abuse and the

16   homicides in Fort Worth might be.

17   Q. Okay.  Did you know who you were looking for?

18   A. No, sir.

19   Q. Did you ever develop a description while you were at

20   the Seahorse Inn?

21   A. Yes, sir, a little bit of one.

22   Q. And what was that description?

23   A. White male approximately 30 to 40 years of age.

24   Q. Who did you get that from, the manager at the hotel?

25   A. Yes, sir.

1    Q. And did y'all put that out on the air or distribute

2    it to other police officers?

3    A. Yes, sir, we did.

4    Q. Did you have anything else to do other than process

5    that scene as far as looking for this person?

6    A. Yeah.  I photographed the scene, and I also did some

7    follow-up investigations from local convenience stores and, of

8    course, Mr. Teo, the manager at the Seahorse.

9    Q. The other convenience stores, what did you do in

10   those stores?

11   A. Officer Simpson had already been there and spoke with

12   the clerk, and sometimes it's customary for one officer to

13   go behind them, maybe ask some questions he neglected to ask;

14   or actually there is a little time duration there, so sometimes

15   the clerks may have remembered something that they didn't tell

16   the first officer.

17   Q. Okay.  And so you tried to develop that information

18   A. Yes, sir.

19   Q. Did you get anything new or any more information than

20   you already had?

21   A. Nothing earth shattering, no.

22   Q. Okay.  Did you get any different description from any

23   of those other clerks?

24   A. Basically all the same.  It was a fairly generic

25   description.

1    Q. So Mr. Teo, that's the manager at the motel, right?

2    A. Yes, sir.

3    Q. And you knew him, right?

4    A. Not really, no.

5    Q. Okay.  Mr. Teo had given you a description, and do I

6    understand you correctly to say that someone at one of these

7    other convenient stores had given you a similar description?

8    A. Yes, sir.

9    Q. White male, 30 to 40 years old.

10   A. Yes.

11   Q. Was there any kind of weight given?

12   A. Not that I recall that was given to me, no.

13   Q. This guy sitting here to my left, would he fit the

14   description you were given by these people?

15   A. In a broad general sense, yes.

16   Q. Well, he's got gray hair and he's a white male, but

17   does he otherwise fit the description, the other details

18   besides that?

19   A. He's possibly 40 years old.  Different people have

20   different age rates.

21   Q. He'd be pushing it to be 25 or 30 though, wouldn't

22   he?

23   A. Yeah, probably so.

24   Q. Okay.  Did y'all collect any videotapes?

25   A. I did not personally, no.

1 Q. Thank you.

2    MR. RAY: We'll pass the witness

3    CROSS-EXAMINATION

4 BY MS. CALLAGHAN:

5 Q. Officer Contenta, can you first tell us about what
6 you did when you processed the room?

7 A. Yes, ma'am. When I went in, the first thing I do is
8 take photographs. That's to the preserve the integrity of what
9 the scene looked like when I got there.

10    After that, then I will try to dust for latent
11 fingerprints using volcanic ash for the print dust.

12 Q. Okay. What did you note in the room when you were in
13 there?

14 A. One of the things I noticed was the room key to that
15 particular room was laying on a nightstand. There was also a
16 potato chip bag that looked like it had some chili and cheese
17 on it.

18 Q. What did that signify to you?

19 A. Well, judging from that and the proximity of the
20 Seahorse Motel to two convenience stores that might possibly
21 sell potato chips in a bag like that and chili-cheese hot dogs,
22 Officer Simpson and I discussed it. He actually drove over to
23 the two stores that were closest to the Seahorse to see if
24 anybody had been in there purchasing those particular items.

25 Q. Are you and Officer Simpson familiar with the local

1 convenience stores that sell chili-cheese dogs like that?

2 A. Yes, ma'am.

3 Q. Do you guys like those?

4 A. Sometimes.

5 Q. Okay. So you went -- you instructed or talked to
6 Officer Simpson about going over there to those particular
7 convenience stores because you knew they sold products of that
8 nature.

9 A. That's correct.

10 Q. Did you process the room for prints?

11 A. Yes, ma'am.

12 Q. Were you able to obtain any usable prints?

13 A. Yes.

14 Q. How many were you able to obtain?

15 A. I don't recall offhand. I think three.

16 Q. None of those rapped back to any particular
17 individual?

18 A. Not that I'm aware of.

19 Q. Is that uncommon?

20 A. No.

21 Q. Particularly in a hotel room which is frequented by
22 many people.

23 A. That's correct.

24 Q. Now, what kind of motel is this Seahorse Inn?

25 A. It is one of your more seedy-type motels. It's

1 pretty much what we call a dive.

2 Q. Okay. And in this dive is it common to go ahead and
3 pay up front --

4 A. Yes.

5 Q. -- when renting a room?

6 A. Yes.

7 Q. It isn't like the Hilton where you go down to pay
8 after you have been there.

9 A. That's correct.

10 Q. All right. And when you went into the room, in
11 addition to the chili-cheese to chip bag, there was also a key
12 which was left in the room.

13 A. That's correct.

14 Q. Was there anything that you noted in any other way
15 that was unusual or odd?

16 A. The room actually looked fairly well kept like
17 somebody had been there but they really didn't stay. The bed
18 was still made. It didn't have your normal looked-in -- or
19 lived-in type appearance.

20 Q. It was very neat?

21 A. Yes.

22 Q. Now, you indicated that you went and spoke to Mr.
23 Daniel Teo.

24 A. Yes, ma'am.

25 Q. And he's the man that runs the Seahorse Inn.

1 A. Yes, at nighttime he is.

2 Q. Okay. You don't know him personally, but you knew
3 him as manager, correct?

4 A. Yes.

5 Q. Okay. The Seahorse is a place where police officers
6 will often go?

7 A. Yes, that's correct.

8 Q. So all of you have had some contact with Mr. Teo.

9 A. Yes, ma'am.

10 Q. And you said that he gave you what description of the
11 person who was staying in that room?

12 A. He told me it was a white male approximately 30 to 40
13 years of age.

14 Q. Okay. And this was the person that used the credit
15 card belonging to Patricia Syren.

16 A. Yes, that's correct.

17 Q. What name was given?

18 A. I believe he said that that guy's name -- George
19 Simpson actually did more of a follow-up. I believe he was
20 registered under the name of Davey Jones or Dan Taylor. I
21 don't remember.

22 Q. Okay. It was one of those two.

23 A. Yes.

24 Q. Did Mr. Teo indicate any other information about the
25 white male 30 to 40 years of age?

1    A. Yes, ma'am.

2    Q. What did he tell you?

3    A. He told me he arrived, he appeared to have been

4 drinking. He thought he was delivered by a taxicab, Yellow Cab

5 specifically; and for some reason Mr. Teo believed that the

6 subject had been drinking at a bar called Club 23.

7    Q. All right. Now, Yellow Cab, that is a cab company

8 that services Galveston Island, correct?

9    A. Yes.

10    Q. And in relationship to the Seahorse Motel, where is

11 the nearest Yellow Cab stand?

12    A. Probably at 23rd Street.

13    Q. How far away is that?

14    A. Approximately 14 blocks, 13 or 14 blocks.

15    Q. And how close is the Yellow Cab stand to Club 23?

16    A. They are actually in an adjoining building. The

17 building is attached.

18    Q. So it's really one big building.

19    A. Yes.

20    Q. And Yellow Cab stand is part of that and Club 23 is

21 part of that?

22    A. That's correct.

23    Q. Did that indicate to you that Club 23 and the Yellow

24 Cab stand might be good places to go talk to people about the

25 white male, age 30 to 40 years?

1    A. Yes, that's correct.

2    Q. Are you also familiar with a business called Economy

3 Liquor?

4    A. Yes, I am.

5    Q. And how close is that to the Seahorse?

6    A. Again, probably 13 or 14 blocks.

7    Q. Is it in the same area as the Yellow Cab stand and

8 Club 23?

9    A. Yes, it's within one block.

10    Q. So you are beginning to get the impression that

11 there's a lot of contact between the individual who had rented

12 that Room 101 and this one area of Galveston Island.

13    A. Yes.

14    Q. Did you go down to the Yellow Cab stand yourself?

15    A. Yes, I did.

16    Q. What did you do when you arrived there?

17    A. I went in and I spoke to the night dispatcher to see

18 if I could generate any information of a walk-in somewhere in

19 the last 20 hours with a subject matching that general

20 description.

21    Q. What was the response?

22    A. She told me that yes, she found on the dispatcher log

23 that somebody had walked in, which means they could walk up to

24 the cab stand and say, "I need a cab," and then got a ride from

25 there to the general area of the Seahorse at about 1:30 a.m.

1 that day.

2    Q. All right. Did you ask the dispatcher in that case

3 to put out a dispatch to the various cab driver's concerning

4 that individual?

5    A. Yes.

6    Q. To your knowledge, was that done?

7    A. Yes, it was. I was standing there when she did it.

8    Q. Did you also go to Club 23?

9    A. Yes.

10    Q. Did you do a walk-through of that area?

11    A. Yes.

12    Q. Did you find anything?

13    A. Yes. There was a videotape and there were video

14 cameras surveillance.

15    Q. Anything else?

16    A. No.

17    Q. Now, have you had conversations with some officers

18 from the Fort Worth Police Department by telephone?

19    A. After my last walk-through at the Club 23, yes.

20    Q. All right. At that time did they give you

21 information concerning the crime scene in Fort Worth?

22    A. Yes, they did.

23    Q. Were you aware that you were looking for a person

24 that possibly had a physical injury like a cut?

25    A. Yes, ma'am, I was.

1        MS. CALLAGHAN: Pass the witness.

2        REDIRECT EXAMINATION

3 BY MR. RAY:

4    Q. Did you ask if there were any videotape cameras at

5 the cab stand?

6    A. Yes, I did.

7    Q. What was the answer?

8    A. The response was that, yes, there were.

9    Q. Did the Galveston Police Department obtain those

10 tapes?

11    A. Not at that time, no.

12    Q. Ultimately did they get gathered up?

13    A. I did not personally do it, so I can't answer that

14 question.

15    Q. You didn't tell the lady that you wanted -- you told

16 her you wanted a videotape of the time you thought this person

17 was over there getting a ride in a cab, right?

18    A. Yes.

19    Q. You didn't tell her you wanted the videotape from

20 some other time, did you?

21    A. No.

22    Q. And she was a lady that tried to do what you asked

23 her to, right?

24    A. She advised me that she couldn't get into the

25 videotape surveillance system, only the manager could.

1  Q. Okay. But, I mean, you didn't say, "I want the tape
2 from Christmas Eve"; you said, "I want the tape from " --
3  A. Yes.
4     MR. RAY: All right. That's all.
5     MS. CALLAGHAN: The State has no further
6 questions.
7     THE COURT: You may step down.
8     MR. MOORE: We'd call Officer Garcia, Sr. --
9 Junior.
10    (Witness Sworn),
11 Whereupon,
12        CLEMENTE GARCIA, JR.,
13 having been first duly sworn, testified as follows:
14        DIRECT EXAMINATION
15 BY MR. MOORE:
16   Q. Would you state your name for the jury, please?
17   A. Clemente Garcia.
18   Q. You are retired from the Galveston Police Department
19 now, correct?
20   A. Yes, sir.
21   Q. But back on April 9 of this year, you were employed
22 by the Galveston Police Department, correct?
23   A. Yes, sir.
24   Q. How long had you been employed with the Galveston
25 Police Department back in April?

1  A. 28 years.
2  Q. When did you retire?
3  A. May 30 of this year.
4  Q. You remember that day, do you?
5  A. Yes, sir.
6  Q. Are you enjoying your retirement?
7  A. Yes, sir.
8  Q. Are you still in Galveston?
9  A. Yes.
10   Q. Actually, your son is now a Galveston police officer,
11 and he's here; is that correct?
12   A. Yes, sir.
13   Q. Officer Garcia, back on April 9 you were involved in
14 an investigation of a homicide that happened here in Fort
15 Worth, weren't you?
16   A. At the time it was for credit card abuse, yes, sir.
17   Q. Right. But that credit card abuse, as you knew, was
18 a credit card that had been taken from Fort Worth in a
19 murder case.
20   A. Yes, sir.
21   Q. And you were on duty that day. Were you patrolling
22 around in your patrol car?
23   A. Yes, sir.
24   Q. By yourself?
25   A. Yes, sir.

1  Q. Was your son on duty also?
2  A. He came on later. He was working a program which is
3 a truancy program.
4  Q. So you get information that there's a person down in
5 Galveston with a stolen credit card out of Fort Worth,
6 right?
7  A. Yes, sir.
8  Q. And you had a description that was generated around
9 Galveston PD of the person who was in possession of that
10 credit card, didn't you?
11   A. Yes, sir.
12   Q. What was that description?
13   A. A male white, five-nine, between 150 to 175 pounds,
14 sandy-blond hair, between 25 and 35 years of age.
15   Q. Did they tell you any kind of clothing that the
16 person might have been wearing?
17   A. Later from a cab driver, I found out he had a white
18 T-shirt that said Joe's Crab Shack, blue jeans, a red cap
19 and glasses.
20   Q. Okay. We'll get to that in just a second again.
21        About what time do you remember getting the
22 information that there was a credit card being used down
23 there? Do you remember?
24   A. It was before 6:00 o'clock in the morning.
25   Q. On April 9?

1  A. Yes, sir.
2  Q. What's the first thing you did in relation to that?
3  A. I rode around and checked certain areas on the
4 Seawall.
5  Q. Where did you check?
6  A. The beach front looking for somebody fitting that
7 description, maybe -- since they had come from the hotel
8 room, I thought maybe he'd be walking up the boulevard. I
9 checked out the Flagship Hotel, which extends out in the
10 water, I checked under there; and then I went farther east
11 to check the Seawall Boulevard.
12   Q. You are looking for somebody about five-nine, 150 to
13 175 pounds with dirty blond hair, correct --
14   A. Yes, sir.
15   Q. -- at that point?
16   A. Yes, sir.
17   Q. Okay. Later that morning did you get another
18 description or more detailed description of the person?
19   A. Yes, sir.
20   Q. About what time was that?
21   A. About 11:30.
22   Q. 11:30 in the morning?
23   A. Yes, sir.
24   Q. On April 9?
25   A. Yes, sir.

CondenseIt™

**Page 205**

1  Q. Okay. What description were you given?

2  A. Male, white, he had a white T-shirt with Joe's Crab

3  Shack, blue jeans, he was wearing a red baseball cap and

4  glasses.

5  Q. Was there any information that you knew of that the

6  person you were looking for had been injured or was bleeding in

7  any way?

8  A. No, sir.

9  Q. You got that information about the blond hair and the

10  ball cap and the glasses from a cab driver, correct?

11  A. Yes, sir.

12  Q. And that cab driver had dropped that person off at a

13  place called the Elbow Room, correct?

14  A. Tonis Lazy Lounge.

15  Q. Tonis Lazy Lounge.

16  A. Yes, sir.

17  Q. Did you go to Tonis Lazy Lounge?

18  A. At that time, no, sir.

19  Q. Where did you go?

20  A. He then told me -- another cab driver had called me

21  and said that he picked that subject up from Tonis Lazy Lounge

22  and took him to the Elbow Room and that the subject was at the

23  Elbow Room at that time.

24  Q. Okay.

25  A. That's when I went to the Elbow Room.

**Page 206**

1  Q. Okay. So your information was the same, white male,

2  five-nine, 150 to 175 with dirty blond hair now wearing a red

3  baseball cap and glasses was the suspect you were looking for.

4  A. I suspected it. I --

5  Q. Okay. So you go to the Elbow Room with who?

6  A. My son was there at the time when the cab driver was

7  talking to me, so he left before I did. When I arrived, he was

8  there, Officer Casso and Officer Barella.

9  Q. So your son would have heard the same description

10  that you would have?

11  A. Yes, sir.

12  Q. Okay. And you went to the Elbow Room and didn't see

13  anybody there?

14  A. Yes, sir.

15  Q. Then where did you go?

16  A. At the time I left and went to the Seahorse because I

17  heard Sergeant Parks staking out at the Seahorse, so I

18  went over there to see what he was doing.

19  Q. About what time did you get to the Seahorse?

20  A. Can I check my report?

21  Q. You bet.

22  A. I don't have it in here, sir, but it was between

23  11:30 and 12:00.

24  Q. Between 11:30 and 12:00 you go over to the Seahorse.

25  How long do you stay at the Seahorse?

**Page 207**

1  A. When I arrived there, I talked to the maid and asked

2  her if she had seen anybody in that room, and she said no. By

3  that time I heard on the radio that my son had the subject in

4  custody.

5  Q. Okay. Where was that? Where did he have him in

6  custody?

7  A. At Tonis Lazy Lounge.

8  Q. And Tonis Lazy Lounge is just a matter of blocks from

9  the Elbow Room, isn't it?

10  A. Yes, sir.

11  Q. And did you go over to where your -- where the

12  suspect that your son had arrested was in custody?

13  A. Yes, sir.

14  Q. Was the person that you saw already handcuffed and in

15  the patrol unit?

16  A. Yes, sir.

17  Q. Did you go around and look at the person?

18  A. Yes, sir.

19  Q. And were you surprised about the description -- or

20  were you surprised to see that the person in the back didn't

21  match the description of the person you had?

22  A. Yes, sir.

23  Q. Very surprised, weren't you?

24  A. Yes, sir.

25  Q. Okay. The person in the back of the patrol unit

**Page 208**

1  didn't appear to be 25 to 35 years old, did he?

2  A. Correct.

3  Q. Didn't have a red ball cap on, did he?

4  A. Correct.

5  Q. Didn't have glasses on, did he?

6  A. Correct.

7  Q. Didn't appear to be 150 to 175 pounds.

8  A. He was pretty big. I couldn't tell with him sitting

9  in the police car.

10  Q. Okay. Appeared to be pretty hefty?

11  A. Yes, sir.

12  Q. Didn't have dirty blond hair, did he?

13  A. No, sir.

14  Q. So up until that point -- well, at that point this

15  person was definitely under arrest by the Galveston Police

16  Department, correct?

17  A. Yes, sir.

18  Q. You came to know there was a charge of failure to

19  identify, correct?

20  A. That's what I was told.

21  Q. You weren't there when the actual arrest occurred.

22  A. I wasn't there.

23  Q. Just shortly thereafter.

24  A. Yes, sir.

25  Q. Did you take this -- that's the person that was in

CondenseIt!™

1 the back of the police car, wasn't it?

2    A. Yes, sir.

3    Q. And you -- did you go -- did you take Mr. Crutsinger

4 down to the police station?

5    A. No, sir.

6    Q. Your son did?

7    A. Yes, sir.

8    Q. And did you read him his Miranda Warnings?

9    A. Yes, sir.

10    Q. What name did he give you?

11    A. David Townsend.

12    Q. Again, this was after the arrest, though.

13    A. Yes, sir.

14    Q. And after the arrest, you noticed that he had a cut

15 on his finger.

16    A. Yes, sir.

17        MR. MOORE: Thank you, Officer.

18        I'll pass the witness.

19        CROSS-EXAMINATION

20 BY MS. HARTMANN:

21    Q. Hello. How are you doing?

22    A. Fine.

23    Q. Congratulations on your retirement.

24        You have previously identified the Defendant

25 here in the courtroom as being the same person that you

1 encountered back on April 9 of this year down in Galveston.

2    A. Yes, ma'am.

3        MS. HARTMANN: Your Honor, may the record

4 reflect that Officer Garcia, retired, has identified the

5 Defendant?

6        THE COURT: It will.

7    Q. When you met with the Defendant, he gave you the name

8 David Townsend.

9    A. Yes, ma'am.

10    Q. That wasn't his name, was it?

11    A. No, ma'am.

12    Q. What date of birth did he give you?

13    A. He gave me 6-5-54.

14    Q. Did you run that name and date of birth in your

15 computer?

16    A. Yes, ma'am.

17    Q. Did you get any results back?

18    A. No, ma'am.

19    Q. Did you go back to Mr. Crutsinger and ask for a

20 different date of birth?

21    A. Yes, ma'am. When I went back, he gave me a different

22 date of birth. He gave me 9-5-54.

23    Q. Did you get any results or hits back on that

24 information?

25    A. Didn't get any back.

1    Q. You Mirandized the Defendant and you noticed that he

2 had a Band-Aid on one of his fingers.

3    A. Yes, ma'am.

4    Q. And when the Defendant was placed back in the patrol

5 car, you stated that he --

6        MR. MOORE: Your Honor, I am going to have to

7 object to anything that he said at that point in time because

8 he was in custody.

9        THE COURT: Sustained.

10        MS. HARTMANN: Well --

11        MR. MOORE: And we'd ask you to ask the jury to

12 disregard that last question of the prosecutor.

13        THE COURT: Denied.

14    Q. Let me ask you this. When you put the Defendant in

15 the back of the patrol car, were you questioning him?

16    A. No, ma'am.

17    Q. Did you ask him any questions?

18    A. No, ma'am.

19    Q. Were any other law enforcement officers asking him

20 questions at that point?

21    A. No, ma'am.

22    Q. Did he voluntarily make a statement just in general?

23    A. Yes, ma'am.

24        MR. MOORE: Again we'd have to object that he

25 was in custody and an oral statement not reduced to writing.

1        THE COURT: Overruled.

2    Q. He was not being interrogated, was he?

3    A. No, ma'am.

4    Q. Nobody was asking him questions.

5    A. No, ma'am.

6    Q. And he spoke up just out of the blue that he had,

7 quote, "fucked up."

8    A. Yes, ma'am.

9    Q. When the Defendant was taken down to the police

10 department, you and your son were assigned to stay with him

11 initially; is that correct?

12    A. Yes, ma'am.

13        MS. HARTMANN: May I approach the witness?

14        THE COURT: Yes.

15    Q. You did a report, did you not --

16    A. Yes, ma'am.

17    Q. -- as to what your participation was?

18    A. Yes, ma'am.

19    Q. And I have got my own scribbling all over, but is

20 that a copy of the report that you initiated in regards to your

21 participation in the investigation of this case?

22    A. Yes, ma'am.

23    Q. And in your report do you notate that the Defendant

24 told you that he wanted to talk with a Fort Worth detective?

25    A. Yes, ma'am.

1    Q. That he asked to talk with a Fort Worth detective.

2    A. Yes, ma'am.

3    Q. And that he was stating that he had messed up.

4    A. Yes, ma'am.

5    Q. Did you notify the Fort Worth detective that the

6 Defendant wanted to talk to him?

7    A. I notified my supervisor, and they notified the

8 detective.

9    Q. All right. Now, the Defendant was, in fact, located

10 in one of the bars there on that strip, correct?

11    A. Yes, ma'am.

12    Q. And pursuant to the investigation by the Galveston

13 Police Department, you knew the person you were looking for was

14 taking cabs to these various bars.

15    A. Yes, ma'am.

16    Q. And the Elbow Room and Tonis Lazy Lounge, those are

17 within just blocks of each other.

18    A. Five blocks.

19    Q. Up and down one street.

20    A. Yes, ma'am.

21    Q. And this description that you had was that the man

22 was wearing blue jeans.

23    A. Yes, ma'am.

24    Q. And the Defendant was wearing blue jeans, wasn't he?

25    A. Yes, ma'am.

1    Q. The description was that he was wearing a Joe's Crab

2 Shack T-shirt?

3    A. Yes, ma'am.

4    Q. And the Defendant was wearing a Joe's Crab Shack

5 T-shirt.

6    A. Yes, ma'am.

7    Q. The description that you all had obtained, this was

8 coming from a cabby, correct?

9    A. Yes, ma'am.

10    Q. A cabby who recognized a fare, a person who claimed

11 he was from the Dallas area?

12    A. Yes, ma'am.

13    Q. And that the man was anywhere from 30 to 40 years old

14 approximately?

15    A. He didn't give me an age, ma'am.

16    Q. Just very quickly, you and your son had escorted Mr.

17 Crutsinger to the restroom.

18    A. Yes, ma'am.

19    Q. Is that because he requested to use the facilities?

20    A. Yes, ma'am.

21    Q. And you-all were accommodating him?

22    A. Yes, ma'am.

23    Q. At some point when the Defendant said that he wanted

24 to talk to the detectives, was he standing up or on his knees,

25 what was going on?

1    A. At the time in the restroom?

2    Q. Yes.

3    A. He was on his knees.

4    Q. And how was he acting?

5    A. He was crying.

6    Q. And was he basically begging you to let him see the

7 detective?

8    A. No, he just kept saying, "I messed up," and he was

9 crying, and we picked him up.

10    Q. And it was during that time that he asked to speak to

11 the detective.

12    A. He wanted to talk, yes, to the detective.

13    Q. All right. When you got the Defendant down to the

14 station -- I know you testified at the scene he was giving you

15 a false name and at least two false date of births?

16    A. Yes, ma'am.

17    Q. Did he eventually give you his true legal name, Billy

18 Jack Crutsinger?

19    A. Yes, ma'am.

20    Q. Was that down at the police department?

21    A. Yes, ma'am.

22    Q. Was that prior to when the Fort Worth Police

23 Department detectives came?

24    A. Yes, ma'am.

25         MS. HARTMANN: Pass the witness.

1         REDIRECT EXAMINATION

2 BY MR. MOORE:

3    Q. Mr. Garcia, when Mr. Crutsinger was taken to the

4 Galveston Police Department, the detective from Fort Worth

5 arrived shortly thereafter, didn't he?

6    A. Yes, sir.

7    Q. Pretty quick, wasn't it?

8    A. When we got there, he was there already.

9    Q. Oh, he was already there.

10    A. Yes.

11    Q. Was Mr. Crutsinger already there?

12    A. Yes, sir, he was already there.

13    Q. Okay. Did you go in the room where Mr. Crutsinger

14 was?

15    A. Yes, sir.

16    Q. And was the detective already in there?

17    A. No, sir.

18    Q. Did he come in shortly thereafter?

19    A. Yes, sir.

20    Q. And did he introduce himself?

21    A. Yes, sir.

22    Q. What did he tell him?

23    A. I don't remember the name. He said, "I am detective

24 so and so; I will be talking to you shortly," and Mr.

25 Crutsinger said, "Okay, sir."

CondenseIt™

1 Q. Okay. And -- well, let me ask you this. Besides the
2 blue jeans and the Joe's Crab Shack T-shirt, that was about the
3 only two things in common with the description, isn't it?
4 A. Yes, sir.
5 Q. Otherwise, the descriptions were very far apart.
6 A. The description we received from Officer Simpson --
7 Q. Didn't match.
8 A. No, sir.
9 MR. MOORE: Pass the witness.
10 RECROSS-EXAMINATION
11 BY MS. HARTMANN:
12 Q. And is it fair to say that other officers besides you
13 and Officer Simpson were working on this case?
14 A. Yes.
15 Q. And that there were multiple officers out there
16 obtaining information from different people?
17 A. Yes, ma'am.
18 Q. And is it fair to say that you don't know what
19 information the arresting officer actually had at the time the
20 arrest was made?
21 A. Correct.
22 MS. HARTMANN: Thank you, sir. Pass the
23 witness.
24 FURTHER REDIRECT EXAMINATION
25 BY MR. MOORE:

1 Q. Well, the arresting officer was your son, wasn't it?
2 A. Yes, sir.
3 Q. And he was there at the cab stand when you got the
4 description, wasn't he?
5 A. Yes.
6 Q. So the arresting officer did have that very same
7 description you gave us, didn't he?
8 A. Yes, sir.
9 Q. Of five-nine, 150 to 175 pounds with a red cap,
10 glasses, and dirty blond hair, correct?
11 A. The description that my son got when the cab driver
12 talked to me was the white T-shirt with Joe's Crab Shack, blue
13 jeans, red cap and glasses. The weight and all that, no.
14 Q. But he had the red cap and glasses.
15 A. Yes, sir.
16 MR. MOORE: Pass the witness.
17 FURTHER RECROSS-EXAMINATION
18 BY MS. HARTMANN:
19 Q. You don't know what other information he would have
20 received from other officers --
21 A. No, ma'am.
22 Q. People who wear glasses, they take them on and off if
23 they don't have to use them all the time, don't they?
24 A. Correct.
25 Q. If they need them for reading or maybe talk to people

1 up close, they might put them on and then take them off?
2 A. Correct.
3 Q. That, in and of itself, is not unusual, is it?
4 A. Right.
5 Q. Did it take awhile to check and verify what the
6 Defendant's true name was?
7 A. From the time we got to the station and he gave me
8 the information, no, it didn't take that long.
9 Q. Okay. Were you sure who he was by the time Detective
10 McCaskill arrived, or were you still in the process of trying
11 to verify the information?
12 A. At that time, yes.
13 Q. Yes, what?
14 A. We knew who he was because when he gave his
15 information, my son went upstairs to run the criminal history
16 on him, and by the time the detective got there, we had the
17 information.
18 MS. HARTMANN: Thank you, sir.
19 We'll pass the witness.
20 FURTHER REDIRECT EXAMINATION
21 BY MR. MOORE:
22 Q. Well, I don't want to belabor the point, but
23 Galveston police have radios in their car, don't they?
24 A. Yes, ma'am -- yes, sir.
25 Q. And y'all are on the same channel, aren't you?

1 A. Yes, sir.
2 Q. And this was kind of a big deal down there, wasn't
3 it?
4 A. Yes, sir.
5 Q. And so it wasn't like y'all were hiding information
6 from each other, was it?
7 A. That's correct.
8 Q. So when there is a description sent by anybody, it's
9 sent to everybody in the Galveston Police Department that's
10 looking, isn't it?
11 A. Yes.
12 Q. It's not, "Well, Officer Garcia, III, we're going to
13 give you one description," and, "Officer Garcia, the father,
14 we're going to give you another," was it?
15 A. No, sir. Anybody that was monitoring the radio got
16 the information --
17 Q. They got that information that you got looking for
18 that suspect.
19 A. Yes, sir.
20 MR. MOORE: Thank you, sir.
21 MS. HARTMANN: We don't have anything further.
22 Thank you.
23 THE COURT: You may step down, sir.
24 Ladies and gentlemen, let's take a stretch
25 break. Please retire to the jury room and remember and follow

Page 221

1 your instructions.
2          (Recess taken)
3          (Jury not present)
4          THE COURT: Are both sides ready for the jury?
5          MS. HARTMANN: Ready.
6          MR. RAY: We are ready.
7          THE COURT: Call your next witness, please.
8 Clemente Garcia, III.
9          (Jury present)
10          (Witness Sworn),
11 Whereupon,
12          CLEMENTE GARCIA, III.,
13 having been first duly sworn, testified as follows:
14          DIRECT EXAMINATION
15 BY MR. RAY:
16     Q. State your name please, sir.
17     A. Clemente Garcia, III.
18     Q. There is another Clemente Garcia that testified here
19 a few minutes ago. Is he your father?
20     A. Yes, sir.
21     Q. Y'all all rode up from Galveston together?
22     A. Yes, sir.
23     Q. Are you planning on leaving Fort Worth as soon as you
24 get through testifying?
25     A. Hope so.

Page 222

1     Q. Okay. How are you employed?
2     A. City of Galveston Police Department.
3     Q. How long have you had that job?
4     A. Eight years.
5     Q. So you were employed as a police officer back in
6 April of this year.
7     A. Yes, sir.
8     Q. I want to direct your attention to April 8 and April
9 9, the evening hours of April 8 and early morning hours of
10 April 9, and ask you if you became involved in an investigation
11 that arose out of a murder or homicide in Fort Worth where the
12 Galveston police were looking for somebody.
13     A. Yes, sir.
14     Q. What was your first thing that drew your attention to
15 that? How did you get involved in that case?
16     A. I overheard on the radio bits and pieces. The
17 suspect they were looking for was involved in a credit card
18 abuse on the island.
19     Q. Did you try to go find that person?
20     A. Not initially. I met up with my father, who gave me
21 a better description.
22     Q. Where you did you meet up with your father?
23     A. At 57th and Avenue J., which is a Taco Bell parking
24 lot.
25     Q. And your father gave you a description?

Page 223

1     A. Yes, sir.
2     Q. And then did you go look for someone or to look for
3 that person?
4     A. Yes, sir, I did.
5     Q. What was the description of the person you were
6 looking for? Who did you have your eyeballs --
7     A. A male, white wearing blue jeans and a white Joe's
8 Crab Shack shirt. He was believed to have been approximately
9 five foot nine.
10     Q. Did you get a weight description?
11     A. Not initially. Later on.
12     Q. Was that the first description you ever had of this
13 person?
14     A. Yes.
15     Q. Okay. Did you have an age, or did you say one and I
16 didn't hear it?
17     A. It's in my report, no.
18     Q. Did you previously testify at a prior hearing in this
19 case that it was 25 to 35 years of age?
20     A. Yes, I did.
21     Q. Does that sound about right?
22     A. Yes, sir.
23     Q. Okay. And what did you do after you got that
24 description?
25          Do you need some water?

Page 224

1     A. No, I'm fine.
2          Myself and Officer Garcia, my father; Officer
3 Casso and Officer Barella got together and went down to the
4 Elbow Room, which is on 52nd and S --
5     Q. Did y'all go together or in separate cars?
6     A. Separate units.
7     Q. Okay. Go ahead.
8     A. We arrived at the Elbow Room and we went inside
9 looking for a person who fit the description of what we had.
10     Q. Did you find anybody that fit that description?
11     A. No, we didn't.
12     Q. Did you ask the bartender if he had seen anybody that
13 looked like that?
14     A. Yes, sir, we did.
15     Q. What was the information you got and what did you do
16 after that?
17     A. No one had seen anybody fitting that description. We
18 decided to leave and to look elsewhere.
19     Q. Where else did you go?
20     A. The next place we went was across the street, which
21 was a corner bar. No one was in there. We gave the bartender
22 a description of who we were looking for and decided to leave.
23     Q. Okay. Where else did you go?
24     A. The next place we went was Tonis Lazy Lounge on 57th
25 and S.

Page 225

1   Q. How far are all these bars apart from each other?
2   A. 52nd and -- about five books. 52nd to 57th and S.
3   Q. You went to Tonis, and what did you do when you got
4 there?
5   A. We walked inside. It was myself, Officer Casso and
6 Officer Barella. We walked inside and noticed two gentlemen
7 and a bartender.
8   Q. And did you tell the bartender what you were looking
9 for, or did you talk to either one of those gentlemen?
10   A. Yes. We asked the gentlemen if they were regulars
11 there, had they been going there for a while, and they stated
12 yes.
13   Q. Okay.
14   A. We asked the bartender -- we told the bartender a
15 description of who we were looking for, told him if anybody
16 came in fitting that description, to give us a call.
17   Q. Okay. And what did you do after that?
18   A. We left and we went maybe about a block and a half,
19 two blocks away to another bar called Taucers and we went in
20 there.
21   Q. Was there anybody in Taucers?
22   A. There was a bartender. That was all.
23   Q. Any other customers?
24   A. No.
25   Q. And let me back up for a second. Tonis Lazy Lounge,

Page 226

1 how big of a bar is that?
2   A. It is not that big.
3   Q. Would that bar fit inside this courtroom?
4   A. I'd say so.
5   Q. Tonis is not a place that you can't see the other end
6 of it or that sort of thing.
7   A. No.
8   Q. If it's got 25 people in it, is it full?
9   A. Yes, sir.
10   Q. What did you do after you got to Taucers found out
11 there was nobody in there?
12   A. We spoke to the bartender and explained to her who we
13 were looking for, a description.
14   Q. This is the same description that you had given the
15 lady at Tonis and the Elbow Room and the Corner Bar, right?
16   A. Yes.
17   Q. All right. Go ahead.
18   A. When we were speaking to her, the phone rang, and it
19 was one of the bartenders from the -- hold on a second -- from
20 the Elbow Room.
21   Q. Okay.
22   A. She had called over there and wanted to speak to one
23 of us.
24   Q. Okay.
25   A. I got on the phone, and she said, "The gentleman you

Page 227

1 are looking for, I remember him now." He had just left. I
2 believe that's what she said. He had just left the --
3   Q. Was that before you had gotten to the Elbow Room?
4   A. Hold on a second.
5   I believe she said that he left right after --
6   Q. Okay.
7   A. -- we had left.
8   Q. What happened after that?
9   A. I told Officer Casso and Officer Barella to head back
10 to the Elbow Room, believing that he may still be in the area.
11   Q. Okay.
12   A. I then got a further description and gave that
13 description over the radio to Officer Casso and Officer
14 Barella.
15   Q. All these bars are on a street called Stewart, or
16 Avenue S in Galveston; is that correct?
17   A. Yes, sir.
18   Q. And if you start at 52nd and Stewart -- first of all,
19 the streets in Galveston, they are numbered; is that correct?
20 Is that the way most of the streets are?
21   A. They are numbered going east to west.
22   Q. And that would be from left to right -- if you were
23 standing out in the ocean and looking at Galveston and you
24 started on the north end of the island, where the ferry is and
25 you started coming down south towards Corpus Christi, the

Page 228

1 numbers get bigger.
2   A. Yes.
3   Q. Then the opposite streets are letters, correct?
4   A. Yes.
5   Q. Y'all even have M some streets called "M and a half"
6 and "O and a Half Street," I guess because somebody ran out of
7 letters.
8   A. Yes, sir.
9   Q. Okay. As you go from really the intersection of
10 Broadway and Seawall Boulevard, if you go 57 blocks down, you
11 get to 57th Street, right?
12   A. Yes, sir.
13   Q. 57th Street and Stewart is where the Elbow Room is,
14 correct?
15   A. Yes.
16   Q. And Stewart Street actually runs parallel to Seawall
17 Boulevard, and it is about four or five blocks off the Seawall;
18 is that correct?
19   A. You said Avenue S?
20   Q. Yes.
21   A. Depending on where you are at. The further west you
22 go, the further it is from the Seawall.
23   Q. Avenue S and Stewart are synonymous; that's the same
24 street.
25   A. Yes.

Page 229

1   Q. So if you're at 52nd and Stewart, you are standing at
2 the corner of where you can see the Elbow Room and the Corner
3 Bar. They are both on the corner, right?
4   A. Yes.
5   Q. And if you go southwest in Galveston, you get to
6 about 53rd, what's there? 53rd, 54th Street?
7   A. That's our substation.
8   Q. That's the police department.
9   A. Right.
10   Q. You go down a little further and you get to 57th
11 Street, that's where Tonis is.
12   A. Yes.
13   Q. And you go maybe another block or so, and you get to
14 Taucers, right?
15   A. Yes.
16   Q. Okay. You had sent Officer Barella and Casso back to
17 the Elbow Room.
18   A. Yes.
19   Q. What did you do?
20   A. I stayed at the Taucers Bar and got the rest of the
21 description; and as I finished the conversation with the
22 bartender, I hung the phone up, got back in my unit, relayed
23 the information, whatever else I had, over to the officers, and
24 then proceeded to the Elbow Room.
25   Q. Was that a different description than the one you

Page 230

1 had?
2   A. Yes.
3   Q. In your mind were the two descriptions you had a
4 description that would apply to the same person?
5   A. No.
6   Q. Why is that?
7   A. Because of the age and the weight.
8   Q. Okay. In fact, did you remember that you had seen
9 someone fitting that second description earlier in your little
10 travels that day?
11   A. Can you ask me again?
12   Q. Sure. The description that you got from the
13 bartender over the telephone, that was a different description
14 than the one you had?
15   A. Yes, it was.
16   Q. What did you do after you got that description?
17   A. When I got the description, I went back to the Elbow
18 Room and spoke to the bartender that I had spoken to on the
19 phone.
20   Q. Why did you do that?
21   A. Just to verify that it was her I was speaking to and
22 to get the description again.
23   Q. You made sure whoever called you on the phone was, in
24 fact, who you thought it was.
25   A. Yes.

Page 231

1   Q. Okay. What did you do after that?
2   A. After I got the description, I then got back in my
3 unit and circled the area and looking for the person that was
4 supposedly spotted at the bar.
5   Q. The new description?
6   A. Yes.
7   Q. What was this description?
8   A. This description was that he was in his mid 40's
9 wearing a white Joe's Crab Shack shirt, blue jeans, white
10 tennis shoes brand new, weighed about 220 to 250 pounds with
11 wavy gray hair.
12   Q. That wasn't anything close to the one you had, was
13 it?
14   A. It was kind of close, but it was different in age and
15 weight.
16   Q. What did you do after you drove around for a little
17 while?
18   A. I had remembered that while in the Tonis Lazy Lounge,
19 I noticed a -- the gentleman at the bar had fit that
20 description.
21   Q. Okay,
22   A. It was pretty close.
23   Q. So what did you do?
24   A. I got on my radio and notified Officer Casso and
25 Officer Barella and whoever else wanted to join me in going

Page 232

1 over there. And where I was at the time, I mean, like you
2 said, they are pretty close to each other. So I arrived on the
3 location first with -- by myself and walked inside the bar.
4   Q. What did you notice when you got back inside Tonis?
5   A. I noticed that there was a gentleman at the bar --
6 two gentlemen at the bar. One was Hispanic; one was a white
7 male.
8   Q. Was that the same two gentlemen you had seen earlier?
9   A. Yes.
10   Q. Go ahead.
11   A. The white gentleman was wearing a white shirt with
12 blue jeans and white Nike tennis shoes.
13   Q. Okay. What did you do at that point?
14   A. As I got closer, I noticed that his shirt said Joe's
15 Crab Shack on it.
16   Q. Okay.
17   A. And that he had the wavy grayish hair.
18   Q. Did he fit the description in your mind of what the
19 bartender had given you down at the Elbow Room?
20   A. Yes, he did.
21   Q. But you had seen him before and he didn't fit that
22 description that you had, or you would have said something to
23 him before, wouldn't you?
24   A. Well, when we asked the bartender, she had said these
25 guys are regulars, and we kind of ruled the two gentlemen out.

Page 233

1    Q. You testified back on August, 22, did you not, that
2 you had seen the man there earlier and he didn't fit the
3 description and you didn't pay any attention to him after that
4 or you didn't think that was the person you were looking for?
5    A. Yes, I may have said that. I can't recall.
6    Q. What did you do after that?
7    A. When I approached him and I noticed his shirt and his
8 hair, noticed that he was in his 40's and he was wearing
9 bluejeans and Nike tennis shoes, I walked up to him. And he
10 seemed to be standing there, holding a beer in a Styrofoam cup,
11 what appeared to be beer. And he was smiling and watched me
12 walk up to him.
13        At that point I asked him -- I told him, "How
14 are you doing?"
15        He said, "I'm doing fine."
16        I said, "Well, sir, what is your name?"
17    Q. What did he say?
18    A. At that point he kind of froze and just looked at
19 me. If I could take a second to look at my report.
20        I asked him again what his name was, and he said
21 David.
22    Q. Let me make sure I have got the order right.
23    A. Okay.
24    Q. You walk up to him and say, "How are you, what are
25 you doing?"

Page 234

1    A. Yes, sir.
2    Q. And then you asked him his name?
3    A. Yes, sir.
4    Q. And he didn't answer you, correct?
5    A. Yes, sir.
6    Q. Or he didn't say anything?
7    A. Yes, sir.
8    Q. So you asked him his name again.
9    A. Yes.
10    Q. And that's where we are right now, right?
11    A. Yes, sir.
12    Q. What did he say to you?
13    A. He said, "David."
14    Q. Did you do anything else as far as conversation?
15    A. Yes, I did.
16    Q. What did you do?
17    A. I asked him where he was from, and he again refused
18 to answer.
19    Q. Okay. Did you ask him what his last name was?
20    A. Hold on a second.
21        (Pause in the proceedings)
22        THE WITNESS: I don't have it in my report. I
23 don't --
24    Q. Let me ask you this. Are you looking at your
25 report -- I don't want you to read from it. You can read it

Page 235

1 before you answer the question. I don't want you to read from
2 it, but just so we are on kind of the same page, there is a
3 paragraph down at the bottom of page 1 of 2 that starts with,
4 "I then remember" --
5    A. Yes, sir, I just found it.
6    Q. Why don't you read through that paragraph right
7 quick, and it might go a little faster. Don't read it out
8 loud; just read it to yourself, and I'm going to ask you some
9 questions about it.
10    A. (Witness complies) Okay.
11    Q. All right. Let's go back to the point where you
12 first walked up to him after you got inside the bar.
13    A. Yes, sir.
14    Q. You walk up to him and you said, "Hi, how are you
15 doing, what's your name," correct?
16    A. Yes, sir.
17    Q. And he said -- he didn't say anything, right?
18    A. Yes.
19    Q. That's --
20    A. He didn't say anything.
21    Q. He did not answer, correct?
22    A. Yes, sir.
23    Q. And you asked him his name again, and he said,
24 "David."
25    A. Yes, sir.

Page 236

1    Q. Then did you ask him what his last name was?
2    A. Yes, sir.
3    Q. Did he give you an answer?
4    A. No, he didn't.
5    Q. Then did you at that point ask him where he was from?
6    A. Yes.
7    Q. Did he tell you where he was from?
8    A. No, he didn't.
9    Q. What did he do?
10    A. He just ignored me.
11    Q. He didn't answer?
12    A. He didn't answer.
13    Q. What did you do at that point?
14    A. I asked him to place his hands behind his head, and I
15 walked him outside.
16    Q. At that point in time when you said, David or sir,
17 whatever you said to him, "Place your hands on your head; we
18 are going outside," prior to that point, was he under arrest?
19    A. No, he wasn't.
20    Q. Prior to that point, was he detained?
21    A. I believe I testified last time that he wasn't.
22    Q. You said he was not at that point in time.
23    A. Yes.
24    Q. He was only detained after -- at the point where you
25 said, "Put your hands on your head; let's go outside," correct?

1   A. Yes, sir.

2   Q. Then you took him outside -- he walked outside with
3   you.

4   A. Yes, sir.

5   Q. And you asked him what, if anything?

6   A. I asked him his date of birth.

7   Q. Okay. Did he give you an answer?

8   A. No, he didn't.

9   Q. He didn't say anything?

10   A. Didn't say anything.

11   Q. What did you do at that point?

12   A. I placed him under arrest for failure to ID.

13   Q. For failure to ID?

14   A. Yes.

15   Q. The law allows you -- if you view a crime that is
16   being committed within your view in front of your own eyes, the
17   law allows you to arrest a person without a warrant, correct?

18   A. Yes.

19   Q. If I am driving a car down Seawall Boulevard and you
20   turn on your lights and stop me and I am drunk, you don't have
21   to have a warrant to arrest me.

22   A. That's correct.

23   Q. That's essentially the same law that allows you to
24   arrest David because you felt like he committed this offense.

25   A. Yes.

1   Q. And actually the person you arrested was Billy Jack?

2   A. Yes.

3   Q. That's the person that you had seen in the bar
4   earlier that didn't fit the description who fit the description
5   when you came back the second time.

6   A. Yes, sir.

7   Q. Was there any conversation from the time you said,
8   "Put your hands on your head" until you said, "You are under
9   arrest?" Was there any other conversation between the two of
10   you other than you asking for his date of birth and him not
11   answering you?

12   A. I don't believe so.

13   Q. Okay. There is not anything in your report that
14   memorializes that, right?

15   A. Uh-huh.

16   Q. And you don't remember it being any other way other
17   than what you just testified to.

18   A. That's correct.

19   Q. After that point, he was under arrest and you put him
20   in your police car; is that right?

21   A. Yes.

22   Q. What did you do with him after that?

23   A. At that point other officers had begun to arrive, and
24   I just stood by my unit at that point.

25   Q. Once you said, "You are under arrest," he wasn't free

1   to go at that time; he was going to jail, right?

2   A. Yes.

3   Q. Did y'all have any other conversation on the way to
4   the jail?

5   A. No.

6      MR. RAY: Okay. Hang on just a second.

7      (Pause in the proceedings)

8   Q. Now, was Mr. Crutsinger arrested for any other
9   offense other than failure to ID?

10   A. No, he wasn't.

11   Q. Let me ask you a question. Let's say you stop a
12   person because they are speeding. And correct me if I'm wrong,
13   if you are a licensed Texas driver and you have a valid
14   Texas -- you have a valid license and you have insurance on a
15   vehicle and the vehicle is in your name and the police stop you
16   for speeding, you have got to let them go with a ticket; is
17   that right?

18   A. That's correct.

19   Q. That doesn't apply to just about any other offense,
20   does it?

21   A. Right.

22   Q. If I commit some other traffic violation, you can
23   take me to jail, right?

24   A. I can, yes.

25   Q. But when you stop a person, you always check them for

1   warrants, do you not?

2   A. Yes.

3   Q. Unless there is some reason that you just can't. For
4   instance, if you stop me and I was speeding, you would let me
5   go if I took a ticket from you and if I said, "I will take the
6   ticket." If I have a warrant for my arrest, you will take me
7   to jail.

8   A. Yes, sir.

9   Q. And you would do that in the regular course of the
10   way the police department operates.

11   A. Yes, sir.

12   Q. At the time that you placed Mr. Crutsinger under
13   arrest for failure to ID, to your knowledge, had he committed
14   any other offense or was there any warrant for his arrest for
15   any offense?

16   A. I didn't know about the search warrant because
17   we didn't have his name and date of birth.

18   Q. When you say the warrants, there was no warrant for
19   any other crime, was there?

20   A. I don't believe so.

21   Q. Okay. And if you had, you would have certainly put
22   that in your report.

23   A. Yes, sir.

24   Q. The point I want to make is the only thing he was
25   arrested for was the failure to ID.

1   A. Yes, sir.

2   Q. And you were the police officer that actually

3 arrested him.

4   A. Yes, sir.

5   Q. If he developed some charge later, that doesn't have

6 anything to do with whether or not -- with you arresting him

7 because that's all you arrested him for.

8   A. That's correct.

9   Q. Nobody else came along and said, "Hey, you're wanted

10 for some other offense" while he was sitting in your car. That

11 never happened, did it?

12   A. No.

13   Q. Okay. Are you ready to go back to Galveston?

14   A. I would like to.

15       MR. RAY: Thank you. I'll pass the witness.

16       CROSS-EXAMINATION

17 BY MS. CALLAGHAN:

18   Q. Hello, Officer Garcia. How are you doing?

19   A. Good, ma'am. How are you?

20   Q. Just fine.

21       Now, let me ask you this. You were aware and

22 the other police officers who were looking for this individual

23 were aware that a double homicide had been committed in Fort

24 Worth; is that right?

25   A. Yes, ma'am.

1   Q. And you were aware that the victim's credit cards

2 were missing and had been used on Galveston Island.

3   A. Yes, ma'am.

4   Q. And you were aware that they had been used at a

5 number of local businesses, and that's why you were trying to

6 go to those businesses and find a description of this person.

7   A. Yes.

8   Q. Because the belief is he was connected to the double

9 homicide and that he was illegally committing credit card

10 abuse.

11   A. Yes, ma'am.

12   Q. So that's where you were starting from in looking for

13 this individual.

14   A. Yes, ma'am.

15   Q. Now, you said initially you met with your father and

16 with an individual who was a cab driver, correct?

17   A. Yes, ma'am.

18   Q. And got a description.

19   A. Yes, ma'am.

20   Q. And that later you went to some of the bars and you

21 were looking through there to see if the individual was there.

22   A. Yes, ma'am.

23   Q. Let me show you what is marked State's Exhibit 169

24 and 170 for identification in this cause. Do you recognize

25 this?

1   A. Yes, ma'am.

2   Q. What are they?

3   A. They are pictures of the big poster board. The one

4 is the Lazy Lounge and looks like a picture of Taucers from the

5 parking lot of Tonis Lazy Lounge.

6   Q. And that's 169 you just referred to?

7   A. Yes, ma'am.

8   Q. What about 170?

9   A. This, I believe, is the inside of Tonis Lazy Lounge.

10   Q. All right. Are these true and accurate depictions of

11 the way that Tonis Lazy Lounge appears both from the inside and

12 outside?

13   A. Yes, ma'am.

14       MS. CALLAGHAN: Your Honor, at this time the

15 State would offer State's Exhibit 169 and 170 for all purposes

16 subject to tendering them to Defense Counsel for inspection.

17       MR. RAY: No objection to Tonis -- either one of

18 them.

19       THE COURT: They are admitted.

20       (State's Exhibit No. 169, 170 received)

21   Q. You said when you first went --

22       MS. CALLAGHAN: If I may publish them by walking

23 in front of the jury, Your Honor?

24       THE COURT: Yes.

25   Q. You said when you first went to Tonis, there were two

1 men in there, two customers.

2   A. Yes, ma'am.

3   Q. And one of them was Mr. Crutsinger.

4   A. Yes, ma'am.

5   Q. When you first went in there, was he facing towards

6 you or facing away, from your recollection?

7   A. I believe he was facing towards me.

8   Q. Were you able to see his shirt?

9   A. Yes, ma'am.

10   Q. Could you see that it said "Joe's Crab Shack"?

11   A. Was this the second time that I went?

12   Q. No, sir, the very first time that you went in is when

13 I am talking about.

14   A. Okay.

15   Q. There were two individuals, correct?

16   A. Yes, ma'am.

17   Q. Were you able to see the shirt of Mr. Crutsinger when

18 you first went in?

19   A. Yes, I was.

20   Q. Could you see the Joe's Crab Shack emblem on it?

21   A. I didn't notice it the first time.

22   Q. Okay. You just saw a white T-shirt.

23   A. Yes, ma'am.

24   Q. But he did not otherwise, in terms of age, appear

25 like the person you were looking for.

## Page 245

1   A. Yes, ma'am.

2   Q. Then you left, correct?

3   A. Yes.

4   Q. All right. And while you were gone, you were at

another bar when a telephone call came in to you.

6   A. Yes, ma'am.

7   Q. Which bar were you at?

8   A. Taucers.

9   Q. The call came from who?

10   A. From the bartender at the Elbow Room.

11   Q. All right. Now, let's go over that. The individual

12  was a bartender at the Elbow Room who called you.

13   A. Yes, ma'am.

14   Q. What description did she give you of the person you

15  were looking for? First of all, she was aware that you were

16  looking for an individual.

17   A. Yes, ma'am.

18   Q. And that was from a previous trip to the Elbow Room.

19   A. Yes, ma'am.

20   Q. And so she was aware of who you were looking for and

21  called to talk to you about the person you were looking for.

22   A. Yes, ma'am.

23   Q. What description did she give you?

24   A. She gave me a description of a male, white, who was

25  in his 40's -- his mid 40's wearing a white Joe's Crab Shack

## Page 246

1   shirt.

2   Q. Hold on a second. Mid 40s.

3   A. Blue jeans, brand new white tennis shoes, weighed

4   220 to 250 pounds and had wavy gray hair.

5   Q. Did she say anything about his stomach area?

6   A. I just can't find it in the report, but I remember

7   she said that he had a gut, you know, a big stomach.

8   Q. Gut, pot belly?

9   A. Yes.

10   Q. Okay. All right. Now, this is the description you

11  received from that bartender at the Elbow Room, correct?

12   A. Yes, ma'am.

13   Q. And it was when you received this description you

14  recalled having seen someone generally fitting that description

15  back at Tonis.

16   A. Yes, ma'am.

17   Q. Now, when you went back to Tonis, did you see the

18  Defendant, Mr. Crutsinger, there?

19   A. Yes, I did.

20   MS. HARTMANN: Approach the bench, Your Honor?

21   (Outside the hearing of the jury)

22   MS. CALLAGHAN: The Defense has opened the door

23  to this issue. We would like to use the photograph taken of

24  the Defendant, full body photograph taken of the Defendant

25  taken, to show that his appearance at that time precisely fit

## Page 247

1   the description.

2   MR. RAY: I don't care if she wants to show him

3   the photograph.

4   MS. CALLAGHAN: I want to offer it for the jury.

5   MR. RAY: That's fine.

6   MS. CALLAGHAN: Okay.

7   (In the hearing of the jury)

8   Q. Officer Garcia, let me show you what's marked

9   State's Exhibit 168 in this cause. Do you recognize this

10  photograph?

11   A. Yes, I do.

12   Q. Is that, for the jury, a true and accurate depiction

13  of the way Mr. Crutsinger looked when you saw him in Tonis Lazy

14  Lounge the second time?

15   A. Yes, ma'am.

16   Q. This is also how he looked the first time, right?

17   A. Yes, ma'am.

18   MS. CALLAGHAN: The State would offer State's

19  Exhibit 168 for identification in this cause.

20   MR. RAY: She showed it to me and I don't have

21  any objection.

22   THE COURT: 168 is admitted.

23   (State's Exhibit No. 168 received)

24   MS. CALLAGHAN: If I may publish it by walking

25  in front of the jury?

## Page 248

1   THE COURT: You may.

2   Q. Officer, when you saw him in Tonis Lazy Lounge the

3   second time, you walked up to him and looked at him, correct?

4   A. Yes, I did.

5   Q. Was he a white male?

6   A. Yes, he was.

7   Q. Was he approximately in appearance in his mid 40's?

8   A. Yes, ma'am.

9   Q. Was he wearing a white Joe's Crab Shack T-shirt?

10   A. Yes, he was.

11   Q. Was he wearing blue jeans?

12   A. Yes, he was.

13   Q. Was he wearing brand-new appearing white tennis

14  shoes?

15   A. Yes, he was.

16   Q. Did he look to be between 220 and 250 pounds?

17   A. Yes, ma'am.

18   Q. Did he appear to have -- and you can see in that

19  photograph -- a tummy or a pot belly or a gut or whatever you

20  want to call it?

21   A. Yes, he did.

22   Q. Did he have wavy gray hair?

23   A. Yes, he did.

24   Q. So the description that you got, the refined

25  description from the bartender at the Elbow Room exactly and

Page 249

1 precisely fit this Defendant, Billy Jack Crutsinger, on that
2 day.
3    A. Yes, ma'am.
4    Q. And that's what drew your attention to him at that
5 point, correct?
6    A. Yes, ma'am.
7    Q. All right. Now, when you go in and you talk to him,
8 at that point he's not detained, correct?
9    A. No, he's not.
10   Q. And you ask him his name.
11   A. Yes, ma'am.
12   Q. And what's his response?
13   A. He just stared at me, ignored the question. He
14 failed to answer.
15   Q. All right. What did you do?
16   A. I asked him another question.
17   Q. What did you ask him?
18   A. I asked him again what his name was.
19   Q. What did he answer the second time?
20   A. He stated his name was David.
21   Q. Did he give you a last name?
22   A. No, he did not.
23   Q. What did you ask him then?
24   A. I asked him his last -- what was his last name.
25   Q. Did he respond?

Page 250

1    A. No, he didn't.
2    Q. Is it at that point that you asked him to put his
3 hands behind his head?
4    A. Yes, ma'am.
5    Q. At that point your intention was to detain him,
6 correct?
7    A. Yes, ma'am.
8    Q. While you were asking these questions, did you notice
9 anything about his eyes?
10   A. Yes, I did.
11   Q. What did you notice?
12   A. When I initially approached him, he had a smile on
13 his face. He was kind of leaning back on the bar holding a
14 Styrofoam cup with possibly beer in it, and when I approached
15 him and asked him -- I told him, "How are you doing," and I
16 asked him what his name was, his smile just kind of faded.
17         When he was looking at me in my face. At that
18 time he motioned his eyes towards the door as if -- it gave me
19 an impression that he was looking for a safe passage to the
20 door and it alerted my attention. I began to use caution with
21 him at that point.
22   Q. All right. So he appears to be cutting his eyes
23 towards the door.
24   A. Yes, ma'am.
25   Q. As though looking for a way out.

Page 251

1    A. Yes.
2    Q. This behavior, the fading smile, the eyes cutting to
3 the door, his reluctance to give you a name and when he did,
4 refusal to give you a last name, was that suspicious to you?
5    A. Yes, it was, ma'am.
6    Q. In combination with the information you already had,
7 did you believe you had reasonable suspicion to detain him for
8 the offense of credit card abuse?
9    A. Yes, ma'am.
10   Q. Now, a reasonable suspicion to detain someone is for
11 the purpose of investigating and being able to identify them,
12 correct?
13   A. Yes, ma'am.
14   Q. At that point after his arrest, he was taken back to
15 the Galveston Police Department, correct?
16   A. Yes, ma'am.
17   Q. And while he was there, did you continue --
18       MS. CALLAGHAN: Approach the bench, Your Honor?
19       THE COURT: Yes.
20       (Outside the hearing of the jury)
21       MS. CALLAGHAN: At this point I intend to ask
22 him after his arrest, did he continue to ask him for his name
23 and information and date of birth and that the Defendant
24 continued for some period of time to not tell his real name.
25       Now, my thinking that I should be able to go

Page 252

1 into this is that as long as it's from routine book-in
2 procedures you can go into it; and second, the Defense has
3 opened the door for us to go into it, but in an abundance of
4 precaution, I thought I would approach the bench.
5       THE COURT: What is the relevance of all this?
6       MS. CALLAGHAN: In terms of reasonable
7 suspicion, they were right to detain him until such time as
8 they were able to identify him.
9       MR. MOORE: That's all after the fact.
10      MS. CALLAGHAN: It doesn't matter because what
11 you're talking about is when the detective arrived to take his
12 statement, the fact is they hadn't fully identified him at the
13 time Detective --
14      THE COURT: He was under arrest.
15      MS. CALLAGHAN: He was under arrest, but he
16 finally gave the name Billy Jack Crutsinger, and it was when he
17 was upstairs confronting whether that was true or false --
18      THE COURT: What does that -- what's the
19 relevance of that?
20      MS. CALLAGHAN: The relevance is that they had a
21 right to detain him. Reasonable suspicion they had a right to
22 detain him until such time as they were able to identify him.
23 And the detective arrived before they had fully ID'd him. They
24 were right to keep him at that point.
25      Now, at the time the detective arrived --

Page 253

1    THE COURT: I already ruled that the arrest was
2  illegal. He has to be legally detained.
3    MS. CALLAGHAN: Well, I believe the Defense has
4  opened the door to information by asking the witness --
5    THE COURT: What did they ask?
6    MS. CALLAGHAN: They asked, "Did he give you a
7  name?"
8    "Yes."
9    "Did you identify -- do something to identify
10  him?"
11    "Yes."
12    "Did you have to keeping asking him?"
13    "Yes."
14    THE COURT: There was something about that. I
15  don't remember what it was.
16    MS. CALLAGHAN: The information came in --
17    MR. MOORE: Now, he is under arrest -- and it is
18  in response to their --
19    MS. CALLAGHAN: Generally speaking, preliminary
20  information that is obtained -- name, address, phone number,
21  information that the jailers obtain or police officers obtain,
22  information of that nature is not generally held to be
23  custodial interrogation. There is case law on that.
24    THE COURT: I know that. Y'all want to go into
25  some of the conversations that were held after his arrest?

Page 254

1    MS. CALLAGHAN: Yes, we do.
2    THE COURT: I don't remember what the question
3  was. Once you go into it, it's --
4    MR. RAY: Well, the fact of the matter is this
5  whole issue of whether or not he's properly under arrest or
6  not. She can --
7    THE COURT: I have already ruled on that.
8    MR. RAY: I understand that, but --
9    THE COURT: Now, it's whether you have opened
10  the door to the question --
11    MR. RAY: What does it prove or not prove?
12  There is plenty of testimony --
13    THE COURT: Well, you asked it. There wasn't
14  any relevance to it when you asked it.
15    MR. RAY: The fact that she didn't object to
16  what I did doesn't --
17    MS. CALLAGHAN: You didn't object.
18    THE COURT: No, you asked it. Now that makes it
19  relevant.
20    MR. RAY: It doesn't prove anything. It doesn't
21  have any probative value in this case. What is --
22    THE COURT: The probative value is it develops
23  fully the conversation that went on.
24    MR. RAY: Right, but --
25    THE COURT: That's the relevance.

Page 255

1    MR. RAY: Regardless of the outcome, it doesn't
2  make the arrest valid because that's something that already
3  happened. They have either got a valid arrest or they don't.
4    THE COURT: Y'all have spent all afternoon long
5  litigating something that's already been decided. Your
6  objection is overruled.
7    MR. MOORE: Just for the record, we also object
8  under 38.22 that this is obviously --
9    THE COURT: If you wanted to preserve a 38.22
10  objection, you shouldn't have gone into it.
11    MR. MOORE: We didn't go into anything that they
12  started talking about at the police station. It was at the
13  scene and Tonis. Once they get down to the police station, we
14  didn't ask a single question about that.
15    THE COURT: Any of the questions have to do at
16  the police station? That's already been gone into.
17    (Pause in the proceedings)
18    MS. CALLAGHAN: I just wanted to confirm
19  something and verify that's what the State intends to do. Am I
20  to be permitted to do it?
21    MR. RAY: We object.
22    THE COURT: And I overrule it. I have already
23  overruled it once.
24    (In the hearing of the jury)
25    Q. Now, when you were taking him downtown and once he

Page 256

1  arrived downtown, did you continue to ask him questions
2  concerning his name or identity?
3    A. Yes, ma'am.
4    Q. Did he give you his correct name or identity
5  initially?
6    A. No, he didn't.
7    Q. What names did he give you?
8    A. I believe he gave his last name as Townsend, and when
9  we got to the station, I believe we obtained a date of birth
10  from him. I went upstairs to run it. At that time I found out
11  it was a false name. It came back to no one with the date of
12  birth.
13    When I went back down there, Officer Garcia, my
14  father, was also speaking with him, and I believe he may have
15  gave him another false name. And I remembered hearing a
16  different spelling of his last name, Crutsinger, and it wasn't
17  pronounced as Crutsinger; it was Cratsinger. And we had him
18  spell it out and ran that one, and it came back to no one.
19  And he eventually gave us his real name and date of birth.
20    Q. He eventually gave you his real name as Billy Jack
21  Crutsinger?
22    A. Yes.
23    Q. And his correct date of birth?
24    A. Yes.
25    Q. Were you requested by your father to go upstairs and

CondenseIt™

Page 257

1 to confirm that through your information computers?
2  A. Yes, ma'am.
3  Q. And did you do so?
4  A. Yes, I did.
5  Q. While you were upstairs waiting for confirmation on
6 that information, did anyone arrive from out of town?
7  A. Yes.
8  Q. Who arrived?
9  A. The Fort Worth detectives.
10  Q. Detective McCaskill?
11  A. I believe so, yes.
12  Q. And Detective Hardy?
13  A. Yes.
14  Q. And it was while you were upstairs that they arrived
15 at the police department?
16  A. It may have been right before, but we had gotten word
17 that they were at the police station when we initially got
18 there.
19  Q. All right. And then when you got the information
20 confirming his identity, that's when you came downstairs.
21  A. Yes, ma'am.
22  Q. Now, at the beginning of this, you and your father
23 had talked to the cabby, Mr. Epps, correct?
24  A. Yes, ma'am.
25  Q. And that's who you got your initial information from?

Page 258

1  A. Yes, ma'am.
2  Q. Was it your understanding from the cabby and from
3 your father that Mr. Epps had taken the suspect to the Elbow
4 Room?
5  A. Yes, ma'am.
6  Q. That's where he had dropped him off?
7  A. Yes, ma'am.
8  Q. And it was from the Elbow Room bartender that this
9 information came to you describing him as a white male in his
10 40's with the Joe's Crab Shack T-shirt, blue jeans, the brand
11 new tennis shoes, the pot belly and the wavy hair.
12  A. Yes, ma'am.
13     MS. CALLAGHAN: Thank you, Officer Garcia.
14     Pass the witness.
15       REDIRECT EXAMINATION
16 BY MR. RAY:
17  Q. Regardless of what you knew, before you told -- or
18 even what you thought, the decision that you made to detain
19 Billy Jack Crutsinger was after he had told you the name David
20 and when you decided you wanted to take him out of the bar,
21 right?
22  A. Around that time, yes, sir.
23  Q. Well, you testified it was exactly when you told him,
24 "Put your hands on your head; I'm going to take you outside,"
25 that's when you decided to detain him, right?

Page 259

1  A. Yes, sir.
2  Q. Okay. And anything that you learned later doesn't
3 support the basis that you used to arrest him. In other words,
4 you can't dream up something later to support that arrest. Are
5 you with me on that?
6  A. No, sir.
7  Q. Well, you arrest a person and then for whatever
8 reasons are known to you, if you find out ten different reasons
9 after that, that doesn't support your arrest, right?
10  A. No, it doesn't.
11  Q. And reasonable suspicion that gives you the right to
12 speak with someone, that does not give you probable cause to
13 arrest someone, right?
14  A. No, it doesn't.
15  Q. If you don't have probable cause, you can't arrest
16 somebody.
17  A. That's true.
18  Q. If you are doing your job.
19  A. Yes.
20     MR. RAY: That's all I have.
21       RECROSS-EXAMINATION
22 BY MS. CALLAGHAN:
23  Q. With reasonable suspicion, though, Officer, you can
24 detain someone until you are able to identify them.
25  A. Yes, ma'am.

Page 260

1  Q. It is a detention for the purpose of criminal
2 investigation.
3  A. Yes, ma'am.
4     MS. CALLAGHAN: Pass the witness.
5       FURTHER REDIRECT EXAMINATION
6 BY MR. RAY:
7  Q. But you didn't reasonably detain him; you arrested
8 him.
9  A. Yes, I did.
10  Q. So once you have arrested him, you had already made
11 your decision to put him in jail and take him into custody,
12 right?
13  A. Yes, sir.
14  Q. And the only reason you arrested him was because you
15 felt like he committed the offense of failure to identify, and
16 that arrest will stand or not stand on its own facts.
17  A. That's correct.
18     MR. RAY: That's all we have.
19     MS. CALLAGHAN: The State has no further
20 questions.
21     THE COURT: You may step down, sir.
22     MR. RAY: Judge, may Officer Garcia and his
23 father, Officer Garcia, Jr.; and Officers Contenta and Simpson
24 be finally excused?
25     MS. HARTMANN: The State has no objection.

Page 261

1     THE COURT:  They may.

2 Ladies and gentlemen, we are going to break here for the

3 evening.  We will break until 9:00 o'clock tomorrow morning.

4     Please remember and follow your instructions.

5 The bailiffs will meet you as usual.  Have a good evening.

6     (Jury not present)

7     THE COURT:  Any issues that need to be decided

8 outside the jury's presence?

9     MS. HARTMANN:  Not from the State.

10     MR. RAY:  I don't believe so.

11     THE COURT:  How about the issue of the

12 videotape?

13     MS. HARTMANN:  If the Defense wants to offer

14 them, we have no objection.

15     MR. MOORE:  I think that's still up in the air.

16     THE COURT:  We need to bring it back down.

17     MS. HARTMANN:  The State will offer the

18 videotapes.

19     (End of proceedings)

20

21

22

23

24

25

Page 262

1 STATE OF TEXAS    |

2 COUNTY OF TARRANT    |

3    I, Steve Schiller, Official Court Reporter for the

4 213th District Court of Tarrant County, Texas, do hereby

5 certify that the above and foregoing contains a true and

6 correct transcription of all portions of evidence and other

7 proceedings requested in writing by counsel for the parties to

8 be included in this volume of the Reporter's Record, in the

9 above-styled and numbered cause, all of which occurred in open

10 court or in chambers and were reported by me.

11

12    I further certify that this Reporter's Record of the

13 proceedings truly and correctly reflects the exhibits, if any,

14 admitted by the respective parties.

15

16

17

18

19 WITNESS MY OFFICIAL HAND this the 25th day of April, 2004.

20

21 STEVE SCHILLER, CSR
   Official Court Reporter
22 213th District Court
   401 West Belknap
23 Fort Worth, Texas 76196
   (817) 884-2687
24 State Certification No. 4665

25    Certification Expires: 12-31-05