IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FT. WORTH DIVISION


BILLY JACK CRUTSINGER

      Petitioner,

v.                                                                No. 4:07-CV-00703-Y

LORIE DAVIS, Director
Texas Department of Criminal Justice,
      Correctional Institutions Division

      Respondent.

_____


**CRUTSINGER'S**
**OPPOSED MOTION FOR RELIEF FROM JUDGMENT**
**PURSUANT TO FED. R. CIV. PROC. 60(b)(6)**


Lydia M.V. Brandt, Esq.
The Brandt Law Firm, P.C.
Texas Bar No. 00795262
P.O. Box 326
Farmersville, TX 75442-0326
(972) 752-5805
COUNSEL FOR CRUTSINGER

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1
II.     STATEMENT OF THE CASE WITH FACTS RELEVANT TO THE ISSUE ......... 2
        A.      Trial and direct appeal proceedings ................................................................. 2
                1.      Pre-trial and Trial Proceedings .......................................................... 2
                2.      Direct Appeal and the 2006 Certiorari in the U.S. Supreme Court ..... 8
        B.      State habeas corpus proceedings ...................................................................... 9
        C.      Federal Habeas proceedings in district court .................................................. 13
        D.      Habeas proceedings in the Fifth Circuit .......................................................... 17
        E.      The Supreme Court overrules the Fifth Circuit rule "that a prisoner cannot
                show a substantial need for funds when his claim is procedurally barred
                from review" ................................................................................................... 18
III.    ARGUMENT ....................................................................................................... 19
        A.      The Legal Standard ......................................................................................... 19
        B.      The Court has jurisdiction over the motion because the motion attacks not
                the substance of the federal court's resolution of any claim but the denial of
                representation services ................................................................................... 20
        C.      Extraordinary circumstances warrant reopening .......................................... 23
CONCLUSION ............................................................................................................ 27

# TABLE OF AUTHORITIES

## Cases

*Ames v. Miller,* 184 F.Supp.2d 566, 570–71, 573, 575 (N.D. TX 2002 ....................................... 19

*Ayestas v. Davis*, 138 S. Ct. 1080 (2018)................................................................................. 1

*Barker v. Wingo*, 407 U.S. 514 (1972) ..................................................................................... 3

*Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008)................................................. 3

*Crutsinger v. State*, 206 S.W.3d 607 (Tex. Crim. App. 2006). ................................................. 8

*Crutsinger v. Stephens*, 540 F. App'x 310 (5th Cir. 2013)..................................................... 17

*Crutsinger v. Stephens*, 576 Fed.Appx. 422, 431 (5th Cir. 2014) .......................................... 2

*Crutsinger v. Texas*, 549 U.S. 1098 (2006). ............................................................................. 2

*Ex Parte Crutsinger*, 2007 WL 3277524 (Tex. Crim. App. Nov. 7, 2007) ............................ 13

*Ex parte Kerr*, No. WR-62,402-03 (Tex. Crim. App. Apr. 28, 2011). .................................... 10

*Ex parte Medina*, 361 S.W.3d 633, 640 (Tex. Crim. App. 2011)............................................ 11

*Fackelman v. Bell*, 564 F.2d 734, 735 (5th Cir. 1977) ............................................................ 25

*Furman v. Georgia*, 408 U.S. 238 (1972)................................................................................. 24

*Gonzalez v. Crosby*, 545 U.S. 524 (2005)................................................................................. 20

*Gregg v. Georgia*, 428 U.S. 153, 188 (1976) ........................................................................... 24

*Harris v. Nelson*, 394 U.S. 286, 292 (1969). ........................................................................... 24

*Hughes v. Johnson*, 191 F.3d 607, 623 (5th Cir. 1999) ............................................................ 8

*Lagrone v. Johnson*, No. 4:99-CV-521-X (N.D. Tex. Nov. 2, 2000)....................................... 9

*Martel v. Clair*, 565 U.S. 648, 659 (2012)............................................................................... 24

*Martinez v. Ryan*, 566 U.S. 1 (2012) ......................................................................................... 1

*McFarland v. Scott*, 512 U.S. 849 (1994) ................................................................................. 20

*Ruiz v. Quarterman*, 504 F.3d 523, 531–32 (5th Cir. 2007)................................................... 25

*Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. 1981) ........................................... 20

*Shepherd v. International Paper Co.*, 372 F.3d 326, 330–31 (5th Cir. 2004) ............................. 19

*Standard Oil v. United States*, 429 U.S. 17 (1976)................................................................... 19

*Trevino v. Thaler*, 569 U.S. 413 (2013),................................................................................... 1

*Wiggins v. Smith*, 539 U.S. 510 (2003)..................................................................................... 1

## Statutes

TEX. CODE CRIM. PROC. § 37.071(2)(b)(1).............................................................................. 8

TEX. CODE CRIM. PROC. § 37.071(2)(d)(1)............................................................................... 8

TEX. CRIM. PROC. CODE Art. 11.071 § 3(a) ............................................................................. 11

## Other Authorities

ABA GUIDELINES FOR APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, GUIDELINE 10.15.1 (rev. ed. 2003).................................................... 11

Chuck Lindell, *Death Row Legal-help Legislation Languishes*, Austin-American Statesman at A01, June 9, 2007 ............................................................................................................ 9

Commentary to Guideline 4.1, ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (rev. ed. Feb. 2003) ................................................................................................................................ 3

**CRUTSINGER'S OPPOSED MOTION FOR RELIEF FROM JUDGMENT
PURSUANT TO Fed. R. Civ. Proc. 60(b)(6)**

# I.   INTRODUCTION

Mr. Crutsinger seeks 60(b)(6) relief from judgment because his federal habeas proceeding was marred by a structural procedural defect. The federal courts denied a request under 18 U.S.C. § 3599 for investigative and expert services to investigate the effectiveness of trial counsel on the ground that such a claim[1] was procedurally defaulted.   Even after *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), established that the default could be excused where the default is attributable to the ineffectiveness of state collateral counsel, the federal courts nevertheless closed the record and denied Mr. Crutsinger's undeveloped Sixth Amendment allegations on the merits.   The premature adjudication of an undeveloped claim on its "merits" erected precisely the barrier *Martinez/Treviño* were supposed to overcome—an inequitable restriction on an indigent, capitally sentenced prisoner's ability to obtain at least one round of meaningful process on a Sixth Amendment trial ineffectiveness claim.

On March 21, 2018, the Supreme Court decided *Ayestas v. Davis*, 138 S. Ct. 1080 (2018). The *Ayestas* decision <u>overruled</u>[2] the rule applied by the district court and the Fifth Circuit in this case:   "[O]ur rule [is] that a prisoner cannot show a substantial need for funds when his claim is

---

[1]     *Wiggins v. Smith*, 539 U.S. 510 (2003).

[2]     "A judicial decision is said to be overruled when a later decision, rendered by the same court or by a superior court in the same system, expresses a judgment upon the same question or law directly opposite to that which was before given, thereby depriving the earlier opinion of all authority as a precedent."   The Law Dictionary Featuring Black's Law Dictionary Free Online Legal Dictionary 2nd Ed.   https://thelawdictionary.org/overrule/

procedurally barred from review." *Crutsinger v. Stephens*, 576 Fed.Appx. 422, 431 (5th Cir. 2014).

The Supreme Court characterized that rule as "too restrictive" after *Martinez*, because auxiliary

representation services may enable a habeas petitioner to overcome the procedural default obstacle.

*Ayestas*, 138 S. Ct. at 1094.

     As more fully discussed below, equity demands that Mr. Crutsinger be granted relief from

the judgment in this case and that it be reopened.

## II.   STATEMENT OF THE CASE WITH FACTS RELEVANT TO THE ISSUE

### A.   Trial and direct appeal proceedings

     Billy Jack Crutsinger was convicted of capital murder and sentenced to death in Tarrant

County, Texas for the April 6, 2003, fatal stabbing of two women. The Texas Court of Criminal

Appeals ("TCCA") affirmed the conviction and sentence on direct appeal. *Crutsinger v. State*, 206

S.W.3d 607 (Tex. Crim. App. 2006). The U.S. Supreme Court denied Mr. Crutsinger's petition for

writ of certiorari. *Crutsinger v. Texas*, 549 U.S. 1098 (2006).

### 1.   Pre-trial and Trial Proceedings

     The Fort Worth Police charged Mr. Crutsinger with a double murder, and on April 17,

2003, the trial court appointed William Ray to represent him. 1 CR 4, 19.[3] Only eleven days after

being appointed, and seventeen days after capital murder charges were brought, on April 28, 2003

Mr. Ray filed a "Constitutional Motion for a Speedy Trial," arguing the failure of the State to

afford Mr. Crutsinger a speedy trial was prejudicial. 1 CR 31. On the same day, Mr. Ray also filed

---

3     CR refers to the state Clerk's Record.   RR refers to the state Reporter Record.

a "Statutory Motion for Speedy Trial," demanding that the trial court set Mr. Crutsinger's case for trial within 90 days, and further demanding that Mr. Crutsinger be released from custody if the State was not ready for trial. 1 CR 33. At the time he pressed for a speedy trial, Mr. Ray had _not_ sought: the appointment of co-counsel, an investigator to look into the circumstances of the offense, a mitigation specialist to investigate Mr. Crutsinger's background and complete a psychosocial assessment, or any experts to interpret leads generated by the mitigation investigation. In short, trial counsel made a frivolous[4] Sixth Amendment argument compressing the time for investigation at precisely the time that trial counsel dragged their feet on the investigation itself.

On June 13, 2003, the trial court appointed Tim Moore as co-counsel. 1 CR 38. An indictment charging capital murder was filed June 19, 2003. 1 CR 3. That same day, without the benefit of a mitigation specialist or any social history investigation,[5] counsel moved for and obtained permission to retain the assistance of a mental health expert, psychiatrist Barry Mills. 1 CR 48, 50. In order to confidently assess the mental health of inmates that they are supposed to examine, mental health professionals like Dr. Mills heavily rely on investigatory information provided by the lawyers and mitigation specialists, which allows the metal health professionals to

---

[4]    Texas courts have found that a pretrial delay of four months is not sufficient to trigger a speedy-trial problem, _see Barker v. Wingo_, 407 U.S. 514 (1972), but a seventeen-month delay is. _See Cantu v. State_, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008). In any event, no Texas court has ever held that a pretrial delay of seventeen days was presumptively prejudicial.

[5]    One of the roles of a mitigation specialist is to use specialized expertise to advise counsel on appropriate mental health and expert assistance, and to use the product of their mitigation investigation to inform the work of the expert. See, e.g., Commentary to Guideline 4.1, ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (rev. ed. Feb. 2003).

3

identify and exclude diagnoses. Dr. Mills did not have the benefit of an adequate psychosocial history to provide context to his examination, did not prepare a report about Mr. Crutsinger, and appears not to have formed any diagnostic impression.[6]

In mid-June, counsel also began communicating with local psychologist Kelly Goodness about retaining her assistance. On June 16, 2003, Dr. Goodness wrote to counsel highlighting the need to complete a mitigation investigation *before* "develop[ing] an appropriate trial strategy," and noting that "it would be difficult, if not impossible to collect all of the information necessary for either trial or mitigation in anything less than three full months."  Exhibit 1: 6-16-2003 letter Kelly Goodness to Ray. Leaving the sense of urgency open to no interpretation, Goodness warned that "swift action [was] required." Exhibit 1: 6-16-2003 letter, page 2, Kelly Goodness to Ray.  By letter also dated June 16, 2003, Dr. Goodness provided Mr. Ray a "Terms of Engagement Contract" that would take effect when Mr. Ray signed it. Exhibit 2:   6-16-2003 Goodness to Ray: Terms of Engagement Contract.

Despite Dr. Goodness having emphasized the importance of "swift action," trial counsel did not move expeditiously and the contract remained unsigned. After more than three weeks passed, on July 10, 2003, Dr. Goodness's assistant faxed a follow-up letter to trial counsel. Exhibit 3: 7-10-2003 fax follow-up Goodness to Ray. It indicated that Dr. Goodness's calendar was "quite full;" Dr. Goodness no longer accepted assignments for cases that were less than three months away, "due to the time required to conduct these comprehensive investigations." Exhibit 3. It was not until receiving this reminder from Dr. Goodness's assistant that trial counsel moved the court to appoint Dr. Goodness as an expert "to evaluate the Defendant and other evidence in

---

6  1 CR 50; Doc 31-2, Fed. Hab. Pet., p. 35 at n.11.

this case and report to Counsel for the Defendant the results of that examination, and testify, if necessary." 1 CR 65. Counsel's inexplicable delay was the only thing holding up the investigation; the district court approved the appointment of Dr. Goodness on the same day trial counsel sought it, July 11, 2003. 1 CR 68.  Counsel's demands for a speedy trial, however, created more problems.  Counsel did not seek a continuance to allow sufficient time to conduct an adequate mitigation investigation even though voir dire was to start in less than a month and, as Dr. Goodness had advised, her work required at least three months to complete.

Voir dire began on August 18, 2003—about four months after counsel had been appointed. 3 RR 1; *see also* RR Master Index. Counsel questioned potential jurors without knowing what evidence the defense might present in mitigation. On September 10, 2003, twelve (12) days before testimony was to begin (9-22-2003) and during the latter half of voir dire, counsel received a report from Dr. Goodness. 27 RR 1; *see also* Master Index of RR. Exhibit 4: Goodness Presentence Evaluation Report. As part of her psychological evaluation, Dr. Goodness interviewed a handful of people who knew Mr. Crutsinger—his mother and two siblings, an ex-wife, an ex-girlfriend and two friends—and conducted tests of Mr. Crutsinger's intellectual functioning.

The Goodness Report was not a comprehensive social history (*e.g.,* the "Early Developmental and Social History" section was a scant two paragraphs long), but it contained many red flags that should have immediately prompted further investigation by trial counsel. Exhibit 4. For instance, Mr. Crutsinger suffered from cognitive impairment; Dr. Goodness observed that Mr. Crutsinger's "brain does not function in an altogether average manner" and that he seemed to present "intellectual and cognitive difficulties"—difficulties that were also manifest among multiple members of the Crutsinger family. Exhibit 4: Goodness Presentence Evaluation

5

Report, pp. 5, 6, 10, 11. His family presented a multigenerational history of substance abuse, and Mr. Crutsinger was no different: Mr. Crutsinger had a severe alcohol addiction that dominated his life.   Exhibit 4: Goodness Presentence Evaluation Report, pp. 5-6. Mr. Crutsinger suffered from persistent mental health problems, saw psychiatric professionals regularly, took anti-depressant medication, Exhibit 4: Goodness Presentence Evaluation Report, p. 6. Those who knew him were concerned about his mental health. Mr. Crutsinger suffered the traumatic loss of three children— one shortly after birth, one who drowned as a toddler in a swimming pool, and one who died at 16—and he experienced the death of two siblings, including his sister Patsy, who died in a car accident where Mr. Crutsinger was the driver. Exhibit 4: Goodness Presentence Evaluation Report, p. 5. During the accident that killed his sister Patsy, Mr. Crutsinger suffered a closed traumatic brain injury, losing consciousness after hitting his head on the steering wheel.   Exhibit 4: Goodness Presentence Evaluation Report, p. 6. Further, Mr. Crutsinger's medical history indicated that he suffered from gout, alcoholic hepatitis and long-standing, uncontrolled high blood pressure. Exhibit 4: Goodness Presentence Evaluation Report, p. 6. After receiving Dr. Goodness's report, counsel did not request a continuance or investigative assistance. There is no evidence that trial counsel conducted any further inquiry into the red flags that the Goodness Report contained, or made any further efforts to develop mitigating evidence.

On September 22, 2003, five months after having been appointed and with counsel having ignored virtually every lead produced by their curt investigation, Mr. Crutsinger's trial commenced.   27 RR 1.   Shortly after hearing closing arguments on September 25, 2003, the jury returned a guilty verdict. 30 RR 213.   Counsel's failure to follow up on the Goodness Report severely constricted the universe of sentencing-phase argumentation. The state presented evidence

6

of Mr. Crutsinger's criminal record and his history of committing acts of violence towards others, including his own family. 31 RR 17-91. The defense countered the prosecution's sentencing-phase case by presenting testimony from Mr. Crutsinger's friends and family that "he was a good man when he was not drinking," see, e.g., 32 RR 57, and that he had a "wet brain," meaning that he would become a different person after consuming even one beer, 32 RR 101. Testimony also established that Mr. Crutsinger's father, two siblings, and his three children had died. 32 RR 67-69. The defense also presented testimony regarding future dangerousness: three sheriff deputies testified that Mr. Crutsinger had not had any disciplinary problems while awaiting trial. 32 RR 2-32.

The only expert witness the defense called during the penalty phase was Dr. Walter Quijano, a former psychologist with the Texas prison system, who offered damaging testimony about the possibility of escape from prison and access to weapons. As a *defense* witness, Dr. Quijano testified that Mr. Crutsinger, were he sentenced to life in prison, would be in less-restrictive housing and could achieve a less-restrictive security status after only ten years, with the latter status allowing him to have certain jobs outside of the main prison buildings. Dr. Quijano offered his opinion that alcohol did not make individuals violent; rather, alcohol disinhibited violent individuals, and he stated that alcohol would be available to Mr. Crutsinger in prison. 32 RR 156. Dr. Quijano also indicated that Mr. Crutsinger would have access to knives, pots of boiling water, razor blades, and other implements that he could potentially use as weapons against staff or other inmates. 32 RR 160-67.

7

On September 30, 2003, the state court imposed a death sentence pursuant to the jury's answers to the two Texas punishment-phase special issues. 33 RR 33-34. Under the first special issue, the jury responded affirmatively to the question, "Do you find from the evidence beyond a reasonable doubt that there is a reasonable probability that [Mr. Crutsinger] would commit criminal acts of violence that would constitute a continuing threat to society?" TEX. CODE CRIM. PROC. § 37.071(2)(b)(1). Under the second special issue, the jury responded negatively to (2) "Do you find * * *, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of [Mr. Crutsinger], * * * that there [are] sufficient mitigating * * * circumstances to warrant [a life sentence]." TEX. CODE CRIM. PROC. § 37.071(2)(d)(1).

Texas is a "non-weighing" state in that capital juries do not weigh evidence of mitigation against aggravating evidence. As a result, the jury's answer to the "mitigation question" is evaluated separate and apart from the answer on "future dangerousness."[7] Thus, a jury's favorable finding of mitigation under the second special issue would entail a life sentence, no matter what the aggravating circumstances were.

2.   Direct Appeal and the 2006 Certiorari in the U.S. Supreme Court

Mr. Crutsinger's trial counsel represented him on appeal. 7 CR 1306. The TCCA denied relief. *Crutsinger v. State*, 206 S.W.3d 607 (Tex. Crim. App. 2006). The Supreme Court denied a petition for certiorari. *Crutsinger v. Texas*, 549 U.S. 1098 (2006).

---

[7]      *See, e.g., Hughes v. Johnson*, 191 F.3d 607, 623 (5th Cir. 1999) ("Texas is a 'non-weighing state' in that its capital-sentencing scheme does not direct the .... jury to "weigh" aggravating factors against mitigating ones.").

## B.   State habeas corpus proceedings

Mr. Richard Alley was appointed as Mr. Crutsinger's state post-conviction counsel on October 9, 2003. Even at the time of his appointment, Mr. Alley notoriously provided deficient representation in capital post-conviction cases.[8] He was one of only two lawyers ever to have been removed by the Texas Court of Criminal Appeals from the list of counsel qualified to represent capitally sentenced prisoners in state post-conviction proceedings.[9] The 140-page state application

---

[8]       Mr. Alley had been disciplined several times before ever being appointed to represent Mr. Crutsinger. On March 15, 1985, Mr. Alley was publicly reprimanded by the District 7-A Grievance Committee upon a finding that he engaged in conduct prejudicial to the administration of justice; practiced law in a jurisdiction in violation of regulations of the profession in that jurisdiction; engaged in the practice of law while in a status of suspension for failure to timely pay Bar dues; knowingly used false evidence; knowingly made false statements of fact; and counseled a client in conduct that the attorney knew to be illegal. 48 TEX. B.J. 690 (1985). On October 26, 1992, Alley was publicly reprimanded by the District 7-A Grievance Committee upon a finding that he failed to properly safeguard the property of a client and failed to keep complete records of such property. 56 Tex. B.J. 74 (1993). On November 2, 2000, Mr. Alley was disciplined in a different capital case by federal Magistrate Judge Bleil. Magistrate Bleil found that Mr. Alley had knowingly made false and misleading statements, but for which he would not have been appointed as an attorney in that case. Magistrate Bleil also found that Mr. Alley had exhibited a pattern of inability to conduct litigation properly by failing to make timely and proper objections. He also found that the habeas application in that case "overall is poorly done" as "approximately half of it appears to have been pulled nearly verbatim and indiscriminately from the state court papers and other briefs and documents Alley has prepared or collected in the course of his legal practice." Furthermore, Mr. Alley made false statements to various courts and repeatedly engaged in a practice of unprofessional and unethical behavior. Magistrate Bleil found that "Alley's reputation for sloppiness is not confined to the federal court system." Magistrate Bleil also accused Mr. Alley of "intentional deception or lack of regard for the accuracy of the information he furnishes to the courts." *See* Findings, Conclusions, & Recommendations of the U.S. Magistrate Judge and Order of Discipline of Attorney Travis Richard Alley, *Lagrone v. Johnson*, No. 4:99-CV-521-X (N.D. Tex. Nov. 2, 2000). On January 22, 2002, the district court accepted Judge Bleil's findings and disciplined Mr. Alley, including by suspending from the bar of the Northern District of Texas.

[9]       *See* Chuck Lindell, *Death Row Legal-help Legislation Languishes*, Austin-American Statesman at A01, June 9, 2007.

he filed reflects that it is no better than a boiler plate, direct appeal brief that is inappropriate for a collateral post-conviction proceeding.[10] [Doc 17 at 8; 1 SHR 2].

Mr. Alley's legal file for Mr. Crutsinger reflects that he conducted no extra-record investigation. [Doc 17 at 8; 1 SHR 2]. The claims consisted of only boilerplate allegations. 1 SHR 2. The inadequacy of state post-conviction representation meant that, when Mr. Crutsinger got to federal court, he had procedurally defaulted ineffective-assistance-of-trial-counsel ("IATC") claims that his state post-conviction lawyer never investigated.

Specifically, on March 17, 2005, Alley filed an application for a writ of habeas corpus on behalf of Mr. Crutsinger that raised no cognizable claims. Besides a series of direct appeal claims, which are not cognizable in a state habeas corpus application in Texas, *Ex parte Reynoso*, 257 S.W.3d 715, 723 (Tex. Crim. App. 2008), the application purported to raise a claim that Mr. Crutsinger was deprived of effective assistance of counsel because trial counsel failed to conduct reasonable investigation. Alley, however, did not allege a single fact in support of the claim to show either (1) that trial counsel's investigation was unreasonable; or (2) what evidence could have been discovered through reasonable investigation. The claim consisted of only the cursory, conclusory allegations, unsupported by appendices or evidence, and a humdrum summary of cases discussing IATC claims. 1 SHR 2. In short, the state habeas application Mr. Alley filed was deficient on its face and did not even constitute a habeas corpus application. *See Ex parte Kerr*, 64

---

[10]     In 2011, two Texas Court of Criminal Appeals' judges wrote about Mr. Alley's representation in a different case that he "raised only record-based or non-cognizable claims on his [client's] behalf, and appears to have conducted no investigation into the constitutional effectiveness of the applicant's trial attorneys with respect to developing a case for mitigation." Dissenting Statement, *Ex parte Kerr*, No. WR-62,402-03 (Tex. Crim. App. Apr. 28, 2011).

S.W.3d 414, 419 (Tex. Crim. App. 2002) (application must raise cognizable claims to constitute a habeas application in Texas); *Ex parte Medina*, 361 S.W.3d 633, 640 (Tex. Crim. App. 2011) (application must allege facts to constitute a habeas corpus application in Texas).

As post-conviction counsel to Mr. Crutsinger, Alley was ethically and legally obligated to conduct an extra-record investigation into potential collateral claims, including ineffective assistance of trial counsel—but he did not. *See* TEX. CRIM. PROC. CODE Art. 11.071 § 3(a) (requiring "expeditious[]" investigation, "before and after the appellate record is filed," of the factual and legal basis for potential claims); *see also* ABA GUIDELINES FOR APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, GUIDELINE 10.15.1 (rev. ed. 2003) ("Post-conviction counsel should fully discharge the ongoing obligations imposed by these Guidelines, including the obligation[] to ... continue an aggressive investigation of all aspects of the case.").

There is nothing in any record suggesting that, prior to filing Mr. Crutsinger's habeas petition, Alley conducted any extra-record investigation into a potential IATC claim. He never sought the appointment of a trained and qualified mitigation specialist; he did not interview any witnesses or conduct any investigation relating to the red flags identified by Dr. Goodness; he never reviewed the files belonging to trial counsel; and he never sought to interview or depose trial counsel.

Indeed, Mr. Alley had represented to undersigned counsel that trial counsel would not provide their file for review, yet it appears Mr. Alley took no further action, as for example contacting the Client Attorney Assistance Program to aid in obtaining the client file. Without trial counsel files, post-conviction counsel cannot begin to understand what actions former counsel had

11

undertaken on the client's behalf. [Doc 17 at 11]. On May 5, 2008, undersigned counsel had faxed a letter and client release to lead counsel William Ray requesting the files of trial counsel for review. That same day, Mr. Ray called undersigned counsel and agreed to make the files available by May 19, 2008. [Doc 17 at 11, n.5].

The state post-conviction record shows that the only extra-record investigation done in connection with the claim of ineffective assistance of counsel was actually done at the behest of the district attorney; notwithstanding its facial deficiency, the court ordered, on the prosecutor's motion, 7 SHR 1413-15, that trial counsel file affidavits. 7 SHR 1416-17. After receiving a short, joint affidavit of both trial counsel, Mr. Alley did not seek a hearing or any other process to challenge or rebut the assertions contained therein, seek funding for any post-petition fact development, or file a reply to the state's answer. Indeed, Alley failed to propose findings of fact and conclusions of law despite being ordered to do so by the trial court. See 7 SHR 1533. The state post-conviction record reflects that Alley failed to take any action as Mr. Crutsinger's legal representative after filing the petition. In short, Mr. Alley abandoned Mr. Crutsinger, if an attorney-client relationship was ever formed at all. On November 7, 2005, the trial court adopted the State's proposed findings of fact and conclusions of law, and transmitted Mr. Crutsinger's writ to the TCCA for decision.

Somewhere between November 16, 2006, and December 18, 2006, while the state habeas application was pending before the TCCA, Mr. Alley was removed from the list of qualified counsel approved for state capital post-conviction representation by the Texas Court of Criminal Appeals ("TCCA"). Exhibit 5: TCCA lists for 11.071 Counsel Nov and Dec 2006. However, the TCCA did not replace Mr. Alley as Mr. Crutsinger's attorney, and Mr. Alley did not seek to have

12

new counsel appointed. The TCCA simply adopted the trial court's findings and denied relief to Mr. Crutsinger on the basis of representation—or lack thereof—afforded by Mr. Alley, the very attorney it had stricken from the list of qualified habeas counsel months earlier. *See Ex Parte Crutsinger*, 2007 WL 3277524 (Tex. Crim. App. Nov. 7, 2007).

### C.   Federal Habeas proceedings in district court

Mr. Alley filed a motion to withdraw as counsel in federal district. [Doc 1].   On January 15, 2008, undersigned counsel was appointed to represented Mr. Crutsinger in federal habeas and Mr. Alley was removed as counsel of record. [Doc 7].

Mr. Crutsinger, through new counsel, filed a motion requesting investigative services under 21 U.S.C. 848(q)(9) (now 28 U.S.C. § 3599) in order to assist new counsel's investigation into trial counsel's effectiveness under *Wiggins v. Smith*, 539 U.S. 510. [Doc 13]. On April 29, 2008, the district court issued a sealed order denying the request. Exhibit 6: Order Denies funding for Investigative Assistance [Doc 14].

In its sealed order, [Doc 14], the district court explained that "the evidentiary development of a claim in federal court would be inappropriate when the habeas petitioner failed to develop the factual basis for that claim in the state court proceedings." [Doc 14 at 2]. The court denied investigative services because "the required showing [under § 3599] cannot be made when the claim sought to be investigated is procedurally barred from review." [Doc 14 at 2]. In short, the district court denied representation services because it found that the underlying claim was procedurally defaulted and unexcused.[11]

---

11  On August 6, 2008, Mr. Crutsinger had also filed a funding request for mental health expert

On May 8, 2008, federal habeas counsel filed a sealed motion for reconsideration of the denial of investigative services. [Doc 17]. On May 21, 2008, the district court issued an unsealed order again denying the requested investigative assistance. Exhibit 7: Order Denying Motion for Reconsideration on Denial of Investigative Assistance [Doc 18]. In its order, the district court noted the "tragic circumstances that appear to have been all too common in the post-conviction investigation and presentation of habeas corpus claims" and "the plight of inmates who are precluded from presenting such claims in federal court due to the failure of their counsel to raise those claims in the state-court proceedings." [Doc 18 at 1].

Notwithstanding its observation of the "tragic circumstance[]" of Mr. Crutsinger's state post-conviction representation, the district court denied investigative services to develop the claim because it believed that the existing state of procedural default law tied its hands. The court explained that, under then-controlling precedent, the "ineffective assistance of state habeas counsel cannot justify a failure to comply with the exhaustion requirement or excuse any resulting procedural default." [Doc 18 at 6]. The court further noted that "it cannot be denied that his argument relies upon a right to the assistance of counsel in state habeas proceedings that this Circuit has consistently refused to recognize at all and certainly not as sufficient to excuse or avoid the exhaustion requirement. This fatal defect will not be cured by further evidentiary development." [Doc 18 at 8-9].

On October 30, 2008, having been denied § 3599 services on the basis of procedural default, counsel nonetheless filed a habeas corpus petition alleging, as best she could absent any

---

services; it too was denied by the district court based on procedural default, among other reasons. Sealed Docs 24 & 25.

14

investigative assistance, a *Wiggins* claim that Mr. Crutsinger's trial counsel were ineffective for failing to conduct a reasonable background investigation. [Doc 31 at pp. 35-49]. Mr. Crutsinger also sought an evidentiary hearing on the claim, noting that it had never been the subject of a state evidentiary hearing. [Doc 30]. In his *Wiggins* claim, Mr. Crutsinger argued that counsel was unreasonable for not having followed up on the red flags appearing in the Goodness Report.

However, without § 3599 services counsel was unable to meaningfully identify and plead factual allegations establishing deficiency and prejudice. In the absence of a thorough investigation into her client's background, federal habeas counsel relied on various academic journals to extrapolate from the red flags known to and unreasonably ignored by previous counsel. The deprivation of § 3599 services, though, effectively prevented Mr. Crutsinger's federal habeas lawyer from pleading detailed facts supporting both prongs of the *Wiggins* claim.

Having withheld § 3599 services and denied Mr. Crutsinger an opportunity to meaningfully plead the *Wiggins* claim that it believed to be unreviewable and defaulted,[12] on February 6, 2012,

---

[12] The Opinion and Order Denying Writ of Habeas Corpus [Doc 48 at p.8, n.5] recites:

"The claims presented in state court alleged a general failure to investigate, failure to adequately communicate with the client, and an attempt to coerce a guilty plea. (1 SHR 127-28; 7 SHR 1564, 1614). The present claims are, therefore, unexhausted. See 28 U.S.C. § 2254(b)(1)(A). This Court stated as much in its Order Denying Motion for Evidentiary Hearing (doc. 42, p. 8). Respondent, however, does not assert a procedural bar based on the failure to exhaust, as he does against the third ground for relief. Answer, p. 26 (doc. 36). Nor does the Petition or Reply anticipate any such defense by presenting arguments to overcome a procedural bar. Under these circumstances, where the omission appears to be the result of a deliberate decision rather than inadvertent omission, the Court is not inclined to apply a procedural bar sua sponte."

15

the district court nonetheless purported to deny it on the merits. [Doc 48 at 30]. The district court also denied a COA. [Doc 51].

On March 5, 2012, Mr. Crutsinger filed a post-judgment motion [Doc 52] under FED. R. CIV. PROC. 59(e). He requested, *inter alia*; 1) that the district court stay and hold in abeyance the proceeding until the Supreme Court decided *Martinez*; and 2) that it rescind its May 21, 2008 order [Doc 18] denying § 3599 services, and hold in abeyance its 2012 order denying relief because the May 21, 2008 order [Doc 18] was predicated on the existence of a procedural bar that was not asserted by the state or applied by the court in 2012. [Doc 52]. Mr. Crutsinger also filed a separate Motion to Stay Pending Supreme Court Decision in *Martinez*, [Doc 53], and a related Motion for Oral Argument. [Doc 54].

On March 20, 2012, the Supreme Court decided *Martinez*, holding that a federal court may consider a substantial IATC claim on the merits if it was defaulted in state post-conviction proceedings by an inadequate state post-conviction lawyer. *See Martinez v. Ryan*, 566 U.S. 1 (2012). On April 13, 2012, the district court denied the Rule 59(e) Motion and denied Mr. Crutsinger's request to reconsider its denial of § 3599 services, the Motion to Stay, and the Motion for Oral Argument. [Doc 56, 57, 58]. In the Order denying the Rule 59(e) motion, the district court reasoned that *Martinez* did not excuse any default because the district court had already determined—after preventing factual development of the claim—that the claim lacked merit. [Doc 56 at 6-8].

16

## D.   Habeas proceedings in the Fifth Circuit

Mr. Crutsinger sought a COA from the Fifth Circuit to appeal the denial of his *Wiggins*

claim. He also sought review of the order denying § 3599 services.   Challenging the limits on the

representation, he argued that *Martinez* voided the district court's rationale for denying resources

and that *Martinez* entitled him, on the basis of Alley's state postconviction representation, to a

meaningful opportunity to investigate and fully plead his *Wiggins* allegations.

The Fifth Circuit denied Mr. Crutsinger a COA on his *Wiggins* claim and affirmed the

district court's denial of § 3599 services in an Opinion Order on September 18, 2013. *Crutsinger*

*v. Stephens*, 540 F. App'x 310 (5th Cir. 2013). Mr. Crutsinger subsequently sought rehearing *en*

*banc*, and the Fifth Circuit thereafter issued a new Opinion Order denying COA on the merits and

again affirming the § 3599 denial on appeal. *Crutsinger v. Stephens*. 576 F. App'x. 422, 424 (5th

Cir. 2014).

The substituted Opinion Order contained two different holdings. First, it affirmed the

district court's decision to deny § 3599 services, paradoxically holding that habeas applicants must

plead a substantial IATC claim before they can obtain resources to discover their underlying facts.

Citing the "well-established" Fifth Circuit rule that a petitioner cannot show a "substantial need"

for funds under 18 U.S.C. 3599(f) when a claim is procedurally defaulted, the panel rejected Mr.

Crutsinger's argument that he was entitled to § 3599 services to establish the substantiality

component of *Martinez* cause. *Crutsinger v. Stephens*, 576 Fed. Appx. 422, 431 (5th Cir. 2014)

("*Martinez*, however, does not mandate prepetition funding, nor does it alter our rule that a prisoner

cannot show a substantial need for funds when his claim is procedurally barred from review.").

Thus, "without both a showing ... that state habeas counsel was ineffective and a demonstration

that the underlying IAC claim 'has some merit'"—a showing that had to be developed in the absence of reasonably necessary § 3599 services—the Fifth Circuit continued, "*Martinez* offers no relief from a potential procedural default." *Id.*

Second, the Fifth Circuit held that, notwithstanding the absence of § 3599 services and of any other opportunity to discover facts, it was in a position to assess the merits of the *Wiggins* claim. With respect to the reasonableness of the investigative choices made on the basis of information disclosed in the Goodness report, the Fifth Circuit simply explained that the report itself was thorough. *Crutsinger*, 576 Fed. Appx. at 427. The Fifth Circuit also reached the *Wiggins* prejudice prong, observing that Mr. Crutsinger had "not explained ... how [the additional investigation] would have changed the result of his trial and sentence." *Crutsinger*, 576 Fed. Appx. at 428.

Mr. Crutsinger filed a timely petition for writ of certiorari presenting the question of whether the Fifth Circuit had misapplied § 3599 to deny him representation services. The petition was denied. *Crutsinger v. Stephens*, 135 S.Ct. 1401 (2015).

### E.   The Supreme Court overrules the Fifth Circuit rule "that a prisoner cannot show a substantial need for funds when his claim is procedurally barred from review"

With the conclusion of the direct appeal and denial of certiorari in 2015, Mr. Crutsinger had exhausted all avenues of appeal that the denial of § 3599 services deprived him of meaningful representation to investigate and plead factual allegations in support of habeas claims. [13]

---

13   In 2017, the district court denied a defense request for the funding of $500 for Services of a DNA expert based on correspondence from the district attorney about the State's 2016 preliminary laboratory review and DNA-mixture-interpretation protocols.   The appeal of that order is

18

In 2018, the Supreme Court decided *Ayestas v. Davis*, 138 S. Ct. 1080 (2018), which overruled the Fifth Circuit's *Crutsinger* decision. Specifically, the Court held that the Fifth Circuit's rule "that a prisoner cannot show a substantial need for funds when his claim is procedurally barred from review" was "too restrictive" in the wake of its decisions in *Martinez* and *Trevino*, because it may be an abuse of discretion to deny representation services in "cases in which funding stands a credible chance of enabling a habeas petitioner to overcome the obstacle of procedural default." *Ayestas*, 138 S. Ct. at 1094. In doing so, the Court expressly cited the *Crutsinger* decision as an example of an erroneous interpretation. *Id*. at 1093.

## III.   ARGUMENT

### A.   The Legal Standard

FED. R. CIV. PROC. 60(b)(6) allows a party to seek relief from a final judgment, and permits the case to be reopened when the movant shows "any other means that justifies relief" from the

---

currently pending in the Fifth Circuit Court of Appeals.   Notwithstanding, this district court has jurisdiction to decide the current 60(b) motion without a stay and remand from the Fifth Circuit because the 5/10/2012 appeal [Doc #59] is a completed appeal. *See Shepherd v. International Paper Co*., 372 F.3d 326, 330–31 (5th Cir. 2004):

> "*Standard Oil* and *Ames* dealt with a clearly different procedural issue—the ability of the district court to dispose of a Rule 60(b) motion *after a completed* appeal, rather than during the pendency of an appeal. *See Standard Oil v. United States,* 429 U.S. 17 (1976); *Ames v. Miller,* 184 F.Supp.2d 566, 570–71, 573, 575 (N.D. TX 2002). "The power of the district court to act on a Rule 60(b) motion *after* the appellate court has finished with the case raises different problems," and *Standard Oil* is the case that resolved this issue. 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2873 (2d ed.1995) (emphasis added)…."

operation of a judgment other than the more specific circumstances set out in Rules 60(b)(1-5)—

which are not applicable in the case at bar. The rule is applicable in habeas corpus proceedings,

but is limited. In a habeas corpus proceeding, a Rule 60(b) motion must "attack[], not the substance

of the federal court's resolution of a claim on the merits, but some defect in the integrity of the

federal habeas proceedings." *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005). Otherwise, the motion

is considered a successive habeas application over which the district court lacks jurisdiction absent

prior authorization to consider it from the court of appeals.

Relief from judgment is appropriate when the petitioner demonstrates "extraordinary

circumstances justifying the reopening of a final judgment." *Gonzalez*, 545 U.S. at 535.

Determining whether extraordinary circumstances exist requires examination of the unique facts

and "equities of the particular case." *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir.

1981). The rule is "liberally construed in order to do substantial justice." *Gonzalez*, 545 U.S. at

402.

## B.   The Court has jurisdiction over the motion because the motion attacks not the substance of the federal court's resolution of any claim but the denial of representation services

The deprivation of representation—or the wrongful provision of inadequate

representation—in a case is a procedural error that prevents the true merits of the cause from being

heard. In *McFarland v. Scott*, 512 U.S. 849 (1994), the Supreme Court recognized that the

complexity of habeas corpus jurisprudence "makes it unlikely that capital defendants will be able

to file successful petitions for collateral relief" without representation. *Id*. at 855-56. *McFarland's*

essential holding is that the deprivation of meaningful representation prevents the true merits of a

habeas applicant's claims from being heard. Because habeas corpus requires investigation to discover and present claims, a failure to afford meaningful representation "expose[s the habeas applicant] to the substantial risk that his claims never would be heard on the merits." *Id.* at 856. It was for these reasons that Congress afforded to death-sentenced prisoners an enhanced right to representation in a federal habeas corpus proceeding that attaches even before the filing of the application. *Id. See also* 18 U.S.C. § 3599 (granting right of representation).

Failure to provide the meaningful representation guaranteed by § 3599 is a defect in the integrity of the proceeding. Notwithstanding that an applicant filed a habeas corpus application raising claims, and that the district court purported to pass on those claims, a challenge to the scope and adequacy of representation afforded is *not* an attack on the substance of the federal court's resolution of those claims. It is an argument that the habeas petitioner was deprived of a meaningful opportunity to *present* his claims.

An example suffices to demonstrate the procedural nature of this defect. Consider a situation in which an applicant who qualifies for § 3599 representation is nonetheless not appointed a lawyer at all. The applicant proceeds to file a habeas corpus application, without any legal assistance, raising unmeritorious, record-based claims, which the district court decides against him on the merits. A post-judgment challenge to this proceeding on the ground that the prisoner was denied representation in the proceeding would clearly be an allegation directed not at the substance of the court's disposition of the merits, but at a defect in the integrity of the proceeding—the denial of representation.

Although Mr. Crutsinger does not contend he was deprived of all representation, this is a quantitative and not a qualitative difference from the case in which all representation is denied.

Where a prisoner alleges that he was deprived of meaningful representation, the prisoner is challenging a procedural defect in the integrity of the proceeding that precluded the true merits from being presented or adjudicated, notwithstanding whether the district court purported to reach any of the claims raised on the merits.

Because of deficient state habeas representation (to the point of abandonment), Mr. Crutsinger arrived in federal court without ever having had an opportunity to investigate the effectiveness of his trial counsel's sentencing investigation. When he requested representation services to do so from the federal courts, they strictly applied an erroneous rule to deny him the representation that was critical to the identification and complete presentation of a Sixth Amendment claim based on trial counsel's failure to conduct a reasonable sentencing investigation, on the ground that any such claim was defaulted. *Crutsinger*, 576 Fed. Appx. at 431 ("our rule [is] that a prisoner cannot show a substantial need for funds when his claim is procedurally barred from review."). The courts purported to apply the *Martinez* exception-to-default *not* to an investigated, developed, and fully pleaded Sixth Amendment claim, but to a truncated shell of a claim that had not been meaningfully investigated by Mr. Crutsinger.

The premature merits adjudication erected precisely the barriers *Martinez* and *Treviño* were supposed to overcome—restrictions on an inmate's ability to obtain at least one round of meaningful process on a procedurally defaulted IATC claim. This is the defect in the integrity of the proceeding that the instant motion challenges. Accordingly, the motion is not a successive habeas application and the court has jurisdiction to entertain it.

With the very recent decision by the U.S. Supreme Court in *Ayestas*, and the extraordinary circumstances that exist, all of which will be more fully argued below, this court can and should

22

remedy the structural defect by granting Mr. Crutsinger's 60(b)(6) motion, reopen the proceedings, grant § 3599 services to Mr. Crutsinger so he can investigate, develop and present factual allegations to support the merits of a Sixth Amendment failure-to-investigate claim.

## C.    Extraordinary circumstances warrant reopening

The Fifth Circuit engages in a fact-intensive, case-by-case analysis to determine whether a movant is eligible for relief under Rule 60(b).[14] *See Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402–03 (5th Cir. 1981), *citing United States v. Gould*, 301 F.2d 353, 355-56 (5th Cir. 1962). Factors a court may consider include, *inter alia*, "the risk of injustice to the parties" and "the risk of undermining the public's confidence in the judicial process." *Buck v. Davis*, 137 S. Ct. 759, 778 (2017). Several factors warrant reopening this case.

---

[14]    The Fifth Circuit has delineated factors that may inform a district court's consideration of a motion under Rule 60(b):

(1)    That final judgments should not lightly be disturbed;

(2)    that the Rule 60(b) motion is not to be used as a substitute for appeal;

(3)    that the rule should be liberally construed in order to achieve substantial justice;

(4)    whether the motion was made within a reasonable time;

(5)    whether if the judgment was a default or a dismissal in which there was no consideration of the merits the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of judgments, and there is merit in the movant's claim or defense;

(6)    whether if the judgment was rendered after a trial on the merits the movant had a fair opportunity to present his claim or defense;

(7)    whether there are intervening equities that would make it inequitable to grant relief; and

(8)    any other factors relevant to the justice of the judgment under attack."

*Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402–03 (5th Cir. 1981).

23

*First*, the instant proceeding is a habeas corpus proceeding. "There is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus, for it is in such proceedings that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful confinement and that he is deprived of his freedom contrary to law." *Harris v. Nelson*, 394 U.S. 286, 292 (1969).

*Second*, this is a capital case. "[T]he penalty of death is different in kind from any other punishment imposed under our system of criminal justice." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). Thus, it cannot be imposed in an arbitrary and capricious manner. *Furman v. Georgia*, 408 U.S. 238 (1972). Moreover, the risk of injustice to Mr. Crutsinger is extraordinarily high, higher than in any other conceivable case.

*Third*, the defect in the integrity of the proceeding complained about in the instant motion concerns a statutory right to representation, created by Congress in recognition of the above, that was intended to enhance the quality of representation from that afforded in cases in which death has not been sought or imposed. *See Martel v. Clair*, 565 U.S. 648, 659 (2012) (§ 3599 "grants federal capital defendants and capital habeas petitioners enhanced rights of representation, in light of what it calls 'the seriousness of the possible penalty and ... the unique and complex nature of the litigation,'" quoting 18 U.S.C. § 3599(d) (2006 ed.)). Congress's goal was to improve the quality of representation afforded to capital habeas petitioners. *Id*. The failure to afford this enhanced representation deprived Mr. Crutsinger of a fair opportunity to present his claim in a capital case and thwarts the will of Congress. *See Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981) (in determining whether equity warrants reopening of a purported merits judgment

under Rule 60(b)(6), federal court should look to whether the movant had a fair opportunity to present his claim or defense).

*Fourth*, the nature of the defect—deprivation of meaningful representation in a capital case—undermines the public's confidence in the judicial process. Where the government guarantees—but fails to afford—meaningful representation, the public cannot be confident in the fairness of the proceeding or its outcome. This is all the more so in a capital case, in which the deprivation of meaningful representation gives the appearance of creating an unfair playing field in matters of life and death.

*Fifth*, the Supreme Court's recent decision in *Ayestas v. Davis*, 138 S. Ct. 1080 (2018), overruled precisely the rule formulated and applied in this case that a prisoner is not entitled to retain assistance to investigate a defaulted Sixth Amendment claim without first demonstrating its substantiality. The Court found the rule "too restrictive" to effectuate the purposes of § 3599. *Id.* at 1093. Mr. Crutsinger's case was explicitly cited by the Supreme Court as an example of this "too restrictive" application of the provision. *Id. Ayestas* held that a federal court may not assess the substantiality of a defaulted Sixth Amendment ineffectiveness claim without affording investigative services to develop it, because "it is possible that investigation might enable a petitioner to carry that burden." *Id.* at 1094.

*Sixth*, because Mr. Crutsinger's representation rights were infringed, the true merits of his Sixth Amendment ineffectiveness claim have never been heard. *See Ruiz v. Quarterman*, 504 F.3d 523, 531–32 (5th Cir. 2007) ("The 'main application' of Rule 60(b) 'is to those cases in which the true merits of a case might never be considered,'" quoting *Fackelman v. Bell*, 564 F.2d 734, 735 (5th Cir. 1977)). This is so even though this Court and the Fifth Circuit purported to review them.

In fact, only a thumbnail sketch of a Sixth Amendment claim was presented or reviewed. As the *Ayestas* Court observed, the authorization of investigative services can enable a petitioner to plead a stronger, substantial claim through the discovery of additional allegations.

*Seventh*, the known facts of Mr. Crutsinger's underlying Sixth Amendment claim are extraordinary. By insisting on Mr. Crutsinger's right to a speedy trial, trial counsel took Mr. Crutsinger's life in his hands and played a game of chicken with the State and lost. Trial started only five months after counsel was appointed. The predictable result was that counsel was woefully unprepared for the sentencing phase and failed to conduct any semblance of a reasonable investigation—much less the constitutionally required *thorough* investigation—into their client's background. Counsel failed to conduct investigation into any of the red flags identified in a report based on a cursory investigation by a psychologist they retained, performance that is clearly deficient. *See Ruiz v. Thaler*, 783 F. Supp. 2d 905, 939 (W.D. Tex. 2011) (trial counsel's failure to conduct any investigation to follow up on mitigating red flags appearing in expert report was deficient performance).

*Eighth*, the known facts of Mr. Crutsinger's abandonment by state habeas counsel are extraordinary. The state court appointed Mr. Crutsinger a lawyer who, at the time he was appointed, was well known to be patently incompetent to represent a client in a capital state post-conviction proceeding. The representation afforded was predictable. After failing to conduct any investigation at all and filing a document purporting to be a state habeas application which raised no cognizable or redressable claims for relief, Mr. Alley simply abandoned Mr. Crutsinger until the court finally denied his frivolous filing.

26

*Ninth*, few, if any, cases present as stark a deprivation of minimally adequate representation in the trial and state collateral stages of a capital case than Mr. Crutsinger's. In conjunction with the constraints erroneously placed on his representation in federal habeas corpus, public confidence in the justice system is threatened, and equitable relief is warranted.

## CONCLUSION

For the foregoing reasons, Mr. Crutsinger requests that this Court reopen its judgment in this case and permit Mr. Crutsinger to file a motion for auxiliary representation services under 18 U.S.C. § 3599.

Respectfully submitted,


/s/ Lydia M.V. Brandt

_____

Lydia M.V. Brandt, Esq.
The Brandt Law Firm, P.C.
Texas Bar No. 00795262
P.O. Box 326
Farmersville, TX 75442-0326
(972) 752-5805
COUNSEL FOR CRUTSINGER


**CERTIFICATE OF CONFERENCE**

This certifies that on May 7, 2018, undersigned counsel conferred with Travis Bragg, Assistant Texas Attorney General, counsel for Respondent concerning this motion.   Respondent is opposed.

27

/s/ Lydia M.V. Brandt

_____

Lydia M.V. Brandt

## CERTIFICATE OF SERVICE

This certifies that on May 9, 2018, I electronically filed the foregoing document with the clerk of court using the electronic case filing system of the court.  The electronic case filing system sent a notice of electronic filing to the   attorneys of record for the Appellee, Gwendolyn Suzanne Vindell and Travis Bragg, Assistant Texas Attorney Generals, who have consented in writing to accept this notice as service of this document by electronic means.

/s/ Lydia M.V. Brandt

_____

Lydia M.V. Brandt, Esq.
The Brandt Law Firm, P.C.
Texas Bar No. 00795262
P.O. Box 326
Farmersville, TX 75442-0326
(972) 752-5805
COUNSEL FOR CRUTSINGER

cc:     Bill Jack Crutsinger, #999-459
        Polunsky Unit
        Texas Department of Criminal Justice
        3872 FM 350 South
        Livingston, TX 77351-8580

28

**EXHIBITS**

Exhibit 1        June 16, 2003 letter Kelly Goodness to Ray

Exhibit 2        June 16, 2003 Goodness: "Terms of Engagement Contract"

Exhibit 3        July 10, 2003 fax follow-up Goodness to Ray

Exhibit 4        Goodness Presentence Evaluation Report

Exhibit 5        TCCA lists for 11.071 Counsel Nov, 2006 and Dec, 2006

Exhibit 6        Doc 14 Unsealed Order Denies Funding of Investigator

Exhibit 7        Doc 18 Unsealed Order Denies Reconsideration (Investigator Funding)