IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BILLY JACK CRUTSINGER, | § | |
| Petitioner, | § | |
| v. | § | |
| | § | No. 4:07-CV-00703-Y |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal | § | (death-penalty case) |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

**MEMORANDUM OPINION AND ORDER DENYING RULE 60(b) MOTION AND,
IN THE ALTERNATIVE, DENYING AUTHORIZATION OF FUNDS**

Eleven years ago, this Court denied federal habeas petitioner
Billy Jack Crutsinger's request under 18 U.S.C. § 3599(f) for funds
to investigate an unexhausted and procedurally barred claim of
ineffective trial counsel. That ruling was correct under the law,
but the law has since changed. It may now be error for a district
court to refuse needed funding in cases where there is a credible
chance it would enable the petitioner to overcome procedural
default--and the ineffectiveness of state habeas counsel may over-
come procedural default for claims of ineffective trial counsel.
*Ayestas v. Davis*, 138 S. Ct. 1080, 1094 (2018); *Trevino v. Thaler,*
569 U.S 413 (2013); *Martinez v. Ryan*, 566 U.S. 1 (2012).

The questions now before the Court are whether the circum-
stances require reopening this case under Federal Rule of Civil
Procedure 60(b)(6) and, if so, whether Crutsinger has made the
necessary showing for funding under § 3599(f). The Court answers
both of these questions in the negative.

## I.   RULE 60(b)(6) Motion

The Court assumes the parties' familiarity with the history of the case as set out in the Court of Appeals' remand order and will not repeat it. *See Crutsinger v. Davis*, No. 18-70027, 2019 WL 2864445 (5th Cir. July 3, 2019).

Federal Rule of Civil Procedure 60(b)(6) allows a district court to grant relief from a final judgment, order, or proceeding for any reason that justifies relief. See Fed. R. Civ. P. 60(b)(6). District courts have jurisdiction to consider Rule 60(b) motions in 28 U.S.C. § 2254 habeas-corpus proceedings so long as the motion attacks not the substance of the court's resolution of the claim on the merits but some alleged defect in the integrity of the habeas proceedings. *See Gonzalez v. Crosby*, 545 U.S. 524, 532 nn. 4, 5 (2005). The United States Court of Appeals for the Fifth Circuit held that this Court has jurisdiction to decide Crutsinger's Rule 60(b) motion. *Crutsinger*, 2019 WL 2864445, at *4.

To justify reopening the judgment, Crutsinger must show "extraordinary circumstances." *See Gonzalez*, 545 U.S. at 535. Such circumstances will rarely occur in the habeas context. *Id*. (parenthetically noting that this strict interpretation is essential to preserve the finality of judgments). In determining whether extraordinary circumstances exist, this Court may consider a wide range of factors, including, in an appropriate case, the "risk of injustice to the parties" and the "risk of undermining the public's

confidence in the judicial process." *Buck v. Davis*, 137 S. Ct. 759, 778 (2017). A change in the Supreme Court's interpretation of the AEDPA is rarely extraordinary by itself. *See Gonzalez*, 545 U.S. at 536 (stating that it is hardly extraordinary that, after Gonzalez's case was no longer pending, the Supreme Court interpreted the statute differently).

As the Court of Appeals has already acknowledged, circuit precedent appears to foreclose Crutsinger's reliance on the changes in law brought by *Martinez/Trevino*. *Crustinger v. Davis*, No. 18-70027, 2019 WL 3243399, at *2 n.1 (5th Cir. July 19, 2019) (order denying stay); *see Adams v. Thaler*, 679 F.3d 312, 319-20 (5th Cir. 2012)(rejecting argument that *Martinez* and the equitable imperative that the "true merit of the cause be heard" constitute extra-ordinary circumstances in death-penalty case); *Diaz v. Stephens*, 731 F.3d 370, 376 (5th Cir. 2013) (holding that *Trevino* did not undermine *Adams*).

Crutsinger's reliance on the changes in law brought by *Martinez/Trevino* appears to be foreclosed by *Gonzalez* as well. In *Gonzalez*, the Supreme Court held that a change in equitable-tolling law under the AEDPA did not constitute an extraordinary circumstance that justified reopening the district court's dismis-sal of Gonzalez's petition as time-barred. The Supreme Court further stated that the change in law was "all the less extraordinary in petitioner's case because of his lack of diligence

in pursuing review of the statute-of-limitations issue." *Gonzalez*, 545 U.S. at 636-37.

Here, the changes in the law affecting funding are, if anything, less extraordinary than the changes discussed in *Gonzalez* because a lack of funding did not prevent Crutsinger from presenting a claim. Unlike *Gonzalez*, whose petition was dismissed, this Court addressed at length the merits of Crutsinger's ineffective-trial-counsel claim (IATC) based on the timing of counsel's investigation. *Crutsinger v. Thaler*, No. 4:07-CV-703-Y, 2012 WL 369927, at *4-13 (N.D. Tex. Feb. 6, 2012). Although Crutsinger did not develop or present this particular IATC claim in state court (he presented different ones), the record *in this Court* was sufficient to make an informed merits review, as discussed in the pages that follow.

Nevertheless, Crutsinger asserts that the following additional factors together create extraordinary circumstances that justify reopening the judgment:

1. The nature of the proceedings as habeas corpus, in which traditional res-judicata rules have never applied, and the careful adjudication of which the Supreme Court has called the highest duty of a federal court, citing *Preiser v. Rodriguez*, 411 U.S. 475, 497 (1973) and *Harris v. Nelson*, 394 U.S. 286, 292 (1969).

2. The nature of the case as a capital case.

3. The nature of the alleged defect as a deprivation of guaranteed representation, which is structural in nature and undermines public confidence in the judicial process.

4

4. The nature of the alleged defect, which operated to preclude hearing the true merits of the case because it thwarted Crutsinger's ability "even to discover and allege material facts in support of claims he sought to pursue in good faith."

5. The fact that the Supreme Court specifically mentioned this case in *Ayestas*, 138 S. Ct. at 1093.

6. The facts underlying the claims affected by the alleged defect are egregious, including that petitioner's trial counsel went to trial only five months after being appointed in a capital case and state habeas counsel effectively abandoned him.

7. Crutsinger has exercised extraordinary diligence in pursuing his representation rights.

(Opposed Motion for Relief from Judgment Pursuant to Fed. R. Civ. Proc. 60(b)(6), p. 24-26 (Dkt. No. 90); Supplemental Brief in Support of Motion for Relief from Judgment, p. 3-4 (Dkt. No. 111).) The Court addresses these factors below.

## Factors 1, 2 (capital habeas nature of the case)

Crutsinger's assertion that Rule 60(b)(6) relief is proper because this is a death penalty proceeding in the nature of habeas is not persuasive because the cases offered in support (*Preiser* and *Harris*) do not address Rule 60(b) or the reopening of a judgment. Further, these cases pre-date the AEDPA, which significantly changed and limited the availability of habeas relief. *See Gonzalez*, 545 U.S. at 530; *see also, e.g., Teague v. Lane*, 489 U.S. 288 (1989) (holding that new constitutional rules of criminal procedure generally do not apply on habeas review).

The opinions in *Adams*, 679 F.3d 312 and *Diaz*, 731 F.3d 370, which were death-penalty cases, also undermine Crutsinger's argument that all death-penalty habeas cases are extraordinary for purposes of Rule 60(b). To hold otherwise would render meaningless the strict limits on Rule 60(b)(6) relief. As the Supreme Court noted in *Harris,* 394 U.S. at 298, the courts have no power to rewrite the rules by judicial interpretations.

<u>Factor 3 (structural error)</u>

Crutsinger wrongly characterizes the alleged defect in this proceeding as structural error in the form of the denial of representation. This Court's 2008 ruling on his motion for funding was not a "defect" in the proceedings. It was correct under the law, which did not allow the alleged ineffective assistance of state habeas counsel to excuse a procedural default. *See Coleman v. Thompson, 501 U.S. 722 (1991). That did not change for Texas until Trevino* was decided in May of 2013.

In recognition of this long-standing rule, Crutsinger did not even present in 2008 the argument under which he now claims the Court's ruling was defective. He stated clearly that he was *not* relying on the alleged ineffectiveness of his state habeas counsel as cause to excuse procedural default:

> To be sure that we are on the same page, Mr. Crutsinger is ***not*** asserting a theory that his state habeas counsel [ ] rendered ineffective assistance of state habeas counsel thereby violating a ***constitutionally***-based right sufficient to constitute cause to excuse a procedural default. What Mr. Crutsinger is asserting is that the

*state corrective process was ineffective* thereby
triggering the statutory law exception, 28 U.S.C.
2254(b)(1)(B)(ii). Accordingly, there is no "unexhausted
claim for which funding is sought," because the doctrines
of exhaustion and procedural default are inapplicable.

See Motion for Reconsideration and Amplification of Application for

Funding and Appointment of Investigator, p. 15 (Dkt. No. 17)

(emphasis in original) ("Amended Application for Funds").

Crutsinger has modified his briefing post-*Martinez* to include

the argument he previously disavowed. See Opposed Motion to Alter

or Amend the Judgment under Fed. R. Civ. Proc. 59(e), p. 14, ¶ 28

(Dkt. No. 52); Rule 60(b) Motion, p. 1 (Dkt. No. 90). But in 2008,

it was not a procedural "defect" to refuse to fund an unexhausted

claim. The fact that Crutsinger specifically declined to rely on

his state habeas counsel's alleged ineffectiveness as cause to

excuse default suggests a lack of diligence and a lack of extra-

ordinariness. *See Gonzalez*, 545 U.S. at 537 (stating that change in

law is made all the less extraordinary by a lack of diligence).

Factors 4 and 6 (preclusion of "true merits review" and
egregious representation by trial counsel)

Crutsinger asserts that the denial of funds precluded a "true

merits" review of the case and that trial counsel's representation

was egregious. He concludes that, therefore, there is a risk of

undermining public confidence because the "erroneous" denial of

funding dictated the outcome of every decision that followed.

(Supplemental Brief, p. 4, 8 (Dkt. 111).) This argument

misrepresents the Court's ruling, which was not erroneous at the

time it was made. As such, the reopening of a proper judgment *not* for the purpose of addressing an error, but to fund a fishing expedition for new claims, creates a greater risk of undermining public confidence. It would signal that death-penalty cases are never final but subject to new litigation with every change in law, regardless of the effect on the validity of the judgment.

Moreover, the assertions that the denial of funding precluded a true merits review and that trial counsel's representation was egregious, border on frivolous. This Court thoroughly reviewed Crutsinger's IATC claim that trial counsel failed "to timely initiate a social history investigation, which caused counsel to overlook evidence of his mental impairments caused by alcohol addiction, head trauma, depression, and low intelligence." *See Crutsinger v. Stephens*, 576 F. App'x 422, 425 (5th Cir. 2014), *abrogated on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080 (2018). Crutsinger's disagreement with the Court's conclusions notwithstanding, the record before this Court was sufficient to do so.

First, Crutsinger filed in support of his federal petition the report from the trial mitigation specialist and forensic psychologist, Dr. Kelly Goodness, and her team. See Petition, Exhibit C.[1]

---

[1] Dr. Goodness's complete report can most easily be found at CM/ECF docket entry 26, attachment #4, which is the unfiled version of the Petition. Although the report was refiled under docket entry 31 (attachments #3 and #4), that version is missing some pages.

Dr. Goodness's timing, credentials, and thoroughness can therefore be objectively assessed. Second, the state habeas record contains an affidavit from trial counsel generally addressing their efforts in the case. They explained that testimony from their two mental-health experts would not have benefitted Crutsinger at trial due to their opinions and the fact that it would have opened the door to an evaluation by, and testimony from, the State's expert. (7/7 SHR 1529; *see* 25 RR 16-18 (trial counsel's colloquy in open court regarding decision not to present psychiatric testimony).) Third, Crutsinger's petition was also supported by scientific literature, which this Court took at face value, and other materials apparently from trial counsel's files. (Petition, p. 67 (Exhibit List).)[2] All of this material spoke directly to Crutsinger's claim that trial counsel's investigation began too late and caused him to overlook mental-health impairments.

In addition, the trial court clerk's record includes orders demonstrating that trial counsel had procured a fact investigator, a psychiatrist (Barry Mills), a DNA expert (Identagene, Inc.), a forensic psychologist and mitigation investigator (Kelly Goodness), and a prison classification expert (Walter Quijano). (1/8 CR 35, 50, 63, 67; 7/8 CR 1309.) The clerk's record also reveals a rigorous pretrial motions practice. While this information does not

---

[2]The Exhibit List is on .pdf page 17 to the attachment identified as "#2 Supplement" to docket entry number 31.

directly reflect the sufficiency of the mitigation investigation, it speaks to the quality of counsel's overall representation. For example, trial counsel targeted Crutsinger's confession as the critical piece of evidence and challenged its admissibility in four motions to suppress and two pretrial hearings. The trial court agreed in part, ruled the arrest was illegal, and excluded some evidence. (25 RR 14; 8/8 CR 1333.) Counsel also developed a claim challenging the disproportionate treatment by local district attorneys of death-eligible defendants, a claim that was commonly presented in post-conviction litigation at the time but had never before been factually developed. (3/8 CR 287.) These are but two examples.

Tarrant County, where Crutsinger was tried, also practices an open-file policy in capital-murder cases. (32 RR 23-24 (testimony regarding open file policy for misdemeanor cases all the way up to capital murder).) Thus, all records obtained by the prosecution would have been available to the defense. In this regard, the clerk's record contains orders for the release of records and/or subpoena requests from: Tarrant County Outreach, The Salvation Army, Phoenix Association, Tarrant County Mental Health/Mental retardation services, Tarrant County Jail, Galveston Sheriff's Department, John Peter Smith Health Center, John Peter Smith Stop Six Clinic, Birdville Independent School District, television news channels, state prison health services archives, John R. Lindsey

State Jail, Osteopathic Hospital--Fort Worth, Tarrant County Medical Examiner's Office (concerning the death of Crutsinger's toddler, Billy Earl), Keller Police Department (concerning Billy Earl), Mount Olivet Cemetery (burial records for Crutsinger family and Misty Juanita Crutsinger), and Bluebonnet Hills Funeral Home (concerning Billy Earl and Crutsinger family). (1/8 CR 68-71; 8/8 CR 1340-1438.) Most of these records, and many more, are included in the case material reviewed by Dr. Goodness. See Petition, Exhibit C, Appendix A.[3]

Next, this Court assessed trial counsel's investigative efforts from the contents of the reporter's record. In a case such as this, where DNA evidence tied the defendant to the crime and the defendant confessed to the detective and a jail nurse, the strategies at the guilt-innocence phase are necessarily limited. Nevertheless, counsel called the detective and four police officers to relitigate the legality of Crutsinger's arrest before the jury. Trial counsel presented expert testimony over the State's objection that the arrest lacked probable cause, such that the confession and buccal swab (from which the DNA evidence was developed) were constitutionally tainted. (30 RR 2-15 (hearing on admissibility of testimony), 30 RR 29-33, 41 (expert testimony).)

---

[3] The Appendix can be found at .pdf pages 19-21 in attachment #4 of docket entry 26 (the unfiled petition).

At punishment, trial counsel called two correctional officers and the bailiff to testify to Crutsinger's good behavior while incarcerated. (31 RR 154, 158 (describing Crutsinger as "top of the heap"); 32 RR 2, 7 (no write-ups), 10, 13 (no disciplinary marks, no complaints from officers or other prisoners).) Counsel called an assistant district attorney to downplay the seriousness of Crutsinger's prior conviction for assaulting his mother by showing that the prosecutor entered into a plea bargain for deferred adjudication probation. (32 RR 18-20.)

Counsel called a private detective and youth minister who met Crutsinger three weeks before the murders while serving meals to the homeless. He said Crutsinger was a broken man, wept heavily, and that "the desperation in his life was overwhelming." Crutsinger had indicated he might hurt himself. (32 RR 33-40.)

The defense called Crutsinger's first wife, who described the loss of their newborn daughter and said Crutsinger probably took it harder than she. (32 RR 45-49.) Counsel called Crutsinger's current wife, who described his drinking problem and "personality changes" from drinking. She told the jury about the death of his sister (who died in a car accident while Crutsinger was driving), the death of his brother from illness, the death of his father who was hit by a car, the death of his toddler son by drowning, and the death of his teenage son who died from lymphoma. She said Crutsinger was on medication due to depression from all these deaths. (32 RR 67-78.)

The defense called Crutsinger's sister-in-law, who also described his huge alcohol problem but said he was kind, caring, and helpful when not drinking and "would give you the shirt off his back." (32 RR 93-102.)

Counsel called Crutsinger's mother, who admitted that the sheriff had to bring her to court because she did not want to testify. She stated that Crutsinger's father abused alcohol, even on the job, and that Crutsinger's bad behavior was mostly caused by drinking. Although she was the complainant in the assault case against Crutsinger, she denied that he ever hit her, and said she could not have "anybody better" when he was sober. (32 RR 111-18, 123.)

The defense closed by calling a classification expert who testified about the conditions and security measures under which Crutsinger would live if given a life sentence. (32 RR 128-153.) The defense offered Crutsinger's health records from John Lindsey State Jail and his records from the Birdville Independent School District. (32 RR 177 (DX 9, 10).) Crutsinger agreed on the record that he was satisfied with counsel's representation and "got every witness that we wanted." (32 RR 179-80.)

This Court rejected Crutsinger's allegations that the mitiga-tion investigation was too compressed to reasonably inform trial counsel's strategy at all phases of the trial and, in particular, the decision not to pursue a mental-health based defense. The Court

also alternatively addressed the asserted prejudice, which will not be reiterated here. See *Crutsinger*, 2012 WL 369927, *7-9. Crutsinger's argument that the "true merits" of his claim were not heard is therefore incorrect.

Indeed, this argument is based on Crutsinger's post-judgment attempts to recast his IATC claim as some other claim which, Crutsinger alternatively asserts, was either misinterpreted by this Court or was a claim he *would* have made if only this Court had provided the requested funds. See Opposed Motion to Alter or Amend the Judgment under Fed. R. Civ. Proc. 59(e) (Dkt. No. 52); Order Denying Motion to Alter or Amend the Judgment (Dkt. No. 56). In denying the Rule 59(e) motion, this Court held that Crutsinger's revamped IATC claim had no more purchase than the claim he actually raised. See Order Denying Rule 59(e) Motion, p. 5-6 (Dkt. No. 56).

If Crutsinger's failure to obtain funding prevented him from presenting a claim, he has not stated what exactly that claim is. As discussed in Section II, he makes general allegations of purported deficiencies by trial counsel that are contradicted by the record. It rather appears from his most recent briefing that Crutsinger no longer asserts that this Court misread his petition or that he was unable to develop a specific IATC claim. His contention now appears to be that, without funds to retain an investigator, federal habeas counsel can never provide the "representation" contemplated under the statute. See Reply to

Response to Motion to Stay Execution Pending Provision of Representation to Investigate and Prepare an Initial Habeas Corpus Application, p. 2-3 (Dkt. No. 119). This argument belies the standards for discretionary funding in § 3599(f) that are discussed in *Ayestas*, and Crutsinger is no more extraordinary than any other petitioner represented by counsel who failed to meet those standards.

### Factor 5 (*Ayestas'* abrogation of *Crutsinger*)

The fact that the Supreme Court in *Ayestas* specifically mentioned the Fifth Circuit's opinion in this case is merely a restatement of the fact that the decisional law has changed since the appeal was decided. In fact, the *Ayestas* opinion emphasizes that there was no error in this case before *Trevino*. See *Ayestas*, 138 S. Ct. at 1093 (holding that Fifth Circuit rule, adopted before *Trevino*, that funding request must present viable constitutional claim not procedurally barred is, after *Trevino,* too restrictive).

### Factor 7 (due diligence)

Assuming Crutsinger has exhibited due diligence, he fails to provide authority that diligence plus a change in law are sufficient in death-penalty cases to reopen a judgment under Rule 60(b)(6).

## Conclusion

The Court concludes that Crutsinger has not demonstrated extraordinary circumstances sufficient to justify reopening the judgment. The Rule 60(b) Motion is **DENIED**.


## II. APPLICATION FOR FUNDS

Alternatively, if the Court were to reopen the case and reconsider the funding request under *Ayestas*, it would be denied.

### Crutsinger's Prepetition Requests

In 2008, Crutsinger moved *ex parte* for authorization of $7,500 to retain a mitigation investigator. See Application for Authorization for Funding and Appointment of Investigator (Dkt. No. 13) ("Application for Funds"). Crutsinger asserted that only five months had elapsed between his arrest and conviction, which was insufficient for a "thorough mitigation workup," and he asserted that trial counsel did not "address the current scientific knowledge" about alcohol addiction. Crutsinger sought to retain Toni Knox, LCSW, to develop a *Wiggins/Rompilla* claim and possibly other claims. He concluded that upon information and belief, he had meritorious claims that pivoted on his mental-health deficits and could overcome the failure to exhaust. *Id.*, p. 2-5. This Court denied the motion without prejudice to his filing another motion addressing how he could overcome the procedural bar and his failure, if any, to develop the factual basis for the claim in

state court. Ex-Parte Order Denying Application for Funding and Appointment of Investigator (Dkt. No. 14).

In his amended ex-parte motion, Crutsinger argued that he was excepted from the exhaustion requirement because the corrective process in state court was so clearly deficient as to render futile any effort to obtain relief. *See* § 2254(b)(1)(B)(ii); *Duckworth v. Serrano*, 454 U.S. 1 (1981). As previously noted, he said his state habeas counsel was ineffective, but he did not assert this as cause to excuse procedural default. *See Coleman*, 501 U.S. 722. (Amended Application for Funds, p. 15-18 (Dkt. No. 17).)

The mainstay of Crutsinger's claim against trial counsel was that the jury's verdict was not reliable because only five months had elapsed from the date of the offense to the date of trial. (Amended Application for Funds, p. 9 (Dkt. No. 17).) Crutsinger presented a declaration from Toni Knox stating that a trial-level mitigation investigation requires eight to twelve months to complete. See Application for Funds, Exhibit A, ¶ 9.[4] Knox recommended that a "thorough mitigation investigation be completed and a psycho-social history prepared, which can be reviewed, at a minimum, by an expert in addiction to help explain" Crutsinger's behavior. Although Knox referred to some trial testimony, she did not acknowledge the investigative work that was done at trial. For

---

[4] Ms. Knox's declaration is in the docket as "#1 Supplement" to docket entry number 13.

example, she stated the mitigation investigation should have included extensive interviews with the defendant, but she failed to acknowledge that Dr. Goodness's team subjected him to fourteen hours of interviews and testing. *Id.* ¶ 11; Petition, Exhibit C, p. 3 (Dkt. No. 26).

So it was *not* Knox's opinion that the mitigation investigation at trial was insufficient. Knox simply said it was of insufficient length and recommended that "a thorough mitigation investigation be completed." (Application for Funds, Exhibit A, ¶ 15 (Dkt. No. 13).) Strangely, and contrary to her assertion that such an investigation takes a minimum of eight to twelve months, she stated she could complete the investigation in 150 hours, although she might need additional hours if further needs were identified. *(Id.,* ¶ 9, 17.) Thus, Knox's ability to conduct an investigation in 150 hours, the equivalent of about four forty-hour work weeks spent over, presumably, several months, appears to undermine Crutsinger's main complaint.

In any event, Crutsinger concluded that both trial counsel and state habeas counsel left significant issues "unexplored and unexplained," including Crutsinger's alcoholism and "personality change" after one drink, his history of domestic violence and abuse, and repeated losses of significant friends and relatives during his childhood and early adulthood. (Amended Application for Funds, p. 11 (Dkt. No. 17).)

## Applicable Law

A state prisoner under a sentence of death who petitions for habeas relief under § 2254 and is financially unable to obtain adequate representation or "investigative, expert, or other reasonably necessary services," is entitled to the appointment of counsel and the furnishing of such services. *See* 18 U.S.C. § 3599(a)(2). The proper application of the standard requires this Court to consider (1) the potential merit of the claim that Crutsinger wants to pursue, (2) the likelihood that the services will generate useful and admissible evidence, and (3) the prospect that Crutsinger will be able to clear any procedural hurdles standing in the way. *Ayestas*, 138 S. Ct. at 1093. Crutsinger is not expected to prove that he will be able to win relief; the inquiry turns on the likely utility of the services requested and there is no guarantee that an applicant will have enough money to turn over every stone. *Id.*

In addressing the likelihood that the requested services would generate useful and admissible evidence in pursuit of a claim with potential merit, the Court is necessarily mindful of the Supreme Court law governing IATC claims. Specifically, the selection of expert witnesses is the paradigmatic example of the type of strategic choice that, when made after a thorough investigation of the law and facts, is virtually unchallengeable. *See Hinton v. Alabama,* 571 U.S. 263, 275 (2014). Also, counsel is not required to

investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. *Wiggins v. Smith*, 539 U.S. 510, 533 (2003).

## Discussion

Because Crutsinger has not shown the potential merit of the claim he wants to pursue nor the likelihood that the services would generate useful and admissible evidence, his application must be denied. In a nutshell, Crutsinger's position is that trial counsel's investigation was too short, and Ms. Knox would do some more investigating to see what might have been missed, if anything. Crucially, Crutsinger's application does not acknowledge the investigation and mental-health evaluations that were performed for trial. His conclusion that trial counsel failed to explore his alcoholism, his "personality change" after a single drink, his history of domestic violence and abuse, and his repeated losses of significant friends and relatives, is completely false. (Amended Application for Funds, p. 11 (Dkt. No. 17).) Information about these issues is in Dr. Goodness's report and in the trial testimony, as discussed in Section I. In failing to acknowledge this, the ex-parte application leaves the false impression that counsel never inquired into these issues.[5]

---

[5] This Court denied Crutsinger's ex-parte request for a mental-health expert for similar reasons. Although Crutsinger addressed the denial of the expert in his Rule 60(b)(6) Motion, it is not before this Court on remand. See Rule 60(b)Motion, p. 13 n.11; Memorandum Op. And Order Transferring Rule 60(b) Motion (Dkt. No. 98).

## Additional Arguments in Rule 60(b) Motion

In his Rule 60(b)(6) Motion, filed in May of 2018, Crutsinger acknowledged some of the information in Dr. Goodness's report, which, by that point, had already been discussed in this Court's memorandum opinion denying habeas relief. But even the post-*Ayestas* Rule 60(b) Motion does no more than identify so-called "red flags" in Dr. Goodness's report involving matters that were clearly investigated by trial counsel and/or presented at trial. (Rule 60(b) Motion, p. 6-7 (Dkt. No. 90).) Crutsinger gives short shrift to the defense evidence at punishment and suggests that reasonable counsel would have presented a mental-health defense. But, as already stated, trial counsel hired two experts whose opinions would not have helped. Dr. Goodness also cautioned against the usefulness of further testing (Petition, Exhibit C, .pdf page 10(Dkt. No. 26)), and the jury heard little of the extensive damaging information in the mitigation report precisely because counsel did not rely on a mental-health defense. Other than the allegedly insufficient timing of the investigation, which was carefully parsed in this Court's order denying reflief and refuted by Knox's own declaration, Crutsinger has not alleged that potential evidence exists that could show counsel unreasonably relied on the opinions of the experts. See *Crutsinger*, 2012 WL 369927, at *7.

## Additional Arguments in Reply to
## Response to Rule 60(b) Motion

In Crutsinger's 2018 Reply to the Response to his Rule 60(b) Motion, he attempts to identify specific, potential deficiencies in Dr. Goodness's report. See Reply to Director's Response to Motion for Relief from Judgment Pursuant to Fed. R. Civ. Proc. 60(b)(6), p. 14-24 (Dkt. No. 96). Even if these allegations accurately reflect reality (which is not the case), the assertion that Dr. Goodness should have done "more" is patently not the same as showing that the requested services would likely generate useful, admissible evidence in pursuit of a claim with potential merit. Every counsel, in every case, can do "more."

Crutsinger initially complains that Dr. Mills "apparently" conducted an evaluation without the benefit of documented historical information and an adequate psycho-social history. This assumption is supported by vague references to when counsel hired Dr. Mills and Dr. Goodness and demonstrates nothing about what Dr. Mills knew when he evaluated Crutsinger. Moreover, Dr. Goodness evaluated Crutsinger as well, *and* she conducted her own psycho-social history evaluation.

He next points out that Dr. Goodness's team only interviewed six people. But he does not state that these were the only people interviewed by the defense. Crutsinger possesses the files and work product of his two trial attorneys and a fact investigator and could presumably make such an allegation if it were true. In fact,

it cannot be true, because trial counsel called eight witnesses to testify at punishment who were not interviewed by Dr. Goodness. Obviously, she was not the only investigator for sentencing issues.

Crutsinger relatedly asserts that the records collection "done by Goodness was paultry," noting particularly that there was "no evidence of an attempt to collect" elementary-school records and Texas Department of Criminal Justice records. (Reply to Response, p. 22 (Dkt. No. 96).) Again, the fact that Dr. Goodness did not collect the records does not mean they were not collected. The school records–including a cumulative record from elementary school with teacher comments - were admitted into evidence. (DX 10.) Dr. Goodness lists "Department of Criminal Justice records" as well as jail records on her list of Case Material Received. (Petition, Exhibit C, Appendix A, .pdf page 19 (Dkt. No. 26).)

Crutsinger complains Dr. Goodness's report lists "no records or documentation reflecting any attempt to gather birth and child-hood medical records," but he does not allege there are potentially any to be found. On the contrary, the existing record suggests there are not. Crutsinger's mother said his birth was uncomplicated, and Dr. Goodness concluded that Crutsinger enjoyed a "lifelong lack of consequences" for his behavior until adulthood. (Petition, Exhibit C, .pdf p. 5, 12-13 (Dkt. No. 26).) Dr. Goodness also administered Birth History and Childhood Social History self-report surveys. (*Id.* at 3, 18, 22.) Crutsinger does not allege the

surveys demonstrated the potential existence of unexplored evidence.

Crutsinger asserts that there is "no indication that any effort had been made to locate and interview officers who had interacted with Mr. Crutsinger in the criminal justice system." (Reply to Response, p. 22 (Dkt. No. 96).) Again, this does not mean officers were not contacted. As discussed in Section I, counsel called the bailiff and two deputy sheriffs to testify about Crutsinger's behavior while incarcerated. (31 RR 154; 32 RR 2, 10.)

Crutsinger argues in the reply to response that trial counsel unreasonably failed to hire an expert in addiction and pursue a defense that would help the jury understand the link between the criminal conduct, "his history of trauma," and Crutsinger's alcoholism. (Reply to Response, p. 23 (Dkt. No. 96).) Dr. Goodness is a forensic psychologist whose qualifications to advise counsel on this subject have not been challenged. She diagnosed Crutsinger with (among other things) alcohol dependence, in institutional remission, and believed he likely had a biological predisposition to alcoholism and poorer brain functioning as a result. But she, like the scientific articles that Crutsinger filed in support of his petition, asserted there is no definitive neuropsychological pattern exhibited by individuals who have damaged their brains due to alcohol use, and that "consideration should be given to exactly how useful further clarification" from additional testing would be,

given the circumstances. (Petition, Exhibit C, .pdf page 10 (Dkt. No. 26).) Thus, the trial team did not overlook the defensive strategy Crutsinger now proposes.

In short, these arguments for funding in the reply to the response to the Rule 60(b) Motion must be rejected. They are artfully phrased facial challenges to Dr. Goodness's report that ignore material, conflicting information in the record showing what the defense team obviously did as a whole.

### Conclusion

Lest Crustinger complain that, in discussing the trial record, the Court is deciding in advance that the claim has no merit in order to deny the requested funds, this is not the case. This Court is not obligated to turn a blind eye when the record contradicts assertions made by a party, especially in ex-parte proceedings. Moreover, the Court has viewed the application for funds as it might potentially apply to any type of *Wiggins* claim and not simply the one that has already been denied on the merits.

Trial counsel's investigation touched on all of the issues that Crutsinger says were overlooked. It is incumbent on Crutsinger to explicitly allege what potential evidence remains to be found. Even if the Court were to accept the facial challenges to Dr. Goodness's report, which it does not, the alleged deficiencies in document collection and witness development do not justify authorizing the $7,500 requested.

Crutsinger chose not to update his application in supplemental briefing filed after remand. See Supplemental Brief (Dkt. No. 111). Thus, eleven years after his initial request, Crutsinger has not shown the potential merit of a claim he wants to pursue; rather, he seeks funds to go in search of a claim. He also has not shown the likelihood that the services would generate useful and admissible evidence; he instead proposes to re-do the investigation.

Crutsinger's application for funding is **DENIED**.

### Certificate of Appealability

The Court **denies** a certificate of appealability. *See* 28 U.S.C. § 2253(c). Crutsinger's arguments are based on (1) the false premise that this Court wrongly denied funds in 2008, and (2) a false and misleading representation of the record. Crutsinger has not demonstrated that reasonable jurists would (1) find the Court's assessment of the constitutional claims debatable or wrong, or (2) find it debatable whether the Court was correct in its procedural ruling. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

SIGNED on this the 8th day of August, 2019.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

26